# Exhibit 1

**Table of Contents**

**As filed with the Securities and Exchange Commission on May 31, 2019**

Registration No. 333-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM S-1

**REGISTRATION STATEMENT**
**UNDER**
**THE SECURITIES ACT OF 1933**

# The RealReal, Inc.

*(Exact name of Registrant as specified in its charter)*

| **Delaware** | **7389** | **45-1234222** |
|---|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(Primary Standard Industrial Classification Code Number)* | *(I.R.S. Employer Identification Number)* |

**55 Francisco Street**
**Suite 600**
**San Francisco, CA 94133**
**(855) 435-5893**

*(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)*

**Julie Wainwright**
**Chief Executive Officer**
**55 Francisco Street**
**Suite 600**
**San Francisco, CA 94133**
**(855) 435-5893**

*(Name, address, including zip code, and telephone number, including area code, of agent for service)*

*Copies to:*

| | | |
|---|---|---|
| **Hank V. Barry** | **Dana DuFrane** | **Steven E. Bochner** |
| **Martin A. Wellington** | **General Counsel** | **Robert G. Day** |
| **Helen Theung** | **The RealReal, Inc.** | **Michael Nordtvedt** |
| **Sidley Austin LLP** | **55 Francisco Street** | **Wilson Sonsini Goodrich & Rosati,** |
| **1001 Page Mill Road** | **Suite 600** | **Professional Corporation** |
| **Building 1** | **San Francisco, CA 94133** | **650 Page Mill Road** |
| **Palo Alto, CA 94304** | **(855) 435-5893** | **Palo Alto, CA 94304** |
| **(650) 565-7000** | | **(650) 493-9300** |

**Approximate date of commencement of proposed sale to the public**: As soon as practicable after the effective date of this Registration Statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☐ |
| Emerging growth company | ☒ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Proposed Maximum Aggregate Offering Price(1)(2) | Amount of Registration Fee |
|---|---|---|
| Common Stock, par value $0.00001 per share | $100,000,000 | $12,120 |

(1) Estimated solely for the purpose of computing the amount of the registration fee pursuant to Rule 457(o) under the Securities Act of 1933, as amended.
(2) Includes the aggregate offering price of any additional common stock that the underwriters have the option to purchase, if any.

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

**Table of Contents**

The information in this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is declared effective. This prospectus is not an offer to sell these securities and we are not soliciting offers to buy these securities in any jurisdiction where the offer or sale is not permitted.

SUBJECT TO COMPLETION, DATED MAY 31, 2019

Shares

# The RealReal

## Common Stock

This is the initial public offering of shares of common stock of The RealReal, Inc. Prior to this offering, there has been no public market for our common stock. We anticipate that the initial public offering price will be between $        and $        per share. We have applied to list our common stock on The Nasdaq Global Select Market under the symbol "REAL."

We have granted the underwriters a 30-day option to purchase up to        additional shares of common stock from us at the initial public offering price, less the underwriting discounts and commissions.

We are an "emerging growth company" as the term is used in the Jumpstart Our Business Startups Act of 2012 and, as such, have elected to comply with certain reduced public company reporting requirements. See the section titled "Prospectus Summary—Emerging Growth Company."

**Investing in our common stock involves risks. See "Risk Factors" on page 13.**

|  | Price to Public | Underwriting Discounts and Commissions | Proceeds to Us, Before Expenses |
| --- | --- | --- | --- |
| Per Share | $ | $ | $ |
| Total | $ | $ | $ |

Neither the Securities and Exchange Commission, any state securities commission nor any other regulatory body has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

The underwriters expect to deliver the shares to investors on or about        , 2019.

**Credit Suisse**          **BofA Merrill Lynch**          **UBS Investment Bank**

**KeyBanc Capital Markets**                              **Stifel**

**Cowen**                                             **Raymond James**

The date of this prospectus is        , 2019

**Table of Contents**

Our Mission

Empower consignors and buyers to extend the life cycle of luxury goods in a way that honors luxury brands.

The future of luxury is circular.



Table of Contents

Sustainability

We have built a vibrant marketplace that promotes the recirculation of luxury goods and contributes to a more sustainable world.

In 2018, we estimated our positive environmental impact since inception: 87 million driving miles and 1.39 billion glasses of water saved.



Table of Contents

$711m

2018 GMV

$207m

2018 total revenue

9.4m

cumulative item sales

2.6m

new items added to the marketplace in 2018

~$1b

cumulative consignor payouts

80%+

of 2018 GMV from repeat buyers

**Table of Contents**

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| PROSPECTUS SUMMARY | 1 |
| RISK FACTORS | 13 |
| CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS | 37 |
| MARKET, INDUSTRY AND OTHER DATA | 39 |
| USE OF PROCEEDS | 40 |
| DIVIDEND POLICY | 41 |
| CAPITALIZATION | 42 |
| DILUTION | 44 |
| SELECTED FINANCIAL AND OTHER DATA | 47 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 50 |
| THE FUTURE OF LUXURY IS CIRCULAR | 72 |
| BUSINESS | 82 |
| MANAGEMENT | 102 |
| EXECUTIVE COMPENSATION | 110 |
| CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS | 118 |
| PRINCIPAL STOCKHOLDERS | 121 |
| DESCRIPTION OF CAPITAL STOCK | 125 |
| SHARES ELIGIBLE FOR FUTURE SALE | 131 |
| MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES TO NON-U.S. HOLDERS OF OUR COMMON STOCK | 133 |
| UNDERWRITING | 137 |
| LEGAL MATTERS | 146 |
| EXPERTS | 146 |
| WHERE YOU CAN FIND ADDITIONAL INFORMATION | 146 |
| INDEX TO FINANCIAL STATEMENTS | F-1 |

You should rely only on the information contained in this document or to which we have referred you. Neither we nor the underwriters have authorized anyone to provide you with information that is different. This document may only be used where it is legal to sell these securities. The information in this document may only be accurate on the date of this document. Regardless of the time of delivery of this prospectus or of any sale of shares of our common stock and the information in any free writing prospectus that we may provide you in connection with this offering is accurate only as of the date of that free writing prospectus. Our business, financial condition, results of operations and future growth prospects may have changed since those dates.

Through and including             (the 25th day after the date of this prospectus), all dealers effecting a transaction in these securities, whether or not participating in this offering, may be required to deliver a prospectus. This delivery requirement is in addition to the dealers' obligation to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.

For investors outside the United States: Neither we, nor the underwriters have done anything that would permit this offering or possession or distribution of this prospectus in any jurisdiction where action for that purpose is required, other than in the United States. Persons outside the United States who come into possession of this prospectus must inform themselves about, and observe any restrictions relating to, the offering of the common stock and the distribution of this prospectus outside of the United States.

i

Table of Contents

**PROSPECTUS SUMMARY**

*This summary highlights selected information contained elsewhere in this prospectus. This summary does not contain all of the information you should consider before buying shares in this offering. Therefore, you should read this entire prospectus carefully, including the sections titled "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and the related notes included elsewhere in this prospectus, before deciding whether to purchase our common stock. Unless the context requires otherwise, the words "we," "us," "our," and "the Company" refer to The RealReal, Inc.*

**The RealReal, Inc.**

**Our Mission**

Our mission is to empower consignors and buyers to extend the lifecycle of luxury goods in a way that honors luxury brands.

**Overview**

The RealReal is the world's largest online marketplace for authenticated, consigned luxury goods. We are revolutionizing luxury resale by providing an end-to-end service that unlocks supply from consignors and creates a trusted, curated online marketplace for buyers globally. Over the past eight years, we have cultivated a loyal and engaged consignor and buyer base through continuous investment in our technology platform, logistics infrastructure and people. We aggregate and curate unique, pre-owned luxury supply that is exclusive to The RealReal across multiple categories, including women's, men's, kids', jewelry and watches, and home and art. We have built a vibrant online marketplace that we believe expands the overall luxury market, promotes the recirculation of luxury goods and contributes to a more sustainable world.

We participate in the large and growing personal luxury goods market, which was expected to reach $294 billion in 2018, and is expected to grow to between $362 and $412 billion in 2025, according to Bain. Luxury goods retain value over time as a result of their enduring desirability and durability, making them particularly well-suited for resale. The total addressable market of luxury products in U.S. homes potentially available for resale, including men's and women's apparel, handbags, shoes, watches, jewelry, high-end furniture and art valued below $250,000, is approximately $198 billion according to Frost & Sullivan. We are well positioned to benefit from several favorable industry and consumer trends, including the accelerating shift of luxury to digital channels, the increasing acceptance of resale, a rising value consciousness and a desire to embrace sustainability.

The existing luxury resale market is outdated, fragmented, difficult to access and laden with counterfeit goods. Primarily due to these challenges, a vast quantity of consignable luxury goods languishes in homes, and buyers can be hesitant to purchase pre-owned luxury goods. We are transforming the luxury resale experience by addressing these challenges.

- *We provide a seamless consignment experience enabled by our proprietary technology platform and data*. We leverage our proprietary technology and data analytics to provide world-class service, making consignment easy, convenient, reliable and fast. As a result, we unlock luxury supply from first-time consignors, convert consignors who typically consign at local brick-and-mortar shops to our online marketplace and drive high repeat consignment rates. We leverage data from millions of previous transactions and current market data to optimize pricing and sales velocity for our consignors. Through March 31, 2019, we have cumulatively paid $987.7 million in commissions to our consignors.

1

Table of Contents

- *We offer buyers a vast, yet curated supply of pre-owned luxury goods and instill trust in the buying process*. In 2018, we added approximately 2.6 million new items to our online marketplace. Our highly trained experts build trust in our buyer base by thoroughly inspecting the quality and condition of, and authenticating, every item we receive. This trust drives repeat purchases from our buyer base and instills confidence in first-time buyers to purchase pre-owned luxury goods.

A strong network effect drives the growth of our online marketplace. As we bring more consignors onto our platform, we unlock more high-quality, luxury supply, which increases our merchandise assortment and attracts more buyers. This, in turn, increases sales velocity and commissions for our consignors. In addition, a meaningful share of our consignors become buyers and vice versa, which creates a differentiated flywheel that enhances the network effect of our online marketplace.

We generate revenue from orders processed through our website, mobile app and three retail stores located in New York and Los Angeles. Our revenue is primarily based on our take rates from these transactions. Our growth and success are evidenced by our operating and financial results in 2018:

- We processed 1.6 million orders, up 42% over 2017.

- Our average order value was $446, up 2% over 2017.

- Our gross merchandise value ("GMV") was $710.8 million, up 44% over 2017. Please refer to the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Key Financial and Operating Metrics" for a discussion of how we calculate GMV.

- Our total revenue was $207.4 million, up 55% over 2017.

- Our gross profit was $136.9 million, up 56% over 2017.

**Consumer Trends in Our Favor**

We believe the following consumer trends provide strong tailwinds for our business:

- Increasing acceptance of resale.

- Rising value consciousness.

- Desire for newness, uniqueness and individuality.

- Focus on sustainability.

**Our Market Opportunity**

Consumers globally purchase hundreds of billions of dollars of personal luxury goods every year. These goods accumulate in homes over time and create a meaningful market opportunity for us. The number of garments purchased annually by the average consumer increased by 60% between 2000 and 2014, according to McKinsey. However, we believe that only a small portion of the clothes in an average person's closet are worn on a regular basis. We unlock and recirculate underutilized personal luxury goods to address demand from millions of buyers globally through our trusted online marketplace.

**Challenges with Existing Luxury Resale Models**

Existing luxury resale models have failed to unlock the abundance of pre-owned luxury supply due to inherent challenges, which include the following:

- *Friction for consignors*. Existing luxury resale models often require consignors to spend a significant amount of time and energy dropping off items at physical locations or self-listing on peer-to-peer platforms.

2

Table of Contents

- **Lack of trust for buyers**. Due to the pervasiveness of counterfeit luxury goods and inconsistent authentication standards, buyers can be hesitant to purchase pre-owned luxury goods.

- **Fragmented supply**. Luxury supply that is available for resale is largely distributed across thousands of brick-and-mortar stores that have limited hours of operation, feature a narrow selection and only offer exposure to a local buyer base. As a result, consignors often experience slow monetization times at suboptimal prices.

**Our Solution**

We are delivering the future of luxury resale. Over the past eight years, we developed innovative service and technology solutions to address the challenges inherent in existing luxury resale models.

*Unique Service Model to Unlock Pre-owned Luxury Supply*

Our large sales and service organization, as of December 31, 2018, included more than 180 luxury managers serving more than 40 major metropolitan markets in the United States and is responsible for obtaining exclusive supply for our online marketplace. Our sales professionals generate a robust pipeline of new consignors and build lasting relationships, which cannot be easily replicated. They consult on the consignment process and leverage data to advise consignors on pricing, expected selling time and market trends. In 2018, approximately 80% of our GMV came from repeat consignors.

- *We deliver an end-to-end service experience.* We remove friction from the consignment process by providing multiple consignment methods: White Glove in-home consultation and pickup; drop off at one of our eleven luxury consignment offices, three of which are located in our retail stores; or complimentary shipping directly to our merchandising and fulfillment facilities.

- *We do the work on behalf of consignors*. Once consigned items reach one of our four merchandising and fulfillment facilities, we authenticate, write the associated copy, photograph, price, sell and handle all fulfillment and returns logistics, making the consignment process seamless.

- *We generate high commissions for consignors*. Our scale and global reach combined with our technology-driven online marketplace and proprietary data enable consignors to realize optimal value for their pre-owned luxury goods. Our consignors earn up to 85% in commissions and achieved an average commission rate of approximately 65% in 2018.

- *We drive rapid monetization*. Our online marketplace efficiently matches supply with demand resulting in exceptional sales velocity. In 2017 and 2018, approximately 60% and 80% of the products on our online marketplace sold within 30 days and 90 days, respectively. In addition to sales velocity, we measure the ratio of demand versus supply in a given period, which we refer to as our online marketplace sell-through ratio. Sell-through ratio is defined as GMV in the period divided by the aggregate initial value of items added to our online marketplace in that period. In 2017 and 2018, our online marketplace sell-through ratios were 93% and 96%, respectively.

*Exclusive, Authenticated Pre-owned Luxury Supply Drives Demand*

We make it easy for buyers to shop our vast, yet curated selection of authenticated, pre-owned luxury goods. In 2018, we had approximately 416,000 active buyers in approximately 60 countries and greater than 80% of our GMV came from repeat buyers. As we continue to unlock exclusive luxury supply, we expect to attract new buyers and drive repeat purchases from our existing buyers.

- *We offer a seamless buying experience*. Buyers access our omni-channel online marketplace through our website, mobile app and retail stores, enabling them to purchase anytime, anywhere.

3

**Table of Contents**

- *We build trust by expertly authenticating every item.* Each item is put through a rigorous, multi-point authentication process by our highly trained gemologists, horologists, brand experts or art curators. As a result, we believe we have become the most trusted online marketplace for pre-owned luxury goods.

- *We provide access to unique, highly coveted and exclusive products.* We provide buyers with access to a vast, yet curated selection of unique, authenticated, pre-owned luxury goods. In 2018, we sold goods bearing the brand of over 7,000 luxury and premium designers, including highly coveted items such as rare watches and handbags.

### Proprietary Technology Platform to Manage Complex Single-SKU Logistics

Technology powers all aspects of our business, including our complex, single-SKU inventory management system. Our supply comes from thousands of individual consignors across the United States. Each item we sell is a truly unique, individual stock keeping unit ("single-SKU") and is exclusively available on our online marketplace. We have processed up to 14,000 single-SKUs a day in 2018. Given the complexity of our inventory model, we developed and continuously innovate specialized, proprietary applications to optimize inbound processes, such as authentication, copywriting, photography and photo-editing. We increasingly use our technology platform to automate pricing for goods sold through our online marketplace.

### Proprietary Data and Powerful Algorithms

Our powerful data analytics capabilities enable us to improve both consignor and buyer experiences. Our online marketplace generates and aggregates hundreds of millions of unique data points, including data from approximately 400 million views of items on our online marketplace in 2018 by potential buyers, which we refer to as item views, and approximately 9.4 million item sales since inception. Each consigned item also has up to 50 unique attributes. Informed by this data, we have developed proprietary algorithms and business processes to optimize our operations, including supply sourcing, merchandising, authentication, pricing and marketing.

### Focus on Luxury to Expand the Market and Create a More Sustainable World

We offer important benefits to both the new and resale luxury markets, including the following:

- *We provide a gateway to luxury brands.* We believe we are expanding the overall market for both new and pre-owned luxury goods, as the ability to experience and engage with luxury brands through our online marketplace results in an earlier appreciation for high-quality, well-crafted items, and inspires consumers to purchase new luxury items. While we presently have no contractual or other affiliations with luxury brands other than our partnership with Stella McCartney, we believe our online marketplace cultivates customer relationships for luxury brands.

- *We promote sustainability and a circular economy.* We are committed to extending the lifecycle of luxury goods by promoting their recirculation, rather than creating waste. By creating a circular economy and reshaping consumer purchasing behavior, we contribute to a more sustainable world.

### Our Competitive Strengths

### Scale and Powerful Network Effects

We are the largest online marketplace for authenticated, consigned luxury goods. We expect to maintain our leadership position by increasing our scale, thereby amplifying the network effects between consignors and buyers. In addition, as buyers become consignors and vice versa, we create a unique flywheel that further accelerates our momentum. Through March 31, 2019, 53% of our consignors are also buyers and 13% of our buyers are also consignors.

4

Table of Contents

*Trust*

Trust is the cornerstone of our online marketplace. Consignors trust us because we treat their items with the utmost care and quickly sell them at the optimal price. Buyers trust us because we have a rigorous authentication process. We believe the trust and personal relationships that we have built with both consignors and buyers over the past eight years cannot be easily replicated.

*End-to-end Service*

We make consignment easy, convenient, reliable and fast by offering an end-to-end service that drives existing consignors to consign more frequently and attracts new consignors to our online marketplace. We provide world-class customer service to drive repeat purchases from our existing buyers and attract new buyers.

*Efficient, Technology-enabled Operations at Scale*

Over the past eight years, we have invested significant resources to optimize our logistics, processes and purpose-built, proprietary technology platform, which enables us to efficiently manage the unique complexities of our operational model at scale.

*Data-driven Insights*

Our proprietary data and algorithms provide us with operational insights that continuously enhance our consignor and buyer experiences. Through these insights, we are able to identify market trends early and incentivize our sales professionals to obtain on-trend, highly coveted merchandise.

*Innovative, Founder-led Management Team*

We are led by our CEO, Julie Wainwright, who founded The RealReal with a vision to transform the luxury resale experience. We have built a talented, experienced senior management team and a culture of innovation and entrepreneurship where inspired people thrive.

**Growth Strategies**

We strive to make the luxury resale experience frictionless for consignors and buyers. We intend to achieve this goal by:

- Attracting new consignors and buyers.

- Increasing the lifetime value of consignors and buyers.

- Amplifying The RealReal brand.

- Increasing penetration in existing categories.

- Continuing to invest in innovation and infrastructure.

- Strategically expanding offline.

- Growing our international presence.

**Risks Factors Summary**

Our business is subject to numerous risks and uncertainties, including those highlighted in the section titled "Risk Factors" immediately following this prospectus summary. These risks include the following:

- If we fail to generate a sufficient amount of new and recurring supply of pre-owned luxury goods by attracting and retaining consignors, our business would be harmed.

5

Table of Contents

- We may not be able to identify and lease merchandising and fulfillment facilities in geographic regions that enable us to effectively scale our operations and attract and retain specialized personnel to effectively manage the merchandising operations required to authenticate, process and sell consigned luxury goods.

- We have a history of losses and we may not achieve or maintain profitability in the future.

- We may not be able to sustain our revenue growth rate or effectively manage growth.

- National retailers and brands set their own retail prices and promotional discounts on new luxury goods, which could adversely affect our value proposition to consumers.

- We have a short operating history in an evolving industry and, as a result, our past results may not be indicative of future operating performance.

- We rely on consumer discretionary spending and may be adversely affected by economic downturns and other macroeconomic conditions or trends.

- Our success depends on the accuracy of our authentication process, and failure by us to identify counterfeit goods could adversely affect our reputation and expose us to liability.

- We may not succeed in promoting and sustaining our brand, which could have an adverse effect on our business and future growth.

- We may fail to attract new buyers and retain repeat buyers.

- We are currently, and may be in the future, party to lawsuits and other claims that are expensive and time- consuming, and, if resolved adversely, could have a significant impact on our business, financial condition and operating results.

- If we are unable to successfully leverage technology to automate and drive efficiencies in our operations, our business could be adversely affected.

**Corporate Information**

We were incorporated in the state of Delaware in March 2011. Our principal executive offices are located at 55 Francisco Street, Suite 600, San Francisco, California 94133, and our telephone number is (855) 435-5893. Our website address is www.therealreal.com. Information contained on, or that can be accessed through, our website is not incorporated by reference into this prospectus, and you should not consider information on our website to be part of this prospectus.

The RealReal, *Obsessions* and other trademarks or service marks of The RealReal, Inc. appearing in this prospectus are the property of The RealReal, Inc. This prospectus contains additional trade names, trademarks and service marks of others, which are the property of their respective owners. Solely for convenience, the trademarks, service marks, logos and trade names referred to in this prospectus are without the ® and ™ symbols, but such references are not intended to indicate that we will not assert our rights in these trademarks, service marks and trade names.

**Emerging Growth Company**

The Jumpstart Our Business Startups Act (the "JOBS Act"), was enacted in April 2012 with the intention of encouraging capital formation in the United States and reducing the regulatory burden on newly public companies that qualify as emerging growth companies. We are an "emerging growth company" within the meaning of the JOBS Act. We may take advantage of certain exemptions from various public reporting requirements, including the requirement that we provide more than two years of audited financial statements and related management's discussion and analysis of financial condition and results of operations, and that our

6

Table of Contents

internal control over financial reporting be audited by our independent registered public accounting firm pursuant to Section 404 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"). In addition, the JOBS Act provides that an "emerging growth company" can delay adopting new or revised accounting standards until those standards apply to private companies. We intend to take advantage of these exemptions until we are no longer an emerging growth company. We have elected to use the extended transition period to enable us to comply with new or revised accounting standards that have different effective dates for public and private companies until the earlier of the date we (1) are no longer an emerging growth company and (2) affirmatively and irrevocably opt out of the extended transition period provided in the JOBS Act. As a result, our financial statements may not be comparable to companies that comply with new or revised accounting pronouncements as of public company effective dates.

We will cease to be an emerging growth company upon the earliest of (1) the end of the fiscal year following the fifth anniversary of this offering; (2) the last day of the fiscal year during which our annual gross revenues are $1.07 billion or more; (3) the date on which we have, during the previous three-year period, issued more than $1.0 billion in non-convertible debt securities; and (4) the end of any fiscal year in which the market value of our common stock held by non-affiliates exceeded $700.0 million as of the end of the second quarter of that fiscal year.

See the section titled "Risk Factors—Risks Relating to Our Initial Public Offering and Ownership of Our Common Stock—We are an emerging growth company, and any decision on our part to comply only with certain reduced reporting and disclosure requirements applicable to emerging growth companies could make our common stock less attractive to investors."

7

Table of Contents

**THE OFFERING**

| | |
|---|---|
| Common stock offered | shares |
| Common stock outstanding after this offering | shares |
| Option to purchase additional shares | shares |
| Use of proceeds | We estimate that the net proceeds to us from the sale of the shares of common stock offered by us will be approximately $      or approximately $      if the underwriters' option to purchase additional shares is exercised in full, based on an assumed initial public offering price of $      per share, which is the midpoint of the estimated price range set forth on the cover page of this prospectus, and after deducting underwriting discounts and commissions and estimated offering expenses payable by us.<br><br>We intend to use the net proceeds from this offering for general corporate purposes, including working capital, operating expenses and capital expenditures. In addition, 1% of the net proceeds will be used to fund The RealReal Foundation, a Delaware non-profit organization formed to engage in charitable activities. We may also use a portion of the net proceeds to acquire, invest in or obtain rights to complementary technologies, products, services or businesses. There are no such transactions under consideration at this time. See section titled "Use of Proceeds" for additional information. |
| Proposed Nasdaq Global Select Market trading symbol | "REAL" |
| Risk factors | See the section titled "Risk Factors" and other information included in this prospectus for a discussion of factors you should carefully consider before deciding to invest in our common stock. |

The number of shares of common stock that will be outstanding after this offering is based on 135,401,581 shares of our common stock outstanding as of March 31, 2019 and excludes:

- 18,408,192 shares of common stock issuable upon exercise of options outstanding, as of March 31, 2019, at a weighted-average exercise price of $1.66 per share under our 2011 Equity Incentive Plan ("2011 Plan");

- 2,009,650 shares issuable upon exercise of options outstanding, granted after March 31, 2019, at a weighted-average exercise price of $5.29 per share under our 2011 Plan;

- 11,484 shares of common stock issuable upon exercise of common stock warrants, outstanding as of March 31, 2019 at a weighted average exercise price of $1.74 per share;

- 207,127 shares of common stock issuable upon exercise of preferred stock warrants, outstanding as of March 31, 2019 at a weighted average exercise price of $1.67 per share;

- 1,612,450 shares of common stock reserved for future issuance under our 2011 Plan, as of March 31, 2019, which shares will be added to the shares reserved for future issuance under our 2019 Equity Incentive Plan ("2019 Plan");

8

Table of Contents

-         shares of common stock initially reserved for future issuance under our 2019 Equity Incentive Plan which became effective on the business day immediately prior to the effectiveness of the registration statement of which this prospectus forms a part; and

-         shares of common stock initially reserved for issuance under our 2019 Employee Stock Purchase Plan ("ESPP"), which became effective on the business day immediately prior to the effectiveness of the registration statement of which this prospectus forms a part.

Unless otherwise indicated, all information in this prospectus assumes:

- no exercise of outstanding options;

- no exercise of outstanding warrants;

- conversion of all of our preferred stock into an aggregate of 116,727,269 shares of common stock immediately prior to the consummation of this offering, assuming an initial public offering price of $      per share, which is the midpoint of the estimated offering price range on the cover page of this prospectus;

- the filing and effectiveness of our certificate of incorporation in Delaware and the effectiveness of our bylaws will each occur immediately prior to the completion of this offering; and

- no exercise of the underwriters of their option to purchase up to an additional      shares of our common stock.

9

Table of Contents

**SUMMARY FINANCIAL AND OTHER DATA**

The summary statement of operations data for 2017 and 2018 are derived from our audited financial statements appearing elsewhere in this prospectus. The summary statement of operations data for the three months ended March 31, 2018 and 2019 and the balance sheet data as of March 31, 2019 are derived from our unaudited financial statements appearing elsewhere in this prospectus. We have prepared the unaudited financial statements on the same basis as the audited financial statements and have included all adjustments, consisting only of normal recurring adjustments, that we consider necessary for a fair presentation of the financial information set forth in those statements. Our historical results are not necessarily indicative of the results to be expected in the future. You should read this summary financial and other data in conjunction with the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements, related notes and other financial information included elsewhere in this prospectus.

**Statement of Operations Data**

| | Year Ended December 31, | | Three Months Ended March 31, | |
| --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2018 | 2019 |
| | (In thousands, except share and per share data) | | | |
| Revenue: | | | | |
| Consignment and service revenue | $ 121,210 | $ 183,991 | $ 40,999 | $ 56,236 |
| Direct revenue | 12,661 | 23,385 | 5,460 | 13,019 |
| Total revenue | 133,871 | 207,376 | 46,459 | 69,255 |
| Cost of revenue: | | | | |
| Cost of consignment and service revenue | 35,657 | 50,855 | 11,577 | 15,946 |
| Cost of direct revenue | 10,572 | 19,603 | 4,277 | 10,927 |
| Total cost of revenue | 46,229 | 70,458 | 15,854 | 26,873 |
| Gross profit | 87,642 | 136,918 | 30,605 | 42,382 |
| Operating expenses[1]: | | | | |
| Marketing | 36,711 | 42,165 | 9,634 | 11,733 |
| Operations and technology | 58,680 | 104,929 | 21,332 | 31,544 |
| Selling, general and administrative | 44,035 | 63,728 | 13,524 | 22,319 |
| Total operating expenses | 139,426 | 210,822 | 44,490 | 65,596 |
| Loss from operations | (51,784) | (73,904) | (13,885) | (23,214) |
| Interest income | 355 | 1,046 | 84 | 405 |
| Interest expense | (762) | (1,152) | (197) | (131) |
| Other expense, net | (60) | (1,656) | (108) | (282) |
| Loss before provision for income taxes | (52,251) | (75,666) | (14,106) | (23,222) |
| Provision for income taxes | 57 | 99 | — | — |
| Net loss | $ (52,308) | $ (75,765) | $ (14,106) | $ (23,222) |
| Accretion of redeemable convertible preferred stock to redemption value | (2,610) | (8,922) | $ (1,109) | $ (3,355) |
| Net loss attributable to common stockholders | $ (54,918) | $ (84,687) | $ (15,215) | $ (26,577) |
| Net loss per share attributable to common stockholders, basic and diluted[2] | $ (3.37) | $ (5.06) | $ (0.92) | $ (1.53) |
| Shares used to compute net loss per share attributable to common stockholders, basic and diluted[2] | 16,291,653 | 16,730,803 | 16,599,476 | 17,411,487 |
| Pro forma net loss per share attributable to common stockholders, basic and diluted[2] | | $ (0.67) | | $ (0.18) |
| Shares used to compute pro forma net loss per share attributable to common stockholders, basic and diluted[2] | | 112,804,256 | | 125,064,556 |

10

(1) Operating expenses include stock-based compensation expense as follows:

| | Year Ended December 31, | | Three Months Ended March 31, | |
|---|---|---|---|---|
| | 2017 | 2018 | 2018 | 2019 |
| | (In thousands) | | | |
| Marketing | $ 129 | $ 164 | $ 34 | $ 68 |
| Operations and technology | 625 | 1,160 | 273 | 490 |
| Selling, general and administrative | 1,099 | 1,587 | 238 | 551 |
| Total | $1,853 | $2,911 | $ 545 | $ 1,109 |

(2) See Notes 2 and 13 to our financial statements for an explanation of the calculations of our basic and diluted net loss per share attributable to common stockholders, pro forma net loss per share attributable to common stockholders and the weighted-average number of shares used in the computation of the per share amounts.

**Balance Sheet Data**

| | As of March 31, 2019 | | |
|---|---|---|---|
| | Actual | Pro Forma(1) | Pro Forma As Adjusted(2)(3) |
| | (In thousands) | | |
| Cash and cash equivalents | $ 88,790 | $ 88,790 | $ |
| Short-term investments | 14,246 | 14,246 | |
| Total assets | 187,113 | 187,113 | |
| Total liabilities | 100,686 | 99,796 | |
| Redeemable convertible preferred stock | 198,308 | — | |
| Convertible preferred stock | 169,098 | — | |
| Accumulated deficit | (280,982) | (280,982) | |
| Total stockholders' (deficit) equity | (280,979) | 87,317 | |

(1) The pro forma column reflects (a) the conversion of all of the outstanding shares of our preferred stock into an aggregate of 116,727,269 shares of our common stock and (b) the conversion of the preferred stock warrants to common stock warrants and the related reclassification of the preferred stock warrant liability to additional paid-in capital all of which will occur immediately prior to the completion of this offering.

(2) The pro forma as adjusted column in the balance sheet data table above gives effect to (a) the pro forma adjustments set forth above, (b) the sale and issuance by us of          shares of our common stock in this offering, based upon the assumed initial public offering price of $          per share, which is the midpoint of the estimated offering price range on the cover page of this prospectus, and after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us and (c) the application of the net proceeds of this offering, including the 1% of the net proceeds of this offering used to fund The RealReal Foundation, as described in the section titled " Use of Proceeds" and a $0.3 million success fee to the lender under our term loan facility payable upon completion of our initial public offering.

(3) Each $1.00 increase or decrease in the assumed initial public offering price of $          per share, which is the midpoint of the estimated offering price range set forth on the cover page of this prospectus, would increase or decrease the amount of our pro forma as adjusted cash and cash equivalents, total assets and total stockholders' (deficit) equity by $          , assuming that the number of shares offered by us, as set forth on the cover page of this prospectus, remains the same, after deducting estimated underwriting discounts and commissions payable by us and the application of the net proceeds of this offering, including the 1% of the net proceeds of this offering used to fund The RealReal Foundation. An increase or decrease of 1.0 million shares in the number of shares offered by us would increase or decrease, as applicable, the amount of our pro forma as adjusted cash and cash equivalents, total assets and total stockholders' (deficit) equity by $          assuming the assumed initial public offering price remains the same, and after deducting estimated underwriting discounts and commissions payable by us.

11

Table of Contents

**Key Financial and Operating Metrics**

We review a number of operating and financial metrics, including the following key business and non-GAAP metrics to evaluate our business, measure our performance, identify trends affecting our business, formulate business plans and make strategic decisions.

| | Year Ended December 31, | | Three Months Ended March 31, | |
| --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2018 | 2019 |
| | (In thousands, except AOV and percentages) | | | |
| GMV | $492,205 | $ 710,750 | $158,378 | $224,116 |
| Number of orders | 1,123 | 1,595 | 356 | 498 |
| Take rate | 33.7% | 35.5% | 35.1% | 35.3% |
| Active buyers | 291 | 416 | 326 | 456 |
| AOV | $ 438 | $ 446 | $ 445 | $ 450 |
| Adjusted EBITDA | $ (44,297) | $ (58,856) | $ (11,342) | $ (18,478) |

See the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Key Financial and Operating Metrics" for a description of GMV, number of orders, take rate, active buyers, AOV and Adjusted EBITDA. Adjusted EBITDA is a non-GAAP measure. Please see the section titled "Selected Financial and Other Data—Non-GAAP Financial Measures" for information regarding our use of Adjusted EBITDA and its reconciliation to net loss.

12

Table of Contents

## RISK FACTORS

*Investing in our common stock involves a high degree of risk. You should consider and read carefully all of the risks and uncertainties described below, as well as other information included in this prospectus, including our financial statements and related notes appearing at the end of this prospectus, before making an investment decision. The risks described below are not the only ones facing us. The occurrence of any of the following risks or additional risks and uncertainties not presently known to us or that we currently believe to be immaterial could materially and adversely affect our business, financial condition or results of operations. In such case, the trading price of our common stock could decline, and you may lose all or part of your original investment. This prospectus also contains forward-looking statements and estimates that involve risks and uncertainties. Our actual results could differ materially from those anticipated in the forward-looking statements as a result of specific factors, including the risks and uncertainties described below.*

**Risks Relating to Our Business**

***If we fail to generate a sufficient amount of new and recurring supply of pre-owned luxury goods by attracting and retaining consignors, our business would be harmed.***

Our success depends on our ability to cost-effectively attract, retain and grow relationships with consignors, and in turn, our supply of luxury goods sold through our online marketplace. To expand our consignor base, we must appeal to and engage individuals new to consignment, or who have consigned through traditional brick-and-mortar shops but are unfamiliar with our business. We find new consignors by converting buyers utilizing our online marketplace, shopping in our three retail stores, utilizing our eleven luxury consignment offices ("LCOs"), paid advertising, referral programs, organic word-of-mouth and other methods of discovery, such as mentions in the press, Internet search engine results and through our partnership with Stella McCartney. We recently increased our paid marketing expenses by investing more in television advertising and digital marketing and we expect to increase our spending on these and other paid marketing channels in the future. We cannot be certain that these efforts will yield more consignors or be cost-effective. Moreover, new consignors may not choose to consign with us a second time or consign as frequently, or consign as many items or the same value of items, as has historically been the case with existing consignors. Therefore, the revenue generated from new consignors may not be as high as the revenue generated historically from our existing consignors or as high as we expect. If we fail to attract new consignors or drive repeat consignments, our ability to grow our business would be adversely affected.

Our ability to drive growth also depends on our success in continuing to generate a high volume of consigned items from new and existing consignors. To accomplish this, we rely on our sales professionals to drive our supply of luxury goods by identifying, developing and maintaining relationships with our consignors. Our sales professionals source high-quality, coveted luxury goods from consignors through a variety of methods including White Glove consultation, meeting with potential consignors in one of our eleven LCOs or shipping consigned goods to us from remote locations. The process of identifying and hiring sales professionals with the combination of skills and attributes required in these roles can be difficult and can require significant time. In addition, competition for qualified employees and personnel in the retail industry is intense and turnover amongst our sales professionals within a few years is not uncommon. Any shortage in sales professionals or delay in identifying and hiring quality sales professionals could have a negative impact on the business. If we are not successful in attracting and retaining effective sales professionals, the quantity and quality of the luxury goods sold through our online marketplace may be negatively impacted, which would have a material adverse effect on our business and operating results.

13

Table of Contents

***We may not be able to attract and retain specialized personnel to effectively manage the merchandising operations required to authenticate, process and sell consigned luxury goods or identify and lease merchandising and fulfillment facilities in geographic regions that enable us to effectively scale our operations.***

We lease facilities to store and accommodate the logistics infrastructure required to merchandise and ship the pre-owned luxury goods we sell through our online marketplace. To grow our business, we must continue to improve and expand our merchandising and fulfillment operations, information systems and skilled personnel in the jurisdictions that have the skilled talent necessary to effectively operate our business. The operation of our business is complex and requires the coordination of multiple functions that are highly dependent on numerous employees and personnel. Each luxury item that we offer through our online marketplace is unique and requires multiple touch points, including inspection, evaluation, authentication, photography, pricing, copywriting, application of a unique individual stock keeping unit ("single-SKU") and fulfillment. We have rapidly increased our operations employee headcount to support the growth of our business. The number of employees in our merchandising and fulfillment facilities increased to 801 as of March 31, 2019 from 268 as of December 31, 2017, and we expect that number to continue to increase significantly in 2019. The market for these employees is increasingly competitive and is highly dependent on geographic location. Some of our employees have specific knowledge and skills that would make it more difficult to hire replacement personnel capable of effectively performing the same tasks without substantial training. If we fail to effectively locate, hire and retain such personnel, our operations would be negatively impacted, which would have an adverse effect on our business, financial condition and operating results.

Our ability to successfully grow our business also depends on the availability and cost of leasing additional merchandising and fulfillment facilities that meet our criteria for a geographic location with access to a large, qualified talent pool, square footage, cost and other factors. We currently have four merchandising and fulfillment facilities—one in California and three in New Jersey. Optimal space is becoming increasingly scarce, and where it is available, the lease terms offered by landlords are increasingly competitive. Incentives currently offered by local, state and federal entities to offset operating expenses may be reduced or become unavailable. Companies who have more financial resources and negotiating leverage than us may be more attractive tenants and, as a result, may outbid us for the facilities we seek. We also may be unable to renew our existing leases or renew them on satisfactory terms. Failure to identify and secure adequate new merchandising and fulfillment facilities in optimal geographic locations or maintain our current merchandising and fulfillment facilities could have an adverse effect on our business and operating results.

***We have a history of losses and we may not achieve or maintain profitability in the future.***

We experienced net losses of $52.3 million, $75.8 million and $23.2 million in 2017, 2018 and the three months ended March 31, 2019, respectively, and as of March 31, 2019 we had an accumulated deficit of $281.0 million. We believe there is substantial opportunity for growth in our business and our market and intend to invest aggressively to capitalize on this opportunity. As a result of these investments, we expect to incur additional losses for the foreseeable future. In particular, we are making significant investments in our marketing initiatives, expanding our operations and infrastructure, developing and introducing new technologies and automation and hiring additional personnel. These efforts may be more costly than we expect and may not result in revenue growth. In addition, in connection with operating as a public company, we will incur additional significant legal, accounting and other expenses that we did not incur as a private company. If our investments do not prove successful or our market does not develop as we expect, we may continue to experience losses over the long term. Any failure to increase our revenue sufficiently to keep pace with our investments and other expenses could prevent us from achieving or maintaining profitability or positive cash flow on a consistent basis. If we are unable to successfully address these risks and challenges as we encounter them, our business, financial condition and operating results could be adversely affected. We cannot assure you that we will ever achieve or sustain profitability and may continue to incur significant losses going forward.

14

Table of Contents

### We may not be able to sustain our revenue growth rate or effectively manage growth.

Our recent revenue growth should not be considered indicative of our future performance. As we grow our business, we expect our future revenue growth rates may slow due to a number of factors, including the maturation of our business, increased market adoption against which future growth will be measured, increasing competition or our failure to capitalize on growth opportunities. Additionally, consignors may opt to consign less with us to the extent we take steps, such as increasing our take rates, that make our online marketplace appear less attractive to them. Alternatively, the emergence of direct competitors may force us to decrease our take rates to remain competitive to attract consignors, which will have a negative impact on our financial performance.

We have experienced, and expect to continue to experience, rapid growth, which has placed, and will continue to place, significant demands on our management and our operational and financial infrastructure. Continued growth could also strain our ability to maintain reliable service levels for our consignors and buyers, develop and improve our operational, financial and management controls, enhance our reporting systems and procedures and recruit, train and retain highly skilled personnel. To support anticipated growth, we are committing substantial financial, operational and technical resources. Failure to effectively manage the growth of our business and operations would negatively affect our reputation and brand, business, financial condition and operating results.

### National retailers and brands set their own retail prices and promotional discounts on new luxury goods, which could adversely affect our value proposition to consumers.

National retailers and brands set pricing for new luxury goods. Promotional pricing by these parties may adversely affect the value of products consigned with us and our inventory, and, in turn, our gross merchandise value ("GMV") and operating results. In order to attract buyers to our online marketplace, the prices for the pre-owned luxury goods sold through our online marketplace may need to be lowered in order to compete with these pricing strategies, which could negatively affect gross merchandise value and in turn, our revenue. We have experienced a reduction in our GMV in the past due to fluctuations in the price of new luxury goods sold by retailers and brands, and we anticipate similar reductions and fluctuations in the future. Any of the foregoing risks could adversely affect our business, financial condition and operating results.

### We have a short operating history in an evolving industry and, as a result, our past results may not be indicative of future operating performance.

Our online marketplace represents a substantial departure from the traditional resale market for luxury goods. While our business has grown rapidly, the resale market for luxury goods may not continue to develop in a manner that we expect or that otherwise would be favorable to our business. Our relatively short operating history and the changes in our market make it difficult to assess our future performance. You should consider our business and prospects in light of the risks and difficulties we may encounter.

Our future success will depend in large part upon our ability to, among other things:

- cost-effectively acquire and engage with new and existing consignors and buyers and grow our supply of high-quality, coveted luxury goods for sale through our online marketplace;

- scale our revenue and achieve the operating efficiencies necessary to achieve and maintain profitability;

- increase consignor and buyer awareness of our brand;

- anticipate and respond to changing consignor and buyer preferences;

- manage and improve our business processes in response to changing business needs;

- anticipate and respond to macroeconomic changes generally, including changes in both the primary and secondary market for luxury goods;

15

Table of Contents

- effectively scale our operations while maintaining high service quality and consignor and buyer satisfaction;

- hire and retain talented people at all levels of our business;

- avoid or manage interruptions in our business from information technology downtime, cybersecurity breaches and other factors affecting our physical and digital infrastructure;

- fulfill and deliver orders in a timely manner and in accordance with customer expectations, which may change over time;

- maintain the quality of our technology and operations infrastructure;

- develop new technology or services to enhance the consignor and buyer experience; and

- comply with regulations applicable to our business.

If we fail to address the risks and difficulties that we face, including those associated with the challenges listed above as well as those described elsewhere in this "Risk Factors" section, our business and our operating results would be adversely affected.

### *We rely on consumer discretionary spending and may be adversely affected by economic downturns and other macroeconomic conditions or trends.*

Our business and operating results are subject to global economic conditions and their impact on consumer discretionary spending, particularly in the luxury goods market. Some of the factors that may negatively influence consumer spending on luxury goods include high levels of unemployment, higher consumer debt levels, reductions in net worth, and declines in asset values and related market uncertainty, home foreclosures and reductions in home values, fluctuating interest rates and credit availability, fluctuating fuel and other energy costs, fluctuating commodity prices and general uncertainty regarding the overall future political and economic environment. Economic conditions in certain regions may also be affected by natural disasters, such as earthquakes, hurricanes and wildfires. Consumer purchases of new luxury goods have declined during periods of economic uncertainty, when disposable income is reduced or when there is a reduction in consumer confidence. Such economic uncertainty and decrease in the rate of luxury purchases in the primary market may slow the rate at which individuals choose to consign their goods with us which could result in a decrease of items available in our online marketplace.

### *As an online marketplace for pre-owned luxury goods, our success depends on the accuracy of our authentication process. Failure by us to identify counterfeit goods could adversely affect our reputation and expose us to liability for the sale of counterfeit goods.*

Our success depends on our ability to accurately and cost-effectively determine whether an item offered for consignment is an authentic product, a genuine gemstone or piece of jewelry or a validated work of art. From time to time we receive counterfeit goods for consignment. While we have invested heavily in our authentication processes and we reject any goods we believe to be counterfeit, we cannot be certain that we will identify every counterfeit item that is consigned to us. As the sophistication of counterfeiters increases, it may be increasingly difficult to identify counterfeit products. We refund the cost of a product to a buyer if the buyer questions its authenticity and returns the item. The sale of any counterfeit goods may damage our reputation as a trusted online marketplace for authenticated, pre-owned luxury goods which may impact our ability to attract and maintain repeat consignors and buyers. Additionally, we may be subject to allegations that a pre-owned luxury item we sold is not authentic despite our confirmed authentication of such item. Such controversy could negatively impact our reputation and brand and harm our business and operating results.

16

Table of Contents

***We may not succeed in promoting and sustaining our brand, which could have an adverse effect on our business and future growth.***

We believe that maintaining The RealReal brand is critical to driving consignor and buyer engagement. An important goal of our brand promotion strategy is establishing trust with our consignors and buyers. Maintaining our brand will depend largely on our ability to continue providing our consignors with service that is consistent with the level of luxury associated with the goods they are consigning and delivering value for the goods they consign, all in a timely and consistent manner. Our success depends in part on the quality of our sales professionals who represent our brand to new and existing consignors. Sales professionals cultivate relationships with our consignor base by making in-home visits to evaluate the luxury goods that our consignors want to consign. While we require that all sales professionals undergo a background check, this may not prevent illegal, improper or otherwise inappropriate actions by such employees, such as theft or physical assault, from occurring in connection with our services. Any negative publicity related to the foregoing could adversely affect our reputation and brand or public perception of our model of luxury consignment, which could negatively affect demand for our services and harm our business, financial condition and operating results.

For buyers, maintaining our brand requires that we foster trust through authentication, timely and reliable fulfillment of orders, and responsive and effective customer service. If we fail to provide consignors or buyers with the service and experience they expect, or experience consignor or buyer complaints or negative publicity about our online marketplace services, merchandise, delivery times or customer support, whether justified or not, the value of our brand would be harmed and our business may suffer.

***Our continued growth depends on attracting new and retaining repeat buyers.***

To expand our buyer base, we must appeal to and attract buyers who do not typically purchase luxury goods, who have historically purchased only new luxury goods or who used other means to purchase pre-owned luxury goods, such as traditional brick-and-mortar consignment shops, auction houses and the websites of other secondary marketplaces. We reach new buyers through television and digital advertising, other paid marketing, press coverage, referral programs, organic word of mouth and other methods of discovery, such as converting consignors to buyers. We expect to continue investing heavily in these and other marketing channels in the future and cannot be certain that these efforts will yield more buyers or be cost-effective. Moreover, new buyers may not purchase through our online marketplace as frequently or spend as much with us as historically has been the case with existing buyers. As a result, the revenue generated from new buyer transactions may not be as high as the revenue generated from transactions with our existing buyers. Failure to attract new buyers and to maintain relationships with existing buyers would adversely affect our operating results and our ability to attract and retain consignors.

***We are currently, and may be in the future, party to lawsuits and other claims that are expensive and time consuming and, if resolved adversely, could have a significant impact on our business, financial condition or operating results.***

We rely on the fair use doctrine when we routinely refer to third-party intellectual property, such as trademarks, on our platform. Third parties may dispute the scope of that doctrine and challenge our ability to reference their intellectual property in the course of our business. For instance, from time to time, we are contacted by companies controlling brands of goods consignors sell, demanding that we cease referencing those brands in connection with such sales, whether in advertising or on our website. We have consistently responded by reference to the holding in *Tiffany (NY), Inc. v. eBay* that factual use of a brand to describe and sell a used good is not false advertising. These matters have generally been resolved with no further communications, but some have resulted in litigation against us. For example, in November 2018, Chanel, Inc. ("Chanel") filed a lawsuit against us in the U.S. District Court for the Southern District of New York bringing various trademark and advertising-related claims under the Lanham Act and New York state law analogues. Chanel alleges, among other things, that we have misrepresented certain counterfeit Chanel products as authentic Chanel products, that

17

Table of Contents

our resale of Chanel products confuses consumers into believing that Chanel is affiliated with us and involved in authenticating consignors' goods and that only Chanel is capable of authenticating second-hand Chanel goods. This litigation is in its early stages and the final outcome, including our liability, if any, with respect to Chanel's claims, is uncertain. Chanel could in the future assert additional trademark and advertising or other claims against us in this or other proceedings. An unfavorable outcome in this or similar litigation could adversely affect our ability to conduct business and could lead Chanel and other luxury brands to bring additional claims against us. If this were to occur, our business, operating results and financial condition would be materially and adversely affected.

We are also at risk of claims by others that we have infringed their copyrights, trademarks or patents or improperly used or disclosed their trade secrets. In particular, third parties may allege that goods consigned to us are counterfeit or that by offering goods of a particular brand we are suggesting that we are sponsored by or affiliated with that brand. The costs of resolving any litigation or disputes related to these claims can be considerable, and we cannot assure you that we will achieve a favorable outcome of any such claim.

In addition, we have in the past and could face in the future a variety of employee claims against us, including but not limited to general discrimination, privacy, wage and hour, labor and employment, ERISA and disability claims. Any claims could also result in litigation against us or regulatory proceedings being brought against us by various federal and state agencies that regulate our business, including the U.S. Equal Employment Opportunity Commission. Often these cases raise complex factual and legal issues and create risks and uncertainties.

Defending litigation is costly and can impose a significant burden on management and employees, and there can be no assurances that favorable final outcomes will be obtained. The results of any such litigation, investigations and other legal proceedings are inherently unpredictable and expensive. In addition, plaintiffs may seek, and we may become subject to, preliminary or provisional rulings in the course of any such litigation, including potential preliminary injunctions requiring us to cease some or all of our operations. We may decide to settle such lawsuits and disputes on terms that are unfavorable to us. Similarly, if any litigation to which we are a party is resolved adversely, we may be subject to an unfavorable judgment that may not be reversed upon appeal. The terms of such a settlement or judgment may require us to cease some or all of our operations or pay substantial amounts to the other party. In addition, we may have to seek a license to continue practices found to be in violation of a third-party's rights, which may not be available on reasonable terms or at all, and may significantly increase our operating costs and expenses. As a result, we may also be required to develop alternative practices or discontinue the practices. The development of alternative practices could require significant effort and expense or may not be feasible. Our business, financial condition or operating results could be adversely affected as a result of an unfavorable resolution of the disputes and litigation referred to above.

***If we are unable to successfully leverage technology to automate and drive efficiencies in our operations, our business could be adversely affected.***

We are building automation, machine learning and other capabilities to drive efficiencies in our merchandising and fulfillment operations. As we continue to add capacity, capabilities and automation, our operations will become increasingly complex and challenging. While we expect these technologies to improve productivity in many of our merchandising operations, including pricing, copywriting, authentication, photography and photo retouching, any flaws or failures of such technologies could cause interruptions in and delays to our operations which may harm our business. We are increasing our investment in technology to support these efforts but they may not be effective in driving productivity, maintaining or improving the experience for buyers and consignors or providing a positive return on investment. We have created our own purpose-built technology to operate our business, but we also rely on technology from third parties. If these technologies do not perform in accordance with our expectations, third parties change the terms and conditions that govern their relationships with us, or if competition increases for the technology and services provided by third parties, our business may be harmed. In addition, if we are unable to add automation to our operations, we

18

Table of Contents

may be unable to reduce the costs of processing consignments and fulfilling orders, which could cause delays in buyers receiving their purchases. Any of these outcomes could harm our reputation and our relationships with our consignors and buyers.

### Our advertising activity may fail to efficiently drive growth in consignors and buyers.

Our future growth and profitability will depend in large part upon the effectiveness and efficiency of our advertising, promotion, public relations and marketing programs and we are investing heavily in these activities. These brand promotion activities may not yield increased revenue and the efficacy of these activities will depend on a number of factors, including our ability to do the following:

- determine the effective creative message and media mix for advertising, marketing and promotional expenditures;

- select the right markets, media and specific media vehicles in which to advertise;

- identify the most effective and efficient level of spending in each market, media and specific media vehicle; and

- effectively manage marketing costs, including creative and media expenses, to maintain acceptable consignor and buyer acquisition costs.

We closely monitor the effectiveness of our advertising campaigns and changes in the advertising market, and adjust or re-allocate our advertising spend across channels, customer segments and geographic markets in real-time to optimize the effectiveness of these activities. We expect to increase advertising spend in future periods to continue driving our growth. Increases in the pricing of one or more of our marketing and advertising channels could increase our marketing and advertising expenses or cause us to choose less expensive but possibly less effective marketing and advertising channels. If we implement new marketing and advertising strategies, we may incur significantly higher costs than our current channels, which, in turn, could adversely affect our operating results.

Implementing new marketing and advertising strategies also could increase the risk of devoting significant capital and other resources to endeavors that do not prove to be cost effective. We also may incur marketing and advertising expenses significantly in advance of the time we anticipate recognizing revenue associated with such expenses and our marketing and advertising expenditures may not generate sufficient levels of brand awareness or result in increased revenue. Even if our marketing and advertising expenses result in increased sales, the increase might not offset our related expenditures. If we are unable to maintain our marketing and advertising channels on cost-effective terms or replace or supplement existing marketing and advertising channels with similarly or more effective channels, our marketing and advertising expenses could increase substantially, our consignor and buyer base could be adversely affected, and our business, operating results, financial condition and brand could suffer.

### We may experience damage or destruction to our merchandising and fulfillment facilities or retail stores in which we store all of the consigned luxury goods we offer through our online marketplace which may materially adversely impact our business and operating results.

We store the majority of the luxury goods we offer through our online marketplace in our merchandising and fulfillment facilities in California and New Jersey, with a small portion of luxury goods offered for sale in our three retail stores. Our merchandising and fulfillment facilities are located in areas that have a history of natural disasters, such as earthquakes and severe weather events, rendering our merchandising and fulfillment facilities vulnerable to damage. Any large scale damage to or catastrophic loss of goods stored in such merchandising and fulfillment facilities or retail stores, due to natural disasters or man-made disasters such as arson or theft or otherwise would result in liability to our consignors for the expected commission liability for the lost items, reduction in the value of our inventory and a significant disruption to our business. Additionally, given

19

Table of Contents

the nature of the unique consigned luxury goods we offer on our online marketplace, our ability to restore the supply of consigned luxury goods on our online marketplace would take time and would result in a limitation and delay of available supply for buyers which would negatively impact our revenue and operating results. While we carry insurance for the consigned luxury goods stored in these merchandising and fulfillment facilities, the number of carriers which provide for such insurance has declined, which has resulted in increased premiums and deductibles. The insurance we do carry may not continue to be available on commercially reasonable terms and, in any event, may not be adequate to cover all possible losses that our business could suffer. In the event that we suffer a catastrophic loss of any or all of our merchandising and fulfillment facilities and the consigned luxury goods stored in such facilities, our liabilities may exceed the maximum insurance coverage amount which would materially adversely impact our business and operating results.

### *We have experienced seasonal and quarterly variations in our revenue and operating results and, as a result, our quarterly results may fluctuate and could be below expectations.*

Our business is seasonal and historically we have realized a disproportionate amount of our revenue and earnings for the year in the fourth quarter as a result of the holiday season and seasonal promotions. We expect this to continue in the future. In anticipation of increased activity during the fourth quarter, we incur significant additional expenses, including additional marketing and staffing in our sales and customer support operations. In addition, we may experience an increase in our shipping costs due to complimentary upgrades, split-shipments and additional long-zone shipments necessary to ensure timely delivery for the holiday season. At peak periods, there could also be further delays in processing consigned goods or fulfilling buyer orders, which could lead to lower consignor and/or buyer satisfaction. As a result of increased expenses or delays in shipping, if we experience lower than expected revenue during any fourth quarter, it may have a disproportionately large impact on our operating results and financial condition for that year. Any factors that harm our fourth quarter operating results, including disruptions in our consignors' willingness to consign or unfavorable economic conditions, or adverse weather could have a disproportionate effect on our operating results for our entire fiscal year. In the future, our seasonal sales patterns may become more pronounced, may strain our personnel and may cause a shortfall in revenue related to expenses in a given period, which could substantially harm our business, operating results and financial condition.

### *Our industry is highly competitive and if we do not compete effectively our operating results could be adversely affected.*

The resale market for luxury goods is highly competitive. We compete with vendors of new and pre-owned luxury goods, including branded luxury goods stores, department stores, traditional brick-and-mortar consignment stores, pawn shops, auction houses, specialty retailers, discount chains, independent retail stores, the online offerings of these traditional retail competitors, resale players focused on niche or single categories, as well as technology-enabled marketplaces that may offer the same or similar luxury goods and services that we offer. We believe our ability to compete depends on many factors within and beyond our control, including:

- engaging and enhancing our relationships with existing consignors and buyers and attracting new consignors and buyers;

- further developing our data science capabilities;

- maintaining favorable brand recognition and effectively delivering our online marketplace to consignors and buyers;

- identifying and delivering authentic luxury goods;

- maintaining and increasing the amount, diversity and quality of brands and luxury goods that we or our competitors offer;

- our ability to expand the categories of luxury goods our consignors consign and sell;

- the price at which consigned, authenticated luxury goods through our online marketplace are offered;

20

Table of Contents

- the speed and cost at which we can authenticate and make available consigned luxury goods and deliver purchased goods to our buyers; and

- the ease with which our consignors and buyers can consign, purchase and return goods.

Failure to adequately meet these demands may cause us to lose potential consignors and buyers which could harm our business.

Many of our competitors have longer operating histories, larger fulfillment infrastructures, greater brand recognition and technical capabilities, faster shipping times, lower-cost shipping, larger databases, greater financial, marketing, institutional and other resources and larger buyer bases than we do. As the market evolves, competitors may emerge. For example, Farfetch Ltd recently announced the launch of a new consignment service. Some of our competitors may have greater resources than we do, which may allow them to derive greater revenue and profits from their existing buyer bases, acquire consignors at lower costs or respond more quickly than we can to new or emerging technologies and changes in consumer shopping behavior. These competitors may engage in more extensive research and development efforts, enter the business of online luxury consignment, undertake more far-reaching marketing campaigns and adopt more aggressive pricing policies, which may allow them to build larger consignor or buyer bases or generate revenue from their existing buyer bases more effectively than we do. If we fail to compete effectively, our business and operating results may be adversely affected.

***We rely on third parties to host our website and mobile app and to process payments made by buyers or to consignors on our online marketplace. Any significant disruption in service provided by, or termination of our relationship with, such third parties could damage our reputation and result in loss of buyers and consignors, which would harm our business and results of operations.***

Our brand and ability to attract and retain consignors and buyers depends in part on the reliable performance of our network infrastructure and content delivery process. We have experienced, and expect that in the future we will experience, interruptions, delays and outages in service and availability from time to time due to a variety of factors, including infrastructure changes, human or software errors, website hosting disruptions and capacity constraints which could affect the availability of services on our platform and prevent or inhibit the ability of buyers to access our online marketplace or complete purchases on our website and app. We currently host our platform and support our operations using AWS. We do not have control over the operations of the facilities of AWS that we use. AWS' facilities are vulnerable to damage or interruption from natural disasters, cybersecurity attacks, terrorist attacks, power outages and similar events or acts of misconduct. The continuing and uninterrupted performance of our online marketplace is critical to our success. Volume of traffic and activity on our online marketplace spikes on certain days and during certain periods of the year, such as during a Black Friday promotion and generally during the fourth quarter due to the seasonality of our business, and any interruption would be particularly problematic if it were to occur at such a high volume time. We also use Google services for our business emails, file storage and communications. Any disruption or failure in the services we receive from Google could harm our ability to run our business.

We rely on third-party payment processors to process payments made by buyers or to consignors on our online marketplace. If our third-party payment processors terminate their relationships with us or refuse to renew their agreements with us on commercially reasonable terms, we would need to find an alternate payment processor and may not be able to secure similar terms or replace such payment processors in an acceptable timeframe. Further, the software and services provided by our third-party payment processors may not meet our expectations, contain errors or vulnerabilities, be compromised or experience outages. Any of these risks could cause us to lose our ability to accept online payments, make payments to consignors or conduct other payment transactions, any of which could make our platform less convenient and attractive and adversely affect our ability to attract and retain buyers and consignors.

21

Table of Contents

***We must successfully gauge and respond to changing preferences among our consignors and buyers.***

Our success is in large part dependent upon our ability to anticipate and identify trends in the market for pre-owned luxury goods in a timely manner and to obtain consignments of luxury goods that address those trends. We use data science to predict consignor and buyer preferences, and there can be no assurance that our data science will accurately anticipate consignor or buyer requirements. Lead times relating to these changing preferences may make it difficult for us to respond rapidly to new or changing trends. We have begun to expand our offerings and the impact on our business from these new offerings is not clear as it is difficult to accurately predict consignor and buyer preferences. To the extent we do not accurately predict the evolving preferences of our consignors and buyers, our ability to grow our business and our operating results would be adversely affected.

***Failure to comply with applicable laws or regulations, including those relating to the sale of secondhand goods, may subject us to fines, penalties, loss of licensure, registration and approval or other governmental enforcement action.***

The sale of consigned goods through our online marketplace is subject to regulation, including by regulatory bodies such as the U.S. Consumer Product Safety Commission, the Federal Trade Commission, the U.S. Fish and Wildlife Service and other international, federal, state and local governments and regulatory authorities. These laws and regulations are complex, vary from state to state and change often. We monitor these laws and regulations and adjust our business practices as warranted to comply. We receive luxury goods on consignment from numerous consignors located in all 50 U.S. states and Puerto Rico, and the goods we receive from our consignors may contain materials such as fur, python, ivory and other exotic animal product components, that are subject to regulation. Our standard consignor terms and conditions require consignors to comply with applicable laws when consigning their goods. Failure of our consignors to comply with applicable laws, regulations and contractual requirements could lead to litigation or other claims against us, resulting in increased legal expenses and costs. Moreover, failure by us to effectively monitor the application of these laws and regulations to our business, and to comply with such laws and regulations, may negatively affect our brand and subject us to penalties and fines.

Numerous U.S. states and municipalities, including the States of California and New York, have regulations regarding the handling of secondhand goods and licensing requirements of secondhand dealers. Such government regulations could require us to change the way we conduct business or our buyers conduct their purchases in ways that increase costs or reduce revenues, such as prohibiting or otherwise restricting the sale or shipment of certain items in some locations. We could also be subject to fines or other penalties which in the aggregate could harm our business.

Additionally, the luxury goods our consignors sell could be subject to recalls and other remedial actions and product safety, labeling and licensing concerns may require us to voluntarily remove selected goods from our online marketplace. Such recalls or voluntary removal of goods can result in, among other things, lost sales, diverted resources, potential harm to our reputation and increased customer service costs and legal expenses, which could have a material adverse effect on our operating results.

Some of the luxury goods sold through our online marketplace on behalf of our consignors may expose us to product liability claims and litigation or regulatory action relating to personal injury, environmental or property damage. We cannot be certain that our insurance coverage will be adequate for liabilities actually incurred or that insurance will continue to be available to us on economically reasonable terms or at all. In addition, while all of our vendor agreements contain a standard indemnification provision, certain vendors may not have sufficient resources or insurance to satisfy their indemnity and defense obligations which may harm our business.

22

Table of Contents

*We rely on third parties to drive traffic to our website, and these providers may change their algorithms or pricing in ways that could negatively impact our business, operations, financial condition and prospects.*

We rely in part on digital advertising, including search engine marketing, to promote awareness of our online marketplace, grow our business, attract new consignors and buyers and increase engagement with existing consignors and buyers. In particular, we rely on search engines, such as Google, and the major mobile app stores as important marketing channels. Search engine companies change their search algorithms periodically, and our ranking in searches may be adversely impacted by those changes. Search engine companies or app stores may also determine that we are not in compliance with their guidelines and penalize us as a result. If search engines change their algorithms, terms of service, display or the featuring of search results, determine we are out of compliance with their terms of service or if competition increases for advertisements, we may be unable to cost-effectively add consignors and buyers to our website and apps. Our relationships with our marketing vendors are not long term in nature and do not require any specific performance commitments. In addition, many of our online advertising vendors provide advertising services to other companies, including companies with whom we may compete. As competition for online advertising has increased, the cost for some of these services has also increased. Our marketing initiatives may become increasingly expensive and generating a return on those initiatives may be difficult. Even if we successfully increase revenue as a result of our paid marketing efforts, such increase may not offset the additional marketing expenses we incur.

*Greater than expected product returns could have a negative impact on our revenue.*

We allow buyers to return certain purchases from our website and retail stores under our return policy. We record a reserve for returns against proceeds to us from the sale of goods on our online marketplace in calculating revenue. We estimate this reserve based on historical return trends. The introduction of new products in the retail market, changes in consumer confidence or other competitive and general economic conditions may also cause actual returns to exceed our reserve for returns. We believe adverse economic conditions in the past have resulted in an increase in our returns, and we have also experienced higher than expected returns in connection with fourth quarter holiday buying. Additionally, most of the consigned luxury goods are valuable and require special handling and delivery. From time to time, such goods are damaged in transit which can increase return rates, increase our costs and harm our brand. Returned goods may also be damaged in transit as part of the return process which can significantly impact the price we are able to charge for such goods on our online marketplace. Any significant increase in returns that exceeds our reserves could adversely affect our revenue and operating results.

*Compromises of our data security could cause us to incur unexpected expenses and may materially harm our reputation and operating results.*

In the ordinary course of our business, we collect, process and store certain personal information and other data relating to individuals, such as our consignors, buyers and employees. We also maintain other information, such as our trade secrets and confidential business information, that is sensitive and that we seek to protect. We rely substantially on commercially available systems, software, tools and monitoring to provide security for our processing, transmission and storage of personal information and other confidential information. We or our vendors could be the subject of hacking, social engineering, phishing attacks or other attacks. We have faced these attacks previously. Due to these or other causes, we or our vendors may suffer a data breach or other security incident, which may allow hackers or other unauthorized parties to gain access to personal information or other data, including payment card data or confidential business information, and we might not discover such issues for an extended period. The techniques used to obtain unauthorized access or to sabotage systems change frequently and generally are not identified until they are launched against a target. As a result, we and our vendors may be unable to anticipate these techniques or to implement adequate preventative measures. In addition, our employees, contractors, vendors or other third parties with whom we do business may attempt to circumvent security measures in order to misappropriate such personal information, confidential information or other data, or may inadvertently release or compromise such data. We expect to incur ongoing costs associated

23

**Table of Contents**

with the detection and prevention of security breaches and other security-related incidents. We may incur additional costs in the event of a security breach or other security-related incident. Any actual or perceived compromise of our systems or data security measures or those of third parties with whom we do business, or any failure to prevent or mitigate the loss of personal or other confidential information and delays in detecting or providing notice of any such compromise or loss could disrupt our operations, harm the perception of our security measures, damage our reputation, cause some participants to decrease or stop their use of our online marketplace and subject us to litigation, government action, increased transaction fees, regulatory fines or penalties or other additional costs and liabilities that could adversely affect our business, financial condition and operating results.

We cannot be certain that our insurance coverage will be adequate for data handling or data security liabilities, that insurance will continue to be available to us on economically reasonable terms, or at all, or that any insurer will not deny coverage as to any future claim. The successful assertion of one or more large claims against us that exceed available insurance coverage or the occurrence of changes in our insurance policies, including premium increases or the imposition of large deductible or co-insurance requirements, could have a material and adverse effect on our business, including our financial condition, operating results and reputation.

***Our use and other processing of personal information and other data is subject to laws and obligations relating to privacy and data protection, and our failure to comply with such laws and obligations could harm our business.***

Numerous state, federal and international laws, rules and regulations govern privacy, data protection and the collection, use and protection of personal information and other types of data we collect, use, disclose and otherwise process. These laws, rules and regulations are constantly evolving, and we expect that there will continue to be new proposed laws, regulations and industry standards concerning privacy, data protection and information security in the United States, the EU and other jurisdictions. For example, California enacted legislation in June 2018, the California Consumer Privacy Act (the "CCPA") that will, among other things, require covered companies to provide new disclosures to California consumers and afford such consumers new abilities to opt-out of certain sales of personal information, when it goes into effect on January 1, 2020. The CCPA was amended in September 2018, and it is possible that it will be amended again before it goes into effect. It remains unclear what, if any, modifications will be made to the CCPA or how it will be interpreted. The CCPA may require us to modify our data processing practices and policies and to incur substantial costs and expenses in an effort to comply. Similarly, the European Commission adopted a General Data Protection Regulation (the "GDPR") that became fully effective on May 25, 2018, imposing stringent EU data protection requirements.

We cannot yet fully determine the impact these or future laws, rules and regulations may have on our business or operations. These laws, rules and regulations may be inconsistent from one jurisdiction to another, subject to differing interpretations and may be interpreted to conflict with our practices. Additionally, we may be bound by contractual requirements applicable to our collection, use, processing and disclosure of various types of data, including personal information, and may be bound by, or voluntarily comply with, self-regulatory or other industry standards relating to these matters.

Any failure or perceived failure by us or any third parties with which we do business to comply with these laws, rules and regulations, or with other obligations to which we or such third parties are or may become subject, may result in actions against us by governmental entities, private claims and litigation, the expenditure of legal and other costs and of substantial time and resources, and fines, penalties or other liabilities. Any such action would be expensive to defend, may require the expenditure of substantial legal and other costs and substantial time and resources and likely would damage our reputation and adversely affect our business and operating results.

Further, in view of new or modified federal, state or foreign laws and regulations, industry standards, contractual obligations and other legal obligations, or any changes in their interpretation, we may find it

24

Table of Contents

necessary or desirable to fundamentally change our business activities and practices or to expend significant resources to modify our product and otherwise adapt to these changes. We may be unable to make such changes and modifications in a commercially reasonable manner or at all, and our ability to develop new products and features could be limited. Privacy, data protection and information security concerns, whether valid or not valid, may inhibit the use and growth of our online marketplace, particularly in certain foreign countries.

### *If we fail to attract and retain key personnel on our executive team or to effectively manage leadership succession, our business, financial condition and operating results could be adversely impacted.*

Our success depends in part on our ability to attract and retain key personnel on our executive team. Senior employees have left our company in the past and others may in the future. We often cannot anticipate such departures, and may not be able to promptly replace key leadership personnel. The loss of one or more of our key personnel or the inability to promptly identify a suitable successor to a key role could have an adverse effect on our business. In particular, our Founder and Chief Executive Officer, Julie Wainwright, has unique and valuable experience from creating and leading our company from its inception through today. If she were to depart or otherwise reduce her focus on The RealReal, our business may be disrupted.

### *Labor-related matters, including labor disputes, may adversely affect our operations.*

None of our employees are currently represented by a union. If our employees decide to form or affiliate with a union, we cannot predict the negative effects such future organizational activities will have on our business and operations. If we were to become subject to work stoppages, we could experience disruption in our operations, including delays in merchandising operations and shipping, and increases in our labor costs which could materially adversely affect our business, financial condition or results of operations.

### *Expansion of our operations internationally will require management attention and resources, involves additional risks and may be unsuccessful.*

We have members from outside the United States who purchase items from our online marketplace, but we have not expanded our physical operations outside the United States. If we choose to expand our physical operations internationally, we would need to adapt to different local cultures, languages, standards, laws and regulations and policies. The online marketplace consignment business model we employ may not appeal to consignors and buyers outside of the United States. Furthermore, to succeed with clients in international locations, it will be necessary to locate merchandising and fulfillment facilities in foreign markets and hire local employees in those markets, and we may have to invest in such facilities before demonstrating that we can successfully run operations outside of the United States. We may not be successful in expanding into international markets or in generating revenue from foreign operations for a variety of reasons, including:

- our failure to localize our luxury consignment business model, including translation into foreign languages and adaptation for local cultures and customs;

- different buyer demand dynamics, which may make our model and the merchandise we offer less successful compared to the United States;

- competition from local firms that understand the local market and may operate more effectively;

- regulatory requirements, taxes, trade laws, trade sanctions and economic embargoes, tariffs, export quotas, import laws and regulations, custom duties, shipping of pre-owned goods from or into the U.S. or other trade restrictions or any unexpected changes thereto;

- differing labor regulations where labor laws may be more advantageous to employees as compared to the United States and increased labor costs;

- more stringent regulations relating to privacy and data security and access to, or use of, commercial and personal information, particularly in Europe;

25

Table of Contents

- changes in a specific country's or region's political or economic conditions; and

- risks resulting from changes in currency exchange rates.

If we invest substantial time and resources to establish and expand our operations internationally and are unable to do so successfully and in a timely manner, our operating results would suffer.

### *Our inability to replicate our business model for newer categories of consigned luxury goods in a timely and cost-effective manner may damage our business, financial condition and operating results.*

Our women's category accounted for approximately 67% of our GMV in 2018. We intend to deepen our penetration in other high-value categories such as men's, jewelry and watches, and home and art. We continue to explore additional categories of luxury goods to serve our existing consignors and buyers and to attract new consignors and buyers. These additional category offerings may not have the same success, or gain traction with consignors and buyers as quickly, as our women's offerings. If these additional categories of pre-owned luxury goods are not accepted by our existing consignors or buyers, or if such categories do not attract new consignors or buyers, our revenues may fall short of expectations, our brand and reputation could be adversely affected and we may incur expenses that are not offset by revenues. In addition, our business may be adversely affected if we are unable to attract new and repeat consignors that supply the necessary high-quality, appropriately priced and in-demand luxury merchandise in these additional categories, and these categories of goods may also have a different range of margin profiles than the goods currently sold through our online marketplace. Additionally, as we enter into new categories, potential consignors may demand higher commissions than our current categories, which would adversely affect our take rate and operating results. Expansion of our offerings may also strain our management and operational resources, specifically the need to hire and manage additional authentication and market experts. We may also face greater competition in specific categories from companies that are more focused on these categories. If any of these were to occur, it could damage our reputation, limit our growth and have an adverse effect on our operating results.

### *Our business, including our costs and supply of consigned goods, is subject to risks associated with sourcing, processing, warehousing and shipping.*

Nearly all of the luxury goods we offer through our online marketplace are initially sourced from consignors who are individuals. As a result, we may be subject to periodic fluctuations in the number, brands and quality of goods sold through our online marketplace on behalf of our consignors. Our operating results could be negatively impacted by these fluctuations. In addition, as we expand into new categories of luxury goods, our payments to our consignors may rise relative to our existing categories, which could adversely affect our operating results.

We can make no assurance that goods we receive from consignors will be of sufficient quality or free from damage, or that such goods will not be damaged during shipping, while stored in one of our merchandising and fulfillment facilities or when shipped to buyers. While we take measures to avoid damage, conduct inspections of consigned goods and inspect returned products, we cannot control items while they are out of our possession or prevent all damage while in our merchandising and fulfillment facilities. For example, we have in the past and may in the future experience contamination, such as mold, bacteria, insects and other pests, in the goods shipped to us by our consignors, which may cause contamination of the goods stored in our merchandising and fulfillment facilities or while shipping to buyers. If we are unable to detect and quarantine such contaminants at the time such goods are initially received in our merchandising and fulfillment facilities, some or all of the goods stored in such facilities could be contaminated. We may incur additional expenses and our reputation could be harmed if clients and potential clients believe that the luxury goods we offer on behalf of our consignors is not of high-quality or may be damaged or contain contaminants.

### *We could be liable for fraudulent or unlawful activities of consignors.*

We may fail to prevent consignors from consigning stolen goods. Government regulators and law enforcement officials may allege that our services violate, or aid and abet violations of certain laws, including

26

**Table of Contents**

laws restricting or prohibiting the transferability and, by extension, the resale, of stolen goods. Our form of consignor agreement includes a representation that the consignor has the necessary right and title to the goods they may consign, and we include such a rule and requirement in our terms of service prohibiting the listing of stolen or otherwise illegal products. In addition, we have implemented other protective measures to detect such products. If these measures prove inadequate, we may be required to spend substantial resources to take additional protective measures which could negatively impact our operations. Any costs incurred as a result of potential liability relating to the alleged or actual sale of stolen goods could harm our business. In addition, negative publicity relating to the actual or perceived listing or sale of stolen goods using our services could damage our reputation, and make our consignors and buyers reluctant to use our services. To the extent any of this occurs, it could harm our business or damage our reputation and we could face liability for such unlawful activities. Despite measures taken by us to detect stolen goods, to cooperate fully with law enforcement, and to respond to inquiries regarding potentially stolen goods, any resulting claims or liabilities could harm our business.

### *Shipping is a critical part of our business and any changes in our shipping arrangements or any interruptions in shipping could adversely affect our operating results.*

We currently rely on major vendors for our shipping. If we are not able to negotiate acceptable pricing and other terms with these vendors or they experience performance problems or other difficulties, it could negatively impact our operating results and our consignors' and buyers' experience. In addition, our ability to receive inbound consignments efficiently and ship luxury goods to buyers may be negatively affected by inclement weather, fire, flood, power loss, earthquakes, labor disputes, acts of war or terrorism and similar factors. Because of the seasonality of our business, we tend to ship more goods in the fourth quarter than any other quarter. Disruption to delivery services due to winter weather in the fourth quarter could result in delays that could adversely affect our reputation or operational results. If our goods are not delivered in a timely fashion or are damaged or lost during the consignment or the delivery process, our consignors or buyers could become dissatisfied and cease using our services, which would adversely affect our business and operating results.

### *We may incur significant losses from fraud.*

We have in the past incurred and may in the future incur losses from various types of fraudulent transactions, including the use of stolen credit card numbers, claims that a consignment of a good was not authorized and that a buyer did not authorize a purchase. In addition to the direct costs of such losses, if the fraud is related to credit card transactions and becomes excessive, it could result in us paying higher fees or losing the right to accept credit cards for payment. Under current credit card practices, we are liable for fraudulent credit card transactions because we do not obtain a cardholder's signature. Our failure to adequately prevent fraudulent transactions could damage our reputation, result in litigation or regulatory action or lead to expenses that could substantially impact our operating results.

### *Use of social media, emails and text messages may adversely impact our reputation or subject us to fines or other penalties.*

We use social media, emails, push notifications and text messages as part of our omni-channel approach to marketing. As laws and regulations evolve to govern the use of these channels, the failure by us, our employees or third parties acting at our direction to comply with applicable laws and regulations in the use of these channels could adversely affect our reputation or subject us to fines or other penalties. In addition, our employees or third parties acting at our direction may knowingly or inadvertently make use of social media in ways that could lead to the loss or infringement of intellectual property, as well as the public disclosure of proprietary, confidential or sensitive personal information of our business, employees, consumers or others. Information concerning us or our consignors and brands, whether accurate or not, may be posted on social media platforms at any time and may have an adverse impact on our brand, reputation or business. The harm may be immediate without affording us an opportunity for redress or correction and could have a material adverse effect on our reputation, business, operating results, financial condition and prospects.

Table of Contents

### *We may not accurately forecast revenue and appropriately plan our expenses.*

We rely on constant replenishment of consigned goods to sustain and grow our revenue, and our revenue in a given period can be difficult to predict. Additionally, our business is affected by general economic and business conditions. A downturn in the United States or global economies may result in decreased consumer disposable income and decreased purchases. We make certain assumptions when planning our expenses based on our expected revenue. These assumptions are partly based on historical results. Because our operating expenses are relatively fixed in the short term, any failure to achieve our revenue expectations would have a direct, adverse effect on our operating results. If actual results differ from our estimates, the trading price of our common stock may be adversely affected.

### *If we cannot successfully protect our intellectual property, our business could suffer.*

We rely on a combination of intellectual property rights, contractual protections and other practices to protect our brand, proprietary information, technologies and processes. We primarily rely on copyright and trade secret laws to protect our proprietary technologies and processes, including the algorithms we use throughout our business. Others may independently develop the same or similar technologies and processes, or may improperly acquire and use information about our technologies and processes, which may allow them to provide a service similar to ours, which could harm our competitive position. Our principal trademark assets include the registered trademark "The RealReal" and our logos and taglines. Our trademarks are valuable assets that support our brand and consumers' perception of our services and merchandise. We also hold the rights to the "therealreal.com" Internet domain name and various related domain names, which are subject to Internet regulatory bodies and trademark and other related laws of each applicable jurisdiction. If we are unable to protect our trademarks or domain names, our brand recognition and reputation would suffer, we would incur significant expense establishing new brands and our operating results would be adversely impacted. Further, to the extent we pursue patent protection for our innovations, patents we may apply for may not issue, and patents that do issue or that we acquire may not provide us with any competitive advantages or may be challenged by third parties. There can be no assurance that any patents we obtain will adequately protect our inventions or survive a legal challenge, as the legal standards relating to the validity, enforceability and scope of protection of patent and other intellectual property rights are uncertain. We may be required to spend significant resources to monitor and protect our intellectual property rights, and the efforts we take to protect our proprietary rights may not be sufficient.

### *We could be required to pay or collect sales taxes in jurisdictions in which we do not currently do so, with respect to past or future sales. This could adversely affect our business and operating results.*

An increasing number of states have considered or adopted laws that impose tax collection obligations on out-of-state sellers of goods. Additionally, the Supreme Court of the United States recently ruled in *South Dakota v. Wayfair, Inc. et al* ("Wayfair"), that online sellers can be required to collect sales tax despite not having a physical presence in the state of the customer. In response to Wayfair, or otherwise, states or local governments and taxing authorities may adopt, or begin to enforce, laws requiring us to calculate, collect and remit taxes on sales in their jurisdictions. While we collect and remit sales taxes in every state that requires sales taxes to be collected, including states where we do not have a physical presence, the adoption of new laws by, or a successful assertion by the taxing authorities of, one or more state or local governments requiring us to collect taxes where we presently do not do so, or to collect more taxes in a jurisdiction in which we currently do collect some taxes, could result in substantial tax liabilities, including taxes on past sales, as well as penalties and interest. The imposition by state governments and taxing authorities of sales tax collection obligations on out-of-state ecommerce businesses could also create additional administrative burdens for us, put us at a competitive disadvantage if they do not impose similar obligations on our competitors and decrease our future sales, which could have a materially adverse impact on our business and operating results.

### *Application of existing tax laws, rules or regulations are subject to interpretation by taxing authorities.*

The application of the income and tax laws is subject to interpretation. Although we believe our tax methodologies are compliant, a taxing authority's final determination in the event of a tax audit could materially

28

Table of Contents

differ from our past or current methods for determining and complying with our tax obligations, including the calculation of our tax provisions and accruals, in which case we may be subject to additional tax liabilities, possibly including interest and penalties. Furthermore, taxing authorities have become more aggressive in their interpretation and enforcement of such laws, rules and regulations over time, as governments are increasingly focused on ways to increase revenues. This has contributed to an increase in audit activity and stricter enforcement by taxing authorities. As such, additional taxes or other assessments may be in excess of our current tax reserves or may require us to modify our business practices to reduce our exposure to additional taxes going forward, any of which may have a material adverse effect on our business, results of operations, financial condition and prospects.

*Amendments to existing tax laws, rules or regulations or enactment of new unfavorable tax laws, rules or regulations could have an adverse effect on our business and operating results.*

Many of the underlying laws, rules and regulations imposing taxes and other obligations were established before the growth of the Internet and ecommerce. U.S. federal, state and local taxing authorities are currently reviewing the appropriate treatment of companies engaged in Internet commerce and considering changes to existing tax or other laws that could levy sales, income, consumption, use or other taxes relating to our activities, and/or impose obligations on us to collect such taxes. If such tax or other laws, rules or regulations are amended, or if new unfavorable laws, rules or regulations are enacted, the results could increase our tax payments or other obligations, prospectively or retrospectively, subject us to interest and penalties, decrease the demand for our services if we pass on such costs to our buyers or consignors, result in increased costs to update or expand our technical or administrative infrastructure or effectively limit the scope of our business activities if we decided not to conduct business in particular jurisdictions. As a result, these changes may have a material adverse effect on our business, results of operations, financial condition and prospects.

Recently enacted legislation commonly referred to as the Tax Cuts and Jobs Act of 2017 made a number of significant changes to the current U.S. federal income tax rules, including reducing the generally applicable corporate tax rate from 35% to 21%, imposing additional limitations on the deductibility of interest, placing limits on the utilization of net operating losses and making substantial changes to the international tax rules. Many of the provisions of the Tax Cuts and Jobs Act still require guidance through the issuance and/or finalization of regulations by the U.S. Department of the Treasury in order to fully assess their effect, and there may be substantial delays before such regulations are promulgated and/or finalized, increasing the uncertainty as to the ultimate effect of the Tax Cuts and Jobs Act on us and our stockholders. There also may be technical corrections legislation or other legislative changes proposed with respect to the Tax Cuts and Jobs Act, the effect of which cannot be predicted and may be adverse to us or our stockholders.

*Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited.*

We have incurred substantial net operating losses ("NOLs"), during our history. Unused NOLs may carry forward to offset future taxable income if we achieve profitability in the future, unless such NOLs expire under applicable tax laws. However, under the rules of Sections 382 and 383 of the Internal Revenue Code of 1986, as amended (the "Code"), if a corporation undergoes an "ownership change," generally defined as a greater than 50% change (by value) in its equity ownership over a three-year period, the corporation's ability to use its NOLs and other pre-change tax attributes to offset its post-change taxable income or taxes may be limited. The applicable rules generally operate by focusing on changes in ownership among stockholders considered by the rules as owning, directly or indirectly, 5% or more of the stock of a company, as well as changes in ownership arising from new issuances of stock by the company. To date, we have not undertaken an analysis of whether we have experienced a change of control that would limit our ability to use our NOLs. As a result of these rules, in the event that it is determined that we have experienced an ownership change in the past, or if we experience one or more ownership changes as a result of this offering or future transactions in our stock, then we may be limited in our ability to use our NOL carryforwards to offset our future taxable income, if any. In addition, the Tax Cuts and Jobs Act imposes certain limitations on the deduction of NOLs generated in tax years that began on or after

29

**Table of Contents**

January 1, 2018, including a limitation on use of NOLs to offset 80% of taxable income and the disallowance of NOL carryback. Although NOLs generated in tax years before 2018 may still be used to offset future income without limitation, the recent legislation may limit our ability to use our NOLs to offset any future taxable income.

> *We may require additional capital to support business growth, and this capital might not be available or may be available only by diluting existing stockholders.*

We intend to continue making investments to support our growth and may require additional funds to support this growth and respond to business challenges, including the need to develop our online marketplace services, expand our categories of pre-owned luxury goods, enhance our operating infrastructure, expand the markets in which we operate and potentially acquire complementary businesses and technologies. Accordingly, we may need to engage in equity or debt financings to secure additional funds. If we raise additional funds through further issuances of equity or convertible debt securities, our existing stockholders could suffer significant dilution, and any new equity securities we issue could have rights, preferences and privileges superior to those of holders of our common stock. Any debt financing secured by us in the future could involve restrictive covenants relating to our capital-raising activities and other financial and operational matters, which may make it more difficult for us to obtain additional capital and to pursue business opportunities. In addition, we may not be able to obtain additional financing on terms favorable to us, if at all. If we are unable to obtain financing on terms satisfactory to us when we require it, our ability to continue to support our business growth and to respond to business challenges could be significantly limited, and our business and prospects could fail or be adversely affected.

> *Our reported results of operations may be adversely affected by changes in generally accepted accounting principles.*

Generally accepted accounting principles are subject to interpretation by the Financial Accounting Standards Board ("FASB"), the SEC and various bodies formed to promulgate and interpret appropriate accounting principles. A change in these principles or interpretations could have a significant effect on our reported results of operations and could affect the reporting of transactions completed before the announcement of a change. It is difficult to predict the impact of future changes to accounting principles or our accounting policies, any of which could negatively affect our reported results of operations.

> *If our internal control over financial reporting or our disclosure controls and procedures are not effective, we may not be able to accurately report our financial results, prevent fraud or file our periodic reports in a timely manner, which may cause investors to lose confidence in our reported financial information and may lead to a decline in our stock price.*

We have been a private company and, as such, we have not been subject to the internal control and financial reporting requirements applicable to a publicly-traded company. We are required to comply with the requirements of Section 404 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), following the later of the date we are deemed to be an "accelerated filer" or a "large accelerated filer," each as defined in the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or the date we are no longer an "emerging growth company," as defined in the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"). Section 404 of the Sarbanes-Oxley Act requires that we maintain effective internal control over financial reporting and disclosure controls and procedures. In particular, we must perform system and process evaluations, document our controls and perform testing of our key controls over financial reporting to allow management and our independent public accounting firm to report on the effectiveness of our internal control over financial reporting. Our testing, or the subsequent testing by our independent public accounting firm, may reveal deficiencies in our internal control over financial reporting that are deemed to be material weaknesses. If we are not able to comply with the requirements of Section 404 in a timely manner, or if we or our accounting firm identify deficiencies in our internal control over financial reporting that are deemed to be material weaknesses, the market price of our

30

Table of Contents

stock would likely decline and we could be subject to lawsuits, sanctions or investigations by regulatory authorities, which would require additional financial and management resources.

We may encounter difficulties in the timely and accurate reporting of our financial results, which would impact our ability to provide our investors with information in a timely manner. As a result, our investors could lose confidence in our reported financial information, and our stock price could decline.

### Risks Relating to Our Initial Public Offering and Ownership of Our Common Stock

*The market price of our common stock may be volatile or may decline steeply or suddenly regardless of our operating performance and we may not be able to meet investor or analyst expectations. You may not be able to resell your shares at or above the initial public offering price and may lose all or part of your investment.*

The initial public offering price for our common stock will be determined through negotiations between the underwriters and us, and may vary from the market price of our common stock following this offering. If you purchase shares of our common stock in this offering, you may not be able to resell those shares at or above the initial public offering price. We cannot assure you that the market price following this offering will equal or exceed prices in privately negotiated transactions of our shares that have occurred from time to time before this offering. The market price of our common stock may fluctuate or decline significantly in response to numerous factors, many of which are beyond our control, including:

- actual or anticipated fluctuations in our consignor or buyer base, the level of consignor and buyer engagement, revenue or other operating results;

- variations between our actual operating results and the expectations of securities analysts, investors and the financial community;

- any forward-looking financial or operating information we may provide to the public or securities analysts, any changes in this information or our failure to meet expectations based on this information;

- actions of securities analysts who initiate or maintain coverage of us, changes in financial estimates by any securities analysts who follow our company or our failure to meet these estimates or the expectations of investors;

- additional shares of our common stock being sold into the market by us or our existing stockholders, or the anticipation of such sales, including if existing stockholders sell shares into the market when applicable "lock-up" period ends;

- hedging activities by market participants;

- announcements by us or our competitors of significant products or features, technical innovations, acquisitions, strategic partnerships, joint ventures or capital commitments;

- changes in operating performance and stock market valuations of companies in our industry, including our competitors;

- price and volume fluctuations in the overall stock market, including as a result of trends in the economy as a whole;

- lawsuits threatened or filed against us;

- developments in new legislation and pending lawsuits or regulatory actions, including interim or final rulings by judicial or regulatory bodies; and

- other events or factors, including those resulting from war or incidents of terrorism, or responses to these events.

31

Table of Contents

In addition, extreme price and volume fluctuations in the stock markets have affected and continue to affect many online marketplace and other technology companies' stock prices. Stock prices often fluctuate in ways unrelated or disproportionate to the companies' operating performance. In the past, stockholders have filed securities class action litigation following periods of market volatility. If we were to become involved in securities litigation, it could subject us to substantial costs, divert resources and the attention of management from our business and seriously harm our business.

Moreover, because of these fluctuations, comparing our operating results on a period-to-period basis may not be meaningful. You should not rely on our past results as an indication of our future performance. This variability and unpredictability could also result in our failing to meet the expectations of industry or financial analysts or investors for any period. If our revenue or operating results fall below the expectations of analysts or investors or below any forecasts we may provide to the market, or if the forecasts we provide to the market are below the expectations of analysts or investors, the price of our common stock could decline substantially. Such a stock price decline could occur even when we have met any previously publicly stated revenue or earnings forecasts that we may provide.

### *An active trading market for our common stock may never develop or be sustained.*

We have applied to list our common stock on The Nasdaq Global Select Market ("Nasdaq") under the symbol "REAL." However, we cannot assure you that an active trading market for our common stock will develop on that exchange or elsewhere or, if developed, that any market will be sustained. Accordingly, we cannot assure you of the likelihood that an active trading market for our common stock will develop or be maintained, the liquidity of any trading market, your ability to sell your shares of our common stock when desired or the prices that you may obtain for your shares.

### *Future sales of shares by existing stockholders could cause our stock price to decline.*

If our existing stockholders, including employees and service providers who obtain equity, sell or indicate an intention to sell, substantial amounts of our common stock in the public market after the lock-up and legal restrictions on resale discussed in this prospectus lapse, the trading price of our common stock could decline. Based on shares outstanding as of         , on the completion of this offering, we will have outstanding a total of         shares of common stock. Of these shares, only the shares of common stock sold in this offering will be freely tradable, without restriction, in the public market immediately after the offering. Each of our directors, executive officers and other holders of substantially all our outstanding equity securities are subject to lock-up agreements that restrict their ability to sell or transfer their shares for a period of 180 days after the date of this prospectus subject to certain exceptions. However, Credit Suisse Securities (USA) LLC and BofA Securities, Inc. may, in their sole discretion, waive the contractual lock-up before the lock-up agreements expire. After the lock-up agreements expire, all         shares outstanding as of         (assuming the closing of the offering) will be eligible for sale in the public market, of which         shares are held by directors, executive officers and other affiliates and will be subject to volume limitations under Rule 144 of the Securities Act of 1933, as amended (the "Securities Act"), and various vesting agreements. Sales of a substantial number of such shares upon expiration of the lock-up and market stand-off agreements, the perception that such sales may occur or early release of these agreements, could cause our market price to fall or make it more difficult for you to sell your common stock at a time and price that you deem appropriate.

In addition,         shares of common stock were subject to outstanding stock options as of         and outstanding stock options to purchase an aggregate of         shares of common stock were granted subsequent to         . These shares will become eligible for sale in the public market to the extent permitted by the provisions of various vesting agreements, the lock-up agreements and Rules 144 and 701 of the Securities Act. We intend to file a registration statement on Form S-8 under the Securities Act covering all the shares of common stock subject to stock options outstanding and reserved for issuance under our stock plans. That registration statement will become effective immediately on filing, and shares covered by that registration

32

Table of Contents

statement will be eligible for sale in the public markets, subject to Rule 144 limitations applicable to affiliates and the lock-up agreement described above. If these additional shares are sold, or if it is perceived that they will be sold in the public market, the trading price of our common stock could decline.

> ### *We have broad discretion in how we may use the net proceeds from this offering, and we may not use them effectively.*

The principal purposes of this offering are to create a public market for our common stock, facilitate access to the public equity markets, increase our visibility in the marketplace and obtain additional capital to support further growth in our business. In addition, 1% of the net proceeds of this offering will be used to fund The RealReal Foundation, a Delaware non-profit organization formed to engage in charitable activities. We cannot specify with any certainty the particular uses of the remaining net proceeds that we will receive from this offering. Our management will have broad discretion in applying the net proceeds we receive from this offering. We may use the net proceeds for general corporate purposes, including working capital, operating expenses and capital expenditures. We may use a portion of the net proceeds to acquire complementary businesses, products, services or technologies. However, we do not have agreements or commitments to enter into any acquisitions at this time. We may also spend or invest these proceeds in a way with which our stockholders disagree. If our management fails to use these funds effectively, our business could be seriously harmed.

> ### *If securities or industry analysts either do not publish research about us or publish inaccurate or unfavorable research about us, our business or our market, or if they change their recommendations regarding our common stock adversely, the trading price or trading volume of our common stock could decline.*

The trading market for our common stock will be influenced in part by the research and reports that securities or industry analysts may publish about us, our business, our market or our competitors. If one or more analysts initiate research with an unfavorable rating or downgrade our common stock, provide a more favorable recommendation about our competitors or publish inaccurate or unfavorable research about our business, our common stock price would likely decline. If any analyst who may cover us were to cease coverage of us or fail to regularly publish reports on us, we could lose visibility in the financial markets, which in turn could cause the trading price or trading volume of our common stock to decline.

> ### *We are an emerging growth company, and any decision on our part to comply only with certain reduced reporting and disclosure requirements applicable to emerging growth companies could make our common stock less attractive to investors.*

We are an emerging growth company and, for as long as we continue to be an emerging growth company, we may choose to take advantage of exemptions from various reporting requirements applicable to other public companies but not to "emerging growth companies," including:

- not being required to have our independent registered public accounting firm audit our internal control over financial reporting under Section 404 of the Sarbanes-Oxley Act;

- reduced disclosure obligations regarding executive compensation in our periodic reports and annual report on Form 10-K; and

- exemptions from the requirements of holding non-binding advisory votes on executive compensation and stockholder approval of any golden parachute payments not previously approved.

As a result, our stockholders may not have access to certain information that they may deem important. We could be an emerging growth company for up to five years, although circumstances could cause us to lose that status earlier, including if our total annual gross revenue exceeds $1.07 billion, if we issue more than $1.0 billion in non-convertible debt securities during any three-year period, or if we are a large accelerated filer and the

Table of Contents

market value of our common stock held by non-affiliates exceeds $700 million as of the end of any second quarter before that time. We cannot predict if investors will find our common stock less attractive if we choose to rely on any of the exemptions afforded emerging growth companies. If some investors find our common stock less attractive because we rely on any of these exemptions, there may be a less active trading market for our common stock and the market price of our common stock may be more volatile.

Under the JOBS Act, "emerging growth companies" can also delay adopting new or revised accounting standards until such time as those standards apply to private companies. We elected to use the extended transition period for complying with new or revised accounting standards that have different effective dates for public and private companies until the earlier of the date that we (1) are no longer an emerging growth company or (2) affirmatively and irrevocably opt out of the extended transition period provided in the JOBS Act. As a result, these financial statements may not be comparable to companies that comply with the new or revised accounting pronouncements as of public company effective dates.

***Future securities issuances could result in significant dilution to our stockholders and impair the market price of our common stock.***

Future issuances of shares of our common stock, or the perception that these sales may occur, could depress the market price of our common stock and result in dilution to existing holders of our common stock. Also, to the extent outstanding options and warrants to purchase our shares of our common stock are exercised or options or other stock-based awards are issued or become vested, there will be further dilution. The amount of dilution could be substantial depending upon the size of the issuances or exercises. Furthermore, we may issue additional equity securities that could have rights senior to those of our common stock. As a result, purchasers of our common stock in this offering bear the risk that future issuances of debt or equity securities may reduce the value of our common stock and further dilute their ownership interest.

***Operating as a public company will require us to incur substantial costs and will require substantial management attention.***

As a public company, we will incur substantial legal, accounting and other expenses that we did not incur as a private company. For example, we will be subject to the reporting requirements of the Exchange Act, the applicable requirements of the Sarbanes-Oxley Act and the Dodd-Frank Wall Street Reform and Consumer Protection Act and the rules and regulations of the SEC. The rules and regulations of Nasdaq will also apply to us following this offering. As part of the new requirements, we will need to establish and maintain effective disclosure and financial controls and make changes to our corporate governance practices. We expect that compliance with these requirements will increase our legal and financial compliance costs and will make some activities more time-consuming.

We expect that our management and other personnel will need to divert attention from other business matters to devote substantial time to the reporting and other requirements of being a public company. In particular, we expect to incur significant expense and devote substantial management effort to complying with the requirements of Section 404 of the Sarbanes-Oxley Act. We will need to hire additional accounting and financial staff with appropriate public company experience and technical accounting knowledge.

We also expect that being a public company and complying with applicable rules and regulations will make it more expensive for us to obtain director and officer liability insurance. Given recent developments in the market for such coverage, we expect to incur substantially higher costs to obtain and maintain the same or similar coverage. These factors could also make it more difficult for us to attract and retain qualified executive officers and members of our board of directors.

34

**Table of Contents**

***Delaware law and provisions in our certificate of incorporation and bylaws that will be in effect on the completion of this offering could make a merger, tender offer or proxy contest difficult, thereby depressing the trading price of our common stock.***

Our certificate of incorporation and bylaws that will be in effect on the completion of this offering contain provisions that could depress the trading price of our common stock by acting to discourage, delay or prevent a change of control of our company or changes in our management that the stockholders of our company may deem advantageous. These provisions include the following:

- establish a classified board of directors so that not all members of our board of directors are elected at one time;

- permit the board of directors to establish the number of directors and fill any vacancies and newly-created directorships;

- provide that directors may only be removed for cause;

- require super-majority voting to amend some provisions in our certificate of incorporation and bylaws;

- authorize the issuance of "blank check" preferred stock that our board of directors could use to implement a stockholder rights plan;

- prohibit stockholders from calling special meetings of stockholders;

- prohibit stockholder action by written consent, which requires all stockholder actions to be taken at a meeting of our stockholders;

- provide that the board of directors is expressly authorized to make, alter or repeal our bylaws;

- restrict the forum for certain litigation against us to Delaware; and

- establish advance notice requirements for nominations for election to our board of directors or for proposing matters that can be acted upon by stockholders at annual stockholder meetings.

Any provision of our certificate of incorporation or bylaws that will be in effect on the completion of this offering or Delaware law that has the effect of delaying or deterring a change in control could limit the opportunity for our stockholders to receive a premium for their shares of our common stock, and could also affect the price that some investors are willing to pay for our common stock. For information regarding these and other provisions, see section titled "Description of Capital Stock—Anti-Takeover Provisions."

***Our certificate of incorporation will designate a state or federal court located within the State of Delaware as the exclusive forum for substantially all disputes between us and our stockholders, which could limit our stockholders' ability to choose the judicial forum for disputes with us or our directors, officers or employees.***

Our certificate of incorporation, which will become effective immediately prior to the completion of this offering, will provide that, unless we consent in writing to the selection of an alternative forum, to the fullest extent permitted by law, the sole and exclusive forum for (1) any derivative action or proceeding brought on our behalf, (2) any action asserting a claim of breach of a fiduciary duty owed by any of our directors, officers or other employees to us or our stockholders, (3) any action arising pursuant to any provision of the Delaware General Corporation Law ("DGCL"), our certificate of incorporation or our bylaws or (4) any other action asserting a claim that is governed by the internal affairs doctrine shall be the Court of Chancery of the State of Delaware (or, if the Court of Chancery does not have jurisdiction, the federal district court for the District of Delaware), in all cases subject to the court having jurisdiction over indispensable parties named as defendants. Nothing in our certificate of incorporation precludes stockholders that assert claims under the Securities Act or the Exchange Act from bringing such claims in state or federal court, subject to applicable law.

35

Table of Contents

Any person or entity purchasing or otherwise acquiring any interest in any of our securities shall be deemed to have notice of and consented to this provision. This exclusive-forum provision may limit a stockholder's ability to bring a claim in a judicial forum of its choosing for disputes with us or our directors, officers or other employees, which may discourage lawsuits against us and our directors, officers and other employees. If a court were to find the exclusive-forum provision in our certificate of incorporation to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving the dispute in other jurisdictions, which could harm our results of operations.

36

Table of Contents

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This prospectus contains forward-looking statements within the meaning of the federal securities laws. All statements other than statements of historical fact contained in this prospectus, including statements regarding our future results of operations and financial position, business strategy and plans and objectives of management for future operations, are forward-looking statements. These statements involve known and unknown risks, uncertainties and other important factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements.

In some cases, you can identify forward-looking statements by terms such as "may," "should," "expects," "plans," "anticipates," "could," "intends," "target," "projects," "contemplates," "believes," "estimates," "predicts," "potential" or "continue" or the negative of these terms or other similar expressions. The forward-looking statements in this prospectus are only predictions. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our business, financial condition and results of operations. These forward-looking statements speak only as of the date of this prospectus and are subject to a number of risks, uncertainties and assumptions described in the section titled "Risk Factors" and elsewhere in this prospectus. Because forward-looking statements are inherently subject to risks and uncertainties, some of which cannot be predicted or quantified, you should not rely on these forward-looking statements as predictions of future events. The events and circumstances reflected in our forward-looking statements may not be achieved or occur and actual results could differ materially from those projected in the forward-looking statements. Some of the key factors that could cause actual results to differ from our expectations include:

- our future financial performance, including our expectations regarding our revenue, cost of revenue, operating expenses, and our ability to achieve and maintain future profitability;

- our ability to effectively manage or sustain our growth and to effectively expand our operations;

- our strategies, plans, objectives and goals;

- the market demand for authenticated, pre-owned luxury goods and new and pre-owned luxury goods in general and the online market for luxury goods;

- our ability to compete with existing and new competitors in existing and new markets and offerings;

- our ability to attract and retain consignors and buyers;

- our ability to increase the supply of luxury goods offered through our online marketplace;

- our ability to timely and effectively scale our operations;

- our ability to enter international markets

- our ability to optimize, operate and manage our merchandising and fulfillment facilities;

- our ability to develop and protect our brand;

- our ability to comply with laws and regulations;

- our expectations regarding outstanding litigation;

- our expectations and management of future growth;

- our expectations concerning relationships with third parties;

- economic and industry trends, projected growth or trend analysis;

- seasonal sales fluctuations;

- our ability to add capacity, capabilities and automation to our operations;

37

**Table of Contents**

- the increased expenses associated with being a public company; and

- our anticipated uses of net proceeds from this offering.

In addition, statements such as "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based upon information available to us as of the date of this prospectus and, although we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted a thorough inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain and investors are cautioned not to unduly rely upon these statements. Furthermore, if our forward-looking statements prove to be inaccurate, the inaccuracy may be material. In light of the significant uncertainties in these forward-looking statements, you should not regard these statements as a representation or warranty by us or any other person that we will achieve our objectives and plans in any specified time frame, or at all. Except as required by applicable law, we do not plan to publicly update or revise any forward-looking statements contained herein until after we distribute this prospectus, whether as a result of any new information, future events or otherwise.

38

Table of Contents

**MARKET, INDUSTRY AND OTHER DATA**

This prospectus contains estimates, projections and other information concerning our industry, including market size and growth rates of the markets in which we participate, and discussion of our general expectations, market position, and market opportunity. Although we are responsible for the disclosure contained in this prospectus, this information is based on various sources, including reports and publications from the Association of Resale Professionals, Bain & Company, Inc., Cone Communications LLC, Ellen MacArthur Foundation, McKinsey & Company, Inc., Organisation for Economic Co-operation and Development, Pew Research Center and U.S. Census Bureau and other industry publications, surveys and forecasts, on assumptions that we have made that are based on such data and other similar sources and on our knowledge of the markets for our services. This information involves a number of assumptions and limitations, and you are cautioned not to give undue weight to these estimates.

The reports and publications appearing in this prospectus consist of:

- The Association of Resale Professionals, Industry Statistics & Trends, August 2018.

- Bain & Company, Inc., Luxury Goods Worldwide Market Study, December 2018. Information contained in this prospectus from this report was converted from euro to U.S. dollars at an exchange rate of $1.12991 as of the date of the release of the report, November 15, 2018.

- Cone Communications LLC, 2017 Cone Gen Z CSR Study: How to Speak Z, September 2017.

- Ellen MacArthur Foundation, A New Textiles Economy: Redesigning Fashion's Future, November 2017.

- Ellen MacArthur Foundation and the Circular Fibres Initiative, One garbage truck of textiles wasted every second: report creates vision for change, November 2017.

- Frost & Sullivan, Inc., Total Addressable Market Assessment for the Luxury Resale Market, May 2019.

- McKinsey & Company, Inc., The State of Fashion 2019, November 2018.

- McKinsey & Company, Inc., Style that's sustainable: a new fast-fashion formula, October 2016.

- Organisation for Economic Co-operation and Development, Trends in Trade in Counterfeit and Pirated Goods, March 2019.

- Organisation for Economic Co-operation and Development, Trade in fake goods is now 3.3% of world trade and rising, March 18, 2019.

- Pew Research Center, Millennials are the largest generation in the U.S. labor force, April 2018.

- U.S. Census Bureau, Millennials Outnumber Baby Boomers and Are Fare More Diverse, Census Bureau Reports, June 2015.

Industry data and other third-party information have been obtained from sources believed to be reliable, but we have not independently verified any third-party information. In addition, projections, assumptions and estimates of our future performance and the future performance of the industry in which we operate is necessarily subject to a high degree of uncertainty and risk due to a variety of factors, including those described in the section titled "Risk Factors" and elsewhere in this prospectus. These and other factors could cause results to differ materially from those expressed in the estimates made by third parties and by us.

39

Table of Contents

## USE OF PROCEEDS

We estimate that the net proceeds from the sale of the          shares of common stock that we are selling in this offering will be approximately $          million, based on an assumed initial public offering price of $          per share, the midpoint of the range on the front cover of this prospectus, after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us. If the underwriters fully exercise their option to purchase additional common stock in this offering, we estimate that our net proceeds will be approximately $          million, based on an assumed initial public offering price of $          per share, the midpoint of the range on the front cover of this prospectus, after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us.

Each $1.00 increase (decrease) in the assumed initial public offering price of $          per share, which is the midpoint of the price range set forth on the cover page of this prospectus, would increase (decrease) the net proceeds from this offering by $          million, assuming that the number of shares offered by us, as set forth on the cover page of this prospectus, remains the same and after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us. Similarly, each 1 million share increase (decrease) in the number of shares offered by us would increase (decrease) the net proceeds from this offering by $          million, assuming no change in the assumed initial public offering price per share and after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us. We do not expect that a change in the initial public offering price or the number of shares by these amounts would have a material effect on our uses of the proceeds from this offering, although it may accelerate the time when we need to seek additional capital.

The principal purposes of this offering are to create a public market for our common stock, facilitate access to the public equity markets, increase our visibility in the marketplace and obtain additional capital to support further growth in our business. We intend to use the net proceeds we receive from this offering for general corporate purposes, including working capital, operating expenses and capital expenditures. In addition, 1% of the net proceeds will be used to fund The RealReal Foundation, a Delaware non-profit organization formed to engage in charitable activities. We also intend to use a portion of the net proceeds to pay a $0.3 million success fee to the lender under our term loan facility. We may also use a portion of the net proceeds to acquire, invest in or obtain rights to complementary technologies, products, services or businesses. There are no such transactions under consideration at this time.

Because we expect to use the net proceeds from this offering for working capital and other general corporate purposes, our management will have broad discretion over the use of the net proceeds from this offering. As of the date of this prospectus, we intend to invest the net proceeds that are not used as described above in capital-preservation investments, including short-term interest-bearing investment-grade securities, certificates of deposit or U.S. government backed securities.

40

Table of Contents

## DIVIDEND POLICY

We have never declared or paid cash dividends on our capital stock. We currently intend to retain all available funds and future earnings, if any, to fund the development and expansion of our business, and we do not anticipate paying any cash dividends in the foreseeable future. Any future determination regarding the declaration and payment of dividends, if any, will be at the discretion of our board of directors and will depend on then-existing conditions, including our financial condition, operating results, contractual restrictions, capital requirements, business prospects and other factors our board of directors may deem relevant. Our ability to pay cash dividends on our capital stock is limited by the terms of our existing term loans and may be limited by any future debt instruments or preferred securities.

41

[Table of Contents](#)

**CAPITALIZATION**

The following table sets forth our cash and cash equivalents and capitalization as of March 31, 2019:

- on an actual basis;

- on a pro forma basis, giving effect to (1) the conversion of all of the outstanding shares of our preferred stock into an aggregate of 116,727,269 shares of our common stock, assuming an initial offering price of $          per share, which is the midpoint of the estimated offering price range on the cover page of this prospectus; (2) the conversion of the preferred stock warrants to common stock warrants and the related reclassification of the preferred stock warrant liability to additional paid-in capital; and (3) the filing and effectiveness of our certificate of incorporation which will be effective immediately prior to the completion of this offering; and

- on a pro forma as adjusted basis, giving effect to the pro forma adjustments above, our issuance and sale of          shares of our common stock in this offering at the assumed initial offering price of $          per share, which is the midpoint of the estimated offering price range on the cover page of this prospectus, after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us.

You should read this table together with the sections titled "Selected Financial and Other Data," "Use of Proceeds," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and related notes included elsewhere in this prospectus.

| | As of March 31, 2019 | | |
|---|---|---|---|
| | Actual | Pro Forma | Pro Forma as Adjusted(1) |
| | (In thousands, except share and per share data) | | |
| Cash and cash equivalents | $  88,790 | $  88,790 | $ |
| Total debt | $  7,996 | $  7,996 | $ |
| Redeemable convertible preferred stock, $0.00001 par value; 37,403,946 shares authorized; 37,403,946 shares issued and outstanding, actual; no shares authorized, issued and outstanding, pro forma and pro forma as adjusted | 198,308 | — | |
| Convertible preferred stock $0.00001 par value; 77,781,921 shares authorized; 77,556,411 shares issued and outstanding, actual; no shares authorized, issued and outstanding, pro forma and pro forma as adjusted | 169,098 | — | |
| Stockholders' (deficit) equity: | | | |
| Common stock, $0.00001 par value; 155,649,887 shares authorized; 18,674,312 shares issued and outstanding, actual;          shares authorized, pro forma and pro forma as adjusted;          shares issued and outstanding, pro forma;          shares issued and outstanding, pro forma as adjusted | — | 1 | |
| Additional paid-in capital | — | 368,295 | |
| Other comprehensive loss | 3 | 3 | |
| Accumulated deficit | (280,982) | (280,982) | |
| Total stockholders' (deficit) equity | (280,979) | 87,317 | |
| Total capitalization | $  94,423 | $  95,313 | $ |

(1) Each $1.00 increase or decrease in the assumed initial public offering price of $          per share, which is the midpoint of the estimated offering price range on the cover page of this prospectus, would increase or decrease the amount of our pro forma as adjusted cash and cash equivalents, additional paid-in capital, total stockholders' equity and total capitalization by $          , assuming that the number of

42

Table of Contents

shares offered by us, as set forth on the cover page of this prospectus, remains the same and after deducting estimated underwriting discounts and commissions payable by us. An increase or decrease of 1.0 million shares in the number of shares offered by us would increase or decrease, as applicable, the amount of our pro forma as adjusted cash and cash equivalents, additional paid-in capital, total stockholders' equity and total capitalization by $          , assuming the assumed initial public offering price remains the same, and after deducting estimated underwriting discounts and commissions payable by us.

The number of shares of common stock that will be outstanding after this offering is based on 135,401,581 shares of our common stock outstanding as of March 31, 2019 and excludes:

- 18,408,192 shares of common stock issuable upon exercise of options outstanding, as of March 31, 2019, at a weighted-average exercise price of $1.66 per share under our 2011 Equity Incentive Plan ("2011 Plan");

- 2,009,650 shares issuable upon exercise of options outstanding, granted after March 31, 2019, at a weighted-average exercise price of $5.29 per share under our 2011 Plan;

- 11,484 shares of common stock issuable upon exercise of common stock warrants, outstanding as of March 31, 2019 at a weighted average exercise price of $1.74 per share;

- 207,127 shares of common stock issuable upon exercise of preferred stock warrants, outstanding as of March 31, 2019 at a weighted average exercise price of $1.67 per share;

- 1,612,450 shares of common stock reserved for future issuance under our 2011 Plan, as of March 31, 2019, which shares will be added to the shares reserved for future issuance under our 2019 Equity Incentive Plan ("2019 Plan");

-          shares of common stock initially reserved for future issuance under our 2019 Equity Incentive Plan which became effective on the business day immediately prior to the effectiveness of the registration statement of which this prospectus forms a part; and

-          shares of common stock initially reserved for issuance under our 2019 Employee Stock Purchase Plan ("ESPP"), which became effective on the business day immediately prior to the effectiveness of the registration statement of which this prospectus forms a part.

43

Table of Contents

**DILUTION**

If you invest in our common stock in this offering, your interest will be diluted to the extent of the difference between the initial public offering price per share of common stock and the pro forma as adjusted net tangible book value per share immediately after this offering.

Our pro forma net tangible book value as of March 31, 2019 was $85.6 million, or $0.63 per share. Pro forma net tangible book value per share represents the amount of our total tangible assets less our total liabilities, divided by the number of our shares of common stock outstanding as of March 31, 2019, after giving effect to the conversion of all of our preferred stock into shares of common stock immediately prior to the completion of this offering, assuming an initial public offering price of $        per share, which is the midpoint of the estimated offering price range on the cover page of this prospectus and the conversion of the preferred stock warrants to common stock warrants and the related reclassification of the preferred stock warranty liability to additional paid-in capital. After giving effect to the sale by us of        shares of common stock in this offering at an assumed initial public offering price of $        per share, the midpoint of the estimated offering price range on the cover page of this prospectus, and after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us, our pro forma as adjusted net tangible book value as of would have been $        , or $        per share. This amount represents an immediate increase in pro forma as adjusted net tangible book value of $        per share to our existing stockholders and an immediate dilution in pro forma as adjusted net tangible book value of $        per share to new investors purchasing common stock in this offering. We determine dilution by subtracting the pro forma as adjusted net tangible book value per share after this offering from the amount of cash that a new investor paid for a share of common stock. The following table illustrates this dilution on a per share basis:

| | | |
|---|---|---|
| Assumed initial public offering price per share | | $ |
| Pro forma net tangible book value per share as of March 31, 2019 | $0.63 | |
| Increase in pro forma net tangible book value per share attributable to this offering per share to existing investors | | |
| Pro forma as adjusted net tangible book value per share after this offering | | |
| Dilution per share to new investors purchasing shares in this offering | | $ |

The dilution information discussed above is illustrative only and may change based on the actual initial public offering price and other terms of this offering. A $1.00 increase (decrease) in the assumed initial public offering price of $        per share of common stock, the midpoint of the estimated offering price range on the cover page of this prospectus, would increase (decrease) our pro forma as adjusted net tangible book value per share after this offering by $        per share and increase (decrease) the dilution to new investors by $        per share, in each case assuming the number of shares of common stock offered by us, as set forth on the cover page of this prospectus, remains the same, and after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us. Similarly, each increase or decrease of 1.0 million shares in the number of shares of common stock offered by us would increase (decrease) our pro forma as adjusted net tangible book value by approximately $        per share and decrease (increase) the dilution to new investors by approximately $        per share, in each case assuming the assumed initial public offering price of $        per share of common stock remains the same, and after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us.

If the underwriters exercise their option to purchase additional shares of common stock in full, the pro forma net tangible book value per share, as adjusted to give effect to this offering, would be $        per share, and the dilution in pro forma net tangible book value per share to new investors in this offering would be $        per share.

The following table summarizes, as of        , on a pro forma as adjusted basis as described above, the number of shares of our common stock, the total consideration and the average price per share (1) paid to us by

44

**Table of Contents**

existing stockholders and (2) to be paid by new investors acquiring our common stock in this offering at an assumed initial public offering price of $       per share, the midpoint of the estimated offering price range on the cover page of this prospectus, before deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us.

| | Shares Purchased | | Total Consideration | | Average Price Per Share |
|---|---|---|---|---|---|
| | Number | Percent | Amount | Percent | |
| Existing investors | | % | $ | % | $ |
| New investors | | | | | |
| Total | | 100% | $ | 100% | |

The table above assumed no exercise of the underwriters' option to purchase       additional shares in this offering. If the underwriters exercise in full their option to purchase additional shares from us, the number of shares held by new investors will increase to       shares, or      % of the total number of shares outstanding following the completion of this offering.

Each $1.00 increase (decrease) in the assumed initial public offering price of $       per share, the midpoint of the estimated offering price range on the cover page of this prospectus, would increase (decrease) the total consideration paid by new investors and total consideration paid by all stockholders by approximately $       , assuming that the number of shares of common stock offered by us, as set forth on the cover page of this prospectus, remains the same and after deducting estimated underwriting discounts and commissions.

The number of shares of common stock that will be outstanding after this offering is based on 135,401,581 shares of our common stock outstanding as of March 31, 2019 and excludes:

- 18,408,192 shares of common stock issuable upon exercise of options outstanding, as of March 31, 2019, at a weighted-average exercise price of $1.66 per share under the 2011 Plan;

- 2,009,650 shares issuable upon exercise of options outstanding, granted after March 31, 2019, at a weighted-average exercise price of $5.29 per share under our 2011 Plan;

- 11,484 shares of common stock issuable upon exercise of common stock warrants, outstanding as of March 31, 2019 at a weighted average exercise price of $1.74 per share;

- 207,127 shares of common stock issuable upon exercise of preferred stock warrants, outstanding as of March 31, 2019 at a weighted average exercise price of $1.67 per share;

- 1,612,450 shares of common stock reserved for future issuance under our 2011 Plan, as of March 31, 2019, which shares will be added to the shares reserved for future issuance under our 2019 Equity Incentive Plan ("2019 Plan");

-        shares of common stock initially reserved for future issuance under our 2019 Equity Incentive Plan which became effective on the business day immediately prior to the effectiveness of the registration statement of which this prospectus forms a part; and

-        shares of common stock initially reserved for issuance under the ESPP, which became effective on the business day immediately prior to the effectiveness of the registration statement of which this prospectus forms a part.

Our 2019 Equity Incentive Plan provides that the number of available shares will increase on an annual basis, beginning with the fiscal year ending December 31, 2020 and continuing until, and including, the fiscal year ending December 31, 2029. The annual increase will be equal to      % of the number of shares of common stock outstanding on the first day of such fiscal year, shares of our common stock or such lesser amount as determined by our board of directors. The 2019 Equity Incentive Plan also provides that the available shares under the plan will be increased for any shares of our common stock granted pursuant to awards under the 2019

45

Table of Contents

Equity Incentive Plan or the 2011 Equity Incentive Plan that expire, are tendered to or withheld by us for payment of an exercise price or for satisfying tax withholding obligations or are forfeited or otherwise repurchased by us, as more fully described in the section titled "Executive Compensation—Equity Compensation Plans."

In addition, the ESPP provides that the number of available shares will automatically increase on the first trading day in January of each calendar year, commencing January 2020, by an amount equal to the lesser of          % of the shares of our common stock issued and outstanding on December 31 of the immediately preceding calendar year,          shares of our common stock or such lesser amount as is determined by our board of directors, as more fully described in the section titled "Executive Compensation—Equity Compensation Plans."

To the extent that any outstanding options are exercised or new options are issued under our stock-based compensation plans, or we issue additional shares of common stock in the future, there will be further dilution to investors participating in this offering.

46

Table of Contents

## SELECTED FINANCIAL AND OTHER DATA

The selected statement of operations data for the years 2017 and 2018 and the selected balance sheet data as of December 31, 2017 and 2018 are derived from our audited financial statements included elsewhere in this prospectus. The selected statement of operations data for the three months ended March 31, 2018 and 2019 and the balance sheet data as of March 31, 2019 are derived from our unaudited financial statements appearing elsewhere in this prospectus. We have prepared the unaudited financial statements on the same basis as the audited financial statements and have included all adjustments, consisting only of normal recurring adjustments, that we consider necessary for a fair presentation of the financial information set forth in those statements. Our historical results are not necessarily indicative of the results to be expected in any future period. You should read the following selected financial and other data in conjunction with the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and related notes appearing elsewhere in this prospectus.

**Statement of Operations Data**

| | Year Ended December 31, | | Three Months Ended March 31, | |
| --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2018 | 2019 |
| | (In thousands, except share and per share data) | | | |
| Revenue: | | | | |
| Consignment and service revenue | $ 121,210 | $ 183,991 | $ 40,999 | $ 56,236 |
| Direct revenue | 12,661 | 23,385 | 5,460 | 13,019 |
| Total revenue | 133,871 | 207,376 | 46,459 | 69,255 |
| Cost of revenue: | | | | |
| Cost of consignment and service revenue | 35,657 | 50,855 | 11,577 | 15,946 |
| Cost of direct revenue | 10,572 | 19,603 | 4,277 | 10,927 |
| Total cost of revenue | 46,229 | 70,458 | 15,854 | 26,873 |
| Gross profit | 87,642 | 136,918 | 30,605 | 42,382 |
| Operating expenses[1]: | | | | |
| Marketing | 36,711 | 42,165 | 9,634 | 11,733 |
| Operations and technology | 58,680 | 104,929 | 21,332 | 31,544 |
| Selling, general and administrative | 44,035 | 63,728 | 13,524 | 22,319 |
| Total operating expenses | 139,426 | 210,822 | 44,490 | 65,596 |
| Loss from operations | (51,784) | (73,904) | (13,885) | (23,214) |
| Interest income | 355 | 1,046 | 84 | 405 |
| Interest expense | (762) | (1,152) | (197) | (131) |
| Other expense, net | (60) | (1,656) | (108) | (282) |
| Loss before provision for income taxes | (52,251) | (75,666) | (14,106) | (23,222) |
| Provision for income taxes | 57 | 99 | — | — |
| Net loss | $ (52,308) | $ (75,765) | $ (14,106) | $ (23,222) |
| Accretion of redeemable convertible preferred stock to redemption value | (2,610) | (8,922) | $ (1,109) | $ (3,355) |
| Net loss attributable to common stockholders | $ (54,918) | $ (84,687) | $ (15,215) | $ (26,577) |
| Net loss per share attributable to common stockholders, basic and diluted[2] | $ (3.37) | $ (5.06) | $ (0.92) | $ (1.53) |
| Shares used to compute net loss per share attributable to common stockholders, basic and diluted[2] | 16,291,653 | 16,730,803 | 16,599,476 | 17,411,487 |
| Pro forma net loss per share attributable to common stockholders, basic and diluted[2] | | $ (0.67) | | $ (0.18) |
| Shares used to compute pro forma net loss per share attributable to common stockholders, basic and diluted[2] | | 112,804,256 | | 125,064,556 |

47

**Table of Contents**

(1)    Operating expenses include stock-based compensation expense as follows:

| | Year Ended December 31, | | Three Months Ended March 31, | |
| | 2017 | 2018 | 2018 | 2019 |
|---|---|---|---|---|
| | (In thousands) | | | |
| Marketing | $   129 | $   164 | $   34 | $   68 |
| Operations and technology | 625 | 1,160 | 273 | 490 |
| Selling, general and administrative | 1,099 | 1,587 | 238 | 551 |
| Total | $   1,853 | $   2,911 | $   545 | $   1,109 |

(2)    See Notes 2 and 13 to our financial statements for an explanation of the calculations of our basic and diluted net loss per share attributable to common stockholders, pro forma net loss per share attributable to common stockholders and the weighted-average number of shares used in the computation of the per share amounts.

**Balance Sheet Data**

| | As of December 31, | | As of March 31, |
| | 2017 | 2018 | 2019 |
|---|---|---|---|
| | (In thousands) | | |
| Cash and cash equivalents | $   16,486 | $   34,393 | $   88,790 |
| Short-term investments | 12,421 | 27,131 | 14,246 |
| Total assets | 75,965 | 135,417 | 187,113 |
| Total liabilities | 79,594 | 98,907 | 100,686 |
| Redeemable convertible preferred stock | 50,367 | 151,381 | 198,308 |
| Convertible preferred stock | 122,990 | 142,819 | 169,098 |
| Accumulated deficit | (181,571) | (257,665) | (280,982) |
| Total stockholders' deficit | (176,986) | (257,690) | (280,979) |

**Non-GAAP Financial Measures**

Adjusted EBITDA is a key performance measure that our management uses to assess our operating performance. Because Adjusted EBITDA facilitates internal comparisons of our historical operating performance on a more consistent basis, we use this measure as an overall assessment of our performance, to evaluate the effectiveness of our business strategies and for business planning purposes. Adjusted EBITDA may not be comparable to similarly titled metrics of other companies.

We calculate Adjusted EBITDA as net loss before net interest expense, income tax provision and depreciation and amortization, further adjusted to exclude stock-based compensation and certain one-time expenses. Adjusted EBITDA has certain limitations as the measure excludes the impact of certain expenses that are included in our statements of operations that are necessary to run our business and should not be considered as an alternative to net loss or any other measure of financial performance calculated and presented in accordance with GAAP.

48

Table of Contents

The following table presents a reconciliation of Adjusted EBITDA from net loss for 2017 and 2018 and the three months ended March 31, 2018 and 2019:

| | Year Ended December 31, | | Three Months Ended March 31, | |
| --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2018 | 2019 |
| | (In thousands) | | | |
| **Adjusted EBITDA Reconciliation:** | | | | |
| Net loss | $ (52,308) | $ (75,765) | $ (14,106) | $ (23,222) |
| Add (deduct): | | | | |
| Depreciation and amortization | 5,634 | 9,290 | 1,998 | 2,808 |
| Stock-based compensation | 1,853 | 2,911 | 545 | 1,109 |
| Compensation expense related to stock sales by current and former employees | — | 847 | — | 819 |
| Vendor services settlement | — | 2,000 | — | — |
| Interest income | (355) | (1,046) | (84) | (405) |
| Interest expense | 762 | 1,152 | 197 | 131 |
| Other expense, net | 60 | 1,656 | 108 | 282 |
| Provision for income taxes | 57 | 99 | — | — |
| Adjusted EBITDA | $ (44,297) | $ (58,856) | $ (11,342) | $ (18,478) |

49

Table of Contents

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
AND RESULTS OF OPERATIONS**

*The following discussion of our financial condition and results of operations should be read together with our financial statements and related notes and other financial information included in this prospectus. The following discussion contains forward-looking statements that reflect our plans, estimates and beliefs. Our actual results could differ materially from those discussed in the forward-looking statements. Factors that could cause or contribute to these differences include those discussed below and elsewhere in this prospectus, particularly in the section titled "Risk Factors." Our historical results are not necessarily indicative of the results that may be expected for any period in the future, and our interim results are not necessarily indicative of the results we expect for the full calendar year or any other period.*

**Overview**

We are the world's largest online marketplace for authenticated, consigned luxury goods. We are revolutionizing luxury resale by providing an end-to-end service that unlocks supply from consignors and creates a trusted, curated online marketplace for buyers globally. Over the past eight years, we have cultivated a loyal and engaged consignor and buyer base through continuous investment in our technology platform, logistics infrastructure and people. We aggregate and curate unique, pre-owned luxury supply that is exclusive to The RealReal across multiple categories, including women's, men's, kids', jewelry and watches, and home and art. We have built a vibrant online marketplace that we believe expands the overall luxury market, promotes the recirculation of luxury goods and contributes to a more sustainable world.

We have transformed the luxury consignment experience by removing the friction and pain points inherent in the traditional consignment model. For consignors, we provide White Glove in-home consultation and pickup, drop off at one of our eleven LCOs, three of which are located in our retail stores, or complimentary shipping directly to our merchandising and fulfillment facilities. We leverage our proprietary transactional database and market insights from approximately 9.4 million item sales since inception to deliver optimal pricing and rapid sell-through. For buyers, we offer highly coveted and exclusive authenticated pre-owned luxury goods at attractive values, as well as a high-quality experience befitting the products we offer. Our online marketplace is powered by our proprietary technology platform, including consumer facing applications and purpose-built software that supports our complex, single-SKU inventory model and merchandising operations.

The substantial majority of our revenue is generated by consignment sales. We also generate revenue from other services and direct sales.

- *Consignment and service revenue*. When we sell goods through our online marketplace on behalf of our consignors, we retain a percentage of the proceeds, which we refer to as our take rate. Take rates vary depending on the total value of goods sold through our online marketplace on behalf of a particular consignor as well as the category and price point of the items. In 2018, and the three months ended March 31, 2019, our overall take rate on consigned goods was 35.5% and 35.3% respectively. Additionally, we earn revenue from shipping fees and from our subscription program, *First Look,* in which we offer buyers early access to the items we sell in exchange for a monthly fee.

- *Direct revenue*. In certain cases, such as when we accept returns from buyers after we have already remitted sale proceeds to the consignor, we take ownership of goods and retain 100% of the proceeds when the goods subsequently resell through our online marketplace.

We generate revenue from orders processed through our website, mobile app and three retail stores located in New York and Los Angeles. Our omni-channel experience enables buyers to purchase anytime and anywhere. We have a global base of approximately 11.4 million members as of March 31, 2019. We count as a member any user who has registered an email address on our website or downloaded our mobile app, thereby agreeing to our terms of service.

50

Table of Contents

The following graph illustrates key developments in the evolution of our business over the past eight years.



Through March 31, 2019, we have cumulatively paid $987.7 million in commissions to our consignors. In 2017 and 2018, our GMV was $492.2 million and $710.8 million, respectively, representing an annual growth rate of 44%. In 2017 and 2018, our total revenue was $133.9 million and $207.4 million, respectively, representing an annual growth rate of 55%. In 2017 and 2018, our gross profit was $87.6 million and $136.9 million, respectively, representing an annual growth rate of 56%.

51

Table of Contents

**Factors Affecting Our Performance**

To analyze our business performance, determine financial forecasts and help develop long-term strategic plans, we focus on the factors described below. While each of these factors presents significant opportunity for our business, collectively, they also pose important challenges that we must successfully address in order to sustain our growth, improve our operating results and achieve and maintain our profitability.

*Supply and Demand*

*Consignor growth and retention*. We grow our sales by increasing the supply of luxury goods offered through our consignment online marketplace. In 2018, consignors consigned approximately 2.6 million items on our online marketplace, a 52% increase over 2017. In 2017 and 2018, approximately 60% and 80% of the products on our online marketplace sold within 30 days and 90 days. In addition to sales velocity, we measure the ratio of demand versus supply in a given period, which we refer to as our online marketplace sell-through ratio. Sell-through ratio is defined as GMV in the period divided by the aggregate initial value of items added to our online marketplace in the period. In 2017 and 2018, our marketplace sell-through ratios were 93% and 96%, respectively.

We grow our supply both by attracting new consignors and by creating lasting engagement with existing consignors. We generate leads for new consignors principally through our advertising activity. We convert those leads into active consignors through the activities of our sales professionals, who are trained and incentivized to identify and source high-quality, coveted luxury goods from consignors. Our sales professionals form a consultative relationship with consignors and deliver a high-quality, rapid consigning experience. Our existing relationships with consignors allow us to unlock valuable supply across multiple categories within the home, including women's, men's, kids', jewelry and watches, and home and art. We leverage our proprietary transactional database and market insights based on approximately 9.4 million item sales since inception to deliver consignors optimal pricing and rapid sell-through. If we fail to continue to attract consignors to our online marketplace or grow available supply over time, our operating results would be adversely affected.

Our growth has been driven in significant part by repeat sales from existing consignors concurrent with growth of our consignor base. The graph on the left shows trends in annual GMV for consignor cohorts for each year beginning in 2014. Each cohort represents all consignors that first sold across our online marketplace in the designated year and the aggregate GMV sold by such cohort for the initial year and each year thereafter. The graph on the right shows the percentage of GMV in each year from our repeat consignors. GMV from repeat consignors reflects sales made after their first consignment. As shown below, consignors in historical cohorts continue to drive the significant majority of sales on our platform.



52

Table of Contents

*Buyer growth and retention.* We grow our business by attracting and retaining buyers. We attract and retain buyers by offering highly coveted, authenticated, pre-owned luxury goods at attractive values and delivering a high-quality, luxury experience. We measure our success in attracting and retaining buyers by tracking buyer satisfaction and purchasing activity over time. We have experienced high buyer satisfaction, as evidenced by our net promoter score of 74 as of February 2019. If we fail to continue to attract and retain our buyer base to our online marketplace, our operating results would be adversely affected.

The graph on the left shows trends in purchasing activity for buyer cohorts for each year beginning in 2014. Each cohort represents all buyers that first purchased across our online marketplace in the designated year and the aggregate GMV purchased by such cohort for the initial year and each year thereafter. As illustrated in the graph below, buyer cohorts maintain approximately the same level of spend in each year following their initial year of purchase, as buyers with recurring purchase habits increase their total spend on our online marketplace over time. The graph on the right shows the percentage of GMV in each year from our repeat buyers. GMV from repeat buyers reflects purchases made after their initial purchase month.



We believe there is substantial opportunity to grow our business by having buyers also become consignors and vice versa. As of March 31, 2019, 13% of our buyers had become consignors and 53% of our consignors had become buyers. The graph below shows the percentage of GMV in each year from buyers who have participated as both buyers and consignors on our online marketplace. GMV attributable to consigning activity of such buyers is not included.

53

**Table of Contents**

**Buyers Who are Also Consignors**
**(% of GMV)**



*Buyer acquisition cost.* Our financial performance depends on effectively managing the expenses we incur to attract and retain buyers. We closely monitor our efficiency in acquiring new buyers. Our buyer acquisition cost ("BAC") for a given period is comprised of our total advertising spend, which is principally the cost of television, digital and direct mail advertising, divided by the number of buyers acquired in that period. We adjust or re-allocate our advertising in real-time to optimize our spend across channels, buyer demographics and geographies to improve our return on advertising spend. Our BAC has declined over time as we have achieved greater efficiency from our marketing spend.

**Buyer Acquisition Cost**



We also evaluate the success of our buyer acquisition activity by comparing the lifetime value of buyers ("BLTV") attracted in a given period to the aggregate BAC in that same period. We calculate BLTV as the cumulative gross profit attributable to purchases by such buyers. The BLTV to BAC ratio in excess of 1.0 for all cohorts presented after 12 months reflects that each cohort has achieved payback at least equal to BAC within 1 year after acquisition. We have observed that BLTV for buyers who are also consignors is significantly higher than for buyers who have not also consigned.

54

**Table of Contents**

The following graphs depict the BLTV to BAC ratio by annual cohort since 2015 in the aggregate and for buyers who are also consignors, respectively. BLTV in the graph on the right includes only gross profit attributable to transactions in which the members participated as buyers and does not include gross profit attributable to transactions in which the member participated as a consignor.





*Scaling operations and technology.* To support the future growth of our business, we are expanding our capacity through investments in physical infrastructure, talent and technology. We principally conduct our intake, authentication, merchandising and fulfillment operations in our four leased merchandising and fulfillment facilities located in California and New Jersey comprising an aggregate of approximately 1 million square feet of space. We secured leases on more than half of this space in 2018 and are in the process of bringing this space online. The market for real estate to support operations centers such as ours is becoming increasingly competitive, and we will need to continue to secure and efficiently bring online additional capacity to support future growth. The opening of our retail stores in New York in late 2017 and Los Angeles in mid-2018 significantly contributed to the increase in operations and technology expense in 2018. We opened a second retail store in New York in May 2019 and we intend to open additional retail stores in the future. In addition to scaling our physical infrastructure, growing our single-SKU business operations requires that we attract, train and retain highly-skilled personnel for purposes of authentication, copywriting, merchandising, pricing and fulfilling orders. We are also investing substantially in technology to automate our operations and support growth. While we expect our operations and technology development expenses to increase as we continue to grow, we expect such expenses to decrease as a percentage of total revenue over the longer-term.

*Seasonality.* We have observed trends in seasonality of supply and demand in our business that we believe will continue. Specifically, our supply increases in the third and fourth quarters, and our demand increases in the fourth quarter. As a result of this seasonality, we typically see stronger AOV and more rapid sell-through in the fourth quarter. We also incur higher operating expenses in the last four months of the year as we increase advertising spend to attract consignors and buyers and increase headcount in sales and operations to handle the higher volumes.

Table of Contents

**Key Financial and Operating Metrics**

The key operating and financial metrics that we use to assess the performance of our business are set forth below for 2017, 2018 and the three months ended March 31, 2018 and 2019.

| | Year Ended December 31, | | Three Months Ended March 31, | |
|---|---|---|---|---|
| | 2017 | 2018 | 2018 | 2019 |
| | (In thousands, except AOV and percentages) | | | |
| GMV | $ 492,205 | $ 710,750 | $ 158,378 | $ 224,116 |
| Number of orders | 1,123 | 1,595 | 356 | 498 |
| Take rate | 33.7% | 35.5% | 35.1% | 35.3% |
| Active buyers | 291 | 416 | 326 | 456 |
| AOV | $ 438 | $ 446 | $ 445 | $ 450 |
| Adjusted EBITDA | $ (44,297) | $ (58,856) | $ (11,342) | $ (18,478) |

*GMV*

GMV represents the total amount paid for goods across our online marketplace in a given period. We do not reduce GMV to reflect product returns or order cancellations, which totaled 29.0%, 28.7% and 25.8% of GMV in 2017, 2018 and the three months ended March 31, 2019, respectively. GMV includes amounts paid for both consigned goods and our inventory and excludes certain buyer incentives, shipping fees and sales tax. We believe this is the primary measure of the scale and growth of our online marketplace and the key indicator of the health of our consignor ecosystem. We monitor trends in GMV to inform budgeting and operational decisions to support and promote growth in our business and to monitor our success in adapting our business to meet the needs of our consignors and buyers.

*Number of Orders*

Number of orders means the total number of orders placed across our online marketplace in a given period. We do not reduce number of orders to reflect product returns or order cancellations.

*Take Rate*

Take rate is a key driver of our revenue and provides comparability to other marketplaces. The numerator used to calculate our take rate is equal to GAAP consignment and service revenue, excluding certain buyer incentives and shipping and subscription service revenue. The denominator is equal to the numerator plus consignor commissions. We exclude direct revenue from our calculation of take rate because direct revenue represents the sale of inventory owned by us, which costs are included in cost of direct revenue. See the subsection titled "—Components of our Operating Results—Revenue" for further discussion of consignment and service revenue and direct revenue. Our take rate reflects the high level of service that we provide to our consignors across multiple touch points and the consistently high velocity of sales for their goods.

*Active Buyers*

Active buyers includes buyers who purchased goods through our online marketplace during the 12 months ended on the last day of the period presented, irrespective of returns or cancellations. We believe this metric reflects scale, brand awareness, buyer acquisition and engagement.

*Average Order Value ("AOV")*

Average order value ("AOV") means the average value of all orders placed across our online marketplace, excluding shipping fees and sales taxes. Our focus on luxury goods across multiple categories drives a consistently high AOV. Our AOV reflects both the average price of items sold as well as the number of items per order. Our high AOV is a key driver of our operating leverage.

56

**Table of Contents**

*Adjusted EBITDA*

Adjusted EBITDA means net loss before net interest expense, income tax provision and depreciation and amortization, further adjusted to exclude stock-based compensation and certain one-time expenses. Adjusted EBITDA provides a basis for comparison of our business operations between current, past and future periods by excluding items that we do not believe are indicative of our core operating performance. Adjusted EBITDA is a non-GAAP measure. Please see the section titled "Selected Financial and Other Data—Non-GAAP Financial Measures" for information regarding our use of Adjusted EBITDA and its reconciliation to net loss.

**Components of our Operating Results**

*Revenue*

Our revenue is comprised of consignment and service revenue and direct revenue.

- *Consignment and service revenue.* We generate the substantial majority of our revenue from the sale of pre-owned luxury goods through our online marketplace on behalf of consignors. For consignment sales, we retain a percentage of the proceeds received, which we refer to as our take rate. We recognize consignment revenue, net of allowances for product returns, order cancellations and certain buyer incentives. Additionally, we generate revenue from shipping fees we charge to buyers. We also generate service revenue from subscription fees paid by buyers for early access to products, but to date our subscription revenue has not been material.

- *Direct revenue.* We generate direct revenue from the sale of items that we own, which we refer to as our inventory. We generally acquire inventory when we accept returns from buyers after we have already remitted sale proceeds to the consignor. As such, growth in direct sales is generally a byproduct of growth in our consignment business. We recognize direct revenue based on the gross purchase price paid by buyers, net of allowances for product returns and order cancellations and certain incentives.

*Cost of Revenue*

Cost of revenue consists of shipping costs, credit card fees, packaging, customer service and website hosting services. Cost of direct revenue also includes the cost of our inventory sold through our online marketplace.

*Marketing*

Marketing expense comprises the cost of acquiring new consignors and buyers, including the cost of television, digital and direct mail advertising. Marketing expense also includes personnel-related costs for employees engaged in these activities. We intend to increase marketing spend as we invest to drive the growth of our business. While these expenses may vary from period to period, we expect these expenses to decrease as a percentage of revenue over the longer term.

*Operations and Technology*

Operations and technology expense principally includes personnel-related costs for employees involved with the authentication, merchandising and fulfillment of goods sold through our online marketplace, as well as our general information technology expense. Operations and technology expense also includes allocated facility and overhead costs, costs related to our retail stores, facility supplies and depreciation of hardware and equipment, as well as research and development expense for technology associated with managing and improving our operations. We capitalize a portion of our proprietary software and technology development costs. As such, operations and technology expense also includes amortization of capitalized technology development costs. We expect operations and technology expense to increase in future periods to support our growth, including bringing on additional merchandising and fulfillment facilities and continuing to invest in automation and other technology improvements to support and drive efficiency in our operations. These expenses may vary from period to period as a percentage of revenue, depending primarily upon when we choose to make more significant investments. We expect these expenses to decrease as a percentage of revenue over the longer term.

57

**Table of Contents**

*Selling, General and Administrative*

Selling, general and administrative expense is principally comprised of personnel-related costs for our sales professionals and employees involved in finance and administration. Selling, general and administrative expense also includes allocated facilities and overhead costs and professional services, including accounting and legal advisors. We expect to increase selling, general and administrative expense as we grow our infrastructure to support operating as a public company and the overall growth in our business. While these expenses may vary from period to period as a percentage of revenue, we expect them to decrease as a percentage of revenue over the longer term.

*Income Tax Provision*

Our provision for income taxes consists primarily of state minimum taxes in the United States. We have a full valuation allowance for our net deferred tax assets primarily consisting of net operating loss carryforwards, accruals and reserves. We expect to maintain this full valuation allowance for the foreseeable future.

**Results of Operations**

The results of operations presented below should be reviewed in conjunction with the financial statements and notes included elsewhere in the prospectus. The following tables set forth our results of operations and such data as a percentage of revenue for the periods presented:

| | Year Ended December 31, | | Three Months Ended March 31, | |
|---|---|---|---|---|
| | 2017 | 2018 | 2018 | 2019 |
| | (In thousands) | | | |
| Revenue: | | | | |
| Consignment and service revenue | $121,210 | $183,991 | $ 40,999 | $ 56,236 |
| Direct revenue | 12,661 | 23,385 | 5,460 | 13,019 |
| Total revenue | 133,871 | 207,376 | 46,459 | 69,255 |
| Cost of revenue: | | | | |
| Cost of consignment and service revenue | 35,657 | 50,855 | 11,577 | 15,946 |
| Cost of direct revenue | 10,572 | 19,603 | 4,277 | 10,927 |
| Total cost of revenue | 46,229 | 70,458 | 15,854 | 26,873 |
| Gross profit | 87,642 | 136,918 | 30,605 | 42,382 |
| Operating expenses: | | | | |
| Marketing | 36,711 | 42,165 | 9,634 | 11,733 |
| Operations and technology | 58,680 | 104,929 | 21,332 | 31,544 |
| Selling, general and administrative | 44,035 | 63,728 | 13,524 | 22,319 |
| Total operating expenses | 139,426 | 210,822 | 44,490 | 65,596 |
| Loss from operations | (51,784) | (73,904) | (13,885) | (23,214) |
| Interest income | 355 | 1,046 | 84 | 405 |
| Interest expense | (762) | (1,152) | (197) | (131) |
| Other expense, net | (60) | (1,656) | (108) | (282) |
| Loss before provision for income taxes | (52,251) | (75,666) | (14,106) | (23,222) |
| Provision for income taxes | 57 | 99 | — | — |
| Net loss | $ (52,308) | $ (75,765) | $(14,106) | $(23,222) |

58

Table of Contents

| | Year Ended December 31, | | Three Months Ended March 31, | |
|---|---|---|---|---|
| | 2017 | 2018 | 2018 | 2019 |
| Revenue: | | | | |
|     Consignment and service revenue | 91% | 89% | 88% | 81% |
|     Direct revenue | 9 | 11 | 12 | 19 |
|         Total revenue | 100 | 100 | 100 | 100 |
| Cost of Revenue: | | | | |
|     Cost of consignment and service revenue | 27 | 25 | 25 | 23 |
|     Cost of direct revenue | 8 | 9 | 9 | 16 |
|         Total cost of revenue | 35 | 34 | 34 | 39 |
| Gross profit | 65 | 66 | 66 | 61 |
| Operating expenses: | | | | |
|     Marketing | 27 | 20 | 21 | 17 |
|     Operations and technology | 44 | 51 | 46 | 46 |
|     Selling, general and administrative | 33 | 31 | 29 | 32 |
|         Total operating expenses | 104 | 102 | 96 | 95 |
| Loss from operations | (39) | (36) | (30) | (34) |
| Interest income | — | 1 | — | — |
| Interest expense | (1) | (1) | — | — |
| Other expense, net | — | (1) | — | — |
| Loss before provision for income taxes | (40) | (37) | (30) | (34) |
| Provision for income taxes | — | — | — | — |
| Net loss | (40)% | (37)% | (30)% | (34)% |

**Comparison of the Three Months Ended March 31, 2018 and 2019**

*Consignment and Service Revenue*

| | Three Months Ended March 31, | | Change | |
|---|---|---|---|---|
| | 2018 | 2019 | Amount | % |
| | (In thousands, except percentage) | | | |
| Consignment and service revenue, net | $40,999 | $56,236 | $15,237 | 37% |

Consignment and service revenue increased by $15.2 million, or 37%, in the three months ended March 31, 2019 compared to the three months ended March 31, 2018. The growth in revenue was driven primarily by a 42% increase in GMV resulting from growth in both active consignors and active buyers in the three months ended March 31, 2019 compared to the three months ended March 31, 2018, as well as an improvement from 35.1% to 35.3% in our take rate due to changes to our commission structure.

*Direct Revenue*

| | Three Months Ended March 31, | | Change | |
|---|---|---|---|---|
| | 2018 | 2019 | Amount | % |
| | (In thousands, except percentage) | | | |
| Direct revenue | $5,460 | $13,019 | $7,559 | 138% |

Direct revenue increased by $7.6 million, or 138%, in the three months ended March 31, 2019 compared to the three months ended March 31, 2018. The increase was driven in part by an overall growth in our consignment

59

**Table of Contents**

business. Additionally, during the annual extended holiday return period in connection with the 2018-2019 holiday season, our owned-inventory increased as a result of a higher than usual volume of returns received subsequent to payments to consignors. The subsequent sale of our owned-inventory drove the increase in direct revenue in the first quarter of 2019 both on an absolute basis and as a percent of total revenue. We expect direct revenue as a percent of total revenue to vary from period to period.

*Cost of Consignment and Service Revenue*

| | Three Months Ended March 31, | | Change | |
|---|---|---|---|---|
| | 2018 | 2019 | Amount | % |
| | (In thousands, except percentage) | | | |
| Cost of consignment and service revenue | $11,577 | $15,946 | $4,369 | 38% |
| As a percent of consignment and service revenue | 28% | 28% | | |

Cost of consignment and service revenue increased by $4.4 million, or 38%, in the three months ended March 31, 2019 compared to the three months ended March 31, 2018. The increase was primarily attributable to increases in shipping costs of $3.0 million driven by fulfillment of a larger number of orders in the first quarter of 2019 and credit card fees of $1.2 million driven by growth in our business.

*Cost of Direct Revenue*

| | Three Months Ended March 31, | | Change | |
|---|---|---|---|---|
| | 2018 | 2019 | Amount | % |
| | (In thousands, except percentage) | | | |
| Cost of direct revenue | $4,277 | $10,927 | $6,650 | 155% |
| As a percent of direct revenue | 78% | 84% | | |

Cost of direct revenue increased by $6.7 million, or 155%, in the three months ended March 31, 2019 compared to the three months ended March 31, 2018, consistent with the increase in direct revenue. As a percentage of direct revenue, cost of direct revenue increased to 84% in the three months ended March 31, 2019 from 78% in the three months ended March 31, 2018, as a result of inventory valuation adjustments.

*Marketing*

| | Three Months Ended March 31, | | Change | |
|---|---|---|---|---|
| | 2018 | 2019 | Amount | % |
| | (In thousands, except percentage) | | | |
| Marketing | $9,634 | $ 11,733 | $2,099 | 22% |

Marketing expense increased by $2.1 million, or 22%, in the three months ended March 31, 2019 compared to the three months ended March 31, 2018. The increase was primarily due to a $1.8 million, or 21%, increase in advertising costs as we seek to grow the number of buyers and consignors using our online marketplace. As a percent of revenue, marketing expense decreased to 17% in the three months ended March 31, 2019 from 21% in the three months ended March 31, 2018, reflecting greater scale in our business and efficiency in our buyer and consignor acquisition and retention activities.

*Operations and Technology*

| | Three Months Ended March 31, | | Change | |
|---|---|---|---|---|
| | 2018 | 2019 | Amount | % |
| | (In thousands, except percentage) | | | |
| Operations and technology | $21,332 | $31,544 | $10,212 | 48% |

60

Table of Contents

Operations and technology expense increased by $10.2 million, or 48%, in the three months ended March 31, 2019 compared to the three months ended March 31, 2018. The increase was primarily due to investments to support our growth and drive long-term operational efficiencies, including investments to significantly expand our merchandising and fulfillment facilities, open our first retail stores and grow our talent. This includes increases of $6.6 million as a result of adding headcount in merchandising, authentication, fulfillment, technology and retail stores, $2.1 million in occupancy costs related to our new retail stores and merchandising and fulfillment facilities and $0.8 million in depreciation and amortization expense. As a percent of revenue, operations and technology expense was consistent at 46% in the three months ended March 31, 2018 and 2019. These expenses may vary from period to period as a percentage of revenue, depending primarily upon when we choose to make more significant investments. We expect these expenses to decrease as a percentage of revenue over the longer term.

### Selling, General and Administrative

| | Three Months Ended March 31, | | Change | |
| | 2018 | 2019 | Amount | % |
| | (In thousands, except percentage) | | | |
|---|---|---|---|---|
| Selling, general and administrative | $13,524 | $22,319 | $8,795 | 65% |

Selling, general and administrative expense increased by $8.8 million, or 65%, in the three months ended March 31, 2019 compared to the three months ended March 31, 2018. The increase was due to investments to support the growth of our sales organization and scale our general and administrative functions as necessary to operate as a public company. This includes an increase of $6.4 million driven by additional headcount in our sales organization and general and administrative functions and an increase of $1.5 million in accounting, consulting and legal fees. As a percent of revenue, selling, general and administrative expense increased to 32% in the three months ended March 31, 2019 from 29% in the three months ended March 31, 2018 as we invested in the growth of the sale organization and expanded our finance and administrative functions in anticipation of being a public company. These expenses may vary from period to period as a percentage of revenue. We expect these expenses to decrease as a percentage of revenue over the long term.

### Comparison of 2017 and 2018

#### Consignment and Service Revenue

| | Year Ended December 31, | | Change | |
| | 2017 | 2018 | Amount | % |
| | (In thousands, except percentage) | | | |
|---|---|---|---|---|
| Consignment and service revenue | $121,210 | $183,991 | $62,781 | 52% |

Consignment and service revenue increased by $62.8 million, or 52%, in 2018 compared to 2017. The growth in revenue was driven primarily by a 44% increase in GMV in 2018 compared to 2017, as well as an improvement from 33.7% to 35.5% in our take rate due to changes to our commission structure.

#### Direct Revenue

| | Year Ended December 31, | | Change | |
| | 2017 | 2018 | Amount | % |
| | (In thousands, except percentage) | | | |
|---|---|---|---|---|
| Direct revenue | $12,661 | $23,385 | $10,724 | 85% |

61

**Table of Contents**

Direct revenue increased by $10.7 million, or 85%, in 2018 compared to 2017. The increase was driven by an overall growth in our consignment business and related out-of-policy returns in 2018.

### Cost of Consignment and Service Revenue

| | Year Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2017 | 2018 | Amount | % |
| | (In thousands, except percentage) | | | |
| Cost of consignment and service revenue | $35,657 | $50,855 | $15,198 | 43% |
| As a percent of consignment and service revenue | 29% | 28% | | |

Cost of consignment and service revenue increased by $15.2 million, or 43%, in 2018 compared to 2017. The increase was primarily attributable to increases in shipping costs of $9.4 million and credit card fees of $3.5 million as a result of the growth in consignment revenue.

### Cost of Direct Revenue

| | Year Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2017 | 2018 | Amount | % |
| | (In thousands, except percentage) | | | |
| Cost of direct revenue | $10,572 | $19,603 | $9,031 | 85% |
| As a percent of direct revenue | 84% | 84% | | |

Cost of direct revenue increased by $9.0 million, or 85%, in 2018 compared to 2017, consistent with the increase in direct revenue.

### Marketing

| | Year Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2017 | 2018 | Amount | % |
| | (In thousands, except percentage) | | | |
| Marketing | $36,711 | $42,165 | $5,454 | 15% |

Marketing expense increased by $5.5 million, or 15%, in 2018 compared to 2017. The increase was primarily due to a $4.5 million, or 14%, increase in advertising costs as we seek to grow the number of buyers and consignors using our online marketplace. As a percent of revenue, marketing expense decreased to 20% in 2018 from 27% in 2017, reflecting greater scale in our business and efficiency in our buyer and consignor acquisition and retention activities.

### Operations and Technology

| | Year Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2017 | 2018 | Amount | % |
| | (In thousands, except percentage) | | | |
| Operations and technology | $58,680 | $104,929 | $46,249 | 79% |

Operations and technology expense increased by $46.2 million, or 79%, in 2018 compared to 2017. The increase was due to investments to support our growth and drive long-term operational efficiencies, including investments to significantly expand our merchandising and fulfillment facilities, enhance our technology, open

62

**Table of Contents**

our first retail stores and grow our talent. This includes increases of $27.0 million as a result of adding headcount in merchandising, authentication, fulfillment, technology and retail stores, $4.6 million in occupancy costs related to our new retail stores and merchandising and fulfillment facilities, $4.6 million in depreciation and amortization expense, $3.6 million in consulting fees primarily related to technology development, and $2.0 million related to a settlement payment in connection with early termination of a vendor services agreement. As a percent of revenue, operations and technology expense increased to 51% in 2018 from 44% in 2017. These expenses may vary from period to period as a percentage of revenue, depending primarily upon when we choose to make more significant investments. We expect these expenses to decrease as a percentage of revenue over the longer term.

### *Selling, General and Administrative*

| | Year Ended December 31, | | Change | |
| | 2017 | 2018 | Amount | % |
| | (In thousands, except percentage) | | | |
| Selling, general and administrative | $44,035 | $63,728 | $19,693 | 45% |

Selling, general and administrative expense increased by $19.7 million, or 45%, in 2018 compared to 2017. The increase was due to investments to support the growth of our sales organization and scale our general and administrative functions as necessary to operate as a public company. This includes an increase of $14.5 million driven by an increase in headcount in our sales organization and general and administrative functions. As a percent of revenue, selling, general and administrative expense decreased to 31% in 2018 from 33% in 2017.

63

Table of Contents

**Quarterly Results of Operations and Key Metrics**

The following table sets forth certain unaudited financial data for each fiscal quarter for the periods indicated in dollars and as a percentage of revenue. The information for each quarter has been prepared on a basis consistent with our audited consolidated financial statements included in this prospectus and reflect all adjustments, consisting only of normal recurring adjustments, that we consider necessary for a fair presentation of the financial information contained in those statements. Our historical results are not necessarily indicative of the results that may be expected for the full year or any other period in the future. The following quarterly financial information should be read in conjunction with our audited consolidated financial statements and related notes included in this prospectus.

|  | 2018 | | | | 2019 |
|  | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | First Quarter |
|  | (In thousands) | | | | |
| Revenue: | | | | | |
| Consignment and service revenue | $ 40,999 | $ 42,178 | $ 45,744 | $ 55,070 | $ 56,236 |
| Direct revenue | 5,460 | 4,807 | 6,095 | 7,023 | 13,019 |
| Total revenue | 46,459 | 46,985 | 51,839 | 62,093 | 69,255 |
| Cost of revenue: | | | | | |
| Cost of consignment and service revenue | 11,577 | 12,349 | 13,157 | 13,772 | 15,946 |
| Cost of direct revenue | 4,277 | 3,857 | 5,352 | 6,117 | 10,927 |
| Total cost of revenue | 15,854 | 16,206 | 18,509 | 19,889 | 26,873 |
| Gross profit | 30,605 | 30,779 | 33,330 | 42,204 | 42,382 |
| Operating expenses: | | | | | |
| Marketing | 9,634 | 9,276 | 10,624 | 12,631 | 11,733 |
| Operations and technology | 21,332 | 22,997 | 28,257 | 32,343 | 31,544 |
| Selling, general and administrative | 13,524 | 14,377 | 16,325 | 19,502 | 22,319 |
| Total operating expenses | 44,490 | 46,650 | 55,206 | 64,476 | 65,596 |
| Loss from operations | (13,885) | (15,871) | (21,876) | (22,272) | (23,214) |
| Interest income | 84 | 81 | 437 | 444 | 405 |
| Interest expense | (197) | (526) | (204) | (225) | (131) |
| Other expense, net | (108) | (1,279) | (205) | (64) | (282) |
| Loss before provision for income taxes | (14,106) | (17,595) | (21,848) | (22,117) | (23,222) |
| Provision for income taxes | — | — | 37 | 62 | — |
| Net loss | $(14,106) | $(17,595) | $(21,885) | $(22,179) | $(23,222) |

64

**Table of Contents**

| | 2018 | | | | 2019 |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | First Quarter |
|---|---|---|---|---|---|
| Revenue: | | | | | |
| Consignment and service revenue | 88% | 90% | 88% | 89% | 81% |
| Direct revenue | 12 | 10 | 12 | 11 | 19 |
| Total revenue | 100 | 100 | 100 | 100 | 100 |
| Cost of revenue: | | | | | |
| Cost of consignment and service revenue | 25 | 26 | 26 | 22 | 23 |
| Cost of direct revenue | 9 | 8 | 10 | 10 | 16 |
| Total cost of revenue | 34 | 34 | 36 | 32 | 39 |
| Gross profit | 66 | 66 | 64 | 68 | 61 |
| Operating expenses: | | | | | |
| Marketing | 21 | 20 | 20 | 20 | 17 |
| Operations and technology | 46 | 49 | 55 | 52 | 46 |
| Selling, general and administrative | 29 | 31 | 31 | 31 | 32 |
| Total operating expenses | 96 | 100 | 106 | 104 | 95 |
| Loss from operations | (30) | (34) | (42) | (36) | (34) |
| Interest income | — | 1 | — | — | — |
| Interest expense | — | (1) | — | — | — |
| Other expense, net | — | (3) | — | — | — |
| Loss before provision for income taxes | (30) | (37) | (42) | (36) | (34) |
| Provision for income taxes | — | — | — | — | — |
| Net loss | (30)% | (37)% | (42)% | (36)% | (34)% |

**Key Financial and Operating Metrics**

| | 2018 | | | | 2019 |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | First Quarter |
| | (In thousands, except AOV and percentages) | | | | |
|---|---|---|---|---|---|
| GMV | $158,378 | $162,954 | $170,923 | $218,495 | $224,116 |
| Number of Orders | 356 | 359 | 409 | 471 | 498 |
| Take rate | 35.1% | 35.5% | 36.4% | 34.9% | 35.3% |
| Active buyers | 326 | 352 | 379 | 416 | 456 |
| AOV | $ 445 | $ 453 | $ 418 | $ 464 | $ 450 |
| Adjusted EBITDA | $ (11,342) | $ (13,052) | $ (15,936) | $ (18,526) | $ (18,478) |

65

**Table of Contents**

The following table presents a reconciliation of Adjusted EBITDA from net loss:

| | 2018 | | | | 2019 |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | First Quarter |
|---|---|---|---|---|---|
| | (In thousands) | | | | |
| **Adjusted EBITDA Reconciliation:** | | | | | |
| Net loss | $(14,106) | $(17,595) | $(21,885) | $(22,179) | $(23,222) |
| Add (deduct): | | | | | |
| Depreciation and amortization | 1,998 | 2,138 | 2,353 | 2,801 | 2,808 |
| Stock-based compensation | 545 | 681 | 740 | 945 | 1,109 |
| Compensation expense related to stock sales by current and former employees | — | — | 847 | — | 819 |
| Vendor services settlement | — | — | 2,000 | — | — |
| Interest income | (84) | (81) | (437) | (444) | (405) |
| Interest expense | 197 | 526 | 204 | 225 | 131 |
| Other expense, net | 108 | 1,279 | 205 | 64 | 282 |
| Provision for income taxes | — | — | 37 | 62 | — |
| Adjusted EBITDA | $(11,342) | $(13,052) | $(15,936) | $(18,526) | $(18,478) |

*Quarterly Trends*

Our quarterly revenue increased sequentially for all periods presented primarily due to increases in our GMV. Generally, we have experienced the highest levels of revenue in the fourth quarter of the year compared to other quarters due to the seasonality in our business. Specifically, our supply increases in the third and fourth quarters, and our demand increases in the fourth quarter. As a result of this seasonality, we typically see stronger AOV and more rapid sell-through in the fourth quarter. Additionally, during the annual extended holiday return period in connection with the 2018-2019 holiday season, our owned-inventory increased as a result of a higher than usual volume of returns received subsequent to payments to consignors. The subsequent sale of our owned-inventory drove the increase in direct revenue in the first quarter of 2019 both on an absolute basis and as a percent of total revenue.

Our quarterly costs and expenses generally increased sequentially for all periods presented, primarily due to the increase of personnel-related expenses from increases in headcount as well as ongoing marketing expenses related to buyer and consignor acquisition and retention efforts and investments to support our growth and drive long-term operational efficiencies. We incurred higher operating expenses starting in the latter half of 2018 due to investments to support our growth and drive long-term operational efficiencies, including investments to significantly expand our merchandising and fulfillment facilities, open our first retail stores and grow our talent.

**Liquidity and Capital Resources**

As of March 31, 2019, we had cash, cash equivalents and short-term investments of $103.0 million and an accumulated deficit of $281.0 million. Since inception, we have generated negative cash flows from operations and have primarily financed our operations through several rounds of venture capital financing. In March 2019, we received aggregate gross proceeds of $70.0 million from the issuance of our Series H preferred stock.

We expect that operating losses and negative cash flows from operations could continue in the foreseeable future as we continue to invest in expansion activities. We believe our existing cash and cash equivalents and short-term investments as of March 31, 2019 will be sufficient to meet our working capital and capital expenditures needs for at least the next 12 months.

66

**Table of Contents**

Our future capital requirements will depend on many factors, including, but not limited to, our ability to grow our revenues and the timing of investments to support growth in our business, such as the build-out of new fulfillment centers and, to a lesser extent, the opening of new retail stores. We may seek additional equity or debt financing. In the event that additional financing is required from outside sources, we may not be able to raise it on terms acceptable to us or at all. If we are unable to raise additional capital when desired, our business, financial condition and results of operations could be adversely affected.

### *Cash Flows*

The following table summarizes our cash flows for the periods indicated.

|  | Year Ended December 31, | | Three Months Ended March 31, | |
|---|---|---|---|---|
|  | **2017** | **2018** | **2018** | **2019** |
|  | **(In thousands)** | | | |
| Net cash (used in) provide by: | | | | |
| Operating activities | $(38,574) | $ (47,195) | $(14,972) | $(22,571) |
| Investing activities | (11,303) | (33,923) | 9,210 | 7,444 |
| Financing activities | 46,719 | 106,085 | (711) | 69,711 |
| Net (decrease) increase in cash, cash equivalents and restricted cash | $  (3,158) | $  24,967 | $  (6,473) | $ 54,584 |

### *Net Cash Used in Operating Activities*

During the three months ended March 31, 2019, net cash used in operating activities was $22.6 million, which consisted of a net loss of $23.2 million, adjusted by non-cash charges of $5.4 million and a net change of $4.8 million in our operating assets and liabilities. The net change in our operating assets and liabilities was primarily the result of a $4.0 million increase in accounts receivable driven by the timing of settlement of credit card purchases relative to year-end sales and a $2.4 million increase in prepaid expenses and other current assets, partially offset by $1.3 million increase in accrued consignor payable.

During the three months ended March 31, 2018, net cash used in operating activities was $15.0 million, which consisted of a net loss of $14.1 million, adjusted by non-cash charges of $2.9 million and a net change of $3.7 million in our operating assets and liabilities. The net change in our operating assets and liabilities was primarily the result of a $1.3 million decrease in accrued consignor payable, a $1.3 million increase in prepaid expenses and other current assets and a $0.8 million decrease in other accrued and current liabilities driven by the growth in our operations.

During 2018, net cash used in operating activities was $47.2 million, which consisted of a net loss of $75.8 million, partially offset by non-cash charges of $16.5 million and a net change of $12.1 million in our operating assets and liabilities. The net change in our operating assets and liabilities was primarily the result of a $15.7 million increase in other accrued and current liabilities driven by our growth, a $6.6 million increase in accrued consignor payable and a $3.4 million increase in other non-current liabilities, partially offset by a $5.3 million increase in prepaid expenses and other current assets and a $3.7 million increase in inventory, net.

During 2017, net cash used in operating activities was $38.6 million, which consisted of a net loss of $52.3 million, partially offset by non-cash charges of $8.5 million and a net change of $5.2 million in our operating assets and liabilities. The net change in our operating assets and liabilities was primarily the result of a $10.5 million increase in accrued consignor payable and $6.1 million increase other accrued and current liabilities as a result of our growth, partially offset by $4.2 million increase in accounts receivable, a $3.9 million increase in inventory, net, and a $2.4 million increase in prepaid expenses and other current assets.

67

Table of Contents

### *Net Cash Used in Investing Activities*

During the three months ended March 31, 2019, net cash provided by investing activities was $7.4 million, which consisted of $12.9 million proceeds from maturities on short-term investments partially offset by $3.7 million for purchases of property and equipment, net, including leasehold improvements, and $1.7 million for capitalized proprietary software costs.

During the three months ended March 31, 2018, net cash provided by investing activities was $9.2 million, which consisted of proceeds of $7.6 million from maturities on short-term investments and proceeds of $7.0 million from the sale of short-term investments, partially offset by $2.4 million for purchases of property and equipment, net, $2.2 million for purchases of short-term investments and $0.8 million for capitalized proprietary software costs.

During 2018, net cash used in investing activities was $33.9 million, which consisted of $31.5 million for purchases of short-term investments, $13.4 million for purchases of property and equipment, net, including leasehold improvements, and $5.7 million for capitalized proprietary software costs, partially offset by the proceeds of $9.6 million from maturities on short-term investments and proceeds of $7.0 million from the sale of short-term investments.

During 2017, net cash used in investing activities was $11.3 million, which consisted of $27.5 million for purchases of short-term investments, $11.6 million for purchases of property and equipment, net, including leasehold improvements, and $2.5 million for capitalized proprietary software costs, partially offset by the proceeds of $30.3 million from maturities of short-term investments.

### *Net Cash Provided by Financing Activities*

During the three months ended March 31, 2019, net cash provided by financing activities was $69.7 million, which primarily consisted of proceeds of $69.9 million from the issuance of redeemable convertible preferred stock and convertible preferred stock, net of issuance costs, and proceeds of $1.3 million from the exercise of stock options and warrants partially offset by $1.3 million for repayment of debt.

During the three months ended March 31, 2018, net cash used in financing activities was $0.7 million which was primarily as a result of repayment of debt.

During 2018, net cash provided by financing activities was $106.1 million, which primarily consisted of proceeds of $96.3 million from the issuance of preferred stock, net of issuance costs, and proceeds of $14.3 million from the issuance of convertible notes, net of issuance costs, partially offset by $4.5 million for repayments of debt.

During 2017, net cash provided by financing activities was $46.7 million, which primarily consisted of proceeds of $47.8 million from the issuance of preferred stock, net of issuance costs, partially offset by $1.3 million for repayments of debt.

Table of Contents

**Contractual Obligations and Commitments**

The following table summarizes our contractual obligations and commitments as of December 31, 2018:

| | | Payments Due by Period | | | |
| --- | --- | --- | --- | --- | --- |
| | Total | Less Than 1 Year | 1 to 3 Years | 3 to 5 Years | More Than 5 Years |
| | | | (In thousands) | | |
| Operating leases[1][2][3] | $121,250 | $ 15,563 | $32,102 | $24,612 | $  48,973 |
| Term loans, including interest | 10,022 | 6,440 | 3,582 | — | — |
| Unconditional endowment grant[4] | 1,500 | 500 | 1,000 | — | — |
| Capital leases | 359 | 329 | 30 | — | — |
| Non-cancellable purchase commitments | 4,489 | 2,390 | 2,099 | — | — |
| Total | $137,620 | $ 25,222 | $38,813 | $24,612 | $  48,973 |

(1)  This table does not include the noncancelable operating lease we entered into in January 2019 to extend and expand the existing lease in Chicago, IL. The additional minimum lease payments over the eight-year term total $1.3 million.

(2)  This table does not include the noncancelable operating lease we entered into in April 2019 for our second retail store in New York City. The minimum lease payments for the initial lease term through January 31, 2020 total $0.6 million.

(3)  This table does not include the noncancelable operating lease we entered into in May 2019 for a luxury consignment office in Los Angeles. The minimum lease payments for the initial lease term through July 31, 2027 total $10.6 million.

(4)  In January 2018, we entered into an agreement with the University of Arizona Foundation to endow a gemology degree program in the Department of Geosciences. We committed to endow a total of $2.0 million, of which $1.5 million remained to be funded as of December 31, 2018.

*Term Loans*

We are party to a loan and security agreement that includes a term loan facility, which consists of a $7.5 million term loan with a maturity date of January 1, 2020 and a $7.5 million term loan maturing at January 31, 2021 (together the "Term Loans").

The Term Loans bear interest on the outstanding daily balance thereof at a variable annual rate equal to 0.35% above the prime rate then in effect. As of December 31, 2018 and March 31, 2019, we had $9.2 million and $8.0 million, respectively, outstanding under the Term Loans, and the associated interest rate on our debt was 5.85%. The Term Loans are secured by liens on substantially all of our present and future assets.

The Term Loans include affirmative, negative and financial covenants that restrict our ability to, among other things, incur additional indebtedness, make investments, sell or otherwise dispose of assets, pay dividends or repurchase stock. As of December 31, 2018 and March 31, 2019, we were in compliance with all debt covenants.

**Off-Balance Sheet Arrangements**

We did not have during the periods presented, and we do not currently have, any off-balance sheet financing arrangements or any relationships with unconsolidated entities or financial partnerships, including entities sometimes referred to as structured finance or special purpose entities, that were established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes.

**Critical Accounting Policies and Estimates**

Our management's discussion and analysis of our financial condition and results of operations is based on our financial statements, which have been prepared in accordance with United States generally accepted accounting principles. The preparation of these financial statements requires our management to make judgments and estimates that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and

69

**Table of Contents**

liabilities at the date of the financial statements, as well as the reported revenue generated, and expenses incurred during the reporting periods. Our estimates are based on our historical experience and on various other factors that we believe are reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these judgments and estimates under different assumptions or conditions and any such differences may be material. We believe that the accounting policies discussed below are critical to understanding our historical and future performance, as these policies relate to the more significant areas involving management's judgments and estimates.

### *Revenue Recognition*

*Consignment and Service Revenue*

We generate the majority of our revenue from consignment services for the sale of pre-owned luxury goods on behalf of consignors through our online consignment marketplace. For consignment sales, we retain a portion of the proceeds received, which we refer to as our take rate, and remit the balance to the consignors. We recognize consignment revenue upon purchase of the goods by the buyer based on our take rate, net of allowances for product returns and order cancellations and certain incentives.

We also generate revenue from shipping fees to buyers, and occasionally consignors, and have elected to treat shipping and handling activities performed after control transfers to the buyer as fulfillment activities. Accordingly, we recognized shipping fees as revenue upon purchase of the goods by the buyer. We also generate service revenue from our *First Look* subscription program, through which buyers pay a monthly fee for early access to our listings. Subscription fees are recognized on a monthly basis.

Certain transactions provide consignors with a material right resulting from the tiered consignor commission plan. Under this plan, the amount an individual consignor receives for future sales of consigned goods may be dependent on previous consignment sales for that consignor. Accordingly, in certain consignment transactions, a small portion of our consignment service revenue is allocated to such material right using the portfolio method, as applicable. Such deferred revenue is recorded as deferred revenue and recognized based on the pattern of exercise.

We recognize a returns reserve in the period that the related revenue is recorded based on historical experience. Historically, our estimate for returns has not varied materially from our actual returns. In the future, if we conclude that an adjustment is required due to material changes in returns activity, the returns reserve will be adjusted accordingly.

*Direct Revenue*

We also generate revenue from the sales of company-owned inventory. We recognize direct revenue upon purchase of the goods through our online marketplace, based on the gross purchase price net of allowances for product returns and order cancellations and certain incentives.

### *Stock-based Compensation*

We estimate the fair value of stock options granted to employees, non-employees and directors using the Black-Scholes option-pricing model. The fair value of stock options that is expected to vest is recognized as compensation expense on a straight-line basis over the requisite service period.

The Black-Scholes model considers several variables and assumptions in estimating the fair value of stock-based awards. These variables include per share fair value of the underlying common stock, exercise price, expected term, risk-free interest rate, expected annual dividend yield and expected stock price volatility over the

**Table of Contents**

expected term. For all stock options granted to date, we calculated the expected term using the simplified method for "plain vanilla" stock option awards. We determine volatility using the historical volatility of the stock price of similar publicly traded peer companies. The risk-free interest rate is based on the yield available on U.S. Treasury zero-coupon issues similar in duration to the expected term of the equity-settled award.

The fair value of the shares of common stock underlying the stock options has historically been determined by our board of directors, with assistance by management and using contemporaneous third-party valuations, as there was no public market for the common stock. The fair value of our common stock is determined by considering a number of objective and subjective factors, including: the valuation of comparable companies, sales of preferred stock to unrelated third parties, secondary sale transactions, our operating and financial performance, the lack of liquidity of common stock and general and industry specific economic outlook, amongst other factors. Following the closing of our initial public offering, the fair value per share of our common stock for purposes of determining stock-based compensation will be the closing price of our common stock as reported on the applicable grant date.

**Qualitative and Quantitative Disclosures about Market Risk**

We are exposed to market risks in the ordinary course of our business, including fluctuations in interest rates. Such fluctuations to date have not been significant.

As of March 31, 2019, we had unrestricted cash, cash equivalents and short-term investments of approximately $103.0 million, which carry a degree of interest rate risk. A hypothetical 10% change in interest rates would not have a material impact on our financial condition or results of operations due to the short-term nature of our investment portfolio.

We do not believe that inflation has had a material effect on our business, results of operations or financial condition. Nonetheless, if our costs were to become subject to significant inflationary pressures, we may not be able to fully offset such higher costs. Our inability or failure to do so could harm our business, results of operations or financial condition.

**Recent Accounting Pronouncements**

In February 2016, the FASB issued ASU No. 2016-02, Leases (Topic 842), or ASU 2016-02, which is aimed at making leasing activities more transparent and comparable and requires substantially all leases to be recognized by lessees on their balance sheet as a right-of-use asset and corresponding lease liability, including leases currently accounted for as operating leases. The new standard is effective for non-public entities in fiscal years beginning after December 15, 2019. We are currently evaluating the impact that this standard will have on our financial statements but we expect that it will result in a significant increase in our long-term assets and liabilities.

For more information on recently issued accounting pronouncements, see Note 2 to our financial statements "Significant Accounting Policies."

**JOBS Act Accounting Election**

We are an "emerging growth company," as defined in the JOBS Act. Under the JOBS Act, emerging growth companies can delay adopting new or revised accounting standards issued subsequent to the enactment of the JOBS Act until such time as those standards apply to private companies. We have elected to use this extended transition period to enable us to comply with new or revised accounting standards that have different effective dates for public and private companies until the earlier of the date we (1) are no longer an emerging growth company or (2) affirmatively and irrevocably opt out of the extended transition period provided in the JOBS Act. As a result, our financial statements may not be comparable to companies that comply with new or revised accounting pronouncements as of public company effective dates.

71

**Table of Contents**

The Future of Luxury is Circular

To Our Current and Future Shareholders,

Welcome to The RealReal!

The RealReal represents my proudest achievement. This is in large part due to the unwavering trust of our consignors and buyers who enthusiastically engage with The RealReal every day. Through the dedication of our 1,700+ employees, and the commitment of our investors, we've developed a unique business model and reinvented resale for the luxury-focused, value conscious and sustainably-minded customer.

My years of leading companies seeking to transport old business models into the digital age informed the key tenets and values that drive The RealReal today. We are addressing an enormous market with a disruptive business model that relies on deep data insights and rigorous analysis to drive consignor and buyer engagement. As a result, we are constantly optimizing our business to build the foundation for long-term sustainable growth and profitability.

When I conceived of The RealReal, I was mindful of the competitive dynamics online. I created a map of the strengths of leading online companies and was looking for a market opportunity that would require a unique set of operational competencies to "unlock" its online potential. Then I had my "aha!" moment. I was shopping with a friend at an upscale boutique that carried full-priced designer shoes, jewelry and clothing in the front of the store, and offered beautifully merchandised designer goods on consignment in the back of the store. Much to my surprise, my friend bought the luxury consignment items— something I had never seen her do before. When asked about her purchase decision, she explained that she trusted the shop owner who curated the goods meticulously. She loved that she was finding great value on luxury products from designers she loved like Chanel, Louis Vuitton and Gucci. She said she would not shop for pre-owned luxury goods at traditional consignment stores or online as she did not trust that they were real. Further, she had never consigned and felt it required too much work. This is when I realized that there was a unique opportunity to bring luxury consignment online.

My research confirmed the immensity of the primary luxury market. That market was expected to reach global annual sales of nearly $300 billion in 2018 with the United States accounting for less than a third of that total. Even more staggering was the cumulative value of under-utilized luxury items in good condition accumulating in people's homes. I set out to create a business by injecting trust and service into the equation for consignors and buyers and leveraging data and technology to transform the luxury resale market. We opened the virtual doors of The RealReal on June 23, 2011, as the first marketplace solely offering authenticated luxury goods for buyers and full-service consultation and pick-up for consignors. The enthusiastic reception we received from both consignors and buyers quickly made it clear to me that we had a massive worldwide opportunity with significant competitive advantages.

In the intervening years, the five basic pillars upon which we have built our business are set forth below:

1. **Service.** We infuse the consignment process with exceptional service, ease of use, pricing transparency and regular payments that keep consignors returning to us consistently.

2. **Trust.** The trust engendered by our investment in authentication is the force that attracts buyers and keeps them coming back.

3. **Data.** Unique data insights combined with artificial intelligence and our expert analysts' judgment results in price optimization, increased sales velocity and business model efficiencies.

4. **Technology.** Proprietary technology developed over eight years to manage the complexity of operating a marketplace with up to 14,000 single-SKU items per day and 1.6 million transactions in 2018 is an important part of our competitive strength.

72

**Table of Contents**

5.  **Sustainability.** Our buyers and consignors are motivated by the awareness that recirculating luxury products (and recouping some of their original investment) is not just good for them personally but good for the planet.

The fifth pillar has become very important in the last few years. What I didn't appreciate in 2010, but am fully aware of now, is the importance of recirculating luxury goods for sustainability. Since The RealReal's inception, the fast fashion market has exploded making fashion disposable and is a key contributor to the estimated dump-truck-per-second of apparel added to landfills according to a report by the Ellen MacArthur Foundation. Increasingly, The RealReal's buyers and consignors are aware of the negative environmental and societal impact of the new fashion industry. They are embracing resale as a way to buy sustainably and many have replaced their fast fashion purchases with The RealReal purchases.

As the oldest child of commercial artists and entrepreneurs, I learned early on that creativity and passion are the best motivators. You must love what you do, and I hope you will understand and appreciate how passionate my team and I are about our company's mission. We are well on our way to making The RealReal a global company. We are building a brand that is emotionally engaged with its customers and stands proudly next to the venerable auction houses. We are a rapidly growing and increasingly trustworthy marketplace for pre-owned luxury goods. We aim to become an iconic indispensable partner for the brands who create them.

Going public now paves the way for our next leg of growth. Our initial public offering will provide access to capital, elevate The RealReal brand to drive further business to our marketplace and demand continued discipline from our management team to execute optimally.

As stockholders, you deserve the same from us that our consignors and buyers demand: trust and transparency. We will rely on long-term thinking to inspire our strategy and execution. We will continue to use data to drive our decisions, technology to make the company more efficient, and excellent service to delight our consignors and buyers. We will continue to take risks, experiment, iterate and reduce friction for our customers. Like the luxury brands we respect and honor, over time we hope to become a truly global organization. Our team thinks big.

I look forward to working with you, our employees and our consignors and buyers in the creation of an enduring brand of which we can all be proud.

Keep it The RealReal!


Julie Wainwright
Chief Executive Officer

73

**Table of Contents**



Table of Contents



Member Testimonials

"Knowing that everything you find on The RealReal is authentic makes you even more confident in what you're wearing...it's like the true life cycle of fashion on The RealReal. I love it."

Marnie L.,
Westport, CT

Table of Contents



**Table of Contents**



Member Testimonials

"So pretty much every month I get a commission check in the mail from The RealReal. It is absolutely found money. I'm like, 'Cha-ching. This is amazing.'"

Laura W.,
Los Angeles, CA

Table of Contents

Partner Testimonial

# "It's the biggest compliment for your product to have an afterlife —to me, that's luxury."

Stella McCartney,
*Vogue*, February 2019

Table of Contents

**Table of Contents**

**BUSINESS**

**Our Mission**

Our mission is to empower consignors and buyers to extend the lifecycle of luxury goods in a way that honors luxury brands.

**Overview**

The RealReal is the world's largest online marketplace for authenticated, consigned luxury goods. We are revolutionizing luxury resale by providing an end-to-end service that unlocks supply from consignors and creates a trusted, curated online marketplace for buyers globally. Over the past eight years, we have cultivated a loyal and engaged consignor and buyer base through continuous investment in our technology platform, logistics infrastructure and people. We aggregate and curate unique, pre-owned luxury supply that is exclusive to The RealReal across multiple categories, including women's, men's, kids', jewelry and watches, and home and art. We have built a vibrant online marketplace that we believe expands the overall luxury market, promotes the recirculation of luxury goods and contributes to a more sustainable world.

We participate in the large and growing personal luxury goods market, which was estimated to reach $294 billion in 2018, and is expected to grow to between $362 and $412 billion in 2025, according to Bain. Luxury goods retain value over time as a result of their enduring desirability and durability, making them particularly well-suited for resale. The total addressable market of luxury producers in U.S. homes potentially available for resale including men's and women's apparel, handbags, shoes, watches, jewelry, high-end furniture and art valued below $250,000 is approximately $198 billion, according to Frost & Sullivan. We are well positioned to benefit from several favorable industry and consumer trends, including the accelerating shift of luxury to digital channels, the increasing acceptance of resale, a rising value consciousness and a desire to embrace sustainability.

The existing luxury resale market is outdated, fragmented, difficult to access and laden with counterfeit goods. Primarily due to these challenges, a vast quantity of consignable luxury goods languishes in homes, and buyers can be hesitant to purchase pre-owned luxury goods. We are transforming the luxury resale experience by addressing these challenges.

- *We provide a seamless consignment experience enabled by our proprietary technology platform and data*. We leverage our proprietary technology and data analytics to provide world-class service, making consignment easy, convenient, reliable and fast. As a result, we unlock luxury supply from first-time consignors, convert consignors who typically consign at local brick-and-mortar shops to our online marketplace, and drive high repeat consignment rates. We leverage data from millions of previous transactions and current market data to optimize pricing and sales velocity for our consignors. Through March 31, 2019, we have cumulatively paid $987.7 million in commissions to our consignors.

- *We offer buyers a vast, yet curated supply of pre-owned luxury goods and instill trust in the buying process*. In 2018, we added approximately 2.6 million new items to our online marketplace. Our highly trained experts build trust in our buyer base by thoroughly inspecting the quality and condition of, and authenticating every item we receive. This trust drives repeat purchases from our buyer base and instills confidence in first-time buyers to purchase pre-owned luxury goods.

A strong network effect drives the growth of our online marketplace. As we bring more consignors onto our platform, we unlock more high-quality, luxury supply, which increases our merchandise assortment and attracts more buyers. This, in turn, increases sales velocity and commissions for our consignors. In addition, a meaningful share of our consignors become buyers and vice versa, which creates a differentiated flywheel that enhances the network effect of our online marketplace.

82

Table of Contents

Our technology, data analytics and unique service model provide us with a number of sustainable competitive advantages:

- **Technology**. We have built a proprietary technology platform that powers our complex single-SKU inventory model and merchandising operations, which include authenticating, copywriting, pricing and photographing up to 14,000 unique items a day in 2018. By leveraging our technology platform, automation and machine learning, we are able to drive operational efficiencies at scale.

- **Data analytics**. Our powerful data analytics capabilities enable us to improve both the consignor and buyer experiences across all channels. We had approximately 400 million item views in 2018 and made approximately 9.4 million item sales since inception through March 31, 2019, providing us with rich product and customer data. We leverage this data to optimize merchandising, pricing and sales velocity. In 2017 and 2018, approximately 60% and 80% of the products on our online marketplace sold within 30 days and 90 days, respectively. In 2017 and 2018, our online marketplace sell-through ratios were 93% and 96% respectively.

- **Service model**. Our large sales and service organization serves most major metropolitan markets in the United States and is responsible for obtaining exclusive supply for our online marketplace. Our sales professionals generate a robust pipeline of new consignors and build lasting relationships which cannot be easily replicated. They consult on the consignment process and leverage data to advise consignors on pricing, expected selling time and market trends. This results in a consistent supply of desirable, high-quality pre-owned luxury goods.

We generate revenue from orders processed through our website, mobile app and three retail stores located in New York and Los Angeles. Our revenue is primarily based on our take rates from these transactions. Our growth and success are evidenced by our operating and financial results in 2018:

- We processed 1.6 million orders, up 42% over 2017.

- Our average order value was $446, up 2% over 2017.

- Our GMV was $710.8 million, up 44% over 2017.

- Our total revenue was $207.4 million, up 55% over 2017.

- Our gross profit was $136.9 million, up 56% over 2017.

**The Luxury Industry**

We participate in the large and growing luxury market. The global market for personal luxury goods was expected to reach $294 billion in 2018, growing at a 6% compounding constant currency annual growth rate since 1996, according to Bain. Categories such as fine art and home goods further increase the size of this market. Specific market forces and consumer trends that are transforming the future of the global luxury market include the following:

- **Luxury retail is rapidly shifting online**. According to Bain, the online share of the global personal luxury goods market in 2018 was approximately 10% up from approximately 2% in 2008, and Bain estimates that online penetration will reach 25% by 2025 as new technologies continue to enhance the digital shopping experience.

- **Younger generations are driving growth**. Millennials accounted for more than 25% of the U.S. population in 2015, according to the U.S. Census Bureau. Millennials made up the largest percentage of the U.S. workforce in 2017, according to the Pew Research Center. According to Bain, Millennials and Generation Z were expected to account for approximately 33% of the luxury market in 2018 and Millennials were expected to drive virtually 100% of market growth in 2018 as their purchasing power increases. Millennials and Generation Z are expected to collectively account for 55% of the luxury market in 2025, and drive 130% of market growth from 2018 to 2025. According to Frost & Sullivan, U.S.

83

Table of Contents

consumers aged 18 to 34 on average spend approximately 37% more annually on new luxury items than U.S. consumers aged 35 and over.

- *Luxury is resilient to economic cycles*. The luxury market demonstrated stable average annual growth of 6% compounding constant currency annual growth rate since 1996, according to Bain, with the only meaningful decline observed during the global financial crisis from 2008 to 2009. During this period, the personal luxury goods market declined approximately 8%, but it quickly recovered and increased 14% from 2009 to 2010, according to Bain.

## Consumer Trends in Our Favor

We believe the following consumer trends provide strong tailwinds for our business:

- *Increasing acceptance of resale*. Consumers are demonstrating an increasing acceptance of purchasing pre-owned goods. 44% of international fashion executives and experts expect resale ownership models to be more relevant in 2019, according to McKinsey.

- *Rising value consciousness*. The resale market expands access to and availability of luxury goods by offering high-quality items at more attainable price points. Resale serves as a gateway to luxury brands for aspirational consumers, particularly Millennials and Generation Z. Even affluent consumers are searching for value as prices for new luxury goods continue to increase, according to McKinsey.

- *Desire for newness, uniqueness and individuality*. Luxury consumption has become a means for self-expression as Generation Z consumers desire unique products as a way to express their individuality and make a personal statement, according to Bain.

- *Focus on sustainability*. Nine in ten Generation Z consumers believe companies have a responsibility to address environmental and social issues, according to Cone Communications. Based on our survey data, 56% of our overall consignor base and 64% of our Millennial consignor base cite environmental impact or extending the lifecycle of luxury items as key motivators for consigning with us.

## Our Market Opportunity

Consumers globally purchase hundreds of billions of dollars of personal luxury goods every year. These goods accumulate in homes over time and create a meaningful market opportunity for us. We commissioned Frost & Sullivan, a third party research company, to assess the value of luxury products potentially available for resale in U.S. consumers' homes. Frost & Sullivan performed an analysis by U.S. demographic on consumer spending on luxury products and estimated the total addressable market of luxury products in U.S. homes potentially available for resale including men's and women's apparel, handbags, shoes, watches, jewelry, high end furniture and art valued below $250,000 at approximately $198 billion.

In addition, the number of garments purchased annually by the average consumer increased by 60% between 2000 and 2014, according to McKinsey. However, we believe that only a small portion of the clothes in an average person's closet are worn on a regular basis. We unlock and recirculate underutilized personal luxury goods to address demand from millions of buyers globally through our trusted online marketplace.

## Challenges with Existing Luxury Resale Models

Existing luxury resale models have failed to unlock the abundance of pre-owned luxury supply due to inherent challenges, which include the following:

- *Friction for consignors*. Existing luxury resale models often require consignors to spend a significant amount of time and energy dropping off items at physical locations, such as consignment stores or pawn shops, or self-listing on peer-to-peer platforms. Consignment stores and pawn shops typically offer inferior economics and experiences to consignors, fail to achieve optimal pricing and sales velocity, pay

84

Table of Contents

commissions slowly and are sometimes disreputable. Peer-to-peer platforms require sellers to do a significant amount of work, including photography, copywriting, pricing, fulfillment and customer service.

- **Lack of trust for buyers**. Due to the pervasiveness of counterfeit luxury goods and inconsistent authentication standards, buyers can be hesitant to purchase pre-owned luxury goods. The global trade in counterfeit goods in 2016 was over $509 billion, according to the Organisation for Economic Co-operation and Development. Peer-to-peer marketplaces and consignment stores do not authenticate effectively as they do not take physical possession of the item, have inconsistent authentication standards or do not employ expert authenticators. Furthermore, the quality of photos and accuracy of descriptions vary widely and are often misleading. There is a lack of transparency as buyers are not able to easily obtain information such as fair market value or verify authenticity.

- **Fragmented supply**. Luxury supply that is available for resale is largely distributed across thousands of brick-and-mortar stores. There are over 25,000 resale shops in the United States, according to the Association of Resale Professionals. These stores typically only serve local markets, have limited hours of operation, feature a narrow product selection and only offer exposure to a local buyer base. As a result, consignors often experience slow monetization times at suboptimal prices.

## Our Solution

We are delivering the future of luxury resale. Over the past eight years, we developed innovative service and technology solutions to address the specific challenges inherent in existing luxury resale models.

### Unique Service Model to Unlock Pre-Owned Luxury Supply

By making consignment easy, convenient, reliable and fast, we are able to unlock a vast quantity of desirable, high-quality, pre-owned luxury goods. Our sales professionals remove friction from the consignment process and build lasting relationships with our consignors. In 2018, approximately 80% of our GMV came from repeat consignors. Our unique service model incentivizes consumers to consign by making the process easy.

- *We deliver an end-to-end service experience.* We provide multiple points of access for our consignors. Across most major U.S. metropolitan areas, we offer White Glove in-home consultation and pickup or drop off at one of our eleven LCOs, three of which are located in our retail stores. We also offer complimentary shipping directly to our merchandising and fulfillment facilities. In addition, we provide complimentary consultations and valuations.

- *We do the work on behalf of consignors.* Once consigned items reach one of our four merchandising and fulfillment facilities, we authenticate, write the associated copy, photograph, price, sell and handle all fulfillment and returns logistics, making the process seamless for the consignor.

- *We generate high commissions for consignors.* Our scale and global reach combined with our technology-driven online marketplace and proprietary data enable consignors to realize optimal value for their pre-owned luxury goods. We leverage data from millions of previous transactions and current market data to optimize pricing for our consignors. Our consignors earn up to 85% in commissions and achieved an average commission rate of approximately 65% in 2018.

- *We drive rapid monetization.* Our online marketplace efficiently matches supply with demand resulting in exceptional sales velocity. In 2017 and 2018, approximately 60% and 80% of the products on our online marketplace sold within 30 days and 90 days, respectively, fueled by our data-driven merchandising, pricing and marketing strategies. In 2017 and 2018, our markeplace sell-through ratio was 93% and 96%, respectively.

### Exclusive, Authenticated Pre-Owned Luxury Supply Drives Demand

We make it easy for buyers to shop our vast, yet curated selection of authenticated, pre-owned luxury goods. In 2018, we had approximately 416,000 active buyers in approximately 60 countries and greater than 80% of our

85

**Table of Contents**

GMV came from repeat buyers. As we continue to unlock exclusive luxury supply, we expect to attract new buyers and drive repeat purchases from our existing buyers.

- *We offer a seamless buying experience*. Buyers access our omni-channel online marketplace through our website, mobile app and retail stores, enabling them to purchase anytime, anywhere. In 2018, 57%, 39% and 4% of our total GMV was purchased using mobile devices, on our website and in our retail stores, respectively. Our platform is easy to navigate and provides buyers the ability to customize their own personalized product feeds and curate highly coveted items into their *Obsessions* page where they can view all of their favorite items together.

- *We build trust by expertly authenticating every item*. We employ more than 100 gemologists, horologists, brand experts and art curators. Our authenticators are highly trained, experienced experts in their respective fields. Each item we receive is put through a rigorous, multi-point authentication process before it is curated onto our online marketplace. As a result, we believe we have become the most trusted online marketplace for pre-owned luxury goods.

- *We provide access to unique, highly coveted and exclusive products*. We provide buyers with access to a vast, yet curated selection of unique, authenticated, pre-owned luxury goods. In 2018, we sold goods bearing the brand of over 7,000 luxury and premium designers, including highly coveted items such as rare watches and handbags. Buyers come back to our online marketplace time and again to experience the "thrill of the hunt" and ensure that they do not miss out on their *Obsessions*.

### *Proprietary Technology Platform to Manage Complex Single-SKU Logistics*

Technology powers all aspects of our business, including our complex, single-SKU inventory management system. Our supply comes from thousands of individual consignors across the United States. Each item we sell is a truly unique single-SKU and is exclusively available on our online marketplace. We have processed up to 14,000 single-SKUs a day in 2018. Given the complexity of our inventory model, we developed and continuously innovate specialized, proprietary applications to optimize inbound processes, such as authentication, copywriting, photography and photo-editing. We increasingly use our technology platform to automate pricing for goods sold through our online marketplace.

We developed *RealReal 360*, an innovative commerce solution, to provide a single, real-time view of buyers, consignors and all luxury goods available on our online marketplace across digital and physical channels. This allows us to optimize our product availability as each unique item on our online marketplace has multiple demand points. Further, our store experts have access to a complete buyer history, which enables them to provide a truly personalized experience.

### *Proprietary Data Asset and Powerful Algorithms*

Our online marketplace generates and aggregates hundreds of millions of unique data points, including data from approximately 400 million item views in 2018 and approximately 9.4 million item sales since inception. Each consigned item also has up to 50 unique attributes including designer, style, color and condition. Informed by this data, we develop proprietary algorithms and business processes to optimize our operations, including supply sourcing, merchandising, authentication, pricing and marketing.

### *Focus on Luxury to Expand the Market and Create a More Sustainable World*

Luxury goods retain value over time as a result of their enduring desirability and durability, making them particularly well-suited for resale. We offer important benefits to both the new and resale luxury markets, including the following:

- *We provide a gateway to luxury brands*. We believe we are expanding the overall market for both new and pre-owned luxury goods as the ability to experience and engage with luxury brands through our

86

Table of Contents

online marketplace results in an earlier appreciation for high-quality, well-crafted items and inspires consumers to purchase new luxury items. While we presently have no contractual or other affiliations with luxury brands other than our partnership with Stella McCartney, we believe our online marketplace cultivates customer relationships for luxury brands.

• *We promote sustainability and a circular economy*. We are committed to extending the lifecycle of luxury goods by promoting their recirculation, rather than creating waste. This is an increasingly important consideration given that every second, the equivalent of one garbage truck of textiles is either landfilled or burned, according to the Ellen MacArthur Foundation. Our survey data indicates that approximately 32% of buyers shop The RealReal as a replacement for fast fashion. By creating a circular economy and reshaping consumer purchasing behavior, we contribute to a more sustainable world.

**Our Competitive Strengths**

*Scale and Powerful Network Effects*

We are the largest online marketplace for authenticated, consigned luxury goods. We expect to maintain our leadership position by increasing our scale, thereby amplifying the network effects between consignors and buyers. In addition, as buyers become consignors and vice versa, we create a unique flywheel that further accelerates our momentum. Through March 31, 2019, 53% of our consignors are buyers and 13% of our buyers are consignors.



*Trust*

Trust is the cornerstone of our online marketplace. Consignors trust that we will treat their items with the utmost care and quickly sell them at the optimal price. Buyers trust us because we have a rigorous authentication process. We believe the trust and personal relationships that we have built with both consignors and buyers over the past eight years cannot be easily replicated.

87

**Table of Contents**

*End-to-end Service*

We make consignment easy, convenient, reliable and fast by offering an end-to-end service that drives existing consignors to consign more frequently and attracts new consignors to our online marketplace. We provide world-class customer service to drive repeat purchases from our existing buyers and attract new buyers.

*Efficient, Technology-enabled Operations at Scale*

Over the past eight years, we have invested significant resources to optimize our logistics, processes and purpose-built, proprietary technology platform, which enables us to efficiently manage the unique complexities of our operational model at scale. In addition, with a real-time, single view of our consignors and buyers and the products on our online marketplace, we are able to provide a superior, personalized service for our consignors and buyers.

*Data-driven Insights*

Our proprietary data and algorithms provide us with operational insights that continuously enhance our consignor and buyer experiences. Through these insights, we are able to identify market trends early and incentivize our sales professionals to obtain on-trend, highly coveted merchandise. For consignors, we provide optimal pricing and sales velocity, resulting in higher commissions. For buyers, we source and curate the most desirable products and offer constant newness, which results in high engagement, demand and conversion.

*Innovative, Founder-led Management Team*

We are led by our CEO, Julie Wainwright, who founded The RealReal with a vision to transform the luxury resale experience. In addition, our management team is comprised of senior executives who have significant experience in the ecommerce, retail and technology industries, with an average experience of 21 years. We have built a culture of innovation and entrepreneurship where inspired people thrive. Our employees think creatively, act collaboratively and use technology and data to solve problems.

**Growth Strategies**

Key components of our growth strategy include:

*Attract New Consignors and Buyers*

We believe there is a significant opportunity to expand our customer base, and we will continue to invest in acquiring consignors and buyers efficiently. We believe we are significantly underpenetrated in the U.S. market given that our consignors and buyers span broad income and age ranges and geographies. There were 58 million U.S. households with annual incomes of more than $50,000 in 2017, according to the U.S. Census Bureau. As of December 31, 2018, our active buyers represented less than 1% of these households, leaving significant opportunity for us to grow. Through our targeted, data-driven marketing efforts we generate meaningful returns on our consignor and buyer acquisition investments. In addition, we intend to expand our White Glove service to new markets to attract more consignors and unlock more pre-owned luxury supply, thereby attracting more buyers.

*Increase the Lifetime Value of Consignors and Buyers*

We intend to increase the lifetime value of our consignors and buyers by driving repeat consignment and purchase frequency. For consignors, we cultivate lasting relationships through our sales professionals to encourage more frequent consignment. For buyers, we drive repeat purchases by enhancing our product selection, providing luxury service and leveraging our data insights to increase personalization and conversion.

88

Table of Contents

We also increase lifetime value by encouraging consignment and purchases across multiple categories. In addition, converting consignors into buyers and vice versa accelerates the powerful flywheel that drives our online marketplace and leads to greater value per customer.

### Amplify The RealReal Brand

With aided brand awareness among consumers of luxury and premium goods at only 21% in 2018, we have a significant opportunity to increase the visibility of our brand. We will continue to invest in brand marketing campaigns and deepen our connection with our consignors and buyers. We also rely on word of mouth to amplify brand awareness and thus continue to focus on customer satisfaction. We achieved a buyer NPS of 74 as of February 2019, indicating that buyers view their experiences positively and would recommend to others.

### Increase Penetration in Existing Categories

Our women's category accounted for approximately 67% of our GMV in 2018. We intend to deepen our penetration in other high-value categories such as men's, jewelry and watches, and home and art. We strive to enhance our product offering in these categories by leveraging our existing relationships with consignors to unlock supply across multiple categories. For buyers, we facilitate discovery and purchase outside of our core women's category by curating dynamic multi-category feeds on our website and mobile app daily.

### Continuing to Invest in Innovation and Infrastructure

We will continue to invest in technology, data analytics and infrastructure to drive innovation. This includes continuing to optimize our merchandising operations and automation capabilities with respect to pricing, authentication, photo-editing and copywriting. To enhance the experience for our consignors and buyers and drive frequent engagement with our online marketplace, we will continue to refine our approach to data analytics. We also plan to continue investing in our merchandising and fulfillment facilities and logistics infrastructure to optimize single-SKU processing.

### Strategically Expanding Offline

We believe the future of luxury resale will be defined by an increasingly frictionless, personalized, omni-channel discovery and purchasing experience. We currently operate three retail stores and eleven LCOs, three of which are located in our retail stores. We believe there is opportunity to expand to additional markets where we can unlock high-quality, pre-owned luxury supply, build our brand and drive incremental GMV. We continuously evaluate the performance of our retail stores by tracking their impact on consignor and buyer acquisition cost, brand awareness, consignor and buyer repeat purchase behavior, incremental supply sourced and GMV. Given the favorable performance of our retail stores to date, we intend to expand our footprint in the future.

### Growing International Presence

As we continue to build our brand and scale our platform in the United States, we believe international demand for our online marketplace will also continue to increase. In 2018, international sales contributed only approximately 4% to our GMV. The international luxury market accounts for nearly 78% of the total global luxury market according to Bain. We may elect to invest in international operations and marketing. In addition, we may also selectively pursue targeted acquisitions to enter new geographies.

### How Our Business Works

We operate the largest online marketplace for authenticated, consigned luxury goods. We authenticate every item we sell and deliver on our standard of world-class service by leveraging our technology platform and data

89

**Table of Contents**

analytics capabilities to source supply, merchandise and fulfill orders. We have developed and refined our capabilities and processes to efficiently manage the unique operational aspects of our business, especially our single-SKU inventory model.

### Sourcing Supply from Our Consignors

Our unique service model unlocks a significant amount of exclusive pre-owned luxury supply from consignors' homes because we make the process easy. In the second half of 2018, approximately 40% of our consignors were new to consigning because they were unaware of consignment as a way to efficiently monetize existing goods in their homes or they did not want the hassle of traditional brick-and-mortar consignment models or online-only peer-to-peer marketplaces. Our personalized level of support removes friction from the consignment process, making it easy, convenient, reliable and fast.

Our team of sales professionals ensures that we deliver a consistent flow of high-quality, pre-owned luxury supply. We keep a dynamic directory of thousands of luxury and premium contemporary designers that we use as a guideline for curating products that our buyers want. We drive the majority of our GMV through our White Glove channel which provides the highest level of service to consignors. Consignors who use our White Glove channel are highly valuable as they typically consign higher value items and do so more frequently.

Consignors can access our online marketplace through a variety of channels:

- *White Glove.* Consignors who have a greater number of items from designers in our directory or higher value items are eligible for our complimentary White Glove service in most major metropolitan areas across the United States. We provide this service in the following manner:

  - *In-home.* Consignors make an appointment with one of our luxury managers and receive a complimentary consultation in their home. Our luxury managers advise on the process, as well as provide price estimates, expected selling time and trend advice. They also arrange for the consigned items to be securely transported to one of our merchandising and fulfillment facilities. Our home and art curators are also available for complimentary, in-home or virtual consultations.

  - *Luxury consignment offices.* We operate eleven LCOs in the following key luxury gateway cities: New York, Los Angeles, San Francisco, Dallas, Miami, Chicago and Washington D.C. Our gemologists, horologists, brand experts and art curators offer complimentary valuations on luxury items in a no-pressure environment. Consignors can schedule an in-person appointment with one of our experts and learn how much their luxury items are worth, ask questions and, if they choose, easily consign on the spot. We offer consignors a valuation document to keep for their records.

  - *In-store.* We operate three retail stores, two in New York and one in Los Angeles, where consignors can meet with experts in person to learn more about the consignment process, receive a complimentary consultation or valuation or drop off items.

90

**Table of Contents**

- *Free direct shipping.* Consignors with fewer items from designers in our directory or those who live in areas where White Glove service is not yet available can ship their items to us for free. We provide virtual consultations over the phone or through video conferencing. We send a free shipping label and, upon request, a consignment kit. For fine art pieces, consignors can send us photographs and information. Our art curators will research the piece, provide an estimated price and arrange for pickup by a reputable art shipper so the item can be authenticated and inspected at one of our four facilities.



91

Table of Contents

Our consignors have access to My Sales, a dynamic, real-time dashboard that enables them to track the status of their items. We also provide frequent communication with our consignors at each step of the process and keep them engaged with interesting facts, such as which consigned items were most obsessed over or sold most quickly.

**My Sales**



Substantially all of our supply comes from individual consignors. As of December 31, 2018, approximately 80% of our consignors were female, approximately 81% had a household income above $50,000 and approximately 46% were under 45 years old. We selectively engage with business sellers in certain categories.

As of March 31, 2019, our sales team consisted of 379 employees.

*Data-driven Merchandising*

Our merchandising process starts before we take possession of consigned items. Our merchandising team works closely with our sales professionals to drive favorable unit economics by optimizing the mix of designers, categories, price points and units. Our data analytics capabilities enable us to forecast potential opportunities in supply and proactively incentivize our sales professionals to obtain coveted, on-trend items. Additionally, historical transaction data informs us of items that we should not accept due to a low probability of sale. Throughout the process, our consignors are educated on which designers, styles and colors retain value over time, which influences their purchasing behavior when buying new or pre-owned luxury goods in the future.

92

**Table of Contents**

Once we receive consigned items, our merchandising team leverages our technology platform and data analytics capabilities for a first point of authentication and to efficiently write copy, photograph and price the items before they are curated onto our online marketplace.

**Inbound Merchandising Operations**



- *Authentication*. We authenticate every item we sell to continue building trust in our online marketplace. We employ over 100 highly trained gemologists, horologists, brand experts and art curators who collectively inspect thousands of items each day. All items pass through a rigorous multi-point, brand-specific authentication process before they are accepted for consignment. This process includes inspecting the item for attributes such as appropriate brand markings, date codes, serial tags and hologram stickers. Our gemologists and horologists authenticate and inspect our fine jewelry and watches, and each piece comes with an authentication certificate. In addition, our team of fine art curators and specialists research and validate art pieces for authenticity. We have a zero-tolerance policy when it comes to counterfeit goods. Items that are deemed to be counterfeit are confiscated. We are working with the University of Arizona to develop proprietary technology to inspect gemstones faster and more accurately, without unmounting the stone.

- *Photography and copywriting*. Because we take possession of each item, we are able to accurately and consistently describe the item and its condition, as opposed to online-only peer-to-peer resale models. Our items are professionally photographed and presented in a visually appealing manner to encourage engagement and conversion.

- *Pricing*. Leveraging our database of approximately 9.4 million historical item sales and current market data, we price items to optimize value and sales velocity. We use proprietary algorithms to optimize pricing based on factors such as designer, category, age, condition, color and current market demand. Increasingly, we are using our technology platform to automate pricing of the goods sold through our online marketplace. We also provide human oversight of the pricing process, which allows us to recognize and appropriately adjust for real-time changes in market trends. For example, if a designer is trending, we can adjust the price accordingly. For high-value items, we recommend a price that the consignor must approve before the item goes live on our online marketplace.

Our buyers desire newness and the ability to easily browse our vast selection of products. In 2018, we added approximately 2.6 million new items to our online marketplace, providing buyers with a constant stream of new listings. Editorial features based on trends, style and heritage encourage exploration and discovery across designers and categories. These dynamic daily curations emphasize storytelling and celebrate luxury, for example: Men's Future Tech Sneakers, The Luxe Diamond Edit, Watches for Every Occasion and Prada on the Rise.

In order for buyers to efficiently browse our vast selection of authenticated, pre-owned luxury goods, we built specialized features to allow for the curation of multiple personalized feeds based on individual preferences

93

Table of Contents

and collection of favorite items *("Obsessions"),* into one place. Buyers can filter by criteria such as size, designer, color, style, category, price and condition making it easy and fast to find exactly what they are looking for. When buyers find an item they want to consider purchasing, they can click on the heart icon to add it to their *Obsessions*. Having a side-by-side view of favorite items provides a helpful way to visualize how they will look together in an outfit. In addition, once items are added to *Obsessions*, buyers automatically receive notifications via email or mobile app to indicate when items go on sale. *Obsessions* are a key driver of conversion to purchase. In 2018, *Obsessions* drove 36% of GMV.

| Dynamic Daily Curation | Customizable Feeds | Obsessions |
| :---: | :---: | :---: |
|  |  |  |

Our merchandising team is also responsible for delivering a seamless omni-channel experience and ensuring customer satisfaction while driving conversion and sales velocity. As of March 31, 2019, our merchandising operations and core merchandising teams consisted of 480 and 326 employees, respectively.

### Fulfillment and Logistics

Our fulfillment and logistics team ensures that orders are efficiently and accurately picked, packed, shipped and delivered to buyers. In 2018, we shipped more than 3 million units at an average of over 8,500 items per business day. In the fourth quarter of 2018, more than 95% of packages were shipped within 24 hours of receiving the order. We are able to ship to and service buyers in approximately 60 countries. We have a proven track record of leveraging our technology platform to build proprietary order and warehouse management systems and scale our single-SKU model. Our three facilities in New Jersey and one in California provide a scalable and flexible infrastructure to deliver merchandise quickly and efficiently to our buyers and help reduce shipping and fulfillment expenses. Our fulfillment and logistics processes create a consistent and reliable buying experience that drives loyalty and repeat purchases. As of March 31, 2019, our fulfillment and logistics team consisted of 321 employees.

### Customer Service and Consignor Relations

Our deep commitment to service enables us to offer a luxury experience for our buyers and consignors. Our customer service and consignor relations teams interact with buyers and consignors by phone and email. Customer service representatives provide an exceptional experience for buyers by addressing questions relating to orders, deliveries and returns, as well as condition, style and fit. Consignor relations managers address questions relating to the consignment process and commission payments. We have achieved buyer and consignor

94

Table of Contents

NPS of 74 and 60, respectively, as of February 2019. As of March 31, 2019, our customer service and consignor relations teams consisted of 82 employees.

***Commission Structure and Loyalty Program***

Our *RealReal Rewards* program drives loyalty as consignors earn more when they consign more. *RealReal Rewards* commission rates are generally based on net sales during a one-year commission window and are dynamically adjusted to reflect conditions in the market and the evolution of our business model. Currently, commission rates range from 55% for consignors who generate less than $1,500 in net sales during such one-year period to 70% for consignors who generate $10,000 or more in net sales during such one-year period. For certain items, our commission structure is also based on a set of pre-defined criteria, such as category and value. Item level commission rates currently range from 40% for all items with an original resale list price of $145 or less to 85% for watches with a resale list price of $2,500 or more.

**Buyer Engagement**

We have a global buyer base that engages with us through our website, mobile apps for both iOS and Android devices and retail stores. By offering highly coveted luxury brands and providing a seamless omni-channel experience, we are able to both attract first-time buyers who have never purchased pre-owned luxury and drive repeat purchases from our existing buyer base.

Our mobile app and mobile-enabled website have empowered our buyers to browse and purchase on our online marketplace anytime, anywhere. Mobile has become the primary channel for new buyers, representing a majority of purchases. The strong engagement from our buyers on mobile is further evidenced by the time they spend browsing. Buyers who purchase in a given month spent approximately 35 minutes on our mobile app and 26 minutes on our mobile website per day visited between December 2018 and February 2019.

Our *First Look* program provides members with access to our newest items 24 hours in advance of general members for a fee of $10 per month. In addition to early access, members also receive special invitations to monthly promotions and 24 hour advance waitlist notifications. In 2018, we generated 19% of GMV from our *First Look* members.

Approximately 70% of our buyers are new to buying pre-owned luxury. As of December 31, 2018, approximately 72% of our buyers were female, approximately 77% of our buyers had an annual household income of at least $50,000 and approximately 48% were under 45 years old.

95

**Table of Contents**

**Our Product Assortment**

As of March 31, 2019, we offered over 620,000 unique, authenticated, pre-owned luxury goods on our online marketplace bearing the brand of over 5,500 luxury and premium designers. The top-selling luxury designers on our online marketplace include Cartier, Chanel, Christian Louboutin, Gucci, Hermès, Louis Vuitton, Prada, Rolex, Tiffany & Co. and Valentino. We offer products across multiple categories including women's, men's, kids', jewelry and watches, and home and art.

**Gross Merchandise Value**
**(In millions)**



**Our Marketing Approach**

We acquire new buyers and drive traffic to our website primarily through a mix of digital, television, direct mail and other direct response marketing channels. In 2018, approximately 49% of our desktop and mobile web new user sessions originated from organic channels, which included organic search and direct website access. We collect buyer response data by channel at every step of the purchasing process. By understanding how buyers respond to our campaigns, we are able to quickly adapt and optimize our marketing approach. We devote considerable resources to multi-variate testing to continuously improve the buyer experience and drive conversion. Our data-centric approach has led us to focus on accelerating mobile growth, which has proven to be an efficient acquisition channel.

We retain buyers through a variety of non-paid channels including mobile "push" notifications, email and non-paid social media. Based on purchase history, we are able to create a unique profile for each individual buyer that allows us to understand which items they are more likely to purchase. We know their preferences from their customized feeds and *Obsessions* so we can recommend products to them in a more personalized manner. We monitor satisfaction on a daily basis to continuously improve our buyer experience.

We acquire new consignors primarily through lead generation campaigns and targeted email communications, referrals, behavior targeting and promotional incentives. We market to our growing base of approximately 10 million members who are already familiar with our online marketplace in order to convert them into consignors and buyers.

We are able to efficiently reach and retain existing consignors without spending significantly on paid marketing efforts. We retain consignors through a variety of non-paid marketing channels, including mobile "push" notifications, email, programmatic retargeting campaigns, non-paid social and our loyalty program, *RealReal Rewards*. In addition, we strive to convert our buyers into consignors and consignors into buyers to further propel our flywheel.

96

**Table of Contents**

We carefully monitor and track consumer trends and brand affinity on our online marketplace. We compile these trends into periodic reports and make them readily available on our website. These reports are widely covered by a broad range of mainstream and industry focused media outlets, further establishing our credibility and thought-leadership in the luxury resale market and amplifying our brand awareness.

As of March 31, 2019, our marketing team consisted of 28 employees.

**Technology and Data**

Our proprietary technology platform is purpose-built to be high-performing, scalable and flexible. It forms the foundation of our merchandising, marketing, logistics and fulfillment operations. We built our platform using a modern architecture to efficiently manage the unique operational aspects of our business, including our complex single-SKU inventory model. We continue to enhance the architecture on which our platform is built to support the growth of our business. For example, we invested in building an event-driven architecture that has enabled us to scale our technology organization to deploy unique solutions such as in-store point of sale and mobile apps. Our platform seamlessly integrates key functional areas and creates optimized solutions that allow us to continuously improve the consignor and buyer experience, enhance operational efficiencies and drive innovation across our organization.

Our technology organization is composed of highly efficient, agile and autonomous teams. They deliver value to our business through a relentless focus on our three main stakeholders: consignors, buyers and employees. Each team delivers functionality to our platform using modern development and deployment methodologies. To continuously improve the quality of our solutions, our teams extensively test new features to measure their impact and constantly iterate on new features and functionality. We use open source software and third party vendors whenever possible to ensure that in-house development resources are focused on areas that are strategic to our business.

Our proprietary technology platform includes the following:

*Massive Data Asset*

Data drives all decision-making in our organization. Over the past eight years, we generated and aggregated hundreds of millions of data points from millions of interactions and approximately 9.4 million item sales with up to 50 attributes per item. We also collect data directly at each step of our interaction with consignors and buyers, learning their preferences and allowing us to offer a more personalized experience. In addition, our data allows us to better understand supply and demand trends, automate key merchandising processes and support our authentication efforts.

*Proprietary Processes and Algorithms*

To continue building scale, we are automating key processes by using machine learning algorithms and computer vision, including image recognition. For example, we have increasingly automated pricing for items on our online marketplace. In addition, we leverage rule-based algorithms to enhance risk assessment as a first step in the authentication process. Our investments in building proprietary processes and automation enable us to continue scaling our inbound operations efficiently.

*Real-time, Single View of Products Available on Our Online Marketplace*

To maximize the exposure of a single item, all items on our online marketplace are available through multiple demand points, including our website, mobile app and retail stores. Because we only have one of each item, we built a technology solution, *RealReal 360*, to resolve instances where there are multiple demand points against a single-SKU. *RealReal 360* enables a real-time, single view of products available on our online

97

Table of Contents

marketplace across all possible demand points. For example, when a buyer in one of our retail stores begins to purchase an item, our system instantly updates the item's status on our website and mobile app to ensure the item will not be sold to another buyer.

### Single View of Consignors and Buyers

Through *RealReal 360*, we also have a single view of our consignors and buyers across all touchpoints, including website, mobile app, LCOs and retail stores. A unique profile is created for each consignor and buyer, allowing us to personalize every interaction. For example, when a buyer visits one of our retail stores, the sales associate can easily access his or her *Obsessions* and view previous purchases and consignments. The sales associate is then able to understand the buyer's preferences and tailor recommendations according to specific items that are available in the store.

### Our Unique Consignor Tracking and Payment System

In order to ensure timely and accurate payments to our consignors each month, we developed an automated, rule-based consignor tracking and payment system. This system takes into account factors such as the cumulative value of previous consignments, item level commission rates, application of promotional discounts and the time period in which the item sold.

As of March 31, 2019, our technology and product teams consisted of 132 employees.

### Our Retail Stores

We operate a retail store in each of West Hollywood in Los Angeles, California, and SoHo and Upper East Side in New York, New York. Our stores are located in highly desirable, densely populated locations with strong foot traffic. For consignors, our retail stores provide an alternative location to drop off consigned items and an opportunity to interact with our experts. Our buyers experience world-class service, surrounded by a beautifully designed space, where they can shop our dynamic curation of authenticated pre-owned luxury goods across all of our categories. To continue strengthening and building our connection with consignors and buyers, we offer complimentary experiential events where we invite our community to meet with our experts and discuss topics, such as Is Your Handbag the Real Deal?, Collecting Art & Design: Where to Begin, and Ask A Stylist: How To Wear The Biggest Trends Of Spring 2019.

Our retail stores also serve as fulfillment centers as items we offer in our stores are also sold online. We are able to quickly and accurately fulfill orders from our retail stores using radio frequency identification technology ("RFID"), which helps sales associates quickly locate items. The RFID technology enhances inventory control in a physical retail environment.

We are able to leverage the investment in our retail stores to improve the growth in a given market. For example, our SoHo store generated approximately $2,450 in GMV per square foot and approximately $3,000 in supply per square foot in 2018. Additionally, retail stores improve unit economics by acquiring higher value buyers and consignors, increasing lifetime value and lowering return rates. We also benefit from increased brand awareness that accelerates overall market growth.

### Our Culture and Team

We are a team of passionate, mission-driven individuals who lead with a growth mindset. An entrepreneurial spirit permeates all aspects of our company. Our commitment to extending the lifecycle of luxury goods is grounded in data analytics and world-class customer service. Our cross-functional teams specialize in creative thinking, nimble execution and solving unique challenges such as scaling our single-SKU inventory model. We are not afraid to experiment, and we embrace constant iteration and improvement.

98

Table of Contents

We are proud that our employee and director population is gender diverse. As of March 31, 2019, 68% of our employees and 67% of our director-level employees were female. We support and celebrate all diversity. Our diversity is a reflection of our culture and the skills necessary to build and grow an innovative online marketplace that is revolutionizing the luxury resale market and reshaping consumer purchasing behavior.

**Our Values**

Our core values drive our business:

- *We are curious, creative and dynamic*. We believe that creative thinking surfaces the best ideas. We are inspired to create, invent and iterate on ways to drive our business forward.

- *We advocate growing our people from within*. We offer opportunities for all experience levels. We empower our employees with increasing responsibility and instill accountability while providing the freedom to experiment and innovate.

- *We embrace and celebrate diversity*. We are a welcoming and inclusive company.

- *We are data-driven*. We are thinkers and analyzers who are results-driven.

- *We are obsessed with service*. We provide our consignors and buyers with the ultimate luxury experience.

- *We respect luxury brands*. We seek to honor the enduring heritage of luxury brands.

**Our Sustainability Efforts**

Sustainability is woven into the fabric of our business. We believe a growing awareness of the environmental impact of recirculating luxury goods significantly contributes to the appeal of consigning and purchasing on our online marketplace. Based on our survey data, 56% of our consignors base and 64% of our Millennial consignor base cite environmental impact or extending the lifecycle of luxury as key motivators for consigning with us.

Our sustainability efforts include:

- *Ellen MacArthur Foundation*. We are a member of the Ellen MacArthur Foundation Circular Economy 100 USA, which connects organizations that are rejecting the traditional linear economy in favor of a self-sustaining circular economy. This network brings together a diverse set of stakeholders to encourage collaboration on issues related to sustainability. The Ellen MacArthur Foundation advised us on the methodology used to create our proprietary Sustainability Calculator, which quantifies the greenhouse gasses, energy output and water usage offset by the most popular items consigned on our platform.

- *United Nations Climate Change's Fashion Industry Charter for Climate Action*. In April 2019, we became the first company in the resale industry to join the UN Climate Change's Fashion Industry Charter for Climate Action, which aims to limit global warming within the fashion industry and inspire climate action. The Charter endeavors to achieve a 30% reduction in carbon emissions in the fashion industry by 2030 and net-zero emissions by 2050. We are helping to create a clear path to achieve the actions outlined in the Charter by joining the Charter's working group on promoting broader climate action.

- *National Consignment Day*. We founded National Consignment Day as a national recognition day that occurs on the first Monday of October. National Consignment Day celebrates the positive impact consigning has on the environment. Each year we create a National Consignment Day campaign as an opportunity to encourage people to consign.

- *Brand partnerships*. Our partnership with Stella McCartney demonstrates our value in the luxury ecosystem and encourages consignment by giving a credit to consignors to be applied to a new purchase when they consign a Stella McCartney item.

Table of Contents

- *Sustainability Calculator*. In 2018, we launched our Sustainability Calculator on National Consignment day as a tool to quantify the positive impact consignment has on the planet. This calculator, vetted by sustainability experts, focused solely on women's apparel and measured the impact of 3.2 million items of women's clothing items consigned to The RealReal since inception. In 2018, we estimate that our environmental savings since inception equated to 87 million driving miles in greenhouse gas emissions and energy savings and 329 million liters of water. This equals a savings of 3,494 trips by car around the world or 1.39 billion eight-ounce glasses of water.

**Competition**

Although we have built a scaled and highly differentiated online marketplace model, we face competition from both online and offline resale players. We have indirect competitors in two primary categories:

- *Technology-enabled companies*. We compete indirectly with technology-enabled companies that may attract sellers by enabling commerce, such as eBay and traditional physical retailers who have increasingly broadened their ecommerce platform.

- *Luxury resellers*. Luxury resellers with whom we compete include brick-and-mortar consignment stores, pawn shops and auction houses, such as Sotheby's, as well as niche or single category luxury resellers.

We compete primarily on the basis of consignor and buyer experience, product authenticity, quality and assortment, breadth of brand offering, convenience and price. We believe that we are able to compete effectively because we offer consignors an easy, convenient, reliable and fast way to monetize their goods. For buyers, we offer a vast selection of unique, high-quality, authenticated, pre-owned luxury goods at compelling prices.

**Intellectual Property**

Our intellectual property, including copyrights and trademarks, is an important component of our business. We rely on trademark, copyright, trade secrets, patents, confidentiality agreements and other practices to protect our brands, proprietary information, technologies and processes. We primarily rely on copyright and trade secret laws to protect our proprietary technologies and processes, including the algorithms we use throughout our business. Our principal trademark assets include the registered trademark "The RealReal" and our logos and taglines. Our trademarks are valuable assets that support our brand and consumers' perception of our services and merchandise. We also hold the rights to the "therealreal.com" Internet domain name and various related domain names, which are subject to Internet regulatory bodies and trademark and other related laws of each applicable jurisdiction. We continually review our development efforts to assess the existence and patentability of new intellectual property and intend to pursue patent protection to the extent we believe it would be beneficial and cost-effective.

We control access to and use of our intellectual property through confidentiality procedures, non-disclosure agreements with third parties and our employment and contractor agreements. We rely on contractual provisions to protect our proprietary technology, brands and creative assets with consignors and buyers.

**Facilities**

Our corporate headquarters are located in San Francisco and are leased for a term that expires in 2025 with a right of renewal. We lease an aggregate of approximately 1 million square feet of space for storage, merchandising operations and fulfillment located in California and New Jersey. The lease to our California facility expires in 2021 and leases to our New Jersey facilities each expire in 2029, all with a right of renewal. We lease additional offices located in New York City and LCOs located in Chicago, Dallas, Los Angeles, Miami, New York, San Francisco and Washington D.C. We also have three retail stores located in Los Angeles and New York.

100

Table of Contents

**Legal proceedings**

We are from time to time subject to, and are presently involved in, litigation and other legal proceedings.

On November 14, 2018, Chanel filed a lawsuit against us in the U.S. District Court for the Southern District of New York bringing various trademark- and advertising-related claims under the Lanham Act and New York state law analogues. Chanel alleges that our resale of Chanel products confuses consumers into believing that Chanel is affiliated with us and involved in authenticating consignors' goods and that only Chanel is capable of authenticating second-hand Chanel goods. Chanel alleges, in particular, that we have made false representations concerning the Chanel-branded goods sold on our platform and that a number of these goods were counterfeit. The lawsuit seeks money damages as well as injunctive relief. We intend to vigorously defend this lawsuit and believe we have meritorious defenses.

We are also subject to employee-related claims under state and federal law, including claims for discrimination, wrongful discharge or retaliation and claims for wage and hour violations under the Fair Labor Standards Act or state wage and hour laws.

There are inherent uncertainties in these legal matters, some of which are beyond management's control, making the ultimate outcomes difficult to predict. Moreover, management's views and estimates related to these matters may change in the future, as new events and circumstances arise and the matters continue to develop.

**The RealReal Foundation**

The RealReal Foundation is an independent non-profit organization. We will contribute 1% of the net proceeds of this offering to The RealReal Foundation. The RealReal Foundation's mission is to foster the mentoring of women CEOs, support and guide boys and girls into becoming the next generation of leaders and provide scholarships to support students in need.

101

**Table of Contents**

**MANAGEMENT**

**Executive Officers and Directors**

The following table sets forth information concerning our executive officers and directors as of May 10, 2019.

| Name | Age | Position(s) |
|---|---|---|
| *Executive Officers* | | |
| Julie Wainwright | 62 | President, Chief Executive Officer and Chairperson |
| Fredrik Bjôrk | 40 | Chief Technology Officer |
| Dana DuFrane | 54 | General Counsel |
| Matt Gustke | 45 | Chief Financial Officer |
| Rati Sahi Levesque | 38 | Chief Operating Officer |
| | | |
| *Non-Employee Directors* | | |
| | | |
| Chip Baird(2)(3) | 47 | Director |
| Maha Ibrahim(1) | 48 | Director |
| Rob Krolik(1) | 50 | Director |
| Michael Kumin(2)(3) | 46 | Director |
| Stefan Larsson(3) | 44 | Director |
| Niki Leondakis(2) | 58 | Director |
| James Miller(1) | 55 | Director |

(1)   Member of our audit committee
(2)   Member of our compensation committee
(3)   Member of our nominating and governance committee

*Executive Officers*

*Julie Wainwright* founded The RealReal in March 2011 and has served as our Chief Executive Officer and the Chairperson of our board of directors since March 2011. Previously, Ms. Wainwright served as Chief Executive Officer of SmartNow.com, an online health and wellness company, from February 2008 to January 2011, as President and Chief Executive Officer of Bellamax, a photo-editing software company, from August 2003 to November 2006 and as Interim Chief Executive Officer of OntheFrontier, a firm providing strategic consulting for emerging growth countries, from 2001 to 2002. Prior to OntheFrontier, she served as Chief Executive Officer of Pets.com, an online pet supply company, from February 1999 to January 2001. Ms. Wainwright holds a B.S. in General Management from Purdue University.

Ms. Wainwright was selected to serve on our board of directors because of the perspective and experience she brings as our Chief Executive Officer and as the founder of The RealReal.

*Fredrik Bjôrk* has served as our Chief Technology Officer since May 2016. Previously, Mr. Bjôrk served as our Vice President of Engineering from September 2013 to May 2016. Mr. Bjôrk holds a B.S. in Information Technology from Rochester Institute of Technology.

*Dana DuFrane* has served as our General Counsel since September 2018. Previously, she served as our Vice President, Legal from November 2015 to September 2018. Prior to joining The RealReal, Ms. DuFrane served as the General Counsel of Ecologic Brands, a sustainable packaging company, from July 2014 to August 2015 and as Counsel and Head of HR at Imergy Power Systems, an energy storage company, from December 2013 to August 2014. Ms. DuFrane was previously Assistant General Counsel at Sun Microsystems, a computer software and hardware company and subsidiary of Oracle Corporation, an enterprise technology company, from 2000 to 2006. Ms. DuFrane holds a B.A. in International Affairs from the University of Colorado, Boulder and a J.D. from Santa Clara University.

102

**Table of Contents**

*Matt Gustke* has served as our Chief Financial Officer since April 2013. Prior to joining The RealReal, Mr. Gustke served as the Chief Financial Officer and Head of Strategy at StubHub, an online ticket exchange company and subsidiary of eBay, an online marketplace and payments company, from January 2010 to April 2013. Mr. Gustke holds a B.S. in Finance and Entrepreneurial Management from the Wharton School at the University of Pennsylvania.

*Rati Sahi Levesque* has served as our Chief Operating Officer since April 2019 and served as our Chief Merchant from May 2012 to March 2019. Previously, Ms. Levesque served as our Director of Merchandise from May 2011 to May 2012. Prior to joining The RealReal, Ms. Levesque was the owner of Anica Boutique, a clothing boutique, from June 2005 to May 2011. Ms. Levesque holds a B.S. in Business Management Economics from the University of California, Santa Cruz.

### Non-Employee Directors

*Gilbert L. (Chip) Baird III* has served on our board of directors since June 2018. Mr. Baird co-founded and has been the Co-head of PWP Growth Equity, the middle market private equity group of Perella Weinberg Partners Capital Management, since February 2012. Mr. Baird also serves on the boards of a number of private companies. He has also previously served as a director of RE/MAX Holdings, an international real estate franchisor company, from July 2013 to February 2015. Mr. Baird holds a B.S. in Finance and International Business from the Pennsylvania State University and an M.B.A. from Harvard Business School.

Mr. Baird was selected to our board of directors because of his experience in finance and capital structure.

*Maha Ibrahim* has served on our board of directors since July 2012. Ms. Ibrahim is currently a General Partner at Canaan Partners, an early stage venture capital firm, a position she has held since March 2000. Ms. Ibrahim also serves on the boards of a number of private companies. Ms. Ibrahim is also a trustee for the Carnegie Endowment for International Peace, a foreign policy think tank. Ms. Ibrahim holds a B.A. in Economics and an M.A. in Sociology from Stanford University and a Ph.D. in Economics from the Massachusetts Institute of Technology.

Ms. Ibrahim was selected to our board of directors because of her experience on the board of directors of rapidly growing consumer and technology companies.

*Rob Krolik* has served on our board of directors since January 2019. Mr. Krolik currently serves as the General Partner and Chief Financial Officer of Burst Capital, a venture capital investment firm, a position he has held since October 2018. Previously, Mr. Krolik served as the Chief Financial Officer of Yelp, an online platform company that connects people with local businesses, from July 2011 to May 2016. Mr. Krolik also serves on the boards of a number of private companies. Mr. Krolik holds a B.B.A. in Finance from the University of Texas at Austin and is a certified public accountant (inactive).

Mr. Krolik was selected to our board of directors because of his experience with rapidly growing technology companies and as the chief financial officer of a publicly-held company.

*Michael A. Kumin* has served on our board of directors since May 2017. Mr. Kumin has worked as an investment professional at Great Hill Partners, a private equity firm, since 2002 where he currently serves as a Managing Partner. Mr. Kumin has served on the board of directors of Wayfair, an ecommerce home goods company, since June 2011, and Yogaworks, a yoga studio, brand and teaching company, since July 2014. Mr. Kumin also serves on the boards of a number of private companies. Mr. Kumin holds a B.A. from Princeton University's Woodrow Wilson School of Public & International Affairs.

Mr. Kumin was selected to serve on our board of directors because of his experience in the consumer retail and ecommerce industries as a private equity investor and his service on the board of directors of other consumer and technology companies.

103

Table of Contents

*Stefan Larsson* has served on our board of directors since January 2019. Mr. Larsson has been named President of PVH, the parent company of Calvin Klein and Tommy Hilfiger, which will be effective June 2019. Previously, Mr. Larsson was the President and Chief Executive Officer and a director of Ralph Lauren Corporation, a premium lifestyle apparel company, from November 2015 until May 2017. Mr. Larsson served as the Global President of Old Navy, an apparel brand and division of Gap, a global clothing retailer, from October 2012 to October 2015. Prior to Old Navy, Mr. Larsson was a key part of the leadership team that built H&M, a clothing retailer, from $3 to $17 billion in revenue and expanded operations from 12 to 44 countries, from August 1998 to September 2012. Mr. Larsson received a Master of Science in Business Administration jointly from the Hanken School of Economics in Finland and Jônkôping International Business School in Sweden.

Mr. Larsson was selected to serve on our board of directors because of his extensive experience in managing global, diversified retail businesses, along with his in-depth knowledge of the fashion and apparel industry.

*Niki Leondakis* has served on our board of directors since April 2019. Ms. Leondakis currently serves as President of The Wolff Resident experience Company, a real estate hospitality company, a position she has held since February 2019. Previously, Ms. Leondakis served as the Chief Executive Officer of Equinox Fitness Clubs at Equinox Holdings, a luxury fitness company, from March 2017 to July 2018, as Chief Executive Officer of Hotels and Resorts at Two Roads Hospitality, a lifestyle hotel hospitality company, from November 2012 to March 2017 and as President and Chief Operating Officer of Kimpton Hotels and Restaurants from September 1993 to November 2012. Ms. Leondakis holds a B.S. in Hotel, Restaurant Management and Travel Administration from the University of Massachusetts in Amherst.

Ms. Leondakis was selected to serve on our board of directors because of her executive skills and understanding of quality customer experience.

*James R. Miller* has served on our board of directors since May 2019. Mr. Miller currently serves as Strategic Advisor of AREVO, a computer software and 3D printing company, a position he has held since January 2019. Previously, Mr. Miller served as the Chief Executive Officer of AREVO, from February 2018 to January 2019, and Vice President, Global/Worldwide Operations of Google, an internet service and products company, from July 2010 to February 2018. Mr. Miller has served on the board of directors of Wayfair, an ecommerce home goods company, since July 2016, and DocuSign, an electronic signature company, since March 2014. Mr. Miller also serves on the boards of a number of private companies. He has also previously served on the board of directors of Corporate Eco Forum, a corporate sustainability organization, from July 2008 to June 2018. Mr. Miller holds a B.S. in aerospace engineering from Purdue University, a M.S. in mechanical engineering from Massachusetts Institute of Technology and an M.B.A. from MIT's Sloan School of Management.

Mr. Miller was selected to serve on our board of directors because of his extensive experience in scaling operations in rapidly-growing internet companies.

**Family Relationships**

There are no family relationships among any of our executive officers or directors.

**Corporate Governance**

*Classified Board of Directors*

Upon the completion of this offering, our board of directors will consist of     members and be divided into three classes of directors that will serve staggered three-year terms. At each annual meeting of stockholders, a class of directors will be elected for a three-year term to succeed the same class whose term is then expiring. As a result, only one class of directors will be elected at each annual meeting of our stockholders, with the other

104

**Table of Contents**

classes continuing for the remainder of their respective three-year terms. Our directors will be divided among the three classes as follows:

- the Class I directors will be Maha Ibrahim, Michael Kumin and Stefan Larsson, and their terms will expire at the first annual meeting of stockholders to be held after the completion of this offering;

- the Class II directors will be Robert Krolik and Niki Leondakis, and their terms will expire at the second annual meeting of stockholders to be held after the completion of this offering; and

- the Class III directors will be Chip Baird, James Miller and Julie Wainwright, and their terms will expire at the third annual meeting of stockholders to be held after the completion of this offering.

Each director's term continues until the election and qualification of his or her successor, or his or her earlier death, resignation or removal. Our certificate of incorporation and bylaws to be in effect upon the completion of this offering will authorize only our board of directors to fill vacancies on our board of directors. Any increase or decrease in the number of directors will be distributed among the three classes so that, as nearly as possible, each class will consist of one-third of the directors. This classification of our board of directors may have the effect of delaying or preventing changes in control of our company. See the section titled "Description of Capital Stock—Anti-Takeover Provisions."

### *Director Independence*

In connection with this offering, we have applied to list our common stock on Nasdaq. Under the rules of Nasdaq, independent directors must comprise a majority of a listed company's board of directors within a specified period after the completion of this offering. In addition, the rules of Nasdaq require that, subject to specified exceptions, each member of a listed company's audit, compensation and nominating and governance committees be independent. Under the rules of Nasdaq, a director will only qualify as an "independent director" if, in the opinion of that company's board of directors, that person does not have a relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director.

Additionally, compensation committee members must not have a relationship with us that is material to the director's ability to be independent from management in connection with the duties of a compensation committee member.

Audit committee members must also satisfy the independence criteria set forth in Rule 10A-3 under the Exchange Act. In order to be considered independent for purposes of Rule 10A-3, a member of an audit committee of a listed company may not, other than in his or her capacity as a member of the audit committee, the board of directors or any other board committee: accept, directly or indirectly, any consulting, advisory or other compensatory fee from the listed company or any of its subsidiaries; or be an affiliated person of the listed company or any of its subsidiaries. We intend to satisfy the audit committee independence requirements of Rule 10A-3 as of the completion of this offering.

Our board of directors has undertaken a review of the independence of each director and considered whether each director has a material relationship with us that could compromise his or her ability to exercise independent judgment in carrying out his or her responsibilities. As a result of this review, our board of directors determined that, with the exception of our Chief Executive Officer, Julie Wainwright, each member of our board of directors is an "independent director" as defined under the applicable rules and regulations of the SEC and the listing requirements and rules of Nasdaq. In making these determinations, our board of directors reviewed and discussed information provided by the directors and by us with regard to each director's business and personal activities and relationships as they may relate to us and our management, including the beneficial ownership of our common stock by each non-employee director and the transactions involving them described in the section titled "Certain Relationships and Related Party Transactions."

105

**Table of Contents**

**Board Leadership Structure**

Our corporate governance guidelines provide that the roles of chairperson of the board and chief executive officer may be separated or combined. In the event that the roles are combined, our corporate governance guidelines provide for the naming of a Lead Independent Director. Our board of directors has appointed Michael Kumin to serve as our Lead Independent Director. As Lead Independent Director, Mr. Kumin will preside over periodic meetings of our independent directors, serve as liaison between the chairperson of our board of directors and the independent directors and perform such additional duties as our board of directors may otherwise determine and delegate.

**Board Committees**

Our board of directors has established an audit committee, a compensation committee and a nominating and governance committee prior to the completion of this offering. The composition and responsibilities of each of the committees of our board of directors are described below. Following the completion of this offering, copies of the charters for each committee will be available on our website. Members serve on these committees until their resignation or until otherwise determined by our board of directors. Our board of directors may establish other committees as it deems necessary or appropriate from time to time.

*Audit Committee*

Our audit committee consists of Maha Ibrahim, Robert Krolik and James Miller, with Robert Krolik serving as the chairperson. Our board of directors has determined that each member of our audit committee is independent within the meaning of Rule 10A-3 under the Exchange Act. Our board of directors has also determined that Robert Krolik is an "audit committee financial expert" as defined by the applicable SEC rules.

Specific responsibilities of our audit committee will include:

- overseeing our corporate accounting and financial reporting processes and our internal controls over financial reporting;

- evaluating the independent public accounting firm's qualifications, independence and performance;

- engaging and providing for the compensation of the independent public accounting firm;

- pre-approving audit and permitted non-audit and tax services to be provided to us by the independent public accounting firm;

- reviewing our financial statements;

- reviewing our critical accounting policies and estimates and internal controls over financial reporting;

- establishing procedures for complaints received by us regarding accounting, internal accounting controls or auditing matters, including for the confidential anonymous submission of concerns by our employees, and periodically reviewing such procedures, as well as any significant complaints received, with management;

- discussing with management and the independent registered public accounting firm the results of the annual audit and the reviews of our quarterly financial statements;

- review and approve any transaction between us and any related person (as defined by the Securities Act) in accordance with the Company's related party transaction approval policy; and

- such other matters that are specifically designated to the audit committee by our board of directors from time to time.

Our audit committee will operate under a written charter, to be effective prior to the completion of this offering, that satisfies the applicable Nasdaq listing standards.

Table of Contents

### Compensation Committee

Our compensation committee consists of Chip Baird, Michael Kumin and Niki Leondakis, with          serving as chairperson. Our board of directors has determined that each member of our compensation committee is independent under the Nasdaq listing standards and a "non-employee director" as defined in Rule 16b-3 promulgated under the Exchange Act.

Specific responsibilities of our compensation committee will include:

- reviewing and recommending policies relating to compensation and benefits of our officers and employees, including reviewing and approving corporate goals and objectives relevant to compensation of the Chief Executive Officer and other senior officers;

- evaluating the performance of the Chief Executive Officer and other senior officers in light of those goals and objectives;

- setting compensation of the Chief Executive Officer and other senior officers based on such evaluations;

- administering the issuance of options and other awards under our equity-based incentive plans;

- reviewing and approving, for the Chief Executive Officer and other senior officers, employment agreements, severance agreements, consulting agreements and change in control or termination agreements; and

- such other matters that are specifically designated to the compensation committee by our board of directors from time to time.

Our compensation committee will operate under a written charter, to be effective prior to the completion of this offering, that satisfies the applicable Nasdaq listing standards.

### Nominating and Corporate Governance Committee

Our nominating and corporate governance committee consists of Chip Baird, Michael Kumin and Stefan Larsson, with          serving as chairperson. Our board of directors has determined that each member of our nominating and corporate governance committee is independent under the applicable Nasdaq listing standards.

Specific responsibilities of our nominating and corporate governance committee will include:

- identifying and evaluating candidates, including the nomination of incumbent directors for reelection and nominees recommended by stockholders, to serve on our board of directors;

- considering and making recommendations to our board of directors regarding changes to the size and composition of our board of directors;

- considering and making recommendations to our board of directors regarding the composition and chairmanship of the committees of our board of directors;

- instituting plans or programs for the continuing education of our board of directors and orientation of new directors;

- establishing procedures to exercise oversight of, and oversee the performance evaluation process of, our board of directors and management;

- developing and making recommendations to our board of directors regarding corporate governance guidelines and matters; and

- overseeing periodic evaluations of the board of directors' performance, including committees of the board of directors.

107

**Table of Contents**

Our nominating and corporate governance committee will operate under a written charter, to be effective prior to the completion of this offering, that satisfies the applicable Nasdaq listing standards.

**Code of Ethics and Business Conduct**

Our board of directors has adopted a code of ethics and business conduct, which establishes the standards of ethical conduct applicable to all of our directors, officers, employees and senior financial officers. A copy of our code of conduct will be posted on the investor relations page of our website, www.therealreal.com. In addition, we intend to post on our website all disclosures that are required by law or the Nasdaq listing standards concerning any amendments to, or waivers from, any provision of the code.

**Compensation Committee Interlocks and Insider Participation**

None of the members of our compensation committee is or has been an officer or employee of our company. None of our executive officers currently serves, or in the past year has served, as a member of the board of directors or compensation committee (or other board committee performing equivalent functions) of any entity that has one or more executive officers serving on our board of directors or compensation committee.

**Director Compensation**

During 2018, members of our board of directors did not receive any retainer fees or other cash or equity-based compensation for their services as a director, other than reimbursements for out-of-pocket expenses incurred in connection with rendering such services. In connection with the offering, we engaged an independent compensation consultant to assist in the evaluation of our post-offering non-employee director compensation program.

**Limitations on Director and Officer Liability and Indemnification**

Our certificate of incorporation that will become effective in connection with this offering will contain provisions that will limit the liability of our directors for monetary damages to the fullest extent permitted by the DGCL. Consequently, our directors will not be personally liable to us or our stockholders for monetary damages for any breach of fiduciary duties as directors, except liability for:

- any breach of the director's duty of loyalty to us or our stockholders;

- any act or omission not in good faith or that involves intentional misconduct or a knowing violation of law;

- unlawful payments of dividends or unlawful stock repurchases or redemptions as provided in Section 174 of the DGCL; or

- any transaction from which the director derived an improper personal benefit.

Our certificate of incorporation and our bylaws that will become effective in connection with this offering will require us to indemnify our directors and officers, and allow us to indemnify other employees and agents, to the fullest extent permitted by the DGCL. Subject to certain limitations and limited exceptions, our certificate of incorporation will also require us to advance expenses incurred by our directors and officers for the defense of any action for which indemnification is required or permitted.

We have entered into indemnification agreements with each of our directors and our executive officers. These agreements will provide that we will indemnify each of our directors and such officers to the fullest extent permitted by law and our certificate of incorporation.

**Table of Contents**

We believe that these provisions in our certificate of incorporation, bylaws and indemnification agreements are necessary to attract and retain qualified persons such as directors, officers and key employees. We also maintain directors' and officers' liability insurance. The limitation of liability and indemnification provisions in our certificate of incorporation and bylaws may discourage stockholders from bringing a lawsuit against our directors and officers for breaches of their fiduciary duties. They may also reduce the likelihood of derivative litigation against our directors and officers, even though an action, if successful, might benefit us and other stockholders. Further, a stockholder's investment may be adversely affected to the extent that we pay the costs of settlement and damage awards against directors and officers as required by these indemnification provisions.

**Role of the Board in Risk Oversight**

One of the key functions of our board of directors is informed oversight of our risk management process. The board of directors does not have a standing risk management committee, but rather administers this oversight function directly through the board of directors as a whole, as well as through its standing committees that address risks inherent in their respective areas of oversight. In particular, our board of directors is responsible for monitoring and assessing strategic risk exposure. Our audit committee has the responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. The audit committee also monitors compliance with legal and regulatory requirements, in addition to oversight of the performance of our external audit function. Our nominating and corporate governance committee monitors the effectiveness of our corporate governance guidelines. Our compensation committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking.

**Table of Contents**

**EXECUTIVE COMPENSATION**

The following is a discussion and analysis of compensation arrangements of our named executive officers. This discussion contains forward-looking statements that are based on our current plans, considerations, expectations and determinations regarding future compensation programs. Actual compensation programs that we adopt may differ materially from currently planned programs as summarized in this discussion. As an "emerging growth company" as defined in the JOBS Act, we are not required to include a Compensation Discussion and Analysis section and have elected to comply with the scaled back disclosure requirements applicable to emerging growth companies.

### Overview

Our current executive compensation program is intended to align executive compensation with our business objectives and to enable us to attract, retain and reward executive officers who contribute to our long-term success. The compensation paid or awarded to our executive officers is generally based on the assessment of each individual's performance compared against the business objectives established for the fiscal year as well as our historical compensation practices. In the case of new hire executive officers, their compensation is primarily determined based on the negotiations of the parties as well as our historical compensation practices. For 2018, the material elements of our executive compensation program were base salary, annual cash bonuses and equity-based compensation in the form of stock options.

We expect that our executive compensation program will evolve to reflect our status as a newly publicly-traded company, while still supporting our overall business and compensation objectives. In connection with this offering, we have retained Compensia, an independent executive compensation consultant, to help advise on our post-offering executive compensation program.

This section provides a discussion of the compensation paid or awarded to our Chief Executive Officer and our two other most highly compensated executive officers as of December 31, 2018. We refer to these individuals as our "named executive officers." For 2018, our named executive officers were:

- Julie Wainwright, Chief Executive Officer;

- Matt Gustke, Chief Financial Officer; and

- Rati Sahi Levesque, Chief Operating Officer.

### Compensation of Named Executive Officers

#### *Base Salary*

Base salaries are intended to provide a level of compensation sufficient to attract and retain an effective management team, when considered in combination with the other components of our executive compensation program. The relative levels of base salary for our named executive officers are designed to reflect each executive officer's scope of responsibility and accountability with us. Please see the "Salary" column in the 2018 Summary Compensation Table for the base salary amounts received by each named executive officer in 2018.

#### *Annual Cash Bonuses*

Historically, we have provided our senior leadership team with short-term incentive compensation through our annual cash bonus plan. Annual bonus compensation holds executives accountable, rewards the executives based on actual business results and helps create a "pay for performance" culture. Our annual cash bonus program provides cash incentive award opportunities for the achievement of performance goals established by our board of directors at the beginning of each fiscal year.

110

**Table of Contents**

The payment of awards under the 2018 annual cash bonus program applicable to the named executive officers was subject to the attainment of a number of goals relating to our performance. Specifically, as approved by the board of directors, 50% of the bonus was based on the attainment of GMV goals, 30% was based on gross margin goals, 10% was based on operating expenses and the remaining 10% was based upon department goals.

Early in 2018, the board of directors established the bonus targets for Ms. Wainwright, Mr. Gustke and Ms. Levesque in the annual bonus program. Ms. Wainwright had a 2018 target bonus equal to 50% of her base salary and Mr. Gustke and Ms. Levesque each had bonus targets equal to 40% of his or her base salary. Based on our 2018 performance, the board of directors awarded payouts under our annual cash bonus program equal to, as a percentage of target opportunity, 96%, 95% and 93% for Ms. Wainwright, Mr. Gustke and Ms. Levesque, respectively. Please see the "Non-Equity Incentive Compensation" column in the 2018 Summary Compensation Table for the amount of annual bonuses paid to Ms. Wainwright, Mr. Gustke and Ms. Levesque in 2018.

### Stock Options

To further align the interests of our executive officers with the interests of our stockholders and to further focus our executive officers on our long-term performance, we have historically granted equity compensation in the form of stock options. Stock options generally vest (1) in 1/48th increments for each month of continuous employment following the vesting commencement date or (2) 25% on the first anniversary of the vesting commencement date and in 1/36th increments for each subsequent month of continuous employment. In 2018, the board of directors awarded Mr. Gustke and Ms. Levesque stock options to purchase 150,000 and 250,000 shares of our common stock, respectively.

### 2018 Summary Compensation Table

The following table shows information regarding the compensation of our named executive officers for services performed in the year ended December 31, 2018.

| Name and Principal Position | Year | Salary[1] | Option Awards[2] | Non-Equity Incentive Plan Compensation[3] | All Other Compensation | Total[5] |
|---|---|---|---|---|---|---|
| Julie Wainwright<br>*Chief Executive Officer* | 2018 | $ 362,365 | $ — | $ 172,119 | $ 1,000[4] | $535,484 |
| Matt Gustke<br>*Chief Financial Officer* | 2018 | 321,750 | 283,065 | 120,868 | 1,000[4] | 726,683 |
| Rati Sahi Levesque<br>*Chief Operating Officer* | 2018 | 292,673 | 471,775 | 108,037 | 1,000[4] | 873,485 |

(1)  Amounts reported in this column reflect the base salaries earned during 2018.

(2)  Amounts reported in this column reflect the aggregate grant date fair value of stock options awarded in 2018, computed in accordance with FASB ASC Topic 718, Compensation—Stock Compensation based on the following assumptions: risk-free interest rate of 2.7%-2.9%; expected volatility of 46.6%-48.1%; expected term of 5.2-6.2 years and expected dividend rate of 0%.

(3)  Amounts reported in this column for each named executive officer represents payouts under our annual cash bonus program.

(4)  Consists of $1,000 of 401(k) contributions received.

(5)  Amounts reported in this table exclude payments to our named executive officers in connection with the sale of common stock to existing investors. The difference between the purchase price paid to each named executive officer and the fair market value of the applicable shares on the date of purchase was as follows: (a) $529,528 for Ms. Wainwright; (b) $85,528 for Mr. Gustke; and (c) $156,870 for Ms. Levesque.

111

Table of Contents

**Outstanding Equity Awards at 2018 Fiscal Year-End**

The following table presents information regarding the outstanding stock options held by each of the named executive officers as of December 31, 2018. None of the named executive officers held any outstanding restricted stock or other equity awards as of that date.

| Name | Grant Date | Vesting Commencement Date | Number of Securities Underlying Unexercised Options Exercisable | Number of Securities Underlying Unexercised Options Unexercisable | Option Exercise Price | Option Expiration Date |
|---|---|---|---|---|---|---|
| Julie Wainwright | 3/27/2014 | 3/14/2014 | 1,248,500 | — | $ 0.45 | 3/27/2024 |
| | 2/19/2015 | 2/19/2015 | 459,768 | 88,891 | 0.96 | 2/19/2020 |
| | 2/19/2015 | 2/19/2015 | 1,584,722 | — | 0.96 | 2/19/2020 |
| | 12/17/2015(1) | 12/17/2015 | 75,000 | 25,000 | 1.74 | 12/17/2020 |
| | 2/16/2017(1) | 2/16/2017 | 229,166 | 270,834 | 1.28 | 2/16/2027 |
| Matt Gustke | 5/31/2013 | 4/3/2013 | 387,642 | — | 0.39 | 5/30/2023 |
| | 3/27/2014 | 3/14/2014 | 150,000 | — | 0.45 | 3/26/2024 |
| | 2/19/2015(1) | 2/19/2015 | 115,032 | 5,002 | 0.87 | 2/18/2025 |
| | 12/17/2015(1) | 12/17/2015 | 36,143 | 12,048 | 1.74 | 12/16/2025 |
| | 12/17/2015(1) | 12/17/2015 | 76,356 | 25,453 | 1.74 | 12/16/2025 |
| | 2/16/2017(1) | 2/16/2017 | 42,940 | 50,749 | 1.28 | 2/16/2027 |
| | 12/5/2018(1) | 12/5/2018 | — | 150,000 | 3.82 | 12/5/2028 |
| Rati Sahi Levesque | 11/28/2011 | 6/1/2011 | 238,250 | — | 0.004 | 11/28/2021 |
| | 3/27/2014 | 3/14/2014 | 351,500 | — | 0.45 | 3/27/2024 |
| | 2/19/2015(1) | 2/19/2015 | 181,901 | 7,909 | 0.87 | 2/19/2025 |
| | 12/17/2015(1) | 12/17/2015 | 74,999 | 25,001 | 1.74 | 12/17/2025 |
| | 2/16/2017(1) | 2/16/2017 | 57,030 | 67,401 | 1.28 | 2/16/2027 |
| | 12/5/2018(1) | 12/5/2018 | — | 250,000 | 3.82 | 12/5/2028 |

(1)  This option vests in 1/48th increments beginning on the one-month anniversary of the vesting commencement date and for each subsequent month of continuous employment.

**Additional Narrative Disclosure**

*Executive Severance Benefits*

Our executives are not eligible for any severance benefits upon termination of their employment.

*Equity Awards*

In the event an executive's employment is terminated without cause or due to good reason in connection with or within 12 months following a change in control or stock sale, 50% of any unvested options held by the executive as of the termination date will vest upon such termination. This offering will not constitute a change in control or stock sale under the terms of the option agreement.

*401(k) Plan*

We maintain a qualified 401(k) savings plan which allows participants to defer from 0% to 100% of cash compensation up to the maximum amount allowed under Internal Revenue Service ("IRS") guidelines. We may make discretionary matching and profit sharing contributions to the plan. In 2018, we matched up to 25% of employee elective deferrals that did not exceed $1,000 per employee and did not make any profit sharing contributions. Participants are always vested in their contributions to the plan. Participants vest in their company matching and profit sharing contributions under a one to four-year graded vesting schedule.

Table of Contents

**Equity Compensation Plans**

*2019 Equity Incentive Plan*

In connection with this offering, our board of directors has adopted and our current stockholders expect to approve the 2019 Plan, prior to the effective date of this offering. The 2019 Plan will replace the 2011 Equity Incentive Plan, as described below.

The purposes of the 2019 Plan are to align the interests of our stockholders and those eligible for awards, to retain officers, directors, employees and other service providers, and to encourage them to act in our long-term best interests. Our 2019 Plan provides for the grant of incentive stock options (within the meaning of Code Section 422), nonstatutory stock options, stock appreciation rights, restricted stock, restricted stock units, other stock awards and performance awards. Officers, directors, employees, consultants, agents and independent contractors who provide services to us or to any subsidiary of ours are eligible to receive awards under the 2019 Plan. The material terms of the 2019 Plan are expected to be as follows:

*Stock Subject to the Plan*

The number of shares reserved for issuance under the 2019 Plan is            , plus an annual increase added on the first day of each fiscal year, beginning with the fiscal year ending December 31, 2020 and continuing until and including the fiscal year ending December 31, 2029. The annual increase will be equal to    % of the number of shares of common stock outstanding on the first day of such fiscal year,            shares of our common stock or such lesser amount as determined by our board of directors. To the extent an equity award granted under the 2019 Plan or a prior equity plan of ours (other than any substitute award) expires or otherwise terminates without having been exercised or paid in full, or is settled in cash, the shares subject to such award will become available for future grant under the 2019 Plan. In addition, to the extent shares subject to an award granted under the 2019 Plan or a prior equity plan of ours are withheld to satisfy a participant's tax withholding obligation upon the exercise or settlement of such award (other than any substitute award) or to pay the exercise price of a stock option, such shares will become available for future grant under the 2019 Plan.

*Plan Administration*

Our compensation committee will administer the 2019 Plan. Our board of directors has the authority to amend and modify the 2019 Plan, subject to any stockholder approval required by applicable law or stock exchange rules. Subject to the terms of the 2019 Plan, our compensation committee will have the authority to determine the eligibility for awards and the terms, conditions and restrictions, including vesting terms, the number of shares subject to an award and any performance goals applicable to grants made under the 2019 Plan. The compensation committee also will have the authority, subject to the terms of the 2019 Plan, to construe and interpret the 2019 Plan and awards, and amend outstanding awards at any time.

*Stock Options and Stock Appreciation Rights*

Our compensation committee may grant incentive stock options, nonstatutory stock options and stock appreciation rights under the 2019 Plan, provided that incentive stock options are granted only to employees. The exercise price of stock options and stock appreciation rights under the 2019 Plan will be fixed by the compensation committee, but must equal at least 100% of the fair market value of our common stock on the date of grant. The term of an option or stock appreciation right may not exceed ten years; provided, however, that an incentive stock option held by an employee who owns more than 10% of all of our classes of stock, or of certain of our affiliates, may not have a term in excess of five years, and must have an exercise price of at least 110% of the fair market value of our common stock on the grant date. Subject to the provisions of the 2019 Plan, the compensation committee will determine the remaining terms of the options and stock appreciation rights (e.g., vesting). Upon a participant's termination of service, the participant may exercise his or her option or stock appreciation right, to the extent vested (unless the compensation committee permits otherwise), as specified in the award agreement.

113

**Table of Contents**

*Stock Awards*

Our compensation committee will decide at the time of grant whether an award will be in the form of restricted stock, restricted stock units or other stock award. The compensation committee will determine the number of shares subject to the award, vesting and the nature of any performance measures. Unless otherwise specified in the award agreement, the recipient of restricted stock will have voting rights and be entitled to receive dividends when and if declared with respect to his or her shares of restricted stock. The recipient of restricted stock units will not have voting rights, but his or her award agreement may provide for the receipt of dividend equivalents. Our compensation committee may grant other stock awards that are based on or related to shares of our common stock, such as awards of shares of common stock granted as bonus and not subject to any vesting conditions, deferred stock units, stock purchase rights and shares of our common stock issued in lieu of our obligations to pay cash under any compensatory plan or arrangement.

*Performance Awards*

Our compensation committee will determine the value of any performance award, the vesting and nature of the performance measures, and whether the award is denominated or settled in cash or in shares of our common stock. The performance goals applicable to a particular award will be determined by our compensation committee at the time of grant.

*Transferability of Awards*

The 2019 Plan does not allow awards to be transferred other than by will or the laws of inheritance following the participant's death, and options may be exercised during the lifetime of the participant only by the participant. However, an award agreement may permit a participant to assign an award to a family member by gift, pursuant to a domestic relations order, to a charitable organization designated by the participant or to a trust, family limited partnership or similar entity established for one of the participant's family members. A participant may also designate a beneficiary who will receive outstanding awards upon the participant's death.

*Certain Adjustments*

If any change is made in our common stock subject to the 2019 Plan, or subject to any award agreement under the 2019 Plan, without the receipt of consideration by us, such as through a stock split, stock dividend, extraordinary distribution, recapitalization, combination of shares, exchange of shares or other similar transaction, appropriate adjustments will be made in the number, class and price of shares subject to each outstanding award and the numerical share limits contained in the plan.

*Change in Control*

Subject to the terms of the applicable award agreement, upon a "change in control" (as defined in the 2019 Plan), our board of directors may, in its discretion, determine whether some or all outstanding options and stock appreciation rights will become exercisable in full or in part, whether the restriction period and performance period applicable to some or all outstanding restricted stock awards and restricted stock unit awards will lapse in full or in part and whether the performance measures applicable to some or all outstanding awards will be deemed to be satisfied. Our board of directors may further require that shares of stock of the corporation resulting from such a change in control, or a parent corporation thereof, be substituted for some or all of our shares of common stock subject to an outstanding award and that any outstanding awards, in whole or in part, be surrendered to us by the holder and be immediately cancelled by us in exchange for a cash payment, shares of capital stock of the corporation resulting from or succeeding us or a combination of both cash and such shares of stock.

114

**Table of Contents**

*Clawback*

Awards granted under the 2019 Plan and any cash payment or shares of our common stock delivered pursuant to an award are subject to forfeiture, recovery or other action pursuant to the applicable award agreement or any clawback or recoupment policy that we may adopt.

*Plan Termination and Amendment*

Our board of directors has the authority to amend, suspend or terminate the 2019 Plan, subject to any requirement of stockholder approval required by law or stock exchange rules. Our 2019 Plan will terminate on the ten-year anniversary of its approval by our board of directors, unless we terminate it earlier.

*New Plan Benefits*

The compensation committee has the discretion to grant awards under the 2019 Plan, and therefore it is not possible at the time of filing of this prospectus to determine future awards that will be received by our named executive officers or others under the 2019 Plan. All of our officers, directors, employees, consultants, agents and independent contractors are eligible for consideration to participate in the 2019 Plan.

**2011 Equity Incentive Plan**

The following is a description of the material terms of the 2011 Plan. The summary below does not contain a complete description of all provisions of the 2011 Plan and is qualified in its entirety by reference to the 2011 Plan, a copy of which will be included as an exhibit to the registration statement of which this prospectus forms a part.

As discussed above, we expect to replace the 2011 Plan with a new plan adopted prior to the completion of this offering. Once that new plan becomes effective, we will no longer make awards under the 2011 Plan. However, the 2011 Plan will continue to govern outstanding awards granted prior to its termination.

The purposes of the 2011 Plan are to: attract and retain the best available personnel for positions of substantial responsibility; provide additional incentives to employees, directors and consultants; and promote the success of our business. Our 2011 Plan provides for the grant of incentive stock options (within the meaning of Code Section 422), nonstatutory stock options, stock appreciation rights, restricted stock and restricted stock units. Officers, directors, employees and consultants who provide services to us or to any parent or subsidiary of ours are eligible to receive such awards; provided, however, that only officers and employees may receive incentive stock options. The material terms of the 2011 Plan are as follows.

*Stock Subject to the Plan*

The number of shares reserved for issuance under the 2011 Plan is 25,974,511. To the extent an award granted under the 2011 Plan is not issued or delivered or is returned to us by reason of the expiration, termination, cancellation, forfeiture or cash settlement of such award, the shares subject to such award will become available for future grant under the 2011 Plan. With respect to stock appreciation rights, only shares actually issued pursuant to stock appreciation rights will cease to be available under the 2011 Plan. In addition, to the extent shares subject to an award are withheld to satisfy a participant's tax withholding obligation upon the exercise or settlement of such award or to pay the exercise price of a stock option, such shares will become available for future grant under the 2011 Plan. Finally, if shares issued pursuant to awards of restricted stock or restricted stock units are repurchased by, or forfeited to, us due to the failure to vest, such shares will become available for future grant under the 2011 Plan.

*Plan Administration*

Historically, our board of directors has administered the 2011 Plan, which included the authority to determine the eligibility for awards and the terms, conditions, and restrictions, including vesting terms, the

115

**Table of Contents**

number of shares subject to an award and any performance goals applicable to grants made under the 2011 Plan. The board of directors, as administrator of the 2011 Plan, also had the authority, subject to the terms of the 2011 Plan, to construe and interpret the 2011 Plan and awards, and amend outstanding awards at any time.

As noted above, once our 2019 Plan becomes effective, we will no longer make awards under the 2011 Plan; however, the 2011 Plan will continue to govern outstanding awards granted prior to its termination. The board of directors has designated the compensation committee as the administrator of the 2011 Plan with respect to these outstanding awards.

*Stock Options and Stock Appreciation Rights*

Our compensation committee may grant incentive stock options, nonstatutory stock options and stock appreciation rights under the 2011 Plan, provided that incentive stock options are granted only to officers and employees. The exercise price of stock options and stock appreciation rights under the 2011 Plan will be fixed by the compensation committee, but must equal at least 100% of the fair market value of our common stock on the date of grant. The term of an option or stock appreciation right may not exceed ten years; provided, however, that an incentive stock option held by an employee who owns more than 10% of all of our classes of stock, or of any parent or subsidiary of ours, may not have a term in excess of five years and must have an exercise price of at least 110% of the fair market value of our common stock on the grant date. Subject to the provisions of the 2011 Plan, the compensation committee will determine the remaining terms of the options and stock appreciation rights (e.g., vesting). Upon a participant's termination of service for a reason other than the participant's death or disability, the participant may exercise his or her option or stock appreciation right, to the extent vested (unless the compensation committee permits otherwise), within 30 days of such termination or as specified in the award agreement. Upon a participant's termination of service due to the participant's death or disability, the participant (or, in the case of the participant's death, the participant's designated beneficiary or the personal representative of the participant's estate) may exercise his or her option or stock appreciation right, to the extent vested (unless the compensation committee permits otherwise), within 6 months of such termination or as specified in the award agreement.

*Stock Awards*

Our compensation committee will decide at the time of grant whether an award will be in the form of restricted stock or restricted stock units. The compensation committee will determine the number of shares subject to the award, vesting and the nature of any performance measures. Unless otherwise specified in the award agreement, the recipient of restricted stock will have voting rights and be entitled to receive dividends with respect to his or her shares of restricted stock. The recipient of restricted stock units will not have voting rights and will not be entitled to receive dividend equivalents.

*Certain Adjustments*

If any dividend or other distribution, recapitalization, stock split, reverse stock split, reorganization, merger, consolidation, split-up, spin-off, combination, repurchase, exchange of our share or other of our securities or any other change in our corporate structure affecting our shares occurs, appropriate adjustments will be made in the number, class and price of shares subject to each outstanding award and the numerical share limits contained in the plan.

*Merger or Change in Control*

Subject to the terms of individual award agreements, upon a merger or "change in control" (as defined in the 2011 Plan), our compensation committee may, in its discretion, determine whether some or all outstanding options and stock appreciation rights will become exercisable in full or in part, whether the restriction period applicable to some or all outstanding restricted stock awards and restricted stock unit awards will lapse in full or in part and whether the performance measures applicable to some or all outstanding awards will be deemed to be

116

Table of Contents

satisfied. Our compensation committee may further require that shares of stock of the corporation resulting from such a merger or change in control, or a parent corporation thereof, be substituted for some or all of our shares of common stock subject to an outstanding award and that any outstanding awards, in whole or in part, be surrendered to us by the holder and be immediately cancelled by us in exchange for a cash payment, shares of capital stock of the corporation resulting from or succeeding us or a combination of both cash and such shares of stock. This offering will not constitute a change in control under the 2011 Plan.

*Plan Termination and Amendment*

Our board of directors has the authority to amend, alter, suspend or terminate the 2011 Plan, subject to any requirement of stockholder approval required by law or stock exchange rules.

**Employee Stock Purchase Plan**

In connection with this offering, our board of directors expects to adopt, and our current stockholders expect to approve, the ESPP to be effective upon the completion of this offering. The material terms of the ESPP are expected to be as follows.

Generally, all of our employees (including those of our consolidated subsidiaries, other than those subsidiaries excluded from participation by our board of directors or compensation committee) who have been employed for at least 90 days are eligible to participate in the ESPP. The ESPP permits employees to purchase our common stock through payroll deductions during     -month offering periods. Participants may authorize payroll deductions of a specific percentage of compensation of up to    %, with such deductions being accumulated for        -month purchase periods beginning on the first business day of each offering period and ending on the last business day of each offering period. Under the terms of the ESPP, the purchase price per share with respect to an offering period will equal the lesser of (1) 85% of the fair market value of a share of our common stock on the first business day of such offering period and (2) 85% of the fair market value of a share of our common stock on the last business day of such offering period, although the compensation committee has discretion to change the purchase price with respect to future offering periods, subject to the terms of the ESPP. No employee may participate in an offering period if the employee owns 5% or more of the total combined voting power or value of our stock or the stock of any of our subsidiaries. No participant may purchase more than        shares of our common stock during any offering period.

Subject to adjustment for stock splits, stock dividends or other changes in our capital stock,     shares of our common stock have been reserved for issuance under the ESPP. Subject to the adjustment provisions contained in the ESPP, the maximum number of shares of our common stock available under the ESPP will automatically increase on the first trading day in January of each calendar year, commencing January 2020, by an amount equal to the lesser of    % of the shares of our common stock issued and outstanding on December 31 of the immediately preceding calendar year,        shares of our common stock or such lesser amount as is determined by our board of directors.

The ESPP will be administered by the compensation committee or a designee of the compensation committee. The ESPP may be amended by our board of directors or the compensation committee but may not be amended without prior stockholder approval to the extent required by Section 423 of the Code. The ESPP shall continue in effect until the earlier of (1) the termination of the ESPP by our board of directors or the compensation committee pursuant to the terms of the ESPP and (2) the ten-year anniversary of the effective date of the ESPP, with no new offering periods commencing on or after such ten-year anniversary.

117

**Table of Contents**

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

In addition to the compensation arrangements discussed in the section titled "Executive Compensation," we describe below the transactions since January 1, 2015 to which we have been a participant, in which the amount involved in the transaction exceeds or will exceed $120,000 and in which any of our directors, executive officers or holders of more than 5% of our capital stock, or any immediate family member of, or person sharing the household with, any of these individuals, had or will have a direct or indirect material interest.

### Equity Financings

#### Series D Preferred Stock Financing

From March 2015 through April 2015, we sold an aggregate of 7,162,321 shares of our Series D preferred stock to related persons at a purchase price of $2.79239 per share, for an aggregate purchase price of $19,999,994. The following table summarizes purchases of our Series D preferred stock by such related persons:

| Stockholder | Shares of Series D Preferred Stock | Total Purchase Price |
|---|---|---|
| Canaan IX, L.P.[1][2] | 1,790,580 | $ 4,999,998 |
| InterWest Partners X, L.P.[1] | 1,790,580 | 4,999,998 |
| e.ventures Growth, LP[1] | 1,110,160 | 3,100,000 |
| Greycroft Growth, L.P.[1] | 2,471,001 | 6,899,998 |

[1]   Currently holds more than 5% of our outstanding common stock.
[2]   Maha Ibrahim, a member of our board of directors, is a General Partner at Canaan Partners.

#### Series E Preferred Stock Financing

In April 2016, we sold an aggregate of 10,868,329 shares of our Series E preferred stock to related persons at a purchase price of $2.9440 per share, for an aggregate purchase price of $31,996,361. The following table summarizes purchases of our Series E preferred stock by such related persons:

| Stockholder | Shares of Series E Preferred Stock | Total Purchase Price |
|---|---|---|
| Canaan IX, L.P.[1][2] | 654,298 | $ 1,926,253 |
| InterWest Partners X, L.P.[1] | 739,272 | 2,176,417 |
| e.ventures Growth, LP[1] | 305,041 | 898,041 |
| Entities affiliated with Greenspring Associates[1][3] | 8,491,847 | 24,999,998 |
| Greycroft Growth, L.P.[1] | 677,871 | 1,995,652 |

[1]   Currently holds more than 5% of our outstanding common stock.
[2]   Maha Ibrahim, a member of our board of directors, is a General Partner at Canaan Partners.
[3]   Entities affiliated with Greenspring Associates include Greenspring Opportunities III, L.P., Greenspring Global Partners VII-A, L.P., Greenspring Global Partners VII-C, L.P., Greenspring Secondaries Fund III, L.P. and AU Special Investments, L.P.

#### Series F Preferred Stock Financing

In May 2017, we sold an aggregate of 12,956,724 shares of our Series F preferred stock to Great Hill Equity Partners V, L.P. and Great Hill Investors, LLC at a purchase price of $3.8590 per share, for an aggregate purchase price of $49,999,998. Entities affiliated with Great Hill Partners currently hold more than 5% of our voting securities. Michael Kumin, a member of our board of directors, is a Managing Partner of Great Hill Partners.

118

Table of Contents

*Series G Preferred Stock Financing*

In June 2018, we issued 2,627,625 shares of Series G preferred stock upon conversion of convertible notes to related persons at a purchase price of $4.7565 for an aggregate purchase price of $12,498,298. In June and July 2018, we issued 17,029,327 shares of Series G preferred stock to related persons at a purchase price of $5.2850 for an aggregate purchase price of $89,999,993. The following table summarizes purchases of our Series G preferred stock by such related persons:

| Stockholder | Shares of Series G Preferred Stock | Total Purchase Price |
|---|---|---|
| Entities affiliated with Great Hill Partners[1][2] | 3,905,771 | $ 20,077,800 |
| Canaan IX, L.P.[1][3] | 427,020 | 2,031,121 |
| Entities affiliated with PWP Growth Equity[1][4] | 14,191,106 | 74,999,995 |
| InterWest Partners X, L.P. [1] | 427,020 | 2,031,121 |
| e.ventures Growth, LP[1] | 132,523 | 630,346 |
| Entities affiliated with Greenspring Associates[1][5] | 279,016 | 1,327,140 |
| Entities affiliated with Greycroft[1][6] | 294,496 | 1,400,768 |

[1]  Currently holds more than 5% of our outstanding common stock.
[2]  Entitles affiliated with Great Hill Partners include Great Hill Equity Partners V, L.P. and Great Hill Investors, LLC. Michael Kumin, a member of our board of directors, is a Managing Partner of Great Hill Partners.
[3]  Maha Ibrahim, a member of our board of directors, is a General Partner at Canaan Partners.
[4]  Entities affiliated with PWP Growth Equity include PWP Growth Equity Fund II LP and PWP Growth Equity Fund II B LP. Chip Baird, a member of our board of directors, is the Co-head of PWP Growth Equity.
[5]  Entities affiliated with Greenspring Associates include Greenspring Opportunities III, L.P., Greenspring Global Partners VII-A, L.P., Greenspring Global Partners VII-C, L.P., Greenspring Secondaries Fund III, L.P. and AU Special Investments, L.P.
[6]  Entitles affiliated with Greycroft include Greycroft Growth, L.P., Greycroft Partners II, L.P., GCEV Co-Invest TRR, L.P. and GCEV Co-Invest TRR-1, L.P.

*Series H Preferred Stock Financing*

In March 2019, we sold an aggregate of 6,786,721 shares of our Series H preferred stock to related persons at a purchase price of $6.8748 per share, for an aggregate purchase price of $46,657,350. The following table summarizes purchases of our Series H preferred stock by such related persons:

| Stockholder | Shares of Series H Preferred Stock | Total Purchase Price |
|---|---|---|
| Entities affiliated with Greycroft[1][2] | 4,336,732 | $29,814,165 |
| Entities affiliated with Great Hill Partners[1][3] | 1,304,058 | 8,965,138 |
| Entities affiliated with PWP Growth Equity[1][4] | 709,555 | 4,878,049 |
| Entities affiliated with Greenspring Associates[1][5] | 436,376 | 2,999,998 |

[1]  Currently holds more than 5% of our outstanding common stock.
[2]  Entities affiliated with Greycroft include Greycroft Growth, L.P., Greycroft Partners II, L.P., GCEV Co-Invest TRR, L.P. and GCEV Co-Invest TRR-1, L.P.
[3]  Entitles affiliated with Great Hill Partners include Great Hill Equity Partners V, L.P. and Great Hill Investors, LLC. Michael Kumin, a member of our board of directors, is a Managing Partner of Great Hill Partners.
[4]  Entitles affiliated with PWP Growth Equity include PWP Growth Equity Fund II LP and PWP Growth Equity Fund II B LP. Chip Baird, a member of our board of directors, is the Co-head of PWP Growth Equity.
[5]  Entities affiliated with Greenspring Associates include Greenspring Opportunities III, L.P., Greenspring Global Partners VII-A, L.P., Greenspring Global Partners VII-C, L.P., Greenspring Secondaries Fund III, L.P. and AU Special Investments, L.P.

**Investors' Rights Agreement**

We are party to an investors' rights agreement, dated as of March 22, 2019 ("IRA"), between us and the holders of these registrable securities which provides, among other things, that certain holders of our capital

Table of Contents

stock, including entities affiliated with Great Hill Partners, Canaan Partners, PWP Growth Equity, InterWest Partners, e.ventures, Greenspring Associates and Greycroft have the right to demand that we file a registration statement or request that their shares of our capital stock be covered by a registration statement that we are otherwise filing. Chip Baird, Maha Ibrahim and Michael Kumin, members of our board of directors, are or have been affiliated with PWP Growth Equity, Canaan Partners and Great Hill Partners, respectively. Keval Desai and Mathias Schilling, former members of our board of directors, were affiliated with InterWest Partners, and e.ventures, respectively, during their respective service on our board of directors. Julie Wainwright, our Chief Executive Officer and Chairperson of our board of directors, is a party to the IRA. Rita Sahi, the mother of Rati Sahi Levesque, one of our executive officers, is also a party to the IRA. See the section titled "Description of Capital Stock—Registration Rights" for additional information regarding these registration rights.

### Secondary Sales

Pursuant to certain of our equity compensation plans and certain agreements with our stockholders, including a right of first refusal and co-sale agreement, dated as of March 22, 2019, we or our assignees have a right to purchase shares of our capital stock which stockholders propose to sell to other parties. These rights will terminate immediately prior to the completion of this offering. In September 2018 and March 2019, we waived our right of first refusal in connection with the sale of certain shares of our capital stock by our executive officers, Julie Wainwright, Matt Gustke, Rati Sahi Levesque and Fredrik Björk. Greenspring Associates, who currently holds more than 5% of our outstanding common stock, was the purchaser of certain of such shares.

### Indemnification of Directors and Executive Officers

We have entered into indemnification agreements with each of our directors and executive officers. The indemnification agreements and our bylaws will require us to indemnify our directors to the fullest extent not prohibited by DGCL. Subject to very limited exceptions, our bylaws will also require us to advance expenses incurred by our directors and officers. For more information regarding these agreements, see the section titled "Management—Limitations on Director and Officer Liability and Indemnification."

### Policies and Procedures for Related Party Transactions

Our audit committee has the primary responsibility for the review, approval and oversight of any "related party transaction," which is any transaction, arrangement or relationship (or series of similar transactions, arrangements or relationships) in which we are, were or will be a participant and the amount involved exceeds $120,000, and in which the related person has, had or will have a direct or indirect material interest. We intend to adopt a written related party transaction policy to be effective upon the completion of this offering. Under our related party transaction policy, our management will be required to submit any related person transaction not previously approved or ratified by our audit committee to our audit committee. In approving or rejecting the proposed transactions, our audit committee will take into account all of the relevant facts and circumstances available.

120

Table of Contents

**PRINCIPAL STOCKHOLDERS**

The following table sets forth certain information with respect to the beneficial ownership of our common stock as of May 13, 2019 and as adjusted to reflect the sale of our common stock offered by us in this offering for:

- each person, or group of affiliated persons, known by us to beneficially own more than 5% of our common stock;

- each of our directors;

- each of our named executive officers; and

- all directors and executive officers as a group.

Beneficial ownership is determined in accordance with the rules of the SEC. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, common stock subject to options or warrants held by that person that are currently exercisable or exercisable within 60 days of May 13, 2019 are deemed outstanding, but are not deemed outstanding for computing the percentage ownership of any other person. Percentage of beneficial ownership is based on 135,499,731 shares of common stock outstanding as of May 13, 2019 and assumes the conversion of 114,960,357 outstanding shares of our preferred stock into 116,727,269 shares of our common stock immediately prior to the completion of this offering, as if this conversion had occurred as of May 13, 2019. Percentage of beneficial ownership after this offering (assuming no exercise of the underwriters' option to purchase additional shares) also assumes the sale by us of          shares of common stock in this offering.

121

Table of Contents

To our knowledge, except as set forth in the footnotes to this table and subject to applicable community property laws, each person named in the table has sole voting and investment power with respect to the shares set forth opposite such person's name. Except as otherwise indicated, the address of each of the persons in this table is c/o The RealReal, Inc., 55 Francisco Street, Suite 600, San Francisco, CA 94133.

| Name of Beneficial Owner | Shares Beneficially Owned Before and After this Offering | Percentage of Shares Beneficially Owned Before this Offering | Percentage of Shares Beneficially Owned After this Offering |
|---|---|---|---|
| **Directors and Named Executive Officers:** | | | |
| Julie Wainwright[1] | 12,191,690 | 8.8% | |
| Chip Baird[2] | 14,900,661 | 11.0 | |
| Maha Ibrahim[3] | 17,613,842 | 13.0 | |
| Rob Krolik[4] | 4,166 | * | |
| Michael Kumin[5] | 19,933,465 | 14.7 | |
| Stefan Larsson[6] | 23,086 | * | |
| Niki Leondakis[7] | 1,666 | * | |
| James R. Miller[8] | 1,666 | * | |
| Matt Gustke[9] | 907,325 | * | |
| Rati Sahi Levesque[10] | 1,180,659 | * | |
| All executive officers and directors as a group (12 persons)[11] | 67,490,404 | 47.7 | |
| **5% Shareholders:** | | | |
| Entities affiliated with Great Hill Partners[12] | 19,933,465 | 14.7 | |
| Canaan IX, L.P.[13] | 17,613,842 | 13.0 | |
| Entities affiliated with PWP Growth Equity[14] | 14,900,661 | 11.0 | |
| InterWest Partners X, L.P.[15] | 13,408,160 | 9.9 | |
| Entities affiliated with Greycroft[16] | 12,219,462 | 9.0 | |
| Entities affiliated with e.ventures[17] | 10,971,406 | 8.1 | |
| Entities affiliated with Greenspring Associates[18] | 10,092,304 | 7.4 | |

\* Indicates beneficial ownership of less than 1% of the outstanding shares of our common stock.

(1) Consists of (a) 8,430,643 shares of common stock held by Julie Wainwright, and (b) 3,761,047 shares of common stock issuable upon exercise of options held by Ms. Wainwright that are vested and exercisable as of May 13, 2019 or will become vested and exercisable within 60 days of such date.

(2) Consists of 14,900,661 shares beneficially owned by entities affiliated with PWP Growth Equity, as set forth in footnote (14). Mr. Baird is the Co-head of PWP Growth Equity and disclaims beneficial ownership of the shares listed in footnote (14) within the meaning of Rule 16a-1(a)(2) promulgated pursuant to the Exchange Act, except to the extent of his proportionate pecuniary interest therein, if any. The address for Mr. Baird is 767 Fifth Avenue, New York, New York 10153.

(3) Consists of 17,613,842 shares beneficially owned by Canaan IX L.P., as set forth in footnote (13). Ms. Ibrahim is a General Partner at Canaan Partners and disclaims beneficial ownership of the shares listed in footnote (13), except to the extent of her proportionate pecuniary interest therein, if any. The address for Ms. Ibrahim is 2765 Sand Hill Road, Menlo Park, California 94025.

(4) Consists of 4,166 shares of common stock issuable upon exercise of options held by Rob Krolik that are vested and exercisable as of May 13, 2019 or will become vested and exercisable within 60 days of such date.

(5) Consists of 19,933,465 shares beneficially owned by entities affiliated with Great Hill Partners, as set forth in footnote (12). Mr. Kumin is a Managing Partner of Great Hill Partners and disclaims beneficial ownership of the shares listed in footnote (12), except to the extent of his proportionate pecuniary interest therein, if any. The address for Mr. Kumin is c/o Great Hill Partners, L.P., One Liberty Square, Boston, Massachusetts 02109.

(6) Consists of (a) 18,920 shares of common stock held by Stefan Larsson, and (b) 4,166 shares of common stock issuable upon exercise of options held by Mr. Larsson that are vested and exercisable as of May 13, 2019 or will become vested and exercisable within 60 days of such date.

(7) Consists of 1,666 shares of common stock issuable upon exercise of options held by Niki Leondakis that are vested and exercisable as of May 13, 2019 or will become vested and exercisable within 60 days of such date.

(8) Consists of 1,666 shares of common stock issuable upon exercise of options held by James R. Miller that are vested and exercisable as of May 13, 2019 or will become vested and exercisable within 60 days of such date.

122

(9)   Consists of (a) 141,874 shares of common stock held by Matt Gustke, and (b) 765,451 shares of common stock issuable upon exercise of options held by Mr. Gustke that are vested and exercisable as of May 13, 2019 or will become vested and exercisable within 60 days of such date.

(10)   Consists of (a) 204,558 shares of common stock held by Rati Sahi Levesque, and (b) 976,101 shares of common stock issuable upon exercise of options held by Ms. Levesque that are vested and exercisable as of May 13, 2019 or will become vested and exercisable within 60 days of such date.

(11)   Consists of (a) all shares of common stock beneficially owned by our directors and five current executive officers, and (b) all shares of common stock issuable upon exercise of options held by our directors and five current executive officers that are vested and exercisable as of May 13, 2019 or will become vested and exercisable within 60 days of such date.

(12)   Consists of (a) 19,856,525 shares of common stock held by Great Hill Equity Partners V, L.P. ("GHEP V"), LP and (b) 76,940 shares of common stock held by Great Hill Investors, LLC ("GHI"). Great Hill Partners GP V, L.P. ("GHP V GP"), is the general partner of GHEP V, L.P. GHP V, LLC is the managing member of GHP V GP. Christopher Gaffney, John G. Hayes, Michael A. Kumin, Mark D. Taber and Matthew T. Vettel (collectively, the "GH Control Persons") are the managers of GHI and GHP V, LLC. As such, each of the GH Control Persons, GHP V, LLC, and GHP V GP may be deemed to beneficially own and have voting, investment and dispositive power with respect to the shares held by GHEP V, LP and GHI. Each of the GH Control Persons, GHP V, LLC and GHP V GP disclaims beneficial ownership of such shares, except to the extent of its or his proportionate pecuniary interest therein, if any. The address of each of GHEP V, LP, GHI, GHP V, LLC, GHP V GP, and the GH Control Persons is c/o Great Hill Partners, L.P., One Liberty Square, Boston, Massachusetts 02109.

(13)   Consists of 17,613,842 shares of common stock held by Canaan IX, L.P. ("Canaan IX"). Canaan Partners IX LLC is the general partner of Canaan IX and may be deemed to beneficially own and have voting, investment and dispositive power with respect to the shares held by Canaan IX. The managing members of Canaan Partners IX LLC are Brenton K. Ahrens, Stephen M. Bloch, Daniel T. Ciporin, Wende S. Hutton, Maha S. Ibrahim, Deepak Kamra, and Guy M. Russo (collectively, the "Canaan Managing Members"). Investment, voting and dispositive decisions with respect to the shares held by Canaan IX are made by the managers of Canaan Partners IX LLC, collectively. The Canaan Managing Members and Canaan Partners IX LLC disclaim beneficial ownership of such shares, except to the extent of its, his, or her proportionate pecuniary interest therein, if any. The address of Canaan IX, Canaan Partners IX LLC, and each of the Canaan Managing Members is 2765 Sand Hill Road, Menlo Park, California 94025.

(14)   Consists of (a) 11,570,364 shares of common stock held by PWP Growth Equity Fund II LP ("PWPGEF II") and (b) 3,330,297 shares of common stock held by PWP Growth Equity Fund II B LP, ("PWPGEF II B"). PWP Growth Equity Fund II GP LLC ("PWPGEF II GP") is the general partner of PWPGEF II and of PWPGEF II B. PWPGEF II GP is managed by its managing member, Perella Weinberg Partners Capital Management LP ("PWPCM"). PWPCM is managed by its general partner, Perella Weinberg Partners Capital Management GP LLC ("PWPCMGP"). PWPCMGP is managed by its managing member, PWP Capital Group LP ("PWPCG"). PWPCG is managed by its general partner, PWP Capital Group GP LLC ("PWPCGGP"). PWPGCGP is managed by its managing member, PWP Capital Holdings LP ("PWPCH"). PWPCH is managed by its general partner, Perella Weinberg Partners LLC ("PWPLLC"). Each of PWPGEF II GP, PWPCM, PWPCMGP, PWPCG, PWPCGGP, PWPCH and PWPLLC may be deemed to beneficially own and share voting, investment and dispositive power with respect to the shares held by PWPGEF II and PWPGEF II B. Each of PWPGEF II GP, PWPCM, PWPCMGP, PWPCG, PWPCGGP, PWPCH and PWPLLC disclaims beneficial ownership of such shares within the meaning of Rule 16a-1(a)(2) promulgated pursuant to the Exchange Act, except to the extent of its proportionate pecuniary interest therein, if any. Pursuant to a delegation of certain investment management authority by PWPCM to Chip Baird and David Ferguson as portfolio managers of PWP Growth Equity, each of Mr. Baird and Mr. Ferguson may be deemed to beneficially own and share voting, investment and dispositive power with respect to the shares held by PWPGEF II and PWPGEF II B. Each of Mr. Baird and Mr. Ferguson disclaims beneficial ownership of such shares within the meaning of Rule 16a-1(a)(2) promulgated pursuant to the Exchange Act, except to the extent of his proportionate pecuniary interest therein, if any. The address of each of PWPGEF II, PWPGEF II B, PWPGEF II GP, PWPCM, PWPCMGP, PWPCG, PWPCGGP, PWPCH, PWPLLC and Messrs. Baird and Ferguson is 767 Fifth Avenue, New York, New York 10153.

(15)   Consists of 13,408,160 shares of common stock held by InterWest Partners X, L.P ("IWP X"). InterWest Management Partners X, LLC ("IMP X"), is the general partner of IWP X. Gilbert H. Kliman and Arnold L. Oronsky are Managing Directors of IMP X. Keval Desai and Khaled A. Nasr are Venture Members of IMP X. As such, each of IMP X, Gilbert H. Kliman, Arnold L. Oronsky, Keval Desai and Khaled A. Nasr may be deemed to beneficially own and share voting, investment and dispositive power with respect to the shares held by IWP X. Each of IMP X, Gilbert H. Kliman, Arnold L. Oronsky, Keval Desai and Khaled A. Nasr disclaims beneficial ownership of such shares, except to the extent of its or his proportionate pecuniary interest therein, if any. The address of each of IWP X, IMP X, Gilbert H. Kliman, Arnold L. Oronsky, Keval Desai and Khaled A. Nasr is 2710 Sand Hill Road, Suite 200, Menlo Park, California 94025.

(16)   Consists of (a) 4,262,116 shares of common stock held by Greycroft Partners II, L.P. ("GP II"), (b) 3,620,614 shares of common stock held by Greycroft Growth, L.P. ("GG LP, (c) 3,594,893 shares of common stock held by GCEV Co-Invest TRR, L.P. ("Co-Invest TRR"), and (d) 741,839 shares of common stock held by GCEV Co-Invest TRR-1, L.P. ("Co-Invest TRR-1"). Greycroft Managers II, LLC ("GM II") is the general partner of GP II. Greycroft Growth, LLC ("GG LLC") is the general partner of GG LP. GCEV TRR, LLC ("GCEV TRR") is the general partner of each of Co-Invest TRR and Co-Invest TRR-1. GM II may be deemed to beneficially own and have voting, investment and dispositive power with respect to the shares held by GP II. GG LLC may be deemed to beneficially own and have voting, investment and dispositive power with respect to the shares held by GG LP. GCEV TRR may be deemed to beneficially own and have voting, investment and dispositive power with respect to the shares held by Co-Invest TRR and Co-Invest TRR-1. Each of (i) GM II, GP LLC and GCEV TRR, (ii) Greycroft LP, the management company of each of GP II, GG LP, Co-Invest TRR and Co-Invest TRR-1, and (iii) Dana Settle, Ian Sigalow, John Elton and Mark Terbeek, Directors of each of Greycroft LP, GM II, GP LLC and GCEV TRR, may be deemed to beneficially own and have voting, investment and dispositive power with respect to the shares held

123

Table of Contents

by GP II, GG LP, Co-Invest TRR and Co-Invest TRR-1. Each of GM II, GG LLC, GCEV TRR, Greycroft LP, Dana Settle, Ian Sigalow, John Elton and Mark Terbeek disclaims beneficial ownership of such shares, except to the extent of its, his or her proportionate pecuniary interest therein, if any. The address of each of GP II, GG LP, Co-Invest TRR, Co-Invest TRR-1, GM II, GG LLC, GCEV TRR, Greycroft LP, Dana Settle, Ian Sigalow, John Elton and Mark Terbeek is 292 Madison Avenue, 20th Floor, New York, New York 10017.

(17)  Consists of (a) 9,343,922 shares of common stock held by BV eVenture Fund II, LP ("BVEVF II") and (b) 1,627,484 shares of common stock held by e.ventures Growth, L.P. ("EVG"). eVenture Capital Partners II LLC ("EVCP II"), is the general partner of BVEVF II. e.ventures Growth GP, LLC, or EVG GP, is the general partner of EVG. Mathias Schilling and Thomas Gieselmann are the managers of EVG GP and EVCP II. Each of Mathias Schilling and Thomas Gieselmann may be deemed to beneficially own and have voting, investment and dispositive power with respect to the shares held by BVEVF II and EVG. EVCP II may be deemed to beneficially own and have voting, investment and dispositive power with respect to the shares held by BVEVF II. EVG GP may be deemed to beneficially own and have voting, investment and dispositive power with respect to the shares held by EVG. Each of EVCP II, EVG GP, Mathias Schilling and Thomas Gieselmann disclaims beneficial ownership of such shares, except to the extent of its or his proportionate pecuniary interest therein, if any. The address of each of BVEVF II, EVG, EVCP II, EVG GP, Mathias Schilling and Thomas Gieselmann is 600 Montgomery Street, 43rd Floor, San Francisco, California 94111.

(18)  Consists of (a) 3,556,391 shares of common stock held by Greenspring Opportunities III, L.P. ("GO III"), (b) 3,200,751 shares of common stock held by AU Special Investments, L.P., or AU, (c) 1,946,083 shares of common stock held by Greenspring Global Partners VII-A, L.P. ("GGP VII-A"), (d) 187,749 shares of common stock held by Greenspring Global Partners VII-C, L.P. ("GGP VII-C"), and (e) 1,201,330 shares of common stock held by Greenspring Secondaries Fund III, L.P. ("Greenspring Secondaries"). Greenspring Opportunities General Partner III, L.P. ("GO III GP"), is the general partner of GO III. Greenspring Opportunities GP III, LLC ("GO III GP LLC"), is the general partner of GO III GP. Greenspring FF-GP III, LLC ("GS FF-GP"), is the general partner of AU. Greenspring SPV, LLC ("GS SPV"), is the member of GS FF-GP. Greenspring General Partner VII, L.P. ("Greenspring General Partner"), is the general partner of GGP VII-A and GGP VII-C. Greenspring GP VII, Ltd. ("Greenspring GP Ltd"), is the general partner of Greenspring General Partner. Greenspring Secondaries General Partner III, L.P. ("Secondaries GP"), is the general partner of Greenspring Secondaries. Greenspring Secondaries GP III, LLC ("Secondaries GP LLC"), is the general partner of Secondaries GP. Greenspring Associates, Inc. ("Greenspring Associates"), is the managing member of each of GO III GP LLC, GS SPV and Secondaries GP LLC. C. Ashton Newhall and James Lim are the directors of each of Greenspring GP Ltd. and Greenspring Associates. Each of C. Ashton Newhall and James Lim may be deemed to beneficially own and have voting, investment and dispositive power with respect to the shares held by GO III, AU, GGP VII-A, GGP VII-C and Greenspring Secondaries. Greenspring Associates may be deemed to beneficially own and have voting, investment and dispositive power with respect to the shares held by GO III, AU and Greenspring Secondaries. Each of GO III GP LLC and GO III GP may be deemed to beneficially own and have voting, investment and dispositive power with respect to the shares held by GO III. Each of GS FF-GP and GS SPV may be deemed to beneficially own and have voting, investment and dispositive power with respect to the shares held by AU. Each of Greenspring GP Ltd. and Greenspring General Partner may be deemed to beneficially own and have voting, investment and dispositive power with respect to the shares held by GGP VII-A and GGP VII-C. Each of Secondaries GP and Secondaries GP LLC may be deemed to beneficially own and have voting, investment and dispositive power with respect to the shares held by Greenspring Secondaries. Each of GO III GP, GO III GP LLC, GS FF-GP, GS SPV, Greenspring General Partner, Greenspring GP Ltd, Secondaries GP, Secondaries GP LLC, Greenspring Associates, C. Ashton Newhall and James Lim disclaims beneficial ownership of such shares, except to the extent of its or his proportionate pecuniary interest therein, if any. The address of each of GO III, AU, GGP VII-A, GGP VII-C, Greenspring Secondaries, GO III GP, GO III GP LLC, GS FF-GP, GS SPV Greenspring General Partner, Greenspring GP Ltd, Secondaries GP, Secondaries GP LLC, Greenspring Associates, C. Ashton Newhall, and James Lim is 100 Painters Mill Road, Suite 700, Owings Mills, Maryland 21117.

124

Table of Contents

## DESCRIPTION OF CAPITAL STOCK

This section contains a description of our capital stock and the material provisions of our certificate of incorporation and bylaws that will be in effect upon the completion of this offering and is qualified by reference to the forms of our certificate of incorporation and our bylaws filed as exhibits to the registration statement relating to this prospectus, and by the applicable provisions of Delaware law.

### General

Upon the completion of this offering, our certificate of incorporation will authorize          shares of common stock, $0.00001 par value per share, and          shares of undesignated preferred stock, $0.00001 par value per share, the rights, preferences and privileges of which may be designated from time to time by our board of directors.

Assuming the conversion of all outstanding shares of our preferred stock into shares of our common stock, which will occur immediately prior to the completion of this offering, as of          , there were outstanding          shares of our common stock, held by approximately          stockholders of record, and          shares of our common stock issuable upon exercise of outstanding stock options.

### Common Stock

#### *Dividend Rights*

Subject to preferences that may apply to shares of preferred stock outstanding at the time, the holders of outstanding shares of our common stock are entitled to receive dividends out of funds legally available if our board of directors, in its discretion, determines to issue dividends and only then at the times and in the amounts that our board of directors may determine. See the section titled "Dividend Policy" for more information.

#### *Voting Rights*

The holders of our common stock are entitled to one vote per share. Stockholders do not have the ability to cumulate votes for the election of directors. Our certificate of incorporation and bylaws that will be in effect upon completion of this offering will provide for a classified board of directors consisting of three classes of approximately equal size, each serving staggered three-year terms. Only one class of directors will be elected at each annual meeting of our stockholders, with the other classes continuing for the remainder of their respective three-year terms.

#### *No Preemptive or Similar Rights*

Our common stock is not entitled to preemptive rights and is not subject to redemption or sinking fund provisions.

#### *Right to Receive Liquidation Distributions*

Upon our liquidation, dissolution or winding-up, the assets legally available for distribution to our stockholders would be distributable ratably among the holders of our common stock and any participating preferred stock outstanding at that time, subject to prior satisfaction of all outstanding debt and liabilities and the preferential rights of and the payment of liquidation preferences, if any, on any outstanding shares of preferred stock.

**Table of Contents**

**Preferred Stock**

Pursuant to the provisions of our certificate of incorporation in effect prior to this offering, our          outstanding shares of preferred stock will automatically be converted into          shares of common stock immediately prior to the completion of this offering. Following the completion of this offering, no shares of our preferred stock will be outstanding.

Pursuant to our certificate of incorporation that will become effective immediately prior to the completion of this offering, our board of directors will be authorized, subject to limitations prescribed by Delaware law, to issue preferred stock in one or more series, to establish from time to time the number of shares to be included in each series and to fix the designation, powers, preferences and rights of the shares of each series and any of its qualifications, limitations or restrictions, in each case without further vote or action by our stockholders. Our board of directors can also increase or decrease the number of shares of any series of preferred stock, but not below the number of shares of that series then outstanding, without any further vote or action by our stockholders. Our board of directors may authorize the issuance of preferred stock with voting or conversion rights that could adversely affect the voting power or other rights of the holders of our common stock. The issuance of preferred stock, while providing flexibility in connection with possible acquisitions and other corporate purposes, could, among other things, have the effect of delaying, deferring or preventing a change in our control and might adversely affect the market price of our common stock and the voting and other rights of the holders of our common stock. We have no current plan to issue any shares of preferred stock.

**Stock Options**

As of          , we had outstanding options to purchase an aggregate of          shares of our common stock, with a weighted-average exercise price of $          per share, pursuant to our 2011 Plan.

**Registration Rights**

Following the completion of this offering, the holders of an aggregate of          shares of our common stock, including          shares of common stock issuable upon conversion of our preferred stock, or their permitted transferees, will be entitled to rights with respect to the registration of these shares under the Securities Act. These shares are referred to as registrable securities. These rights are provided under the terms of our investors' rights agreement, which registration rights include demand registration rights, Form S-3 registration rights and piggyback registration rights. All fees, costs and expenses incurred in connection with the registration of registrable securities, including reasonable fees and disbursements of one special counsel to the selling stockholders, will be borne by us and all selling expenses, including underwriting discounts and selling commissions, will be borne by the holders of the shares being registered.

The registration rights terminate upon the earlier of (1) the closing of a deemed liquidation event and (2) five years following the completion of this offering.

*Demand Registration Rights*

Under the terms of the IRA, if we receive a written request, at any time after 180 days following the effective date of this offering, from the holders of at least a majority of the registrable securities then outstanding that we file a registration statement under the Securities Act covering the registration of registrable securities and if the aggregate price to the public of the shares offered is at least $30.0 million, net of selling expenses, then we will be required to file as soon as practicable, and in any event no later than 60 days following such request, a registration statement covering all registrable securities requested to be registered for public resale. We are required to effect only two registrations pursuant to this provision of the IRA, and may postpone the filing of a registration statement for up to 60 days twice in any 12-month period if our board of directors determines that the

126

**Table of Contents**

filing would be seriously detrimental to us and our stockholders. We are not required to effect a demand registration under certain additional circumstances specified in the IRA, including at any time during the 180-day period after the effective date of this offering.

### Form S-3 Registration Rights

The holders of a majority of the registrable securities can request that we register all or part of their shares on Form S-3 if we are eligible to file a registration statement on Form S-3 and if the aggregate price to the public of the shares offered is at least $10.0 million, net of selling expenses. Upon such a request, we would be required to file as soon as practicable, and in any event no later than 45 days following such a request, a registration statement covering all registrable securities requested to be registered for public resale. We are not required to file a registration on Form S-3 if we have filed two registrations on Form S-3 in the proceeding 12-month period and may postpone the filing of a registration statement on Form S-3 for up to 60 days twice in any 12-month period if our board of directors determines that the filing would be seriously detrimental to us and our stockholders. We are not required to file a registration statement on Form S-3 under certain additional circumstances specified in the IRA.

### Piggyback Registration Rights

If we register any of our securities for public sale, each holder of registrable securities has a right to request the inclusion of any then-outstanding registrable securities held by them on our registration statement. However, this right does not apply to a registration relating solely to employee benefit plans, a corporate reorganization or stock issuable upon conversion of debt securities. If the underwriters of any underwritten offering determine in their reasonable discretion to limit the number of registrable securities to be included in such underwritten offering, the number of registrable securities to be registered will be apportioned pro rata among such holders, based on the number of registrable securities held by each holder. However, the number of registrable securities to be registered cannot be reduced below 25% of the total shares covered by the registration statement, other than in the initial public offering.

### Anti-Takeover Provisions

The provisions of the Delaware General Corporation Law ("DGCL"), our certificate of incorporation and our bylaws to be in effect following this offering could have the effect of delaying, deferring or discouraging another person from acquiring control of our company. These provisions, which are summarized below, are expected to discourage certain types of coercive takeover practices and inadequate takeover bids and encourage persons seeking to acquire control of our company to first negotiate with our board of directors. We believe that the benefits of increased protection of our potential ability to negotiate with an unfriendly or unsolicited acquirer outweigh the disadvantages of discouraging a proposal to acquire us because negotiation of these proposals could result in an improvement of their terms.

### Section 203 of the DGCL

We are subject to the provisions of Section 203 of the DGCL regulating corporate takeovers. In general, Section 203 prohibits a publicly held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a three-year period following the date that this stockholder becomes an interested stockholder, unless the business combination is approved in a prescribed manner. Under Section 203, a business combination between a corporation and an interested stockholder is prohibited unless it satisfies one of the following conditions:

- before the stockholder became interested, our board of directors approved either the business combination or the transaction, which resulted in the stockholder becoming an interested stockholder;

127

**Table of Contents**

- upon consummation of the transaction, which resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding for purposes of determining the voting stock outstanding, shares owned by persons who are directors and also officers, and employee stock plans in some instances, but not the outstanding voting stock owned by the interested stockholder; or

- at or after the time the stockholder became interested, the business combination was approved by our board and authorized at an annual or special meeting of the stockholders by the affirmative vote of at least two-thirds of the outstanding voting stock, which is not owned by the interested stockholder.

Section 203 defines a business combination to include:

- any merger or consolidation involving the corporation and the interested stockholder;

- any sale, transfer, lease, pledge or other disposition involving the interested stockholder of 10% or more of the assets of the corporation;

- subject to exceptions, any transaction that results in the issuance of transfer by the corporation of any stock of the corporation to the interested stockholder;

- subject to exceptions, any transaction involving the corporation that has the effect of increasing the proportionate share of the stock of any class or series of the corporation beneficially owned by the interested stockholder; and

- the receipt by the interested stockholder of the benefit of any loans, advances, guarantees, pledges or other financial benefits provided by or through the corporation.

In general, Section 203 defines an interested stockholder as any entity or person beneficially owning 15% or more of the outstanding voting stock of the corporation and any entity or person affiliated with or controlling or controlled by the entity or person.

### Certificate of Incorporation and Bylaw Provisions

Our certificate of incorporation and our bylaws will include a number of provisions that may have the effect of deterring hostile takeovers, or delaying or preventing changes in control of our management team or changes in our board of directors or our governance or policy, including the following:

### Board Vacancies

Our certificate of incorporation and bylaws will authorize generally only our board of directors to fill vacant directorships resulting from any cause or created by the expansion of our board of directors. In addition, the number of directors constituting our board of directors may be set only by resolution adopted by a majority vote of our entire board of directors. These provisions prevent a stockholder from increasing the size of our board of directors and gaining control of our board of directors by filling the resulting vacancies with its own nominees.

### Classified Board

Our certificate of incorporation and bylaws will provide that our board of directors is classified into three classes of directors. The existence of a classified board of directors could delay a successful tender offeror from obtaining majority control of our board of directors, and the prospect of that delay might deter a potential offeror. See the section titled "Management—Corporate Governance—Classified Board of Directors" for additional information.

### Directors Removed Only for Cause

Our certificate of incorporation will provide that stockholders may remove directors only for cause.

128

Table of Contents

*Supermajority Requirements for Amendments of Our Certificate of Incorporation and Bylaws*

Our certificate of incorporation will further provide that the affirmative vote of holders of at least two-thirds of the voting power of our outstanding common stock will be required to amend certain provisions of our certificate of incorporation, including provisions relating to the classified board, the size of the board of directors, removal of directors, special meetings, actions by written consent and designation of our preferred stock. The affirmative vote of holders of at least two-thirds of the voting power of our outstanding common stock will be required to amend or repeal our bylaws, although our bylaws may be amended by a simple majority vote of our board of directors.

*Stockholder Action; Special Meetings of Stockholders*

Our certificate of incorporation will provide that our stockholders may not take action by written consent, but may only take action at annual or special meetings of our stockholders. As a result, holders of our capital stock would not be able to amend our bylaws or remove directors without holding a meeting of our stockholders called in accordance with our bylaws. Our certificate of incorporation and our bylaws will provide that special meetings of our stockholders may be called only by a majority of our board of directors, the chairperson of our board of directors, our chief executive officer, our president or the lead independent director, thus prohibiting a stockholder from calling a special meeting. These provisions might delay the ability of our stockholders to force consideration of a proposal or for stockholders to take any action, including the removal of directors.

*Advance Notice Requirements for Stockholder Proposals and Director Nominations*

Our bylaws will provide advance notice procedures for stockholders seeking to bring business before our annual meeting of stockholders or to nominate candidates for election as directors at our annual meeting of stockholders. To be timely, a stockholder's notice generally must be delivered to us not later than the close of business on the 90th day nor earlier than the close of business on the 120th day prior to the first anniversary of the preceding year's annual meeting of stockholders. Our bylaws also will specify certain requirements regarding the form and content of a stockholder's notice. With respect to nominations of persons for election to our board of directors, the notice shall provide information about the nominee, including, among other things, name, age, address, principal occupation, ownership of our capital stock and whether they meet applicable independence requirements. With respect to the proposal of other business to be considered by our stockholders at an annual meeting, the notice shall provide a brief description of the business desired to be brought before the meeting, the text of the proposal or business, the reasons for conducting such business at the meeting and any material interest in such business by such stockholder and any beneficial owners and associated persons on whose behalf the notice is made, or the proposing persons. In addition, a stockholder's notice must set forth certain information related to the proposing persons, including, among other things:

- the name and address of the proposing persons;

- information as to the ownership by the proposing persons of our capital stock and any derivative interest or short interest in any of our securities held by the proposing persons;

- information as to any material relationships and interest between the proposing persons and us, any of our affiliates and any of our principal competitors;

- a representation that the stockholder is a holder of record of our stock entitled to vote at that meeting and that the stockholder intends to appear in person or by proxy at the meeting to propose such nomination or business; and

- a representation whether the proposing persons intend or are part of a group which intends to deliver a proxy statement or form of proxy to holders of at least the percentage of our outstanding capital stock required to elect the nominee or carry the proposal.

These provisions may preclude our stockholders from bringing matters before our annual meeting of stockholders or from making nominations for directors at our annual meeting of stockholders. We expect that

129

**Table of Contents**

these provisions might also discourage or deter a potential acquirer from conducting a solicitation of proxies to elect the acquirer's own slate of directors or otherwise attempting to obtain control of our company.

*No Cumulative Voting*

The DGCL provides that stockholders are not entitled to the right to cumulate votes in the election of directors unless a corporation's certificate of incorporation provides otherwise. Our certificate of incorporation and bylaws will not provide for cumulative voting.

*Issuance of Undesignated Preferred Stock*

We anticipate that after the filing of our certificate of incorporation, our board will have the authority, without further action by the stockholders, to issue up to        shares of undesignated preferred stock with rights and preferences, including voting rights, designated from time to time by our board of directors. The existence of authorized but unissued shares of preferred stock enables our board of directors to render more difficult or to discourage an attempt to obtain control of us by means of a merger, tender offer, proxy contest or otherwise.

*Exclusive Forum*

Our certificate of incorporation will provide that, unless we consent in writing to the selection of an alternative forum, to the fullest extent permitted by law, the sole and exclusive forum for (1) any derivative action or proceeding brought on our behalf under Delaware law, (2) any action asserting a claim of breach of a fiduciary duty owed by any of our directors, officers or other employees to us or our stockholders, (3) any action arising pursuant to any provision of the Delaware General Corporation Law or our certificate of incorporation or bylaws, (4) any other action asserting a claim that is governed by the internal affairs doctrine shall be the Court of Chancery of the State of Delaware (or, if the Court of Chancery does not have jurisdiction, the federal district court for the District of Delaware) or (5) any other action asserting an "internal corporate claim," as defined in Section 115 of the Delaware General Corporation Law, in all cases subject to the court having jurisdiction over indispensable parties named as defendants. Nothing in our certificate of incorporation precludes stockholders that assert claims under the Securities Act or Exchange Act from bringing such claims in state or federal court, subject to applicable law. Any person or entity purchasing or otherwise acquiring any interest in our securities shall be deemed to have notice of and consented to this provision. Although we believe these provisions benefit us by providing increased consistency in the application of Delaware law for the specified types of actions and proceedings, the provisions may have the effect of discouraging lawsuits against us or our directors and officers.

**Transfer Agent and Registrar**

Upon the completion of this offering, the transfer agent and registrar for our common stock will be Computershare Trust Company, N.A. The transfer agent's address is 250 Royall Street, Canton, MA 02021, and its telephone number is (800) 962-4284.

**Exchange Listing**

We intend to apply to list our common stock on The Nasdaq Global Select Market under the symbol "REAL."

Table of Contents

## SHARES ELIGIBLE FOR FUTURE SALE

Prior to this offering, there has been no public market for our common stock, and we cannot predict the effect, if any, that market sales of our common stock or the availability of our common stock for sale will have on the market price of our common stock prevailing from time to time. Future sales of our common stock in the public market, or the availability of such shares for sale in the public market, could adversely affect market prices prevailing from time to time. As described below, only a limited number of our common stock will be available for sale shortly after this offering due to contractual and legal restrictions on resale. Nevertheless, sales of our common stock in the public market after such restrictions lapse, or the perception that those sales may occur, could adversely affect the prevailing market price at such time and our ability to raise equity capital in the future.

Following the completion of this offering, based on the number shares of our common stock outstanding as of March 31, 2019, and assuming no exercise of outstanding options after such date, we will have a total of        shares of common stock outstanding.

Of those outstanding shares,        shares of common stock sold in the offering will be freely tradeable, except that any shares purchased in this offering by our affiliates, as that term is defined in Rule 144 under the Securities Act, would only be able to be sold in compliance with the Rule 144 limitations described below.

The remaining outstanding common stock will be, and shares subject to outstanding options will be upon issuance, deemed "restricted securities" as defined in Rule 144 under the Securities Act. Restricted securities may be sold in the public market only if they are registered or if they qualify for an exemption from registration under Rule 144 or Rule 701 under the Securities Act, which rules are summarized below. All of our executive officers, directors and holders of substantially all of our equity securities are subject to lock-up agreements under which they have agreed, subject to specific exceptions, not to sell any of our equity securities for 180 days following the date of this prospectus. As a result of these agreements and subject to the provisions of Rule 144 or Rule 701, common stock will be available for sale in the public market as follows:

- beginning on the date of this prospectus, all        shares of our common stock sold in this offering will be immediately available for sale in the public market; and

- beginning 181 days after the date of this prospectus (subject to the terms of the lock-up and market standoff agreements described below),        additional shares will become eligible for sale in the public market, of which        shares will be held by affiliates and subject to the volume and other restrictions of Rule 144, as described below.

### Lock-Up Agreements

We, our directors and officers and holders of substantially all of our equity securities have agreed, subject to certain exceptions, not to offer, pledge sell, contract to sell, transfer, lend or otherwise dispose of, directly or indirectly, any shares of our common stock or securities convertible into or exchangeable or exercisable for common stock, for 180 days after the date of this prospectus without first obtaining the written consent of Credit Suisse Securities (USA) LLC and BofA Securities, Inc., on behalf of the underwriters. These agreements are described below under the section titled "Underwriting."

### Rule 144

In general, Rule 144 provides that once we have been subject to the public company reporting requirements of Section 13 or Section 15(d) of the Exchange Act for at least 90 days, a person who is not deemed to have been one of our affiliates for purposes of the Securities Act at any time during the 90 days preceding a sale and who has beneficially owned the common stock proposed to be sold for at least six months is entitled to sell those shares without complying with the manner of sale, volume limitation or notice provisions of Rule 144, subject to compliance with the public information requirements of Rule 144. If such a person has beneficially owned the

131

**Table of Contents**

common stock proposed to be sold for at least one year, including the holding period of any prior owner other than our affiliates, then that person would be entitled to sell those shares without complying with any of the requirements of Rule 144.

In general, Rule 144 provides that our affiliates or persons selling our common stock on behalf of our affiliates are entitled to sell upon expiration of the market standoff agreements and lock-up agreements described above, within any three-month period, a number of our common stock that does not exceed the greater of:

- 1% of the number of our common stock then outstanding, which will equal           shares immediately after the completion of this offering; or
- the average weekly trading volume of our common stock during the four calendar weeks preceding the filing of a notice on Form 144 with respect to that sale.

Sales of our common stock made in reliance upon Rule 144 by our affiliates or persons selling our common stock on behalf of our affiliates are also subject to certain manner of sale provisions and notice requirements and to the availability of current public information about us.

### Rule 701

Rule 701 generally allows a stockholder who purchased our common stock pursuant to a written compensatory plan or contract and who is not deemed to have been an affiliate of our company during the immediately preceding 90 days to sell these shares in reliance upon Rule 144, but without being required to comply with the public information, holding period, volume limitation or notice provisions of Rule 144. Rule 701 also permits affiliates of our company to sell their Rule 701 shares under Rule 144 without complying with the holding period requirements of Rule 144. All holders of Rule 701 shares, however, are required to wait until 90 days after the date of this prospectus before selling those shares pursuant to Rule 701.

### Registration Rights

Pursuant to our IRA, after the completion of this offering, the holders of up to           shares of our common stock, or certain transferees, will be entitled to certain rights with respect to the registration of the offer and sale of those shares under the Securities Act. See the section titled "Description of Capital Stock—Registration Rights" for a description of these registration rights. If the offer and sale of these shares of our common stock are registered, the shares will be freely tradable without restriction under the Securities Act, subject to the Rule 144 limitations applicable to affiliates, and a large number of shares may be sold into the public market.

### Registration Statement

We intend to file a registration statement on Form S-8 under the Securities Act promptly after the effectiveness of this offering to register shares of our common stock subject to options outstanding, as well as reserved for future issuance, under our equity compensation plans. The registration statement on Form S-8 is expected to become effective immediately upon filing, and shares of our common stock covered by the registration statement will then become eligible for sale in the public market, subject to the Rule 144 limitations applicable to affiliates, vesting restrictions and any applicable market standoff agreements and lock-up agreements. See the section titled "Executive Compensation—Equity Compensation Plans" for a description of our equity compensation plans.

132

**Table of Contents**

**MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES TO NON-U.S. HOLDERS OF OUR COMMON STOCK**

The following is a summary of material U.S. federal income tax consequences of the ownership and disposition of shares of our common stock as of the date hereof. Except where noted, this summary deals only with common stock that is held as a capital asset by a non-U.S. holder (as defined below). This summary is based upon provisions of the Code and regulations, rulings and judicial decisions as of the date hereof. Those authorities may be changed, perhaps retroactively, so as to result in U.S. federal income consequences different from those summarized below. We cannot assure you that a change in law will not alter significantly the tax considerations that we describe in this summary.

A "non-U.S. holder" means a beneficial owner of shares of our common stock (other than an entity treated as a partnership for U.S. federal income tax purposes) that is not, for U.S. federal income tax purposes, any of the following:

- an individual who is a citizen or resident of the United States;

- a corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if it (1) is subject to the primary supervision of a court within the United States and one or more U.S. persons as defined under the Code have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

This summary does not address all aspects of U.S. federal income taxation that may be relevant to non-U.S. holders in light of their particular circumstances. In addition, this summary does not address the Medicare tax on certain net investment income, U.S. federal gift or estate tax laws, any state, local or non-U.S. tax laws or any tax treaties. This summary also does not address the U.S. federal income tax consequences applicable to non-U.S. holders that are subject to special treatment under the U.S. federal income tax laws, including (without limitation) former citizens or long-term residents of the United States, foreign pension funds, "controlled foreign corporations," "passive foreign investment companies," financial institutions, insurance companies, regulated investment companies, real estate investment trusts, mutual funds, broker-dealers, traders in securities or other persons that elect to use a mark-to-market method of accounting for their holdings in our common stock, persons who hold our common stock as "qualified small business stock" within the meaning of Section 1202 of the Code, persons who hold our common stock as a position in a hedging transaction, "straddle," "conversion transaction," or other risk reduction transaction or integrated investment, persons subject to the alternative minimum tax, persons who acquired our common stock through stock options or in other compensatory transactions or partnerships or other pass-through entities for U.S. federal income tax purposes.

If a partnership (or other entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds shares of our common stock, the tax treatment of a partner will generally depend upon the status of the partner, the activities of the partnership and certain determinations made at the partner level. Accordingly, we urge partners in partnerships (including entities or arrangements treated as partnerships for U.S. federal income tax purposes) considering the purchase of our common stock to consult their tax advisors regarding the U.S. federal income tax considerations of the purchase, ownership and disposition of our common stock by such partnership.

THIS DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. PROSPECTIVE INVESTORS ARE ENCOURAGED TO CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE APPLICATION OF THE U.S. FEDERAL INCOME TAX LAWS TO THEIR PARTICULAR SITUATION, AS WELL AS ANY TAX CONSEQUENCES OF THE PURCHASE,

Table of Contents

OWNERSHIP AND DISPOSITION OF OUR STOCK ARISING UNDER THE U.S. FEDERAL GIFT OR ESTATE TAX LAWS OR UNDER THE LAWS OF ANY STATE, LOCAL, NON-U.S. OR OTHER TAXING JURISDICTION OR UNDER ANY APPLICABLE TAX TREATY.

**Distributions**

Distributions of cash or property on our common stock will constitute dividends for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings and profits, as determined under U.S. federal income tax principles. To the extent those distributions exceed our current and accumulated earnings and profits, the distributions will be treated as a nontaxable return of capital to the extent of the non-U.S. holder's tax basis in our common stock and thereafter as capital gain from the sale or exchange of such common stock. Please read "—Sales or other Taxable Dispositions." Subject to the withholding rules discussed below under "—Backup Withholding and Information Reporting" and "—Additional Withholding Requirements under FATCA" and with respect to effectively connected dividends, any distribution made to a non-U.S. holder on our common stock generally will be subject to U.S. withholding tax at a rate of 30% of the gross amount of the distribution unless an applicable income tax treaty provides for a lower rate. To receive the benefit of a reduced treaty rate, a non-U.S. holder must provide the applicable withholding agent with a properly executed IRS Form W-8BEN or IRS Form W-8BEN-E (or other applicable or successor form) certifying qualification for the reduced rate, and the non-U.S. holder will be required to update such forms and certifications from time to time as required by law. A non-U.S. holder eligible for a reduced rate of U.S. federal withholding tax pursuant to an income tax treaty may be eligible to obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. If the non-U.S. holder holds our common stock through a financial institution or other agent acting on the non-U.S. holder's behalf, the non-U.S. holder will be required to provide appropriate documentation to the agent, which then will be required to provide certification to us or our paying agent, either directly or through other intermediaries. Non-U.S. holders should consult their tax advisors regarding their entitlement to benefits under an applicable income tax treaty.

If dividends paid to a non-U.S. holder are effectively connected with a trade or business conducted by the non-U.S. holder in the United States (and, if required by an applicable income tax treaty, are treated as attributable to a permanent establishment maintained by the non-U.S. holder in the United States), the non-U.S. holder will be exempt from the U.S. withholding tax described above, provided the non-U.S. holder satisfies certain certification requirements by providing the applicable withholding agent a properly executed IRS Form W-8ECI certifying eligibility for exemption, and the non-U.S. holder will be required to update such forms and certifications from time to time as required by law. Any such effectively connected dividends generally will be taxed on a net income basis at the rates and in the manner generally applicable to United States persons (as defined under the Code). If the non-U.S. holder is a corporation for U.S. federal income tax purposes, it may also be subject to a branch profits tax (at a 30% rate or such lower rate as specified by an applicable income tax treaty) on its effectively connected earnings and profits (as adjusted for certain items), which will include effectively connected dividends. Non-U.S. holders should consult their tax advisors regarding any applicable tax treaties that may provide for different rules.

**Sales or other Taxable Dispositions**

Subject to the discussion below under "—Backup Withholding and Information Reporting", any gain realized by a non-U.S. holder on the sale or other disposition of our common stock generally will not be subject to U.S. federal income tax unless:

- the gain is effectively connected with a trade or business of the non-U.S. holder in the United States (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment of the non-U.S. holder);

- the non-U.S. holder is an individual who is present in the United States for 183 days or more in the taxable year of that disposition, and certain other conditions are met; or

134

Table of Contents

- we are or have been a "United States real property holding corporation" for U.S. federal income tax purposes and certain other conditions are met.

A non-U.S. holder described in the first bullet point immediately above will be subject to tax on the gain derived from the sale or other disposition in the same manner as if the non-U.S. holder were a U.S. person as defined under the Code. In addition, if any non-U.S. holder described in the first bullet point immediately above is a foreign corporation, the gain realized by such non-U.S. holder may be subject to an additional "branch profits tax" at a 30% rate or such lower rate as may be specified by an applicable income tax treaty. An individual non-U.S. holder described in the second bullet point immediately above will be subject to a 30% (or such lower rate as may be specified by an applicable income tax treaty) tax on the gain derived from the sale or other disposition, which gain may be offset by U.S. source capital losses even though the individual is not considered a resident of the United States.

Generally, a corporation is a "United States real property holding corporation" ("USRPHC") if the fair market value of its U.S. real property interests equals or exceeds 50% of the sum of the fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (all as determined for U.S. federal income tax purposes). We believe that we are not currently and will not become a USRPHC, and the remainder of this discussion assumes this is the case. However, because the determination of whether we are a USRPHC depends on the fair market value of our U.S. real property interests relative to the fair market value of our other business assets, there can be no assurance that we will not become a USRPHC in the future. If we are or become a USRPHC, however, so long as our common stock is regularly traded on an established securities market during the calendar year in which the sale or other disposition occurs, only a non-U.S. holder who actually or constructively holds or held (at any time during the shorter of the five-year period preceding the date of disposition or the holder's holding period) more than 5% of our common stock will be subject to U.S. federal income tax on the sale or other disposition of our common stock.

**Backup Withholding and Information Reporting**

Any dividends paid to a non-U.S. holder must be reported annually to the IRS and to the non-U.S. holder. Copies of these information returns may be made available to the tax authorities in the country in which the non-U.S. holder resides or is established. Payments of dividends to a non-U.S. holder generally will not be subject to backup withholding if the non-U.S. holder establishes an exemption by properly certifying its non-U.S. status on an IRS Form W-8BEN, IRS Form W-8BEN-E or other applicable or successor form.

Payments of the proceeds from a sale or other disposition by a non-U.S. holder of our common stock effected by or through the office of a broker generally will be subject to information reporting and backup withholding (currently at the rate of 24%) unless the non-U.S. holder establishes an exemption by properly certifying its non-U.S. status on an IRS Form W-8BEN, IRS Form W-8BEN-E or other applicable or successor form and certain other conditions are met. Information reporting and backup withholding generally will not apply to any payment of the proceeds from a sale or other disposition of our common stock effected outside the United States by a non-U.S. office of a broker. However, unless such broker has documentary evidence in its records that the holder is not a United States person and certain other conditions are met, or the non-U.S. holder otherwise establishes an exemption, information reporting will apply to a payment of the proceeds of the disposition of our common stock effected outside the United States by such a broker if it has certain relationships within the United States. Notwithstanding the foregoing, backup withholding and information reporting may apply if either we or our paying agent has actual knowledge, or reason to know, that the non-U.S. holder is a United States person who is not an exempt recipient under the Code and applicable Treasury regulations.

Backup withholding is not an additional tax. Rather, the U.S. income tax liability (if any) of persons subject to backup withholding will be reduced by the amount of tax withheld. If backup withholding results in an overpayment of taxes, a refund may be obtained, provided that the required information is timely furnished to the IRS.

135

**Table of Contents**

**Additional Withholding Requirements under FATCA**

Sections 1471 through 1474 of the Code, and the Treasury regulations and administrative guidance issued thereunder ("FATCA"), impose a 30% withholding tax on any dividends paid on our common stock if paid to a "foreign financial institution" or a "non-financial foreign entity" (each as defined in the Code) (including, in some cases, when such foreign financial institution or non-financial foreign entity is acting as an intermediary), unless (1) in the case of a foreign financial institution, such institution enters into an agreement with the U.S. government to withhold on certain payments and to collect and provide to the U.S. tax authorities substantial information regarding U.S. account holders of such institution (which includes certain equity and debt holders of such institution, as well as certain account holders that are non-U.S. entities with U.S. owners); (2) in the case of a non-financial foreign entity, such entity certifies that it does not have any "substantial United States owners" (as defined in the Code) or provides the applicable withholding agent with a certification identifying the direct and indirect substantial United States owners of the entity (in either case, generally on an IRS Form W-8BEN-E) and provides certain information with respect to such United States owners; or (3) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules and provides appropriate documentation (such as an IRS Form W-8BEN-E). The Treasury Secretary has issued proposed regulations providing that the withholding provisions under FATCA do not apply with respect to gross proceeds from a sale or other disposition of our common stock, which may be relied upon by taxpayers until final regulations are issued. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing these rules may be subject to different rules. Under certain circumstances, a holder might be eligible for refunds or credits of such taxes.

INVESTORS CONSIDERING THE PURCHASE OF OUR COMMON STOCK ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE APPLICATION OF THE U.S. FEDERAL INCOME TAX LAWS TO THEIR PARTICULAR SITUATIONS AND THE APPLICABILITY AND EFFECT OF U.S. FEDERAL GIFT AND ESTATE TAX LAWS AND ANY STATE, LOCAL OR NON-U.S. TAX LAWS AND TAX TREATIES.

136

**Table of Contents**

**UNDERWRITING**

Under the terms and subject to the conditions contained in an underwriting agreement dated          , we have agreed to sell to the underwriters named below, for whom Credit Suisse Securities (USA) LLC, BofA Securities, Inc. and UBS Securities LLC are acting as representatives, the following respective numbers of shares of common stock:

| Underwriter | Number of Shares |
| --- | --- |
| Credit Suisse Securities (USA) LLC | |
| BofA Securities, Inc. | |
| UBS Securities LLC | |
| KeyBanc Capital Markets Inc. | |
| Stifel, Nicolaus & Company | |
| Cowen and Company, LLC | |
| Raymond James & Associates, Inc. | |
| Total | |

The underwriting agreement provides that the underwriters are obligated to purchase all the shares of common stock in the offering if any are purchased, other than those shares covered by the over-allotment option described below. The underwriting agreement also provides that if an underwriter defaults the purchase commitments of non-defaulting underwriters may be increased or the offering may be terminated.

We have agreed to indemnify the underwriters and certain of their controlling persons against certain liabilities, including liabilities under the Securities Act, and to contribute to payments that the underwriters may be required to make in respect of those liabilities.

We have granted to the underwriters a 30-day option to purchase on a pro rata basis up to          additional shares from us at the initial public offering price less the underwriting discounts and commissions. The option may be exercised only to cover any over-allotments of common stock.

The underwriters propose to offer the shares of common stock initially at the public offering price on the cover page of this prospectus and to selling group members at that price less a selling concession of $          per share. After the initial public offering the representatives may change the public offering price and concession and discount to broker/dealers.

The following table summarizes the compensation that we will pay:

| | Per Share | | Total | |
| --- | --- | --- | --- | --- |
| | Without Over-allotment | With Over-allotment | Without Over-allotment | With Over-allotment |
| Underwriting Discounts and Commissions paid by us | $ | $ | $ | $ |
| Expenses payable by us | $ | $ | $ | $ |

We estimate that our out of pocket expenses for this offering excluding the underwriting discounts and commissions will be approximately $          . We have also agreed to reimburse the underwriters for up to $          of expenses related to the review of this offering by the Financial Industry Regulatory Authority, Inc. ("FINRA"). In accordance with FINRA Rule 5110, this reimbursed fee is deemed underwriting compensation for this offering.

We have agreed that we will not offer, sell, contract to sell, pledge or otherwise dispose of, directly or indirectly, or file with the Securities and Exchange Commission a registration statement under the Securities Act

137

Table of Contents

relating to, any shares of our common stock or securities convertible into or exchangeable or exercisable for any shares of our common stock, or publicly disclose the intention to make any offer, sale, pledge, disposition or filing, without the prior written consent of the representatives for a period of 180 days after the date of this prospectus, except for (1) issuances pursuant to the conversion or exchange of convertible or exchangeable securities or the exercise of warrants or options, in each case outstanding on the date hereof and described in the prospectus and (2) grants of employee stock options pursuant to the terms of a plan in effect on the date hereof and described in the prospectus.

Our officers and directors and substantially all of our security holders have agreed, subject to certain exceptions, that they will not offer, sell, contract to sell, pledge or otherwise dispose of, directly or indirectly, any shares of our common stock or securities convertible into or exchangeable or exercisable for any shares of our common stock, enter into a transaction that would have the same effect, or enter into any swap, hedge or other arrangement that transfers, in whole or in part, any of the economic consequences of ownership of our common stock, whether any of these transactions are to be settled by delivery of our common stock or other securities, in cash or otherwise, or publicly disclose the intention to make any such offer, sale, pledge or disposition, or to enter into any such transaction, swap, hedge or other arrangement, or make any demand for or exercise any right with respect to the registration of our common stock, without, in each case, the prior written consent of Credit Suisse Securities (USA) LLC and BofA Securities, Inc. for a period of 180 days after the date of this prospectus.

Credit Suisse Securities (USA) LLC and BofA Securities, Inc., on behalf of the underwriters, in their sole discretion, may release the common stock and other securities subject to the lock-up agreements described above in whole or in part at any time with or without notice. At least three business days before the effectiveness of any release or waiver of the restrictions described above in connection with any transfer of shares of common stock by an officer or director, Credit Suisse Securities (USA) LLC and BofA Securities, Inc. will notify us of the impending release or waiver of any restriction and we have agreed to announce the impending release or waiver by press release through a major news service at least two business days before the effective date of the release or waiver, except where the release or waiver is effected solely to permit a transfer of common stock that is not for consideration and where the transferee has agreed in writing to be bound by the same terms as the lock-up agreements described above to the extent and for the duration that such terms remain in effect at the time of transfer.

We have agreed to indemnify the underwriters against certain liabilities under the Securities Act or contribute to payments that the underwriters may be required to make in that respect.

We will apply to list the shares of common stock on The Nasdaq Global Select Market under the symbol "REAL."

Prior to this offering, there has been no public market for our common stock. The initial public offering price was determined by negotiations among us and the representatives and will not necessarily reflect the market price of the common stock following this offering. The principal factors that were considered in determining the initial public offering price included:

- the information presented in this prospectus and otherwise available to the underwriters;

- the history of, and prospects for, the industry in which we will compete;

- the ability of our management;

- the prospects for our future earnings;

- the present state of our development, results of operations and our current financial condition;

- the general condition of the securities markets at the time of this offering; and

- the recent market prices of, and the demand for, publicly traded common stock of generally comparable companies.

138

**Table of Contents**

We cannot assure you that the initial public offering price will correspond to the price at which the common stock will trade in the public market subsequent to this offering or that an active trading market for the common stock will develop and continue after this offering.

In connection with the offering the underwriters may engage in stabilizing transactions, over-allotment transactions, syndicate covering transactions and penalty bids in accordance with Regulation M under the Exchange Act.

- Stabilizing transactions permit bids to purchase the underlying security so long as the stabilizing bids do not exceed a specified maximum.

- Over-allotment involves sales by the underwriters of shares in excess of the number of shares the underwriters are obligated to purchase, which creates a syndicate short position. The short position may be either a covered short position or a naked short position. In a covered short position, the number of shares over-allotted by the underwriters is not greater than the number of shares that they may purchase in the over-allotment option. In a naked short position, the number of shares involved is greater than the number of shares in the over-allotment option. The underwriters may close out any covered short position by either exercising their over-allotment option and/or purchasing shares in the open market.

- Syndicate covering transactions involve purchases of the common stock in the open market after the distribution has been completed in order to cover syndicate short positions. In determining the source of shares to close out the short position, the underwriters will consider, among other things, the price of shares available for purchase in the open market as compared to the price at which they may purchase shares through the over-allotment option. If the underwriters sell more shares than could be covered by the over-allotment option, a naked short position, the position can only be closed out by buying shares in the open market. A naked short position is more likely to be created if the underwriters are concerned that there could be downward pressure on the price of the shares in the open market after pricing that could adversely affect investors who purchase in the offering.

- Penalty bids permit the representatives to reclaim a selling concession from a syndicate member when the common stock originally sold by the syndicate member is purchased in a stabilizing transaction or a syndicate covering transaction to cover syndicate short positions.

These stabilizing transactions, syndicate covering transactions and penalty bids may have the effect of raising or maintaining the market price of our common stock or preventing or retarding a decline in the market price of the common stock. As a result the price of our common stock may be higher than the price that might otherwise exist in the open market. These transactions may be effected on or otherwise and, if commenced, may be discontinued at any time.

A prospectus in electronic format will be made available on the websites maintained by one or more of the underwriters, or selling group members, if any, participating in this offering and one or more of the underwriters participating in this offering may distribute prospectuses electronically. The representatives may agree to allocate a number of shares to underwriters and selling group members for sale to their online brokerage account holders. Internet distributions will be allocated by the underwriters and selling group members that will make Internet distributions on the same basis as other allocations.

**Selling Restrictions**

***Notice to Prospective Investors in Australia***

No placement document, prospectus, product disclosure statement or other disclosure document has been lodged with the Australian Securities and Investments Commission, in relation to the offering. This prospectus does not constitute a prospectus, product disclosure statement or other disclosure document under the Corporations Act 2001 (the "Corporations Act"), and does not purport to include the information required for a prospectus, product disclosure statement or other disclosure document under the Corporations Act.

139

Table of Contents

Any offer in Australia of the shares may only be made to persons, or Exempt Investors, who are "sophisticated investors" (within the meaning of section 708(8) of the Corporations Act), "professional investors" (within the meaning of section 708(11) of the Corporations Act) or otherwise pursuant to one or more exemptions contained in section 708 of the Corporations Act so that it is lawful to offer the shares without disclosure to investors under Chapter 6D of the Corporations Act.

The shares applied for by Exempt Investors in Australia must not be offered for sale in Australia in the period of 12 months after the date of allotment under the offering, except in circumstances where disclosure to investors under Chapter 6D of the Corporations Act would not be required pursuant to an exemption under section 708 of the Corporations Act or otherwise or where the offer is pursuant to a disclosure document which complies with Chapter 6D of the Corporations Act. Any person acquiring shares must observe such Australian on-sale restrictions.

This prospectus contains general information only and does not take account of the investment objectives, financial situation or particular needs of any particular person. It does not contain any securities recommendations or financial product advice. Before making an investment decision, investors need to consider whether the information in this prospectus is appropriate to their needs, objectives and circumstances, and, if necessary, seek expert advice on those matters.

#### Notice to Prospective Investors in Bermuda

Shares may be offered or sold in Bermuda only in compliance with the provisions of the Investment Business Act of 2003 of Bermuda which regulates the sale of securities in Bermuda. Additionally, non-Bermudian persons (including companies) may not carry on or engage in any trade or business in Bermuda unless such persons are permitted to do so under applicable Bermuda legislation.

#### Notice to Prospective Investors in the British Virgin Islands

The shares are not being, and may not be, offered to the public or to any person in the British Virgin Islands for purchase or subscription by or on behalf of the company. The shares may be offered to companies incorporated under the BVI Business Companies Act, 2004 (British Virgin Islands) ("BVI Companies"), but only where the offer will be made to, and received by, the relevant BVI Company entirely outside of the British Virgin Islands.

This prospectus has not been, and will not be, registered with the Financial Services Commission of the British Virgin Islands. No registered prospectus has been or will be prepared in respect of the shares for the purposes of the Securities and Investment Business Act, 2010 or the Public Issuers Code of the British Virgin Islands.

#### Canada

The shares may be sold only to purchasers purchasing, or deemed to be purchasing, as principal that are accredited investors, as defined in National Instrument 45-106 Prospectus Exemptions or subsection 73.3(1) of the Securities Act (Ontario), and are permitted clients, as defined in National Instrument 31-103 Registration Requirements, Exemptions and Ongoing Registrant Obligations. Any resale of the shares must be made in accordance with an exemption from, or in a transaction not subject to, the prospectus requirements of applicable securities laws.

Securities legislation in certain provinces or territories of Canada may provide a purchaser with remedies for rescission or damages if this prospectus (including any amendment thereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the purchaser within the time limit prescribed by the securities legislation of the purchaser's province or territory. The purchaser should refer to any applicable provisions of the securities legislation of the purchaser's province or territory for particulars of these rights or consult with a legal advisor.

140

Table of Contents

Pursuant to section 3A.3 (or, in the case of securities issued or guaranteed by the government of a non-Canadian jurisdiction, section 3A.4) of National Instrument 33-105 Underwriting Conflicts (NI 33-105), the underwriters are not required to comply with the disclosure requirements of NI 33-105 regarding underwriter conflicts of interest in connection with this offering.

### Cayman Islands

No offer or invitation to subscribe for shares or units may be made to the public in the Cayman Islands.

### Notice to Prospective Investors in China

This prospectus does not constitute a public offer of shares, whether by sale or subscription, in the People's Republic of China (the "PRC"). The shares are not being offered or sold directly or indirectly in the PRC to or for the benefit of, legal or natural persons of the PRC.

Further, no legal or natural persons of the PRC may directly or indirectly purchase any of the shares or any beneficial interest therein without obtaining all prior PRC's governmental approvals that are required, whether statutorily or otherwise. Persons who come into possession of this document are required by the issuer and its representatives to observe these restrictions.

### Notice to Prospective Investors in the Dubai International Financial Centre ("DIFC")

This document relates to an Exempt Offer in accordance with the Markets Rules 2012 of the Dubai Financial Services Authority ("DFSA"). This document is intended for distribution only to persons of a type specified in the Markets Rules 2012 of the DFSA. It must not be delivered to, or relied on by, any other person. The DFSA has no responsibility for reviewing or verifying any documents in connection with Exempt Offers. The DFSA has not approved this prospectus nor taken steps to verify the information set forth herein and has no responsibility for this document. The securities to which this document relates may be illiquid and/or subject to restrictions on their resale. Prospective purchasers of the securities offered should conduct their own due diligence on the securities. If you do not understand the contents of this document you should consult an authorized financial advisor.

In relation to its use in the DIFC, this document is strictly private and confidential and is being distributed to a limited number of investors and must not be provided to any person other than the original recipient and may not be reproduced or used for any other purpose. The interests in the securities may not be offered or sold directly or indirectly to the public in the DIFC.

### European Economic Area

In relation to each Country of the European Economic Area that has implemented the Prospectus Directive, each, a Relevant Country, an offer to the public of any shares of our common stock may not be made in that Relevant Country, except that an offer to the public in that Relevant Country of any shares of our common stock may be made at any time under the following exemptions under the Prospectus Directive, if they have been implemented in that Relevant Country:

(a)   to any legal entity that is a qualified investor as defined in the Prospectus Directive;

(b)   to fewer than 100 or, if the Relevant Country has implemented the relevant provision of the 2010 PD Amending Directive, 150, natural or legal persons (other than qualified investors as defined in the Prospectus Directive), as permitted under the Prospectus Directive, subject to obtaining the prior consent of the representatives for any such offer; or

(c)   in any other circumstances falling within Article 3(2) of the Prospectus Directive, provided that no such offer of shares of our common stock shall result in a requirement for the publication by us or any underwriter of a prospectus pursuant to Article 3 of the Prospectus Directive.

141

**Table of Contents**

For the purposes of this provision, the expression an "offer to the public" in relation to any shares of our common stock in any Relevant Country means the communication in any form and by any means of sufficient information on the terms of the offer and any shares of our common stock to be offered so as to enable an investor to decide to purchase any shares of our common stock, as the same may be varied in that Relevant Country by any measure implementing the Prospectus Directive in that Relevant Country, the expression "Prospectus Directive" means Directive 2003/71/EC (and amendments thereto, including the 2010 PD Amending Directive, to the extent implemented in the Relevant Country), and includes any relevant implementing measure in the Relevant Country, and the expression "2010 PD Amending Directive" means Directive 2010/73/EU.

### *Notice to Prospective Investors in Hong Kong*

The securities have not been offered or sold and will not be offered or sold in Hong Kong, by means of any document, other than (a) to "professional investors" as defined in the Securities and Futures Ordinance (Cap. 571) of Hong Kong and any rules made under that Ordinance; or (b) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies Ordinance (Cap. 32) of Hong Kong or which do not constitute an offer to the public within the meaning of that Ordinance. No advertisement, invitation or document relating to the securities has been or may be issued or has been or may be in the possession of any person for the purposes of issue, whether in Hong Kong or elsewhere, which is directed at, or the contents of which are likely to be accessed or read by, the public of Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to securities which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" as defined in the Securities and Futures Ordinance and any rules made under that Ordinance.

### *Notice to Prospective Investors in Japan*

The securities have not been and will not be registered under the Financial Instruments and Exchange Law of Japan (Law No. 25 of 1948, as amended) and, accordingly, will not be offered or sold, directly or indirectly, in Japan, or for the benefit of any Japanese Person or to others for re-offering or resale, directly or indirectly, in Japan or to any Japanese Person, except in compliance with all applicable laws, regulations and ministerial guidelines promulgated by relevant Japanese governmental or regulatory authorities in effect at the relevant time. For the purposes of this paragraph, "Japanese Person" shall mean any person resident in Japan, including any corporation or other entity organized under the laws of Japan.

### *Notice to Prospective Investors in Korea*

The shares have not been and will not be registered under the Financial Investments Services and Capital Markets Act of Korea and the decrees and regulations thereunder (the "FSCMA"), and the shares have been and will be offered in Korea as a private placement under the FSCMA. None of the shares may be offered, sold or delivered directly or indirectly, or offered or sold to any person for re-offering or resale, directly or indirectly, in Korea or to any resident of Korea except pursuant to the applicable laws and regulations of Korea, including the FSCMA and the Foreign Exchange Transaction Law of Korea and the decrees and regulations thereunder (the "FETL"). Furthermore, the purchaser of the shares shall comply with all applicable regulatory requirements (including but not limited to requirements under the FETL) in connection with the purchase of the shares. By the purchase of the shares, the relevant holder thereof will be deemed to represent and warrant that if it is in Korea or is a resident of Korea, it purchased the shares pursuant to the applicable laws and regulations of Korea.

### *Kuwait*

Unless all necessary approvals from the Kuwait Capital Markets Authority ("CMA"), pursuant to Law No. 7/2010, its Executive Regulations and the various Resolutions and Announcements issued pursuant thereto or in connection therewith have been given in relation to the marketing of, and sale of, the shares of common stock, these may not be offered for sale, nor sold in the State of Kuwait ("Kuwait"). Neither this prospectus nor

142

Table of Contents

any of the information contained herein is intended to lead to the conclusion of any contract of whatsoever nature within Kuwait.

With regard to the contents of this document we recommend that you consult a party licensed by the CMA to conduct securities activities in Kuwait and specialized in giving advice about the purchase of shares of common stock and other securities before making the subscription decision.

### Notice to Prospective Investors in Malaysia

No prospectus or other offering material or document in connection with the offer and sale of the shares has been or will be registered with the Securities Commission of Malaysia ("Commission") for the Commission's approval pursuant to the Capital Markets and Services Act 2007. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the shares may not be circulated or distributed, nor may the shares be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Malaysia other than (1) a closed end fund approved by the Commission; (2) a holder of a Capital Markets Services License; (3) a person who acquires the shares, as principal, if the offer is on terms that the shares may only be acquired at a consideration of not less than RM250,000 (or its equivalent in foreign currencies) for each transaction; (4) an individual whose total net personal assets or total net joint assets with his or her spouse exceeds RM3 million (or its equivalent in foreign currencies), excluding the value of the primary residence of the individual; (5) an individual who has a gross annual income exceeding RM300,000 (or its equivalent in foreign currencies) per annum in the preceding twelve months; (6) an individual who, jointly with his or her spouse, has a gross annual income of RM400,000 (or its equivalent in foreign currencies), per annum in the preceding twelve months; (7) a corporation with total net assets exceeding RM10 million (or its equivalent in a foreign currencies) based on the last audited accounts; (8) a partnership with total net assets exceeding RM10 million (or its equivalent in foreign currencies); (9) a bank licensee or insurance licensee as defined in the Labuan Financial Services and Securities Act 2010; (10) an Islamic bank licensee or takaful licensee as defined in the Labuan Financial Services and Securities Act 2010; and (11) any other person as may be specified by the Commission; provided that, in the each of the preceding categories (1) to (11), the distribution of the shares is made by a holder of a Capital Markets Services License who carries on the business of dealing in securities. The distribution in Malaysia of this prospectus is subject to Malaysian laws. This prospectus does not constitute and may not be used for the purpose of public offering or an issue, offer for subscription or purchase, invitation to subscribe for or purchase any securities requiring the registration of a prospectus with the Commission under the Capital Markets and Services Act 2007.

### Qatar

Without the approval of the Qatar Financial Markets Authority ("QFMA"), the shares of common stock will not be provided, promoted, offered, sold or delivered, at any time, directly or indirectly in the State of Qatar to any person.

If the approval of the QFMA is obtained, the offer of the shares of common stock in the State of Qatar will only be made through a private placement on an exclusive basis to the specifically intended professional and sophisticated identified recipient thereof, upon that person's request and initiative, for personal use only and will not be provided, promoted, offered, sold or delivered, at any time, directly or indirectly in the State of Qatar to any other person. Such an offer shall in no way be construed as a general public offer for the sale of securities to the public or an attempt to do business as a bank, an investment company or otherwise in the State of Qatar. Such promotion will not be approved by the Qatar Central Bank and will not be registered or licensed by any other regulator in the State of Qatar including the Qatar Financial Centre Regulatory Authority and the Qatar Exchange. If provided in the State of Qatar in accordance with the foregoing restrictions, the information contained in this prospectus shall be for the recipient only and may not be shared with any third party in Qatar. It shall not be for general circulation in the State of Qatar and any distribution or reproduction of this prospectus by any recipient to third parties in Qatar is not permitted and shall be at the liability of such recipient only and no liability whatsoever shall apply to us or the underwriters in this regard.

143

**Table of Contents**

***Notice to Prospective Investors in Singapore***

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of Non-CIS Securities may not be circulated or distributed, nor may the Non-CIS Securities be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (1) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore ("SFA"), (2) to a relevant person pursuant to Section 275(1), or any person pursuant to Section 275(1A), and in accordance with the conditions specified in Section 275, of the SFA, or (3) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the Non-CIS Securities are subscribed or purchased under Section 275 of the SFA by a relevant person which is:

(a) a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(b) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor,

securities (as defined in Section 239(1) of the SFA) of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within six months after that corporation or that trust has acquired the Non-CIS Securities pursuant to an offer made under Section 275 of the SFA except:

(a) to an institutional investor or to a relevant person defined in Section 275(2) of the SFA, or to any person arising from an offer referred to in Section 275(1A) or Section 276(4)(i)(B) of the SFA;

(b) where no consideration is or will be given for the transfer;

(c) where the transfer is by operation of law;

(d) as specified in Section 276(7) of the SFA; or

(e) as specified in Regulation 32 of the Securities and Futures (Offers of Investments) (Shares and Debentures) Regulations 2005 of Singapore.

***Switzerland***

This prospectus supplement is not intended to constitute an offer or solicitation to purchase or invest in the notes described herein. The notes may not be publicly offered, sold or advertised, directly or indirectly, in, into or from Switzerland and will not be listed on the SIX Swiss Exchange or on any other exchange or regulated trading facility in Switzerland. Neither this prospectus supplement nor any other offering or marketing material relating to the notes constitutes a prospectus as such term is understood pursuant to article 652a or article 1156 of the Swiss Code of Obligations, and neither this prospectus supplement nor any other offering or marketing material relating to the notes may be publicly distributed or otherwise made publicly available in Switzerland.

***Notice to Prospective Investors in Taiwan***

The shares have not been and will not be registered with the Financial Supervisory Commission of Taiwan pursuant to relevant securities laws and regulations and may not be sold, issued or offered within Taiwan through a public offering or in circumstances which constitutes an offer within the meaning of the Securities and Exchange Act of Taiwan that requires a registration or approval of the Financial Supervisory Commission of Taiwan. No person or entity in Taiwan has been authorized to offer, sell, give advice regarding or otherwise intermediate the offering and sale of the shares in Taiwan.

Table of Contents

*Notice to Prospective Investors in the United Arab Emirates*

The shares have not been, and are not being, publicly offered, sold, promoted or advertised in the United Arab Emirates (including the Dubai International Financial Centre) other than in compliance with the laws of the United Arab Emirates (and the Dubai International Financial Centre) governing the issue, offering and sale of securities. Further, this prospectus does not constitute a public offer of securities in the United Arab Emirates (including the Dubai International Financial Centre) and is not intended to be a public offer. This prospectus has not been approved by or filed with the Central Bank of the United Arab Emirates, the Securities and Commodities Authority or the Dubai Financial Services Authority.

*United Kingdom*

Each underwriter has represented and agreed that:

(a) it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act 2000 ("FSMA")) received by it in connection with the issue or sale of the shares of our common stock in circumstances in which Section 21(1) of the FSMA does not apply to us; and

(b) it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the shares of our common stock in, from or otherwise involving the United Kingdom.

145

**Table of Contents**

**LEGAL MATTERS**

Certain legal matters with respect to U.S. federal law in connection with this offering will be passed upon for us by Sidley Austin LLP, Palo Alto, California. Wilson Sonsini Goodrich & Rosati, P.C., Palo Alto, California is acting as counsel to the underwriters in this offering.

**EXPERTS**

The financial statements of The RealReal, Inc. as of December 31, 2017 and 2018, and for each of the years in the two-year period ended December 31, 2018 have been included herein in reliance upon the report of KPMG LLP, independent registered public accounting firm, appearing elsewhere herein, and upon the authority of said firm as experts in accounting and auditing.

**WHERE YOU CAN FIND ADDITIONAL INFORMATION**

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the common stock offered by this prospectus. This prospectus, which constitutes a part of the registration statement, does not contain all of the information set forth in the registration statement, some of which is contained in exhibits to the registration statement as permitted by the rules and regulations of the SEC. For further information with respect to us and our common stock, we refer you to the registration statement, including the exhibits filed as a part of the registration statement. Statements contained in this prospectus concerning the contents of any contract or any other document is not necessarily complete. If a contract or document has been filed as an exhibit to the registration statement, please see the copy of the contract or document that has been filed. Each statement in this prospectus relating to a contract or document filed as an exhibit is qualified in all respects by the filed exhibit. The SEC also maintains a website that contains reports, proxy statements and other information about issuers, like us, that file electronically with the SEC. The address of that website is www.sec.gov.

As a result of this offering, we will become subject to the information and reporting requirements of the Exchange Act and, in accordance with this law, will file periodic reports, proxy statements and other information with the SEC. These periodic reports, proxy statements and other information will be available for inspection and copying at the SEC's public reference facilities and the website of the SEC referred to above. We also maintain a website at www.therealreal.com. Upon completion of this offering, you may access these materials free of charge as soon as reasonably practicable after they are electronically filed with, or furnished to, the SEC. Information contained on our website is not a part of this prospectus and the inclusion of our website address in this prospectus is an inactive textual reference only.

146

Table of Contents

**THE REALREAL, INC.**

**INDEX TO FINANCIAL STATEMENTS**

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Financial Statements: | |
| Balance Sheets | F-3 |
| Statements of Operations | F-4 |
| Statements of Comprehensive Loss | F-5 |
| Statements of Redeemable Convertible Preferred Stock, Convertible Preferred Stock and Stockholders' Deficit | F-6 |
| Statements of Cash Flows | F-8 |
| Notes to Financial Statements | F-10 |

F-1

**Table of Contents**

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Stockholders and Board of Directors
The RealReal, Inc.:

*Opinion on the Financial Statements*

We have audited the accompanying balance sheets of The RealReal, Inc. (the Company) as of December 31, 2017 and 2018, the related statements of operations, comprehensive loss, redeemable convertible preferred stock, convertible preferred stock and stockholders' deficit, and cash flows for each of the years in the two-year period ended December 31, 2018, and the related notes (collectively, the financial statements). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2017 and 2018, and the results of its operations and its cash flows for each of the years in the two-year period ended December 31, 2018, in conformity with U.S. generally accepted accounting principles.

*Change in Accounting Principle*

As discussed in Note 2 to the financial statements, the Company has changed its method of accounting for revenue on January 1, 2018 due to the adoption of ASU 2014-09, Revenue from Contracts with Customers (Topic 606 or ASC 606). The Company adopted the new revenue standard using the full retrospective approach.

*Basis for Opinion*

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

*/s/ KPMG LLP*

We have served as the Company's auditor since 2013.

San Francisco, California
April 8, 2019

F-2

**Table of Contents**

**THE REALREAL, INC.**

**Balance Sheets**

**(In thousands, except share and per share data)**

| | December 31, | | March 31, | Pro Forma March 31, |
| --- | --- | --- | --- | --- |
| | 2017 (as revised) | 2018 | 2019 (unaudited) | 2019 (unaudited) |
| **Assets** | | | | |
| Current assets | | | | |
| Cash and cash equivalents | $ 16,486 | $ 34,393 | $ 88,790 | |
| Short-term investments | 12,421 | 27,131 | 14,246 | |
| Accounts receivable | 6,998 | 7,571 | 11,300 | |
| Inventory, net | 6,614 | 10,355 | 10,528 | |
| Prepaid expenses and other current assets | 4,358 | 9,696 | 12,084 | |
| Total current assets | 46,877 | 89,146 | 136,948 | |
| Property and equipment, net | 23,422 | 33,286 | 35,224 | |
| Restricted cash | 4,174 | 11,234 | 11,421 | |
| Other assets | 1,492 | 1,751 | 3,520 | |
| Total assets | $ 75,965 | $ 135,417 | $ 187,113 | |
| **Liabilities, Redeemable Convertible Preferred Stock, Convertible Preferred Stock and Stockholders' Deficit** | | | | |
| Current liabilities | | | | |
| Accounts payable | $ 7,566 | $ 5,149 | $ 5,242 | |
| Accrued consignor payable | 28,672 | 35,259 | 36,551 | |
| Other accrued and current liabilities | 26,157 | 41,956 | 42,964 | |
| Long-term debt, current portion | 2,976 | 5,990 | 5,495 | |
| Total current liabilities | 65,371 | 88,354 | 90,252 | |
| Long-term debt, net of current portion | 10,745 | 3,249 | 2,501 | |
| Other noncurrent liabilities | 3,478 | 7,304 | 7,933 | $ 7,043 |
| Total liabilities | 79,594 | 98,907 | 100,686 | |
| Commitments and contingencies (Note 11) | | | | |
| Redeemable convertible preferred stock, $0.00001 par value; 12,956,724, 31,053,601 and 37,403,946 shares authorized as of December 31, 2017 and 2018 and March 31, 2019 (unaudited), respectively; aggregate liquidation preference of $52,610, $156,467 and $204,188 as of December 31, 2017 and 2018, and March 31, 2019 (unaudited), respectively; 12,956,724, 31,053,601 and 37,403,946 shares issued and outstanding as of December 31, 2017 and 2018 and March 31, 2019 (unaudited), respectively; no shares issued and outstanding, pro forma (unaudited) | 50,367 | 151,381 | 198,308 | — |
| Convertible preferred stock $0.00001 par value; 70,060,297, 73,950,153 and 77,781,921 shares authorized as of December 31, 2017 and 2018 and March 31, 2019 (unaudited), respectively; aggregate involuntary liquidation preference of $123,591, $144,879 and $171,819 as of December 31, 2017 and 2018 and March 31, 2019 (unaudited), respectively; 69,834,789, 73,724,645 and 77,556,411 shares issued and outstanding as of December 31, 2017 and 2018 and March 31, 2019 (unaudited), respectively; no shares issued and outstanding, pro forma (unaudited) | 122,990 | 142,819 | 169,098 | — |
| Stockholders' (deficit) equity: | | | | |
| Common stock, $0.00001 par value; 118,000,000, 145,467,774 and 155,649,887 shares authorized as of December 31, 2017 and 2018 and March 31, 2019 (unaudited), respectively; 16,576,057, 17,186,302 and 18,674,312 shares issued and outstanding as of December 31, 2017 and 2018 and March 31, 2019 (unaudited), respectively; 135,401,581 shares issued and outstanding, pro forma (unaudited) | — | — | — | 1 |
| Additional paid-in capital | 4,591 | — | — | 368,295 |
| Other comprehensive loss | (6) | (25) | 3 | 3 |
| Accumulated deficit | (181,571) | (257,665) | (280,982) | (280,982) |
| Total stockholders' (deficit) equity | (176,986) | (257,690) | (280,979) | $ 87,317 |
| Total liabilities, redeemable convertible preferred stock, convertible preferred stock and stockholders' deficit | $ 75,965 | $ 135,417 | $ 187,113 | |

The accompanying notes are an integral part of these financial statements.

F-3

**Table of Contents**

**THE REALREAL, INC.**

**Statements of Operations**

**(In thousands, except share and per share data)**

| | Year Ended December 31, | | Three Months Ended March 31, | |
| --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2018 | 2019 |
| | (as revised) | | (unaudited) | |
| Revenue: | | | | |
| Consignment and service revenue | $ 121,210 | $ 183,991 | $ 40,999 | $ 56,236 |
| Direct revenue | 12,661 | 23,385 | 5,460 | 13,019 |
| Total revenue | 133,871 | 207,376 | 46,459 | 69,255 |
| Cost of revenue: | | | | |
| Cost of consignment and service revenue | 35,657 | 50,855 | 11,577 | 15,946 |
| Cost of direct revenue | 10,572 | 19,603 | 4,277 | 10,927 |
| Total cost of revenue | 46,229 | 70,458 | 15,854 | 26,873 |
| Gross profit | 87,642 | 136,918 | 30,605 | 42,382 |
| Operating expenses: | | | | |
| Marketing | 36,711 | 42,165 | 9,634 | 11,733 |
| Operations and technology | 58,680 | 104,929 | 21,332 | 31,544 |
| Selling, general and administrative | 44,035 | 63,728 | 13,524 | 22,319 |
| Total operating expenses | 139,426 | 210,822 | 44,490 | 65,596 |
| Loss from operations | (51,784) | (73,904) | (13,885) | (23,214) |
| Interest income | 355 | 1,046 | 84 | 405 |
| Interest expense | (762) | (1,152) | (197) | (131) |
| Other expense, net | (60) | (1,656) | (108) | (282) |
| Loss before provision for income taxes | (52,251) | (75,666) | (14,106) | (23,222) |
| Provision for income taxes | 57 | 99 | — | — |
| Net loss | $ (52,308) | $ (75,765) | $ (14,106) | $ (23,222) |
| Accretion of redeemable convertible preferred stock to redemption value | $ (2,610) | $ (8,922) | $ (1,109) | $ (3,355) |
| Net loss attributable to common stockholders | $ (54,918) | $ (84,687) | $ (15,215) | $ (26,577) |
| Net loss per share attributable to common stockholders, basic and diluted | $ (3.37) | $ (5.06) | $ (0.92) | $ (1.53) |
| Shares used to compute net loss per share attributable to common stockholders, basic and diluted | 16,291,653 | 16,730,803 | 16,599,476 | 17,411,487 |
| Pro forma net loss per share attributable to common stockholders, basic and diluted (unaudited) | | $ (0.67) | | (0.18) |
| Shares used to compute pro forma net loss per share attributable to common stockholders, basic and diluted (unaudited) | | 112,804,256 | | 125,064,556 |

The accompanying notes are an integral part of these financial statements.

F-4

Table of Contents

**THE REALREAL, INC.**

**Statements of Comprehensive Loss**

**(In thousands)**

|  | Year Ended December 31, | | Three Months Ended March 31, | |
|  | 2017 | 2018 | 2018 | 2019 |
| --- | --- | --- | --- | --- |
|  | (as revised) | | (unaudited) | |
| Net loss | $ (52,308) | $ (75,765) | $ (14,106) | $ (23,222) |
| Other comprehensive loss, net of tax: | | | | |
| Unrealized gain (loss) on investments | 16 | (19) | 6 | 28 |
| Comprehensive loss | $ (52,292) | $ (75,784) | $ (14,100) | $ (23,194) |

The accompanying notes are an integral part of these financial statements.

F-5

Table of Contents

**THE REALREAL, INC.**

**Statements of Redeemable Convertible Preferred Stock, Convertible Preferred Stock and Stockholders' Deficit**

**(In thousands, except share amounts)**

| | Redeemable Convertible Preferred Stock | | Convertible Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Other Comprehensive Gain (Loss) | Accumulated Deficit | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | | | | |
| Balances as of December 31, 2016 | — | $ — | 69,834,789 | $122,990 | 16,149,343 | $ — | $ 5,093 | $ (22) | $ (127,995) | $ (122,924) |
| Impact of adopting new accounting standard *(as revised)* | — | — | — | — | — | — | — | — | (1,268) | (1, 268) |
| Issuance of Series F redeemable convertible preferred stock, net of issuance costs of $2,243 | 12,956,724 | 47,757 | — | — | — | — | — | — | — | — |
| Accretion of redeemable convertible preferred stock to redemption value | — | 2,610 | — | — | — | — | (2,610) | — | — | (2,610) |
| Issuance of common stock upon exercise of options | — | — | — | — | 426,714 | — | 212 | — | — | 212 |
| Issuance of common stock warrants | — | — | — | — | — | — | 43 | — | — | 43 |
| Stock-based compensation expense | — | — | — | — | — | — | 1,853 | — | — | 1,853 |
| Other comprehensive income | — | — | — | — | — | — | — | 16 | — | 16 |
| Net loss *(as revised)* | — | — | — | — | — | — | — | — | (52,308) | (52,308) |
| Balances as of December 31, 2017 *(as revised)* | 12,956,724 | 50,367 | 69,834,789 | 122,990 | 16,576,057 | — | 4,591 | (6) | (181,571) | (176,986) |
| Issuance of Series G redeemable convertible preferred stock upon conversion of notes, net of issuance costs of $190 | 1,067,550 | 5,452 | — | — | — | — | — | — | — | — |
| Issuance of Series G convertible preferred stock upon conversion of notes, net of issuance costs of $355 | — | — | 1,997,709 | 10,202 | — | — | — | — | — | — |
| Loss on extinguishment of convertible notes (Note 7) | — | — | — | — | — | — | (370) | — | — | (370) |
| Issuance of Series G redeemable convertible preferred stock, net of issuance costs of $3,360 | 17,029,327 | 86,640 | — | — | — | — | — | — | — | — |
| Issuance of Series G convertible preferred stock, net of issuance costs of $373 | — | — | 1,892,147 | 9,627 | — | — | — | — | — | — |
| Accretion of redeemable convertible preferred stock to redemption value | — | 8,922 | — | — | — | — | (8,593) | — | (329) | (8,922) |
| Issuance of common stock upon exercise of options | — | — | — | — | 495,650 | — | 481 | — | — | 481 |
| Issuance of common stock upon exercise of warrants | — | — | — | — | 114,595 | — | 133 | — | — | 133 |
| Compensation expense related to stock sales by current and former employees | — | — | — | — | — | — | 847 | — | — | 847 |
| Stock-based compensation expense | — | — | — | — | — | — | 2,911 | — | — | 2,911 |
| Other comprehensive loss | — | — | — | — | — | — | — | (19) | — | (19) |
| Net loss | — | — | — | — | — | — | — | — | (75,765) | (75,765) |
| Balance as of December 31, 2018 | 31,053,601 | $151,381 | 73,724,645 | $142,819 | 17,186,302 | $ — | $ — | $ (25) | $ (257,665) | $ (257,690) |

F-6

Table of Contents

**THE REALREAL, INC.**

**Statements of Redeemable Convertible Preferred Stock, Convertible Preferred Stock and Stockholders' Deficit—Continued**

**(In thousands, except share amounts)**

| | Redeemable Convertible Preferred Stock | | Convertible Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Other Comprehensive Gain (Loss) | Accumulated Deficit | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | | | | |
| Issuance of Series H redeemable convertible preferred stock net of issuance costs of $86 (unaudited) | 6,350,345 | $ 43,572 | — | — | — | — | — | — | — | — |
| Issuance of Series H convertible preferred stock net of issuance costs of $63 (unaudited) | — | — | 3,831,766 | $ 26,279 | — | — | — | — | — | — |
| Accretion of redeemable preferred stock to redemption value (unaudited) | — | $ 3,355 | — | — | — | — | (3,260) | — | (95) | (3,355) |
| Compensation expense related to stock sales by current employees (unaudited) | — | — | — | — | — | — | 819 | — | — | 819 |
| Issuance of common stock upon exercise of options (unaudited) | — | — | — | — | 1,478,139 | — | 1,319 | — | — | 1,319 |
| Issuance of common stock upon exercise of warrants (unaudited) | — | — | — | — | 9,871 | — | 13 | — | — | 13 |
| Stock-based compensation expense (unaudited) | — | — | — | — | — | — | 1,109 | — | — | 1,109 |
| Other comprehensive loss (unaudited) | — | — | — | — | — | — | — | 28 | — | 28 |
| Net loss (unaudited) | — | — | — | — | — | — | — | — | (23,222) | (23,222) |
| Balance as of March 31, 2019 (unaudited) | 37,403,946 | $198,308 | 77,556,411 | $169,098 | 18,674,312 | $ — | $ — | $ 3 | $ (280,982) | $ (280,979) |

| | Redeemable Convertible Preferred Stock | | Convertible Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Other Comprehensive Gain (Loss) | Accumulated Deficit | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | | | | |
| Balance as of December 31, 2017 *(as revised)* | 12,956,724 | $50,367 | 69,834,789 | $122,990 | 16,576,057 | $ — | $ 4,591 | $ (6) | $ (181,571) | $ (176,986) |
| Accretion of redeemable convertible preferred stock to redemption value (unaudited) | — | 1,109 | — | — | — | — | (1,109) | — | — | (1,109) |
| Issuance of common stock upon exercise of options (unaudited) | — | — | — | — | 37,254 | — | 39 | — | — | 39 |
| Stock-based compensation expense (unaudited) | — | — | — | — | — | — | 545 | — | — | 545 |
| Other comprehensive income (unaudited) | — | — | — | — | — | — | — | 6 | — | 6 |
| Net loss (unaudited) | — | — | — | — | — | — | — | — | (14,106) | (14,106) |
| Balance as of March 31, 2018 (unaudited) | 12,956,724 | $51,476 | 69,834,789 | $122,990 | 16,613,311 | $ — | $ 4,066 | $ — | $ (195,677) | $ (191,611) |

F-7

**Table of Contents**

**THE REALREAL, INC.**

**Statements of Cash Flows**

**(In thousands)**

| | Year Ended December 31, | | Three Months Ended March 31, | |
|---|---|---|---|---|
| | 2017 | 2018 | 2018 | 2019 |
| | (as revised) | | (unaudited) | |
| **Cash flows from operating activities** | | | | |
| Net loss | $ (52,308) | $ (75,765) | $(14,106) | $ (23,222) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | |
| Depreciation and amortization | 5,634 | 9,290 | 1,998 | 2,808 |
| Stock-based compensation expense | 1,853 | 2,911 | 545 | 1,109 |
| Change in fair value of convertible note derivative liability | — | 1,248 | — | — |
| Bad debt expense | 636 | 999 | 167 | 321 |
| Compensation expense related to stock sales by current and former employees | — | 847 | — | 819 |
| Change in fair value of convertible preferred stock warrant liability | — | 450 | 104 | 280 |
| Accrued interest on convertible notes | — | 223 | — | — |
| Loss on retirement of property and equipment | 140 | 203 | — | — |
| Accretion of unconditional endowment grant liability | — | 118 | 21 | 26 |
| Accretion of debt discounts | 27 | 104 | 6 | 7 |
| Amortization of premium of short-term investments | 157 | 78 | 15 | 40 |
| Issuance of common stock warrant to third-party service provider | 43 | — | — | — |
| Changes in operating assets and liabilities: | | | | |
| Accounts receivable | (4,206) | (1,572) | (382) | (4,050) |
| Inventory, net | (3,913) | (3,741) | (444) | (173) |
| Prepaid expenses and other current assets | (2,386) | (5,338) | (1,268) | (2,388) |
| Other assets | (802) | (318) | (62) | (111) |
| Accounts payable | (88) | (2,576) | (50) | 797 |
| Accrued consignor payable | 10,462 | 6,587 | (1,348) | 1,292 |
| Other accrued and current liabilities | 6,144 | 15,681 | (753) | (475) |
| Other noncurrent liabilities | 33 | 3,376 | 585 | 349 |
| Net cash used in operating activities | (38,574) | (47,195) | (14,972) | (22,571) |
| **Cash flows from investing activities** | | | | |
| Purchases of short-term investments | (27,521) | (31,454) | (2,211) | — |
| Proceeds from maturities of short-term investments | 30,338 | 9,624 | 7,600 | 12,873 |
| Proceeds from sale of short-term investments | — | 7,023 | 7,023 | — |
| Capitalized proprietary software costs | (2,521) | (5,724) | (800) | (1,686) |
| Purchases of property and equipment | (11,599) | (13,392) | (2,402) | (3,743) |
| Net cash provided by (used in) investing activities | (11,303) | (33,923) | 9,210 | 7,444 |
| **Cash flows from financing activities** | | | | |
| Proceeds from issuance of redeemable convertible preferred stock, net of issuance costs | 47,757 | 86,640 | — | 43,572 |
| Proceeds from issuance of convertible preferred stock, net of issuance costs | — | 9,627 | — | 26,279 |
| Proceeds from issuance of convertible notes, net of issuance costs | — | 14,273 | — | — |
| Proceeds from exercise of stock options and common stock warrants | 212 | 614 | 39 | 1,332 |
| Payment of deferred offering costs | — | (24) | — | (222) |
| Issuance costs paid related to conversion of convertible notes | — | (545) | — | — |
| Repayment of debt | (1,250) | (4,500) | (750) | (1,250) |
| Net cash provided by (used in) financing activities | 46,719 | 106,085 | (711) | 69,711 |
| Net (decrease) increase in cash, cash equivalents and restricted cash | (3,158) | 24,967 | (6,473) | 54,584 |
| **Cash, cash equivalents and restricted cash** | | | | |
| Beginning of period | 23,818 | 20,660 | 20,660 | 45,627 |
| End of period | $ 20,660 | $ 45,627 | $ 14,187 | $100,211 |

F-8

**Table of Contents**

**THE REALREAL, INC.**

**Statements of Cash Flows (continued)**
**(In thousands)**

| | Year Ended December 31, | | Three Months Ended March 31, | |
| --- | --- | --- | --- | --- |
| | **2017** | **2018** | **2018** | **2019** |
| | | | (unaudited) | |
| **Supplemental disclosures of cash flow information** | | | | |
| Cash paid for interest | $      704 | $      666 | $      157 | $      98 |
| Cash paid for income taxes | 22 | 49 | — | — |
| **Supplemental disclosures of non-cash investing and financing activities** | | | | |
| Issuance of convertible preferred stock upon extinguishment of convertible notes | — | 10,557 | — | — |
| Issuance of redeemable convertible preferred stock upon extinguishment of convertible notes | — | 5,642 | — | — |
| Accretion of redeemable convertible preferred stock to redemption value | 2,610 | 8,922 | 1,109 | 3,355 |
| Loss on extinguishment of convertible notes | — | 370 | — | — |
| Purchases of property and equipment included in accounts payable | 196 | 158 | (169) | (704) |
| Deferred offering costs in accounts payable and accrued liabilities | — | 10 | — | 1,457 |

The accompanying notes are an integral part of these financial statements.

F-9

**Table of Contents**

**THE REALREAL, INC.**

**Notes to Financial Statements**

### 1.  Organization and Description of Business

The RealReal, Inc. (the "Company") is an online marketplace for authenticated, consigned luxury goods across multiple categories, including women's, men's, kids', jewelry and watches, and home and art. The Company was incorporated in the state of Delaware on March 29, 2011 and is headquartered in San Francisco, California.

#### *Liquidity*

The Company has incurred losses and negative cash flows from operations. The Company has primarily financed its operations through several rounds of venture capital financing. In March 2019, the Company received aggregate gross proceeds of $70.0 million from the issuance of its Series H redeemable convertible preferred stock and convertible preferred stock. Management expects operating losses and negative cash flows from operations to continue in the foreseeable future as the Company continues to invest in expansion activities. Management believes that the Company's current cash, cash equivalents and short-term investments, combined with the net proceeds from its Series H preferred stock financing, are adequate to meet its needs for at least the next twelve months. However, the Company may need to borrow funds or raise additional equity to achieve its longer-term business objectives.

### 2.  Significant Accounting Policies

#### *Basis of Presentation*

The accompanying financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America ("GAAP"). The Company's functional and reporting currency is the U.S. dollar.

#### *Revisions to Previously Reported Financial Statements*

On January 1, 2018, the Company adopted ASU 2014-09, *Revenue from Contracts with Customers* (Topic 606 or ASC 606) using the full retrospective method. The Company recorded a cumulative catch-up adjustment as of January 1, 2017 resulting in an increase to the opening accumulated deficit of $1.3 million, comprised of the impact of $1.5 million from the recognition of a material right resulting from the tiered consignor commission plan, partially offset by $0.2 million from the change in timing of recognition of consignment revenue. Additionally, deferred revenue increased by $1.3 million, accrued consignor payable decreased by $0.4 million and revenues decreased and net loss increased by $0.4 million in the year ended December 31, 2017 as a result of the adoption of ASC 606. Refer to Recently Adopted Accounting Pronouncements and Note 2—Revenue Recognition for further information.

The Company has also made certain reclassifications to the financial statements and related disclosures for the year ended December 31, 2017 to conform to current period presentation. These reclassifications primarily relate to the balance sheet presentation of other accrued and current liabilities and other non-current liabilities and the statement of operations presentation of cost of revenue, operating expenses and other expenses, net. These reclassifications had no impact on previously reported net loss.

#### *Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and

F-10

**Table of Contents**

**THE REALREAL, INC.**

**Notes to Financial Statements**

liabilities as of the date of the financial statements and the reported amounts of expenses during the reporting period. Significant items subject to such estimates and assumptions include those related to revenue recognition, including the returns reserve and material right related to the Company's tiered consignor commission plan, the useful lives of property and equipment and proprietary software, valuation of short-term investments, valuation of inventory, stock-based compensation, redemption value of redeemable convertible preferred stock, income tax uncertainties and other contingencies. The Company evaluates its estimates and assumptions on an ongoing basis using historical experience and other factors and adjusts those estimates and assumptions when facts and circumstances dictate. Actual results could differ from those estimates.

*Net Loss per Share Attributable to Common Stockholders*

The Company follows the two-class method when computing net loss per common share when shares are issued that meet the definition of participating securities. The two-class method determines net loss per common share for each class of common stock and participating securities according to dividends declared or accumulated and participation rights in undistributed earnings. The two-class method requires income available to common stockholders for the period to be allocated between common stock and participating securities based upon their respective rights to receive dividends as if all income for the period had been distributed. The Company's redeemable convertible preferred stock and convertible preferred stock contractually entitles the holders of such shares to participate in dividends but does not contractually require the holders of such shares to participate in the Company's losses.

For periods in which the Company reports net losses, diluted net loss per common share attributable to common stockholders is the same as basic net loss per common share attributable to common stockholders, because potentially dilutive common shares are not assumed to have been issued if their effect is anti-dilutive.

*Unaudited Pro Forma Net Loss per Share Attributable to Common Stockholders*

In contemplation of the initial public offering ("IPO"), the Company has presented the unaudited pro forma basic and diluted net loss per share attributable to common stockholders, which has been computed to give effect to the conversion of the redeemable convertible preferred stock and convertible preferred stock into shares of common stock. In addition, the numerator in the pro forma basic and diluted net loss per common share calculation has been adjusted to remove the accretion of redeemable convertible preferred stock to redemption value and gains or losses resulting from the remeasurement of the convertible preferred stock warrant liability as the related convertible preferred stock warrant liability will be reclassified to additional paid-in capital upon the completion of an IPO.

*Unaudited Pro Forma Balance Sheet*

The unaudited pro forma balance sheet information as of March 31, 2019 is presented as though all of the Company's outstanding shares of redeemable convertible preferred stock and convertible preferred stock have been converted into shares of common stock upon the completion of the IPO assuming an initial offering price of $         per share, which is the mid-point of the estimated offering price range. In addition, the pro forma balance sheet information assumes the reclassification of the convertible preferred stock warrant liability to additional paid-in capital upon completion of the IPO, as the warrants to purchase convertible preferred stock automatically convert into common stock warrants. The unaudited pro forma balance sheet information does not assume any proceeds from the IPO.

F-11

**Table of Contents**

**THE REALREAL, INC.**

**Notes to Financial Statements**

*Segments*

The Company has one operating segment and one reportable segment as its chief operating decision maker, who is its Chief Executive Officer, reviews financial information on a consolidated basis for purposes of allocating resources and evaluating financial performance. All long-lived assets are located in the United States and substantially all revenue is attributed to consignors and buyers based in the United States.

*Revenue Recognition*

The Company generates revenue from the sale of pre-owned luxury goods through its online marketplace.

*Consignment and Service Revenue*

The Company provides a service to sell pre-owned luxury goods on behalf of consignors to buyers through its online marketplace. The Company retains a percentage of the proceeds received as payment for its consignment service, which the Company refers to as its take rate. The Company reports consignment revenue on a net basis as an agent and not the gross amount collected from the buyer. Title to the consigned goods remain with the consignor until transferred to the end customer subsequent to purchase of the consigned goods. The Company does not take title of consigned goods at any time except in certain cases where returned goods become Company-owned inventory.

The Company recognizes consignment revenue upon purchase of the consigned good by the buyer as its performance obligation of providing consignment services to the consignor is satisfied at that point. Consignment revenue is recognized net of certain buyer incentives and estimated returns and cancellations. The Company recognizes a returns reserve, based on historical experience, which is recorded in other accrued and current liabilities on the balance sheets (see Note 5). Sales tax assessed by governmental authorities is excluded from revenue.

Certain transactions provide consignors with a material right resulting from the tiered consignor commission plan. Under this plan, the amount an individual consignor receives for future sales of consigned goods may be dependent on previous consignment sales for that consignor within his/her consignment period. Accordingly, in certain consignment transactions, a small portion of the Company's consignment revenue is allocated to such material right using the portfolio method and recorded as deferred revenue.

The Company charges shipping fees to buyers and has elected to treat shipping and handling activities performed after control transfers to the buyer as fulfillment activities. All outbound shipping and handling costs are accounted for as fulfillment costs in cost of consignment and service revenue at the time revenue is recognized.

The Company also generates subscription revenue from monthly memberships allowing buyers early access to shop for luxury goods. The buyers receive the early access and other benefits over the term of the subscription period, which represents a single stand-ready performance obligation. Therefore, the subscription fees paid by the buyer are recognized over the monthly subscription period. Subscription revenue was not material in the years ended December 31, 2017 and 2018 or the three months ended March 31, 2019 (unaudited).

*Direct Revenue*

The Company generates direct revenue from the sale of Company-owned inventory. The Company recognizes direct revenue upon shipment of the purchased good to the buyer as its performance obligation, consisting of the sale of goods, is satisfied at this point. Direct revenue is recognized net of incentives and estimated returns. Sales tax assessed by governmental authorities is excluded from revenue.

F-12

**Table of Contents**

**THE REALREAL, INC.**

**Notes to Financial Statements**

*Incentives*

Promotional incentives, which include basket promotional code discounts and other credits, may periodically be offered to consignors and buyers. These are treated as a reduction of consignment and service revenue and direct revenue. Additionally, the Company may offer site credits to buyers on current transactions to be applied towards future transactions, which are accounted as site credit liabilities and included in other accrued and current liabilities on the balance sheets.

*Contract Liabilities*

The Company's contractual liabilities consist of deferred revenue for material rights primarily related to the tiered consignor commission plan totaling $1.8 million and $2.7 million as of December 31, 2017 and 2018, respectively, and $3.1 million as of March 31, 2019 (unaudited), which are recognized as revenue using a portfolio approach based on the pattern of exercise and certain unredeemed site credits, which were immaterial as of December 31, 2017 and 2018 and March 31, 2019 (unaudited). Contract liabilities are recorded in other accrued and current liabilities on the balance sheets and are generally expected to be recognized within one year.

*Cost of Revenue*

Cost of revenue for consignment and services and direct revenue consists of shipping costs, credit card fees, packaging, customer service and website hosting services. Cost of direct revenue also includes the cost of goods sold.

*Marketing*

Marketing expense is comprised of the cost of acquiring new consignors and buyers for our online platform and physical stores, including the cost of television, digital and direct mail advertising. Marketing expense also includes personnel-related costs, including stock-based compensation, of employees engaged in these activities. Advertising costs are expensed as incurred and were $32.1 million and $36.6 million in 2017 and 2018, respectively, and $8.3 million and $10.1 million in the three months ended March 31, 2018 and 2019 (unaudited), respectively.

*Operations and Technology*

Operations and technology expense is comprised of costs associated with the authentication, merchandising and fulfillment of goods sold through our online marketplace, as well as general information technology expense. The principal component of operations and technology expense is personnel-related costs, including stock-based compensation, of employees engaged in these activities. Operations and technology expense also includes allocated facility and overhead costs, costs related to our retail stores, facility supplies and depreciation of hardware and equipment, as well as research and development expense for technology associated with managing and improving our operations. In 2017, 2018 and the three months ended March 31, 2018 and 2019 (unaudited), the Company capitalized proprietary software developments costs of $2.5 million, $5.7 million, $0.8 million and $1.7 million, respectively. As such, operations and technology expense also includes amortization of capitalized technology development costs, which is taken on straight-line basis over three years once the technology is ready for its intended use.

*Selling, General and Administrative*

Selling, general and administrative expense is principally comprised of the personnel-related costs for employees involved in sales, finance and administration, and includes stock-based compensation expense.

F-13

**Table of Contents**

**THE REALREAL, INC.**

**Notes to Financial Statements**

Selling, general and administrative expense also includes allocated facility and overhead costs and professional services, including accounting and legal advisors.

*Stock-based Compensation*

Stock-based compensation expense related to employees is measured based on the grant-date fair value of the awards. Compensation expense is recognized in the statements of operations over the period during which the employee is required to perform services in exchange for the award (the vesting period of the applicable award) using the straight-line method. The Company estimates the fair value of stock options granted using the Black-Scholes option pricing model and accounts for forfeitures as they occur.

*Cash, Cash Equivalents and Restricted Cash*

The Company considers all highly liquid investments purchased with original maturities of three months or less from the purchase date to be cash equivalents. Cash equivalents consist primarily of amounts invested in reverse repurchase agreement ("RRAs"). RRAs are collateralized by deposits in the form of United States government securities and obligations for an amount not less than 102% of their value. The Company has a policy that the collateral has at least an A (or equivalent) credit rating. The Company utilizes a third-party custodian to manage the exchange of funds and ensure that collateral received is maintained at 102% of the value of the RRAs on a daily basis. RRAs with stated maturities of greater than three months from the date of purchase are classified as short-term investments.

Restricted cash consists of cash deposited with a financial institution as collateral for the Company's letters of credit for its facility leases and the Company's credit cards. As of December 31, 2017 and 2018, the Company had letters of credit outstanding and collateral accounts in the amounts of $4.2 million and $11.2 million, respectively. The year over year increase in restricted cash was primarily due to new facility leases and credit card agreements entered into in 2018. As of March 31, 2019 (unaudited), the Company had letters of credit outstanding and collateral accounts in the amounts of $11.4 million. The restricted cash is classified as noncurrent as the Company expects the cash to remain restricted for a period greater than one year.

The following table provides a reconciliation of cash, cash equivalents and restricted cash reported within the balance sheets that sum to the total of the same amounts shown in the statements of cash flows (in thousands):

|  | December 31, | | March 31, | |
|---|---|---|---|---|
|  | 2017 | 2018 | 2018 | 2019 |
|  |  |  | (unaudited) | |
| Cash and cash equivalents | $16,486 | $34,393 | $ 9,013 | $ 88,790 |
| Restricted cash | 4,174 | 11,234 | 5,174 | 11,421 |
| Total cash, cash equivalents and restricted cash | $20,660 | $45,627 | $14,187 | $100,211 |

*Short-term Investments*

The Company has classified and accounted for its short-term investments as available-for-sale which are carried at fair value on its balance sheets. The Company records any unrealized gains and losses as a component of stockholders' deficit, except for unrealized losses determined to be other than temporary, of which there are none as of December 31, 2017 and 2018 and March 31, 2019 (unaudited).

F-14

**Table of Contents**

**THE REALREAL, INC.**

**Notes to Financial Statements**

The Company evaluates its short-term investments periodically for possible impairment. A decline in the fair value below the amortized costs of the short-term investment is considered an other-than-temporary impairment if the Company has the intent to sell the short-term investments or it is more likely than not that the Company will be required to sell the short-term investment before recovery of the entire amortized cost basis.

*Accounts Receivable*

Accounts receivables are recorded at the amounts billed to buyers and do not bear interest. Accounts receivables result from credit card transactions, the majority of which are settled within two business days.

*Inventory, Net*

Inventory primarily consists of finished goods arising from goods returned after the consignor has been paid, upon which the Company assumes the title to the goods until it is resold and recognizes it as inventory in an amount equal to that paid to the consignor. The Company also periodically purchases finished goods directly from vendors. Inventory is valued at the lower of cost and net realizable value using the specific identification method, and the Company records provisions, as appropriate, to write down obsolete and excess inventory to estimated net realizable value.

The inventory reserve, which reduces inventory on the balance sheets, was $0.2 million and $0.7 million as of December 31, 2017 and 2018, respectively, and $1.0 million as of March 31, 2019 (unaudited).

*Property and Equipment, Net*

Property and equipment, net is recorded at cost less accumulated depreciation and amortization. Depreciation and amortization are recorded on a straight-line basis over the estimated useful lives of the respective assets. Repair and maintenance costs are expensed as incurred.

The estimated useful lives of our assets are as follows:

| | |
|---|---|
| Proprietary software | 3 years |
| Furniture and equipment | 3-5 years |
| Vehicles | 5 years |
| Leasehold improvements | Shorter of lease term or estimated useful life |

*Software Development Costs*

Proprietary software includes the costs of developing the Company's internal proprietary business platform. The Company capitalizes qualifying proprietary software development costs that are incurred during the application development stage. Capitalization of costs begins when two criteria are met: (1) the preliminary project stage is completed and (2) it is probable that the software will be completed and used for its intended function. Such costs are capitalized in the period incurred. Capitalization ceases and amortization begins when the software is substantially complete and ready for its intended use, including the completion of all significant testing. Costs related to preliminary project activities and post-implementation operating activities are expensed as incurred.

F-15

**Table of Contents**

**THE REALREAL, INC.**

**Notes to Financial Statements**

*Impairment of Long-lived Assets*

The carrying amounts of long-lived assets, including property and equipment, net and capitalized proprietary software, are periodically reviewed for impairment whenever events or changes in circumstances indicate that the carrying value of these assets may not be recoverable or that the useful life is shorter than originally estimated. Recoverability of assets to be held and used is measured by comparing the carrying amount of assets to future undiscounted net cash flows the assets are expected to generate over its remaining life.

If the assets are considered to be impaired, the amount of any impairment is measured as the difference between the carrying value and the fair value of the impaired assets. If the useful life is shorter than originally estimated, the Company amortizes the remaining carrying value over the revised shorter useful life.

*Deferred Offering Costs*

Deferred offering costs, which consist of direct incremental legal, consulting, banking and accounting fees relating to the anticipated equity offering, are capitalized and will be offset against proceeds upon the consummation of the offering. In the event an anticipated offering is terminated, deferred offering costs will be expensed. As of December 31, 2018 and March 31, 2019 (unaudited), $34,000 and $1.7 million of deferred offering costs were capitalized, respectively, which are included in other assets on the balance sheet. There were no such costs capitalized as of December 31, 2017.

*Accretion of Redeemable Convertible Preferred Stock*

The carrying value of the redeemable convertible preferred stock is accreted to redemption value from the date of issuance to the earliest redemption date using the effective interest method. Increases to the carrying value of redeemable convertible preferred stock recognized in each period are charged to additional paid-in capital, or in the absence of additional paid-in capital, charged to accumulated deficit.

*Convertible Preferred Stock Warrant Liability*

The Company issued convertible preferred stock warrants in conjunction with the issuance of debt. Such warrants are recorded as other noncurrent liabilities on the balance sheets at their estimated fair value because the shares underlying the warrants may obligate the Company to transfer assets to the holders at a future date under certain circumstances such as a deemed liquidation event. The warrants are subject to re-measurement at each balance sheet date and the change in fair value, if any, is included in other expense, net. The Company will continue to remeasure these warrants until the earlier of the expiration, exercise or conversion of the convertible preferred stock warrants. In connection with an IPO, the convertible preferred stock warrants will be automatically converted into common stock warrants. On exercise, expiration or conversion of the convertible preferred stock warrants, the related convertible preferred stock warrant liability will be reclassified to additional paid-in capital.

*Leases*

Leases are reviewed for classification as operating or capital leases. For operating leases, the Company recognizes rent on a straight-line basis over the term of the lease. The Company records the difference between cash payments and rent expense recognized as a deferred rent liability included in other accrued and current liabilities and other noncurrent liabilities on the balance sheets. Incentives granted under the Company's facility leases, including allowances to fund leasehold improvements, are deferred and are recognized as adjustments to rental expense on a straight-line basis over the term of the lease.

F-16

**Table of Contents**

**THE REALREAL, INC.**

**Notes to Financial Statements**

*Income Taxes*

Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled.

The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period of enactment. The Company recognizes the effect of income tax positions only if those positions are more likely than not of being sustained. Recognized income tax positions are measured at the largest amount that is greater than 50% likely of being realized. Changes in recognition or measurement are reflected in the period in which the change in judgment occurs.

*Concentrations of Credit Risks*

Financial instruments that potentially subject the Company to concentrations of credit risk consist of cash and cash equivalents. At times, such amount may exceed federally-insured limits. The Company reduces credit risk by placing its cash and cash equivalents with major credit-worthy financial institutions within the United States.

As of December 31, 2017 and 2018 and March 31, 2019 (unaudited), there were no customers that represented 10% or more of the Company's accounts receivable balance and there were no customers that individually exceeded 10% of the Company's total revenue for each of the years ended December 31, 2017 and 2018 and the three months ended March 31, 2018 and 2019 (unaudited).

*Recently Adopted Accounting Pronouncements*

In May 2014, the Financial Accounting Standards Board (FASB) issued ASU 2014-09, *Revenue from Contracts with Customers*. ASC 606 supersedes the existing revenue recognition requirements and requires entities to recognize revenue when control of the promised goods or services is transferred to customers at an amount that reflects the consideration to which the entity expects to be entitled to in exchange for those goods or services. The Company adopted ASC 606 as of January 1, 2018 using the full retrospective transition method. See Note 2—Revenue Recognition and Revisions to Previously Issued Financial Statements for further details.

In July 2015, the FASB issued ASU 2015-11, *Simplifying the Measurement of Inventory (Topic 330)*, which changes the measurement principle for inventory from the lower of cost or market to the lower of cost and net realizable value. The Company adopted the new standard beginning January 1, 2017. The adoption of this standard did not have a material impact on the financial statements.

In March 2016, the FASB issued ASU 2016-09, *Improvements to Employee Share-Based Payment Accounting (Topic 718)*. This standard requires entities to record all excess tax benefits and tax deficiencies as income tax expense or benefit in the income statement when awards vest or are settled and eliminates additional paid-in capital pools. The standard also changes the accounting for an employee's use of shares to satisfy the employer's statutory income tax withholding obligation and the accounting for forfeitures, and provides two practical expedients for nonpublic entities. The Company adopted this standard as of January 1, 2017 and recorded a net change of $0.6 million to its valuation allowance.

In November 2016, the FASB issued ASU 2016-18, *Restricted Cash (Topic 230)*, which requires companies to present amounts generally described as restricted cash and restricted cash equivalents in cash and cash equivalents on the statement of cash flows. The Company adopted this guidance beginning January 1, 2017.

F-17

**Table of Contents**

**THE REALREAL, INC.**

**Notes to Financial Statements**

In May 2017, the FASB issued ASU 2017-09, *Compensation—Stock Compensation (Topic 718): Scope of Modification Accounting*, which provides guidance about which changes to the terms or conditions of a share-based payment award require an entity to apply modification accounting in the ASU. The Company adopted this standard during the year ended December 31, 2017. The adoption of this standard did not have a material impact on the Company's financial statements.

In June 2018, the FASB issued ASU 2018-08, *Clarifying the Scope and the Accounting Guidance for Contributions Received and Contributions Made (Topic 958)*, which clarified the accounting for contributions made or received by business entities. The Company adopted this guidance beginning on January 1, 2018 using the modified prospective transition. Adoption of the standard did not have a material impact on its financial statements.

In August 2018, the FASB issued ASU 2018-15*, Intangibles—Goodwill and Other—Internal-Use Software (Subtopic 350-40)*. ASU 2018-15 clarifies and aligns the accounting for implementation costs for hosting arrangements with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software. The Company has early adopted this standard effective January 1, 2018 on a prospective basis, which did not have a material impact on its financial statements.

### *Recently Issued Accounting Pronouncements*

In January 2016, the FASB issued ASU 2016-01, *Recognition and Measurement of Financial Assets and Financial Liabilities (Subtopic 825-10)*, which will change how to recognize, measure, present and make disclosures about certain financial assets and financial liabilities. Under this standard, if an entity designates a financial liability under the fair value option in accordance with ASC 825, the entity shall measure the financial liability at fair value with qualifying changes in fair value recognized in net income. The entity shall present separately in other comprehensive loss the portion of the total change in the fair value of the liability that results from a change in the instrument-specific credit risk. ASU 2016-01 is effective for the Company for annual and interim periods within fiscal years beginning after December 15, 2019. The Company does not expect the adoption of this standard to have a material impact on the operating results.

In February 2016, the FASB issued ASU 2016-02, *Leases (Topic 842)*. ASU 2016-02 is aimed at making leasing activities more transparent and comparable and requires substantially all leases to be recognized by lessees on their balance sheet as a right-of-use asset and corresponding lease liability, including leases currently accounted for as operating leases. The new standard is effective for non-public entities in fiscal years beginning after December 15, 2019. The Company is currently evaluating the impact that this standard will have on its financial statements but expects that it will result in a significant increase in its long-term assets and liabilities.

In June 2018, the FASB issued ASU 2018-07, *Compensation—Stock Compensation (Topic 718),* which expands the scope of Topic 718 to include share-based payment transactions for acquiring goods and services from non-employees. The standard is effective for fiscal years beginning after December 15, 2019, including interim reporting periods within that fiscal year. Early adoption is permitted, but no earlier than the Company's adoption date of ASC 606. The Company does not expect the adoption of this standard to have a material impact on the operating results.

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement (Topic 820)*. This standard modifies disclosure requirements related to fair value measurement and is effective for all entities for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2019. Early adoption is permitted. Implementation on a prospective or retrospective basis varies by specific disclosure requirement. The standard also allows for early adoption of any removed or modified disclosures upon issuance while delaying adoption of the additional disclosures until their effective date. The Company is currently evaluating the impact that this standard will have on its financial statements.

F-18

Table of Contents

**THE REALREAL, INC.**

**Notes to Financial Statements**

3.  **Cash, Cash Equivalents and Short-Term Investments**

The following tables summarize the estimated value of the Company's cash, cash equivalents and short-term investments (in thousands):

| | December 31, 2017 | | | |
| --- | --- | --- | --- | --- |
| | Amortized Cost | Unrealized Gain | Unrealized Loss | Fair Value |
| Cash and cash equivalents: | | | | |
| Cash | $ 12,862 | $ — | $ — | $12,862 |
| Money market fund | 124 | — | — | 124 |
| Reverse repurchase agreements | 3,500 | — | — | 3,500 |
| Total cash and cash equivalents | $ 16,486 | $ — | $ — | $16,486 |
| Short-term investments: | | | | |
| U.S. corporate bonds | $ 4,814 | $ — | $ (3) | $ 4,811 |
| International corporate bonds | 7,613 | — | (3) | 7,610 |
| Total short-term investments | $ 12,427 | $ — | $ (6) | $12,421 |

| | December 31, 2018 | | | |
| --- | --- | --- | --- | --- |
| | Amortized Cost | Unrealized Gain | Unrealized Loss | Fair Value |
| Cash and cash equivalents: | | | | |
| Cash | $ 10,253 | $ — | $ — | $10,253 |
| Money market fund | 140 | — | — | 140 |
| Reverse repurchase agreements | 24,000 | — | — | 24,000 |
| Total cash and cash equivalents | $ 34,393 | $ — | $ — | $34,393 |
| Short-term investments: | | | | |
| U.S. corporate bonds | $ 21,184 | $ — | $ (19) | $21,165 |
| International corporate bonds | 5,972 | — | (6) | 5,966 |
| Total short-term investments | $ 27,156 | $ — | $ (25) | $27,131 |

| | March 31, 2019 | | | |
| --- | --- | --- | --- | --- |
| | Amortized Cost | Unrealized Gain | Unrealized Loss | Fair Value |
| | (unaudited) | | | |
| Cash and cash equivalents: | | | | |
| Cash | $ 72,145 | $ — | $ — | $72,145 |
| Money market fund | 4,645 | — | — | 4,645 |
| Reverse repurchase agreements | 12,000 | — | — | 12,000 |
| Total cash and cash equivalents | $ 88,790 | $ — | $ — | $88,790 |
| Short-term investments: | | | | |
| U.S. corporate bonds | $ 12,246 | $ — | $ 2 | $12,248 |
| International corporate bonds | 1,998 | — | — | 1,998 |
| Total short-term investments | $ 14,244 | $ — | $ 2 | $14,246 |

**Table of Contents**

**THE REALREAL, INC.**

**Notes to Financial Statements**

As of December 31, 2017 and 2018 and March 31, 2019 (unaudited), the contractual maturity for the short-term investments is less than one year. For the years ended December 31, 2017 and 2018 and the three months ended March 31, 2018 and 2019 (unaudited), the Company recognized no material realized gains or losses on short-term investments.

**4.  Fair Value Measurement**

Assets and liabilities recorded at fair value on a recurring basis on the balance sheets are categorized based upon the level of judgment associated with the inputs used to measure their fair values. Fair value is defined as the exchange price that would be received for an asset or an exit price that would be paid to transfer a liability in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. Valuation techniques used to measure fair value must maximize the use of observable inputs and minimize the use of unobservable inputs. The authoritative guidance on fair value measurements establishes a three-tier fair value hierarchy for disclosure of fair value measurements as follows:

Level 1—Observable inputs such as unadjusted, quoted prices in active markets for identical assets or liabilities at the measurement date.

Level 2—Inputs (other than quoted prices included in Level 1) are either directly or indirectly observable for the asset or liability. These include quoted prices for similar assets or liabilities in active markets and quoted prices for identical or similar assets or liabilities in markets that are not active.

Level 3—Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

There were no transfers between Level 1, Level 2 or Level 3 of the fair value hierarchy during the periods presented.

F-20

Table of Contents

**THE REALREAL, INC.**

**Notes to Financial Statements**

The following tables provide the financial instruments measured at fair value (in thousands):

| | December 31, 2017 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets** | | | | |
| Cash equivalents: | | | | |
| Money market fund | $ 124 | $ — | $ — | $ 124 |
| Reverse repurchase agreements | — | 3,500 | — | 3,500 |
| Total cash equivalents | $ 124 | $ 3,500 | $ — | $ 3,624 |
| Short-term investments: | | | | |
| U.S. corporate bonds | $ — | $ 4,811 | $ — | $ 4,811 |
| International corporate bonds | — | 7,610 | — | 7,610 |
| Total short-term investments | $ — | $12,421 | $ — | $12,421 |
| Total assets | $ 124 | $15,921 | $ — | $16,045 |
| **Liabilities** | | | | |
| Convertible preferred stock warrant liability | $ — | $ — | $ 160 | $ 160 |
| Total liabilities | $ — | $ — | $ 160 | $ 160 |

| | December 31, 2018 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets** | | | | |
| Cash equivalents: | | | | |
| Money market fund | $ 140 | $ — | $ — | $ 140 |
| Reverse repurchase agreements | — | 24,000 | — | 24,000 |
| Total cash equivalents | $ 140 | $24,000 | $ — | $24,140 |
| Short-term investments: | | | | |
| U.S. corporate bonds | $ — | $21,165 | $ — | $21,165 |
| International corporate bonds | — | 5,966 | — | 5,966 |
| Total short-term investments | $ — | $27,131 | $ — | $27,131 |
| Total assets | $ 140 | $51,131 | $ — | $51,271 |
| **Liabilities** | | | | |
| Convertible preferred stock warrant liability | $ — | $ — | $ 610 | $ 610 |
| Total liabilities | $ — | $ — | $ 610 | $ 610 |

F-21

**Table of Contents**

**THE REALREAL, INC.**

**Notes to Financial Statements**

| | March 31, 2019 | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| | | (unaudited) | | |
| Assets | | | | |
| Cash equivalents: | | | | |
| Money market fund | $4,645 | $ — | $ — | $ 4,645 |
| Reverse repurchase agreements | — | 12,000 | — | 12,000 |
| Total cash equivalents | $4,645 | $12,000 | $ — | $16,645 |
| Short-term investments: | | | | |
| U.S. corporate bonds | $ — | $12,248 | $ — | $12,248 |
| International corporate bonds | — | 1,998 | — | 1,998 |
| Total short-term investments | $ — | $14,246 | $ — | $14,246 |
| Total assets | $4,645 | $26,246 | $ — | $30,891 |
| Liabilities | | | | |
| Convertible preferred stock warrant liability | $ — | $ — | $ 890 | $ 890 |
| Total liabilities | $ — | $ — | $ 890 | $ 890 |

The following table presents a rollforward of the fair value of the level 3 liabilities recorded at fair value (in thousands):

| | Convertible Preferred Stock Warrant Liability | Convertible Notes Derivative Liability |
|---|---|---|
| Balance as of December 31, 2016 | $ 160 | $ — |
| Changes in estimated fair value | — | — |
| Balance as of December 31, 2017 | 160 | — |
| Recognition of derivative liability in connection with issuance of convertible notes | — | 372 |
| Changes in estimated fair value | 450 | 1,248 |
| Extinguishment of derivative liability on conversion of convertible notes | — | (1,620) |
| Balance as of December 31, 2018 | 610 | — |
| Changes in estimated fair value (unaudited) | 280 | — |
| Balance as of March 31, 2019 (unaudited) | $ 890 | $ — |

F-22

Table of Contents

**THE REALREAL, INC.**

**Notes to Financial Statements**

5.  **Balance Sheet Components**

*Property and Equipment, Net*

Property and equipment, net consists of the following (in thousands):

| | December 31, | | March 31, |
|---|---|---|---|
| | **2017** | **2018** | **2019** |
| | | | **(unaudited)** |
| Proprietary software | $ 8,328 | $ 14,052 | $ 15,738 |
| Furniture and equipment | 7,957 | 12,665 | 14,128 |
| Automobiles | 234 | 346 | 449 |
| Leasehold improvements | 17,282 | 25,702 | 27,165 |
| | 33,801 | 52,765 | 57,480 |
| Less: accumulated depreciation and amortization | (10,379) | (19,479) | (22,256) |
| Property and equipment, net | $ 23,422 | $ 33,286 | $ 35,224 |

Depreciation and amortization expense on property and equipment was $5.6 million and $9.3 million for the years ended December 31, 2017 and 2018, respectively, which includes amortization expense for equipment and automobiles acquired under capital leases of $0.4 million and $0.3 million, and amortization for proprietary software of $1.8 million and $2.8 million for the years ended December 31, 2017 and 2018, respectively. Depreciation and amortization expense on property and equipment was $2.0 million and $2.8 million for the three months ended March 31, 2018 and 2019 (unaudited), respectively.

*Other Accrued and Current Liabilities*

Other accrued and current liabilities consist of the following (in thousands):

| | December 31, | | March 31, |
|---|---|---|---|
| | **2017** | **2018** | **2019** |
| | **(as revised)** | | **(unaudited)** |
| Returns reserve | $ 9,292 | $14,311 | $ 11,205 |
| Accrued compensation | 4,596 | 8,078 | 5,438 |
| Site credit liability | 3,535 | 4,700 | 5,239 |
| Accrued sales tax and other taxes | 2,794 | 4,476 | 4,972 |
| Deferred revenue | 2,133 | 3,184 | 3,887 |
| Accrued marketing and outside services | 1,976 | 4,152 | 9,116 |
| Other | 1,831 | 3,055 | 3,107 |
| Other accrued and current liabilities | $ 26,157 | $41,956 | $ 42,964 |

6.  **Debt and Convertible Preferred Stock Warrants**

*Term Loans*

In 2013, the Company entered into an agreement to obtain a term loan facility ("Term Loan Facility") in the amount of $5.0 million for general corporate purposes and working capital expenditures. In 2014, 2015 and 2016, the Company amended its Term Loan Facility to increase the amount borrowed under the facility by $11.6 million. The Term Loan Facility is secured by liens on substantially all of the Company's present and future assets.

F-23

**Table of Contents**

**THE REALREAL, INC.**

**Notes to Financial Statements**

The Term Loan Facility includes affirmative, negative and financial covenants that restrict the Company's ability to, among other things, incur additional indebtedness, make investments, sell or otherwise dispose of assets, pay dividends or repurchase stock. The Term Loan Facility's financial covenants required the Company to achieve at least 80% of its forecasted gross revenue and a liquidity ratio on a monthly basis. As of December 31, 2017 and 2018 and March 31, 2019 (unaudited), the Company was in compliance with all covenants.

In 2017, the Company executed the eighth amendment ("Eight Amendment") to the Term Loan Facility. The Eighth Amendment refinanced the $15.0 million repayment schedule to be two term loans, which included a $7.5 million interest only term loan with a maturity date of January 31, 2019 ("Term Loan I"), and the remaining $7.5 million under the existing Term Loan Facility with a maturity date of January 1, 2020 ("Term Loan II") (together the "Term Loans").

In 2018, the Company entered into the ninth, tenth, eleventh amendment and twelfth amendment ("Ninth Amendment," "Tenth Amendment," "Eleventh Amendment" and "Twelfth Amendment") to the existing Term Loans. The Ninth Amendment removed the liquidity ratio covenant, amended Term Loan I to be due in 30 equal monthly installments, plus all accrued interest, beginning July 31, 2018, increased the variable annual interest rate from 0.10% above the prime rate to 0.35% above the prime rate and extended the maturity date of Term Loan I to January 31, 2021.

The Eighth Amendment and Ninth Amendment required the Company to pay a combined success fee of $0.3 million upon (1) any sale or licensing of all or substantially all of the Company's assets, (2) any change in control of the Company, or (3) an initial public offering of the Company's equity securities. The Ninth Amendment also required the Company to pay an additional success fee of $0.1 million upon the sale or issuance of the Company's equity securities or subordinated debt securities for net cash proceeds of at least $50.0 million on or prior to June 30, 2018. The Company paid the $0.1 million success fee upon the Series G convertible preferred stock financing in June 2018.

The Tenth and Twelfth Amendments adjusted and waived certain covenant violations which were subsequently amended and met. The Eleventh Amendment provided an additional letter of credit of $1.5 million for corporate credit cards with a maturity date of August 1, 2019.

During the years ended December 31, 2017 and 2018, the Company recorded interest expense related to the Term Loans of $0.7 million and $0.6 million, respectively. During the three months ended March 31, 2018 and 2019 (unaudited), the Company recorded interest expense related to the Term Loans of $0.2 million and $0.1 million, respectively.

As of December 31, 2018, the minimum payments on the Term Loans described above are as follows (in thousands):

| Year Ending December 31, | Amount |
|---|---|
| 2019 | $6,000 |
| 2020 | 3,000 |
| 2021 | 250 |
| Total future payments | 9,250 |
| Less: long-term debt, current portion | 5,990 |
| Less: unamortized debt discount | 11 |
| Long-term debt, net of current portion | $3,249 |

F-24

**Table of Contents**

**THE REALREAL, INC.**

**Notes to Financial Statements**

*Warrants Issued with Term Loan Facility*

During the period from 2013 to 2016, in connection with the Term Loan Facility, the Company issued convertible preferred stock warrants, which included warrants to purchase 131,652 shares of its Series B convertible preferred stock with an exercise price of $1.03 per share, 6,868 shares of its Series C convertible preferred stock with an exercise price of $2.18 per share, 43,010 shares of its Series D convertible preferred stock with an exercise price of $2.79 per share and 25,597 shares of its Series E convertible preferred stock with an exercise price of $2.93 per share (together the "Convertible Preferred Stock Warrants"). The Convertible Preferred Stock Warrants were exercisable from the date of issuance and have a 10-year term. The initial estimated fair value of the Convertible Preferred Stock Warrants was recorded as convertible preferred stock warrant liability with an offset to the debt discount associated with the Term Loan Facility. The debt discount is amortized to interest expense over the repayment period of the loan using the effective-interest method. All Convertible Preferred Stock Warrants were unexercised and outstanding as of December 31, 2017 and 2018 and March 31, 2019 (unaudited).

**7.  Convertible Notes**

In April 2018, the Company issued $14.4 million in convertible notes ("Convertible Notes") to existing shareholders of redeemable convertible and convertible preferred stock. Interest accrued on the principal balance at an annual rate of 8%. Principal and accrued interest were due at the earliest of (1) the one-year anniversary of the issuance date, (2) event of default and (3) a change of control, defined as either a merger, sale of stock or assets or other form of transaction.

The maturity date could be extended if agreed upon by the Company and investors holding the convertible notes representing at least 80% of the outstanding amount at such time. On change of control, the holders of convertible notes could elect to either (1) receive full repayment of the note outstanding or (2) convert the entire outstanding amount of principal and accrued interest into shares of Series F preferred stock at a price per share of $3.8590.

The outstanding balance of principal and accrued interest automatically converts into fully paid and nonassessable shares of preferred stock issued on the issuance of preferred stock with aggregate gross proceeds of at least $25.0 million (a "Qualified Financing") prior to the maturity date of the convertible notes. On the issuance of preferred stock with aggregate gross proceeds of less than $25.0 million (a "Non-Qualified Financing"), holders of the Convertible Notes could elect to convert all or any portion of the outstanding principal and interest into fully paid and nonassessable shares of preferred stock. On conversion of the convertible notes in either a Qualified Financing or Non-Qualified Financing, preferred shares would be issued at a price of 90% of the price per share paid by the purchasers of preferred stock participating in the financing.

The Qualified Financing and Non-Qualified Financing redemption features were determined to be a compound embedded derivative requiring bifurcation and separate accounting at its estimated fair value. On issuance of the Convertible Notes, the Company recognized a liability of $0.4 million for the estimated fair value of the embedded derivative and incurred $0.1 million in debt issuance costs, both of which were recorded as a debt discount associated with the Convertible Notes.

During the year ended December 31, 2018, the Company recognized $0.2 million of interest expense related to the Convertible Notes. The Company also recognize an expense of $1.2 million during the year ended December 31, 2018 related to the change in fair value of the Convertible Notes embedded derivative liability, which was included in other expense, net in the statements of operations.

**Table of Contents**

**THE REALREAL, INC.**

**Notes to Financial Statements**

In June 2018, the outstanding balance of principal and accrued interest on the Convertible Notes of $14.6 million converted into 1,067,550 and 1,997,709 shares of the Company's Series G redeemable convertible and convertible preferred stock, respectively, at a price of $4.7565 per share in conjunction with the Company's Series G convertible preferred stock financing (see Note 8), which was a Qualified Financing under the terms of the Convertible Notes. The conversion of the Convertible Notes into Series G redeemable convertible preferred stock and Series G convertible preferred stock was accounted for as an extinguishment. The extinguishment of the Convertible Notes was considered a capital transaction and accordingly, the Company recognized a $0.4 million loss on extinguishment through additional paid in capital equal to the unamortized debt discount at the date of conversion.

8.  **Convertible Preferred Stock and Redeemable Convertible Preferred Stock**

Convertible preferred stock and redeemable convertible preferred stock consisted of the following (in thousands, except share amounts):

| | December 31, 2017 | | | |
| --- | --- | --- | --- | --- |
| | Shares Authorized | Shares Issued and Outstanding | Net Carrying Value | Aggregate Liquidation Preference |
| Series A | 18,960,000 | 18,941,619 | $ 9,161 | $ 9,217 |
| Series B | 13,784,443 | 13,652,791 | 13,774 | 14,000 |
| Series C | 9,335,659 | 9,328,791 | 20,289 | 20,374 |
| Series D | 14,367,652 | 14,324,642 | 39,886 | 40,000 |
| Series E | 13,612,543 | 13,586,946 | 39,880 | 40,000 |
| Series F | 12,956,724 | 12,956,724 | 50,367 | 52,610 |
| Total | 83,017,021 | 82,791,513 | $ 173,357 | $ 176,201 |

| | December 31, 2018 | | | |
| --- | --- | --- | --- | --- |
| | Shares Authorized | Shares Issued and Outstanding | Net Carrying Value | Aggregate Liquidation Preference |
| Series A | 18,960,000 | 18,941,619 | $ 9,161 | $ 9,217 |
| Series B | 13,784,443 | 13,652,791 | 13,774 | 14,000 |
| Series C | 9,335,659 | 9,328,791 | 20,289 | 20,374 |
| Series D | 14,367,652 | 14,324,642 | 39,886 | 40,000 |
| Series E | 13,612,543 | 13,586,946 | 39,880 | 40,000 |
| Series F | 12,956,724 | 12,956,724 | 54,968 | 57,211 |
| Series G | 21,986,733 | 21,986,733 | 116,242 | 120,544 |
| Total | 105,003,754 | 104,778,246 | $ 294,200 | $ 301,346 |

F-26

**Table of Contents**

**THE REALREAL, INC.**

**Notes to Financial Statements**

| | March 31, 2019 | | | |
| --- | --- | --- | --- | --- |
| | Shares Authorized | Shares Issued and Outstanding | Net Carrying Value | Aggregate Liquidation Preference |
| | | (unaudited) | | |
| Series A | 18,960,000 | 18,941,619 | $  9,161 | $  9,217 |
| Series B | 13,784,443 | 13,652,791 | 13,774 | 14,000 |
| Series C | 9,335,659 | 9,328,791 | 20,289 | 20,374 |
| Series D | 14,367,652 | 14,324,642 | 39,886 | 40,000 |
| Series E | 13,612,543 | 13,586,946 | 39,880 | 40,000 |
| Series F | 12,956,724 | 12,956,724 | 56,154 | 58,397 |
| Series G | 21,986,733 | 21,986,733 | 118,325 | 123,881 |
| Series H | 10,182,113 | 10,182,111 | 69,937 | 70,138 |
| Total | 115,185,867 | 114,960,357 | $ 367,406 | $ 376,007 |

*Voting*

Each holder of Series A, B, C, D, E, G and H convertible preferred stock (together the "convertible preferred stock") and Series F, G and H redeemable convertible preferred stock (together the "redeemable convertible preferred stock") (or all together the "preferred stock") is entitled to cast the number of votes equal to the number of whole shares of common stock into which the shares of preferred stock held by such holder are convertible as of the record date for determining stockholders entitled to vote on such matter. Holders of preferred stock vote together with the holders of common stock as a single class.

*Dividends*

The holders of Series A, B, C, D and E convertible preferred stock are entitled to receive noncumulative dividends at the per annum rate of 8% of the original issue price, if and when, declared by the board of directors, prior and in preference to any payment of any dividend on the common stock.

The holders of Series F, Series G and Series H redeemable convertible preferred stock and Series G and Series H convertible preferred stock are entitled to receive cumulative dividends that accrue at a rate of 8% of the Series F, Series G and Series H original issue price per annum, compounding quarterly and whether or not declared. Accruing dividends on redeemable convertible preferred stock are only payable when, as and if declared by the board of directors or upon a liquidation event.

Holders of preferred stock are also entitled to participate in dividends of common stock on an as-converted basis. As of December 31, 2018 and March 31, 2019 (unaudited), no dividends have been declared or paid to date.

*Liquidation*

In the event of any liquidation, dissolution or winding up, certain mergers, consolidations and asset sales, the holders of shares of Series F redeemable convertible preferred stock, Series G redeemable convertible preferred stock, Series G convertible preferred stock, Series H redeemable convertible preferred stock and Series H convertible preferred stock are entitled to receive, prior and in preference to the holders of Series A, B, C, D and E convertible preferred stock or common stock, an amount per share equal to the greater of (1) the sum of the original issuance price of each series, all accrued but unpaid and all declared but unpaid dividends, or (2) the amount per share that have been payable had all shares of the convertible preferred stock been converted to common stock.

F-27

**Table of Contents**

**THE REALREAL, INC.**

**Notes to Financial Statements**

If the assets and funds to be distributed among the holders of redeemable convertible preferred stock and convertible preferred stock are insufficient to permit the payment to such holders, then the entire assets and funds of the Company legally available for distribution will be distributed ratably among the holders of redeemable convertible preferred stock in proportion to the preferential amount each such holder is otherwise entitled to receive.

After the distribution to holders of Series F, G and H redeemable convertible preferred stock and Series G and H convertible preferred stock, any remaining assets of the Company shall be distributed to the holders of Series E preferred stock, prior and in preference to any distribution of the assets of the Company to the holders of the then outstanding Series A, B, C and D convertible preferred stock and common stockholders an amount per share equal to the greater of (1) the sum of the original issuance prices of each series and all declared but unpaid dividends, if any, or (2) such amount per share as would have been payable had all shares of the convertible preferred stock been converted to common stock. If upon occurrence of such an event, the assets to be distributed among the holders of Series E convertible preferred stock are insufficient to permit the payment to such holders, the entire assets legally available for distribution will be distributed ratably among the Series E holders.

After the distribution to the holders of the Series E preferred stock, any remaining assets of the Company shall be distributed to the holders of the then outstanding Series A, B, C and D convertible preferred stock, prior and in preference to any distribution of any of the assets of the Company to the holders of the common stock an amount per share equal to the greater of (1) the applicable original issue price for each series of convertible preferred stock plus any declared and unpaid dividends (the "Original Issue Price") and (2) the amount per share that would have been payable if all shares of convertible preferred stock were converted into common stock subject to the applicable conversion rights. Upon completion of the distribution to the holders of the convertible preferred stock, all remaining legally available assets will be distributed ratably to the holders of common stock.

*Conversion*

At the option of the holder, each share of convertible preferred stock is convertible into fully paid and non-assessable shares of common stock as is determined by dividing the applicable Original Issue Price by the applicable Conversion Price in effect at the time of conversion. The "Conversion Price" shall mean $0.48660, $1.02543, $2.18403, $2.79239, $2.9440, $3.3959, $5.2850 and $6.8748 (unaudited) per share for Series A, Series B, Series C, Series D, Series E, Series F, Series G and Series H preferred stock, respectively. The Series F redeemable convertible preferred stock contains a conversion price adjustment feature based on a 2017 gross profit target. Because the Company's gross profit for the year ended December 31, 2017 was below the target, the conversion price for Series F was reduced from $3.8590 to $3.3959.

Each share of preferred stock automatically converts into the number of shares of common stock into which such shares are convertible at the then applicable conversion ratio upon (1) the closing of the sale of shares of common stock in a public offering resulting in gross proceeds of at least $50.0 million and the listing of our common stock at a price per share that is at least 1.75 times the Series G issue price (the "Qualified Public Offering"), or (2) the affirmative vote of the holders of a majority of the preferred stock; provided that, with respect to the Series B, E, F and G convertible preferred stockholders, conversion requires approval of the holders of a majority of the then outstanding shares of each such series. Additionally, in the event of a Qualified Public Offering, the holders of Series H preferred stock are entitled to an adjustment of the conversion price of the Series H preferred stock if the offering price per share is less than the original issuance price of the Series H preferred stock.

*Redemption*

Certain stockholders that hold all outstanding shares of Series F redeemable convertible preferred stock and certain outstanding shares of Series G redeemable convertible preferred stock are entitled to redemption privileges

F-28

Table of Contents

**THE REALREAL, INC.**

**Notes to Financial Statements**

(the "Redemption Stockholders") that are not available to all preferred stockholders. On or after June 21, 2023, the five-year anniversary of the Series G original issue date, Redemption Stockholders have the one-time right to request the Company to redeem all or any portion of the outstanding Series F and G redeemable convertible preferred stock at a price equal to the redemption price which is calculated as greater of (1) the Series F issue price or the Series G issue price per share, plus any Series F or Series G accrued but unpaid dividends and (2) the fair market value of a single share of Series F or Series G preferred stock as of the date of the receipt of the redemption request, as mutually agreed upon by the Redemption Stockholders and the Company. Additionally, the holders of Series H preferred stock are not entitled to initiate a redemption but are entitled to participate in a redemption initiated by the holders of the Series F or G preferred stock.

*Classification*

The Company has classified the redeemable convertible preferred stock as temporary equity on the balance sheets as a result of the redemption rights described above. The Company has also classified its convertible preferred stock as temporary equity on the balance sheets as the stock is contingently redeemable. Upon the occurrence of certain change in control events that are outside the Company's control, including liquidation, sale or transfer of the Company, holders of the convertible preferred stock can cause redemption for cash.

**9.  Common Stock**

The Company had reserved shares of common stock for issuance, on an as-converted basis, as follows:

|  | December 31, | | March 31, 2019 |
|---|---|---|---|
|  | 2017 | 2018 | (unaudited) |
| Convertible preferred stock outstanding | 69,834,789 | 73,724,645 | 77,556,411 |
| Redeemable convertible preferred stock outstanding | 14,723,636 | 32,820,513 | 39,170,858 |
| Options issued and outstanding | 15,597,136 | 19,344,243 | 18,408,192 |
| Shares available for future stock option issuances | 1,349,521 | 2,248,965 | 1,612,450 |
| Warrants to purchase convertible preferred stock | 207,127 | 207,127 | 207,127 |
| Warrants to purchase common stock | 135,950 | 21,355 | 11,484 |
| Total | 101,848,159 | 128,366,848 | 136,966,522 |

**10.  Share-based Compensation Plans**

In 2011, the Company adopted the Equity Incentive Plan (2011 Plan) authorizing the granting of incentive stock options (ISOs) and non-statutory stock options (NSOs) to eligible participants for up to 25,974,511 shares of common stock. Under the 2011 Plan, incentive stock options and non-statutory stock options are to be granted at an exercise price that is no less than 100% of the fair value of the stock at the date of grant. Options generally vest over four years and are exercisable for up to 10 years after the date of grant. Incentive stock options granted to stockholders who own more than 10% of the outstanding stock of the Company at the time of grant must be issued at an exercise price no less than 110% of the fair value of the stock on the date of grant.

F-29

**Table of Contents**

**THE REALREAL, INC.**

**Notes to Financial Statements**

Activity under the Company's stock option plan is set forth below:

| | Options Available for Grant | Number of Options | Weighted-Average Exercise Price Per Share | Weighted-Average Remaining Contractual Life (years) | Aggregate Intrinsic Value |
|---|---|---|---|---|---|
| Balances at December 31, 2017 | 1,349,521 | 15,597,136 | $ 1.01 | 7.6 | $ 5,881 |
| Options authorized | 5,142,201 | | | | |
| Options granted | (6,528,650) | 6,528,650 | 2.61 | | |
| Options exercised | — | (495,650) | 0.97 | | |
| Options cancelled | 2,285,893 | (2,285,893) | 1.44 | | |
| Balances at December 31, 2018 | 2,248,965 | 19,344,243 | 1.50 | 7.1 | 44,883 |
| Balances at March 31, 2019 (unaudited) | 1,612,450 | 18,408,192 | 1.66 | 7.4 | 67,019 |
| Options exercisable—December 31, 2018 | | 11,193,405 | 0.90 | 5.5 | 32,562 |
| Options vested and expected to vest—December 31, 2018 | | 19,344,243 | 1.50 | 7.1 | 44,883 |

The aggregate intrinsic value of options exercised for the years ended December 31, 2017 and 2018 was $0.4 million and $1.4 million, respectively. The aggregate intrinsic value of options exercised was immaterial for the three months ended March 31, 2018 and $6.8 million for the three months ended March 31, 2019 (unaudited).

*Stock-based Compensation*

In determining the fair value of the stock-based awards, the Company uses the Black-Scholes option-pricing model and assumptions discussed below. Each of these inputs is subjective and generally requires significant judgment.

*Fair Value of Common Stock*—The fair value of the shares of common stock has historically been determined by the Company's board of directors as there was no public market for the common stock. The board of directors determines the fair value of the common stock by considering a number of objective and subjective factors, including: third-party valuations of the Company's common stock, the valuation of comparable companies, the Company's operating and financial performance and general and industry specific economic outlook, amongst other factors.

*Expected Term*—The expected term represents the period that the Company's stock options are expected to be outstanding and is determined using the simplified method (based on the mid-point between the vesting date and the end of the contractual term).

*Volatility*—Because the Company is privately held and does not have an active trading market for its common stock, the expected volatility was estimated based on the average volatility for publicly-traded companies that we consider to be comparable, over a period equal to the expected term of the stock option grants.

*Risk-free Rate*—The risk-free rate assumption is based on the U.S. Treasury zero coupon issues in effect at the time of grant for periods corresponding with the expected term of the option.

*Dividends*—The Company has never paid dividends on its common stock and does not anticipate paying dividends on common stock. Therefore, the Company uses an expected dividend yield of zero.

Table of Contents

**THE REALREAL, INC.**

**Notes to Financial Statements**

The following assumptions were used to estimate the fair value of stock options granted and the resulting fair values:

| | Year Ended December 31, | | Three Months Ended March 31, | |
| --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2018 | 2019 |
| | | | (unaudited) | |
| Expected term (in years) | 5.0 – 6.9 | 5.2 – 6.2 | 5.8 – 6.1 | 5.5 – 6.1 |
| Expected volatility | 47.0% – 50.3% | 46.6% – 48.1% | 47.8% – 47.9% | 47.5% – 47.8% |
| Average risk-free rate | 1.7% – 2.2% | 2.7% – 2.9% | 2.7% –2.8% | 2.4% – 2.6% |
| Dividend yield | — | — | — | — |

The weighted average grant date fair value of options granted during the years ended December 31, 2017 and 2018 was $0.63 per share and $1.68 per share, respectively. The weighted average grant date fair value of options granted during the three months ended March 31, 2018 and 2019 was $0.65 per share and $2.71 per share, respectively (unaudited).

As of December 31, 2018 and March 31, 2019 (unaudited), total unrecognized stock-based compensation expense was $10.4 million and $12.5 million, respectively. These costs are expected to be recognized over a weighted average period of 3.4 years and 3.3 years as of December 31, 2018 and March 31, 2019 (unaudited), respectively.

Total stock-based compensation expense by function was as follows (in thousands):

| | Year Ended December 31, | | Three Months Ended March 31, | |
| --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2018 | 2019 |
| | | | (unaudited) | |
| Marketing | $ 129 | $ 164 | $ 34 | $ 68 |
| Operations and technology | 625 | 1,160 | 273 | 490 |
| Selling, general and administrative | 1,099 | 1,587 | 238 | 551 |
| Total | $ 1,853 | $ 2,911 | $ 545 | $ 1,109 |

The amounts presented in the above table exclude compensation expense related to the secondary sale transaction. In September 2018, executives of the Company sold an aggregate of 864,547 shares of the Company's common stock at a price of $4.5451 per share for an aggregate amount of $3.9 million to certain of the Company's existing investors. The Company determined that the purchase price was in excess of the fair value of such shares. As a result, during the year ended December 31, 2018, the Company recorded the excess of the purchase price above fair value of $0.8 million as compensation expense within selling, general and administrative in the statements of operations and a corresponding credit to additional paid-in capital.

Additionally, in March 2019 (unaudited), executives of the Company sold an aggregate of 764,954 shares of the Company's common stock at a price of $6.36 per share for an aggregate amount of $4.9 million to certain of the Company's existing investors. The Company determined that the purchase price was in excess of the fair value of such shares. As a result, during the three months ended March 31, 2019 (unaudited), the Company recorded the excess of the purchase price above fair value of $0.8 million as compensation expense within selling, general and administrative in the statement of operations and a corresponding credit to additional paid-in capital.

Table of Contents

**THE REALREAL, INC.**

**Notes to Financial Statements**

**11.   Commitments and Contingencies**

*Leases*

The Company leases its corporate offices, retail spaces and merchandising and fulfillment facilities under various noncancelable operating leases with terms ranging from one year to eleven years. Rent expense from operating leases totaled $7.2 million and $10.4 million for the years ended December 31, 2017 and 2018, respectively. The current portion of deferred rent was $0.5 million and $0.7 million as of December 31, 2017 and 2018, respectively, and is included in other accrued and current liabilities on the balance sheets. The noncurrent portion of deferred rent was $2.9 million and $5.3 million as of December 31, 2017 and 2018, respectively, and is included in other noncurrent liabilities on the balance sheets.

In January 2019, the Company signed a noncancelable operating lease to extend and expand the existing lease in Chicago, Illinois to a 91-month term ending November 2026. The minimum lease payments for the extension are $1.3 million (unaudited).

Rent expense from operating leases totaled $2.0 million and $4.1 million for the three months ended March 31, 2018 and 2019, respectively (unaudited). The current portion of deferred rent was $0.8 million as of March 31, 2019 (unaudited). The noncurrent portion of deferred rent was $5.8 million as of March 31, 2019 (unaudited).

The Company has capital lease obligations for certain vehicles and equipment. The Company recognized interest expense from capital leases of $0.1 million and $47,000 for the years ended December 31, 2017 and 2018, respectively. Interest expense related to capital leases were insignificant for the three months ended March 31, 2018 and 2019 (unaudited). The current portion of capital lease obligations was $0.3 million and $0.3 million as of December 31, 2017 and 2018, respectively, and $0.3 million as of March 31, 2019 (unaudited) and is included in other accrued and current liabilities on the balance sheets. The noncurrent portion of capital lease obligation was $0.3 million and $30,000 as of December 31, 2017 and 2018, respectively, and $24,000 as of March 31, 2019 (unaudited) and is included in other noncurrent liabilities on the balance sheets. The noncurrent portion as of December 31, 2018 is due within two years.

As of December 31, 2018, the Company's future minimum lease payments under the noncancelable leases are as follows (in thousands):

| Year Ending December 31, | Operating Leases |
|---|---|
| 2019 | $  15,563 |
| 2020 | 16,082 |
| 2021 | 16,020 |
| 2022 | 12,959 |
| 2023 | 11,653 |
| Thereafter | 48,973 |
| Total future minimum payments | $ 121,250 |

F-32

**Table of Contents**

**THE REALREAL, INC.**

**Notes to Financial Statements**

*Noncancelable Purchase Commitments*

As of December 31, 2018, the future minimum payments under the Company's noncancelable purchase commitments were as follows (in thousands):

| Year Ending December 31, | Purchase Commitments |
|---|---:|
| 2019 | $ 2,390 |
| 2020 | 1,890 |
| 2021 | 209 |
| Total future minimum payments | $ 4,489 |

*Other Commitments*

In January 2018, the Company and the University of Arizona Foundation entered into an endowment agreement (the "Endowment Agreement") to establish a fund (the "Fund") to create and grow a gemology degree program in the Department of Geosciences at the University of Arizona (the "University"). The Company agreed to donate a total of $2.0 million, payable in four annual installments of $0.5 million. The first installment was paid in January 2018 on execution of the Endowment Agreement.

There are no conditions that the University must meet to receive the funds nor any penalties to the University for nonperformance. The Endowment Agreement directs the use of the funds but contains no binding restrictions on the use of the funds. On the execution of the Endowment Agreement, the Company recognized $1.7 million expense for the estimated fair value of the grant, using a discount rate of 10%, to selling, general and administrative expenses in the statements of operations. The Company recognized a corresponding liability for the remaining installment payments and will recognize accretion of the liability as interest expense over the remaining term of the Endowment Agreement.

For the year ended December 31, 2018, the Company recognized $0.1 million in interest expense in the statements of operations for the accretion of the grant liability. Interest expense related to the accretion of the grant liability was immaterial in the three months ended March 31, 2018 and 2019 (unaudited). As of December 31, 2018, the outstanding liability was $1.4 million, of which $0.5 million is included in other accrued and current liabilities on the balance sheet and $0.9 million is included in other noncurrent liabilities on the balance sheet. As of March 31, 2019 (unaudited), the outstanding liability was $0.9 million, of which $0.5 million is included in other accrued and current liabilities on the balance sheet and $0.4 million is included in other noncurrent liabilities on the balance sheet.

*Contingencies*

From time to time the Company is subject to, and it is presently involved in, litigation and other legal proceedings. Accounting for contingencies requires the Company to use judgment related to both the likelihood of a loss and the estimate of the amount or range of loss. The Company records a loss contingency when it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated.

On November 14, 2018, Chanel, Inc. ("Chanel") filed a lawsuit against the Company in the U.S. District Court for the Southern District of New York bringing various trademark- and advertising-related claims under the Lanham Act and New York state law analogues. Chanel alleges that the Company's resale of Chanel products confuses consumers into believing that Chanel is affiliated with the Company and involved in authenticating

F-33

Table of Contents

**THE REALREAL, INC.**

**Notes to Financial Statements**

consignors' goods and that only Chanel is capable of authenticating second-hand Chanel goods. Chanel alleges, in particular, that the Company has made false representations concerning the Chanel-branded goods sold on our platform and that a number of these goods were counterfeit. The lawsuit seeks money damages as well as injunctive relief. The Company believes that it has meritorious defenses and intends to defend this lawsuit vigorously. The Company is not able to predict or reasonably estimate the ultimate outcome or possible losses relating to this claim.

*Indemnifications*

In the ordinary course of business, the Company may provide indemnifications of varying scope and terms to vendors, directors, officers and other parties with respect to certain matters. The Company has not incurred any material costs as a result of such indemnifications and have not accrued any liabilities related to such obligations in its financial statements.

**12.  Income Taxes**

The components of the Company's income tax provision consisted of (in thousands):

|  | Year Ended December 31, | |
|---|---|---|
|  | 2017 | 2018 |
| Current: | | |
| Federal | $ — | $ — |
| State | 57 | 99 |
| Total current tax expense | 57 | 99 |
| Deferred: | — | — |
| Federal | — | — |
| State | — | — |
| Total deferred tax expense | — | — |
| Total provision for income taxes | $ 57 | $ 99 |

The reconciliation of the Federal statutory income tax provision for the Company's effective income tax provision (in thousands):

|  | Year Ended December 31, | |
|---|---|---|
|  | 2017 | 2018 |
| Tax at federal statutory rate | $ (17,637) | $ (15,890) |
| State taxes, net of federal effect | (2,150) | (4,280) |
| Non-deductible items | 618 | 537 |
| Valuation allowance | 19,226 | 19,732 |
| Provision for income taxes | $ 57 | $ 99 |

F-34

**Table of Contents**

**THE REALREAL, INC.**

**Notes to Financial Statements**

The Company's deferred tax assets and liabilities (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2017 (as revised) | 2018 |
| Deferred tax assets: | | |
| Net operating loss carryforwards | $ 42,723 | $ 61,173 |
| Fixed assets and intangibles | 655 | 1,380 |
| Accruals and reserves | 1,885 | 3,702 |
| Gross deferred tax assets | 45,263 | 66,255 |
| Less: valuation allowance | (44,693) | (65,611) |
| Total deferred tax assets | 570 | 644 |
| Deferred tax liabilities: | | |
| Fixed assets and intangibles | (570) | (644) |
| Gross deferred tax liabilities | (570) | (644) |
| Net deferred tax assets | $ — | $ — |

The Tax Cuts and Jobs Act of 2017 ("Tax Act"), which went into effect on December 22, 2017, significantly revises the Internal Revenue Code of 1986, as amended ("IRC"). The Tax Act contains, among other things, significant changes to corporate taxation, including reduction of the corporate tax rate from a top marginal rate of 35% to a flat rate of 21%. The Company's gross deferred tax assets have been revalued from 35% to 21% with a corresponding offset to the valuation allowance and any potential other taxes arising due to the Tax Act will result in reductions to its net operating loss carryforward and valuation allowance. Deferred tax items of approximately $67.0 million as of December 31, 2017, have been revalued to approximately $44.6 million with a corresponding decrease to the Company's valuation allowance of approximately $22.4 million related to the rate change for December 31, 2017. During 2018, the Company continued to assess the provision for income taxes as guidance was issued. No significant revisions have been necessary.

In assessing the realizability of deferred tax assets, the Company evaluates all available positive and negative evidence by considering whether it is more likely than not that some portion or all of the deferred tax assets will not be recognized. The ultimate realization of deferred tax assets is dependent upon future taxable income, future reversals of existing taxable temporary difference, taxable income in carryback years and tax-planning strategies. The Company believes it is more likely than not that the deferred tax assets in the U.S. will not be realized; accordingly, a valuation allowance has been established against our U.S. deferred tax assets. The net change in the valuation allowance for the years ended December 31, 2017 and December 31, 2018 was a decrease of $3.2 million and an increase of $21.0 million, respectively.

As of December 31, 2017 and 2018, the Company has a net operating loss carryforward of $169.0 million and $232.3 million for federal tax purposes, respectively, and $148.7 million and $199.8 million for state tax purposes, respectively. If not utilized, these losses will expire beginning in 2032 for California purposes. Based on the available positive and negative evidence, management believes it is more likely than not that the net deferred tax assets will not be fully realizable. However, beginning in tax year 2018 and forward, the Federal law has changed such that net operating losses generated after December 31, 2017 may be carried forward indefinitely. Accordingly, $169.0 million of the federal net operating losses will begin to expire in 2032. However, $63.3 million of the federal net operating losses will not expire.

F-35

Table of Contents

**THE REALREAL, INC.**

**Notes to Financial Statements**

The Tax Reform Act of 1986 limits the use of net operating loss and tax credit carryforwards in certain situations where changes occur in the stock ownership of a company. In the event that the Company has had a change in ownership, utilization of the carryforwards could be restricted.

The Company files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Company is subject to examination by federal, state and local, jurisdictions, where applicable. As of December 31, 2017 and 2018, all years generally remain open to examination. Additionally, net operating loss carryforwards are subject to examination by the Internal Revenue Service and the California Franchise Tax Board for up to three years after utilization.

As of December 31, 2017 and 2018, the Company does not have uncertain tax positions for which it has recorded as a liability. The Company's policy is to include interest and penalties as a component to the statements of operations. There were no such tax penalties or interest during the years ended December 31, 2017 and 2018.

**13. Net Loss Per Share Attributable to Common Stockholders**

A reconciliation of the numerator and denominator used in the calculation of the basic and diluted net loss per share attributable to common stockholders is as follows (in thousands, except share and per share data):

| | Years Ended December 31, | | Three Months Ended March 31, | |
| | 2017 | 2018 | 2018 | 2019 |
| --- | --- | --- | --- | --- |
| | | | (unaudited) | |
| **Numerator** | | | | |
| Net loss attributable to common stockholders | $ (54,918) | $ (84,687) | $ (15,215) | $ (26,577) |
| **Denominator** | | | | |
| Weighted-average common shares outstanding used to calculate net loss per share attributable to common stockholders, basic and diluted | 16,291,653 | 16,730,803 | 16,599,476 | 17,411,487 |
| Net loss per share attributable to common stockholders, basic and diluted | $ (3.37) | $ (5.06) | $ (0.92) | $ (1.53) |

The following securities were excluded from the computation of diluted net loss per share attributable to common stockholders for the periods presented, because including them would have been anti-dilutive (on an as-converted basis):

| | Year Ended December 31, | | Three Months Ended March 31, | |
| | 2017 | 2018 | 2018 | 2019 |
| --- | --- | --- | --- | --- |
| | | | (unaudited) | |
| Convertible preferred stock | 69,834,789 | 73,724,645 | 69,834,789 | 77,556,411 |
| Redeemable convertible preferred stock | 14,723,636 | 32,820,513 | 14,723,636 | 39,170,858 |
| Options to purchase common stock | 15,597,136 | 19,344,243 | 15,602,738 | 18,408,192 |
| Warrants to purchase convertible preferred stock | 207,127 | 207,127 | 207,127 | 207,127 |
| Warrant to purchase common stock | 135,950 | 21,355 | 135,950 | 11,484 |
| Total | 100,498,638 | 126,117,883 | 100,504,240 | 135,354,072 |

F-36

**Table of Contents**

**THE REALREAL, INC.**

**Notes to Financial Statements**

*Unaudited Pro Forma Net Loss Per Share*

The following table sets forth the computation of the Company's unaudited pro forma basic and diluted net loss per share attributable to common stockholders (in thousands, except share and per share data) assuming the automatic conversion of the redeemable convertible preferred stock and the convertible preferred stock into common stock and convertible preferred stock warrants into common stock warrants upon consummation of an IPO as if such an event had occurred as of the beginning of the respective period, or the issuance date of the redeemable convertible preferred stock or the convertible preferred stock, if later:

| | Year Ended December 31, 2018 | Three Months Ended March 31, 2019 |
|---|---|---|
| **Numerator** | | |
| Net loss attributable to common stockholders | $ (84,687) | $ (26,577) |
| Add: Change in fair value of redeemable convertible preferred stock warrant liability | 450 | 280 |
| Add: Accretion to redemption value on redeemable convertible preferred stock | 8,922 | 3,355 |
| Net loss used in calculating pro forma earnings per share attributable to common stockholders, basic and diluted | $ (75,315) | $ (22,942) |
| **Denominator** | | |
| Weighted-average shares used in computing net loss per common share, basic and diluted | 16,730,803 | 17,411,487 |
| Pro forma adjustment to reflect assumed conversion of: | | |
| Weighted average convertible preferred stock | 71,731,203 | 74,134,235 |
| Weighted average redeemable convertible preferred stock | 24,342,250 | 33,518,834 |
| Weighted-average shares of common stock used in computing pro forma net loss per share attributable to common stockholders, basic and diluted | 112,804,256 | 125,064,556 |
| Pro forma net loss per share attributable to common stockholders, basic and diluted | $ (0.67) | $ (0.18) |

**14.   Retirement Plan**

The Company has a defined-contribution 401(k) retirement plan covering substantially all of its employees. Eligible employees are permitted to contribute up to an amount not to exceed an annual statutory maximum. The Company matches employee contributions at a rate of 25% of vested contributions. The Company's contributions to the 401(k) plan were immaterial for the years ended December 31, 2017 and 2018 and the three months ended March 31, 2018 and 2019 (unaudited).

**15.   Subsequent Events**

*Series H Preferred Stock Financing*

In March 2019, the Company sold 6,350,345 shares of Series H redeemable convertible preferred stock and 3,831,766 shares of Series H convertible preferred stock at $6.8748 per share to new and existing investors for aggregate gross proceeds of $70.0 million. Each share of Series H convertible preferred stock is convertible into one share of the Company's common stock. The rights and privileges of the Series H preferred stock are substantially similar to the rights and privileges of the Series G preferred stock; provided, however, that (1) the

F-37

**Table of Contents**

**THE REALREAL, INC.**

**Notes to Financial Statements**

holders of Series H preferred stock are not entitled to initiate a redemption but are entitled to participate in a redemption initiated by the holders of the Series F or G preferred stock and (2) the holders of Series H preferred stock are entitled to an adjustment of the conversion price of the Series H preferred stock in the event of a Qualified Public Offering in which the offering price per share is less than the original issuance price of the Series H preferred stock.

*Leases*

In January 2019, the Company signed a noncancelable operating lease to extend and expand the existing lease in Chicago, IL to a 91-month term ending November 2026. The minimum lease payments for the extension are $1.3 million.

**16.  Subsequent Events (Unaudited)**

*Leases*

In April 2019, the Company signed a new noncancelable operating lease for its second retail store in New York City. The lease term is through January 31, 2020 with an option to extend for up to five years. The minimum lease payments for the initial lease term total $0.6 million.

F-38

Table of Contents



Table of Contents

# The RealReal

Table of Contents

Table of Contents

**PART II**

**INFORMATION NOT REQUIRED IN PROSPECTUS**

**Item 13. Other Expenses of Issuance and Distribution**

The following table sets forth all expenses to be paid by the registrant, other than estimated underwriting discounts and commissions, in connection with this offering. All amounts shown are estimates except for the Securities and Exchange Commission registration fee, the FINRA filing fee and the exchange listing fee:

| | Amount to be Paid |
|---|---|
| Securities and Exchange Commission registration fee | $ 12,120 |
| FINRA filing fee | 13,500 |
| Nasdaq listing fee | * |
| Printing and engraving expenses | * |
| Legal fees and expenses | * |
| Accounting fees and expenses | * |
| Transfer agent and registrar fees | * |
| Miscellaneous | * |
| Total | $ * |

*    To be filed by amendment.

**Item 14. Indemnification of Directors and Officers**

The RealReal, Inc. is incorporated under the laws of the State of Delaware. Reference is made to Section 102(b)(7) of the General Corporation Law of the State of Delaware, as amended (the "DGCL"), which enables a corporation in its original certificate of incorporation or an amendment thereto to eliminate or limit the personal liability of a director for violations of the director's fiduciary duty, except (1) for any breach of the director's duty of loyalty to the corporation or its stockholders, (2) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (3) pursuant to Section 174 of the DGCL, which provides for liability of directors for unlawful payments of dividends or unlawful stock purchase or redemptions or (4) for any transaction from which the director derived an improper personal benefit.

Section 145(a) of the DGCL provides, in general, that a corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation), because he or she is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with such action, suit or proceeding, if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the corporation and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful.

Section 145(b) of the DGCL provides, in general, that a corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor because the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if he or she acted in good faith and in a manner he or she reasonably believed to

II-1

Table of Contents

be in or not opposed to the best interests of the corporation, except that no indemnification shall be made with respect to any claim, issue or matter as to which he or she shall have been adjudged to be liable to the corporation unless and only to the extent that the adjudicating court determines that, despite the adjudication of liability but in view of all of the circumstances of the case, he or she is fairly and reasonably entitled to indemnity for such expenses which the adjudicating court shall deem proper.

Section 145(g) of the DGCL provides, in general, that a corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of his or her status as such, whether or not the corporation would have the power to indemnify the person against such liability under Section 145 of the DGCL.

We expect that the certificate of incorporation adopted by us prior to the completion of this offering will provide that no director of our company shall be personally liable to us or our stockholders for monetary damages for any breach of fiduciary duty as a director, except for liability (1) for any breach of the director's duty of loyalty to us or our stockholders, (2) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (3) in respect of unlawful dividend payments or stock redemptions or repurchases or other distributions pursuant to Section 174 of the DGCL, or (4) for any transaction from which the director derived an improper personal benefit. In addition, our charter will provide that if the DGCL is amended to authorize the further elimination or limitation of the liability of directors, then the liability of a director of our company shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended.

We also expect our charter will further provide that any amendment, repeal or modification of such article unless otherwise required by law will not adversely affect any right or protection existing at the time of such repeal or modification with respect to any acts or omissions occurring before such repeal or amendment of a director serving at the time of such repeal or modification.

We expect that our certificate of incorporation adopted by us prior to the completion of this offering, will provide that we shall indemnify each of our directors and executive officers, and shall have power to indemnify our other officers, employees and agents, to the fullest extent permitted by the DGCL as the same may be amended (except that in the case of an amendment, only to the extent that the amendment permits us to provide broader indemnification rights than the DGCL permitted us to provide prior to such the amendment) against any and all expenses, judgments, penalties, fines and amounts reasonably paid in settlement that are incurred by the director, officer or such employee or on the director's, officer's or employee's behalf in connection with any threatened, pending or completed proceeding or any claim, issue or matter therein, to which he or she is or is threatened to be made a party because he or she is or was serving as a director, officer or employee of our company, or at our request as a director, partner, trustee, officer, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of our company and, with respect to any criminal proceeding, had no reasonable cause to believe his or her conduct was unlawful. We expect the certificate of incorporation will further provide for the advancement of expenses to each of our directors and, in the discretion of the board of directors, to certain officers and employees, in advance of the final disposition of such action, suit or proceeding only upon receipt of an undertaking by such person to repay all amounts advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that such person is not entitled to be indemnified for such expenses.

In addition, we expect the certificate of incorporation will provide that the right of each of our directors and officers to indemnification and advancement of expenses shall not be exclusive of any other right now possessed or hereafter acquired under any statute, provision of the charter or bylaws, agreement, vote of stockholders or otherwise. Furthermore, our certificate of incorporation will authorize us to provide insurance for our directors,

II-2

**Table of Contents**

officers, employees and agents against any liability, whether or not we would have the power to indemnify such person against such liability under the DGCL or the bylaws.

We have entered into indemnification agreements with each of our directors and our executive officers. These agreements will provide that we will indemnify each of our directors and such officers to the fullest extent permitted by law and our certificate of incorporation.

We also maintain a general liability insurance policy which covers certain liabilities of directors and officers of our company arising out of claims based on acts or omissions in their capacities as directors or officers.

In any underwriting agreement we will enter into in connection with the sale of the common stock being registered hereby, the underwriters will agree to indemnify, under certain conditions, us, our directors, our officers and persons who control us within the meaning of the Securities Act, against certain liabilities.

**Item 15. Recent Sales of Unregistered Securities**

Since December 31, 2015, we have issued the following unregistered securities:

*Preferred Stock Issuances*

In April 2016, we sold an aggregate of 13,586,946 shares of our Series E preferred stock to 23 accredited investors at a purchase price of $2.944 per share, for an aggregate purchase price of $40.0 million.

In May 2017, we sold an aggregate of 12,956,724 shares of our Series F preferred stock to two accredited investors at a purchase price of $3.859 per share, for an aggregate purchase price of $50.0 million.

In June 2018, we issued an aggregate of 3,065,259 shares of Series G preferred stock to 15 accredited investors, upon conversion of convertible notes at a purchase price of $4.7565 for an aggregate purchase price of $14.6 million. In June and July 2018, we sold an aggregate of 18,921,474 shares of Series G preferred stock to six accredited investors at a purchase price of $5.2850 for an aggregate purchase price of $100.0 million.

In March 2019, we sold an aggregate of 10,182,111 shares of our Series H preferred stock to 15 accredited investors at a purchase price of $6.8748 per share, for an aggregate purchase price of $70.0 million.

The preferred stock issuances described above were exempt from registration under the Securities Act (or Regulation D promulgated thereunder) by virtue of Section 4(a)(2) of the Securities Act as transactions by an issuer not involving a public offering. The recipients of the securities in each of these transactions represented their intentions to acquire the securities for investment only and not with a view to or for sale in connection with any distribution thereof, and appropriate legends were placed upon the stock certificates issued in these transactions. All recipients had adequate access, through their relationships with us, to information about us. The sales of these securities were made without any general solicitation or advertising.

*Warrant Issuances*

In September 2016, we issued a warrant to purchase 25,597 shares of our Series E preferred stock to Pacific Western Bank in connection with an increase to the outstanding principal under the existing loan and security agreement, as amended, with Square 1 Bank, a division of Pacific Western Bank, at an exercise price of $2.93 per share. The warrant has not been exercised.

In August 2017, we issued a warrant to purchase 45,833 shares of our common stock to an accredited investor in connection with an executive search consulting agreement at an exercise price of $1.34 per share. The warrant has been exercised in full.

II-3

Table of Contents

*Option and RSU Issuances*

From December 31, 2015 through the filing date of this registration statement, we granted to our directors, officers, employees, consultants and other service providers options to purchase an aggregate of          shares of our common stock under our equity compensation plans at exercise prices ranging from approximately $1.74 to $3.82 per share.

The option and RSU issuances described above were exempt from registration under the Securities Act under either (1) Rule 701 in that the transactions were under compensatory benefit plans and contracts relating to compensation as provided under Rule 701 or (2) Section 4(a)(2) of the Securities Act as transactions by an issuer not involving any public offering. The recipients of such securities were the registrant's employees, consultants or directors and received the securities under the registrant's equity compensation plans. The recipients of securities in each of these transactions represented their intention to acquire the securities for investment only and not with view to or for sale in connection with any distribution thereof and appropriate legends were affixed to the securities issued in these transactions

## Item 16. Exhibits and Financial Statement Schedules

(a)     Exhibits

See the Exhibit Index immediately preceding the signature page hereto for a list of exhibits filed as part of this registration statement on Form S-1, which Exhibit Index is incorporated herein by reference.

(b)     Financial Statement Schedules

Schedules not listed have been omitted because the information required to be set forth therein is not applicable, not material or is shown in the financial statements or notes thereto.

## Item 17. Undertakings

The undersigned registrant hereby undertakes to provide to the underwriters at the closing specified in the underwriting agreement certificates in such denominations and registered in such names as required by the underwriters to permit prompt delivery to each purchaser.

Insofar as indemnification for liabilities arising under the Securities Act of 1933, as amended, (the "Act"), may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

The undersigned registrant hereby undertakes that:

(1)     For purposes of determining any liability under the Act, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the registrant pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

II-4

**Table of Contents**

(2)    For the purpose of determining any liability under the Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

II-5

**Table of Contents**

**EXHIBIT INDEX**

| Exhibit Number | Description |
| --- | --- |
| 1.1* | Form of Underwriting Agreement. |
| 3.1 | Amended and Restated Certificate of Incorporation of The RealReal, Inc., as amended, as currently in effect. |
| 3.2* | Form of Amended and Restated Certificate of Incorporation of The RealReal, Inc., to be in effect on the completion of the offering. |
| 3.3 | Amended and Restated Bylaws of The RealReal, Inc., as currently in effect. |
| 3.4* | Form of Amended and Restated Bylaws of The RealReal, Inc., to be in effect on the completion of the offering. |
| 4.1* | Form of Common Stock Certificate. |
| 4.2 | Form of Warrant to Purchase Common Stock. |
| 4.3 | Form of Warrant to Purchase Series B Preferred Stock. |
| 4.4 | Form of Warrant to Purchase Series C Preferred Stock. |
| 4.5 | Form of Warrant to Purchase Series D Preferred Stock. |
| 4.6 | Form of Warrant to Purchase Series E Preferred Stock. |
| 4.7 | Seventh Amended and Restated Investor Rights Agreement, dated March 22, 2019 among The RealReal, Inc. and certain holders of its capital stock. |
| 5.1* | Opinion of Sidley Austin LLP. |
| 10.1+ | The RealReal, Inc. 2011 Equity Incentive Plan and related form agreements. |
| 10.2+* | Form of Indemnification Agreement entered into by and between The RealReal, Inc. and its directors and executive officers. |
| 10.3# | Loan and Security Agreement dated as of September 19, 2013 by and between The RealReal, Inc. and Square 1 Bank. |
| 10.4# | First Amendment to Loan and Security Agreement dated as of March 13, 2014 by and between The RealReal, Inc. and Square 1 Bank. |
| 10.5# | Second Amendment to Loan and Security Agreement dated as of August 5, 2014 by and between The RealReal, Inc. and Square 1 Bank. |
| 10.6# | Third Amendment to Loan and Security Agreement dated as of September 25, 2014 by and between The RealReal, Inc. and Square 1 Bank. |
| 10.7# | Fourth Amendment to Loan and Security Agreement dated as of December 28, 2015 by and between The RealReal, Inc. and Pacific Western Bank. |
| 10.8# | Fifth Amendment to Loan and Security Agreement dated as of July 18, 2016 by and between The RealReal, Inc. and Pacific Western Bank. |
| 10.9# | Sixth Amendment to Loan and Security Agreement dated as of September 16, 2016 by and between The RealReal, Inc. and Pacific Western Bank. |
| 10.10# | Seventh Amendment to Loan and Security Agreement dated as of March 28, 2017 by and between The RealReal, Inc. and Pacific Western Bank. |
| 10.11# | Eighth Amendment to Loan and Security Agreement dated as of July 27, 2017 by and between The RealReal, Inc. and Pacific Western Bank. |
| 10.12# | Ninth Amendment to Loan and Security Agreement dated as of March 5, 2018 by and between The RealReal, Inc. and Pacific Western Bank. |

**Table of Contents**

| 10.13# | Tenth Amendment to Loan and Security Agreement dated as of July 25, 2018 by and between The RealReal, Inc. and Pacific Western Bank. |
| 10.14 | Eleventh Amendment to Loan and Security Agreement dated as of August 9, 2018 by and between The RealReal, Inc. and Pacific Western Bank. |
| 10.15# | Twelfth Amendment to Loan and Security Agreement dated as of December 19, 2018 by and between The RealReal, Inc. and Pacific Western Bank. |
| 10.16# | Lease Agreement dated as of March 18, 2014 by and between The RealReal, Inc. and 35 Enterprise Avenue, L.L.C. |
| 10.17# | Lease Modification Agreement dated as of March 8, 2018 by and between The RealReal, Inc. and 35 Enterprise Avenue, L.L.C. |
| 10.18# | Lease Agreement dated as of March 14, 2016 by and between The RealReal, Inc. and M&L Associates. |
| 10.19# | Lease Agreement dated as of June 5, 2018 by and between The RealReal, Inc. and Hartz Enterprise LLC. |
| 10.20# | Lease Agreement dated as of September 14, 2018 by and between The RealReal, Inc. and Prologis Perth Amboy Associates, LLC. |
| 23.1 | Consent of KPMG LLP, independent registered public accounting firm. |
| 23.2* | Consent of Sidley Austin LLP (included in Exhibit 5.1). |
| 24.1 | Power of Attorney (included on the signature page to this Registration Statement). |

\* To be filed by amendment.
\+ Indicates management contract or compensatory plan.
\# Portions of the exhibit have been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.

II-7

**Table of Contents**

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in San Francisco, California, on the 31st day of May, 2019.

**The RealReal, Inc.**

By: /s/ Julie Wainwright
Julie Wainwright
Chief Executive Officer

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Julie Wainwright, Matt Gustke and Dana DuFrane and each of them, as such person's true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for such person and in such person's name, place and stead, in any and all capacities, to sign any and all amendments (including post-effective amendments) to this Registration Statement and to sign any registration statement for the same offering covered by the Registration Statement that is to be effective upon filing pursuant to Rule 462 promulgated under the Securities Act of 1933, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith and about the premises, as fully to all intents and purposes as such person might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, or their or such person's substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ Julie Wainwright<br>Julie Wainwright | Chairperson and Chief Executive Officer<br>(Principal Executive Officer) | May 31, 2019 |
| /s/ Matt Gustke<br>Matt Gustke | Chief Financial Officer<br>(Principal Financial Officer) | May 31, 2019 |
| /s/ Steve Lo<br>Steve Lo | Vice President, Corporate Controller<br>(Principal Accounting Officer) | May 31, 2019 |
| /s/ Chip Baird<br>Chip Baird | Director | May 31, 2019 |
| /s/ Maha Ibrahim<br>Maha Ibrahim | Director | May 31, 2019 |
| /s/ Rob Krolik<br>Rob Krolik | Director | May 31, 2019 |
| /s/ Michael Kumin<br>Michael Kumin | Director | May 31, 2019 |

II-8

**Table of Contents**

| /s/ Stefan Larsson | Director | May 31, 2019 |
|---|---|---|
| Stefan Larsson | | |
| /s/ Niki Leondakis | Director | May 31, 2019 |
| Niki Leondakis | | |
| /s/ James Miller | Director | May 31, 2019 |
| James Miller | | |

II-9

**Exhibit 3.1**

ELEVENTH AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
THE REALREAL, INC.

(Pursuant to Sections 242 and 245 of the
General Corporation Law of the State of Delaware)

The RealReal, Inc., a corporation organized and existing under and by virtue of the provisions of the General Corporation Law of the State of Delaware (the "**General Corporation Law**"),

**DOES HEREBY CERTIFY:**

1.     That the name of this corporation is The RealReal, Inc., and that this corporation was originally incorporated pursuant to the General Corporation Law on March 29, 2011, under the name TheRealReal, Inc.

2.     That the Board of Directors duly adopted resolutions proposing to amend and restate the Certificate of Incorporation of this corporation, declaring said amendment and restatement to be advisable and in the best interests of this corporation and its stockholders, and authorizing the appropriate officers of this corporation to solicit the consent of the stockholders therefor, which resolution setting forth the proposed amendment and restatement is as follows:

RESOLVED, that the Certificate of Incorporation of this corporation be amended and restated in its entirety (such Certificate of Incorporation, as so amended and restated, the "**Certificate of Incorporation**") to read as follows:

**FIRST:**      The name of this corporation is The RealReal, Inc. (the **"Corporation"**).

**SECOND:**      The address of the registered office of the Corporation in the State of Delaware is 160 Greentree Drive, Suite 101, in the City of Dover, County of Kent, 19904. The name of its registered agent at such address is National Registered Agents, Inc.

**THIRD:**      The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law.

**FOURTH:**      The total number of shares of all classes of stock which the Corporation shall have authority to issue is: 270,835,754, divided among classes as follows: (i) 155,649,887 of Common Stock, $0.00001 par value per share ("**Common Stock**"), and (ii) 115,185,867 shares of Preferred Stock, $0.00001 par value per share ("**Preferred Stock**"), of which (A) 18,960,000 are designated "**Series A Preferred Stock**", (B) 13,784,443 are designated "**Series B Preferred Stock**", (C) 9,335,659 are designated "**Series C Preferred Stock**", (D) 14,367,652 are designated "**Series D Preferred Stock**", (E) 13,612,543 are designated "**Series E Preferred Stock**", (F) 12,956,724 are designated "**Series F Preferred Stock**", (G) 21,986,733 are designated as "**Series G Preferred Stock**", and 10,182,113 are designated as "**Series H Preferred Stock**".

The following is a statement of the designations and the powers, privileges and rights, and the qualifications, limitations or restrictions thereof in respect of each class of capital stock of the Corporation:

**A.     COMMON STOCK**

1.     <u>General</u>. The voting, dividend and liquidation rights of the holders of Common Stock are subject to and qualified by the rights, powers and preferences of the holders of Preferred Stock set forth herein.

2.     <u>Voting</u>. The holders of Common Stock are entitled to one vote for each share of Common Stock held at all meetings of stockholders (and written actions in lieu of meetings); <u>provided</u>, <u>however</u>, that, except as otherwise required by law, holders of Common Stock, as such, shall not be entitled to vote on any amendment to the Certificate of Incorporation that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to the Certificate of Incorporation or pursuant to the General Corporation Law. There shall be no cumulative voting. The number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares thereof then outstanding or reserved for issuance) by (in addition to any vote of the holders of one or more series of Preferred Stock that may be required by the terms of the Certificate of Incorporation) the affirmative vote of the holders of shares of capital stock of the Corporation representing a majority of the votes represented by all outstanding shares of capital stock of the Corporation entitled to vote, irrespective of the provisions of Section 242(b)(2) of the General Corporation Law.

**B.     PREFERRED STOCK**

The Preferred Stock shall have the following rights, preferences, powers, privileges and restrictions, qualifications and limitations. Unless otherwise indicated, references to "Sections" or "Sections" in this Part B of this Article FOURTH refer to sections and Sections of Part B of this Article FOURTH.

1.     <u>Dividends</u>.

1.1     From and after the date of the issuance of any shares of Series F Preferred Stock, dividends at the rate per annum of 8% of the Series F Issue Price (defined below) per share shall accrue on such shares of Series F Preferred Stock (the "**Series F Accruing Dividends**"). From and after the date of the issuance of any shares of Series G Preferred Stock, dividends at the rate per annum of 8% of the Series G Issue Price (defined below) per share shall accrue on such shares of Series G Preferred Stock (the "**Series G Accruing Dividends**"). From and after the date of the issuance of any shares of Series H Preferred Stock, dividends at the rate per annum of 8% of the Series H Issue Price (defined below) per share shall accrue on such shares of Series H

2

Preferred Stock (the "**Series H Accruing Dividends**" and collectively with the Series F Accruing Dividends and Series G Accruing Dividends, the "**Accruing Dividends**"). Accruing Dividends shall accrue from day to day, compounding quarterly, whether or not declared, and shall be cumulative; provided, however, that except as set forth in the following sentence of this Section 1.1 or in Section 2.1, Section 2.2, Section 2.3 or Section 6.1, such Accruing Dividends shall be payable only when, as, and if declared by the Board of Directors and the Corporation shall be under no obligation to pay such Accruing Dividends.

1.2    Subject to the foregoing, for any shares of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, or Series E Preferred Stock, dividends at the rate per annum of 8% of the Issue Price (defined below) per share shall be payable out of any assets legally available therefor, prior and in preference to any declaration or payment of any dividend (payable other than in Common Stock or other securities and rights convertible into or entitling the holder thereof to receive, directly or indirectly, additional shares of Common Stock of this Corporation) on the Common Stock of this Corporation when, as, and if declared by the Board of Directors. Such dividends shall not be cumulative. The holders of Preferred Stock shall participate equally on an as-converted basis with the holders of the Common Stock in all other dividends or similar distributions by the Corporation at the then effective Conversion Price (as defined below). The "**Issue Price**" shall mean: (a) with respect to the Series A Preferred Stock, $0.48660 per share, subject to appropriate adjustment in the event of any stock dividend, stock split, combination, subdivision, or other similar recapitalization with respect to the Series A Preferred Stock (the "**Series A Issue Price**"), (b) with respect to the Series B Preferred Stock, $1.025432 per share, subject to appropriate adjustment in the event of any stock dividend, stock split, combination, subdivision, or other similar recapitalization with respect to the Series B Preferred Stock (the "**Series B Issue Price**"), (c) with respect to the Series C Preferred Stock, $2.18403 per share, subject to appropriate adjustment in the event of any stock dividend, stock split, combination, subdivision, or other similar recapitalization with respect to the Series C Preferred Stock (the "**Series C Issue Price**"), (d) with respect to the Series D Preferred Stock, $2.79239 per share, subject to appropriate adjustment in the event of any stock dividend, stock split, combination, subdivision, or other similar recapitalization with respect to the Series D Preferred Stock (the "**Series D Issue Price**"), (e) with respect to the Series E Preferred Stock, $2.9440 per share, subject to appropriate adjustment in the event of any stock dividend, stock split, combination, subdivision, or other similar recapitalization with respect to the Series E Preferred Stock (the "**Series E Issue Price**"), (f) with respect to the Series F Preferred Stock, $3.8590 per share, subject to appropriate adjustment in the event of any stock dividend, stock split, combination, subdivision, or other similar recapitalization with respect to the Series F Preferred Stock (the "**Series F Issue Price**"), (g) with respect to the Series G Preferred Stock, $5.2850 per share, subject to appropriate adjustment in the event of any stock dividend, stock split, combination, subdivision, or other similar recapitalization with respect to the Series G Preferred Stock (the "**Series G Issue Price**"), and (h) with respect to the Series H Preferred Stock, $6.8748 per share, subject to appropriate adjustment in the event of any stock dividend, stock split, combination, subdivision, or other similar recapitalization with respect to the Series H Preferred Stock (the "**Series H Issue Price**").

3

2.    <u>Liquidation, Dissolution or Winding Up; Certain Mergers, Consolidations and Asset Sales</u>.

    2.1    <u>Preferential Payments to Holders of Series H Preferred Stock, Series G Preferred Stock and Series F Preferred Stock</u>. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation or Deemed Liquidation Event (as defined below), the holders of shares of Series H Preferred Stock, Series G Preferred Stock and/or Series F Preferred Stock then outstanding shall be entitled to be paid out of the assets of the Corporation available for distribution to its stockholders before any payment shall be made to the holders of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock or Common Stock by reason of their ownership thereof, an amount per share equal to (a) with respect to shares of Series H Preferred Stock, the greater of (i) the Series H Issue Price, plus any Series H Accruing Dividends accrued but unpaid thereon, whether or not declared, together with any other dividends declared but unpaid thereon, on the Series H Preferred Stock, and (ii) such amount per share as would have been payable had all shares of the Series H Preferred Stock been converted into Common Stock pursuant to <u>Section 4</u> immediately prior to such liquidation, dissolution, winding up or Deemed Liquidation Event (the "**Series H Liquidation Amount**"), (b) with respect to shares of Series G Preferred Stock, the greater of (i) the Series G Issue Price, plus any Series G Accruing Dividends accrued but unpaid thereon, whether or not declared, together with any other dividends declared but unpaid thereon, on the Series G Preferred Stock, and (ii) such amount per share as would have been payable had all shares of the Series G Preferred Stock been converted into Common Stock pursuant to <u>Section 4</u> immediately prior to such liquidation, dissolution, winding up or Deemed Liquidation Event (the "**Series G Liquidation Amount**"), and (c) with respect to shares of Series F Preferred Stock, the greater of (i) the Series F Issue Price, plus any Series F Accruing Dividends accrued but unpaid thereon, whether or not declared, together with any other dividends declared but unpaid thereon, on the Series F Preferred Stock, and (ii) such amount per share as would have been payable had all shares of the Series F Preferred Stock been converted into Common Stock pursuant to <u>Section 4</u> immediately prior to such liquidation, dissolution, winding up or Deemed Liquidation Event (the "**Series F Liquidation Amount**"). If upon any such liquidation, dissolution or winding up of the Corporation or Deemed Liquidation Event, the assets of the Corporation available for distribution to its stockholders shall be insufficient to pay the holders of shares of Series H Preferred Stock, Series G Preferred Stock and Series F Preferred Stock the full amount to which they shall be entitled under this <u>Section 2.1</u>, the holders of shares of Series H Preferred Stock, Series G Preferred Stock and Series F Preferred Stock shall share ratably in any distribution of the assets available for distribution to the holders of shares of Series H Preferred Stock, Series G Preferred Stock and Series F Preferred Stock in proportion to the respective amounts which would otherwise be payable in respect of the shares held by them upon such distribution if all amounts payable on or with respect to such shares were paid in full.

4

2.2    Preferential Payments to Holders of Series E Preferred Stock. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation or Deemed Liquidation Event, after the payment of all preferential amounts required to be paid to the holders of shares of Series H Preferred Stock, Series G Preferred Stock and Series F Preferred Stock pursuant to Section 2.1 above, the holders of shares of Series E Preferred Stock then outstanding shall be entitled to be paid out of the assets of the Corporation available for distribution to its stockholders before any payment shall be made to the holders of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock or Common Stock by reason of their ownership thereof, an amount per share equal to the greater of (i) the Series E Issue Price together with any dividends declared but unpaid on the Series E Preferred Stock or (ii) such amount per share as would have been payable had all shares of the Series E Preferred Stock been converted into Common Stock pursuant to Section 4 immediately prior to such liquidation, dissolution, winding up or Deemed Liquidation Event (the "**Series E Liquidation Amount**"). If upon any such liquidation, dissolution or winding up of the Corporation or Deemed Liquidation Event, the assets of the Corporation available for distribution to its stockholders shall be insufficient to pay the holders of shares of Series E Preferred Stock the full amount to which they shall be entitled under this Section 2.2, the holders of shares of Series E Preferred Stock shall share ratably in any distribution of the assets available for distribution to the holders of shares of Series E Preferred Stock in proportion to the respective amounts which would otherwise be payable in respect of the shares held by them upon such distribution if all amounts payable on or with respect to such shares were paid in full.

2.3    Preferential Payments to Holders of Preferred Stock. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation or Deemed Liquidation Event, after the payment of all preferential amounts required to be paid to the holders of shares of Series H Preferred Stock, Series G Preferred Stock and Series F Preferred Stock pursuant to Section 2.1 above and Series E Preferred Stock pursuant to Section 2.2 above, the holders of shares of Preferred Stock then outstanding (other than with respect to shares of Series H Preferred Stock, Series G Preferred Stock, Series F Preferred Stock and Series E Preferred Stock) shall be entitled to be paid out of the assets of the Corporation available for distribution to its stockholders before any payment shall be made to the holders of Common Stock by reason of their ownership thereof, an amount per share equal to the greater of (i) the applicable Issue Price, plus any dividends declared but unpaid thereon and (ii) such amount per share as would have been payable had all shares of the applicable series of Preferred Stock been converted into Common Stock pursuant to Section 4 immediately prior to such liquidation, dissolution, winding up or Deemed Liquidation Event (the amount payable pursuant to this sentence to the holders of Series A Preferred Stock is hereinafter referred to as the "**Series A Liquidation Amount**", the amount payable pursuant to this sentence to the holders of Series B Preferred Stock is hereinafter referred to as the "**Series B Liquidation Amount**", the amount payable pursuant to this sentence to the holders of Series C Preferred Stock is hereinafter referred to as the "**Series C Liquidation Amount**", the amount payable pursuant to this sentence to the holders of Series D Preferred Stock is hereinafter referred to as the "**Series D

5

**Liquidation Amount**", and, collectively with the Series E Liquidation Amount, the Series F Liquidation Amount, the Series G Liquidation Amount and the Series H Liquidation Amount, all amounts payable pursuant to this sentence to the holders of Preferred Stock are hereinafter referred to as the "**Liquidation Amount**"). If upon any such liquidation, dissolution or winding up of the Corporation or Deemed Liquidation Event, after the payment of all preferential amounts required to be paid to the holders of shares of Series H Preferred Stock, Series G Preferred Stock and Series F Preferred Stock pursuant to Section 2.1 above and to the holders of shares of Series E Preferred Stock pursuant to Section 2.2 above, the assets of the Corporation available for distribution to its stockholders shall be insufficient to pay the holders of shares of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, and Series D Preferred Stock the full amount to which they shall be entitled under this Section 2.3, the holders of shares of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, and Series D Preferred Stock shall share ratably in any distribution of the assets available for distribution in proportion to the respective amounts which would otherwise be payable in respect of the shares of Preferred Stock held by them upon such distribution if all amounts payable on or with respect to such shares of Preferred Stock were paid in full.

2.4    Payments to Holders of Common Stock. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation or Deemed Liquidation Event, after the payment of all preferential amounts required to be paid to the holders of shares of Preferred Stock pursuant to Section 2.1, Section 2.2 and Section 2.3 above, the remaining assets of the Corporation available for distribution to its stockholders shall be distributed among the holders of shares of Common Stock, pro rata based on the number of shares held by each such holder.

2.5    Deemed Liquidation Events.

2.5.1.    Definition. Each of the following events shall be considered a "**Deemed Liquidation Event**" unless the holders of a majority of the then outstanding shares of Preferred Stock (including each of the holders of a majority of the then outstanding shares of Series B Preferred Stock, the holders of a majority of the then outstanding shares of Series E Preferred Stock, the holders of a majority of the then outstanding shares of Series F Preferred Stock, and the holders of a majority of the then outstanding shares of Series G Preferred Stock) (the "**Requisite Holders**") approve by written consent or affirmative vote, together as a single class on an as-converted basis, by written notice sent to the Corporation at least two days prior to the effective date of any such event:

(a)    a merger or consolidation in which

(i)    the Corporation is a constituent party or

(ii)    a subsidiary of the Corporation is a constituent party and the Corporation issues shares of its capital stock pursuant to such merger or consolidation,

6

except any such merger or consolidation involving the Corporation or a subsidiary in which the shares of capital stock of the Corporation outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, at least 50%, by voting power, of the capital stock of (1) the surviving or resulting corporation or (2) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation;

(b)     the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Corporation or any subsidiary of the Corporation of all or substantially all the assets of the Corporation and its subsidiaries taken as a whole, or the sale or disposition (whether by merger or otherwise) of one or more subsidiaries of the Corporation if substantially all of the assets of the Corporation and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Corporation; or

(c)     the closing of the transfer or issuance (whether by merger, consolidation or otherwise), in one transaction or a series of related transactions, to a person or group of affiliated persons (other than an underwriter of the Corporation's securities), of the Corporation's securities pursuant to which the Corporation received the proceeds if, after such closing, such person or group of affiliated persons would hold 50% or more of the outstanding voting stock of the Corporation (or the surviving or acquiring entity).

2.5.2.    <u>Effecting a Deemed Liquidation Event</u>.

(a)     The Corporation shall not have the power to effect a Deemed Liquidation Event referred to in <u>Section 2.5.1(a)(i)</u> unless the agreement or plan of merger or consolidation for such transaction (the "**Merger Agreement**") provides that the consideration payable to the stockholders of the Corporation shall be allocated among the holders of capital stock of the Corporation in accordance with <u>Sections 2.1</u>, <u>2.2</u>, and <u>2.3</u>.

(b)     In the event of a Deemed Liquidation Event referred to in <u>Sections 2.5.1(a)(i)</u> or <u>2.5.1(b)</u>, if the Corporation does not effect a dissolution of the Corporation under the General Corporation Law within 90 days after such Deemed Liquidation Event, then (i) the Corporation shall send a written notice to each holder of Preferred Stock no later than the 90th day after the Deemed Liquidation Event advising such holders of their right (and the requirements to be met to secure such right) pursuant to the terms of the following clause (ii) to require the redemption of such shares of

7

Preferred Stock, and (ii) if the holders of a majority of the then outstanding shares of Preferred Stock (including each of the holders of a majority of the then outstanding shares of Series B Preferred Stock, the holders of a majority of the then outstanding shares of Series E Preferred Stock, the holders of a majority of the then outstanding shares of Series F Preferred Stock, the holders of a majority of the then outstanding shares of Series G Preferred Stock, and the holders of a majority of the then outstanding shares of Series H Preferred Stock) so request in a written instrument delivered to the Corporation not later than 120 days after such Deemed Liquidation Event, the Corporation shall use the consideration received by the Corporation for such Deemed Liquidation Event (net of any retained liabilities associated with the assets sold or technology licensed, as determined in good faith by the Board of Directors of the Corporation), together with any other assets of the Corporation available for distribution to its stockholders, all to the extent permitted by Delaware law governing distributions to stockholders (the "**Available Proceeds**"), on the 150th day after such Deemed Liquidation Event, to redeem all outstanding shares of Series H Preferred Stock at a price per share equal to the Series H Liquidation Amount, to redeem all outstanding shares of Series G Preferred Stock at a price per share equal to the Series G Liquidation Amount, to redeem all outstanding shares of Series F Preferred Stock at a price per share equal to the Series F Liquidation Amount, to redeem all outstanding shares of Series E Preferred Stock at a price per share equal to the Series E Liquidation Amount, to redeem all outstanding shares of Series D Preferred Stock at a price per share equal to the Series D Liquidation Amount, to redeem all outstanding shares of Series C Preferred Stock at a price per share equal to the Series C Liquidation Amount, to redeem all outstanding shares of Series B Preferred Stock at a price per share equal to the Series B Liquidation Amount and to redeem all outstanding shares of Series A Preferred Stock at a price per share equal to the Series A Liquidation Amount. Notwithstanding the foregoing, in the event of a redemption pursuant to the preceding sentence, if the Available Proceeds are not sufficient to redeem all outstanding shares of Preferred Stock, the Corporation shall redeem each holder's shares of Preferred Stock in accordance with the priorities set forth in Section 2.1, 2.2, and 2.3 above to the fullest extent of such Available Proceeds, based on the respective amounts which would otherwise be payable in respect of the shares of Preferred Stock to be redeemed if the Available Proceeds were sufficient to redeem all such shares, and shall redeem the remaining shares of Preferred Stock to be redeemed in accordance with such priorities as soon as it may lawfully do so under Delaware law governing distributions to stockholders.

2.5.3.    <u>Amount Deemed Paid or Distributed</u>. The amount deemed paid or distributed to the holders of capital stock of the Corporation upon any such merger, consolidation, sale, transfer, exclusive license, other disposition or redemption shall be the cash or the value of the property, rights or securities paid or

8

distributed to such holders by the Corporation or the acquiring person, firm or other entity. The value of such property, rights or securities shall be determined in good faith by the Board of Directors of the Corporation, including (a) the Series A Director, (b) the Series D Director, (c) the Series F Director, and (d) the Series G Director.

2.5.4.    Allocation of Escrow. In the event of a Deemed Liquidation Event pursuant to Section 2.5.1(a)(i), if any portion of the consideration payable to the stockholders of the Corporation is placed into escrow and/or is payable to the stockholders of the Corporation subject to contingencies, the Merger Agreement shall provide that (a) the portion of such consideration that is not placed in escrow and not subject to any contingencies (the "**Initial Consideration**") shall be allocated among the holders of capital stock of the Corporation in accordance with Sections 2.1, 2.2, 2.3, and 2.4 as if the Initial Consideration were the only consideration payable in connection with such Deemed Liquidation Event and (b) any additional consideration which becomes payable to the stockholders of the Corporation upon release from escrow or satisfaction of contingencies shall be allocated among the holders of capital stock of the Corporation in accordance with Sections 2.1, 2.2, 2.3, and 2.4 after taking into account the previous payment of the Initial Consideration as part of the same transaction.

3.    Voting.

3.1    General. On any matter presented to the stockholders of the Corporation for their action or consideration at any meeting of stockholders of the Corporation (or by written consent of stockholders in lieu of meeting), each holder of outstanding shares of Preferred Stock shall be entitled to cast the number of votes equal to the number of whole shares of Common Stock into which the shares of Preferred Stock held by such holder are convertible as of the record date for determining stockholders entitled to vote on such matter. Except as provided by law or by the other provisions of the Certificate of Incorporation, holders of Preferred Stock shall vote together with the holders of Common Stock as a single class.

3.2    Election of Directors.

3.2.1.    Series G Director. As long as at least 7,500,000 shares of Series G Preferred Stock (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Series G Preferred Stock) remain outstanding, the holders of record of the Series G Preferred Stock, exclusively and as a separate class, shall be entitled to elect one director of the Corporation (the "**Series G Director**").

3.2.2.    Series F Director. As long as at least 4,500,000 shares of Series F Preferred Stock (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Series F Preferred Stock) remain outstanding, the holders of record of the Series F Preferred Stock, exclusively and as a separate class, shall be entitled to elect one director of the Corporation (the "**Series F Director**").

9

3.2.3.   Series D Director. As long as the DBL Partners III, L.P. continues to hold at least 1,500,000 shares of Series D Preferred Stock (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Series D Preferred Stock), the holders of record of the Series D Preferred Stock, exclusively and as a separate class, shall be entitled to elect one director of the Corporation (the "**Series D Director**").

3.2.4.   Series A Director. As long as at least 2,500,000 shares of Series A Preferred Stock remain outstanding (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Series A Preferred Stock), the holders of record of the Series A Preferred Stock, exclusively and as a separate class, shall be entitled to elect one director of the Corporation (the "**Series A Director**").

3.2.5.   Common Directors. The holders of record of the shares of Common Stock, exclusively and as a separate class, shall be entitled to elect two directors of the Corporation.

3.2.6.   Additional Directors Upon Exercise of the Special Board Appointment Right. If and to the extent the Redemption Stockholders have exercised the Special Board Appointment Right pursuant to Section 6.9, such Redemption Stockholders shall be entitled to elect such number of additional directors of the Corporation so that the number of directors of the Corporation designated and elected by such Redemption Stockholders pursuant to Section 6.9 together with one or both of the Series G Director and the Series F Director designated by such Redemption Stockholders pursuant to Sections 3.2.1 and 3.2.2, as applicable, constitute a majority of the then-serving members of the Board, until and unless the Redemption Right of such Redemption Stockholders has been satisfied in full. This Section 3.2.6 shall terminate and be of no further force or effect pursuant to Section 6.8(b).

All remaining member(s) of the Board of Directors shall be elected by the holders of record of the shares of Common Stock and Preferred Stock voting together as a single class on an as converted to Common Stock basis. Any director elected as provided in the preceding sentence may be removed without cause by, and only by, the affirmative vote of the holders of the shares of the class or series of capital stock entitled to elect such director or directors, given either at a special meeting of such stockholders duly called for that purpose or pursuant to a written consent of stockholders. Notwithstanding the provisions of Section 223(a)(1) and 223(a)(2) of the General Corporation Law, any vacancy, including newly created directorships resulting from any increase in the authorized number of directors or amendment of the Certificate of Incorporation, and vacancies created by removal or resignation of a director, may be filled by a majority of the directors then in office, though less than a quorum, or by a

10

sole remaining director, and the directors so chosen shall hold office until the next annual election and until their successors are duly elected and shall qualify, unless sooner displaced; provided, however, that where such vacancy occurs among the directors elected by the holders of a class or series of stock, the holders of shares of such class or series may override the Board of Directors' action to fill such vacancy by (i) voting for their own designee to fill such vacancy at a meeting of the corporation's stockholders or (ii) written consent, if the consenting stockholders hold a sufficient number of shares to elect their designee at a meeting of the stockholders. At any meeting held for the purpose of electing a director, the presence in person or by proxy of the holders of a majority of the outstanding shares of the class or series entitled to elect such director shall constitute a quorum for the purpose of electing such director.

3.3    Protective Provisions.

3.3.1.    Preferred Stock Protective Provisions. At any time when at least 2,500,000 shares of Preferred Stock (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Preferred Stock), are outstanding, the Corporation shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by law or the Certificate of Incorporation) the written consent or affirmative vote of a majority of the then outstanding shares of Preferred Stock, given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a class on an as-converted basis, and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect:

(a)    liquidate, dissolve or wind-up the business, or effect a Deemed Liquidation Event, or consent to any of the foregoing;

(b)    amend, alter or repeal any provision of the Certificate of Incorporation or Bylaws of the Corporation in a manner that adversely affects the powers, preferences or rights of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock, Series G Preferred Stock or Series H Preferred Stock;

(c)    create, or authorize the creation of, any additional class or series of capital stock unless the same ranks junior to the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock, Series G Preferred Stock and Series H Preferred Stock with respect to the distribution of assets on the liquidation, dissolution or winding up of the Corporation, the payment of dividends and rights of redemption, or increase the authorized number of shares of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred

11

Stock, Series E Preferred Stock, Series F Preferred Stock, Series G Preferred Stock or Series H Preferred Stock, or increase the authorized number of shares of any additional class or series of capital stock unless the same ranks junior to the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock, Series G Preferred Stock or Series H Preferred Stock with respect to the distribution of assets on the liquidation, dissolution or winding up of the Corporation, the payment of dividends and rights of redemption;

(d)    acquire all, or a substantial portion, of the assets or business of another company or entity, or otherwise acquire any material assets;

(e)    grant an exclusive license to any of the Corporation's material intellectual property rights;

(f)    (i) reclassify, alter or amend any existing security of the Corporation that is pari passu with the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock, Series G Preferred Stock or Series H Preferred Stock in respect of the distribution of assets on the liquidation, dissolution or winding up of the Corporation, the payment of dividends or rights of redemption, if such reclassification, alteration or amendment would render such other security senior to the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock, Series G Preferred Stock or Series H Preferred Stock, respectively, in respect of any such right, preference or privilege, or (ii) reclassify, alter or amend any existing security of the Corporation that is junior to the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock, Series G Preferred Stock or Series H Preferred Stock in respect of the distribution of assets on the liquidation, dissolution or winding up of the Corporation, the payment of dividends or rights of redemption, if such reclassification, alteration or amendment would render such other security senior to or pari passu with the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock, Series G Preferred Stock or Series H Preferred Stock, respectively, in respect of any such right, preference or privilege;

(g)    purchase or redeem (or permit any subsidiary to purchase or redeem) or pay or declare any dividend or make any distribution on, any shares of capital stock of the Corporation other than (i) redemptions of or dividends or distributions on the Preferred Stock as expressly authorized herein, (ii) dividends or other distributions payable on the Common Stock solely in the form of additional shares of Common Stock and

12

(iii) repurchases of stock from former employees, officers, directors, consultants or other persons who performed services for the Corporation or any subsidiary in connection with the cessation of such employment or service at the lower of the original purchase price or the then-current fair market value thereof, or (iv) purchases of stock upon the Corporation's exercise of its contractual right of first refusal with respect to such stock (unless approved by the Board of Directors including (A) the Series A Director, (B) the Series D Director, (C) the Series F Director, and (D) the Series G Director);

(h)    increase or decrease the authorized number of directors constituting the Board of Directors (other than any increase as a result of the exercise of the Special Board Appointment Right pursuant to Section 3.2.6 and Section 6.8);

(i)    create, or hold capital stock in, any subsidiary that is not wholly owned (either directly or through one or more other subsidiaries) by the Corporation, or sell, transfer or otherwise dispose of any capital stock of any direct or indirect subsidiary of the Corporation, or permit any direct or indirect subsidiary to sell, lease, transfer, exclusively license or otherwise dispose (in a single transaction or series of related transactions) of all or substantially all of the assets of such subsidiary;

(j)    change the rights, preferences and privileges of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock, Series G Preferred Stock or Series H Preferred Stock; or

(k)    increase or decrease (other than by redemption or conversion) the total number of authorized shares of Common Stock or Preferred Stock or designated shares of any series of Preferred Stock.

3.3.2.    Series H Preferred Stock Protective Provisions. The Corporation shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by law or the Certificate of Incorporation) the written consent or affirmative vote of a majority of the then outstanding shares of Series H Preferred Stock, given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a class, and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect:

(a)    enter into or become a party to any transaction with any director, officer or employee of the Corporation or any affiliate or immediate family member of any such person, other than for transactions made in the ordinary course of business and approved by the Board of Directors;

(b)    amend or waive any of the rights, preferences, or privileges of the Series H Preferred Stock;

13

(c)   authorize, incur, or issue any capital (including all guarantees, debts, liens, or leases) which ranks senior to or pari passu with the Series H Preferred Stock, other than a credit line secured from a reputable lender on customary terms up to $50 million;

(d)   pay or declare any dividend or make any distribution on, or redeem or acquire any shares of capital stock of the Corporation other than repurchases of stock from former employees, officers, directors, consultants or other persons who performed services for the Corporation in connection with the cessation of such employment or service at the lower of the original purchase price or the then-current fair market value thereof, in which the holders of Series H Preferred Stock are treated differently from other holders of Preferred Stock; or

(e)   make any material changes in the Corporation's business.

3.3.3.   <u>Series G Preferred Stock Protective Provisions</u>. The Corporation shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by law or the Certificate of Incorporation) the written consent or affirmative vote of a majority of the then outstanding shares of Series G Preferred Stock, given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a class, and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect:

(a)   enter into or become a party to any transaction with any director, officer or employee of the Corporation or any affiliate or immediate family member of any such person, other than for transactions made in the ordinary course of business and approved by the Board of Directors, including the Series G Director;

(b)   amend or waive any of the rights, preferences, or privileges of the Series G Preferred Stock;

(c)   authorize, incur, or issue any capital (including all guarantees, debts, liens, or leases) which ranks senior to or pari passu with the Series G Preferred Stock;

(d)   pay or declare any dividend or make any distribution on, or redeem or acquire any shares of capital stock of the Corporation other than repurchases of stock from former employees, officers, directors, consultants or other persons who performed services for the Corporation in connection with the cessation of such employment or service at the lower of the original purchase price or the then-current fair market value thereof;

(e)   effect an initial public offering that is not a Qualified Public Offering (as defined below);

14

(f)    make any material changes in the Corporation's business;

(g)    effect any Deemed Liquidation Event prior to third anniversary of the Series G Original Issue Date (as defined below) which does not result in a return to the holders of the Series G Preferred Stock of cash or tradeable securities with a value in excess of two times the Series G Issue Price per share; or

(h)    hire any individual as a Chief Executive Officer, Chief Financial Officer, Chief Technical Officer, Chief Operating Officer, Chief Merchant and Chief Marketing Officer, or equivalent position.

3.3.4.    <u>Series F Preferred Stock Protective Provisions</u>. The Corporation shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by law or the Certificate of Incorporation) the written consent or affirmative vote of a majority of the then outstanding shares of Series F Preferred Stock, given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a class, and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect:

(a)    enter into or become a party to any transaction with any director, officer or employee of the Corporation or any affiliate or immediate family member of any such person, other than for transactions made in the ordinary course of business and approved by the Board of Directors, including the Series F Director;

(b)    amend or waive any of the rights, preferences, or privileges of the Series F Preferred Stock;

(c)    authorize, incur, or issue any capital (including all guarantees, debts, liens, or leases) which ranks senior to or pari passu with the Series F Preferred Stock;

(d)    pay or declare any dividend or make any distribution on, or redeem or acquire any shares of capital stock of the Corporation other than repurchases of stock from former employees, officers, directors, consultants or other persons who performed services for the Corporation in connection with the cessation of such employment or service at the lower of the original purchase price or the then-current fair market value thereof;

(e)    effect an initial public offering that is not a Qualified Public Offering;

(f)    make any material changes in the Corporation's business;

(g)    effect any Deemed Liquidation Event prior to third anniversary of the Series F Original Issue Date which does not result in a return to the holders of the Series F Preferred Stock of cash or tradeable securities with a value in excess of two times the Series F Issue Price per share; or

15

(h)      hire any individual as a Chief Executive Officer, Chief Financial Officer, Chief Technical Officer, Chief Operating Officer, Chief Merchant and Chief Marketing Officer, or equivalent position.

3.3.5.    Series E Preferred Stock Protective Provisions. The Corporation shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by law or the Certificate of Incorporation) the written consent or affirmative vote of a majority of the then outstanding shares of Series E Preferred Stock, given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a class, and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect:

(a)      subject to Section 3.3.5(d) below, amend or waive any of the rights, preferences, or privileges of the Series E Preferred Stock in a manner that adversely affects the rights, preferences, or privileges of the Series E Preferred Stock in a manner different from the other series of Preferred Stock;

(b)      increase or decrease the authorized shares of Series E Preferred Stock;

(c)      reclassify, alter or amend any existing security of the Corporation, or create, or authorize the creation of any additional class or series of capital stock, unless the same ranks junior to the Series E Preferred Stock with respect to the distribution of assets on the liquidation, dissolution or winding up of the Corporation, and with respect to the payment of dividends and rights of redemption; or

(d)      alter, change or waive the provisions of the Corporation's Certificate of Incorporation in a manner that would reduce or eliminate the liquidation preference of the Series E Preferred Stock, or its seniority over the respective liquidation preferences of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, and Series D Preferred Stock.

4.    Optional Conversion.

The holders of Preferred Stock shall have conversion rights as follows (the "**Conversion Rights**"):

4.1    Right to Convert.

4.1.1.    Conversion Ratio. Each share of Preferred Stock shall be convertible, at the option of the holder thereof, at any time and from time to time, and without the payment of additional consideration by the holder thereof, into such number of fully paid and nonassessable shares of Common Stock as is determined by

16

dividing the applicable Issue Price by the applicable Conversion Price (as defined below) in effect at the time of conversion. The "**Conversion Price**" shall initially mean: (a) with respect to shares of Series H Preferred Stock, $6.8748 (the "**Series H Conversion Price**"), (b) with respect to shares of Series G Preferred Stock, $5.2850 (the "**Series G Conversion Price**"), (c) with respect to shares of Series F Preferred Stock, $3.3959 (the "**Series F Conversion Price**"), (d) with respect to shares of Series E Preferred Stock, $2.9440 (the "**Series E Conversion Price**"), (e) with respect to shares of Series D Preferred Stock, $2.79239 (the "**Series D Conversion Price**"), (f) with respect to shares of Series C Preferred Stock, $2.18403 (the "**Series C Conversion Price**"), (g) with respect to shares of Series B Preferred Stock, $1.025432 (the "**Series B Conversion Price**"), and (h) with respect to shares of Series A Preferred Stock, $0.48660 (the "**Series A Conversion Price**"). Such initial Conversion Prices, and the rate at which shares of Preferred Stock may be converted into shares of Common Stock, shall be subject to adjustment as provided below.

4.1.2.    <u>Termination of Conversion Rights</u>. In the event of a liquidation, dissolution or winding up of the Corporation or a Deemed Liquidation Event, the Conversion Rights shall terminate at the close of business on the last full day preceding the date fixed for the payment of any such amounts distributable on such event to the holders of Preferred Stock.

4.2    <u>Fractional Shares</u>. No fractional shares of Common Stock shall be issued upon conversion of Preferred Stock. In lieu of any fractional shares to which the holder would otherwise be entitled, the Corporation shall pay cash equal to such fraction multiplied by the fair market value of a share of Common Stock as determined in good faith by the Board of Directors of the Corporation. Whether or not fractional shares would be issuable upon such conversion shall be determined on the basis of the total number of shares of Preferred Stock the holder is at the time converting into Common Stock and the aggregate number of shares of Common Stock issuable upon such conversion.

4.3    <u>Mechanics of Conversion</u>.

4.3.1.    <u>Notice of Conversion</u>. In order for a holder of Preferred Stock to voluntarily convert shares of Preferred Stock into shares of Common Stock, such holder shall surrender the certificate or certificates for such shares of Preferred Stock (or, if such registered holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate), at the office of the transfer agent for the Preferred Stock (or at the principal office of the Corporation if the Corporation serves as its own transfer agent), together with written notice that such holder elects to convert all or any number of the shares of the Preferred Stock represented by such certificate or certificates and, if applicable, any event on

17

which such conversion is contingent. Such notice shall state such holder's name or the names of the nominees in which such holder wishes the certificate or certificates for shares of Common Stock to be issued. If required by the Corporation, certificates surrendered for conversion shall be endorsed or accompanied by a written instrument or instruments of transfer, in form satisfactory to the Corporation, duly executed by the registered holder or his, her or its attorney duly authorized in writing. The close of business on the date of receipt by the transfer agent (or by the Corporation if the Corporation serves as its own transfer agent) of such certificates (or lost certificate affidavit and agreement) and notice shall be the time of conversion (the "**Conversion Time**"), and the shares of Common Stock issuable upon conversion of the shares represented by such certificate shall be deemed to be outstanding of record as of such date. The Corporation shall, as soon as practicable after the Conversion Time, (i) issue and deliver to such holder of Preferred Stock, or to his, her or its nominees, a certificate or certificates for the number of full shares of Common Stock issuable upon such conversion in accordance with the provisions hereof and a certificate for the number (if any) of the shares of Preferred Stock represented by the surrendered certificate that were not converted into Common Stock, (ii) pay in cash such amount as provided in Section 4.2 in lieu of any fraction of a share of Common Stock otherwise issuable upon such conversion and (iii) pay all declared but unpaid dividends on the shares of Preferred Stock converted.

4.3.2.   Reservation of Shares. The Corporation shall at all times when the Preferred Stock shall be outstanding, reserve and keep available out of its authorized but unissued capital stock, for the purpose of effecting the conversion of the Preferred Stock, such number of its duly authorized shares of Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding Preferred Stock; and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Preferred Stock, the Corporation shall take such corporate action as may be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purposes, including, without limitation, engaging in best efforts to obtain the requisite stockholder approval of any necessary amendment to the Certificate of Incorporation. Before taking any action which would cause an adjustment reducing the Series A Conversion Price, Series B Conversion Price, Series C Conversion Price, Series D Conversion Price, Series E Conversion Price, Series F Conversion Price, Series G Conversion Price or Series H Conversion Price below the then par value of the shares of Common Stock issuable upon conversion of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock, Series G Preferred Stock or Series H Preferred Stock, as applicable, the Corporation will take any corporate action which may, in the opinion of its counsel, be necessary in order that the Corporation may validly and legally issue fully paid and nonassessable shares of Common Stock at such adjusted Series A Conversion Price, Series B Conversion Price, Series C Conversion Price, Series D Conversion Price, Series E Conversion Price, Series F Conversion Price, Series G Conversion Price or Series H Conversion Price.

18

4.3.3.    <u>Effect of Conversion</u>. All shares of Preferred Stock which shall have been surrendered for conversion as herein provided shall no longer be deemed to be outstanding and all rights with respect to such shares shall immediately cease and terminate at the Conversion Time, except only the right of the holders thereof to receive shares of Common Stock in exchange therefor, to receive payment in lieu of any fraction of a share otherwise issuable upon such conversion as provided in <u>Section 4.2</u> and to receive payment of any dividends declared but unpaid thereon. Any shares of Preferred Stock so converted shall be retired and cancelled and may not be reissued as shares of such series, and the Corporation may thereafter take such appropriate action (without the need for stockholder action) as may be necessary to reduce the authorized number of shares of Preferred Stock (and applicable series of Preferred Stock) accordingly.

4.3.4.    <u>No Further Adjustment</u>. Upon any such conversion, no adjustment to the Conversion Price shall be made for any declared but unpaid dividends on the Preferred Stock surrendered for conversion or on the Common Stock delivered upon conversion.

4.3.5.    <u>Taxes</u>. The Corporation shall pay any and all issue and other similar taxes that may be payable in respect of any issuance or delivery of shares of Common Stock upon conversion of shares of Preferred Stock pursuant to this <u>Section 4</u>. The Corporation shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of shares of Common Stock in a name other than that in which the shares of Preferred Stock so converted were registered, and no such issuance or delivery shall be made unless and until the person or entity requesting such issuance has paid to the Corporation the amount of any such tax or has established, to the satisfaction of the Corporation, that such tax has been paid.

4.4    <u>Adjustments to Conversion Price for Diluting Issues</u>.

4.4.1.    <u>Special Definitions</u>. For purposes of this Article FOURTH, the following definitions shall apply:

(a)    "**Option**" shall mean rights, options or warrants to subscribe for, purchase or otherwise acquire Common Stock or Convertible Securities.

(b)    "**Series F Original Issue Date**" shall mean the date on which the first share of Series F Preferred Stock was issued.

(c)    "**Series G Original Issue Date**" shall mean the date on which the first share of Series G Preferred Stock was issued.

19

(d)    "**Series H Original Issue Date**" shall mean the date on which the first share of Series H Preferred Stock was issued.

(e)    "**Convertible Securities**" shall mean any evidences of indebtedness, shares or other securities directly or indirectly convertible into or exchangeable for Common Stock, but excluding Options.

(f)    "**Additional Shares of Common Stock**" shall mean all shares of Common Stock issued (or, pursuant to Section 4.4.3 below, deemed to be issued) by the Corporation after the Series H Original Issue Date, other than (1) the following shares of Common Stock and (2) shares of Common Stock deemed issued pursuant to the following Options and Convertible Securities (clauses (1) and (2), collectively, "**Exempted Securities**"):

(i)    shares of Common Stock, Options or Convertible Securities issued as a dividend or distribution on Preferred Stock;

(ii)    shares of Common Stock, Options or Convertible Securities issued by reason of a dividend, stock split, split-up or other distribution on shares of Common Stock that is covered by Section 4.5, 4.6, 4.7 or 4.8;

(iii)    shares of Common Stock or Options issued to employees or directors of, or consultants or advisors to, the Corporation or any of its subsidiaries pursuant to a plan, agreement or arrangement for the primary purpose of soliciting or retaining their services approved by the Board of Directors of the Corporation, including (A) the Series A Director (B) the Series D Director, (C) the Series F Director, and (D) the Series G Director;

(iv)    shares of Common Stock or Convertible Securities actually issued upon the exercise of Options or shares of Common Stock actually issued upon the conversion or exchange of Convertible Securities, in each case provided such issuance is pursuant to the terms of such Option or Convertible Security;

(v)    shares of Common Stock, Options or Convertible Securities issued to banks, equipment lessors or other financial institutions, or to real property lessors, pursuant to a debt financing, equipment leasing or real property leasing transaction, entered into for non-equity financing purposes, approved by the Board of Directors of the Corporation, including (A) the Series A Director (B) the Series D Director, (C) the Series F Director, and (D) the Series G Director;

(vi)    shares of Common Stock, Options or Convertible Securities issued to suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions approved by the Board of Directors of the Corporation, including ((A) the Series A Director (B) the Series D Director, (C) the Series F Director, and (D) the Series G Director;

20

(vii)     shares of Common Stock, Options or Convertible Securities issued in connection with the acquisition of another corporation by the Corporation by merger, purchase of substantially all of the assets or other reorganization or to a joint venture agreement, provided, that such issuances are approved by the Board of Directors of the Corporation, including (A) the Series A Director (B) the Series D Director, (C) the Series F Director, and (D) the Series G Director;

(viii)     shares of Common Stock, Options or Convertible Securities issued in connection with a Qualified Public Offering (defined below); or

(ix)     shares of Common Stock, Options or Convertible Securities issued in connection with sponsored research, collaboration, technology license, development, OEM, marketing or other similar agreements or strategic partnerships entered into for primarily non-equity financing purposes approved by the Board of Directors of the Corporation, including (A) the Series A Director (B) the Series D Director, (C) the Series F Director, and (D) the Series G Director.

4.4.2.     No Adjustment of Conversion Price. No adjustment in the Conversion Price shall be made as the result of the issuance or deemed issuance of Additional Shares of Common Stock if the Corporation receives, prospectively or retroactively and either generally or in a particular instance, the consent of, the vote of, or written notice from the holders of a majority of the then outstanding shares of Preferred Stock (including each of the holders of a majority of the then outstanding shares of Series B Preferred Stock, the holders of a majority of the then outstanding shares of Series E Preferred Stock, the holders of a majority of the then outstanding shares of Series F Preferred Stock, the holders of a majority of the then outstanding shares of Series G Preferred Stock, and the holders of a majority of the then outstanding shares of Series H Preferred Stock) agreeing that no such adjustment shall be made as the result of the issuance or deemed issuance of such Additional Shares of Common Stock. Any such waiver shall bind all future holders of Preferred Stock.

4.4.3.     Deemed Issue of Additional Shares of Common Stock.

(a)     If the Corporation at any time or from time to time after the Series H Original Issue Date shall issue any Options or Convertible Securities (excluding Options or Convertible Securities which are themselves Exempted Securities) or shall fix a record date for the determination of holders of any class of securities entitled to receive any such Options or Convertible Securities, then the maximum number of shares of Common Stock (as set forth in the instrument relating thereto, assuming the satisfaction of any conditions to exercisability, convertibility or

21

exchangeability but without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or, in the case of Convertible Securities and Options therefor, the conversion or exchange of such Convertible Securities, shall be deemed to be Additional Shares of Common Stock issued as of the time of such issue or, in case such a record date shall have been fixed, as of the close of business on such record date.

(b)     If the terms of any Option or Convertible Security, the issuance of which resulted in an adjustment to an applicable Conversion Price pursuant to the terms of Section 4.4.4, are revised as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (1) any increase or decrease in the number of shares of Common Stock issuable upon the exercise, conversion and/or exchange of any such Option or Convertible Security or (2) any increase or decrease in the consideration payable to the Corporation upon such exercise, conversion and/or exchange, then, effective upon such increase or decrease becoming effective, the applicable Conversion Price computed upon the original issue of such Option or Convertible Security (or upon the occurrence of a record date with respect thereto) shall be readjusted to such Conversion Price as would have obtained had such revised terms been in effect upon the original date of issuance of such Option or Convertible Security. Notwithstanding the foregoing, no readjustment pursuant to this clause (b) shall have the effect of increasing any applicable Conversion Price to an amount which exceeds the lower of (i) the applicable Conversion Price in effect immediately prior to the original adjustment made as a result of the issuance of such Option or Convertible Security, or (ii) the applicable Conversion Price that would have resulted from any issuances of Additional Shares of Common Stock (other than deemed issuances of Additional Shares of Common Stock as a result of the issuance of such Option or Convertible Security) between the original adjustment date and such readjustment date.

(c)     If the terms of any Option or Convertible Security (excluding Options or Convertible Securities which are themselves Exempted Securities), the issuance of which did not result in an adjustment to an applicable Conversion Price pursuant to the terms of Section 4.4.4 (either because the consideration per share (determined pursuant to Section 4.4.5) of the Additional Shares of Common Stock subject thereto was equal to or greater than such Conversion Price then in effect, or because such Option or Convertible Security was issued before the Series H Original Issue Date), are revised after the Series H Original Issue Date as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding

22

automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (1) any increase in the number of shares of Common Stock issuable upon the exercise, conversion or exchange of any such Option or Convertible Security or (2) any decrease in the consideration payable to the Corporation upon such exercise, conversion or exchange, then such Option or Convertible Security, as so amended or adjusted, and the Additional Shares of Common Stock subject thereto (determined in the manner provided in Section 4.4.3(a) shall be deemed to have been issued effective upon such increase or decrease becoming effective.

(d)     Upon the expiration or termination of any unexercised Option or unconverted or unexchanged Convertible Security (or portion thereof) which resulted (either upon its original issuance or upon a revision of its terms) in an adjustment to an applicable Conversion Price pursuant to the terms of Section 4.4.4, the applicable Conversion Price shall be readjusted to such Conversion Price as would have obtained had such Option or Convertible Security (or portion thereof) never been issued.

(e)     If the number of shares of Common Stock issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Corporation upon such exercise, conversion and/or exchange, is calculable at the time such Option or Convertible Security is issued or amended but is subject to adjustment based upon subsequent events, any adjustment to the applicable Conversion Price provided for in this Section 4.4.3 shall be effected at the time of such issuance or amendment based on such number of shares or amount of consideration without regard to any provisions for subsequent adjustments (and any subsequent adjustments shall be treated as provided in clauses (b) and (c) of this Section 4.4.3). If the number of shares of Common Stock issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Corporation upon such exercise, conversion and/or exchange, cannot be calculated at all at the time such Option or Convertible Security is issued or amended, any adjustment to such Conversion Price that would result under the terms of this Section 4.4.3 at the time of such issuance or amendment shall instead be effected at the time such number of shares and/or amount of consideration is first calculable (even if subject to subsequent adjustments), assuming for purposes of calculating such adjustment to such Conversion Price that such issuance or amendment took place at the time such calculation can first be made.

4.4.4.     Adjustment of Conversion Price Upon Issuance of Additional Shares of Common Stock. In the event the Corporation shall at any time after the Series H Original Issue Date issue Additional Shares of Common Stock (including Additional Shares of Common Stock deemed to be issued pursuant to Section

23

4.4.3), without consideration or for a consideration per share less than an applicable Conversion Price in effect immediately prior to such issue of Additional Shares of Common Stock, then such Conversion Price shall be reduced, concurrently with such issue, to a price (calculated to the nearest one-hundredth of a cent) determined in accordance with the following formula:

$$CP2 = CP1 * (A + B) \div (A + C).$$

For purposes of the foregoing formula, the following definitions shall apply:

(a)  "CP2" shall mean the applicable Conversion Price in effect immediately after such issue of Additional Shares of Common Stock;

(b)  "CP1" shall mean the applicable Conversion Price in effect immediately prior to such issue of Additional Shares of Common Stock;

(c)  "A" shall mean the number of shares of Common Stock outstanding immediately prior to such issue of Additional Shares of Common Stock (treating for this purpose as outstanding all shares of Common Stock issuable upon exercise of Options outstanding immediately prior to such issue or upon conversion or exchange of Convertible Securities (including the Preferred Stock) outstanding (assuming exercise of any outstanding Options therefor) immediately prior to such issue);

(d)  "B" shall mean the number of shares of Common Stock that would have been issued if such Additional Shares of Common Stock had been issued at a price per share equal to CP1 (determined by dividing the aggregate consideration received by the Corporation in respect of such issue by CP1); and

(e)  "C" shall mean the number of such Additional Shares of Common Stock issued in such transaction.

4.4.5.  Determination of Consideration. For purposes of this Section 4.4, the consideration received by the Corporation for the issue of any Additional Shares of Common Stock shall be computed as follows:

(a)  Cash and Property: Such consideration shall:

(i)  insofar as it consists of cash, be computed at the aggregate amount of cash received by the Corporation, excluding amounts paid or payable for accrued interest;

(ii)  insofar as it consists of property other than cash, be computed at the fair market value thereof at the time of such issue, as determined in good faith by the Board of Directors of the Corporation, including (A) the Series A Director (B) the Series D Director, (C) the Series F Director, and (D) the Series G Director; and

24

> > > (iii) in the event Additional Shares of Common Stock are issued together with other shares or securities or other assets of the Corporation for consideration which covers both, be the proportion of such consideration so received, computed as provided in clauses (i) and (ii) above, as determined in good faith by the Board of Directors of the Corporation, including (A) the Series A Director (B) the Series D Director, (C) the Series F Director, and (D) the Series G Director.
> >
> > (b) Options and Convertible Securities. The consideration per share received by the Corporation for Additional Shares of Common Stock deemed to have been issued pursuant to Section 4.4.3, relating to Options and Convertible Securities, shall be determined by dividing
> >
> > > (i) the total amount, if any, received or receivable by the Corporation as consideration for the issue of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such consideration) payable to the Corporation upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities, by
> > >
> > > (ii) the maximum number of shares of Common Stock (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities.

> 4.4.6. Multiple Closing Dates. In the event the Corporation shall issue on more than one date Additional Shares of Common Stock that are a part of one transaction or a series of related transactions and that would result in an adjustment to an applicable Conversion Price pursuant to the terms of Section 4.4.4 then, upon the final such issuance, such Conversion Price shall be readjusted to give effect to all such issuances as if they occurred on the date of the first such issuance (and without giving effect to any additional adjustments as a result of any such subsequent issuances within such period).

4.5 Adjustment for Stock Splits and Combinations. If the Corporation shall at any time or from time to time after the Series H Original Issue Date effect a subdivision of the outstanding Common Stock, the Conversion Price in effect immediately before that subdivision shall be proportionately decreased so that the number of shares of

25

Common Stock issuable on conversion of each share of such series shall be increased in proportion to such increase in the aggregate number of shares of Common Stock outstanding. If the Corporation shall at any time or from time to time after the Series H Original Issue Date combine the outstanding shares of Common Stock, the Conversion Price in effect immediately before the combination shall be proportionately increased so that the number of shares of Common Stock issuable on conversion of each share of such series shall be decreased in proportion to such decrease in the aggregate number of shares of Common Stock outstanding. Any adjustment under this Section shall become effective at the close of business on the date the subdivision or combination becomes effective.

4.6    <u>Adjustment for Certain Dividends and Distributions</u>. In the event the Corporation at any time or from time to time after the Series H Original Issue Date shall make or issue, or fix a record date for the determination of holders of Common Stock entitled to receive, a dividend or other distribution payable on the Common Stock in additional shares of Common Stock, then and in each such event the Conversion Price in effect immediately before such event shall be decreased as of the time of such issuance or, in the event such a record date shall have been fixed, as of the close of business on such record date, by multiplying the Conversion Price then in effect by a fraction:

(1)    the numerator of which shall be the total number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance or the close of business on such record date, and

(2)    the denominator of which shall be the total number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance or the close of business on such record date plus the number of shares of Common Stock issuable in payment of such dividend or distribution.

Notwithstanding the foregoing, (a) if such record date shall have been fixed and such dividend is not fully paid or if such distribution is not fully made on the date fixed therefor, the Conversion Price shall be recomputed accordingly as of the close of business on such record date and thereafter the Conversion Price shall be adjusted pursuant to this Section as of the time of actual payment of such dividends or distributions; and (b) that no such adjustment shall be made if the holders of Preferred Stock simultaneously receive a dividend or other distribution of shares of Common Stock in a number equal to the number of shares of Common Stock as they would have received if all outstanding shares of Preferred Stock had been converted into Common Stock on the date of such event.

4.7    <u>Adjustments for Other Dividends and Distributions</u>. In the event the Corporation at any time or from time to time after the Series H Original Issue Date shall make or issue, or fix a record date for the determination of holders of Common Stock entitled to receive, a dividend or other distribution payable in securities of the Corporation (other than a distribution of shares of Common Stock in respect of outstanding shares

26

of Common Stock) or in other property and the provisions of Section 1 do not apply to such dividend or distribution, then and in each such event the holders of Preferred Stock shall receive, simultaneously with the distribution to the holders of Common Stock, a dividend or other distribution of such securities or other property in an amount equal to the amount of such securities or other property as they would have received if all outstanding shares of Preferred Stock had been converted into Common Stock on the date of such event.

4.8    Adjustment for Merger or Reorganization, etc. Subject to the provisions of Section 2.5, if there shall occur any reorganization, recapitalization, reclassification, consolidation or merger involving the Corporation in which the Common Stock (but not the Preferred Stock) is converted into or exchanged for securities, cash or other property (other than a transaction covered by Sections 4.4, 4.6 or 4.7), then, following any such reorganization, recapitalization, reclassification, consolidation or merger, each share of Preferred Stock shall thereafter be convertible in lieu of the Common Stock into which it was convertible prior to such event into the kind and amount of securities, cash or other property which a holder of the number of shares of Common Stock of the Corporation issuable upon conversion of one share of Preferred Stock immediately prior to such reorganization, recapitalization, reclassification, consolidation or merger would have been entitled to receive pursuant to such transaction; and, in such case, appropriate adjustment (as determined in good faith by the Board of Directors of the Corporation) shall be made in the application of the provisions in this Section 4 with respect to the rights and interests thereafter of the holders of the Preferred Stock, to the end that the provisions set forth in this Section 4 (including provisions with respect to changes in and other adjustments of the applicable Conversion Price) shall thereafter be applicable, as nearly as reasonably may be, in relation to any securities or other property thereafter deliverable upon the conversion of the Preferred Stock. For the avoidance of doubt, nothing in this Section 4.8 shall be construed as preventing the holders of Preferred Stock from seeking any appraisal rights to which they are otherwise entitled under the DGCL in connection with a merger triggering an adjustment hereunder, nor shall this Section 4.8 be deemed conclusive evidence of the fair value of the shares of Preferred Stock in any such appraisal proceeding.

4.9    Possible Adjustment of Conversion Price of Series H Preferred Stock. In the event of a Qualified Public Offering (defined in Section 5.1 below) in which the initial price per share to the public for the Company's Common Stock as set forth in the prospectus for such Qualified Public Offering is less than the Series H Issue Price, then the holders of Series H Preferred Stock shall be entitled to, and the Company shall elect, one of the following: (a) the Series H Conversion Price will be adjusted such that as of immediately prior to the completion of such Qualified Public Offering the number of shares of Common Stock issuable upon conversion of the shares of Series H Preferred Stock will be equal to the aggregate Series H Issue Price of the Series H Preferred Stock, (b) a cash payment will be made to the holders of the Series H Preferred Stock such that the value of the shares of Common Stock issuable upon conversion of the shares of Series H Preferred Stock as of immediately prior to the completion of such Qualified Public Offering plus the cash payment will equal one times (1x) the

27

aggregate Series H Issue Price of the Series H Preferred Stock, or (c) any combination thereof. The rights of the Series H Preferred Stock set forth in the immediately preceding sentence shall terminate 18 months after the Series H Original Issue Date.

4.10    <u>Certificate as to Adjustments</u>. Upon the occurrence of each adjustment or readjustment of the Conversion Price pursuant to this <u>Section 4</u>, the Corporation at its expense shall, as promptly as reasonably practicable but in any event not later than ten (10) days thereafter, compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of Preferred Stock a certificate setting forth such adjustment or readjustment (including the kind and amount of securities, cash or other property into which the Preferred Stock is convertible) and showing in detail the facts upon which such adjustment or readjustment is based. The Corporation shall, as promptly as reasonably practicable after the written request at any time of any holder of Preferred Stock (but in any event not later than ten (10) days thereafter), furnish or cause to be furnished to such holder a certificate setting forth (i) the applicable Conversion Price then in effect, and (ii) the number of shares of Common Stock and the amount, if any, of other securities, cash or property which then would be received upon the conversion of the applicable series of Preferred Stock.

4.11    <u>Notice of Record Date</u>. In the event:

(a)    the Corporation shall take a record of the holders of its Common Stock (or other capital stock or securities at the time issuable upon conversion of the Preferred Stock) for the purpose of entitling or enabling them to receive any dividend or other distribution, or to receive any right to subscribe for or purchase any shares of capital stock of any class or any other securities, or to receive any other security; or

(b)    of any capital reorganization of the Corporation, any reclassification of the Common Stock of the Corporation, or any Deemed Liquidation Event; or

(c)    of the voluntary or involuntary dissolution, liquidation or winding-up of the Corporation,

then, and in each such case, the Corporation will send or cause to be sent to the holders of the Preferred Stock a notice specifying, as the case may be, (i) the record date for such dividend, distribution or right, and the amount and character of such dividend, distribution or right, or (ii) the effective date on which such reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up is proposed to take place, and the time, if any is to be fixed, as of which the holders of record of Common Stock (or such other capital stock or securities at the time issuable upon the conversion of the Preferred Stock) shall be entitled to exchange their shares of Common Stock (or such other capital stock or securities) for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up, and the amount per share and character of such exchange applicable to the Preferred Stock and the Common Stock. Such notice shall be sent at least 10 days prior to the record date or effective date for the event specified in such notice.

28

5.    Mandatory Conversion.

5.1    Trigger Events. Upon either (a) the closing of the sale of shares of Common Stock to the public on the New York Stock Exchange or the NASDAQ (National Market) in a firm-commitment underwritten public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended, resulting in at least $50,000,000 of net proceeds to the Corporation and a price per share that is at least 1.75 times the Series G Issue Price (**"Qualified Public Offering"**) to the Corporation; or (b) the date and time, or the occurrence of an event, specified by vote or written consent of the Requisite Holders (the time of such closing or the date and time specified or the time of the event specified in such vote or written consent is referred to herein as the "**Mandatory Conversion Time**"), (i) all outstanding shares of Preferred Stock shall automatically be converted into shares of Common Stock, at the then effective conversion rate and (ii) such shares may not be reissued by the Corporation; provided, however, that no conversion of the shares of Series E Preferred Stock pursuant to Section 5.1(b) shall occur without the approval of the holders of a majority of the then outstanding shares of Series E Preferred Stock, no conversion of the shares of Series F Preferred Stock pursuant to Section 5.1(b) shall occur without the approval of the holders of a majority of the then outstanding shares of Series F Preferred Stock, and no conversion of the shares of Series G Preferred Stock pursuant to Section 5.1(b) shall occur without the approval of the holders of a majority of the then outstanding shares of Series G Preferred Stock.

5.2    Procedural Requirements. All holders of record of shares of Preferred Stock shall be sent written notice of the Mandatory Conversion Time and the place designated for mandatory conversion of all such shares of Preferred Stock pursuant to this Section 5. Such notice need not be sent in advance of the occurrence of the Mandatory Conversion Time. Upon receipt of such notice, each holder of shares of Preferred Stock shall surrender his, her or its certificate or certificates for all such shares (or, if such holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate) to the Corporation at the place designated in such notice. If so required by the Corporation, certificates surrendered for conversion shall be endorsed or accompanied by written instrument or instruments of transfer, in form satisfactory to the Corporation, duly executed by the registered holder or by his, her or its attorney duly authorized in writing. All rights with respect to the Preferred Stock converted pursuant to Section 5.1, including the rights, if any, to receive notices and vote (other than as a holder of Common Stock), will terminate at the Mandatory Conversion Time (notwithstanding the failure of the holder or holders thereof to surrender the certificates at or prior to such time), except only the rights of the holders thereof, upon surrender of their certificate or certificates (or lost certificate affidavit and agreement) therefor, to receive the items provided for in the next sentence of this Section 5.2. As soon as practicable after the Mandatory Conversion Time and the surrender of the certificate or certificates (or lost certificate affidavit and agreement) for Preferred Stock, the Corporation shall issue and deliver to such holder, or to his, her or its nominees, a

29

certificate or certificates for the number of full shares of Common Stock issuable on such conversion in accordance with the provisions hereof, together with cash as provided in Section 4.2 in lieu of any fraction of a share of Common Stock otherwise issuable upon such conversion and the payment of any declared but unpaid dividends on the shares of Preferred Stock converted. Such converted Preferred Stock shall be retired and cancelled and may not be reissued as shares of such series, and the Corporation may thereafter take such appropriate action (without the need for stockholder action) as may be necessary to reduce the authorized number of shares of Preferred Stock accordingly.

6.    Redemption.

6.1    Redemption Right. Unless prohibited by Delaware law governing distributions to stockholders, at any time after the five (5) year anniversary of the Series G Original Issue Date, each of (i) PWP Growth Equity Fund II LP and its affiliates and/or (ii) Great Hill Equity Partners V, L.P. and its affiliates (each, a "**Redemption Stockholder**") shall have the one-time right, exercisable jointly with the other Redemption Stockholder or independently, as determined by each Redemption Stockholder (such right, the "**Redemption Right**") to request the Corporation to redeem all or any portion of the outstanding shares of the Series H Preferred Stock, Series G Preferred Stock and/or Series F Preferred Stock held by such Redemption Stockholder (the "**Redemption Stock**"), for a per share purchase price equal to the greater of (i) the Series H Issue Price, Series G Issue Price or the Series F Issue Price, plus any Series H Accruing Dividends, Series G Accruing Dividends or Series F Accruing Dividends accrued but unpaid thereon, as applicable, and (ii) the Fair Market Value (determined in the manner set forth below) of a single share of Series H Preferred Stock, Series G Preferred Stock or Series F Preferred Stock, as applicable (with respect to each series, as applicable, the "**Redemption Price**"), as of the date of the Corporation's receipt of the written notice requesting redemption of the applicable Redemption Stock (the "**Redemption Request**") from such Redemption Stockholder (the "**Requesting Redemption Stockholder**"); provided, that notwithstanding the foregoing, each such share shall continue to accrue dividends in accordance with Section 6.7 until such date as such share is actually redeemed.

6.2    Additional Redemption Right. If a Redemption Request is made, then (i) the Corporation shall promptly following receipt of such Redemption Request send notice of such Redemption Request to GCEV Co-Invest TRR, L.P. and its affiliates (each an "**Additional Redemption Stockholder**") and (ii) each Additional Redemption Stockholder shall also thereafter have the one-time right, exercisable jointly with the Redemption Stockholders, and on the same economic terms as the Redemption Stockholders (expressly excluding the rights of the Redemption Stockholders as set forth in Section 6.9 below), to request the Corporation to redeem all or any portion of the outstanding shares of the Series H Preferred Stock held by such Additional Redemption Stockholder for a per share purchase price equal to the Redemption Price, as of the date of the Redemption Request; provided, that notwithstanding the foregoing, each such share shall continue to accrue dividends in accordance with Section 6.7 until such date as such share is actually redeemed. For clarity, no Additional Redemption Stockholder shall have the right to initiate a Redemption Request.

30

6.3    Redemption Notice. Within twenty (20) days after the first receipt of a Redemption Request, the Corporation shall send written notice of such Redemption Request (the "**Redemption Notice**") to all other holders of Series F Preferred Stock, Series G Preferred Stock and Series H Preferred Stock (collectively, the "**Series F/G/H Rights Holders**"). Each Redemption Notice shall state:

(a)    the number of shares of the Redemption Stock held by the applicable Requesting Redemption Stockholder that the Corporation shall redeem on the Redemption Date specified in the Redemption Notice;

(b)    the estimated Redemption Date (as defined below) and, to the extent that it has been determined or agreed upon, the Redemption Price;

(c)    the date upon which the Series F/G/H Rights Holders' right to convert such shares terminates (as determined in accordance with Section 4.1); and

(d)    for holders of shares in certificated form, that the holder is to surrender to the Corporation, in the manner and at the place designated, its certificate or certificates representing the shares of stock to be redeemed.

6.4    Coterminous Redemption Right. The Series F/G/H Rights Holders shall have twenty (20) days after the first receipt of the Redemption Notice to exercise a coterminous redemption right with respect to the Series F Preferred Stock, the Series G Preferred Stock and/or Series H Preferred Stock held by such Series F/G/H Rights Holders, with all such shares of Series F Preferred Stock, Series G Preferred Stock and/or Series H Preferred Stock to be redeemed constituting the "**Series F/G/H Participating Redemption Stock**". In the event that more than one Redemption Stockholder or Series F/G/H Rights Holder exercises its Redemption Right, the Redemption Stockholders and Series F/G/H Rights Holders shall receive the total Redemption Price, on a pro rata, pari passu basis. All provisions applicable to the Requesting Redemption Stockholder shall apply, *mutatis mutandis*, to such additional holders, including, without limitation, the same Redemption Date and the same Redemption Price, as of such Redemption Date, except for (i) the right of the Redemption Stockholders to request the redemption pursuant to Section 6.1, and (ii) the right to exercise any of the remedies pursuant to Section 6.9, which in each case shall only be exercisable by each Redemption Stockholder. For the avoidance of doubt, if the Corporation does not receive such written notice within the time limitations set forth above with respect to the first Redemption Request received by the Corporation, the applicable shares of Series F Preferred Stock, Series G Preferred Stock and Series H Preferred Stock registered on the books of the Corporation in the name of all Series F/G/H Rights Holders who are not themselves Redemption Stockholders (it being understood that a non-participating Redemption Stockholder shall retain its one-time Redemption Right if not exercised at such time) at the time of the Corporation's receipt

31

of the first Redemption Request shall thereafter be "**Excluded Shares.**" Excluded Shares shall not be redeemed or redeemable pursuant to this <u>Section 6</u> whether on such Redemption Date or thereafter. The redemption of the Redemption Stock and Series F/G/H Participating Redemption Stock, if any, shall occur within twelve (12) months following receipt of the Redemption Request by the Corporation. The Corporation shall apply all of its assets to any such redemption, and to no other corporate purpose, except to the extent prohibited by Delaware law governing distributions to stockholders. For purposes of this <u>Section 6</u>, the "Fair Market Value" of a single share of Series F Preferred Stock, Series G Preferred Stock or Series H Preferred Stock shall be the value of a single share of Series F Preferred Stock, Series G Preferred Stock or Series H Preferred Stock as mutually agreed upon by the Corporation and the Redemption Stockholder(s) that have exercised their Redemption Rights, and, in the event that the parties are unable to reach agreement, by a nationally recognized investment bank reasonably acceptable to each of the Corporation and the Redemption Stockholders (in each case, assuming an arms' length sale of the Series G Preferred Stock, Series F Preferred Stock, and/or Series H Preferred Stock as applicable, by a willing buyer to a willing seller and without discounts for minority interests, marketability, the inherent lack of liquidity of nonpublic minority interests or similar discounts). The date of the redemption shall be referred to as a "**Redemption Date.**" On the Redemption Date, the Corporation shall redeem, on a pro rata, pari passu basis in accordance with the number of shares of the Redemption Stock and Series F/G/H Participating Redemption Stock owned by each Redemption Stockholder and Series F/G/H Rights Holders that have exercised the Redemption Right or the coterminous Redemption Right. If on the Redemption Date Delaware law governing distributions to stockholders prevents the Corporation from redeeming all shares of the Redemption Stock and Series F/G/H Participating Redemption Stock to be redeemed, the Corporation shall ratably redeem the maximum number of shares that it may redeem consistent with such law, and shall redeem the remaining shares as soon as it may lawfully do so under such law. From and after the delivery of a Redemption Request, (a) in the event there is more than one Redemption Stockholder exercising the Redemption Right, any action to be taken or decision made pursuant to this <u>Section 6</u> by such Redemption Stockholders shall be taken or made by the mutual agreement of the Redemption Stockholders, and (b) in the event there is only one Redemption Stockholder exercising the Redemption Right, any action to be taken or decision made pursuant to this <u>Section 6</u> by such Redemption Stockholder shall be taken or made in the discretion of such Redemption Stockholder, and in the case of each of clauses (a) and (b), such action or decision shall be binding on all other Series F/G/H Rights Holders exercising the coterminous Redemption Right.

6.5    <u>Surrender of Certificates; Payment</u>. On or before the applicable Redemption Date, each holder of shares of the Redemption Stock or Series F/G/H Participating Redemption Stock to be redeemed on such Redemption Date shall, if a holder of shares in certificated form, surrender the certificate or certificates representing such shares (or, if such registered holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate)

32

to the Corporation, in the manner and at the place designated in the Redemption Notice, and thereupon the Redemption Price for such shares shall be payable to the order of the person whose name appears on such certificate or certificates as the owner thereof. In the event less than all of the shares of the Redemption Stock or Series F/G/H Participating Redemption Stock represented by a certificate are redeemed, a new certificate, instrument, or book entry representing the unredeemed shares of the Redemption Stock or Series F/G/H Participating Redemption Stock shall promptly be issued to such holder.

6.6     <u>Rights Subsequent to Redemption</u>. If the Redemption Notice shall have been duly given, and if on the applicable Redemption Date the Redemption Price payable upon redemption of the shares of the Redemption Stock and Series F/G/H Participating Redemption Stock, if any, to be redeemed on such Redemption Date is paid or tendered for payment or deposited with an independent payment agent so as to be available therefor in a timely manner, then notwithstanding that any certificates evidencing any of the shares of the Redemption Stock and Series F/G/H Participating Redemption Stock so called for redemption shall not have been surrendered, dividends with respect to such shares of the Redemption Stock and Series F/G/H Participating Redemption Stock shall cease to accrue after such Redemption Date and all rights with respect to such shares shall forthwith after the Redemption Date terminate, except only the right of the holders to receive the Redemption Price without interest upon surrender of any such certificate or certificates therefor.

6.7     <u>Rights Prior to Complete Redemption</u>. Until such time as the Redemption Stock or Series F/G/H Participating Redemption Stock to be redeemed pursuant to this <u>Section 6</u> has been completely redeemed, the holders of the Redemption Stock will continue to have all rights accorded to it at the Series H Original Issue Date, as such rights may have been amended with the written consent of the holders of a majority of the outstanding Series H Preferred Stock, Series G Preferred Stock or Series F Preferred Stock, as applicable, including, without limitation, the applicable Accruing Dividends with respect to such series of Preferred Stock.

6.8     <u>Insufficient Funds</u>. If on the Redemption Date Delaware law governing distributions to stockholders prevents the Corporation from redeeming all shares of the Redemption Stock and Series F/G/H Participating Redemption Stock to be redeemed, the Corporation shall take any action necessary or appropriate, to the extent reasonably within its control, to remove promptly any impediments to its ability to redeem the total number of shares of the Redemption Stock and Series F/G/H Participating Redemption Stock required to be so redeemed, including, without limitation, incurring any indebtedness necessary to make such redemption, and in any event, use any funds to redeem consistent with such law the maximum possible number of such shares from the holders of such shares to be redeemed in proportion to the respective number of such shares that otherwise would have been redeemed if all such shares had been redeemed in full. At any time thereafter when Delaware law governing distributions to stockholders does not prohibit the Corporation to redeem such shares of the Redemption Stock and Series F/G/H Participating Redemption Stock, the Corporation shall immediately use its funds to redeem the balance of the shares that the Corporation became obligated to redeem on the Redemption Date (but which it has not yet redeemed) at such Redemption Price.

33

6.9    <u>Sale of Corporation and Special Board Appointment Right</u>. In the event that the redemption provided in this <u>Section 6</u> does not occur within twelve (12) months following the Corporation's receipt of the Redemption Request, the Requesting Redemption Stockholder exercising the Redemption Right (or, if more than one Redemption Stockholder exercises its Redemption Right, such Redemption Stockholders) shall (i) have the right to require the Corporation to seek to effectuate and consummate a Sale of the Company (as such term is defined in that certain Seventh Amended and Restated Voting Agreement dated on or about the Series H Original Issue Date, by and among the Corporation and the other parties thereto (the "**Voting Agreement**")) on terms and conditions as approved by the Board of Directors under the applicable Delaware law and satisfactory to such Redemption Stockholder(s) (a "**Redemption Sale**"), and for the avoidance of doubt, a Redemption Sale shall be treated as a Sale of the Company for all purposes in the Voting Agreement; or to solicit third party purchasers of the Redemption Stock and Series F/G/H Participating Redemption Stock (and any transfer restrictions, including, without limitation Section 2.12 of that certain Seventh Amended and Restated Investors' Rights Agreement of the Corporation (as may be amended, restated, modified and/or supplemented from time to time, other than the restrictions under the applicable securities laws, would not apply to any sale to such purchasers), in each case, on terms and conditions satisfactory to such Requesting Redemption Stockholders, (ii) be entitled to nominate a majority of the members of the Board of Directors until the Redemption Right of such Requesting Redemption Stockholders has been satisfied in full (such right, the "**Special Board Appointment Right**"), and (iii) be entitled to exercise the right to approve a Sale of the Company pursuant to Section 3.2(i)(A) of the Voting Agreement). The Company shall cause the size of the Board of Directors to be increased in connection with the exercise the Special Board Appointment Right pursuant to this <u>Section 6.9</u> such that such Requesting Redemption Stockholders will be able to nominate the majority of the members of the Board of Directors (including the Series G Director, the Series F Director or both of them designated by such Requesting Redemption Stockholders pursuant to <u>Sections</u> <u>3.2.1</u> and <u>3.2.2</u>, as applicable).

(a)    The period beginning on the Redemption Date ending on the date upon which all shares of Redemption Stock are so redeemed is referred to herein as the "**Voting Period**." In furtherance of the above, as soon as practicable after the commencement of the Voting Period, the Corporation shall call a special meeting of the Requesting Redemption Stockholders and any other Redemption Stockholders conterminously exercising the Redemption Right to be held not more than ten (10) days after the date of mailing of notice of such meeting. If the Corporation fails to send a notice, any Redemption Stockholder exercising the Redemption Right may call the meeting on like notice. At any such special meeting and at each meeting of Redemption Stockholders held during a Voting Period at which Directors are to be elected (or with respect to any action by written consent

34

in lieu of a meeting of stockholders), the Redemption Stockholders exercising the Redemption Right, voting together as a single class to the exclusion of the holders of all other securities and classes of capital stock of the Corporation, shall be entitled to elect the number of directors prescribed in Section 6.9(ii), and each share of Redemption Stock shall be entitled to one (1) vote (whether voted in person by the holder thereof or by proxy or pursuant to a stockholders consent).

(b) The terms of office of all persons who are incumbent directors of the Corporation at the time of a special meeting of the Redemption Stockholders exercising the Redemption Right to elect such additional directors shall continue, notwithstanding the election at such meeting of the additional directors that such holders are entitled to elect, and the additional directors so elected by such holders, together with such incumbent directors, shall constitute the duly elected directors of the Corporation. Simultaneously with the termination of a Voting Period, the terms of office of the additional directors elected by the Redemption Stockholders exercising the Redemption Right shall terminate, each additional director so elected shall resign or be removed effective immediately thereupon, the other directors elected pursuant to Section 3.2 (other than Section 3.2.6) shall constitute the directors of the Corporation and the rights of the Redemption Stockholders exercising the Redemption Right to elect additional directors pursuant to Section 6.9(ii) shall cease.

7. Redeemed or Otherwise Acquired Shares. Any shares of Preferred Stock that are redeemed or otherwise acquired by the Corporation or any of its subsidiaries shall be automatically and immediately cancelled and retired and shall not be reissued, sold or transferred. Neither the Corporation nor any of its subsidiaries may exercise any voting or other rights granted to the holders of Preferred Stock following redemption.

8. Waiver. Subject to the provisions of Section 3.3.2, Section 3.3.3, Section 3.3.4 and Section 3.3.5 above, any of the rights, powers, preferences and other terms of the Preferred Stock set forth herein may be waived on behalf of all holders of Preferred Stock by the affirmative written consent or vote of the holders of a majority of the shares of Preferred Stock then outstanding, voting together as a single class on an as-converted basis.

9. Notices. Any notice required or permitted by the provisions of this Article FOURTH to be given to a holder of shares of Preferred Stock shall be mailed, postage prepaid, to the post office address last shown on the records of the Corporation, or given by electronic communication in compliance with the provisions of the General Corporation Law, and shall be deemed sent upon such mailing or electronic transmission.

**FIFTH:** Subject to any additional vote required by the Certificate of Incorporation or Bylaws, in furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind any or all of the Bylaws of the Corporation.

35

**SIXTH:** Subject to any additional vote required by the Certificate of Incorporation, the number of directors of the Corporation shall be determined in the manner set forth in the Bylaws of the Corporation.

**SEVENTH:** Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

**EIGHTH:** Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws of the Corporation may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

**NINTH:** To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. If the General Corporation Law or any other law of the State of Delaware is amended after approval by the stockholders of this Article NINTH to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law as so amended.

Any repeal or modification of the foregoing provisions of this Article NINTH by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director occurring prior to, such repeal or modification.

**TENTH:** To the fullest extent permitted by applicable law, the Corporation is authorized to provide indemnification of (and advancement of expenses to) directors, officers and agents of the Corporation (and any other persons to which General Corporation Law permits the Corporation to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the General Corporation Law.

Any amendment, repeal or modification of the foregoing provisions of this Article TENTH shall not adversely affect any right or protection of any director, officer or other agent of the Corporation existing at the time of such amendment, repeal or modification.

**ELEVENTH:** The Corporation renounces, to the fullest extent permitted by law, any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, any Excluded Opportunity. An "**Excluded Opportunity**" is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of, (i) any director of the Corporation who is not an employee of the Corporation or any of its

36

subsidiaries, or (ii) any holder of Preferred Stock or any partner, member, director, stockholder, employee or agent of any such holder, other than someone who is an employee of the Corporation or any of its subsidiaries (collectively, "**Covered Persons**"), unless such matter, transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person expressly and solely in such Covered Person's capacity as a director of the Corporation.

TWELFTH:   Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery in the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of fiduciary duty owed by any director, officer, or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the General Corporation Law or the Corporation's certificate of incorporation or bylaws or (iv) any action asserting a claim governed by the internal affairs doctrine.

THIRTEENTH:   In connection with repurchases by the Corporation of its Common Stock from employees, officers, directors, advisors, consultants or other persons performing services for the Corporation or any subsidiary pursuant to agreements under which the Corporation has the option to repurchase such shares at cost upon the occurrence of certain events, such as the termination of employment, Sections 500 and 501 of the California Corporations Code shall not apply in all or in part with respect to such repurchases.

* * *

37

3.    That the foregoing amendment and restatement was approved by the holders of the requisite number of shares of this Corporation in accordance with Section 228 of the General Corporation Law.

4.    That this Eleventh Amended and Restated Certificate of Incorporation, which restates and integrates and further amends the provisions of this Corporation's Certificate of Incorporation, has been duly adopted in accordance with Sections 242 and 245 of the General Corporation Law.

**IN WITNESS WHEREOF**, this Eleventh Amended and Restated Certificate of Incorporation has been executed by a duly authorized officer of this Corporation on this 21st day of March, 2019.

By:  /s/ Matt Gustke

Matt Gustke
Chief Financial Officer

38

**Exhibit 3.3**

**THIRD AMENDED AND RESTATED BYLAWS**

**OF**

**THE REALREAL, INC.**

**ARTICLE I**

**OFFICES**

**Section 1. Registered Office**. The registered office of the corporation in the State of Delaware shall be in the City of Dover, County of Kent.

**Section 2. Other Offices.** The corporation shall also maintain an office or principal place of business at such place as may be fixed by the Board of Directors, and may also have offices at such other places, both within and without the State of Delaware, as the Board of Directors may determine.

**ARTICLE II**

**CORPORATE SEAL**

**Section 3. Corporate Seal.** The Board of Directors may adopt a corporate seal. The corporate seal shall consist of a die bearing the name of the corporation and the inscription, "Corporate Seal-Delaware." Such seal may be used by causing it or a facsimile thereof to be impressed or reproduced.

**ARTICLE III**

**STOCKHOLDERS' MEETINGS**

**Section 4. Place of Meetings.** Meetings of the stockholders of the corporation may be held at such place, either within or without the State of Delaware, as may be determined by the Board of Directors. The Board of Directors may, in its sole discretion, determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication as provided under the Delaware General Corporation Law ("*DGCL*").

**Section 5. Annual Meetings of Stockholders**.

(a) The annual meeting of the stockholders of the corporation, for the purpose of election of directors and for such other business as may lawfully come before it, shall be held on such date and at such time as may be designated by the Board of Directors. Nominations of persons for election to the Board of Directors and the proposal of business to be considered by the stockholders may be made at an annual meeting of stockholders: (i) pursuant to the corporation's notice of meeting of stockholders; (ii) by or at the direction of the Board of Directors; or (iii) by any stockholder of the corporation who was a stockholder of record at the time of giving of notice provided for in the following paragraph, who is entitled to vote at the meeting and who complied with the notice procedures set forth in Section 5.

**(b)** At an annual meeting of the stockholders, only such business shall be conducted as shall have been properly brought before the meeting. For nominations or other business to be properly brought before an annual meeting by a stockholder pursuant to clause (iii) of Section 5(a) of these Bylaws, (i) the stockholder must have given timely notice thereof in writing to the Secretary of the corporation, (ii) such other business must be a proper matter for stockholder action under the DGCL, (iii) if the stockholder, or the beneficial owner on whose behalf any such proposal or nomination is made, has provided the corporation with a Solicitation Notice (as defined in this Section 5(b)), such stockholder or beneficial owner must, in the case of a proposal, have delivered a proxy statement and form of proxy to holders of at least the percentage of the corporation's voting shares required under applicable law to carry any such proposal, or, in the case of a nomination or nominations, have delivered a proxy statement and form of proxy to holders of a percentage of the corporation's voting shares reasonably believed by such stockholder or beneficial owner to be sufficient to elect the nominee or nominees proposed to be nominated by such stockholder, and must, in either case, have included in such materials the Solicitation Notice, and (iv) if no Solicitation Notice relating thereto has been timely provided pursuant to this section, the stockholder or beneficial owner proposing such business or nomination must not have solicited a number of proxies sufficient to have required the delivery of such a Solicitation Notice under this Section 5. To be timely, a stockholder's notice shall be delivered to the Secretary at the principal executive offices of the Corporation not later than the close of business on the ninetieth (90th) day nor earlier than the close of business on the one hundred twentieth (120th) day prior to the first anniversary of the preceding year's annual meeting; provided that if the date of the annual meeting is advanced more than thirty (30) days prior to or delayed by more than thirty (30) days after the anniversary of the preceding year's annual meeting, notice by the stockholder to be timely must be so delivered not earlier than the close of business on the one hundred twentieth (120th) day prior to such annual meeting and not later than the close of business on the later of the ninetieth (90th) day prior to such annual meeting or the tenth (10th) day following the day on which public announcement of the date of such meeting is first made. In no event shall the public announcement of an adjournment of an annual meeting commence a new time period for the giving of a stockholder's notice as described above. Such stockholder's notice shall set forth: (A) as to each person whom the stockholder proposed to nominate for election or reelection as a director all information relating to such person that is required to be disclosed in solicitations of proxies for election of directors in an election contest, or is otherwise required, in each case pursuant to Regulation 14A under the Securities Exchange Act of 1934, as amended (the "*1934 Act*") and Rule 14a-4(d) thereunder (including such person's written consent to being named in the proxy statement as a nominee and to serving as a director if elected); (B) as to any other business that the stockholder proposes to bring before the meeting, a brief description of the business desired to be brought before the meeting, the reasons for conducting such business at the meeting and any material interest in such business of such stockholder and the beneficial owner, if any, on whose behalf the proposal is made; and (C) as to the stockholder giving the notice and the beneficial owner, if any, on whose behalf the nomination or proposal is made (i) the name and address of such stockholder, as they appear on the corporation's books, and of such beneficial owner, (ii) the class and number of shares of the corporation which are owned beneficially and of record by such stockholder and such beneficial owner, and (iii) whether either such stockholder or beneficial owner intends to deliver a proxy statement and form of proxy to holders of, in the case of the proposal, at least the percentage of the corporation's voting shares required under applicable law to carry the proposal or, in the case of a nomination or nominations, a sufficient number of holders of the corporation's voting shares to elect such nominee or nominees (an affirmative statement of such intent, a "*Solicitation Notice*").

**(c)** Notwithstanding anything in the second sentence of Section 5(b) of these Bylaws to the contrary, if the number of directors to be elected to the Board of Directors of the Corporation is increased and there is no public announcement naming all of the nominees for director or specifying the

-2-

size of the increased Board of Directors made by the corporation at least one hundred (100) days prior to the first anniversary of the preceding year's annual meeting, a stockholder's notice required by this Section 5 shall also be considered timely, but only with respect to nominees for any new positions created by such increase, if it shall be delivered to the Secretary at the principal executive offices of the corporation not later than the close of business on the tenth (10th) day following the day on which such public announcement is first made by the corporation.

(d) Only such persons who are nominated in accordance with the procedures set forth in this Section 5 shall be eligible to serve as directors and only such business shall be conducted at a meeting of stockholders as shall have been brought before the meeting in accordance with the procedures set forth in this Section 5. Except as otherwise provided by law, the Chairman of the meeting shall have the power and duty to determine whether a nomination or any business proposed to be brought before the meeting was made, or proposed in accordance with the procedures set forth in these Bylaws and, if any proposed nomination or business is not in compliance with these Bylaws, to declare that such defective proposal or nomination shall not be presented for stockholder action at the meeting and shall be disregarded.

**Section 6. Special Meetings of Stockholders**.

(a) Special meetings of the stockholders of the corporation may be called, for any purpose or purposes, by (i) the Chairman of the Board of Directors, (ii) the Chief Executive Officer, or (iii) the Board of Directors pursuant to a resolution adopted by a majority of the total number of authorized directors (whether or not there exist any vacancies in previously authorized directorships at the time any such resolution is presented to the Board of Directors for adoption) and shall be held at such place, on such date, and at such time as the Board of Directors shall fix.

At any time or times that the corporation is subject to Section 2115(b) of the California General Corporation Law ("*CGCL*"), stockholders holding thirteen percent (13%) or more of the outstanding shares shall have the right to call a special meeting of stockholders as set forth in Section 18(b) herein.

(b) If a special meeting is properly called by any person or persons other than the Board of Directors, the request shall be in writing, specifying the general nature of the business proposed to be transacted, and shall be delivered personally or sent by certified or registered mail, return receipt requested, or by facsimile or other electronic transmission to the Chairman of the Board of Directors, the Chief Executive Officer, or the Secretary of the corporation. No business may be transacted at such special meeting otherwise than specified in such notice. The Board of Directors shall determine the time and place of such special meeting, which shall be held not less than thirty-five (35) nor more than one hundred twenty (120) days after the date of the receipt of the request. Upon determination of the time and place of the meeting, the officer receiving the request shall cause notice to be given to the stockholders entitled to vote, in accordance with the provisions of Section 7 of these Bylaws. Nothing contained in this paragraph (b) shall be construed as limiting the time when a meeting of stockholders called by action of the Board of Directors may be held.

**Section 7. Notice of Meetings.** Except as otherwise provided by law, notice, given in writing or by electronic transmission, of each meeting of stockholders shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at such meeting, such notice to specify the place, if any, date and hour, in the case of special meetings, the purpose or purposes of the meeting, and the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at any such meeting. If

-3-

mailed, notice is given when deposited in the United States mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the records of the corporation. Notice of the time, place, if any, and purpose of any meeting of stockholders may be waived in writing, signed by the person entitled to notice thereof or by electronic transmission by such person, either before or after such meeting, and will be waived by any stockholder by his attendance thereat in person, by remote communication, if applicable, or by proxy, except when the stockholder attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Any stockholder so waiving notice of such meeting shall be bound by the proceedings of any such meeting in all respects as if due notice thereof had been given.

Section 8. Quorum. At all meetings of stockholders, except where otherwise provided by statute or by the Certificate of Incorporation, or by these Bylaws, the presence, in person, by remote communication, if applicable, or by proxy, of the holders of a majority of the outstanding shares of stock entitled to vote shall constitute a quorum for the transaction of business. In the absence of a quorum, any meeting of stockholders may be adjourned, from time to time, either by the chairman of the meeting or by vote of the holders of a majority of the shares represented thereat, but no other business shall be transacted at such meeting. The stockholders present at a duly called or convened meeting, at which a quorum is present, may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum. Except as otherwise provided by statute, or by the Certificate of Incorporation or these Bylaws, in all matters other than the election of directors, the affirmative vote of a majority of the votes of the shares present in person, by remote communication, if applicable, or represented by proxy at the meeting and entitled to vote generally on the subject matter shall be the act of the stockholders. Except as otherwise provided by statute, the Certificate of Incorporation or these Bylaws, directors shall be elected by a plurality of the votes of the shares present in person, by remote communication, if applicable, or represented by proxy at the meeting and entitled to vote generally on the election of directors. Where a separate vote by a class or classes or series is required, except where otherwise provided by the statute or by the Certificate of Incorporation or these Bylaws, a majority of the outstanding shares of such class or classes or series, present in person, by remote communication, if applicable, or represented by proxy, shall constitute a quorum entitled to take action with respect to that vote on that matter. Except where otherwise provided by statute or by the Certificate of Incorporation or these Bylaws, the affirmative vote of the majority (plurality, in the case of the election of directors) of shares of such class or classes or series present in person, by remote communication, if applicable, or represented by proxy at the meeting shall be the act of such class or classes or series.

Section 9. Adjournment and Notice of Adjourned Meetings. Any meeting of stockholders, whether annual or special, may be adjourned from time to time either by the chairman of the meeting or by the vote of a majority of the shares present in person, by remote communication, if applicable, or represented by proxy. When a meeting is adjourned to another time or place, if any, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

Section 10. Voting Rights. For the purpose of determining those stockholders entitled to vote at any meeting of the stockholders, except as otherwise provided by law, only persons in whose names shares stand on the stock records of the corporation on the record date, as provided in Section 12 of these Bylaws, shall be entitled to vote. Every person entitled to vote or execute consents shall have the

-4-

right to do so either in person, by remote communication, if applicable, or by an agent or agents authorized by a proxy granted in accordance with Delaware law. An agent so appointed need not be a stockholder. No proxy shall be voted after three (3) years from its date of creation unless the proxy provides for a longer period.

**Section 11. Joint Owners of Stock.** If shares having voting power stand of record in the names of two (2) or more persons, whether fiduciaries, members of a partnership, joint tenants, tenants in common or otherwise, or if two (2) or more persons have the same fiduciary relationship respecting the same shares, unless the Secretary is given written notice to the contrary and is furnished with a copy of the instrument or order appointing them or creating the relationship wherein it is so provided, their acts with respect to voting shall have the following effect: (a) if only one (1) votes, his act binds all; (b) if more than one (1) votes, the act of the majority so voting binds all; (c) if more than one (1) votes, but the vote is evenly split on any particular matter, each faction may vote the securities in question proportionally, or may apply to the Delaware Court of Chancery for relief as provided in the DGCL, Section 217(b). If the instrument filed with the Secretary shows that any such tenancy is held in unequal interests, a majority or even-split for the purpose of subsection (c) shall be a majority or even-split in interest.

**Section 12. List of Stockholders.** The Secretary shall prepare, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at such meeting, arranged in alphabetical order, showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or during ordinary business hours, at the principal place of business of the corporation. If the corporation determines to make the list available on an electronic network, the corporation may take reasonable steps to ensure that such information is available only to stockholders of the corporation. The list shall be open to examination of any stockholder during the time of the meeting as provided by law.

**Section 13. Action Without Meeting**.

**(a)** Unless otherwise provided in the Certificate of Incorporation, any action required by statute to be taken at any annual or special meeting of the stockholders, or any action which may be taken at any annual or special meeting of the stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, or by electronic transmission setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

**(b)** Every written consent or electronic transmission shall bear the date of signature of each stockholder who signs the consent, and no written consent or electronic transmission shall be effective to take the corporate action referred to therein unless, within sixty (60) days of the earliest dated consent delivered to the corporation in the manner herein required, written consents or electronic transmissions signed by a sufficient number of stockholders to take action are delivered to the corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to a corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

-5-

**(c)** Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing or by electronic transmission and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of stockholders to take action were delivered to the corporation as provided in Section 228(c) of the DGCL. If the action which is consented to is such as would have required the filing of a certificate under any section of the DGCL if such action had been voted on by stockholders at a meeting thereof, then the certificate filed under such section shall state, in lieu of any statement required by such section concerning any vote of stockholders, that written consent has been given in accordance with Section 228 of the DGCL.

**(d)** An electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxyholder, shall be deemed to be written, signed and dated for the purposes of this section, provided that any such electronic transmission sets forth or is delivered with information from which the corporation can determine (i) that the electronic transmission was transmitted by the stockholder or proxyholder or by a person or persons authorized to act for the stockholder and (ii) the date on which such stockholder or proxyholder or authorized person or persons transmitted such electronic transmission. The date on which such electronic transmission is transmitted shall be deemed to be the date on which such consent was signed. No consent given by electronic transmission shall be deemed to have been delivered until such consent is reproduced in paper form and until such paper form shall be delivered to the corporation by delivery to its registered office in the state of Delaware, its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to a corporation's registered office shall be made by hand or by certified or registered mail, return receipt requested. Notwithstanding the foregoing limitations on delivery, consents given by electronic transmission may be otherwise delivered to the principal place of business of the corporation or to an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded if, to the extent and in the manner provided by resolution of the board of directors of the corporation. Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing.

**Section 14. Organization**.

**(a)** At every meeting of stockholders, the Chairman of the Board of Directors, or, if a Chairman has not been appointed or is absent, the President, or, if the President is absent, a chairman of the meeting chosen by a majority in interest of the stockholders entitled to vote, present in person or by proxy, shall act as chairman. The Secretary, or, in his absence, an Assistant Secretary directed to do so by the President, shall act as secretary of the meeting.

**(b)** The Board of Directors of the corporation shall be entitled to make such rules or regulations for the conduct of meetings of stockholders as it shall deem necessary or appropriate. Subject to any such rules and regulations, the chairman of the meeting shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are necessary or appropriate. The date and time of the opening and closing of the polls for each matter upon which the stockholders will vote at the meeting shall be announced at the meeting. Unless and to the extent determined by the Board of Directors or the chairman of the meeting, meetings of stockholders shall not be required to be held in accordance with rules of parliamentary procedure.

-6-

**ARTICLE IV**

**DIRECTORS**

**Section 15. Number of Directors**. The authorized number of directors of the corporation shall be fixed by the Board of Directors from time to time. Directors need not be stockholders. If for any reason, the directors shall not have been elected at an annual meeting, they may be elected as soon thereafter as convenient.

**Section 16. Powers.** The powers of the corporation shall be exercised, its business conducted and its property controlled by the Board of Directors, except as may be otherwise provided by statute or by the Certificate of Incorporation.

**Section 17. Term of Directors.**

**(a)** Subject to the rights of the holders of any series of Preferred Stock to elect additional directors under specified circumstances, directors shall be elected at each annual meeting of stockholders for a term of one year. Each director shall serve until his successor is duly elected and qualified or until his death, resignation or removal. No decrease in the number of directors constituting the Board of Directors shall shorten the term of any incumbent director.

**(b)** No person entitled to vote at an election for directors may cumulate votes to which such person is entitled, unless, at the time of such election, the corporation is subject to Section 2115(b) of the CGCL. During such time that the corporation is subject to Section 2115(b) of the CGCL, every stockholder entitled to vote at an election for directors may cumulate such stockholder's votes and give one candidate a number of votes equal to the number of directors to be elected multiplied by the number of votes to which such stockholder's shares are otherwise entitled, or distribute the stockholder's votes on the same principle among as many candidates as such stockholder thinks fit. No stockholder, however, shall be entitled to so cumulate such stockholder's votes unless (i) the names of such candidate or candidates have been placed in nomination prior to the voting and (ii) the stockholder has given notice at the meeting, prior to the voting, of such stockholder's intention to cumulate such stockholder's votes. If any stockholder has given proper notice to cumulate votes, all stockholders may cumulate their votes for any candidates who have been properly placed in nomination. Under cumulative voting, the candidates receiving the highest number of votes, up to the number of directors to be elected, are elected.

**Section 18. Board Vacancies.**

**(a)** Unless otherwise provided in the Certificate of Incorporation, and subject to the rights of the holders of any series of Preferred Stock, any vacancies on the Board of Directors resulting from death, resignation, disqualification, removal or other causes and any newly created directorships resulting from any increase in the number of directors shall, unless the Board of Directors determines by resolution that any such vacancies or newly created directorships shall be filled by stockholders, be filled only by the affirmative vote of a majority of the directors then in office, even though less than a quorum. Any director elected in accordance with the preceding sentence shall hold office for the remainder of the full term of the director for which the vacancy was created or occurred and until such director's successor shall have been elected and qualified. A vacancy in the Board of Directors shall be deemed to exist under this Bylaw in the case of the death, removal or resignation of any director.

-7-

**(b)** At any time or times that the corporation is subject to §2115(b) of the CGCL, if, after the filling of any vacancy, the directors then in office who have been elected by stockholders shall constitute less than a majority of the directors then in office, then

**(i)** any holder or holders of an aggregate of five percent (5%) or more of the total number of outstanding shares having the right to vote for those directors may call a special meeting of stockholders; or

**(ii)** the Superior Court of the proper county shall, upon application of such stockholder or stockholders, summarily order a special meeting of the stockholders, to be held to elect the entire board, all in accordance with Section 305(c) of the CGCL, the term of office of any director shall terminate upon that election of a successor.

**Section 19. Resignation of Directors.** Any director may resign at any time by delivering a notice in writing or by electronic transmission to the Secretary, such resignation to specify whether it will be effective at a particular time, upon receipt by the Secretary or at the pleasure of the Board of Directors. If no such specification is made, it shall be deemed effective at the pleasure of the Board of Directors. When one or more directors shall resign from the Board of Directors, effective at a future date, a majority of the directors then in office, including those who have so resigned, shall have power to fill such vacancies, the vote thereon to take effect when such resignations shall become effective, and each Director so chosen shall hold office for the unexpired portion of the term of the Director whose place shall be vacated and until his successor shall have been duly elected and qualified.

**Section 20. Removal of Directors.**

**(a)** Unless otherwise provided in the Certificate of Incorporation, and subject to applicable law and the rights of the holders of any series of Preferred Stock (and assuming the corporation is not subject to Section 2115 of the CGCL), the Board of Directors or any director may be removed from office at any time (i) with cause by the affirmative vote of the holders of a majority of the voting power of all then-outstanding shares of capital stock of the corporation entitled to vote generally at an election of directors or (ii) without cause by the affirmative vote of the holders of a majority of the voting power of all then-outstanding shares of capital stock of the corporation, entitled to vote generally at an election of directors.

**(b)** During such time that the corporation is subject to Section 2115(b) of the CGCL, unless otherwise provided in the Certificate of Incorporation, and subject to applicable law and the rights of the holders of any series of Preferred Stock, the Board of Directors or any individual director may be removed from office at any time without cause by the affirmative vote of the holders of at least a majority of the outstanding shares entitled to vote on such removal; provided that unless the entire Board is removed, no individual director may be removed when the votes cast against such director's removal, or not consenting in writing to such removal, would be sufficient to elect that director if voted cumulatively at an election which the same total number of votes were cast (or, if such action is taken by written consent, all shares entitled to vote were voted) and the entire number of directors authorized at the time of such director's most recent election were then being elected.

-8-

**Section 21. Board Meetings.**

**(a) Regular Meetings.** Unless otherwise restricted by the Certificate of Incorporation, regular meetings of the Board of Directors may be held at any time or date and at any place within or without the State of Delaware which has been designated by the Board of Directors and publicized among all directors, either orally or in writing, including a voice-messaging system or other system designated to record and communicate messages, facsimile or by electronic mail or other electronic means.

**(b) Special Meetings.** Unless otherwise restricted by the Certificate of Incorporation, special meetings of the Board of Directors may be held at any time and place within or without the State of Delaware whenever called by the Chairman of the Board, the President or any director.

**(c) Meetings by Electronic Communications Equipment.** Any member of the Board of Directors, or of any committee thereof, may participate in a meeting by means of any communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at such meeting.

**(d) Notice of Special Meetings.** Notice of the time and place of all special meetings of the Board of Directors shall be orally or in writing, by telephone, including a voice messaging system or other system or technology designed to record and communicate messages, facsimile, or by electronic mail or other electronic means, during normal business hours, at least twenty-four (24) hours before the date and time of the meeting. If notice is sent by US mail, it shall be sent by first class mail, postage prepaid at least three (3) days before the date of the meeting. Notice of any meeting may be waived in writing or by electronic transmission at any time before or after the meeting and will be waived by any director by attendance thereat, except when the director attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully convened.

**(e) Waiver of Notice.** The transaction of all business at any meeting of the Board of Directors, or any committee thereof, however noticed, or wherever held, shall be as valid as though had at a meeting duly held after regular call and notice, if a quorum be present and if, either before or after the meeting, each of the directors not present who did not receive notice shall sign a written waiver of notice or shall waive notice by electronic transmission. All such waivers shall be filed with the corporate records or made a part of the minutes of the meeting.

**Section 22. Quorum and Voting**.

**(a)** Unless the Certificate of Incorporation requires a greater number, a quorum of the Board of Directors shall consist of a majority of the exact number of directors fixed from time to time by the Board of Directors in accordance with the Certificate of Incorporation; *provided, however,* at any meeting, whether a quorum be present or otherwise, a majority of the directors present may adjourn from time to time until the time fixed for the next regular meeting of the Board of Directors, without notice other than by announcement at the meeting.

**(b)** At each meeting of the Board of Directors at which a quorum is present, all questions and business shall be determined by the affirmative vote of a majority of the directors present, unless a different vote be required by law, the Certificate of Incorporation or these Bylaws.

**Section 23. Action Without Meeting.** Unless otherwise provided by the Certificate of Incorporation, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board of Directors or

-9-

committee consent thereto in writing or by electronic transmission, and such writing or transmission is filed with the minutes of proceedings of the Board of Directors or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

    **Section 24. Fees and Compensation.** Directors shall be entitled to such compensation and reimbursement of expenses for their services as may be approved by the Board of Directors. Nothing herein contained shall preclude any director from serving the corporation in any other capacity as an officer, agent, employee, or otherwise and receiving compensation therefor.

    **Section 25. Committees**.

        **(a) Executive Committee.** The Board of Directors may appoint an Executive Committee to consist of one (1) or more members of the Board of Directors. The Executive Committee, to the extent permitted by law and provided in the resolution of the Board of Directors, shall have all the powers and authority of the Board of Directors in the management of the business and affairs of the corporation, but shall not have the power or authority to (i) approve or adopt, or recommend to the stockholders, any action or matter expressly required by the DGCL to be submitted to stockholders for approval, or (ii) adopt, amend or repeal any bylaw of the corporation.

        **(b) Other Committees.** The Board of Directors may appoint such other committees as may be permitted by law. Such committees shall consist of one (1) or more members of the Board of Directors and shall have such powers and perform such duties as may be prescribed by the resolutions creating such committees, but shall not have any powers denied to the Executive Committee in these Bylaws.

        **(c) Term.** The Board of Directors, subject to any requirements of any outstanding series of Preferred Stock and the provisions of subsections (a) or (b) of this Bylaw may at any time increase or decrease the number of members of a committee or terminate the existence of a committee. The membership of a committee member shall terminate on the date of his death or voluntary resignation from the committee or from the Board of Directors. The Board of Directors may at any time for any reason remove any individual committee member and the Board of Directors may fill any committee vacancy created by death, resignation, removal or increase in the number of members of the committee. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee, and, in addition, in the absence or disqualification of any member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not constituting a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.

        **(d) Meetings.** Unless the Board of Directors shall otherwise provide, regular meetings of any committee appointed pursuant to this Section 25 shall be held at such times and places as are determined by the Board of Directors, or by any such committee, and when notice thereof has been given to each member of such committee, no further notice of such regular meetings need be given thereafter. Special meetings of any committee may be held at any place determined by such committee, and may be called by any member of such committee, upon notice to the members of such committee of the time and place of such special meeting given in the manner provided for the giving of notice to members of the Board of Directors of the time and place of special meetings of the Board of Directors. Notice of any special meeting of any committee may be waived in writing at any time before or after the

-10-

meeting and will be waived by any director by attendance thereat, except when the director attends such special meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Unless otherwise provided by the Board of Directors in the resolutions authorizing the creation of the committee, a majority of the authorized number of members of any such committee shall constitute a quorum for the transaction of business, and the act of a majority of those present at any meeting at which a quorum is present shall be the act of such committee.

     **Section 26. Organization.** At every meeting of the directors, the Chairman of the Board of Directors, or, if a Chairman has not been appointed or is absent, the President, or if the President is absent, the most senior Vice President, (if a director) or, in the absence of any such person, a chairman of the meeting chosen by a majority of the directors present, shall preside over the meeting. The Secretary, or in his absence, any Assistant Secretary directed to do so by the President, shall act as secretary of the meeting.

-11-

**ARTICLE V**

**OFFICERS**

**Section 27. Officers Designated.** The officers of the corporation shall include, if and when designated by the Board of Directors, the Chairman of the Board of Directors, the Chief Executive Officer, the President, one or more Vice Presidents, the Secretary, the Chief Financial Officer, the Treasurer and the Controller, all of whom shall be elected at the annual organizational meeting of the Board of Directors. The Board of Directors may also appoint one or more Assistant Secretaries, Assistant Treasurers and such other officers and agents with such powers and duties as it shall deem necessary. Any one person may hold any number of offices of the corporation at any one time unless specifically prohibited therefrom by law. The salaries and other compensation of the officers of the corporation shall be fixed by or in the manner designated by the Board of Directors.

**Section 28. Tenure and Duties of Officers**.

**(a) General.** All officers shall hold office at the pleasure of the Board of Directors and until their successors shall have been duly elected and qualified, unless sooner removed. Any officer elected or appointed by the Board of Directors may be removed at any time by the Board of Directors. If the office of any officer becomes vacant for any reason, the vacancy may be filled by the Board of Directors.

**(b) Chairman of the Board of Directors.** The Chairman of the Board of Directors, when present, shall preside at all meetings of the stockholders and the Board of Directors. The Chairman of the Board of Directors shall perform other duties commonly incident to the office and shall also perform such other duties and have such other powers as the Board of Directors shall designate. If there is no President, then the Chairman of the Board of Directors shall also serve as the Chief Executive Officer of the corporation and shall have the powers and duties prescribed in paragraph (c) of this Section 28.

**(c) President.** The President shall preside at all meetings of the stockholders and at all meetings of the Board of Directors, unless the Chairman of the Board of Directors has been appointed and is present. Unless another officer has been elected Chief Executive Officer of the corporation, the President shall be the chief executive officer of the corporation and shall, subject to the control of the Board of Directors, have general supervision, direction and control of the business and officers of the corporation. The President shall perform other duties commonly incident to the office and shall also perform such other duties and have such other powers as the Board of Directors shall designate.

**(d) Vice Presidents.** The Vice Presidents may assume and perform the duties of the President in the absence or disability of the President or whenever the office of President is vacant. The Vice Presidents shall perform other duties commonly incident to their office and shall also perform such other duties and have such other powers as the Board of Directors or the President shall designate.

**(e) Secretary.** Except as otherwise directed by the Board of Directors, the Secretary shall attend all meetings of the stockholders and of the Board of Directors and shall record all acts and proceedings thereof in the minute book of the corporation. The Secretary shall give notice of all meetings of the stockholders and of the Board of Directors and any committee thereof requiring notice. The Secretary shall perform all other duties provided for in these Bylaws and other duties commonly incident to the office and shall also perform such other duties and have such other powers as the Board of

-12-

Directors shall designate. The President may direct any Assistant Secretary to assume and perform the duties of the Secretary in the absence or disability of the Secretary, and each Assistant Secretary shall perform other duties commonly incident to the office and shall also perform such other duties and have such other powers as the Board of Directors or the President shall designate.

**(f) Chief Financial Officer.** The Chief Financial Officer shall keep or cause to be kept the books of account of the corporation in a thorough and proper manner and shall render statements of the financial affairs of the corporation in such form and as often as required by the Board of Directors or the President. The Chief Financial Officer, subject to the order of the Board of Directors, shall have the custody of all funds and securities of the corporation. The Chief Financial Officer shall perform other duties commonly incident to his office and shall also perform such other duties and have such other powers as the Board of Directors or the President shall designate. The President may direct the Treasurer or any Assistant Treasurer, or the Controller to assume and perform the duties of the Chief Financial Officer in the absence or disability of the Chief Financial Officer, and each Treasurer and Assistant Treasurer and the Controller shall perform other duties commonly incident to the office and shall also perform such other duties and have such other powers as the Board of Directors or the President shall designate.

**Section 29. Delegation of Authority.** The Board of Directors may delegate the powers or duties of any officer to any other officer or agent, notwithstanding any provision hereof.

**Section 30. Resignations and Removal.**

**(a)** Any officer may resign at any time by giving notice in writing or by electronic transmission to the Board of Directors or to the President or to the Secretary. Any such resignation shall be effective when received, unless a later time is specified therein, in which event the resignation shall become effective at such later time. Unless otherwise specified in such notice, the acceptance of any such resignation shall not be necessary to make it effective. Any resignation shall be without prejudice to the rights, if any, of the corporation under any contract with the resigning officer.

**(b)** Any officer may be removed from office at any time, either with or without cause, by the affirmative vote of a majority of the directors in office at the time, or by the unanimous written consent of the directors in office at the time, or by any committee or superior officers upon whom such power of removal may have been conferred by the Board of Directors.

## ARTICLE VI

### EXECUTION OF CORPORATE INSTRUMENTS AND VOTING
### OF SECURITIES OWNED BY THE CORPORATION

**Section 31. Execution of Corporate Instruments.** The Board of Directors may, in its discretion, determine the method and designate the signatory officer or officers, or other person or persons, to execute on behalf of the corporation any corporate instrument or document, or to sign on behalf of the corporation the corporate name, or to enter into contracts on behalf of the corporation, except where otherwise provided by law or these Bylaws, and such execution or signature shall be binding upon the corporation.

-13-

All checks and drafts drawn on banks or other depositaries on funds to the credit of the corporation or in special accounts of the corporation shall be signed by such person or persons as the Board of Directors shall authorize so to do.

Unless authorized or ratified by the Board of Directors or within the agency power of an officer, no officer, agent or employee shall have any power or authority to bind the corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

**Section 32. Voting of Securities Owned by the Corporation.** All stock and other securities of other corporations owned or held by the corporation for itself, or for other parties in any capacity, shall be voted, and all proxies with respect thereto shall be executed, by the person authorized so to do by resolution of the Board of Directors, or, in the absence of such authorization, by the Chairman of the Board of Directors, the Chief Executive Officer, the President, or any Vice President.

**ARTICLE VII**

**SHARES OF STOCK**

**Section 33. Form and Execution of Certificates.** The shares of stock of the corporation shall be represented by certificates; provided that the Board of Directors may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the corporation. Shares of stock represented by certificates shall be in such form as is consistent with the Certificate of Incorporation and applicable law. Every stock certificate shall be entitled to have a certificate signed by or in the name of the corporation by the Chairman of the Board of Directors, or the President or any Vice President and by the Treasurer or Assistant Treasurer or the Secretary or Assistant Secretary, certifying the number of shares owned by him in the corporation. Any or all of the signatures on the certificate may be facsimiles. In case any officer, transfer agent, or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent, or registrar before such certificate is issued, it may be issued with the same effect as if he were such officer, transfer agent, or registrar at the date of issue. Each certificate shall state upon the face or back thereof, in full or in summary, all of the powers, designations, preferences, and rights, and the limitations or restrictions of the shares authorized to be issued or shall, except as otherwise required by law, set forth on the face or back a statement that the corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative, participating, optional, or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights. Within a reasonable time after the issuance or transfer of uncertificated stock, the corporation shall send to the registered owner thereof a written notice containing the information required to be set forth or stated on certificates pursuant to this section or otherwise required by law or with respect to this section a statement that the corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

**Section 34. Lost Certificates.** A new certificate or certificates shall be issued in place of any certificate or certificates theretofore issued by the corporation and not subsequently surrendered alleged to have been lost, stolen, or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen, or destroyed. The corporation may require, as a condition to the issuance of a new certificate or certificates, the owner of such lost, stolen, or destroyed

-14-

certificate or certificates, to agree to indemnify the corporation in such manner as it shall require or to give the corporation a surety bond in such form and amount as it may direct as indemnity against any claim that may be made against the corporation with respect to the certificate alleged to have been lost, stolen, or destroyed.

**Section 35. Transfers**.

(a) Transfers of record of shares of stock of the corporation shall be made only upon its books by the holders thereof, in person or by attorney duly authorized, and, where such shares are represented by a certificate, upon the surrender of a properly endorsed certificate or certificates for a like number of shares.

(b) The corporation shall have power to enter into and perform any agreement with any number of stockholders of any one or more classes of stock of the corporation to restrict the transfer of shares of stock of the corporation of any one or more classes owned by such stockholders in any manner not prohibited by the DGCL.

**Section 36. Fixing Record Dates**.

(a) In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders, the Board of Directors may fix, in advance, a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall, subject to applicable law, not be more than sixty (60) nor less than ten (10) days before the date of such meeting. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided that the Board of Directors may fix a new record date for the adjourned meeting.

(b) In order that the corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board of Directors. Any stockholder of record seeking to have the stockholders authorize or take corporate action by written consent shall, by written notice to the Secretary, request the Board of Directors to fix a record date. The Board of Directors shall promptly, but in all events within ten (10) days after the date on which such a request is received, adopt a resolution fixing the record date. If no record date has been fixed by the Board of Directors within ten (10) days of the date on which such a request is received, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by applicable law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by law, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

-15-

**(c)** In order that the corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix, in advance, a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

**Section 37. Registered Stockholders.** The corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

**ARTICLE VIII**

**OTHER SECURITIES OF THE CORPORATION**

**Section 38. Execution of Other Securities.** All bonds, debentures and other corporate securities of the corporation, other than stock certificates (covered in Section 33), may be signed by the Chairman of the Board of Directors, the President or any Vice President, or such other person as may be authorized by the Board of Directors, and the corporate seal impressed thereon or a facsimile of such seal imprinted thereon and attested by the signature of the Secretary or an Assistant Secretary, or the Chief Financial Officer or Treasurer or an Assistant Treasurer; provided that where any such bond, debenture or other corporate security shall be authenticated by the manual signature, or where permissible facsimile signature, of a trustee under an indenture pursuant to which such bond, debenture or other corporate security shall be issued, the signatures of the persons signing and attesting the corporate seal on such bond, debenture or other corporate security may be the imprinted facsimile of the signatures of such persons. In case any officer who shall have signed or attested any bond, debenture or other corporate security, or whose facsimile signature shall appear thereon, shall have ceased to be such officer before the bond, debenture or other corporate security so signed or attested shall have been delivered, such bond, debenture or other corporate security nevertheless may be adopted by the corporation and issued and delivered as though the person who signed the same or whose facsimile signature shall have been used thereon had not ceased to be such officer of the corporation.

**ARTICLE IX**

**DIVIDENDS**

**Section 39. Declaration of Dividends.** Dividends upon the capital stock of the corporation, subject to the provisions of the Certificate of Incorporation and applicable law, may be declared by the Board of Directors at any regular or special meeting. Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the Certificate of Incorporation and applicable law. Before payment of any dividend, there may be set aside out of any funds of the corporation available for dividends such sum or sums as the Board of Directors, in their absolute

-16-

discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the corporation, or for such other purpose as the Board of Directors shall think conducive to the interests of the corporation, and the Board of Directors may modify or abolish any such reserve in the manner in which it was created.

## ARTICLE X

## FISCAL YEAR

**Section 40. Fiscal Year.** The fiscal year of the corporation shall be determined by the Board of Directors.

## ARTICLE XI

## INDEMNIFICATION

**Section 41. Indemnification of Directors and Executive Officers,**.

(a) **Directors and Executive Officers.** The corporation shall indemnify its directors and executive officers (for the purposes of this Article XI, "executive officers" shall have the meaning defined in Rule 3b-7 under the 1934 Act) to the fullest extent not prohibited by the DGCL or applicable law; provided that the corporation may modify the extent of such indemnification by individual contracts with its directors and executive officers; and, *provided, further,* that the corporation shall not be required to indemnify any director or executive officer in connection with any proceeding (or part thereof) initiated by such person unless (i) such indemnification is expressly required to be made by law, (ii) the proceeding was authorized by the Board of Directors of the corporation, (iii) such indemnification is provided by the corporation, in its sole discretion, pursuant to the powers vested in the corporation under the Delaware General Corporation Law or other applicable law or (iv) such indemnification is required to be made under subsection (d).

(b) **Other Officers, Employees and Other Agents**. The corporation shall have power to indemnify its other officers, employees and other agents as set forth in the DGCL or any other applicable law. The Board of Directors shall have the power to delegate the determination of whether indemnification shall be given to any such person except executive officers to such officers or other persons as the Board of Directors shall determine.

(c) **Expenses.** The corporation shall advance to any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he is or was a director or executive officer of the corporation, or is or was serving at the request of the corporation as a director or executive officer of another corporation, partnership, joint venture, trust or other enterprise, prior to the final disposition of the proceeding, promptly following request therefor, all expenses incurred by any director or executive officer in connection with such proceeding, provided that, if the DGCL requires, an advancement of expenses incurred by a director or officer in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the corporation of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that such indemnitee is not entitled to be indemnified for such expenses under this Section 41 or otherwise.

-17-

Notwithstanding the foregoing, unless otherwise determined pursuant to paragraph (e) of this Bylaw, no advance shall be made by the corporation to an executive officer of the corporation (except by reason of the fact that such executive officer is or was a director of the corporation, in which event this paragraph shall not apply) in any action, suit or proceeding, whether civil, criminal, administrative or investigative, if a determination is reasonably and promptly made (i) by a majority vote of a quorum consisting of directors who were not parties to the proceeding, even if not a quorum, or (ii) by a committee of such directors designated by a majority of such directors, even though less than a quorum, or (iii) if there are no such directors, or such directors so direct, by independent legal counsel in a written opinion, that the facts known to the decision-making party at the time such determination is made demonstrate clearly and convincingly that such person acted in bad faith or in a manner that such person did not believe to be in or not opposed to the best interests of the corporation.

**(d) Enforcement.** Without the necessity of entering into an express contract, all rights to indemnification and advances to directors and executive officers under this Bylaw shall be deemed to be contractual rights and be effective to the same extent and as if provided for in a contract between the corporation and the director or executive officer. Any right to indemnification or advances granted by this Bylaw to a director or executive officer shall be enforceable by or on behalf of the person holding such right in any court of competent jurisdiction if (i) the claim for indemnification or advances is denied, in whole or in part, or (ii) no disposition of such claim is made within ninety (90) days of request therefor. The claimant in such enforcement action, if successful in whole or in part, shall be entitled to be paid also the expense of prosecuting the claim. In connection with any claim for indemnification, the corporation shall be entitled to raise as a defense to any such action that the claimant has not met the standards of conduct that make it permissible under the DGCL or any other applicable law for the corporation to indemnify the claimant for the amount claimed. In connection with any claim by an executive officer of the corporation (except in any action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such executive officer is or was a director of the corporation) for advances, the corporation shall be entitled to raise a defense as to any such action clear and convincing evidence that such person acted in bad faith or in a manner that such person did not believe to be in or not opposed to the best interests of the corporation, or with respect to any criminal action or proceeding that such person acted without reasonable cause to believe that his conduct was lawful. Neither the failure of the corporation (including its Board of Directors, independent legal counsel or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he has met the applicable standard of conduct set forth in the DGCL or any other applicable law, nor an actual determination by the corporation (including its Board of Directors, independent legal counsel or its stockholders) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that claimant has not met the applicable standard of conduct. In any suit brought by a director or executive officer to enforce a right to indemnification or to an advancement of expenses hereunder, the burden of proving that the director or executive officer is not entitled to be indemnified, or to such advancement of expenses, under this Article XI or otherwise shall be on the corporation.

**(e) Non-Exclusivity of Rights.** The rights conferred on any person by this Bylaw shall not be exclusive of any other right which such person may have or hereafter acquire under any applicable statute, provision of the Certificate of Incorporation, Bylaws, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding office. The corporation is authorized to enter into individual contracts with any or all of its directors, officers, employees or agents respecting indemnification and advances, to the fullest extent not prohibited by the DGCL or any other applicable law.

-18-

**(f) Survival of Rights.** The rights conferred on any person by this Bylaw shall continue as to a person who has ceased to be a director, or executive officer, officer, employee or other agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

**(g) Insurance.** To the fullest extent permitted by the DGCL, or any other applicable law, the corporation, upon approval by the Board of Directors, may purchase insurance on behalf of any person required or permitted to be indemnified pursuant to this Bylaw.

**(h) Amendments.** Any repeal or modification of this Bylaw shall only be prospective and shall not affect the rights under this Bylaw in effect at the time of the alleged occurrence of any action or omission to act that is the cause of any proceeding against any agent of the corporation.

**(i) Saving Clause.** If this Bylaw or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the corporation shall nevertheless indemnify each director and executive officer to the full extent not prohibited by any applicable portion of this Bylaw that shall not have been invalidated, or by any other applicable law. If this Section 41 shall be invalid due to the application of the indemnification provisions of another jurisdiction, then the corporation shall indemnify each director and executive officer to the full extent under applicable law.

**(j) Certain Definitions.** For the purposes of this Bylaw, the following definitions shall apply:

**(1)** The term "proceeding" shall be broadly construed and shall include, without limitation, the investigation, preparation, prosecution, defense, settlement, arbitration and appeal of, and the giving of testimony in, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative.

**(2)** The term "expenses" shall be broadly construed and shall include, without limitation, court costs, attorneys' fees, witness fees, fines, amounts paid in settlement or judgment and any other costs and expenses of any nature or kind incurred in connection with any proceeding.

**(3)** The term the "corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Bylaw with respect to the resulting or surviving corporation as he would have with respect to such constituent corporation if its separate existence had continued.

**(4)** References to a "director," "executive officer," "officer," "employee," or "agent" of the corporation shall include, without limitation, situations where such person is serving at the request of the corporation as, respectively, a director, executive officer, officer, employee, trustee or agent of another corporation, partnership, joint venture, trust or other enterprise.

**ARTICLE XII**

**NOTICES**

**Section 42. Notices**.

(a) **Notice to Stockholders.** Written notice to stockholders of stockholder meetings shall be given as provided in Section 7 herein. Without limiting the manner by which notice may otherwise be given effectively to stockholders under any agreement or contract with such stockholder, and except as otherwise required by law, written notice to stockholders for purposes other than stockholder meetings may be sent by United States mail or nationally recognized overnight courier, or by facsimile, electronic mail or other electronic means.

(b) **Notice to Directors.** Any notice required to be given to any director may be given by the method stated in subsection (a), or as provided for in Section 21 of these Bylaws. If such notice is not delivered personally, it shall be sent to such address as such director shall have filed in writing with the Secretary, or, in the absence of such filing, to the last known post office address of such director.

(c) **Affidavit of Mailing.** An affidavit of mailing, executed by a duly authorized and competent employee of the corporation or its transfer agent appointed with respect to the class of stock affected or other agent, specifying the name and address or the names and addresses of the stockholder or stockholders, or director or directors, to whom any such notice or notices was or were given, and the time and method of giving the same, shall in the absence of fraud, be prima facie evidence of the facts therein contained.

(d) **Notice to Person with Whom Communication Is Unlawful.** Whenever notice is required to be given, under any provision of law or of the Certificate of Incorporation or Bylaws of the corporation, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person. Any action or meeting which shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given. If the action taken by the corporation is such as to require the filing of a certificate under any provision of the DGCL, the certificate shall state, if such is the fact and if notice is required, that notice was given to all persons entitled to receive notice except such persons with whom communication is unlawful.

(e) **Notice to Stockholders Sharing an Address.** Except as otherwise prohibited under the DGCL, any notice given under the provisions of the DGCL, the Certificate of Incorporation or the Bylaws shall be effective if given by a single written notice to stockholders who share an address if consented to by the stockholders at that address to whom such notice is given. Such consent shall have been deemed to have been given if such stockholder fails to object in writing to the corporation within 60 days of having been given notice by the corporation of its intention to send the single notice. Any consent shall be revocable by the stockholder by written notice to the corporation.

-20-

## ARTICLE XIII

## AMENDMENTS

**Section 43. Amendments.** The Board of Directors is expressly empowered to adopt, amend or repeal Bylaws of the corporation. The stockholders shall also have power to adopt, amend or repeal the Bylaws of the corporation; provided that, in addition to any vote of the holders of any class or series of stock of the corporation required by law or by the Certificate of Incorporation, the affirmative vote of the holders of at least a majority of the voting power of all of the then-outstanding shares of the capital stock of the corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required to adopt, amend or repeal any provision of the Bylaws of the corporation.

## ARTICLE XIV

## RIGHT OF FIRST REFUSAL

**Section 44. Right of First Refusal.** Except for the holders of Series F Preferred Stock and Series G Preferred Stock, no stockholder shall sell, assign, pledge, or in any manner transfer any of the shares of Common or Preferred Stock of the corporation or any right or interest therein, whether voluntarily or by operation of law, or by gift or otherwise, except by a transfer which meets the requirements hereinafter set forth in this bylaw:

**(a)** If the stockholder desires to sell or otherwise transfer any of his shares of stock, then the stockholder shall first give written notice thereof to the corporation. The notice shall name the proposed transferee and state the number of shares to be transferred, the proposed consideration, and all other terms and conditions of the proposed transfer.

**(b)** For thirty (30) days following receipt of such notice, the corporation shall have the option to purchase all (but not less than all) of the shares specified in the notice at the price and upon the terms set forth in such notice; provided that, with the consent of the stockholder, the corporation shall have the option to purchase a lesser portion of the shares specified in such notice at the price and upon the terms set forth therein. In the event of a gift, property settlement or other transfer in which the proposed transferee is not paying the full price for the shares, and that is not otherwise exempted from the provisions of this Section 44, the price shall be deemed to be the fair market value of the stock at such time as determined in good faith by the Board of Directors. If the corporation elects to purchase all of the shares or, with consent of the stockholder, a lesser portion of the shares, it shall give written notice to the transferring stockholder of its election and settlement for such shares shall be made as provided below in paragraph (d).

**(c)** The corporation may assign its rights hereunder.

**(d)** If the corporation and/or its assignee(s) elect to acquire any of the shares of the transferring stockholder as specified in such transferring stockholder's notice, the Secretary of the corporation shall so notify the transferring stockholder and settlement thereof shall be made in cash within thirty (30) days after the Secretary of the corporation receives such transferring stockholder's notice; provided that if the terms of payment set forth in such transferring stockholder's notice were other than cash against delivery, the corporation and/or its assignee(s) shall pay for such shares on the same terms and conditions set forth in such transferring stockholder's notice.

**(e)** If the corporation and/or its assignees(s) do not elect to acquire all of the shares specified in the transferring stockholder's notice, such transferring stockholder may, within the sixty-day period following the expiration of the option rights granted to the corporation and/or its assignees(s) herein, transfer the shares specified in such transferring stockholder's notice which were not acquired by the corporation and/or its assignees(s) as specified in such transferring stockholder's notice. All shares so sold by such transferring stockholder shall continue to be subject to the provisions of this bylaw.

-21-

**(f)** Notwithstanding any other provision of this Section 44, the following shall be exempt from the provisions of this bylaw:

**(1)** A stockholder's transfer of any or all shares held either during such stockholder's lifetime or on death by will or intestacy to such stockholder's immediate family or to any custodian or trustee for the account of such stockholder or such stockholder's immediate family or to any limited partnership of which the stockholder, members of such stockholder's immediate family or any trust for the account of such stockholder or such stockholder's immediate family will be the general of limited partner(s) of such partnership. "Immediate family" as used herein shall mean spouse, lineal descendant, father, mother, brother, or sister of the stockholder making such transfer.

**(2)** A stockholder's bona fide pledge or mortgage of any shares with a commercial lending institution, provided that any subsequent transfer of such shares by such institution shall be conducted in the manner set forth in this bylaw.

**(3)** A stockholder's transfer of any or all of such stockholder's shares to the corporation or to any other stockholder of the corporation.

**(4)** A stockholder's transfer of any or all of such stockholder's shares to a person who, at the time of such transfer, is an officer or director of the corporation.

**(5)** A corporate stockholder's transfer of any or all of its shares pursuant to and in accordance with the terms of any merger, consolidation, reclassification of shares or capital reorganization of the corporate stockholder, or pursuant to a sale of all or substantially all of the stock or assets of a corporate stockholder.

**(6)** A corporate stockholder's transfer of any or all of its shares to any or all of its stockholders.

**(7)** A transfer by a stockholder which is a limited or general partnership to any or all of its partners or former partners.

In any such case, the transferee, assignee, or other recipient shall receive and hold such stock subject to the provisions of this bylaw, and there shall be no further transfer of such stock except in accord with this bylaw.

**(g)** The provisions of this bylaw may be waived with respect to any transfer either by the corporation, upon duly authorized action of its Board of Directors, or by the stockholders, upon the express written consent of the owners of a majority of the voting power of the corporation (excluding the votes represented by those shares to be transferred by the transferring stockholder). This bylaw may be amended or repealed either by a duly authorized action of the Board of Directors or by the stockholders, upon the express written consent of the owners of a majority of the voting power of the corporation.

**(h)** Any sale or transfer, or purported sale or transfer, of securities of the corporation shall be null and void unless the terms, conditions, and provisions of this bylaw are strictly observed and followed.

-22-

**(i)** The foregoing right of first refusal shall terminate upon the date securities of the corporation are first offered to the public pursuant to a registration statement filed with, and declared effective by, the United States Securities and Exchange Commission under the Securities Act of 1933, as amended.

**(j)** The certificates representing shares of stock of the corporation shall bear on their face the following legend so long as the foregoing right of first refusal remains in effect:

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A RIGHT OF FIRST REFUSAL OPTION IN FAVOR OF THE CORPORATION AND/OR ITS ASSIGNEES, AS PROVIDED IN THE BYLAWS OF THE CORPORATION."

-23-

## ARTICLE XV

## LOANS TO OFFICERS

**Section 45. Loans to Officers.** Except as otherwise prohibited under applicable law, the corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the corporation or of its subsidiaries, including any officer or employee who is a Director of the corporation or its subsidiaries, whenever, in the judgment of the Board of Directors, such loan, guarantee or assistance may reasonably be expected to benefit the corporation. The loan, guarantee or other assistance may be with or without interest and may be unsecured, or secured in such manner as the Board of Directors shall approve, including, without limitation, a pledge of shares of stock of the corporation. Nothing in these Bylaws shall be deemed to deny, limit or restrict the powers of guaranty or warranty of the corporation at common law or under any statute.

## ARTICLE XVI

## MISCELLANEOUS

**Section 46. Annual Report**.

(a) Subject to the provisions of paragraph (b) of this Bylaw, the Board of Directors shall cause an annual report to be sent to each stockholder of the corporation not later than one hundred twenty (120) days after the close of the corporation's fiscal year. Such report shall include a balance sheet as of the end of such fiscal year and an income statement and statement of changes in financial position for such fiscal year, accompanied by any report thereon of independent accounts or, if there is no such report, the certificate of an authorized officer of the corporation that such statements were prepared without audit from the books and records of the corporation. When there are 100 or more stockholders of record of the corporation, as determined by Section 605 of the CGCL, additional information as required by Section 1501(b) of the CGCL shall also be contained in such report, provided that if the corporation has a class of securities registered under Section 12 of the 1934 Act, the 1934 Act shall take precedence. Such report shall be sent to stockholders at least fifteen (15) days prior to the next annual meeting of stockholders after the end of the fiscal year to which it relates.

(b) If and so long as there are fewer than 100 holders of record of the corporation's shares, the requirement of sending of an annual report to the stockholders of the corporation is hereby expressly waived.

-24-

| ARTICLE I | Offices | 1 |
|---|---|---|
| Section 1. | Registered Office | 1 |
| Section 2. | Other Offices | 1 |
| ARTICLE II | Corporate Seal | 1 |
| Section 3. | Corporate Seal | 1 |
| ARTICLE III | Stockholders' Meetings | 1 |
| Section 4. | Place of Meetings | 1 |
| Section 5. | Annual Meetings of Stockholders | 1 |
| Section 6. | Special Meetings of Stockholders | 3 |
| Section 7. | Notice of Meetings | 3 |
| Section 8. | Quorum | 4 |
| Section 9. | Adjournment and Notice of Adjourned Meetings | 4 |
| Section 10. | Voting Rights | 4 |
| Section 11. | Joint Owners of Stock | 5 |
| Section 12. | List of Stockholders | 5 |
| Section 13. | Action Without Meeting | 5 |
| Section 14. | Organization | 6 |
| ARTICLE IV | Directors | 7 |
| Section 15. | Number of Directors | 7 |
| Section 16. | Powers | 7 |
| Section 17. | Term of Directors | 7 |
| Section 18. | Board Vacancies | 7 |
| Section 19. | Resignation of Directors | 8 |
| Section 20. | Removal of Directors | 8 |
| Section 21. | Board Meetings | 9 |
| (a) | Regular Meetings | 9 |
| (b) | Special Meetings | 9 |
| (c) | Meetings by Electronic Communications Equipment | 9 |
| (d) | Notice of Special Meetings | 9 |
| (e) | Waiver of Notice | 9 |
| Section 22. | Quorum and Voting | 9 |
| Section 23. | Action Without Meeting | 9 |

| | | |
|---|---|---|
| Section 24. | Fees and Compensation | 10 |
| Section 25. | Committees | 10 |
| (a) | Executive Committee | 10 |
| (b) | Other Committees | 10 |
| (c) | Term | 10 |
| (d) | Meetings | 10 |
| Section 26. | Organization | 10 |
| ARTICLE V | Officers | 11 |
| Section 27. | Officers Designated | 12 |
| Section 28. | Tenure and Duties of Officers | 12 |
| (a) | General | 12 |
| (b) | Chairman of the Board of Directors | 12 |
| (c) | President | 12 |
| (d) | Vice Presidents | 12 |
| (e) | Secretary | 12 |
| (f) | Chief Financial Officer | 13 |
| Section 29. | Delegation of Authority | 13 |
| Section 30. | Resignations and Removal | 13 |
| ARTICLE VI | Execution Of Corporate Instruments And Voting Of Securities Owned By The Corporation | 13 |
| Section 31. | Execution of Corporate Instruments | 13 |
| Section 32. | Voting of Securities Owned by the Corporation | 14 |
| ARTICLE VII | Shares Of Stock | 14 |
| Section 33. | Form and Execution of Certificates | 14 |
| Section 34. | Lost Certificates | 14 |
| Section 35. | Transfers | 15 |
| Section 36. | Fixing Record Dates | 15 |
| Section 37. | Registered Stockholders | 16 |
| ARTICLE VIII | Other Securities Of The Corporation | 16 |

| Section 38. | Execution of Other Securities | 16 |
|---|---|---|
| ARTICLE IX | Dividends | 16 |
| Section 39. | Declaration of Dividends | 16 |
| ARTICLE X | Fiscal Year | 17 |
| Section 40. | Fiscal Year | 17 |
| ARTICLE XI | Indemnification | 17 |
| Section 41. | Indemnification of Directors, Executive Officers, Other Officers, Employees and Other Agents | 17 |
| (a) | Directors and Executive Officers | 17 |
| (b) | Other Officers, Employees and Other Agents | 17 |
| (c) | Expenses | 17 |
| (d) | Enforcement | 18 |
| (e) | Non-Exclusivity of Rights | 18 |
| (f) | Survival of Rights | 19 |
| (g) | Insurance | 19 |
| (h) | Amendments | 19 |
| (i) | Saving Clause | 19 |
| (j) | Certain Definitions | 19 |
| ARTICLE XII | Notices | 20 |
| Section 42. | Notices | 20 |
| (a) | Notice to Stockholders | 20 |
| (b) | Notice to Directors | 20 |
| (c) | Affidavit of Mailing | 20 |
| (d) | Notice to Person with Whom Communication Is Unlawful | 20 |
| (e) | Notice to Stockholders Sharing an Address | 20 |
| ARTICLE XIII | Amendments | 21 |
| Section 43. | Amendments | 21 |

ARTICLE XIV        Right Of First Refusal                                21

    Section 44.    Right of First Refusal                                21

ARTICLE XV         Loans To Officers                                     24

    Section 45.    Loans to Officers                                     24

ARTICLE XVI        Miscellaneous                                         24

    Section 46.    Annual Report                                         24

-4-

**Exhibit 4.2**

**WARRANT**

THIS WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR QUALIFIED UNDER ANY STATE OR FOREIGN SECURITIES LAWS AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED OR ASSIGNED UNLESS (I) A REGISTRATION STATEMENT COVERING SUCH SHARES IS EFFECTIVE UNDER THE ACT AND IS QUALIFIED UNDER APPLICABLE STATE AND FOREIGN LAW OR (II) THE TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS UNDER THE ACT AND THE QUALIFICATION REQUIREMENTS UNDER APPLICABLE STATE AND FOREIGN LAW AND, IF THE CORPORATION REQUESTS, AN OPINION SATISFACTORY TO THE CORPORATION TO SUCH EFFECT HAS BEEN RENDERED BY COUNSEL.

THIS WARRANT (AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT) IS SUBJECT TO A RESTRICTIONS ON TRANSFER FOR A PERIOD OF TIME FOLLOWING THE EFFECTIVE DATE OF THE UNDERWRITTEN PUBLIC OFFERING OF THE COMPANY'S SECURITIES AS SET FORTH HEREIN. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE SECURITIES REPRESENTED BY THIS WARRANT MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS CONTAINED HEREIN.

Warrant No. WC-____                                                                                              Number of Shares: ____
Date of Issuance: _____

FOR VALUE RECEIVED, THEREALREAL, INC., a Delaware corporation (the "**Company**"), hereby certifies that                (the "**Holder**") is entitled to purchase from the Company        duly authorized, validly issued, fully paid and nonassessable shares of Common Stock at a purchase price per share of $        (the "**Exercise Price**"), all subject to the terms and conditions set forth below in this Warrant. Certain capitalized terms used herein are defined in **Section 1** hereof.

1.    Definitions. As used in this Warrant, the following terms have the respective meanings set forth below:

"**Aggregate Exercise Price**" means an amount equal to the product of (a) the number of Warrant Shares in respect of which this Warrant is then being exercised pursuant to **Section 3** hereof, multiplied by (b) the Exercise Price in accordance with the terms of this Warrant.

"**Board**" means the board of directors of the Company.

"**Business Day**" means any day, except a Saturday, Sunday or legal holiday, on which banking institutions in the city of San Francisco, California are authorized or obligated by law or executive order to close.

"**Common Stock**" means the common stock, par value $0.0001 per share, of the Company, and any capital stock into which such Common Stock shall have been converted, exchanged or reclassified following the date hereof.

"**Company**" has the meaning set forth in the preamble.

"**Convertible Securities**" means any securities (directly or indirectly) convertible into or exchangeable for Common Stock, but excluding Options.

"**Exercise Date**" means, for any given exercise of this Warrant, the date on which the conditions to such exercise as set forth in **Section 3** shall have been satisfied at or prior to 5:00 p.m., San Francisco, CA time, on a Business Day, including, without limitation, the receipt by the Company of the Exercise Agreement, the Warrant and the Aggregate Exercise Price.

"**Exercise Agreement**" has the meaning set forth in **Section 3(a)(i)**.

"**Exercise Period**" has the meaning set forth in **Section 2**.

"**Exercise Price**" has the meaning set forth in the preamble.

"**Fair Market Value**" means the price on a given date as determined in good faith by the Board of Directors of the Company.

"**Holder**" has the meaning set forth in the preamble.

"**Options**" means any warrants or other rights or options to subscribe for or purchase Common Stock or Convertible Securities.

"**Original Issue Date**" means              .

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, corporation, joint venture, trust, incorporated organization or government or department or agency thereof.

2

"**Warrant**" means this Warrant and all warrants issued upon division or combination of, or in substitution for, this Warrant.

"**Warrant Shares**" means the shares of Common Stock or other capital stock of the Company then purchasable upon exercise of this Warrant in accordance with the terms of this Warrant.

2.    <u>Term of Warrant</u>. Subject to the terms and conditions hereof, at any time or from time to time after the date hereof and prior to 5:00 p.m., San Francisco, CA time, on                    (the "**Exercise Period**"), the Holder of this Warrant may exercise this Warrant for all or any part of the Warrant Shares purchasable hereunder.

3.    <u>Exercise of Warrant</u>.

(a)    **Exercise Procedure**. This Warrant may be exercised from time to time on any Business Day during the Exercise Period, for all or any part of the unexercised Warrant Shares, upon:

   (i)    surrender of this Warrant to the Company at its then principal executive offices (or an indemnification undertaking with respect to this Warrant in the case of its loss, theft or destruction), together with an Exercise Agreement in the form attached hereto as **Exhibit A** (each, an "**Exercise Agreement**"), duly completed (including specifying the number of Warrant Shares to be purchased) and executed; and

   (ii)    payment to the Company of the Aggregate Exercise Price in accordance with **Section 3(b)**.

(b)    **Payment of the Aggregate Exercise Price**. Payment of the Aggregate Exercise Price shall be made, at the option of the Holder as expressed in the Exercise Agreement, by the following methods:

   (i)    by delivery to the Company of a certified or official bank check payable to the order of the Company or by wire transfer of immediately available funds to an account designated in writing by the Company, in the amount of such Aggregate Exercise Price;

   (ii)    by instructing the Company to withhold a number of Warrant Shares then issuable upon exercise of this Warrant with an aggregate Fair Market Value as of the Exercise Date equal to such Aggregate Exercise Price;

3

(iii)    any combination of the foregoing.

In the event of any withholding of Warrant Shares or surrender of other equity securities pursuant to clause (ii) above where the number of shares whose value is equal to the Aggregate Exercise Price is not a whole number, the number of shares withheld by or surrendered to the Company shall be rounded up to the nearest whole share and the Company shall make a cash payment to the Holder (by delivery of a certified or official bank check or by wire transfer of immediately available funds) based on the incremental fraction of a share being so withheld by or surrendered to the Company in an amount equal to the product of (x) such incremental fraction of a share being so withheld or surrendered multiplied by the Fair Market Value per Warrant Share as of the Exercise Date.

(c)    **Delivery of Stock Certificates**. Upon receipt by the Company of the Exercise Agreement, surrender of this Warrant and payment of the Aggregate Exercise Price (in accordance with **Section 3(a)** hereof), the Company shall execute (or cause to be executed) and deliver (or cause to be delivered) to the Holder a certificate or certificates representing the Warrant Shares issuable upon such exercise, together with cash in lieu of any fraction of a share, as provided in **Section 3(d)** below. The stock certificate or certificates so delivered shall be, to the extent possible, in such denomination or denominations as the exercising Holder shall reasonably request in the Exercise Agreement and shall be registered in the name of the Holder or, subject to compliance with **Section 7** below, such other Person's name as shall be designated in the Exercise Agreement. This Warrant shall be deemed to have been exercised and such certificate or certificates of Warrant Shares shall be deemed to have been issued, and the Holder or any other Person so designated to be named therein shall be deemed to have become a holder of record of such Warrant Shares for all purposes, as of the Exercise Date.

(d)    **Fractional Shares**. The Company shall not be required to issue a fractional Warrant Share upon exercise of any Warrant. As to any fraction of a Warrant Share that the Holder would otherwise be entitled to purchase upon such exercise, the Company shall pay to such Holder an amount in cash (by delivery of a certified or official bank check or by wire transfer of immediately available funds) equal to the product of (i) such fraction multiplied by (ii) the Fair Market Value of one Warrant Share on the Exercise Date.

4

(e)    **Delivery of New Warrant**. Unless the purchase rights represented by this Warrant shall have expired or shall have been fully exercised, the Company shall, at the time of delivery of the certificate or certificates representing the Warrant Shares being issued in accordance with **Section 3(c)** hereof, deliver to the Holder a new Warrant evidencing the rights of the Holder to purchase the unexpired and unexercised Warrant Shares called for by this Warrant. Such new Warrant shall in all other respects be identical to this Warrant.

(f)    **Valid Issuance of Warrant and Warrant Shares; Payment of Taxes**. With respect to the exercise of this warrant, the Company hereby represents, covenants and agrees:

(i)    This Warrant is, and any Warrant issued in substitution for or replacement of this Warrant shall be, upon issuance, duly authorized and validly issued.

(ii)    All Warrant Shares issuable upon the exercise of this Warrant pursuant to the terms hereof shall be, upon issuance, and the Company shall take all such actions as may be necessary or appropriate in order that such Warrant Shares are, validly issued, fully paid and non-assessable, issued without violation of any preemptive or similar rights of any stockholder of the Company and free and clear of all taxes, liens and charges.

(iii)    The Company shall take all such actions as may be necessary to ensure that all such Warrant Shares are issued without violation by the Company of any applicable law or governmental regulation or any requirements of any domestic securities exchange upon which shares of Common Stock or other securities constituting Warrant Shares may be listed at the time of such exercise (except for official notice of issuance which shall be immediately delivered by the Company upon each such issuance).

(iv)    The Company shall pay all expenses in connection with, and all taxes and other governmental charges that may be imposed with respect to, the issuance or delivery of Warrant Shares upon exercise of this Warrant; provided, that the Company shall not be required to pay any tax or governmental charge that may be imposed with respect to any applicable withholding or the issuance or delivery of the Warrant Shares to any Person other than the Holder, and no such issuance or delivery shall be made unless and until the Person requesting such issuance has paid to the Company the amount of any such tax, or has established to the satisfaction of the Company that such tax has been paid.

5

(g)    **Conditional Exercise**. Notwithstanding any other provision hereof, if an exercise of any portion of this Warrant is to be made in connection with a public offering or a sale of the Company (pursuant to a merger, sale of stock, or otherwise), such exercise may at the election of the Holder be conditioned upon the consummation of such transaction, in which case such exercise shall not be deemed to be effective until immediately prior to the consummation of such transaction.

(h)    **Reservation of Shares**. During the Exercise Period, the Company shall at all times reserve and keep available out of its authorized but unissued Common Stock or other securities constituting Warrant Shares, solely for the purpose of issuance upon the exercise of this Warrant, the maximum number of Warrant Shares issuable upon the exercise of this Warrant, and the par value per Warrant Share shall at all times be less than or equal to the applicable Exercise Price. The Company shall not increase the par value of any Warrant Shares receivable upon the exercise of this Warrant above the Exercise Price then in effect, and shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable shares of Common Stock upon the exercise of this Warrant.

4.    Adjustments to the Shares And Warrant Price.

(a)    **Stock Dividends, Splits, Etc**. If the Company declares or pays a dividend or distribution on the outstanding shares of the Common Stock payable in securities or property (other than cash), then upon exercise of this Warrant, for each Warrant Share acquired, Holder shall receive, without additional cost to Holder, the total number and kind of securities and property which Holder would have received had Holder owned the Warrant Shares of record as of the date the dividend or distribution occurred. If the Company subdivides the outstanding shares of the Common Stock by reclassification or otherwise into a greater number of shares, the number of Warrant Shares purchasable hereunder shall be proportionately increased and the Exercise Price shall be proportionately decreased. If the outstanding shares of the Common Stock are combined or consolidated, by reclassification or otherwise, into a lesser number of shares, the Exercise Price shall be proportionately increased and the number of Warrant Shares shall be proportionately decreased.

6

(b)  **Reclassification, Exchange, Combinations or Substitution**. Upon any event whereby all of the outstanding shares of the Common Stock are reclassified, exchanged, combined, substituted, or replaced for, into, with or by Company securities of a different class and/or series, then from and after the consummation of such event, this Warrant will be exercisable for the number, class and series of Company securities that Holder would have received had the Warrant Shares been outstanding on and as of the consummation of such event, and subject to further adjustment thereafter from time to time in accordance with the provisions of this Warrant. The provisions of this **Section 4(b)** shall similarly apply to successive reclassifications, exchanges, combinations substitutions, replacements or other similar events.

(c)  **No Fractional Share**. No fractional share shall be issuable upon exercise of this Warrant and the number of Warrant Shares to be issued shall be rounded down to the nearest whole share. If a fractional Warrant Share interest arises upon any exercise of the Warrant, the Company shall eliminate such fractional Warrant Share interest by paying Holder in cash the amount computed by multiplying the fractional interest by (i) the Fair Market Value of a full Warrant Share, less (ii) the then-effective Exercise Price.

5.  <u>Lock-Up Period</u>. Holder hereby agrees that Holder shall not offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any Common Stock (or other securities) of the Company or enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Common Stock (or other securities) of the Company held by Holder (other than those included in the registration) for a period specified by the representative of the underwriters of Common Stock (or other securities) of the Company not to exceed one hundred and eighty (180) days following the effective date of any registration statement of the Company filed under the Securities Act (or such other period as may be requested by the Company or the underwriters to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in NASD Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto).

Holder agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the underwriter which are consistent with the foregoing or which are necessary to give further effect thereto. In addition, if requested by the Company or the representative of the underwriters of Common Stock (or other securities) of the Company, Holder shall provide, within ten (10) days of such request, such information as may be required by the Company or such representative in connection with the completion of any public offering of the Company's securities pursuant to a registration statement filed under the

7

Securities Act. The obligations described in this **Section 5** shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a Commission Rule 145 transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end of said one hundred and eighty (180) day (or other) period. Holder agrees that any transferee of the Warrant Shares shall be bound by this **Section 5**.

6.    Company's Right of First Refusal. Before any Warrant Shares held by Holder or any transferee (either being sometimes referred to herein as the "Holder") may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Warrant Shares on the terms and conditions set forth in this **Section 6** (the "***Right of First Refusal***").

(a)    **Notice of Proposed Transfer**. The Holder of the Warrant Shares shall deliver to the Company a written notice (the "***Notice***") stating: (i) the Holder's bona fide intention to sell or otherwise transfer such Shares; (ii) the name of each proposed purchaser or other transferee ("***Proposed Transferee***"); (iii) the number of Shares to be transferred to each Proposed Transferee; and (iv) the bona fide cash price or other consideration for which the Holder proposes to transfer the Shares (the "***Offered Price***"), and the Holder shall offer the Shares at the Offered Price to the Company or its assignee(s).

(b)    **Exercise of Right of First Refusal**. At any time within thirty (30) days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the purchase price determined in accordance with subsection (c) below.

(c)    **Purchase Price**. The purchase price ("***ROFR Purchase Price***") for the Warrant Shares purchased by the Company or its assignee(s) under this **Section 6** shall be the Offered Price. If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in good faith.

8

(d)    **Payment**. Payment of the ROFR Purchase Price shall be made, at the option of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness of the Holder to the Company (or, in the case of repurchase by an assignee, to the assignee), or by any combination thereof within thirty (30) days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(e)    **Holder's Right to Transfer**. If all of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this **Section 6**, then the Holder may sell or otherwise transfer such Shares to that Proposed Transferee at the Offered Price or at a higher price, provided that: (i) the transfer is made only on the terms provided for in the notice, with the exception of the purchase price, which may be either the price listed in the notice or any higher price; (ii) such transfer is consummated within 60 days after the date the notice is delivered to the Company; (iii) the transfer is effected in accordance with any applicable securities laws, and if requested by the Company, the Holder shall have delivered an opinion of counsel acceptable to the Company to that effect; and (iv) the Proposed Transferee agrees in writing that the provisions of this Section shall continue to apply to the transferred Shares in the hands of such Proposed Transferee. If any Shares described in a notice are not transferred to the Proposed Transferee within the period provided above, then before any such Shares may be transferred, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the right of first refusal described in this Section.

(f)    **Exception for Certain Family Transfers**. Notwithstanding anything to the contrary contained elsewhere in this Section, the transfer of any or all of the Warrant Shares during the Holder's lifetime or on the Holder's death by will or intestacy to the Holder's spouse or domestic partner, child, father, mother, brother, sister, father-in-law, mother-in-law, brother-in-law, sister-in-law, grandfather, grandmother, grandchild, cousin, aunt, uncle, niece, nephew, stepchild, or to a trust or other similar estate planning vehicle for the benefit of the Holder or any such person, shall be exempt from the provisions of this Section; provided that, in each such case, the transferee shall agree in writing to receive and hold the Warrant Shares so transferred subject to all of the provisions of this Warrant, including but not limited to this Section, and there shall be no further transfer of such Warrant Shares except in accordance with the terms of this Section. For purposes of this Warrant, a person will be deemed to be a "domestic partner" of another person if the two persons (i) reside in the same residence and plan to do so indefinitely, (ii) have resided together for at least one year, (iii) are each at least 18 years of age and mentally

9

competent to consent to contract, (iv) are not blood relatives any closer than would prohibit legal marriage in the state in which they reside, (v) are financially interdependent, as demonstrated to the reasonable satisfaction of the Company and (vi) have each been the sole spouse equivalent of the other for the year prior to the transfer and plan to remain so indefinitely; provided that a person will not be considered a domestic partner if he or she is married to another person or has any other spouse equivalent.

(g) **Termination of Right of First Refusal**. The Right of First Refusal shall terminate as to any Warrant Shares upon the earlier of (i) the first sale of Common Stock of the Company to the general public, or (ii) a merger or acquisition of the company in which the successor corporation has equity securities that are publicly traded.

7. Transfer of Warrant. This Warrant and all rights hereunder are personal to the Holder and may not be transferred, in whole or in part, by the Holder without the consent of the Company.

8. Holder Not Deemed a Stockholder; Limitations on Liability. Prior to the issuance to the Holder of the Warrant Shares to which the Holder is then entitled to receive upon the due exercise of this Warrant, the Holder shall not be entitled to vote or receive dividends or be deemed the holder of shares of capital stock of the Company for any purpose, nor shall anything contained in this Warrant be construed to confer upon the Holder, as such, any of the rights of a stockholder of the Company or any right to vote, give or withhold consent to any corporate action (whether any reorganization, issue of stock, reclassification of stock, consolidation, merger, conveyance or otherwise), receive notice of meetings, receive dividends or subscription rights, or otherwise. In addition, nothing contained in this Warrant shall be construed as imposing any liabilities on the Holder to purchase any securities (upon exercise of this Warrant or otherwise) or as a stockholder of the Company, whether such liabilities are asserted by the Company or by creditors of the Company.

9. Replacement on Loss; Division and Combination.

(a) **Replacement of Warrant on Loss**. Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and upon delivery of an indemnity reasonably satisfactory to it (it being understood that a written indemnification agreement or affidavit of loss of the Holder shall be a sufficient indemnity) and, in case of mutilation, upon surrender of such Warrant for cancellation to the Company, the Company at its own expense shall execute and deliver to the Holder, in lieu hereof, a new Warrant of like tenor and exercisable for an equivalent number of Warrant Shares as the Warrant so lost, stolen, mutilated or destroyed; provided, that, in the case of mutilation, no indemnity shall be required if this Warrant in identifiable form is surrendered to the Company for cancellation.

10

(b)    **Division and Combination of Warrant**. Subject to compliance with the applicable provisions of this Warrant and the Stockholders Agreement as to any transfer or other assignment which may be involved in such division or combination, this Warrant may be divided or, following any such division of this Warrant, subsequently combined with other Warrants, upon the surrender of this Warrant or Warrants to the Company at its then principal executive offices, together with a written notice specifying the names and denominations in which new Warrants are to be issued, signed by the respective Holders or their agents or attorneys. Subject to compliance with the applicable provisions of this Warrant and the Stockholders Agreement as to any transfer or assignment which may be involved in such division or combination, the Company shall at its own expense execute and deliver a new Warrant or Warrants in exchange for the Warrant or Warrants so surrendered in accordance with such notice. Such new Warrant or Warrants shall be of like tenor to the surrendered Warrant or Warrants and shall be exercisable in the aggregate for an equivalent number of Warrant Shares as the Warrant or Warrants so surrendered in accordance with such notice.

10.    Compliance with the Securities Act.

(a)    **Agreement to Comply with the Securities Act; Legend**. The Holder, by acceptance of this Warrant, agrees to comply in all respects with the provisions of this **Section 10** and the restrictive legend requirements set forth on the face of this Warrant and further agrees that such Holder shall not offer, sell or otherwise dispose of this Warrant or any Warrant Shares to be issued upon exercise hereof except under circumstances that will not result in a violation of the Securities Act of 1933, as amended (the "**Securities Act**"). This Warrant and all Warrant Shares issued upon exercise of this Warrant (unless registered under the Securities Act) shall be stamped or imprinted with a legend in substantially the following form:

"THIS WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR QUALIFIED UNDER ANY STATE OR FOREIGN SECURITIES LAWS AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED OR ASSIGNED UNLESS (I) A REGISTRATION STATEMENT COVERING SUCH SHARES IS EFFECTIVE UNDER THE ACT AND IS QUALIFIED UNDER APPLICABLE STATE

11

AND FOREIGN LAW OR (II) THE TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS UNDER THE ACT AND THE QUALIFICATION REQUIREMENTS UNDER APPLICABLE STATE AND FOREIGN LAW AND, IF THE CORPORATION REQUESTS, AN OPINION SATISFACTORY TO THE CORPORATION TO SUCH EFFECT HAS BEEN RENDERED BY COUNSEL."

(b) **Representations of the Holder**. In connection with the issuance of this Warrant, the Holder specifically represents, as of the date hereof, to the Company by acceptance of this Warrant as follows:

(i) The Holder is an "accredited investor" as defined in Rule 501 of Regulation D promulgated under the Securities Act. The Holder is acquiring this Warrant and the Warrant Shares to be issued upon exercise hereof for investment for its own account and not with a view towards, or for resale in connection with, the public sale or distribution of this Warrant or the Warrant Shares, except pursuant to sales registered or exempted under the Securities Act.

(ii) The Holder understands and acknowledges that this Warrant and the Warrant Shares to be issued upon exercise hereof are "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that, under such laws and applicable regulations, such securities may be resold without registration under the Securities Act only in certain limited circumstances. In addition, the Holder represents that it is familiar with Rule 144 under the Securities Act, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act.

(iii) The Holder acknowledges that it can bear the economic and financial risk of its investment for an indefinite period, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Warrant and the Warrant Shares. The Holder has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Warrant and the business, properties, prospects and financial condition of the Company.

12

11. <u>Warrant Register</u>. The Company shall keep and properly maintain at its principal executive offices books for the registration of the Warrant and any transfers thereof. The Company may deem and treat the Person in whose name the Warrant is registered on such register as the Holder thereof for all purposes, and the Company shall not be affected by any notice to the contrary, except any assignment, division, combination or other transfer of the Warrant effected in accordance with the provisions of this Warrant.

12. <u>Notices</u>. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 12**).

If to the Company:
TheRealReal, Inc.
1980 Oakdale Ave.
San Francisco, CA 94124
Attention: Chief Financial Officer

with a copy to:
Sidley Austin LLP
1001 Page Mill Road, Building 1
Palo Alto, CA 94304
Facsimile:    (650)-565-7001
E-mail:        hbarry@sidley.com
Attention:     Hank Barry

If to the Holder:

Facsimile:
E-mail:
Attention:

13

13.  Cumulative Remedies. Except to the extent expressly provided in **Section 8** to the contrary, the rights and remedies provided in this Warrant are cumulative and are not exclusive of, and are in addition to and not in substitution for, any other rights or remedies available at law, in equity or otherwise.

14.  Entire Agreement. This Warrant constitutes the sole and entire agreement of the parties to this Warrant with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

15.  Successor and Assigns. This Warrant and the rights evidenced hereby shall be binding upon and shall inure to the benefit of the parties hereto and the successors of the Company and the successors and permitted assigns of the Holder. Such successors and/or permitted assigns of the Holder shall be deemed to be a Holder for all purposes hereunder.

16.  No Third-Party Beneficiaries. This Warrant is for the sole benefit of the Company and the Holder and their respective successors and, in the case of the Holder, permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Warrant.

17.  Headings. The headings in this Warrant are for reference only and shall not affect the interpretation of this Warrant.

18.  Amendment and Modification; Waiver. Except as otherwise provided herein, this Warrant may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by the Company or the Holder of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Warrant shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

19.  Severability. If any term or provision of this Warrant is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Warrant or invalidate or render unenforceable such term or provision in any other jurisdiction.

20.  Governing Law. This Warrant shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

14

21. <u>Submission to Jurisdiction</u>. Any legal suit, action or proceeding arising out of or based upon this Warrant or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of California in each case located in the city and county of San Francisco, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by certified or registered mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

22. <u>Waiver of Jury Trial</u>. Each party acknowledges and agrees that any controversy which may arise under this Warrant is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Warrant or the transactions contemplated hereby.

23. <u>Counterparts</u>. This Warrant may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Warrant delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Warrant.

24. <u>No Strict Construction</u>. This Warrant shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

SIGNATURE PAGE FOLLOWS

15

IN WITNESS WHEREOF, the Company has duly executed this Warrant on the Original Issue Date.

THEREALREAL, INC.

By: _____

Name: Julie Wainwright
Title: Chief Executive Officer

Accepted and agreed,

_____

By: _____
Name: _____
Title: _____

16

EXHIBIT A

**EXERCISE AGREEMENT**

To:  **TheRealReal,** Inc.                                                                                          Dated: _____

The undersigned, pursuant to the provisions set forth in the attached Common Stock Purchase Warrant No. WC-    (the **"Warrant"**), hereby irrevocably elects to either

☐ purchase                 shares of the Common Stock covered by such Warrant and herewith makes payment of $              , or

☐ surrender shares of Warrant Stock pursuant to Section 3(b)(ii) of the Warrant, for a fair market value to be determined by the Board of Directors of TheRealReal, Inc. in good faith

representing the full purchase price for such shares at the price per share provided for in such Warrant by one of the methods specified for payment in Section 3(b) of such Warrant.

The undersigned acknowledges that it has reviewed the representations and warranties set forth in Section 10 of the Warrant and by its signature below hereby makes such representations and warranties to the Company. Defined terms contained in such representations and warranties shall have the meanings assigned to them in the Warrant, provided that the term "Purchaser" shall refer to the undersigned and the term "Securities" shall refer to the Warrant Stock.

The undersigned further acknowledges that it has reviewed the restrictions on transfer and the market standoff provisions set forth in Section 5 of the Warrant as well as the right of first refusal provisions set forth in Section 6 of the Warrant, and agrees to be bound by such provisions.

Signature: _____

Name (print): _____

Title (if applicable) _____

Company (if applicable): _____

Exhibit 4.3

THIS WARRANT AND THE SHARES ISSUABLE HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH APPLICABLE LAW.

## WARRANT TO PURCHASE STOCK

|                         |                                             |
|-------------------------|---------------------------------------------|
| Corporation:            | TheRealReal, Inc.                           |
| Number of Shares:       | _____ (subject to adjustment pursuant to Section 1.7) |
| Class of Stock:         | Series B Preferred                          |
| Initial Exercise Price: | $        per share                          |
| Issue Date:             | _____                                      |
| Expiration Date:        | _____                                      |

**THIS WARRANT CERTIFIES THAT,** for good and valuable consideration, the receipt of which is hereby acknowledged,          or its assignee ("*Holder*") is entitled to purchase the number of fully paid and nonassessable shares of the class of securities (the "*Shares*") of the corporation (the "*Company*") at the initial exercise price per Share (the "*Warrant Price*") all as set forth above and as adjusted pursuant to Article 2 of this warrant, subject to the provisions and upon the terms and conditions set forth in this warrant.

## ARTICLE 1

## EXERCISE

**1.1 Method of Exercise.** Holder may exercise this warrant by delivering this warrant and a duly executed Notice of Exercise in substantially the form attached as Appendix 1 to the principal office of the Company. Unless Holder is exercising the conversion right set forth in Section 1.2, Holder shall also deliver to the Company a check for the aggregate Warrant Price for the Shares being purchased.

**1.2 Conversion Right.** In lieu of exercising this warrant as specified in Section 1.1, Holder may from time to time convert this warrant, in whole or in part, into a number of Shares determined by dividing (a) the aggregate fair market value of the Shares or other securities otherwise issuable upon exercise of this warrant minus the aggregate Warrant Price of such Shares by (b) the fair market value of one Share. The fair market value of the Shares shall be determined pursuant to Section 1.3.

**1.3 Fair Market Value.** If the Shares are traded regularly in a public market, the fair market value of the Shares shall be the closing price of the Shares (or the closing price of the Company's stock into which the Shares are convertible) reported for the business day immediately before Holder delivers its Notice of Exercise to the Company. If the Shares are not regularly traded in a public market, the Board of Directors of the Company shall determine fair market value in its reasonable good faith judgment.

*TheRealReal, Inc. — Warrant*

**1.4 Delivery of Certificate and New Warrant.** Promptly after Holder exercises or converts this warrant, the Company shall deliver to Holder certificates for the Shares acquired and, if this warrant has not been fully exercised or converted and has not expired, a new warrant representing the Shares not so acquired.

**1.5 Replacement of Warrants.** On receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this warrant and, in the case of loss, theft or destruction, on delivery of an indemnity agreement reasonably satisfactory in form and amount to the Company or, in the case of mutilation, on surrender and cancellation of this warrant, the Company at its expense shall execute and deliver, in lieu of this warrant, a new warrant of like tenor.

**1.6 Repurchase on Sale, Merger, or Consolidation of the Company.**

**1.6.1** "*Acquisition*." For the purpose of this warrant, "Acquisition" means (a) any sale, license, or other disposition of all or substantially all of the assets (including intellectual property) of the Company, or (b) any reorganization, consolidation, merger or sale of the voting securities of the Company or any other transaction where the holders of the Company's securities before the transaction beneficially own less than 50% of the outstanding voting securities of the surviving entity after the transaction.

**1.6.2 Assumption of Warrant.** If upon the closing of any Acquisition the successor entity assumes the obligations of this warrant, then this warrant shall be exercisable for the same securities, cash, and property as would be payable for the Shares issuable upon exercise of the unexercised portion of this warrant as if such Shares were outstanding on the record date for the Acquisition and subsequent closing. The Warrant Price shall be adjusted accordingly. The Company shall use reasonable efforts to cause the surviving corporation to assume the obligations of this warrant.

**1.6.3 Nonassumption.** If upon the closing of any Acquisition the successor entity does not assume the obligations of this warrant and Holder has not otherwise exercised this warrant in full, then Holder shall have the option either to (a) deem this warrant to have been automatically converted pursuant to Section 1.2 and thereafter Holder shall participate in the Acquisition on the same terms as other holders of the same class of securities of the Company; or (b) require the Company to purchase this warrant for cash upon the closing of the Acquisition for an amount per Share equal to three (3) times the Warrant Price.

**1.7 Adjustment in Number of Shares.** The number of shares for which this warrant is exercisable shall automatically increase by an amount equal to the quotient of (a) (i) the aggregate principal amount of all Term Loans made pursuant to that certain Loan and Security Agreement by and between the Company and              dated              , as it may be amended from time to time (provided that such amount shall not exceed $5,000,000), multiplied by (ii) 0.01125, divided by (b) the Initial Exercise Price; provided, that, for the avoidance of doubt, under no circumstance will the total number of shares for which this warrant is exercisable be greater than              . With respect to any adjustment to the number of shares pursuant to this Section 1.7, all shares subject to this warrant shall be of the same series and class of stock and bearing the same rights, preferences, and privileges as such series and class of stock denoted in the above caption hereto. The adjustment under this Section 1.7 shall be in addition to any adjustment made pursuant to Article 2 hereof.

*TheRealReal, Inc. — Warrant*

**ARTICLE 2**

**ADJUSTMENTS TO THE SHARES**

**2.1 Stock Dividends, Splits, Etc.** If the Company declares or pays a dividend on its common stock payable in common stock, or other securities, or subdivides the outstanding common stock into a greater amount of common stock, then upon exercise of this warrant, for each Share acquired, Holder shall receive, without cost to Holder, the total number and kind of securities to which Holder would have been entitled had Holder owned the Shares of record as of the date the dividend or subdivision occurred.

**2.2 Reclassification, Exchange or Substitution.** Upon any reclassification, exchange, substitution, or other event that results in a change of the number and/or class of the securities issuable upon exercise or conversion of this warrant, Holder shall be entitled to receive, upon exercise or conversion of this warrant, the number and kind of securities and property that Holder would have received for the Shares if this warrant had been exercised immediately before such reclassification, exchange, substitution, or other event. Such an event shall include any automatic conversion of the outstanding or issuable securities of the Company of the same class or series as the Shares to common stock pursuant to the terms of the Company's Certificate of Incorporation upon the closing of a registered public offering of the Company's common stock. The Company or its successor shall promptly issue to Holder a new warrant for such new securities or other property. The new warrant shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article 2 including, without limitation, adjustments to the Warrant Price and to the number of securities or property issuable upon exercise of the new warrant. The provisions of this Section 2.2 shall similarly apply to successive reclassifications, exchanges, substitutions, or other events.

**2.3 Adjustments for Combinations, Etc.** If the outstanding Shares are combined or consolidated, by reclassification or otherwise, into a lesser number of shares, the Warrant Price shall be proportionately increased. If the outstanding Shares are combined or consolidated, by reclassification or otherwise, into a greater number of shares, the Warrant Price shall be proportionately decreased.

**2.4 Adjustments for Diluting Issuances.** In the event of the issuance (a "***Diluting Issuance***") by the Company after the Issue Date of securities at a price per share less than the Warrant Price, then the number of shares of common stock issuable upon conversion of the Shares shall be adjusted in accordance with those provisions of the Company's Certificate of Incorporation that apply to Diluting Issuances.

**2.5 Certificate as to Adjustments.** Upon each adjustment of the Warrant Price, the Company at its expense shall promptly compute such adjustment, and furnish Holder with a certificate of its Chief Financial Officer setting forth such adjustment and the facts upon which such adjustment is based. The Company shall, upon written request, furnish Holder a certificate setting forth the Warrant Price in effect upon the date thereof and the series of adjustments leading to such Warrant Price.

*TheRealReal, Inc. — Warrant*

**2.6 Fractional Shares.** No fractional Shares shall be issuable upon exercise or conversion of the warrant, and the Number of Shares to be issued shall be rounded down to the nearest whole Share. If a fractional share interest arises upon any exercise or conversion of the warrant, the Company shall eliminate such fractional share interest by paying Holder the amount computed by multiplying the fractional interest by the fair market value of a full Share.

## ARTICLE 3

### REPRESENTATIONS AND COVENANTS OF THE COMPANY

**3.1 Representations and Warranties.** The Company hereby represents and warrants to the Holder as follows:

**(a)** The initial Warrant Price referenced on the first page of this warrant is not greater than the fair market value of the Shares as of the date of this warrant.

**(b)** All Shares which may be issued upon the exercise of the purchase right represented by this warrant, and all securities, if any, issuable upon conversion of the Shares, shall, upon issuance, be duly authorized, validly issued, fully paid and nonassessable, and free of any liens and encumbrances except for restrictions on transfer provided for herein or under applicable federal and state securities laws.

**(c)** The Company's capitalization table attached to this warrant is true and complete as of the Issue Date.

**3.2 Notice of Certain Events.** The Company shall provide Holder with not less than 10 days prior written notice, including a description of the material facts surrounding, any of the following events: (a) declaration of any dividend or distribution upon its common stock, whether in cash, property, stock, or other securities and whether or not a regular cash dividend; (b) offering for subscription pro rata to the holders of any class or series of its stock any additional shares of stock of any class or series or other rights; (c) effecting any reclassification or recapitalization of common stock; or (d) the merger or consolidation with or into any other corporation, or sale, lease, license, or conveyance of all or substantially all of its assets, or liquidation, dissolution or winding up.

**3.3 Information Rights.** So long as the Holder holds this warrant and/or any of the Shares, the Company shall deliver to the Holder (a) promptly after mailing, copies of all communiques to the shareholders of the Company, (b) within one hundred eighty (180) days after the end of each fiscal year of the Company, the annual audited financial statements of the Company certified by independent public accountants of recognized standing and (c) within forty-five (45) days after the end of each of the first three quarters of each fiscal year, the Company's quarterly, unaudited financial statements.

*TheRealReal, Inc. — Warrant*

**3.4 Registration Under Securities Act of 1933, as amended.** The Company agrees that upon exercise of the Shares pursuant to Article 1, Holder may become an "Investor" under that certain Investors' Rights Agreement among the Company and other investors dated as of April 3, 2013, as amended from time to time, (the "IRA") by executing a joinder pursuant to Section 6.9 of the IRA. For the avoidance of doubt, Holder will not be a "Major Investor" under the IRA and the common stock of the Company which the Shares are convertible into shall be "Registrable Securities" under the IRA.

## ARTICLE 4

## MISCELLANEOUS

**4.1 Term: Exercise Upon Expiration.** This warrant is exercisable in whole or in part, at any time and from time to time on or before the Expiration Date set forth above; provided, however, that if the Company completes its initial public offering within the three-year period immediately prior to the Expiration Date, the Expiration Date shall automatically be extended until the third anniversary of the effective date of the Company's initial public offering. If this warrant has not been exercised prior to the Expiration Date, this warrant shall be deemed to have been automatically exercised on the Expiration Date by "cashless" conversion pursuant to Section 1.2.

**4.2 Legends.** This warrant and the Shares (and the securities issuable, directly or indirectly, upon conversion of the Shares, if any) shall be imprinted with a legend in substantially the following form:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH APPLICABLE LAW.

**4.3 Compliance with Securities Laws on Transfer.** This warrant and the Shares issuable upon exercise of this warrant (and the securities issuable, directly or indirectly, upon conversion of the Shares, if any) may not be transferred or assigned in whole or in part without compliance with applicable federal and state securities laws by the transferor and the transferee. The Company shall not require Holder to provide an opinion of counsel if the transfer is to an affiliate of Holder or if there is no material question as to the availability of current information as referenced in Rule 144(c), Holder represents that it has complied with Rule 144 (d) and (e) in reasonable detail, the selling broker represents that it has complied with Rule 144(f), and the Company is provided with a copy of Holder's notice of proposed sale.

**4.4 Transfer Procedure.** Subject to the provisions of Section 4.3, Holder may transfer all or part of this warrant or the Shares issuable upon exercise of this warrant (or the securities issuable, directly or indirectly, upon conversion of the Shares, if any) by giving the Company notice of the portion of the warrant being transferred setting forth the name, address and taxpayer identification number of the transferee and surrendering this warrant to the Company for reissuance to the transferee(s) (and Holder, if applicable). No surrender or reissuance shall be required if the transfer is to an affiliate of Holder.

*TheRealReal, Inc. — Warrant*

**4.5 Notices.** All notices and other communications from the Company to the Holder, or vice versa, shall be deemed delivered and effective when given personally or mailed by first-class registered or certified mail, postage prepaid, at such address as may have been furnished to the Company or the Holder, as the case may be, in writing by the Company or such Holder from time to time. All notices to the Holder shall be addressed as follows:

_____

_____

_____

**4.6 Amendments.** This warrant and any term hereof may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

**4.7 Attorneys' Fees.** In the event of any dispute between the parties concerning the terms and provisions of this warrant, the party prevailing in such dispute shall be entitled to collect from the other party all costs incurred in such dispute, including reasonable attorneys' fees.

**4.8 Governing Law.** This warrant shall be governed by and construed in accordance with the laws of the State of California, without giving effect to its principles regarding conflicts of law.

Signature Page Follows

*TheRealReal, Inc. — Warrant*

IN WITNESS WHEREOF, the undersigned has executed this Warrant to Purchase Stock as of the date set forth above.

**THEREALREAL, INC.**

By: _____

Name: _____

Title: _____

*Signature Page to Warrant to Purchase Stock*

**APPENDIX 1**

**NOTICE OF EXERCISE**

**1.** The undersigned hereby elects to purchase          shares of the         stock of **THEREALREAL, INC.** pursuant to the terms of the attached warrant, and tenders herewith payment of the purchase price of such shares in full.

**1.** The undersigned hereby elects to convert the attached warrant into shares in the manner specified in the warrant. This conversion is exercised with respect to        of the shares covered by the warrant.

**Strike paragraph that does not apply.**

**2.** Please issue a certificate or certificates representing said shares in the name of the undersigned or in such other name as is specified below:

_____

_____

_____

**3.** The undersigned represents it is acquiring the shares solely for its own account and not as a nominee for any other party and not with a view toward the resale or distribution thereof except in compliance with applicable securities laws.

_____ or Registered Assignee

_____
(Signature)

_____
(Date)

*TheRealReal, Inc. — Warrant*

THIS WARRANT AND THE SHARES ISSUABLE HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH APPLICABLE LAW.

## SECOND WARRANT TO PURCHASE STOCK

| | |
|---|---|
| Corporation: | TheRealReal, Inc. |
| Number of Shares: | _____ |
| Class of Stock: | Series B Preferred |
| Initial Exercise Price: | $        per share |
| Issue Date: | _____ |
| Expiration Date: | _____ |

THIS SECOND WARRANT CERTIFIES THAT, for good and valuable consideration, the receipt of which is hereby acknowledged,        or its assignee ("*Holder*") is entitled to purchase the number of fully paid and nonassessable shares of the class of securities (the "*Shares*") of the corporation (the "*Company*") at the initial exercise price per Share (the "*Warrant Price*") all as set forth above and as adjusted pursuant to Article 2 of this warrant, subject to the provisions and upon the terms and conditions set forth in this warrant.

## ARTICLE 5

## EXERCISE

**5.1 Method of Exercise.** Holder may exercise this warrant by delivering this warrant and a duly executed Notice of Exercise in substantially the form attached as Appendix 1 to the principal office of the Company. Unless Holder is exercising the conversion right set forth in Section 1.2, Holder shall also deliver to the Company a check for the aggregate Warrant Price for the Shares being purchased.

**5.2 Conversion Right.** In lieu of exercising this warrant as specified in Section 1.1, Holder may from time to time convert this warrant, in whole or in part, into a number of Shares determined by dividing (a) the aggregate fair market value of the Shares or other securities otherwise issuable upon exercise of this warrant minus the aggregate Warrant Price of such Shares by (b) the fair market value of one Share. The fair market value of the Shares shall be determined pursuant to Section 1.3.

**5.3 Fair Market Value.** If the Shares are traded regularly in a public market, the fair market value of the Shares shall be the closing price of the Shares (or the closing price of the Company's stock into which the Shares are convertible) reported for the business day immediately before Holder delivers its Notice of Exercise to the Company. If the Shares are not regularly traded in a public market, the Board of Directors of the Company shall determine fair market value in its reasonable good faith judgment.

**5.4 Delivery of Certificate and New Warrant.** Promptly after Holder exercises or converts this warrant, the Company shall deliver to Holder certificates for the Shares acquired and, if this warrant has not been fully exercised or converted and has not expired, a new warrant representing the Shares not so acquired.

*TheRealReal, Inc. — Warrant*

**5.5 Replacement of Warrants.** On receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this warrant and, in the case of loss, theft or destruction, on delivery of an indemnity agreement reasonably satisfactory in form and amount to the Company or, in the case of mutilation, on surrender and cancellation of this warrant, the Company at its expense shall execute and deliver, in lieu of this warrant, a new warrant of like tenor.

**5.6 Repurchase on Sale, Merger, or Consolidation of the Company.**

**5.6.1 "*Acquisition.*"** For the purpose of this warrant, "Acquisition" means (a) any sale, license, or other disposition of all or substantially all of the assets (including intellectual property) of the Company, or (b) any reorganization, consolidation, merger or sale of the voting securities of the Company or any other transaction where the holders of the Company's securities before the transaction beneficially own less than 50% of the outstanding voting securities of the surviving entity after the transaction.

**5.6.2 Assumption of Warrant.** If upon the closing of any Acquisition the successor entity assumes the obligations of this warrant, then this warrant shall be exercisable for the same securities, cash, and property as would be payable for the Shares issuable upon exercise of the unexercised portion of this warrant as if such Shares were outstanding on the record date for the Acquisition and subsequent closing. The Warrant Price shall be adjusted accordingly. The Company shall use reasonable efforts to cause the surviving corporation to assume the obligations of this warrant.

**5.6.3 Nonassumption.** If upon the closing of any Acquisition the successor entity does not assume the obligations of this warrant and Holder has not otherwise exercised this warrant in full, then Holder shall have the option either to (a) deem this warrant to have been automatically converted pursuant to Section 1.2 and thereafter Holder shall participate in the Acquisition on the same terms as other holders of the same class of securities of the Company; or (b) require the Company to purchase this warrant for cash upon the closing of the Acquisition for an amount per Share equal to three (3) times the Warrant Price.

## ARTICLE 6

### ADJUSTMENTS TO THE SHARES

**6.1 Stock Dividends, Splits, Etc.** If the Company declares or pays a dividend on its common stock payable in common stock, or other securities, or subdivides the outstanding common stock into a greater amount of common stock, then upon exercise of this warrant, for each Share acquired, Holder shall receive, without cost to Holder, the total number and kind of securities to which Holder would have been entitled had Holder owned the Shares of record as of the date the dividend or subdivision occurred.

*TheRealReal, Inc. — Warrant*

**6.2 Reclassification, Exchange or Substitution.** Upon any reclassification, exchange, substitution, or other event that results in a change of the number and/or class of the securities issuable upon exercise or conversion of this warrant, Holder shall be entitled to receive, upon exercise or conversion of this warrant, the number and kind of securities and property that Holder would have received for the Shares if this warrant had been exercised immediately before such reclassification, exchange, substitution, or other event. Such an event shall include any automatic conversion of the outstanding or issuable securities of the Company of the same class or series as the Shares to common stock pursuant to the terms of the Company's Certificate of Incorporation upon the closing of a registered public offering of the Company's common stock. The Company or its successor shall promptly issue to Holder a new warrant for such new securities or other property. The new warrant shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article 2 including, without limitation, adjustments to the Warrant Price and to the number of securities or property issuable upon exercise of the new warrant. The provisions of this Section 2.2 shall similarly apply to successive reclassifications, exchanges, substitutions, or other events.

**6.3 Adjustments for Combinations, Etc.** If the outstanding Shares are combined or consolidated, by reclassification or otherwise, into a lesser number of shares, the Warrant Price shall be proportionately increased. If the outstanding Shares are combined or consolidated, by reclassification or otherwise, into a greater number of shares, the Warrant Price shall be proportionately decreased.

**6.4 Adjustments for Diluting Issuances.** In the event of the issuance (a "*Diluting Issuance*") by the Company after the Issue Date of securities at a price per share less than the Warrant Price, then the number of shares of common stock issuable upon conversion of the Shares shall be adjusted in accordance with those provisions of the Company's Certificate of Incorporation that apply to Diluting Issuances.

**6.5 Certificate as to Adjustments.** Upon each adjustment of the Warrant Price, the Company at its expense shall promptly compute such adjustment, and furnish Holder with a certificate of its Chief Financial Officer setting forth such adjustment and the facts upon which such adjustment is based. The Company shall, upon written request, furnish Holder a certificate setting forth the Warrant Price in effect upon the date thereof and the series of adjustments leading to such Warrant Price.

**6.6 Fractional Shares.** No fractional Shares shall be issuable upon exercise or conversion of the warrant, and the Number of Shares to be issued shall be rounded down to the nearest whole Share. If a fractional share interest arises upon any exercise or conversion of the warrant, the Company shall eliminate such fractional share interest by paying Holder the amount computed by multiplying the fractional interest by the fair market value of a full Share.

## ARTICLE 7

### REPRESENTATIONS AND COVENANTS OF THE COMPANY

**7.1 Representations and Warranties.** The Company hereby represents and warrants to the Holder as follows:

*TheRealReal, Inc. — Warrant*

**(a)** The initial Warrant Price referenced on the first page of this warrant is not greater than the fair market value of the Shares as of the date of this warrant.

**(b)** All Shares which may be issued upon the exercise of the purchase right represented by this warrant, and all securities, if any, issuable upon conversion of the Shares, shall, upon issuance, be duly authorized, validly issued, fully paid and nonassessable, and free of any liens and encumbrances except for restrictions on transfer provided for herein or under applicable federal and state securities laws.

**(c)** The Company's capitalization table attached to this warrant is true and complete as of the Issue Date.

**7.2 Notice of Certain Events.** The Company shall provide Holder with not less than 10 days prior written notice, including a description of the material facts surrounding, any of the following events: (a) declaration of any dividend or distribution upon its common stock, whether in cash, property, stock, or other securities and whether or not a regular cash dividend; (b) offering for subscription pro rata to the holders of any class or series of its stock any additional shares of stock of any class or series or other rights; (c) effecting any reclassification or recapitalization of common stock; or (d) the merger or consolidation with or into any other corporation, or sale, lease, license, or conveyance of all or substantially all of its assets, or liquidation, dissolution or winding up.

**7.3 Information Rights.** So long as the Holder holds this warrant and/or any of the Shares, the Company shall deliver to the Holder (a) promptly after mailing, copies of all communiques to the shareholders of the Company, (b) within one hundred eighty (180) days after the end of each fiscal year of the Company, the annual audited financial statements of the Company certified by independent public accountants of recognized standing and (c) within forty-five (45) days after the end of each of the first three quarters of each fiscal year, the Company's quarterly, unaudited financial statements.

**7.4 Registration Under Securities Act of 1933, as amended.** The Company agrees that, upon exercise of tall or a portion of this warrant pursuant to Article 1, Holder may become an "Investor" under that certain Amended and Restated Investors' Rights Agreement among the Company and other investors dated as of April 3, 2013, as amended from time to time, (the "IRA") by executing a joinder pursuant to Section 6.9 of the IRA. For the avoidance of doubt, Holder will not be a "Major Investor" under the IRA and the common stock of the Company into which the Shares are convertible shall be "Registrable Securities" under the IRA.

## ARTICLE 8

### MISCELLANEOUS

**8.1 Term: Exercise Upon Expiration.** This warrant is exercisable in whole or in part, at any time and from time to time on or before the Expiration Date set forth above; provided, however, that if the Company completes its initial public offering within the three-year period immediately prior to the Expiration Date, the Expiration Date shall automatically be extended until the third anniversary of the effective date of the Company's initial public offering. If this warrant has not been exercised prior to the Expiration Date, this warrant shall be deemed to have been automatically exercised on the Expiration Date by "cashless" conversion pursuant to Section 1.2.

*TheRealReal, Inc. — Warrant*

**8.2 Legends.** This warrant and the Shares (and the securities issuable, directly or indirectly, upon conversion of the Shares, if any) shall be imprinted with a legend in substantially the following form:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH APPLICABLE LAW.

**8.3 Compliance with Securities Laws on Transfer.** This warrant and the Shares issuable upon exercise of this warrant (and the securities issuable, directly or indirectly, upon conversion of the Shares, if any) may not be transferred or assigned in whole or in part without compliance with applicable federal and state securities laws by the transferor and the transferee. The Company shall not require Holder to provide an opinion of counsel if the transfer is to an affiliate of Holder or if there is no material question as to the availability of current information as referenced in Rule 144(c), Holder represents that it has complied with Rule 144 (d) and (e) in reasonable detail, the selling broker represents that it has complied with Rule 144(f), and the Company is provided with a copy of Holder's notice of proposed sale.

**8.4 Transfer Procedure.** Subject to the provisions of Section 4.3, Holder may transfer all or part of this warrant or the Shares issuable upon exercise of this warrant (or the securities issuable, directly or indirectly, upon conversion of the Shares, if any) by giving the Company notice of the portion of the warrant being transferred setting forth the name, address and taxpayer identification number of the transferee and surrendering this warrant to the Company for reissuance to the transferee(s) (and Holder, if applicable). No surrender or reissuance shall be required if the transfer is to an affiliate of Holder.

**8.5 Notices.** All notices and other communications from the Company to the Holder, or vice versa, shall be deemed delivered and effective when given personally or mailed by first-class registered or certified mail, postage prepaid, at such address as may have been furnished to the Company or the Holder, as the case may be, in writing by the Company or such Holder from time to time. All notices to the Holder shall be addressed as follows:

_____

_____

_____

**8.6 Amendments.** This warrant and any term hereof may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

**8.7 Attorneys' Fees.** In the event of any dispute between the parties concerning the terms and provisions of this warrant, the party prevailing in such dispute shall be entitled to collect from the other party all costs incurred in such dispute, including reasonable attorneys' fees.

*TheRealReal, Inc. — Warrant*

**8.8 Governing Law.** This warrant shall be governed by and construed in accordance with the laws of the State of California, without giving effect to its principles regarding conflicts of law.

Signature Page Follows

*TheRealReal, Inc. — Warrant*

IN WITNESS WHEREOF, the undersigned has executed this Second Warrant to Purchase Stock as of the date set forth above.

**THE REALREAL, INC.**

By: _____
Name: _____
Title: _____

*Signature Page to Second Warrant to Purchase Stock*

**APPENDIX 1**

**NOTICE OF EXERCISE**

**1.** The undersigned hereby elects to purchase            shares of the            stock of **THE REALREAL, INC.** pursuant to the terms of the attached warrant, and tenders herewith payment of the purchase price of such shares in full.

**1.** The undersigned hereby elects to convert the attached warrant into shares in the manner specified in the warrant. This conversion is exercised with respect to            of the shares covered by the warrant.

**Strike paragraph that does not apply.**

**2.** Please issue a certificate or certificates representing said shares in the name of the undersigned or in such other name as is specified below:

_____

_____

_____

**3.** The undersigned represents it is acquiring the shares solely for its own account and not as a nominee for any other party and not with a view toward the resale or distribution thereof except in compliance with applicable securities laws.

_____ or Registered Assignee

_____
(Signature)

_____
(Date)

**Exhibit 4.4**

THIS WARRANT AND THE SHARES ISSUABLE HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH APPLICABLE LAW.

### THIRD WARRANT TO PURCHASE STOCK

| | |
|---|---|
| Corporation: | TheRealReal, Inc. |
| Number of Shares: | _____ |
| Class of Stock: | Series C Preferred |
| Initial Exercise Price: | $        per share |
| Issue Date: | _____ |
| Expiration Date: | _____ |

**THIS THIRD WARRANT CERTIFIES THAT,** for good and valuable consideration, the receipt of which is hereby acknowledged,              or its assignee ("*Holder*") is entitled to purchase the number of fully paid and nonassessable shares of the class of securities (the "*Shares*") of the corporation (the "*Company*") at the initial exercise price per Share (the "*Warrant Price*") all as set forth above and as adjusted pursuant to Article 2 of this warrant, subject to the provisions and upon the terms and conditions set forth in this warrant.

### ARTICLE 1

### EXERCISE

**1.1 Method of Exercise.** Holder may exercise this warrant by delivering this warrant and a duly executed Notice of Exercise in substantially the form attached as Appendix 1 to the principal office of the Company. Unless Holder is exercising the conversion right set forth in Section 1.2, Holder shall also deliver to the Company a check for the aggregate Warrant Price for the Shares being purchased.

**1.2 Conversion Right.** In lieu of exercising this warrant as specified in Section 1.1, Holder may from time to time convert this warrant, in whole or in part, into a number of Shares determined by dividing (a) the aggregate fair market value of the Shares or other securities otherwise issuable upon exercise of this warrant minus the aggregate Warrant Price of such Shares by (b) the fair market value of one Share. The fair market value of the Shares shall be determined pursuant to Section 1.3.

**1.3 Fair Market Value.** If the Shares are traded regularly in a public market, the fair market value of the Shares shall be the closing price of the Shares (or the closing price of the Company's stock into which the Shares are convertible) reported for the business day immediately before Holder delivers its Notice of Exercise to the Company. If the Shares are not regularly traded in a public market, the Board of Directors of the Company shall determine fair market value in its reasonable good faith judgment.

**1.4 Delivery of Certificate and New Warrant.** Promptly after Holder exercises or converts this warrant, the Company shall deliver to Holder certificates for the Shares acquired and, if this warrant has not been fully exercised or converted and has not expired, a new warrant representing the Shares not so acquired.

*TheRealReal, Inc. — Warrant*

**1.5 Replacement of Warrants.** On receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this warrant and, in the case of loss, theft or destruction, on delivery of an indemnity agreement reasonably satisfactory in form and amount to the Company or, in the case of mutilation, on surrender and cancellation of this warrant, the Company at its expense shall execute and deliver, in lieu of this warrant, a new warrant of like tenor.

**1.6 Repurchase on Sale, Merger, or Consolidation of the Company.**

**1.6.1 "*Acquisition.*"** For the purpose of this warrant, "Acquisition" means (a) any sale, license, or other disposition of all or substantially all of the assets (including intellectual property) of the Company, or (b) any reorganization, consolidation, merger or sale of the voting securities of the Company or any other transaction where the holders of the Company's securities before the transaction beneficially own less than 50% of the outstanding voting securities of the surviving entity after the transaction.

**1.6.2 Assumption of Warrant.** If upon the closing of any Acquisition the successor entity assumes the obligations of this warrant, then this warrant shall be exercisable for the same securities, cash, and property as would be payable for the Shares issuable upon exercise of the unexercised portion of this warrant as if such Shares were outstanding on the record date for the Acquisition and subsequent closing. The Warrant Price shall be adjusted accordingly. The Company shall use reasonable efforts to cause the surviving corporation to assume the obligations of this warrant.

**1.6.3 Nonassumption.** If upon the closing of any Acquisition the successor entity does not assume the obligations of this warrant and Holder has not otherwise exercised this warrant in full, then Holder shall have the option either to (a) deem this warrant to have been automatically converted pursuant to Section 1.2 and thereafter Holder shall participate in the Acquisition on the same terms as other holders of the same class of securities of the Company; or (b) require the Company to purchase this warrant for cash upon the closing of the Acquisition for an amount per Share equal to three (3) times the Warrant Price.

## ARTICLE 2

## ADJUSTMENTS TO THE SHARES

**2.1 Stock Dividends, Splits, Etc.** If the Company declares or pays a dividend on its common stock payable in common stock, or other securities, or subdivides the outstanding common stock into a greater amount of common stock, then upon exercise of this warrant, for each Share acquired, Holder shall receive, without cost to Holder, the total number and kind of securities to which Holder would have been entitled had Holder owned the Shares of record as of the date the dividend or subdivision occurred.

*TheRealReal, Inc. — Warrant*

**2.2 Reclassification, Exchange or Substitution.** Upon any reclassification, exchange, substitution, or other event that results in a change of the number and/or class of the securities issuable upon exercise or conversion of this warrant, Holder shall be entitled to receive, upon exercise or conversion of this warrant, the number and kind of securities and property that Holder would have received for the Shares if this warrant had been exercised immediately before such reclassification, exchange, substitution, or other event. Such an event shall include any automatic conversion of the outstanding or issuable securities of the Company of the same class or series as the Shares to common stock pursuant to the terms of the Company's Certificate of Incorporation upon the closing of a registered public offering of the Company's common stock. The Company or its successor shall promptly issue to Holder a new warrant for such new securities or other property. The new warrant shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article 2 including, without limitation, adjustments to the Warrant Price and to the number of securities or property issuable upon exercise of the new warrant. The provisions of this Section 2.2 shall similarly apply to successive reclassifications, exchanges, substitutions, or other events.

**2.3 Adjustments for Combinations, Etc.** If the outstanding Shares are combined or consolidated, by reclassification or otherwise, into a lesser number of shares, the Warrant Price shall be proportionately increased. If the outstanding Shares are combined or consolidated, by reclassification or otherwise, into a greater number of shares, the Warrant Price shall be proportionately decreased.

**2.4 Adjustments for Diluting Issuances.** In the event of the issuance (a "***Diluting Issuance***") by the Company after the Issue Date of securities at a price per share less than the Warrant Price, then the number of shares of common stock issuable upon conversion of the Shares shall be adjusted in accordance with those provisions of the Company's Certificate of Incorporation that apply to Diluting Issuances.

**2.5 Certificate as to Adjustments.** Upon each adjustment of the Warrant Price, the Company at its expense shall promptly compute such adjustment, and furnish Holder with a certificate of its Chief Financial Officer setting forth such adjustment and the facts upon which such adjustment is based. The Company shall, upon written request, furnish Holder a certificate setting forth the Warrant Price in effect upon the date thereof and the series of adjustments leading to such Warrant Price.

**2.6 Fractional Shares.** No fractional Shares shall be issuable upon exercise or conversion of the warrant, and the Number of Shares to be issued shall be rounded down to the nearest whole Share. If a fractional share interest arises upon any exercise or conversion of the warrant, the Company shall eliminate such fractional share interest by paying Holder the amount computed by multiplying the fractional interest by the fair market value of a full Share.

## ARTICLE 3

### REPRESENTATIONS AND COVENANTS OF THE COMPANY

**3.1 Representations and Warranties.** The Company hereby represents and warrants to the Holder as follows:

*TheRealReal, Inc. — Warrant*

**(a)** The initial Warrant Price referenced on the first page of this warrant is not greater than the fair market value of the Shares as of the date of this warrant.

**(b)** All Shares which may be issued upon the exercise of the purchase right represented by this warrant, and all securities, if any, issuable upon conversion of the Shares, shall, upon issuance, be duly authorized, validly issued, fully paid and nonassessable, and free of any liens and encumbrances except for restrictions on transfer provided for herein or under applicable federal and state securities laws.

**(c)** The Company's capitalization table attached to this warrant is true and complete as of the Issue Date.

**3.2 Notice of Certain Events.** The Company shall provide Holder with not less than 10 days prior written notice, including a description of the material facts surrounding, any of the following events: (a) declaration of any dividend or distribution upon its common stock, whether in cash, property, stock, or other securities and whether or not a regular cash dividend; (b) offering for subscription pro rata to the holders of any class or series of its stock any additional shares of stock of any class or series or other rights; (c) effecting any reclassification or recapitalization of common stock; or (d) the merger or consolidation with or into any other corporation, or sale, lease, license, or conveyance of all or substantially all of its assets, or liquidation, dissolution or winding up.

**3.3 Information Rights.** So long as the Holder holds this warrant and/or any of the Shares, the Company shall deliver to the Holder (a) promptly after mailing, copies of all communiques to the shareholders of the Company, (b) within one hundred eighty (180) days after the end of each fiscal year of the Company, the annual audited financial statements of the Company certified by independent public accountants of recognized standing and (c) within forty-five (45) days after the end of each of the first three quarters of each fiscal year, the Company's quarterly, unaudited financial statements.

**3.4 Registration Under Securities Act of 1933, as amended.** The Company agrees that, upon exercise of all or a portion of this warrant pursuant to Article 1, Holder may become an "Investor" under that certain Amended and Restated Investors' Rights Agreement among the Company and other investors dated as of April 3, 2013, as amended from time to time, (the "IRA") by executing a joinder pursuant to Section 6.9 of the IRA. For the avoidance of doubt, Holder will not be a "Major Investor" under the IRA and the common stock of the Company into which the Shares are convertible shall be "Registrable Securities" under the IRA.

## ARTICLE 4

### MISCELLANEOUS

**4.1 Term: Exercise Upon Expiration.** This warrant is exercisable in whole or in part, at any time and from time to time on or before the Expiration Date set forth above; provided, however, that if the Company completes its initial public offering within the three-year period immediately prior to the Expiration Date, the Expiration Date shall automatically be extended until the third anniversary of the effective date of the Company's initial public offering. If this warrant has not been exercised prior to the Expiration Date, this warrant shall be deemed to have been automatically exercised on the Expiration Date by "cashless" conversion pursuant to Section 1.2.

*TheRealReal, Inc. — Warrant*

**4.2 Legends.** This warrant and the Shares (and the securities issuable, directly or indirectly, upon conversion of the Shares, if any) shall be imprinted with a legend in substantially the following form:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH APPLICABLE LAW.

**4.3 Compliance with Securities Laws on Transfer.** This warrant and the Shares issuable upon exercise of this warrant (and the securities issuable, directly or indirectly, upon conversion of the Shares, if any) may not be transferred or assigned in whole or in part without compliance with applicable federal and state securities laws by the transferor and the transferee. The Company shall not require Holder to provide an opinion of counsel if the transfer is to an affiliate of Holder or if there is no material question as to the availability of current information as referenced in Rule 144(c), Holder represents that it has complied with Rule 144 (d) and (e) in reasonable detail, the selling broker represents that it has complied with Rule 144(f), and the Company is provided with a copy of Holder's notice of proposed sale.

**4.4 Transfer Procedure.** Subject to the provisions of Section 4.3, Holder may transfer all or part of this warrant or the Shares issuable upon exercise of this warrant (or the securities issuable, directly or indirectly, upon conversion of the Shares, if any) by giving the Company notice of the portion of the warrant being transferred setting forth the name, address and taxpayer identification number of the transferee and surrendering this warrant to the Company for reissuance to the transferee(s) (and Holder, if applicable). No surrender or reissuance shall be required if the transfer is to an affiliate of Holder.

**4.5 Notices.** All notices and other communications from the Company to the Holder, or vice versa, shall be deemed delivered and effective when given personally or mailed by first-class registered or certified mail, postage prepaid, at such address as may have been furnished to the Company or the Holder, as the case may be, in writing by the Company or such Holder from time to time. All notices to the Holder shall be addressed as follows:

_____
_____
_____

**4.6 Amendments.** This warrant and any term hereof may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

**4.7 Attorneys' Fees.** In the event of any dispute between the parties concerning the terms and provisions of this warrant, the party prevailing in such dispute shall be entitled to collect from the other party all costs incurred in such dispute, including reasonable attorneys' fees.

*TheRealReal, Inc. — Warrant*

**4.8 Governing Law.** This warrant shall be governed by and construed in accordance with the laws of the State of California, without giving effect to its principles regarding conflicts of law.

Signature Page Follows

*TheRealReal, Inc. — Warrant*

IN WITNESS WHEREOF, the undersigned has executed this Third Warrant to Purchase Stock as of the date set forth above.

**THE REALREAL, INC.**

By: _____

Name: _____

Title: _____

*Signature Page to Third Warrant to Purchase Stock*

**APPENDIX 1**

**NOTICE OF EXERCISE**

**1.** The undersigned hereby elects to purchase _____ shares of the _____ stock of **THE REALREAL, INC.** pursuant to the terms of the attached warrant, and tenders herewith payment of the purchase price of such shares in full.

**1.** The undersigned hereby elects to convert the attached warrant into shares in the manner specified in the warrant. This conversion is exercised with respect to _____ of the shares covered by the warrant.

**Strike paragraph that does not apply.**

**2.** Please issue a certificate or certificates representing said shares in the name of the undersigned or in such other name as is specified below:

_____

_____

_____

**3.** The undersigned represents it is acquiring the shares solely for its own account and not as a nominee for any other party and not with a view toward the resale or distribution thereof except in compliance with applicable securities laws.

_____ or Registered Assignee

_____
(Signature)

_____
(Date)

**Exhibit 4.5**

THIS WARRANT AND THE SHARES ISSUABLE HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH APPLICABLE LAW.

**FOURTH WARRANT TO PURCHASE STOCK**

| | |
|---|---|
| Corporation: | TheRealReal, Inc. |
| Number of Shares: | _____ |
| Class of Stock: | Series D Preferred |
| Initial Exercise Price: | $        per share |
| Issue Date: | _____ |
| Expiration Date: | _____ |

**THIS FOURTH WARRANT CERTIFIES THAT,** for good and valuable consideration, the receipt of which is hereby acknowledged,                or its assignee ("*Holder*") is entitled to purchase the number of fully paid and nonassessable shares of the class of securities (the "*Shares*") of the corporation (the "*Company*") at the initial exercise price per Share (the "*Warrant Price*") all as set forth above and as adjusted pursuant to Article 2 of this warrant, subject to the provisions and upon the terms and conditions set forth in this warrant. Reference is made to Section 4.4 of this warrant, whereby                shall transfer this warrant to its parent company,                .

**ARTICLE 1**

**EXERCISE**

**1.1 Method of Exercise.** Holder may exercise this warrant by delivering this warrant and a duly executed Notice of Exercise in substantially the form attached as Appendix 1 to the principal office of the Company. Unless Holder is exercising the conversion right set forth in Section 1.2, Holder shall also deliver to the Company a check for the aggregate Warrant Price for the Shares being purchased.

**1.2 Conversion Right.** In lieu of exercising this warrant as specified in Section 1.1, Holder may from time to time convert this warrant, in whole or in part, into a number of Shares determined by dividing (a) the aggregate fair market value of the Shares or other securities otherwise issuable upon exercise of this warrant minus the aggregate Warrant Price of such Shares by (b) the fair market value of one Share. The fair market value of the Shares shall be determined pursuant to Section 1.3.

**1.3 Fair Market Value.** If the Shares are traded regularly in a public market, the fair market value of the Shares shall be the closing price of the Shares (or the closing price of the Company's stock into which the Shares are convertible) reported for the business day immediately before Holder delivers its Notice of Exercise to the Company. If the Shares are not regularly traded in a public market, the Board of Directors of the Company shall determine fair market value in its reasonable good faith judgment.

*TheRealReal, Inc. — Warrant*

**1.4 Delivery of Certificate and New Warrant.** Promptly after Holder exercises or converts this warrant, the Company shall deliver to Holder certificates for the Shares acquired and, if this warrant has not been fully exercised or converted and has not expired, a new warrant representing the Shares not so acquired.

**1.5 Replacement of Warrants.** On receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this warrant and, in the case of loss, theft or destruction, on delivery of an indemnity agreement reasonably satisfactory in form and amount to the Company or, in the case of mutilation, on surrender and cancellation of this warrant, the Company at its expense shall execute and deliver, in lieu of this warrant, a new warrant of like tenor.

**1.6 Repurchase on Sale, Merger, or Consolidation of the Company.**

**1.6.1** "*Acquisition*." For the purpose of this warrant, "Acquisition" means (a) any sale, license, or other disposition of all or substantially all of the assets (including intellectual property) of the Company, or (b) any reorganization, consolidation, merger or sale of the voting securities of the Company or any other transaction where the holders of the Company's securities before the transaction beneficially own less than 50% of the outstanding voting securities of the surviving entity after the transaction.

**1.6.2 Assumption of Warrant.** If upon the closing of any Acquisition the successor entity assumes the obligations of this warrant, then this warrant shall be exercisable for the same securities, cash, and property as would be payable for the Shares issuable upon exercise of the unexercised portion of this warrant as if such Shares were outstanding on the record date for the Acquisition and subsequent closing. The Warrant Price shall be adjusted accordingly. The Company shall use reasonable efforts to cause the surviving corporation to assume the obligations of this warrant.

**1.6.3 Nonassumption.** If upon the closing of any Acquisition the successor entity does not assume the obligations of this warrant and Holder has not otherwise exercised this warrant in full, then Holder shall have the option either to (a) deem this warrant to have been automatically converted pursuant to Section 1.2 and thereafter Holder shall participate in the Acquisition on the same terms as other holders of the same class of securities of the Company; or (b) require the Company to purchase this warrant for cash upon the closing of the Acquisition for an amount per Share equal to three (3) times the Warrant Price.

## ARTICLE 2

## ADJUSTMENTS TO THE SHARES

**2.1 Stock Dividends, Splits, Etc.** If the Company declares or pays a dividend on its common stock payable in common stock, or other securities, or subdivides the outstanding common stock into a greater amount of common stock, then upon exercise of this warrant, for each Share acquired, Holder shall receive, without cost to Holder, the total number and kind of securities to which Holder would have been entitled had Holder owned the Shares of record as of the date the dividend or subdivision occurred.

*TheRealReal, Inc. — Warrant*

**2.2 Reclassification, Exchange or Substitution.** Upon any reclassification, exchange, substitution, or other event that results in a change of the number and/or class of the securities issuable upon exercise or conversion of this warrant, Holder shall be entitled to receive, upon exercise or conversion of this warrant, the number and kind of securities and property that Holder would have received for the Shares if this warrant had been exercised immediately before such reclassification, exchange, substitution, or other event. Such an event shall include any automatic conversion of the outstanding or issuable securities of the Company of the same class or series as the Shares to common stock pursuant to the terms of the Company's Certificate of Incorporation upon the closing of a registered public offering of the Company's common stock. The Company or its successor shall promptly issue to Holder a new warrant for such new securities or other property. The new warrant shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article 2 including, without limitation, adjustments to the Warrant Price and to the number of securities or property issuable upon exercise of the new warrant. The provisions of this Section 2.2 shall similarly apply to successive reclassifications, exchanges, substitutions, or other events.

**2.3 Adjustments for Combinations, Etc.** If the outstanding Shares are combined or consolidated, by reclassification or otherwise, into a lesser number of shares, the Warrant Price shall be proportionately increased. If the outstanding Shares are combined or consolidated, by reclassification or otherwise, into a greater number of shares, the Warrant Price shall be proportionately decreased.

**2.4 Adjustments for Diluting Issuances.** In the event of the issuance (a "*Diluting Issuance*") by the Company after the Issue Date of securities at a price per share less than the Warrant Price, then the number of shares of common stock issuable upon conversion of the Shares shall be adjusted in accordance with those provisions of the Company's Certificate of Incorporation that apply to Diluting Issuances.

**2.5 Certificate as to Adjustments.** Upon each adjustment of the Warrant Price, the Company at its expense shall promptly compute such adjustment, and furnish Holder with a certificate of its Chief Financial Officer setting forth such adjustment and the facts upon which such adjustment is based. The Company shall, upon written request, furnish Holder a certificate setting forth the Warrant Price in effect upon the date thereof and the series of adjustments leading to such Warrant Price.

**2.6 Fractional Shares.** No fractional Shares shall be issuable upon exercise or conversion of the warrant, and the Number of Shares to be issued shall be rounded down to the nearest whole Share. If a fractional share interest arises upon any exercise or conversion of the warrant, the Company shall eliminate such fractional share interest by paying Holder the amount computed by multiplying the fractional interest by the fair market value of a full Share.

## ARTICLE 3

### REPRESENTATIONS AND COVENANTS OF THE COMPANY

**3.1 Representations and Warranties.** The Company hereby represents and warrants to the Holder as follows:

*TheRealReal, Inc. — Warrant*

**(a)** The initial Warrant Price referenced on the first page of this warrant is not greater than the fair market value of the Shares as of the date of this warrant.

**(b)** All Shares which may be issued upon the exercise of the purchase right represented by this warrant, and all securities, if any, issuable upon conversion of the Shares, shall, upon issuance, be duly authorized, validly issued, fully paid and nonassessable, and free of any liens and encumbrances except for restrictions on transfer provided for herein or under applicable federal and state securities laws.

**(c)** The Company's capitalization table attached to this warrant is true and complete as of the Issue Date.

**3.2 Notice of Certain Events.** The Company shall provide Holder with not less than 10 days prior written notice, including a description of the material facts surrounding, any of the following events: (a) declaration of any dividend or distribution upon its common stock, whether in cash, property, stock, or other securities and whether or not a regular cash dividend; (b) offering for subscription pro rata to the holders of any class or series of its stock any additional shares of stock of any class or series or other rights; (c) effecting any reclassification or recapitalization of common stock; or (d) the merger or consolidation with or into any other corporation, or sale, lease, license, or conveyance of all or substantially all of its assets, or liquidation, dissolution or winding up.

**3.3 Information Rights.** So long as the Holder holds this warrant and/or any of the Shares, the Company shall deliver to the Holder (a) promptly after mailing, copies of all communiqués to the shareholders of the Company, (b) within one hundred eighty (180) days after the end of each fiscal year of the Company, the annual audited financial statements of the Company certified by independent public accountants of recognized standing and (c) within forty-five (45) days after the end of each of the first three quarters of each fiscal year, the Company's quarterly, unaudited financial statements.

**3.4 Registration Under Securities Act of 1933, as amended.** The Company agrees that, upon exercise of all or a portion of this warrant pursuant to Article 1, Holder may become an "Investor" under that certain Amended and Restated Investors' Rights Agreement among the Company and other investors dated as of April 3, 2013, as amended from time to time, (the "IRA") by executing a joinder pursuant to Section 6.9 of the IRA. For the avoidance of doubt, Holder will not be a "Major Investor" under the IRA and the common stock of the Company into which the Shares are convertible shall be "Registrable Securities" under the IRA.

**ARTICLE 4**

**MISCELLANEOUS**

**4.1 Term: Exercise Upon Expiration.** This warrant is exercisable in whole or in part, at any time and from time to time on or before the Expiration Date set forth above; provided, however, that if the Company completes its initial public offering within the three-year period immediately prior to the Expiration Date, the Expiration Date shall automatically be extended until the third anniversary of the effective date of the Company's initial public offering. If this warrant has not been exercised prior to the Expiration Date, this warrant shall be deemed to have been automatically exercised on the Expiration Date by "cashless" conversion pursuant to Section 1.2.

*TheRealReal, Inc. — Warrant*

**4.2 Legends.** This warrant and the Shares (and the securities issuable, directly or indirectly, upon conversion of the Shares, if any) shall be imprinted with a legend in substantially the following form:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH APPLICABLE LAW.

**4.3 Compliance with Securities Laws on Transfer.** This warrant and the Shares issuable upon exercise of this warrant (and the securities issuable, directly or indirectly, upon conversion of the Shares, if any) may not be transferred or assigned in whole or in part without compliance with applicable federal and state securities laws by the transferor and the transferee. The Company shall not require Holder to provide an opinion of counsel if the transfer is to            or any other affiliate of Holder or if there is no material question as to the availability of current information as referenced in Rule 144(c), Holder represents that it has complied with Rule 144 (d) and (e) in reasonable detail, the selling broker represents that it has complied with Rule 144(f), and the Company is provided with a copy of Holder's notice of proposed sale.

**4.4 Transfer Procedure.** After receipt by            of this warrant,            will transfer all of this warrant to its parent company,            . Subject to the provisions of Section 4.3, Holder may transfer all or part of this warrant or the Shares issuable upon exercise of this warrant (or the securities issuable, directly or indirectly, upon conversion of the Shares, if any) by giving the Company notice of the portion of the warrant being transferred setting forth the name, address and taxpayer identification number of the transferee and surrendering this warrant to the Company for reissuance to the transferee(s) (and Holder, if applicable). No surrender or reissuance shall be required for the transfer to            or a transfer to any other affiliate of Holder.

**4.5 Notices.** All notices and other communications from the Company to the Holder, or vice versa, shall be deemed delivered and effective when given personally or mailed by first-class registered or certified mail, postage prepaid, at such address as may have been furnished to the Company or the Holder, as the case may be, in writing by the Company or such Holder from time to time. All notices to the Holder shall be addressed as follows:

**4.6 Amendments.** This warrant and any term hereof may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

**4.7 Attorneys' Fees.** In the event of any dispute between the parties concerning the terms and provisions of this warrant, the party prevailing in such dispute shall be entitled to collect from the other party all costs incurred in such dispute, including reasonable attorneys' fees.

*TheRealReal, Inc. — Warrant*

**4.8 Governing Law.** This warrant shall be governed by and construed in accordance with the laws of the State of California, without giving effect to its principles regarding conflicts of law.

Signature Page Follows

*TheRealReal, Inc. — Warrant*

IN WITNESS WHEREOF, the undersigned has executed this Fourth Warrant to Purchase Stock as of the date set forth above.

**THE REALREAL, INC.**

By: _____

Name: _____

Title: _____

*Signature Page to Fourth Warrant to Purchase Stock*

**APPENDIX 1**

**NOTICE OF EXERCISE**

    **1.** The undersigned hereby elects to purchase _____ shares of the _____ stock of **THE REALREAL, INC.** pursuant to the terms of the attached warrant, and tenders herewith payment of the purchase price of such shares in full.

    **1.** The undersigned hereby elects to convert the attached warrant into shares in the manner specified in the warrant. This conversion is exercised with respect to _____ of the shares covered by the warrant.

    **Strike paragraph that does not apply.**

    **2.** Please issue a certificate or certificates representing said shares in the name of the undersigned or in such other name as is specified below:

_____

_____

_____

    **3.** The undersigned represents it is acquiring the shares solely for its own account and not as a nominee for any other party and not with a view toward the resale or distribution thereof except in compliance with applicable securities laws.

_____ or Registered Assignee

_____

(Signature)

_____

(Date)

**Exhibit 4.6**

THIS WARRANT AND THE SHARES ISSUABLE HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH APPLICABLE LAW.

**FIFTH WARRANT TO PURCHASE STOCK**

| | |
|---|---|
| Corporation: | TheRealReal, Inc. |
| Number of Shares: | _____ |
| Class of Stock: | Series E Preferred |
| Initial Exercise Price: | $         per share |
| Issue Date: | _____ |
| Expiration Date: | _____ |

     **THIS FIFTH WARRANT CERTIFIES THAT,** for good and valuable consideration, the receipt of which is hereby acknowledged,              or its assignee ("*Holder*") is entitled to purchase the number of fully paid and nonassessable shares of the class of securities (the "*Shares*") of the corporation (the "*Company*") at the initial exercise price per Share (the "*Warrant Price*") all as set forth above and as adjusted pursuant to Article 2 of this warrant, subject to the provisions and upon the terms and conditions set forth in this warrant. Reference is made to Section 4.4 of this warrant, whereby              shall transfer this warrant to its parent company,              .

**ARTICLE 1**

**EXERCISE**

     **1.1 Method of Exercise.** Holder may exercise this warrant by delivering this warrant and a duly executed Notice of Exercise in substantially the form attached as Appendix 1 to the principal office of the Company. Unless Holder is exercising the conversion right set forth in Section 1.2, Holder shall also deliver to the Company a check for the aggregate Warrant Price for the Shares being purchased.

     **1.2 Conversion Right.** In lieu of exercising this warrant as specified in Section 1.1, Holder may from time to time convert this warrant, in whole or in part, into a number of Shares determined by dividing (a) the aggregate fair market value of the Shares or other securities otherwise issuable upon exercise of this warrant minus the aggregate Warrant Price of such Shares by (b) the fair market value of one Share. The fair market value of the Shares shall be determined pursuant to Section 1.3.

     **1.3 Fair Market Value.** If the Shares are traded regularly in a public market, the fair market value of the Shares shall be the closing price of the Shares (or the closing price of the Company's stock into which the Shares are convertible) reported for the business day immediately before Holder delivers its Notice of Exercise to the Company. If the Shares are not regularly traded in a public market, the Board of Directors of the Company shall determine fair market value in its reasonable good faith judgment.

*TheRealReal, Inc. — Warrant*

**1.4 Delivery of Certificate and New Warrant.** Promptly after Holder exercises or converts this warrant, the Company shall deliver to Holder certificates for the Shares acquired and, if this warrant has not been fully exercised or converted and has not expired, a new warrant representing the Shares not so acquired.

**1.5 Replacement of Warrants.** On receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this warrant and, in the case of loss, theft or destruction, on delivery of an indemnity agreement reasonably satisfactory in form and amount to the Company or, in the case of mutilation, on surrender and cancellation of this warrant, the Company at its expense shall execute and deliver, in lieu of this warrant, a new warrant of like tenor.

**1.6 Repurchase on Sale, Merger, or Consolidation of the Company.**

**1.6.1** "*Acquisition.*" For the purpose of this warrant, "Acquisition" means (a) any sale, license, or other disposition of all or substantially all of the assets (including intellectual property) of the Company, or (b) any reorganization, consolidation, merger or sale of the voting securities of the Company or any other transaction where the holders of the Company's securities before the transaction beneficially own less than 50% of the outstanding voting securities of the surviving entity after the transaction.

**1.6.2 Assumption of Warrant.** If upon the closing of any Acquisition the successor entity assumes the obligations of this warrant, then this warrant shall be exercisable for the same securities, cash, and property as would be payable for the Shares issuable upon exercise of the unexercised portion of this warrant as if such Shares were outstanding on the record date for the Acquisition and subsequent closing. The Warrant Price shall be adjusted accordingly. The Company shall use reasonable efforts to cause the surviving corporation to assume the obligations of this warrant.

**1.6.3 Nonassumption.** If upon the closing of any Acquisition the successor entity does not assume the obligations of this warrant and Holder has not otherwise exercised this warrant in full, then Holder shall have the option either to (a) deem this warrant to have been automatically converted pursuant to Section 1.2 and thereafter Holder shall participate in the Acquisition on the same terms as other holders of the same class of securities of the Company; or (b) require the Company to purchase this warrant for cash upon the closing of the Acquisition for an amount per Share equal to three (3) times the Warrant Price.

## ARTICLE 2

## ADJUSTMENTS TO THE SHARES

**2.1 Stock Dividends, Splits, Etc.** If the Company declares or pays a dividend on its common stock payable in common stock, or other securities, or subdivides the outstanding common stock into a greater amount of common stock, then upon exercise of this warrant, for each Share acquired, Holder shall receive, without cost to Holder, the total number and kind of securities to which Holder would have been entitled had Holder owned the Shares of record as of the date the dividend or subdivision occurred.

*TheRealReal, Inc. — Warrant*

**2.2 Reclassification, Exchange or Substitution.** Upon any reclassification, exchange, substitution, or other event that results in a change of the number and/or class of the securities issuable upon exercise or conversion of this warrant, Holder shall be entitled to receive, upon exercise or conversion of this warrant, the number and kind of securities and property that Holder would have received for the Shares if this warrant had been exercised immediately before such reclassification, exchange, substitution, or other event. Such an event shall include any automatic conversion of the outstanding or issuable securities of the Company of the same class or series as the Shares to common stock pursuant to the terms of the Company's Certificate of Incorporation upon the closing of a registered public offering of the Company's common stock. The Company or its successor shall promptly issue to Holder a new warrant for such new securities or other property. The new warrant shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article 2 including, without limitation, adjustments to the Warrant Price and to the number of securities or property issuable upon exercise of the new warrant. The provisions of this Section 2.2 shall similarly apply to successive reclassifications, exchanges, substitutions, or other events.

**2.3 Adjustments for Combinations, Etc.** If the outstanding Shares are combined or consolidated, by reclassification or otherwise, into a lesser number of shares, the Warrant Price shall be proportionately increased. If the outstanding Shares are combined or consolidated, by reclassification or otherwise, into a greater number of shares, the Warrant Price shall be proportionately decreased.

**2.4 Adjustments for Diluting Issuances.** In the event of the issuance (a "*Diluting Issuance*") by the Company after the Issue Date of securities at a price per share less than the Warrant Price, then the number of shares of common stock issuable upon conversion of the Shares shall be adjusted in accordance with those provisions of the Company's Certificate of Incorporation that apply to Diluting Issuances.

**2.5 Certificate as to Adjustments.** Upon each adjustment of the Warrant Price, the Company at its expense shall promptly compute such adjustment, and furnish Holder with a certificate of its Chief Financial Officer setting forth such adjustment and the facts upon which such adjustment is based. The Company shall, upon written request, furnish Holder a certificate setting forth the Warrant Price in effect upon the date thereof and the series of adjustments leading to such Warrant Price.

**2.6 Fractional Shares.** No fractional Shares shall be issuable upon exercise or conversion of the warrant, and the Number of Shares to be issued shall be rounded down to the nearest whole Share. If a fractional share interest arises upon any exercise or conversion of the warrant, the Company shall eliminate such fractional share interest by paying Holder the amount computed by multiplying the fractional interest by the fair market value of a full Share.

## ARTICLE 3

### REPRESENTATIONS AND COVENANTS OF THE COMPANY

**3.1 Representations and Warranties.** The Company hereby represents and warrants to the Holder as follows:

*TheRealReal, Inc. — Warrant*

**(a)** The initial Warrant Price referenced on the first page of this warrant is not greater than the fair market value of the Shares as of the date of this warrant.

**(b)** All Shares which may be issued upon the exercise of the purchase right represented by this warrant, and all securities, if any, issuable upon conversion of the Shares, shall, upon issuance, be duly authorized, validly issued, fully paid and nonassessable, and free of any liens and encumbrances except for restrictions on transfer provided for herein or under applicable federal and state securities laws.

**(c)** The Company's capitalization table attached to this warrant is true and complete as of the Issue Date.

**3.2 Notice of Certain Events.** The Company shall provide Holder with not less than 10 days prior written notice, including a description of the material facts surrounding, any of the following events: (a) declaration of any dividend or distribution upon its common stock, whether in cash, property, stock, or other securities and whether or not a regular cash dividend; (b) offering for subscription pro rata to the holders of any class or series of its stock any additional shares of stock of any class or series or other rights; (c) effecting any reclassification or recapitalization of common stock; or (d) the merger or consolidation with or into any other corporation, or sale, lease, license, or conveyance of all or substantially all of its assets, or liquidation, dissolution or winding up.

**3.3 Information Rights.** So long as the Holder holds this warrant and/or any of the Shares, the Company shall deliver to the Holder (a) promptly after mailing, copies of all communiques to the shareholders of the Company, (b) within one hundred eighty (180) days after the end of each fiscal year of the Company, the annual audited financial statements of the Company certified by independent public accountants of recognized standing and (c) within forty-five (45) days after the end of each of the first three quarters of each fiscal year, the Company's quarterly, unaudited financial statements.

**3.4 Registration Under Securities Act of 1933, as amended.** The Company agrees that, upon exercise of all or a portion of this warrant pursuant to Article 1, Holder may become an "Investor" under that certain Amended and Restated Investors' Rights Agreement among the Company and other investors dated as of April 3, 2013, as amended from time to time, (the "IRA") by executing a joinder pursuant to Section 6.9 of the IRA. For the avoidance of doubt, Holder will not be a "Major Investor" under the IRA and the common stock of the Company into which the Shares are convertible shall be "Registrable Securities" under the IRA.

## ARTICLE 4

## MISCELLANEOUS

**4.1 Term: Exercise Upon Expiration.** This warrant is exercisable in whole or in part, at any time and from time to time on or before the Expiration Date set forth above; provided, however, that if the Company completes its initial public offering within the three-year period immediately prior to the Expiration Date, the Expiration Date shall automatically be extended until the third anniversary of the effective date of the Company's initial public offering. If this warrant has not been exercised prior to the Expiration Date, this warrant shall be deemed to have been automatically exercised on the Expiration Date by "cashless" conversion pursuant to Section 1.2.

*TheRealReal, Inc. — Warrant*

**4.2 Legends.** This warrant and the Shares (and the securities issuable, directly or indirectly, upon conversion of the Shares, if any) shall be imprinted with a legend in substantially the following form:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH APPLICABLE LAW.

**4.3 Compliance with Securities Laws on Transfer.** This warrant and the Shares issuable upon exercise of this warrant (and the securities issuable, directly or indirectly, upon conversion of the Shares, if any) may not be transferred or assigned in whole or in part without compliance with applicable federal and state securities laws by the transferor and the transferee. The Company shall not require Holder to provide an opinion of counsel if the transfer is to            or any other affiliate of Holder or if there is no material question as to the availability of current information as referenced in Rule 144(c), Holder represents that it has complied with Rule 144 (d) and (e) in reasonable detail, the selling broker represents that it has complied with Rule 144(f), and the Company is provided with a copy of Holder's notice of proposed sale.

**4.4 Transfer Procedure.** After receipt by            of this warrant,            will transfer all of this warrant to its parent company,            . Subject to the provisions of Section 4.3, Holder may transfer all or part of this warrant or the Shares issuable upon exercise of this warrant (or the securities issuable, directly or indirectly, upon conversion of the Shares, if any) by giving the Company notice of the portion of the warrant being transferred setting forth the name, address and taxpayer identification number of the transferee and surrendering this warrant to the Company for reissuance to the transferee(s) (and Holder, if applicable). No surrender or reissuance shall be required for the transfer to            or a transfer to any other affiliate of Holder.

**4.5 Notices.** All notices and other communications from the Company to the Holder, or vice versa, shall be deemed delivered and effective when given personally or mailed by first-class registered or certified mail, postage prepaid, at such address as may have been furnished to the Company or the Holder, as the case may be, in writing by the Company or such Holder from time to time. All notices to the Holder shall be addressed as follows:

---

---

**4.6 Amendments.** This warrant and any term hereof may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

**4.7 Attorneys' Fees.** In the event of any dispute between the parties concerning the terms and provisions of this warrant, the party prevailing in such dispute shall be entitled to collect from the other party all costs incurred in such dispute, including reasonable attorneys' fees.

*TheRealReal, Inc. — Warrant*

**4.8 Governing Law.** This warrant shall be governed by and construed in accordance with the laws of the State of California, without giving effect to its principles regarding conflicts of law.

Signature Page Follows

*TheRealReal, Inc. — Warrant*

IN WITNESS WHEREOF, the undersigned has executed this Fifth Warrant to Purchase Stock as of the date set forth above.

**THE REALREAL, INC.**

By: _____
Name: _____
Title: _____

Exhibit 4.7

**THE REALREAL, INC.**

**SEVENTH AMENDED AND RESTATED**

**INVESTORS' RIGHTS AGREEMENT**

TABLE OF CONTENTS

Page

1.  Previous IRA; Definitions                                          1

2.  Registration Rights                                                5

    2.1   Demand Registration                                          5
    2.2   Company Registration                                         8
    2.3   Underwriting Requirements                                    8
    2.4   Obligations of the Company                                  10
    2.5   Furnish Information                                         14
    2.6   Expenses of Registration                                   14
    2.7   Delay of Registration                                      15
    2.8   Indemnification                                            15
    2.9   Reports Under Exchange Act                                 17
    2.10  Limitations on Subsequent Registration Rights              18
    2.11  "Market Stand-off" Agreement                               18
    2.12  Restrictions on Transfer                                   19
    2.13  Alternative IPO Entities                                   21
    2.14  Termination of Registration Rights                         21

3.  Information Rights                                                21

    3.1   Financial Statements, Reports, Etc.                        21
    3.2   Inspection                                                 23
    3.3   Observer Rights                                            24
    3.4   Termination of Information and Observer Rights             24
    3.5   Confidentiality                                            24

4.  Rights to Future Stock Issuances                                 25

    4.1   Right of First Offer                                       25
    4.2   Termination                                                26

5.  Additional Covenants                                             27

    5.1   Insurance                                                  27
    5.2   Employee Agreements                                        27
    5.3   Employee Stock                                             27
    5.4   Board Matters                                              27
    5.5   Successor Indemnification                                  27
    5.6   Third Party Indemnification                                28
    5.7   Reservation of Common Stock                                28
    5.8   Termination of Covenants                                   28

i

6.  Miscellaneous                                                        29

    6.1   Successors and Assigns                                          29
    6.2   Governing Law                                                   29
    6.3   Counterparts                                                    29
    6.4   Titles and Subtitles                                            29
    6.5   Notices                                                         30
    6.6   Amendments and Waivers                                          30
    6.7   Severability                                                    31
    6.8   Aggregation of Stock                                            31
    6.9   Additional Investors                                            32
    6.10  Entire Agreement                                                32
    6.11  Dispute Resolution                                              32
    6.12  Delays or Omissions                                             33

Schedule A - Schedule of Investors
Schedule B - Schedule of Key Holders

ii

**SEVENTH AMENDED AND RESTATED**
**INVESTORS' RIGHTS AGREEMENT**

This Seventh Amended and Restated Investors' Rights Agreement (this "**Agreement**") is made as of March 22, 2019, by and among The RealReal, Inc., a Delaware corporation (the "**Company**"), each of the investors listed on <u>Schedule A</u> hereto, each of which is referred to in this Agreement as an "**Investor**", each of the stockholders listed on <u>Schedule B</u> hereto, each of whom is referred to herein as a "**Key Holder**" and any Additional Investor (as defined in the Purchase Agreement) that becomes a party to this Agreement in accordance with <u>Section 6.9</u> hereof.

## RECITALS

**WHEREAS**, the Company and certain of the Investors are parties to the Series H Preferred Stock Purchase Agreement of even date herewith (the "**Purchase Agreement**");

**WHEREAS**, in order to induce the Company to enter into the Purchase Agreement and to induce certain of the Investors to invest funds in the Company pursuant to the Purchase Agreement, the Investors, the Key Holders, and the Company hereby agree that this Agreement shall govern the rights of the Investors to cause the Company to register shares of Common Stock issuable to the Investors, to receive certain information from the Company, and to participate in future equity offerings by the Company, and shall govern certain other matters as set forth in this Agreement; and

**WHEREAS**, certain of the parties to this Agreement are parties to the Sixth Amended and Restated Investors' Rights Agreement dated as of June 21, 2018 (the "**Previous IRA**"), which this Agreement is intended to amend, restate, supersede, and replace in its entirety.

**NOW, THEREFORE**, the parties hereby agree as follows:

1.  <u>Previous IRA; Definitions</u>. Upon execution of this Agreement, the Previous IRA shall be void and of no further force or effect. For purposes of this Agreement:

    1.1  "**Affiliate**" means, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person, including without limitation any general partner, managing member, officer or director of such Person or any venture capital fund now or hereafter existing that is controlled by one or more general partners or managing members of, or shares the same management company with, such Person. For the avoidance of doubt, GCEV Co-Invest TRR, L.P. and GCEV Co-Invest TRR-1, L.P., Greycroft Growth, L.P. and Greycroft Partners II, L.P. are deemed Affiliates of one another.

    1.2  "**Certificate of Incorporation**" means the Eleventh Amended and Restated Certificate of Incorporation of the Company, as amended and/or restated at any time and from time to time.

1

1.3 "**Common Stock**" means shares of the Company's common stock, par value $0.00001 per share, and any other shares of stock issued or issuable with respect thereto (whether by way of a stock dividend or stock split or in exchange for or upon conversion of such shares or otherwise in connection with a combination of shares, distribution, recapitalization, merger, consolidation, other corporate reorganization or other similar event with respect to the Common Stock).

1.4 "**Company**" has the meaning set forth in the preamble and, for purposes of Section 2 (and the defined terms used therein), includes the Company's successors by merger, acquisition, reorganization or otherwise.

1.5 "**Damages**" means any loss, damage, claim or liability (joint or several) to which a party hereto may become subject under the Securities Act, the Exchange Act, or other federal or state law, insofar as such loss, damage, claim or liability (or any action in respect thereof) arises out of or is based upon (i) any untrue statement or alleged untrue statement of a material fact contained in any registration statement of the Company, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements or free writing prospectuses thereto; (ii) an omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; or (iii) any violation or alleged violation by the indemnifying party (or any of its agents or Affiliates) of the Securities Act, the Exchange Act, any state securities law, or any rule or regulation promulgated under the Securities Act, the Exchange Act, or any state securities law.

1.6 "**Derivative Securities**" means any securities or rights convertible into, or exercisable or exchangeable for (in each case, directly or indirectly), Common Stock, including options and warrants.

1.7 "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

1.8 "**Excluded Registration**" means a registration (i) pursuant to a registration statement on Form S-8 (or other registration solely relating to an offering or sale to employees or directors of the Company pursuant to a stock option, stock purchase, or similar plans); (ii) pursuant to a registration statement on Form S-4 (or similar form that relates to a transaction subject to SEC Rule 145); (iii) in connection with any dividend or distribution reinvestment or similar plan' or (iv) a registration in which the only Common Stock being registered is Common Stock issuable upon conversion of debt securities that are also being registered other than a registration on a delayed or continuous basis pursuant to Rule 415 of the Securities Act.

1.9 "**FOIA Party**" means a Person that, in the reasonable determination of the Company's Board of Directors, may be subject to, and thereby required to disclose non-public information furnished by or relating to the Company under, the Freedom of Information Act, 5 U.S.C. 552 ("**FOIA**"), any state public records access law, any state or other jurisdiction's laws similar in intent or effect to FOIA, or any other similar statutory or regulatory requirement.

2

1.10  "**Form S-1**" means such form under the Securities Act as in effect on the date hereof or any successor registration form under the Securities Act subsequently adopted by the SEC.

1.11  "**Form S-3**" means such form under the Securities Act as in effect on the date hereof or any registration form under the Securities Act subsequently adopted by the SEC that permits incorporation of substantial information by reference to other documents filed by the Company with the SEC.

1.12  "**Holder**" means any holder of Registrable Securities who is a party to this Agreement.

1.13  "**Immediate Family Member**" means a child, stepchild, grandchild, parent, stepparent, grandparent, spouse, life partner (whether or not covered under the applicable domestic relations statute), sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, including adoptive relationships, of a natural person referred to herein.

1.14  "**Initiating Holders**" means, collectively, Holders who properly initiate a registration request under this Agreement.

1.15  "**IPO**" means the Company's first underwritten public offering of its Common Stock under the Securities Act or if the Company becomes subject to the reporting requirements of the Exchange Act.

1.16  "**Key Holder Registrable Securities**" means (i) shares of Common Stock held by the Key Holders on the date hereof, (ii) any Common Stock, or any Common Stock issued or issuable (directly or indirectly) upon conversion and/or exercise of any other securities of the Company, acquired by the Key Holders after the date hereof, and (iii) any Common Stock issued as (or issuable upon the conversion or exercise of any warrant, right, or other security that is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of such shares.

1.17  "**Major Investor**" means any Investor that, individually or together with such Investor's Affiliates, holds at least 2,500,000 shares of Registrable Securities (as adjusted for any stock split, stock dividend, combination, or other recapitalization or reclassification effected after the date hereof); provided, however, Major Investor shall include Industry Ventures Secondary Fund VII, L.P. ("**Industry Ventures**"), including its successors and assigns, so long as Industry Ventures (or such successor or assign), together with its Affiliates, continues to hold at least 1,500,000 shares of Registrable Securities (as adjusted for any stock split, stock dividend, combination, or other recapitalization or reclassification effected after the date hereof) and shall include NextEquity Partners, LLC, ("**NextEquity**") and

3

Springboard SPV I, LLC ("**Springboard**") including their successors and assigns, so long as NextEquity and Springboard (or their respective successors or assigns), together with their Affiliates, continue to hold collectively at least 1,500,000 shares of Registrable Securities (as adjusted for any stock split, stock dividend, combination, or other recapitalization or reclassification effected after the date hereof).

1.18    "**New Securities**" means, collectively, equity securities of the Company, whether or not currently authorized, as well as rights, options, or warrants to purchase such equity securities, or securities of any type whatsoever that are, or may become, convertible or exchangeable into or exercisable for such equity securities.

1.19    "**Person**" means any individual, corporation, partnership, trust, limited liability company, association or other entity.

1.20    "**Preferred Director**" means any director of the Company that the holders of record of the Series A Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock or Series G Preferred Stock are entitled to elect pursuant to the Certificate of Incorporation.

1.21    "**Preferred Stock**" means shares of the Company's Preferred Stock, including without limitation its Series A Preferred Stock, par value $0.00001 per share, Series B Preferred Stock, par value $0.00001 per share, Series C Preferred Stock, par value $0.00001 per share, Series D Preferred Stock, par value $0.00001 per share, Series E Preferred Stock, par value $0.00001 per share, Series F Preferred Stock, par value $0.00001 per share, Series G Preferred Stock, par value $0.00001 per share, and Series H Preferred Stock, par value $0.00001 per share.

1.22    "**Registrable Securities**" means (i) the Common Stock issuable or issued upon conversion of the Preferred Stock; (ii) any Common Stock, or any Common Stock issued or issuable (directly or indirectly) upon conversion and/or exercise of any other securities of the Company, acquired by the Investors; (iii) the Key Holder Registrable Securities, provided, however, that such Key Holder Registrable Securities shall not be deemed Registrable Securities and the Key Holders shall not be deemed Holders for the purposes of Subsections 2.1, 2.10, 3.1 and 3.2; (iv) any other Common Stock acquired by the Investors after the date hereof; and (v) any Common Stock issued as (or issuable upon the conversion or exercise of any warrant, right, or other security that is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of or in connection with a merger, recapitalization, consolidation, other reorganization or other similar event with respect to, the shares referenced in clauses (i), (ii), and (iv) above; excluding in all cases, however, any Registrable Securities sold by a Person in a transaction in which the applicable rights under this Agreement are not assigned pursuant to Section 6.1, and excluding for purposes of Section 2 any shares for which registration rights have terminated pursuant to Section 2.14 of this Agreement.

4

1.23 "**Registrable Securities then outstanding**" means the number of shares determined by adding the number of shares of outstanding Common Stock that are Registrable Securities and the number of shares of Common Stock issuable (directly or indirectly) pursuant to then exercisable and/or convertible securities that are Registrable Securities.

1.24 "**Restricted Securities**" means the securities of the Company required to bear the legend set forth in Section 2.12(b) hereof; provided, that in no event shall securities sold in a Public Sale be Restricted Securities.

1.25 "**SEC**" means the Securities and Exchange Commission.

1.26 "**SEC Rule 144**" means Rule 144 promulgated by the SEC under the Securities Act.

1.27 "**SEC Rule 145**" means Rule 145 promulgated by the SEC under the Securities Act.

1.28 "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

1.29 "**Selling Expenses**" means all underwriting discounts, selling commissions, and stock transfer taxes applicable to the sale of Registrable Securities, and fees and disbursements of counsel for any Holder, except for the fees and disbursements of the Selling Holder Counsel borne and paid by the Company as provided in Section 2.6.

1.30 "**Series F Director**" means the director of the Company that the holders of record of the Series F Preferred Stock are entitled to elect pursuant to the Certificate of Incorporation.

1.31 "**Series G Director**" means the director of the Company that the holders of record of the Series G Preferred Stock are entitled to elect pursuant to the Certificate of Incorporation.

2. Registration Rights. The Company covenants and agrees as follows:

2.1 Demand Registration.

(a) Form S-1 Demand. Subject to Section 2.14, if at any time after the earlier of (i) five (5) years after the date of this Agreement or (ii) one hundred eighty (180) days after the effective date of the registration statement for the IPO, the Company receives a written request from Holders of a majority of the Registrable Securities then outstanding that the Company file a Form S-1 registration statement with respect to the Registrable Securities then outstanding, having an anticipated aggregate offering price of at least $30 million, net of Selling Expenses, then the Company shall (i) within ten (10) days after the date such request is given, give written

5

notice thereof (the "**Demand Notice**") to all Holders other than the Initiating Holders; and (ii) as soon as practicable, and in any event within sixty (60) days after the date such request is given by the Initiating Holders, file a Form S-1 registration statement under the Securities Act covering all Registrable Securities that the Initiating Holders requested to be registered and any additional Registrable Securities requested to be included in such registration by any other Holders, as specified by notice given by each such Holder to the Company within twenty (20) days of the date the Demand Notice is given, and in each case, subject to the limitations of Section 2.1(c), Section 2.1(d), and Section 2.3.

(b)     Form S-3 Demand. Subject to Section 2.14, if, after the Company has qualified for the use of a Form S-3 registration statement, the Company receives a written request from (i) Holders of at least a majority of the Registrable Securities then outstanding, (ii) the Holders of a majority of the shares of Series F Preferred Stock then outstanding (the "**Series F Majority**") or (iii) the Holders of a majority of the shares of Series G Preferred Stock then outstanding (the "**Series G Majority**"), that the Company file a Form S-3 registration statement (or, with respect to a request from the Series F Majority or the Series G Majority, if the Company has since become ineligible for the use of Form S-3, a Form S-1 registration statement) with respect to outstanding Registrable Securities of such Holders having an anticipated aggregate offering price, net of Selling Expenses, of at least $10 million, then the Company shall (x) within ten (10) days after the date such request is given, give a Demand Notice to all Holders other than the Initiating Holders; and (y) as soon as practicable, and in any event within forty-five (45) days after the date such request is given by the Initiating Holders, file a Form S-3 registration statement under the Securities Act covering all Registrable Securities requested to be included in such registration by any other Holders, as specified by notice given by each such Holder to the Company within twenty (20) days of the date the Demand Notice is given, and in each case, subject to the limitations of Section 2.1(c), Section 2.1(d), and Section 2.3.

(c)     Timing Limitations. Notwithstanding the foregoing obligations, if the Company furnishes to Holders requesting a registration pursuant to this Section 2.1 a certificate signed by the Company's chief executive officer stating that in the good faith judgment of the Company's Board of Directors it would be materially detrimental to the Company and its stockholders for such registration statement to either become effective or remain effective for as long as such registration statement otherwise would be required to remain effective, because such action would (i) materially interfere with a significant acquisition, corporate reorganization, or other similar transaction involving the Company; (ii) require premature disclosure of material information that the Company has a bona fide business purpose for preserving as confidential; or (iii) render the Company unable to comply with requirements under the Securities Act or

6

Exchange Act, then the Company shall have the right to defer taking action with respect to such filing for a period of not more than sixty (60) days after the request of the Initiating Holders is given; provided, however, that the Company may not invoke this right more than twice in any twelve (12) month period; and provided further that the Company shall not register any securities for its own account or that of any other stockholder during such sixty (60) day period other than an Excluded Registration.

(d)    Other Limitations. The Company shall not be obligated to effect, or to take any action to effect, any registration pursuant to Section 2.1(a): (i) during the period that is sixty (60) days before the Company's good faith estimate of the date of filing of, and ending on a date that is one hundred eighty (180) days after the effective date of, a Company-initiated registration in which holders of Registrable Securities were permitted to register the offer and sale under the Securities Act at least sixty-six percent (66%) of the shares of Registrable Securities requested to be included therein, provided, that the Company is actively employing in good faith commercially reasonable efforts to cause such registration statement to become effective; (ii) after the Company has effected two registrations pursuant to Section 2.1(a), provided that a registration shall not count as a registration pursuant to Section 2.1(a) unless and until it has become effective and the holders requesting such registration are able to register at least sixty-six (66%) of the Registrable Securities requested to be included in such registration; or (iii) if the Initiating Holders propose to dispose of shares of Registrable Securities that may be immediately registered on Form S-3 pursuant to a request made pursuant to Section 2.1(b). The Company shall not be obligated to effect, or to take any action to effect, any registration pursuant to Section 2.1(b) (x) during the period that is thirty (30) days before the Company's good faith estimate of the date of filing of, and ending on a date that is ninety (90) days after the effective date of, a Company-initiated registration in which holders of Registrable Securities were permitted to register the offer and sale under the Securities Act at least sixty-six percent (66%) of the shares of Registrable Securities requested to be included therein, provided, that the Company is actively employing in good faith commercially reasonable efforts to cause such registration statement to become effective; or (y) if the Company has effected two registrations pursuant to Section 2.1(b) within the twelve (12) month period immediately preceding the date of such request; provided, that this subsection shall not apply to requests made by the Series F Majority or the Series G Majority, as the case may be, until such time as the Company has effected one registration requested by such Series F Majority or Series G Majority, as applicable, pursuant to Section 2.1(b) within the twelve (12) month period immediately preceding the date of such request. A registration shall not be counted as "effected" for purposes of this Section 2.1(d) until such time as the applicable registration statement has been declared effective by the SEC, unless the

7

Initiating Holders withdraw their request for such registration, elect not to pay the registration expenses therefor, and forfeit their right to one demand registration statement pursuant to Section 2.6, in which case such withdrawn registration statement shall be counted as "effected" for purposes of this Section 2.1(d).

2.2    Company Registration. Subject to Section 2.14, if the Company proposes to register (including, for this purpose, a registration effected by the Company for stockholders other than the Holders) any of its Common Stock under the Securities Act in connection with the public offering of such securities solely for cash (other than in an Excluded Registration), the Company shall, at such time, promptly give each Holder notice of such registration. Upon the request of each Holder given within twenty (20) days after such notice is given by the Company, the Company shall, subject to the provisions of Section 2.3, cause to be registered all of the Registrable Securities that each such Holder has requested to be included in such registration. The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 2.2 before the effective date of such registration, whether or not any Holder has elected to include Registrable Securities in such registration. The expenses (other than Selling Expenses) of such withdrawn registration shall be borne by the Company in accordance with Section 2.6.

2.3    Underwriting Requirements.

(a)    Demand Registration. If, pursuant to Section 2.1, the Initiating Holders intend to distribute the Registrable Securities covered by their request by means of an underwriting, they shall so advise the Company as a part of their request made pursuant to Section 2.1, and the Company shall include such information in the Demand Notice. The underwriter(s) will be selected by the Initiating Holders, subject only to the reasonable approval of the Company. In such event, the right of any Holder to include such Holder's Registrable Securities in such registration shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein. All Holders proposing to distribute their securities through such underwriting shall (together with the Company as provided in Section 2.4(f)) enter into an underwriting agreement in customary form with the underwriter(s) selected for such underwriting. If any Holder disapproves of the terms of any such underwriting, such Holder may elect to withdraw therefrom by promptly delivering written notice to the Company and the underwriter. Any Registrable Securities excluded or withdrawn from such underwriting shall be excluded and withdrawn from the registration unless such registration is a registration statement for a delayed or continuous offering under Rule 415 of the Securities Act. Notwithstanding any other provision of this Section 2.3, if the underwriter(s) advise(s) the Initiating Holders in writing that marketing factors require a limitation on the number of shares to be underwritten,

8

then the Initiating Holders shall so advise all Holders of Registrable Securities that otherwise would be underwritten pursuant hereto, and the number of Registrable Securities that may be included in the underwriting shall be allocated among such Holders of Registrable Securities, including the Initiating Holders, in proportion (as nearly as practicable) to the number of Registrable Securities owned by each Holder or in such other proportion as shall mutually be agreed to by all such selling Holders; provided, however, that the number of Registrable Securities held by the Holders to be included in such underwriting shall not be reduced unless all other securities are first entirely excluded from the underwriting; provided, further, that Holders of Series F Preferred Stock and Series G Preferred Stock shall not be affected by any such limitation until such time as the limitation shall have been applied to all other Holders of Registrable Securities. To facilitate the allocation of shares in accordance with the above provisions, the Company or the underwriters may round the number of shares allocated to any Holder to the nearest 100 shares.

(b)    Company Registration. In connection with any offering involving an underwriting of shares of the Company's capital stock pursuant to Section 2.2, the Company shall not be required to include any of the Holders' Registrable Securities in such underwriting unless the Holders accept the reasonable terms of the underwriting (other than terms specific to such Holders' and the Registrable Securities) as agreed upon between the Company and its underwriters. If any Holder disapproves of the terms of any such underwriting, such Holder may elect to withdraw therefrom by giving prompt written notice to the Company and the underwriter. Any Registrable Securities excluded or withdrawn from such underwriting shall be excluded and withdrawn from the registration unless such registration is a registration statement for a delayed or continuous offering under Rule 415 of the Securities Act. If the total number of securities, including Registrable Securities, requested by stockholders to be included in such offering exceeds the number of securities to be sold (other than by the Company) that the underwriters in their reasonable discretion determine is compatible with the success of the offering, then the Company shall be required to include in the offering only that number of such securities, including Registrable Securities, which the underwriters and the Company in their sole discretion determine will not jeopardize the success of the offering. If the underwriters determine that less than all of the Registrable Securities requested to be registered can be included in such offering, then the Registrable Securities that are included in such offering shall be allocated among the selling Holders in proportion (as nearly as practicable to) the number of Registrable Securities owned by each selling Holder or in such other proportions as shall mutually be agreed to by all such selling Holders. To facilitate the allocation of shares in accordance with the above provisions, the Company or the underwriters may round the number of shares allocated to any Holder to the nearest 100 shares. Notwithstanding the foregoing, in no event shall (i) the number of

9

Registrable Securities included in the offering be reduced unless all other securities (other than securities to be sold by the Company) are first entirely excluded from the offering, (ii) the number of Registrable Securities included in the offering be reduced below twenty-five percent (25%) of the total number of securities included in such offering, unless such offering is the IPO, in which case the selling Holders may be excluded further if the underwriters make the determination described above and no other stockholder's securities are included in such offering, or (iii) notwithstanding (ii) above, any Registrable Securities which are not Key Holder Registrable Securities be excluded from such underwriting unless all Key Holder Registrable Securities are first excluded from such offering. For purposes of the provision in this Section 2.3(b) concerning apportionment, for any selling Holder that is a partnership, limited liability company, or corporation, the partners, members, retired partners, retired members, stockholders, and Affiliates of such Holder, or the estates and Immediate Family Members of any such partners, retired partners, members, and retired members and any trusts for the benefit of any of the foregoing Persons, shall be deemed to be a single "selling Holder," and any pro rata reduction with respect to such "selling Holder" shall be based upon the aggregate number of Registrable Securities owned by all Persons included in such "selling Holder," as defined in this sentence.

2.4    Obligations of the Company. Whenever required under this Section 2 to effect the registration of any Registrable Securities, the Company shall, as expeditiously as reasonably possible:

(a)    promptly give written notice of the proposed registration, and any related qualification or compliance, to all Holders of Registrable securities;

(b)    prepare and file with the SEC a registration statement with respect to such Registrable Securities and use its commercially reasonable efforts to cause such registration statement to become effective and, upon the request of the Holders of a majority of the Registrable Securities registered thereunder, keep such registration statement effective for a period of up to one hundred twenty (120) days or, if earlier, until the distribution contemplated in the registration statement has been completed; provided, however, that (i) such one hundred twenty (120) day period shall be extended for a period of time equal to the period the Holder refrains, at the request of an underwriter of Common Stock (or other securities) of the Company, from selling any securities included in such registration, and (ii) in the case of any registration of Registrable Securities on Form S-3 that are intended to be offered on a continuous or delayed basis, subject to compliance with applicable SEC rules, such one hundred twenty (120) day period shall be extended until the securities so registered cease to be Registrable Securities, if necessary, to keep the registration statement effective until all such Registrable Securities are sold;

10

(c)     prepare and file with the SEC, and notify each Holder of Registrable Securities covered by such registration statement of, such amendments and supplements to such registration statement, and the prospectus used in connection with such registration statement, as may be necessary to comply with the Securities Act in order to enable the disposition of all securities covered by such registration statement;

(d)     furnish to the selling Holders such numbers of copies of a prospectus, including a preliminary prospectus, as required by the Securities Act, and such other documents as the Holders may reasonably request in order to facilitate their disposition of their Registrable Securities;

(e)     use its commercially reasonable efforts to register and qualify the securities covered by such registration statement under such other securities or blue-sky laws of such jurisdictions as shall be reasonably requested by the selling Holders; provided that the Company shall not be required to qualify to do business or to file a general consent to service of process in any such states or jurisdictions;

(f)     in the event of any underwritten public offering, enter into such customary agreements (including underwriting and lock-up agreements in customary form) and take all such other customary actions as the holders of such Registrable Securities or the managing underwriter of such offering reasonably request in order to expedite or facilitate the disposition of such Registrable Securities (including, without limitation, making appropriate officers of the Company available to participate in "road show" and other customary marketing activities (including one-on-one meetings with prospective purchasers of the Registrable Securities));

(g)     use its commercially reasonable efforts to furnish, (i) on the pricing date of the offering, a letter, dated as of such date, from the independent certified public accountants of the Company, in form and substance as is customarily given by independent certified public accountants to underwriters in an underwritten public offering addressed to the underwriters, and (A) on each date that such Registrable Securities are delivered to the underwriters for sale, if such securities are being sold through underwriters, (B) an opinion, dated as of such date, of the counsel representing the Company for the purposes of such registration, in form and substance as is customarily given to underwriters in an underwritten public offering, addressed to the underwriters, if any, and (ii) a letter, dated as of such date, from the independent certified public accountants of the Company, in form and substance as is customarily given by independent certified public accountants to underwriters in an underwritten public offering addressed to the underwriters;

11

(h) use its commercially reasonable efforts to cause all such Registrable Securities covered by such registration statement to be listed on a national securities exchange or trading system and each securities exchange and trading system (if any) on which similar securities issued by the Company are then listed;

(i) provide a transfer agent and registrar for all Registrable Securities registered pursuant to this Agreement and provide a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration;

(j) promptly make available for inspection by the selling Holders, any managing underwriter(s) participating in any disposition pursuant to such registration statement, and any attorney or accountant or other agent retained by any such underwriter or selected by the selling Holders, all financial and other records, pertinent corporate documents, and properties of the Company, and cause the Company's officers, directors, employees, and independent accountants to supply all information reasonably requested by any such seller, underwriter, attorney, accountant, or agent, in each case, as necessary or advisable to verify the accuracy of the information in such registration statement and to conduct appropriate due diligence in connection therewith;

(k) notify each selling Holder, promptly after the Company receives notice thereof, of the time when such registration statement has been declared effective or a supplement to any prospectus forming a part of such registration statement has been filed;

(l) after such registration statement becomes effective, notify each selling Holder of any request by the SEC that the Company amend or supplement such registration statement or prospectus;

(m) within a reasonable time before filing such registration statement, prospectus or amendments or supplements thereto with the SEC, furnish to one counsel selected by holders of a majority of such Registrable Securities copies of such documents proposed to be filed, which documents shall be subject to the review and reasonable comment and approval of such counsel;

(n) notify each selling holder of such Registrable Securities, at any time when a prospectus relating such registration statement is required to be delivered under the Securities Act, of the happening of any event that would cause the prospectus included in such registration statement to contain an untrue statement of a material fact or omit any fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading, and, at the request of any such holder, the Company shall prepare a supplement or amendment to such prospectus so that, as thereafter delivered to the purchasers of such Registrable Securities, such prospectus shall not contain an untrue statement of a material fact or omit to state any fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

12

(o) otherwise use its commercially reasonable efforts to comply with all applicable rules and regulations of the SEC and make available to its stockholders an earnings statement (in a form that satisfies the provisions of Section 11(a) of the Securities Act and Rule 158 under the Securities Act or any successor rule thereto) no later than thirty (30) days after the end of the 12-month period beginning with the first day of the Company's first full fiscal quarter after the effective date of such Registration Statement, which earnings statement shall cover said 12-month period, and which requirement will be deemed to be satisfied if the Company timely files complete and accurate information on Forms 10-K, 10-Q and 8-K under the Exchange Act and otherwise complies with Rule 158 under the Securities Act or any successor rule thereto;

(p) advise the holders of Registrable Securities, promptly after it shall receive notice or obtain knowledge thereof, of the issuance of any stop order by the SEC suspending the effectiveness of such Registration Statement or the initiation or threatening of any proceeding for such purpose and promptly use its commercially reasonable efforts to prevent the issuance of any stop order or to obtain its withdrawal at the earliest possible moment if such stop order should be issued;

(q) if any registration statement refers to any holder by name or otherwise as the holder of any securities of the Company and if in its sole and exclusive judgment such holder is or might be deemed to be an underwriter or "controlling person" (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act) (a "<u>Controlling Person</u>") of the Company, such holder shall have the right to require (i) the insertion therein of language, in form and substance satisfactory to such holder and presented to the Company in writing, to the effect that the holding by such holder of such securities is not to be construed as a recommendation by such holder of the investment quality of the Company's securities covered thereby and that such holding does not imply that such holder shall assist in meeting any future financial requirements of the Company, or (ii) in the event that such reference to such holder by name or otherwise is not required by the Securities Act or any similar federal statute then in force, the deletion of the reference to such holder;

(r) cooperate with the holders of the Registrable Securities to facilitate the timely preparation and delivery of certificates representing the Registrable Securities to be sold pursuant to such registration statement or SEC Rule 144 free of any restrictive legends and representing such number of shares of Common Stock and registered in such names as the holders of the Registrable Securities may reasonably request a reasonable period of time

prior to sales of Registrable Securities pursuant to such Registration Statement or Rule 144; _provided_, that the Company may satisfy its obligations hereunder without issuing physical stock certificates through the use of The Depository Trust Company's Direct Registration System; and

(s)    otherwise use its commercially reasonable efforts to take all other steps necessary to effect the registration of such Registrable Securities contemplated hereby.

In addition, the Company shall ensure that, at all times after any registration statement covering a public offering of securities of the Company under the Securities Act shall have become effective, its insider trading policy shall provide that the Company's directors may implement a trading program under Rule 10b5-1 of the Exchange Act.

2.5    <u>Furnish Information</u>. It shall be a condition precedent to the obligations of the Company to take any action pursuant to this <u>Section 2</u> with respect to the Registrable Securities of any selling Holder that such Holder shall furnish to the Company such information regarding itself, the Registrable Securities held by it, and the intended method of disposition of such securities as is reasonably required to effect the registration of such Holder's Registrable Securities.

2.6    <u>Expenses of Registration</u>. All expenses (other than Selling Expenses) incurred in connection with registrations, filings, or qualifications pursuant to <u>Section 2</u>, including all registration, filing, and qualification fees; printers' and accounting fees; fees and disbursements of counsel for the Company, and the reasonable fees and disbursements of one counsel for the selling Holders ("**Selling Holder Counsel**"), shall be borne and paid by the Company; _provided, however,_ that the Company shall not be required to pay for any expenses of any registration proceeding begun pursuant to <u>Section 2.1</u> if the registration request is subsequently withdrawn at the request of the Holders of a majority of the Registrable Securities to be registered (in which case all selling Holders shall bear such expenses pro rata based upon the number of Registrable Securities that were to be included in the withdrawn registration), unless the Holders of a majority of the Registrable Securities agree to forfeit their right to one registration pursuant to <u>Section 2.1(a)</u> or <u>Section 2.1(b)</u>, as the case may be; _provided further_ that if, at the time of such withdrawal, the Holders shall have learned of a material adverse change in the condition, business, or prospects of the Company from that known to the Holders at the time of their request and have withdrawn the request with reasonable promptness after learning of such information, then the Holders shall not be required to pay any of such expenses and shall not forfeit their right to one registration pursuant to <u>Section 2.1(a)</u> or <u>Section 2.1(b)</u>. All Selling Expenses relating to Registrable Securities registered pursuant to this <u>Section 2</u> shall be borne and paid by the Holders pro rata on the basis of the number of Registrable Securities registered on their behalf.

14

2.7    <u>Delay of Registration</u>. No Holder shall have any right to obtain or seek an injunction restraining or otherwise delaying any registration pursuant to this Agreement as the result of any controversy that might arise with respect to the interpretation or implementation of this <u>Section 2</u>.

2.8    <u>Indemnification</u>. If any Registrable Securities are included in a registration statement under this <u>Section 2</u>:

(a)    To the extent permitted by law, the Company will indemnify and hold harmless each selling Holder, and the partners, members, officers, directors, and stockholders of each such Holder; legal counsel and accountants for each such Holder; any underwriter (as defined in the Securities Act) for each such Holder; and each Person, if any, who controls such Holder or underwriter within the meaning of the Securities Act or the Exchange Act, against any Damages, and the Company will pay to each such Holder, underwriter, controlling Person, or other aforementioned Person any legal or other expenses reasonably incurred thereby in connection with investigating or defending any claim or proceeding from which Damages may result, as such expenses are incurred; <u>provided, however</u>, that the indemnity agreement contained in this <u>Section 2.8(a)</u> shall not apply to amounts paid in settlement of any such claim or proceeding if such settlement is effected without the written consent of the Company, which consent shall not be unreasonably withheld, nor shall the Company be liable for any Damages to the extent that they arise out of or are based upon actions or omissions made in reliance upon and in conformity with written information furnished by or on behalf of any such Holder, underwriter, controlling Person, or other aforementioned Person expressly for use in connection with such registration.

(b)    To the extent permitted by law, each selling Holder, severally and not jointly, will indemnify and hold harmless the Company, and each of its directors, each of its officers who has signed the registration statement, each Person (if any), who controls the Company within the meaning of the Securities Act, legal counsel and accountants for the Company, any underwriter (as defined in the Securities Act), any other Holder selling securities in such registration statement, and any controlling Person of any such underwriter or other Holder, against any Damages, in each case only to the extent that such Damages arise out of or are based upon actions or omissions made in reliance upon and in conformity with written information furnished by or on behalf of such selling Holder expressly for use in connection with such registration; and each such selling Holder will pay to the Company and each other aforementioned Person any legal or other expenses reasonably incurred thereby in connection with investigating or defending any claim or proceeding from which Damages may result, as such expenses are incurred; <u>provided, however</u>, that the indemnity agreement contained in this <u>Section 2.8(b)</u> shall not apply to

15

amounts paid in settlement of any such claim or proceeding if such settlement is effected without the written consent of the Holder, which consent shall not be unreasonably withheld; and provided further that in no event shall the aggregate amounts payable by any Holder by way of indemnity or contribution under Sections 2.8(b) and 2.8(d) exceed the proceeds from the offering received by such Holder (net of any Selling Expenses paid by such Holder), except in the case of fraud or willful misconduct by such Holder.

(c)     Promptly after receipt by an indemnified party under this Section 2.8 of notice of the commencement of any action (including any governmental action) for which a party may be entitled to indemnification hereunder, such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this Section 2.8, give the indemnifying party notice of the commencement thereof. The indemnifying party shall have the right to participate in such action and, to the extent the indemnifying party so desires, participate jointly with any other indemnifying party to which notice has been given, and to assume the defense thereof with counsel mutually satisfactory to the parties; provided, however, that an indemnified party (together with all other indemnified parties that may be represented without conflict by one counsel) shall have the right to retain one separate counsel, with the fees and expenses to be paid by the indemnifying party, if representation of such indemnified party by the counsel retained by the indemnifying party would be inappropriate due to actual or potential differing interests between such indemnified party and any other party represented by such counsel in such action. The failure to give notice to the indemnifying party within a reasonable time of the commencement of any such action shall relieve such indemnifying party of any liability to the indemnified party under this Section 2.8, to the extent that such failure materially prejudices the indemnifying party's ability to defend such action. The failure to give notice to the indemnifying party will not relieve it of any liability that it may have to any indemnified party otherwise than under this Section 2.8.

(d)     To provide for just and equitable contribution to joint liability under the Securities Act in any case in which either (i) any party otherwise entitled to indemnification hereunder makes a claim for indemnification pursuant to this Section 2.8 but it is judicially determined (by the entry of a final judgment or decree by a court of competent jurisdiction and the expiration of time to appeal or the denial of the last right of appeal) that such indemnification may not be enforced in such case, notwithstanding the fact that this Section 2.8 provides for indemnification in such case, or (ii) contribution under the Securities Act may be required on the part of any party hereto for which indemnification is provided under this Section 2.8, then, and in each such case, such parties will contribute to the aggregate losses, claims, damages, liabilities, or expenses to which they may be

16

subject (after contribution from others) in such proportion as is appropriate to reflect the relative fault of each of the indemnifying party and the indemnified party in connection with the statements, omissions, or other actions that resulted in such loss, claim, damage, liability, or expense, as well as to reflect any other relevant equitable considerations. The relative fault of the indemnifying party and of the indemnified party shall be determined by reference to, among other things, whether the untrue or allegedly untrue statement of a material fact, or the omission or alleged omission of a material fact, relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission; provided, however, that, in any such case, (x) no Holder will be required to contribute any amount in excess of the public offering price of all such Registrable Securities offered and sold by such Holder pursuant to such registration statement, and (y) no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) will be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation; and provided further that in no event shall a Holder's liability pursuant to this Section 2.8(d), when combined with the amounts paid or payable by such Holder pursuant to Section 2.8(b), exceed the proceeds from the offering received by such Holder (net of any Selling Expenses paid by such Holder), except in the case of willful misconduct or fraud by such Holder.

(e)    Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are in conflict with the foregoing provisions, the provisions in the underwriting agreement shall control.

(f)    Unless otherwise superseded by an underwriting agreement entered into in connection with the underwritten public offering, the obligations of the Company and Holders under this Section 2.8 shall survive the completion of any offering of Registrable Securities in a registration under this Section 2, and otherwise shall survive the termination of this Agreement.

2.9    Reports Under Exchange Act. With a view to making available to the Holders the benefits of SEC Rule 144 and any other rule or regulation of the SEC that may at any time permit a Holder to sell securities of the Company to the public without registration or pursuant to a registration on Form S-3, the Company shall:

(a)    make and keep available adequate current public information, as those terms are understood and defined in SEC Rule 144, at all times after the effective date of the registration statement filed by the Company for the IPO;

17

(b)     use commercially reasonable efforts to file with the SEC in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act (at any time after the Company has become subject to such reporting requirements); and

(c)     furnish to any Holder, so long as the Holder owns any Registrable Securities, forthwith upon request (i) to the extent accurate, a written statement by the Company that it has complied with the reporting requirements of SEC Rule 144 (at any time after ninety (90) days after the effective date of the registration statement filed by the Company for the IPO), the Securities Act, and the Exchange Act (at any time after the Company has become subject to such reporting requirements), or that it qualifies as a registrant whose securities may be resold pursuant to Form S-3 (at any time after the Company so qualifies); and (ii) such other information as may be reasonably requested in availing any Holder of any rule or regulation of the SEC that permits the selling of any such securities without registration (at any time after the Company has become subject to the reporting requirements under the Exchange Act) or pursuant to Form S-3 (at any time after the Company so qualifies to use such form).

2.10   Limitations on Subsequent Registration Rights. From and after the date of this Agreement, the Company shall not, without the prior written consent of (a) the Holders of a majority of the Registrable Securities then outstanding, (b) the Series F Majority and (c) the Series G Majority enter into any agreement with any holder or prospective holder of any securities of the Company that (i) would allow such holder or prospective holder to include such securities in any registration unless, under the terms of such agreement, such holder or prospective holder may include such securities in any such registration only to the extent that the inclusion of such securities will not reduce the number of the Registrable Securities of the Holders that are included or (ii) would allow such holder or prospective holder to initiate a demand for registration of any securities held by such holder or prospective holder; provided that this limitation shall not apply to any additional Investor who becomes a party to this Agreement in accordance with Section 6.9.

2.11   "Market Stand-off" Agreement. Each Holder hereby agrees that it will not, without the prior written consent of the managing underwriter, with respect to an IPO, during the period commencing on the date of the final prospectus relating to the registration by the Company and ending on the date specified by the Company and the managing underwriter (such period not to exceed one hundred eighty (180) days or, if the Company is not an emerging growth company as defined under the Jumpstart Our Business Startups Act of 2012, such other period as may be requested by the Company or an underwriter to accommodate regulatory restrictions on (1) the publication or other distribution of research reports and (2) analyst recommendations and opinions, including, but not limited to, applicable FINRA or NYSE rules), (i) lend; offer; pledge; sell; contract to sell; sell any option or contract to purchase; purchase any option or contract to sell; grant any option, right, or warrant to purchase; or otherwise transfer or dispose of, directly

18

or indirectly, any shares of Common Stock or any securities convertible into or exercisable or exchangeable (directly or indirectly) for Common Stock held immediately before the effective date of the registration statement for such offering or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such securities, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Common Stock or other securities, in cash, or otherwise. The foregoing provisions of this <u>Section 2.11</u> shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement, any exceptions contained in the lock-up agreement for the offering, or the transfer of any shares to any trust for the direct or indirect benefit of the Holder or the immediate family of the Holder, provided that the trustee of the trust agrees to be bound in writing by the restrictions set forth herein, and provided further that any such transfer shall not involve a disposition for value, and shall be applicable to the Holders only if all officers and directors are subject to the same restrictions and the Company uses commercially reasonable efforts to obtain a similar agreement from all stockholders individually owning more than one percent (1%) of the Company's outstanding Common Stock (after giving effect to conversion into Common Stock of all outstanding Preferred Stock). The underwriters in connection with such registration are intended third-party beneficiaries of this <u>Section 2.11</u> and shall have the right, power, and authority to enforce the provisions hereof as though they were a party hereto. Each Holder further agrees to execute such agreements as may be reasonably requested by the underwriters in connection with such registration that are consistent with this <u>Section 2.11</u> or that are necessary to give further effect thereto, subject to the inclusion of customary exceptions in such agreements. Any discretionary waiver or termination of the restrictions of any or all of such agreements by the Company or the underwriters shall apply pro rata to all Holders subject to such agreements, based on the number of shares subject to such agreements, except that, notwithstanding the foregoing, the Company and the underwriters may, in their sole discretion, waive or terminate these restrictions with respect to up to eight hundred and fifty thousand (850,000) shares of the Common Stock, as adjusted for any stock split, stock dividend, combination, or other recapitalization or reclassification effected with respect to the Common Stock after the date hereof.

2.12  <u>Restrictions on Transfer.</u>

(a)    The Preferred Stock and the Registrable Securities shall not be sold, pledged, or otherwise transferred, and the Company shall not recognize and shall issue stop-transfer instructions to its transfer agent with respect to any such sale, pledge, or transfer, except upon the conditions specified in this Agreement, which conditions are intended to ensure compliance with the provisions of the Securities Act, or, following an IPO, pursuant to an effective registration statement or exemption from the registration requirements of the Securities Act (a "<u>Public Sale</u>"). A transferring Holder will cause any proposed purchaser, pledgee, or transferee of the Preferred Stock and the Registrable Securities held by such Holder to agree to take and hold such securities subject to the provisions and upon the conditions specified in this Agreement unless in a Public Sale.

19

(b)     Prior to a Public Sale, each certificate or instrument representing (i) the Preferred Stock, (ii) the Registrable Securities, and (iii) any other securities issued in respect of the securities referenced in clauses (i) and (ii), upon any stock split, stock dividend, recapitalization, merger, consolidation, or similar event, shall (unless otherwise permitted by the provisions of Section 2.12(c)) be stamped or otherwise imprinted with a legend substantially in the following form:

> THE SECURITIES REPRESENTED HEREBY HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933. SUCH SHARES MAY NOT BE SOLD, PLEDGED, OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR A VALID EXEMPTION FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SAID ACT.

> THE SECURITIES REPRESENTED HEREBY MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY.

The Holders consent to the Company making a notation in its records and giving instructions to any transfer agent of the Restricted Securities in order to implement the restrictions on transfer set forth in this Section 2.12.

(c)     The holder of each certificate representing Restricted Securities, by acceptance thereof, agrees to comply in all respects with the provisions of this Section 2. Before any proposed sale, pledge, or transfer of any Restricted Securities, unless there is in effect a registration statement under the Securities Act covering the proposed transaction, the Holder thereof shall give notice to the Company of such Holder's intention to effect such sale, pledge, or transfer. Each such notice shall describe the manner and circumstances of the proposed sale, pledge, or transfer in sufficient detail and, if reasonably requested by the Company, shall be accompanied at such Holder's expense by either (i) a written opinion of legal counsel who shall, and whose legal opinion shall, be reasonably satisfactory to the Company, addressed to the Company, to the effect that the proposed transaction may be effected without registration under the Securities Act; (ii) a "no action" letter from the SEC to the effect that the

20

proposed sale, pledge, or transfer of such Restricted Securities without registration will not result in a recommendation by the staff of the SEC that action be taken with respect thereto; or (iii) any other evidence reasonably satisfactory to counsel to the Company to the effect that the proposed sale, pledge, or transfer of the Restricted Securities may be effected without registration under the Securities Act, whereupon the Holder of such Restricted Securities shall be entitled to sell, pledge, or transfer such Restricted Securities in accordance with the terms of the notice given by the Holder to the Company. The Company will not require such a legal opinion or "no action" letter (x) in any transaction in compliance with SEC Rule 144 or (y) in any transaction in which such Holder distributes Restricted Securities to an Affiliate of such Holder (including any trust for the benefit of such Holder or one or more of such Holder's Immediate Family Members) for no consideration; provided that each transferee agrees in writing to be subject to the terms of this Section 2.12. Each certificate or instrument evidencing the Restricted Securities transferred as above provided shall bear, except if such transfer is made pursuant to SEC Rule 144, the appropriate restrictive legend set forth in Section 2.12(b), except that such certificate shall not bear such restrictive legend if, in the opinion of counsel for such Holder and the Company, such legend is not required in order to establish compliance with any provisions of the Securities Act.

2.13    Alternative IPO Entities. In the event that the Company in its discretion elects to effect an underwritten registered offering of equity securities of any subsidiary or parent of the Company (collectively, "Alternative IPO Entities") rather than the equity securities of the Company, whether as a result of a reorganization of the Company or otherwise, the Investors and the Company shall cause the Alternative IPO Entity to enter into an agreement with the Investors that provides the Investors with registration rights with respect to the equity securities of the Alternative IPO Entity that are substantially the same as, and in any event no less favorable in the aggregate to, the registration rights provided to the Investors in this Agreement.

2.14    Termination of Registration Rights. The right of any Holder to request registration or inclusion of Registrable Securities in any registration pursuant to Section 2.1 or Section 2.2 shall terminate upon the earlier of:

(a)     the closing of a Deemed Liquidation Event, as such term is defined in the Company's Certificate of Incorporation; and

(b)     the fifth (5th) anniversary of the IPO.

3.    Information Rights.

3.1    Financial Statements, Reports, Etc. The Company shall furnish to each Investor the following reports:

21

(a)    Annual Financial Statements. Within ninety (90) days after the end of each fiscal year of the Company, a consolidated balance sheet of the Company and its subsidiaries, if any, as of the end of such fiscal year and the related consolidated statements of income, stockholders' equity and cash flows for the fiscal year then ended, prepared in accordance with generally accepted accounting principles and certified by a firm of independent public accountants of recognized national standing selected by the Board of Directors of the Company;

(b)    Quarterly Financial Statements. Within forty-five (45) days after the end of each quarter in each fiscal year, a consolidated balance sheet of the Company and its subsidiaries, if any, and the related consolidated statements of income, stockholders' equity and cash flows, unaudited but prepared in accordance with generally accepted accounting principles and certified by the Chief Financial Officer of the Company, such consolidated balance sheet to be as of the end of such quarter and such consolidated statements of income, stockholders' equity and cash flows to be for such quarter and for the period from the beginning of the fiscal year to the end of such quarter, in each case with comparative statements for the prior fiscal year and including a management discussion and analysis section;

(c)    Monthly Financial Statements. Within thirty (30) days after the end of each month in each fiscal year (other than the last month in each fiscal year), a consolidated balance sheet of the Company and its subsidiaries, if any, and the related consolidated statements of income, stockholders' equity and cash flows, unaudited but prepared in accordance with generally accepted accounting principles, such consolidated balance sheet to be as of the end of such month and such consolidated statements of income, stockholders' equity and cash flows to be for such month and for the period from the beginning of the fiscal year to the end of such month, in each case with comparative statements for the prior fiscal year;

(d)    Budget. No later than thirty (30) days prior to the start of each fiscal year, consolidated capital and operating expense budgets, cash flow projections and income and loss projections for the Company and its subsidiaries in respect of such fiscal year, all itemized in reasonable detail and prepared on a monthly basis, and, promptly after preparation, any revisions to any of the foregoing;

(e)    Accountant's Letters. Promptly following receipt by the Company, each audit response letter, accountant's management letter and other written report submitted to the Company by its independent public accountants in connection with an annual or interim audit of the books of the Company or any of its subsidiaries;

(f)    Notices. Promptly after the commencement thereof, notice of all actions, suits, claims, proceedings, investigations and inquiries that could materially and adversely affect the Company or any of its subsidiaries, if any; and

22

(g)     Other Information. Promptly, from time to time, such other information regarding the business, prospects, financial condition, operations, property or affairs of the Company and its subsidiaries as such Investor reasonably may request.

If, for any period, the Company has any subsidiary whose accounts are consolidated with those of the Company, then in respect of such period the financial statements delivered pursuant to the foregoing sections shall be the consolidated and consolidating financial statements of the Company and all such consolidated subsidiaries.

For any Major Investor so requesting, the Company will, unless otherwise notified by such Major Investor, provide the information called for under this Section 3.1 via email in Microsoft Excel format through the Clear Momentum financial reporting service.

Notwithstanding anything else in this Section 3.1 to the contrary, the Company may cease providing the information set forth in this Section 3.1 during the period starting with the date sixty (60) days before the Company's good-faith estimate of the date of filing of a registration statement if it reasonably concludes it must do so to comply with the SEC rules applicable to such registration statement and related offering; provided that the Company's covenants under this Section 3.1 shall be reinstated at such time as the Company is no longer actively employing its commercially reasonable efforts to cause such registration statement to become effective.

3.2    Inspection. The Company shall permit each Major Investor (provided that the Board of Directors has not reasonably determined that such Major Investor is a competitor of the Company), at such Major Investor's expense, to visit and inspect the Company's properties; examine its books of account and records; and discuss the Company's affairs, finances, and accounts with its officers, during normal business hours of the Company as may be reasonably requested by the Major Investor; provided, however, that the Company shall not be obligated pursuant to this Section 3.2 to provide access to any information that it reasonably and in good faith considers to be a trade secret or confidential information (unless covered by an enforceable confidentiality agreement, in form acceptable to the Company) or the disclosure of which would adversely affect the attorney-client privilege between the Company and its counsel.

23

3.3   Observer Rights.

(a)   As long as Greenspring Opportunities III, L.P., and its Affiliates (collectively, "**Greenspring**") owns not less than 2,100,000 shares of the Series E Preferred Stock it is purchasing under the Purchase Agreement (as adjusted for any stock split, stock dividend, combination, or other recapitalization or reclassification effected after the date hereof, or an equivalent amount of Common Stock issued upon conversion thereof), the Company shall invite a representative of Greenspring to attend all meetings of its Board of Directors and each committee thereof in a nonvoting observer capacity and, in this respect, shall give such representative copies of all notices, minutes, consents, and other materials that it provides to its directors at the same time and in the same manner as provided to such directors; provided, however, that such representative shall agree to hold in confidence and trust and to act in a fiduciary manner with respect to all information so provided; and provided further, that the Company reserves the right to withhold any information and to exclude such representative from any meeting or portion thereof if access to such information or attendance at such meeting could adversely affect the attorney-client privilege between the Company and its counsel or result in disclosure of trade secrets or a conflict of interest, or is such Investor or its representative is a competitor of the Company. The Company will reimburse Greenspring's observer for all reasonable out-of-pocket expenses incurred in attending meetings of the Board of Directors and any committees thereof.

3.4   Termination of Information and Observer Rights. The covenants set forth in Section 3.1, Section 3.2, and Section 3.3 shall terminate and be of no further force or effect (i) immediately before the consummation of the IPO, (ii) when the Company first becomes subject to the periodic reporting requirements of Section 12(g) or 15(d) of the Exchange Act, or (iii) upon a Deemed Liquidation Event, as such term is defined in the Company's Certificate of Incorporation, whichever event occurs first.

3.5   Confidentiality. Each Investor agrees that such Investor will keep confidential and will not disclose, divulge, or use for any purpose (other than to monitor its investment in the Company) any confidential information obtained from the Company pursuant to the terms of this Agreement (including notice of the Company's intention to file a registration statement), unless such confidential information (a) is known or becomes known to the public in general (other than as a result of a breach of this Section 3.5 by such Investor), (b) is or has been independently developed or conceived by the Investor without use of the Company's confidential information, or (c) is or has been made known or disclosed to the Investor by a third party without a breach of any obligation of confidentiality such third party may have to the Company; provided, however, that an Investor may disclose confidential information (i) to its attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services in connection with monitoring its investment in the Company; (ii) to any prospective purchaser of any Registrable Securities from such Investor, if such prospective purchaser agrees to be bound by the provisions of this Section 3.5; (iii) to any Affiliate, partner, prospective partner, member, stockholder, or wholly owned subsidiary of such Investor in the ordinary course of business,

24

provided that such Investor informs such Person that such information is confidential and directs such Person to maintain the confidentiality of such information; (iv) as may otherwise be required by law, provided that the Investor promptly notifies the Company of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure; or (v) to any regulatory authority (whether pursuant to an audit, examination, inquiry, request or routine supervisory oversight).

4.    Rights to Future Stock Issuances.

4.1    Right of First Offer. Subject to the terms and conditions of this Section 4.1 and applicable securities laws, if the Company proposes to offer or sell any New Securities after the date hereof, the Company shall first offer such New Securities to each Major Investor. A Major Investor shall be entitled to apportion the right of first offer hereby granted to it, in such proportions as it deems appropriate, among (i) itself and (ii) its Affiliates; provided that, each such Affiliate: (x) is not a competitor or FOIA Party, unless such party's purchase of New Securities is otherwise consented to by the Board of Directors, and (y) agrees to enter into this Agreement and each of the Seventh Amended and Restated Voting Agreement and the Seventh Amended and Restated Right of First Refusal and Co-Sale Agreement of even date herewith, by and among the Company, the Investors and the other parties named therein, in each case as amended and/or restated at any time and from time to time, as an Investor under each such agreement (provided that, any competitor or FOIA Party shall not be entitled to any rights as a Major Investor under Sections 3.1, 3.2 and 4.1 hereof).

(a)    The Company shall give notice (the "**Offer Notice**") to each Major Investor, stating (i) its bona fide intention to offer such New Securities, (ii) the number of such New Securities to be offered, and (iii) the price and terms, if any, upon which it proposes to offer such New Securities.

(b)    By notification to the Company within twenty (20) days after the Offer Notice is given, each Major Investor may elect to purchase or otherwise acquire, at the price and on the terms specified in the Offer Notice, up to that portion of such New Securities which equals the proportion that the Common Stock issued and held, or issuable (directly or indirectly) upon conversion and/or exercise, as applicable, of the Preferred Stock and any other Derivative Securities then held, by such Major Investor bears to the total Common Stock of the Company then held by all the Major Investors (including all shares of Common Stock issuable (directly or indirectly) upon conversion and/or exercise, as applicable, of the Preferred Stock and any other Derivative Securities then held by the Major Investors. At the expiration of such twenty (20) day period, the Company shall promptly notify each Major Investor that elects to purchase or acquire all the shares available to it (each, a "**Fully Exercising Investor**") of any other Major Investor's failure to do likewise. During the ten (10) day period commencing after the Company has given such notice, each Fully

25

Exercising Investor may, by giving notice to the Company, elect to purchase or acquire, in addition to the number of shares specified above, up to that portion of the New Securities for which Major Investors were entitled to subscribe but that were not subscribed for by the Major Investors which is equal to the proportion that the Common Stock issued and held, or issuable (directly or indirectly) upon conversion and/or exercise, as applicable, of Preferred Stock and any other Derivative Securities then held, by such Fully Exercising Investor bears to the Common Stock issued and held, or issuable (directly or indirectly) upon conversion and/or exercise, as applicable, of the Preferred Stock and any other Derivative Securities then held, by all Fully Exercising Investors who wish to purchase such unsubscribed shares. The closing of any sale pursuant to this Section 4.1(b) shall occur within the later of one hundred and twenty (120) days of the date that the Offer Notice is given and the date of initial sale of New Securities pursuant to Section 4.1(c).

(c)     If all New Securities referred to in the Offer Notice are not elected to be purchased or acquired as provided in Section 4.1(b), the Company may, during the ninety (90) day period following the expiration of the periods provided in Section 4.1(b), offer and sell the remaining unsubscribed portion of such New Securities to any Person or Persons at a price not less than, and upon terms no more favorable to the offeree than, those specified in the Offer Notice. If the Company does not enter into an agreement for the sale of the New Securities within such period, or if such agreement is not consummated within thirty (30) days of the execution thereof, the right provided hereunder shall be deemed to be revived and such New Securities shall not be offered unless first reoffered to the Major Investors in accordance with this Section 4.1.

(d)     The right of first offer in this Section 4.1 shall not be applicable to (i) Exempted Securities (as defined in the Company's Certificate of Incorporation); (ii) shares of Common Stock issued in the IPO; and (iii) the issuance of shares of Series H Preferred Stock to Additional Investors (as defined in the Purchase Agreement) pursuant to Section 1.2 of the Purchase Agreement.

4.2    Termination. The covenants set forth in Section 4.1 shall terminate and be of no further force or effect (i) immediately before the consummation of the IPO, (ii) when the Company first becomes subject to the periodic reporting requirements of Section 12(g) or 15(d) of the Exchange Act, or (iii) upon a Deemed Liquidation Event, as such term is defined in the Company's Certificate of Incorporation, whichever event occurs first.

26

5. <u>Additional Covenants</u>.

5.1 <u>Insurance</u>. The Company shall use commercially reasonable efforts to maintain its Key Person and Directors and Officers liability insurance providing coverage of not less than $5,000,000 until such time as the Board of Directors (including the Series F Director, the Series G Director and at least two other Preferred Directors) determines that such insurance should be discontinued.

5.2 <u>Employee Agreements</u>. The Company will cause each person now or hereafter employed by it or by any subsidiary (or engaged by the Company or any subsidiary as a consultant/independent contractor) with access to confidential information and/or trade secrets to enter into a nondisclosure and proprietary rights assignment agreement substantially in the form approved by the Board of Directors. In addition, the Company shall not amend, modify, terminate, waive, or otherwise alter, in whole or in part, any of the above-referenced agreements or any restricted stock agreement between the Company and any employee, without the consent of the Board of Directors.

5.3 <u>Employee Stock</u>. Unless otherwise approved by the Board of Directors, including at least two Preferred Directors, all future employees and consultants of the Company who purchase, receive options to purchase, or receive awards of shares of the Company's capital stock after the date hereof shall be required to execute restricted stock or option agreements, as applicable, providing for

(a) vesting of shares over a four (4) year period, with the first twenty-five percent (25%) of such shares vesting following twelve (12) months of continued employment or service, and the remaining shares vesting in equal monthly installments over the following thirty-six (36) months, and

(b) a market stand-off provision substantially similar to that in <u>Section 2.11</u>. In addition, unless otherwise approved by the Board of Directors, the Company shall have the right to repurchase unvested shares at cost upon termination of employment of a holder of restricted stock.

5.4 <u>Board Matters</u>. Unless otherwise determined by the vote of a majority of the directors then in office, the Board of Directors shall meet at least quarterly in accordance with an agreed-upon schedule. The Company shall reimburse the directors for all documented reasonable and customary expenses incurred in connection with attendance at meetings of the Board of Directors.

5.5 <u>Successor Indemnification</u>. If the Company or any of its successors or assignees consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger, then to the extent necessary, proper provision shall be made so that the successors and assignees of the Company assume the obligations of the Company with respect to indemnification of members of the Board of Directors as in effect immediately before such transaction, whether such obligations are contained in the Company's Bylaws, its Certificate of Incorporation, or elsewhere, as the case may be.

27

5.6    Third Party Indemnification. Without limitation of any other provision of this Agreement or any agreement executed in connection herewith, the Company agrees to defend, indemnify and hold GCEV Co-Invest TRR, L.P. and GCEV Co-Invest TRR-1, L.P. (together, "**Greycroft**"), Great Hill Equity Partners V, L.P. ("**GHP**") and PWP Growth Equity Fund II LP and PWP Growth Equity Fund II B LP (together, "**PWP**"), their respective affiliates and direct and indirect partners (including partners of partners and stockholders and members of partners), members, stockholders, directors, officers, employees and agents and each person who controls any of them within the meaning of Section 15 of the Securities Act, or Section 20 of the Exchange Act (collectively, the "**Investor Indemnified Parties**" and, individually, an "**Investor Indemnified Party**") harmless from and against any and all damages, liabilities, losses, taxes, fines, penalties, reasonable costs and expenses (including, without limitation, reasonable fees of a single counsel representing the Investor Indemnified Parties), as the same are incurred, of any kind or nature whatsoever (whether or not arising out of third party claims and including all amounts paid in investigation, defense or settlement of the foregoing) which may be sustained or suffered by any such Investor Indemnified Party ("**Losses**"), based upon, arising out of, or by reason of any third party or governmental claims relating in any way to such Investor Indemnified Party's status as a security holder, creditor, director, agent, representative or controlling person of the Company or otherwise relating to such Investor Indemnified Party's involvement with the Company (including, without limitation, any and all Losses under the Securities Act, the Exchange Act or other federal or state statutory law or regulation, at common law or otherwise, which relate directly or indirectly to the registration, purchase, sale or ownership of any securities of the Company or to any fiduciary obligation owed with respect thereto), including, without limitation, in connection with any third party or governmental action or claim relating to any action taken or omitted to be taken or alleged to have been taken or omitted to have been taken by any Investor Indemnified Party as security holder, director, agent, representative or controlling person of the Company or otherwise, alleging so called control person liability or securities law liability; provided, however, that the Company will not be liable to the extent that such Losses arise from and are based on (A) an untrue statement or omission or alleged untrue statement or omission in a registration statement or prospectus which is made in reliance on and in conformity with written information furnished to the Company by or on behalf of such Investor Indemnified Party, or (B) conduct by an Investor Indemnified Party which constitutes fraud or willful misconduct.

5.7    Reservation of Common Stock. The Company will at all times reserve and keep available, solely for issuance and delivery upon the conversion of the Preferred Stock, all Common Stock issuable from time to time upon such conversion.

5.8    Termination of Covenants. Except as provided below, the covenants set forth in this Section 5, except for Section 5.7, shall terminate and be of no further force or effect immediately before the consummation of the IPO. Notwithstanding the foregoing, the covenants set forth in Section 5.1 shall continue for so long as any Preferred Director is a member of the Board of Directors, and the covenant set forth in Section 5.6 shall continue for so long as Greycroft, GHP or PWP holds any Registrable Securities or until the expiration of the applicable statute of limitations, if later.

28

6.    Miscellaneous.

6.1    Successors and Assigns. The rights under this Agreement may be assigned (but only with all related obligations) by a Holder to a transferee of Registrable Securities that (i) is an Affiliate of a Holder; (ii) is a Holder's Immediate Family Member or trust for the benefit of (a) an individual Holder or (b) one or more of such Holder's Immediate Family Members; or (iii) after such transfer, holds at least 1,250,000 shares of Registrable Securities (subject to appropriate adjustment for stock splits, stock dividends, combinations, and other recapitalizations); provided, however, that (x) the Company is, within a reasonable time after such transfer, furnished with written notice of the name and address of such transferee and the Registrable Securities with respect to which such rights are being transferred; and (y) such transferee agrees in a written instrument delivered to the Company to be bound by and subject to the terms and conditions of this Agreement, including the provisions of Section 2.11. For the purposes of determining the number of shares of Registrable Securities held by a transferee, the holdings of a transferee (1) that is an Affiliate or stockholder of a Holder; (2) who is a Holder's Immediate Family Member; or (3) that is a trust for the benefit of an individual Holder or such Holder's Immediate Family Member shall be aggregated together and with those of the transferring Holder; provided further that all transferees who would not qualify individually for assignment of rights shall have a single attorney-in-fact for the purpose of exercising any rights, receiving notices, or taking any action under this Agreement. The terms and conditions of this Agreement inure to the benefit of and are binding upon the respective successors and permitted assignees of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and permitted assignees any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided herein.

6.2    Governing Law. This Agreement shall be governed by the internal law of the State of Delaware.

6.3    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

6.4    Titles and Subtitles. The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting this Agreement.

29

6.5    <u>Notices</u>. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (i) personal delivery to the party to be notified; (ii) when sent, if sent by electronic mail or facsimile during the recipient's normal business hours, and if not sent during normal business hours, then on the recipient's next business day; (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one (1) business day after the business day of deposit with a nationally recognized overnight courier, freight prepaid, specifying next-day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their addresses as set forth on <u>Schedule A</u> or <u>Schedule B</u> (as applicable) hereto, or to the principal office of the Company and to the attention of the Chief Executive Officer, in the case of the Company, or to such email address, facsimile number, or address as subsequently modified by written notice given in accordance with this <u>Section 6.5</u>. If notice is given to the Company, it shall be sent to The RealReal, Inc., 55 Francisco Street, Suite 600, San Francisco, CA 94133 Attn: Chief Executive Officer; and a copy (which shall not constitute notice) shall also be sent to Hank Barry, Sidley Austin LLP, 1001 Page Mill Road, Building 1, Palo Alto, CA 94304 and if notice is given to the Investors, copies shall also be given to Caine T. Moss, Goodwin Procter, 135 Commonwealth Drive, Menlo Park, CA 94025, Jim Fulton, Cooley LLP, 1114 Avenue of the Americas, New York, NY 10036, Tim Harris, Morrison Foerster, 755 Page Mill Road, Palo Alto, CA 94304, Kevin Robertson, Ober, Kaler, Grimes & Shriver, P.C., 100 Light Street, Baltimore, MD 21202, Tamara L. Thompson, Thompson Legal Advisory Services, 229 Brannan Street, Suite 18G, San Francisco, CA 94107, Alexander Temel, Sidley Austin LLP, 60 State St, Boston, MA 02109 and Johan V. Brigham and Kristen Grannis, Latham & Watkins LLP, 200 Clarendon Street, 27th Floor, Boston, MA 02116.

6.6    <u>Amendments and Waivers</u>. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance, and either retroactively or prospectively) only with the written consent of the Company and the holders of a majority of the Registrable Securities then outstanding; <u>provided that</u> the Company may in its sole discretion waive compliance with <u>Section 2.12(c)</u> (and the Company's failure to object promptly in writing after notification of a proposed assignment allegedly in violation of <u>Section 2.12(c)</u> shall be deemed to be a waiver); and provided further that any provision hereof may be waived by any waiving party on such party's own behalf, without the consent of any other party. The provisions of <u>Sections 3.1</u>, <u>3.2</u>, <u>3.4</u>, and 4 may be amended or waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the Company and the Major Investors holding a majority of the Registrable Securities that are held by all of the Major Investors. Notwithstanding the foregoing, this Agreement may not be amended or terminated and the observance of any term hereof may not be waived with respect to any Investor without the written consent of such Investor, unless such amendment, termination, or waiver applies to all Investors in the same fashion. Notwithstanding any waiver of any of

30

the provisions of Section 4 above, in the event any Major Investor actually purchases New Securities in any offering by the Company, then each other Major Investor shall be permitted to participate in such offering on a pro rata basis (based on the level of participation of the Major Investor purchasing the largest portion of such Major Investor's pro rata share). Further, (i) the provisos included in Section 1.17 regarding Industry Ventures, NextEquity and Springboard may not be modified or deleted without the written consent of Industry Ventures, NextEquity, or Springboard, respectively; (ii) Section 3.3(a) regarding Greenspring, may not be modified or deleted without the written consent of Greenspring, (iii) Sections 2.1(b), 2.1(d), 2.2, 2.3, 2.10, 3.1, 3.2, 3.4, 4.1, 5.1, 5.4, 5.6 and 5.8, this Section 6.6 and the definitions of any terms used in such sections shall not be modified, waived or deleted without the written consent of GHP; (iv) Sections 2.1(b), 2.1(d), 2.2, 2.3, 2.10, 3.1, 3.2, 3.4, 4.1, 5.1, 5.4, 5.6, and 5.8, this Section 6.6 and the definitions of any terms used in such sections shall not be modified, waived or deleted without the written consent of PWP; (v) Sections 5.6, and 5.8, this Section 6.6 and the definitions of any terms used in such sections shall not be modified, waived or deleted without the written consent of Greycroft; and (vi) this Agreement may not be amended, and no provision hereof may be waived, in each case, in any way which would adversely affect the rights of the Key Holders hereunder in a manner disproportionate to any adverse effect such amendment or waiver would have on the rights of the Investors hereunder, without also the written consent of the holders of at least a majority of the Registrable Securities held by the Key Holders. The Company shall give prompt notice of any amendment or termination hereof or waiver hereunder to any party hereto that did not consent in writing to such amendment, termination, or waiver. Any amendment, termination, or waiver effected in accordance with this Section 6.6 shall be binding on all parties hereto, regardless of whether any such party has consented thereto. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such term, condition, or provision.

6.7     Severability. In case any one or more of the provisions contained in this Agreement is for any reason held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement, and such invalid, illegal, or unenforceable provision shall be reformed and construed so that it will be valid, legal, and enforceable to the maximum extent permitted by law.

6.8     Aggregation of Stock. All shares of Registrable Securities held or acquired by Affiliates shall be aggregated together for the purpose of determining the availability of any rights under this Agreement and such Affiliated persons may apportion such rights as among themselves in any manner they deem appropriate.

31

6.9    Additional Investors. Notwithstanding anything to the contrary contained herein, if the Company issues additional shares of the Company's Preferred Stock after the date hereof, whether pursuant to the Purchase Agreement or otherwise, any purchaser of such shares of Preferred Stock may become a party to this Agreement by executing and delivering an additional counterpart signature page to this Agreement, and thereafter shall be deemed an "Investor" for all purposes hereunder. No action or consent by the Investors shall be required for such joinder to this Agreement by such additional Investor, so long as such additional Investor has agreed in writing to be bound by all of the obligations as an "Investor" hereunder.

6.10    Entire Agreement. This Agreement (including any Schedules and Exhibits hereto) constitutes the full and entire understanding and agreement among the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled.

6.11    Dispute Resolution. The parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of and venue in the state and federal courts located in the City and County of San Francisco, California for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state and federal courts located in the City and County of San Francisco, California, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL

Each party will bear its own costs in respect of any disputes arising under this Agreement. Each of the parties to this Agreement consents to personal jurisdiction for any equitable action sought in the state and federal courts located in the City and County of San Francisco, California.

6.12    <u>Delays or Omissions</u>. No delay or omission to exercise any right, power, or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power, or remedy of such nonbreaching or nondefaulting party, nor shall it be construed to be a waiver of or acquiescence to any such breach or default, or to any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. All remedies, whether under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

Remainder of Page Intentionally Left Blank

33

IN WITNESS WHEREOF, the parties have executed this Seventh Amended and Restated Investors' Rights Agreement as of the date first written above.

**COMPANY:**

**THE REALREAL, INC.**

By:    /s/ Matt Gustke
       Matt Gustke
       Chief Financial Officer

Address:  55 Francisco Street, Suite 600
          San Francisco, CA 94133

**SIGNATURE PAGE TO SEVENTH AMENDED
AND RESTATED INVESTORS' RIGHTS AGREEMENT**

IN WITNESS WHEREOF, the parties have executed this Seventh Amended and Restated Investors' Rights Agreement as of the date first written above.

**INVESTOR:**

**GCEV CO-INVEST TRR, L.P.**

By:     /s/ Matthew Parker
Name:   Matthew Parker
Title:     Chief Financial Officer

Address: 292 Madison Avenue, 20th Floor
             New York, NY 10017

**GCEV CO-INVEST TRR-1, L.P.**

By:     /s/ Matthew Parker
Name:   Matthew Parker
Title:     Chief Financial Officer

Address: 292 Madison Avenue, 20th Floor
             New York, NY 10017

**SIGNATURE PAGE TO SEVENTH AMENDED
AND RESTATED INVESTORS' RIGHTS AGREEMENT**

IN WITNESS WHEREOF, the parties have executed this Seventh Amended and Restated Investors' Rights Agreement as of the date first written above.

**INVESTOR:**

**3L CAPITAL I, LP**

By: 3L Capital GP, LLC
Its Manager

By:      /s/ David T. Leyrer

Name:   David T. Leyrer
Title:    Manager

Address:  1100 Glendon Avenue PH1
             Los Angeles, CA 90024

**SIGNATURE PAGE TO SEVENTH AMENDED
AND RESTATED INVESTORS' RIGHTS AGREEMENT**

IN WITNESS WHEREOF, the parties have executed this Seventh Amended and Restated Investors' Rights Agreement as of the date first written above.

**INVESTOR:**

**ASPECT VENTURES II, L.P.**

By:      Aspect Ventures Management II, LLC

By:      /s/ Jennifer Fonstad
Name:  Jennifer Fonstad
Title:   Managing Member

Address:  471 Emerson Street
            Palo Alto, CA 94301

**ASPECT VENTURES II-A, L.P.**

By:      Aspect Ventures Management II, LLC

By:      /s/ Jennifer Fonstad
Name:  Jennifer Fonstad
Title:   Managing Member

Address:  471 Emerson Street
            Palo Alto, CA 94301

**SIGNATURE PAGE TO SEVENTH AMENDED
AND RESTATED INVESTORS' RIGHTS AGREEMENT**

IN WITNESS WHEREOF, the parties have executed this Seventh Amended and Restated Investors' Rights Agreement as of the date first written above.

**INVESTORS:**

**GREAT HILL EQUITY PARTNERS V, L.P.**

By:    Great Hill Partners GP V, LP
        its General Partner
By:    GHP V, LLC
        its General Partner

By:    /s/ Michael A. Kumin
Name:    Michael A. Kumin
Title:    Manager

Address:    One Liberty Square
          Boston, MA 02109

**GREAT HILL INVESTORS, LLC**

By:    /s/ Michael A. Kumin
Name:    Michael A. Kumin
Title:    Manager

Address:    One Liberty Square
          Boston, MA 02109

**SIGNATURE PAGE TO SEVENTH AMENDED
AND RESTATED INVESTORS' RIGHTS AGREEMENT**

IN WITNESS WHEREOF, the parties have executed this Seventh Amended and Restated Investors' Rights Agreement as of the date first written above.

INVESTORS:

**GREENSPRING SECONDARIES FUND III, L.P.**

By: Greenspring Secondaries General Partner III, L.P., its general partner

By: Greenspring Secondaries GP III, LLC, its general partner

By: Greenspring Associates, Inc., its sole member

By: /s/ Eric Thompson
    Name: Eric Thompson
    Title: Chief Operating Officer

**SIGNATURE PAGE TO SEVENTH AMENDED
AND RESTATED INVESTORS' RIGHTS AGREEMENT**

IN WITNESS WHEREOF, the parties have executed this Seventh Amended and Restated Investors' Rights Agreement as of the date first written above.

**INVESTOR:**

**NEXTEQUITY PARTNERS, LLC**

By: NextEquity Associates, LLC
Its: Managing Member

By:     /s/ Adam Hopkins
Name:   Adam Hopkins
Title:    Managing Member

Address:  3000 Sand Hill Road, Suite 4-140
           Menlo Park, CA 94025

**SIGNATURE PAGE TO SEVENTH AMENDED
AND RESTATED INVESTORS' RIGHTS AGREEMENT**

IN WITNESS WHEREOF, the parties have executed this Seventh Amended and Restated Investors' Rights Agreement as of the date first written above.

**INVESTORS:**

**PWP GROWTH EQUITY FUND II LP**

By: PWP Growth Equity Fund II GP LLC,
    its General Partner

By:      /s/ Francis
Name:    Francis
Title:   Authorized Person

Address: 767 Fifth Avenue
         New York, NY 10153

**PWP GROWTH EQUITY FUND II B LP**

By: PWP Growth Equity Fund II GP LLC,
    its General Partner

By:      /s/ Francis
Name:    Francis
Title:   Authorized Person

Address: 767 Fifth Avenue
         New York, NY 10153

**SIGNATURE PAGE TO SEVENTH AMENDED
AND RESTATED INVESTORS' RIGHTS AGREEMENT**

IN WITNESS WHEREOF, the parties have executed this Seventh Amended and Restated Investors' Rights Agreement as of the date first written above.

**INVESTOR:**

**SANDBRIDGE CONSUMER FUND II, LP**

By: Sandbridge Consumer Fund II General Partner, LLC
Its: General Partner

By: Sandbridge GP II Manager, LLC
Its: Managing Member

By: /s/ Kenneth C. Suslow
Name: Kenneth C. Suslow
Title: Operating Managing Partner

Address: 1999 Avenue of the Stars, 2088
    Los Angeles, CA 90067

**SANDBRIDGE CONSUMER (PARALLEL) FUND II, LP**

By: Sandbridge Consumer Fund II General Partner, LLC
Its: General Partner

By: Sandbridge GP II Manager, LLC
Its: Managing Member

By: /s/ Kenneth C. Suslow
Name: Kenneth C. Suslow
Title: Operating Managing Partner

Address: 1999 Avenue of the Stars, 2088
    Los Angeles, CA 90067

**SIGNATURE PAGE TO SEVENTH AMENDED
AND RESTATED INVESTORS' RIGHTS AGREEMENT**

IN WITNESS WHEREOF, the parties have executed this Seventh Amended and Restated Investors' Rights Agreement as of the date first written above.

**INVESTOR:**

**SPRINGBOARD SPV I, LLC**

By:    /s/ Amy Rosen Wildstein
Name:    Amy Rosen Wildstein
Title:    Managing Partner

Address:  660 Madison Ave, Suite 1600
          New York, NY 10065

**SIGNATURE PAGE TO SEVENTH AMENDED
AND RESTATED INVESTORS' RIGHTS AGREEMENT**

IN WITNESS WHEREOF, the parties have executed this Seventh Amended and Restated Investors' Rights Agreement as of the date first written above.

INVESTOR:

THE PERKINS FUND

By:      /s/ Sonja Hoel Perkins
Name:    Sonja Hoel Perkins
Title:   Managing Director

Address: 2660 Broadway Street
         San Francisco, CA 94115

**SIGNATURE PAGE TO SEVENTH AMENDED
AND RESTATED INVESTORS' RIGHTS AGREEMENT**

IN WITNESS WHEREOF, the parties have executed this Seventh Amended and Restated Investors' Rights Agreement as of the date first written above.

**KEY HOLDER:**

By: /s/ Julie Wainwright

Julie Wainwright

**SIGNATURE PAGE TO SEVENTH AMENDED
AND RESTATED INVESTORS' RIGHTS AGREEMENT**

**SCHEDULE B**
**Key Holders**

Julie Wainwright

**Exhibit 10.1**

**THE REALREAL, INC.**

**2011 EQUITY INCENTIVE PLAN**

*Amended by the Board and Stockholders on*
*July 3, 2012, May 31, 2013, March 27, 2014, December 18, 2014, February 19, 2015, March 25, 2015,*
*April 6, 2016, May 9, 2018 and December 5, 2018*

1. **Purposes of the Plan**. The purposes of this Plan are:

- to attract and retain the best available personnel for positions of substantial responsibility,

- to provide additional incentive to Employees, Directors and Consultants, and

- to promote the success of the Company's business.

The Plan permits the grant of Incentive Stock Options, Nonstatutory Stock Options, Stock Appreciation Rights, Restricted Stock and Restricted Stock Units.

2. **Definitions**. As used herein, the following definitions will apply:

(a) "***Administrator***" means the Committee, or if no committee is designated by the Board, the Board.

(b) "***Applicable Laws***" means the requirements relating to the administration of equity-based awards under U.S. state corporate laws, U.S. federal and state securities laws, the Code, state and local tax laws, any stock exchange or quotation system on which the Common Stock is listed or quoted and the applicable laws of any foreign country or jurisdiction where Awards are, or will be, granted under the Plan.

(c) "***Award***" means, individually or collectively, a grant under the Plan of Options, Stock Appreciation Rights, Restricted Stock, or Restricted Stock Units.

(d) "***Award Agreement***" means the written or electronic agreement setting forth the terms and provisions applicable to each Award granted under the Plan. The Award Agreement is subject to the terms and conditions of the Plan.

(e) "***Board***" means the Board of Directors of the Company.

(f) "***Change in Control***" means the occurrence of any of the following events:

(i) A change in the ownership of the Company which occurs on the date that any one person, or more than one person acting as a group ("***Person***"), acquires ownership of the stock of the Company that, together with the stock held by such Person, constitutes more than fifty percent (50%) of the total voting power of the stock of the Company, except that any change in the ownership of the stock of the Company as a result of a private financing of the Company that is approved by the Board will not be considered a Change in Control; or

(ii) If the Company has a class of securities registered pursuant to Section 12 of the Exchange Act, a change in the effective control of the Company which occurs on the date that a majority of members of the Board is replaced during any twelve (12) month period by Directors whose appointment or election is not endorsed by a majority of the members of the Board prior to the date of the appointment or election. For purposes of this subsection (ii), if any Person is considered to be in effective control of the Company, the acquisition of additional control of the Company by the same Person will not be considered a Change in Control; or

(iii) A change in the ownership of a substantial portion of the Company's assets which occurs on the date that any Person acquires (or has acquired during the twelve (12) month period ending on the date of the most recent acquisition by such person or persons) assets from the Company that have a total gross fair market value equal to or more than fifty percent (50%) of the total gross fair market value of all of the assets of the Company immediately prior to such acquisition or acquisitions. For purposes of this subsection (iii), gross fair market value means the value of the assets of the Company, or the value of the assets being disposed of, determined without regard to any liabilities associated with such assets.

For purposes of this Section 2(f), persons will be considered to be acting as a group if they are owners of a corporation that enters into a merger, consolidation, purchase or acquisition of stock, or similar business transaction with the Company.

Notwithstanding the foregoing, a transaction will not be deemed a Change in Control unless the transaction qualifies as a change in control event within the meaning of Code Section 409A, as it has been and may be amended from time to time, and any proposed or final Treasury Regulations and Internal Revenue Service guidance that has been promulgated or may be promulgated thereunder from time to time.

Further and for the avoidance of doubt, a transaction will not constitute a Change in Control if: (i) its sole purpose is to change the state of the Company's incorporation, or (ii) its sole purpose is to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately before such transaction.

(g) "*Code*" means the Internal Revenue Code of 1986, as amended. Any reference to a section of the Code herein will be a reference to any successor or amended section of the Code.

(h) "*Committee*" means the compensation committee of the Board or other committee of Directors or other individuals appointed by the Board which satisfies Applicable Laws.

(i) "*Common Stock*" means the common stock of the Company.

(j) "*Company*" means The RealReal, Inc., a Delaware corporation, or any successor thereto.

-2-

(k) "*Consultant*" means any person, including an advisor, engaged by the Company or a Parent or Subsidiary to render services to such entity.

(l) "*Director*" means a member of the Board.

(m) "*Disability*" means total and permanent disability as defined in Code Section 22(e)(3)**,** provided that in the case of Awards other than Incentive Stock Options, the Administrator in its discretion may determine whether a permanent and total disability exists in accordance with uniform and non-discriminatory standards adopted by the Administrator from time to time.

(n) "*Employee*" means any person, including officers and Directors, employed by the Company or any Parent or Subsidiary of the Company. Neither service as a Director nor payment of a director's fee by the Company will be sufficient to constitute "*employment*" by the Company.

(o) "*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

(p) "*Exchange Program*" means a program under which (i) outstanding Awards are surrendered or cancelled in exchange for cash, Awards of the same type (which may have higher or lower exercise prices and different terms), or Awards of a different type, and/or (ii) Participants would have the opportunity to transfer any outstanding Awards to a financial institution or other person or entity selected by the Administrator, and/or (iii) the exercise price of an outstanding Award is reduced or increased. The Administrator will determine the terms and conditions of any Exchange Program in its sole discretion.

(q) "*Fair Market Value*" means, as of any date, the value of Common Stock determined as follows:

(i) If the Common Stock is listed on any established stock exchange or a national market system, including without limitation the Nasdaq Global Select Market, the Nasdaq Global Market or the Nasdaq Capital Market of The Nasdaq Stock Market, its Fair Market Value will be the closing sales price for such stock (or the closing bid, if no sales were reported) as quoted on such exchange or system on the day of determination, as reported in The Wall Street Journal or such other source as the Administrator deems reliable;

(ii) If the Common Stock is regularly quoted by a recognized securities dealer but selling prices are not reported, the Fair Market Value of a Share will be the mean between the high bid and low asked prices for the Common Stock on the day of determination (or, if no bids and asks were reported on that date, as applicable, on the last trading date such bids and asks were reported), as reported in The Wall Street Journal or such other source as the Administrator deems reliable; or

(iii) In the absence of an established market for the Common Stock, the Fair Market Value will be determined in good faith by the Administrator.

(r) "*Incentive Stock Option*" means an Option that by its terms qualifies and is otherwise intended to qualify as an incentive stock option within the meaning of Code Section 422 and the regulations promulgated thereunder.

(s) "*Nonstatutory Stock Option*" means an Option that by its terms does not qualify or is not intended to qualify as an Incentive Stock Option.

(t) "*Option*" means a stock option granted pursuant to the Plan.

(u) "*Parent*" means a "parent corporation," whether now or hereafter existing, as defined in Code Section 424(e).

(v) "*Participant*" means the holder of an outstanding Award.

(w) "*Period of Restriction*" means the period during which the transfer of Shares of Restricted Stock are subject to a substantial risk of forfeiture. Such restrictions may be based on the passage of time, the achievement of target levels of performance, or the occurrence of other events as determined by the Administrator.

(x) "*Plan*" means this 2011 Equity Incentive Plan.

(y) "*Restricted Stock*" means Shares issued pursuant to an Award of Restricted Stock under Section 8 of the Plan, or issued pursuant to the early exercise of an Option.

(z) "*Restricted Stock Unit*" means a bookkeeping entry representing an amount equal to the Fair Market Value of one Share, granted pursuant to Section 9. Each Restricted Stock Unit represents an unfunded and unsecured obligation of the Company.

(aa) "*Service Provider*" means an Employee, Director or Consultant.

(bb) "*Share*" means a share of the Common Stock, as adjusted in accordance with Section 13 of the Plan.

(cc) "*Stock Appreciation Right*" means an Award, granted alone or in connection with an Option, that pursuant to Section 7 is designated as a Stock Appreciation Right.

(dd) "*Subsidiary*" means a "*subsidiary corporation*," whether now or hereafter existing, as defined in Code Section 424(f).

3. **Stock Subject to the Plan**.

(a) **Stock Subject to the Plan**. Subject to the provisions of Section 13 of the Plan, the maximum aggregate number of Shares that are available for all Awards under the Plan is Twenty-Five Million Nine Hundred Seventy-Four Thousand Five Hundred Eleven (25,974,511) Shares. The Shares may be authorized but unissued Shares, reacquired Shares or a combination thereof.

-4-

(b) **Lapsed Awards**. If Shares subject to an outstanding Award are not issued or delivered or are returned to the Company by reason of (i) the expiration, termination, cancellation or forfeiture of such Award, (ii) the settlement of such Award in cash or (iii) the delivery or withholding of Shares to pay all or a portion of the exercise price of an Award, if any, or to satisfy all or a portion of the tax withholding obligations relating to an Award, then such Shares shall again be available under the Plan (unless the Plan has terminated). With respect to Stock Appreciation Rights, only Shares actually issued pursuant to a Stock Appreciation Right will cease to be available under the Plan; all remaining Shares under Stock Appreciation Rights will remain available for future grant or sale under the Plan (unless the Plan has terminated). Shares that have actually been issued under the Plan under any Award will not be returned to the Plan and will not again become available for Awards under the Plan; provided, however, that if Shares issued pursuant to Awards of Restricted Stock or Restricted Stock Units are repurchased by, or forfeited to, the Company due to the failure to vest, such Shares will become available for future grant under the Plan.

(c) **Other Limits**. Subject to adjustment as provided in Section 13, the maximum number of Shares that may be issued upon the exercise of Incentive Stock Options will equal the aggregate Share number stated in Section 3(a), plus, to the extent allowable under Code Section 422 and the Treasury Regulations promulgated thereunder, any Shares that become available for issuance under the Plan pursuant to Section 3(b).

(d) **Share Reserve**. The Company, during the term of this Plan, will at all times reserve and keep available such number of Shares as will be sufficient to satisfy the requirements of the Plan.

4. **Administration of the Plan**.

(a) **Procedure**. The Plan shall be administered by the Administrator. The Administrator may be comprised of different Committees with respect to different groups of Service Providers.

(b) **Powers of the Administrator**. Subject to the provisions of the Plan, and in the case of a Committee, subject to the specific duties delegated by the Board to such Committee, the Administrator will have the authority, in its discretion:

(i) to determine the Fair Market Value;

(ii) to select the Service Providers to whom Awards may be granted hereunder;

(iii) to determine the number of Shares to be covered by each Award granted hereunder;

(iv) to approve forms of Award Agreements for use under the Plan;

(v) to determine the terms and conditions, not inconsistent with the terms of the Plan, of any Award granted hereunder. Such terms and conditions include, but are not limited to, the exercise price, the time or times when Awards may be exercised (which may be based on performance criteria), any vesting acceleration or waiver of forfeiture restrictions, and any restriction or limitation regarding any Award or the Shares relating thereto, based in each case on such factors as the Administrator will determine;

-5-

(vi) to institute and determine the terms and conditions of an Exchange Program;

(vii) to construe and interpret the terms of the Plan and Awards granted pursuant to the Plan;

(viii) to prescribe, amend and rescind rules and regulations relating to the Plan, including rules and regulations relating to sub-plans established for the purpose of satisfying applicable foreign laws or for qualifying for favorable tax treatment under applicable foreign laws;

(ix) to modify or amend each Award (subject to Section 18(c) of the Plan), including but not limited to the discretionary authority to extend the post-termination exercisability period of Awards and to extend the maximum term of an Option (subject to Section 6(d));

(x) to allow Participants to satisfy withholding tax obligations in a manner prescribed in Section 14;

(xi) to authorize any person to execute on behalf of the Company any instrument required to effect the grant of an Award previously granted by the Administrator;

(xii) to allow a Participant to defer the receipt of the payment of cash or the delivery of Shares that otherwise would be due to such Participant under an Award (subject to Code Section 409A); and

(xiii) to make all other determinations deemed necessary or advisable for administering the Plan.

(c) **Effect of Administrator's Decision**. The Administrator's decisions, determinations and interpretations will be final and binding on all Participants and any other holders of Awards.

5. **Eligibility**. Nonstatutory Stock Options, Stock Appreciation Rights, Restricted Stock, and Restricted Stock Units may be granted to Service Providers. Incentive Stock Options may be granted only to Employees.

6. **Stock Options**.

(a) **Grant of Options**. Subject to the terms and provisions of the Plan, the Administrator, at any time and from time to time, may grant Options in such amounts as the Administrator, in its sole discretion, will determine.

(b) **Option Agreement**. Each Award of an Option will be evidenced by an Award Agreement that will specify the exercise price, the term of the Option, the number of Shares subject to the Option, the exercise restrictions, if any, applicable to the Option, and such other terms and conditions as the Administrator, in its sole discretion, will determine.

-6-

(c) **Limitations**. Each Option will be designated in the Award Agreement as either an Incentive Stock Option or a Nonstatutory Stock Option. Notwithstanding such designation, however, to the extent that the aggregate Fair Market Value of the Shares with respect to which Incentive Stock Options are exercisable for the first time by the Participant during any calendar year (under all plans of the Company and any Parent or Subsidiary) exceeds one hundred thousand dollars ($100,000), such Options will be treated as Nonstatutory Stock Options. For purposes of this Section 6(c), Incentive Stock Options will be taken into account in the order in which they were granted, the Fair Market Value of the Shares will be determined as of the time the Option with respect to such Shares is granted, and calculation will be performed in accordance with Code Section 422 and Treasury Regulations promulgated thereunder.

(d) **Term of Option**. The term of each Option will be stated in the Award Agreement; provided, however, that the term will be no more than ten (10) years from the date of grant thereof. In the case of an Incentive Stock Option granted to a Participant who, at the time the Incentive Stock Option is granted, owns stock representing more than ten percent (10%) of the total combined voting power of all classes of stock of the Company or any Parent or Subsidiary, the term of the Incentive Stock Option will be five (5) years from the date of grant or such shorter term as may be provided in the Award Agreement.

(e) **Option Exercise Price and Consideration**.

(i) **Exercise Price**. The per Share exercise price for the Shares to be issued pursuant to the exercise of an Option will be determined by the Administrator, but will be no less than one hundred percent (100%) of the Fair Market Value per Share on the date of grant. In addition, in the case of an Incentive Stock Option granted to an Employee who owns stock representing more than ten percent (10%) of the voting power of all classes of stock of the Company or any Parent or Subsidiary, the per Share exercise price will be no less than one hundred ten percent (110%) of the Fair Market Value per Share on the date of grant.

(ii) **Waiting Period and Exercise Dates**. The period during which an Option may be exercised shall be determined by the Administrator at the time an Option is granted; provided, however that no Option shall be exercised after the expiration of its term. The Administrator may, in its discretion, determine any other conditions that must be satisfied before the Option may be exercised.

(iii) **Form of Consideration**. The Administrator will determine the acceptable form of consideration for exercising an Option, including the method of payment. In the case of an Incentive Stock Option, the Administrator will determine the acceptable form of consideration at the time of grant. Such consideration may consist entirely of: (1) cash; (2) check; (3) promissory note, to the extent permitted by Applicable Laws, (4) other Shares, provided that such Shares have a Fair Market Value on the date of surrender equal to the aggregate exercise price of the Shares as to which such Option will be exercised and provided further that accepting such Shares will not result in any adverse accounting consequences to the Company, as the Administrator determines in its sole discretion; (5) consideration received by the Company under cashless exercise program (whether through a broker or otherwise) implemented by the Company in connection with the Plan; (6) by net exercise, (7) such other consideration and method of payment for the issuance of Shares to the extent permitted by Applicable Laws, or (8) any combination of the foregoing methods of payment. In making its determination as to the type of consideration to accept, the Administrator will consider if acceptance of such consideration may be reasonably expected to benefit the Company.

**(f) Exercise of Option.**

(i) **Procedure for Exercise; Rights as a Stockholder**. Any Option granted hereunder will be exercisable according to the terms of the Plan and at such times and under such conditions as determined by the Administrator and set forth in the Award Agreement. An Option may not be exercised for a fraction of a Share.

An Option will be deemed exercised when the Company receives: (i) notice of exercise (in such form as the Administrator may specify from time to time) from the person entitled to exercise the Option, and (ii) full payment for the Shares with respect to which the Option is exercised (together with applicable tax withholding). Full payment shall consist of any consideration and method of payment authorized by the Administrator and permitted by the Award Agreement and the Plan. Shares issued upon exercise of an Option will be issued in the name of the Participant or, if requested by the Participant, in the name of the Participant and his or her spouse. Until the Shares are issued (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a stockholder will exist with respect to the Shares subject to an Option, notwithstanding the exercise of the Option. The Company will issue (or cause to be issued) such Shares promptly after the Option is exercised. No adjustment will be made for a dividend or other right for which the record date is prior to the date the Shares are issued, except as provided in Section 13 of the Plan.

Exercising an Option in any manner will decrease the number of Shares thereafter available, both for purposes of the Plan and for sale under the Option, by the number of Shares as to which the Option is exercised.

(ii) **Termination of Relationship as a Service Provider**. If a Participant ceases to be a Service Provider, other than upon the Participant's termination as the result of the Participant's death or Disability, the Participant may exercise his or her Option within thirty (30) days of termination, or such longer period of time as is specified in the Award Agreement (but in no event later than the expiration of the term of such Option as set forth in the Award Agreement) to the extent that the Option is vested on the date of termination. Unless otherwise provided by the Administrator, if on the date of termination the Participant is not vested as to his or her entire Option, the Shares covered by the unvested portion of the Option will revert to the Plan. If after termination the Participant does not exercise his or her Option within the time specified by the Administrator, the Option will terminate, and the Shares covered by such Option will revert to the Plan.

(iii) **Disability of Participant**. If a Participant ceases to be a Service Provider as a result of the Participant's Disability, the Participant may exercise his or her Option within six (6) months of termination, or such longer period of time as is specified in the Award Agreement (but in no event later than the expiration of the term of such Option as set forth in the Award Agreement) to the extent the Option is vested on the date of termination. Unless otherwise provided by the Administrator, if on the date of termination the Participant is not vested as to his or her entire Option, the Shares covered by the unvested portion of the Option will revert to the Plan. If after termination the Participant does not exercise his or her Option within the time specified herein, the Option will terminate, and the Shares covered by such Option will revert to the Plan.

-8-

(iv) **Death of Participant**. If a Participant dies while a Service Provider, the Option may be exercised within six (6) months following the Participant's death, or within such longer period of time as is specified in the Award Agreement (but in no event later than the expiration of the term of such Option as set forth in the Award Agreement) to the extent that the Option is vested on the date of death, by the Participant's designated beneficiary, provided such beneficiary has been designated prior to the Participant's death in a form acceptable to the Administrator. If no such beneficiary has been designated by the Participant, then such Option may be exercised by the personal representative of the Participant's estate or by the person(s) to whom the Option is transferred pursuant to the Participant's will or in accordance with the laws of descent and distribution. Unless otherwise provided by the Administrator, if at the time of death Participant is not vested as to his or her entire Option, the Shares covered by the unvested portion of the Option will immediately revert to the Plan. If the Option is not so exercised within the time specified herein, the Option will terminate, and the Shares covered by such Option will revert to the Plan.

7. **Stock Appreciation Rights**.

(a) **Grant of Stock Appreciation Rights**. Subject to the terms and conditions of the Plan, a Stock Appreciation Right may be granted to Service Providers at any time and from time to time as will be determined by the Administrator, in its sole discretion.

(b) **Number of Shares**. The Administrator will have complete discretion to determine the number of Shares subject to any Award of Stock Appreciation Rights.

(c) **Exercise Price and Other Terms**. The per Share exercise price for the Shares that will determine the amount of the payment to be received upon exercise of a Stock Appreciation Right as set forth in Section 7(f) will be determined by the Administrator and will be no less than one hundred percent (100%) of the Fair Market Value per Share on the date of grant. Otherwise, the Administrator, subject to the provisions of the Plan, will have complete discretion to determine the terms and conditions of Stock Appreciation Rights granted under the Plan.

(d) **Stock Appreciation Right Agreement**. Each Stock Appreciation Right grant will be evidenced by an Award Agreement that will specify the exercise price, the term of the Stock Appreciation Right, the conditions of exercise, and such other terms and conditions as the Administrator, in its sole discretion, will determine.

(e) **Exercise and Expiration of Stock Appreciation Rights**. A Stock Appreciation Right granted under the Plan will expire upon the date determined by the Administrator, in its sole discretion, and set forth in the Award Agreement. Notwithstanding the foregoing, the rules of Section 6(d) relating to the maximum term and Section 6(f) relating to exercise also will apply to Stock Appreciation Rights.

(f) **Payment of Stock Appreciation Right Amount**. Upon exercise of a Stock Appreciation Right, a Participant will be entitled to receive payment from the Company in an amount determined by multiplying:

-9-

(i) The difference between the Fair Market Value of a Share on the date of exercise over the exercise price; times

(ii) The number of Shares with respect to which the Stock Appreciation Right is exercised.

At the discretion of the Administrator, the payment upon Stock Appreciation Right exercise may be in cash, in Shares of equivalent value, or in some combination thereof.

8. **Restricted Stock**.

(a) **Grant of Restricted Stock**. Subject to the terms and provisions of the Plan, the Administrator, at any time and from time to time, may grant Shares of Restricted Stock to Service Providers in such amounts as the Administrator, in its sole discretion, will determine.

(b) **Restricted Stock Agreement**. Each Award of Restricted Stock will be evidenced by an Award Agreement that will specify the Period of Restriction, the number of Shares granted, and such other terms and conditions as the Administrator, in its sole discretion, will determine. Unless the Administrator determines otherwise, the Company as escrow agent will hold Shares of Restricted Stock until the restrictions on such Shares have lapsed.

(c) **Transferability**. Except as provided in this Section 8 or as the Administrator determines, Shares of Restricted Stock may not be sold, transferred, pledged, assigned, or otherwise alienated or hypothecated until the end of the applicable Period of Restriction.

(d) **Other Restrictions**. The Administrator, in its sole discretion, may impose such other restrictions on Shares of Restricted Stock as it may deem advisable or appropriate.

(e) **Removal of Restrictions**. Except as otherwise provided in this Section 8, Shares of Restricted Stock covered by each Restricted Stock grant made under the Plan will be released from escrow as soon as practicable after the last day of the Period of Restriction or at such other time as the Administrator may determine, but in no event later than the 15th day of the third month following the end of the calendar year in which the Period of Restriction lapses. The Administrator, in its discretion, may accelerate the time at which any restrictions will lapse or be removed.

(f) **Voting Rights**. During the Period of Restriction, Service Providers holding Shares of Restricted Stock granted hereunder may exercise full voting rights with respect to those Shares, unless the Administrator determines otherwise.

(g) **Dividends and Other Distributions**. During the Period of Restriction, Service Providers holding Shares of Restricted Stock will be entitled to receive all dividends and other distributions paid with respect to such Shares, unless the Administrator provides otherwise. If any such dividends or distributions are paid in Shares, the Shares will be subject to the same restrictions on transferability and forfeitability as the Shares of Restricted Stock with respect to which they were paid.

-10-

(h) **Return of Restricted Stock to Company**. On the date set forth in the Award Agreement, the Restricted Stock for which restrictions have not lapsed will revert to the Company and again will become available for grant under the Plan.

9. **Restricted Stock Units**.

(a) **Grant**. Restricted Stock Units may be granted at any time and from time to time as determined by the Administrator. After the Administrator determines that it will grant Restricted Stock Units, it will advise the Participant in an Award Agreement of the terms, conditions, and restrictions related to the grant, including the number of Restricted Stock Units.

(b) **Vesting Criteria and Other Terms**. The Administrator will set vesting criteria in its discretion, which, depending on the extent to which the criteria are met, will determine the number of Restricted Stock Units that will be paid out to the Participant. The Administrator may set vesting criteria based upon the achievement of Company-wide, business unit, or individual goals (including, but not limited to, continued employment or service), or any other basis determined by the Administrator in its discretion.

(c) **Earning Restricted Stock Units**. Upon meeting the applicable vesting criteria, the Participant will be entitled to receive a payout as determined by the Administrator. Notwithstanding the foregoing, at any time after the grant of Restricted Stock Units, the Administrator, in its sole discretion, may reduce or waive any vesting criteria that must be met to receive a payout.

(d) **Form and Timing of Payment**. Payment of earned Restricted Stock Units will be made at the time and in the form as set forth in the Award Agreement. The Administrator, in its sole discretion, may settle earned Restricted Stock Units in cash, Shares, or a combination of both.

(e) **Cancellation**. On the date set forth in the Award Agreement, all unearned Restricted Stock Units will be forfeited to the Company.

10. **Compliance With Code Section 409A**. Awards will be designed and operated in such a manner that they are either exempt from the application of, or comply with, the requirements of Code Section 409A, except as otherwise determined in the sole discretion of the Administrator. The Plan and each Award Agreement under the Plan is intended to meet the requirements of Code Section 409A and will be construed and interpreted in accordance with such intent, except as otherwise determined in the sole discretion of the Administrator. To the extent that an Award or payment, or the settlement or deferral thereof, is subject to Code Section 409A, the Award will be granted, paid, settled or deferred in a manner that will meet the requirements of Code Section 409A, such that the grant, payment, settlement or deferral will not be subject to the additional tax or interest applicable under Code Section 409A.

11. **Leaves of Absence/Transfer Between Locations**. Unless the Administrator provides otherwise, vesting of Awards granted hereunder will be suspended during any unpaid leave of absence. A Participant will not cease to be an Employee in the case of (i) any leave of absence approved by the Company or (ii) transfers between locations of the Company or between the Company, its Parent, or any Subsidiary. For purposes of Incentive Stock Options, no such leave

-11-

may exceed three (3) months, unless reemployment upon expiration of such leave is guaranteed by statute or contract. If reemployment upon expiration of a leave of absence approved by the Company is not so guaranteed, then six (6) months following the first (1st) day of such leave, any Incentive Stock Option held by the Participant will cease to be treated as an Incentive Stock Option and will be treated for tax purposes as a Nonstatutory Stock Option.

12. **Limited Transferability of Awards**.

(a) Unless determined otherwise by the Administrator, Awards may not be sold, pledged, assigned, hypothecated, or otherwise transferred in any manner other than by will or by the laws of descent and distribution, and may be exercised, during the lifetime of the Participant, only by the Participant. If the Administrator makes an Award transferable, such Award may only be transferred (i) by will, (ii) by the laws of descent and distribution, or (iii) as permitted by Rule 701 of the Securities Act of 1933, as amended (the "*Securities Act*").

(b) Further, until the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, or after the Administrator determines that it is, will, or may no longer be relying upon the exemption from registration under the Exchange Act as set forth in Rule 12h-1(f) promulgated under the Exchange Act, an Option, or prior to exercise, the Shares subject to the Option, may not be pledged, hypothecated or otherwise transferred or disposed of, in any manner, including by entering into any short position, any "*put equivalent position*" or any "*call equivalent position*" (as defined in Rule 16a-1(h) and Rule 16a-1(b) of the Exchange Act, respectively), other than to (i) persons who are "family members" (as defined in Rule 701(c)(3) of the Securities Act) through gifts or domestic relations orders, or (ii) to an executor or guardian of the Participant upon the death or disability of the Participant. Notwithstanding the foregoing sentence, the Administrator, in its sole discretion, may determine to permit transfers to the Company or in connection with a Change in Control or other acquisition transactions involving the Company to the extent permitted by Rule 12h-1(f).

13. **Adjustments; Dissolution or Liquidation; Merger or Change in Control**.

(a) **Adjustments**. In the event that any dividend or other distribution (whether in the form of cash, Shares, other securities, or other property), recapitalization, stock split, reverse stock split, reorganization, merger, consolidation, split-up, spin-off, combination, repurchase, or exchange of Shares or other securities of the Company, or other change in the corporate structure of the Company affecting the Shares occurs, the Administrator, in order to prevent diminution or enlargement of the benefits or potential benefits intended to be made available under the Plan, will appropriately adjust the number and class of Shares available under the Plan, the number, class, and price of Shares subject to each outstanding Award, the maximum number of Shares with respect to which Options or Stock Appreciation Rights may be granted during any fiscal year of the Company to any one grantee and the maximum number of Shares that may be awarded during any fiscal year of the Company to any one grantee pursuant to any Award that is subject to performance measures; provided, however, that (i) the Administrator will make such adjustments to an Award required by Section 25102(o) of the California Corporations Code to the extent the Company is relying upon the exemption afforded thereby with respect to the Award and (ii) such adjustments shall be made in the case of outstanding Awards consisting of Options and Stock Appreciation Rights in accordance with Code Section 409A. If any such adjustment would result in a fractional security being (a) available

-12-

under the Plan, such fractional security shall be disregarded, or (b) subject to an Award, the Company shall pay the holder of such Award, in connection with the first vesting, exercise or settlement of such award, in whole or in part, occurring after such adjustment, an amount in cash determined by multiplying (i) the fraction of such security (rounded to the nearest hundredth) by (ii) the excess, if any, of (A) the Fair Market Value on the vesting, exercise or settlement date over (b) the exercise or base price, if any, of such award.

(b) **Dissolution or Liquidation**. In the event of the proposed dissolution or liquidation of the Company, the Administrator will notify each Participant as soon as practicable prior to the effective date of such proposed transaction. To the extent it has not been previously exercised, an Award will terminate immediately prior to the consummation of such proposed action.

(c) **Merger or Change in Control**. In the event of a merger or Change in Control, each outstanding Award will be treated as the Administrator (as constituted prior to such merger or Change in Control) may determine without a Participant's consent. Without limiting the generality of the foregoing sentence, in the event of a merger or Change in Control, the Administrator may, in its sole discretion, provide that:

(i) Awards will be assumed, or substantially equivalent Awards, in its sole discretion, will be substituted, by the acquiring or succeeding corporation (or an affiliate thereof) with appropriate adjustments as to the number and kind of shares and prices;

(ii) all outstanding Awards, in whole or in part, shall be surrendered to the Company by the holder, and immediately cancelled by the Company, and to provide for the holder to receive (A) an amount of cash, if any, equal to the amount that would have been attained upon the exercise of such Award or realization of the Participant's rights as of the date of the occurrence of the transaction (and, for the avoidance of doubt, if as of the date of the occurrence of the transaction the Administrator determines in good faith that no amount would have been attained upon the exercise of such Award or realization of the Participant's rights, then such Award may be terminated by the Company without payment), (B) such other rights or property selected by the Administrator in its sole discretion, or (C) a combination of (A) and (B);

(iii) all outstanding Options and Stock Appreciation Rights will immediately vest and become exercisable in full or in part, all restrictions on Restricted Stock and Restricted Stock Units will lapse, and with respect to Awards with performance-based vesting, all performance goals or other vesting criteria will be deemed achieved at one hundred percent (100%) of target level and all other terms and conditions met, in whole or in part, prior to or upon consummation of such merger or Change in Control; and/or

(iv) any combination of the foregoing.

In taking any of the actions permitted under this subsection 13(c), the Administrator will not be obligated to treat all Awards, all Awards held by a Participant, or all Awards of the same type, similarly.

-13-

For the purposes of this subsection 13(c), an Award will be considered assumed if, following the merger or Change in Control, the Award confers the right to purchase or receive, for each Share subject to the Award immediately prior to the merger or Change in Control, the consideration (whether stock, cash, or other securities or property) received in the merger or Change in Control by holders of Common Stock for each Share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding Shares); provided, however, that if such consideration received in the merger or Change in Control is not solely common stock of the successor corporation or its Parent, the Administrator may, with the consent of the successor corporation, provide for the consideration to be received upon the exercise of an Option or Stock Appreciation Right or upon the payout of a Restricted Stock Unit, for each Share subject to such Award, to be solely common stock of the successor corporation or its Parent equal in fair market value to the per share consideration received by holders of Common Stock in the merger or Change in Control.

Notwithstanding anything in this Section 13(c) to the contrary, an Award that vests, is earned or paid-out upon the satisfaction of one or more performance goals will not be considered assumed if the Company or its successor modifies any of such performance goals without the Participant's consent; provided, however, a modification to such performance goals only to reflect the successor corporation's post-Change in Control corporate structure will not be deemed to invalidate an otherwise valid Award assumption.

Notwithstanding anything in this Section 13(c) to the contrary, if a payment under an Award Agreement is subject to Code Section 409A and if the change in control definition contained in the Award Agreement does not comply with the definition of "change of control" for purposes of a distribution under Code Section 409A, then any payment of an amount that is otherwise accelerated under this Section will be delayed until the earliest time that such payment would be permissible under Code Section 409A without triggering any penalties applicable under Code Section 409A.

14. **Tax Withholding**.

(a) **Withholding Requirements**. Prior to the delivery of any Shares or cash pursuant to an Award (or exercise thereof), the Company will have the power and the right to deduct or withhold, or require a Participant to remit to the Company, an amount sufficient to satisfy federal, state, local, foreign or other taxes (including the Participant's FICA obligation) required to be withheld with respect to such Award (or exercise thereof).

(b) **Withholding Arrangements**. The Administrator, in its sole discretion and pursuant to such procedures as it may specify from time to time, may permit a Participant to satisfy such tax withholding obligation, in whole or in part by (without limitation) (i) paying cash, (ii) electing to have the Company withhold otherwise deliverable Shares having a Fair Market Value equal to the minimum statutory amount required to be withheld, (iii) delivering to the Company already-owned Shares having a Fair Market Value equal to the statutory amount required to be withheld, provided the delivery of such Shares will not result in any adverse accounting consequences, as the Administrator determines in its sole discretion, or (iv) selling a sufficient number of Shares otherwise deliverable to the Participant through such means as the Administrator may determine in its sole discretion (whether through a broker or otherwise) equal to the amount required to be withheld. The amount of the withholding requirement will be deemed to include any amount which the Administrator agrees may be withheld at the time the election is made, not to exceed the amount determined by using the maximum federal, state or local marginal income tax

-14-

rates applicable to the Participant with respect to the Award on the date that the amount of tax to be withheld is to be determined. The Fair Market Value of the Shares to be withheld or delivered will be determined as of the date that the taxes are required to be withheld. Any fraction of a Share which would be required to satisfy such an obligation shall be disregarded and the remaining amount due shall be paid in cash by the holder.

15. **No Effect on Employment or Service**. Neither the Plan nor any Award will confer upon a Participant any right with respect to continuing the Participant's relationship as a Service Provider with the Company, nor will they interfere in any way with the Participant's right or the Company's right to terminate such relationship at any time, with or without cause, to the extent permitted by Applicable Laws.

16. **Date of Grant**. The date of grant of an Award will be, for all purposes, the date on which the Administrator makes the determination granting such Award, or such other later date as is determined by the Administrator. Notice of the determination will be provided to each Participant within a reasonable time after the date of such grant.

17. **Term of Plan**. Subject to Section 21 of the Plan, the Plan will become effective upon its adoption by the Board. Unless sooner terminated under Section 18, it will continue in effect for a term of ten (10) years from the later of (a) the effective date of the Plan, or (b) the earlier of the most recent Board or stockholder approval of an increase in the number of Shares reserved for issuance under the Plan.

18. **Amendment and Termination of the Plan**.

(a) **Amendment and Termination**. The Board may at any time amend, alter, suspend or terminate the Plan.

(b) **Stockholder Approval**. The Company will obtain stockholder approval of any Plan amendment to the extent necessary and desirable to comply with Applicable Laws.

(c) **Effect of Amendment or Termination**. No amendment, alteration, suspension or termination of the Plan will impair the rights of any Participant, unless mutually agreed otherwise between the Participant and the Administrator, which agreement must be in writing and signed by the Participant and the Company. Termination of the Plan will not affect the Administrator's ability to exercise the powers granted to it hereunder with respect to Awards granted under the Plan prior to the date of such termination.

19. **Conditions Upon Issuance of Shares**.

(a) **Legal Compliance**. Shares will not be issued pursuant to the exercise of an Award unless the exercise of such Award and the issuance and delivery of such Shares will comply with Applicable Laws and will be further subject to the approval of counsel for the Company with respect to such compliance.

(b) **Investment Representations**. As a condition to the exercise of an Award, the Company may require the person exercising such Award to represent and warrant at the time of any such exercise that the Shares are being purchased only for investment and without any present intention to sell or distribute such Shares if, in the opinion of counsel for the Company, such a representation is required.

-15-

20. **Inability to Obtain Authority**. The inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, will relieve the Company of any liability in respect of the failure to issue or sell such Shares as to which such requisite authority will not have been obtained.

21. **Stockholder Approval**. The Plan will be subject to approval by the stockholders of the Company within twelve (12) months after the date the Plan is adopted by the Board. Such stockholder approval will be obtained in the manner and to the degree required under Applicable Laws.

22. **Information to Participants**. Beginning on the earlier of (i) the date that the aggregate number of Participants under this Plan is five hundred (500) or more and the Company is relying on the exemption provided by Rule 12h-1(f)(1) under the Exchange Act and (ii) the date that the Company is required to deliver information to Participants pursuant to Rule 701 under the Securities Act, and until such time as the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, is no longer relying on the exemption provided by Rule 12h-1(f)(1) under the Exchange Act or is no longer required to deliver information to Participants pursuant to Rule 701 under the Securities Act, , the Company shall provide to each Participant the information described in paragraphs (e)(3), (4), and (5) of Rule 701 under the Securities Act not less frequently than every six (6) months with the financial statements being not more than 180 days old and with such information provided either by physical or electronic delivery to the Participants or by written notice to the Participants of the availability of the information on an Internet site that may be password-protected and of any password needed to access the information. The Company may request that Participants agree to keep the information to be provided pursuant to this section confidential. If a Participant does not agree to keep the information to be provided pursuant to this section confidential, then the Company will not be required to provide the information unless otherwise required pursuant to Rule 12h-1(f)(1) under the Exchange Act or Rule 701 of the Securities Act.

-16-

**THE REALREAL, INC.**

**2011 EQUITY INCENTIVE PLAN**

**STOCK OPTION AGREEMENT**

Unless otherwise defined herein, the terms defined in this Stock Option Agreement (the "*Option Agreement*") shall have the same defined meanings as set forth in the 2011 Equity Incentive Plan (the "*Plan*").

1.    NOTICE OF STOCK OPTION GRANT

**Name:**    «Name»
**Address:**

The undersigned Participant has been granted an Option to purchase Common Stock of the Company, subject to the terms and conditions of the Plan and this Option Agreement, as follows:

| | |
|---|---|
| Grant Number: | «Grant_Number» |
| Grant Date: | «Grant_Date» |
| Vesting Commencement Date: | «Vesting_Commencement_Date» |
| Exercise Price per Share: | «Exercise_Price_Per_Share» |
| Total Number of Shares Granted: | «Total_Shares» |
| Total Exercise Price: | «Exercise_Price» |
| Type of Option: | «ISO»    Incentive Stock Option |
| | «NSO»    Nonstatutory Stock Option |
| Term/Expiration Date: | «Term_date» |

**Vesting Schedule:**

This Option shall be exercisable, in whole or in part, according to the following vesting schedule:

**«Vesting_Schedule»**

**Termination Period:**

This Option shall be exercisable for three (3) months after Participant ceases to be a Service Provider, unless such termination is due to Participant's death or Disability, in which case this Option shall be exercisable for twelve (12) months after Participant ceases to be a Service Provider. Notwithstanding the foregoing sentence, in no event may this Option be exercised after the Term/Expiration Date as provided above and this Option may be subject to earlier termination as provided in Section 13(c) of the Plan.

**2.    AGREEMENT**

2.1 **Grant of Option**. The Administrator hereby grants to the Participant named in the Notice of Stock Option Grant in Part I of this Agreement ("***Participant***"), an option (the "***Option***") to purchase the number of Shares set forth in the Notice of Stock Option Grant, at the exercise price per Share set forth in the Notice of Stock Option Grant (the "***Exercise Price***"), and subject to the terms and conditions of the Plan, which is incorporated herein by reference. In the event of a conflict between the terms and conditions of the Plan and this Option Agreement, the terms and conditions of the Plan shall prevail.

If designated in the Notice of Stock Option Grant as an Incentive Stock Option ("***ISO***"), this Option is intended to qualify as an Incentive Stock Option as defined in Code Section 422; provided, however, that to the extent the aggregate Fair Market Value of the Shares with respect to which Option is exercisable for the first time during any calendar year exceeds $100,000, as set forth in Code Section 422(d), this Option shall be treated as a Nonstatutory Stock Option ("***NSO***"). Further, if for any reason this Option (or portion thereof) shall not qualify as an ISO, then, to the extent of such nonqualification, such Option (or portion thereof) shall be regarded as a NSO granted under the Plan. In no event shall the Administrator, the Company or any Parent or Subsidiary or any of their respective employees or directors have any liability to Participant (or any other person) due to the failure of the Option to qualify for any reason as an ISO.

2.2 **Exercise of Option**.

(a) **Right to Exercise**. This Option shall be exercisable during its term in accordance with the Vesting Schedule set out in the Notice of Stock Option Grant and with the applicable provisions of the Plan and this Option Agreement.

(b) **Method of Exercise**. This Option shall be exercisable by delivery of an exercise notice in the form attached as **Exhibit A** (the "***Exercise Notice***") or in a manner and pursuant to such procedures as the Administrator may determine, which shall state the election to exercise the Option, the whole number of Shares with respect to which the Option is being exercised, and such other representations and agreements as may be required by the Company. The Exercise Notice shall be accompanied by payment of the aggregate Exercise Price as to all Exercised Shares, together with any applicable tax withholding. This Option shall be deemed to be exercised upon receipt by the Company of such fully executed Exercise Notice accompanied by the aggregate Exercise Price, together with any applicable tax withholding.

No Shares shall be issued pursuant to the exercise of an Option unless such issuance and such exercise comply with Applicable Laws. Assuming such compliance, for income tax purposes the Shares shall be considered transferred to Participant on the date on which the Option is exercised with respect to such Shares.

2.3 **Participant's Representations**. In the event the Shares have not been registered under the Securities Act of 1933, as amended, at the time this Option is exercised, Participant shall, if required by the Company, concurrently with the exercise of all or any portion of this Option, deliver to the Company his or her Investment Representation Statement in the form attached hereto as **Exhibit B**.

2

2.4 **Lock-Up Period**. Participant hereby agrees that Participant shall not offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any Common Stock (or other securities) of the Company or enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Common Stock (or other securities) of the Company held by Participant (other than those included in the registration) for a period specified by the representative of the underwriters of Common Stock (or other securities) of the Company not to exceed one hundred and eighty (180) days following the effective date of any registration statement of the Company filed under the Securities Act (or such other period as may be requested by the Company or the underwriters to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in NASD Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto).

Participant agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the underwriter which are consistent with the foregoing or which are necessary to give further effect thereto. In addition, if requested by the Company or the representative of the underwriters of Common Stock (or other securities) of the Company, Participant shall provide, within ten (10) days of such request, such information as may be required by the Company or such representative in connection with the completion of any public offering of the Company's securities pursuant to a registration statement filed under the Securities Act. The obligations described in this Section 4 shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a Commission Rule 145 transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end of said one hundred and eighty (180) day (or other) period. Participant agrees that any transferee of the Option or shares acquired pursuant to the Option shall be bound by this Section 4.

2.5 **Method of Payment**. Payment of the aggregate Exercise Price shall be by any of the following, or a combination thereof, at the election of the Participant:

(a) cash;

(b) check;

(c) consideration received by the Company under a formal cashless exercise program adopted by the Company in connection with the Plan; or

(d) surrender of other Shares which (i) shall be valued at its Fair Market Value on the date of exercise, and (ii) must be owned free and clear of any liens, claims, encumbrances or security interests, if accepting such Shares, in the sole discretion of the Administrator, shall not result in any adverse accounting consequences to the Company.

Any fraction of a Share which would be required to pay such the Exercise Price shall be disregarded and the remaining amount due shall be paid in cash by Participant.

2.6 **Restrictions on Exercise**. This Option may not be exercised until such time as the Plan has been approved by the stockholders of the Company, or if the issuance of such Shares upon such exercise or the method of payment of consideration for such shares would constitute a violation of any Applicable Law.

2.7 **Non-Transferability of Option**.

(a) This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of Participant only by Participant. The terms of the Plan and this Option Agreement shall be binding upon the executors, administrators, heirs, successors and assigns of Participant.

(b) Further, until the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, or after the Administrator determines that it is, will, or may no longer be relying upon the exemption from registration of Options under the Exchange Act as set forth in Rule 12h-1(f) promulgated under the Exchange Act (the "***Reliance End Date***"), Participant shall not transfer this Option or, prior to exercise, the Shares subject to this Option, in any manner other than (i) to persons who are "***family members***" (as defined in Rule 701(c)(3) of the Securities Act of 1933, as amended) through gifts or domestic relations orders, or (ii) to an executor or guardian of Participant upon the death or disability of Participant. Until the Reliance End Date, the Options and, prior to exercise, the Shares subject to this Option, may not be pledged, hypothecated or otherwise transferred or disposed of, including by entering into any short position, any "***put equivalent position***" or any "***call equivalent position***" (as defined in Rule 16a-1(h) and Rule 16a-1(b) of the Exchange Act, respectively), other than as permitted in clauses (i) and (ii) of this paragraph.

2.8 **Term of Option**. This Option may be exercised only within the term set out in the Notice of Stock Option Grant, and may be exercised during such term only in accordance with the Plan and the terms of this Option Agreement.

4

2.9 **Tax Obligations**.

(a) **Tax Withholding**. Participant agrees to make appropriate arrangements with the Company (or the Parent or Subsidiary employing or retaining Participant) for the satisfaction of all Federal, state, local and foreign income and employment tax withholding requirements applicable to the Option exercise. Participant acknowledges and agrees that the Company may refuse to honor the exercise and refuse to deliver the Shares if such withholding amounts are not delivered at the time of exercise.

(b) **Notice of Disqualifying Disposition of ISO Shares**. If the Option granted to Participant herein is an ISO, and if Participant sells or otherwise disposes of any of the Shares acquired pursuant to the ISO on or before the later of (i) the date two (2) years after the Date of Grant, or (ii) the date one (1) year after the date of exercise, Participant shall immediately notify the Company in writing of such disposition. Participant agrees that Participant may be subject to income tax withholding by the Company on the compensation income recognized by Participant.

(c) **Code Section 409A**. Under Code Section 409A, an Option that vests after December 31, 2004 (or that vested on or prior to such date but which was materially modified after October 3, 2004) that was granted with a per Share exercise price that is determined by the Internal Revenue Service (the "**IRS**") to be less than the Fair Market Value of a Share on the date of grant (a "*discount option*") may be considered "*deferred compensation*." An Option that is a "*discount option*" may result in (i) income recognition by Participant prior to the exercise of the Option, (ii) an additional twenty percent (20%) federal income tax, (iii) potential penalty and interest charges and (iv) additional state income, penalty and interest tax to the Participant ("*409A Penalties*"). Participant acknowledges that the Company cannot and has not guaranteed that the IRS will agree that the per Share exercise price of this Option equals or exceeds the Fair Market Value of a Share on the date of grant in a later examination. Participant agrees that if the IRS determines that the Option was granted with a per Share exercise price that was less than the Fair Market Value of a Share on the date of grant, Participant shall be solely responsible for Participant's costs related to such a determination, including but not limited, to any 409A Penalties.

2.10 **Agreement to Participate**

(a) You hereby agree that, in the event a Change in Control transaction is approved by the Board and requisite vote of the stockholders, and upon written notice from the Company pursuant to Section 10(h) below (the "*Participation Notice*"), you will (i) vote all shares then held by you, including the shares of Common Stock you acquired upon the exercise of your option pursuant to this Stock Option Agreement or upon the exercise or conversion of any options, warrants or other convertible securities (collectively, the "*Subject Shares*"), in favor of such Change in Control, and (ii) to sell or exchange all shares then held by you pursuant to the terms and conditions of such Change in Control, subject to the following conditions:

(b) you will not be required in your capacity as a shareholder to make any representation, covenant or warranty in connection with such Change in Control, other than as to your ownership and authority to sell, exchange or otherwise transfer the Subject Shares in such Change in Control, free and clear of all liens, claims and encumbrances;

5

(c) the consideration payable with respect to each share in each class or series of capital stock of the Company as a result of such Change in Control is the same (except for cash payments in lieu of fractional shares) as for each other share in such class or series;

(d) each class and series of capital stock of the Company will be entitled to receive the same form of consideration (and be subject to the same indemnity and escrow provisions) as a result of such Change in Control; and

(e) each holder of shares of a series of Preferred Stock will receive the same amount of consideration per share of such series of Preferred Stock and each holder of shares of Common Stock will receive the same amount of consideration per share of Common Stock; and unless the holders of each series of Preferred Stock agree otherwise by legally sufficient amendment or waiver of the provisions of the Company's Certificate of Incorporation then in effect, the aggregate consideration receivable by all holders of Common Stock and Preferred Stock shall be allocated among the holders of Common Stock and Preferred Stock in the basis of the relative liquidation preferences to which the holders of each respective series of Preferred Stock and the holders of Common Stock are entitled in a deemed liquidation event (assuming for this purpose that the Change in Control is a deemed Liquidation Event (as defined in the Company's Certificate of Incorporation, as may be amended from time to time) in accordance with the Company's Certificate of Incorporation in effect immediately prior to the Change in Control. The provisions of this Section 10(e) shall not be deemed to require any holder to approve any amendment or waiver of any provision of the Company's Certificate of Incorporation or otherwise approve a Change in Control transaction that would not allocate the consideration in accordance with the Company's Certificate of Incorporation.

(f) If the Change in Control is structured as a stock sale or exchange (a "***Stock Sale***"), then you hereby agree to sell or otherwise transfer to the acquiring entity in such Stock Sale a number of your Subject Shares equal to (i) your Pro Rata Percentage (as defined below), multiplied by (ii) the aggregate number of shares of capital stock of the Company that the acquiring entity desires to purchase. The consideration received pursuant to such transaction shall be allocated among the parties thereto in the manner specified in the Company's Certificate of Incorporation in effect immediately prior to the Stock Sale (as if such transaction were a deemed Liquidation Event). As used in this Section 10(f), "***Pro Rata Percentage***" means, at any time, the percentage obtained by dividing (a) the number of Subject Shares held by you at such time, by (b) the aggregate number of Common Stock Equivalents held by all stockholders at such time; and "***Common Stock Equivalents***" means all shares of Common Stock of the Company, including all shares of Preferred Stock converted or convertible into shares of Common Stock and all options, warrants, and other securities converted into or exercised for shares of Common Stock prior to the Change in Control.

(g) You further agree that with respect to any Change in Control approved in accordance with Section 10(a), to (i) refrain from exercising dissenters' rights or other similar statutory rights of appraisal (if any), and (ii) execute and deliver such instruments and take such other actions as may be reasonably requested by the Company or the acquiring entity to effect such Change in Control, and (iii) refrain from entering into any agreement or understanding (including any proxy or voting trust) that would be inconsistent with, or violate the provisions, of this Section 10(g).

6

(h) The Participation Notice shall include: (i) a summary of the material terms of the proposed Change in Control; (ii) information relating to any shareholder meeting or action by written consent and instructions with respect to the voting of your Subject Shares as required pursuant to Section 10(a); and (iii) such other information as the Board shall determine as necessary or appropriate.

2.11 **Entire Agreement; Governing Law**. The Plan is incorporated herein by reference. The Plan and this Option Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Participant with respect to the subject matter hereof, and may not be modified adversely to the Participant's interest except by means of a writing signed by the Company and Participant. This Agreement is governed by the internal substantive laws but not the choice of law rules of California.

2.12 **No Guarantee of Continued Service**. PARTICIPANT ACKNOWLEDGES AND AGREES THAT THE VESTING OF SHARES PURSUANT TO THE VESTING SCHEDULE HEREOF IS EARNED ONLY BY CONTINUING AS A SERVICE PROVIDER AT THE WILL OF THE COMPANY (OR THE PARENT OR SUBSIDIARY EMPLOYING OR RETAINING PARTICIPANT) AND NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THIS OPTION OR ACQUIRING SHARES HEREUNDER. PARTICIPANT FURTHER ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREUNDER AND THE VESTING SCHEDULE SET FORTH HEREIN DO NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED ENGAGEMENT AS A SERVICE PROVIDER FOR THE VESTING PERIOD, FOR ANY PERIOD, OR AT ALL, AND SHALL NOT INTERFERE IN ANY WAY WITH PARTICIPANT'S RIGHT OR THE RIGHT OF THE COMPANY (OR THE PARENT OR SUBSIDIARY EMPLOYING OR RETAINING PARTICIPANT) TO TERMINATE PARTICIPANT'S RELATIONSHIP AS A SERVICE PROVIDER AT ANY TIME, WITH OR WITHOUT CAUSE.

Participant acknowledges receipt of a copy of the Plan and represents that he or she is familiar with the terms and provisions thereof, and hereby accepts this Option subject to all of the terms and provisions thereof. Participant has reviewed the Plan and this Option in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Option and fully understands all provisions of the Option. Participant hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions arising under the Plan or this Option. Participant further agrees to notify the Company upon any change in the residence address indicated below.

*(Signature Page Follows)*

7

PARTICIPANT                                    THE REALREAL, INC.

_____              _____
Signature                                     By

«Name»                                        Julie Wainwright
_____              _____
Print Name                                    Print Name

_____              Chief Executive Officer
                                             _____
_____              Title
Residence Address

*Signature Page to Stock Option Agreement*

**EXHIBIT A**

**2011 EQUITY INCENTIVE PLAN**

**EXERCISE NOTICE**

The RealReal, Inc.
55 Francisco Street, Suite 600
San Francisco, CA 94133
Attention: Secretary

2.1 **Exercise of Option**. Effective as of today,            ,       , the undersigned ("Participant") hereby elects to exercise Participant's option (the "*Option*") to purchase            shares of the Common Stock (the "*Shares*") of The RealReal, Inc. (the "*Company*") under and pursuant to the 2011 Equity Incentive Plan (the "*Plan*") and the Stock Option Agreement dated «Grant_Date» (the "*Option Agreement*").

2.2 **Delivery of Payment**. Participant herewith delivers to the Company the full purchase price of the Shares, as set forth in the Option Agreement, and any and all withholding taxes due in connection with the exercise of the Option.

2.3 **Representations of Participant**. Participant acknowledges that Participant has received, read and understood the Plan and the Option Agreement and agrees to abide by and be bound by their terms and conditions.

2.4 **Rights as Stockholder**. Until the issuance of the Shares (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a stockholder shall exist with respect to the Common Stock subject to an Award, notwithstanding the exercise of the Option. The Shares shall be issued to Participant as soon as practicable after the Option is exercised in accordance with the Option Agreement. No adjustment shall be made for a dividend or other right for which the record date is prior to the date of issuance except as provided in Section 13 of the Plan.

2.5 **Company's Right of First Refusal**. Before any Shares held by Participant or any transferee (either being sometimes referred to herein as the "*Holder*") may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section 5 (the "*Right of First Refusal*").

(a) **Notice of Proposed Transfer**. The Holder of the Shares shall deliver to the Company a written notice (the "*Notice*") stating: (i) the Holder's bona fide intention to sell or otherwise transfer such Shares; (ii) the name of each proposed purchaser or other transferee ("*Proposed Transferee*"); (iii) the number of Shares to be transferred to each Proposed Transferee; and (iv) the bona fide cash price or other consideration for which the Holder proposes to transfer the Shares (the "*Offered Price*"), and the Holder shall offer the Shares at the Offered Price to the Company or its assignee(s).

A-1

(b) **Exercise of Right of First Refusal**. At any time within thirty (30) days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the purchase price determined in accordance with subsection (c) below.

(c) **Purchase Price**. The purchase price ("*Purchase Price*") for the Shares purchased by the Company or its assignee(s) under this Section 5 shall be the Offered Price. If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in good faith.

(d) **Payment**. Payment of the Purchase Price shall be made, at the option of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness of the Holder to the Company (or, in the case of repurchase by an assignee, to the assignee), or by any combination thereof within thirty (30) days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(e) **Holder's Right to Transfer**. If all of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section 5, then the Holder may sell or otherwise transfer such Shares to that Proposed Transferee at the Offered Price or at a higher price, *provided that:* (i) the transfer is made only on the terms provided for in the notice, with the exception of the purchase price, which may be either the price listed in the notice or any higher price; (ii) such transfer is consummated within 60 days after the date the notice is delivered to the Company; (iii) the transfer is effected in accordance with any applicable securities laws, and if requested by the Company, the Holder shall have delivered an opinion of counsel acceptable to the Company to that effect; and (iv) the Proposed Transferee agrees in writing that the provisions of this Section shall continue to apply to the transferred Shares in the hands of such Proposed Transferee. If any Shares described in a notice are not transferred to the Proposed Transferee within the period provided above, then before any such Shares may be transferred, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the right of first refusal described in this Section.

(f) **Exception for Certain Family Transfers**. Notwithstanding anything to the contrary contained elsewhere in this Section, the transfer of any or all of the Shares during the Holder's lifetime or on the Holder's death by will or intestacy to the Holder's spouse or domestic partner, child, father, mother, brother, sister, father-in-law, mother-in-law, brother-in-law, sister-in-law, grandfather, grandmother, grandchild, cousin, aunt, uncle, niece, nephew, stepchild, or to a trust or other similar estate planning vehicle for the benefit of the Holder or any such person, shall be exempt from the provisions of this Section; provided that, in each such case, the transferee shall agree in writing to receive and hold the Shares so transferred subject to all of the provisions of this Option Agreement, including but not limited to this Section, and there shall be no further transfer of such Shares except in accordance with the terms of this Section. For purposes of this Option Agreement, a person will be deemed to be a "domestic partner" of another person if the two persons (i) reside in the same residence and plan to do so indefinitely, (ii) have resided together for at least one year, (iii) are each at least 18 years of age and mentally competent to consent to contract, (iv) are not blood relatives any closer than would prohibit legal marriage in the state in which they reside, (v) are financially interdependent, as demonstrated to the reasonable satisfaction of the Company and (vi) have each been the sole spouse equivalent of the other for the year prior to the transfer and plan to remain so indefinitely; provided that a person will not be considered a domestic partner if he or she is married to another person or has any other spouse equivalent.

A-2

(g) **Termination of Right of First Refusal**. The Right of First Refusal shall terminate as to any Shares upon the earlier of (i) the first sale of Common Stock of the Company to the general public, or (ii) a Change in Control in which the successor corporation has equity securities that are publicly traded.

2.6 **Tax Consultation**. Participant understands that Participant may suffer adverse tax consequences as a result of Participant's purchase or disposition of the Shares. Participant represents that Participant has consulted with any tax consultants Participant deems advisable in connection with the purchase or disposition of the Shares and that Participant is not relying on the Company for any tax advice.

2.7 **Restrictive Legends and Stop-Transfer Orders**.

(a) **Legends**. Participant understands and agrees that the Company shall cause the legends set forth below or legends substantially equivalent thereto, to be placed upon any certificate(s) evidencing ownership of the Shares together with any other legends that may be required by the Company or by state or federal securities laws:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS IN COMPLIANCE THEREWITH.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND A RIGHT OF FIRST REFUSAL HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE EXERCISE NOTICE BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER. SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SHARES.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER FOR A PERIOD OF TIME FOLLOWING THE EFFECTIVE DATE OF THE UNDERWRITTEN PUBLIC OFFERING OF THE COMPANY'S SECURITIES SET FORTH IN AN AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES AND MAY NOT BE SOLD OR OTHERWISE DISPOSED OF BY THE HOLDER PRIOR TO THE EXPIRATION OF SUCH PERIOD WITHOUT THE CONSENT OF THE COMPANY OR THE MANAGING UNDERWRITER.

A-3

(b) **Stop-Transfer Notices**. Participant agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "*stop transfer*" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c) **Refusal to Transfer**. The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Exercise Notice or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

2.8 **Successors and Assigns**. The Company may assign any of its rights under this Exercise Notice to single or multiple assignees, and this Exercise Notice shall inure to the benefit of the successors and assigns of the Company. Subject to the restrictions on transfer herein set forth, this Exercise Notice shall be binding upon Participant and his or her heirs, executors, administrators, successors and assigns.

2.9 **Interpretation**. Any dispute regarding the interpretation of this Exercise Notice shall be submitted by Participant or by the Company forthwith to the Administrator, which shall review such dispute at its next regular meeting. The resolution of such a dispute by the Administrator shall be final and binding on all parties.

2.10 **Governing Law; Severability**. This Exercise Notice is governed by the internal substantive laws, but not the choice of law rules, of California. In the event that any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Exercise Notice shall continue in full force and effect.

A-4

2.11 **Entire Agreement**. The Plan and Option Agreement are incorporated herein by reference. This Exercise Notice, the Plan, the Option Agreement and the Investment Representation Statement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Participant with respect to the subject matter hereof, and may not be modified adversely to the Participant's interest except by means of a writing signed by the Company and Participant.

Submitted by:                                          Accepted by:

**PARTICIPANT**                                        **THE REALREAL, INC.**
_____                                _____
Signature                                              By

«Name»                                                 Julie Wainwright
_____                                _____
Print Name                                             Print Name

                                                       Chief Executive Officer
                                                       _____
                                                       Title

Address:                                               Address:
_____                                _____

_____                                _____

                                                       _____
                                                       Date Received

A-5

**EXHIBIT B**

**INVESTMENT REPRESENTATION STATEMENT**

PARTICIPANT            :    «Name»

COMPANY                :    The RealReal, Inc.

SECURITY               :    COMMON STOCK

AMOUNT                 :    _____ shares

DATE                   :

In connection with the purchase of the above-listed Securities, the undersigned Participant represents to the Company the following:

(a) Participant is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Securities. Participant is acquiring these Securities for investment for Participant's own account only and not with a view to, or for resale in connection with, any "***distribution***" thereof within the meaning of the Securities Act of 1933, as amended (the "***Securities Act***").

(b) Participant acknowledges and understands that the Securities constitute "***restricted securities***" under the Securities Act and have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Participant's investment intent as expressed herein. In this connection, Participant understands that, in the view of the Securities and Exchange Commission, the statutory basis for such exemption may be unavailable if Participant's representation was predicated solely upon a present intention to hold these Securities for the minimum capital gains period specified under tax statutes, for a deferred sale, for or until an increase or decrease in the market price of the Securities, or for a period of one (1) year or any other fixed period in the future. Participant further understands that the Securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Participant further acknowledges and understands that the Company is under no obligation to register the Securities. Participant understands that the certificate evidencing the Securities shall be imprinted with any legend required under applicable state securities laws.

(c) Participant is familiar with the provisions of Rule 701 and Rule 144, each promulgated under the Securities Act, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly from the issuer thereof, in a non-public offering subject to the satisfaction of certain conditions. Rule 701 provides that if the issuer qualifies under Rule 701 at the time of the grant of the Option to Participant, the exercise shall be exempt from registration under the Securities Act. In the event the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, ninety (90) days thereafter (or such

A-1

longer period as any market stand-off agreement may require) the Securities exempt under Rule 701 may be resold, subject to the satisfaction of the applicable conditions specified by Rule 144, including in the case of affiliates (1) the availability of certain public information about the Company, (2) the amount of Securities being sold during any three (3) month period not exceeding specified limitations, (3) the resale being made in an unsolicited "***broker's transaction***", transactions directly with a "***market maker***" or "***riskless principal transactions***" (as those terms are defined under the Securities Exchange Act of 1934) and (4) the timely filing of a Form 144, if applicable.

In the event that the Company does not qualify under Rule 701 at the time of grant of the Option, then the Securities may be resold in certain limited circumstances subject to the provisions of Rule 144, which may require (i) the availability of current public information about the Company; (ii) the resale to occur more than a specified period after the purchase and full payment (within the meaning of Rule 144) for the Securities; and (iii) in the case of the sale of Securities by an affiliate, the satisfaction of the conditions set forth in sections (2), (3) and (4) of the paragraph immediately above.

(d) Participant further understands that in the event all of the applicable requirements of Rule 701 or 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption shall be required; and that, notwithstanding the fact that Rules 144 and 701 are not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rules 144 or 701 shall have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk. Participant understands that no assurances can be given that any such other registration exemption shall be available in such event.

**PARTICIPANT**

_____

Signature

«Name»_____
Print Name

_____

Date

A-2

**Exhibit 10.3**

**\*Portions of this exhibit have been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.**

**THEREALREAL, INC.**

**LOAN AND SECURITY AGREEMENT**

This LOAN AND SECURITY AGREEMENT (the "Agreement") is entered into as of September 19, 2013, by and between Square I Bank ("Bank") and TheRealReal, Inc. ("Borrower").

RECITALS

Borrower wishes to obtain credit from time to time from Bank, and Bank desires to extend credit to Borrower. This Agreement sets forth the terms on which Bank will advance credit to Borrower, and Borrower will repay the amounts owing to Bank.

AGREEMENT

The parties agree as follows:

**1. DEFINITIONS AND CONSTRUCTION**.

    **1.1 Definitions**. As used in this Agreement, all capitalized terms shall have the definitions set forth on Exhibit A. Any term used in the Code and not defined herein shall have the meaning given to the term in the Code.

    **1.2 Accounting Terms**. Any accounting term not specifically defined on Exhibit A shall be construed in accordance with GAAP and all calculations shall be made in accordance with GAAP (except for non-compliance with FAS 123R in monthly reporting). The term "financial statements" shall include the accompanying notes and schedules.

**2. LOAN AND TERMS OF PAYMENT**.

    **2.1 Credit Extensions**.

        **(a) Promise to Pay**. Borrower promises to pay to Bank, in lawful money of the United States of America, the aggregate unpaid principal amount of all Credit Extensions made by Bank to Borrower, together with interest on the unpaid principal amount of such Credit Extensions at rates in accordance with the terms hereof

        **(b) Term Loan**.

            **(i)** Subject to and upon the terms and conditions of this Agreement, Bank agrees to make one (1) or more term loans to Borrower in an aggregate principal amount not to exceed Five Million Dollars ($5,000,000) (each a "Term Loan" and collectively the "Term Loans"). Borrower may request Term Loans at any time from the date hereof through the Availability End Date. The proceeds of the Term Loans shall be used for general corporate purposes and working capital expenditures.

            **(ii)** Interest shall accrue from the date of each Term Loan at the rate specified in Section 2.3(a), and prior to the Availability End Date for the applicable Term Loan shall be payable monthly beginning on the 19th day of the month next following such Term Loan, and continuing on the same day of each month thereafter. Any Term Loans that are outstanding on the Availability End Date shall be payable in 30 equal monthly installments of

TheRealReal, Inc. LSA                                                1

principal, plus all accrued interest, beginning on the date that is one month immediately following the Availability End Date, and continuing on the same day of each month thereafter through the Term Loan Maturity Date, at which time all amounts due in connection with the Term Loans and any other amounts due under this Agreement shall be immediately due and payable. Term Loans, once repaid, may not be reborrowed. Borrower may prepay any Term Loan without penalty or premium.

(iii) When Borrower desires to obtain a Term Loan, Borrower shall notify Bank (which notice shall be irrevocable) by facsimile transmission to be received no later than 3:30 p.m. Eastern time on the day on which the Term Loan is to be made. Such notice shall be substantially in the form of Exhibit C. The notice shall be signed by an Authorized Officer.

**2.2 Intentionally Left Blank**.

**2.3 Interest Rates, Payments, and Calculations**.

**(a) Interest Rates**.

**(i) Term Loans**. Except as set forth in Section 2.3(b), the Term Loans shall bear interest, on the outstanding daily balance thereof, at a variable annual rate equal to the greater of: (A) 1.50% above the Prime Rate then in effect, provided that such variable annual rate may not exceed 5.25%; or (B) 4.75%.

**(b) Late Fee; Default Rate**. If any payment is not made within 15 days after the date such payment is due, Borrower shall pay Bank a late fee equal to the lesser of (i) [***]% of the amount of such unpaid amount or (ii) the maximum amount permitted to be charged under applicable law. All Obligations shall bear interest, from and after the occurrence and during the continuance of an Event of Default, at a rate equal to [***] percentage points above the interest rate applicable immediately prior to the occurrence of the Event of Default.

**(c) Payments**. Bank shall charge all interest, all Bank Expenses, and all Periodic Payments against any of Borrower's deposit accounts. Any interest not paid when due shall be compounded by becoming a part of the Obligations, and such interest shall thereafter accrue interest at the rate then applicable hereunder.

**(d) Computation**. In the event the Prime Rate is changed from time to time hereafter, the applicable rate of interest hereunder shall be increased or decreased, effective as of the day the Prime Rate is changed, by an amount equal to such change in the Prime Rate. All interest chargeable under the Loan Documents shall be computed on the basis of a 360 day year for the actual number of days elapsed.

**2.4 Crediting Payments**. Prior to the occurrence of an Event of Default, Bank shall credit a wire transfer of funds, check or other item of payment to such deposit account or Obligation as Borrower specifies. After the occurrence and during the continuance of an Event of Default, Bank shall have the right, in its sole discretion, to immediately apply any wire transfer of funds, check, or other item of payment Bank may receive to conditionally reduce Obligations, but such applications of funds shall not be considered a payment on account unless such payment is of immediately available federal funds or unless and until such check or other item of payment is

TheRealReal, Inc. LSA                                    2

honored when presented for payment. Notwithstanding anything to the contrary contained herein, any wire transfer or payment received by Bank after 5:30 p.m. Eastern time shall be deemed to have been received by Bank as of the opening of business on the immediately following Business Day. Whenever any payment to Bank under the Loan Documents would otherwise be due (except by reason of acceleration) on a date that is not a Business Day, such payment shall instead be due on the next Business Day, and additional fees or interest, as the case may be, shall accrue and be payable for the period of such extension.

**2.5 Fees**. Borrower shall pay to Bank the following:

(a) **Facility Fee**. On or before the Closing Date, a fee equal to $[***], which shall be nonrefundable; and

(b) **Bank Expenses**. On the Closing Date, all Bank Expenses incurred through the Closing Date, provided that Borrower shall not be responsible for more than $[***] of such Bank Expenses if there are no more than three turns of the Loan Documents drafts. After the Closing Date, all Bank Expenses, as and when they become due.

**2.6 Term**. This Agreement shall become effective on the Closing Date and, subject to Section 12.7, shall continue in full force and effect for so long as any Obligations (other than Surviving Obligations) remain outstanding or Bank has any obligation to make Credit Extensions under this Agreement. Notwithstanding the foregoing, Bank shall have the right to terminate its obligation to make Credit Extensions under this Agreement immediately and without notice upon the occurrence and during the continuance of an Event of Default. With 10 days prior written notice to Bank, and upon payment in full in Cash of the Obligations (other than Surviving Obligations) in their entirety, Borrower may terminate this Agreement.

**3. CONDITIONS OF LOANS**.

**3.1 Conditions Precedent to Closing**. The agreement of Bank to enter into this Agreement on the Closing Date is subject to the condition precedent that Bank shall have received, in form and substance satisfactory to Bank, each of the following items and completed each of the following requirements:

(a) this Agreement;

(b) an officer's certificate of Borrower with respect to incumbency and resolutions authorizing the execution and delivery of this Agreement;

(c) a financing statement (Form UCC-1);

(d) Borrower shall have opened and funded not less than $[***] in deposit accounts held with Bank;

(e) payment of the fees and Bank Expenses then due specified in Section 2.5, which may be debited from any of Borrower's accounts with Bank;

TheRealReal, Inc. LSA                                        3

**(f)** current SOS Reports indicating that except for Permitted Liens, there are no other security interests or Liens of record in the Collateral;

**(g)** current financial statements, including audited statements (or such other level required by the Investment Agreement) for Borrower's most recently ended fiscal year, together with an unqualified opinion (or an opinion qualified only for going concern so long as Borrower's investors provide additional equity as needed), company prepared consolidated and consolidating balance sheets, income statements, and statements of cash flows for the most recently ended month in accordance with Section 6.2, and such other updated financial information as Bank may reasonably request;

**(h)** a current Compliance Certificate in accordance with Section 6.2;

**(i)** an account control agreement, duly executed by First Republic Bank and Borrower;

**(j)** a warrant, duly executed by Borrower;

**(k)** a Borrower Information Certificate; and

**(l)** such other documents or certificates, and completion of such other matters, as Bank may reasonably request.

**3.2 Conditions Precedent to all Credit Extensions**. The obligation of Bank to make each Credit Extension, including the initial Credit Extension, is contingent upon Borrower's compliance with Section 3.1 above, and is further subject to the following conditions:

**(a)** timely receipt by Bank of the Loan Advance/Paydown Request Form as provided in Section 2.1;

**(b)** in Bank's sole discretion, there has not been a material adverse effect on (i) the operations, business, or financial condition of Borrower and its Subsidiaries taken as a whole, or (ii) the ability of Borrower to repay the Obligations or otherwise perform its obligations under the Loan Documents; and

**(c)** the representations and warranties contained in Section 5 shall be true and correct in all material respects on and as of the date of such Loan Advance/Paydown Request Form and on the effective date of each Credit Extension as though made at and as of each such date, and no Event of Default shall have occurred and be continuing, or would exist after giving effect to such Credit Extension (provided, however, that those representations and warranties expressly referring to another date shall be true and correct in all material respects as of such date). The making of each Term Loan shall be deemed to be a representation and warranty by Borrower that, on the funding date requested for such Term Loan (as noted in the Loan Advance/Paydown Request Form, or the date of funding if no such date is noted on the form), the representations and warranties contained in Section 5 are true and correct in all material respects (provided, however, that those representations and warranties expressly referring to another date shall be true and correct in all material respects as of such date).

TheRealReal, Inc. LSA                                           4

**4. CREATION OF SECURITY INTEREST**.

      **4.1 Grant of Security Interest**. Borrower grants and pledges to Bank a continuing security interest in the Collateral to secure prompt repayment of any and all Obligations and to secure prompt performance by Borrower of each of its covenants and duties under the Loan Documents. Except for Permitted Liens or as disclosed in the Schedule, such security interest constitutes a valid, first priority security interest in the presently existing Collateral, and will constitute a valid, first priority security interest in later-acquired Collateral. Except for Permitted Indebtedness, Permitted Liens, Permitted Investments, and Permitted Transfers, Borrower also hereby agrees not to sell, transfer, assign, mortgage, pledge, lease, grant a security interest in, or encumber any of its Intellectual Property. Notwithstanding any termination of this Agreement or of any filings undertaken related to Bank's rights under the Code, Bank's Lien on the Collateral shall remain in effect for so long as any Obligations (other than Surviving Obligations) are outstanding.

      **4.2 Perfection of Security Interest**. Borrower authorizes Bank to file at any time financing statements, continuation statements, and amendments thereto that (i) either specifically describe the Collateral or describe the Collateral as all assets of Borrower of the kind pledged hereunder, and (ii) contain any other information required by the Code for the sufficiency of filing office acceptance of any financing statement, continuation statement, or amendment, including whether Borrower is an organization, the type of organization and any organizational identification number issued to Borrower, if applicable. Borrower shall have possession of the Collateral, except where expressly otherwise provided in this Agreement or where Bank chooses to perfect its security interest by possession in addition to the filing of a financing statement. Where Collateral is in possession of a third party bailee, Borrower shall take such steps as Bank reasonably requests for Bank to (i) subject to Section 7.10 below, obtain an acknowledgment, in form and substance satisfactory to Bank, of the bailee that the bailee holds such Collateral for the benefit of Bank, and (ii) obtain "control" of any Collateral consisting of investment property, deposit accounts, letter-of-credit rights or electronic chattel paper (as such items and the term "control" are defined in Revised Article 9 of the Code) by causing the securities intermediary or depositary institution or issuing bank to execute a control agreement in form and substance satisfactory to Bank. Borrower will not create any chattel paper without placing a legend on the chattel paper acceptable to Bank indicating that Bank has a security interest in the chattel paper. Borrower from time to time may deposit with Bank specific cash collateral to secure specific Obligations; Borrower authorizes Bank to hold such specific balances in pledge and to decline to honor any drafts thereon or any request by Borrower or any other Person to pay or otherwise transfer any part of such balances for so long as the specific Obligations are outstanding. Borrower shall take such other actions as Bank reasonably requests to perfect its security interests granted under this Agreement.

      **4.3 Consignment Arrangement**. Bank acknowledges and agrees that Borrower is an online luxury resale store in the business of having possession of, and preparing and offering for sale, consumer goods owned by third party consignors, including, without limitation, clothing, handbags, shoes, watches, art, jewelry, leather, goods, and accessories. Notwithstanding anything to the contrary, all items consigned to Borrower for the purpose of sale are neither Inventory nor Collateral.

TheRealReal, Inc. LSA                                             5

**5. REPRESENTATIONS AND WARRANTIES**.

Borrower represents and warrants as follows:

**5.1 Due Organization and Qualification**. Borrower and each Subsidiary is a corporation duly existing under the laws of the state in which it is organized and qualified and licensed to do business in any state in which the conduct of its business or its ownership of property requires that it be so qualified, except where the failure to do so would not reasonably be expected to cause a Material Adverse Effect.

**5.2 Due Authorization; No Conflict**. The execution, delivery, and performance of the Loan Documents are within Borrower's powers, have been duly authorized, and are not in conflict with nor constitute a breach of any provision contained in Borrower's Certificate of Incorporation or Bylaws, nor will they constitute an event of default under any material agreement by which Borrower is bound. Borrower is not in default under any agreement by which it is bound, except to the extent such default would not reasonably be expected to cause a Material Adverse Effect.

**5.3 Collateral**. Borrower has rights in or the power to transfer the Collateral, and its title to the Collateral is free and clear of Liens, adverse claims, and restrictions on transfer or pledge except for Permitted Liens. Other than movable items of personal property such as laptop computers, all Collateral having an aggregate book value not in excess of $[***], is located solely in the Collateral States. All Inventory is in all material respects of good and merchantable quality, free from all material defects, except for Inventory for which adequate reserves have been made. Except as set forth in the Schedule, none of Borrower's Cash is maintained or invested in violation of Section 6.6.

**5.4 Intellectual Property**. Borrower is the sole owner of the intellectual property created or purchased by Borrower, except for licenses granted by Borrower to its customers and business partners in the ordinary course of business. To the best of Borrower's knowledge, each of the Copyrights, Trademarks and Patents created or purchased by Borrower is valid and enforceable, and no part of the intellectual property created or purchased by Borrower has been judged invalid or unenforceable, in whole or in part, and no claim has been made to Borrower that any part of the intellectual property created or purchased by Borrower violates the rights of any third party except to the extent such claim would not reasonably be expected to cause a Material Adverse Effect.

**5.5 Name; Location of Chief Executive Office**. Except as disclosed in the Schedule, Borrower has not done business under any name other than that specified on the signature page hereof, and its exact legal name is as set forth in the first paragraph of this Agreement. The chief executive office of Borrower is located at the address indicated in Section 10 hereof.

**5.6 Litigation**. Except as set forth in the Schedule, there are no actions or proceedings pending by or against Borrower or any Subsidiary before any court or administrative agency in which a likely adverse decision would reasonably be expected to have a Material Adverse Effect.

**5.7 No Material Adverse Change in Financial Statements**. All consolidated and consolidating financial statements related to Borrower and any Subsidiary that are delivered by Borrower to Bank fairly present in all material respects Borrower's consolidated and consolidating financial condition as of the date thereof and Borrower's consolidated and consolidating results of operations for the period then ended. There has not been a material adverse change in the consolidated or in the consolidating financial condition of Borrower between the date of the most recent of such financial statements submitted to Bank and the date on which a Term Loan is made.

**5.8 Solvency, Payment of Debts**. Borrower is able to pay its debts (including trade debts) as they mature; the fair saleable value of Borrower's assets (including goodwill minus disposition costs) exceeds the fair value of its liabilities; and Borrower is not left with unreasonably small capital after the transactions contemplated by this Agreement.

**5.9 Compliance with Laws and Regulations**. Borrower and each Subsidiary have met the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA. No event has occurred resulting from Borrower's failure to comply with ERISA that is reasonably likely to result in Borrower's incurring any liability that could have a Material Adverse Effect. Borrower is not an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940. Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T and U of the Board of Governors of the Federal Reserve System). Borrower has not violated any statutes, laws, ordinances or rules applicable to it, the violation of which would reasonably be expected to have a Material Adverse Effect. Borrower and each Subsidiary have filed or caused to be filed all tax returns required to be filed, and have paid, or have made adequate provision for the payment of, all taxes reflected therein except those being contested in good faith with adequate reserves under GAAP or where the failure to file such returns or pay such taxes would not reasonably be expected to have a Material Adverse Effect.

**5.10 Subsidiaries**. Borrower does not own any stock, partnership interest or other equity securities of any Person, except for Permitted Investments.

**5.11 Government Consents**. Borrower and each Subsidiary have obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all governmental authorities that are necessary for the continued operation of Borrower's business as currently conducted, except where the failure to do so would not reasonably be expected to cause a Material Adverse Effect.

**5.12 Inbound Licenses**. Except as disclosed on the Schedule, Borrower is not a party to, nor is bound by, any material license or other agreement important for the conduct of Borrower's business that prohibits or otherwise restricts Borrower from granting a security interest in Borrower's interest in such license or agreement or any other property important for the conduct of Borrower's business, other than this Agreement or the other Loan Documents.

**5.13 Full Disclosure**. No representation, warranty or other statement made by Borrower in any certificate or written statement furnished to Bank taken together with all such certificates and written statements furnished to Bank contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained in such certificates or statements not misleading in light of the circumstances in which they were made, it being recognized by Bank that the projections and forecasts provided by Borrower in good faith and based upon reasonable assumptions are not to be viewed as facts and that actual results during the period or periods covered by any such projections and forecasts may differ from the projected or forecasted results.

**6. AFFIRMATIVE COVENANTS**.

Borrower covenants that, until payment in frill of all outstanding Obligations (other than Surviving Obligations), and for so long as Bank may have any commitment to make a Term Loan hereunder, Borrower shall do all of the following:

**6.1 Good Standing and Government Compliance**. Borrower shall maintain its and each of its Subsidiaries' corporate existence and good standing in the respective states of formation, shall maintain qualification and good standing in each other jurisdiction in which the failure to so qualify would reasonably be expected to have a Material Adverse Effect, and shall furnish to Bank the organizational identification number issued to Borrower by the authorities of the state in which Borrower is organized, if applicable. Borrower shall meet, and shall cause each Subsidiary to meet, the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA. Borrower shall comply, and shall cause each Subsidiary to comply, with all statutes, laws, ordinances and government rules and regulations to which it is subject, and shall maintain, and shall cause each of its Subsidiaries to maintain, in force all licenses, approvals and agreements, the loss of which or failure to comply with which would reasonably be expected to have a Material Adverse Effect.

**6.2 Financial Statements, Reports, Certificates**.

(a) Borrower shall deliver to Bank:

(i) <u>Monthly Financials</u>. As soon as available, but in any event within [***] after the end of each calendar month, a company prepared consolidated and consolidating balance sheet, income statement, and statement of cash flows covering Borrower's operations during such period, in a form reasonably acceptable to Bank and certified by a Responsible Officer;

(ii) <u>Annual Audited Financials</u>. As soon as available, but in any event within [***] after the end of Borrower's fiscal year, audited (or such other level as is required by Borrower's Board of Directors) consolidated and consolidating financial statements of Borrower prepared in accordance with GAAP, consistently applied, together with an opinion, which is either (A) unqualified, (B) qualified only for going concern due to a projected inability to finance future operations, or (C) otherwise consented to in writing by Bank, on such financial statements of an independent certified public accounting firm reasonably acceptable to Bank (it being agreed by Bank that ally of the "Big 4" accounting firms is acceptable to Bank);

TheRealReal, Inc. LSA                                                    8

**(iii)** Annual Budget. An annual budget approved by Borrower's Board of Directors as soon as available but not later than [***] after the beginning of each fiscal year of Borrower during the term of this Agreement;

**(iv)** Notices to Stockholders and Securities Filings. If applicable, copies of all statements, reports and notices sent or made available generally by Borrower to its security holders or to any holders of Subordinated Debt and all reports on Forms 10-K and 10-Q filed with the Securities and Exchange Commission;

**(v)** Legal Action Notice. Promptly upon receipt of notice thereof, a report of any legal actions pending or threatened against Borrower or any Subsidiary that could reasonably be expected to result in damages or costs to Borrower or any Subsidiary of $[***] or more;

**(vi)** Accountant Management Letters. Promptly upon receipt, each management letter prepared by Borrower's independent certified public accounting firm regarding Borrower's management control systems; and

**(vii)** Other Financial Information. Such budgets, sales projections, operating plans or other financial information generally prepared by Borrower in the ordinary course of business as Bank may reasonably request from time to time.

**(b)** Compliance Certificate; A/R and A/P Aging's Report. Within [***] after the last day of each month, Borrower shall deliver to Bank with the monthly financial statements (i) a Compliance Certificate certified as of the last day of the applicable month and signed by a Responsible Officer in substantially the form of Exhibit D hereto and (ii) aged listings by invoice date of accounts receivable and accounts payable.

**(c)** Event of Default Notice. As soon as possible and in any event within [***] calendar days after becoming aware of the occurrence or existence of an Event of Default hereunder, Borrower shall deliver to Bank a written statement of a Responsible Officer setting forth details of the Event of Default, and the action which Borrower has taken or proposes to take with respect thereto.

**(d)** Audit. Bank (through any of its officers, employees, or agents) shall have the right, upon reasonable prior notice, from time to time during Borrower's usual business hours and without undue disruption of Borrower's business, to inspect Borrower's Books and to make copies thereof and to check, test, inspect, audit and appraise the Collateral in order to verify Borrower's financial condition or the amount, condition of, or any other matter relating to, the Collateral. Borrower shall be responsible for the expenses of no more than one such audit per year; provided that, if an Event of Default has occurred and is continuing at the time an audit is ordered, Borrower shall be responsible for the expenses of such audit.

**(e)** Electronic Delivery. Borrower may deliver to Bank on an electronic basis any certificates, reports or information required pursuant to this Section 6.2, and Bank shall be entitled to rely on the information contained in the electronic files, provided that Bank in good faith believes that the files were delivered by a Responsible Officer. Borrower shall include a submission date on any certificates and reports to be delivered electronically.

TheRealReal, Inc. LSA                                            9

**6.3 Inventory and Equipment; Returns**. Borrower shall keep all Inventory and Equipment owned by it in good and merchantable condition, free from all material defects except for Inventory and Equipment (i) sold in the ordinary course of business, and (ii) for which adequate reserves have been made, in all cases in the United States and such other locations as to which Borrower gives prior written notice. Returns and allowances, if any, as between Borrower and its account debtors shall be on the same basis and in accordance with the usual customary practices of Borrower, as they exist on the Closing Date. Borrower shall promptly notify Bank of all returns and recoveries and of all disputes and claims involving inventory having a book value of more than $[***]. Except for Inventory sold in the ordinary course of business and for movable items of personal property having an aggregate book value not in excess of $[***], and except for such other locations as are listed in the Schedule or as Bank may approve in writing, Borrower shall keep the Inventory and Equipment only at the location set forth in Section 10 and such other locations of which Borrower gives Bank prior written notice and as to which Bank consents or is able to take such actions as may be necessary to perfect its security interest or to obtain a bailee's acknowledgment of Bank's rights in the Collateral.

**6.4 Taxes**. Borrower shall make, and cause each Subsidiary to make, due and timely payment or deposit of all material federal, state, and local taxes, assessments, or contributions required of it by law, including, but not limited to, those laws concerning income taxes, F.I.C.A., F.U.T.A. and state disability, and will execute and deliver to Bank, on demand, proof satisfactory to Bank indicating that Borrower or a Subsidiary has made such payments or deposits and any appropriate certificates attesting to the payment or deposit thereof; provided that Borrower or a Subsidiary need not make any payment if the amount or validity of such payment is contested in good faith by appropriate proceedings and is reserved against (to the extent required by GAAP) by Borrower or such Subsidiary.

**6.5 Insurance**. Borrower, at its expense, shall (i) keep the Collateral insured against loss or damage, and (ii) maintain liability and other insurance, in each case as ordinarily insured against by other owners in businesses similar to Borrower's. All such policies of insurance shall be in such form, with such companies, and in such amounts as reasonably satisfactory to Bank. All policies of property insurance shall contain a lender's loss payable endorsement, in a form satisfactory to Bank, showing Bank as an additional loss payee, and all liability insurance policies shall show Bank as an additional insured and specify that the insurer must give at least [***] days' notice to Bank before canceling its policy for any reason. Within 30 days of the Closing Date, Borrower shall cause to be furnished to Bank a copy of its policies or certificate of insurance including any endorsements covering Bank or showing Bank as an additional insured. Upon Bank's request, Borrower shall deliver to Bank certified copies of the policies of insurance and evidence of all premium payments. Proceeds payable under any casualty policy will, at Borrower's option, be payable to Borrower to replace the property subject to the claim, provided that any such replacement property shall be deemed Collateral in which Bank has been granted a first priority security interest, provided that if an Event of Default has occurred and is continuing, all proceeds payable under any such policy shall, at Bank's option, be payable to Bank to be applied on account of the Obligations.

TheRealReal, Inc. LSA                                             10

**6.6** "**Primary Depository**". Subject to the provisions of Section 3.1(d), commencing on the 61st day following the Closing Date, Borrower shall maintain (i) all its depository and operating accounts with Bank and (ii) its primary investment accounts with Bank or Bank's affiliates. Notwithstanding the foregoing, Borrower may maintain the Designated First Republic Bank Account for the time and to the extent necessary to honor checks outstanding on the Closing Date and drawn on the Designated First Republic Bank Account, provided that (x) from the Closing Date through the date that is 120 days after the Closing Date, the balance in the Designated First Republic Bank Account may not exceed $[***], (y) beginning on the date that is 121 days after the Closing Date and continuing at all times thereafter, the balance in the Designated First Republic Bank Account may not exceed $[***], and (z) the Designated First Republic Bank Account is subject to an account control agreement with Bank.

**6.7 Financial Covenants**. Borrower shall at all times maintain the following financial ratios and covenants:

**(a) Minimum Net Revenue**. For Borrower's fiscal year ending December 31, 2013, measured as of December 31, 2013, Net Revenue of at least $[***]. Beginning in 2014, Borrower's quarterly Net Revenue, measured as of the last day of each calendar quarter, shall be not less than an agreed-upon Minimum Quarterly Net Revenue for such calendar quarter. Bank and Borrower hereby agree that, on or before January 15 of each year during the term of this Agreement, Borrower shall provide Bank with a board-approved budget for such year containing a forecast of Net Revenues for each calendar quarter during such year, and, unless such budget is unsatisfactory to Bank, the minimum quarterly Net Revenue for a particular quarter during such year shall be [***]% of the forecasted Net Revenue for such quarter. If such budget is unsatisfactory to Bank, then Bank and Borrower agree to discuss alternate levels. It shall be a violation by Borrower of this Section 6.7(a) if, following a reasonable period of discussion, Bank and Borrower fail to agree to minimum quarterly Net Revenue covenant levels for such year. Both parties shall act in a commercially reasonable manner in the process of establishing and discussing the setting of covenant levels. Once agreed, the minimum quarterly Net Revenue levels shall be incorporated into this Agreement though an amendment, which Bank and Borrower agree to execute promptly.

**6.8 Consent of Inbound Licensors**. Prior to entering into or becoming bound by any material inbound license agreement, Borrower shall: (i) provide written notice to Bank of the material terms of such license agreement with a description of its likely impact on Borrower's business or financial condition; and (ii) in good faith use commercially reasonable efforts to obtain the consent of, or waiver by, any person whose consent or waiver is necessary for Borrower's interest in such licenses or contract rights to be deemed Collateral and for Bank to have a security interest in it that might otherwise be restricted by the terms of the applicable license or agreement, whether now existing or entered into in the future, provided, however, that the failure to obtain any such consent or waiver shall not constitute a default under this Agreement.

**6.9 Creation/Acquisition of Subsidiaries**. In the event any Borrower or any Subsidiary of any Borrower creates or acquires any Subsidiary, Borrower or such Subsidiary shall promptly notify Bank of such creation or acquisition, and Borrower or such Subsidiary shall take all actions reasonably requested by Bank to achieve any of the following with respect to such "***New Subsidiary***" (defined as a Subsidiary formed after the date hereof during the term of this Agreement): (i) to cause such New Subsidiary to become either a co-Borrower hereunder, if such New Subsidiary is organized under the laws of the United States, or a secured guarantor with respect to the Obligations; and (ii) to grant and pledge to Bank a perfected security interest in

TheRealReal, Inc. LSA                                                11

100% of the stock, units or other evidence of ownership held by Borrower or its Subsidiaries of any such New Subsidiary which is organized under the laws of the United States, and 65% of the stock, units or other evidence of ownership held by Borrower or its Subsidiaries of any such New Subsidiary which is not organized under the laws of the United States.

**6.10 Further Assurances**. At any time and from time to time Borrower shall execute and deliver such further instruments and take such further action as may reasonably be requested by Bank to effect the purposes of this Agreement.

**7. NEGATIVE COVENANTS**.

Borrower covenants and agrees that, until the outstanding Obligations (other than Surviving Obligations) are paid in full or for so long as Bank may have any commitment to make any Term Loans, Borrower will not do any of the following without Bank's prior written consent, which shall not be unreasonably withheld:

**7.1 Dispositions**. Convey, sell, lease, license, transfer or otherwise dispose of (collectively, to "Transfer"), or permit any of its Subsidiaries to Transfer, all or any part of its business or property, or move cash balances on deposit with Bank to accounts opened at another financial institution, other than Permitted Transfers.

**7.2 Change in Name, Location, Executive Office, or Executive Management; Change in Business; Change in Fiscal Year; Change in Control**. Change its name or the state of Borrower's formation or relocate its chief executive office without [***] prior written notification to Bank; fail to notify Bank of the departure of its chief executive officer or chief financial officer within [***]; fail to appoint an interim replacement or fill a vacancy in the position of chief executive officer or chief financial officer for more than [***]; suffer a change on its board of directors which results in (i) the failure of at least one partner of Caanan Partners or InterWest Partners, or their respective Affiliates, to serve as a voting member, or suffer the resignation of one or more directors from its board of directors in anticipation of Borrower's insolvency, in each case without the prior written consent of Bank which may be withheld in Bank's sole discretion; take action to liquidate, wind up, or otherwise cease to conduct business in the ordinary course; engage in any business, or permit any of its Subsidiaries to engage in any business, other than or reasonably related or incidental to the businesses currently engaged in by Borrower; change its fiscal year end; have a Change in Control.

**7.3 Mergers or Acquisitions**. Merge or consolidate, or permit any of its Subsidiaries to merge or consolidate, with or into any other business organization (other than mergers or consolidations of a Subsidiary into another Subsidiary or into Borrower), or acquire, or permit any of its Subsidiaries to acquire, all or substantially all of the capital stock or property of another Person except where (a) each of the following conditions is applicable: (i) the consideration paid in connection with such transactions (including assumption of liabilities) does not in the aggregate exceed $[***] during any fiscal year, (ii) no Event of Default has occurred, is continuing or would exist immediately after giving effect to such transactions, (iii) such transactions do not result in a Change in Control, and (iv) Borrower is the surviving entity; or (b) the Obligations (other than Surviving Obligations) are repaid in full concurrently with the closing of any merger or consolidation of Borrower in which Borrower is not the surviving entity.

TheRealReal, Inc. LSA                                         12

Borrower shall not, without Bank's prior written consent, enter into any binding contractual arrangement with any Person (such as a broker or investment banker) to attempt to facilitate a merger or acquisition of Borrower unless (i) no Event of Default exists when such agreement is entered into by Borrower (or, if an Event of Default does then exist, such Person agrees to defer any compensation owed to it pursuant to the contractual arrangement until after Bank has been repaid in full), (ii) such agreement does not give such Person the right to claim any fee, payment or damages from any parties, other than from Borrower or Borrower's investors, in connection with a sale of Borrower's stock or assets pursuant to or resulting from an assignment for the benefit of creditors, an asset turnover to Borrower's creditors (including, without limitation, Bank), foreclosure, bankruptcy or similar liquidation, and (iii) Borrower notifies Bank in advance of entering into such an agreement (provided, the failure to give such notification shall not be deemed a material breach of this Agreement).

　　　　**7.4 Indebtedness**. Create, incur, assume, guarantee or be or remain liable with respect to any Indebtedness, or permit any Subsidiary so to do, other than Permitted Indebtedness, or prepay any Indebtedness or take any actions which impose on Borrower an obligation to prepay any Indebtedness, except Indebtedness to Bank.

　　　　**7.5 Encumbrances**. Create, incur, assume or allow any Lien with respect to its property, or assign or otherwise convey any right to receive income, including the sale of any Accounts, or permit any of its Subsidiaries so to do, except for Permitted Liens, or covenant to any other Person (other than (i) the licensors of in-licensed property with respect to such property or (ii) the lessors of specific equipment or lenders financing specific equipment with respect to such leased or financed equipment) that Borrower in the future will refrain from creating, incurring, assuming or allowing any Lien with respect to any of Borrower's property.

　　　　**7.6 Distributions**. Pay any dividends or make any other distribution or payment on account of or in redemption, retirement or purchase of Borrower's or any Subsidiary's capital stock, except that Borrower may (i) repurchase the stock of former employees, consultants, advisors, and the like pursuant to agreements to repurchase stock, as long as an Event of Default does not exist prior to such repurchase or would not exist immediately after giving effect to such repurchase, (ii) repurchase the stock of former employees, consultants, advisors, and the like pursuant to agreements to repurchase stock by the cancellation of indebtedness owed by such persons to Borrower regardless of whether an Event of Default exists, and (iii) make repurchases listed in the Schedule.

　　　　**7.7 Investments**. Directly or indirectly acquire or own, or make any Investment in or to any Person, or permit any of its Subsidiaries so to do, other than Permitted Investments, or maintain or invest any of its Investment Property with a Person other than Bank or Bank's Affiliates or permit any Subsidiary to do so unless such Person has entered into a control agreement with Bank, in form and substance satisfactory to Bank, or suffer or permit any Subsidiary to be a party to, or be bound by, an agreement that restricts such Subsidiary from paying dividends or otherwise distributing property to Borrower.

　　　　**7.8 Transactions with Affiliates**. Directly or indirectly enter into or permit to exist any material transaction with any Affiliate of Borrower except for transactions that are in the ordinary course of Borrower's business, upon fair and reasonable terms that are no less favorable to Borrower than would be obtained in an arm's length transaction with a non-affiliated Person.

TheRealReal, Inc. LSA                                                    13

**7.9 Subordinated Debt**. Make any payment in respect of any Subordinated Debt, or permit any of its Subsidiaries to make any such payment, except in compliance with the terms of such Subordinated Debt, or amend any provision affecting Bank's rights contained in any documentation relating to the Subordinated Debt without Bank's prior written consent.

**7.10 Inventory and Equipment**. Store the Inventory or the Equipment of a book value in excess of $[***] with a bailee, warehouseman, collocation facility or similar third party unless the third party has been notified of Bank's security interest and Bank (a) has received an acknowledgment from the third party that it is holding or will hold the Inventory or Equipment for Bank's benefit or (b) is in possession of the warehouse receipt, where negotiable, covering such Inventory or Equipment.

**7.11 No Investment Company; Margin Regulation**. Become or be controlled by an "investment company," within the meaning of the Investment Company Act of 1940, or become principally engaged in, or undertake as one of its important activities, the business of extending credit for the purpose of purchasing or carrying margin stock, or use the proceeds of any Credit Extension for such purpose.

**8. EVENTS OF DEFAULT**.

Any one or more of the following events shall constitute an Event of Default by Borrower under this Agreement:

**8.1 Payment Default**. If Borrower fails to pay any of the Obligations when due;

**8.2 Covenant Default**.

(a) If Borrower fails to perform any obligation under Sections 6.6 (primary accounts) or 6.7 (financial covenants), or violates any of the covenants contained in Article 7 of this Agreement;

(b) If Borrower fails to perform any obligation set forth in Sections 6.2 (financial reporting), 6.4 (taxes), or 6.5 (insurance), Borrower shall have ten (10) days to cure such default, and within such cure period the failure to have cured such default shall not be deemed an Event of Default but no Credit Extension will be made; or

(c) If Borrower fails or neglects to perform or observe any other material term, provision, condition, or covenant contained in this Agreement, in any of the Loan Documents, or in any other present or future agreement between Borrower and Bank and as to any default under such other term, provision, condition or covenant that can be cured, has failed to cure such default within [***] after Borrower receives notice thereof or any officer of Borrower becomes aware thereof; provided, however, that if the default cannot by its nature be cured within the [***] period or cannot after diligent attempts by Borrower be cured within such [***] period, and such default is likely to be cured within a reasonable time, then Borrower shall have an additional reasonable period (which shall not in any case exceed [***]) to attempt to cure such default, and within such reasonable time period the failure to have cured such default shall not be deemed an Event of Default but no Credit Extensions will be made.

TheRealReal, Inc. LSA                                                                 14

**8.3 Investor Support; Priority of Security Interest**. If (i) Bank reasonably determines in its good faith business judgment, that none of Borrower's then-existing venture capital investors intend to continue to fund Borrower in the amounts and timeframe necessary to enable Borrower to satisfy the Obligations (other than Surviving Obligations) as they become due and payable, and no other investor reasonably satisfactory to Bank has offered to provide such funding, or (ii) there is a material impairment in the perfection or priority of Bank's security interest in the Collateral;

**8.4 Attachment.** If any material portion of Borrower's assets is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any trustee, receiver or person acting in a similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged or rescinded within [***], or if Borrower is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, or if a judgment or other claim becomes a lien or encumbrance upon any material portion of Borrower's assets, or if a notice of lien, levy, or assessment is filed of record with respect to any material portion of Borrower's assets by the United States Government, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, and the same is not paid within ten days after Borrower receives notice thereof, provided that none of the foregoing shall constitute an Event of Default where such action or event is stayed or an adequate bond has been posted pending a good faith contest by Borrower (provided that no Credit Extensions will be made during such cure period);

**8.5 Insolvency**. If Borrower becomes insolvent, or if an Insolvency Proceeding is commenced by Borrower, or if an Insolvency Proceeding is commenced against Borrower and is not dismissed or stayed within [***] (provided that no Credit Extensions will be made prior to the dismissal of such Insolvency Proceeding);

**8.6 Other Agreements**. If there is a default or other failure to perform in any agreement to which Borrower is a party with a third party or parties (a) resulting in a right by such third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount in excess of $[***], or (b) in connection with any lease of real property;

**8.7 Judgments**. If a final, uninsured judgment or judgments for the payment of money in an amount, individually or in the aggregate, of at least $[***] shall be rendered against Borrower and shall remain unsatisfied and unstayed for a period of [***] (provided that no Credit Extensions will be made prior to the satisfaction or stay of the judgment); or

**8.8 Misrepresentations**. If any material misrepresentation or material misstatement is made by Borrower in any warranty or representation set forth herein or in any certificate delivered to Bank by any Responsible Officer pursuant to this Agreement or to induce Bank to enter into this Agreement or any other Loan Document.

TheRealReal, Inc. LSA                                    15

**9. BANK'S RIGHTS AND REMEDIES**.

**9.1 Rights and Remedies**. Upon the occurrence and during the continuance of an Event of Default, Bank may, at its election, without notice of its election and without demand, do any one or more of the following to the extent not prohibited by applicable law, all of which are authorized by Borrower:

(a) Declare all Obligations, whether evidenced by this Agreement, by any of the other Loan Documents, or otherwise, immediately due and payable (provided that upon the occurrence of an Event of Default described in Section 8.5 (insolvency), all Obligations shall become immediately due and payable without any action by Bank);

(b) Demand that Borrower (i) deposit cash with Bank in an amount equal to the amount of any Letters of Credit remaining undrawn, as collateral security for the repayment of any future drawings under such Letters of Credit, and (ii) pay in advance all Letter of Credit fees scheduled to be paid or payable over the remaining term of the Letters of Credit, and Borrower shall promptly deposit and pay such amounts;

(c) Cease advancing money or extending credit to or for the benefit of Borrower under this Agreement or under any other agreement between Borrower and Bank;

(d) Settle or adjust disputes and claims directly with account debtors for amounts, upon terms and in whatever order that Bank reasonably considers advisable;

(e) Make such payments and do such acts as Bank considers necessary or reasonable to protect its security interest in the Collateral. Borrower agrees to assemble the Collateral if Bank so requires, and to make the Collateral available to Bank as Bank may designate. Borrower authorizes Bank to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any encumbrance, charge, or lien which in Bank's determination appears to be prior or superior to its security interest and to pay all expenses incurred in connection therewith. With respect to any of Borrower's owned premises, Borrower hereby grants Bank a license to enter into possession of such premises and to occupy the same, without charge, solely in order to exercise any of Bank's rights or remedies provided herein, at law, in equity, or otherwise;

(f) Set off and apply to the Obligations any and all (i) balances and deposits of Borrower held by Bank, and (ii) indebtedness at any time owing to or for the credit or the account of Borrower held by Bank;

(g) Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell (in the manner provided for herein) the Collateral. Bank is hereby granted a license or other right, solely pursuant to the provisions of this Section 9.1, to use, without charge, Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and, in connection with Bank's exercise of its rights under this Section 9.1, Borrower's rights under all licenses and all franchise agreements shall inure to Bank's benefit;

TheRealReal, Inc. LSA                                                16

**(h)** (i) Sell the Collateral at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Borrower's premises) as Bank determines is commercially reasonable, and apply any proceeds to the Obligations in whatever manner or order Bank deems appropriate; (ii) Bank may sell the Collateral without giving any warranties as to the Collateral; and (iii) Bank may specifically disclaim any warranties of title or the like. This procedure will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral. If Bank sells any of the Collateral upon credit, Borrower will be credited only with payments actually made by the purchaser, received by Bank, and applied to the indebtedness of the purchaser. If the purchaser fails to pay for the Collateral, Bank may resell the Collateral and Borrower shall be credited with the proceeds of the sale;

**(i)** Bank may credit bid and purchase at any public sale;

**(j)** Apply for the appointment of a receiver, trustee, liquidator or conservator of the Collateral, without notice and without regard to the adequacy of the security for the Obligations and without regard to the solvency of Borrower, any guarantor or any other Person liable for any of the Obligations; and

**(k)** Any deficiency that exists after disposition of the Collateral as provided above will be paid immediately by Borrower.

Bank's compliance with any applicable state or federal law requirements in connection with a disposition of the Collateral will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

**9.2 Power of Attorney**. Effective only upon the occurrence and during the continuance of an Event of Default, Borrower hereby irrevocably appoints Bank (and any of Bank's designated officers, or employees) as Borrower's true and lawful attorney to: (a) send requests for verification of Accounts or notify account debtors of Bank's security interest in the Accounts; (b) endorse Borrower's name on any checks or other forms of payment or security that may come into Bank's possession; (c) sign Borrower's name on any invoice or bill of lading relating to any Account, drafts against account debtors, schedules and assignments of Accounts, verifications of Accounts, and notices to account debtors; (d) dispose of any Collateral to the extent authorized elsewhere in this Agreement; (e) make, settle, and adjust all claims under and decisions with respect to Borrower's policies of insurance; (0 settle and adjust disputes and claims respecting the accounts directly with account debtors, for amounts and upon terms which Bank determines to be reasonable; and (g) file, in its sole discretion, one or more financing or continuation statements and amendments thereto, relative to any of the Collateral; provided Bank may exercise such power of attorney to sign the name of Borrower on any of the documents described in clause (g) above, regardless of whether an Event of Default has occurred. The appointment of Bank as Borrower's attorney in fact, and each and every one of Bank's rights and powers, being coupled with an interest, is irrevocable until all of the Obligations (other than Surviving Obligations) have been fully repaid and performed and Bank's obligation to provide Term Loans hereunder is terminated.

TheRealReal, Inc. LSA                                                    17

**9.3 Accounts Collection**. At any time after the occurrence and during the continuation of an Event of Default, Bank may notify any Person owing funds to Borrower of Bank's security interest in such finds and verify the amount of such Account. Borrower shall collect all amounts owing to Borrower for Bank, receive in trust all payments as Bank's trustee, and immediately deliver such payments to Bank in their original form as received from the account debtor, with proper endorsements for deposit.

**9.4 Bank Expenses**. If Borrower fails to pay any amounts or furnish any required proof of payment due to third persons or entities, as required under the terms of this Agreement, then Bank may do any or all of the following after reasonable notice to Borrower: (a) make payment of the same or any part thereof; and/or (b) obtain and maintain insurance policies of the type discussed in Section 6.5 of this Agreement, and take any action with respect to such policies as Bank deems prudent. Any amounts so paid or deposited by Bank shall constitute Bank Expenses, shall be immediately due and payable, and shall bear interest at the then applicable rate hereinabove provided, and shall be secured by the Collateral. Any payments made by Bank shall not constitute an agreement by Bank to make similar payments in the future or a waiver by Bank of any Event of Default under this Agreement.

**9.5 Bank's Liability for Collateral**. Bank has no obligation to clean up or otherwise prepare the Collateral for sale. All risk of loss, damage or destruction of the Collateral shall be borne by Borrower absent Bank's negligence, willful misconduct, recklessness, or fraud.

**9.6 No Obligation to Pursue Others**. Bank has no obligation to attempt to satisfy the Obligations by collecting them from any other person liable for them and Bank may release, modify or waive any collateral provided by any other Person to secure any of the Obligations, all without affecting Bank's rights against Borrower. Borrower waives any right it may have to require Bank to pursue any other Person for any of the Obligations.

**9.7 Remedies Cumulative**. Bank's rights and remedies under this Agreement, the Loan Documents, and all other agreements shall be cumulative. Bank shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity. No exercise by Bank of one right or remedy shall be deemed an election, and no waiver by Bank of any Event of Default on Borrower's part shall be deemed a continuing waiver. No delay by Bank shall constitute a waiver, election, or acquiescence by it. No waiver by Bank shall be effective unless made in a written document signed on behalf of Bank and then shall be effective only in the specific instance and for the specific purpose for which it was given. Borrower expressly agrees that this Section 9.7 may not be waived or modified by Bank by course of performance, conduct, estoppel or otherwise.

**9.8 Demand; Protest**. Except as otherwise provided in this Agreement, Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment and any other notices relating to the Obligations.

**10. NOTICES**.

Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other agreement entered into in connection herewith shall be in writing and (except for financial statements other informational documents and other documents that Bank ordinarily accepts by email, fax, or mail, which may be sent by email, fax, or first-class mail, postage prepaid) shall be personally delivered or sent by a recognized overnight delivery service, certified mail, postage prepaid, return receipt requested, or by tele facsimile to Borrower or to Bank, as the case may be, at its addresses set forth below:

TheRealReal, Inc. LSA                                                18

If to Borrower:                             TheRealReal, Inc.
                                            1980 Oakdale Avenue
                                            San Francisco, CA 94124
                                            Attn: Chief Financial Officer
                                            FAX: _____

                                            with a copy to (which shall not constitute notice):

                                            Sidley Austin LLP
                                            1001 Page Mill Road
                                            Building 1
                                            Palo Alto, CA 94304
                                            Attn: Ilan Hornstein
                                            FAX: [***]

If to Bank:                                 Square 1 Bank
                                            406 Blackwell Street, Suite 240
                                            Durham, North Carolina 27701
                                            Attn: Loan Operations Manager
                                            FAX: [***]

                                            with a copy to:

                                            Square 1 Bank
                                            2420 Sand Hill Road, Suite 100
                                            Menlo Park, CA 94025
                                            Attn: Tim McDonough
                                            FAX: [***]

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

**11. CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER**.

This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of California, without regard to principles of conflicts of law. Jurisdiction shall lie in the State of California. All disputes, controversies, claims, actions and similar proceedings arising with respect to Borrower's account or any related agreement or transaction shall be brought in the Superior Court of San Mateo County, California or the United States District Court for the Northern District of California, except as provided below with respect to arbitration of such matters. BANK AND BORROWER EACH ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH OF

TheRealReal, Inc. LSA                              19

THEM, AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL OF THEIR CHOICE, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT ANY OF THEM MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY RELATED INSTRUMENT OR LOAN DOCUMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY COURSE OF CONDUCT, DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTION OF ANY OF THEM. THESE PROVISIONS SHALL NOT BE DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY BANK OR BORROWER, EXCEPT BY A WRITTEN INSTRUMENT EXECUTED BY EACH OF THEM. If the jury waiver set forth in this Section 11 is not enforceable, then any dispute, controversy, claim, action or similar proceeding arising out of or relating to this Agreement, the Loan Documents or any of the transactions contemplated therein shall be settled by final and binding arbitration held in San Mateo County, California in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association by one arbitrator appointed in accordance with those rules. The arbitrator shall apply California law to the resolution of any dispute, without reference to rules of conflicts of law or rules of statutory arbitration. Judgment upon any award resulting from arbitration may be entered into and enforced by any state or federal court having jurisdiction thereof. Notwithstanding the foregoing, the parties may apply to any court of competent jurisdiction for preliminary or interim equitable relief, or to compel arbitration in accordance with this Section. The costs and expenses of the arbitration, including without limitation, the arbitrator's fees and expert witness fees, and reasonable attorneys' fees, incurred by the parties to the arbitration may be awarded to the prevailing party, in the discretion of the arbitrator, or may be apportioned between the parties in any manner deemed appropriate by the arbitrator. Unless and until the arbitrator decides that one party is to pay for all (or a share) of such costs and expenses, both parties shall share equally in the payment of the arbitrator's fees as and when billed by the arbitrator.

## 12. GENERAL PROVISIONS.

**12.1 Successors and Assigns**. This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties and shall bind all persons who become bound as a debtor to this Agreement; provided, however, that neither this Agreement nor any rights hereunder may be assigned by Borrower without Bank's prior written consent, which consent may be granted or withheld in Bank's sole discretion. Bank shall have the right without the consent of or notice to Borrower to sell, assign, transfer, negotiate, or grant participation in all or any part of, or any interest in, Bank's obligations, rights and benefits hereunder.

**12.2 Indemnification**. Borrower shall defend, indemnify and hold harmless Bank and its officers, employees, and agents against: (a) all obligations, demands, claims, and liabilities claimed or asserted by any third party in connection with the transactions contemplated by this Agreement; and (b) all losses in any way suffered, incurred, or paid by Bank, its officers, employees and agents as a result of or in any way arising out of, following, or consequential to transactions between Bank and Borrower whether under this Agreement, or otherwise (including without limitation reasonable attorney's fees and expenses), except for losses caused by Bank's or any of its officers' employees', or agents' gross negligence, willful misconduct, recklessness, or fraud. For the avoidance of doubt, the foregoing indemnity shall exclude Bank's direct credit losses on credit facilities between Borrower and Bank; provided that such exclusion shall in no way diminish Bank's rights of repayment or any other rights established elsewhere in this Agreement.

TheRealReal, Inc. LSA                                    20

**12.3 Time of Essence**. Time is of the essence for the performance of all obligations set forth in this Agreement.

**12.4 Severability of Provisions**. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

**12.5 Amendments in Writing, Integration**. All amendments to or terminations of this Agreement or the other Loan Documents must be in writing. All prior agreements, understandings, representations, warranties, and negotiations between the parties hereto with respect to the subject matter of this Agreement and the other Loan Documents, if any, are merged into this Agreement and the Loan Documents. The phrase "upon the occurrence and during the continuance" of an event or condition and similar phrases shall mean the time period commencing upon the occurrence of the relevant event or condition and continuing only for so long as the event or condition continues to occur without interruption.

**12.6 Counterparts**. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Executed copies of the signature pages of this Agreement sent by facsimile or transmitted electronically in Portable Document Format ("PDF"), or any similar format, shall be treated as originals, fully binding and with full legal force and effect, and the parties waive any rights they may have to object to such treatment.

**12.7 Survival**. All covenants, representations and warranties made in this Agreement shall continue in full force and effect so long as any Obligations (other than Surviving Obligations) remain outstanding or Bank has any obligation to make any Term Loan to Borrower. The obligations of Borrower to indemnify Bank with respect to the expenses, damages, losses, costs and liabilities described in Section 12.2 shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Bank have run.

**12.8 Confidentiality**. In handling any confidential information, Bank and Borrower and all employees and agents of such party shall exercise the same degree of care that such party exercises with respect to its own proprietary information of the same types (but not less than a reasonable standard of care) to maintain the confidentiality of any non-public information thereby received or received pursuant to this Agreement except that disclosure of such information may be made on a need to know basis (i) in the case of Bank, to the subsidiaries or Affiliates of Bank in connection with their present or prospective business relations with Borrower, (ii) in the case of Bank, to prospective transferees or purchasers of any interest in the Credit Extensions, provided that they have entered into a comparable confidentiality agreement in favor of Borrower and have delivered a copy to Borrower, (iii) as required by law, regulations, rule or order, subpoena, judicial order or similar order, (iv) in the case of Bank, as may be necessary in

TheRealReal, Inc. LSA                                                    21

connection with the examination, audit or similar investigation of Bank, and (v) as may be necessary in connection with the enforcement of any remedies hereunder. Confidential information hereunder shall not include information that either: (a) is in the public domain or in the knowledge or possession of the receiving party when disclosed to such party, or becomes part of the public domain after disclosure to such receiving party through no fault of such receiving party; or (b) is disclosed to such receiving party by a third party, provided such receiving party does not have actual knowledge that such third party is prohibited from disclosing such information.

* * * * * * * *

TheRealReal, Inc. LSA                                                                22

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

THEREALREAL, INC.

By:   /s/ Matt Gustke
Name:  Matt Gustke
Title:   Chief Financial Officer

SQUARE I BANK

By:   /s/ Zack Robbins
Name:  Zack Robbins
Title:   AVP

TheRealReal, Inc. LSA          23

**EXHIBIT A**

DEFINITIONS

"Accounts" means all presently existing and hereafter arising accounts, contract rights, payment intangibles and all other forms of obligations owing to Borrower arising out of the sale or lease of goods (including, without limitation, the licensing of software and other technology) or the rendering of services by Borrower and any and all credit insurance, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by Borrower and Borrower's Books relating to any of the foregoing.

"Affiliate" means, with respect to any Person, any Person that owns or controls directly or indirectly such Person, any Person that controls or is controlled by or is under common control with such Person, and each of such Person's senior executive officers, directors, and general partners.

"Authorized Officer" means someone designated as such in the corporate resolution provided by Borrower to Bank in which this Agreement and the transactions contemplated hereunder are authorized by Borrower's board of directors. If Borrower provides subsequent corporate resolutions to Bank after the Closing Date, the individual(s) designated as "Authorized Officer(s)" in the most recently provided resolution shall be the only "Authorized Officers" for purposes of this Agreement.

"Availability End Date" means September 19, 2014.

"Bank Expenses" means all reasonable costs or expenses (including reasonable attorneys' fees and expenses) incurred in connection with the preparation, negotiation, administration, and enforcement of the Loan Documents; reasonable Collateral audit fees; and Bank's reasonable attorneys' fees and expenses (whether generated in-house or by outside counsel) incurred in amending, enforcing or defending the Loan Documents (including fees and expenses of appeal), incurred before, during and after an Insolvency Proceeding, whether or not suit is brought.

"Borrower's Books" means all of Borrower's books and records including: ledgers; records concerning Borrower's assets or liabilities, the Collateral, business operations or financial condition; and all computer programs, or tape files, and the equipment, containing such information.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks in the State of North Carolina are authorized or required to close.

"Cash" means unrestricted cash and cash equivalents.

"Change in Control" means a transaction other than a bona fide equity financing or series of financings on terms and from investors reasonably acceptable to Bank in which any "person" or "group" (within the meaning of Section 13(d) and 14(d)(2) of the Securities Exchange Act of 1934) becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934), directly or indirectly, of a sufficient number of shares of all classes of stock then outstanding of Borrower ordinarily entitled to vote in the election of directors, empowering such "person" or "group" to elect a majority of the Board of Directors of Borrower, who did not have such power before such transaction.

TheRealReal, Inc. LSA                                                        1

"Closing Date" means the date of this Agreement.

"Code" means the California Uniform Commercial Code as amended or supplemented from time to time.

"Collateral" means the property described on Exhibit B attached hereto, except to the extent any such property (i) is non-assignable by its terms without the consent of the licensor thereof or another party (but only to the extent such prohibition on transfer is enforceable under applicable law, including, without limitation, §9406 and §9408 of the Code), (ii) is property for which the granting of a security interest therein is contrary to applicable law, provided that upon the cessation of any such restriction or prohibition. such property shall automatically become part of the Collateral, t iii) constitutes the capital stock or a controlled foreign corporation (as defined in the lRC), in excess of 65% of the voting power of all classes of capital stock of such controlled foreign corporations entitled to vote, or (iv) is property (including any attachments, accessions or replacements) that is subject to a Lien that is permitted pursuant to clause (c) of the definition of Permitted Liens, if the grant of a security interest with respect to such property pursuant to this Agreement would be prohibited by the agreement creating such Permitted Lien or would otherwise constitute a default thereunder, provided, that such property will be deemed "Collateral" hereunder upon the termination and release of such Permitted Lien,

"Collateral State" means the state or states where the Collateral (other than movable items of personal property such as laptop computers) is located, which at the Closing Date are California and New York.

"Contingent Obligation" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to (i) any indebtedness, lease, dividend, letter or credit or other obligation of another, including, without limitation, any such obligation directly or indirectly guaranteed, endorsed. co-made or discounted or sold with recourse by that Person, or in respect of which that Person is otherwise directly or indirectly liable; (ii) any obligations with respect to undrawn letters of credit, corporate credit cards or merchant services issued for the account of that Person; and (iii) all obligations arising under any interest rate, currency or commodity swap agreement, interest rate cap agreement, interest rate collar agreement, or other agreement or arrangement designated to protect a Person against fluctuation in interest rates, currency exchange rates or commodity prices; provided, however, that the term "Contingent Obligation" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determined amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith; provided, however, that such amount shall not in any event exceed the maximum amount of the obligations under the guarantee or other support arrangement.

"Copyrights" means any and all copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof, whether published or unpublished and whether or not the same also constitutes a trade secret, now or hereafter existing, created, acquired or held.

TheRealReal, Inc. LSA                                    2

"Credit Extension" means each Term Loan, or any other extension of credit, by Bank to or for the benefit of Borrower hereunder.

"Designated First Republic Bank Account" means count number [***] maintained with First Republic Bank.

"Equipment" means all present and future machinery, equipment, tenant improvements, furniture, fixtures, vehicles, tools, parts and attachments in which Borrower has any interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"Event of Default" has the meaning assigned in Article 8.

"GAAP" means generally accepted accounting principles, consistently applied, as in effect from time to time in the United States.

"Indebtedness" means (a) all indebtedness for borrowed money or the deferred purchase price of property or services, including without limitation reimbursement and other obligations with respect to surety bonds and letters of credit, (b) all obligations evidenced by notes, bonds, debentures or similar instruments, (c) all capital lease obligations, and (d) all Contingent Obligations, including but not limited to any sublimit contained herein.

"Insolvency Proceeding" means any proceeding commenced by or against any Person or entity under any provision of the United States Bankruptcy Code, as amended, or under any other bankruptcy or insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions, extension generally with its creditors, or proceedings seeking reorganization, arrangement, or other relief.

"Inventory" means all present and future inventory in which Borrower has any ownership interest. For the avoidance of doubt, in no event shall the term Inventory include any items consigned to Borrower for the purpose of sale, but which is not the personal property of Borrower.

"Investment" means any beneficial ownership of (including stock, partnership or limited liability company interest or other securities) any Person, or any loan, advance or capital contribution to any Person.

"Investment Agreement" means, collectively, Borrower's stock purchase and other agreement(s) pursuant to which Borrower most recently issued its preferred stock.

"IRC" means the Internal Revenue Code of 1986, as amended, and the regulations thereunder.

"Letter of Credit" means a commercial or standby letter of credit or similar undertaking issued by Bank at Borrower's request.

TheRealReal, Inc. LSA                                    3

"Lien" means any mortgage, lien, deed of trust, charge, pledge, security interest or other encumbrance.

"Loan Documents" means, collectively, this Agreement, any note or notes executed by Borrower, and any other document, instrument or agreement entered into in connection with this Agreement, all as amended or extended from time to time.

"Material Adverse Effect" means a material adverse effect on: (i) the operations, business or financial condition of Borrower and its Subsidiaries taken as a whole; (ii) the ability of Borrower to repay the Obligations or otherwise perform its obligations under the Loan Documents; or (iii) Borrower's interest in, or the value, perfection or priority of Bank's security interest in the Collateral.

"Net Revenue" means net revenue recognized in accordance with GAAP.

"Obligations" means all debt, principal, interest, Bank Expenses and other amounts owed to Bank by Borrower pursuant to this Agreement or any other agreement, whether absolute or contingent, due or to become due, now existing or hereafter arising, including any interest that accrues after the commencement of an Insolvency Proceeding and including any debt, liability, or obligation owing from Borrower to others that Bank may have obtained by assignment or otherwise.

"Patents" means all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"Periodic Payments" means all installments or similar recurring payments that Borrower may now or hereafter become obligated to pay to Bank pursuant to the terms and provisions of any instrument, or agreement now or hereafter in existence between Borrower and Bank.

"Permitted Indebtedness" means:

(a) Indebtedness of Borrower in favor of Bank;

(b) Indebtedness existing on the Closing Date and disclosed in the Schedule;

(c) Indebtedness (such as capitalized leases and purchase money Indebtedness) secured by a lien described in clause (c) of the defined term "Permitted Liens" not to exceed $[***] in the aggregate in any fiscal year of Borrower, provided such Indebtedness does not exceed at the time it is incurred the lesser of the cost or fair market value of the property financed with such Indebtedness;

(d) Indebtedness of up to $[***] in the aggregate outstanding at any time under real property leases for distribution facilities;

(e) Subordinated Debt;

(f) Indebtedness to trade creditors incurred in the ordinary course of business;

TheRealReal, Inc. LSA                                                    4

**(g)** Indebtedness incurred as a result of endorsing negotiable instruments received in the ordinary course of business or in connection with the processing of customer payments in the ordinary course of business;

**(h)** Other, unsecured Indebtedness not otherwise permitted by Section 7.4 not exceeding $[***] in the aggregate outstanding at any time; and

**(i)** Extensions, refinancings and renewals of any items of Permitted Indebtedness, provided that the principal amount is not increased or the terms modified to impose more burdensome terms upon Borrower or its Subsidiary, as the case may be.

"Permitted Investment" means:

**(a)** Investments existing on the Closing Date disclosed in the Schedule;

**(b)** (i) Marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency or any State thereof maturing within one year from the date of acquisition thereof, (ii) commercial paper maturing no more than one year from the date of creation thereof and currently having rating of at least A-2 or P-2 from either Standard & Poor's Corporation or Moody's Investors Service, (iii) Bank's certificates of deposit maturing no more than one year from the date of investment therein, (iv) Bank's money market accounts, (v) Investments in regular deposit or checking accounts held with Bank or subject to a control agreement in favor of Bank, and (vi) Investments consistent with any investment policy adopted by Borrower's board of directors;

**(c)** Repurchases of stock from former employees, consultants, advisors, or directors of Borrower under the terms of applicable repurchase agreements (i) in an aggregate amount not to exceed $[***] in any fiscal year, provided that no Event of Default has occurred, is continuing or would exist after giving effect to the repurchases, or (ii) in any amount where the consideration for the repurchase is the cancellation of indebtedness owed by such former employees to Borrower regardless of whether an Event of Default exists;

**(d)** Investments accepted in connection with Permitted Transfers;

**(e)** Investments of Subsidiaries in or to other Subsidiaries or Borrower and Investments by Borrower in Subsidiaries not to exceed $[***] in the aggregate in any fiscal year;

**(f)** Investments not to exceed $[***] outstanding in the aggregate at any time consisting of (i) travel advances and employee relocation loans and other employee loans and advances in the ordinary course of business, and (ii) loans to employees, officers or directors relating to the purchase of equity securities of Borrower or its Subsidiaries pursuant to employee stock purchase plan agreements approved by Borrower's board of directors;

**(g)** Investments in unfinanced capital expenditures in any fiscal year, not to exceed $[***];

TheRealReal, Inc. LSA                                                                                          5

**(h)** Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of Borrower's business;

**(i)** Investments consisting of notes receivable of, or prepaid royalties and other credit extensions, to customers and suppliers who are not Affiliates, in the ordinary course of business, provided that this subparagraph (i) shall not apply to Investments of Borrower in any Subsidiary;

**(j)** Joint ventures or strategic alliances in the ordinary course of Borrower's business consisting of the non-exclusive licensing of technology, the development of technology or the providing of technical support, provided that any cash Investments by Borrower do not exceed $[***] in the aggregate in any fiscal year; and

**(k)** Investments permitted under Section 7.3.

"Permitted Liens" means the following:

**(a)** (i) Any Liens existing on the Closing Date and disclosed in the Schedule (excluding Liens to be satisfied with the proceeds of the Credit Extensions), (ii) any Liens arising under this Agreement, the other Loan Documents, or any other agreement in favor of Bank, and (iii) any Liens in favor of Bank or its Affiliates;

**(b)** Liens for taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings and for which Borrower maintains adequate reserves;

**(c)** Liens not to exceed $[***] in the aggregate in any fiscal year of Borrower (i) upon or in any Equipment (other than Equipment financed by a Credit Extension) acquired or held by Borrower or any of its Subsidiaries to secure the purchase price of such Equipment or indebtedness incurred solely for the purpose of financing the acquisition or lease of such Equipment, or (ii) existing on such Equipment at the time of its acquisition, in each case provided that the Lien is confined solely to the property so acquired and improvements thereon, and the proceeds of such Equipment;

**(d)** Liens arising from Permitted Transfers;

**(e)** Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clauses (a) through (e) above and (0 and (g) below, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the indebtedness being extended, renewed or refinanced does not increase;

**(f)** Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Sections 8.4 (attachment) or 8.7 (judgments);

**(g)** Liens securing Subordinated Debt; and

TheRealReal, Inc. LSA                                              6

**(h)** Liens to secure payment of workers' compensation, employment insurance, old-age pensions, social security and other like obligations incurred in the ordinary course of business (other than Liens imposed by ERISA).

"Permitted Transfer" means Transfers permitted under Article 7 (other than Section 7.1) and the Transfer by Borrower or any Subsidiary of:

**(a)** Inventory in the ordinary course of business;

**(b)** licenses and similar arrangements for the use of the property of Borrower or its Subsidiaries in the ordinary course of business;

**(c)** worn-out, surplus or obsolete Equipment;

**(d)** grants of security interests and other Liens that constitute Permitted Liens; and

**(e)** other assets of Borrower or its Subsidiaries that do not in the aggregate exceed $[***] during any fiscal year.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or governmental agency.

"Prime Rate" means the variable rate of interest, per annum, most recently announced by Bank, as its "prime rate," whether or not such announced rate is the lowest rate available from Bank.

"Responsible Officer" means each of the Chief Executive Officer, the Chief Operating Officer, the Chief Financial Officer, Vice President of Finance and the Controller of Borrower, as well as any other officer or employee identified as an Authorized Officer in the corporate resolution delivered by Borrower to Bank in connection with this Agreement.

"Schedule" means the schedule of exceptions attached hereto as Exhibit E.

"SOS Reports" means the official reports from the Secretaries of State of each Collateral State, the state where Borrower's chief executive office is located, the state of Borrower's formation and other applicable federal, state or local government offices identifying all current security interests filed in the Collateral and Liens of record as of the date of such report.

"Subordinated Debt" means any debt incurred by Borrower that is subordinated in writing to the debt owing by Borrower to Bank on terms reasonably acceptable to Bank (and identified as being such by Borrower and s Bank).

"Subsidiary" means any corporation, partnership or limited liability company or joint venture in which (i) any general partnership interest or (ii) more than 50% of the stock, limited liability company interest or joint venture of which by the terms thereof ordinary voting power to elect the Board of Directors, managers or trustees of the entity, at the time as of which any determination is being made, is owned by Borrower, either directly or through an Affiliate (excluding circumstances where Borrower's deemed ownership exists solely as a result of a venture capital investor, officer or director of Borrower holding such voting power).

TheRealReal, Inc. LSA                                                    7

"Surviving Obligations" means Obligations that are inchoate indemnity obligations, obligations under warrants issued by Borrower to Bank, and obligations that have been cash-collateralized in a manner reasonably satisfactory to Bank.

"Term Loan Maturity Date" means March 19, 2017.

"Trademarks" means any trademark and service mark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of Borrower connected with and symbolized by such trademarks.

TheRealReal, Inc. LSA                                                         8

**DEBTOR:**          **THEREALREAL, INC.**

**SECURED PARTY:**          **SQUARE 1 BANK**

**EXHIBIT B**

**COLLATERAL DESCRIPTION ATTACHMENT TO LOAN AND SECURITY
AGREEMENT**

All personal property of Borrower (herein referred to as "Borrower" or "Debtor") whether presently existing or hereafter created or acquired, and wherever located, including, but not limited to:

    **(a)** all accounts (including health-care-insurance receivables), chattel paper (including tangible and electronic chattel paper), deposit accounts, documents (including negotiable documents), drafts, equipment (including all accessions and additions thereto), financial assets, general intangibles (including patents, trademarks, copyrights, goodwill, payment intangibles, domain names, and software), goods (including fixtures), instruments (including promissory notes), inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), investment property (including securities and securities entitlements), letter of credit rights and letters of credit of which Debtor is a beneficiary, money, and all of Debtor's books and records with respect to any of the foregoing, and the computers and equipment containing said books and records; and

    **(b)** any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment.

All terms above have the meanings given to them in the California Uniform Commercial Code, as amended or supplemented from time to time, including revised Division 9 of the Uniform Commercial Code-Secured Transactions.

Notwithstanding the foregoing, the Collateral shall not include any items consigned to Debtor for the purpose of sale, including, without limitation, all consumer goods.

Notwithstanding the foregoing, the Collateral shall not include any of the intellectual property, in any medium, of any kind or nature whatsoever, now or hereafter owned or acquired or received by Borrower, or in which Borrower now holds or hereafter acquires or receives any right or interest (collectively, the "Intellectual Property"); provided, however, that the Collateral shall include all accounts and general intangibles that consist of rights to payment and proceeds from the sale, licensing or disposition of all or any part, or rights in, the foregoing (the "Rights to Payment").

Notwithstanding the foregoing, if a judicial authority (including a U.S. Bankruptcy Court) holds that a security interest in the underlying Intellectual Property is necessary to have a security interest in the Rights to Payment, then the Collateral shall automatically, and effective as of September 19, 2013, include the Intellectual Property to the extent and only to the extent necessary to permit perfection of Bank's security interest in the Rights to Payment, and further provided, however, that Bank's enforcement rights with respect to any security interest in the Intellectual Property shall be absolutely limited to the Rights to Payment only, and Bank shall have no recourse whatsoever with respect to the underlying Intellectual Property.

TheRealReal, Inc. LSA                                                  1

**EXHIBIT C**

**LOAN ADVANCE/PAYDOWN REQUEST FORM**

*Please refer to New Borrower Kit*

**EXHIBIT D**

**COMPLIANCE CERTIFICATE**

*Please refer to New Borrower Kit*

TheRealReal, Inc. LSA                                                    1

**EXHIBIT E**

**SCHEDULE OF EXCEPTIONS**

**(See attached)**

TheRealReal, Inc. LSA                                                     1

**Exhibit 10.4**

**\*Portions of this exhibit have been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.**

**FIRST AMENDMENT
TO
LOAN AND SECURITY AGREEMENT**

This First Amendment to Loan and Security Agreement (this "Amendment") is entered into as of March 13, 2014 by and between SQUARE 1 BANK ("Bank") and THE REALREAL, INC. ("Borrower").

**RECITALS**

Borrower and Bank are parties to that certain Loan and Security Agreement dated as of September 19, 2013, as may be amended from time to time (the "Agreement"). The parties desire to amend the Agreement in accordance with the terms of this Amendment.

NOW, THEREFORE, the parties agree as follows:

1. Borrower has informed Bank that as of October 2, 2013, the Borrower identified herein has changed its name from TheRealReal, Inc. to The RealReal, Inc. Bank and Borrower agree that the Agreement is hereby amended wherever necessary to reflect this change.

2. A new Section 2.1(c) is hereby added to the Agreement, as follows:

    **(c) Term Loan B**.

        (i) Subject to and upon the terms and conditions of this Agreement, Borrower may request, and hereby requests, that Bank make one (1) term loan to Borrower in an aggregate principal amount of One Million Dollars ($1,000,000) ("Term Loan B," and together with each Term Loan, the ('Term Loans") on or about the First Amendment Effective Date. The proceeds of Term Loan B shall be used to cash secure any Letters of Credit issued by Bank at Borrower's request and for general corporate purposes.

        (ii) Interest shall accrue from the date of the Term Loan B at the rate specified in Section 2.3(a), and prior to the Interest Only End Date shall be payable monthly beginning on the 13th day of the month next following such Term Loan B, and continuing on the same day of each month thereafter. Any Term Loan B that is outstanding on the Interest Only End Date shall be payable in equal monthly installments of principal, plus all accrued interest, beginning on the date that is one month immediately following the Interest Only End Date, and continuing on the same day of each month thereafter through the Term Loan B Maturity Date, at which time all amounts due in connection with the Term Loan B and any other amounts due under this Agreement shall be immediately due and payable. Term Loan B, once repaid, may not be reborrowed. Borrower may prepay Term Loan B, without penalty or premium.

3. Section 6.2(a)(iii) of the Agreement is hereby amended and restated, as follows:

(iii) <u>Annual Budget</u>. An annual budget (which shall include a forecast of Net Revenues for each calendar quarter for such year) approved by Borrower's Board of Directors as soon as available, but not later than February 15th of each year during the term of this Agreement;

4. Section 6.7(a) of the Agreement is hereby amended and restated, as follows:

(a) **Minimum Net Revenue**. Borrower's quarterly Net Revenue, measured as of the last day of each calendar quarter on a non-cumulative basis, shall be not less than the levels set forth in the table immediately below. Bank and Borrower hereby agree that, on or before February 15 of each year during the term of this Agreement, Borrower shall provide Bank with a board-approved budget for such year containing a forecast of Net Revenues for each calendar quarter during such year, and, unless such budget is unsatisfactory to Bank, the minimum quarterly Net Revenue for a particular quarter during such year shall be [***]% of the forecasted Net Revenue for such quarter. If such budget is unsatisfactory to Bank, then Bank and Borrower agree to discuss alternate levels. It shall be a violation by Borrower of this Section 6.7(a) if, following a reasonable period of discussion, Bank and Borrower fail to agree to minimum quarterly Net Revenue covenant levels for such year. Both parties shall act in a commercially reasonable manner in the process of establishing and discussing the setting of covenant levels. Once agreed, the minimum quarterly Net Revenue levels shall be incorporated into this Agreement through an amendment, which Bank and Borrower agree to execute promptly.

| Reporting Period | Minimum Net Revenue | |
|---|---|---|
| March 31, 2014 | $ | [***] |
| June 30, 2014 | $ | [***] |
| September 30, 2014 | $ | [***] |
| December 31, 2014 | $ | [***] |

5. The following defined terms are hereby added to Exhibit A to the Agreement, as follows:

"Interest Only End Date" means September 13, 2014. Notwithstanding the foregoing, if Borrower remains in compliance with the Net Revenue covenant set forth in Section 6.7(a) of this Agreement at all times from the First Amendment Effective Date through September 13, 2014, then the term "Interest Only End Date" shall instead mean March 13, 2015.

"First Amendment Effective Date" means March 13, 2014.

"Term Loan B Maturity Date" means March 13, 2017.

6. Unless otherwise defined herein, all initially capitalized terms in this Amendment shall have the meaning set forth in the Agreement. The Agreement, as amended hereby, shall be and remain in full force and effect in accordance with its respective terms and hereby is ratified and confirmed in all respects. Except as expressly set forth herein, the execution, delivery, and performance of this Amendment shall not operate as a waiver of, or as an amendment of, any right, power, or remedy of Bank under the Agreement, as in effect prior to the date hereof.

2

7. Borrower represents and warrants that the representations and warranties contained in the Agreement are true and correct as of the date of this Amendment (except to the extent such representations and warranties relate to an earlier date, in which case they are true and correct as of such date).

8. This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.

9. As a condition to the effectiveness of this Amendment, Bank shall have received, in form and substance satisfactory to Bank, the following:

    (a)    this Amendment, duly executed by Borrower;

    (b)    a Second Warrant to Purchase Stock, duly executed by Borrower;

    (c)    an officer's certificate of Borrower with respect to incumbency and resolutions authorizing the execution and delivery of this Amendment;

    (d)    a pledge and security agreement, in form and substance satisfactory to Bank, duly executed by Borrower;

    (e)    a securities account control agreement, in form and substance satisfactory to Bank, duly executed by Borrower;

    (f)    a Loan Advance/Paydown request form, duly executed by an Authorized Officer, pursuant to which Borrower shall request that Bank make the Term Loan B;

    (g)    payment of a $[***] facility fee, which may be debited from any of Borrower's accounts;

    (h)    payment of all Bank Expenses, including Bank's expenses for the documentation of this Amendment and any related documents, and any UCC, good standing or intellectual property search or filing fees, which may be debited from any of Borrower's accounts; and

    (i)    such other documents, and completion of such other matters, as Bank may reasonably deem necessary or appropriate.

***Signature Page Follows***

3

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the first date above written.

**THE REALREAL, INC.**                                    **SQUARE 1 BANK**

By:    /s/ Matt Gustke                                    By:    /s/ Patrick Cahill
Name  Matt Gustke                                         Name:  Patrick Cahill
Title   CFO                                               Title:   VP

*Signature Page to First Amendment to Loan and Security Agreement*

**Exhibit 10.5**

**\*Portions of this exhibit have been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.**

**SECOND AMENDMENT
TO
LOAN AND SECURITY AGREEMENT**

This Second Amendment to Loan and Security Agreement (the "***Amendment***"), is made and entered into as of August 5, 2014 by and between SQUARE I BANK ("***Bank***") and THE REALREAL, INC. ("***Borrower***").

**RECITALS**

Borrower and Bank are parties to that certain Loan and Security Agreement dated as of September 19, 2013, as may be amended from time to time (the "***Agreement***"). The parties desire to amend the Agreement in accordance with the terms of this Amendment.

NOW, THEREFORE, the parties agree as follows:

1.      As of the date hereof, Borrower has not yet delivered its audited consolidated and consolidating fiscal year-end financial statements for the 2013 fiscal year (the "***2013 Financials***") to Bank as required pursuant to Section 6.2(a)(ii) of the Agreement, resulting in a violation of the Agreement (the "***2013 Financials Violations***"). Bank hereby: (i) waives the 2013 Financials Violation; and (ii) extends the due date for Borrower to provide Bank the 2013 Financials until September 1, 2014.

2.      Bank hereby waives Borrower's violation of Section 6.2(b) of the Agreement (as in effect immediately prior to the date of this Amendment), for failing to deliver to Bank a report of Borrower's accounts receivable and accounts payable as required therein.

3.      Section 6.2(b) of the Agreement is hereby amended and restated, as follows:

   (b) <u>Compliance Certificate; AIR and A/P Agings Report.</u> Within [\*\*\*] after the last day of each month, Borrower shall deliver to Bank with the monthly financial statements a Compliance Certificate certified as of the last day of the applicable month and signed by a Responsible Officer in substantially the form of Exhibit D hereto. Notwithstanding the foregoing, upon demand or request by Bank, Borrower shall deliver a report of Borrower's aged listings by invoice date of accounts receivable and accounts payable, in form and substance satisfactory to Bank.

4.      Unless otherwise defined herein, all initially capitalized terms in this Amendment shall have the meaning set forth in the Agreement. The Agreement, as amended hereby, shall be and remain in full force and effect in accordance with its respective terms and hereby is ratified and confirmed in all respects. Except as expressly set forth herein, the execution, delivery, and performance of this Amendment shall not operate as a waiver of, or as an amendment of, any right, power, or remedy of Bank under the Agreement, as in effect prior to the date hereof.

5.  Borrower represents and warrants that the representations and warranties contained in e representations and warranties relate to an earlier date, in which case they are true and correct as of such date.

6.  This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.

7.  As a condition to the effectiveness of this Amendment, Bank shall have received, in form and substance satisfactory to Bank, the following:

    (a)  this Amendment, duly executed by Borrower;

    (b)  payment of all Bank Expenses, including Bank's expenses for the documentation of this Amendment and any related documents, and any UCC, good standing or intellectual property search or filing fees, which may be debited from any of Borrower's accounts; and

    (c)  such other documents, and completion of such other matters, as Bank may reasonably deem necessary or appropriate.

***Signature Page Follows***

2

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the first date above written.

**THE REALREAL, INC.**                                        **SQUARE 1 BANK**

By:    /s/ Matt Gustke                                        By:    /s/ Tim McDonough
Name:  Matt Gustke                                            Name:  Tim McDonough
Title: CFO                                                    Title: Vice President

*Signature Page to Second Amendment to Loan and Security Agreement*

**Exhibit 10.6**

*Portions of this exhibit have been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.

**THIRD AMENDMENT
TO
LOAN AND SECURITY AGREEMENT**

This Third Amendment to Loan and Security Agreement (the "*Amendment*"*)* is made and entered into as of September 25, 2014 by and between SQUARE I BANK *("Bank")* and THE REALREAL, INC. *("Borrower")*.

## RECITALS

Borrower and Bank are parties to that certain Loan and Security Agreement, dated as of September 19, 2013 (the "*Agreement*"). The parties desire to amend the Agreement in accordance with the terms of this Amendment.

NOW, THEREFORE, the parties agree as follows:

1) Bank and Borrower hereby agree that, effective as of the date of this Amendment, any cash secured credit cards issued by Bank for the benefit of Borrower shall be transferred to the Credit Card Services Non-Formula Revolving Line (as set forth in Section 2.l(d) of the Agreement as in effect immediately following the date of this Amendment).

2) As of the date hereof, Borrower has not yet delivered its audited consolidated and consolidating fiscal year-end financial statements for the 2013 fiscal year (the "*2013 Audited Financials*") to Bank as required pursuant to Section 6.2(a)(ii) of the Agreement, resulting in a violation of the Agreement (the "*2013 Financials Violation*"). In the Second Amendment to the Agreement, Bank extended the due date for Borrower to provide the 2013 Audited Financials to September 1, 2014. Bank hereby: (i) waives the 2013 Financials Violation; and (ii) further extends the due date for Borrower to provide Bank the 2013 Audited Financials until November I, 2014.

3) Section 2.1(b)(ii) of the Agreement is hereby amended and restated, as follows:

   **(ii)** Interest shall accrue from the date of each Term Loan at the rate specified in Section 2.3(a), and prior to the Interest Only End Date for the applicable Term Loan shall be payable monthly beginning on the 13th day of the month next following such Term Loan, and continuing on the same day of each month thereafter. Any Term Loans that are outstanding on the Interest Only End Date shall be payable in equal monthly installments of principal, plus all accrued interest, beginning on the date that is one month immediately following the Interest Only End Date, and continuing on the same day of each month thereafter through the Term Loan Maturity Date, at which time all amounts due in connection with the Term Loans and any other amounts due under this Agreement shall be immediately due and payable. Term Loans, once repaid, may not be reborrowed. Borrower may prepay any Term Loan without penalty or premium.

4)      A new Section 2.1(d) is hereby added to the Agreement, as follows:

(d) **Usage of Credit Card Services Under the Credit Card Services Non-Formula Revolving Line**.

(i) **Usage Period**. Subject to and upon the terms and conditions of this Agreement, at any time from the Third Amendment Effective Date through the Credit Card Services Non-Formula Revolving Maturity Date, Borrower may use Credit Card Services (as defined below).

(ii) **Credit Card Services**. Subject to and upon the terms and conditions of this Agreement, Borrower may request corporate credit card services (collectively, the "Credit Card Services") from Bank. The aggregate amount of Credit Card Services outstanding at any time shall not exceed the Credit Card Services Non-Formula Revolving Line. The terms and conditions (including repayment and fees) of such Credit Card Services shall be subject to the terms and conditions of the Bank's standard forms of applications and agreements for the Credit Card Service provided, each of which Borrower hereby agrees to execute.

(iii) **Collateralization of Obligations Extending Beyond Maturity**. If Borrower has not cash secured its obligations with respect to any Credit Card Services by the Credit Card Services Non-Formula Revolving Maturity Date, then, effective as of such date, the balance in any deposit accounts held by Bank and the certificates of deposit or time deposit accounts issued by Bank in Borrower's name (and any interest paid thereon or proceeds thereof, including any amounts payable upon the maturity or liquidation of such certificates or accounts), shall automatically secure such obligations to the extent of the then continuing or outstanding Credit Card Services. Borrower authorizes Bank to hold such balances in pledge and to decline to honor any drafts thereon or any requests by Borrower or any other Person to pay or otherwise transfer any part of such balances for so long as the applicable Credit Card Services are outstanding or continue.

5)      The following new defined terms are hereby added to Exhibit A to the Agreement, as follows:

"Credit Card Services Non-Formula Revolving Line" means a Credit Extension of up to $250,000.

"Credit Card Services Non-Formula Revolving Maturity Date" means September 25, 2015.

"Series D Financing Milestone" means Borrower's receipt, after the Third Amendment Effective Date but on or before March 31, 2015, of at least $20,000,000 in net Cash proceeds from the sale or issuance of Borrower's Series D equity securities to investors acceptable to Bank.

"Third Amendment Effective Date" means September 25, 2014.

2

6)  The following defined terms in Exhibit A to the Agreement are hereby amended and restated, as follows:

"Credit Extension" means each Term Loan, Term Loan B, Credit Card Services provided under the Credit Card Services Non-Formula Revolving Line, or any other extension of credit, by Bank to or for the benefit of Borrower hereunder.

"Interest Only End Date" means the earlier to occur of: (i) March 31, 2015, or (ii) the date upon which Borrower achieves the Series D Financing Milestone.

"Term Loan Maturity Date" means September 30, 2017.

"Term Loan B Maturity Date" means September 30, 2017.

7)  Unless otherwise defined, all initially capitalized terms in this Amendment shall be as defined in the Agreement. The Agreement, as amended hereby, shall be and remain in full force and effect in accordance with its respective terms and hereby is ratified and confirmed in all respects. Except as expressly set forth herein, the execution, delivery, and performance of this Amendment shall not operate as a waiver of, or as an amendment of, any right, power, or remedy of Bank under the Agreement, as in effect prior to the date hereof. Borrower ratifies and reaffirms the continuing effectiveness of all agreements entered into in connection with the Agreement.

8)  Borrower represents and warrants that the representations and warranties contained in the Agreement are true and correct as of the elate of this Amendment.

9)  This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.

10) As a condition to the effectiveness of this Amendment, Bank shall have received, in form and substance satisfactory to Bank, the following:

(a)  this Amendment, duly executed by Borrower;

(b)  an officer's certificate of Borrower with respect to incumbency and resolutions authorizing the execution and delivery of this Amendment;

(c)  a Third Warrant to Purchase Stock, duly executed by Borrower;

(d)  payment of a $[***] facility fee, which may be debited from any of borrower's accounts;

(e)  payment for all Bank Expenses, including Bank's expenses in the documentation of this Amendment and any related documents, and any UCC, good standing or intellectual property search or filing fees, which may be debited from any of Borrower's accounts; and

(f)  such other documents and completion of such other matters, as Bank may reasonably deem necessary or appropriate.

***Signature Page Follows***

3

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the first date above written.

**THE REALREAL, INC.**                                    **SQUARE 1 BANK**

By:   /s/ Matt Gustke                                      By:   /s/ Lan Zhu
Name:  Matt Gustke                                        Name:  Lan Zhu
Title:  CFO                                               Title:   Client Manager

*Signature Page to Third Amendment to Loan and Security Agreement*

**Exhibit 10.7**

**\*Portions of this exhibit have been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.**

FOURTH AMENDMENT
TO
LOAN AND SECURITY AGREEMENT

This Fourth Amendment to Loan and Security Agreement (the "*Amendment*") is made and entered into as of December 28, 2015 by and between PACIFIC WESTERN BANK, a California state chartered bank ("*Bank*"), and THE REALREAL. INC. ("*Borrower*").

**RECITALS**

Borrower and Bank (as successor in interest by merger to Square I Bank) are parties to that certain Loan and Security Agreement dated as of September 19, 2013 (the "*Agreement*"). The parties desire to amend the Agreement in accordance with the terms of this Amendment.

NOW, THEREFORE, the parties agree as follows:

1) Bank and Borrower hereby agree that within [\*\*\*] of the date of this Amendment Borrower shall deliver to Bank fully executed bailee agreements for each of Borrower's leased premises or locations for which Borrower maintains or stores Inventory and/or Equipment. Borrower's failure to deliver such executed bailee agreements as required pursuant to this Paragraph I shall constitute an immediate Event of Default.

2) Section 2.1(b) of the Agreement is hereby amended and restated, as follows:

   (b) Term Loan.

   (i) Subject to and upon the terms and conditions of this Agreement, Bank agrees to make one (1) or more term loans to Borrower in an aggregate principal amount not to exceed Ten Million Dollars (S10.000.000) (each a "Term Loan" and collectively the "Term Loans"). Borrower may request Term Loans at any time from the date hereof through the Availability End Date. The proceeds of the Term Loans shall be used (A) first, to refinance all outstanding Term Loans (as such term is defined immediately prior to the fourth Amendment Effective Date) (the "Term Loan Refinance Amount"), and all accrued interest thereon on or about the Fourth Amendment Effective Date, and (B) second, for general corporate purposes and working capital expenditures.

   (ii) Interest shall accrue from the date of each Term Loan at the rate specified in Section 2.3(a), and prior to the Availability End Date for the applicable Term Loan, shall be payable month beginning on the first day of the month next following such Term Loan, and continuing on the same day of each month thereafter. Any Term Loans that are outstanding on the Availability End Date shall be payable in 24 equal monthly installments of principal, plus all accrued interest, beginning on the date that is one month immediately following the Availability End Date, and continuing on the same day of each month thereafter through the Term Loan Maturity Date, at which time all amounts due in connection with the Term Loans and any other amounts due under this Agreement shall be immediately due and payable. Term Loans, once repaid, may not he reborrowed. Borrower may prepay any Term Loan without penalty or premium.

(iii) Borrower hereby requests that Bank make a Term Loan in an amount equal to the Term Loan Refinance Amount on the Fourth Amendment Effective Date or as soon as practicable thereafter. To document this request, Borrower shall notify Bank (which notice shall be irrevocable) by facsimile transmission to be received no later than 3:30 p.m. Eastern time on the day on which such Term Loan is to be made. Such notice shall be substantially in the form of Exhibit C. The notice shall he signed by an Authorized Officer. When Borrower desires to obtain any subsequent Term Loan, Borrower shall notify Bank (which notice shall be irrevocable) by facsimile transmission to be received no later than 3:30 p.m. Eastern time on the day on which such Term Loan is to be made. Such notice shall be substantially in the form of Exhibit C. The notice shall be signed by an Authorized Officer

3)    Section 2.1(c) and Section 2.1(d) of the Agreement are hereby deleted in their entirety.

4)    Section 2.3(a)(i) of the Agreement is hereby amended and restated, as follows:

(i) Term Loans. Except as set forth in Section 2.3(b), the Term Loans shall bear interest, on the outstanding daily balance thereof, at a variable annual rate equal to the greater of: (A) 1.50% above the Prime Rate then in effect, provided that such variable annual rate may not exceed 4.50%: or (B) 4.50%.

5) Section 6.7(a) of the Agreement is hereby amended and restated, as follows:

(a) **Minimum Gross Revenue**. Borrower's quarterly Gross Revenue, measured as of the last day of each calendar quarter on a non-cumulative basis, shall be not less than the levels set forth in the table immediately below. Bank and Borrower hereby agree that, on or before February 15 of each year during the term of this Agreement, Borrower shall provide Bank with a board-approved budget for such year containing a forecast of Gross Revenue for each calendar quarter during such year, and, unless such budget is unsatisfactory to Bank, the minimum quarterly Gross Revenue for a particular quarter during such year shall be 80% of the forecasted Gross Revenue for such quarter. If such budget is unsatisfactory to Bank, then Bank and Borrower agree to discuss alternate levels. It shall be a violation by Borrower or this Section 6.7(a) if, following a reasonable period of discussion, Bank and Borrower fail to agree to minimum quarterly Gross Revenue covenant levels for such year. Both parties shall act in a commercially reasonable manner in the process of establishing and discussing the setting of covenant levels. Once agreed, the minimum quarterly Gross Revenue levels shall be incorporated into this Agreement through an amendment, which Bank and Borrower agree to execute promptly.

| Reporting Period Ending | Minimum Gross Revenue |
|---|---|
| March 31, 2016 | $            [***] |
| June 30, 2016 | $            [***] |
| September 30, 2016 | $            [***] |
| December 31, 2016 | $            [***] |

2

6) The following new defined term is hereby added to Exhibit A to the Agreement, as follows:

"Fourth Amendment Effective Date" means December 28, 2015.

"Gross Revenue" means gross revenue recognized in accordance with GAAP.

7) The following defined terms in Exhibit A to the Agreement are hereby amended and restated, as follows:

"Availability End Date" means December 1, 2016.

"Credit Extension" means each Term Loan, or any other extension of credit, by Bank to or for the benefit of Borrower hereunder.

"Term Loan Maturity Date" means January 1, 2019.

8) The defined terms "Credit Card Services Non-Formula Revolving Line", "Credit Card Services Non-Formula Revolving Maturity Date", "Series D Financing Milestone" and "Interest Only End Date" and "Term Loan B Maturity Date" and their corresponding definitions set forth in Exhibit A to the Agreement are hereby deleted in their entirety.

9) Unless otherwise defined, all initially capitalized terms in this Amendment shall be as defined in the Agreement. The Agreement, as amended hereby, shall be and remain in full force and effect in accordance with its respective terms and hereby is ratified and confirmed in all respects. Except as expressly set forth herein, the execution, delivery, and performance of this Amendment shall not operate as a waiver of, or as an amendment of, any right, power, or remedy of Bank under the Agreement, as in effect prior to the date hereof. Borrower ratifies and reaffirms the continuing effectiveness of all agreements entered into in connection with the Agreement.

10) Borrower represents and warrants that the representations and warranties contained in the Agreement are true and correct as of the date of this Amendment.

11) This Amendment may be executed in two or more counterparts, each or which shall be deemed an original, but all of which together shall constitute one instrument.

12) As a condition to the effectiveness of this Amendment, Bank shall have received, in form and substance satisfactory to Bank, the following:

a) this Amendment, duly executed by Borrower:

b) an officer's certificate of Borrower with respect to incumbency and resolutions authorizing the execution and delivery or this Amendment:

c) a Fourth Warrant to Purchase Stock, duly executed by Borrower:

d) payment for all Bank Expenses, including Bank's expenses in the documentation of this Amendment and any related documents, and any UCC, good standing or intellectual property search or filing fees, which may be debited from any of Borrower's accounts: and

e) such other documents and completion of such other matters, as Bank may reasonably deem necessary or appropriate.

3

IN WITNESS WHEREOF, the undersigned have executed this Amendment as or the first date above written.

THE REALREAL, INC.

By:   /s/ Julie Wainwright

Name:  Julie Wainwright

Title:  CEO

PACIFIC WESTERN BANK

By:   /s/ Tim McDonough

Name:  Tim McDonough

Title:  VP Technology

*Signature Page to Fourth Amendment to Loan and Security Agreement*

**Exhibit 10.8**

**\*Portions of this exhibit have been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.**

**FIFTH AMENDMENT
TO
LOAN AND SECURITY AGREEMENT**

This Fifth Amendment to Loan and Security Agreement (the "*Amendment*"), is made and entered into as of July 18, 2016 by and between PACIFIC WESTERN BANK, a California state chartered bank ("*Bank*") and THE REALREAL, INC. ("*Borrower*").

**RECITALS**

Borrower and Bank are parties to that certain Loan and Security Agreement, dated as of September 19, 2013 (the *"Agreement").* The parties desire to amend the Agreement in accordance with the terms of this Amendment.

NOW, THEREFORE, the parties agree as follows:

1)    The following new Section 2.l(c) is hereby added to the Agreement, as follows:

**(c)    Usage of Credit Card Services Under the Credit Card Line.**

(i) **Usage Period**. Subject to and upon the terms and conditions of this Agreement, at any time from the Fifth Amendment Effective Date through the Credit Card Line Maturity Date, Borrower may use Credit Card Services, in amounts and upon terms as restricted in Section 2.l(c)(ii) below.

(ii) **Credit Card Services**. Subject to and upon the terms and conditions of this Agreement, Borrower may request Credit Card Services from Bank. The aggregate amount of Credit Card Services outstanding at any time shall not exceed the Credit Card Line. The terms and conditions (including repayment and fees) of such Credit Card Services shall be subject to the terms and conditions of the Bank's standard forms of applications and agreements for the Credit Card Service provided, each of which Borrower hereby agrees to execute.

(iii) **Collateralization of Obligations Extending Beyond Maturity**. If Borrower has not cash secured its obligations with respect to any Credit Card Services by the Credit Card Line Maturity Date, then, effective as of such date, the balance in any deposit accounts held by Bank and the certificates of deposit or time deposit accounts issued by Bank in Borrower's name (and any interest paid thereon or proceeds thereof, including any amounts payable upon the maturity or liquidation of such certificates or accounts), shall automatically secure such obligations to the extent of the then continuing or outstanding Credit Card Services. Borrower authorizes Bank to hold such balances in pledge and to decline to honor any drafts thereon or any requests by Borrower or any other Person to pay or otherwise transfer any part of such balances for so long as the applicable Credit Card Services are outstanding or continue.

2) Section 6.6 of the Agreement is hereby amended and restated, as follows:

**6.6 "Primary Depository"**. Subject to the provision of Section 3.2(b), Borrower shall maintain (i) all its depository and operating accounts with Bank and (ii) all its investment accounts with Bank or Bank's affiliates; provided that prior to maintaining any investment accounts with Bank's affiliates, Borrower, Bank, and any such affiliate shall have entered into a securities account control agreement with respect to any such investment accounts, in form and substance satisfactory to Bank. Notwithstanding the above, Borrower shall be permitted to maintain Cash in one or more accounts outside of Bank, without the requirement for control agreements, provided that the total aggregate amount of Cash maintained in such accounts does not exceed $[***] at any time.

3) The following defined terms are either added to, or are amended and restated in, Exhibit A to the Agreement, as follows:

"Credit Card Services" means corporate credit card services requested by Borrower and approved by Bank under the Credit Card Line.

"Credit Card Line" means a Credit Extension of up to $2,000,000.

"Credit Card Line Maturity Date" means December 31, 2017.

"Credit Extension" means each Term Loan, Credit Card Services provided under the Credit Card Line, or any other extension of credit, by Bank to or for the benefit of Borrower hereunder.

"Fifth Amendment Effective Date" means July 18, 2016.

4) Unless otherwise defined, all initially capitalized terms in this Amendment shall be as defined in the Agreement. The Agreement, as amended hereby, shall be and remain in full force and effect in accordance with its respective terms and hereby is ratified and confirmed in all respects. Except as expressly set forth herein, the execution, delivery, and performance of this Amendment shall not operate as a waiver of, or as an amendment of, any right, power, or remedy of Bank under the Agreement, as in effect prior to the date hereof. Borrower ratifies and reaffirms the continuing effectiveness of all agreements entered into in connection with the Agreement.

5) Borrower represents and warrants that the representations and warranties contained in the Agreement are true and correct as of the date of this Amendment.

6) This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.

2

7) As a condition to the effectiveness of this Amendment, Bank shall have received, in form and substance satisfactory to Bank, the following:

    (a) this Amendment, duly executed by Borrower;

    (b) an officer's certificate of Borrower with respect to incumbency and resolutions authorizing the execution and delivery of this Amendment;

    (c) payment for all Bank Expenses, including Bank's expenses in the documentation of this Amendment and any related documents, and any UCC, good standing or intellectual property search or filing fees, which may be debited from any of Borrower's accounts; and

    (d) such other documents and completion of such other matters, as Bank may reasonably deem necessary or appropriate.

***Signature Page Follows***

3

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the first date above written.

**THE REALREAL, INC.**

By:   /s/ Matt Gustke

Name:  Matt Gustke

Title:  CFO

**PACIFIC WESTERN BANK**

By:   /s/ Tim McDonough

Name:  Tim McDonough

Title:  SVP, Technology

*Signature Page to Fifth Amendment to Loan and Security Agreement*

**Exhibit 10.9**

**\*Portions of this exhibit have been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.**

## SIXTH AMENDMENT
## TO
## LOAN AND SECURITY AGREEMENT

This Sixth Amendment to Loan and Security Agreement (the "***Amendment***") is made and. entered into as of September 16, 2016 by and between PACIFIC WESTERN BANK, a California state chartered bank ("***Bank***"). and THE REALREAL, INC. ("***Borrower***").

## RECITALS

Borrower and Bank arc parties to that certain Loan and Security Agreement, dated as of September 19, 2013 (the *"Agreement").* The parties desire to amend the Agreement in accordance with the terms of this Amendment.

NOW, THEREFORE, the parties agree as follows:

1) As of the date hereof, Borrower has not yet delivered its audited consolidated and consolidating fiscal year-end financial statements for its 2015 fiscal year (the "***2015 Financials")*** to Bank as required pursuant to Section 6.2(ii) of the Agreement, resulting in a violation of the Agreement (the *"**2015 Financials Violation***"*)*. Bank hereby: (i) waives the 2015 Financials Violation; and (ii) extends the due date for Borrower to provide Bank the 2015 Financials until November 15, 2016.

2) Section 2.l(b) of the Agreement is hereby amended and restated, as follows:

**(b)    Term Loan.**

(i) Subject to and upon the terms and conditions of this Agreement, Bank agrees to make one (1) term loan to Borrower in a principal amount equal to Fifteen Million Dollars ($15,000,000) (the "***Term Loan***"), The proceeds of the Term Loan shall be used (A) first, to refinance all outstanding Term Loans (as such term is defined immediately prior to the Sixth Amendment Effective Date), and all accrued interest thereon on or about the Sixth Amendment Effective Date, and (B) second, for general corporate purposes and working capital expenditures.

(ii) Interest shall accrue from the date of the Term Loan at the rate specified in Section 2.3(a), and prior to the Interest Only End Date shall be payable monthly beginning on the first day of the month next following the Term Loan, and continuing on the same day of each month thereafter. Any portion of the Term Loan that is outstanding on the Interest Only End Date shall be payable in 30 equal monthly installments of principal, plus all accrued interest. Beginning on the date that is one month immediately following the Interest Only End Date, and continuing on the same day of each month thereafter through the Term Loan Maturity Date, at which time all amounts due in connection with the Term Loan and any other amounts due under this Agreement shall be immediately due and payable. The Term Loan, once repaid, may not be reborrowed. Borrower may prepay all or any portion of the Term Loan without penalty or premium.

(iii) Borrower hereby requests that Bank make the Term Loan on or about the Sixth Amendment Effective Date or as soon as practicable thereafter. To document this request, Borrower shall notify Bank (which notice shall be irrevocable) by facsimile transmission to be received no later than 3:30 p.m. Eastern time on the day on which the Term Loan is to be made. Such notice shall be substantially in the form or Exhibit C. The notice shall be signed by an Authorized Officer. Borrower hereby requests that Bank make the Term Loan on or about the Sixth Amendment Effective Date or as soon as practicable thereafter. To document this request, Borrower shall notify Bank (which notice shall be irrevocable) by facsimile transmission to be received no later than 3:30 p.m. Eastern time on the day on which the Term Loan is lo be made. Such notice shall be substantially in the form or Exhibit C. The notice shall be signed by an Authorized Officer.

3)      Section 6.7(a) of the Agreement is hereby amended and restated. as follows:

(a) **Minimum Gross Revenue**. Borrower's monthly Gross Revenue, measured as of the last day of each calendar month on a trailing-three-month non-cumulative basis, shall be not less than the levels set forth in the table immediately below. Bank and Borrower hereby agree that, on or before February 15 of each year during the term of this Agreement, Borrower shall provide Bank with a board-approved budget for such year containing a forecast of Gross Revenue for each calendar month during such year, and, unless such budget is unsatisfactory to Bank, the minimum monthly Gross Revenue for a particular month during such year shall be 80% of the forecasted Gross Revenue for such month. If such budget is unsatisfactory to Bank, then Bank and Borrower agree to discuss alternate levels. It shall be a violation by Borrower of this Section 6.7(a) if, following a reasonable period of discussion, Bank and Borrower fail to agree to minimum monthly Gross Revenue covenant levels for such year. Both parties shall act in a commercially reasonable manner in the process of establishing and discussing the setting or covenant levels. Once agreed, the minimum monthly Gross Revenue levels shall be incorporated into this Agreement through an amendment, which Bank and Borrower agree to execute promptly.

| Reporting Period Ending | Minimum Gross Revenue | |
|---|---|---|
| July 31, 2016 | $ | [***] |
| August 31, 2016 | $ | [***] |
| September 30, 20 I 6 | $ | [***] |
| October 31, 2016 | $ | [***] |
| November 30, 2016 | $ | [***] |
| December 31, 2016 | $ | [***] |
| January 31, 2017 | $ | [***] |
| February 28, 2017 | $ | [***] |
| March 31, 2017 | $ | [***] |
| April 30, 2017 | $ | [***] |
| May 31, 2017 | $ | [***] |
| June 30, 2017 | $ | [***] |
| July 31, 2017 | $ | [***] |
| August 31, 2017 | $ | [***] |
| September 30, 2017 | $ | [***] |
| October 31, 2017 | $ | [***] |
| November 30, 2017 | $ | [***] |
| December 31, 2017 | $ | [***] |

2

4)    Section 6.7(b) is hereby added to the Agreement as follows:

(b) **Minimum EBITDA**. Borrower's monthly EBITDA, measured as of the last day of each calendar month on a trailing-three-month non-cumulative basis shall be not less than the levels set forth in the table immediately below. Bank and Borrower hereby agree that on or before February 15 or each year during the term of this Agreement, Borrower shall provide Bank with a board-approved budget for such year containing a forecast or EBITDA for each calendar month during such year, and, unless such budget is unsatisfactory to Bank. The minimum monthly EBITDA for a particular month during such year shall be [***]% of the forecasted EB ITDA for such month. If such budget is unsatisfactory to Bank, then Bank and Borrower agree to discuss alternate levels. It shall be a violation by Borrower or this Section 6.7(a) if, following a reasonable period of discussion, Bank and Borrower fail to agree to minimum monthly EBITDA covenant levels for such year. Both parties shall act in a commercially reasonable manner in the process of establishing and discussing the setting of covenant levels. Once agreed, the minimum monthly EBITDA levels shall be incorporated into this Agreement through an amendment, which Bank and Borrower agree to execute promptly.

| Reporting Period Ending | Minimum EBITDA |
| --- | --- |
| July 31, 2016 | [***] |
| August 31, 2016 | [***] |
| September 30, 2016 | [***] |
| October 31, 2016 | [***] |
| November 30, 2016 | [***] |
| December 31, 2016 | [***] |
| January 31, 2017 | [***] |
| February 28, 2017 | [***] |
| March 31, 2017 | [***] |
| April 30, 2017 | [***] |
| May 31, 2017 | [***] |
| June 30, 2017 | [***] |
| July 31, 2017 | [***] |
| August 31, 2017 | [***] |
| September 30, 2017 | [***] |
| October 31 , 2017 | [***] |
| November 30, 2017 | [***] |
| December 31, 2017 | [***] |

3

5)   The following defined terms are either added to, or are amended and restated in, Exhibit A to the Agreement, as follows:

"EBITDA'' means, with respect to any fiscal period, an amount equal to earnings before the sum of (a) tax, plus (b) depreciation and amortization, plus (c) interest and non-Cash expenses, plus (d) any non-Cash stock compensation expenses.

"Gross Sales Milestone" means Borrower's achievement of at least $[***] from Borrower's gross sales on or prior to June 30, 2017.

''Interest Only End Date" means June 30, 2017; provided, however, if Borrower achieves the Gross Sales Milestone, then the term "Interest Only End Date" shall instead mean December 31, 2017.

"Sixth Amendment Effective Date" means September 16, 2016.

"Term Loan Maturity Date" means December 31, 2019; provided, however, if Borrower achieves the Gross Sales Milestone, then the term "Term Loan Maturity Date" shall instead mean June 30, 2020.

6)   The defined term "Availability End Date" and its corresponding definition set forth in Exhibit A to the Agreement is hereby deleted in its entirety.

7)   Unless otherwise defined, all initially capitalized terms in this Amendment shall be as defined in the Agreement. The Agreement, as amended hereby, shall be and remain in full force and effect in accordance with its respective terms and hereby is ratified and confirmed in all respects. Except as expressly set forth herein, the execution, delivery, and performance of this Amendment shall not operate as a waiver at or as an amendment of any right, power, or remedy of Bank under the Agreement, as in effect prior to the date hereof. Borrower ratifies and reaffirms the continuing effectiveness of all agreements entered into in connection with the Agreement.

8)   Borrower represents and warrants that the representations and warranties contained in the Agreement are true and correct as of the date of this Amendment.

9)   This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.

4

10)    As a condition to the effectiveness of this Amendment, Bank shall have received, in form and substance satisfactory to Bank, the following:

(a) this Amendment, duly executed by Borrower;

(b) an officer's certificate of Borrower with respect to incumbency and resolutions authorizing tlie execution and delivery of this Amendment:

(c) a Fifth Warrant to Purchase Stock, duly executed by Borrower:

(d) payment for all Bank Expenses, including Bank's expenses in the documentation of this Amendment and any related documents, and any UCC, good standing or intellectual property search or filing fees, which may be debited from any of Borrower's accounts; and

(e) such other documents and completion of such other matters, as Bank may reasonably deem necessary or appropriate.

***Signature Page Follows***

5

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the first date above written.

**THE REALREAL, INC.**                          **PACIFIC WESTERN BANK**

By:   /s/ Matt Gustke                           By:   /s/ Tim McDonough
Name: Matt Gustke                               Name: Tim McDonough
Title: CFO                                       Title: SVP, Technology

*Signature Page to Sixth Amendment to Loan and Security Agreement*

**Exhibit 10.10**

**\*Portions of this exhibit have been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.**

**SEVENTH AMENDMENT**
**TO**
**LOAN AND SECURITY AGREEMENT**

This Third Amendment to Loan and Security Agreement (the "*Amendment*"*)* is made and entered into as of March 28, 2017 by and between PACIFIC WESTERN BANK *("Bank")* and THE REALREAL, INC. *("Borrower")*.

**RECITALS**

Borrower and Bank are parties to that certain Loan and Security Agreement, dated as of September 19, 2013 (the "*Agreement*"). The parties desire to amend the Agreement in accordance with the terms of this Amendment.

NOW, THEREFORE, the parties agree as follows:

1)   Bank hereby waives Borrower's violation of the Minimum Gross Revenue covenant, as more specifically described in Section 6.7(a) of the Agreement (as such section is in effect immediately prior to the execution of this Amendment) , for the reporting period ending January 31.

2)   Bank hereby waives Borrower's violation of the Minimum EBITDA covenant, as more specifically described in Section 6.7(b) of the Agreement (as such section is in effect immediately prior to the execution of this Amendment) , for the reporting period ending January 31, 2017.

3)   Section 2.1(b)(ii) of the Agreement is hereby amended and restated, as follows:

**(ii)** Interest shall accrue from the date of the Term Loan at the rate specified in Section 2.3(a), and prior to the Interest Only End Date shall be payable monthly beginning on the first day of the month next following the Term Loan, and continuing on the same day of each month thereafter. Any portion of the Term Loan that is outstanding on the Interest Only End Date shall be payable in 36 equal monthly installments of principal, plus all accrued interest , beginning on the date that is one month immediately following the Interest Only End Date, and continuing on the same day of each month thereafter through the Term Loan Maturity Date, at which time all amounts due in connection with the Term Loan and any other amounts due under this Agreement shall be immediately due and payable. The Term Loan, once repaid, may not be reborrowed. Borrower may prepay all or any portion of the Term Loan without penalty or premium.

4)   A new Section 6.7(a) of the Agreement is hereby amended and restated, as follows:

**(a) Minimum Gross Revenue**. Borrower's monthly Gross Revenue, measured as of the last day of each calendar month on a trailing-three-month no n-cumulative basis , shall be not less than the levels set forth in the table immediately below. Bank and Borrower hereby agree that, on or before February 15 of each year during the term of this

Agreement, Borrower shall provide Bank with a board-approved budget for such year containing a forecast of Gross Revenue for each calendar month during such year, and, unless such budget is unsatisfactory to Bank, the minimum monthly Gross Revenue for a particular month during such year shall be 80% of the forecasted Gross Revenue for such month. If such budget is unsatisfactory to Bank, then Bank and Borrower agree to discuss alternate levels. It shall be a violation by Borrower of this Section 6.7(a) if, following a reasonable period of discussion, Bank and Borrower fail to agree to minimum monthly Gross Revenue covenant levels for such year. Both parties shall act in a commercially reasonable manner in the process of establishing and discussing the setting of covenant levels. Once agreed, the minimum monthly Gross Revenue levels shall be incorporated into this Agreement through an amendment, which Bank and Borrower agree to execute promptly.

| Reporting Period Endine | Minimum Gross Revenue | |
| --- | --- | --- |
| February 28, 2017 | $ | [***] |
| March 31, 2017 | $ | [***] |
| April 30, 2017 | $ | [***] |
| May 31, 2017 | $ | [***] |
| June 30, 2017 | $ | [***] |
| July 31, 2017 | $ | [***] |
| August 31, 2017 | $ | [***] |
| September 30, 2017 | $ | [***] |
| October 31, 2017 | $ | [***] |
| November 30, 2017 | $ | [***] |
| December 31, 2017 | $ | [***] |

5)    Section 6.7(b) of the Agreement is hereby amended and restated, as follows:

**(b) Term Sheet Milestone**. Borrower shall have delivered to Bank, after the Seventh Amendment Effective Date but on or before April 30, 2017, a signed and accepted term sheet for the sale or issuance of Borrower's equity securities resulting in Borrower's receipt of at least $30,000,000 in net Cash proceeds to investors acceptable to Bank (the "Term Sheet") and with such transaction underlying the Term Sheet to close by June 30, 2017 (such transaction, the "Funding Transaction" ).

6)    The following new Section 6.7(c) is hereby added to the Agreement, as follows:

**(c) Future Covenants**. Borrower hereby agrees that it shall deliver to Bank an updated board-approved budget for the remainder of Borrower's 2017 fiscal year (the "Updated 2017 Plan") on or prior to June 30, 2017. Bank and Borrower hereby further agree that following Bank's receipt of the Updated 2017 Plan, Bank may establish new financial covenants and/or restructure the financial covenants set forth in this Section 6.7 upon Bank's receipt and review of such budget. Any such new and/or restructured covenant( s) shall be added to this Agreement through an amendment on or prior to August 31, 20 17, which Borrower hereby agrees to promptly execute in accordance with the terms hereof.

2

7)  The following defined terms are either added to, or are amended and restated in, Exhibit A to the Agreement, as follows:

"Interest Only End Date" means June 30, 2017..

"Term Loan Maturity Date" means June 30, 2020

8)  The defined terms "EBITDA" and "Gross Sales Milestone" and their corresponding definition se t forth in Exhibit A to the Agreement are he re by delete d in their entirety.

9)  Unless otherwise defined, all initially capitalized terms in this Amendment shall be as defined in the Agreement. The Agreement, as amended hereby, shall be and remain in full force and effect in accordance with its respective terms and here by is ratified and confirmed in all respects. Except as expressly set forth herein, the execution, delivery , and performance of this Amendment shall not operate as a waiver of, or as an amendment of , any right, power, or remedy of Bank under the Agreement, as in effect prior to the date hereof. Borrower ratifies and reaffirms the continuing effectiveness of all agreements entered into in connection with the Agree men t.

10) Borrower represents and warrants that the representations and warranties contained in the Agreement are true and correct as of the elate of this Amendment.

11) This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.

12) As a condition to the effectiveness of this Amendment, Bank shall have received, in form and substance satisfactory to Bank, the following:

(a)  this Amendment, duly executed by Borrower;

(b)  payment for all Bank Expenses, including Bank's expenses in the documentation of this Amendment and any related documents, and any UCC, good standing or intellectual property search or filing fees, which may be debited from any of Borrower's accounts; and

(c)  such other documents and completion of such other matters, as Bank may reasonably deem necessary or appropriate.

***Signature Page Follows***

3

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the first date above written.

**THE REALREAL, INC.**                                    **PACIFIC WESTERN BANK**

By:    /s/ Matt Gustke                                    By:    /s/ Tim McDonough
Name:  Matt Gustke                                        Name:  Tim McDonough
Title: CFO                                                Title: SVP, Technology


*Signature Page to Seventh Amendment to Loan and Security Agreement*

**Exhibit 10.11**

**\*Portions of this exhibit have been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.**

**EIGHTH AMENDMENT**
**TO**
**LOAN AND SECURITY AGREEMENT**

This Eighth Amendment to Loan and Security Agreement (the "***Amendment***") is made and entered into as of July 27, 2017, by and between PACIFIC WESTERN BANK, a California state chartered bank ("***Bank***")*,* and THE REALREAL, INC. ("***Borrower***").

**RECITALS**

Borrower and Bank are parties to that certain Loan and Security Agreement, dated as of September 19, 2013 (the "***Agreement***"). The parties desire to amend the Agreement in accordance with the terms of this Amendment.

NOW, THEREFORE, the parties agree as follows:

1) Bank and Borrower hereby agree that, immediately following the execution of this Amendment, the outstanding amounts under the Term Loan (as such term is defined immediately prior to the execution of this Amendment) shall he refinanced with the proceeds (i) of the Refinance Term Loan (as such term is defined immediately following the execution of this Amendment), and (ii) of Non-Formula Advances under the Non-Formula Revolving Line (collectively, the "***Term Loan Refinancing***").

2) Pursuant to Section 6.2(a)(ii) of the Agreement, Borrower is required to deliver audited consolidated and consolidating financial statements for Borrower's 2016 fiscal year to Bank on or prior to June 30, 2017 (the "***2016 Audited Financials***"). As of the date hereof, Bank has not yet received the 2016 Audited Financials, resulting in a violation under the Agreement (the "***2016 Audited Financials Violation***"). Bank hereby (i) waives the 2016 Audited Financials Violation, and (ii) extends the due date for the 2016 Audited Financials to October 15, 2017.

3) Section 2.1(b) of the Agreement is hereby amended and restated, as follows:

    **(a)    Refinance Term Loan.**

        **(i)** Subject to and upon the terms and conditions of this Agreement, Bank agrees to make one (1) term loan to Borrower in a principal amount equal to Seven Million Five Hundred Thousand Dollars ($7,500,000) (the "Refinance Term Loan"). The proceeds of the Refinance Term Loan shall be used solely to refinance Seven Million Five Hundred Thousand Dollars ($7,500,000) in outstanding principal under the Term Loan (as such term is defined immediately prior to the Eighth Amendment Effective Date).

        **(ii)** Interest shall accrue from the date of the Refinance Term Loan at the rate specified in Section 2.3(a), and prior to the Refinance Interest Only End Date shall he payable monthly beginning on the first day of the month next following the Refinance Term Loan, and continuing on the same day of each month thereafter. Any portion of the Refinance Term Loan that is outstanding on the Refinance Interest Only End

Date shall be payable in 30 equal monthly installments of principal, plus all accrued interest, beginning on the date that is one month immediately following the Refinance Interest Only End Date, and continuing on the same day of each month thereafter through the Refinance Term Loan Maturity Date, at which time all amounts due in connection with the Refinance Term Loan and any other amounts due under this Agreement shall be immediately due and payable. The Refinance Term Loan, once repaid, may not he reborrowed. Borrower may prepay all or any portion of the Refinance Term Loan without penalty or premium.

4)    The following new Section 2.1(c) is hereby added to the Agreement, as follows:

  **(a)    Advances Under Non-Formula Revolving Line.**

     **(i) Amount**. Subject to and upon the terms and conditions of this Agreement, Borrower may request Non-Formula Advances in an aggregate outstanding principal amount not to exceed the Non-Formula Revolving Line. Amounts borrowed pursuant to this Section 2.1(c) may be repaid and reborrowed at any time prior to the Non-Formula Revolving Maturity Date, at which time all Non-Formula Advances under this Section 2.1(c) shall be immediately due and payable. Borrower may prepay any Non-Formula Advances without penalty or premium.

     **(ii) Form of Request**. Whenever Borrower desires a Non-Formula Advance, Borrower will notify Bank by facsimile transmission, telephone or email no later than 3:30 p.m. Eastern time (2:30 p.m. Eastern time for wire transfers), on the Business Day that the Non-Formula Advance is to be made. Each such notification shall be promptly confirmed by a Loan Advance/Paydown Request Form in substantially the form of Exhibit C. Bank is authorized to make Non-Formula Advances under this Agreement, based upon instructions received from an Authorized Officer, or without instructions if in Bank's discretion such Non-Formula Advances are necessary to meet Obligations which have become due and remain unpaid. Bank shall be entitled to rely on any telephonic or email notice given by a person whom Bank reasonably believes to be an Authorized Officer or a designee thereof, and Borrower shall indemnify and hold Bank harmless for any damages, loss, costs and expenses suffered by Bank as a result of such reliance. Bank will credit the amount of Non-Formula Advances made under this Section 2.1(c) to Borrower's deposit account.

5)    Section 2.2 of the Agreement is hereby amended and restated, as follows:

     **2.2 Overadvances**. If the aggregate amount of the outstanding Non-Formula Advances exceeds the Non-Formula Revolving Line at any time, Borrower shall immediately pay to Bank, in Cash, the amount of such excess.

2

6) Section 2.3(a) of the Agreement is hereby amended and restated, as follows:

**(a)**     **Interest Rates.**

**(i) Refinance Term Loan**. Except as set forth in Section 2.3(b), the Refinance Term Loan shall bear interest, on the outstanding daily balance thereof, at a variable annual rate equal to 0.10% above the Prime Rate then in effect.

**(ii) Non-Formula Advances**. Except as set forth in Section 2.3(b), the Non-Formula Advances shall bear interest, on the outstanding daily balance thereof, at a variable annual rate equal to 0.10% above the Prime Rate then in effect.

7) Section 2.3(c) of the Agreement is hereby amended and restated, as follows:

**(c) Payments**. Interest under the Non-Formula Revolving Line shall he due and payable on the first calendar day of each month during the term hereof. Bank shall charge all interest, all Bank Expenses, and all Periodic Payments against any of Borrower's deposit accounts or against the Non-Formula Revolving Line, in which case those amounts shall thereafter accrue interest at the rate then applicable hereunder. Any interest not paid when due shall be compounded by becoming a part of the Obligations, and such interest shall thereafter accrue interest at the rate then applicable hereunder.

8) The following Section 2.5(c) is hereby added to the Agreement, as follows:

**(a) Success Fee**. Upon the occurrence of a Liquidity Event, a fee equal $175,000. This Section 2.5(c) shall survive any termination of this Agreement.

9) Section 6.7 of the Agreement is hereby amended and restated, as follows:

**6.7 Financial Covenants**. Borrower shall at all times maintain the following financial ratios and covenants:

**(a) Minimum Revenue**. Measured monthly and calculated on a trailing three-month-basis, Borrower shall achieve minimum Revenue of at least the amounts shown in the table immediately below for the corresponding reporting periods. For subsequent reporting periods, Bank and Borrower hereby agree that, on or before January 15 of each year during the term of this Agreement, Borrower shall provide to Bank with a budget for the upcoming calendar year, which shall be approved by Borrower's Board of Directors, and Bank shall use that budget to establish the minimum Revenue amounts for the upcoming year, with such amounts being incorporated herein by an amendment, which Borrower hereby agrees to execute.

| Reporting Periods | Minimum Revenue | |
|---|---|---|
| July 31, 2017 | $ | [***] |
| August 31, 2017 | $ | [***] |
| September 30, 2017 | $ | [***] |
| October 31, 2017 | $ | [***] |
| November 30, 2017 | $ | [***] |
| December 31, 2017 | $ | [***] |
| January 30, 2018 | $ | [***] |
| February 28, 2018 | $ | [***] |
| March 31, 2018 | $ | [***] |

3

**(b) Liquidity Ratio**. A Liquidity Ratio of at least [***].

**(c) Future Covenants**. Bank and Borrower hereby further agree that following Bank's receipt of Borrower's 2018 fiscal year budget, which shall be approved Borrower's Board of Directors, Bank may establish new financial covenants and/or restructure the financial covenants set forth in this Section 6.7 upon Bank's receipt and review of such budget. Any such new and/or restructured covenant(s) shall he added to this Agreement through an amendment, which Borrower hereby agrees to promptly execute.

10) Section 9.4 of the Agreement is hereby amended and restated, as follows:

**9.4 Bank Expenses**. if Borrower fails to pay any amounts or furnish any required proof of payment due to third persons or entities, as required under the terms of this Agreement, then Bank may do any or all of the following after reasonable notice to Borrower: (a) make payment of the same or any part thereof; and/or (b) set up such reserves under the Non-formula Revolving Line as Bank deems necessary to protect Bank from the exposure created by such failure; (c) obtain and maintain insurance policies of the type discussed in Section 6.5 of this Agreement, and take any action with respect to such policies as Bank deems prudent. Any amounts so paid or deposited by Bank shall constitute Bank Expenses, shall be immediately due and payable, and shall bear interest at the then applicable rate hereinabove provided, and shall be secured by the Collateral. Any payments made by Bank shall not constitute an agreement by Bank to make similar payments in the future or a waiver by Bank of any Event of Default under this Agreement.

11) The following defined terms are either added to, or are amended and restated in Exhibit A to the Agreement, as follows:

"Credit Extension" means each Non-Formula Advance, the Refinance Term Loan, or any other extension of credit by Bank to or for the benefit of Borrower.

"Eighth Amendment Effective Date" means July 27, 2017.

"Liquidity" means the sum of: (i) Cash at Bank, plus Cash at a Bank Affiliate subject to an account control agreement reasonably acceptable to Bank; plus (ii) (A) net Accounts less than 90 days from invoice date, less (B) accrued commissions (as such accrual is calculated on Borrower's financial statement as of the Eighth Amendment Effective Date).

"Liquidity Event" means (a) any sale, license, or other disposition of all or substantially all of the assets (including intellectual property) of Borrower, (b) any reorganization, consolidation, merger or sale of the voting securities of Borrower or any other transaction where the holders of Borrower's securities before the transaction beneficially own less than 50% of the outstanding voting securities of the surviving entity after the transaction, or (c) an initial public offering of Borrower's equity securities.

4

"Liquidity Ratio" means the ratio of Liquidity to all Indebtedness to Bank (but excluding any Indebtedness to Bank which is secured by Cash held in a segregated deposit account at Bank).

"Non-Formula Advance" or "Non-Formula Advances" means a Cash advance or Cash advances under the Non-Formula Revolving Line.

"Non-Formula Revolving Line" means a Credit Extension of up to $7,500,000.

"Non-Formula Revolving Maturity Date" means January 31, 2019.

"Refinance Interest Only End Date" means June 30, 2017.

"Refinance Term Loan Maturity Date" means January 1, 2020.

"Revenue" means revenue recognized in accordance with GAAP.

12) The defined terms "interest Only End Date" and "Term Loan Maturity Date" and their corresponding definition set forth in Exhibit A to the Agreement are hereby deleted in their entirety.

13) Unless otherwise defined, all initially capitalized terms in this Amendment shall be as defined in the Agreement. The Agreement, as amended hereby, shall be and remain in full force and effect in accordance with its respective terms and hereby is ratified and confirmed in all respects. Except as expressly set forth herein, the execution, delivery, and performance of this Amendment shall not operate as a waiver of, or as an amendment of, any right, power, or remedy of Bank under the Agreement, as in effect prior to the date hereof. Borrower ratifies and reaffirms the continuing effectiveness of all agreements entered into in connection with the Agreement.

14) Borrower represents and warrants that the representations and warranties contained in the Agreement arc true and correct as of the date of this Amendment.

15) This Amendment may he executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.

16) As a condition to the effectiveness of this Amendment, Bank shall have received, in form and substance satisfactory to Bank, the following:

a) this Amendment, duly executed by Borrower;

b) an officer's certificate of Borrower with respect to incumbency and resolutions authorizing the execution and delivery of this Amendment;

c) payment for all Bank Expenses, including Bank's expenses in the documentation of this Amendment and any related documents, and any UCC, good standing or intellectual property search or filing fees, which may be debited from any of Borrower's accounts; and

5

d) such other documents and completion of such other matters, as Bank may reasonably deem necessary or appropriate.

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the first date above written.

**THE REALREAL, INC.**                                    **PACIFIC WESTERN BANK**

By:    /s/ Matt Gustke                                    By:    /s/ Tim McDonough
Name:  Matt Gustke                                        Name:  Tim McDonough
Title: CFO                                                Title: SVP, Technology

*Signature Page to Eighth Amendment to Loan and Security Agreement*

6

**Exhibit 10.12**

**\*Portions of this exhibit have been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.**

NINTH AMENDMENT
TO
LOAN AND SECURITY AGREEMENT

This Ninth Amendment to Loan and Security Agreement (the "*Amendment*") is made and entered into as of March 5, 2018, by and between PACIFIC WESTERN BANK, a California state chartered bank ("*Bank*"), and THE REALREAL, INC. ("*Borrower*").

**RECITALS**

Borrower and Bank are parties to that certain Loan and Security Agreement, dated as of September 19, 2013 (the "*Agreement*"). The parties desire to amend the Agreement in accordance with the terms of this Amendment.

NOW, THEREFORE, the parties agree as follows:

1) Bank hereby waives any and all of Borrower's violations of the "Primary Depository" covenant, as more specifically described in Section 6.6 of the Agreement, existing and occurring on or prior to the date of this Amendment (the "*Banking Relationship Default*").

2) Bank hereby waives any and all of Borrower's violations of the Liquidity Ratio covenant, as such covenant is more specifically described in Section 6.7(b) of the Agreement (as such section is in effect immediately prior to the date of this Amendment), existing and occurring on or prior to the date of this Amendment (the "*LQR Defaults*", and together with the Banking Relationship Default, the "*Existing Defaults*"),

3) The following new Section 2.1(d) is hereby added to the Agreement, as follows:

**(d) Term Out of Non-Formula Advances**. The Non-Formula Advances outstanding on the Non-Formula Revolving Maturity Date shall amortize, automatically and without further action by either party hereto, as follows:

**(i)** the aggregate principal amount of Non-Formula Advances outstanding on the Non-Formula Revolving Maturity Date (the "Termed-Out Non-Formula Advances") shall be payable in 30 equal monthly installments of principal, plus all accrued interest thereon, beginning on July 31, 2018 (the "Term Out Date"), and continuing on the last day of each month thereafter through the Termed Out Maturity Date, at which time all amounts due in connection with the Non-Formula Revolving Line, including the Termed-Out Non-Formula Advances, shall be immediately due and payable; and

**(ii)** Borrower may not request additional Non-Formula Advances after the Term Out Date, and Termed-Out Non-Formula Advances, once repaid, may not be reborrowed. Borrower may prepay the Termed-Out Non-Formula Advances without penalty or premium.

4) Section 2.3(a) of the Agreement is hereby amended and restated, as follows:

**(a) Interest Rates**.

**(i) Refinance Term Loan**. Except as set forth in Section 2.3(b), the Refinance Term Loan shall bear interest, on the outstanding daily balance thereof, at a variable annual rate equal to 0.35% above the Prime Rate then in effect.

**(ii) Non-Formula Advances**. Except as set forth in Section 2.3(b), each of the Non-Formula Advances, as applicable, shall bear interest, on the outstanding daily balance thereof, at a variable annual rate equal to 0.35% above the Prime Rate then in effect.

5) The following new Section 2.5(d) is hereby added to the Agreement, as follows:

**(d) Ninth Amendment First Success Fee**. Within [***] following the occurrence of the Funding Milestone, a fee equal to $[***], which shall be non-refundable and may be debited from any of Borrower's accounts.

6) The following new Section 2.5(e) is hereby added to the Agreement, as follows:

**(a) Ninth Amendment Second Success Fee**. Upon the occurrence of a Liquidity Event, a fee equal to $75,000. This Section 2.5(e) shall survive any termination of this Agreement.

7) Section 6.7 of the Agreement is hereby amended and restated, as follows:

**6.7 Financial Covenants**. Borrower shall at all times maintain the following financial ratios and covenants:

**(a) Minimum Revenue**. Measured monthly and calculated on a trailing three-month-basis, Borrower shall achieve minimum Revenue of at least the amounts shown in the table immediately below for the corresponding reporting periods. For subsequent reporting periods, Bank and Borrower hereby agree that, on or before January 15 of each year during the term of this Agreement, Borrower shall provide to Bank with a budget for the upcoming calendar year, which shall be approved by Borrower's Board of Directors, and Bank shall use that budget to establish the minimum Revenue amounts for the upcoming year, with such amounts being incorporated herein by an amendment, which Borrower hereby agrees to execute.

| Reporting Periods | Minimum Revenue |
| --- | --- |
| January 31, 2018 | $        [***] |
| February 28, 2018 | $        [***] |
| March 31, 2018 | $        [***] |
| April 30, 2018 | $        [***] |
| May 31, 2018 | $        [***] |
| June 30, 2018 | $        [***] |
| July 31, 2018 | $        [***] |
| August 31, 2018 | $        [***] |
| September 30, 2018 | $        [***] |
| October 31, 2018 | $        [***] |
| November 30, 2018 | $        [***] |
| December 31, 2018 | $        [***] |
| January 31, 2019 | $        [***] |
| February 28, 2019 | $        [***] |
| March 31, 2019 | $        [***] |

2

**(b) Minimum Cash Plus Accounts**. A balance of Minimum Cash Plus Accounts of not less than $[***] (the "Minimum Cash Plus Accounts Threshold"), monitored on a daily basis; provided, however, that from the Ninth Amendment Effective Date through [***], the Minimum Cash Plus Accounts Threshold shall instead be $[***].

**(c) Term Sheet Milestone**. Borrower shall have achieved the Term Sheet Milestone.

**(d) Funding Milestone**. Borrower shall have achieved the Funding Milestone.

8)    The following defined terms are either added to, or are amended and restated in, Exhibit A to the Agreement, as follows:

"Funding Milestone" means Borrower's consummation of, and receipt of the funding specified in, the transaction underlying the Term Sheet on or prior to June 30, 2018.

"Minimum Cash Plus Accounts" means the sum of: (i) Cash at Bank, plus Cash at a Bank Affiliate subject to an account control agreement reasonably acceptable to Bank, plus (ii) 100% of net Accounts less than 90 days from invoice date (as determined by Bank after its review of aged listings by invoice date of accounts receivable, as delivered by Borrower to Bank pursuant to Section 6.2(b) hereof).

"Ninth Amendment Effective Date" means March 5, 2018.

"Non-Formula Revolving Maturity Date" means July 31, 2018.

"Termed Out Maturity Date" means January 31, 2021.

"Term Sheet Milestone" means Borrower's delivery to Bank, after the Ninth Amendment Effective Date but on or before May 15, 2018, an executed and accepted term sheet for the sale or issuance of Borrower's equity securities or Subordinated Debt securities evidencing a commitment by certain parties to fund at least $50,000,000 net Cash proceeds to Borrower, all to investors, and on terms and conditions, acceptable to Bank (the "Term Sheet").

9)    The defined terms "Liquidity" and "Liquidity Ratio" and their corresponding definition set forth in Exhibit A to the Agreement are hereby deleted in their entirety.

3

10) No course of dealing on the part of Bank or its officers, nor any failure or delay in the exercise of any right by Bank, shall operate as a waiver thereof, and any single or partial exercise of any such right shall not preclude any later exercise of any such right. Bank's failure at any time to require strict performance by Borrower of any provision shall not affect any right of Bank thereafter to demand strict compliance and performance. Any suspension or waiver of a right must be in writing signed by an officer of Bank.

11) Unless otherwise defined, all initially capitalized terms in this Amendment shall be as defined in the Agreement. The Agreement, as amended hereby, shall be and remain in full force and effect in accordance with its respective terms and hereby is ratified and confirmed in all respects. Except as expressly set forth herein, the execution, delivery, and performance of this Amendment shall not operate as a waiver of, or as an amendment of, any right, power, or remedy of Bank under the Agreement, as in effect prior to the date hereof. Borrower ratifies and reaffirms the continuing effectiveness of all agreements entered into in connection with the Agreement.

12) Borrower represents and warrants that the representations and warranties contained in the Agreement are true and correct in all respects as of the date of this Amendment (except to the extent such representations and warranties relate to an earlier date, in which case they are true and correct in all respects as of such date), and that no Event of Default (other than the Existing Defaults) has occurred and is continuing.

13) This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.

14) As a condition to the effectiveness of this Amendment, Bank shall have received, in form and substance satisfactory to Bank, the following:

a) this Amendment, duly executed by Borrower;

b) a Pledge and Security Agreement, whereby any obligations arising under or related to any credit card services provided to Borrower by Bank are cash-secured to the satisfaction of Bank, duly executed by Borrower;

c) payment for all Bank Expenses, including Bank's expenses in the documentation of this Amendment and any related documents, and any UCC, good standing or intellectual property search or filing fees, which may be debited from any of Borrower's accounts; and

d) such other documents and completion of such other matters, as Bank may reasonably deem necessary or appropriate.

***Signature Page Follows***

4

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the first date above written.

**THE REALREAL, INC.**                                    **PACIFIC WESTERN BANK**

By: /s/ Matt Gustke                                       By: /s/ Nader Maghsoudnia
Name: Matt Gustke                                         Name: Nader Maghsoudnia
Title: CFO                                                Title: Senior Vice President

*(Signature Page to Ninth Amendment to Loan and Security Agreement)*

5

**Exhibit 10.13**

**\*Portions of this exhibit have been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.**

**TENTH AMENDMENT
TO
LOAN AND SECURITY AGREEMENT**

This Tenth Amendment to Loan and Security Agreement (the **"Amendment")** is made and entered into as of July 25, 2018, by and between PACIFIC WESTERN BANK, a California state chartered bank **("Bank"),** and THE REALREAL, INC. **("Borrower").**

**RECITALS**

Borrower and Bank are parties to that certain Loan and Security Agreement, dated as of September 19, 2013 (the **"Agreement").** The parties desire to amend the Agreement in accordance with the terms of this Amendment.

**NOW,** THEREFORE, the parties agree as follows:

1)   Pursuant to Section 6.2(a)(ii) of the Agreement, Borrower was required to deliver audited consolidated and consolidating financial statements for Borrower's 2017 fiscal year to Bank on or before June 29, 2018 (the "2017 Audited Financials"). As of the date hereof, Bank has not yet received the 2017 Audited Financials, resulting in a violation under the Agreement (the "2017 Audited Financials Violation"). Bank hereby (i) waives the 2017 Audited Financials Violation, and (ii) extends the due date for the 2017 Audited Financials to October 15, 2018.

2)   Section 6.6 of the Agreement is hereby amended and restated, as follows:

**6.6 "Primary Depository".** Borrower shall maintain (i} all its depository and operating accounts with Bank and (ii) all its investment accounts with Bank or Bank's affiliates; provided that prior to maintaining any investment accounts with Bank's affiliates, Borrower, Bank, and any such affiliate shall have entered into a securities account control agreement with respect to any such investment accounts, in form and substance satisfactory to bank. Notwithstanding the above, Borrower shall be permitted to maintain Cash in one or more accounts outside of Bank, without the requirement for control agreements, provided that the total aggregate amount of Cash maintained in such accounts does not exceed $[***] at any time.

3)   Unless otherwise defined, all initially capitalized terms in this Amendment shall be as defined in the Agreement. The Agreement, as amended hereby, shall be and remain in full force and effect in accordance with its respective terms and hereby is ratified and confirmed in all respects. Except as expressly set forth herein, the execution, delivery, and performance of this Amendment shall not operate as a waiver of, or as an amendment of, any right, power, or remedy of Bank under the Agreement, as in effect prior to the date hereof. Borrower ratifies and reaffirms the continuing effectiveness of all agreements entered into in connection with the Agreement.

4)   Borrower represents and warrants that the representations and warranties contained in the Agreement are true and correct as of the date of this Amendment.

5)   This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.

*The RealReal, Inc. - 10th Amendment to LSA - Execution*

6)    As a condition to the effectiveness of this Amendment, Bank shall have received, in form and substance satisfactory to Bank, the following:

    a)    this Amendment, duly executed by Borrower;

    b)    payment for all Bank Expenses, including Bank's expenses in the documentation of this Amendment and any related documents, and any UCC, good standing or intellectual property search or filing fees, which may be debited from any of Borrower's accounts; and

    c)    such other documents and completion of such other matters, as Bank may reasonably deem necessary or appropriate.

*The RealReal, Inc. - 10th Amendment to LSA - Execution*

*2*

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the first date above written.

**THE REALREAL, INC.**                                     **PACIFIC WESTERN BANK**

By: /s/ Matt Gustke                                        By: /s/ Nader Maghsoudnia
Name: Matt Gustke                                          Name:  Nader Maghsoudnia
Title: CFO                                                 Title:   Senior Vice President

*Signature Page to Tenth Amendment to Loan and Security Agreement*

*The RealReal, Inc. - 10th Amendment to LSA - Execution*

*3*

**Exhibit 10.14**

**ELEVENTH AMENDMENT**
**TO**
**LOAN AND SECURITY AGREEMENT**

This Eleventh Amendment to Loan and Security Agreement (the *"Amendment")* is made and entered into as of August 9, 2018 by and between PACIFIC WESTERN BANK, a California state chartered bank *("Bank"),* and THE REALREAL, INC. *("Borrower").*

**RECITALS**

Borrower and Bank are parties to that certain Loan and Security Agreement, dated as of September 19, 2013 (the *"Agreement").* The parties desire to amend the Agreement in accordance with the terms of this Amendment.

NOW, THEREFORE, the parties agree as follows:

1) Section 2.1(c) of the Agreement is hereby amended and restated, as follows:

(c) **Usage of Credit Card Services Under the Credit Card Line.**

(i) **Usage Period.** Subject to and upon the terms and conditions of this Agreement, at any time from August 9, 2018 through the Credit Card Line Maturity Date, Borrower may use Credit Card Services in amounts and upon terms as restricted in Section 2.1(c)(ii) below.

(ii) **Credit Card Services.** Subject to and upon the terms and conditions of this Agreement, Borrower may request Credit Card Services from Bank. The aggregate amount of Credit Card Services outstanding at any time shall not exceed the Credit Card Line. The terms and conditions (including repayment and fees) of such Credit Card Services shall be subject to the terms and conditions of the Bank's standard forms of applications and agreements for the Credit Card Service provided, each of which Borrower hereby agrees to execute.

(iii) **Collateralization of Obligations Extending Beyond Maturity.** If Borrower has not cash secured its obligations with respect to any Credit Card Services by the Credit Card Line Maturity Date, then, effective as of such date, the balance in any of Borrower's deposit accounts held by Bank and the certificates of deposit or time deposit accounts issued by Bank in Borrower's name (and any interest paid thereon or proceeds thereof, including any amounts payable upon the maturity or liquidation of such certificates or accounts) shall automatically secure such obligations to the extent of the then continuing or outstanding Credit Card Services. Borrower authorizes Bank to hold such balances in pledge and to decline to honor any drafts thereon or any requests by Borrower or any other Person to pay or otherwise transfer any part of such balances for so long as the applicable Credit Card Services are outstanding or continue.

*The Real/Real, Inc. - 11th Amendment to LSA - Execution*

2) The following defined terms in Exhibit A to the Agreement are hereby amended and restated, as follows:

"Credit Card Line" means a Credit Extension of up to $1,500,000.

"Credit Card Line Maturity Date" means August 1, 2019.

"Credit Extension", means each Termed-Out Non-Formula Advance, the Refinance Term Loan, Credit Card Services provided under the Credit Card Line, or any other extension of credit by Bank to or for the benefit of Borrower.

3) Unless otherwise defined, all initially capitalized terms in this Amendment shall be as defined in the Agreement. The Agreement, as amended hereby, shall be and remain in full force and effect in accordance with its respective terms and hereby is ratified and confirmed in all respects. Except as expressly set forth herein, the execution, delivery, and performance of this Amendment shall not operate as a waiver of, or as an amendment of, any right, power, or remedy of Bank under the Agreement, as in effect prior to the date hereof. Borrower ratifies and reaffirms the continuing effectiveness of all agreements entered into in connection with the Agreement.

4) Borrower represents and warrants that the representations and warranties contained in the Agreement are true and correct as of the date of this Amendment.

5) This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.

6) As a condition to the effectiveness of this Amendment, Bank shall have received, in form and substance satisfactory to Bank, the following:

a) this Amendment, duly executed by Borrower;

b) payment for all Bank Expenses, including Bank's expenses in the documentation of this Amendment and any related documents, and any UCC, good standing or intellectual property search or filing fees, which may be debited from any of Borrower's accounts; and

c) such other documents and completion of such other matters, as Bank may reasonably deem necessary or appropriate.

*Signature Page Follows*

*The Real/Real, Inc. - 11th Amendment to LSA - Execution*

2

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the first date above written.

**THE REALREAL, INC.**                            **PACIFIC WESTERN BANK**

By: /s/ Matt Gustke                              By: /s/ Nader Maghsoudnia
Name: Matt Gustke                                Name: Nader Maghsoudnia
Title: CFO                                        Title: Senior Vice President

*Signature Page to Eleventh Amendment to Loan and Security Agreement*


*The Real/Real, Inc. - 11th Amendment to LSA - Execution*

3

**Exhibit 10.15**

**\*Portions of this exhibit have been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.**

**TWELFTH AMENDMENT**
**TO**
**LOAN AND SECURITY AGREEMENT**

This Twelfth Amendment to Loan and Security Agreement (the *"Amendment")* is made and entered into as of December 19, 2018, by and between PACIFIC WESTERN BANK, a California state chartered bank *("Bank"),* and THE REALREAL, INC. *("Borrower").*

**RECITALS**

Borrower and Bank are parties to that certain Loan and Security Agreement, dated as of September 19, 2013 (the *"Agreement").* The parties desire to amend the Agreement in accordance with the terms of this Amendment.

NOW, THEREFORE, the parties agree as follows:

I)   Bank hereby waives any and all of Borrower's violations of the Primary Depository covenant, as more particularly described in Section 6.6 of the Agreement (as in effect immediately prior to the date of this Amendment), occurring on or before the date of this Amendment for maintaining cash outside Bank in excess of the amount permitted thereunder.

2)   Section 6.6 of the Agreement is hereby amended and restated, as follows:

**6.6 "Primary Depository".** Borrower shall maintain (i) all its depository and operating accounts with Bank and (ii) all its investment accounts with Bank or Bank's affiliates; provided that prior to maintaining any investment accounts with Bank's affiliates, Borrower, Bank, and any such affiliate shall have entered into a securities account control agreement with respect to any such investment accounts, in form and substance satisfactory to bank. Notwithstanding the above, Borrower shall be permitted to maintain Cash in one or more accounts outside of Bank, without the requirement for control agreements, provided that the total aggregate amount of Cash maintained in such accounts does not exceed $[\*\*\*] at any time.

3)   Unless otherwise defined, all initially capitalized terms in this Amendment shall be as defined in the Agreement. The Agreement, as amended hereby, shall be and remain in full force and effect in accordance with its respective terms and hereby is ratified and confirmed in all respects. Except as expressly set forth herein, the execution, delivery, and performance of this Amendment shall not operate as a waiver of, or as an amendment of, any right, power, or remedy of Bank under the Agreement, as in effect prior to the date hereof. Borrower ratifies and reaffirms the continuing effectiveness of all agreements entered into in connection with the Agreement.

4)   Borrower represents and warrants that the representations and warranties contained in the Agreement are true and correct as of the date of this Amendment.

5)   This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.

*The RealReal, Inc. – 12th Amendment to LSA - EXECUTION*

6)  As a condition to the effectiveness of this Amendment, Bank shall have received, in form and substance satisfactory to Bank, the following:

a)  this Amendment, duly executed by Borrower;

b)  payment for all Bank Expenses, including Bank's expenses in the documentation of this Amendment and any related documents, and any UCC, good standing or intellectual property search or filing fees, which may be debited from any of Borrower's accounts; and

c)  such other documents and completion of such other matters, as Bank may reasonably deem necessary or appropriate.

2

*The RealReal, Inc. – 12th Amendment to LSA - EXECUTION*

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the first date above written.

**THE REALREAL, INC.**                              **PACIFIC WESTERN BANK**

By: /s/ Matt Gustke                                By: /s/ Darrell Sorenson
Name: Matt Gustke                                  Name: Darrell Sorenson
Title: CFO                                         Title: VP

*Signature Page to Twelfth Amendment to Loan and Security Agreement*

3

*The RealReal, Inc. – 12th Amendment to LSA - EXECUTION*

**Exhibit 10.16**

**\*Portions of this exhibit have been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.**

35 ENTERPRISE AVENUE, L.L.C.

Landlord,

and

THEREALREAL, INC.

Tenant

LEASE

Premises

35 ENTERPRISE AVENUE
SECAUCUS, NEW JERSEY

TABLE OF CONTENTS

ARTICLES

|  | PAGE |
|---|---|
| ARTICLE 1 - DEFINITIONS | 3 |
| ARTICLE 2 - DEMISE AND TERM | 7 |
| ARTICLE 3 - RENT | 7 |
| ARTICLE 4 - USE OF DEMISED PREMISES | 9 |
| ARTICLE 5 - PREPARATION OF DEMISED PREMISES | 10 |
| ARTICLE 6 - TAX AND OPERATING EXPENSE PAYMENTS | 12 |
| ARTICLE 7 - DEVELOPMENT COMMON AREAS | 13 |
| ARTICLE 8 - SECURITY | 14 |
| ARTICLE 9 - SUBORDINATION | 15 |
| ARTICLE 10 - QUIET ENJOYMENT | 16 |
| ARTICLE 11 - ASSIGNMENT, SUBLETTING AND MORTGAGING | 16 |
| ARTICLE 12 - COMPLIANCE WITH LAWS | 20 |
| ARTICLE 13 - INSURANCE AND INDEMNITY | 21 |
| ARTICLE 14 - RULES AND REGULATIONS | 24 |
| ARTICLE 15 - ALTERATIONS AND SIGNS | 24 |
| ARTICLE 16 - LANDLORD'S AND TENANT'S PROPERTY | 25 |
| ARTICLE 17 - REPAIRS AND MAINTENANCE | 26 |
| ARTICLE 18 - UTILITY CHARGES | 28 |
| ARTICLE 19 - ACCESS, CHANGES AND NAME | 30 |
| ARTICLE 20 - MECHANICS' LIENS AND OTHER LIENS | 31 |
| ARTICLE 21 - NON-LIABILITY AND INDEMNIFICATION | 31 |
| ARTICLE 22 - DAMAGE OR DESTRUCTION | 31 |
| ARTICLE 23 - EMINENT DOMAIN | 33 |
| ARTICLE 24 - SURRENDER | 34 |
| ARTICLE 25 - CONDITIONS OF LIMITATION | 35 |
| ARTICLE 26 - RE-ENTRY BY LANDLORD | 36 |
| ARTICLE 27 - DAMAGES | 36 |
| ARTICLE 28 - AFFIRMATIVE WAIVERS | 38 |
| ARTICLE 29 - NO WAIVERS | 39 |
| ARTICLE 30 - CURING TENANT'S DEFAULTS | 39 |

ARTICLE 31 - BROKER                                                    40

ARTICLE 32 - NOTICES                                                   40

ARTICLE 33 - ESTOPPEL CERTIFICATES                                     40

ARTICLE 34 - ARBITRATION                                               41

ARTICLE 35 - MEMORANDUM OF LEASE                                       41

ARTICLE 36 - MISCELLANEOUS                                             42

EXHIBITS

Exhibit A - Description of Land
Exhibit B - Site Plan
Exhibit C - Landlord's Work letter
Exhibit D - Rules and Regulations
Exhibit E - Letter of Credit
Exhibit F - Landscaping Specification
Exhibit G - Form of Subordination, Attornment and Non-Disturbance Agreement

SCHEDULES

Schedule 1- Fixed Rent

Schedule 2- Operating Expense Exclusions

2

3/12/14

LEASE, dated March 18, 2014, between **35 ENTERPRISE AVENUE, L.L.C.**, a New Jersey limited liability company, having an office at 400 Plaza Drive, P.O. Box 1515, Secaucus, New Jersey 07096-1515 ("Landlord"), and **THE REALREAL, INC.**, a Delaware corporation, having an office at 1980 Oakdale Avenue, San Francisco, CA 94124 ("Tenant").

ARTICLE 1 - DEFINITIONS

1.01. As used in this Lease (including in all Exhibits and any Riders attached hereto, all of which shall be deemed to be part of this Lease) the following words and phrases shall have the meanings indicated:

A. Advance Rent: $[***].

B. Additional Charges: All amounts that become payable by Tenant to Landlord hereunder other than the Fixed Rent.

C. Architect: As Landlord may designate.

D. Broker: Newmark Grubb Night Frank.

E. Building: The building or buildings located on the Land and known as 35 Enterprise Avenue (a/k/a 1 American Way), Secaucus, NJ.

F. Building Fraction: The fraction, the numerator of which is the Floor Space of the Building ([***] square feet) and the denominator of which is the aggregate Floor Space of the buildings in the Development. If the aggregate Floor Space of the buildings in the Development shall be changed due to any construction or alteration, the denominator of the Building Fraction shall be increased or decreased to reflect such change.

G. Business Days: All days except Saturdays, Sundays, days observed by the federal or state government as legal holidays.

H. Business Hours: Generally customary daytime business hours, but not before 9:00 A.M. or after 6:00 P.M.

I. Calendar Year: Any twelve-month period commencing on a January **1.**

J. Commencement Date: The date hereof

K. Demised Premises: The Building containing [***] square feet of Floor Space and the Land at 35 Enterprise Avenue, Secaucus, New Jersey depicted on the site plan(s) attached hereto as Exhibit B, outlined in red.

L. Development: All land and improvements now existing or hereafter constructed, located south of Route 3, east of the Hackensack River, west of County Avenue and north of Castle Road, that are owned or managed from time to time by Landlord or any entity controlling Landlord, controlled by Landlord or under common control with Landlord (any such entity, a "Landlord Affiliate"). As used herein, the term "control" means (i) the ownership of a majority of the issued and outstanding beneficial ownership interests (stock, partnership or limited liability membership interests) in the controlled entity and (ii) the power to control the day to day business operations of the controlled entity as well as all transactions of the controlled entity that are outside the normal course of the controlled entity's business.

M. Development Common Areas: The roads and bridges that from time to time service and provide access to the Development for the common use of the tenants, invitees, occupants of the Development, that are maintained by Landlord or any Landlord Affiliate.

N. Expiration Date: June 30, 2019. However, if the Term is extended by Tenant's effective exercise of Tenant's right, if any, to extend the Term, the "Expiration Date" shall be changed to the last day of the latest extended period as to which Tenant shall have effectively exercised its right to extend the Term. For the purposes of this definition, the earlier termination of this Lease shall not affect the "Expiration Date."

O. Fixed Rent: From July 1, 2014 (the "Rent Commencement Date") until June 30, 2015, an amount at the annual rate of [***] multiplied by the Floor Space of the Building and an amount at the annual rate of [***] multiplied by the Floor Space of the Building from July 1, 2015 until June 30, 2016, and an amount at the annual rate of [***] multiplied by the Floor Space of the Building from July 1, 2016 until June 30, 2017, and an amount at the annual rate of [***] multiplied by the Floor Space of the Building from July 1, 2017 until June 30, 2018, and an amount at the annual rate of [***] multiplied by the Floor Space of the Building from July 1, 2018 until the Expiration Date. It is intended that the Fixed Rent shall be an absolutely net return to Landlord throughout the Term, free of any expense, charge or other deduction whatsoever, with respect to the Demised Premises, the Building, the Land and/or the ownership, leasing, operation, management, maintenance, repair, rebuilding, use or occupation thereof, or any portion thereof, with respect to any interest of Landlord therein, except as may otherwise expressly be provided in this Lease. A schedule setting forth the annual amount of the Fixed Rent and the monthly installments is set forth as Schedule 1 to this Lease.

P. Floor Space: As to the Building, the sum of the floor area stated in square feet bounded by the exterior faces of the exterior walls. Any reference to Floor Space of a building shall mean the floor area of all leasable levels or stories of such building, excluding any roof, except such portion thereof (other than cooling towers, elevator penthouses, mechanical rooms, chimneys and staircases, entrances and exits) as is permanently enclosed, and including any interior basement level or mezzanine area not occupied or used by a tenant on a continuing or repetitive basis, and any mechanical room, enclosed or interior truck dock, and areas used by Landlord for storage, for housing meters and/or other equipment or for other purposes. Any reference to the Floor Space is intended to refer to the Floor Space of the entire area in question irrespective of the Person(s) who may be the owner(s) of all or any part thereof.

4

Q. Guarantor: None.

R. Insurance Requirements: Rules, regulations, orders and other requirements of the applicable board of underwriters and/or the applicable fire insurance rating organization and/or any other similar body performing the same or similar functions and having jurisdiction or cognizance over the Land and Building, whether now or hereafter in force.

S. Land: The land described on Exhibit A, upon which the Building is located.

T. Landlord's Work: The materials and work to be furnished, installed and performed by Landlord at its expense in accordance with the provisions of Exhibit C.

U. Legal Requirements: Laws and ordinances of all federal, state, county, and municipal governments, and rules, regulations, orders and directives of all departments, subdivisions, bureaus, agencies or offices thereof, and of any other governmental, public or quasi-public authorities having jurisdiction over the Land and Building, whether now or hereafter in force, including, but not limited to, those pertaining to environmental matters.

V. Mortgage: A mortgage and/or a deed of trust.

W. Mortgagee: A holder of a mortgage or a beneficiary of a deed of trust.

X. Operating Expenses: The sum of the following: (1) the cost and expense (whether or not within the contemplation of the parties) for the repair, replacement, maintenance, policing, insurance and operation of the Building and Land, and (2) the Building Fraction of the sum of (a) the actual, reasonable, out-of-pocket cost and expense for the repair, replacement, maintenance, policing, insurance and operation of the Development Common Areas; (b) the Real Estate Taxes, if any, attributable to the Development Common Areas. The "Operating Expenses" shall, include, without limitation, the following: (i) the cost for rent, casualty, liability, boiler and fidelity insurance, (ii) if an independent managing agent is employed by Landlord, the fees payable to such agent (provided the same are competitive with the fees payable to independent managing agents of comparable facilities), (iii) costs and expenses incurred for legal, accounting and other professional services (including, but not limited to, costs and expenses for in-house or staff legal counsel or outside counsel) at rates not to exceed the reasonable and customary charges for any such services as would be imposed in an arm's length third party agreement for such services, plus (iv) if Landlord (or its affiliate) is itself managing the Building and has not employed an independent third party for such management, an amount equal to [***] percent of the resulting total of all of the foregoing items making up Operating Expenses. (For clarification, no such administration fee will be charged on the Roof Supplement, as defined in Section R9.) All items included in Operating Expenses shall be determined in accordance with generally accepted accounting principles consistently applied. In no event shall the Operating Expenses include any of the costs and expenses set forth on Schedule 2 annexed hereto and made a part hereof. Notwithstanding anything herein contained to the contrary, to the extent the Operating Expenses include an expenditure for a capital improvement, as defined under generally accepted accounting principles, Tenant shall only be responsible for that portion of the cost of said capital improvement as is determined by amortizing said cost over the useful life of the capital improvement; and an annual amount equal to the amortized cost of the capital improvement plus an interest component equal to the Prime Rate of JPMorgan Chase Bank plus four percent per annum shall be then added to the Operating Expenses and paid by Tenant over the then remaining Term (or extension thereof) of the Lease.

5

Y. Permitted Uses: Warehousing and distribution of non-hazardous materials, preparation of inventory for distribution, photography in connection with inventory preparation and sales promotion, light assembly and ancillary offices.

Z. Person: A natural person or persons, a partnership, a corporation, or any other form of business or legal association or entity.

AA. Real Estate Taxes: The real estate taxes, assessments, special assessments, sewer rents, water charges, and all other similar charges and impositions imposed upon the Building and Land by any federal, state, municipal or other governments or governmental bodies or authorities, and any actual, reasonable, out-of-pocket expenses incurred by Landlord in contesting such taxes or assessments and/or the assessed value of the Building and Land, which expenses shall be allocated to the period of time to which such expenses relate. If at any time during the Term the methods of taxation prevailing on the date hereof shall be altered so that in lieu of, or as an addition to or as a substitute for, the whole or any part of such real estate taxes, assessments and special assessments now imposed on real estate there shall be levied, assessed or imposed (a) a tax, assessment, levy, imposition, license fee or charge wholly or partially as a capital levy or otherwise on the rents received therefrom, or (b) any other such additional or substitute tax, assessment, levy, imposition or charge, then all such taxes, assessments, levies, impositions, fees or charges or the part thereof so measured or based shall be deemed to be included within the term "Real Estate Taxes" for the purposes hereof. In no event shall the Real Estate Taxes include any impact fee rising due to any Landlord's Work, or any death taxes, excess profit taxes, franchise taxes or any taxes imposed or measured on or by the net income or revenue of Landlord or any of Landlord's Affiliates from the operation of the Demised Premises and/or the Development Common Areas.

BB. Rent: The Fixed Rent and the Additional Charges.

CC. Rules and Regulations: The reasonable rules and regulations that may be promulgated by Landlord from time to time, which may be reasonably changed by Landlord from time to time upon not less than thirty (30) days prior written notice to Tenant. The Rules and Regulations now in effect are attached hereto as Exhibit D.

DD. Security Deposit: Such amount as Tenant has deposited or hereinafter deposits with Landlord as security under this Lease. Tenant is required to deposit the sum of $[***] with Landlord as security hereunder as of the date hereof.

EE. Successor Landlord: As defined in Section 9.03.

FF. Superior Lease: Any lease to which this Lease is, at the time referred to, subject and subordinate.

GG. Superior Lessor: The lessor of a Superior Lease or its successor in interest, at the time referred to.

6

HH. Superior Mortgage: Any Mortgage to which this Lease is, at the time referred to, subject and subordinate.

II. Superior Mortgagee: The Mortgagee of a Superior Mortgage at the time referred to. JJ. Tenant's Property: As defined in Section 16.02.

KK. Tenant's Work: The facilities, materials and work which may be undertaken by or for the account of Tenant (other than the Landlord's Work) to equip, decorate and furnish the Demised Premises for Tenant's occupancy.

LL. Term: The period commencing on the Commencement Date and ending at 11:59 p.m. of the Expiration Date, but in any event the Term shall end on the date when this Lease is earlier terminated.

MM. Unavoidable Delays: A delay arising from or as a result of a strike, lockout, or labor difficulty, explosion, sabotage, accident, riot or civil commotion, act of war, fire or other catastrophe, Legal Requirement or an act of the other party and any cause beyond the reasonable control of that party, provided that the party asserting such Unavoidable Delay has exercised its best efforts to minimize such delay.


ARTICLE 2 - DEMISE AND TERM

2.01. Landlord hereby leases to Tenant, and Tenant hereby hires from Landlord, the Demised Premises, for the Term. This Lease is subject to (a) any and all existing encumbrances, conditions, rights, covenants, easements, restrictions and rights of way, of record, and other matters of record, applicable zoning and building laws, regulations and codes, and such matters as may be disclosed by an inspection or survey, and (b) easements now or hereafter created by Landlord in, under, over, across and upon the Land for access, sewer, water, electric, gas and other utility lines and services now or hereafter installed, provided that no such easement shall adversely impact ingress to or egress from the Building or the Demised Premises in any material manner or otherwise adversely impact the use and enjoyment of the Demised Premises by Tenant in any material manner. Promptly following the Commencement Date, the parties hereto shall enter into an agreement in form and substance reasonably satisfactory to Landlord and Tenant setting forth the Commencement Date; provided, however, that the failure to enter into such agreement shall not affect the Commencement Date or any of the party's' rights or obligations pursuant to this Lease.


ARTICLE 3 - RENT

3.01. Commencing on the Rent Commencement Date, Tenant shall pay the Fixed Rent in equal monthly installments in advance on the first day of each and every calendar month during the Term (except that Tenant shall pay, upon the execution and delivery of this Lease by Tenant, the Advance Rent, to be applied against the first installment or installments of Fixed Rent becoming due under this Lease). If the Rent Commencement Date occurs on a day other than the first day of a calendar month, the Fixed Rent for the partial calendar month at the commencement of the Term shall be prorated.

7

3.02. The Rent shall be paid in lawful money of the United States to Landlord at its office, or such other place, or Landlord's agent, as Landlord shall designate by notice to Tenant. Tenant shall pay the Rent promptly when due without notice or demand therefor and without any abatement, deduction or setoff for any reason whatsoever, except as may be expressly provided in this Lease. If Tenant makes any payment to Landlord by check, same shall be by check of Tenant and Landlord shall not be required to accept the check of any other Person, and any check received by Landlord shall be deemed received subject to collection. If any check is mailed by Tenant, Tenant shall post such check in sufficient time prior to the date when payment is due so that such check will be received by Landlord on or before the date when payment is due. Tenant shall assume the risk of lateness or failure of delivery of the mails, and no lateness or failure of the mails will excuse Tenant from its obligation to have made the payment in question when required under this Lease.

3.03. No payment by Tenant or receipt or acceptance by Landlord of a lesser amount than the correct Rent shall be deemed to be other than a payment on account, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance or pursue any other remedy in this Lease or at law provided.

3.04. If Tenant is in arrears in payment of Rent, Tenant waives Tenant's right, if any, to designate the items to which any payments made by Tenant are to be credited, and Landlord may apply any payments made by Tenant to such items as Landlord sees fit, irrespective of and notwithstanding any designation or request by Tenant as to the items to which any such payments shall be credited.

3.05. In the event that any installment of Rent due hereunder shall be overdue, a "Late Charge" equal to [***] or the maximum rate permitted by law, whichever is less for Rent so overdue may be charged by Landlord for each month or part thereof that the same remains overdue ("Late Payment Rate"). In the event that any check tendered by Tenant to Landlord is returned for insufficient funds, Tenant shall pay to Landlord, in addition to the charge imposed by the preceding sentence, a fee of $[***]. Any such Late Charges if not previously paid shall, at the option of the Landlord, be added to and become part of the next succeeding Rent payment to be made hereunder. Notwithstanding the foregoing and without waiving any other rights of Landlord in this Agreement, the Late Charge shall be waived for the first time in each calendar year that the Tenant fails to make a payment of Rent on a timely basis, provided such late payment is received by Landlord within seven (7) days of the date that such payment of Rent is due and owing and provided further that Tenant is in compliance with all other terms of the Lease.

3.06. It is intended that, except as otherwise expressly provided in this Lease to the contrary, the Fixed Rent shall be an absolutely net return to Landlord throughout the Term, free of any expense, charge or other deduction whatsoever, with respect to the Demised Premises, the Building, the Land and/or the ownership, leasing, operation, management, maintenance, repair, rebuilding, use or occupation thereof, or any portion thereof, with respect to any interest of Landlord therein.

8

ARTICLE 4 - USE OF DEMISED PREMISES

4.01. Tenant shall use and occupy the Demised Premises for the Permitted Uses, and Tenant shall not use or permit or suffer the use of the Demised Premises or any part thereof for any other purpose.

4.02. Subject to Landlord's obligation to perform Landlord's Work and deliver to Tenant a Certificate of Continued Occupancy, and except as otherwise expressly provided in this Lease with respect to Landlord's obligations, if any, to perform alterations and improvements required by Legal Requirements or otherwise, any governmental license or permit, including a certificate of occupancy or certificate of continued occupancy (a "Certificate of Occupancy"), shall be required for the proper and lawful conduct of Tenant's business in the Demised Premises or any part thereof, Tenant shall duly procure and thereafter maintain such license or permit and submit the same to Landlord for inspection. Tenant shall at all times comply with the terms and conditions of each such license or permit. Tenant shall not at any time use or occupy, or suffer or permit anyone to use or occupy the Demised Premises, or do or permit anything to be done in the Demised Premises, in any manner which (a) violates the Certificate of Occupancy for the Demised Premises or for the Building; (b) causes or is liable to cause injury to the Building or any equipment, facilities or systems therein; (c) constitutes a violation of the Legal Requirements or Insurance Requirements; (d) impairs the character, reputation or appearance of the Building; or (e) impairs the proper and economic maintenance, operation and repair of the Building and/or its equipment, facilities or systems.

4.03. Tenant shall not conduct any warehouse sale at the Demised Premises without Landlord's prior written consent. Provided Tenant is not in default of its monetary or any other material non-monetary obligations under this Lease beyond applicable notice and cure periods, Landlord agrees not to unreasonably withhold its consent to not more than three (3) warehouse sales in any consecutive twelve (12) month period. Tenant shall pay to Landlord as an Additional Charge, an amount equal to [***] of Gross Receipts (as hereinafter defined) from any warehouse sale conducted at the Demised Premises, payable within fifteen (15) days after the warehouse sale. Tenant shall comply, at Tenant's sole cost and expense with all Legal Requirements with respect to any warehouse sale. Any warehouse sale conducted by Tenant shall be not more than four (4) consecutive days in duration. As used herein Gross Receipts shall mean the dollar aggregate of: (a) the actual sales price of all goods and merchandise sold, leased or licensed and the charges for all services performed by Tenant or otherwise in connection with all business conducted at such warehouse sale, whether made for cash, by check, credit or otherwise, without reserve or deduction for inability or failure to collect the same, including, without limitation, sales and services (i) where the orders therefor originate at or are accepted at or from the Demised Premises, whether delivery or performance thereof is made at or from the Demised Premises or any other place, it being understood that all sales made and orders received at or from the Demised Premises shall be deemed to have been made and completed therein even though the orders are fulfilled elsewhere or the payments of account are transferred to some other office for collection, and (ii) where the orders therefor result from solicitation off the Demised Premises but which are conducted by personnel operating from or reporting to or under the control or supervision of any person at the Demised Premises, and (b) all monies or other things of value received by Tenant from its operations at the Demised Premises (which are not excluded from Gross Receipts by the next succeeding sentence) including all finance charges, cost of gift or

9

merchandise certificates and all deposits not refunded to customers. Gross Receipts shall not include (x) the exchange of merchandise between stores of Tenant where such exchange is made solely for the convenient operation of Tenant's business and neither for the purpose of depriving Landlord of the benefits of a sale which would otherwise be made at or from the Demised Premises nor for the purpose of consummating a sale which has been theretofore made at or from the Demised Premises, or (y) the amount of any city, county, state or federal sales tax, luxury tax or excise tax on sales if the tax is added to the selling price and separately stated and actually paid to the taxing authority by Tenant; provided, however, no franchise or capital stock tax and no income or similar tax based upon income, profits or Gross Receipts shall be deducted from Gross Receipts in any event whatsoever. Cash or credit refunds made upon transactions included within the Gross Receipts, but not exceeding the selling price of merchandise returned by the purchaser and accepted by Tenant, shall be deducted from the Gross Receipts for the period when such refunds are made. Each charge or sale upon installment or credit or layaway, so called, shall be treated as a sale for the full price irrespective of the time when Tenant shall receive payment from its customer. For purposes of this paragraph (i) the word "Tenant" shall include any of Tenant's subtenants, concessionaires and licensees and (ii) sales by Tenant made in its ordinary course of business which merely occur at the same time as the so-called warehouse sale shall not be included in Gross Receipts.

ARTICLE 5 - PREPARATION OF DEMISED PREMISES

5.01. (a) The Demised Premises shall be completed and prepared for Tenant's occupancy by Landlord at Landlord's sole cost and expense in the manner described in, and subject to the provisions of Exhibit C. Except as expressly provided to the contrary in this Lease, the taking of possession by Tenant of the Demised Premises shall be conclusive evidence as against Tenant that the Demised Premises and the Building were in good and satisfactory condition at the time such possession was taken. Except as expressly provided to the contrary in this Lease, Tenant is leasing the Demised Premises "as is" on the date hereof, subject to reasonable wear and tear.

(b) (i) Except for Landlord's Work or as otherwise provided in this Lease to the contrary, (a) Landlord shall deliver the Demised Premises to Tenant in "as is" condition, and (b) Tenant shall be responsible for all construction and work to prepare the Demised Premises for Tenant's occupancy at Tenant's cost and expense. Such construction shall be in accordance with Section 36.09 of this Lease. Prior to performing any work in the Demised Premises, Tenant shall, within seven (7) Business Days of the date thereof submit to Landlord for approval final plans and specifications for all construction work in the Demised Premises including, but not limited to layout, mechanical, electrical and plumbing plans and finish schedules ("Plans and Specifications"). Landlord shall not unreasonably withhold its approval for construction work which is non-structural in nature and does not involve or affect the mechanical systems of the Demised Premises. Tenant shall employ licensed architect(s) and/or engineer(s) for the preparation of the Plans and Specifications. Landlord shall notify Tenant of Landlord's approval or disapproval of such Plans and Specifications within ten (10) Business Days of Landlord's receipt thereof. If Landlord disapproves, Landlord shall specify the reasons for disapproval with reasonable specificity and Tenant shall resubmit revised Plans and Specifications that correct such items. The foregoing procedure shall be repeated, if requested by Tenant up to three (3) times, until Landlord approves the Plans and Specifications. If Landlord shall fail to provide notice of its approval or disapproval of any Plans and Specifications or resubmitted Plans and Specifications within the required period, Landlord shall be deemed to have approved the Plans and Specifications if Tenant notifies Landlord of this deemed approval provisions in each such request for approval.

10

(ii) Tenant shall obtain and provide all design and architectural services necessary to perform Tenant's Work and shall be responsible for complying with all building codes and Legal Requirements in connection with Tenant's Work, prior to commencing any work in the Demised Premises. Tenant shall obtain a new permanent certificate of occupancy or continued certificate of occupancy, as applicable, for the Permitted Uses at the Demised Premises as may be required in connection with Tenant's Work. The construction of the Demised Premises shall be performed in a first class workmanlike manner. At all times when Tenant's Work is in progress and prior to the Commencement Date, Tenant shall maintain or cause to be maintained the insurance coverage required under Section 13.02.

(iii) Tenant shall be solely responsible for the structural integrity of Tenant's Work and for the adequacy or sufficiency of the Plans and Specifications and all the improvements depicted thereon or covered thereby, and Landlord's consent thereto, approval thereof, or incorporation therein of any of its recommendations shall in no way diminish Tenant's responsibility therefor or reduce or mitigate Tenant's liability in connection therewith. Landlord shall have no obligations or liabilities by reason of this Lease in connections with the performance of construction or of the finish, decorating or installation work performed by Tenant, or on its behalf, or in connection with the contracts for the performance thereof entered into by Tenant. Any warranties extended or available to Tenant in connection with the aforesaid work shall be for the benefit also of Landlord. Tenant further agrees that once it commences construction, it shall diligently and continuously proceed with construction to completion.

5.02. Subject to Rider Paragraph R22, if the substantial completion of the Landlord's Work shall be delayed (any such delay, a "Tenant Delay") solely due to (a) any act or omission of Tenant or any of its employees, agents or contractors (including, without limitation, i any delays due to changes in or additions to the Landlord's Work required by Tenant, or ii any delays by Tenant in the submission of plans, drawings, specifications or other information or in approving any working drawings or estimates or in giving any authorizations or approvals), or (b) any additional time needed for the completion of the Landlord's Work by the inclusion in the Landlord's Work of any items specified by Tenant that require long lead time for delivery or installation, then Landlord's Work shall be deemed substantially complete on the date when they would have been ready but for such Tenant Delay. The Demised Premises shall be conclusively presumed to be in satisfactory condition on the Commencement Date except for the minor or insubstantial details of finish work or mechanical adjustment that do not interfere in any material manner with Tenant's use and enjoyment of the Demised Premises, other than to a de minimis extent (such minor or insubstantial details, "Punchlist Work"), which Tenant gives Landlord notice within thirty (30) days after Landlord's delivery of possession of the Demised Premises to Tenant with all of Landlord's Work substantially completed. Tenant's notice shall specify such Punchlist Work with reasonable particularity. Landlord shall use commercially reasonable efforts to complete all Punchlist Work within thirty (30) days of Tenant's delivery of its notice thereof. Notwithstanding the foregoing, if Tenant shall notify Landlord within one (1) year of the substantial completion of Landlord's Work (except one year from completion of the Punchlist Work with respect to such Punchlist Work) of any defects in Landlord's Work, Landlord shall promptly remedy such defects at its sole cost and expense.

11

ARTICLE 6 - TAX AND OPERATING EXPENSE PAYMENTS

6.01. From and after July 1, 2014, Tenant shall pay to Landlord, as hereinafter provided, the Real Estate Taxes. If any portion of the Building shall be exempt from all or any part of the Real Estate Taxes, then for the period of time when such exemption is in effect, the Floor Space on such exempt portion shall be excluded when making the above computations in respect of the part of the Real Estate Taxes for which such portion shall be exempt. Landlord shall estimate the annual amount of the Real Estate Taxes (which estimate may be changed by Landlord at any time and from time to time), and Tenant shall pay to Landlord 1/12th of the amount so estimated on the first day of each month in advance. Tenant shall also pay to Landlord on demand from time to time the amount which, together with said monthly installments, will be sufficient in Landlord's reasonable estimation to pay any Real Estate Taxes thirty (30) days prior to the date when such Real Estate Taxes shall first become due. When the amount of any item comprising Real Estate Taxes is finally determined for a real estate fiscal tax year, Landlord shall submit to Tenant a statement in reasonable detail of the same accompanied by copies of the applicable tax bills, and the figures used for computing the same, and if the amount so stated is more or less than the amount theretofore paid by Tenant for such item based on Landlord's estimate, Tenant shall pay to Landlord the deficiency within thirty (30) days after submission of such statement, or Landlord shall, at its sole election, either refund to Tenant the excess or apply same to future installments of Real Estate Taxes due hereunder. Notwithstanding the foregoing, if the Lease shall expire or be sooner terminated before any such excess has been fully recovered by Tenant, Landlord shall pay the remainder of the excess to Tenant within thirty (30) days of the expiration or sooner termination of the Term, which obligation shall survive any such expiration or termination. Any Real Estate Taxes for a real estate fiscal tax year, a part of which is included within the Term and a part of which is not so included, shall be apportioned on the basis of the number of days in the real estate fiscal tax year included in the Term, and the real estate fiscal tax year for any improvement assessment will be deemed to be the one-year period commencing on the date when such assessment is due, except that if any improvement assessment is payable in installments, the real estate fiscal tax year for each installment will be deemed to be the one-year period commencing on the date when such installment is due. The above computations shall be made by Landlord in accordance with generally accepted accounting principles, and the Floor Space referred to will be based upon the average of the Floor Space in existence on the first day of each month during the period in question. In addition to the foregoing, Tenant shall be responsible for any increase in Real Estate Taxes attributable to assessments for improvements installed by or for the account of Tenant at the Demised Premises. If the Demised Premises are not separately assessed, the amount of any such increase shall be determined by reference to the records of the tax assessor.

6.02. From and after July 1, 2014, Tenant shall pay to Landlord the Operating Expenses within twenty (20) days after Landlord submits to Tenant an invoice for the Operating Expenses.

6.03. Each such statement given by Landlord pursuant to Section 6.01 or Section 6.02 shall be conclusive and binding upon Tenant unless within 90 days after the receipt of such statement Tenant shall notify Landlord that it disputes the correctness of the statement, specifying the particular respects in which the statement is claimed to be incorrect. If such dispute is not

12

settled by agreement, either party may submit the dispute to arbitration as provided in Article 33. Pending the determination of such dispute by agreement or arbitration as aforesaid, Tenant shall, within thirty (30) days after receipt of such statement, pay the Additional Charges in accordance with Landlord's statement, without prejudice to Tenant's position. If the dispute shall be determined in Tenant's favor, Landlord shall forthwith pay to Tenant the amount of Tenant's overpayment resulting from compliance with Landlord's statement.

6.04. Notwithstanding anything in this Lease to the contrary, Tenant shall have no obligation to pay Real Estate Taxes or Operating Expenses that accrue with respect to any period that predates the Rent Commencement Date.

6.05. Provided Tenant is not in default of monetary or any other material non-monetary obligations under this Lease beyond any applicable notice and cure periods, Tenant shall have the right, at its sole cost and expense, upon at least thirty (30) days' prior written notice to Landlord, to examine Landlord's records relating to Operating Expenses of the Demised Premises for no more than one day per Calendar Year. Landlord shall make records available for examination at Landlord's principal office during Landlord's normal business days and normal business hours. If any such review discloses that Operating Expenses were overstated by Landlord, Landlord shall promptly refund or credit to Tenant any such excess. This provision shall not be deemed to give Tenant the right to offset or deduct or withhold payment of Rent. No subtenant shall have the right to conduct an examination and no assignee shall conduct an inspection for any period during which such assignee was not in possession of the Demised Premises. In the event Tenant elects to exercise an inspection of Landlord's records relating to Operating Expenses of the Demised Premises in accordance with this Section 6.05, such inspection must be conducted by an independent nationally recognized accounting firm that is not being compensated by Tenant on a contingency fee basis and Tenant and such firm agree to keep all information obtained during such examination confidential.

ARTICLE 7 - DEVELOPMENT COMMON AREAS

7.01. Landlord reserves the right, at any time and from time to time, to close all or any portions of the Development Common Areas when in Landlord's reasonable judgment any such closing, is necessary or desirable (a) to make repairs or changes or to effect construction, (b) to prevent the acquisition of public rights in such areas, (c) to discourage unauthorized parking, (d) to protect or preserve natural persons or property, or (e) to cease the utilization of such premises as a Development Common Area, provided that no such closure shall adversely impact in any material manner upon ingress to or egress from the Building or the Demised Premises or otherwise adversely impact in any material manner upon the use and enjoyment of the Demised Premises by Tenant and its assigns, if any. Landlord may do such other acts in and to the Development Common Areas as in its judgment may be desirable to improve or maintain same so long as such other acts do not adversely impact in any material manner upon the use and enjoyment of the Demised Premises by Tenant and its subtenants and assigns, if any.

13

ARTICLE 8 - SECURITY

8.01. (a) In the event Tenant deposits with Landlord any Security Deposit, the same shall be held as security for the full and faithful payment and performance by Tenant of Tenant's obligations under this Lease. If Tenant defaults beyond applicable notice and cure periods in the full and prompt payment and performance of any of its obligations under this Lease, including, without limitation, the payment of Rent, Landlord may use, apply or retain the whole or any part of the security so deposited to the extent required for the payment of any Rent or any other sums as to which Tenant is in default or for any sum which Landlord may expend or may be required to expend by reason of Tenant's default in respect of any of Tenant's obligations under this Lease, including, without limitation, any damages or deficiency in the reletting of the Demised Premises, whether such damages or deficiency accrue before or after summary proceedings or other re-entry by Landlord. If Landlord shall so use, apply or retain the whole or any part of the security, Tenant shall upon demand promptly deposit with Landlord a sum equal to the amount so used, applied and retained, as security as aforesaid. Provided at the end of the Term Tenant is not in default hereunder beyond any notice and cure period, the security or any balance thereof to which Tenant is entitled shall be returned or paid over to Tenant after the date on which this Lease shall expire or sooner end or terminate, and after delivery to Landlord of entire possession of the Demised Premises. In the event of any sale or leasing of the Land, Landlord shall transfer the security to which Tenant is entitled to the vendee or lessee and Landlord shall thereupon be released by Tenant from all liability for the return or payment thereof; and Tenant shall look solely to the new landlord for the return or payment of the same; and the provisions hereof shall apply to every transfer or assignment made of the same to a new landlord. Tenant shall not assign or encumber or attempt to assign or encumber the monies deposited herein as security, and neither Landlord nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance.

(b) In lieu of the cash security required by this Lease, Tenant shall provide to Landlord an irrevocable transferable Letter of Credit in the amount of the Security Deposit in form annexed hereto as Exhibit E and issued Square One Bank or any other financial institution approved by Landlord. Landlord shall have the right, upon written notice to Tenant (except that for Tenant's nonpayment of Rent or for Tenant's failure to comply with Article 8.03, no such notice shall be required) and regardless of the exercise of any other remedy the Landlord may have by reason of a default, to draw upon said Letter of Credit to cure any default of Tenant which (except as otherwise provided herein) is not cured within applicable notice and cure periods, or for any purpose authorized by section 8.01(a) of this Lease and if Landlord does so, Tenant shall, upon demand, additionally fund the Letter of Credit with the amount so drawn so that Landlord shall have the full deposit on hand at all times during the Term of the Lease and for a period of thirty (30) days' thereafter. In the event of a sale of the Building or a lease of the Building subject to this Lease, Landlord shall have the right to transfer the security to the vendee or lessee.

8.02. The Letter of Credit shall expire not earlier than thirty (30) days after the Expiration Date of this Lease. The Letter of Credit may be of the type which is automatically renewed on an annual basis (Annual Renewal Date), provided however, in such event Tenant shall maintain the Letter of Credit and its renewals in full force and effect during the entire Term of this Lease (including any renewals or extensions) and for a period of thirty (30) days thereafter. The Letter of Credit will contain a provision requiring the issuer thereof to give the beneficiary (Landlord) thirty (30) days' advance written notice of its intention not to renew the Letter of Credit on the next Annual Renewal Date.

14

8.03. In the event Tenant shall fail to deliver to Landlord a substitute irrevocable Letter of Credit, in the amount stated above, on or before thirty (30) days prior to the next Annual Renewal Date, said failure shall be deemed a default under this Lease. Landlord may, in its discretion treat this the same as a default in the payment of Rent or any other default and pursue the appropriate remedy. In addition, and not in limitation, Landlord shall be permitted to draw upon the Letter of Credit as in the case of any other default by Tenant under the Lease.

8.04. Provided Tenant is not in default of its obligations under this Lease beyond applicable notice and cure periods, the Security Deposit shall be reduced in the amount of $[***] on July 1, 2015 resulting in a total Security Deposit of $[***], and $[***] on July 1, 2016 resulting in a total Security Deposit of $[***], and $[***] on July 1, 2017 resulting in a total Security Deposit of $[***]. In no event however shall the Letter of Credit contain a provision for its automatic reduction. If such reduction in the Letter of Credit shall be accomplished via the issuance of a replacement Letter of Credit, rather than an amendment to the existing Letter of Credit, Landlord agrees to return the existing Letter of Credit to Tenant or the issuer thereof within two (2) Business Days of Tenant's delivery of the replacement Letter of Credit in the reduced amount permitted above.

ARTICLE 9 - SUBORDINATION

9.01. This Lease, and all rights of Tenant hereunder, are and shall be subject and subordinate to all ground leases and underlying leases of the Land and/or the Building now or hereafter existing and to all Mortgages which may now or hereafter affect the Land and/or building and/or any of such leases, whether or not such Mortgages or leases shall also cover other lands and/or buildings, to each and every advance made or hereafter to be made under such Mortgages, and to all renewals, modifications, replacements and extensions of such leases and such Mortgages and spreaders and consolidations of such Mortgages. The provisions of this Section 9.01 shall be self-operative and no further instrument of subordination shall be required. In confirmation of such subordination, Tenant shall within ten (10) days of request execute, acknowledge and deliver any instrument that Landlord, the lessor under any such lease or the Mortgagee of any such Mortgage or any of their respective successors in interest may reasonably request to evidence such subordination. (See Rider Section R12.)

9.02. If any act or omission of Landlord would give Tenant the right, immediately or after lapse of a period of time, to cancel or terminate this Lease, or to claim a partial or total eviction, Tenant shall not exercise such right (a) until it has given written notice of such act or omission to Landlord and each Superior Mortgagee and each Superior Lessor whose name and address shall previously have been furnished to Tenant, and (b) until a reasonable period for remedying such act or omission shall have elapsed following the giving of such notice and following the time when such Superior Mortgagee or Superior Lessor shall have become entitled under such Superior Mortgage or Superior Lease, as the case may be, to remedy the same (which reasonable period shall in no event be less than the period to which Landlord would be entitled under this Lease or otherwise, after similar notice, to effect such remedy), provided such Superior Mortgagee or Superior Lessor shall with due diligence give Tenant notice of intention to, and commence, its cure of Landlord's default within forty five (45) days of Tenant's delivery of notice of Landlord's default, and thereafter continue to remedy such act or omission with commercially reasonable and diligent efforts.

15

9.03. If any Superior Lessor or Superior Mortgagee shall succeed to the rights of Landlord under this Lease, whether through possession or foreclosure action or delivery of a new lease or deed, then at the request of such party so succeeding to Landlord's rights ("Successor Landlord") and upon such Successor Landlord's written agreement to accept Tenant's attornment, Tenant shall attorn to and recognize such Successor Landlord as Tenant's landlord under this Lease and shall promptly execute and deliver any instrument that such Successor Landlord may reasonably request to evidence such attornment. Upon such attornment this Lease shall continue in full force and effect as a direct lease between the Successor Landlord and Tenant upon all of the terms, conditions and covenants as are set forth in this Lease except that the Successor Landlord shall not (a) be liable for any previous act or omission of Landlord under this Lease not continuing after Successor Landlord shall succeed to the rights of Landlord under this Lease; (b) be subject to any offset, not expressly provided for in this Lease, which theretofore shall have accrued to Tenant against Landlord; (c) be liable for the return of any Security Deposit, in whole or in part, to the extent that same is not paid over to the Successor Landlord; or (d) be bound by any previous modification of this Lease or by any previous prepayment of more than one month's Fixed Rent or Additional Charges, unless such modification or prepayment shall have been expressly approved in writing by the Superior Lessor of the Superior Lease or the Mortgagee of the Superior Mortgage through or by reason of which the Successor Landlord shall have succeeded to the rights of Landlord under this Lease.

9.04. If any then present or prospective Superior Mortgagee shall require any modification(s) of this Lease, Tenant shall promptly execute and deliver to Landlord such instruments effecting such modification(s) as Landlord shall request, provided that such modification(s) do not adversely affect in any material respect any of Tenant's rights under this Lease or at law or in equity, or increase the Rent or any of Tenant's costs of doing business from the Demised Premises, other than to a de minimis extent.

ARTICLE 10 - QUIET ENJOYMENT

10.01. So long as this Lease shall be in full force and effect, Tenant shall peaceably and quietly have, hold and enjoy the Demised Premises without hindrance, ejection or molestation by Landlord or any person lawfully claiming through or under Landlord, subject, nevertheless, to the provisions of this Lease and to Superior Leases and Superior Mortgages.

ARTICLE 11 - ASSIGNMENT, SUBLETTING AND MORTGAGING

11.01. Tenant shall not, whether voluntarily, involuntarily, or by operation of law or otherwise, (a) assign or otherwise transfer this Lease, or advertise to do so, (b) sublet the Demised Premises or any part thereof, or advertise to do so, or allow the same to be used, occupied or utilized by anyone other than Tenant, or (c) mortgage, pledge, encumber or otherwise hypothecate this Lease in any manner whatsoever, without in each instance obtaining the prior written consent of Landlord. Landlord agrees not to unreasonably withhold its consent to the subletting of the Demised Premises or an assignment of this Lease. In determining reasonableness, Landlord may take into consideration all relevant factors surrounding the proposed sublease and assignment, including, without limitation, the following: (i) The business reputation of the proposed assignee or subtenant and its officers or directors in relation to the other tenants or occupants of the Development; (ii) the nature of the business and the proposed use of the Demised Premises by the

16

proposed assignee or subtenant in relation to the other tenants or occupants of the Development; (iii) whether the proposed assignee or subtenant is then a tenant (or subsidiary, affiliate or parent of a tenant) of other space in the Development, or any other property owned or managed by Landlord or its affiliates; (iv) the financial condition of the proposed assignee or subtenant; (v) restrictions, if any, contained in leases or other agreements affecting the Building and the Development; (vi) the effect that the proposed assignee's or subtenant's occupancy or use of the Demised Premises would have upon the operation and maintenance of the Building and the Development; (vii) the extent to which the proposed assignee and Tenant provide Landlord with assurances reasonably satisfactory to Landlord as to the satisfaction of Tenant's obligations hereunder. In any event, at no time shall there be more than two (2) subtenants of the Demised Premises permitted. Notwithstanding the foregoing, Tenant may advertise an assignment of the Lease or a sublease of the Demised Premises provided the advertising does not price the unit at an effective cost per square foot which is less than Landlord's then asking rents for comparable properties in the vicinity of the Demised Premises.

In the event the Demised Premises are sublet or this Lease is assigned, Tenant shall pay to Landlord as an Additional Charge the following amounts less the actual reasonable expense incurred by Tenant in connection with such assignment or subletting, as substantiated by Tenant, in writing, to Landlord's reasonable satisfaction, including, without limitation, a reasonable brokerage fee and reasonable legal fees, as the case may be: (i) in the case of an assignment, an amount equal to [***] of all sums and other consideration paid to Tenant by the assignee for or by reason of such assignment, and (ii) in the case of a sublease, [***] of any rents, additional charge or other consideration payable under the sublease to Tenant by the subtenant which is in excess of the Fixed Rent and Additional Charges accruing during the term of the sublease in respect of the subleased space (at the rate per square foot payable by Tenant hereunder) pursuant to the terms hereof. Notwithstanding anything herein contained in this subsection to the contrary, the forgoing Additional Charge shall not be applicable to and upon prior or simultaneous notice to Landlord Tenant may assign this Lease, or sublet the whole or any portion of the Premises, to its parent, subsidiary or any affiliate, provided that (i) with respect to an assignment, that such assignee promptly executes and delivers to Landlord an assignment agreement pursuant to which it assumes all obligations under the Lease; and (ii) with respect to a sublease, that such sublessee promptly executes and delivers to Landlord a sublease agreement which includes a provision to the effect that the sublease is subject to the terms and provisions of the Lease. The term "affiliate", as used hereinabove, shall mean any corporation or other entity controlled by, under common control with, or which controls Tenant.

11.02. If at any time (a) the original Tenant named herein, (b) the then Tenant, (c) any Guarantor, or (d) any Person owning a majority of the voting stock of, or directly or indirectly controlling, the then Tenant shall be a corporation, limited liability company, or partnership, any transfer of voting stock or other ownership interest (including but not limited to membership interest, economic interest, or partnership interest) resulting in the person(s) who shall have owned a majority of such corporation's shares of voting stock, or the majority of the membership interests or economic interest in such limited liability company, or the majority of the general partners' interest or the majority of the limited partner's interest in such partnership, as the case may be, immediately before such transfer, ceasing to own a majority of such shares of voting stock, membership or economic interest, general partner's ownership or economic interest, or limited partner's ownership or economic interest, as the case may be, except as the result of transfers by

17

inheritance, shall be deemed to be an assignment of this Lease as to which Landlord's consent shall have been required, and in any such event Tenant shall notify Landlord. The provisions of this Section 11.02 shall not be applicable to any corporation all the outstanding voting stock of which is listed on a national securities exchange (as defined in the Securities Exchange Act of 1934, as amended) or is traded in the over-the-counter market with quotations reported by the National Association of Securities Dealers through its automated system for reporting quotations and shall not apply to transactions with a corporation or limited liability company into or with which the then Tenant is merged or consolidated or to which substantially all of the then Tenant's assets are transferred or to any corporation or limited liability company which controls or is controlled by the then Tenant or is under common control with the then Tenant, provided that in any of such events (i) the successor to Tenant has a net worth computed in accordance with generally accepted accounting principles at least equal to the greater of (1) the net worth of Tenant immediately prior to such merger, consolidation or transfer, or (2) the net worth of the original Tenant on the date of this Lease, and (ii) proof satisfactory to Landlord of such net worth shall have been delivered to Landlord at least 10 days prior to the effective date of any such transaction (or immediately following such transaction if Tenant shall reasonably require that the transaction remain confidential). For the purposes of this Section, the words "voting stock" shall refer to shares of stock regularly entitled to vote for the election of directors of the corporation. Landlord shall have the right at any time and from time to time during the Term to inspect the stock record books or other ownership records of the entity to which the provisions of this Section 11.02 apply, and Tenant will produce the same on request of Landlord. Notwithstanding the foregoing, notice only to (and not consent by) Landlord shall be required in connection with a sale of the tenant entity, whether effected via a stock sale or a sale of assets, provided (i) such sale is not made in an effort to avoid the assignment restrictions contained in section 11.01; (ii) the provisions of subsections (i)—(vii) in the first paragraph of section 11.01 are satisfied; and (iii) the net worth of the successor tenant/assignee is not less than $[***] at the time of such transaction. In the event the foregoing conditions are satisfied, landlord shall not be entitled to share in any profits of such transaction as provided for in the second paragraph of section 11.01.

11.03. If this Lease is assigned, whether or not in violation of this Lease, Landlord may collect rent from the assignee. If the Demised Premises or any part thereof are sublet or used or occupied by anybody other than Tenant, whether or not in violation of this Lease, Landlord may, after any monetary or other material non-monetary default by Tenant, and expiration of Tenant's time to cure such default, collect rent from the subtenant or occupant. In either event, Landlord may apply the net amount collected to the Rent, but no such assignment, subletting, occupancy or collection shall be deemed a waiver of any of the provisions of Section 11.01 or Section 11.02, or the acceptance of the assignee, subtenant or occupant as tenant, or a release of Tenant from the performance by Tenant of Tenant's obligations under this Lease. The consent by Landlord to any assignment, mortgaging, subletting or use or occupancy by others shall not in any way be considered to relieve Tenant from obtaining the express written consent of Landlord to any other or further assignment, mortgaging or subletting or use or occupancy by others not expressly permitted by this Article 10. References in this Lease to use or occupancy by others (that is, anyone other than Tenant) shall not be construed as limited to subtenants and those claiming under or through subtenants but shall be construed as including also licensees and others claiming under or through Tenant, immediately or remotely.

18

11.04. Any permitted assignment or transfer, whether made with Landlord's consent pursuant to Section 11.01 or without Landlord's consent if permitted by Section 11.02, shall be made only if, and shall not be effective until, the assignee shall execute, acknowledge and deliver to Landlord an agreement in form and substance reasonably satisfactory to Landlord whereby the assignee shall assume Tenant's obligations under this Lease and whereby the assignee shall agree that all of the provisions in this Article 11 shall, notwithstanding such assignment or transfer, continue to be binding upon it in respect to all future assignments and transfers. Notwithstanding any assignment or transfer, whether or not in violation of the provisions of this Lease, and notwithstanding the acceptance of Rent by Landlord from an assignee, transferee, or any other party, the original Tenant and any other person(s) who at any time was or were Tenant shall remain fully liable for the payment of the Rent and for Tenant's other obligations under this Lease.

11.05. The liability of the original named Tenant and any other Person(s) (including but not limited to any Guarantor) who at any time are or become responsible for Tenant's obligations under this Lease shall not be discharged, released or impaired by any agreement extending the time of, or modifying any of the terms or obligations under this Lease, or by any waiver or failure of Landlord to enforce, any of this Lease.

11.06. The listing of any name other than that of Tenant, whether on the doors of the Demised Premises or the Building directory, or otherwise, shall not operate to vest any right or interest in this Lease or in the Demised Premises, nor shall it be deemed to be the consent of Landlord to any assignment or transfer of this Lease or to any sublease of the Demised Premises or to the use or occupancy thereof by others. Notwithstanding anything contained in this Lease to the contrary, Landlord shall have the absolute right to withhold its consent to an assignment or subletting to a Person who is otherwise a tenant or occupant of a building owned or managed by Landlord or its affiliated entities in the Development.

11.07. Without limiting any of the provisions of Article 24, if pursuant to the Federal Bankruptcy Code (or any similar law hereafter enacted having the same general purpose), Tenant is permitted to assign this Lease notwithstanding the restrictions contained in this Lease, adequate assurance of future performance by an assignee expressly permitted under such Code shall be deemed to mean the deposit of cash security in an amount equal to the sum of one (1) year's Fixed Rent plus an amount equal to the Additional Charges for the Calendar Year preceding the year in which such assignment is intended to become effective, which deposit shall be held by Landlord for the balance of the Term, without interest, as security for the full performance of all of Tenant's obligations under this Lease, to be held and applied in the manner specified for security in Article 8.

11.08. If Tenant shall propose to assign or in any manner transfer this Lease or any interest therein, or sublet the Demised Premises or any part or parts thereof, or grant any concession or license or otherwise permit occupancy of all or any part of the Demised Premises by any person, Tenant shall give notice thereof to Landlord, together with a copy of a letter of intent or term sheet setting forth the material terms and provisions of the proposed assignment or sublease transaction and such financial and other information pertaining to the proposed assignee, transferee, subtenant, concessionaire or licensee as Landlord shall reasonably require. Landlord shall provide written notice of its consent to or rejection of any proposed assignment or sublease transaction within twenty (20) days of Tenant's delivery of its notice requesting Landlord's consent. If Landlord

19

shall reject the proposed assignment or sublease transaction, Landlord shall include with its notice of rejection a reasonably detailed description of Landlord's reason(s) for rejecting the proposed transaction. If Landlord consents to the proposed assignment or sublease transaction and Tenant does not consummate the subject transaction within ninety (90) days after Landlord delivers its notice approving the transaction, Tenant shall again be required to comply with the provisions of this Section 11.08 in connection with any such transaction as if the notice by Tenant referred to above in this Section 11.08 had not been given. Notwithstanding anything contained in this Lease to the contrary, Landlord shall not be obligated to entertain or consider any request by Tenant to consent to any proposed assignment of this Lease or sublet of all or any part of the Demised Premises unless each request by Tenant is accompanied by a non-refundable fee payable to Landlord in the amount of [***] to cover Landlord's administrative, legal, and other costs and expenses incurred in processing each of Tenant's requests. Neither Tenant's payment nor Landlord's acceptance of the foregoing fee shall be construed to impose any obligation whatsoever upon Landlord to consent to Tenant's request. If Landlord shall fail to provide notice of its approval or disapproval of any request for assignment or sublease within twenty (20) days, Landlord shall be deemed to have approved of the assignment or sublease if Tenant refers to this Lease section and notifies Landlord of this deemed approval provision in Tenant's request for approval.

ARTICLE 12 - COMPLIANCE WITH LAWS

12.01. Tenant shall comply with all Legal Requirements which shall, in respect of the Demised Premises or the use and occupation thereof, or the abatement of any nuisance in, on or about the Demised Premises, impose any violation, order or duty on Landlord or Tenant; and Tenant shall pay all the cost, expenses, fines, penalties and damages which may be imposed upon Landlord or any Superior Lessor by reason of or arising out of Tenant's failure to fully and promptly comply with and observe the provisions of this Section 12.01. However, Tenant need not comply with any such law or requirement of any public authority so long as Tenant shall be contesting the validity thereof, or the applicability thereof to the Demised Premises, in accordance with Section 12.02. Landlord represents that to the best of its knowledge there are no outstanding notices of violation of any Legal Requirements affecting the Demised Premises and Landlord shall be solely responsible for correcting any such open violations notices received prior to the Commencement Date unless arising as a result of any action of Tenant or any entity acting under the direction of or on behalf of Tenant.

12.02. Tenant may contest, by appropriate proceedings prosecuted diligently and in good faith, the validity, or applicability to the Demised Premises, of any Legal Requirement, provided that (a) Landlord shall not be subject to criminal penalty or to prosecution for a crime or offense, and neither the Demised Premises nor any part thereof shall be subject to being condemned or vacated, by reason of non-compliance or otherwise by reason of such contest; (b) before the commencement of such contest, Tenant shall furnish to Landlord either (i) the bond of a surety company reasonably satisfactory to Landlord, which bond shall be, as to its provisions and form, satisfactory to Landlord, and shall be in an amount at least equal to [***]% of the cost of such compliance (as estimated by a reputable contractor designated by Landlord) and shall indemnify Landlord against the cost thereof and against all liability for damages, interest, penalties and expenses (including reasonable attorneys' fees and expenses), resulting from or incurred in connection with such contest or non-compliance, or (ii) other security in place of such bond

20

satisfactory to Landlord; (c) such non-compliance or contest shall not constitute or result in any violation of any Superior Lease or Superior Mortgage, or if any such Superior Lease and/or Superior Mortgage shall permit such non-compliance or contest on condition of the taking of action or furnishing of security by Landlord, such action shall be taken and such security shall be furnished at the expense of Tenant; and (d) Tenant shall keep Landlord advised as to the status of such proceedings. Without limiting the application of the above, Landlord shall be deemed subject to prosecution for a crime or offense if Landlord, or its managing agent, or any officer, director, partner, shareholder or employee of Landlord or its managing agent, as an individual, is charged with a crime or offense of any kind or degree whatsoever, whether by service of a summons or otherwise, unless such charge is withdrawn before Landlord or its managing agent, or such officer, director, partner, shareholder or employee of Landlord or its managing agent (as the case may be) is required to plead or answer thereto. Notwithstanding anything contained in this Lease to the contrary, Tenant shall not file any Real Estate Tax appeal without the prior written consent of Landlord, which consent may be given or withheld in Landlord's absolute discretion. Notwithstanding the foregoing, at any time other than the last eighteen (18) months of the Term, Landlord shall consent to Tenant's request to appeal the Real Estate Taxes provided (i) Tenant shall notify Landlord of its intention to commence an appeal (and such notice shall make reference to this Section) and (ii) on the thirtieth day prior to the final date permitted for such tax appeal, Landlord has failed to either commence such appeal or to notify Tenant of its intention to do so. In the event Tenant commences such appeal, Tenant shall provide Landlord with the opportunity to participate in such appeal and shall provide Landlord with copies of all correspondence, documentation and records of such appeal upon receipt of same. Under no circumstances shall Tenant make any commitment restricting the right to undertake a tax appeal for any future period of time.

ARTICLE 13 - INSURANCE AND INDEMNITY

13.01. During the Term Tenant shall maintain at its own cost and expense the following insurance: (a) comprehensive or commercial general liability insurance in respect of the Demised Premises and the conduct and operation of business therein, having limits of liability not less than $[***] per occurrence for bodily injury or property damage coverage to include but not be limited to completed operations, contractual liability and product liability, (b) automobile liability insurance covering all owned, hired and non-owned vehicles used by the Tenant in connection with their work and any loading or unloading of such vehicles, with limits as stated above and (c) workmen's compensation and employers liability insurance as required by statutes, but in any event not less than $[***] for each accident or occupational disease for employers liability, (d) All-Risk insurance (including flood and earthquake) covering the Demised Premises and Tenant's stock in trade, fixtures, furniture, furnishings, removable floor coverings, equipment, signs or any other property of Tenant in the Demised Premises, against loss or damage in an amount equal to the full replacement value thereof as same might increase from time to time or such higher amount as either may be required by the holder of any fee mortgage covering the Demises Premises or is necessary to prevent Landlord and/or Tenant from becoming a co-insurer, such insurance to include (i) coverage for property of others in the care, custody and control of Tenant in amounts sufficient to cover the maximum value of such property and to the extent of Tenant's liability therefor, (ii) boiler and machinery insurance, if applicable (iii) rent insurance in an amount equal to the Rent, and all other charges payable by Tenant pursuant to this Lease for a period of one (1) year and (iv) a provision that the insurer will waive subrogation against Landlord,

21

and (e) any other insurance that Landlord may reasonably require provided same is generally required by owners of similar real property. Landlord may at any time and from time to time require that the limits for the liability insurance to be maintained by Tenant be increased to the limits that new Tenants in similar buildings are required by Landlord to maintain, but in no event more frequently than once every two (2) years. The insurance carried pursuant to Section 13.01 (d) shall be carried in favor of Landlord and the holder of any fee mortgage on the Premises and the standard mortgagee clause shall be attached to the appropriate policies or certificates thereof. Insurance carried pursuant to Section 13.01(d) shall provide that the loss, if any, shall be adjusted with and payable to the party who will perform the work of restoration pursuant to Article 22 and such mortgagee as their interests may appear. Tenant shall deliver to Landlord and any additional insured(s) certificates for such fully paid for policies (with property and liability insurance evidenced on an Acord 27 form) upon execution hereof. Upon request of Landlord, Tenant shall furnish Landlord with copies of all such insurance policies. Tenant shall procure and pay for renewals of such insurance from time to time before the expiration thereof, and Tenant shall deliver to Landlord and any additional insured(s), certificates therefor at least five (5) Business Days before the expiration of any existing policy. All such policies shall be issued by companies acceptable to Landlord, having a Bests Rating of not less than A, Class VII (or an equivalent S&P rating if requested by Landlord), and licensed to do business in New Jersey, and all such policies shall contain a provision whereby the same cannot be canceled unless Landlord and any additional insured(s) are given at least thirty (30) days' prior written notice of such cancellation. The insurance required by this Section (other than worker's compensation insurance) and the certificates thereof to be delivered to Landlord by Tenant shall name Landlord as an additional insured and, at Landlord's request, shall also name any Superior Lessors or Superior Mortgagees as additional insureds, and the following phrase must be typed on the certificate of insurance: "Hartz Mountain Industries, Inc., and its respective subsidiaries, affiliates, associates, joint ventures, and partnerships, are hereby named as additional insureds as their interests may appear (and if Landlord has so requested, Tenant shall include any Superior Lessors and Superior Mortgagees as additional insured(s)). It is intended for this insurance to be primary and non-contributing." Tenant shall give Landlord at least thirty (30) days' prior written notice that any such policy is being canceled or replaced.

13.02. Tenant shall not do, permit or suffer to be done any act, matter, thing or failure to act in respect of the Demised Premises or use or occupy the Demised Premises or conduct or operate Tenant's business in any manner objectionable to any insurance company or companies whereby the fire insurance or any other insurance then in effect in respect to the Land and Building or any part thereof shall become void or suspended or whereby any premiums in respect of insurance maintained by Landlord shall be materially higher than those which would normally have been in effect for the occupancy contemplated under the Permitted Uses. In case of a breach of the provisions of this Section 13.02, in addition to all other rights and remedies of Landlord hereunder, Tenant shall (a) indemnify Landlord and the Superior Lessors and hold Landlord and the Superior Lessors harmless from and against any loss which would have been covered by insurance which shall have become void or suspended because of such breach by Tenant and (b) pay to Landlord any and all increases of premiums on any insurance, including, without limitation, rent insurance, resulting from any such breach.

22

13.03. Tenant shall indemnify and hold harmless Landlord and all Superior Lessors and its and their respective partners, joint venturers, directors, officers, agents, servants and employees from and against any and all claims arising from or in connection with (a) the conduct or management of the Demised Premises or of any business therein, or any work or thing whatsoever done, or any condition created (other than by Landlord or its employees, agents or contractors) in the Demised Premises during the Term or during the period of time, if any, prior to the Commencement Date that Tenant may have been given access to the Demised Premises; (b) any act, omission or negligence of Tenant or any of its subtenants or licensees or its or their partners, joint venturers, directors, officers, agents, employees or contractors; (c) any accident, injury or damage whatever (unless caused solely by the negligence of Landlord or its employees, agents or contractors) occurring in the Demised Premises; and (d) any breach or default by Tenant in the full and prompt payment and performance of Tenant's obligations under this Lease; together with all costs, expenses and liabilities incurred in or in connection with each such claim or action or proceeding brought thereon, including, without limitation, all reasonable attorneys' fees and expenses. In case any action or proceeding is brought against Landlord and/or any Superior Lessor and/or its or their partners, joint venturers, directors, officers, agents and/or employees in connection with conduct or management of the Demised Premises or by reason of any claim referred to above, Tenant, upon notice from Landlord or such Superior Lessor, shall, at Tenant's cost and expense, resist and defend such action or proceeding by counsel reasonably satisfactory to Landlord.

13.04. Neither Landlord nor Tenant shall be liable or responsible for, and each party releases the other from, all liability and responsibility to the other and any person claiming by, through or under Tenant, by way of subrogation or otherwise, for any injury, loss or damage to any person or property in or around the Demised Premises or to a party's business irrespective of the cause of such injury, loss or damage, and each of Landlord and Tenant shall require its respective insurers to include in all of their insurance policies which could give rise to a right of subrogation against the other a clause or endorsement whereby the insurer waives any rights of subrogation against the other or permits the insured, prior to any loss, to agree with a third party to waive any claim it may have against said third party without invalidating the coverage under the insurance policy.

13.05. Landlord shall indemnify and hold harmless Tenant and its partners, joint venturers, directors, officers, agents, servants and employees from and against any and all claims arising from or in connection with (a) any act, omission or negligence of Landlord or its partners, joint venturers, directors, officers, agents, employees with respect to management of the Development Common Areas; and (b) any breach or default by Landlord in the full and prompt payment and performance of Landlord's obligations under this Lease; together with all costs, expenses and liabilities incurred in or in connection with each such claim or action or proceeding brought thereon, including, without limitation, all reasonable attorneys' fees and expenses. In case any action or proceeding is brought against Tenant and/or its partners, joint venturers, directors, officers, agents and/or employees in connection with foregoing management of the Development Common Areas or by reason of any claim referred to above, Landlord, upon notice from Tenant, shall, at Landlord's cost and expense, resist and defend such action or proceeding by counsel reasonably satisfactory to Tenant.

23

ARTICLE 14 - RULES AND REGULATIONS

14.01. Tenant and its employees and agents shall faithfully observe and comply with the Rules and Regulations and such reasonable changes therein (whether by modification, elimination or addition) as Landlord at any time or times hereafter may make and notify Tenant in writing, which in Landlord's reasonable judgment, shall be necessary for the reputation, safety, care or appearance of the Land and Building, or the preservation of good order therein, or the operation or maintenance of the Building or its equipment and fixtures, and which do not unreasonably affect the conduct of Tenant's business in the Demised Premises; provided, however, that in case of any conflict or inconsistency between the provisions of this Lease and any of the Rules and Regulations, the provisions of this Lease shall control. Landlord shall not discriminate against Tenant in the enactment or enforcement of any of the Rules and Regulations. In the event Landlord shall desire to change any of the Rules and Regulations, Landlord in each instance shall provide Tenant with prior written notice of such changes, and in no event shall any such changes reduce or diminish any of Tenant's rights or Landlord's obligations under the Lease in any material manner. So long as Tenant and its subtenants and assigns shall be the sole occupants of the Building, any of the Rules and Regulations which are designed to control the interactions between occupants in a multi-tenanted building and/or to minimize conflicts between occupants in a multi-tenanted building shall not be applicable to Tenant and its subtenants and assigns, and Tenant shall have the sole right and authority to promulgate rules governing the interactions between itself and its subtenants and assigns provided same shall not conflict in any manner with the terms of this Lease.

ARTICLE 15 - ALTERATIONS AND SIGNS

15.01. Tenant shall not make any alterations or additions to the Demised Premises, or make any holes or cuts in the walls, ceilings, roofs, or floors thereof, or change the exterior color or architectural treatment of the Demised Premises, without on each occasion first obtaining the consent of Landlord. Notwithstanding the foregoing, Landlord shall not unreasonably withhold its consent for alterations that are non-structural in nature and do not involve or affect the mechanical systems of the Demised Premises or Building and having a cost of less than $[***]. Tenant shall submit to Landlord plans and specifications for such work at the time Landlord's consent is sought. Tenant shall pay to Landlord upon demand the actual, reasonable, out-of-pocket cost and expense of Landlord in (a) reviewing said plans and specifications and (b) inspecting the alterations to determine whether the same are being performed in accordance with the approved plans and specifications and all Legal Requirements and Insurance Requirements, including, without limitation, the actual, reasonable, out-of-pocket fees of any architect or engineer employed by Landlord for such purpose. Before proceeding with any permitted alteration which will cost more than $[***] (exclusive of the costs of decorating work and items constituting Tenant's Property), as estimated by a reputable contractor reasonably designated by Landlord, Tenant shall obtain and deliver to Landlord either (i) a performance bond and a labor and materials payment bond (issued by a corporate surety licensed to do business in New Jersey), each in an amount equal to [***]% of such estimated cost and in form reasonably satisfactory to Landlord, or (ii) such other security as shall be reasonably satisfactory to Landlord. Tenant shall fully and promptly comply with and observe the reasonable Rules and Regulations then in force and of which notice has been provided to Tenant in respect of the making of alterations. Any review or approval by Landlord of any plans and/or specifications with respect to any alterations is solely for Landlord's benefit, and without any representation or warranty whatsoever to Tenant in respect to the adequacy, correctness or efficiency thereof or otherwise.

24

15.02. Tenant shall obtain all necessary governmental permits and certificates for the commencement and prosecution of permitted alterations and for final approval thereof upon completion, and shall cause alterations to be performed in compliance with all applicable Legal Requirements and Insurance Requirements. Alterations shall be diligently performed in a good and workmanlike manner, using new materials and equipment at least equal in quality and class to the better of (a) the original installations of the Building, or (b) the then standards for the Building established by Landlord. Alterations shall be performed by contractors first approved by Landlord (such approval not to be unreasonably withheld, conditioned or delayed); provided, however, that any alterations in or to the mechanical, electrical, sanitary, heating, ventilating, air conditioning or other systems of the Building shall be performed only by the contractor(s) designated by Landlord. Alterations shall be made in such manner as not to unreasonably interfere with or delay and as not to impose any additional material expense upon Landlord in the construction, maintenance, repair or operation of the Building; and if any such additional expense shall be incurred by Landlord as a result of Tenant's making of any alterations, Tenant shall pay any such additional expense upon demand. Throughout the making of alterations, Tenant shall carry, or cause to be carried, workmen's compensation insurance in statutory limits and general liability insurance, with completed operation endorsement, for any occurrence in or about the Building, under which Landlord and its managing agent and any Superior Lessor whose name and address shall previously have been furnished to Tenant shall be named as parties insured, in such limits as Landlord may reasonably require, with insurers reasonably satisfactory to Landlord. Tenant shall furnish Landlord with reasonably satisfactory evidence that such insurance is in effect at or before the commencement of alterations and, on request, at reasonable intervals thereafter during the making of alterations.

15.03. Tenant shall not place any signs on the roof, exterior walls or grounds of the Demised Premises without first obtaining Landlord's written consent thereto, which consent shall not be unreasonably withheld, conditioned or delayed, provided however that Landlord's consent shall not be unreasonably withheld, conditioned or delayed with respect to Tenant's request to place signage on the exterior walls of the Building or the grounds of the Demised Premises in compliance with Legal Requirements. In placing any signs on or about the Demised Premises, Tenant shall, at its expense, comply with all applicable legal requirements and obtain all required permits and/or licenses.


ARTICLE 16 - LANDLORD'S AND TENANT'S PROPERTY


16.01. All fixtures, equipment, improvements and appurtenances attached to or built into the Demised Premises at the commencement of or during the Term, whether or not by or at the expense of Tenant, shall be and remain a part of the Demised Premises, shall be deemed to be the property of Landlord and shall not be removed by Tenant, except as provided in Section 16.02. Further, any carpeting or other personal property in the Demised Premises on the Commencement Date, unless installed and paid for by Tenant, shall be and shall remain Landlord's property and shall not be removed by Tenant.

25

16.02. All movable partitions, business and trade fixtures, machinery and equipment, communications equipment and office equipment, whether or not attached to or built into the Demised Premises, which are installed in the Demised Premises by or for the account of Tenant without expense to Landlord and can be removed without structural damage to the Building and all furniture, furnishings, and other movable personal property owned by Tenant and located in the Demised Premises (collectively, "Tenant's Property") shall be and shall remain the property of Tenant and may be removed by Tenant at any time during the Term; provided that if any of the Tenant's Property is removed, Tenant shall repair or pay the cost of repairing any damage to the Demised Premises, resulting from the installation and/or removal thereof. Any equipment or other property for which Landlord shall have granted any allowance or credit to Tenant shall not be deemed to have been installed by or for the account of Tenant without expense to Landlord, shall not be considered as the Tenant's Property and shall be deemed the property of Landlord.

16.03. At or before the Expiration Date or the date of any earlier termination of this Lease, or within fifteen (15) days after such an earlier termination date, Tenant shall remove from the Demised Premises all of the Tenant's Property (except such items thereof as Landlord shall have expressly permitted to remain, which property shall become the property of Landlord if not removed), and Tenant shall repair any damage to the Demised Premises resulting from any installation and/or removal of the Tenant's Property. Any items of the Tenant's Property which shall remain in the Demised Premises after the Expiration Date or after a period of fifteen (15) days following an earlier termination date, may, at the option of Landlord, be deemed to have been abandoned, and in such case such items may be retained by Landlord as its property or disposed of by Landlord, without accountability, in such manner as Landlord shall determine at Tenant's expense.

16.04. At or before the Expiration Date or the date of any earlier termination of this Lease, or within fifteen (15) days after such an earlier termination date, Tenant shall, at Tenant's sole cost and expense, remove from the Demised Premises such rack system as may be installed in the Demised Premises and Tenant shall repair any damage to the Demised Premises, the Building and the Common Areas resulting from any installation and/or removal thereof Such removal, if any, shall be in accordance with the following procedures, unless Landlord shall advise Tenant to the contrary by written notice to Tenant:

> Core a hole centered over the anchor bolt with a core bit 1.5 times larger than the bolt to be removed, but in no event smaller than 1" in diameter.

> Core hole shall be drilled to a depth equal to the bolt depth, but not less than 2" deep. Remove the cored concrete with the anchor bolt from the hole. Clean all concrete slurry and debris from area to be patched. Fill the cored hole with a polymer-modified non-shrink mortar, specifically SikaTop 122 or Master Builders Ceilcote 648 CP, or equivalent, and finish to match surrounding concrete surface.

## ARTICLE 17 - REPAIRS AND MAINTENANCE

17.01. Tenant shall, throughout the Term, take good care of the Demised Premises, the fixtures and appurtenances therein, and shall not do, suffer, or permit any waste with respect thereto. Tenant shall keep and maintain all interior and exterior portions of the Demised Premises including, without limitation, all Building equipment, windows, doors, loading bay doors and

26

shelters, plumbing and electrical systems, heating, ventilating and air conditioning ("HVAC") systems in a clean and orderly condition and in good order and repair. Tenant shall keep and maintain all floors, sidewalks, landscaping (including lawn areas), curbing, paving whether in driveways, parking areas or access easements, including but not limited to the maintenance of the exterior grounds in accordance with the requirements of Exhibit F annexed hereto. The phrase "keep and maintain" as used herein includes repairs, replacement and/or restoration as appropriate. Tenant shall maintain the exterior areas of the Demised Premises free of accumulation of snow, ice, dirt and rubbish. Tenant shall not permit or suffer any over-loading of the floors of the Building. Tenant shall be responsible for all repairs, interior and exterior, structural and nonstructural, ordinary and extraordinary, in and to the Demised Premises, including the Building and Land and the facilities and systems thereof, the need for which arises out of (a) the performance or existence of the Tenant's Work or alterations, (b) the installation, use or operation of the Tenant's Property in the Demised Premises, (c) the moving of the Tenant's Property in or out of the Building, or (d) the act, omission, misuse or neglect of Tenant or any of its subtenants or its or their employees, agents, contractors or invitees. Upon request by Landlord, Tenant shall furnish Landlord with true and complete copies of maintenance contracts and with copies of all invoices for work performed, confirming Tenant's compliance with its obligations under this Article. In the event Tenant fails to furnish such copies within thirty (30) days of Landlord's written request upon at least one Business Days advance notice (which in this circumstance may be made by telephonic device), Landlord shall have the right, at Tenant's cost and expense, to conduct such inspections or surveys as may be required to determine whether or not Tenant is in compliance with this Article and to have any work required of Tenant that is not performed within applicable notice and cure periods to be performed at Tenant's cost and expense upon no less than ten (10) Business Days' notice to Tenant. Tenant shall promptly replace all scratched, damaged or broken doors and glass in and about the- Demised Premises and shall be responsible for all repairs, maintenance and replacement of wall and floor coverings in the Demised Premises and for the repair and maintenance of all sanitary and electrical fixtures and equipment therein. Tenant shall promptly make all repairs in or to the Demised Premises for which Tenant is responsible, and any repairs required to be made by Tenant to the mechanical, electrical, sanitary, heating, ventilating, air-conditioning or other systems of the Building shall be performed only by contractor(s) designated by Landlord. Any other repairs in or to the Building and the facilities and systems thereof for which Tenant is responsible may, at Landlord's option, be performed by Landlord upon at least ten (10) Business Days advance notice at Tenant's expense; but Landlord may, at its option, before commencing any such work or at any time thereafter, require Tenant to furnish to Landlord such security, in form (including, without limitation, a bond issued by a corporate surety licensed to do business in New Jersey) and amount, as Landlord shall deem necessary to assure the payment for such work by Tenant. Prior to any entry by Landlord upon the Demised Premises as provided in this section, Landlord shall give Tenant reasonable advance notice (stating the date and approximate time of such entry) and afford Tenant the opportunity to have a representative of Tenant accompany Landlord or its representative during such entry, If, on the date and approximate time of such entry as provided in such notice, Tenant shall not have made a representative of Tenant available to accompany Landlord or its representative during such entry, Landlord may lawfully enter upon the Demised Premises on the date and at the approximate time set forth in such notice without the need for such representative of Tenant to be present. The foregoing reasonable advance notice shall be the time period and manner of notice stated in this section, if so stated.

27

17.02. Tenant shall be responsible to maintain the structural integrity of the Building and shall, at its cost and expense, make all repairs and replacements thereto (including but not limited to the roof and roof deck). Notwithstanding the foregoing, Landlord at its sole cost and expense shall be responsible for structural repairs and/or structural replacements to the foundations, pilings if any, structural steel, structural walls and structural support to the roof, unless the need for such repairs or replacements is due to the act of Tenant or its agents, employees, or contractors.

17.03. Except as otherwise expressly provided in this Lease, Landlord shall have no liability to Tenant, nor shall Tenant's covenants and obligations under this Lease be reduced or abated in any manner whatsoever, by reason of any inconvenience, annoyance, interruption or injury to business arising from Landlord's doing any repairs, maintenance, or changes which Landlord is required or permitted by this Lease, or required by Law, to make in or to any portion of the Building. Without limiting the foregoing (i) Landlord shall not unreasonably interfere with Tenant, its subtenants or assigns or any of the business operations at the Demised Premises while performing any such repairs, maintenance, or changes, and (ii) Landlord shall conduct any work in connection therewith in such a manner as shall be required to minimize any such interference to the extent commercially practicable (but without any obligation to perform same during overtime hours).

17.04. Tenant shall not permit or suffer the overloading of the floors of the Demised Premises beyond 250 pounds per square foot, or lesser amount as may be applicable to any mezzanine area.

ARTICLE 18 - UTILITY CHARGES

18.01. Tenant shall pay all charges for gas, water, sewer, electricity, heat or other utility or service supplied to the Demised Premises as measured by meters relating to Tenant's use, and the cost of repair, maintenance, replacement, and reading of any meters measuring Tenant's consumption thereof. Tenant expressly agrees that Landlord shall not be responsible for the failure of supply to Tenant of any of the aforesaid, or any other utility service. Landlord shall not be responsible for any public or private telephone service to be installed in the space, particularly conduit if required. If Landlord, or its designee is permitted by law to provide electric energy to the Demised Premises by re-registering meters or otherwise and to collect any charges for electric energy, Landlord or its designee shall have the exclusive right to do so, in which event Tenant shall pay to Landlord or its designee upon receipt of bills therefor charges for electric energy provided the rates for such electric energy shall not be more than the rates Tenant would be charged for electric energy if furnished directly to Tenant by the public utility or Tenant's electricity supplier which would otherwise have furnished electric energy.

18.02. Tenant's use of electric energy in the Demised Premises shall not at any time exceed the capacity of any of the electrical conductors and equipment in or otherwise serving the Demised Premises. In order to insure that such capacity is not exceeded and to avert possible adverse effect upon the Building's electric service, Tenant shall not, without Landlord's prior consent in each instance (which shall not be unreasonably withheld, conditioned or delayed) make any alteration or addition to the electric system of the Demised Premises existing on the Commencement Date. Should Landlord grant such consent, all additional risers or other equipment required therefor shall be provided by Landlord and the actual, reasonable, out-of-pocket cost thereof shall be paid by Tenant to Landlord on demand.

28

18.03. At Landlord's option, Landlord or Landlord's designee shall have the exclusive right, but not the obligation, to install or cause to be installed solar panels or other energy generating equipment on the Building (including but not limited to the roof thereof) for purposes of furnishing in whole or in part electric energy to the Building (herein an "Energy System"). Tenant shall provide Landlord or its designee with access to the Demised Premises for the installation, maintenance and repair of such Energy System as Landlord or its designee may require so long as such access shall not unreasonably interfere with the normal business operations in the Building of Tenant or its subtenants and assigns, if any. Landlord shall not unreasonably interfere with Tenant, its subtenants or assigns or any of the business operations at the Demised Premises while installing the Energy System, if any, and shall conduct any work in connection therewith in such a manner as shall be required to minimize any such interference to the extent commercially practicable. Tenant may require that Landlord schedule any work with Tenant in advance and conduct such work on such dates and/or at such times as Tenant shall reasonably require to minimize any disturbance to or interference with the business operations in the Demised Premises. If installed, such Energy System shall (either itself or together with such service provided by a public utility provider designated by Tenant) meet the minimum service provided to the Building immediately prior to the installation of such Energy System. In the event Landlord elects to install or cause such Energy System to be installed, Tenant shall purchase electric energy for the Demised Premises from Landlord or its designee and Tenant shall pay the charges established by Landlord or its designee for such service from time to time, but not in excess of the rates payable by Tenant from a third party public utility provider having service available to the Building. Landlord also reserves the right to discontinue furnishing electric energy at any time whether or not Tenant is in default of this Lease upon not less than sixty (60) days' notice to Tenant. Prior to any entry by Landlord upon the Demised Premises as provided in this section, Landlord shall give Tenant reasonable advance notice (stating the date and approximate time of such entry) and afford Tenant the opportunity to have a representative of Tenant accompany Landlord or its representative during such entry, If, on the date and approximate time of such entry as provided in such notice, Tenant shall not have made a representative of Tenant available to accompany Landlord or its representative during such entry, Landlord may lawfully enter upon the Demised Premises on the date and at the approximate time set forth in such notice without the need for such representative of Tenant to be present. The foregoing reasonable advance notice shall be the time period and manner of notice stated in this section, if so stated.

18.04. Subject to the provisions of Article 15 of the Lease, Tenant shall have the right to use a portion of the roof to install one or more supplemental HVAC units and/or satellite antennas, provided that any such satellite antennas shall be used solely in connection with the business operations being performed in the Building. In the event of any interference with Tenant's approved roof installations, the Landlord's plans and specifications for installation of an Energy System on the roof of the Building shall be subject to Tenant's consent, not to be unreasonably withheld, conditioned or delayed, and Tenant shall have the right to withhold consent to such plans if they fail to reserve one or more areas on the roof of the Building that are reasonably adequate for such supplemental HVAC units and satellite antennas, as reasonably determined by Tenant, or if the location of such reserved areas shall not adequately support the installation and maintenance of any such existing or proposed future supplemental HVAC units and/or satellite antennas, as reasonably determined by Tenant.

29

ARTICLE 19 - ACCESS, CHANGES AND NAME

19.01. Landlord and its agents shall have the right to enter and/or pass through the Demised Premises at any reasonable time or times (a) to examine the Demised Premises and to show them to actual and prospective Superior Lessors, Superior Mortgagees, or prospective purchasers of the Building, and (b) to make such repairs, alterations, additions and improvements in or to the Demised Premises and/or in or to the Building or its facilities and equipment as Landlord is required or desires to make, provided that (i) Landlord shall use commercially reasonable efforts to minimize interference with Tenant or its assigns or any of the business operations at the Demised Premises which performing any such repairs, alterations, additions and/or improvements, (ii) Landlord shall conduct any work in connection therewith in such a manner as shall be required to minimize interference to the extent commercially practicable (without obligation to perform such work on an overtime basis), and (iii) Tenant may reasonably require that Landlord schedule any work with Tenant in advance and conduct such work on such dates and/or at such times as Tenant shall reasonably require (during regular hours) to minimize disturbance to or interference with the business operations in Demised Premises. Landlord shall be allowed to take all materials into and upon the Demised Premises that may be required in connection therewith, without any liability to Tenant and without any reduction of Tenant's obligations hereunder. During the period of nine (9) months prior to the Expiration Date, Landlord and its agents may exhibit the Demised Premises to prospective tenants. Prior to any entry by Landlord upon the Demised Premises as provided in this section, Landlord shall give Tenant reasonable advance notice (stating the date and approximate time of such entry) and afford Tenant the opportunity to have a representative of Tenant accompany Landlord or its representative during such entry, If, on the date and approximate time of such entry as provided in such notice, Tenant shall not have made a representative of Tenant available to accompany Landlord or its representative during such entry, Landlord may lawfully enter upon the Demised Premises on the date and at the approximate time set forth in such notice without the need for such representative of Tenant to be present. The foregoing reasonable advance notice shall be the time period and manner of notice stated in this section, if so stated.

19.02. If at any time any windows of the Demised Premises are temporarily darkened or obstructed by reason of any repairs, improvements, maintenance and/or cleaning in or about the Building, or if any part of the Building is temporarily or permanently closed or inoperable, the same shall not be deemed a constructive eviction and shall not result in any reduction or diminution of Tenant's obligations under this Lease.

19.03. Upon prior notice, Landlord reserves the right to change the address of the Building at any time.

30

ARTICLE 20 - MECHANICS' LIENS AND OTHER LIENS

20.01. Nothing contained in this Lease shall be construed to imply any consent of Landlord to subject Landlord's interest or estate to any liability under any mechanic's, construction or other lien law. If any lien or any notice of intention (to file a lien), lis pendens, or notice of unpaid balance and right to file lien is filed against the Land, the Building, or any part thereof, or the Demised Premises, or any part thereof, for any work, labor, services or materials claimed to have been performed or furnished for or on behalf of Tenant, or anyone holding any part of the Demised Premises through or under Tenant, Tenant shall cause the same to be canceled and discharged of record by payment, bond or order of a court of competent jurisdiction within thirty (30) days after notice by Landlord to Tenant.

ARTICLE 21 - NON-LIABILITY AND INDEMNIFICATION

21.01. Neither Landlord nor any partner, joint venturer, director, officer, agent, servant or employee of Landlord shall be liable to Tenant for any loss, injury or damage to Tenant or to any other Person, or to its or their property, irrespective of the cause of such injury, damage or loss, unless caused by or resulting from the negligence of Landlord, its agents, servants or employees in the operation or maintenance of the Land or Building without contributory negligence on the part of Tenant or any of its subtenants or licensees or its or their employees, agents or contractors. Further, neither Landlord nor any partner, joint venturer, director, officer, agent, servant or employee of Landlord shall be liable (a) for any such damage caused by other tenants or Persons in, upon or about the Land or Building, or caused by operations in construction of any private, public or quasi-public work; or (b) even if negligent, for consequential damages arising out of any loss of use of the Demised Premises or any equipment or facilities therein by Tenant or any Person claiming through or under Tenant.

21.02. Notwithstanding any provision to the contrary, Tenant shall look solely to the estate and property of Landlord in and to the Land and Building (or the proceeds thereof) in the event of any claim against Landlord arising out of or in connection with this Lease, the relationship of Landlord and Tenant or Tenant's use of the Demised Premises, and Tenant agrees that the liability of Landlord arising out of or in connection with this Lease, the relationship of Landlord and Tenant or Tenant's use of the Demised Premises shall be limited to such estate and property of Landlord (or proceeds). No other properties or assets of Landlord or any partner, joint venturer, director, officer, agent, servant or employee of Landlord shall be subject to levy, execution or other enforcement procedures for the satisfaction of any judgment (or other judicial process) or for the satisfaction of any other remedy of Tenant arising out of, or in connection with, this Lease, the relationship of Landlord and Tenant or Tenant's use of the Demised Premises and if Tenant shall acquire a lien on or interest in any other properties or assets by judgment or otherwise, Tenant shall promptly release such lien on or interest in such other properties and assets by executing, acknowledging and delivering to Landlord an instrument to that effect prepared by Landlord's attorneys.

ARTICLE 22 - DAMAGE OR DESTRUCTION

22.01. If the Building or the Demised Premises shall be partially or totally damaged or destroyed by fire or other casualty (and if this Lease shall not be terminated as in this Article 22 hereinafter provided), Landlord shall repair the damage and restore and rebuild the Building and/or the Demised Premises (except for the Tenant's Property) with reasonable dispatch after notice to it of the damage or destruction and the collection of the insurance proceeds attributable to such damage.

31

22.02. Subject to the provisions of Section 22.05, if all or part of the Demised Premises shall be damaged or destroyed or rendered completely or partially untenantable on account of fire or other casualty, the Rent shall be abated or reduced, as the case may be, in the proportion that the untenantable area of the Demised Premises bears to the total area of the Demised Premises (to the extent of rent insurance proceeds received by Landlord from insurance maintained by Landlord or Tenant), for the period from the date of the damage or destruction to the date the damage to the Demised Premises shall be substantially repaired provided, however, should Tenant reoccupy a portion of the Demised Premises during the period the repair or restoration work is taking place and prior to the date that the Demised Premises are substantially repaired or made tenantable the Rent allocable to such reoccupied portion, based upon the proportion which the area of the reoccupied portion of the Demised Premises bears to the total area of the Demised Premises, shall be payable by Tenant from the date of such occupancy.

22.03. If (a) the Building or the Demised Premises shall be totally damaged or destroyed by fire or other casualty, or (b) the Building shall be so damaged or destroyed by fire or other casualty that its repair or restoration requires the expenditure, as estimated by a reputable contractor or architect designated by Landlord and acceptable to Tenant, of more than [***] (or [***] if such casualty occurs during the last year of the Term) of the full insurable value of the Building immediately prior to the casualty, or (c) the Building shall be damaged or destroyed by fire or other casualty and either the loss shall not be covered by Landlord's or Tenant's insurance or the net insurance proceeds (after deducting all expenses in connection with obtaining such proceeds) shall, in the estimation of a reputable contractor or architect designated by Landlord and acceptable to Tenant be insufficient to pay for the repair or restoration work, then in either such case Landlord may terminate this Lease by giving Tenant notice to such effect within ninety (90) days after the date of the fire or other casualty. Tenant's acceptance of such architect or contractor shall not be unreasonably withheld, delayed or conditioned and acceptance shall be deemed if no response is received within five (5) Business Days of Landlord's notice. Upon request by Tenant, Landlord shall advise Tenant of Landlord's reasonably estimated completion date of such restoration (the "Landlord's Advise") and if such date is more than twelve (12) months following the date of casualty, provided Tenant's grossly negligent or intentional acts were not cause of such casualty, Tenant shall have the right to terminate this Lease upon fifteen (15) days' prior notice to Landlord, given within fifteen (15) days of Landlord's Advise. In addition, in the event the Demised Premises are not substantially restored on or before the later of the estimated date specified in the Landlord's Advise, if any, or twelve (12) months following the date of casualty, provided Tenant's grossly negligent or intentional acts were not the cause of such casualty, Tenant shall have the right to terminate this Lease upon thirty (30) days' prior notice to Landlord, if given within the later of thirty (30) days following the estimated date specified in Landlord's Advise, or thirteen (13) months following the date of casualty, provided Tenant's grossly negligent or intentional acts were not the cause of such casualty.

22.04. Except as provided in the preceding section, Tenant shall not be entitled to terminate this Lease and no damages, compensation or claim shall be payable by Landlord for inconvenience, loss of business or annoyance arising from any repair or restoration of any portion of the Building pursuant to this Article 22. Landlord shall use its best efforts to make such repair or restoration promptly and in such manner as to not unreasonably interfere with Tenant's use and occupancy of the Demised Premises, but Landlord shall not be required to do such repair or restoration work except during Business Hours on Business Days.

32

22.05. Notwithstanding any of the foregoing provisions of this Article 22, if by reason of some act or omission on the part of Tenant or any of its subtenants or its or their partners, directors, officers, servants, employees, agents or contractors, Landlord or any Superior Lessor or any Superior Mortgagee shall be unable to collect all of the insurance proceeds (including, without limitation, rent insurance proceeds) applicable to damage or destruction of the Building by fire or other casualty, then, without prejudice to any other remedies which may be available against Tenant, there shall be no abatement or reduction of the Rent. Further, nothing contained in this Article 21 shall relieve Tenant from any liability that may exist as a result of any damage or destruction by fire or other casualty.

22.06. Landlord will not carry insurance of any kind on the Tenant's Property and, except as provided by law or by reason of Landlord's breach of any of its obligations hereunder, shall not be obligated to repair any damage to or replace the Tenant's Property.

22.07. The provisions of this Article 22 shall be deemed an express agreement governing any case of damage or destruction of the Building by fire or other casualty, and any law providing for such a contingency in the absence of an express agreement, now or hereafter in force, shall have no application in such case.

## ARTICLE 23 - EMINENT DOMAIN

23.01. If the whole of the Demised Premises shall be taken by any public or quasi-public authority under the power of condemnation, eminent domain or expropriation, or in the event of conveyance of the whole of the Demised Premises in lieu thereof, this Lease shall terminate as of the day possession shall be taken by such authority. If [***]% or less of the Floor Space of the Building shall be so taken or conveyed, this Lease shall terminate only in respect of the part so taken or conveyed as of the day possession shall be taken by such authority. Except as otherwise provided herein, if more than [***]% of the Floor Space of the Building shall be so taken or conveyed, this Lease shall terminate only in respect of the part so taken or conveyed as of the day possession shall be taken by such authority, but either party shall have the right to terminate this Lease upon notice given to the other party within 30 days after such taking possession. Tenant shall also have the right to so terminate the Lease if commercially reasonable access to the Building shall be so taken or conveyed, or if any parking or truck court areas required for Tenant to conduct its normal business operations at the Demised Premises shall be so taken or conveyed, or if Tenant shall otherwise determine in its reasonable discretion that it is unable to conduct its business operations at the Demised Premises from a single location or otherwise in a cost effective manner at the Demised Premises as a result of any such taking or conveyance. If this Lease shall continue in effect as to any portion of the Demised Premises not so taken or conveyed, the Rent shall be computed as of the day possession shall be taken on the basis of the remaining Floor Space of the Building. Except as specifically provided herein, in the event of any such taking or conveyance there shall be no reduction in Rent. If this Lease shall continue in effect, Landlord shall, at its expense, but shall be obligated only to the extent of the net award or other compensation (after deducting all expenses in connection with obtaining same) available to Landlord for the improvements taken or conveyed (excluding any award or other compensation for land or for the

33

unexpired portion of the term of any Superior Lease), promptly make all necessary alterations so as to constitute the remaining Building a complete architectural and tenantable unit, except for the Tenants' property, and Tenant shall make all alterations or replacements to the Tenant's Property and decorations in the Demised Premises. All awards and compensation for any taking or conveyance, whether for the whole or a part of the Land or Building, shall be property of Landlord, and Tenant hereby assigns to Landlord all of Tenant's right, title and interest in and to any and all such awards and compensation, including, without limitation, any award or compensation for the value of the unexpired portion of the Term. Tenant shall be entitled to claim, prove and receive in the condemnation proceeding such award or compensation as may be allowed for the Tenant's property and for loss of business, good will, and depreciation or injury to and cost of removal of the Tenant's property, but only if such award or compensation shall be made by the condemning authority in addition to, and shall not result in a reduction of, the award or compensation made by it to Landlord.

23.02. If the temporary use or occupancy of all or any part of the Demised Premises shall be taken during the Term, Tenant shall be entitled, except as hereinafter set forth, to receive that portion of the award or payment for such taking which represents compensation for the use and occupancy of the Demised Premises, for the taking of the Tenant's Property and for moving expenses, and Landlord shall be entitled to receive that portion which represents reimbursement for the cost of restoration of the Demised Premises. This Lease shall be and remain unaffected by such taking and Tenant shall continue responsible for all of its obligations hereunder insofar as such obligations are not affected by such taking and shall continue to pay the Rent in full when due. If the period of temporary use or occupancy shall extend beyond the Expiration Date, that part of the award or payment which represents compensation for the use and occupancy of the Demised Premises (or a part thereof) shall be divided between Landlord and Tenant so that Tenant shall receive (except as otherwise provided below) so much thereof as represents compensation for the period up to and including the Expiration Date and Landlord shall receive so much thereof as represents compensation for the period after the Expiration Date. All monies to be paid to Tenant as, or as part of, an award or payment for temporary use and occupancy for a period beyond the date to which the Rent has been paid shall be received, held and applied by the first Superior Mortgagee (or if there is no Superior Mortgagee, by Landlord as a trust fund) for payment of the Rent becoming due hereunder.

ARTICLE 24 - SURRENDER

24.01. On the Expiration Date, or upon any earlier termination of this Lease, or upon any reentry by Landlord upon the Demised Premises, Tenant shall quit and surrender the Demised Premises to Landlord "broom-clean" and in good order, condition and repair, except for ordinary wear and tear and such damage or destruction as Landlord is required to repair or restore under this Lease, and Tenant shall remove all of Tenant's property therefrom except as otherwise expressly provided in this Lease.

24.02. If Tenant remains in possession of the Demised Premises after the expiration of the Term, Tenant shall be deemed to be occupying the Demised Premises at the sufferance of Landlord subject to all of the provisions of this Lease, except that the monthly Fixed Rent shall be twice the Fixed Rent in effect during the last month of the Term, except the holdover rate for the first month if Landlord is notified and if paid prior thereto shall be [***]% of such Fixed Rent.

34

24.03. No act or thing done by Landlord or its agents shall be deemed an acceptance of a surrender of the Demised Premises, and no agreement to accept such surrender shall be valid unless in writing and signed by Landlord.

ARTICLE 25 - CONDITIONS OF LIMITATION

25.01. This Lease is subject to the limitation that whenever Tenant or any Guarantor (a) shall make an assignment for the benefit of creditors, or (b) shall commence a voluntary case or have entered against it an order for relief under any chapter of the Federal Bankruptcy Code (Title 11 of the United States Code) or any similar order or decree under any federal or state law, now in existence, or hereafter enacted having the same general purpose, and such order or decree shall have not been stayed or vacated within 90 days after entry, or (c) shall cause, suffer, permit or consent to the appointment of a receiver, trustee, administrator, conservator, sequestrator, liquidator or similar official in any federal, state or foreign judicial or nonjudicial proceeding, to hold, administer and/or liquidate all or substantially all of its assets, and such appointment shall not have been revoked, terminated, stayed or vacated and such official discharged of his duties within 90 days of his appointment then Landlord, at any time after the occurrence of any such event, may give Tenant a notice of intention to end the Term at the expiration of five (5) days from the date of service of such notice of intention, and upon the expiration of said five (5) day period, whether or not the Term shall theretofore have commenced, this Lease shall terminate with the same effect as if that day were the expiration date of this Lease, but Tenant shall remain liable for damages as provided in Article 27.

25.02. This Lease is subject to the further limitations that: (a) if Tenant shall default in the payment of any Rent and shall not cure such default within ten (10) days of such notice of default, or (b) if Tenant shall, whether by action or inaction, be in default of any of its obligations under this Lease (other than a default in the payment of Rent) and such default shall continue and not be remedied within thirty (30) days after Landlord shall have given to Tenant a notice specifying the same, or, in the case of a default which cannot with due diligence be cured within a period of thirty (30) days and the continuance of which for the period required for cure will not subject Landlord or any Superior Lessor or prosecution for a crime or offense (as more particularly described in Section 12.02) or termination of any Superior Lease or foreclosure of any Superior Mortgage, if Tenant shall not, (i) within said thirty (30) day period advise Landlord of Tenant's intention to take all steps necessary to remedy such default, (ii) duly commence within said thirty (30) day period, and thereafter diligently prosecute to completion all steps necessary to remedy the default, and (iii) complete such remedy within a reasonable time after the date of said notice by Landlord, or (c) if any event shall occur or any contingency shall arise whereby this Lease would, by operation of law or otherwise, devolve upon or pass to any person, firm or corporation other than Tenant, except as expressly permitted by Article 11, or (d) if Tenant shall abandon the Demised Premises, then in any of said cases Landlord may give to Tenant a notice of intention to end the Term at the expiration of five (5) days from the date of the service of such notice of intention, and upon the expiration of said five (5) days, whether or not the Term shall theretofore have commenced, this Lease shall terminate with the same effect as if that day were the expiration date of this Lease, but Tenant shall remain liable for damages as provided in Article 27.

35

ARTICLE 26 - RE-ENTRY BY LANDLORD

26.01. If Tenant shall default in the payment of any Rent, or if this Lease shall terminate as provided in Article 25, Landlord or Landlord's agents and employees may immediately or at any time thereafter re-enter the Demised Premises, or any part thereof, either by summary dispossess proceedings or by any suitable action or proceeding at law without being liable to indictment, prosecution or damages therefor, and may repossess the same, and may remove any Person therefrom, to the end that Landlord may have, hold and enjoy the Demised Premises. The word "reenter," as used herein, is not restricted to its technical legal meaning. If this Lease is terminated under the provisions of Article 25, or if Landlord shall re-enter the Demised Premises under the provisions of this Article 26, or in the event of the termination of this Lease, or of re-entry, by or under any summary dispossess or other proceedings or action or any provision of law by reason of default hereunder on the part of Tenant, Tenant shall thereupon pay to Landlord the Rent payable up to the time of such termination of this Lease, or of such recovery of possession of the Demised Premises by Landlord, as the case may be, and shall also pay to Landlord damages as provided in Article 27.

26.02. In the event of a breach or threatened breach by Tenant of any of its obligations under this Lease, Landlord shall also have the right of injunction. The special remedies to which Landlord may resort hereunder are cumulative and are not intended to be exclusive of any other remedies to which Landlord may lawfully be entitled at any time and Landlord may invoke any remedy allowed at law or in equity as if specific remedies were not provided for herein.

26.03. If this Lease shall terminate under the provisions of Article 25, or if Landlord shall reenter the Demised Premises under the provisions of this Article 26, or in the event of the termination of this Lease, or of re-entry, by or under any summary dispossess or other proceeding or action or any provision of law by reason of default hereunder on the part of Tenant, Landlord shall be entitled to retain all monies, if any, paid by Tenant to Landlord, whether as Advance Rent, security or otherwise, but such monies shall be credited by Landlord against any Rent due from Tenant at the time of such termination or re-entry or, at Landlord's option, against any damages payable by Tenant under Article 27 or pursuant to law with the excess, if any, promptly refunded to Tenant.

ARTICLE 27 - DAMAGES

27.01. If this Lease is terminated under the provisions of Article 25, or if Landlord shall reenter the Demised Premises under the provisions of Article 26, or in the event of the termination of this Lease, or of re-entry, by or under any summary dispossess or other proceeding or action or any provision of law by reason of default hereunder on the part of Tenant, Tenant shall pay as Additional Charges to Landlord, at the election of Landlord, either or any combination of:

(a) a sum which at the time of such termination of this Lease or at the time of any such reentry by Landlord, as the case may be, represents the then value of the excess, if any, of (i) the aggregate amount of the Rent which would have been payable by Tenant (conclusively presuming the average monthly Additional Charges to be the same as were the average monthly Additional Charges payable for the year, or if less than 365 days have then elapsed since the Commencement Date, the partial year, immediately preceding such termination or re-entry) for the period commencing with such earlier termination of this Lease or the date of any such re-entry, as the case may be, and ending with the Expiration Date, over (ii) the aggregate rental value of the Demised Premises for the same period; or

36

(b) sums equal to the Fixed Rent and the Additional Charges which would have been payable by Tenant had this Lease not so terminated, or had Landlord not so re-entered the Demised Premises, payable upon the due dates therefor specified herein following such termination or such re-entry and until the Expiration Date, provided, however, that if Landlord shall relet the Demised Premises during said period, Landlord shall credit Tenant with the net rents received by Landlord from such reletting, such net rents to be determined by first deducting from the gross rents as and when received by Landlord from such reletting the expenses incurred or paid by Landlord in terminating this Lease or in re-entering the Demised Premises and in securing possession thereof, as well as the expenses of reletting, including, without limitation, altering and preparing the Demised Premises for new tenants, brokers' commissions, legal fees, and all other expenses properly chargeable against the Demised Premises and the rental therefrom, it being understood that any such reletting may be for a period shorter or longer than the period ending on the Expiration Date; but in no event shall Tenant be entitled to receive any excess of such net rents over the sums payable by Tenant to Landlord hereunder, nor shall Tenant be entitled in any suit for the collection of damages pursuant to this subdivision (b) to a credit in respect of any rents from a reletting, except to the extent that such net rents are actually received by Landlord. If the Demised Premises or any part thereof should be relet in combination with other space, then proper apportionment on a square foot basis shall be made of the rent received from such reletting and of the expenses of reletting.

If the Demised Premises or any part thereof should be re-let by Landlord before presentation of proof of such damages to any court, commission or tribunal, the amount of rent reserved upon such re-letting shall, prima facie, be the fair and reasonable rental value for the Demised Premises, or part thereof, so re-let during the term of the re-letting. Landlord shall not be liable in any way whatsoever for its failure to re-let the Demised Premises or any part thereof, or if the Demised Premises or any part thereof are re-let, for its failure to collect the rent under such re-letting, and no such failure to re-let or failure to collect rent shall release or affect Tenant's liability for damages or otherwise under this Lease. Landlord shall use commercially reasonable efforts to re-let the Demised Premises to mitigate Landlord's damages. For the purposes hereof, "commercially reasonable efforts" shall mean the following actions, which actions shall create an irrebuttable presumption that Landlord has fulfilled such obligation: (i) Landlord shall include the availability of the Demised Premises in Landlord's leasing flyers sent to brokers (if any), commencing following Landlord's recovery of possession of the Demised Premises, and ending upon re-leasing of the Demised Premises; and (ii) Landlord shall include the availability of the Demised Premises on a website operated by Landlord or its affiliate (if any), commencing following Landlord's recovery of possession of the Demised Premises, and ending upon re-leasing of the Demised Premises; and (iii) Landlord shall hold an "Open House" for the Demised Premises within forty-five (45) days of Landlord's recovery of possession of the Demised Premises, or (iv) in lieu of (i), (ii) and (iii) of this paragraph, upon Tenant's written request, or at Landlord's option, Landlord shall engage an independent commercial real estate broker to re-let the Demised Premises, the cost and expense of which shall be an element of Landlord's damages in addition to any other damages recoverable pursuant to Section 29.01 hereof. Nothing contained herein shall require Landlord to re-let the Demised Premises prior to or with any preference over the leasing of any other similar

37

premises of Landlord or any affiliate of Landlord, nor shall any rental of such other premises reduce the damages which Landlord would be entitled to recover from Tenant. In the event Tenant, on behalf of itself or any and all persons claiming through or under Tenant, attempts to raise a defense or assert any affirmative obligations on Landlord's part to mitigate such damages or re-let the Demised Premises other than as provided herein, Tenant shall reimburse Landlord for any costs and expenses incurred by Landlord as a result of any such defense or assertion, including but not limited to Landlords attorneys' fees incurred in connection therewith.

27.02. Suit or suits for the recovery of such damages or, any installments thereof, may be brought by Landlord at any time and from time to time at its election, and nothing contained herein shall be deemed to require Landlord to postpone suit until the date when the Term would have expired if it had not been so terminated under the provisions of Article 24, or under any provision of law, or had Landlord not re-entered the Demised Premises. Nothing herein contained shall be construed to limit or preclude recovery by Landlord against Tenant of any sums or damages to which, in addition to the damages particularly provided above, Landlord may lawfully be entitled by reason of any default hereunder on the part of Tenant. Nothing herein contained shall be construed to limit or prejudice the right of Landlord to prove for and obtain as damages by reason of the termination of this Lease or re-entry of the Demised Premises for the default of Tenant under this Lease, an amount equal to the maximum allowed by any statute or rule of law in effect at the time, whether or not such amount be greater than, equal to, or less than any of the sums referred to in Section 27.01.

27.03. In addition, if this Lease is terminated under the provisions of Article 25, or if Landlord shall re-enter the Demised Premises under the provisions of Article 26, Tenant covenants that: (a) the Demised Premises then shall be in the same condition as that in which Tenant has agreed to surrender the same to Landlord at the Expiration Date; (b) Tenant shall have performed prior to any such termination any obligation of Tenant contained in this Lease for the making of any alteration or for restoring or rebuilding the Demised Premises or the Building, or any part thereof; and (c) for the breach of any covenant of Tenant set forth above in this Section 27.03, Landlord shall be entitled immediately, without notice or other action by Landlord, to recover, and Tenant shall pay, as and for liquidated damages therefor, the cost of performing such covenant (as estimated by an independent contractor selected by Landlord).

27.04. In addition to any other remedies Landlord may have under this Lease, and without reducing or adversely affecting any of Landlord's rights and remedies under this Article 27, if any Rent or damages payable hereunder by Tenant to Landlord are not paid within ten (10) Business Days of written demand therefor, the same shall bear interest at the Late Payment Rate or the maximum rate permitted by law, whichever is less, from the due date thereof until paid, and the amounts of such interest shall be Additional Charges hereunder.

ARTICLE 28 - AFFIRMATIVE WAIVERS

28.01. Tenant, on behalf of itself and any and all persons claiming through or under Tenant, does hereby waive and surrender all right and privilege which it, they or any of them might have under or by reason of any present or future law, to redeem the Demised Premises or to have a continuance of this Lease after being dispossessed or ejected from the Demised Premises by process of law or under the terms of this Lease or after the termination of this Lease as provided in this Lease.

38

28.02. Landlord and Tenant hereby waive trial by jury in any action, proceeding or counterclaim brought by either against the other on any matter whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, and Tenant's use or occupancy of the Demised Premises including, without limitation, any claim of injury or damage, and any emergency and other statutory remedy with respect thereto. Tenant shall not interpose any counterclaim of any kind in any action or proceeding commenced by Landlord to recover possession of the Demised Premises.

ARTICLE 29 - NO WAIVERS

29.01. The failure of either party to insist in any one or more instances upon the strict performance of any one or more of the obligations of this Lease, or to exercise any election herein contained, shall not be construed as a waiver or relinquishment for the future of the performance of such one or more obligations of this Lease or of the right to exercise such election, but the same shall continue and remain in full force and effect with respect to any subsequent breach, act or omission. The receipt by Landlord of Fixed Rent or Additional Charges with knowledge of breach by Tenant of any obligation of this Lease shall not be deemed a waiver of such breach.

ARTICLE 30 - CURING TENANT'S DEFAULTS

30.01. If Tenant shall default in the performance of any of Tenant's obligations under this Lease beyond applicable notice and cure periods, Landlord, without thereby waiving such default, may (but shall not be obligated to) perform the same for the account and at the expense of Tenant, without notice in a case of emergency, and in any other case only if such default continues after the expiration of thirty (30) days from the date Landlord gives Tenant notice of the default beyond applicable notice and cure periods. Charges for any expenses incurred by Landlord in connection with any such performance by it for the account of Tenant, and charges for all costs, expenses and disbursements of every kind and nature whatsoever, including reasonable attorneys' fees and expenses, involved in collecting or endeavoring to collect the Rent or any part thereof or enforcing or endeavoring to enforce any rights against Tenant or Tenant's obligations hereunder, under or in connection with this Lease or pursuant to law, including any such cost, expense and disbursement involved in instituting and prosecuting summary proceedings or in recovering possession of the Demised Premises after default by Tenant or upon the expiration of the Term or sooner termination of this Lease, and interest on all sums advanced by Landlord under this Article at the Late Payment Rate or the maximum rate permitted by law, whichever is less, shall be payable by Tenant and may be invoiced by Landlord to Tenant monthly, or immediately, or at any time, at Landlord's option, and such amounts shall be due and payable within ten (10) Business Days of the delivery of written demand therefor.

39

## ARTICLE 31 - BROKER

31.01. Landlord and Tenant each represent to the other that no broker except the Broker was instrumental in bringing about or consummating this Lease and that Tenant had no conversations or negotiations with any broker except the Broker concerning the leasing of the Demised Premises to Tenant. The representing party agrees to indemnify and hold harmless the other against and from any claims for any brokerage commissions and all costs, expenses and liabilities in connection therewith, including, without limitation, attorneys' fees and expenses, arising out of any conversations or negotiations had by the representing party with any broker other than the Broker. Landlord shall pay any brokerage commissions due the Broker pursuant to a separate agreement between Landlord and the Broker. Landlord agrees to indemnify and hold harmless Tenant against and from any claims for any brokerage commission and all costs, expenses and liabilities in connection therewith, including, without limitation, attorneys' fees and expenses, arising out of claim for a commission or other compensation in connection with this Lease by the Broker.

## ARTICLE 32 - NOTICES

32.01. Any notice, statement, demand, consent, approval or other communication required or permitted to be given, rendered or made by either party to the other, pursuant to this Lease or pursuant to any applicable Legal Requirement (each a "Notice"), shall be in writing and shall be deemed to have been properly given, rendered or made only if hand delivered or sent by United States registered or certified mail, return receipt requested, addressed to the other party at the address hereinabove set forth and as to Landlord, to the attention of General Counsel with a concurrent copy of the Notice to the attention of Controller, as to Tenant, to the attention of the Chief Financial Officer with a concurrent copy of a Notice pertaining to a default and/or lease termination to Wolff & Samson PC, One Boland Drive, West Orange, New Jersey 07052, to the attention of Mitchell S. Berkey, Esq., and shall be deemed to have been given, rendered or made on the second day after the day so mailed, unless mailed outside the State of New Jersey, in which case it shall be deemed to have been given, rendered or made on the third business day after the day so mailed. Either party may, by notice as aforesaid, designate a different address or addresses for notices, statements, demands, consents, approvals or other communications intended for it. In addition, upon and to the extent requested by Landlord, copies of notices shall be sent to the Superior Mortgagee. Notices sent by counsel to either party and complying with the foregoing provisions of this Article 32 shall be valid and effective.

## ARTICLE 33 - ESTOPPEL CERTIFICATES

33.01. Tenant shall, at any time and from time to time, as requested by the Landlord, but not 42 more than twice in a given twelve (12) month period, upon not less than ten (10) days' prior notice, execute and deliver to the Landlord or a Superior Mortgagee or Superior Lessor a statement certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications), certifying the dates to which the Fixed Rent and Additional Charges have been paid, stating whether or not, to the actual knowledge of Tenant, the Landlord is in default in performance of any of its obligations under this Lease, and, if so, specifying each such default of which Tenant shall have actual knowledge, and stating whether or not, to the actual knowledge of Tenant, any event has occurred which with the giving of notice or passage of time, or both, would constitute such a default of Landlord, and, if so, specifying each such event; any such statement delivered pursuant hereto shall be deemed a representation and warranty to be relied upon by others with whom such party may be dealing, regardless of independent investigation, but as between Landlord and Tenant shall not be deemed to be an amendment of this Lease. Tenant also shall include in any such statement such other information concerning this Lease as Landlord may reasonably request.

40

33.02. Landlord shall, at any time and from time to time as requested by the Tenant, but not more frequently than twice in any given twelve (12) month period, upon not less than ten (10) days' prior notice, execute and deliver to the Tenant or its designee a statement certifying that this Lease is unmodified and in full for and effect (or if there have been modifications, that the same is in full for and effect as modified and stating the modifications), certifying the dates to which the Fixed Rent and Additional Charges have been paid, stating whether or not, to the actual knowledge of Landlord, the Tenant is in default in performance of any of its obligations under this Lease, and if so, specifying each such default of which Landlord shall have actual knowledge, and stating whether or not, to the actual knowledge of Landlord, any event has occurred which with the giving of notice or passage of time, or both, would constitute such a default of Tenant, and, if so, specifying each such event; any such statement delivered pursuant thereto shall be deemed a representation and warranty to be relied upon by others with whom Tenant may be dealing, regardless of independent investigation, but as between Landlord and Tenant shall not be deemed to be an amendment of this Lease. Landlord also shall include in any such statement such other information concerning this Lease as Tenant may reasonably request.

## ARTICLE 34 - ARBITRATION

34.01. Landlord may at any time request arbitration, and Tenant may at any time when not in default in the payment of any Rent beyond applicable notice and cure periods, request arbitration, of any matter in dispute but only where arbitration is expressly provided for in this Lease. The party requesting arbitration shall do so by giving notice to that effect to the other party, specifying in said notice the nature of the dispute, and said dispute shall be determined in Newark, New Jersey, by a single arbitrator, in accordance with the rules then obtaining of the American Arbitration Association. The award in such arbitration may be enforced on the application of either party by the order or judgment of a court of competent jurisdiction. The fees and expenses of any arbitration shall be borne by the parties equally, but each party shall bear the expense of its own attorneys and experts and the additional expenses of presenting its own proof. If Tenant gives notice requesting arbitration as provided in this Article, Tenant shall simultaneously serve a duplicate of the notice on each Superior Mortgagee and Superior Lessor whose name and address shall previously have been furnished to Tenant in writing, and such Superior Mortgagees and Superior Lessor shall have the right to participate in such arbitration.

## ARTICLE 35 - MEMORANDUM OF LEASE

35.01. At the request of either party, the other party shall promptly execute, acknowledge and deliver to the requesting party a memorandum of lease in respect of this Lease sufficient for recording. Such memorandum shall not be deemed to change or otherwise affect any of the obligations or provisions of this Lease. Whichever party records such memorandum of Lease shall pay all recording costs and expenses, including any taxes that are due upon such recording.

41

ARTICLE 36 - MISCELLANEOUS

36.01. Tenant expressly acknowledges and agrees that Landlord has not made and is not making, and Tenant, in executing and delivering this Lease, is not relying upon, any warranties, representations, promises or statements, except to the extent that the same are expressly set forth in this Lease or in any other written agreement(s) which may be made between the parties concurrently with the execution and delivery of this Lease. All understandings and agreements heretofore had between the parties with respect to the subject matter of this Lease are merged in this Lease and any other written agreement(s) made concurrently herewith, which alone fully and completely express the agreement of the parties and which are entered into after full investigation. Neither party has relied upon any statement or representation not embodied in this Lease or in any other written agreement(s) made concurrently herewith. The submission of this Lease to Tenant does not constitute by Landlord a reservation of, or an option to Tenant for, the Demised Premises, or an offer to lease on the terms set forth herein and this Lease shall become effective as a lease agreement only upon execution and delivery thereof by Landlord and Tenant.

36.02. No agreement shall be effective to change, modify, waive, release, discharge, terminate or effect an abandonment of this Lease, in whole or in part, unless such agreement is in writing, refers expressly to this Lease and is signed by the party against whom enforcement of the change, modification, waiver, release, discharge, termination or effectuation of abandonment is sought.

36.03. If Tenant shall at any time request Landlord to sublet or let the Demised Premises for Tenant's account, Landlord or its agent is authorized to receive keys for such purposes without releasing Tenant from any of its obligations under this Lease, and Tenant hereby releases Landlord of any liability for loss or damage to any of the Tenant's Property in connection with such subletting or letting unless and to the extent resulting from the negligence or intentional misconduct of Landlord or its agents, employees or contractors.

36.04. Except as otherwise expressly provided in this Lease, the obligations under this Lease 44 shall bind and benefit the successors and assigns of the parties hereto with the same effect as if mentioned in each instance where a party is named or referred to; provided, however, that (a) no violation of the provisions of Article 11 shall operate to vest any rights in any successor or assignee of Tenant and (b) the provisions of this Section 36.04 shall not be construed as modifying the conditions of limitation contained in Article 25.

36.05. Except for Tenant's obligations to pay Rent, the time for Landlord or Tenant, as the case may be, to perform any of its respective obligations hereunder shall be extended if and to the extent that the performance thereof shall be prevented due to any Unavoidable Delay. Except as expressly provided to the contrary, the obligations of Tenant hereunder shall not be affected, impaired or excused, nor shall Landlord have any liability whatsoever to Tenant, because Landlord is unable to fulfill, or is delayed in fulfilling, any of its obligations under this Lease due to any of the matters set forth in the first sentence of this Section 36.05, or because of any failure or defect in the supply, quality or character of electricity, water or any other utility or service furnished to the Demised Premises.

42

36.06. Any liability for payments hereunder during the Term (including, without limitation, Additional Charges) shall survive the expiration of the Term or earlier termination of this Lease.

36.07. If Tenant shall request Landlord's consent and Landlord shall fail or refuse to give such consent, Tenant shall not be entitled to any damages for any withholding by Landlord of its consent; Tenant's sole remedy shall be an action for specific performance or injunction, and such remedy shall be available only in those cases where Landlord has expressly agreed in writing not to unreasonably withhold or delay its consent or where as a matter of law Landlord may not unreasonably withhold its consent.

36.08. Intentionally omitted.

36.09. Tenant shall not exercise its rights under Article 15 or any other provision of this Lease in a manner which would create any work stoppage, picketing labor disruption or dispute or any interference with the business of Landlord.

36.10. Tenant shall give prompt notice to Landlord of (a) any occurrence in or about the Demised Premises for which Landlord might be liable, (b) any fire or other casualty in the Demised Premises, (c) any damage to or defect in the Demised Premises, including the fixtures and equipment thereof, for the repair of which Landlord might be responsible, and (d) any damage to or defect in any part of the Building's sanitary, electrical, heating, ventilating, air-conditioning, elevator or other systems located in passing through the Demised Premises or any part thereof.

36.11. This Lease shall be governed by and construed in accordance with the laws of the State of New Jersey. Tenant and Landlord each hereby irrevocably agrees that any legal action or proceeding arising out of or relating to this Lease may be brought in the Courts of the State of New Jersey, or the Federal District Court for the District of New Jersey, as Landlord or Tenant as plaintiff may elect. By execution and delivery of this Lease, Tenant hereby irrevocably accepts and submits generally and unconditionally for itself and with respect to its properties, to the jurisdiction of any such court in any such action or proceeding, and hereby waives in the case of any such action or proceeding brought in the courts of the State of New Jersey, or Federal District Court for the District of New Jersey, any defenses based on jurisdiction, venue or forum non coveniens. If any provision of this Lease shall, be invalid or unenforceable, the remainder of this Lease shall not be affected and shall be enforced to the extent permitted by law. The table of contents, captions, headings and titles in this Lease are solely for convenience of reference and shall not affect its interpretation. This Lease shall be construed without regard to any presumption or other rule requiring construction against the party causing this Lease to be drafted. If any words or phrases in this Lease shall have been stricken out or otherwise eliminated, whether or not any other words or phrases have been added, this Lease shall be construed as if the words or phrases so stricken out or otherwise eliminated were never included in this Lease and no implication or inference shall be drawn from the fact that said words or phrases were so stricken out or otherwise eliminated. Each covenant, agreement, obligation or other provision of this Lease on Tenant's part to be performed, shall be deemed and construed as a separate and independent covenant of Tenant, not dependent on any other provision of this Lease. All terms and words used in this Lease, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender as the context may require. Tenant specifically agrees to pay all of

43

Landlord's costs, charges and expenses, including attorneys' fees, incurred in connection with any document review requested by Tenant and upon submission of bills therefor. In the event Landlord permits Tenant to examine Landlord's books and records with respect to any Additional Charge imposed under this Lease, such examination shall be conducted at Tenant's sole cost and expense and shall be conditioned upon Tenant retaining an independent accounting firm for such purposes which shall not be compensated on any type of contingent fee basis with respect to such examination. Wherever in this Lease or by law Landlord is authorized to charge or recover costs and expenses for legal services or attorneys' fees, same shall include, without limitation, the costs and expenses for in-house or staff legal counsel or outside counsel at rates not to exceed the reasonable and customary charges for any such services as would be imposed in an arm's length third party agreement for such services.

36.12. Upon request made not more than two (2) times in any twelve (12) month period, Tenant shall furnish to Landlord a copy of its then current audited financial statement (provided however that an unaudited statement certified as true and complete by Tenant's senior financial officer shall be acceptable in the event audited statements are not prepared for Tenant) which shall be employed by Landlord for purposes of financing the Premises and not distributed otherwise without prior authorization of Tenant.

36.13. (i) Tenant represents that the NAICS code number applicable to Tenant's operations is 424310 which, as of the Commencement Date, does not subject the Demised Premises to the requirements of the New Jersey Industrial Site Recovery Act, N.J.S.A. 13:1K-6 et seq. ("ISRA") and applicable regulations, N.J.A.C. 7:26B-1.1 et seq.

(ii) Not later than ninety (90) days prior to the Expiration Date, Tenant shall provide to 46 Landlord an affidavit, executed by a duly authorized officer of Tenant, setting forth the following: (a) the NAICS code applicable to the operations performed at the Demised Premises; and (b) the type and amounts of any hazardous substances (as defined in N.J.A.C. 7:1E-1.6) treated, stored, disposed of, handled, or used in Tenant's operations, except for such hazardous substances that may be ingredients in typical janitorial, maintenance, photography, warehouse, office and light assembly supplies so long as same are stored, handled and disposed of properly. During the term, Landlord reserves the right to require Tenant to execute an affidavit in similar form for any transaction which Landlord reasonably believes may trigger the requirements of ISRA, including without limitation, an assignment of this Lease, a subtenancy, or a sale or transfer of direct or indirect ownership or control of Tenant (a "Triggering Event").

(iii) In the event Tenant, or the New Jersey Department of Environmental Protection ("NJDEP") determines that ISRA is applicable to a Triggering Event or Tenant's cessation of operations at the Demised Premises, Tenant shall satisfy its obligations under ISRA prior to its lease termination date by securing an unconditional Response Action Outcome (or its equivalent in the event of a change of law) from a New Jersey Licensed Site Remediation Professional ("LSRP") reasonably acceptable to Landlord with respect to the Demised Premises. Notwithstanding the foregoing, in the event that the LSRP identifies areas of concern that are attributable solely to Landlord or other third parties (e.g., historic fill, railroad sidings, underground storage tanks, or such other areas of concern reasonably determined by the LSRP to have existed prior to the date Landlord delivers possession of the Demised Premises to Tenant) ("Landlord AOCs"), Landlord shall be solely responsible, at its sole cost and expense, for

44

investigating and remediating such Landlord AOCs. Except for the Landlord AOCs for which Landlord is responsible, Tenant shall bear sole responsibility for any investigation and cleanup costs, fees, penalties, or damages associated with ISRA compliance, including any supplemental obligations which may arise from any audit of the LSRP, or his/her work, whether such audit is performed by the NJDEP, or the LSRP licensing board. This requirement shall survive the termination of the Lease. In the event that Tenant is unable to complete its ISRA compliance obligations by the date of its lease termination, Landlord shall continue to provide Tenant with reasonable access to the Demised Premises, provided that any work undertaken by Tenant shall be performed in such a manner as to minimize interference with Landlord's or any other tenant's use of the Demised Premises. However, Landlord reserves its rights to deem Tenant a holdover tenant in the event that Tenant's ISRA compliance unreasonably restricts the Landlord's use of the Demised Premises.

(iv) Both Landlord and Tenant shall cooperate with each other with respect to any ISRA compliance obligations with respect to the Demised Premises which shall include, but not limited to, the sharing of all correspondence, documents, data and reports, including sampling results submitted to or received from any LSRP, governmental agency or third party.

36.14. Certification. Tenant certifies that: (i) It is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control; and (ii) It is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity, or nation. Tenant hereby agrees to defend, indemnify, and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities, and expenses (including attorney's fees and costs) arising from or related to any breach of the foregoing certification.

IN WITNESS WHEREOF, Landlord and Tenant have duly executed this Lease as of the day and year first above written.

**35 ENTERPRISE AVENUE, L.L.C**

By: /s/ Phillip R. Patton
Phillip R. Patton
Executive Vice President

45

**THE REALREAL, INC.**

By:    /s/ Julie Wainwright
Name:  Julie Wainwright
Title:  CEO

Copyright © Hartz Mountain Industries, Inc. 2014. All Rights Reserved. No portion of this document may be reproduced without the express written consent of Hartz Mountain Industries, Inc.

46

RIDER TO LEASE DATED MARCH 18, 2014, BETWEEN 35 ENTERPRISE AVENUE, L.L.C., AS LANDLORD AND THE REALREAL, INC., AS TENANT.

R1. If any of the provisions of this Rider shall conflict with any of the provisions, printed or typewritten, of this Lease, such conflict shall resolve in every instance in favor of the provisions of this Rider.

R2. **Option to Renew**: Provided Tenant is not then in monetary or material non-monetary default of any of the terms and provisions of this Lease beyond applicable notice and cure periods, and provided Tenant has not sublet more than [***] percent of the Demised Premises in the aggregate to one or more third-party subtenants (i.e., subtenants that are not parents, subsidiaries or affiliates of Tenant), Tenant shall have [***] to extend the Term of its lease of the Demised Premises, from the date upon which this Lease would otherwise expire, for [***], upon the following terms and conditions:

a. If Tenant elects to exercise said option, it shall do so by giving notice of such election to Landlord on or before the date which is [***] before the beginning of the Extended Period for which the Term is to be extended by the exercise of such option. Tenant agrees that it shall have forever waived its right to exercise any such option if it shall fail for any reason whatsoever to give such notice to Landlord by the time provided herein for the giving of such notice, whether such failure is inadvertent or intentional, time being of the essence as to the exercise of each such option.

b. If Tenant elects to exercise said option, the Term shall be automatically extended for the Extended Period covered by the option so exercised without execution of an extension or renewal lease. Within [***] after request of either party following the effective exercise of any such option, however, Landlord and Tenant shall execute, acknowledge and deliver to each other duplicate originals of an instrument in recordable form confirming that such option was effectively exercised, provided, however, that the parties' failure to do so shall not invalidate Tenant's exercise of such option.

c. The Extended Period shall be upon the same terms and conditions as are in effect immediately preceding the commencement of such Extended Period; provided, however, that Tenant shall have no right or option to extend the Term for any period of time beyond the expiration of the Extended Period and, provided further, that in the Extended Period the Fixed Rent during the first twelve (12) months of each Extended Period shall be at Fair Market Value ("FMV"). FMV shall be determined by mutual agreement of the parties. If the parties are unable to agree on the FMV within [***] of Tenant's exercise of its option, the parties shall choose a licensed Real Estate Appraiser who shall determine the FMV. The cost of said Real Estate Appraiser shall be borne equally by the parties. If the parties are unable to agree on a licensed Real Estate Appraiser within [***] of Tenant's exercise of its option, each party shall select one Appraiser to appraise the FMV. All appraisals shall be rendered within

[***] of appointment of the respective Appraiser appointed under this paragraph. If the difference between the two appraisals is [***]% or less of the lower appraisal, then the FMV shall be the average of the two appraisals. If the difference between the two appraisals is greater than [***]% of the lower appraisal, the two Appraisers shall select a third licensed Real Estate Appraiser to appraise the FMV. The cost of the third appraisal shall be borne equally by the parties. If the two Appraisers shall be unable to reach agreement upon the third Appraiser within [***] of Tenant's exercise of its option, either party may contact the nearest office of the American Arbitration Associations (the "Association") and request that the Association select an independent Appraiser to determine the FMV in accordance with the provisions of this Paragraph R2. Upon the Association's designation of such Appraiser, such Appraiser shall be deemed to be the third Appraiser for purposes of this Paragraph R2. Landlord and Tenant shall split evenly the fees and expenses of the Association in selecting the third Appraiser and shall each pay their own costs and expenses of working with the Association in connection with such selection. Upon such date as shall be designated by the third Appraiser by written notice to Landlord and Tenant (which date shall be no sooner than [***] of the delivery of such notice), Tenant's Appraiser and Landlord's Appraiser each shall submit to the third Appraiser its written determination of the FMV for the Demised Premises for the first year of the applicable Extended Term. If only one party's Appraiser shall submit such a written determination by the date designated by the third Appraisers, such party's Appraiser's determination of the FMV shall be conclusive and binding upon the parties and shall be the Fixed Rent during the first year of the applicable Extended Period. If both parties' Appraisers shall timely deliver their written determinations of the FMV for the Demised Premises for the first year of the applicable Extended Term to the third Appraiser, the third Appraiser shall select the determination which is closest to the third Appraiser's own determination of the FMV for the Demised Premises for the first year of the applicable Extended Term, and such determination shall be the Fixed Rent for the Demised Premises during the first year of the applicable Extended Term. The third Appraiser must select one of the two submitted determinations; it may not select its own determination. The third Appraiser shall provide notice of its selection to Landlord and Tenant within [***] of its receipt of the last of the Appraisers' determination. Anything to the contrary contained herein notwithstanding, the Fixed Rent for the first year of each Extended Period shall not be less than the Fixed Rent for the twelve (12) month period immediately preceding the Extended Period for which the Fixed Rent is being calculated and the Fixed Rent shall increase by [***] annually on each anniversary of the commencement of each Extended Period.

d. Any termination, expiration, cancellation or surrender of this Lease shall terminate any right or option for the Extended Period not yet exercised.

e. Landlord shall have the right, for [***] after receipt of notice of Tenant's election to exercise any option to extend the Term, to reject Tenant's election if Tenant gave such notice while Tenant was in default in the performance of any of its monetary or other material non-monetary obligations under the Lease, beyond applicable notice and cure periods and such rejection shall automatically render Tenant's election to exercise such option null and void and of no effect.

f. The option provided herein to extend the Term of the Lease may not be severed from the Lease or separately sold, assigned or otherwise transferred.

R3. **Rent Abatement**: Notwithstanding the provisions of Article 1.01(0), provided that Tenant is not then in default of its monetary or material non-monetary obligations under this Lease beyond applicable notice and cure periods, Fixed Rent on [***] square feet of Floor Space (at the rate of $[***] per month) shall be abated for the period of July 1, 2014 through June 30, 2015.

R4. **Continued Certificate of Occupancy**: Promptly following the date hereof, Landlord shall make an application for a Continued Certificate of Occupancy for the Building ("CCO") and shall deliver same to Tenant promptly upon receipt of same. In the event Landlord fails to deliver the CCO to Tenant by April 15, 2014, except to the extent the delay in issuance arises from the actions of Tenant or its agents, then for every day beyond such date that the CCO is not delivered by Landlord to Tenant, the Rent Commencement Date as defined in Section 1.010, shall be delayed by one (1) day. (By way of example, if the CCO is issued five (5) days after April 15, 2014, then the Rent Commencement Date shall occur on July 5, 2014). In the event Landlord fails to deliver the CCO to Tenant by May 15, 2014, except to the extent the delay in issuance arises from the actions of Tenant or its agents, Tenant may, as its sole and exclusive remedy for Landlord's failure to deliver the CCO by such date, terminate this Lease upon two days' written notice to Landlord (which notice must be delivered by Tenant to Landlord not more than five (5) business days after May 15, 2014, time being of the essence, or such right to terminate will be deemed waived), and, promptly upon such termination, Landlord shall return to Tenant all monies, letters of credit and/or other security or other payments previously made or remitted by Tenant to Landlord, which obligation of Landlord shall survive such termination. Upon such termination, except for the foregoing obligation of Landlord, neither party shall have any further obligation under or in respect of this Lease.

R5. **Repaving of Parking**: In the event Tenant properly exercises its option to extend the Lease for the First Extended Period, Landlord shall at its sole cost and expense repave and restripe the parking areas (top coat thickness to be not less than two inches) not later than June 30, 2020.

R6. **Tenant Allowance**: Provided Tenant is not in default of its monetary or any other material non-monetary obligations under this Lease beyond applicable notice and cure periods, Tenant shall be entitled to a buildout allowance of an amount equal to [***] (the "Tenant Buildout Allowance"), which Tenant Buildout Allowance shall be paid or credited to Tenant against the next monthly installment(s) of Fixed Rent and/or any Additional Charges, upon payment of the first month's Fixed Rent following occupancy of the Demised Premises, provided Tenant has submitted to Landlord invoices demonstrating that Tenant has expended such sums on the Demised Premises (exclusive of costs for Tenant's furniture, removable trade fixtures, removable equipment and/or inventory) (the "Permitted Buildout Items") and delivers to Landlord lien waivers from its contractors and material suppliers. In no event shall the Tenant Buildout Allowance exceed the invoices submitted for Permitted Buildout Items, nor shall Landlord be required to make reimbursement payments to Tenant more frequently than on a monthly basis. Such payment or credit shall be issued within ten (10) Business Days of Tenant's satisfaction of the foregoing requirements.

R7. **HVAC Warrantee**: Notwithstanding the provisions of Section 17.02 of the Lease, for the period beginning on the Commencement Date and ending June 30, 2015 (the "Warrantee Period") Landlord shall be responsible at its sole cost and expense for performing all repairs and replacements to the existing five (5) roof top HVAC units at the Building (the "HVAC"), provided that during the Warrantee Period, Tenant will contract with a reputable HVAC contractor for a maintenance contract and no repairs or replacement required during the Warrantee Period shall be occasioned by the misuse or negligent or wrongful acts of Tenant or its employees, agents, or contractors. Any claim made hereunder must be made upon Landlord within the Warrantee Period. If Tenant shall make such a claim, Landlord shall promptly perform the required repair and/or replacement even if same is not completed by the expiration of the Warranty Period. Thereafter, Tenant shall repair and maintain the HVAC units at a cost not to exceed $[***] per unit during any given twelve (12) calendar month period for one or more of the HVAC units. Landlord shall reimburse Tenant for such sums reasonably incurred that exceed such $[***] per year threshold via a credit against the following month(s) Fixed Rent. If any of the HVAC units shall have reached the end of its useful life and shall require replacement, as reasonably determined by Landlord, the actual, reasonable, out-of-pocket, third party cost of replacing the unit shall be amortized in accordance with generally accepted accounting principles, on a straight-line basis in monthly installments over the useful life of the replacement unit, as reasonably estimated by Landlord, and for each month during the remainder of the Lease Term Tenant shall pay an amount equal to such amortized monthly installments of the replacement cost of the unit. Such payments shall be deemed to be an Additional Charge and shall be due on the first of the month together with Tenant's payment of the monthly installment of Fixed Rent due for such month; provided, however, that (i) in no event shall Tenant have any obligation to pay any such monthly installments until Landlord shall deliver an invoice for same accompanied by copies of the third-party invoices submitted in connection with the replacement of the applicable HVAC unit, and (ii) Tenant shall have no obligation to reimburse Landlord for any of the amortized replacement costs that relate to any period from and after the expiration of the term of this Lease.

R8. **Racking**: The existing racking in the retail store and the existing computer racking/shelving shall remain and Tenant may relocate same as needed, subject nevertheless to the provisions of Article 16 of the Lease.

R9. **Roof Membrane**: Amending Section 17.02 of the Lease, Landlord shall, at its sole cost and expense, maintain the roof and roof membrane and Tenant shall pay for same as an Operating Expense hereunder at the annual rate of $[***] multiplied by the Floor Space of the Building (the "Roof Supplement"). When the roof and roof membrane has reached the end of its useful life, as reasonably determined by Landlord or, promptly upon Landlord receipt of written notice from Tenant that the roof membrane's condition is adversely impacting Tenant's use and enjoyment of the Demised Premises in more than a de minimis manner, whichever is earlier, Landlord shall install a new membrane or replace the roof membrane at the sole cost and expense of Landlord except to the extent such replacement is required due to• the acts of Tenant or its agents. Following any such replacement, Tenant may elect upon not less than thirty (30) days' notice to Landlord to maintain the roof and roof membrane (but not the roof structure) at its cost and expense, in which event the Roof Supplement shall cease, or to continue to pay the Roof Supplement, in which event Landlord shall continue to be responsible for all costs and expenses of maintaining and repairing the roof and the roof membrane other than for such costs and expenses as shall be required to repair damage caused by the acts of Tenant or its agents, employees or contractors.

R10. **Sprinkler**: Tenant shall be responsible for any sprinkler upgrades in the office, warehouse or studio areas.

R11. **Signage and Building Name**:

a. Subject to Tenant's compliance with all applicable Legal Requirements, Tenant shall have the exclusive right to install any and all signs on the exterior or interior of the Demised Premises and the Building, including, without limitation, pylon and/or monument signs, as Tenant shall deem necessary or appropriate after receipt of Landlord's approval, which shall not be unreasonably withheld, delayed or conditioned. Such signs shall advertise only Tenant and any of its subtenants or assigns in the Building and shall not advertise any third parties. Notwithstanding the foregoing, Tenant shall not install any signs on the roof of the Building if such signs shall interfere with any rooftop solar or other installations made by Landlord on the roof of the Building and/or if such signs would adversely affect the Landlord's warranty on the roof membrane for the Building.

b. Landlord may erect "For Let" and similar signs on the exterior of the Building and/or on the Land during the last nine (9) months of the Term or following a monetary or other non-monetary default not cured within the applicable notice and cure period, but during the Term Landlord may not erect any other signs on or about the Demised Premises, the right to install such signs being exclusive to Tenant.

R12. **Subordination and Non-Disturbance**:

a. Landlord represents to Tenant that there are no Mortgages or Superior Leases encumbering the Demised Premises or any portion thereof as of the date of this Lease except for the Mortgage and Security Agreement, given by Landlord, as mortgagor, to or for the benefit of Mortgage Electronic Registration Systems, Inc., a Delaware corporation, as mortgagee nominee of Bear Stearns Commercial Mortgage, Inc. ("Lender") dated April 23, 2007 and filed May 7, 2007 in Mortgage Book 15819 Page1. Provided Tenant first executes same, Landlord shall obtain from Lender an original agreement in the form of Exhibit G (an "SNDA"), executed and notarized by Landlord and Lender within thirty (30) days following the date hereof. Landlord shall include with its delivery of such original executed and notarized counterpart of the SNDA such additional executed and notarized counterparts as shall be required for Tenant to retain at least one (1) original counterpart of the SNDA for its files.

b. If Landlord (any successor owner of the Demised Premises) shall grant any other Mortgage or enter into any other Superior Lease in the future, Landlord (i) shall as a condition to the subordination of this Lease obtain and deliver to Tenant multiple counterparts of a fully executed and notarized SNDA from all future Mortgagee and Superior Lessors concurrently with the final execution and delivery of any such Mortgage and/or Superior Lease and (ii) shall promptly record such SNDA in the office of the County Register for Hudson County upon and subject to Tenant's execution and return of such SNDA to Landlord. Tenant agrees that in lieu of an SNDA in the form of Exhibit G it shall execute and return such other SNDA as shall be in form and substance substantially similar to Exhibit G or otherwise reasonably acceptable to such Mortgagee or Superior Lessor.

c. Landlord shall be responsible at its sole cost and expense for paying any recording or other fees imposed in connection with the recording of any SNDA for future Mortgagees and Superior Lessors.

R13. **Landlord Representations and Covenants**: Landlord represents to, and covenants with, Tenant as follows:

a. There are no easements or other matters of record with respect to the Demised Premises or any portion thereof which materially restrict the use of the Demised Premises for the Permitted Uses.

b. Except with respect to three (3) UST's removed circa 1991, for which a No Further Action Letter was received from the New Jersey Department of Environmental Protection, to Landlord's knowledge, neither the Demised Premises or any part thereof has been the subject of a remediation, an ISRA trigger, a no further action letter, or a response action outcome.

R14. **Landlord Alterations, Improvements and Repairs**:

a. Except as stated in Section 18.03 or with respect to any Landlord repair obligations hereunder, Landlord shall not make any alterations and/or improvements to the Demised Premises during the Term of the Lease without Tenant's consent, not to be unreasonably withheld, conditioned or delayed. Landlord shall not unreasonably interfere with Tenant, its subtenants or assigns or any of the business operations at the Demised Premises while performing any such alterations and/or improvements and shall conduct any work in connection therewith so as to minimize interference to the extent commercially practicable. Tenant shall be permitted to condition its consent to any such alterations or improvements upon Landlord scheduling on-site work with Tenant in advance and conducting such work on such dates and/or at such times as Tenant shall reasonably require to minimize any disturbance to or interference with the business operations in the Demised Premises (but shall not require any such work during overtime hours). In no event shall Landlord shall make any alterations or improvements to the Demised Premises (including, without limitation, alteration of any curb cuts leading into the Building's truck court or any utilities servicing the Building), nor shall Landlord grant any utility or other easements or rights with respect to any of the Demised Premises, if such alterations, improvements, easements or other rights would interfere with Tenant's use and/or enjoyment of the Demised Premises, other than to a de minimis extent.

b. If during the Term the Floor Space of the Development is decreased by more than [***] percent, whether due to casualty, condemnation, the exercise of eminent domain, the sale of any Floor Space or any other reason, the Floor Space of the Development shall be deemed to be not less than [***] percent of the Floor Space of the Development as of the date of this Lease for purposes of determining the Building Fraction.

c. Other than in the event of an emergency, Tenant shall have the right to have a representative present at all times Landlord or any of its employees, agents, contractor or representative are present in or about the Demised Premises. Any and all work performed by Landlord in or about the Demised Premises shall be performed in a good and workmanlike manner in accordance with all applicable Insurance Requirements and Legal Requirements. Landlord shall

not unreasonably interfere with Tenant, its subtenants or assigns or any of the business operations at the Demised Premises while performing any such alterations and/or improvements and shall conduct any work in connection therewith so as to minimize any such interference to the extent commercially practicable. Tenant may require that any such work be scheduled with Tenant in advance and conducted on such dates and/or at such times as Tenant shall reasonably require to minimize any disturbance to or interference with the business operations in the Demised Premises (but not during overtime hours). In no event shall Landlord have the right to stage work to areas outside of the Demised Premises from within the parking lots or other areas of the Demised Premises if such staging would or does materially interfere with Tenant's business operations. Any pipes, conduits and other like installations shall to the extent practicable be installed behind walls, ceilings or floors or within columns. In no event shall the usable area of the Building be permanently reduced by such alterations, improvements or other work performed by or on behalf of Landlord.

R15. **Tenant Alterations and Improvements**:

a. Tenant shall be permitted to paint the interior of the Building or any portion thereof, install carpeting and make other decorative alterations upon advance notice to Landlord but without Landlord's consent.

b. All alterations and improvements performed by or on behalf of Tenant shall be deemed to be Tenant's Property during the Term of the Lease and Tenant shall be the sole party entitled to depreciate same as an asset for tax purposes.

c. If Landlord shall have the right to and shall require that Tenant use a contractor designated by Landlord to perform any alterations, improvements, maintenance, repairs or other work to the Demised Premises, Landlord shall cause such contractor to provide its services to Tenant at competitive market rates.

Notwithstanding anything in the Lease or this Rider to the contrary, Tenant shall have no obligation to remove any improvements to the Demised Premises made by Tenant or assigns if such alterations or improvements could be made without Landlord's consent pursuant to the terms of this Lease.

R16. **Zoning; Storage of Materials; Exclusive Use**:

a. Landlord shall not apply for any change to the zoning for the Demised Premises, or consent to any such change if the effect thereof would impact in any material manner upon Tenant's right to use the Demised Premises for the Permitted Uses during the Term.

b. Materials stored in the Building shall not be considered to be hazardous materials merely because they contain components or materials which, by themselves in concentrated quantities, would be considered hazardous materials. By way of example, but not limitation, the storage of oil paintings in the Building would not be deemed to be the improper warehouse of hazardous materials merely because the oil paint on the paintings, if stored in concentrated quantities, would be deemed to be an improper storage of hazardous materials.

c. Except as otherwise expressly provided in the Lease to the contrary (i) Tenant shall have the exclusive right to occupy and use the Demised Premises, including, without limitation, the parking areas and truck courts currently located or hereinafter placed upon the Land, and (ii) Landlord shall not prevent Tenant from having access to the Demised Premises twenty-four (24) hours per day, seven (7) days, three hundred sixty five days per year (three hundred sixty six days per year in any leap year).

R17. **Environmental Indemnity**: Landlord agrees that it shall defend, indemnify and save Tenant harmless from and against all claims, loss, damage, liability and expense (including reasonable attorney's fees and expenses) which the Tenant may sustain as a result of or on account of non-compliance of the Demised Premises with the Environmental Laws as the result of conditions existing on the Demised Premises (a) prior to the Commencement Date and/or (b) which were caused by Landlord, or its agents, and employees after the Commencement Date (except to the extent caused by Tenant, its agents, invitees, or employees). Environmental Laws are defined as laws, statutes, ordinances or regulations relating to the discharge of "Hazardous Substances", as defined under New Jersey law N.J.A.C. 7:1E-1.7, into the air, water, lands or groundwaters of the State of New Jersey, or the United States of America.

R18. **Real Estate Taxes**:

a. Subject to the provisions of Section 12.02, Tenant at is option shall have the right to contest the Real Estate Tax assessment for the Demised Premises for any portion of the Term by appropriate legal proceedings conducted with due diligence using counsel designated by Tenant and reasonably acceptable to Landlord. If Tenant shall so elect to prosecute any such proceedings, Landlord shall at no cost to Landlord cooperate in the prosecution thereof as Tenant shall reasonably request and require.

b. Tenant shall pay its own cost and expense of participating in any such proceedings and shall reimburse Landlord for its actual, reasonable, out-of-pocket costs and expenses of prosecuting any such proceedings in the event Landlord elects at its option to do so, or providing any cooperation requested by Tenant. Any refund or credit for the Real Estate Taxes shall belong solely to Tenant to the extent it shall relate to the Term of this Lease. If any such refund shall be paid to Landlord, or if Landlord shall receive any such credit, it shall pay any amount equal to such refund or credit promptly upon Landlord's receipt thereof. Such obligation shall survive the expiration or sooner termination of the Term of this Lease.

R19. **Assignment and Subletting**: Landlord's consent to Tenant's use of a third-party logistics provider (a "3PL") to manage all or any portion of Tenant's warehouse and distribution functions at the Demised Premises, and any use of the Demised Premises that the 3PL might make as Tenant's 3PL shall not be unreasonably withheld, delayed or conditioned.

R20. **Landlord's Defaults**: If Landlord fails to perform any of its obligations under this Lease (a "Landlord Default"), Tenant may give Landlord notice specifying the Landlord Default. A Landlord Default must be cured (i) for monetary defaults within fifteen (15) days after receiving notice from Tenant; or (ii) for non-monetary defaults within thirty (30) days after receiving notice thereof, however for those that cannot reasonably be cured within thirty (30) days, within a reasonable period of time thereafter provided that Landlord has commenced its cure within such

thirty (30) day period and thereafter prosecutes its cure to completion with commercially reasonable and diligent efforts. If the Landlord Default is not corrected within the applicable cure period, the Tenant shall have all rights powers or remedies permitted by law but under no circumstances shall Tenant be permitted to offset any sums incurred against Rent due under the Lease.

R21. **Required Landlord Payments to Tenant**: No payment by Landlord or receipt or acceptance by Tenant of a lesser amount than the correct payment or reimbursement due Tenant from Landlord shall be deemed to be other than a payment on account, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and Tenant may accept such check or payment without prejudice to Tenant's right to recover the balance or pursue any other remedy in this Lease or at law provided.

R22. **Landlord's Work and Tenant's Delays**: Tenant shall not be charged with a Tenant Delay for delay in Landlord's Work resulting from changes to Landlord's Work requested by Tenant, including, without limitation, requested changes involving long lead-time items, unless (i) prior to approving such changes Landlord notifies Tenant of the estimated delay in Landlord's Work likely to result from such changes, and (ii) Tenant provides notice to Landlord requesting that Landlord proceed with the requested change. In no event shall Tenant be charged with a Tenant Delay for a delay in submitting or approving plans or other information or materials unless Tenant shall fail to provide plans, information or other submissions, or consents or approvals, expressly provided for in the Lease within the time periods expressly set forth in the Lease.

R23. **Landlord's Waiver of Consequential Damages**: Other than a holdover beyond the Expiration Date, in no event shall Tenant be liable to Landlord with respect to any consequential, exemplary or punitive damages in connection with this Lease and/or Tenant's use and occupancy of the Demised Premises.

R24. **Loss of Service**: If due to any activities of Landlord (i) Tenant shall lose commercially reasonable access to the Building or commercially reasonable access to a material portion of the parking areas or truck access which prevent Tenant from conducting its normal business activities in the Building, or (ii) the delivery of electricity or other utility or service required for Tenant to conduct its normal business activities in the Building shall be interrupted, or (iii) if Tenant shall lose the ability to use all or a significant portion of the Building for Tenant's normal business activities and the condition created in (i), (ii) or (iii) continues for five (5) consecutive Business Days during which time Tenant is prevented from and does not use the affected areas, then all Rent shall abate with respect to the affected area of the Building for the period of time following forty-eight (48) hours after Tenant has given written notice to Landlord of such loss and shall continue until the earlier of (x) the day the condition giving rise to such abatement no longer exists, or (y) the date Tenant resumes business activities in the area(s) affected.

**35 ENTERPRISE AVENUE, L.L.C.**

By:  /s/ Phillip R. Patton
      Phillip R. Patton
      Executive Vice President

**THE REALREAL, INC.**

By:  /s/ Julie Wainwright
      Name: Julie Wainwright
      Title: CEO

**EXHIBIT A**

**DESCRIPTION SHEET**

**EXHIBIT C**

**LANDLORD'S WORKLETTER**

**THE REALREAL, INC.**

**35 ENTERPRISE AVENUE**
**SECAUCUS, NEW JERSEY**

Landlord at its sole cost and expense shall perform the following:

1. Such maintenance, repairs and replacements, if any, as are required to deliver the five (5) existing HVAC units in good working order;

2. Such maintenance, repairs and replacements, if any, as are required to deliver the roof and skylights of the Building free of cracks or leaks and in good condition and repair;

3. Following the Commencement Date, restripe parking lot similar to striping noted on the Site Plan;

4. Following the Commencement Date, enclose the existing the fire pump area to meet code;

5. Following the Commencement Date, wiring connecting the fire pump to the electrical panel shall be relocated from the existing fire pump room to the outside of the building parallel with the foundation and then back into the electrical panel, all in accordance with applicable code requirements;

6. Such maintenance, repairs and replacements, if any, as are required to deliver the Building including all structural elements of the Building, in-wall and underground plumbing and electrical transmission lines of the facility and all existing mechanical systems in the Building, including HVAC and the existing sprinklers, lighting (including all warehouse light fixtures and bulbs), and life safety systems in good working order;

7. Deliver a Certificate of Continuing Occupancy issued by the applicable governing body having jurisdiction over the Building;

8. Deliver the warehouse floor scrubbed and in broom clean condition and with any major cracks and holes repaired; and

9. Remove all vending machines in the Demised Premises.

10. Remove/correct "hump" in floor in retail store near window as noted in attached photo.

END.

EXHIBIT "D"

RULES AND REGULATIONS

1. The rights of each tenant in the entrances, corridors, or any other Common Areas are limited to ingress and egress from such tenant's premises for the tenant and its employees, licensees and invitees, and no tenant shall use, or permit the use of, the entrances, corridors, or any other Common Areas for any other purpose. No tenant shall encumber or obstruct, or permit the encumbrance or obstruction of, or place any objects in any of the sidewalks, plazas, entrances, corridors, escalators, fire exits, stairways or any other Common Areas of the Building. Landlord reserves the right to control and operate the public portions of the Building and the public facilities, as well as facilities furnished for the common use of the tenants, in such manner as it deems best for the benefit of the tenants generally.

2. Any person whose presence in the Building at any time shall, in the judgment of Landlord, be prejudicial to the safety, character or reputation of the Building or of its tenants may be denied access to the Building or may be ejected therefrom. During any invasion, riot, public excitement or other commotion, Landlord may prevent all access to the Building by closing the doors or otherwise for the safety of the tenants and protection of property in the Building.

3. The cost of repairing any damage to the public portions of the Building or the public facilities or to any facilities used in common with other tenants, caused by a tenant or its employees, or licensees shall be paid by such tenant.

4. No vehicles, animals, fish or birds of any kind shall be brought into or kept in or about the premises of any tenant of the Building. Notwithstanding the foregoing, entry of vehicles onto the Building shall be subject to conditions reasonably imposed by Landlord.

5. No noise, including, but not limited to, music or the playing of musical instruments, recordings, radio or television, or the use of loudspeakers which, in the judgment of Landlord, might disturb other tenants or invitees in the Building or which can be heard in the Common Areas, shall be made or permitted by any tenant. Nothing shall be done or permitted in the premises of any tenant which would impair or interfere with the use or enjoyment by any other tenant of any other space in the Building

6. No tenant, nor any tenant's contractors, employees, agents, visitors or licensees, shall at any time bring into or keep upon the premises or the Building any flammable, combustible, explosive or otherwise dangerous fluid, chemical or substance.

7. All removals, deliveries, or the carrying in or out of any safes, freight, furniture, fixtures, packages, boxes, crates or any other object or matter of any description must take place during such hours and in such locations and in such manner as Landlord or its agent may reasonably determine from time to time. The persons employed to move safes and other heavy objects shall be reasonably acceptable to Landlord and, if so required by law, shall hold a master rigger's license. Arrangements will be made by Landlord with any tenant for moving large quantities of fixtures and equipment into or out of the Building. All labor and engineering costs incurred by Landlord in connection with any moving specified in this rule, shall be paid by Tenant to Landlord, on demand.

1

**EXHIBIT "D"**

8. Landlord reserves the right to exclude from the Building all objects and matter which violate any of these Rules and Regulations or this Lease.

9. No tenant shall occupy or permit any 'portion of its premises for the possession, storage, manufacture, or sale of liquor, narcotics, dope, tobacco in any form, or as a school. No tenant shall use its premises or any part thereof to be used, for manufacturing, or on-site auction of merchandise, goods or property of any kind.

10. Landlord, its contractors, and their respective employees, shall have the right to use, without charge therefor all light, power and water in the premises of any tenant while cleaning or making repairs or alterations in the premises of such tenant.

11. No premises of any tenant shall be used for lodging or sleeping or for any immoral or illegal purpose.

12. The requirements of tenants will be attended to only upon application at the office of the Building. Employees of Landlord shall not perform any work or do anything outside of their regular duties, unless under special instructions from Landlord.

13. Canvassing, soliciting and peddling in the common areas are prohibited and each tenant shall cooperate to prevent the same.

14. No tenant shall cause or permit any unusual or objectionable odors to emanate from its premises which would annoy other tenants or create a public or private nuisance. No cooking shall be done in the premises of any tenant except as is expressly permitted in such tenant's Lease.

15. Nothing shall be done or permitted in any tenant's premises, and nothing shall be brought into or kept in any tenant's premises, which would impair or interfere with any of the Building's services or the proper and economic heating, cleaning or other servicing of the Building or the premises, or the use or enjoyment by any other tenant of any other premises.

16. No acids, vapors or other materials shall be discharged or permitted to be discharged into the waste lines, vents or flues of the Building which may damage them. The water and wash closets and other plumbing fixtures in or serving any tenant's premises shall not be used for any purpose other than the purposes for which they were designed or constructed, and no sweepings, rubbish, rags, acids or other foreign substances shall be deposited therein. All damages resulting from any misuse of the fixtures shall be borne by the tenants who, or whose servants, employees, agents, visitors or licensees shall have, caused the same. Any cuspidors or containers or receptacles used as such in the premises of any tenant or for garbage or similar refuse, shall be emptied, cared for and cleaned by and at the expense of such tenant.

17. Each tenant, before closing and leaving its premises at any time, shall turn out all lights and lock all entrance doors.

2

**EXHIBIT "D"**

18. Hand trucks not equipped with rubber tires and side guards shall not be used within the Building.

19. Landlord reserves the right to rescind, alter or waive any rule or regulation at any time prescribed for the Building when, in its judgment, it deems it necessary, desirable or proper for its best interest and for the best interests of the tenants, and no alteration or waiver of any rule or regulation in favor of one tenant shall operate as an alteration or waiver in favor of any other tenant. Landlord shall not be responsible to any tenant for the non-observance or violation by any other tenant of any of the rules and regulations at any time prescribed for the Building.

20. Sustainability: Tenant has been provided with a copy of Landlord's Sustainability Initiative. Consistent with such Initiative, Tenant shall use its reasonable efforts to ensure effective and energy efficient operation of the Demised Premises. Accordingly:

(i) Tenant shall not waste electricity, water, heat, air conditioning, and other utilities and services at the Demised Premises; and

(ii) Tenant shall not obstruct, alter, or in any way impair the efficient operation of the Building's heat, air conditioning, and ventilation systems. To this end, Tenant shall:

(A) Not place furniture, equipment, or other objects where they would interfere with air flow;

(B) Keep corridor doors closed and not open any windows (except if air circulation shall not be in operation, windows may be opened with Landlord's consent; and

(C) During hot weather months, lower and partially close window blinds or drapes when the sun's rays fall directly on windows or the Premises.

(D) Use, to the maximum extent economically practicable, energy efficient materials and supplies, including but not limited to fluorescent light fixtures and bulbs, waterless plumbing fixtures, and such other items consistent with Landlord's specifications, which specifications may be amended by Landlord from time to time.

(E) Upon request of Landlord, provide Landlord with copies of its utility bills, or authorize the various utilities (e.g. providers of electric, gas, and water) to provide copies of such bills directly to Landlord.

(F) Recycle waste materials to the maximum extent economically practicable, and in all events in compliance with applicable solid waste management laws and regulations.

Notwithstanding anything herein to the contrary, (i) as long as Tenant and its licensees, subtenants and assigns shall be the sole occupants of the Building, the foregoing first and third sentences of Rule 1, Rules 2, 3, 5, 7, 10, 13 -15, 17 and 19 shall not be applicable to or enforced against Tenant or any of its licensees, subtenants, or assigns, and (ii) in the event of any conflict between the terms and provisions of these Rules and Regulations and the terms and provisions of the Lease to which this Exhibit D is annexed (the "Lease"), the terms and provisions of the Lease shall govern and control.

3

**EXHIBIT "D"**

**Hartz Green Building and Sustainability Initiative**

No matter one's political stripe, it cannot be denied that energy and natural resources are finite, climate change is upon us, and a sustainable future requires a fundamental shift in the national and international consciousness. As we move forward into the 21st century, we must recognize that sustainable development must meet the needs of the present, without compromising the ability of future generations to meet their own needs.

With over 38 million square feet of buildings, Hartz is uniquely situated to address these challenges. USEPA estimates that in the United States, buildings account for:

- 39% of energy use

- 12% of total water consumption

- 68% of total electricity consumption; and

- 38% of carbon dioxide emissions

Starting now, Hartz will begin implementing its Green Building and Sustainability Initiative. We will commence by evaluating energy consumption in existing buildings, and moving forward with energy saving measures, both technical and institutional. Technical early actions may range from converting from incandescent to fluorescent light bulbs, installing automatic motion-activated switches, and making changes to our HVAC and plumbing systems. Institutional changes will include, to the extent both economic and practical, changes to our building and vendor specifications to require use of sustainable materials and practices, and changes to our leases to promote tenant use of energy-efficient technology.

Our longer-term goals will be to reduce our "carbon footprint." Though not yet here, we envision technology that will allow our buildings to be energy self-sustaining. Our many acres of roofs alone have the potential to serve as energy farms, generating electricity for our building tenants, and potentially adding energy to the grid.

To move forward with this vision, I have established a Sustainability Committee, made up of members from our Administration, Environmental, Legal, Architecture, and Property Management departments, to begin developing and implementing ways to reduce our energy consumption and carbon footprints, and to promote a sustainable real estate portfolio. But achieving our goals will require more than a committee — it will require a commitment from all of us. Our success has always been achieved through collaboration and collective effort. Whether you are an employee, tenant, or vendor, your perspective is invaluable. We welcome your ideas and inspiration.

4

**EXHIBIT "D"**

EXHIBIT E

NAME AND ADDRESS OF ISSUING BANK

INSERT DATE

IRREVOCABLE LETTER OF CREDIT NO. (insert number)

Landlord

c/o Hartz Mountain Industries, Inc.
400 Plaza Drive
Secaucus, New Jersey 07096-1515

Ladies and Gentlemen:

At the request and for the account of **TENANT**, located at                    (hereinafter called "Applicant"), we hereby establish our Irrevocable Letter of Credit No. **Insert number** in your favor and authorize you and your assigns to draw on us up to the aggregate amount of US$ TO BE INSERTED available by your draft(s) at sight drawn on us and accompanied by the following:

> A statement signed to the effect of or similar to the following: "The drawer hereunder is entitled to draw upon this letter of credit pursuant to that certain lease agreement, dated INSERT DATE, by and between LANDLORD, as Landlord, and TENANT, as Tenant (the "Lease")."

This Irrevocable Letter of Credit will be duly honored by us at sight upon delivery of the statement set forth above without inquiry as to the accuracy of such statement and regardless of whether Applicant disputes the content of such statement. Partial drawings against this Letter of Credit are permitted.

This Irrevocable Letter of Credit shall automatically renew itself for successive twelve (12) month periods from the date above, unless we notify you, by certified mail, return receipt requested, of our intention not to renew at least sixty (60) days prior to any annual renewal date.

This irrevocable Letter of Credit is transferable at no charge to any transferee of Landlord upon notice to the undersigned from you and such transferee.

Multiple draws on this Letter of Credit are permitted.

You shall have the right, at your option, to present a photocopy of this Letter of Credit in lieu of the original and we shall make payment hereunder as if the original were presented.

At your option, draw requests may be made in person, or by mail, or by courier service, including but not limited to FedEx, Airborne, or UPS.

At your option draw requests may be made by fax to the following fax number (or such other number as we may designate upon written notice to you):

Fax number for draws hereunder: INSERT FAX NUMBER.

If the original of this Letter of Credit has been lost, stolen, mutilated or destroyed upon receipt of (a) in the case of loss, theft or destruction of this Letter of Credit, a certificate signed by an authorized officer of the beneficiary (who is identified as such) to such effect or (b) in the case of mutilation of this Letter of Credit. The mutilated Letter of Credit, we will issue a replacement Letter of Credit in your favor, dated the same date, bearing a new number, and in the same stated amount as, and with other provisions identical to, this Letter of Credit.

This undertaking is subject to The International Standby Practices 1998 (ISP98).

Upon receipt of the documents above described, we shall pay you as requested.

Very truly yours,

**Name of Bank**                                                        **Countersigned:**


**Vice President**                                                      **Vice President**

Exhibit F

Ground & Maintenance Specifications for Net Leased Properties

Except as otherwise provided to the contrary in the Lease to which this Exhibit F is attached (the "Lease"), Tenant shall be required to maintain the exterior areas of the Demised Premises in a clean and sightly condition, consistent with the standards of a first class warehouse building, including but not limited to maintenance substantially in accordance with the following specification for the exterior maintenance of the landscaped and parking lot areas around the building, including, but not limited to the following activities from March 1st to November 31st each calendar year:

**Lawn Maintenance**

General lawn maintenance shall consist of weekly mowing, weeding and edging of all lawn areas. Grass clipping shall be removed from the site and disposed of by the contractor. All parking lots shall be weeded and neatly edged on a weekly basis and edging should be done around all shrub and tree beds on a monthly basis.

**Weed Control, Fertilization and Liming**

A program shall be in place for five applications of weed control and fertilization of all soil areas, and liming during the fall. An inspection should be conducted monthly by the contractor to determine if there is any insect or diseases present, what the cause is and then apply pesticides or other treatments to relieve this condition.

**Shrub and Tree Maintenance**

Shrub beds shall be weeded on a weekly basis. All shrubs and trees should be pruned on a bi-annual basis in the spring and in the fall. All shrubs and trees should be inspected regularly for any disease and treated accordingly.

**Litter and Debris Removal**

Litter and debris removal should be conducted weekly by the contractor from all turf, shrub beds and open parking lots (on a year round basis). Leaves shall be removed from the turf and bed areas on a weekly basis in the fall.

**Irrigation Systems**

The maintenance and repair of the irrigation systems are the sole responsibility of the tenant. Each Spring the tenant must have the system turned on by a qualified contractor and make any necessary repairs and adjustments for proper operation.

A mid-year inspection is also required to further confirm proper operating condition. In the fall the system must be shut down properly and the system completely winterized for the winter.

In the event of any conflict between the terms and provisions of this Exhibit F and the Lease to which this Exhibit F is annexed, the terms and provisions of the Lease shall govern and control.

<u>EXHIBIT G</u>

Recording Requested by
and when Recorded return to:

WELLS FARGO BANK, N.A.
Commercial Mortgage Servicing
1901 Harrison Street, 2nd Floor
Oakland, CA 94612


**Attention:**      **CMS Lease Review**s

**Loan No.:**        _____


### SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

**Tenant's Trade Name:** _____

**NOTICE: THIS SUBORDINATION AGREEMENT RESULTS IN YOUR LEASEHOLD ESTATE IN THE PROPERTY BECOMING SUBJECT TO AND OF LOWER PRIORITY THAN THE LIEN OF THE SECURITY DOCUMENTS (DEFINED BELOW).**

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT ("Agreement") is made as of         , 2  , by and between ("Tenant"), and U.S. BANK NATIONAL ASSOCIATION, as Trustee, successor-in-interest to. BANK OF AMERICA, N.A., as Trustee, successor by merger to LASALLE BANK NATIONAL ASSOCIATION, as Trustee, for the registered holders of Bear Stearns Commercial Mortgage Securities Inc., Commercial Mortgage Pass-Through Certificates, Series 2007-PWR16 ("Lender").


### R E C I T A L S

A.     ("Owner") is the owner of the land and improvements commonly known as and more specifically described in <u>Exhibit A</u> attached hereto ("Property").

B.     Tenant is the lessee under a lease dated         , 2  , executed by Owner (or its predecessor in interest), as landlord, and Tenant, as tenant (as the same may have been amended, the "Lease"), covering certain premises (the "Premises") compromising all or a part of the Property.

C.     Lender is the current holder of a mortgage loan (the "Loan") previously made to Owner, evidenced by a note (the "Note") and secured by, among other things: (a) a first mortgage, deed of trust or deed to secure debt encumbering the Property (the "Mortgage"); and (b) a

1

first priority assignment of leases and rents on the Property (the "Assignment of Leases and Rents") contained in the Mortgage or in a separate document. The Mortgage and the Assignment of Leases and Rents are collectively referred to as the "Security Documents." The Note, the Security Documents and all other documents executed in connection with the Loan are collectively referred to as the "Loan Documents."

D.    Tenant has requested Lender's agreement that if Lender forecloses the Mortgage or otherwise exercises Lender's remedies under the Security Documents, Lender will not disturb Tenant's right to quiet possession of the Premises under the terms of the Lease.

E.    Lender is willing to so agree on the terms and conditions provided in this Agreement, including, without limitation, Tenant's agreement to subordinate the Lease and attorn to Lender as provided herein.

NOW, THEREFORE, for mutual consideration, including the mutual covenants and agreements set forth below, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    **SUBORDINATION**. The Lease is and shall remain unconditionally subject and subordinate to (a) the liens or charges imposed by the Security Documents, (b) all currently outstanding or future advances secured by the Security Documents, and (c) all renewals, amendments, modifications, consolidations, replacements and extensions of the Security Documents. The subordination described herein is intended by the parties to have the same force and effect as if the Security Documents and such renewals, modifications, consolidations, replacements and extensions of the Security Documents had been executed, acknowledged, delivered and recorded prior to the Lease and any amendments or modifications thereof.

2.    **NON-DISTURBANCE**. If Lender exercises any of its rights under the Security Documents, including any right of entry on the Property pursuant to the Mortgage or upon a foreclosure of or deed in lieu of foreclosure of the Mortgage, Lender shall not disturb Tenant's right of quiet possession of the Premises under the terms of the Lease, so long as Tenant is not in default under this Agreement or in default beyond any applicable grace period under the Lease.

3.    **ATTORNMENT**. Notwithstanding anything to the contrary contained in the Lease, should title to the Premises and the landlord's interest in the Lease be transferred to Lender or any other person or entity by foreclosure of or deed in-lieu of foreclosure of the Mortgage, Tenant shall, for the benefit of Lender or such other person or entity, effective immediately and automatically upon the occurrence of any such transfer, attorn to Lender or such other person or entity as landlord under the Lease and shall be bound under all provisions of the Lease including, but not limited to, the obligation to pay all rent required to be paid by Tenant pursuant to the terms of the Lease, for the remainder of the Lease term.

2

4.  **PROTECTION OF LENDER**. If Lender succeeds to the interest of landlord under the Lease, Lender shall not be: (a) liable for any act or omission of any previous landlord under the Lease; (b) subject to any offsets or defenses which Tenant may have against any previous landlord under the Lease; (c) bound by any payment of rent or additional rent which Tenant might have paid for more than one month in advance of the due date under the Lease to any previous landlord; (d) obligated to make any payment to Tenant which any previous landlord was required to make before Lender succeeded to the landlord's interest; (e) accountable for any monies deposited with any previous landlord (including security deposits), except to the extent such monies are actually received by Lender; (f) bound by any amendment or modification of the Lease or any waiver of any term of the Lease made without Lender's written consent; (g) bound by any surrender or termination of the Lease made without Lender's written consent (unless effected unilaterally by Tenant pursuant to the express terms of the Lease); (h) obligated to complete any improvement or construction on the Property or to pay or reimburse Tenant for any tenant improvement allowance, construction allowance or leasing commissions; (i) liable for any default of any previous landlord under the Lease; (j) bound by any provision in the Lease granting Tenant a purchase option or first right of refusal or offer with regard to the Property. Furthermore, notwithstanding anything to the contrary contained in this Agreement or the Lease, upon any such succession, the Lease shall be deemed to have been automatically amended to provide that Lender's obligations and liabilities under the Lease shall be limited solely to Lender's interest, if any, in the Property, and the proceeds from any sale or disposition of the Property by Lender (collectively, "Lender's Interest") and, following such succession, Tenant shall look exclusively to Lender's Interest for the payment or discharge of any obligations of Lender under the Lease.

5.  **LENDER'S RIGHT TO CURE**. Tenant shall deliver to Lender a copy of any notice of any default(s) by landlord under the Lease in the same manner as, and whenever, Tenant shall give any such notice to Owner, and no such notice shall be deemed given to Owner unless and until a copy of such notice shall have been so delivered to Lender. Lender shall have the right to remedy, or cause to be remedied, any default by Owner under the Lease, and, for such purpose Tenant grants Lender such additional period of time as may be reasonable to enable Lender to remedy, or cause to be remedied, any such default in addition to the period given to Owner for remedying, or causing to be remedied, any such default. Tenant shall accept performance by Lender of any covenant or condition to be performed by Owner under the Lease with the same force and effect as though performed by Owner. No default by Landlord under the Lease shall exist or shall be deemed to exist (a) so long as Lender, in good faith, shall have commenced to cure such default within the above-referenced time period and shall be prosecuting the same to completion with reasonable diligence, subject to force majeure, or (b) if possession of the Premises is required in order to cure such default, or if such default is not susceptible of being cured by Lender, so long as Lender, in good faith, shall have notified Tenant that Lender intends to institute enforcement proceedings under the Security Documents, and, thereafter, so long as such proceedings shall have been instituted and shall be prosecuted with reasonable diligence. Lender shall have the right, without notice to Tenant or Tenant's consent, to foreclose the Mortgage or to accept a deed in lieu of foreclosure of the Mortgage or otherwise realize upon the Mortgage or to exercise any other remedies under the Security Documents or state law.

3

6.  **ASSIGNMENT OF LEASES AND RENTS**. Tenant consents to the Assignment of Leases and Rents and acknowledges Lender shall have no duty, liability or obligation whatsoever under the Lease or any extension or renewal thereof, either by virtue of said assignment or by any subsequent receipt or collection of rents thereunder, unless Lender shall specifically undertake such liability in writing or unless Lender or its designee or nominee becomes, and then only with respect to periods in which Lender or its designee or nominee becomes, the fee owner of the Premises. Upon Tenant's receipt of a written notice from Lender of a default by Owner under the Loan, Tenant shall thereafter, if requested by Lender, pay rent to Lender in accordance with the terms of the Lease. Lender's delivery of such notice to Tenant, or Tenant's compliance therewith, shall not be deemed to (a) cause Lender to succeed to or assume any obligations or responsibilities of Owner under the Lease or (b) relieve Owner of any of its obligations under the Lease.

7.  **INSURANCE PROCEEDS AND CONDEMNATION AWARDS**. Notwithstanding anything to the contrary contained in this Agreement or the Lease, the terms of the Loan Documents shall continue to govern with respect to the disposition of any insurance proceeds or condemnation awards, and any obligations of Owner to restore the Property following a casualty or condemnation shall, insofar as they apply to Lender, be limited to the amount of any insurance proceeds or condemnation awards received by Lender after the deduction of all costs and expenses incurred in obtaining such proceeds or awards. Following the foreclosure or deed in lieu of foreclosure of the Mortgage, the provisions of this section shall remain in full force and effect unless and until fee title to the Premises becomes vested in a person or entity other than (a) the holder of the Loan at the time of such foreclosure or deed in lieu of foreclosure or (b) a parent, subsidiary or affiliate of such holder.

8.  **ASSIGNMENT OF LEASE BY TENANT**. Tenant shall not assign any right or interest of Tenant under the Lease (except for an assignment that is permitted under the Lease without Owner's consent), without Lender's prior written consent.

9.  **MISCELLANEOUS**.

    9.1  **Heirs, Successors and Assigns**. The covenants herein shall be binding upon, and inure to the benefit of, the heirs, successors and assigns of the parties hereto. The term "Lender" as used herein includes any successor or assign of the named Lender herein, including without limitation, any co-lender at the time of making the Loan, any purchaser at a foreclosure sale and any transferee pursuant to a deed in lieu of foreclosure, and their successors and assigns, trustees and agents, as well as any single purpose entity established by Lender to take title to the Property by reason of such foreclosure or deed in lieu of foreclosure. The terms "Tenant" and "Owner" as used herein include any successor or assign of the named Tenant and Owner herein, respectively; provided, however, that such reference to Tenant's or Owner's successors and assigns shall not be construed as Lender's consent to any assignment or other transfer by Tenant or Owner.

4

9.2    **Addresses; Request for Notice**. All notices and other communications that are required or permitted to be given to a party under this Agreement shall be in writing and shall be sent to such party, either by personal delivery, by overnight delivery service, by certified first class mail, return receipt requested, or by facsimile transmission, to the address or facsimile number below. All such notices and communications shall be effective upon receipt of such delivery or facsimile transmission. The addresses and facsimile numbers of the parties shall be:

**Tenant:**

 

**Lender:**
Wells Fargo Bank, N.A., as Master Servicer
Attn: Lease Reviews
1901 Harrison Street, 2nd Floor
Oakland, California 94612
FAX No.: 510-446-4468

FAX No.:

provided, however, any party shall have the right to change its address for notice hereunder by the giving of written notice thereof to the other party in the manner set forth in this Agreement.

9.3    **Entire Agreement**. This Agreement constitutes the entire agreement between Lender and Tenant with regard to the subordination of the Lease to the Security Documents and the rights and obligations of Tenant and Lender as to the subject matter of this Agreement, and shall supersede and cancel, but only insofar as would affect the priority between the Security Documents and the Lease, any prior agreements as to such subordination, including, without limitation, those provisions, if any, contained in the Lease which provide for the subordination of the Lease to a deed or deeds of trust, a mortgage or mortgages, a deed or deeds to secure debt or a trust indenture or trust indentures.

9.4    **Disbursements**. Lender, in making disbursements of any funds pursuant to the Loan Documents, is under no obligation to, nor has Lender represented that it will, monitor or control the application of such funds by the recipient and any application of such funds, including, without limitation, any application of such funds for purposes other than those provided for in the Loan Documents, shall not defeat this agreement to subordinate in whole or in part.

9.5    **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute and be construed as one and the same instrument.

9.6    **Section Headings**. Section headings in this Agreement are for convenience only and are not to be construed as part of this Agreement or in any way limiting or applying the provisions hereof.

9.7    **Attorneys' Fees**. If any legal action, suit or proceeding is commenced between Tenant and Lender regarding their respective rights and obligations under this Agreement, the prevailing party shall be entitled to recover, in addition to damages or other relief, costs and expenses, attorneys' fees and court costs (including,

5

without limitation, expert witness fees). As used herein, the term "prevailing party" shall mean the party which obtains the principal relief it has sought, whether by compromise settlement or judgment. If the party which commenced or instituted the action, suit or proceeding shall dismiss or discontinue it without the concurrence of the other party, such other party shall be deemed the prevailing party.

9.8    **Severability**. If any provision of this Agreement is held to be invalid or unenforceable by a court of competent jurisdiction, such provision shall be deemed modified to the extent necessary to be enforceable, or if such modification is not practicable, such provision shall be deemed deleted from this Agreement, and the other provisions of this Agreement shall remain in full force and effect, and shall be liberally construed in favor of Lender.

9.9    **Termination; Amendment**. Neither this Agreement nor any of the terms hereof may be terminated, amended, supplemented, waived or modified orally, but only by an instrument in writing executed by the party against which enforcement of the termination, amendment, supplement, waiver or modification is sought.

9.10    **Governing Law**. This Agreement and any claim, controversy or dispute arising under or related to or in connection with this Agreement, the relationship of the parties or the interpretation and enforcement of the rights and duties of the parties shall be governed by the law of the state where the Property is located, without regard to any conflicts of law principles.

9.11    **Authority**. Tenant and all persons executing this Agreement on behalf of Tenant jointly and severally represent and warrant to Lender that such persons are authorized by Tenant to do so and that such execution hereof is the binding act of Tenant enforceable against Tenant.

9.12    **Form of Agreement**. Owner and Tenant acknowledge that Wells Fargo Bank, N.A. enters into numerous agreements of this type on a regular basis, both in its own capacity and as a commercial mortgage servicer on behalf of other lenders, and that the specific provisions contained in any agreement of this type entered into by Wells Fargo Bank, N.A. will vary depending on numerous transaction-specific factors, including, without limitation, the borrowers, loan documents, tenants, leases, servicers, servicing agreements and property and market conditions involved in the transaction. Accordingly, Owner and Tenant further acknowledge that the specific provisions contained in this Agreement will not necessarily be acceptable to Wells Fargo Bank, N.A. in connection with any other transaction.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

6

**LENDER:**

U.S. BANK NATIONAL ASSOCIATION, as Trustee,
successor-in-interest to BANK OF AMERICA, N.A., as Trustee,
successor by merger to LASALLE BANK NATIONAL ASSOCIATION,
as Trustee, for the registered holders of Bear Steams Commercial
Mortgage Securities Inc., Commercial Mortgage Pass-Through
Certificates, Series 2007-PWRI6

By:  Wells Fargo Bank, National Association
     as Master Servicer

     By:      _____
     Name:    _____
     Title:   _____

**TENANT:**

_____

By:  _____
Its: _____

The undersigned Owner hereby consents to the foregoing Agreement and confirms the facts stated in the foregoing Agreement and the acknowledgement contained in Section 9.12 of the foregoing Agreement.

**OWNER:**

_____

By:  _____
Its: _____

**IT IS RECOMMENDED THAT, PRIOR TO EXECUTING THIS AGREEMENT, THE PARTIES CONSULT WITH THEIR ATTORNEYS WITH RESPECT HERETO.**

**ALL SIGNATURES MUST BE ACKNOWLEDGED.**

7

STATE OF                         )

                                   )    SS.

COUNTY OF                   )

On        , 20   , personally appeared the above named           , a         of WELLS FARGO BANK, NATIONAL ASSOCIATION, acting in its authorized capacity as Master Servicer for and on behalf of      , **AS TRUSTEE FOR THE REGISTERED HOLDERS OF**      **COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES**    , and acknowledged the foregoing to be the free act and deed of said association, before me.

_____
Notary Public
My commission expires:         _____

_____ , ss.

On       , 20   , personally appeared the above named      , the      , of      and acknowledged the foregoing to be the free act and deed of said      , before me.

_____
Notary Public
My commission expires:         _____

_____ , ss.

On       , 20   , personally appeared the above named      , the      , of      and acknowledged the foregoing to be the free act and deed of said      , before me.

_____
Notary Public
My commission expires:         _____

8

**EXHIBIT A**
**(Description of Property)**

EXHIBIT A to SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT dated as of                , executed by                , as "Tenant", and                "Lender."

All that certain land located in the County of                , State of                , described as follows:

Loan No. _____

**Schedule 1**

**Fixed Rent**

| Period | Annual Fixed Rent | | Monthly Installments | |
|---|---|---|---|---|
| First Rent Year | $ | [***][1] | $ | [***][2] |
| Second Rent Year | $ | [***] | $ | [***] |
| Third Rent Year | $ | [***] | $ | [***] |
| Fourth Rent Year | $ | [***] | $ | [***] |
| Fifth Rent Year | $ | [***] | $ | [***] |

The first Rent Year shall commence on the Rent Commencement Date and expire at 11:59 p.m. on the day before the first anniversary of the Rent Commencement Date. Each succeeding Rent Year shall commence on the applicable anniversary of the Rent Commencement Date and expire at 11:59 p.m. on the day before the next succeeding anniversary of the Rent Commencement Date; provided, however, that the Fifth Rent Year shall expire on the Expiration Date.

---

[1]  Such Fixed Rent for the first Rent Year is subject to a rent abatement of $[***]. After giving effect to such rent abatement the net Fixed Rent for the first Rent Year is $[***].

[2]  Such monthly installments of Fixed Rent are subject to a rent abatement of $[***] per month. After giving effect to such rent abatement, the net monthly installment of Fixed Rent for the first Rent Year is $[***].

**Schedule 2**

**Operating Expense Exclusions**

- Rentals and other related expenses, if any, incurred in leasing capital items.

- Ground rent.

- Payment of principal, finance charges or interest on debt or amortization on any mortgage or any penalties assessed as a result of Landlord's late payments of such amounts.

- Impact fees and other costs and expenses paid or incurred in connection with the initial development and construction of the Development Common Areas.

- Charitable or political contributions.

- The cost of repairs, replacements or other work occasioned by fire, windstorm or other casualty, except to the extent of any commercially reasonable deductible.

- The cost of repairs, replacements or other work occasioned by the exercise of eminent domain.

- All costs of correcting latent defects, including any allowances for same, in the initial construction of the Development Common Areas.

- The cost of any judgment, settlement or arbitration award resulting from liability of Landlord which is the result of gross, negligence, willful misconduct or fraud of Landlord and all expenses incurred in connection therewith.

- Salaries, benefits, wages, fees, etc. for employees above the grade of building manager or for directors, officers, partners or members of Landlord.

- Except for the management fee set forth in the Lease, any overhead or profit increments to any subsidiary or affiliate of Landlord for services to the extent that the costs of such services exceed competitive costs for comparable services rendered by persons or entities of similar skill, competence and experience, other than a subsidiary or affiliate of Landlord.

- Any costs of Landlord's general overhead, including general and administrative expenses, which costs would not be chargeable to operating expenses in accordance with generally accounting principles, consistently applied.

- Any otherwise includible costs of correcting defects or replacing defective equipment to the extent such costs are recovered under warranties of manufacturers, suppliers or contractors, or are otherwise borne by parties other than Landlord.

- All costs and expenses associated with the operation of the business of the entity which constitutes Landlord as the same are distinguished from the costs of operation of the Development Common Areas, including accounting and legal matters, costs of defending any lawsuits with any Landlord's Mortgagee, costs of selling, syndicating, financing, mortgaging or hypothecating any of the Landlord's interest in the Development Common Areas, costs of any disputes between Landlord and its employees (if any) not engaged in operation of the Development Common Areas, disputes of Landlord with managers of the Development Common Areas, or fees or costs paid in connection with disputes where such employee provides services.

- Depreciation and amortization (except as otherwise permitted in the definition of Operating Expenses).

- Costs and expenses relating to Landlord's willful misconduct or willful violation of law.

- Reserves.

- Costs and expenses which under GAAP would not be considered operating expenses (except for capital items otherwise permitted in the definition of Operating Expenses).

- Operating Expenses to be reduced by insurance proceeds.

Other Applicable Provisions:

- To the extent that employees are not employed exclusively at the Development Common Areas, the costs and expenses with respect to such employees should be pro-rated.

**Exhibit 10.17**

**\*Portions of this exhibit have been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.**

3/2/18

**LEASE MODIFICATION AGREEMENT**

**THIS LEASE MODIFICATION AGREEMENT**, made this 8th day of March, 2018 by and between **35 ENTERPRISE AVENUE, L.L.C.** a New Jersey limited liability company, having an office at 400 Plaza Drive, Secaucus, New Jersey 07094 (hereinafter referred to as "Landlord") and **THE REALREAL, INC.** a Delaware corporation having an office at 55 Francisco Street, San Francisco, CA 94133(hereinafter referred to as "Tenant").

**WITNESSETH:**

**WHEREAS**, by Agreement of Lease dated March 18, 2014 (the "Lease"), Landlord leased to Tenant and Tenant hired from Landlord the Demised Premises, as defined in the Lease, which includes the Building containing [***] square feet of Floor Space located at 35 Enterprise Avenue in Secaucus, New Jersey (hereinafter the "Demised Premises"); and

**WHEREAS**, Landlord and Tenant wish to modify the Lease to renew and extend the Term of Lease for an additional ten (10) years, and amend the Lease accordingly; and

**NOW, THEREFORE**, for and in consideration of the Lease, the mutual covenants herein contained and the consideration set forth herein, the parties agree as follows:

1. **Term**: The Term for the Demised Premises is hereby extended for the period beginning on July 1, 2019 through and including June 30, 2029 (hereinafter the "Extended Period").

2. **Fixed Rent**: The Fixed Rent for the Demised Premises during the Extended Period shall be at the following annual rates multiplied by the Floor Space of the Building: [***] from July 1, 2019 until June 30, 2020; [***] from July 1, 2020 until June 30, 2021; [***] from July 1, 2021 until June 30, 2022; [***] from July 1, 2022 until June 30, 2023; [***] from July 1, 2023 until June 30, 2024; [***] from July 1, 2024 until June 30, 2025; [***] from July 1, 2025 until June 30, 2026; [***] from July 1, 2026 until June 30, 2027; [***] from July 1, 2027 until June 30, 2028; and [***] from July 1, 2028 until the Expiration Date.

3. **Option to Extend**: [***].

4. **Certification**: Tenant certifies that: (i) It is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control; and (ii) It

is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity, or nation. Tenant hereby agrees to defend, indemnify, and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities, and expenses (including attorney's fees and costs) arising from or related to any breach of the foregoing certification.

5. Except as provided herein, all of the terms and conditions of the Lease as amended above are in full force and effect and are confirmed as if fully set forth herein.

**IN WITNESS WHEREOF**, the parties hereto have caused this Lease Modification Agreement to be duly executed as of the day and year first above written.

**35 ENTERPRISE AVENUE, L.L.C.**

By: /s/ Phillip R. Patton
     Phillip R. Patton
     Executive Vice President

**THE REALREAL, INC.**

By:    /s/ Matt Gustke
Name:  Matt Gustke
Title:  CFO

2

**Exhibit 10.18**

**\*Portions of this exhibit have been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.**

California Net Lease

## LEASE AGREEMENT

THIS LEASE AGREEMENT is made this 14th day of March, 2016, between <u>M & L Associates, a new Jersey general partnership</u> ("Landlord"), and the Tenant named below.

| | |
|---|---|
| **Landlord:** | <u>M & L Associates, a new Jersey general partnership</u> |
| **Landlord's Representative:** | <u>Amy Pallas, Vice President, Leasing Officer</u> |
| **Address and Telephone:** | <u>3353 Gateway Boulevard</u> |
| | <u>Fremont, California 94538</u> |
| | <u>Phone: (510) 661-4087</u> |
| **Tenant:** | <u>The RealReal, Inc., a Delaware Corporation</u> |
| **Tenant's Representative:** | <u>Matt Gustke</u> |
| **Address and Telephone:** | <u>1980 Oakdale Avenue</u> |
| | <u>San Francisco, California 94124</u> |
| | <u>Phone: 415-992-8366</u> |
| **Premises:** | The entire interior portion of the Building, which is a portion of the Project, containing approximately [***] rentable square feet, consisting of certain "Warehouse Space" and "Office Space," as shown on Exhibit A attached hereto. |
| **Project:** | The project commonly known as Prologis San Francisco Distribution Center, which includes an additional building and the land shown on Exhibit A. |
| **Building:** | 3745 Bayshore Boulevard<br>Brisbane, California |
| **Tenant's Proportionate Share of Project:** | <u>77.7%</u> |
| **Tenant's Proportionate Share of Building:** | <u>100%</u> |
| **Lease Team:** | Beginning on the Commencement Date and ending on the last day of the 64th full month following the Commencement Date. |

| **Commencement Date:** | Upon Substantial Completion of the Warehouse Initial Improvements (as such term is defined in the Construction Addendum 5 attached to this Lease the "Work Letter") for the Warehouse Space, which is anticipated to occur on or about June 1, 2016; subject, however, to the provisions of Paragraph 4, below, pertaining to the partial payment of Base Rent and Operating Expenses related to the phased delivery of portions of the Warehouse Space. Notwithstanding anything to the contrary herein, the Substantial Completion of the Creative Space Improvements (as defined in the Work Letter) is not a condition for the Commencement Date to occur, and Tenant acknowledges that the Creative Space Improvements will not be Substantially Completed prior to the Commencement Date and rent will commence on the Creative Space Improvements at the same time as the Substantial Completion of the Office Initial Improvements. |
|---|---|

| **Initial Monthly Base Rent:** | See Addendum 1 | |
|---|---|---|
| **Initial Estimated Monthly Operating Expense Payments:** (estimates only and subject to adjustment to actual costs and expenses according to the provisions of this Lease) | 1. Utilities: | <u>N/A</u> |
| | 2. Common Area Charges: | [***] |
| | 3. Taxes: | [***] |
| | 4. Insurance: | [***] |
| | 5. Management Fee: | [***] |

**Initial Estimated Monthly Operating Expense Payments**        $    [***]

**Initial Monthly Base Rent and Estimated Operating Expense Payments**        $    [***]

| **Security Deposit:** | $[***] (Letter of Credit per the terms of Paragraph 5) |
|---|---|
| **Broker:** | Landlord: CBRE: Marshall Hydorn; David Back; Jason Cranston Tenant: Newmark Cornish & Carey: Steve Kapp; Shannon D. Aja |
| **Addenda:** | 1. Base Rent Adjustments 2. HVAC Maintenance Contract 3. Move Out Conditions 4. One Renewal Option 5. Construction Allowance (Work Letter) |
| **Exhibits:** | A. Site Plan A-1. Warehouse and Office Initial Improvements A-2. Creative Space Improvements B. Project Rules and Regulations C. Commencement Date Certificate D. Letter of Credit |

1. **Granting Clause**. In consideration of the obligation of Tenant to pay rent as herein provided and in consideration of the other terms, covenants, and conditions hereof, Landlord leases to Tenant, and Tenant takes from Landlord, the Premises, to have and to hold for the Lease Term, subject to the terms, covenants and conditions of this Lease. In addition, Tenant shall have the right to use the common areas of the Project appurtenant to the Premises on a non-exclusive basis.

2. **Acceptance of Premises**. Tenant acknowledges that Landlord has made no representation or warranty regarding the condition of the Premises, Building, or Project except as specifically stated in this Lease. Tenant shall accept the Premises subject to all applicable laws, ordinances, regulations, covenants and restrictions. In no event shall Landlord have any obligation for any limitation on the use of the Premises. Subject to Landlord's obligations under Addendum 5 Work Letter, the taking of possession of the Premises shall be conclusive evidence that Tenant accepts the Premises and that the Premises were in good condition at the time possession was taken except for items that are Landlord's responsibility under Paragraph 10 and Landlord's or third party obligations expressly set forth under the Lease with respect to Hazardous Materials. No later than 10 days after written demand is made therefor by Landlord of Tenant, Tenant shall execute and deliver to Landlord a factually accurate Commencement Date Certificate in the form of Exhibit C attached to and hereby made a part of this Lease.

3. **Use**. The Premises shall be used only for the purpose of receiving, storing, shipping and selling (but specifically excluding retail selling to customers at the Premises) products, materials and merchandise made and/or distributed by Tenant (including without limitation e-commerce consumer products), along with freight forwarding and related administrative uses, and for such other lawful purposes as may be incidental thereto; provided, however, with Landlord's prior written consent, Tenant may also use the Premises for light manufacturing. Tenant shall not conduct or give notice of any auction, liquidation, or going out of business sale on the Premises. Tenant will use the Premises in a careful, safe and proper manner and will not commit waste, overload the floor or structure of the Premises or subject the Premises to use that would damage the Premises. Tenant shall not permit any objectionable or unpleasant odors, smoke, dust, gas, noise, or vibrations to emanate from the Premises, or take any other action that would constitute a nuisance or would disturb, unreasonably interfere with, or endanger Landlord or any tenants of the Project. Outside storage, including without limitation, storage of trucks and other vehicles, is prohibited without Landlords prior written consent; provided, however, Tenant shall have the right to park operable vehicles and trailers overnight at the truck loading docks and designated truck and trailer parking areas for the Premises and operable automobiles in the designated automobile parking areas, and further provided there is no interference with the access of other tenants to the Building and Project parking lots and truck courts. Except for Landlord's obligations in connection with the delivery of the Premises set forth in the Addendum 5 Work Letter, Tenant, at its sole expense, shall use and occupy the Premises in compliance with all laws, including, without limitation, the Americans With Disabilities Act, orders, judgments, ordinances, regulations, codes, directives, permits, licenses, covenants and restrictions now or hereafter applicable to the Premises (collectively, "Legal Requirements"). The Premises shall not be used as a place of public accommodation under the Americans With Disabilities Act or similar state statutes or local ordinances or any regulations promulgated thereunder, all as may be amended from time to time. Tenant shall, at its expense, make any alterations or modifications, within or without the Premises, that are required by Legal Requirements related to Tenant's use or occupation of the Premises; provided, however, Tenant shall only be required to make structural changes to the Premises to the extent such changes are required due to Tenant-Made Alterations, racking or fixturing or Tenant's particular use of the Premises. Tenant will not use or permit the Premises to be used for any purpose or in any manner that would void Tenant's or Landlord's insurance, increase the

insurance risk, or cause the disallowance of any sprinkler credits. If any increase in the cost of any insurance on the Premises or the Project is caused by Tenant's use or occupation of the Premises, or because Tenant vacates the Premises, then Tenant shall pay the amount of such increase to Landlord. Any occupation of the Premises by Tenant prior to the Commencement Date shall be subject to all obligations of Tenant under this Lease, other than the payment of rent for the portion of the Initial Improvements not Substantially Completed.

4. **Base Rent**. Tenant shall pay Base Rent in the amount set forth on Page 1 of this Lease. The first month's Base Rent, the Security Deposit, and the first monthly installment of estimated Operating Expenses (as hereafter defined) shall be due and payable on the date hereof, and such Base Rent and Operating Expenses payments shall be applied to the first full month's rental due after the expiration of the free rent period set forth in Addendum One. Tenant promises to pay to Landlord in advance, without demand, deduction or set-off, monthly installments of Base Rent on or before the first day of each calendar month succeeding the Commencement Date in accordance with the rent scheduled set forth in Addendum One. Payments of Base Rent for any fractional calendar month shall be prorated. All payments required to be made by Tenant to Landlord hereunder (or to such other party as Landlord may from time to time specify in writing) shall be made by check or by Electronic Fund Transfer ("EFT") of immediately available federal funds before 11:00 a.m., Pacific Time at such place, within the continental United States, as Landlord may from time to time designate to Tenant in writing. The obligation of Tenant to pay Base Rent and other sums to Landlord and the obligations of Landlord under this Lease are independent obligations. Except as expressly provided in this Lease, Tenant shall have no right at any time to abate, reduce, or set-off any rent due hereunder except as may be expressly provided in this Lease. If Tenant is delinquent in any monthly installment of Base Rent or of estimated Operating Expenses for more than 5 days, Tenant shall pay to Landlord on demand a late charge equal to 5 percent of such delinquent sum, provided the first late charge in any 12 month period shall be waived by Landlord. The provision for such late charge shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as a penalty.

Notwithstanding the foregoing, the parties anticipate that Landlord will be able to Substantially Complete certain portions of the Warehouse Initial Improvements in phases (the "Phased Space") for delivery to Tenant in such a condition that Tenant can commence business operations within such Phased Space and prior to the completion of the Office Initial Improvements. Plans depicting each Phased Space of the Warehouse Space are attached hereto as Exhibits A-1 and A-2. Tenant shall be permitted to attend all weekly project meetings and Landlord shall use commercially reasonable efforts to advise Tenant of a change in the regular schedule of the same. At least five (5) business days prior to delivery of any such Phased Space Landlord shall notify Tenant in writing of Landlord's intention to deliver such Phased Space. Upon delivery of the Phased Space Tenant shall pay Base Rent and Operating Expenses on a proportionate basis for such Phased Space, using the Base Rent amount of $[***] per square foot per month and prorated Operating Expenses applicable to such Phased Space. During any such phased occupancy of Phased Space prior to the Commencement Date Tenant shall be bound by its obligations under the Lease, including the obligation to provide evidence of insurance. The delivery of any Phased Space, and Tenant's acceptance of any Phased Space, shall not affect the Commencement Date, which shall not be deemed to occur until Substantial Completion of the Warehouse Initial Improvements (as defined in Addendum 5), excluding the Building Upgrades. Upon Substantial Completion of the Warehouse Initial Improvements, the Commencement Date

shall be deemed to occur and Tenant shall commence payment of Base Rent for the Warehouse Space in accordance with the Base Rent schedule set forth in Addendum 1. Tenant's obligation to commence payment of Base Rent with respect to the Office Space shall commence upon Substantial Completion of the Office Initial Improvements (and the free rent period applicable to the Office Space shall also commence on such Substantial Completion such that Tenant will receive the full value of the Base Rent abatement (which variable amount depending on Tenant's closing on Series E funding is shown on Addendum 1), subject to Tenant's funding pursuant to Addendum 1, where it shall be offset against Tenant's Base Rent obligation as it becomes due upon delivery of the Premises),

Notwithstanding anything to the contrary herein, Substantial Completion of the Creative Space Improvements and the Building Upgrades (as each term is defined in Addendum 5) is not a condition for the obligation to commence payment of Base Rent and Operating Expenses, and Tenant acknowledges that the Creative Space Improvements and the Building Upgrades will not be Substantially Completed prior to the Commencement Date, and shall not affect the Term of the Lease. Base Rent and Operating Expense obligations for the portion of the Warehouse Space that includes the Creative Space Improvements shall commence as soon as the Office Initial Improvements have been Substantially Completed, regardless of whether the Creative Space Improvements and Building Upgrades are Substantially Complete.

5. **Security Deposit**. The Security Deposit shall be held by Landlord as security for the performance of Tenant's obligations under this Lease. The Security Deposit is not an advance rental deposit or a measure of Landlord's damages in case of Tenant's default. Upon each occurrence of an Event of Default (hereinafter defined), Landlord may use all or part of the Security Deposit to pay delinquent payments due under this Lease, and the cost of any damage, injury, expense or liability caused by such Event of Default, without prejudice to any other remedy provided herein or provided by law. Tenant shall pay Landlord on demand the amount that will restore the Security Deposit to its original amount. Landlord's obligation respecting the Security Deposit is that of a debtor, not a trustee; no interest shall accrue thereon. The Security Deposit shall be the property of Landlord, but shall be paid to Tenant when Tenant's obligations under this Lease have been completely fulfilled. Landlord shall not be required to keep all or any part of the Security Deposit separate from its general accounts. Tenant waives any limitations set forth in California Civil Code Section 1950.7 limiting the use to which a security deposit may be applied. Landlord shall be released from any obligation with respect to the Security Deposit upon transfer of this Lease and the Premises to a person or entity assuming Landlord's obligations under this Paragraph 5.

The Security Deposit under the Lease shall be $[***], in the form of an unconditional, irrevocable letter of credit from Pacific Western Bank and in substantially similar form as shown in Exhibit D attached hereto ("Letter of Credit"). The Letter of Credit shall either provide that it does not expire until 60 days following the end of the Lease Term or, if it is for less than the full term of the Lease, shall be renewed by Tenant at least 60 days prior to its expiration during the Term of the Lease. The Letter of Credit shall provide that it may be drawn down upon by Landlord at any time Landlord delivers its site draft to the bank consistent with the terms herein. If Landlord sells or conveys the Premises, Tenant shall, at Landlord's request and Tenant's expense, cooperate in having the Letter of Credit transferred to the purchaser and Landlord agrees to notify Tenant in the event of such transfer. If the Letter of Credit is ever drawn upon by Landlord pursuant to the terms of the Lease, Tenant shall within ten (10) days thereafter cause the Letter of Credit to be restored to the then existing amount at the time of the draw down.

Notwithstanding anything contained herein to the contrary, in the event Tenant fails to renew the Letter of Credit in accordance with the terms and conditions as set forth in this Paragraph 5, or in the event that Tenant shall commence any proceeding for relief, as defined in Paragraph 23(ii) of the Lease, an immediate Event of Default shall be deemed to have occurred, without the requirement of notice or opportunity to cure, in which case Landlord may immediately draw down on the Letter of Credit.

Once each of the following conditions have been met: (i) no Event of Default shall then exist or has existed at any time during the Lease Term or would exist but with the passage of time or the giving of notice or both and (ii) Tenant has received at least $[***] of Series E Funding, as confirmed by Landlord in Landlord's sole discretion, the required amount of the Letter of Credit shall be reduced to $[***]. Provided that each of the following conditions have been met as of the expiration of the 36th full month following the Commencement Date: (i) no Event of Default shall then exist or has existed at any time during the Lease Term or would exist but with the passage of time or the giving of notice or both, (ii) Tenant has achieved 12 consecutive months of positive earnings before interest, taxes, depreciation and amortization ("EBITDA"), and (iii) Tenant has a tangible net worth of at least $[***], then on the first day of the 37th month following the Commencement Date the required amount of the Letter of Credit shall be reduced to $[***]. Prior to such Letter of Credit reduction, Tenant shall provide Landlord with audited financial statements evidencing the satisfaction of the foregoing requirements.

6. **Operating Expense Payments**. During each month of the Lease Term, but excluding the free rent period set forth in Addendum 1, Tenant shall pay Landlord on the same date that Base Rent is due an amount equal to 1/12 of the annual cost, as estimated by Landlord from time to time, of Tenant's Proportionate Share (hereinafter defined) of Operating Expenses for the Project. Payments thereof for any fractional calendar month shall be prorated. Landlord agrees to incur Operating Costs in a commercially reasonable manner. The term "Operating Expenses" means all costs and expenses incurred by Landlord with respect to the ownership, maintenance, and operation of the Project including, but not limited to costs of: Taxes (hereinafter defined) and fees payable to tax consultants and attorneys for consultation and contesting taxes; insurance; utilities; maintenance, repair and replacement of all portions of the Project, including without limitation, paving and parking areas, roads, non-structural components of the roofs (including the roof membrane), alleys, and driveways, mowing, landscaping, exterior painting, utility lines, heating, ventilation and air conditioning systems, lighting, electrical systems and other mechanical and building systems; amounts paid to contractors and subcontractors for work or services performed in connection with any of the foregoing; charges or assessments of any association to which the Project is subject; market rate property management fees payable to a property manager, including any affiliate of Landlord, or if there is no property manager, an administration fee of 10 percent of Operating Expenses payable to Landlord; security services, if any; trash collection, sweeping and removal; and (x) additions or alterations made by Landlord to the Project or the Building in order to comply with Legal Requirements applicable to the Project after the date of this Lease (other than those expressly required herein to be made by Tenant) or that are appropriate to the continued efficient operation of the Project or the Building as a bulk warehouse facility in the market area or (y) or capital repairs or replacements needed to operate

the Building or Project at the same quality levels (or levels of efficiency) as prior to the capital repair or replacement, provided that the cost of additions or alterations or replacement equipment that are required to be capitalized for federal income tax purposes shall be amortized on a straight line basis over a period equal to the lesser of the useful life thereof for federal income tax purposes or 10 years. Operating Expenses shall not include the following: (a) debt service under mortgages or ground rent under ground leases; (b) leasing commissions, or the costs of renovating space for tenants; (c) repairs, alterations, additions, improvements or replacements made to rectify or correct any defect in the design, materials or workmanship of the Premises, the Building or the Project; (d) costs of repairs, restoration, replacements or other work occasioned by (i) fire, windstorm or other casualty (including the costs of any deductibles paid by Landlord) and either (aa) payable (whether paid or not) by insurance required to be carried by Landlord under this Lease, or (bb) otherwise paid by insurance then in effect obtained by Landlord, (ii) the negligence or intentional tort of Landlord, or any representative, employee or agent of Landlord, (iii) the act of any other tenant in the Premises, the Building or the Project, or any other tenant's agents, employees, licensees or invitees to the extent the applicable cost is, in the Landlord's reasonable judgment, practically recoverable from such person; (e) costs incurred (less costs of recovery) for any items to the extent such amounts are, in Landlord's reasonable judgment, recoverable by Landlord under a manufacturer's, materialman's, vendor's or contractor's warranty; (f) non-cash items, such as deductions for depreciation and amortization of the Premises, the Building or the Project and the Premises, the Building or the Project equipment, or interest on capital invested; (g) legal fees, accountants' fees and other expenses incurred in connection with disputes with other tenants or occupants of the Premises, the Building or the Project or associated with the enforcement of any lease or defense of Landlord's title to or interest in the Premises, the Building or the Project or any part thereof; (h) costs incurred due to violation by Landlord or any other tenant in the Premises, the Building or the Project of the terms and conditions of any lease; (i) the cost of any service provided to Tenant or other occupants of the Premises, the Building or the Project for which Landlord is entitled to be reimbursed; (j) charitable or political contributions; (k) interest, penalties, fines or other costs arising out of Landlord's failure to comply with Legal Requirements or make timely payments of its obligations; (I) costs, expenses, depreciation or amortization for repairs and replacements expressly required to be made by Landlord at its sole cost under Paragraph 10 of this Lease; (m) reserves, including reserves for capital items, bad debts, or rental losses, (n) all costs related to the presence of preexisting Hazardous Materials (defined below) located at the Project (without releasing Tenant from an obligations with respect to Hazardous Materials expressly set forth in Paragraph 30); (o) fines and penalties incurred due to Landlord's operation of the Project in violation of Legal Requirements or due to Landlord's failure to timely pay Taxes (unless due to Tenant's failure to pay for the Taxes included in Operating Expenses), and (p) costs incurred by Landlord in connection with the correction of defects in the original construction of the Building or Project or in connection with Landlord's construction of the Initial Improvements.

By the first day of July of each succeeding calendar year during the Lease Term, or as soon thereafter as possible (but in all events within one (1) year after the end of the applicable calendar year), Landlord shall deliver to Tenant a statement ("Actual Statement") wherein Landlord shall state the actual Operating Expenses for the preceding calendar year. If the Actual Statement reveals Tenant's total payments of Operating Expenses for any year are less than Tenant's Proportionate Share of actual Operating Expenses for such year, then Tenant shall pay the difference to Landlord within 30 days after demand, and if more, then Landlord shall retain such

excess and credit it against Tenant's next payments except that during the last calendar year of the Lease Term or any extension terms thereof, Landlord shall refund any such excess within 60 days following the termination of the Lease Term or any extension terms thereof, provided that Tenant is not in default of its obligations under this Lease. For purposes of calculating Tenant's Proportionate Share of Operating Expenses, a year shall mean a calendar year, except the first year, for which Landlord shall equitably prorate Operating Expenses based on the portion of the Premises occupied during such year by Tenant and Tenant's payment of actual rent for such occupied space, and the last year, which shall end on the expiration of this Lease. With respect to Operating Expenses which Landlord allocates to the entire Project, Tenant's "Proportionate Share" shall be the percentage set forth on the first page of this Lease as Tenant's Proportionate Share of the Project as reasonably adjusted by Landlord in the future for changes in the physical size of the Premises or the Project; and, with respect to Operating Expenses which Landlord allocates only to the Building, Tenant's "Proportionate Share" shall be the percentage set forth on the first page of this Lease as Tenant's Proportionate Share of the Building as reasonably adjusted by Landlord in the future for changes in the physical size of the Premises or the Building. Landlord may equitably increase Tenant's Proportionate Share for any item of expense or cost reimbursable by Tenant that relates to a repair, replacement, or service that benefits only the Premises or only a portion of the Project or Building that includes the Premises or that varies with occupancy or use. The estimated Operating Expenses for the Premises set forth on the first page of this Lease are only estimates, and Landlord makes no guaranty or warranty that such estimates will be accurate.

Tenant, at its expense, shall have the right upon 10 days prior written notice to Landlord (an "Audit Notice") to be given only within 120 days after Tenant receives an Actual Statement to audit Landlord's books and records relating to such Actual Statement with respect to any specific charge or charges disputed in writing by Tenant, subject to the further terms and provisions of this Paragraph: (a) no audit shall be conducted at any time that Tenant is in breach or default of any of the terms, covenants or provisions of this Lease (any required notice having been given and any applicable cure period having expired); (b) no audit shall be conducted on a contingency fee basis; and (c) Tenant shall not audit Landlord's books and records more than one (1) time for any calendar year. After delivery of the audit notice to Tenant, Tenant shall have the right to inspect Landlord's books and records in an office of Landlord, or Landlord's agent, in Fremont, California, during normal business hours, whose payment shall in no way be contingent or based upon the findings of the audit. Tenant shall not remove such books or records from Landlord's office, but Tenant shall have the right to make copies of the relevant documents at Tenant's sole cost and expense. Tenant shall deliver to Landlord a copy of the results of such audit within 10 days after receipt by Tenant. The nature and content of any audit are strictly confidential. Tenant, for itself and on behalf of its representatives, shall not disclose the information obtained from the audit to any other tenant in the Project. If as a result of its audit, Tenant determines that the actual Operating Expenses for the period covered by any statement are more than the amount shown on such statement, Tenant shall promptly pay Landlord the deficiency. If as a result of its audit, Tenant determines that the actual Operating Expenses for the period covered by any statement are less than the amount shown on such statement, Tenant shall promptly notify Landlord of such determination, which notice shall be accompanied by a copy of the results of Tenant's audit. Upon receipt of such notice and accompanying information, Landlord may object to Tenant's determination by providing Tenant with written notice of such objection within 30 days following receipt by Landlord of Tenant's notice and accompanying information. Unless Landlord so objects, Landlord shall credit to Tenant the excess as determined by the results of Tenant's audit

within 30 days following receipt of Tenant's notice and accompanying information. If, however, Landlord timely objects, Landlord and Tenant shall appoint, by mutual agreement, a neutral independent certified public accountant, whose payment shall in no way be contingent or based upon the findings of the audit, who shall promptly make a written determination of the Operating Expenses for the period in question and shall provide such determination to Landlord and Tenant. The neutral independent certified public accountant's determination shall be binding upon Landlord and Tenant for all purposes. If the neutral independent certified public accountant determines (or if Landlord does not timely object to the results of Tenant's audit) that Landlord has overstated Tenant's share of Operating Expenses by [***]% or more during any one accounting year, then Landlord shall pay (i) for the reasonable costs of the audit, not to exceed, however, [***], as well as (ii) the reasonable fees and costs owed to the neutral independent certified public accountant for its services. If the neutral independent certified public accountant determines that Landlord did not overstate Operating Expenses as asserted in Tenant's audit by [***]% or more during any one accounting year, Tenant shall pay the reasonable fees and costs owed to the neutral independent certified public accountant for its services. Any refund due Tenant shall be payable in any event.

7. **Utilities**. The Premises are separately metered for electricity and Tenant shall pay directly to the utility provider charges for all water, gas, electricity, heat, light, power, telephone, sewer, sprinkler services, refuse and trash collection, and other utilities and services used on the Premises, all maintenance charges for utilities, and any storm sewer charges or other similar charges for utilities imposed by any governmental entity or utility provider, together with any taxes, penalties, surcharges or the like pertaining to Tenant's use of the Premises. No interruption or failure of utilities shall result in the termination of this Lease or the abatement of rent. Tenant agrees to limit use of water and sewer for normal restroom use.

Notwithstanding anything contained herein to the contrary, in the event that such interruption or cessation of utilities results from Landlord's negligent or willful act or omission continues beyond three (3) consecutive business days from the date of such interruption or cessation, then, provided Tenant has delivered Landlord with prompt notice of such interruption, the rent under this Lease will abate, commencing on the third (3rd) consecutive business day the Premises remain untenantable, and continuing until the date on which the utilities are restored and the Premises are again tenantable. No abatement of rentals as hereinabove described will apply in the event such interruption of utilities is the result of Tenant's alterations to the Premises, or any negligent act or omission of Tenant, its agents, employees or contractors, or any cause other than the negligent or willful act or omission of Landlord or its employees, agents or contractors.

8. **Taxes**. Landlord shall pay all taxes, assessments and governmental charges (collectively referred to as "Taxes") that accrue against the Project during the Lease Term, which shall be included as part of the Operating Expenses charged to Tenant. Landlord may contest by appropriate legal proceedings the amount, validity, or application of any Taxes or liens thereof. All capital levies or other taxes assessed or imposed on Landlord upon the rents payable to Landlord under this Lease and any franchise tax, any excise, use, margin, transaction, sales or privilege tax, assessment, levy or charge measured by or based, in whole or in part, upon such rents from the Premises and/or the Project or any portion thereof shall be paid by Tenant to Landlord monthly in estimated installments or upon demand, at the option of Landlord, as additional rent; provided, however, in no event shall Tenant be liable for any net income taxes

imposed on Landlord unless such net income taxes are in substitution for any Taxes payable hereunder. If any such tax or excise is levied or assessed directly against Tenant or results from any Tenant-Made Alterations (defined below), then Tenant shall be responsible for and shall pay the same at such times and in such manner as the taxing authority shall require. Tenant shall be liable for all taxes levied or assessed against any personal property or fixtures placed in the Premises, whether levied or assessed against Landlord or Tenant.

9. **Insurance**. Landlord shall maintain all risk or special form property insurance covering the full replacement cost of the Building (including the Initial Improvements) and commercial general liability insurance on the Project in forms and amounts customary for properties substantially similar to the Project, subject to customary deductibles. Landlord may, but is not obligated to, maintain such other insurance and additional coverages as it may deem necessary, including but not limited to, rent loss insurance. All such insurance shall be included as part of the Operating Expenses charged to Tenant. The Project or Building may be included in a blanket policy (in which case the cost of such insurance allocable to the Project or Building will be determined by Landlord based upon the total insurance cost calculations). Tenant shall also reimburse Landlord for any increased premiums or additional insurance which Landlord reasonably deems necessary as a result of Tenant's specific use of the Premises.

Tenant, at its expense, shall maintain during the Lease Term the following insurance, at Tenant's sole cost and expense: (1) commercial general liability insurance applicable to the Premises and its appurtenances providing, on an occurrence basis, a minimum combined single limit of $[***]; and in the event property of Tenant's invitees or customers are kept in, or about the, Premises, Tenant shall maintain warehouser's legal liability or bailee customers insurance for the full value of the property of such invitees or customers as determined by the warehouse contract between Tenant and its customer; (2) all risk or special form property insurance covering the full replacement cost of all property and improvements installed or placed in the Premises by Tenant; (3) workers' compensation insurance as required by the state in which the Premises is located and in amounts as may be required by applicable statute and shall include a waiver of subrogation in favor of Landlord; (4) employers liability insurance of at least $[***], (5) business automobile liability insurance having a combined single limit of not less than $[***] per occurrence insuring Tenant against liability arising out of the ownership maintenance or use of any owned, hired or nonowned automobiles, and (6) business interruption insurance with a limit of liability representing loss of at least approximately 6 months of income. Any company writing any of Tenant's insurance shall have an A.M. Best rating of not less than A-VIII and provide primary coverage to Landlord (any policy issued to Landlord providing duplicate or similar coverage shall be deemed excess over Tenant's policies). All commercial general liability and, if applicable, warehouser's legal liability or bailee customers insurance policies shall name Tenant as a named insured and Landlord, its property manager, and other designees of Landlord as the interest of such designees shall appear, as additional insureds. The limits and types of insurance maintained by Tenant shall not limit Tenant's liability under this Lease. Tenant shall provide Landlord with certificates of such insurance as required under this Lease prior to the earlier to occur of the Commencement Date or the date Tenant is provided with possession of the Premises, and thereafter upon renewals at least 15 days prior to the expiration of the insurance coverage. Acceptance by Landlord of delivery of any certificates of insurance does not constitute approval or agreement by Landlord that the insurance requirements of this section have been met, and failure of Landlord to identify a deficiency from evidence provided will not be

construed as a waiver of Tenant's obligation to maintain such insurance. In the event any of the insurance policies required to be carried by Tenant under this Lease shall be cancelled prior to the expiration date of such policy, or if Tenant receives notice of any cancellation of such insurance policies from the insurer prior to the expiration date of such policy, Tenant shall: (a) immediately deliver notice to Landlord that such insurance has been, or is to be, cancelled, (b) shall promptly replace such insurance policy in order to assure no lapse of coverage shall occur, and (c) shall deliver to Landlord a certificate of insurance for such policy. The insurance required to be maintained by Tenant hereunder are only Landlord's minimum insurance requirements and Tenant agrees and understands that such insurance requirements may not be sufficient to fully meet Tenant's insurance needs.

The all risk or special form property insurance obtained by Landlord and Tenant shall include a waiver of subrogation by the insurers and all rights based upon an assignment from its insured, against Landlord or Tenant, their officers, directors, employees, managers, agents, invitees and contractors, in connection with any loss or damage thereby insured against. Neither party nor its officers, directors, employees, managers, agents, invitees or contractors shall be liable to the other for loss or damage caused by any risk coverable by all risk or special form property insurance, and each party waives any claims against the other party, and its officers, directors, employees, managers, agents, invitees and contractors for such loss or damage. The failure of a party to insure its property shall not void this waiver. Tenant and its agents, employees and contractors shall not be liable for, and Landlord hereby waives all claims against such parties for losses resulting from an interruption of Landlord's business, or any person claiming through Landlord, resulting from any accident or occurrence in or upon the Premises or the Project from any cause whatsoever, including without limitation, damage caused in whole or in part, directly or indirectly, by the negligence of Tenant or its agents, employees or contractors. Landlord and its agents, employees and contractors shall not be liable for, and Tenant hereby waives all claims against such parties for losses resulting from an interruption of Tenant's business, or any person claiming through Tenant, resulting from any accident or occurrence in or upon the Premises or the Project from any cause whatsoever, including without limitation, damage caused in whole or in part, directly or indirectly, by the negligence of Landlord or its agents, employees or contractors.

10. **Landlord's Repairs**. Landlord shall repair (and make replacements as necessary), at its expense and without pass through as an Operating Expense, the structural soundness of the roof (which does not include the roof membrane, which will be maintained by Landlord with the costs thereof passed through as Operating Expenses), the structural soundness of the foundation, and the structural soundness of the exterior walls of the Building in good repair, reasonable wear and tear and uninsured losses and damages caused by Tenant, its agents and contractors excluded. The term "walls" as used in this Paragraph 10 shall not include windows, glass or plate glass, doors or overhead doors, special store fronts, dock bumpers, dock plates or levelers, or office entries. Landlord shall also make capital repairs and replacements as necessary to the parking areas of the Building and the common areas of the Project including, but not limited to driveways, alleys, landscape and grounds surrounding the Building, subject to reimbursement of Operating Expenses to the extent permitted under Paragraph 6 of this Lease. Tenant shall promptly give Landlord written notice of any repair required by Landlord pursuant to this Paragraph 10, after which Landlord shall have a reasonable opportunity to repair.

11. **Tenant's Repairs**. Subject to Landlord's obligation in Paragraph 10 and subject to Paragraphs 9 and 15, Tenant, at its expense, shall repair, replace and maintain in good condition all portions of the Premises and all areas, improvements and systems exclusively serving the Premises including, without limitation, dock and loading areas, truck doors, plumbing, water and sewer lines up to points of common connection, fire sprinklers and fire protection systems, entries, doors, ceilings, windows, interior walls, and the interior side of demising walls, and heating, ventilation and air conditioning systems. Capital expenditures and repairs to the foregoing whose benefit may extend beyond the Lease Term shall be the responsibility of Landlord, subject to reimbursement by Tenant with monthly payments in accordance with the Formula (defined below) in the same manner as Operating Expenses. The "Formula" shall mean that number, the numerator of which shall be one (1) and the denominator of which shall be the amortization period (in months) equal to the useful life of such repair or replacement multiplied by the cost of such capital expenditure or repair. Landlord shall pay for such capital expenditures and repairs and Tenant shall reimburse Landlord its amortized share of same (determined as hereinabove set forth) on monthly basis in the same manner as the payment by Tenant to Landlord of the Operating Expenses. In the event Tenant extends the Lease Term either by way of an option or negotiated extension, such reimbursement by Tenant shall continue as provided above until such amortization period has expired or the Lease has terminated under such extension, whichever is first to occur. Heating, ventilation and air conditioning systems and other mechanical and building systems exclusively serving the Premises shall be maintained at Tenant's expense pursuant to maintenance service contracts entered into by Tenant or, at Landlord's election, by Landlord, in which case the costs of such contracts entered into by Landlord shall be included as an Operating Expense. The scope of services and contractors under such maintenance contracts shall be reasonably approved by Landlord. At Landlord's request, Tenant shall enter into a joint maintenance agreement with any railroad that services the Premises. If Tenant fails to perform any repair or replacement for which it is responsible, Landlord may perform such work and be reimbursed by Tenant within 10 days after demand therefor. Subject to Paragraphs 9 and 15, Tenant shall bear the full cost of any repair or replacement to any part of the Building or Project that results from damage caused by Tenant, its agents, contractors, or invitees and any repair that benefits only the Premises.

12. **Tenant-Made Alterations and Trade Fixtures**. Any alterations, additions, or improvements made by or on behalf of Tenant to the Premises ("Tenant-Made Alterations"), which are interior, non-structural Tenant-Made Alterations, the cost of which exceeds $[***] in each instance, shall be subject to Landlord's prior written consent, not to be unreasonably withheld, delayed or conditioned provided that such alteration does not materially affect the structure or the roof of the Building, modify the exterior of the Building, or modify the utility or mechanical systems of the Project. Tenant shall have the right to perform interior, non-structural Tenant-Made Alterations, the cost of which does not exceed $[***] in each instance, without obtaining Landlord's prior written consent, by providing a written notice of such Tenant-Made Alterations to Landlord containing sufficient and complete information regarding such Tenant-Made Alterations, provided that such alteration does not materially affect the structure or the roof of the Building, modify the exterior of the Building, or modify the utility or mechanical systems of the Building. Tenant shall not perform structural Tenant-Made Alterations without Landlord's prior written consent, which consent may be withheld in Landlord's sole and absolute discretion, and Tenant shall have no right to conduct under slab work or breakage of the slab. Tenant shall cause, at its expense, all Tenant-Made Alterations to comply with insurance requirements and with Legal Requirements and shall construct at its expense any alteration or modification required by Legal

Requirements as a result of any Tenant-Made Alterations. All Tenant-Made Alterations shall be constructed in a good and workmanlike manner by contractors reasonably acceptable to Landlord and only good grades of materials shall be used. All plans and specifications for any Tenant-Made Alterations shall be submitted to Landlord for its approval. Landlord may monitor construction of the Tenant-Made Alterations. Tenant shall reimburse Landlord for its reasonable out-of-pocket costs in reviewing plans and specifications and in monitoring construction. Landlord's right to review plans and specifications and to monitor construction shall be solely for its own benefit, and Landlord shall have no duty to see that such plans and specifications or construction comply with applicable laws, codes, rules and regulations. Tenant shall provide Landlord with the identities and mailing addresses of all persons performing work or supplying materials, prior to beginning such construction, and Landlord may post on and about the Premises notices of non-responsibility pursuant to applicable law. For any Tenant-Made Alterations expected to cost more than $[***], Tenant shall, upon Landlord's request, furnish security or make other arrangements satisfactory to Landlord to assure payment for the completion of all work free and clear of liens. Tenant shall provide certificates of insurance for worker's compensation and other coverage in amounts and from an insurance company reasonably satisfactory to Landlord protecting Landlord against liability for personal injury or property damage during construction. Upon completion of any Tenant-Made Alterations, Tenant shall deliver to Landlord sworn statements setting forth the names of all contractors and subcontractors who did work on the Tenant-Made Alterations and final lien waivers from all such contractors and subcontractors. Upon surrender of the Premises, all Tenant-Made Alterations and any leasehold improvements constructed by Landlord or Tenant shall remain on the Premises as Landlord's property, except to the extent Landlord requires removal at Tenant's expense of any such items or Landlord and Tenant have otherwise agreed in writing in connection with Landlord's consent to any Tenant-Made Alterations. Upon Tenant's written request, Landlord shall provide Tenant, at the time of Tenant's request for approval of Tenant-Made Alterations, a list of which Tenant-Made Alterations Landlord will require Tenant to remove upon surrender of the Premises. Tenant shall repair any damage caused by the removal of such Tenant-Made Alterations upon surrender of the Premises.

Tenant, at its own cost and expense and without Landlord's prior approval, may erect such shelves, racking, bins, machinery and trade fixtures (collectively "Trade Fixtures") in the ordinary course of its business provided that such items do not alter the basic character of the Premises, do not overload or damage the Premises, and may be removed without injury to the Premises, and the construction, erection, and installation thereof complies with all Legal Requirements and with Landlord's requirements set forth above. Tenant shall remove its Trade Fixtures and shall repair any damage caused by such removal upon surrender of the Premises.

13. **Signs**. Tenant shall not make any changes to the exterior of the Premises, install any exterior lights, decorations, balloons, flags, pennants, banners, or painting, or erect or install any signs, windows or door lettering, placards, decorations, or advertising media of any type which can be viewed from the exterior of the Premises, without Landlord's prior written consent, which consent may be withheld in Landlord's reasonable discretion. Upon surrender or vacation of the Premises, Tenant shall have removed all signs and repair, paint, and/or replace the building facia surface to which its signs are attached. Tenant shall obtain all applicable governmental permits and approvals for sign and exterior treatments. All signs, decorations, advertising media, blinds, draperies and other window treatment or bars or other security installations visible from outside the Premises shall be subject to Landlord's approval and conform in all respects to Landlord's requirements.

14. **Parking**. Tenant shall be entitled to use Tenant's Proportionate Share of Building parking spaces, which as of the date of this Lease is 100 percent and approximately 268 parking spaces designated for the Building as depicted in the Site Plan. Landlord shall not be responsible for enforcing Tenant's parking rights against any third parties.

15. **Restoration**. If at any time during the Lease Term the Premises are damaged by a fire or other casualty, Landlord shall notify Tenant within 60 days after such damage as to the amount of time Landlord reasonably estimates it will take to restore the Premises. If the restoration time is estimated to exceed 6 months, either Landlord or Tenant may elect to terminate this Lease upon notice to the other party given no later than 30 days after Landlord's notice. If neither party elects to terminate this Lease or if Landlord estimates that restoration will take 6 months or less, then, subject to receipt of sufficient insurance proceeds, Landlord shall promptly restore the Premises excluding the improvements installed by Tenant or by Landlord and paid by Tenant, subject to delays arising from the collection of insurance proceeds or from Force Majeure events. Tenant at Tenant's expense shall promptly perform, subject to delays arising from the collection of insurance proceeds, or from Force Majeure events (as defined in Paragraph 33), all repairs or restoration not required to be done by Landlord and shall promptly re-enter the Premises and commence doing business in accordance with this Lease. Notwithstanding the foregoing, either party may terminate this Lease if the Premises are damaged during the last year of the Lease Term and Landlord reasonably estimates that it will take more than one month to repair such damage. Base Rent and Operating Expenses shall be abated for the period of repair and restoration commencing on the date of such casualty event in the proportion which the area of the Premises, if any, which is not usable by Tenant bears to the total area of the Premises. Such abatement shall be the sole remedy of Tenant, and except as provided herein, Tenant waives any right to terminate the Lease by reason of damage or casualty loss.

Notwithstanding anything contained in the Lease to the contrary, to the extent the damage to the Project is attributable to Tenant, Tenant shall pay to Landlord with respect to any damage to the Project an amount of the commercially reasonable deductible under Landlord's insurance policy, not to exceed $[***], within 30 days after presentment of Landlord's invoice.

16. **Condemnation**. If any part of the Premises or the Project should be taken for any public or quasi-public use under governmental law, ordinance, or regulation, or by right of eminent domain, or by private purchase in lieu thereof (a "Taking" or "Taken"), and the Taking would materially interfere with or impair Landlord's ownership or operation of the Project, then upon written notice by Landlord this Lease shall terminate and Base Rent and Operating Expenses shall be apportioned as of said date. In the event (i) more than [***] of the Premises is involved in a Taking as described in this Paragraph 16, or (ii) more than [***] of the parking spaces for the Building are Taken and not replaced by Landlord with other parking spaces in the Project proximate to the Building, and in either case the Taking, in Tenant's reasonable judgment, would materially interfere with or impair Tenant's operations at the Premises, then in any such event Tenant shall have the right to terminate this Lease by giving written notice of termination to Landlord within thirty (30) days of such Taking. If part of the Premises shall be Taken, and this Lease is not terminated as provided above, the Base Rent and Operating Expenses

payable hereunder during the unexpired Lease Term shall be reduced to such extent as may be fair and reasonable under the circumstances. In the event of any such Taking, Landlord shall be entitled to receive the entire price or award from any such Taking without any payment to Tenant, and Tenant hereby assigns to Landlord Tenant's interest, if any, in such award. Tenant shall have the right, to the extent that same shall not diminish Landlord's award, to make a separate claim against the condemning authority (but not Landlord) for such compensation as may be separately awarded or recoverable by Tenant for moving expenses and damage to Tenant's Trade Fixtures, goodwill and other personal property, if a separate award for such items is made to Tenant.

  17. **Assignment and Subletting**. Without Landlord's prior written consent, which shall not be unreasonably withheld conditioned or delayed, Tenant shall not assign this Lease or sublease the Premises or any part thereof or mortgage, pledge, or hypothecate its leasehold interest or grant any concession or license within the Premises and any attempt to do any of the foregoing shall be void and of no effect. It shall be reasonable for the Landlord to withhold, delay or condition its consent, where required, to any assignment or sublease in any of the following instances: (i) the assignee does not have a net worth calculated according to generally accepted accounting principles at least equal to the greater of the net worth of Tenant immediately prior to such assignment or the net worth of the Tenant at the time it executed the Lease; (ii) occupancy of the Premises by the assignee or sublessee would, in Landlord's opinion, violate any agreement binding upon Landlord or the Project with regard to the identity of tenants, usage in the Project, or similar matters; (iii) the identity or business reputation of the assignee or sublessee will, in the good faith judgment of Landlord, tend to damage the goodwill or reputation of the Project; (iv) the assignment or sublease is to another tenant in the Project and is at rates which are below those charged by Landlord for comparable space in the Project and Landlord has such comparable space available for lease; or (v) in the case of a sublease, the subtenant has not acknowledged that the sublease is subject and subordinate to the Lease. The foregoing criteria shall not exclude any other reasonable basis for Landlord to refuse its consent to such assignment or sublease. Any approved assignment or sublease shall be expressly subject to the terms and conditions of this Lease. Tenant shall provide to Landlord all information concerning the assignee or sublessee as Landlord may reasonably request. Landlord may revoke its consent immediately and without notice if, as of the effective date of the assignment or sublease, there has occurred and is continuing any default under the Lease. For purposes of this paragraph, a transfer of the ownership interests controlling Tenant shall be deemed an assignment of this Lease unless such ownership interests are publicly traded. Notwithstanding the above, Tenant may assign or sublet the Premises, or any part thereof, to any entity controlling Tenant, controlled by Tenant or under common control with Tenant (a "Tenant Affiliate"), and provided that a proposed assignee has a net worth equal to or greater than the net worth of Tenant at the date of this Lease or on the date of such assignment, whichever is greater, to an entity which is acquired, in whole or in part by Tenant, a successor to Tenant by merger or consolidation, or a successor to Tenant by purchase of all or substantially all of Tenant's assets without the prior written consent of Landlord (each such transfer, a "Permitted Transfer" and each such transferee a "Permitted Transferee"). Tenant shall reimburse Landlord for all of Landlord's reasonable expenses in connection with any assignment or sublease requiring approval of Landlord, not to exceed $[***]. This Lease shall be binding upon Tenant and its successors and permitted assigns. Upon Landlord's receipt of Tenant's written notice of a desire to assign the Lease or sublet more than [***] of the rentable square footage of the Premises for the remainder of the Lease Term (other than to a Tenant Affiliate or a Permitted Transferee), Landlord may, by giving written notice to Tenant within 30 days after receipt of

Tenant's notice, terminate this Lease with respect to the space described in Tenant's notice, as of the date specified in Tenant's notice for the commencement of the proposed assignment or sublease. Tenant may withdraw its notice to sublease or assign by notifying Landlord within 10 days after Landlord has given Tenant notice of such termination, in which case the Lease shall not terminate but shall continue.

Notwithstanding any assignment or subletting, Tenant and any guarantor or surety of Tenant's obligations under this Lease shall at all times remain fully responsible and liable for the payment of the rent and for compliance with all of Tenant's other obligations under this Lease (regardless of whether Landlord's approval has been obtained for any such assignments or sublettings). In the event that the rent due and payable by a sublessee or assignee (or a combination of the rental payable under such sublease or assignment plus any bonus or other consideration therefor or incident thereto) exceeds the rental payable under this Lease, then Tenant shall be bound and obligated to pay Landlord as additional rent hereunder [***] of such excess rental and other excess consideration within 10 days following receipt thereof by Tenant, after deducting therefrom Tenant's reasonable transfer costs and expenses; provided in the event of a sublease which is less than [***]% of the Premises such excess rental and other consideration shall be applied on a square foot basis.

If this Lease be assigned or if the Premises be subleased (whether in whole or in part) or in the event of the mortgage, pledge, or hypothecation of Tenant's leasehold interest or grant of any concession or license within the Premises or if the Premises be occupied in whole or in part by anyone other than Tenant, then upon a default by Tenant hereunder Landlord may collect rent from the assignee, sublessee, mortgagee, pledgee, party to whom the leasehold interest was hypothecated, concessionee or licensee or other occupant and, except to the extent set forth in the preceding paragraph, apply the amount collected to the next rent payable hereunder; and all such rentals collected by Tenant shall be held in trust for Landlord and immediately forwarded to Landlord. No such transaction or collection of rent or application thereof by Landlord, however, shall be deemed a waiver of these provisions or a release of Tenant from the further performance by Tenant of its covenants, duties, or obligations hereunder.

18. **Indemnification**. Except for the negligence of Landlord, its agents, employees or contractors, and to the extent permitted by law, Tenant agrees to indemnify, defend and hold harmless Landlord, and Landlord's agents, employees and contractors, from and against any and all losses, liabilities, damages, costs and expenses (including attorneys' fees) resulting from claims by third parties for injuries to any person and damage to or theft or misappropriation or loss of property occurring in or about the Project and arising from the use and occupancy of the Premises or from any activity, work, or thing done, permitted or suffered by Tenant in or about the Premises or due to any other act or omission of Tenant, its subtenants, assignees, invitees, employees, contractors and agents. The furnishing of insurance required hereunder shall not be deemed to limit Tenant's obligations under this Paragraph 18.

Except for the negligence of Tenant, its agents, employees or contractors, and to the extent permitted by law, Landlord agrees to indemnify, defend and hold harmless Tenant, and Tenant's agents, employees and contractors, from and against any and all losses, liabilities, damages, costs and expenses (including attorneys' fees) resulting from claims by third parties for injuries to any person and damage to or theft or misappropriation or loss of property occurring in or about the Project or arising from any activity, work, or thing done, permitted or suffered by Landlord in or about the Project or due to any other act or omission of Landlord, its assignees, invitees, employees, contractors and agents. The furnishing of insurance required hereunder shall not be deemed to limit Landlord's obligations under this Paragraph 18.

If a claim under the foregoing indemnity is made against the indemnitee which the indemnitee believes to be covered by an indemnitor's indemnification obligations hereunder, the indemnitee shall promptly notify the indemnitor of the claim and, in such notice shall offer to the indemnitor the opportunity to assume the defense of the claim within 10 business days after receipt of the notice (with counsel reasonably acceptable to the indemnitee). If the indemnitor timely elects to assume the defense of the claim, the indemnitor shall have the right to settle the claim on any terms it considers reasonable and without the indemnitee's prior written consent, as long as the settlement shall not require the indemnitee to render any performance or pay any consideration, and the indemnitee shall not have the right to settle any such claim. If the indemnitor fails timely to elect to assume the defense of the claim or fails to defend the claim with diligence, then the indemnitee shall have the right to take over the defense of the claim and to settle the claim on any terms the indemnitee considers reasonable. Any such settlement shall be valid as against the indemnitor. If the indemnitor assumes the defense of a claim, the indemnitee may employ its own counsel but such employment shall be at the sole expense of the indemnitee. If any such claim arises out of the negligence of both Landlord and Tenant, responsibility for such claim shall be allocated between Landlord and Tenant based on their respective degrees of negligence.

This indemnity does not cover claims arising from the presence or release of Hazardous Materials.

19. **Inspection and Access**. Landlord and its agents, representatives, and contractors may enter the Premises at any reasonable time after 24 hours prior notice (except in the event of an emergency) to inspect the Premises and to make such repairs as may be required or permitted pursuant to this Lease and for any other business purpose. Landlord and Landlord's representatives may enter the Premises during business hours after 24 hours prior notice for the purpose of showing the Premises to prospective purchasers and, during the last year of the Lease Term, to prospective tenants. Upon entering the Premises, Landlord shall use reasonable efforts not to interfere with Tenant's business operations. Landlord may erect a suitable sign on the Premises stating the Premises are available to let or that the Project is available for sale. Landlord may grant easements, make public dedications, designate and modify common areas and create restrictions on or about the Premises or modify or obtain variances for the zoning of the Project (including for freight forwarding), provided that no such easement, dedication, designation, modification or restriction materially interferes with Tenant's use, access to or occupancy of the Premises. At Landlord's request, Tenant shall execute such instruments as may be necessary for such easements, dedications or restrictions.

20. **Quiet Enjoyment**. If Tenant shall perform all of the covenants and agreements herein required to be performed by Tenant, Tenant shall, subject to the terms of this Lease, at all times during the Lease Term, have peaceful and quiet enjoyment of the Premises against any person claiming by, through or under Landlord.

21. **Surrender**. Upon termination of the Lease Term or earlier termination of Tenant's right of possession, Tenant shall surrender the Premises to Landlord in the same condition as received ordinary wear and tear, casualty loss and condemnation covered by Paragraphs 15 and 16 and Landlord's repair obligations excepted and otherwise in accordance with the Move Out Conditions Addendum attached hereto. Without limiting the foregoing, Tenant shall remove any odor which may exist in the Premises resulting from Tenant's occupancy of the Premises upon the termination of the Lease Term or earlier termination of Tenant's right of possession. Any Trade Fixtures, Tenant-Made Alterations and property not so removed by Tenant as permitted or required herein shall be deemed abandoned and may be stored, removed, and disposed of by Landlord at Tenant's expense, and Tenant waives all claims against Landlord for any damages resulting from Landlord's retention and disposition of such property. All obligations of Tenant hereunder not fully performed as of the termination of the Lease Term shall survive the termination of the Lease Term, including without limitation, indemnity obligations, payment obligations with respect to Operating Expenses and obligations concerning the condition and repair of the Premises.

22. **Holding Over**. If Tenant retains possession of the Premises after the termination of the Lease Term, unless otherwise agreed in writing, such possession shall be subject to immediate termination by Landlord at any time, and all of the other terms and provisions of this Lease (excluding any expansion or renewal option or other similar right or option) shall be applicable during such holdover period, except that Tenant shall pay Landlord from time to time, upon demand, as Base Rent for the holdover period, an amount equal to [***] of the Base Rent in effect on the termination date, computed on a monthly basis for each month or part thereof during such holding over; provided so long as Tenant has given Landlord at least thirty (30) days prior written notice of its intent to holdover, the first thirty (30) days of holdover shall be at the Base Rent in effect on the termination date. All other payments shall continue under the terms of this Lease. In addition, Tenant shall be liable for all damages incurred by Landlord as a result of such holding over. No holding over by Tenant, whether with or without consent of Landlord, shall operate to extend this Lease except as otherwise expressly provided, and this Paragraph 22 shall not be construed as consent for Tenant to retain possession of the Premises.

23. **Events of Default**. Each of the following events shall be an event of default ("Event of Default") by Tenant under this Lease:

(i) Tenant shall fail to pay any installment of Base Rent or any other payment required herein when due, and such failure shall continue for a period of 5 days after written notice from Landlord to Tenant that such payment was due; provided, however, that Landlord shall not be obligated to provide written notice of such failure more than 2 times in any consecutive 12-month period, and the failure of Tenant to pay any third or subsequent installment of Base Rent or any other payment required herein when due in any consecutive 12-month period shall constitute an Event of Default by Tenant under this Lease without the requirement of notice or opportunity to cure; provided, however, that any such notice shall be in lieu of, and not in addition to, any notice required under applicable law.

(ii) Tenant or any guarantor or surety of Tenant's obligations hereunder shall (A) make a general assignment for the benefit of creditors; (B) commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property (collectively a "proceeding for relief"); (C) become the subject of any proceeding for relief which is not dismissed within 60 days of its filing or entry; or (D) die or suffer a legal disability (if Tenant, guarantor, or surety is an individual) or be dissolved or otherwise fail to maintain its legal existence (if Tenant, guarantor or surety is a corporation, partnership or other entity).

(iii) Any insurance required to be maintained by Tenant pursuant to this Lease shall be cancelled or terminated (and not replaced in accordance with Paragraph 9) or shall expire or shall be reduced or materially changed, except, in each case, as permitted in this Lease.

(iv) Tenant shall not occupy or shall vacate the Premises whether or not Tenant is in monetary or other default under this Lease. Tenant's vacating of the Premises shall not constitute an Event of Default if, prior to vacating the Premises, Tenant has made arrangements reasonably acceptable to Landlord to (a) ensure that Tenant's insurance for the Premises will not be voided or cancelled with respect to the Premises as a result of such vacancy, (b) ensure that the Premises are secured and not subject to vandalism, and (c) ensure that the Premises will be properly maintained after such vacation, including, but not limited to, keeping the heating, ventilation and cooling systems maintenance contracts required by this Lease in full force and effect and maintaining the utility services. Tenant shall inspect the Premises at least once each month and report monthly in writing to Landlord on the condition of the Premises.

(v) Tenant shall attempt or there shall occur any assignment, subleasing or other transfer of Tenant's interest in or with respect to this Lease except as otherwise permitted in this Lease.

(vi) Tenant shall fail to discharge any lien placed upon the Premises in violation of this Lease within 20 days after Tenant's becomes aware of such lien.

(vii) Tenant shall fail to comply with any provision of this Lease other than those specifically referred to in this Paragraph 23, and except as otherwise expressly provided herein, such default shall continue for more than 30 days after Landlord shall have given Tenant written notice of such default (said notice being in lieu of, and not in addition to, any notice required as a prerequisite to a forcible entry and detainer or similar action for possession of the Premises), provided, however, that if the nature of Tenant's default is such that more than thirty (30) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant shall commence such cure within said thirty (30) day period and thereafter diligently and without interruption prosecute such cure to completion.

Tenant agrees that any notice given by Landlord pursuant to this Paragraph of the Lease shall satisfy the requirements for notice under California Code of Civil Procedure Section 1161, and Landlord shall not be required to give any additional notice in order to be entitled to commence an unlawful detainer proceeding.

24. **Landlord's Remedies**. Upon each occurrence of an Event of Default and so long as such Event of Default shall be continuing, Landlord may at any time thereafter at its election: terminate this Lease or Tenant's right of possession, (but Tenant shall remain liable as hereinafter provided) and/or pursue any other remedies at law or in equity. Upon the termination of this Lease or termination of Tenant's right of possession, it shall be lawful for Landlord, without formal demand or notice of any kind, to re-enter the Premises by summary dispossession proceedings or any other action or proceeding authorized by law and to remove Tenant and all persons and property therefrom. If Landlord re-enters the Premises, Landlord shall have the right to keep in place and use, or remove and store, all of the furniture, fixtures and equipment at the Premises.

Except as otherwise provided in the next paragraph, if Tenant breaches this Lease and abandoned the Premises prior to the end of the term hereof, or if Tenant's right to possession is terminated by Landlord because of an Event of Default by Tenant under this Lease, this Lease shall terminate. Upon such termination, Landlord may recover from Tenant the following, as provided in Section 1951.2 of the Civil Code of California: (i) the worth at the time of award of the unpaid Base Rent and other charges under this Lease that had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the reasonable value of the unpaid Base Rent and other charges under this Lease which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonable avoided; (iii) the worth at the time of award by which the reasonable value of the unpaid Base Rent and other charges under this Lease for the balance of the term of this Lease after the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; and (iv) any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or that in the ordinary course of things would be likely to result therefrom. As used herein, the following terms are defined: (a) The "worth at the time of award" of the amounts referred to in Sections (i) and (ii) is computed by allowing interest at the lesser of 18 percent per annum or the maximum lawful rate. The "worth at the time of award" of the amount referred to in Section (iii) is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent; (b) The "time of award" as used in clauses (i), (ii), and (iii) above is the date on which judgment is entered by a court of competent jurisdiction; (c) The "reasonable value" of the amount referred to in clause (ii) above is computed by determining the mathematical product of (1) the "reasonable annual rental value" (as defined herein) and (2) the number of years, including fractional parts thereof, between the date of termination and the time of award. The "reasonable value" of the amount referred to in clause (iii) is computed by determining the mathematical product of (1) the annual Base Rent and other charges under this Lease and (2) the number of years including fractional parts thereof remaining in the balance of the term of this Lease after the time of award. Tenant acknowledges and agrees that the term "detriment proximately caused by Tenant's failure to perform its obligations under this Lease" includes, without limitation, the value of any abated or free rent given to Tenant.

Even though Tenant has breached this Lease and abandoned the Premises, this Lease shall continue in effect for so long as Landlord does not terminate Tenant's right to possession, and Landlord may enforce all its rights and remedies under this Lease, including the right to recover rent as it becomes due. This remedy is intended to be the remedy described in California Civil Code Section 1951.4, and the following provision from such Civil Code Section is hereby repeated: "The Lessor has the remedy described in California Civil Code Section 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover rent as it becomes due, if lessee has right to sublet or assign subject only to reasonable limitations)." Any such payments due Landlord shall be made upon demand therefor from time to time and Tenant agrees that Landlord may file suit to recover any sums falling due from time to time. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect in writing to terminate this Lease for such previous breach.

Exercise by Landlord of any one or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance of surrender of the Premises and/or a termination of this Lease by Landlord, whether by agreement or by operation of law, it being understood that such surrender and/or termination can be effected only by the written agreement of Landlord and Tenant. Any law, usage, or custom to the contrary notwithstanding, Landlord shall have the right at all times to enforce the provisions of this Lease in strict accordance with the terms hereof; and the failure of Landlord at any time to enforce its rights under this Lease strictly in accordance with same shall not be construed as having created a custom in any way or manner contrary to the specific terms, provisions, and covenants of this Lease or as having modified the same. Tenant and Landlord further agree that forbearance or waiver by Landlord to enforce its rights pursuant to this Lease or at law or in equity, shall not be a waiver of Landlord's right to enforce one or more of its rights in connection with any subsequent default. A receipt by Landlord of rent or other payment with knowledge of the breach of any covenant hereof shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by Landlord. To the greatest extent permitted by law, Tenant waives the service of notice of Landlord's intention to re-enter as provided for in any statute, or to institute legal proceedings to that end, and also waives all right of redemption in case Tenant shall be dispossessed by a judgment or by warrant of any court or judge. The terms "enter," "re-enter," "entry" or "re-entry," as used in this Lease, are not restricted to their technical legal meanings. Any reletting of the Premises shall be on such terms and conditions as Landlord in its sole discretion may determine (including without limitation a term different than the remaining Lease Term, rental concessions, alterations and repair of the Premises, lease of less than the entire Premises to any tenant and leasing any or all other portions of the Project before reletting the Premises). Landlord shall not be liable, nor shall Tenant's obligations hereunder be diminished because of, Landlord's failure to relet the Premises or collect rent due in respect of such reletting.

25. **Tenant's Remedies/Limitation of Liability**. Landlord shall not be in default hereunder unless Landlord fails to perform any of its obligations hereunder within 30 days after written notice from Tenant specifying such failure (unless such performance will, due to the nature of the obligation, require a period of time in excess of 30 days, then after such period of time as is reasonably necessary). In the event of any uncured default on the part of Landlord, then Tenant, at Tenant's option, may thereafter pursue one of the following remedies: (a) in the event of an emergency perform Landlord's obligation and invoice Landlord in the manner specifically set forth in the second subparagraph below of this Paragraph 25; or (b) institute an action for damages and/or specific performance against Landlord in the San Francisco Superior Court. All obligations of Landlord hereunder shall be construed as covenants, not conditions; and, except as may be otherwise expressly provided in this Lease, Tenant may not terminate this Lease for breach of

Landlord's obligations hereunder. All obligations of Landlord under this Lease will be binding upon Landlord only during the period of its ownership of the Premises and not thereafter. The term "Landlord" in this Lease shall mean only the owner, for the time being of the Premises, and in the event of the transfer by such owner of its interest in the Premises, such owner shall thereupon be released and discharged from all obligations of Landlord thereafter accruing, but such obligations shall be binding during the Lease Term upon each new owner for the duration of such owner's ownership. Any liability of Landlord under this Lease shall be limited solely to its interest in the Project, and in no event shall any personal liability be asserted against Landlord in connection with this Lease nor shall any recourse be had to any other property or assets of Landlord.

In the event of a Landlord default that caused an emergency (being defined as an imminent threat of personal injury to Tenant's employees or material damage to Tenant's equipment or other property at the Premises or a material impact to Tenant's business operations at the Premises), Tenant shall have the right to make such temporary, emergency repairs to the roof, foundation, floors and exterior walls of the building of which the Premises are a part, or the roof membrane, skylights, roof vents, drains and downspouts of the Project, and the exterior and under slab utility systems for the Project, as may be reasonably necessary to prevent such material damage to the equipment or property of Tenant situated in the Premises, or such personal injury to Tenant's employees, provided Tenant has no reasonable alternative and has notified or attempted in good faith to notify Landlord's representative of such emergency by telephone (with subsequent written notice as soon as practicable). The provisions of this paragraph do not constitute an authorization by Landlord for Tenant to enter the premises of any other tenant of the Project, and Tenant has not been designated as Landlord's agent for the purposes of any such entry. Landlord shall reimburse Tenant for the reasonable, out-of-pocket costs incurred by Tenant in making such emergency repairs to the roof, foundation or exterior walls, as applicable, up to (but not to exceed) $[***] with respect to each such occurrence, within thirty (30) days after submission by Tenant to Landlord of an invoice therefore, accompanied by reasonable supporting documentation for the costs so incurred. In the event Landlord fails or refuses to reimburse Tenant for such costs within such thirty (30) day period and Tenant brings an action for recovery of such amounts from Landlord as provided for in this Lease, then Tenant shall be entitled to recover, in addition to the amount of such costs, interest on such amounts from the date incurred by Tenant until recovered from Landlord, at the rate provided in Paragraph 37(j) of this Lease, and the reasonable attorneys' fees and other costs of court incurred by Tenant in pursuing such action.

26. **Omitted**.

27. **Subordination**. This Lease and Tenant's interest and rights hereunder are and shall be subject and subordinate at all times to the lien of any first mortgage, now existing or hereafter created on or against the Project or the Premises, and all amendments, restatements, renewals, modifications, consolidations, refinancing, assignments and extensions thereof, without the necessity of any further instrument or act on the part of Tenant. Tenant agrees, at the election of the holder of any such mortgage, to attorn to any such holder. Tenant agrees upon demand to execute, acknowledge and deliver such instruments, confirming such subordination and such instruments of attornment as shall be requested by any such holder. Notwithstanding the foregoing, any such holder may at any time subordinate its mortgage to this Lease, without Tenant's consent, by notice in writing to Tenant, and thereupon this Lease shall be deemed prior

to such mortgage without regard to their respective dates of execution, delivery or recording and in that event such holder shall have the same rights with respect to this Lease as though this Lease had been executed prior to the execution, delivery and recording of such mortgage and had been assigned to such holder. The term "mortgage" whenever used in this Lease shall be deemed to include deeds of trust, security assignments and any other encumbrances, and any reference to the "holder" of a mortgage shall be deemed to include the beneficiary under a deed of trust. Notwithstanding the foregoing, any such subordination to a future mortgagee shall be effective only after such mortgagee has executed and delivered a non-disturbance agreement on mortgagee's commercially standard form. If there is a mortgage or deed of trust encumbering the Building, then promptly following execution of this Lease, Landlord agrees to use commercially reasonable efforts to obtain from its current mortgagee (if any) a subordination, non-disturbance and attornment agreement (an "SNDA") in favor of Tenant on such mortgagee's standard form; provided, however, Tenant acknowledges and agrees that Landlord's failure to obtain the SNDA shall not constitute a default by Landlord under this Lease. Landlord shall be responsible for any fees and charges (including, without limitation, attorneys' fees) payable to such mortgagee in connection with providing a commercially reasonable SNDA, and Tenant shall be responsible for any fees and charges (including, without limitation, attorneys' fees) payable to such mortgagee in connection with Tenant's election to negotiate such SNDA.

28. **Mechanic's Liens**. Tenant has no express or implied authority to create or place any lien or encumbrance of any kind upon, or in any manner to bind the interest of Landlord or Tenant in, the Premises or to charge the rentals payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs. Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises and that it will save and hold Landlord harmless from all loss, cost or expense based on or arising out of asserted claims or liens against the leasehold estate or against the interest of Landlord in the Premises or under this Lease. Tenant shall give Landlord immediate written notice after Tenant becomes aware of the placing of any lien or encumbrance against the Premises as a result of Tenant's work and cause such lien or encumbrance to be discharged within 20 days thereafter; provided, however, Tenant may contest such liens or encumbrances as long as such contest prevents foreclosure of the lien or encumbrance and Tenant causes such lien or encumbrance to be bonded or insured over in a manner satisfactory to Landlord within such 20 day period.

29. **Estoppel Certificates**. Tenant agrees, from time to time, within 10 business days after request of Landlord, to execute and deliver to Landlord, or Landlord's designee, any estoppel certificate requested by Landlord, stating that this Lease is in full force and effect, the date to which rent has been paid, that Landlord, to Tenant's knowledge, is not in default hereunder (or specifying in detail the nature of Landlord's default), the termination date of this Lease and such other matters pertaining to this Lease as may be reasonably requested by Landlord. Tenant's obligation to furnish each estoppel certificate in a timely fashion is a material inducement for Landlord's execution of this Lease. No cure or grace period provided in this Lease shall apply to Tenant's obligations to timely deliver an estoppel certificate.

30. **Environmental Requirements**. Except for Hazardous Materials contained in products used by Tenant in de minimis quantities for ordinary cleaning and office purposes, and except for propane used in Tenant's forklifts in the normal course of its business, and except for Hazardous Materials contained in products stored and/or distributed during Tenant's normal course of business in their original, sealed, and unopened containers, Tenant shall not permit or cause any party to bring any Hazardous Material upon the Premises or transport, store, use, generate, manufacture or release any Hazardous Material in or about the Premises without Landlord's prior written consent. Tenant, at its sole cost and expense, shall operate its business in the Premises in strict compliance with all Environmental Requirements and shall remediate in a manner satisfactory to Landlord any Hazardous Materials released on or from the Project by Tenant, its agents, employees, contractors, subtenants or invitees. Tenant shall complete and certify disclosure statements as requested by Landlord from time to time relating to Tenant's transportation, storage, use, generation, manufacture or release of Hazardous Materials on the Premises. The term "Environmental Requirements" means all applicable present and future statutes, regulations, ordinances, rules, codes, judgments, orders or other similar enactments of any governmental authority or agency regulating or relating to health, safety, or environmental conditions on, under, or about the Premises or the environment, including without limitation, the following; the Comprehensive Environmental Response, Compensation and Liability Act; the Resource Conservation and Recovery Act; and all state and local counterparts thereto, and any regulations or policies promulgated or issued thereunder. The term "Hazardous Materials" means and includes any substance, material, waste, pollutant, or contaminant listed or defined as hazardous or toxic, under any Environmental Requirements, asbestos and petroleum, including crude oil or any fraction thereof, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas). As defined in Environmental Requirements, Tenant is and shall be deemed to be the "operator" of Tenant's "facility" and the "owner" of all Hazardous Materials brought on the Premises by Tenant, its agents, employees, contractors or invitees, and the wastes, by-products, or residues generated, resulting, or produced therefrom. No cure or grace period provided in this Lease shall apply to Tenant's obligations to comply with the terms and conditions of this Paragraph 30.

Notwithstanding anything to the contrary in this Paragraph 30, Tenant shall have no liability of any kind to Landlord as to Hazardous Materials located on the Premises or Project as of the date of this Lease or the release of Hazardous Materials caused or permitted by (i) Landlord, its agents, employees, contractors or invitees; or (ii) any other tenants in the Project or their agents, employees, contractors, subtenants, assignees or invitees. Landlord, at Landlord's sole cost, shall comply with all applicable Environmental Requirements applicable to Landlord with respect to any pre-existing such Hazardous Materials to the extent Landlord is so required under the Environmental Requirements.

Tenant shall indemnify, defend, and hold Landlord and VWR Scientific harmless from and against any and all losses (including, without limitation, diminution in value of the Premises or the Project and loss of rental income from the Project), claims, demands, actions, suits, damages (including, without limitation, punitive damages), expenses (including, without limitation, remediation, removal, repair, corrective action, or cleanup expenses), and costs (including, without limitation, actual attorneys' fees, consultant fees or expert fees and including, without limitation, removal or management of any asbestos brought into the property or disturbed in breach of the requirements of this Paragraph 30, regardless of whether such removal or management is required by law) which are brought or recoverable against, or suffered or incurred by Landlord as a result of any release of Hazardous Materials for which Tenant is obligated to remediate as provided above or any other breach of the requirements under this Paragraph 30 by Tenant, its agents, employees, contractors, subtenants, assignees or invitees, regardless of whether Tenant had knowledge of such noncompliance. The obligations of Tenant under this Paragraph 30 shall survive any termination of this Lease.

Landlord shall have access to, and a right to perform inspections and tests of, the Premises to determine Tenant's compliance with Environmental Requirements, its obligations under this Paragraph 30, or the environmental condition of the Premises and to comply with any Environmental Requirements applicable to Landlord under this Lease. Access shall be granted to Landlord upon Landlord's prior notice to Tenant and at such times so as to minimize, so far as may be reasonable under the circumstances, any disturbance to Tenant's operations. Such inspections and tests shall be conducted at Landlord's expense, unless such inspections or tests reveal that Tenant has not complied with any Environmental Requirement, in which case Tenant shall reimburse Landlord for the reasonable cost of such inspection and tests. Landlord's receipt of or satisfaction with any environmental assessment in no way waives any rights that Landlord holds against Tenant.

In the event any Hazardous Materials existing at the Premises prior to the date of this Lease materially impact Tenant's business operations at the Premises, following Tenant's notice of such material impact Landlord shall use good faith, commercially responsible efforts to cause the party responsible for such pre-existing Hazardous Materials to comply with all Environmental Requirements and shall enforce all indemnities from such responsible party for the benefit of Tenant and Landlord.

31. **Rules and Regulations**. Tenant shall, at all times during the Lease Term and any extension thereof, comply with all reasonable rules and regulations at any time or from time to time established by Landlord covering use of the Premises and the Project. The current Project rules and regulations are attached hereto as Exhibit B. In the event of any conflict between said rules and regulations and other provisions of this Lease, the other terms and provisions of this Lease shall control. Landlord shall not have any liability or obligation for the breach of any rules or regulations by other tenants in the Project.

32. **Security Service**. Tenant acknowledges and agrees that, while Landlord may patrol the Project, Landlord is not providing any security services with respect to the Premises and that Landlord shall not be liable to Tenant for, and Tenant waives any claim against Landlord with respect to, any loss by theft or any other damage suffered or incurred by Tenant in connection with any unauthorized entry into the Premises or any other breach of security with respect to the Premises.

33. **Force Majeure**. Landlord shall not be held responsible for delays in the performance of its obligations hereunder when caused by strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, governmental restrictions, governmental regulations, governmental controls, delay in issuance of permits, enemy or hostile governmental action, civil commotion, fire or other casualty, and other causes beyond the reasonable control of Landlord ("Force Majeure").

34. **Entire Agreement**. This Lease constitutes the complete agreement of Landlord and Tenant with respect to the subject matter hereof. No representations, inducements, promises or agreements, oral or written, have been made by Landlord or Tenant, or anyone acting on behalf of Landlord or Tenant, which are not contained herein, and any prior agreements, promises, negotiations, or representations are superseded by this Lease. This Lease may not be amended except by an instrument in writing signed by both parties hereto.

35. **Severability**. If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby. It is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there be added, as a part of this Lease, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

36. **Brokers**. Each party represents and warrants to the other that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, other than the broker, if any, set forth on the first page of this Lease, and each party agrees to indemnify and hold the other harmless from and against any claims by any other broker, agent or other person claiming a commission or other form of compensation by virtue of having dealt with such party with regard to this leasing transaction.

37. **Miscellaneous**. (a) Any payments or charges due from Tenant to Landlord hereunder shall be considered rent for all purposes of this Lease.

(b) If and when included within the term "Tenant," as used in this instrument, there is more than one person, firm or corporation, each shall be jointly and severally liable for the obligations of Tenant.

(c) All notices required or permitted to be given under this Lease shall be in writing and shall be sent by registered or certified mail, return receipt requested, or by a reputable national overnight courier service, postage prepaid, or by hand delivery addressed to Landlord at 3353 Gateway Blvd, Fremont, CA 94538, with a copy sent to Landlord at 4545 Airport Way, Denver, Colorado 80239, Attention: General Counsel, and to Tenant at, until June 1, 2016: 1980 Oakdale Avenue, San Francisco, CA 94124; after June 1, 2016: 55 Francisco Street, Suite 600 San Francisco, California 94133, Attn: CFO. Either party may by notice given aforesaid change its address for all subsequent notices or add an additional party to be copied on all subsequent notices. Except where otherwise expressly provided to the contrary, notice shall be deemed given upon delivery.

(d) Except as otherwise expressly provided in this Lease or as otherwise required by law, Landlord retains the absolute right to withhold any consent or approval.

(e) At Landlord's request from time to time but not more than quarterly unless Landlord is selling or re-financing the Building, Tenant shall furnish Landlord with true and complete copies of its most recent annual and quarterly financial statements prepared by Tenant or Tenant's accountants.

(f) Neither this Lease nor a memorandum of lease shall be filed by or on behalf of Tenant in any public record. Landlord may prepare and file, and upon request by Landlord Tenant will execute, a memorandum of lease.

(g) The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Lease or any exhibits or amendments hereto.

(h) The submission by Landlord to Tenant of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Premises, nor confer any right or impose any obligations upon either party until execution of this Lease by both parties.

(i) Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires. The captions inserted in this Lease are for convenience only and in no way define, limit or otherwise describe the scope or intent of this Lease, or any provision hereof, or in any way affect the interpretation of this Lease.

(j) Any amount not paid by Tenant within 5 days after its due date in accordance with the terms of this Lease shall bear interest from such due date until paid in full at the lesser of the highest rate permitted by applicable law or 10 percent per year. It is expressly the intent of Landlord and Tenant at all times to comply with applicable law governing the maximum rate or amount of any interest payable on or in connection with this Lease. If applicable law is ever judicially interpreted so as to render usurious any interest called for under this Lease, or contracted for, charged, taken, reserved, or received with respect to this Lease, then it is Landlord's and Tenant's express intent that all excess amounts theretofore collected by Landlord be credited on the applicable obligation (or, if the obligation has been or would thereby be paid in full, refunded to Tenant), and the provisions of this Lease immediately shall be deemed reformed and the amounts thereafter collectible hereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder.

(k) Construction and interpretation of this Lease shall be governed by the laws of the state in which the Project is located, excluding any principles of conflicts of laws.

(l) Time is of the essence as to the performance of Tenant's and Landlord's obligations under this Lease.

(m) All exhibits and addenda attached hereto are hereby incorporated into this Lease and made a part hereof. In the event of any conflict between such exhibits or addenda and the terms of this Lease, such exhibits or addenda shall control.

(n) In the event either party hereto initiates litigation to enforce the terms and provisions of this Lease, the non-prevailing party in such action shall reimburse the prevailing party for its reasonable attorney's fees, filing fees, and court costs.

(o) Tenant agrees and understands that Landlord shall have the right (provided that the exercise of Landlord's rights does not adversely affect Tenant's use and occupancy of the Premises or subject "Tenant to additional costs), without Tenant's consent, to place a solar electric generating system on the roof of the Building or enter into a lease for the roof of the Building whereby such roof tenant shall have the right to install a solar electric generating system on the roof of the Building. Upon receipt of written request from Landlord, Tenant, at Tenant's sole cost and expense, shall deliver to Landlord data regarding the electricity consumed in the operation of the Premises (the "Energy Data") for purposes of regulatory compliance, manual and automated benchmarking, energy management, building environmental performance labeling and other related purposes, including but not limited, to the Environmental Protection Agency's Energy Star rating system and other energy benchmarking systems. Landlord shall use commercially reasonable efforts to utilize automated data transmittal services offered by utility companies to access the Energy Data. Landlord shall not publicly disclose Energy Data without Tenant's prior written consent. Landlord may, however, disclose Energy Data that has been modified, combined or aggregated in a manner such that the resulting data is not exclusively attributable to Tenant.

(p) This Lease may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Lease. Execution copies of this Lease may be delivered by facsimile or email, and the parties hereto agree to accept and be bound by facsimile signatures or scanned signatures transmitted via email hereto, which signatures shall be considered as original signatures with the transmitted Lease having the same binding effect as an original signature on an original Lease. At the request of either party, any facsimile document or scanned document transmitted via email is to be re-executed in original form by the party who executed the original facsimile document or scanned document. Neither party may raise the use of a facsimile machine or scanned document or the fact that any signature was transmitted through the use of a facsimile machine or email as a defense to the enforcement of this Lease.

(q) Within fifteen (15) days of Landlord's written request, Tenant agrees to deliver to Landlord such information and/or documents as Landlord requires for Landlord to comply with California Public Resources Code Section 25402.10, or successor statute(s), and California Energy Commission adopted regulations set forth in California Code of Regulations, Title 20, Division 2, Chapter 4, Article 9, Sections 1680-1685, and successor and related California Code of Regulations, relating to commercial building energy ratings. Landlord makes the following statement based on Landlord's actual knowledge in order to comply with California Civil Code Section 1938: The Building and Premises have not undergone an inspection by a Certified Access Specialist (CASp).

(s) **CONTINGENCY**: Please he advised that Landlord is presently under contract to acquire the Project, which includes the Premises. Landlord is not affiliated with nor the agent of the owner, nor does it have any power or authority to represent or bind the owner of the Project in any way. In addition to all other conditions contained in this Lease, this Lease can only be effective following Landlord or its affiliate's acquisition of the Premises or it will need to be expressly approved in writing by the current owner. This Lease is contingent upon Landlord's or its affiliate's successful close of escrow on the Project by April 1, 2016. In the event Landlord does not successfully close escrow on the Project by 5 p.m. April 6, 2016, then either Landlord or Tenant shall have the right, but not the obligation, to terminate this Lease by providing written termination notice to the other party. Tenant acknowledges and agrees that no leasing commissions shall be payable to either of the brokers referenced in this Lease if this Lease is so terminated, and half of said brokers leasing commissions will be paid the earlier of 6 months after Lease Commencement or Tenant has received at least $[***] of Series E Funding, as confirmed by Landlord in Landlord's sole discretion providing such Lease has not been terminated.

(t) **ENVIRONMENTAL DISCLOSURE**: Landlord has advised Tenant and Tenant acknowledges that both the property of which the leased premises is a part and the neighboring property are part of an ongoing environmental investigation that will require future access and remedial activities. The release is due to historic operations from a former tenant and potentially from historic fill materials placed at the property during land reclamation activities. The California Regional Water Quality Control Board (RWQCB) is overseeing the environmental remediation of the property and documentation related to the cleanup is available on the RWQCB's Geotracker webpage at: http://geotracker.waterboards.ca.gov. Planned remedial activities will include excavation of impacted soils beneath a small portion of the Building and installation of subslab monitoring points and groundwater monitoring wells within the Building and in exterior paved areas. The excavation is planned to be completed prior to occupancy, however, ongoing access will be required for monitoring activities. Tenant agrees to cooperate with future remedial activities and Landlord will use commercially reasonable efforts to coordinate access to the property for future remedial activities in an attempt to minimize inconvenience to Tenant's operations as reasonably practical. Ultimately, the Building will have a deed restriction that mandates commercial / industrial use and engineering controls. Tenant will be required to comply with future restrictions.

38. **Limitation of Liability of Trustees, Shareholders, and Officers of Landlord**. Any obligation or liability whatsoever of Landlord which may arise at any time under this Lease or any obligation or liability which may be incurred by it pursuant to any other instrument, transaction, or undertaking contemplated hereby shall not be personally binding upon, nor shall resort for the enforcement thereof be had to the property of, its trustees, directors, shareholders, officers, employees or agents, regardless of whether such obligation or liability is in the nature of contract, tort, or otherwise.

39. **WAIVER OF JURY TRIAL. TENANT AND LANDLORD WAIVE ANY RIGHT TO TRIAL BY JURY OR TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN LANDLORD AND TENANT ARISING OUT OF THIS LEASE OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED HERETO.**

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first above written.

TENANT:

The RealReal, Inc., a Delaware Corporation

By: /s/ Matt Gustke
Name: Matt Gustke
Title: Chief Financial Officer

LANDLORD:

M & L ASSOCIATES
a New Jersey general partnership

By: Prologis OP M&L Holdings LLC
    a Delaware limited liability company
    a Partner

By: Authorized Person

/s/ William Scott Lamson
William Scott Lamson, President, Northwest Region of Prologis, Inc., a Maryland Corporation

By: Prologis M&L Holdco LLC
    a Delaware limited liability company
    a Partner

By: Authorized Person

/s/ William Scott Lamson
William Scott Lamson, President, Northwest Region of Palmtree Acquisition Corporation, a Delaware corporation

Prologis OP M&L Holdings LLC and Prologis M&L Holdco being the partners of M & L Associates

ADDENDUM 1

<u>BASE RENT ADJUSTMENTS</u>

ATTACHED TO AND A PART OF THE LEASE AGREEMENT
DATED MARCH 14, 2016 BETWEEN

Prologis Limited Partnership -I
and
The RealReal, Inc.

Base Rent shall equal the following amounts for the respective periods set forth below:

| Period | | | Monthly Base Rent | |
|---|---|---|---|---|
| <u>Month 01</u> | through | <u>02</u> | $ | [***]* |
| | <u>03</u> | | $ | [***]** |
| | <u>04</u> | through | <u>16</u> | $ | [***]*** |
| <u>17</u> | through | <u>28</u> | $ | [***] |
| <u>29</u> | through | <u>40</u> | $ | [***] |
| <u>41</u> | through | <u>52</u> | $ | [***] |
| <u>53</u> | through | <u>64</u> | $ | [***] |

\*     Tenant shall not pay Operating Expenses during such free Base Rent Period. Additionally, see Paragraph 4 for Tenant's obligation to pay proportionate Base Rent prior to the Commencement Date for any phased portions of the Premises delivered to Tenant and where such proportionate Base Rent shall continue for any delay in the delivery of the Phase 2 Office Initial Improvements, as provided in "\*\*" below.

\*\*    In month 3, Base Rent for portion of Premises attributable to approximately [***] rentable square feet of Warehouse to commence. In the event that the Office Initial Improvements are not Substantially Completed at or prior to the end of month 2, abatement for Phase 2 to be adjusted so that Tenant shall realize two (2) months of abated Base Rent total for such space.

\*\*\*   Base Rent for entire Premises to commence. However, if Tenant has received at least $[***] of Series E Funding, as confirmed by Landlord in Landlord's sole discretion, then Tenant shall have the right to abate Base Rent and Operating Expenses for two consecutive months following Landlord's confirmation of such funding. If Tenant does not receive at least $[***] of Series E Funding, as confirmed by Landlord in Landlord's sole discretion, then Tenant shall have no right to abate Base Rent and Operating Expenses for additional two consecutive months.

ADDENDUM 2

HVAC MAINTENANCE CONTRACT

ATTACHED TO AND A PART OF THE LEASE AGREEMENT
DATED MARCH 14, 2016 BETWEEN

Prologis Limited Partnership -I
and
The RealReal Inc.

Paragraph 11, captioned "TENANT REPAIRS," is revised to include the following:

Tenant agrees to enter into and maintain through the term of the Lease, a regularly scheduled preventative maintenance/service contract for servicing all hot water, heating and air conditioning systems and equipment within the Premises. Landlord requires a qualified HVAC contractor perform this work. A certificate must be provided to the Landlord upon occupancy of the leased Premises.

The service contract must become effective within thirty (30) days of occupancy, and service visits shall be performed on a quarterly basis. Landlord suggests that Tenant send the following list to a qualified HVAC contractor to be assured that these items are included in the maintenance contract:

1.   Adjust belt tension;

2.   Lubricate all moving parts, as necessary;

3.   Inspect and adjust all temperature and safety controls;

4.   Check refrigeration system for leaks and operation;

5.   Check refrigeration system for moisture;

6.   Inspect compressor oil level and crank case heaters;

7.   Check head pressure, suction pressure and oil pressure;

8.   Inspect air filters and replace when necessary;

9.   Check space conditions;

10,  Check condensate drains and drain pans and clean, if necessary;

11.  Inspect and adjust all valves;

12.  Check and adjust dampers;

13.  Run machine through complete cycle.

ADDENDUM 3

<u>MOVE-OUT CONDITIONS</u>

ATTACHED TO AND A PART OF THE LEASE AGREEMENT
DATED MARCH 14, 2016 BETWEEN

Prologis Limited Partnership -I
and
The RealReal Inc.

With respect to Paragraph 21 of the Lease, Tenant shall surrender the Premises in the same condition as received, ordinary wear and tear, casualty loss and condemnation covered by Paragraphs 15 and 16 and Landlord's repair obligations excepted.

Before surrendering the Premises, Tenant shall remove all of its personal property and trade fixtures and such alterations or additions to the Premises made by Tenant as may be specified for removal thereof. If Tenant fails to remove its personal property and fixtures upon the expiration or earlier termination of this Lease, the same shall be deemed abandoned and shall become the property of the Landlord. The following list is designed to assist Tenant in the move-out procedures but is not intended to be all inclusive:

1. Lights: Office, warehouse, emergency and exit lights will be fully operational with all bulbs and ballasts functioning.

2. Dock Levelers, Service Doors and Rollup Doors: All truck doors, service doors, roll up doors and dock levelers shall be serviced and placed in good operating order. This would include the necessary replacement of any dented truck door panels and adjustment of door tension to insure property operation. All door panels which are replaced need to be painted to match the building standard.

3. Dock Seals/Dock Bumpers: Free of tears and broken backboards repaired. All dock bumpers must be left in place and well secured.

4. Structural Columns: All structural steel columns in the warehouse and office shall be inspected for damage. Repairs of this nature should be pre-approved by Landlord prior to implementation.

5. Warehouse Floor: Free of stains and swept with no racking bolts and other protrusions left in floor. Cracks should be repaired with an epoxy or polymer to match concrete color. All floor striping in the Premises shall be removed with no residual staining or other indication that such striping existed.

| 6. | Tenant-Installed Equipment and Wiring: | Removed and space turned to original condition when originally leased. (Remove air lines, junction boxes, conduit, etc.) |
|---|---|---|
| 7. | Walls: | Sheetrock (drywall) damage should be patched and fire-taped so that there are no holes in either office or warehouse. |
| 8. | Carpet and Tiles: | The carpet and vinyl tiles should be in a clean condition and should not have any holes or chips in them. Landlord will accept normal wear on these items provided they appear to be in a maintained condition. |
| 9. | Roof: | Any Tenant-installed equipment must be removed and roof penetrations properly repaired by licensed roofing contractor. Active leaks caused by Tenant must be fixed and latest Landlord maintenance and repairs recommendation must have been followed. Tenant must check with Landlord's property manager to determine if specific roofing contractor is required to perform work. |
| 10. | Signs: | All exterior signs must be removed and holes patched and paint touched-up as necessary. All window signs should likewise be removed. |
| 11. | Heating and Air Conditioning System: | Heating/air conditioning systems should be placed in good working order, including the necessary replacement of any parts to return the unit to a well maintained condition. This includes warehouse heaters and exhaust fans. Upon move out, Landlord will have an exit inspection performed by a certified mechanical contractor to determine the condition. |
| 12. | Electrical & Plumbing: | All electrical and plumbing equipment to be returned in good condition and repair and conforming to code. |
| 14. | Overall Cleanliness: | Clean windows, sanitize bathroom(s), vacuum carpet, and remove any and all debris from office and warehouse. Remove all pallets and debris from exterior of Premises. All trade fixtures, dumpsters, racking, trash, vending machines and other personal property to be removed. |
| 15. | Upon Completion: | Contact Landlord's property manager to coordinate turning in of keys, utility changeover and obtaining of final Landlord inspection of Premises which, in turn, will facilitate refund of Security Deposit. |

ADDENDUM 4

<u>ONE RENEWAL OPTION AT MARKET</u>

ATTACHED TO AND A PART OF THE LEASE AGREEMENT
DATED MARCH 14, 2016, BETWEEN

Prologis Limited Partnership -I
and
The RealReal Inc.

(a) Provided that as of the time of the giving of the Extension Notice and the Commencement Date of the Extension Term, (x) Tenant or a Tenant Affiliate or a Permitted Transferee actually leases and occupies all of the Premises initially demised under this Lease and any space added to the Premises, and (y) no Event of Default exists or would exist but for the passage of time or the giving of notice, or both; then Tenant shall have the right to extend the Lease Term for [***] commencing on the day following the expiration of the Lease Term (hereinafter referred to as the "<u>Commencement Date of the Extension Term</u>"). Tenant shall give Landlord notice (hereinafter called the "<u>Extension Notice</u>") of its election to extend the term of the Lease Term at least [***], prior to the scheduled expiration date of the Lease Term.

(b) The Base Rent payable by Tenant to Landlord during the Extension Term shall be the Fair Market Rent, as defined and determined pursuant to Paragraphs (c), (d), and (e) below.

(c) The term "<u>Fair Market Rent</u>" shall mean the Base Rent, expressed as an annual rent per square foot of floor area, which Landlord would have received from leasing the Premises for the Extension Term to an unaffiliated person which is not then a tenant in the Project, assuming that such space were to be delivered in "as-is" condition, and taking into account the rental which such other tenant would most likely have paid for such premises, including market escalations, provided that Fair Market Rent shall not in any event be less than the Base Rent for the Premises as of the expiration of the Lease Term. Fair Market Rent shall not be reduced by reason of any costs or expenses saved by Landlord by reason of Landlord's not having to find a new tenant for the Premises (including without limitation brokerage commissions, cost of improvements necessary to prepare the space for such tenant's occupancy, rent concession, or lost rental income during any vacancy period). Fair Market Rent means only the rent component defined as Base Rent in the Lease and does not include reimbursements and payments by Tenant to Landlord with respect to Operating Expenses and other items payable or reimbursable by Tenant under the Lease. In addition to its obligation to pay Base Rent (as determined herein), Tenant shall continue to pay and reimburse Landlord as set forth in the Lease with respect to such Operating Expenses and other items with respect to the Premises during the Extension Term. The arbitration process described below shall be limited to the determination of the Base Rent and shall not affect or otherwise reduce or modify the Tenant's obligation to pay or reimburse Landlord for such Operating Expenses and other reimbursable items.

(i) Landlord shall notify Tenant of its determination of the Fair Market Rent (which shall be made in Landlord's sole discretion and shall in any event be not less than the Base Rent in effect as of the expiration of the Lease Term) for the Extension Term, and Tenant shall advise Landlord of any objection within [***] of receipt of Landlord's notice. Failure to respond within the [***] period shall constitute Tenant's acceptance of such Fair Market Rent. If Tenant objects, Landlord and Tenant shall commence negotiations to attempt to agree upon the Fair Market Rent within [***] of Landlord's receipt of Tenant's notice. If the parties cannot agree, each acting in good faith but without any obligation to agree, then the Lease Term shall not be extended and shall terminate on its scheduled termination date and Tenant shall have no further right hereunder or any remedy by reason of the parties' failure to agree unless Tenant or Landlord invokes the arbitration procedure provided below to determine the Fair Market Rent.

(ii) Arbitration to determine the Fair Market Rent shall be in accordance with the Real Estate Valuation Arbitration Rules of the American Arbitration Association. Unless otherwise required by state law, arbitration shall be conducted in the metropolitan area where the Project is located by a single arbitrator unaffiliated with either party. Either party may elect to arbitrate by sending written notice to the other party and the Regional Office of the American Arbitration Association within [***] after the [***] negotiating period provided in Paragraph (d), invoking the binding arbitration provisions of this paragraph. Landlord and Tenant shall each submit to the arbitrator their respective proposal of Fair Market Rent. The arbitrator must choose between the Landlord's proposal and the Tenant's proposal and may not compromise between the two or select some other amount. Notwithstanding any other provision herein, the Fair Market Rent determined by the arbitrator shall not be less than, and the arbitrator shall have no authority to determine a Fair Market Rent less than, the Base Rent in effect as of the scheduled expiration of the Lease Term. The cost of the arbitration shall be paid by Landlord if the Fair Market Rent is that proposed by Landlord and by Tenant if the Fair Market Rent is that proposed by Tenant; and shall be borne equally otherwise. If the arbitrator has not determined the Fair Market Rent as of the end of the Lease Term, Tenant shall pay 105 percent of the Base Rent in effect under the Lease as of the end of the Lease Term until the Fair Market Rent is determined as provided herein. Upon such determination, Landlord and Tenant shall make the appropriate adjustments to the payments between them.

(iii) The parties consent to the jurisdiction of any appropriate court to enforce the arbitration provisions of this Addendum and to enter judgment upon the decision of the arbitrator,

(d) Except for the Base Rent as determined above, Tenant's occupancy of the Premises during the Extension Term shall be on the same terms and conditions as are in effect immediately prior to the expiration of the initial Lease Term; provided, however, Tenant shall have no further right to extend the Lease Term pursuant to this addendum or to any allowances, credits or abatements or options to expand, contract, renew or extend the Lease.

(e) If Tenant does not send the Extension Notice within the period set forth in Paragraph (a), Tenant's right to extend the Lease Term shall automatically terminate. Time is of the essence as to the giving of the Extension Notice and the notice of Tenant's objection under Paragraph (c)(i).

(f) Landlord shall have no obligation to refurbish or otherwise improve the Premises for the Extension Term. The Premises shall be tendered on the Commencement Date of the Extension Term in "as-is" condition.

(g) If the Lease is extended for the Extension Term, then Landlord shall prepare and Tenant shall execute an amendment to the Lease confirming the extension of the Lease Term and the other provisions applicable thereto.

(h) if Tenant exercises its right to extend the term of the Lease for the Extension Term pursuant to this Addendum, the term "Lease Term" as used in the Lease, shall be construed to include, when practicable, the Extension Term except as provided in (d) above.

ADDENDUM 5

<u>CONSTRUCTION</u>

ATTACHED TO AND A PART OF THE LEASE AGREEMENT
DATED MARCH 14, 2016, BETWEEN

Prologis Limited Partnership -I
and
The RealReal Inc.

In the event of a conflict between this Addendum 5 and either Exhibit A-1 or Exhibit A-2, this Addendum 5 shall control.

(a) Landlord agrees to furnish or perform at Landlord's sole cost and expense those items of construction and those improvements (the "Initial Improvements") specified below. The Initial Improvements shall consist of certain improvements to the Warehouse Space approximately [***] excluding the Creative Space Improvements of [***] sf leaving [***] rentable square feet ("<u>Warehouse Initial Improvements</u>") and to the Office Space approximately [***] rentable square feet ("<u>Office Initial Improvements</u>"), the plans, materials/finishes for which shall be agreed upon by the parties in good faith using Prologis standard building materials/finishes. Tenant shall respond to Landlord requests for approvals or information within three (3) business days of Landlord's written requests. Any and all costs of constructing the Creative Space Improvements, as defined below, shall be at Tenant's sole cost and expense, which plans and associated construction shall be mutually approved by Landlord and Tenant (the "<u>Approved Work</u>"). Tenant shall pay for one quarter (1/4) of the Approved Work before Landlord begins construction of the Creative Space Improvements and, over the course of the remaining Creative Space Improvements work in three payments of 25% paid in advance and toward the work to be completed in accordance with the approved plans and work. The parties contemplate the Warehouse Initial Improvements shall be completed and delivered prior to completion of the Office Initial Improvements:

Warehouse Initial Improvements ("Phase 1" as set forth in Exhibit A-1):

- Repaint the building exterior, unless such work will delay delivery of the Warehouse Initial Improvements in which case the parties agree it can be moved to Phase 2

- Update landscaping, unless such work will delay delivery of the Warehouse Initial Improvements in which case the parties agree it can be moved to Phase 2.

- Re-pave and re-stripe the parking lot areas, unless such work will delay delivery of the Warehouse Initial Improvements in which case the parties agree it can be moved to Phase 2.

- Service dock equipment at dock doors.

- New Title 24 compliant warehouse lighting, if required.

- Ensure that roof has at least 5 years of useful life.

- Ensure existing skylights are secure, not leaking and have at least 5 years of useful life.

- Landlord believes the generator may not be operational or have a current permit. Landlord shall allow tenant at Tenant's sole cost and expense to investigate and refurbish if Tenant chooses to, otherwise Landlord shall leave in place.

- Ensure adequate exterior lighting-Landlord shall add additional warehouse wall packs at Landlord's discretion

- Remove observation tower.

- Repair floor in warehouse area, addressing major holes, bolts and flaking sealant.

- Remove existing offices/rooms along the West side of the warehouse where water damage has occurred up to and including the stairway leading to the second floor, leaving the remaining Northern open area that includes small restroom core that will be made functional.

- Take the film off the windows

In addition to the above (and as part of the Initial Improvements), Landlord, at Landlord's sole cost, shall provide the following additional improvements to the Premises based on mutually agreed upon plans, materials/finishes:

Office Initial Improvements ("Phase 2" as set forth in Exhibit A-1):

- Remodel the office area based on a design to be mutually agreed upon, to include new lobby, large and small conference rooms, kitchen, large employee break area (capacity of 200 people), with access to a renovated exterior patio area (renovated area cost not to exceed $[***]. Kitchen shall be a standard kitchen including but not limited to new sink, garbage disposal, dishwasher hookup, upper and lower cabinets, and new countertops, electrical outlets sufficient to support appliances and vending machines and new VCT flooring. Such work shall not include kitchen equipment or appliances.

- Offices shall be provided with new paint, new carpet, lights and minor demo.

- Elevator to 2nd floor of office, if required. This item is part of Building Upgrades and not required for Substantial Completion of the Office Initial Improvements.

- ADA compliant restrooms on each floor of the office.

Landlord shall not charge to Tenant a construction management or oversight fee for the construction of the Initial Improvements. Landlord and Tenant acknowledge that the construction project may be done with multiple permits where required, to accommodate the phasing of Tenant into the Phase Spaces as described in Section 4 of the Lease. Landlord and Tenant acknowledge that certain improvements may not be completed until a later date: elevator, seismic upgrade, fill in slab in concrete block in warehouse so it is level with existing and demolition of the front 4,000 square foot office space that is not part of the Premises ("Building Upgrades"). Landlord will complete such Building Upgrades at its sole cost and expense and use commercially reasonable efforts to coordinate access to the property for performance of such work to minimize disruption to Tenant's operations.

(b) After Landlord and Tenant have agreed upon the plans for the Initial Improvements, if Tenant shall desire any changes, Tenant shall so advise Landlord in writing and Landlord shall determine whether such changes can be made in a reasonable and feasible manner. Any and all out-of-pocket costs of reviewing any requested changes, and any and all costs of making any changes to the Initial Improvements which Tenant may request and which Landlord may agree to

shall be at Tenant's sole cost and expense and shall be paid to Landlord upon demand and before execution of the change order. Landlord and Tenant acknowledge that Tenant desires Landlord to build approximately 46,800 rentable square feet of the warehouse for Creative Space Improvements as further set forth below ("Creative Space Improvements"). Notwithstanding anything to the contrary herein, the Substantial Completion of the Creative Space Improvements is not a condition for the Commencement Date to occur, and Tenant acknowledges that the Creative Space Improvements will not be Substantially Completed prior to the Commencement Date and rent will commence on the Creative Space Improvements at the same time as the Substantial Completion of the Office Initial Improvements.

(c) Landlord shall proceed with and complete with due diligence the construction of the Initial Improvements. Landlord shall be responsible for obtaining at its sole cost and expense all necessary building permits and approvals (and, only if required at issued by the City of Brisbane with respect to the Initial Improvements and the Creative Space Improvements, then a Certificate of Occupancy) to legally permit Tenant's occupancy of the Premises, such as permit inspection card sign-offs to the extent required by the municipality. All work shall be constructed in a good and workmanlike manner, using new materials, and shall comply with all applicable Legal Requirements. Tenant shall be permitted to attend all weekly project meetings and Landlord shall use commercially reasonable efforts to advise Tenant of a change in the regular schedule of the same. Landlord shall notify Tenant in writing in advance as provided in Paragraph 4 of the lease of the date it intends to deliver such Phased Space. Substantial Completion of the Warehouse Initial Improvements, which is anticipated to occur on or about June 1, 2016, unless an earlier date is specified as the Commencement Date in this Lease or otherwise agreed to in writing between Landlord and Tenant, shall be the "Commencement Date," unless the completion of such improvements was delayed due to any act or omission of, or delay caused by, Tenant including, without limitation, Tenant's failure to approve plans, complete submittals or obtain permits within the time periods agreed to by the parties or as reasonably required by Landlord, in which case the Commencement Date shall be the date such improvements would have been completed but for the delays caused by Tenant. The Warehouse Initial Improvements (or Phased Space portions thereof) shall be deemed substantially completed ("Substantially Completed" or "Substantial Completion") when, in the opinion of the project architect (the "Architect"), the Premises (or Phased Space portions thereof) are substantially completed except for minor punch list items which do not prevent in any material way the use of the Premises (or Phased Space portions thereof) for the purposes for which they were intended. Upon Substantial Completion of any portion of the Phase Space, Landlord and Tenant shall complete a walkthrough of the Phase Space to inspect same and Landlord shall promptly prepare and deliver to Tenant a punch list for any outstanding items. In the event Tenant, its employees, agents, or contractors cause construction of such improvements to be delayed, the date of Substantial Completion shall be deemed to be the date that, in the reasonable opinion of construction manager (whether an employee or agent of Landlord or a third party construction manager) ("Construction Manager"), Substantial Completion would have occurred if such delays had not taken place. If Landlord determines any act or omission of Tenant is likely to cause a delay in Substantial Completion, Landlord shall immediately notify Tenant so that Tenant may take actions to mitigate any potential delay. Without limiting the foregoing, Tenant shall be solely responsible for delays caused by Tenant's request for any changes in the plans, Tenant's request for long lead items or Tenant's interference with the construction of the Initial Improvements, and such delays shall not cause a deferral of the Commencement Date beyond what it otherwise would have been. After the Commencement Date Tenant shall, upon

demand, execute and deliver to Landlord a letter of acceptance of delivery of the Premises. In the event of any dispute as to the Initial Improvements, including the Commencement Date, the certificate of the Construction Manager shall be conclusive absent manifest error. Absent a Tenant caused delay, Substantial Completion as to any portion of the Premises shall not be deemed to occur unless and until the Architect is confirmed Substantial Completion of the Initial Improvements or portion thereof so completed.

(d) The failure of Tenant to take possession of or to occupy the Premises shall not serve to relieve Tenant of obligations arising on the Commencement Date or delay the payment of rent by Tenant. Upon mutual Lease execution, Landlord shall allow Tenant access to the Premises for purposes of installing communication cabling and security system cabling only. Access and related work will be coordinated with Landlord's contractor so as not to interfere with or impede completion of the Initial Improvements. Subject to applicable ordinances and building codes governing Tenant's right to occupy or perform in the Premises, Tenant shall be allowed to install its tenant improvements, machinery, equipment, fixtures, or other property on the Premises during the final stages of completion of construction of the Phased Space being delivered provided that Tenant does not thereby interfere with the completion of construction or cause any labor dispute as a result of such installations, and provided further that Tenant does hereby agree to indemnify, defend, and hold Landlord harmless from any loss or damage to such property, and all liability, loss, or damage arising from any injury to the Project or the property of Landlord, its contractors, subcontractors, or materialmen, and any death or personal injury to any person or persons arising out of such installations, unless any such loss, damage, liability, death, or personal injury was caused by Landlord's negligence. Any such occupancy or performance in the Premises shall be in accordance with the provisions governing Tenant-Made Alterations and Trade Fixtures in the Lease, and shall be subject to Tenant providing to Landlord satisfactory evidence of insurance for personal injury and property damage related to such installations and satisfactory payment arrangements with respect to installations permitted hereunder. Delay in putting Tenant in possession of the Premises shall not serve to extend the term of this Lease or to make Landlord liable for any damages arising therefrom.

(e) The Premises (or applicable Phased Spaces) shall be delivered in compliance with all applicable Legal Requirements and in a clean, move-in condition (broom clean), with all Building systems in good working order, including but not limited to HVAC, roof, plumbing, mechanical, electrical, lighting and fire sprinkler systems. Landlord warrants the Initial Improvements against defects for a period of one (1) year from the Substantial Completion of each Phased Space; provided, however, that such warranty shall not be effective for any maintenance, repairs or replacements necessitated due to the misuse of, or damages caused by, Tenant, its employees, contractors, agents, subtenants, or invitees.

(f) In addition to the above Initial Improvements, Landlord, at **Tenant's** sole cost, except as indicated below, shall provide the following additional improvements to the Premises based on mutually agreed upon plans, materials/finishes and Tenant's final approval of all associated costs (the "Creative Space Improvements") where such improvements are not a part of the Initial Improvements, which improvements will be targeted for completion on or before September 1, 2016 or as otherwise mutually agreed by Landlord and Tenant:

Creative Space Improvements:

A

Warehouse Floor leveling Landlord shall pay for up to $[***] towards Creative Space Improvements (previously allocated to warehouse insulation for the Warehouse Initial Improvements).

Inspection/Processing buildout
Roof Insulation
Dock glassed in windows
Design & Permits

B

Electrical
VCT
Ventilation as necessary to allow for required permits
Landlord will install standard warehouse lights
Permits

C

Expanded Restroom Core
Existing conference rooms shall be upgraded at Landlord's sole cost and expense, which shall include new carpet, appropriate lighting and paint
Breakroom including upper and lower cabinets, countertop, plumbing, sink, and electrical
HVAC

Tenant will require access to the roof for installation and maintenance of IT and Wi-Fi equipment

Any and all costs of constructing the Creative Space Improvements shall be at Tenant's sole cost and expense, which plans and associated construction shall be mutually approved by Landlord and Tenant, as set forth above.

EXHIBIT <u>A</u>

<u>SITE PLAN</u>

ATTACHED TO AND A PART OF THE LEASE AGREEMENT
DATED MARCH 14, 2016 BETWEEN

Prologis Limited Partnership -I
And
The RealReal Inc.

EXHIBIT A-1

<u>INITIAL IMPROVEMENTS – WAREHOUSE/OFFICE</u>

ATTACHED TO AND A PART OF THE LEASE AGREEMENT
DATED MARCH 14, 2016 BETWEEN

Prologis Limited Partnership -I
and
The RealReal Inc.

EXHIBIT A-2

<u>CREATIVE SPACE IMPROVEMENTS</u>

ATTACHED TO AND A PART OF THE LEASE AGREEMENT
DATED MARCH 14, 2016 BETWEEN

Prologis Limited Partnership -I
and
The RealReal Inc.

EXHIBIT B

PROJECT RULES AND REGULATIONS

ATTACHED TO AND A PART OF THE LEASE AGREEMENT
DATED MARCH 14, 2016 BETWEEN

Prologis Limited Partnership -I
and
The RealReal Inc.

Rules and Regulations

1. The sidewalk, entries, and driveways of the Project shall not be obstructed by Tenant, or its agents, or used by them for any purpose other than ingress and egress to and from the Premises.

2. Tenant shall not place any objects, including antennas, outdoor furniture, etc., in the parking areas, landscaped areas or other areas outside of its Premises, or on the roof of the Project.

3. Except for seeing-eye dogs, no animals shall be allowed in the offices, halls, or corridors in the Project.

4. Tenant shall not disturb the occupants of the Project or adjoining buildings by the use of any radio or musical instrument or by the making of loud or improper noises.

5. If Tenant desires telegraphic, telephonic or other electric connections in the Premises, Landlord or its agent will direct the electrician as to where and how the wires may be introduced; and, without such direction, no boring or cutting of wires will be permitted. Any such installation or connection shall be made at Tenant's expense.

6. Tenant shall not install or operate any steam or gas engine or boiler, or other mechanical apparatus in the Premises, except as specifically approved in the Lease. The use of oil, gas or inflammable liquids for heating, lighting or any other purpose is expressly prohibited. Explosives or other articles deemed extra hazardous shall not be brought into the Project.

7. Parking any type of recreational vehicles is specifically prohibited on or about the Project. Further, parking any type of trucks, trailers or other vehicles in the Building is specifically prohibited. In the event that a vehicle is disabled, it shall be removed within 48 hours. There shall be no "For Sale" or other advertising signs on or about any parked vehicle. All vehicles shall be parked in the designated parking areas in conformity with all signs and other markings. All parking will be open parking, and no reserved parking, numbering or lettering of individual spaces will be permitted except as specified by Landlord or in the Lease.

8. Tenant shall maintain the Premises free from rodents, insects and other pests.

9. Landlord reserves the right to exclude or expel from the Project any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs or who shall in any manner do any act in violation of the Rules and Regulations of the Project.

10. Tenant shall not cause any unnecessary labor by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness. Landlord shall not be responsible to Tenant for any loss of property on the Premises, however occurring, or for any damage done to the effects of Tenant by the janitors or any other employee or person.

11. Tenant shall give Landlord prompt notice of any defects in the water, lawn sprinkler, sewage, gas pipes, electrical lights and fixtures, heating apparatus, or any other service equipment affecting the Premises.

12. Tenant shall not permit storage outside the Premises, or dumping of waste or refuse or permit any harmful materials to be placed in any drainage system or sanitary system in or about the Premises.

13. All moveable trash receptacles provided by the trash disposal firm for the Premises must be kept in the trash enclosure areas, if any, provided for that purpose.

14. No auction, public or private, will be permitted on the Premises or the Project.

15. No awnings shall be placed over the windows in the Premises except with the prior written consent of Landlord.

16. The Premises shall not be used for lodging, sleeping or cooking or for any immoral or illegal purposes or for any purpose other than that specified in the Lease. No gaming devices shall be operated in the Premises.

17. Tenant shall ascertain from Landlord the maximum amount of electrical current which can safely be used in the Premises, taking into account the capacity of the electrical wiring in the Project and the Premises and the needs of other tenants, and shall not use more than such safe capacity. Landlord's consent to the installation of electric equipment shall not relieve Tenant from the obligation not to use more electricity than such safe capacity.

18. Tenant assumes full responsibility for protecting the Premises from theft, robbery and pilferage.

19. Tenant shall not install or operate on the Premises any machinery or mechanical devices of a nature not directly related to Tenant's ordinary use of the Premises and shall keep all such machinery free of vibration, noise and air waves which may be transmitted beyond the Premises.

20. Tenant shall not permit smoking in the office areas of the Premises.

21. No racking or storage shall occur within 12-inches of demising walls, office and warehouse separation walls, exterior walls, and columns.

EXHIBIT C

FORM OF COMMENCEMENT DATE CERTIFICATE

ATTACHED TO AND PART OF THE LEASE AGREEMENT
DATED MARCH 14, 2016 BETWEEN

Prologis Limited Partnership -I
and
The RealReal Inc.

COMMENCEMENT DATE CERTIFICATE

_____, 201_

Notice Contact Name
Company Name
Notice Street Address
City, State Zip Code

RE:   Lease dated Date between Customer & Owner for Premises Address

Dear Salutation Notice Contact Last Name:

Welcome to your new facility. We would like to confirm the terms of the above referenced lease agreement:

| | |
|---|---|
| Lease Commencement Date: | Date |
| Lease Expiration Date: | Date |
| Rental Commencement Date: | Date |

We are pleased to welcome you as a customer of Prologis and look forward to working with you. Please indicate your agreement with the above changes to your lease by signing and returning the enclosed copy of this letter to me. If I can be of service, please do not hesitate to contact me.

Sincerely,

Property Manager Name
Title

Accepted by:    Accepted by                                        Date:   Date
                By: _____
                Printed: _____
                Title: _____

EXHIBIT D

<u>LETTER OF CREDIT</u>

Prologis Limited Partnership -I
and
The RealReal Inc.

IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

DATE: _____

BENEFICIARY:                                          APPLICANT:

4545 Airport Way
Denver, Co 80239
Attn: Legal Department

BENEFICIARY:

By order of our client            , as tenant ("**Tenant**") in that certain lease agreement dated        , 20      by and between Beneficiary and Tenant (the "**Lease Agreement**"), we hereby establish this Irrevocable Transferable Letter Of Credit No.        in your favor for an amount up to but not exceeding the aggregate sum of          and no/100 U.S. Dollars ($          ) (as reduced from time to time in accordance with the terms hereof, the "**Letter Of Credit Amount**"), effective immediately, and expiring on the close of business one year from the date hereof at our office at              Attn:                    unless renewed as hereinafter provided.

Funds under this Letter Of Credit are available to you on or prior to the expiry date against presentation by you of your (i) sight drafts drawn on us in the form of **Annex 1** hereto, indicating this letter of credit number and (ii) request in the form of **Annex 2** hereto (such sight draft and request, together referred to as a "**Drawing Request**"), sight draft(s), completed and signed by an agent of the Beneficiary. Presentation of your Drawing Request may be made by you to us at the address set forth above or may be made by facsimile transmission, to the following facsimile number                    . You may present to us one or more Drawing Request from time to time prior to the expiry date in an aggregate amount not to exceed the Letter Of Credit Amount then in effect (it being understood that the honoring by us of each drawing request shall reduce the Letter Of Credit Amount then in effect). The proceeds of any draw under this Letter of Credit shall be remitted to an account designated by the Beneficiary in the Drawing Request.

This Letter Of Credit will be automatically renewed for a one-year period upon the expiration date set forth above and upon each anniversary of such date, unless at least sixty (60) days prior to such expiration date, or prior to any anniversary of such date, we notify both you and the applicant in writing by certified mail that we elect not to so renew the Letter Of Credit. In the event that we elect not to renew the Letter Of Credit, you may immediately draw down on the full amount of the Letter Of Credit by presentation of your drawing request. Further, in the event that the Applicant commences any proceeding for relief as defined in the Lease Agreement, you may immediately draw down on the full amount of the Letter Of Credit by presentation of your drawing request.

This Letter Of Credit sets forth in full the terms of our undertaking and such undertaking shall not in any way be modified, amended or amplified by reference to any document or instrument referred to herein or in which this Letter Of Credit is referred to or to which this Letter Of Credit relates, and no such reference shall be deemed to incorporate herein by reference any document or instrument.

All bank charges and commission incurred in this transaction are for the Applicant's account.

This Letter Of Credit is transferable by you and your successors and assigns any number of times in its entirety and not in part, to any successor of the Beneficiary's interests in the Lease Agreement, but only by delivery to us of a Notice Of Transfer in the form of **Annex 3** hereto. Our transfer fee will be payable by the Applicant.

We hereby agree with the drawers, endorsers, and bona fide holders of drafts drawn under and in compliance with the terms of this Letter Of Credit that such drafts will be duly honored upon presentation to the drawee from our own funds and not the funds of the Applicant and shall be available to such drawers, endorsers, and bona fide holders, as the case may be, on or before 4:00 p.m.,                time, on the business day (defined below) next following the date on which such drafts are received by us. "Business Day" shall mean any day which is not a Saturday, Sunday or day on which we are required or authorized by law to be closed in                .

To the extent not inconsistent with the express terms hereof, this Letter Of Credit shall be governed by, and construed in accordance with, the terms of the International Standby Practices 1998 Publication 590 ("ISP 98") and as to matters not governed by the ISP 98, this Letter Of Credit shall be governed by and construed in accordance with the laws of the State of                .

Very truly yours,

_____          _____
Name:                                       Name:
Title:                                      Title:

**Annex 1**
Sight Draft

Name & address of issuing bank _____, 20 __

For value received, at sight pay to the order of name of Beneficiary, the sum of amount in words amount in figures United States Dollars drawn under Irrevocable Transferable Letter Of Credit No.          dated          , 20   .

                                        Beneficiary

                                        By:      _____
                                        Name:    _____
                                        Title:   _____

**Annex 2**
Drawing Request

_____, 20__

Name & address of bank

RE: Irrevocable Transferable Letter Of Credit No.                     (the "**Letter Of Credit**")

The undersigned (the "**Beneficiary**"), hereby certifies to                     (the "**Issuer**") that:

(A)    The Beneficiary is making a request for payment in lawful currency of the United States Of America under Irrevocable Transferable Letter Of Credit No.       (the "**Letter Of Credit**") in the amount of $              .

(B)    The Letter Of Credit Amount (as defined in the Letter Of Credit) as of the date hereof and prior to payment of the amount demanded in this drawing request is $              . The amount requested by this drawing request does not exceed the Letter Of Credit Amount.

(C)    Demand is made for payment under the Letter Of Credit as a result of the occurrence and continuation of an event of default under the Lease Agreement (as defined in the Letter Of Credit) or as a result of non-renewal of the Letter Of Credit or as a result of the Applicant or Tenant (as defined in said Lease Agreement) commencing a proceeding of relief (as defined in said Lease Agreement).

Please wire the proceeds of the drawing to the following account at the financial institution indicated below:

Unless otherwise defined, all capitalized terms used herein have the meanings provided in, or by reference in, the Letter Of Credit.

IN WITNESS WHEREOF, the undersigned has duly executed and delivered this drawing request as of the day of         , 20  .

Beneficiary

By:        _____
Name:    _____
Title:     _____

**Exhibit 10.19**

***Portions of this exhibit have been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.**

HARTZ ENTERPRISE LLC

Landlord,

and

THEREALREAL, INC.

Tenant

LEASE

Premises

60 ENTERPRISE AVENUE
SECAUCUS, NEW JERSEY

TABLE OF CONTENTS

| ARTICLES | PAGE |
|---|---|
| ARTICLE 1 - DEFINITIONS | 1 |
| ARTICLE 2 - DEMISE AND TERM | 6 |
| ARTICLE 3 - RENT | 6 |
| ARTICLE 4 - USE OF DEMISED PREMISES | 7 |
| ARTICLE 5 - PREPARATION OF DEMISED PREMISES | 9 |
| ARTICLE 6 - TAX AND OPERATING EXPENSE PAYMENTS | 11 |
| ARTICLE 7 - DEVELOPMENT COMMON AREAS | 13 |
| ARTICLE 8 - SECURITY | 13 |
| ARTICLE 9 - SUBORDINATION | 15 |
| ARTICLE 10 - QUIET ENJOYMENT | 16 |
| ARTICLE 11 - ASSIGNMENT, SUBLETTING AND MORTGAGING | 16 |
| ARTICLE 12 - COMPLIANCE WITH LAWS | 20 |
| ARTICLE 13 - INSURANCE AND INDEMNITY | 21 |
| ARTICLE 14 - RULES AND REGULATIONS | 23 |
| ARTICLE 15 - ALTERATIONS AND SIGNS | 24 |
| ARTICLE 16 - LANDLORD'S AND TENANT'S PROPERTY | 25 |
| ARTICLE 17 - REPAIRS AND MAINTENANCE | 26 |
| ARTICLE 18 - UTILITY CHARGES | 28 |
| ARTICLE 19 - ACCESS, CHANGES AND NAME | 30 |
| ARTICLE 20 - MECHANICS' LIENS AND OTHER LIENS | 31 |
| ARTICLE 21 - NON-LIABILITY AND INDEMNIFICATION | 31 |
| ARTICLE 22 - DAMAGE OR DESTRUCTION | 32 |
| ARTICLE 23 - EMINENT DOMAIN | 34 |
| ARTICLE 24 - SURRENDER | 35 |
| ARTICLE 25 - CONDITIONS OF LIMITATION | 35 |
| ARTICLE 26 - RE-ENTRY BY LANDLORD | 36 |
| ARTICLE 27 - DAMAGES | 37 |
| ARTICLE 28 - AFFIRMATIVE WAIVERS | 39 |
| ARTICLE 29 - NO WAIVERS | 39 |

i

TABLE OF CONTENTS
(continued)

| ARTICLES | PAGE |
|---|---|
| ARTICLE 30 - CURING TENANT'S DEFAULTS | 39 |
| ARTICLE 31 - BROKER | 40 |
| ARTICLE 32 - NOTICES | 40 |
| ARTICLE 33 - ESTOPPEL CERTIFICATES | 41 |
| ARTICLE 34 - ARBITRATION | 41 |
| ARTICLE 35 - MEMORANDUM OF LEASE | 42 |
| ARTICLE 36 - MISCELLANEOUS | 42 |

EXHIBITS

Exhibit A - Description of Land
Exhibit B - Floor Plan
Exhibit C - Landlord's Workletter
Exhibit D - Rules and Regulations
Exhibit E - Letter of Credit
Exhibit F - Tenant's Work
Exhibit G - Form of Subordination, Attornment and Non-Disturbance Agreement

SCHEDULES

Schedule 1- Fixed Rent
Schedule 2 - Operating Expense Exclusions

ii

LEASE, dated June 5, 2018, between **HARTZ ENTERPRISE LLC**, a Delaware limited liability company, having an office at 400 Plaza Drive, P.O. Box 1515, Secaucus, New Jersey 07096-1515 ("Landlord"), and **THE REALREAL, INC.**, a Delaware corporation, having an office at 55 Francisco Street, Suite 600, San Francisco, CA 94124 ("Tenant").

ARTICLE 1 - DEFINITIONS

1.01. As used in this Lease (including in all Exhibits and any Riders attached hereto, all of which shall be deemed to be part of this Lease) the following words and phrases shall have the meanings indicated:

A. Advance Rent: $[***].

B. Additional Charges: All amounts that become payable by Tenant to Landlord hereunder other than the Fixed Rent.

C. Architect: Studio 1200 LLC.

D. Broker: Newmark Knight Frank.

E. Building: The building or buildings located on the Land and known as 60 Enterprise Avenue, Secaucus, NJ.

F. Building Fraction: The fraction, the numerator of which is the Floor Space of the Building ([***] square feet) and the denominator of which is the aggregate Floor Space of the buildings in the Development. If the aggregate Floor Space of the buildings in the Development shall be changed due to any construction or alteration, the denominator of the Building Fraction shall be increased or decreased to reflect such change.

G. Business Days: All days except Saturdays, Sundays, days observed by the federal or state government as legal holidays.

H. Business Hours: Generally customary daytime business hours, but not before 9:00 A.M. or after 6:00 P.M.

I. Calendar Year: Any twelve-month period commencing on a January L

J. Commencement Date: The earlier of (a) the date on which both: (i) the Demised Premises shall be Ready for Occupancy, and (ii) actual possession of the Demised Premises shall have been delivered to Tenant provided that Landlord delivers written notice to Tenant seven (7) days prior to the date the Landlord intends to deliver actual possession of the Demised Premises to the Tenant, or (b) the date Tenant, or anyone claiming under or through Tenant, first occupies the Demised Premises or any part thereof for any purpose other than the performance of Tenant's Work, including without limitation early access to the Demised Premises pursuant to Section 5.02 hereof.

K. Common Areas: All areas, spaces and improvements in the Building and on the Land which Landlord makes available from time to time for the common use and benefit of the tenants and occupants of the Building and which are not exclusively available for use by a single tenant or occupant, including, without limitation, parking areas, roads, walkways, sidewalks, landscaped and planted areas, community rooms, if any, the managing agent's office, if any, and public rest rooms, if any.

L. Demised Premises: The space that is outlined in red on the floor plan attached hereto as Exhibit B. The Demised Premises contains [***] square feet of Floor Space.

M. Development: All land and improvements now existing or hereafter constructed, located south of Route 3, east of the Hackensack River, west of County Avenue and north of Castle Road, that are owned or managed from time to time by Landlord or any entity controlling Landlord, controlled by Landlord or under common control with Landlord (any such entity, a "Landlord Affiliate"). As used herein, the term "control" means (i) the ownership of a majority of the issued and outstanding beneficial ownership interests (stock, partnership or limited liability membership interests) in the controlled entity and (ii) the power to control the day to day business operations of the controlled entity as well as all transactions of the controlled entity that are outside the normal course of the controlled entity's business.

N. Development Common Areas: The roads and bridges that from time to time service and provide access to the Development for the common use of the tenants, invitees, occupants of the Development, that are maintained by Landlord or any Landlord Affiliate.

O. Expiration Date: June 30, 2029. However, if the Term is extended by Tenant's effective exercise of Tenant's right, if any, to extend the Term, the "Expiration Date" shall be changed to the last day of the latest extended period as to which Tenant shall have effectively exercised its right to extend the Term. For the purposes of this definition, the earlier termination of this Lease shall not affect the "Expiration Date."

P. Fixed Rent: An amount at the following annual rates multiplied by the Floor Space of the Demised Premises: [***] from the Commencement Date until June 30, 2020, [***] from July 1, 2020 until June 30, 2021, [***] from July 1, 2021 until June 30, 2022, [***] from July 1, 2022 until June 30, 2023, [***] from July 1, 2023 until the June 30, 2024, [***] from July 1, 2024 until June 30, 2025, [***] from July 1, 2025 until June 30, 2026, [***] from July 1, 2026 until June 30, 2027, [***] from July 1, 2027 until June 30, 2028, and [***] from July 1, 2028 until the Expiration Date. It is intended that the Fixed Rent shall be an absolutely net return to Landlord throughout the Term, free of any expense, charge or other deduction whatsoever, with respect to the Demised Premises, the Building, the Land and/or the ownership, leasing, operation, management, maintenance, repair, rebuilding, use or occupation thereof, or any portion thereof, with respect to any interest of Landlord therein, except as may otherwise expressly be provided in this Lease. A schedule setting forth the annual amount of the Fixed Rent and the monthly installments is set forth as Schedule 1 to this Lease.

2

Q. Floor Space: As to the Building, the sum of the floor area stated in square feet bounded by the exterior faces of the exterior walls. Any reference to Floor Space of a building shall mean the floor area of all leasable levels or stories of such building, excluding any roof, except such portion thereof (other than cooling towers, elevator penthouses, mechanical rooms, chimneys and staircases, entrances and exits) as is permanently enclosed, and including any interior basement level or mezzanine area not occupied or used by a tenant on a continuing or repetitive basis, and any mechanical room, enclosed or interior truck dock, and areas used by Landlord for storage, for housing meters and/or other equipment or for other purposes. Any reference to the Floor Space is intended to refer to the Floor Space of the entire area in question irrespective of the Person(s) who may be the owner(s) of all or any part thereof.

R. Guarantor: None.

S. Insurance Requirements: Rules, regulations, orders and other requirements of the applicable board of underwriters and/or the applicable fire insurance rating organization and/or any other similar body performing the same or similar functions and having jurisdiction or cognizance over the Land and Building, whether now or hereafter in force.

T. Land: The land described on Exhibit A, upon which the Building is located.

U. Landlord's Work: The materials and work to be furnished, installed and performed by Landlord at its expense in accordance with the provisions of Exhibit C.

V. Legal Requirements: Laws and ordinances of all federal, state, county, and municipal governments, and rules, regulations, orders and directives of all departments, subdivisions, bureaus, agencies or offices thereof, and of any other governmental, public or quasi-public authorities having jurisdiction over the Land and Building, whether now or hereafter in force, including, but not limited to, those pertaining to environmental matters.

W. Mortgage: A mortgage and/or a deed of trust.

X. Mortgagee: A holder of a mortgage or a beneficiary of a deed of trust.

Y. Operating Expenses: The sum of the following: (1) the cost and expense (whether or not within the contemplation of the parties) for the repair, replacement, maintenance, security, insurance and operation of the Building and Land, and (2) the Building Fraction of the sum of (a) the actual, reasonable, out-of-pocket cost and expense for the repair, replacement, maintenance, policing, insurance and operation of the Development Common Areas; (b) the Real Estate Taxes, if any, attributable to the Development Common Areas. The "Operating Expenses" shall, include, without limitation, the following: (i) the cost for rent, casualty, liability, boiler and fidelity insurance, (ii) if an independent managing agent is employed by Landlord, the fees payable to such agent (provided the same are competitive with the fees payable to independent managing agents of comparable facilities), (iii) costs and expenses incurred for legal, accounting and other professional services (including, but not limited to, costs and expenses for in-house or staff legal counsel or outside counsel) at rates not to exceed the reasonable and customary charges for any such services as would be imposed in an arms length third party agreement for such services, plus (iv) if Landlord (or its affiliate) is itself managing the Building and has not employed an independent third party for such management, an amount equal to [***] percent of the resulting total of all of the foregoing items making up Operating Expenses. (For clarification, no such administration fee will be charged on the Roof Supplement, as defined in Section R9.) All

3

items included in Operating Expenses shall be determined in accordance with generally accepted accounting principles consistently applied. In no event shall the Operating Expenses include any of the costs and expenses set forth on Schedule 2 annexed hereto and made a part hereof. Notwithstanding anything herein contained to the contrary, to the extent the Operating Expenses include an expenditure for a capital improvement, as defined under generally accepted accounting principles, Tenant shall only be responsible for that portion of the cost of said capital improvement as is determined by amortizing said cost over the useful life of the capital improvement; and an annual amount equal to the amortized cost of the capital improvement plus an interest component equal to the Prime Rate of JPMorgan Chase Bank plus four percent per annum shall be then added to the Operating Expenses and paid by Tenant over the then remaining Term (or extension thereof) of the Lease.

Z. Permitted Uses: Warehousing and distribution of non-hazardous materials, preparation of inventory for distribution, photography in connection with inventory preparation and sales promotion, light assembly and ancillary offices.

AA. Person: A natural person or persons, a partnership, a corporation, or any other form of business or legal association or entity.

BB. Ready for Occupancy: The condition of the Demised Premises when for the first time the Landlord's Work shall have been substantially completed and a temporary or permanent Certificate of Occupancy or a continued Certificate of Occupancy shall have been issued permitting the use of the Demised Premises for the Permitted Uses. The Landlord's Work shall be deemed substantially completed notwithstanding the fact that minor or insubstantial details of construction, mechanical adjustment or decoration remain to be performed, the noncompletion of which does not materially interfere with Tenant's use of the Demised Premises.

CC. Real Estate Taxes: The real estate taxes, assessments, special assessments, sewer rents, water charges, and all other similar charges and impositions imposed upon the Building and Land by any federal, state, municipal or other governments or governmental bodies or authorities, and any actual, reasonable, out-of-pocket expenses incurred by Landlord in contesting such taxes or assessments and/or the assessed value of the Building and Land, which expenses shall be allocated to the period of time to which such expenses relate. If at any time during the Term the methods of taxation prevailing on the date hereof shall be altered so that in lieu of, or as an addition to or as a substitute for, the whole or any part of such real estate taxes, assessments and special assessments now imposed on real estate there shall be levied, assessed or imposed (a) a tax, assessment, levy, imposition, license fee or charge wholly or partially as a capital levy or otherwise on the rents received therefrom, or (b) any other such additional or substitute tax, assessment, levy, imposition or charge, then all such taxes, assessments, levies, impositions, fees or charges or the part thereof so measured or based shall be deemed to be included within the term "Real Estate Taxes" for the purposes hereof. In no event shall the Real Estate Taxes include any impact fee rising due to any Landlord's Work, or any death taxes, excess profit taxes, franchise taxes or any taxes imposed or measured on or by the net income or revenue of Landlord or any of Landlord's Affiliates from the operation of the Demised Premises and/or the Development Common Areas.

DD. Rent: The Fixed Rent and the Additional Charges.

4

EE. Rules and Regulations: The reasonable rules and regulations that may be promulgated by Landlord from time to time, which may be reasonably changed by Landlord from time to time upon not less than thirty (30) days prior written notice to Tenant. The Rules and Regulations now in effect are attached hereto as Exhibit D.

FF. Security Deposit: Such amount as Tenant has deposited or hereinafter deposits with Landlord as security under this Lease. Tenant is required to deposit the sum of $[***] with Landlord as security hereunder as of the date hereof.

GG. Successor Landlord: As defined in Section 9.03.

HH. Superior Lease: Any lease to which this Lease is, at the time referred to, subject and subordinate.

II. Superior Lessor: The lessor of a Superior Lease or its successor in interest, at the time referred to.

JJ. Superior Mortgage: Any Mortgage to which this Lease is, at the time referred to, subject and subordinate.

KK. Superior Mortgagee: The Mortgagee of a Superior Mortgage at the time referred to.

LL. Tenant's Fraction: The Tenant's Fraction shall mean the fraction, the numerator of which shall be the Floor Space of the Demised Premises and the denominator of which shall be the Floor Space of the Building (52.5%). If the size of the Demised Premises or the Building shall be changed from the initial size thereof, due to any taking, any construction or alteration work or otherwise, the Tenant's Fraction shall be changed to the fraction, the numerator of which shall be the Floor Space of the Demised Premises and the denominator of which shall be the Floor Space of the Building. In the event Landlord determines that Tenant's utilization of any item of Operating Expenses exceeds the fraction referred to above, Tenant's Fraction with respect to such item shall, at Landlord's option, mean the percentage of any such item (but not less than the fraction referred to above) which Landlord reasonably estimates as Tenant's proportionate share thereof. Landlord shall deliver notice of the change in the fraction referred to above promptly upon becoming aware of the appropriateness of such change.

MM. Tenant's Property: As defined in Section 16.02.

NN. Tenant's Work: The facilities, materials and work which may be undertaken by or for the account of Tenant (other than the Landlord's Work) to equip, decorate and furnish the Demised Premises for Tenant's occupancy, including but not limited to those outlined in Exhibit F attached hereto and made a part hereof.

OO. Term: The period commencing on the Commencement Date and ending at 11:59 p.m. of the Expiration Date, but in any event the Term shall end on the date when this Lease is earlier terminated.

5

PP. Unavoidable Delays: A delay arising from or as a result of a strike, lockout, or labor difficulty, explosion, sabotage, accident, riot or civil commotion, act of war, fire or other catastrophe, Legal Requirement or an act of the other party and any cause beyond the reasonable control of that party, provided that the party asserting such Unavoidable Delay has exercised its best efforts to minimize such delay.

ARTICLE 2 - DEMISE AND TERM

2.01. Landlord hereby leases to Tenant, and Tenant hereby hires from Landlord, the Demised Premises, for the Term. This Lease is subject to (a) any and all existing encumbrances, conditions, rights, covenants, easements, restrictions and rights of way, of record, and other matters of record, provided that no such encumbrances, conditions, rights, covenants, easements, restrictions and rights of way, of record shall adversely impact ingress to or egress from the Building or the Demised Premises in any material manner or otherwise adversely impact the use and enjoyment of the Demised Premises by Tenant in any material manner, and is subject to applicable zoning and building laws, regulations and codes, and such matters as may be disclosed by an inspection or survey, and (b) easements now or hereafter created by Landlord in, under, over, across and upon the Land for access, sewer, water, electric, gas and other utility lines and services now or hereafter installed, provided that no such easement shall adversely impact ingress to or egress from the Building or the Demised Premises in any material manner or otherwise adversely impact the use and enjoyment of the Demised Premises by Tenant in any material manner. Promptly following the Commencement Date, the parties hereto shall enter into an agreement in form and substance reasonably satisfactory to Landlord and Tenant setting forth the Commencement Date; provided, however, that the failure to enter into such agreement shall not affect the Commencement Date or any of the party's' rights or obligations pursuant to this Lease.

ARTICLE 3 - RENT

3.01. Commencing on the Commencement Date, Tenant shall pay the Fixed Rent in equal monthly installments in advance on the first day of each and every calendar month during the Term (except that Tenant shall pay, upon the execution and delivery of this Lease by Tenant, the Advance Rent, to be applied against the first installment or installments of Fixed Rent becoming due under this Lease). If the Commencement Date occurs on a day other than the first day of a calendar month, the Fixed Rent for the partial calendar month at the commencement of the Term shall be prorated.

3.02. The Rent shall be paid in lawful money of the United States to Landlord at its office, or such other place, or Landlord's agent, as Landlord shall designate by notice to Tenant. Tenant shall pay the Rent promptly when due without notice or demand therefor and without any abatement, deduction or setoff for any reason whatsoever, except as may be expressly provided in this Lease. If Tenant makes any payment to Landlord by check, same shall be by check of Tenant and Landlord shall not be required to accept the check of any other Person, and any check received by Landlord shall be deemed received subject to collection. If any check is mailed by Tenant, Tenant shall post such check in sufficient time prior to the date when payment is due so that such check will be received by Landlord on or before the date when payment is due. Tenant shall assume the risk of lateness or failure of delivery of the mails, and no lateness or failure of the mails will excuse Tenant from its obligation to have made the payment in question when required under this Lease.

6

3.03. No payment by Tenant or receipt or acceptance by Landlord of a lesser amount than the correct Rent shall be deemed to be other than a payment on account, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance or pursue any other remedy in this Lease or at law provided.

3.04. If Tenant is in arrears in payment of Rent, Tenant waives Tenant's right, if any, to designate the items to which any payments made by Tenant are to be credited, and Landlord may apply any payments made by Tenant to such items as Landlord sees fit, irrespective of and notwithstanding any designation or request by Tenant as to the items to which any such payments shall be credited.

3.05. In the event that any installment of Rent due hereunder shall be overdue, a "Late Charge" equal to [***] or the maximum rate permitted by law, whichever is less for Rent so overdue may be charged by Landlord for each month or part thereof that the same remains overdue ("Late Payment Rate"). In the event that any check tendered by Tenant to Landlord is returned for insufficient funds, Tenant shall pay to Landlord, in addition to the charge imposed by the preceding sentence, a fee of $[***]. Any such Late Charges if not previously paid shall, at the option of the Landlord, be added to and become part of the next succeeding Rent payment to be made hereunder. Notwithstanding the foregoing and without waiving any other rights of Landlord in this Agreement, the Late Charge shall be waived for the first time in each calendar year that the Tenant fails to make a payment of Rent on a timely basis, provided such late payment is received by Landlord within seven (7) days of the date that such payment of Rent is due and owing and provided further that Tenant is in compliance with all other terms of the Lease.

3.06. It is intended that, except as otherwise expressly provided in this Lease to the contrary, the Fixed Rent shall be an absolutely net return to Landlord throughout the Term, free of any expense, charge or other deduction whatsoever, with respect to the Demised Premises, the Building, the Land and/or the ownership, leasing, operation, management, maintenance, repair, rebuilding, use or occupation thereof, or any portion thereof, with respect to any interest of Landlord therein.

ARTICLE 4 - USE OF DEMISED PREMISES

4.01. Tenant shall use and occupy the Demised Premises for the Permitted Uses, and Tenant shall not use or permit or suffer the use of the Demised Premises or any part thereof for any other purpose.

4.02. Subject to Landlord's obligation to perform Landlord's Work and deliver to Tenant a Certificate of Continued Occupancy, and except as otherwise expressly provided in this Lease with respect to Landlord's obligations, if any, to perform alterations and improvements required by Legal Requirements or otherwise, any governmental license or permit, including a certificate of occupancy or certificate of continued occupancy (a "Certificate of Occupancy"), shall be required for the proper and lawful conduct of Tenant's business in the Demised Premises or any

7

part thereof, Tenant shall duly procure and thereafter maintain such license or permit and submit the same to Landlord for inspection; provided however, that so long as no actions by or under the direction of Tenant prevent Landlord from obtaining same, Landlord shall, at its sole cost and expense and without including these costs and expenses in Operating Expenses, pursue and obtain a permanent Certificate of Occupancy and perform all work required in order to obtain the permanent Certificate of Occupancy. Tenant shall at all times comply with the terms and conditions of each such license or permit. Tenant shall not at any time use or occupy, or suffer or permit anyone under Tenant's control to use or occupy the Demised Premises, or do or permit anything to be done in the Demised Premises, in any manner which (a) violates the Certificate of Occupancy for the Demised Premises or for the Building; (b) causes or is liable to cause injury to the Building or any equipment, facilities or systems therein; (c) constitutes a violation of the Legal Requirements or Insurance Requirements; (d) impairs the character, reputation or appearance of the Building; (e) impairs the proper and economic maintenance, operation and repair of the Building and/or its equipment, facilities or systems, or (f) materially inconveniences other tenants or occupants of the Building.

4.03. Tenant shall not conduct any warehouse sale at the Demised Premises without Landlord's prior written consent. Provided Tenant is not in default of its monetary or any other material non-monetary obligations under this Lease beyond applicable notice and cure periods, Landlord agrees not to unreasonably withhold its consent to not more than three (3) warehouse sales in any consecutive twelve (12) month period. Tenant shall pay to Landlord as an Additional Charge, an amount equal to [***] of Gross Receipts (as hereinafter defined) from any warehouse sale conducted at the Demised Premises, payable within fifteen (15) days after the warehouse sale. Tenant shall comply, at Tenant's sole cost and expense with all Legal Requirements with respect to any warehouse sale. Any warehouse sale conducted by Tenant shall be not more than four (4) consecutive days in duration. As used herein Gross Receipts shall mean the dollar aggregate of: (a) the actual sales price of all goods and merchandise sold, leased or licensed and the charges for all services performed by Tenant or otherwise in connection with all business conducted at such warehouse sale, whether made for cash, by check, credit or otherwise, without reserve or deduction for inability or failure to collect the same, including, without limitation, sales and services (i) where the orders therefor originate at or are accepted at or from the Demised Premises, whether delivery or performance thereof is made at or from the Demised Premises or any other place, it being understood that all sales made and orders received at or from the Demised Premises shall be deemed to have been made and completed therein even though the orders are fulfilled elsewhere or the payments of account are transferred to some other office for collection, and (ii) where the orders therefor result from solicitation off the Demised Premises but which are conducted by personnel operating from or reporting to or under the control or supervision of any person at the Demised Premises, and (b) all monies or other things of value received by Tenant from its operations at the Demised Premises (which are not excluded from Gross Receipts by the next succeeding sentence) including all finance charges, cost of gift or merchandise certificates and all deposits not refunded to customers. Gross Receipts shall not include (x) the exchange of merchandise between stores of Tenant where such exchange is made solely for the convenient operation of Tenant's business and neither for the purpose of depriving Landlord of the benefits of a sale which would otherwise be made at or from the Demised Premises nor for the purpose of consummating a sale which has been theretofore made at or from the Demised Premises, or (y) the amount of any city, county, state or federal sales tax, luxury tax or excise tax on sales if the tax is added to the selling price and separately stated and actually paid to

8

the taxing authority by Tenant; provided, however, no franchise or capital stock tax and no income or similar tax based upon income, profits or Gross Receipts shall be deducted from Gross Receipts in any event whatsoever. Cash or credit refunds made upon transactions included within the Gross Receipts, but not exceeding the selling price of merchandise returned by the purchaser and accepted by Tenant, shall be deducted from the Gross Receipts for the period when such refunds are made. Each charge or sale upon installment or credit or layaway, so called, shall be treated as a sale for the full price irrespective of the time when Tenant shall receive payment from its customer. For purposes of this paragraph (i) the word "Tenant" shall include any of Tenant's subtenants, concessionaires and licensees and (ii) sales by Tenant made in its ordinary course of business which merely occur at the same time as the so-called warehouse sale shall not be included in Gross Receipts.

ARTICLE 5 - PREPARATION OF DEMISED PREMISES

5.01. (a) The Demised Premises shall be completed and prepared for Tenant's occupancy by Landlord at Landlord's sole cost and expense in the manner described in, and subject to the provisions of Exhibit C. Except as expressly provided to the contrary in this Lease and subject to the provisions of Section 5.02 hereof, the taking of possession by Tenant of the Demised Premises shall be conclusive evidence as against Tenant that the Demised Premises and the Building were in good and satisfactory condition at the time such possession was taken. Except as expressly provided to the contrary in this Lease, Tenant is leasing the Demised Premises "as is" on the date hereof, subject to reasonable wear and tear.

5.01. (b)(i) Except for Landlord's Work or as otherwise provided in this Lease to the contrary, (a) Landlord shall deliver the Demised Premises to Tenant in "as is" condition, and (b) Tenant shall be responsible for all construction and work to prepare the Demised Premises for Tenant's occupancy at Tenant's cost and expense. Such construction shall be in accordance with Section 36.09 of this Lease. Prior to performing any work in the Demised Premises, Tenant shall, within seven (7) Business Days of the date thereof submit to Landlord for approval final plans and specifications for all construction work in the Demised Premises including, but not limited to layout, mechanical, electrical and plumbing plans and finish schedules ("Plans and Specifications"). Landlord shall not unreasonably withhold its approval for construction work which is non-structural in nature and does not involve or affect the mechanical systems of the Demised Premises. Tenant shall employ licensed architect(s) and/or engineer(s) for the preparation of the Plans and Specifications. Landlord shall notify Tenant of Landlord's approval or disapproval of such Plans and Specifications within ten (10) Business Days of Landlord's receipt thereof. If Landlord disapproves, Landlord shall specify the reasons for disapproval with reasonable specificity and Tenant shall resubmit revised Plans and Specifications that correct such items. The foregoing procedure shall be repeated, if requested by Tenant up to three (3) times, until Landlord approves the Plans and Specifications. If Landlord shall fail to provide notice of its approval or disapproval of any Plans and Specifications or resubmitted Plans and Specifications within the required period, Landlord shall be deemed to have approved the Plans and Specifications if Tenant notifies Landlord of this deemed approval provisions in each such request for approval.

9

(ii) Tenant shall obtain and provide all design and architectural services necessary to perform Tenant's Work and shall be responsible for complying with all building codes and Legal Requirements in connection with Tenant's Work, prior to commencing any work in the Demised Premises. Tenant shall obtain a new permanent certificate of occupancy or continued certificate of occupancy as applicable and as may be required in connection with Tenant's Work. The construction of the Demised Premises shall be performed in a first class workmanlike manner. At all times when Tenant's Work is in progress and prior to the Commencement Date, Tenant shall maintain or cause to be maintained the insurance coverage required under Section 13.02. Without limiting Tenant's obligation to comply with all applicable Legal Requirements, Landlord hereby conceptually approves the Tenant's Work listed on Exhibit F attached hereto subject to its receipt and approval, not to be unreasonably withheld or delayed, of plans and specifications detailing same (except for item numbers 3 and 9 on Exhibit F attached hereto which are approved without the need to submit plans and specifications to Landlord). At the time of Landlord's review of such plans, Landlord will advise Tenant in writing of those matters requiring restoration upon the expiration of the Term or any earlier termination of this Lease. Nothing herein shall prohibit the Tenant from removing, at its sole cost and expense, any items of Tenant's Work from the Demised Premises at any time provided that the Tenant restores any damage caused to the Demised Premises as a result of such installation and removal.

(iii) Tenant shall be solely responsible for the structural integrity of Tenant's Work and for the adequacy or sufficiency of the Plans and Specifications and all the improvements depicted thereon or covered thereby, and Landlord's consent thereto, approval thereof, or incorporation therein of any of its recommendations shall in no way diminish Tenant's responsibility therefor or reduce or mitigate Tenant's liability in connection therewith. Landlord shall have no obligations or liabilities by reason of this Lease in connections with the performance of construction or of the finish, decorating or installation work performed by Tenant, or on its behalf, or in connection with the contracts for the performance thereof entered into by Tenant. Any warranties extended or available to Tenant in connection with the aforesaid work shall be for the benefit also of Landlord. Tenant further agrees that once it commences construction, it shall diligently and continuously proceed with construction to completion.

5.02. Early Access. Provided Tenant has delivered evidence of insurance as required under Article 13 and is not in default of monetary or any other non-monetary obligations under this Lease beyond any applicable notice and cure periods, Tenant and its contractors shall be permitted to enter the Demised Premises prior to the Commencement Date solely (a) for the installation of Tenant's Work, and/or (b) after Landlord's sprinkler work is completed, to store Tenant's inventory in a single area of not more than 20,000 square feet and such entry shall neither (x) constitute evidence as against Tenant that the Demised Premises and the Building were in good and satisfactory condition at the time of such entry nor (y) trigger the Commencement Date under Section 1.01(J); provided, however, that (i) such use shall not hinder or delay Landlord in the performance of any improvements in progress and/or the Landlord's Work, (ii) Tenant shall first obtain Landlord's approval with respect to the Tenant's Work and Tenant shall obtain all required permits for same, and (iii) Tenant acknowledges that Landlord, its agents and contractors shall be performing work in the Demised Premises and Tenant shall be solely responsible for the security of Tenant's property.

5.03. Subject to Rider Paragraph R22, if the substantial completion of the Landlord's Work shall be delayed (any such delay, a "Tenant Delay") solely due to (a) any act or omission of Tenant or any of its employees, agents or contractors (including, without limitation, i any delays due to changes in or additions to the Landlord's Work required by Tenant, or ii any delays by

10

Tenant in the submission of plans, drawings, specifications or other information or in approving any working drawings or estimates or in giving any authorizations or approvals), or (b) any additional time needed for the completion of the Landlord's Work by the inclusion in the Landlord's Work of any items specified by Tenant that require long lead time for delivery or installation, then Landlord's Work shall be deemed substantially complete on the date when they would have been ready but for such Tenant Delay. The Demised Premises shall be conclusively presumed to be in satisfactory condition on the Commencement Date except for the minor or insubstantial details of finish work or mechanical adjustment that do not interfere in any material manner with Tenant's use and enjoyment of the Demised Premises, other than to a de minimis extent (such minor or insubstantial details, "Punchlist Work"), which Tenant gives Landlord notice within thirty (30) days after Landlord's delivery of possession of the Demised Premises to Tenant with all of Landlord's Work substantially completed. Tenant's notice shall specify such Punchlist Work with reasonable particularity. Landlord shall use commercially reasonable efforts to complete all Punchlist Work within thirty (30) days of Tenant's delivery of its notice thereof. Notwithstanding the foregoing, if Tenant shall notify Landlord within one (1) year of the substantial completion of Landlord's Work (except one year from completion of the Punchlist Work with respect to such Punchlist Work) of any defects in Landlord's Work, Landlord shall promptly remedy such defects at its sole cost and expense.

## ARTICLE 6 - TAX AND OPERATING EXPENSE PAYMENTS

6.01. From and after the Commencement Date, Tenant shall pay to Landlord, as hereinafter provided, Tenant's Fraction of Real Estate Taxes. Tenant's Fraction of the Real Estate Taxes shall be the Real Estate Taxes in respect of the Building for the period in question, multiplied by the Tenant's Fraction, plus the Real Estate Taxes in respect of the Land for the period in question multiplied by the Tenant's Fraction. If any portion of the Building shall be exempt from all or any part of the Real Estate Taxes, then for the period of time when such exemption is in effect, the Floor Space on such exempt portion shall be excluded when making the above computations in respect of the part of the Real Estate Taxes for which such portion shall be exempt. Landlord shall estimate the annual amount of Tenant's Fraction of the Real Estate Taxes (which estimate may be changed by Landlord at any time and from time to time), and Tenant shall pay to Landlord 1/12th of the amount so estimated on the first day of each month in advance. Tenant shall also pay to Landlord on demand from time to time the amount which, together with said monthly installments, will be sufficient in Landlord's reasonable estimation to pay Tenant's Fraction of any Real Estate Taxes thirty (30) days prior to the date when such Real Estate Taxes shall first become due. When the amount of any item comprising Real Estate Taxes is finally determined for a real estate fiscal tax year, Landlord shall submit to Tenant a statement in reasonable detail of the same accompanied by copies of the applicable tax bills, and the figures used for computing Tenant's Fraction of the same, and if the Tenant's Fraction so stated is more or less than the amount theretofore paid by Tenant for such item based on Landlord's estimate, Tenant shall pay to Landlord the deficiency within thirty (30) days after submission of such statement, or Landlord shall, at its sole election, either refund to Tenant the excess or apply same to the next installment or installments of Real Estate Taxes becoming due hereunder. Notwithstanding the foregoing, if the Lease shall expire or be sooner terminated before any such excess has been fully recovered by Tenant, Landlord shall pay the remainder of the excess to Tenant within thirty (30) days of the expiration or sooner termination of the Term, which obligation shall survive any such expiration or termination. Any Real Estate Taxes for a real estate fiscal tax year, a part of which is included

11

within the Term and a part of which is not so included, shall be apportioned on the basis of the number of days in the real estate fiscal tax year included in the Term, and the real estate fiscal tax year for any improvement assessment will be deemed to be the one-year period commencing on the date when such assessment is due, except that if any improvement assessment is payable in installments, the real estate fiscal tax year for each installment will be deemed to be the one-year period commencing on the date when such installment is due. The above computations shall be made by Landlord in accordance with generally accepted accounting principles, and the Floor Space referred to will be based upon the average of the Floor Space in existence on the first day of each month during the period in question. In addition to the foregoing, Tenant shall be responsible for any increase in Real Estate Taxes attributable to assessments for improvements installed by or for the account of Tenant at the Demised Premises. If the Demised Premises are not separately assessed, the amount of any such increase shall be determined by reference to the records of the tax assessor.

6.02. From and after the Commencement Date, Tenant shall pay to Landlord Tenant's Fraction of the Operating Expenses within twenty (20) days after Landlord submits to Tenant an invoice for the Operating Expenses. Unless Tenant is in arrears in any payments due under the Lease, Landlord shall not invoice Tenant for Operating Expenses more than once per month.

6.03. Each such statement given by Landlord pursuant to Section 6.01 or Section 6.02 shall be conclusive and binding upon Tenant unless within 90 days after the receipt of such statement Tenant shall notify Landlord that it disputes the correctness of the statement, specifying the particular respects in which the statement is claimed to be incorrect. If such dispute is not settled by agreement, either party may submit the dispute to arbitration as provided in Article 33. Pending the determination of such dispute by agreement or arbitration as aforesaid, Tenant shall, within thirty (30) days after receipt of such statement, pay the Additional Charges in accordance with Landlord's statement, without prejudice to Tenant's position. If the dispute shall be determined in Tenant's favor, Landlord shall within thirty (30) days pay to Tenant the amount of Tenant's overpayment resulting from compliance with Landlord's statement.

6.04. Notwithstanding anything in this Lease to the contrary, Tenant shall have no obligation to pay Real Estate Taxes or Operating Expenses that accrue with respect to any period that predates the Commencement Date.

6.05. Provided Tenant is not in default of monetary or any other material non-monetary obligations under this Lease beyond any applicable notice and cure periods, Tenant shall have the right, at its sole cost and expense, upon at least thirty (30) days' prior written notice to Landlord, to examine Landlord's records relating to Operating Expenses of the Demised Premises for no more than one day per Calendar Year. Landlord shall make records available for examination at Landlord's principal office during Landlord's normal business days and normal business hours. If any such review discloses that Operating Expenses were overstated by Landlord, Landlord shall promptly refund or credit to Tenant any such excess. This provision shall not be deemed to give Tenant the right to offset or deduct or withhold payment of Rent. No subtenant shall have the right to conduct an examination and no assignee shall conduct an inspection for any period during which such assignee was not in possession of the Demised Premises. In the event Tenant elects to exercise an inspection of Landlord's records relating to Operating Expenses of the Demised Premises in accordance with this Section 6.05, such inspection must be conducted by an independent nationally recognized accounting firm that is not being compensated by Tenant on a contingency fee basis and Tenant and such firm agree to keep all information obtained during such examination confidential.

12

ARTICLE 7 - DEVELOPMENT COMMON AREAS

7.01. Except as may be otherwise expressly provided in this Lease and so long as Tenant is not in default under this Lease beyond any applicable notice and cure period, Landlord will operate, manage, equip, light, repair and maintain, or cause to be operated, managed, equipped, lighted, repaired and maintained, the Common Areas for their intended purposes. Landlord reserves the right, at any time and from time to time, to construct within the Common Areas kiosks, fountains, aquariums, planters, pools, and sculptures, and to install vending machines, telephone booths, benches and the like, provided same shall not unreasonably block or interfere with Tenant's means of ingress and egress to and from the Demised Premises or otherwise adversely impact in any material manner upon the use and enjoyment of the Demised Premises by Tenant and its successor and/or assigns, if any.

7.02. So long a Tenant is not in default under this Lease beyond any applicable notice and cure period, Tenant and its subtenants and concessionaires, and their respective officers, employees, agents, customers and invitees, shall have the non-exclusive right, in common with Landlord and all others to whom Landlord has granted or may hereafter grant such right, but subject to the Rules and Regulations, to use the Common Areas. Landlord reserves the right, at any time and from time to time, to close all or any portions of the Development Common Areas when in Landlord's reasonable judgment any such closing is necessary or desirable (a) to make repairs or changes or to effect construction, (b) to prevent the acquisition of public rights in such areas, (c) to discourage unauthorized parking, (d) to protect or preserve natural persons or property, or (e) to cease the utilization of such premises as a Development Common Area, provided that no such closure shall adversely impact in any material manner upon ingress to or egress from the Building or the Demised Premises or otherwise adversely impact in any material manner upon the use and enjoyment of the Demised Premises by Tenant and its successors and/or assigns, if any. Landlord may do such other acts in and to the Development Common Areas as in its judgment may be desirable to improve or maintain same so long as such other acts do not adversely impact in any material manner upon the use and enjoyment of the Demised Premises by Tenant and its subtenants and assigns, if any.

ARTICLE 8 - SECURITY

8.01. (a) In the event Tenant deposits with Landlord any Security Deposit, the same shall be held as security for the full and faithful payment and performance by Tenant of Tenant's obligations under this Lease. If Tenant defaults beyond applicable notice and cure periods in the full and prompt payment and performance of any of its obligations under this Lease, including, without limitation, the payment of Rent, Landlord may use, apply or retain the whole or any part of the security so deposited to the extent required for the payment of any Rent or any other sums as to which Tenant is in default or for any sum which Landlord may expend or may be required to expend by reason of Tenant's default in respect of any of Tenant's obligations under this Lease, including, without limitation, any damages or deficiency in the reletting of the Demised Premises, whether such damages or deficiency accrue before or after summary proceedings or other re-entry

13

by Landlord. If Landlord shall so use, apply or retain the whole or any part of the security, Tenant shall upon demand promptly deposit with Landlord a sum equal to the amount so used, applied and retained, as security as aforesaid. Provided at the end of the Term Tenant is not in default hereunder beyond any notice and cure period, the security or any balance thereof to which Tenant is entitled shall be returned or paid over to Tenant after the date on which this Lease shall expire or sooner end or terminate, and after delivery to Landlord of entire possession of the Demised Premises. In the event of any sale or leasing of the Land, Landlord shall transfer the security to which Tenant is entitled to the vendee or lessee and Landlord shall thereupon be released by Tenant from all liability for the return or payment thereof; and Tenant shall look solely to the new landlord for the return or payment of the same; and the provisions hereof shall apply to every transfer or assignment made of the same to a new landlord. Tenant shall not assign or encumber or attempt to assign or encumber the monies deposited herein as security, and neither Landlord nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance.

8.01. (b) In lieu of the cash security required by this Lease, Tenant shall provide to Landlord an irrevocable transferable Letter of Credit in the amount of the Security Deposit in form annexed hereto as Exhibit E and issued Pacific Western Bank or any other financial institution approved by Landlord. Landlord shall have the right, upon written notice to Tenant (except that for Tenant's non¬payment of Rent or for Tenant's failure to comply with Article 8.03, no such notice shall be required) and regardless of the exercise of any other remedy the Landlord may have by reason of a default, to draw upon said Letter of Credit to cure any default of Tenant which (except as otherwise provided herein) is not cured within applicable notice and cure periods, or for any purpose authorized by section 8.01(a) of this Lease and if Landlord does so, Tenant shall, upon demand, additionally fund the Letter of Credit with the amount so drawn so that Landlord shall have the full deposit on hand at all times during the Term of the Lease and for a period of thirty (30) days' thereafter. In the event of a sale of the Building or a lease of the Building subject to this Lease, Landlord shall have the right to transfer the security to the vendee or lessee.

8.02. The Letter of Credit shall expire not earlier than thirty (30) days after the Expiration Date of this Lease. The Letter of Credit may be of the type which is automatically renewed on an annual basis (Annual Renewal Date), provided however, in such event Tenant shall maintain the Letter of Credit and its renewals in full force and effect during the entire Term of this Lease (including any renewals or extensions) and for a period of thirty (30) days thereafter. The Letter of Credit will contain a provision requiring the issuer thereof to give the beneficiary (Landlord) thirty (30) days' advance written notice of its intention not to renew the Letter of Credit on the next Annual Renewal Date.

8.03. In the event Tenant shall fail to deliver to Landlord a substitute irrevocable Letter of Credit, in the amount stated above, on or before thirty (30) days prior to the next Annual Renewal Date, said failure shall be deemed a default under this Lease. Landlord may, in its discretion treat this the same as a default in the payment of Rent or any other default and pursue the appropriate remedy. In addition, and not in limitation, Landlord shall be permitted to draw upon the Letter of Credit as in the case of any other default by Tenant under the Lease.

14

ARTICLE 9 - SUBORDINATION

9.01. This Lease, and all rights of Tenant hereunder, are and shall be subject and subordinate to all ground leases and underlying leases of the Land and/or the Building now or hereafter existing and to all Mortgages which may now or hereafter affect the Land and/or building and/or any of such leases, whether or not such Mortgages or leases shall also cover other lands and/or buildings, to each and every advance made or hereafter to be made under such Mortgages, and to all renewals, modifications, replacements and extensions of such leases and such Mortgages and spreaders and consolidations of such Mortgages. The provisions of this Section 9.01 shall be self-operative and no further instrument of subordination shall be required. In confirmation of such subordination, Tenant shall within ten (10) days of request execute, acknowledge and deliver any instrument that Landlord, the lessor under any such lease or the Mortgagee of any such Mortgage or any of their respective successors in interest may reasonably request to evidence such subordination. (See Rider Section R12.)

9.02. If any act or omission of Landlord would give Tenant the right, immediately or after lapse of a period of time, to cancel or terminate this Lease, or to claim a partial or total eviction, Tenant shall not exercise such right (a) until it has given written notice of such act or omission to Landlord and each Superior Mortgagee and each Superior Lessor whose name and address shall previously have been furnished to Tenant, and (b) until a reasonable period for remedying such act or omission shall have elapsed following the giving of such notice and following the time when such Superior Mortgagee or Superior Lessor shall have become entitled under such Superior Mortgage or Superior Lease, as the case may be, to remedy the same (which reasonable period shall in no event be less than the period to which Landlord would be entitled under this Lease or otherwise, after similar notice, to effect such remedy), provided such Superior Mortgagee or Superior Lessor shall with due diligence give Tenant notice of intention to, and commence, its cure of Landlord's default within the period provided for in Section 7 of Exhibit G or any other SNDA (as defined in Section 9.05), and thereafter continue to remedy such act or omission with commercially reasonable and diligent efforts.

9.03. If any Superior Lessor or Superior Mortgagee shall succeed to the rights of Landlord under this Lease, whether through possession or foreclosure action or delivery of a new lease or deed, then at the request of such party so succeeding to Landlord's rights ("Successor Landlord") and upon such Successor Landlord's written agreement to accept Tenant's attornment, Tenant shall attorn to and recognize such Successor Landlord as Tenant's landlord under this Lease and shall promptly execute and deliver any instrument that such Successor Landlord may reasonably request to evidence such attornment. Upon such attornment this Lease shall continue in full force and effect as a direct lease between the Successor Landlord and Tenant upon all of the terms, conditions and covenants as are set forth in this Lease except that the Successor Landlord shall not (a) be liable for any previous act or omission of Landlord under this Lease not continuing after Successor Landlord shall succeed to the rights of Landlord under this Lease; (b) be subject to any offset, not expressly provided for in this Lease, which theretofore shall have accrued to Tenant against Landlord; (c) be liable for the return of any Security Deposit, in whole or in part, to the extent that same is not paid over to the Successor Landlord; or (d) be bound by any previous modification of this Lease or by any previous prepayment of more than one month's Fixed Rent or Additional Charges, unless such modification or prepayment shall have been expressly approved in writing by the Superior Lessor of the Superior Lease or the Mortgagee of the Superior Mortgage through or by reason of which the Successor Landlord shall have succeeded to the rights of Landlord under this Lease.

15

9.04. If any then present or prospective Superior Mortgagee shall require any modification(s) of this Lease, Tenant shall promptly execute and deliver to Landlord such instruments effecting such modification(s) as Landlord shall request, provided that such modification(s) do not adversely affect in any material respect any of Tenant's rights under this Lease or at law or in equity, or increase the Rent or any of Tenant's costs of doing business from the Demised Premises, other than to a de minimis extent.

9.05. To the extent of any provision of this Article 9 conflict with the provisions of any subordination, non-disturbance and attornment agreement ("SNDA"), the provisions of the SNDA shall govern. To the extent any SNDA may require Tenant to make payments of Fixed Rent or Additional Charges directly to the Superior Mortgagee or Superior Lessor, as the case may be, Landlord agrees that such payments shall be deemed to satisfy the obligations of the Tenant to make such payments to Landlord.

## ARTICLE 10 - QUIET ENJOYMENT

10.01. So long as this Lease shall be in full force and effect, Tenant shall peaceably and quietly have, hold and enjoy the Demised Premises without hindrance, ejection or molestation by Landlord or any person lawfully claiming through or under Landlord, subject, nevertheless, to the provisions of this Lease and to Superior Leases and Superior Mortgages.

## ARTICLE 11 - ASSIGNMENT, SUBLETTING AND MORTGAGING

11.01. Tenant shall not, whether voluntarily, involuntarily, or by operation of law or otherwise, (a) assign or otherwise transfer this Lease, or advertise to do so, (b) sublet the Demised Premises or any part thereof, or advertise to do so, or allow the same to be used, occupied or utilized by anyone other than Tenant, or (c) mortgage, pledge, encumber or otherwise hypothecate this Lease in any manner whatsoever, without in each instance obtaining the prior written consent of Landlord. Landlord agrees not to unreasonably withhold its consent to the subletting of the Demised Premises or an assignment of this Lease. In determining reasonableness, Landlord may take into consideration all relevant factors surrounding the proposed sublease and assignment, including, without limitation, the following: (i) The business reputation of the proposed assignee or subtenant and its officers or directors in relation to the other tenants or occupants of the Building or Development; (ii) the nature of the business and the proposed use of the Demised Premises by the proposed assignee or subtenant in relation to the other tenants or occupants of the Building or Development; (iii) whether the proposed assignee or subtenant is then a tenant (or subsidiary, affiliate or parent of a tenant) of other space in the Building or Development, or any other property owned or managed by Landlord or its affiliates; (iv) the financial condition of the proposed assignee or subtenant; (v) restrictions, if any, contained in leases or other agreements affecting the Building and the Development; (vi) the effect that the proposed assignee's or subtenant's occupancy or use of the Demised Premises would have upon the operation and maintenance of the Building and the Development; (vii) the extent to which the proposed assignee and Tenant provide Landlord with assurances reasonably satisfactory to Landlord as to the satisfaction of Tenant's obligations hereunder. In any event, at no time shall there be more than two (2) subtenants of the

16

Demised Premises permitted. Notwithstanding the foregoing, Tenant may advertise an assignment of the Lease or a sublease of the Demised Premises provided the advertising does not price the unit at an effective cost per square foot which is less than Landlord's then asking rents for comparable properties in the vicinity of the Demised Premises.

In the event the Demised Premises are sublet or this Lease is assigned, Tenant shall pay to Landlord as an Additional Charge the following amounts less the actual reasonable expense incurred by Tenant in connection with such assignment or subletting, as substantiated by Tenant, in writing, to Landlord's reasonable satisfaction, including, without limitation, a reasonable brokerage fee and reasonable legal fees, as the case may be: (i) in the case of an assignment, an amount equal to [***] of all sums and other consideration paid to Tenant by the assignee for or by reason of such assignment, and (ii) in the case of a sublease, [***] of any rents, additional charge or other consideration payable under the sublease to Tenant by the subtenant which is in excess of the Fixed Rent and Additional Charges accruing during the term of the sublease in respect of the subleased space (at the rate per square foot payable by Tenant hereunder) pursuant to the terms hereof. Notwithstanding anything herein contained in this subsection to the contrary, the forgoing Additional Charge shall not be applicable to and upon prior or simultaneous notice to Landlord Tenant may assign this Lease, or sublet the whole or any portion of the Premises, to its parent, subsidiary or any affiliate, provided that (i) with respect to an assignment, that such assignee promptly executes and delivers to Landlord an assignment agreement pursuant to which it assumes all obligations under the Lease; and (ii) with respect to a sublease, that such sublessee promptly executes and delivers to Landlord a sublease agreement which includes a provision to the effect that the sublease is subject to the terms and provisions of the Lease. The term "affiliate", as used hereinabove, shall mean any corporation or other entity controlled by, under common control with, or which controls Tenant.

11.02. If at any time (a) the original Tenant named herein, (b) the then Tenant, (c) any Guarantor, or (d) any Person owning a majority of the voting stock of, or directly or indirectly controlling, the then Tenant shall be a corporation, limited liability company, or partnership, any transfer of voting stock or other ownership interest (including but not limited to membership interest, economic interest, or partnership interest) resulting in the person(s) who shall have owned a majority of such corporation's shares of voting stock, or the majority of the membership interests or economic interest in such limited liability company, or the majority of the general partners' interest or the majority of the limited partner's interest in such partnership, as the case may be, immediately before such transfer, ceasing to own a majority of such shares of voting stock, membership or economic interest, general partner's ownership or economic interest, or limited partner's ownership or economic interest, as the case may be, except as the result of transfers by inheritance, shall be deemed to be an assignment of this Lease as to which Landlord's consent shall have been required, and in any such event Tenant shall notify Landlord. The provisions of this Section 11.02 shall not be applicable to any corporation all the outstanding voting stock of which is listed on a national securities exchange (as defined in the Securities Exchange Act of 1934, as amended) or is traded in the over-the-counter market with quotations reported by the National Association of Securities Dealers through its automated system for reporting quotations and shall not apply to transactions with a corporation or limited liability company into or with which the then Tenant is merged or consolidated or to which substantially all of the then Tenant's assets are transferred or to any corporation or limited liability company which controls or is controlled by the then Tenant or is under common control with the then Tenant, provided that in

17

any of such events (i) the successor to Tenant has a net worth computed in accordance with generally accepted accounting principles at least equal to the greater of (1) the net worth of Tenant immediately prior to such merger, consolidation or transfer, or (2) the net worth of the original Tenant on the date of this Lease, and (ii) proof satisfactory to Landlord of such net worth shall have been delivered to Landlord at least 10 days prior to the effective date of any such transaction (or immediately following such transaction if Tenant shall reasonably require that the transaction remain confidential). For the purposes of this Section, the words "voting stock" shall refer to shares of stock regularly entitled to vote for the election of directors of the corporation. Landlord shall have the right at any time and from time to time during the Term to inspect the stock record books or other ownership records of the entity to which the provisions of this Section 11.02 apply, and Tenant will produce the same on request of Landlord. Notwithstanding the foregoing, notice only to (and not consent by) Landlord shall be required in connection with a sale of the tenant entity, whether effected via a stock sale or a sale of assets, provided (i) such sale is not made in an effort to avoid the assignment restrictions contained in section 11.01; (ii) the provisions of subsections (i) - (vii) in the first paragraph of section 11.01 are satisfied; and (iii) the net worth of the successor tenant/assignee is not less than $[***] at the time of such transaction. In the event the foregoing conditions are satisfied, landlord shall not be entitled to share in any profits of such transaction as provided for in the second paragraph of section 11.01.

11.03. If this Lease is assigned, whether or not in violation of this Lease, Landlord may collect rent from the assignee. If the Demised Premises or any part thereof are sublet or used or occupied by anybody other than Tenant, whether or not in violation of this Lease, Landlord may, after any monetary or other material non-monetary default by Tenant, and expiration of Tenant's time to cure such default, collect rent from the subtenant or occupant. In either event, Landlord may apply the net amount collected to the Rent, but no such assignment, subletting, occupancy or collection shall be deemed a waiver of any of the provisions of Section 11.01 or Section 11.02, or the acceptance of the assignee, subtenant or occupant as tenant, or a release of Tenant from the performance by Tenant of Tenant's obligations under this Lease. The consent by Landlord to any assignment, mortgaging, subletting or use or occupancy by others shall not in any way be considered to relieve Tenant from obtaining the express written consent of Landlord to any other or further assignment, mortgaging or subletting or use or occupancy by others not expressly permitted by this Article 10. References in this Lease to use or occupancy by others (that is, anyone other than Tenant) shall not be construed as limited to subtenants and those claiming under or through subtenants but shall be construed as including also licensees and others claiming under or through Tenant, immediately or remotely.

11.04. Any permitted assignment or transfer, whether made with Landlord's consent pursuant 21 to Section 11.01 or without Landlord's consent if permitted by Section 11.02, shall be made only if, and shall not be effective until, the assignee shall execute, acknowledge and deliver to Landlord an agreement in form and substance reasonably satisfactory to Landlord whereby the assignee shall assume Tenant's obligations under this Lease and whereby the assignee shall agree that all of the provisions in this Article 11 shall, notwithstanding such assignment or transfer, continue to be binding upon it in respect to all future assignments and transfers. Notwithstanding any assignment or transfer, whether or not in violation of the provisions of this Lease, and notwithstanding the acceptance of Rent by Landlord from an assignee, transferee, or any other party, the original Tenant and any other person(s) who at any time was or were Tenant shall remain fully liable for the payment of the Rent and for Tenant's other obligations under this Lease.

18

11.05. The liability of the original named Tenant and any other Person(s) (including but not limited to any Guarantor) who at any time are or become responsible for Tenant's obligations under this Lease shall not be discharged, released or impaired by any agreement extending the time of, or modifying any of the terms or obligations under this Lease, or by any waiver or failure of Landlord to enforce, any of this Lease.

11.06. The listing of any name other than that of Tenant, whether on the doors of the Demised Premises or the Building directory, or otherwise, shall not operate to vest any right or interest in this Lease or in the Demised Premises, nor shall it be deemed to be the consent of Landlord to any assignment or transfer of this Lease or to any sublease of the Demised Premises or to the use or occupancy thereof by others. Notwithstanding anything contained in this Lease to the contrary, Landlord shall have the absolute right to withhold its consent to an assignment or subletting to a Person who is otherwise a tenant or occupant of the Building, or of a building owned or managed by Landlord or its affiliated entities in the Development.

11.07. Without limiting any of the provisions of Article 24, if pursuant to the Federal Bankruptcy Code (or any similar law hereafter enacted having the same general purpose), Tenant is permitted to assign this Lease notwithstanding the restrictions contained in this Lease, adequate assurance of future performance by an assignee expressly permitted under such Code shall be deemed to mean the deposit of cash security in an amount equal to the sum of one (1) year's Fixed Rent plus an amount equal to the Additional Charges for the Calendar Year preceding the year in which such assignment is intended to become effective, which deposit shall be held by Landlord for the balance of the Term, without interest, as security for the full performance of all of Tenant's obligations under this Lease, to be held and applied in the manner specified for security in Article 8.

11.08. If Tenant shall propose to assign or in any manner transfer this Lease or any interest therein, or sublet the Demised Premises or any part or parts thereof, or grant any concession or license or otherwise permit occupancy of all or any part of the Demised Premises by any person, Tenant shall give notice thereof to Landlord, together with a copy of a letter of intent or term sheet setting forth the material terms and provisions of the proposed assignment or sublease transaction and such financial and other information pertaining to the proposed assignee, transferee, subtenant, concessionaire or licensee as Landlord shall reasonably require. Landlord shall provide written notice of its consent to or rejection of any proposed assignment or sublease transaction within twenty (20) days of Tenant's delivery of its notice requesting Landlord's consent. If Landlord shall reject the proposed assignment or sublease transaction, Landlord shall include with its notice of rejection a reasonably detailed description of Landlord's reason(s) for rejecting the proposed transaction. If Landlord consents to the proposed assignment or sublease transaction and Tenant does not consummate the subject transaction within ninety (90) days after Landlord delivers its notice approving the transaction, Tenant shall again be required to comply with the provisions of this Section 11.08 in connection with any such transaction as if the notice by Tenant referred to above in this Section 11.08 had not been given. Notwithstanding anything contained in this Lease to the contrary, Landlord shall not be obligated to entertain or consider any request by Tenant to consent to any proposed assignment of this Lease or sublet of all or any part of the Demised Premises unless each request by Tenant is accompanied by a non-refundable fee payable to Landlord in the amount of [***] to cover Landlord's administrative, legal, and other costs and expenses incurred in processing each of Tenant's requests. Neither

19

Tenant's payment nor Landlord's acceptance of the foregoing fee shall be construed to impose any obligation whatsoever upon Landlord to consent to Tenant's request. If Landlord shall fail to provide notice of its approval or disapproval of any request for assignment or sublease within twenty (20) days, Landlord shall be deemed to have approved of the assignment or sublease if Tenant refers to this Lease section and notifies Landlord of this deemed approval provision in Tenant's request for approval.

ARTICLE 12 - COMPLIANCE WITH LAWS

12.01. Tenant shall comply with all Legal Requirements which shall, in respect of the Demised Premises or the use and occupation thereof, or the abatement of any nuisance in, on or about the Demised Premises, impose any violation, order or duty on Landlord or Tenant; and Tenant shall pay all the cost, expenses, fines, penalties and damages which may be imposed upon Landlord or any Superior Lessor by reason of or arising out of Tenant's failure to fully and promptly comply with and observe the provisions of this Section 12.01. However, Tenant need not comply with any such law or requirement of any public authority so long as Tenant shall be contesting the validity thereof, or the applicability thereof to the Demised Premises, in accordance with Section 12.02. Landlord represents that to the best of its knowledge there are no outstanding notices of violation of any Legal Requirements affecting the Demised Premises or the Building and Landlord shall be solely responsible for correcting any such open violations notices received prior to the Commencement Date unless arising as a result of any action of Tenant or any entity acting under the direction of or on behalf of Tenant.

12.02. Tenant may contest, by appropriate proceedings prosecuted diligently and in good faith, the validity, or applicability to the Demised Premises, of any Legal Requirement, provided that (a) Landlord shall not be subject to criminal penalty or to prosecution for a crime or offense, and neither the Demised Premises nor any part thereof shall be subject to being condemned or vacated, by reason of non-compliance or otherwise by reason of such contest; (b) before the commencement of such contest, Tenant shall furnish to Landlord either (i) the bond of a surety company reasonably satisfactory to Landlord, which bond shall be, as to its provisions and form, satisfactory to Landlord, and shall be in an amount at least equal to [***]% of the cost of such compliance (as estimated by a reputable contractor designated by Landlord) and shall indemnify Landlord against the cost thereof and against all liability for damages, interest, penalties and expenses (including reasonable attorneys' fees and expenses), resulting from or incurred in connection with such contest or non-compliance, or (ii) other security in place of such bond satisfactory to Landlord; (c) such non-compliance or contest shall not constitute or result in any violation of any Superior Lease or Superior Mortgage, or if any such Superior Lease and/or Superior Mortgage shall permit such non-compliance or contest on condition of the taking of action or furnishing of security by Landlord, such action shall be taken and such security shall be furnished at the expense of Tenant; and (d) Tenant shall keep Landlord advised as to the status of such proceedings. Without limiting the application of the above, Landlord shall be deemed subject to prosecution for a crime or offense if Landlord, or its managing agent, or any officer, director, partner, shareholder or employee of Landlord or its managing agent, as an individual, is charged with a crime or offense of any kind or degree whatsoever, whether by service of a summons or otherwise, unless such charge is withdrawn before Landlord or its managing agent, or such officer, director, partner, shareholder or employee of Landlord or its managing agent (as the case may be) is required to plead or answer thereto. Notwithstanding anything contained in this Lease to the

20

contrary, Tenant shall not file any Real Estate Tax appeal without the prior written consent of Landlord, which consent may be given or withheld in Landlord's absolute discretion. Notwithstanding anything contained in this Lease to the contrary, Tenant shall not file any Real Estate Tax Appeal with respect to the Land, Building or the Demised Premises.

ARTICLE 13 - INSURANCE AND INDEMNITY

13.01. Landlord shall maintain or cause to be maintained All Risk insurance in respect of the Building and other improvements on the Land normally covered by such insurance (except for the property Tenant is required to cover with insurance under Section 13.02 and similar property of other tenants and occupants of the Building or buildings and other improvements which are on land neither owned by nor leased to Landlord) for the benefit of Landlord, any Superior Lessors, any Superior Mortgagees and any other parties Landlord may at any time and from time to time designate, as their interests may appear, but not for the benefit of Tenant, and shall maintain rent insurance as required by any Superior Lessor or any Superior Mortgagee. The All Risk insurance will be in the amounts required by any Superior Lessor or any Superior Mortgagee but not less than the amount sufficient to avoid the effect of the co-insurance provisions of the applicable policy or policies. Landlord may also maintain any other forms and types of insurance which Landlord shall deem reasonable in respect of the Building and Land. Landlord shall have the right to provide any insurance maintained or caused to be maintained by it under blanket policies.

13.02. During the Term Tenant shall maintain at its own cost and expense the following insurance: (a) comprehensive or commercial general liability insurance in respect of the Demised Premises and the conduct and operation of business therein, having limits of liability not less than $[***] per occurrence for bodily injury or property damage coverage to include but not be limited to completed operations, contractual liability and product liability , (b) automobile liability insurance covering all owned, hired and non-owned vehicles used by the Tenant in connection with their work and any loading or unloading of such vehicles, with limits as stated above and (c) workmen's compensation and employers liability insurance as required by statutes, but in any event not less than $[***] for each accident or occupational disease for employers liability, (d) All-Risk insurance covering Tenant's stock in trade, fixtures, furniture, furnishings, removable floor coverings, equipment, signs or any other property of Tenant in the Demised Premises, against loss or damage in an amount equal to the full replacement value thereof as same might increase from time to time or such higher amount as either may be required by the holder of any fee mortgage covering the Demises Premises or is necessary to prevent Landlord and/or Tenant from becoming a co-insurer, such insurance to include (i) coverage for property of others in the care, custody and control of Tenant in amounts sufficient to cover the maximum value of such property and to the extent of Tenant's liability therefor, (ii) boiler and machinery insurance, if applicable (iii) rent insurance in an amount equal to the Rent, and all other charges payable by Tenant pursuant to this Lease for a period of one (1) year and (iv) a provision that the insurer will waive subrogation against Landlord, and (e) any other insurance that Landlord may reasonably require provided same is generally required by owners of similar real property. Landlord may at any time and from time to time require that the limits for the liability insurance to be maintained by Tenant be increased to the limits that new Tenants in similar buildings are required by Landlord to maintain, but in no event more frequently than once every two (2) years. The insurance carried pursuant to Section 13.01 (d) shall be carried in favor of Landlord and the holder of any fee mortgage on the Premises and the standard mortgagee clause shall be attached to the appropriate policies or certificates

21

thereof. Insurance carried pursuant to Section 13.01 (d) shall provide that the loss, if any, shall be adjusted with and payable to the party who will perform the work of restoration pursuant to Article 22 and such mortgagee as their interests may appear. Tenant shall deliver to Landlord and any additional insured(s) certificates for such fully paid for policies (with property and liability insurance evidenced on an Acord 27 form) upon execution hereof. Upon request of Landlord, Tenant shall furnish Landlord with copies of all such insurance policies. Tenant shall procure and pay for renewals of such insurance from time to time before the expiration thereof, and Tenant shall deliver to Landlord and any additional insured(s), certificates therefor at least five (5) Business Days before the expiration of any existing policy. All such policies shall be issued by companies acceptable to Landlord, having a Bests Rating of not less than A, Class VII (or an equivalent S&P rating if requested by Landlord), and licensed to do business in New Jersey, and all such policies shall contain a provision whereby the same cannot be canceled unless Landlord and any additional insured(s) are given at least thirty (30) days' prior written notice of such cancellation. The insurance required by this Section (other than worker's compensation insurance) and the certificates thereof to be delivered to Landlord by Tenant shall name Landlord as an additional insured and, at Landlord's request, shall also name any Superior Lessors or Superior Mortgagees as additional insureds, and the following phrase must be typed on the certificate of insurance: "Hartz Mountain Industries, Inc., and its respective subsidiaries, affiliates, associates, joint ventures, and partnerships, are hereby named as additional insureds as their interests may appear (and if Landlord has so requested, Tenant shall include any Superior Lessors and Superior Mortgagees as additional insured(s)). It is intended for this insurance to be primary and non-contributing." Tenant shall give Landlord at least thirty (30) days' prior written notice that any such policy is being canceled or replaced.

13.03. Tenant shall not do, permit or suffer to be done any act, matter, thing or failure to act in respect of the Demised Premises or use or occupy the Demised Premises or conduct or operate Tenant's business in any manner objectionable to any insurance company or companies whereby the fire insurance or any other insurance then in effect in respect to the Land and Building or any part thereof shall become void or suspended or whereby any premiums in respect of insurance maintained by Landlord shall be materially higher than those which would normally have been in effect for the occupancy contemplated under the Permitted Uses. In case of a breach of the provisions of this Section 13.03, in addition to all other rights and remedies of Landlord hereunder, Tenant shall (a) indemnify Landlord and the Superior Lessors and hold Landlord and the Superior Lessors harmless from and against any loss which would have been covered by insurance which shall have become void or suspended because of such breach by Tenant and (b) pay to Landlord any and all increases of premiums on any insurance, including, without limitation, rent insurance, resulting from any such breach.

13.04. Tenant shall indemnify and hold harmless Landlord and all Superior Lessors and its and their respective partners, joint venturers, directors, officers, agents, servants and employees from and against any and all claims arising from or in connection with (a) the conduct or management of the Demised Premises or of any business therein, or any work or thing whatsoever done, or any condition created (other than by Landlord or its employees, agents or contractors) in the Demised Premises during the Term or during the period of time, if any, prior to the Commencement Date that Tenant may have been given access to the Demised Premises; (b) any act, omission or negligence of Tenant or any of its subtenants or licensees or its or their partners, joint venturers, directors, officers, agents, employees or contractors; (c) any accident, injury or

22

damage whatever (unless caused solely by the negligence of Landlord or its employees, agents or contractors) occurring in the Demised Premises; and (d) any breach or default by Tenant in the full and prompt payment and performance of Tenant's obligations under this Lease; together with all costs, expenses and liabilities incurred in or in connection with each such claim or action or proceeding brought thereon, including, without limitation, all reasonable attorneys' fees and expenses. In case any action or proceeding is brought against Landlord and/or any Superior Lessor and/or its or their partners, joint venturers, directors, officers, agents and/or employees in connection with conduct or management of the Demised Premises or by reason of any claim referred to above, Tenant, upon notice from Landlord or such Superior Lessor, shall, at Tenant's cost and expense, resist and defend such action or proceeding by counsel reasonably satisfactory to Landlord.

13.05. Neither Landlord nor Tenant shall be liable or responsible for, and each party releases the other from, all liability and responsibility to the other and any person claiming by, through or under Tenant, by way of subrogation or otherwise, for any injury, loss or damage to any person or property in or around the Demised Premises or to a party's business irrespective of the cause of such injury, loss or damage, and each of Landlord and Tenant shall require its respective insurers to include in all of their insurance policies which could give rise to a right of subrogation against the other a clause or endorsement whereby the insurer waives any rights of subrogation against the other or permits the insured, prior to any loss, to agree with a third party to waive any claim it may have against said third party without invalidating the coverage under the insurance policy.

13.06. Landlord shall indemnify and hold harmless Tenant and its partners, joint venturers, directors, officers, agents, servants and employees from and against any and all claims arising from or in connection with (a) any act, omission or negligence of Landlord or its partners, joint venturers, directors, officers, agents, employees with respect to management of the Development Common Areas; and (b) any breach or default by Landlord in the full and prompt payment and performance of Landlord's obligations under this Lease; together with all costs, expenses and liabilities incurred in or in connection with each such claim or action or proceeding brought thereon, including, without limitation, all reasonable attorneys' fees and expenses. In case any action or proceeding is brought against Tenant and/or its partners, joint venturers, directors, officers, agents and/or employees in connection with foregoing management of the Development Common Areas or by reason of any claim referred to above, Landlord, upon notice from Tenant, shall, at Landlord's cost and expense, resist and defend such action or proceeding by counsel reasonably satisfactory to Tenant.

ARTICLE 14 - RULES AND REGULATIONS

14.01. Tenant and its employees and agents shall faithfully observe and comply with the Rules and Regulations and such reasonable changes therein (whether by modification, elimination or addition) as Landlord at any time or times hereafter may make and notify Tenant in writing, which in Landlord's reasonable judgment, shall be necessary for the reputation, safety, care or appearance of the Land and Building, or the preservation of good order therein, or the operation or maintenance of the Building or its equipment and fixtures, and which do not unreasonably affect the conduct of Tenant's business in the Demised Premises; provided, however, that in case of any conflict or inconsistency between the provisions of this Lease and any of the Rules and

23

Regulations, the provisions of this Lease shall control. Nothing in this Lease contained shall be construed to impose upon Landlord any duty or obligations to enforce the Rules and Regulations against any other tenant or any employees or agents of any other tenant, and Landlord shall not be liable to Tenant for violation of the Rules and Regulations by any other tenant or its employees, agents, invitees or licensees, provided however, the Rules and Regulations shall be reasonable, uniformly applied and enforced and shall not conflict with the terms of this Lease. Landlord shall not discriminate against Tenant in the enactment or enforcement of any of the Rules and Regulations. In the event Landlord shall desire to change any of the Rules and Regulations, Landlord in each instance shall provide Tenant with prior written notice of such changes, and in no event shall any such changes reduce or diminish any of Tenant's rights or Landlord's obligations under the Lease in any material manner. So long as Tenant and its subtenants and assigns shall be the sole occupants of the Building, any of the Rules and Regulations which are designed to control the interactions between occupants in a multi-tenanted building and/or to minimize conflicts between occupants in a multi-tenanted building shall not be applicable to Tenant and its subtenants and assigns, and Tenant shall have the sole right and authority to promulgate rules governing the interactions between itself and its subtenants and assigns provided same shall not conflict in any manner with the terms of this Lease.

ARTICLE 15 - ALTERATIONS AND SIGNS

15.01. Tenant shall not make any alterations or additions to the Demised Premises, or make any holes or cuts in the walls, ceilings, roofs, or floors thereof, or change the exterior color or architectural treatment of the Demised Premises, without on each occasion first obtaining the consent of Landlord. Notwithstanding the foregoing, Landlord shall not unreasonably withhold its consent for alterations that are non-structural in nature and do not involve or affect the mechanical systems of the Demised Premises or Building and having a cost of less than $[***]. Tenant shall submit to Landlord plans and specifications for such work at the time Landlord's consent is sought. Tenant shall pay to Landlord upon demand the actual, reasonable, out-of-pocket cost and expense of Landlord in (a) reviewing said plans and specifications and (b) inspecting the alterations to determine whether the same are being performed in accordance with the approved plans and specifications and all Legal Requirements and Insurance Requirements, including, without limitation, the actual, reasonable, out-of-pocket fees of any architect or engineer employed by Landlord for such purpose. Before proceeding with any permitted alteration which will cost more than $[***] (exclusive of the costs of decorating work and items constituting Tenant's Property), as estimated by a reputable contractor reasonably designated by Landlord, Tenant shall obtain and deliver to Landlord either (i) a performance bond and a labor and materials payment bond (issued by a corporate surety licensed to do business in New Jersey), each in an amount equal to [***]% of such estimated cost and in form reasonably satisfactory to Landlord, or (ii) such other security as shall be reasonably satisfactory to Landlord. Tenant shall fully and promptly comply with and observe the reasonable Rules and Regulations then in force and of which notice has been provided to Tenant in respect of the making of alterations. Any review or approval by Landlord of any plans and/or specifications with respect to any alterations is solely for Landlord's benefit, and without any representation or warranty whatsoever to Tenant in respect to the adequacy, correctness or efficiency thereof or otherwise.

24

15.02. Tenant shall obtain all necessary governmental permits and certificates for the commencement and prosecution of permitted alterations and for final approval thereof upon completion, and shall cause alterations to be performed in compliance with all applicable Legal Requirements and Insurance Requirements. Alterations shall be diligently performed in a good and workmanlike manner, using new materials and equipment at least equal in quality and class to the better of (a) the original installations of the Building, or (b) the then standards for the Building established by Landlord. Alterations shall be performed by contractors first approved by Landlord (such approval not to be unreasonably withheld, conditioned or delayed); provided, however, that any alterations in or to the mechanical, electrical, sanitary, heating, ventilating, air conditioning or other systems of the Building shall be performed only by the contractor(s) designated by Landlord. Alterations shall be made in such manner as not to unreasonably interfere with or delay and as not to impose any additional material expense upon Landlord in the construction, maintenance, repair or operation of the Building; and if any such additional expense shall be incurred by Landlord as a result of Tenant's making of any alterations, Tenant shall pay any such additional expense upon demand. Throughout the making of alterations, Tenant shall carry, or cause to be carried, workmen's compensation insurance in statutory limits and general liability insurance, with completed operation endorsement, for any occurrence in or about the Building, under which Landlord and its managing agent and any Superior Lessor whose name and address shall previously have been furnished to Tenant shall be named as parties insured, in such limits as Landlord may reasonably require, with insurers reasonably satisfactory to Landlord. Tenant shall furnish Landlord with reasonably satisfactory evidence that such insurance is in effect at or before the commencement of alterations and, on request, at reasonable intervals thereafter during the making of alterations.

15.03. Tenant shall not place any signs on the roof, exterior walls or grounds of the Demised Premises without first obtaining Landlord's written consent thereto, which consent shall not be unreasonably withheld, conditioned or delayed, provided however that Landlord's consent shall not be unreasonably withheld, conditioned or delayed with respect to Tenant's request to place signage on the exterior walls of the Building or the grounds of the Demised Premises in compliance with Legal Requirements. In placing any signs on or about the Demised Premises, Tenant shall, at its expense, comply with all applicable legal requirements and obtain all required permits and/or licenses. (See Rider Section R11.)

## ARTICLE 16 - LANDLORD'S AND TENANT'S PROPERTY

16.01. All fixtures, equipment, improvements and appurtenances attached to or built into the Demised Premises at the commencement of or during the Term, whether or not by or at the expense of Tenant, shall be and remain a part of the Demised Premises, shall be deemed to be the property of Landlord and shall not be removed by Tenant, except as provided in Section 16.02. Further, any carpeting or other personal property in the Demised Premises on the Commencement Date, unless installed and paid for by Tenant, shall be and shall remain Landlord's property and shall not be removed by Tenant.

16.02. All movable partitions, business and trade fixtures, machinery and equipment, communications equipment and office equipment, whether or not attached to or built into the Demised Premises, which are installed in the Demised Premises by or for the account of Tenant without expense to Landlord and can be removed without structural damage to the Building and all furniture, furnishings, and other movable personal property owned by Tenant and located in the Demised Premises (collectively, "Tenant's Property") shall be and shall remain the property of

25

Tenant and may be removed by Tenant at any time during the Term; provided that if any of the Tenant's Property is removed, Tenant shall repair or pay the cost of repairing any damage to the Demised Premises, the Building or the Common Areas resulting from the installation and/or removal thereof. Any equipment or other property for which Landlord shall have granted any allowance or credit to Tenant shall not be deemed to have been installed by or for the account of Tenant without expense to Landlord, shall not be considered as the Tenant's Property and shall be deemed the property of Landlord.

16.03. Subject to Section 5.01(b)(ii) of the Lease, at or before the Expiration Date or the date of any earlier termination of this Lease, or within fifteen (15) days after such an earlier termination date, Tenant shall remove from the Demised Premises all of the Tenant's Property (except such items thereof as Landlord shall have expressly permitted to remain, which property shall become the property of Landlord if not removed), and Tenant shall repair any damage to the Demised Premises, the Building and the Common Areas resulting from any installation and/or removal of the Tenant's Property. Any items of the Tenant's Property which shall remain in the Demised Premises after the Expiration Date or after a period of fifteen (15) days following an earlier termination date, may, at the option of Landlord, be deemed to have been abandoned, and in such case such items may be retained by Landlord as its property or disposed of by Landlord, without accountability, in such manner as Landlord shall determine at Tenant's expense.

16.04. At or before the Expiration Date or the date of any earlier termination of this Lease, or within fifteen (15) days after such an earlier termination date, Tenant shall, at Tenant's sole cost and expense, remove from the Demised Premises such rack system as may be installed in the Demised Premises (which removal obligation shall be subject to the provisions provided for in Section 5.01(b)(ii)) and Tenant shall repair any damage to the Demised Premises, the Building and the Common Areas resulting from any installation and/or removal thereof. Such removal, if any, shall be in accordance with the following procedures, unless Landlord shall advise Tenant to the contrary by written notice to Tenant:

Core a hole centered over the anchor bolt with a core bit 1.5 times larger than the bolt to be removed, but in no event smaller than 1" in diameter.

Core hole shall be drilled to a depth equal to the bolt depth, but not less than 2" deep. Remove the cored concrete with the anchor bolt from the hole. Clean all concrete slurry and debris from area to be patched. Fill the cored hole with a polymer-modified non-shrink mortar, specifically SikaTop 122 or Master Builders Ceilcote 648 CP, or equivalent, and finish to match surrounding concrete surface.

## ARTICLE 17 - REPAIRS AND MAINTENANCE

17.01. Tenant shall, throughout the Term, take good care of the Demised Premises, the fixtures and appurtenances therein, and shall not do, suffer, or permit any waste with respect thereto. Tenant shall keep and maintain all interior and exterior portions of the Demised Premises including, without limitation, all building equipment, windows, doors, loading bay doors and shelters, plumbing and electrical systems, heating, ventilating and air conditioning ("HVAC") systems (whether located in the interior of the Demised Premises or on the exterior of the Building) exclusively serving the Demised Premises, in a clean and orderly condition and in good order and repair. Tenant shall keep and maintain in a clean and orderly condition all HVAC systems and any other mechanical or other systems exclusively serving the Demised Premises which are located in whole or in part outside the Demised Premises. Tenant shall keep and maintain all exterior

26

components of any windows, doors, loading bay doors and shelters serving the Demised Premises in a clean and orderly condition. The phrase "keep and maintain" as used herein includes repairs, replacement and/or restoration as appropriate. Tenant shall not permit or suffer any over-loading of the floors of the Demised Premises. Tenant shall be responsible for all repairs, interior and exterior, structural and nonstructural, ordinary and extraordinary, in and to the Demised Premises, including the Building and Land and the facilities and systems thereof and the Common Areas, the need for which arises out of (a) the performance or existence of the Tenant's Work or alterations, (b) the installation, use or operation of the Tenant's Property in the Demised Premises, (c) the moving of the Tenant's Property in or out of the Building, or (d) the act, omission, misuse or neglect of Tenant or any of its subtenants or its or their employees, agents, contractors or invitees. Upon request by Landlord, Tenant shall furnish Landlord with true and complete copies of maintenance contracts and with copies of all invoices for work performed, confirming Tenant's compliance with its obligations under this Article. In the event Tenant fails to furnish such copies within thirty (30) days of Landlord's written request upon at least one Business Days advance notice (which in this circumstance may be made by telephonic device), Landlord shall have the right, at Tenant's cost and expense, to conduct such inspections or surveys as may be required to determine whether or not Tenant is in compliance with this Article and to have any work required of Tenant that is not performed within applicable notice and cure periods to be performed at Tenant's cost and expense upon no less than ten (10) Business Days' notice to Tenant. Tenant shall promptly replace all scratched, damaged or broken doors and glass in and about the Demised Premises and shall be responsible for all repairs, maintenance and replacement of wall and floor coverings in the Demised Premises and for the repair and maintenance of all sanitary and electrical fixtures and equipment therein. The Tenant shall also arrange for its own cleaning services and rubbish removal. Tenant shall promptly make all repairs in or to the Demised Premises for which Tenant is responsible, and any repairs required to be made by Tenant to the mechanical, electrical, sanitary, heating, ventilating, air-conditioning or other systems of the Building shall be performed only by contractor(s) designated by Landlord. Any other repairs in or to the Building and the facilities and systems thereof for which Tenant is responsible may, at Landlord's option, be performed by Landlord upon at least ten (10) Business Days advance notice at Tenant's expense; but Landlord may, at its option, before commencing any such work or at any time thereafter, require Tenant to furnish to Landlord such security, in form (including, without limitation, a bond issued by a corporate surety licensed to do business in New Jersey) and amount, as Landlord shall deem necessary to assure the payment for such work by Tenant. Prior to any entry by Landlord upon the Demised Premises as provided in this section, Landlord shall give Tenant reasonable advance notice (stating the date and approximate time of such entry) and afford Tenant the opportunity to have a representative of Tenant accompany Landlord or its representative during such entry, If, on the date and approximate time of such entry as provided in such notice, Tenant shall not have made a representative of Tenant available to accompany Landlord or its representative during such entry, Landlord may lawfully enter upon the Demised Premises on the date and at the approximate time set forth in such notice without the need for such representative of Tenant to be present. The foregoing reasonable advance notice shall be the time period and manner of notice stated in this section, if so stated.

17.02. So long as Tenant is not in default under this Lease beyond any applicable notice and cure period, Landlord shall make all structural repairs and replacements, including, specifically, the roof and roof membrane (except as hereinabove provided in Section 17.01 and as provided in Rider R9) and the cost thereof shall be included in Operating Expenses, for which

27

Tenant shall pay Tenant's Fraction. Landlord shall keep and maintain the Common Areas and shall procure landscaping and snow removal services for the Building and the cost thereof shall be an Additional Charge. Landlord acknowledges that the Tenant may utilize the Demised Premises on a twenty-four (24) hours a day, seven (7) days a week basis. Tenant shall cooperate with Landlord with regard to roof maintenance, repairs and replacements and shall permit Landlord to make such inspections and perform such maintenance, repairs and replacements. Notwithstanding the foregoing, Landlord at its sole cost and expense shall be responsible for structural repairs and/or structural replacements to the foundations, pilings if any, structural steel, structural walls and structural support to the roof, unless the need for such repairs or replacements is due to the act of Tenant or any occupant of the Demised Premises or its or their agents, employees, or contractors.

17.03. Except as otherwise expressly provided in this Lease, Landlord shall have no liability to Tenant, nor shall Tenant's covenants and obligations under this Lease be reduced or abated in any manner whatsoever, by reason of any inconvenience, annoyance, interruption or injury to business arising from Landlord's doing any repairs, maintenance, or changes which Landlord is required or permitted by this Lease, or required by Law, to make in or to any portion of the Building. Without limiting the foregoing (i) Landlord shall not unreasonably interfere with Tenant, its subtenants or assigns or any of the business operations at the Demised Premises while performing any such repairs, maintenance, or changes, and (ii) Landlord shall conduct any work in connection therewith in such a manner as shall be required to minimize any such interference to the extent commercially practicable (but without any obligation to perform same during overtime hours).

17.04. Tenant shall not permit or suffer the overloading of the floors of the Demised Premises beyond 250 pounds per square foot, or lesser amount as may be applicable to any mezzanine area.

## ARTICLE 18 - UTILITY CHARGES

18.01. Tenant shall pay all charges for gas, water, sewer, electricity, heat or other utility or service supplied to the Demised Premises as measured by meters relating to Tenant's use, and the cost of repair, maintenance, replacement, and reading of any meters measuring Tenant's consumption thereof. If any utilities or services are not separately metered or assessed or are only partially separately metered or assessed and are used in common with other tenants or occupants of the Building, Tenant shall pay to Landlord, within thirty (30) days of Landlord's written notice accompanied by appropriate invoices, Tenant's proportionate share of such charges or utilities and/or services, which shall be such charges multiplied by a fraction the numerator of which shall be the Floor Space of the Demised Premises and the denominator of which shall be the Floor Space of all tenants and occupants of the Building using such utilities and/or services. In the event Landlord determines that Tenant's utilization of any such service exceeds the fraction referred to above, Tenant's proportionate share with respect to such service shall, at Landlord's option, mean the percentage of any such service (but not less than the fraction referred to above) which Landlord reasonably estimates as Tenant's utilization. Tenant expressly agrees that Landlord shall not be responsible for the failure of supply to Tenant of any of the aforesaid, or any other utility service. Landlord shall not be responsible for any public or private telephone service to be installed in the space, particularly conduit if required. If Landlord, or its designee is permitted by law to provide electric energy to the Demised Premises by re-registering meters or otherwise and to collect any

28

charges for electric energy, Landlord or its designee shall have the exclusive right to do so, in which event Tenant shall pay to Landlord or its designee upon receipt of bills therefor charges for electric energy provided the rates for such electric energy shall not be more than the rates Tenant would be charged for electric energy if furnished directly to Tenant by the public utility or Tenant's electricity supplier which would otherwise have furnished electric energy. Tenant acknowledges that as of the date hereof it will pay Landlord [***]% of the gas and electric meters serving the Demised Premises, and [***]% of the water charges for the Building. There shall be no administrative fee charged with respect to meter reading.

18.02. Tenant's use of electric energy in the Demised Premises shall not at any time exceed the capacity of any of the electrical conductors and equipment in or otherwise serving the Demised Premises. In order to insure that such capacity is not exceeded and to avert possible adverse effect upon the Building's electric service, Tenant shall not, without Landlord's prior consent in each instance (which shall not be unreasonably withheld, conditioned or delayed) make any alteration or addition to the electric system of the Demised Premises existing on the Commencement Date. Should Landlord grant such consent, all additional risers or other equipment required therefor shall be provided by Landlord and the actual, reasonable, out-of-pocket cost thereof shall be paid by Tenant to Landlord on demand.

18.03. At Landlord's option, Landlord or Landlord's designee shall have the exclusive right, but not the obligation, to install or cause to be installed solar panels or other energy generating equipment on the Building (including but not limited to the roof thereof) for purposes of furnishing in whole or in part electric energy to the Building (herein, an "Energy System"). Tenant shall provide Landlord or its designee with access to the Demised Premises for the installation, maintenance and repair of such Energy System as Landlord or its designee may require so long as such access shall not unreasonably interfere with the normal business operations in the Building of Tenant or its subtenants and assigns, if any. Landlord shall not unreasonably interfere with Tenant, its subtenants or assigns or any of the business operations at the Demised Premises while installing the Energy System, if any, and shall conduct any work in connection therewith in such a manner as shall be required to minimize any such interference to the extent commercially practicable. Tenant may require that Landlord schedule any work with Tenant in advance and conduct such work on such dates and/or at such times as Tenant shall reasonably require to minimize any disturbance to or interference with the business operations in the Demised Premises. If installed, such Energy System shall (either itself or together with such service provided by a public utility provider designated by Tenant) meet the minimum service provided to the Building immediately prior to the installation of such Energy System. In the event Landlord elects to install or cause such Energy System to be installed, Tenant shall purchase electric energy for the Demised Premises from Landlord or its designee and Tenant shall pay the charges established by Landlord or its designee for such service from time to time, but not in excess of the rates payable by Tenant from a third party public utility provider having service available to the Building. Landlord also reserves the right to discontinue furnishing electric energy at any time whether or not Tenant is in default of this Lease upon not less than sixty (60) days' notice to Tenant. Prior to any entry by Landlord upon the Demised Premises as provided in this section, Landlord shall give Tenant reasonable advance notice (stating the date and approximate time of such entry) and afford Tenant the opportunity to have a representative of Tenant accompany Landlord or its representative during such entry, If, on the date and approximate time of such entry as provided in such notice, Tenant shall not have made a representative of Tenant available to accompany Landlord or its

29

representative during such entry, Landlord may lawfully enter upon the Demised Premises on the date and at the approximate time set forth in such notice without the need for such representative of Tenant to be present. The foregoing reasonable advance notice shall be the time period and manner of notice stated in this section, if so stated.

18.04. Subject to the provisions of Article 15 of the Lease, Tenant shall have the right to use and access a portion of the roof of the Building to install and maintain one or more HVAC units and/or satellite antennas, provided that any such satellite antennas shall be used solely in connection with the business operations being performed in the Demised Premises and, provided Landlord has delivered to Tenant a copy of any applicable roof warranty, any such installation shall be performed in a manner which does not impact Landlord's roof warranty, if any, in any way. In the event Tenant has installed its approved roof installations, the Landlord's plans and specifications for installation of any Energy System on the roof of the Building shall be done in a manner which accommodates Tenant's installations.

## ARTICLE 19 - ACCESS, CHANGES AND NAME

19.01. Landlord and its agents shall have the right to enter and/or pass through the Demised Premises at any reasonable time or times (a) to examine the Demised Premises and to show them to actual and prospective Superior Lessors, Superior Mortgagees, or prospective purchasers of the Building, and (b) to make such repairs, alterations, additions and improvements in or to the Demised Premises and/or in or to the Building or its facilities and equipment as Landlord is required or desires to make, provided that (i) Landlord shall use commercially reasonable efforts to minimize interference with Tenant or its assigns or any of the business operations at the Demised Premises which performing any such repairs, alterations, additions and/or improvements, (ii) Landlord shall conduct any work in connection therewith in such a manner as shall be required to minimize interference to the extent commercially practicable (without obligation to perform such work on an overtime basis), and (iii) Tenant may reasonably require that Landlord schedule any work with Tenant in advance and conduct such work on such dates and/or at such times as Tenant shall reasonably require (during regular hours) to minimize disturbance to or interference with the business operations in Demised Premises. Landlord shall be allowed to take all materials into and upon the Demised Premises that may be required in connection therewith, without any liability to Tenant and without any reduction of Tenant's obligations hereunder. During the period of nine (9) months prior to the Expiration Date, Landlord and its agents may exhibit the Demised Premises to prospective tenants. Prior to any entry by Landlord upon the Demised Premises as provided in this section, Landlord shall give Tenant reasonable advance notice (stating the date and approximate time of such entry) and afford Tenant the opportunity to have a representative of Tenant accompany Landlord or its representative during such entry. If, on the date and approximate time of such entry as provided in such notice, Tenant shall not have made a representative of Tenant available to accompany Landlord or its representative during such entry, Landlord may lawfully enter upon the Demised Premises on the date and at the approximate time set forth in such notice without the need for such representative of Tenant to be present. The foregoing reasonable advance notice shall be the time period and manner of notice stated in this section, if so stated.

30

19.02. If at any time any windows of the Demised Premises are temporarily darkened or obstructed by reason of any repairs, improvements, maintenance and/or cleaning in or about the Building, or if any part of the Building or the Common Areas, other than the Demised Premises, is temporarily or permanently closed or inoperable, the same shall not be deemed a constructive eviction and shall not result in any reduction or diminution of Tenant's obligations under this Lease.

19.03. Landlord reserves the right, at any time and from time to time, to make such changes, alterations, additions and improvements in or to the Building and the fixtures and equipment thereof as Landlord shall deem necessary or desirable, provided same shall not unreasonably block or interfere with Tenant's means of ingress and egress to and from the Demised Premises or otherwise adversely impact in any material manner upon the use and enjoyment of the Demised Premises by Tenant and its successors and/or assigns, if any.

19.04. Upon prior notice, Landlord reserves the right to change the address of the Building at any time.

ARTICLE 20 - MECHANICS' LIENS AND OTHER LIENS

20.01. Nothing contained in this Lease shall be construed to imply any consent of Landlord to subject Landlord's interest or estate to any liability under any mechanic's, construction or other lien law. If any lien or any notice of intention (to file a lien), lis pendens, or notice of unpaid balance and right to file lien is filed against the Land, the Building, or any part thereof, or the Demised Premises, or any part thereof, for any work, labor, services or materials claimed to have been performed or furnished for or on behalf of Tenant, or anyone holding any part of the Demised Premises through or under Tenant, Tenant shall cause the same to be canceled and discharged of record by payment, bond or order of a court of competent jurisdiction within thirty (30) days after notice by Landlord to Tenant.

ARTICLE 21 - NON-LIABILITY AND INDEMNIFICATION

21.01. Neither Landlord nor any partner, joint venturer, director, officer, agent, servant or employee of Landlord shall be liable to Tenant for any loss, injury or damage to Tenant or to any other Person, or to its or their property, irrespective of the cause of such injury, damage or loss, unless caused by or resulting from the negligence of Landlord, its agents, servants or employees in the operation or maintenance of the Land or Building without contributory negligence on the part of Tenant or any of its subtenants or licensees or its or their employees, agents or contractors. Further, neither Landlord nor any partner, joint venturer, director, officer, agent, servant or employee of Landlord shall be liable (a) for any such damage caused by other tenants or Persons in, upon or about the Land or Building, or caused by operations in construction of any private, public or quasi-public work; or (b) even if negligent, for consequential damages arising out of any loss of use of the Demised Premises or any equipment or facilities therein by Tenant or any Person claiming through or under Tenant.

21.02. Notwithstanding any provision to the contrary, Tenant shall look solely to the estate and property of Landlord in and to the Land and Building (or the proceeds thereof) in the event of any claim against Landlord arising out of or in connection with this Lease, the relationship of Landlord and Tenant or Tenant's use of the Demised Premises or the Common Areas, and Tenant agrees that the liability of Landlord arising out of or in connection with this Lease, the relationship

31

of Landlord and Tenant or Tenant's use of the Demised Premises or the Common Areas shall be limited to such estate and property of Landlord (or proceeds). No other properties or assets of Landlord or any partner, joint venturer, director, officer, agent, servant or employee of Landlord shall be subject to levy, execution or other enforcement procedures for the satisfaction of any judgment (or other judicial process) or for the satisfaction of any other remedy of Tenant arising out of, or in connection with, this Lease, the relationship of Landlord and Tenant or Tenant's use of the Demised Premises or the Common Areas and if Tenant shall acquire a lien on or interest in any other properties or assets by judgment or otherwise, Tenant shall promptly release such lien on or interest in such other properties and assets by executing, acknowledging and delivering to Landlord an instrument to that effect prepared by Landlord's attorneys.

ARTICLE 22 - DAMAGE OR DESTRUCTION

22.01. If the Building or the Demised Premises shall be partially or totally damaged or destroyed by fire or other casualty (and if this Lease shall not be terminated as in this Article 22 hereinafter provided), Landlord shall repair the damage and restore and rebuild the Building and/or the Demised Premises (except for the Tenant's Property) with reasonable dispatch after notice to it of the damage or destruction and the collection of the insurance proceeds attributable to such damage.

22.02. Subject to the provisions of Section 22.05, if all or part of the Demised Premises shall be damaged or destroyed or rendered completely or partially untenantable on account of fire or other casualty, the Rent shall be abated or reduced, as the case may be, in the proportion that the untenantable area of the Demised Premises bears to the total area of the Demised Premises (to the extent of rent insurance proceeds received by Landlord from insurance maintained by Landlord), for the period from the date of the damage or destruction to (a) the date the damage to the Demised Premises shall be substantially repaired, or (b) if the Building and not the Demised Premises is so damaged or destroyed, the date on which the Demised Premises shall be made tenantable; provided, however, should Tenant reoccupy a portion of the Demised Premises during the period the repair or restoration work is taking place and prior to the date that the Demised Premises are substantially repaired or made tenantable the Rent allocable to such reoccupied portion, based upon the proportion which the area of the reoccupied portion of the Demised Premises bears to the total area of the Demised Premises, shall be payable by Tenant from the date of such occupancy.

22.03. If (a) the Building or the Demised Premises shall be totally damaged or destroyed by fire or other casualty, or (b) the Demised Premises shall be so damaged or destroyed by fire or other casualty that its repair or restoration requires the expenditure, as estimated by a reputable contractor or architect designated by Landlord and acceptable to Tenant, of more than [***] (or [***] if such casualty occurs during the last year of the Term) of the full insurable value of the Demised Premises immediately prior to the casualty, or (c) the Demised Premises shall be damaged or destroyed by fire or other casualty and either the loss shall not be covered by Landlord's or Tenant's insurance or the net insurance proceeds (after deducting all expenses in connection with obtaining such proceeds) shall, in the estimation of a reputable contractor or architect designated by Landlord and acceptable to Tenant be insufficient to pay for the repair or restoration work, then in either such case Landlord may terminate this Lease by giving Tenant notice to such effect within ninety (90) days after the date of the fire or other casualty.

32

Tenant's acceptance of such architect or contractor shall not be unreasonably withheld, delayed or conditioned and acceptance shall be deemed if no response is received within five (5) Business Days of Landlord's notice. Upon request by Tenant, Landlord shall advise Tenant of Landlord's reasonably estimated completion date of such restoration (the "Landlord's Advise") and if such date is more than twelve (12) months following the date of casualty, provided Tenant's grossly negligent or intentional acts were not cause of such casualty, Tenant shall have the right to terminate this Lease upon fifteen (15) days prior notice to Landlord, given within fifteen (15) days of Landlord's Advise. In addition, in the event the Demised Premises are not substantially restored on or before the later of the estimated date specified in the Landlord's Advise, if any, or twelve (12) months following the date of casualty, provided Tenant's grossly negligent or intentional acts were not the cause of such casualty, Tenant shall have the right to terminate this Lease upon thirty (30) days prior notice to Landlord, if given within the later of thirty (30) days following the estimated date specified in Landlord's Advise, or thirteen (13) months following the date of casualty, provided Tenant's grossly negligent or intentional acts were not the cause of such casualty.

22.04. Except as provided in the preceding section, Tenant shall not be entitled to terminate this Lease and no damages, compensation or claim shall be payable by Landlord for inconvenience, loss of business or annoyance arising from any repair or restoration of any portion of the Demised Premises or of the Building pursuant to this Article 22. Landlord shall use its best efforts to make such repair or restoration promptly and in such manner as to not unreasonably interfere with Tenant's use and occupancy of the Demised Premises, but Landlord shall not be required to do such repair or restoration work except during Business Hours on Business Days.

22.05. Notwithstanding any of the foregoing provisions of this Article 22, if by reason of some act or omission on the part of Tenant or any of its subtenants or its or their partners, directors, officers, servants, employees, agents or contractors, Landlord or any Superior Lessor or any Superior Mortgagee shall be unable to collect all of the insurance proceeds (including, without limitation, rent insurance proceeds) applicable to damage or destruction of the Demised Premises or of the Building by fire or other casualty, then, without prejudice to any other remedies which may be available against Tenant, there shall be no abatement or reduction of the Rent. Further, nothing contained in this Article 21 shall relieve Tenant from any liability that may exist as a result of any damage or destruction by fire or other casualty.

22.06. Landlord will not carry insurance of any kind on the Tenant's Property and, except as provided by law or by reason of Landlord's breach of any of its obligations hereunder, shall not be obligated to repair any damage to or replace the Tenant's Property.

22.07. The provisions of this Article 22 shall be deemed an express agreement governing any case of damage or destruction of the Building by fire or other casualty, and any law providing for such a contingency in the absence of an express agreement, now or hereafter in force, shall have no application in such case.

33

ARTICLE 23 - EMINENT DOMAIN

23.01. If the whole of the Demised Premises shall be taken by any public or quasi-public authority under the power of condemnation, eminent domain or expropriation, or in the event of conveyance of the whole of the Demised Premises in lieu thereof, this Lease shall terminate as of the day possession shall be taken by such authority. If [***]% or less of the Floor Space of the Demised Premises shall be so taken or conveyed, this Lease shall terminate only in respect of the part so taken or conveyed as of the day possession shall be taken by such authority. Except as otherwise provided herein, if more than [***]% of the Floor Space of the Demised Premises shall be so taken or conveyed, this Lease shall terminate only in respect of the part so taken or conveyed as of the day possession shall be taken by such authority, but either party shall have the right to terminate this Lease upon notice given to the other party within 30 days after such taking possession. If more than [***]% of the Floor Space of the Building shall be so taken or conveyed, Landlord may, by notice to Tenant, terminate this Lease as of the day possession shall be taken. Tenant shall also have the right to so terminate the Lease if commercially reasonable access to the Building shall be so taken or conveyed, or if any parking or truck court areas required for Tenant to conduct its normal business operations at the Demised Premises shall be so taken or conveyed, or if Tenant shall otherwise determine in its reasonable discretion that it is unable to conduct its business operations at the Demised Premises from a single location or otherwise in a cost effective manner at the Demised Premises as a result of any such taking or conveyance. If this Lease shall continue in effect as to any portion of the Demised Premises not so taken or conveyed, the Rent shall be computed as of the day possession shall be taken on the basis of the remaining Floor Space of the Building. Except as specifically provided herein, in the event of any such taking or conveyance there shall be no reduction in Rent. If this Lease shall continue in effect, Landlord shall, at its expense, but shall be obligated only to the extent of the net award or other compensation (after deducting all expenses in connection with obtaining same) available to Landlord for the improvements taken or conveyed (excluding any award or other compensation for land or for the unexpired portion of the term of any Superior Lease), promptly make all necessary alterations so as to constitute the remaining Building a complete architectural and tenantable unit, except for the Tenants' property, and Tenant shall make all alterations or replacements to the Tenant's Property and decorations in the Demised Premises. All awards and compensation for any taking or conveyance, whether for the whole or a part of the Demised Premises, the Land or Building, shall be the property of Landlord, and Tenant hereby assigns to Landlord all of Tenant's right, title and interest in and to any and all such awards and compensation, including, without limitation, any award or compensation for the value of the unexpired portion of the Term. Tenant shall be entitled to claim, prove and receive in the condemnation proceeding such award or compensation as may be allowed for the Tenant's property and for loss of business, good will, and depreciation or injury to and cost of removal of the Tenant's property, but only if such award or compensation shall be made by the condemning authority in addition to, and shall not result in a reduction of, the award or compensation made by it to Landlord.

23.02. If the temporary use or occupancy of all or any part of the Demised Premises shall be taken during the Term, Tenant shall be entitled, except as hereinafter set forth, to receive that portion of the award or payment for such taking which represents compensation for the use and occupancy of the Demised Premises, for the taking of the Tenant's Property and for moving expenses, and Landlord shall be entitled to receive that portion which represents reimbursement for the cost of restoration of the Demised Premises. This Lease shall be and remain unaffected by such taking and Tenant shall continue to be responsible for all of its obligations hereunder insofar as such obligations are not affected by such taking and shall continue to pay the Rent in full when due. If the period of temporary use or occupancy shall extend beyond the Expiration Date, that part of the award or payment which represents compensation for the use and occupancy of the

34

Demised Premises (or a part thereof) shall be divided between Landlord and Tenant so that Tenant shall receive (except as otherwise provided below) so much thereof as represents compensation for the period up to and including the Expiration Date and Landlord shall receive so much thereof as represents compensation for the period after the Expiration Date. All monies to be paid to Tenant as, or as part of, an award or payment for temporary use and occupancy for a period beyond the date to which the Rent has been paid shall be received, held and applied by the first Superior Mortgagee (or if there is no Superior Mortgagee, by Landlord as a trust fund) for payment of the Rent becoming due hereunder.

ARTICLE 24 - SURRENDER

24.01. On the Expiration Date, or upon any earlier termination of this Lease, or upon any re-entry by Landlord upon the Demised Premises, Tenant shall quit and surrender the Demised Premises to Landlord "broom-clean" and in good order, condition and repair, except for ordinary wear and tear and such damage or destruction as Landlord is required to repair or restore under this Lease, and Tenant shall remove all of Tenant's property therefrom except as otherwise expressly provided in this Lease.

24.02. If Tenant remains in possession of the Demised Premises after the expiration of the Term, Tenant shall be deemed to be occupying the Demised Premises at the sufferance of Landlord subject to all of the provisions of this Lease, except that the monthly Fixed Rent shall be twice the Fixed Rent in effect during the last month of the Term, except the holdover rate for the first month if Landlord is notified and if paid prior thereto shall be [***]% of such Fixed Rent.

24.03. No act or thing done by Landlord or its agents shall be deemed an acceptance of a surrender of the Demised Premises, and no agreement to accept such surrender shall be valid unless in writing and signed by Landlord.

ARTICLE 25 - CONDITIONS OF LIMITATION

25.01. This Lease is subject to the limitation that whenever Tenant or any Guarantor (a) shall make an assignment for the benefit of creditors, or (b) shall commence a voluntary case or have entered against it an order for relief under any chapter of the Federal Bankruptcy Code (Title 11 of the United States Code) or any similar order or decree under any federal or state law, now in existence, or hereafter enacted having the same general purpose, and such order or decree shall have not been stayed or vacated within 90 days after entry, or (c) shall cause, suffer, permit or consent to the appointment of a receiver, trustee, administrator, conservator, sequestrator, liquidator or similar official in any federal, state or foreign judicial or nonjudicial proceeding, to hold, administer and/or liquidate all or substantially all of its assets, and such appointment shall not have been revoked, terminated, stayed or vacated and such official discharged of his duties within 90 days of his appointment then Landlord, at any time after the occurrence of any such event, may give Tenant a notice of intention to end the Term at the expiration of five (5) days from the date of service of such notice of intention, and upon the expiration of said five (5) day period, whether or not the Term shall theretofore have commenced, this Lease shall terminate with the same effect as if that day were the expiration date of this Lease, but Tenant shall remain liable for damages as provided in Article 27.

35

25.02. This Lease is subject to the further limitations that: (a) if Tenant shall default in the payment of any Rent and shall not cure such default within ten (10) days of such notice of default, or (b) if Tenant shall, whether by action or inaction, be in default of any of its obligations under this Lease (other than a default in the payment of Rent) and such default shall continue and not be remedied within thirty (30) days after Landlord shall have given to Tenant a notice specifying the same, or, in the case of a default which cannot with due diligence be cured within a period of thirty (30) days and the continuance of which for the period required for cure will not subject Landlord or any Superior Lessor or prosecution for a crime or offense (as more particularly described in Section 12.02) or termination of any Superior Lease or foreclosure of any Superior Mortgage, if Tenant shall not, (i) within said thirty (30) day period advise Landlord of Tenant's intention to take all steps necessary to remedy such default, (ii) duly commence within said thirty (30) day period, and thereafter diligently prosecute to completion all steps necessary to remedy the default, and (iii) complete such remedy within a reasonable time after the date of said notice by Landlord, or (c) if any event shall occur or any contingency shall arise whereby this Lease would, by operation of law or otherwise, devolve upon or pass to any person, firm or corporation other than Tenant, except as expressly permitted by Article 11, or (d) if Tenant shall abandon the Demised Premises, then in any of said cases Landlord may give to Tenant a notice of intention to end the Term at the expiration of five (5) days from the date of the service of such notice of intention, and upon the expiration of said five (5) days, whether or not the Term shall theretofore have commenced, this Lease shall terminate with the same effect as if that day were the expiration date of this Lease, but Tenant shall remain liable for damages as provided in Article 27.

ARTICLE 26 - RE-ENTRY BY LANDLORD

26.01. If Tenant shall default in the payment of any Rent, or if this Lease shall terminate as provided in Article 25, Landlord or Landlord's agents and employees may immediately or at any time thereafter re-enter the Demised Premises, or any part thereof, either by summary dispossess proceedings or by any suitable action or proceeding at law without being liable to indictment, prosecution or damages therefor, and may repossess the same, and may remove any Person therefrom, to the end that Landlord may have, hold and enjoy the Demised Premises. The word "re-enter," as used herein, is not restricted to its technical legal meaning. If this Lease is terminated under the provisions of Article 25, or if Landlord shall re-enter the Demised Premises under the provisions of this Article 26, or in the event of the termination of this Lease, or of re-entry, by or under any summary dispossess or other proceedings or action or any provision of law by reason of default hereunder on the part of Tenant, Tenant shall thereupon pay to Landlord the Rent payable up to the time of such termination of this Lease, or of such recovery of possession of the Demised Premises by Landlord, as the case may be, and shall also pay to Landlord damages as provided in Article 27.

26.02. In the event of a breach or threatened breach by Tenant of any of its obligations under this Lease, Landlord shall also have the right of injunction. The special remedies to which Landlord may resort hereunder are cumulative and are not intended to be exclusive of any other remedies to which Landlord may lawfully be entitled at any time and Landlord may invoke any remedy allowed at law or in equity as if specific remedies were not provided for herein.

36

26.03. If this Lease shall terminate under the provisions of Article 25, or if Landlord shall re-enter the Demised Premises under the provisions of this Article 26, or in the event of the termination of this Lease, or of re-entry, by or under any summary dispossess or other proceeding or action or any provision of law by reason of default hereunder on the part of Tenant, Landlord shall be entitled to retain all monies, if any, paid by Tenant to Landlord, whether as Advance Rent, security or otherwise, but such monies shall be credited by Landlord against any Rent due from Tenant at the time of such termination or re-entry or, at Landlord's option, against any damages payable by Tenant under Article 27 or pursuant to law with the excess, if any, promptly refunded to Tenant.

## ARTICLE 27 - DAMAGES

27.01. If this Lease is terminated under the provisions of Article 25, or if Landlord shall re-enter the Demised Premises under the provisions of Article 26, or in the event of the termination of this Lease, or of re-entry, by or under any summary dispossess or other proceeding or action or any provision of law by reason of default hereunder on the part of Tenant, Tenant shall pay as Additional Charges to Landlord, at the election of Landlord, either or any combination of:

(a) a sum which at the time of such termination of this Lease or at the time of any such re-entry by Landlord, as the case may be, represents the then value of the excess, if any, of (i) the aggregate amount of the Rent which would have been payable by Tenant (conclusively presuming the average monthly Additional Charges to be the same as were the average monthly Additional Charges payable for the year, or if less than 365 days have then elapsed since the Commencement Date, the partial year, immediately preceding such termination or re-entry) for the period commencing with such earlier termination of this Lease or the date of any such re-entry, as the case may be, and ending with the Expiration Date, over (ii) the aggregate rental value of the Demised Premises for the same period; or

(b) sums equal to the Fixed Rent and the Additional Charges which would have been payable by Tenant had this Lease not so terminated, or had Landlord not so re-entered the Demised Premises, payable upon the due dates therefor specified herein following such termination or such re-entry and until the Expiration Date, provided, however, that if Landlord shall relet the Demised Premises during said period, Landlord shall credit Tenant with the net rents received by Landlord from such reletting, such net rents to be determined by first deducting from the gross rents as and when received by Landlord from such reletting the expenses incurred or paid by Landlord in terminating this Lease or in re-entering the Demised Premises and in securing possession thereof, as well as the expenses of reletting, including, without limitation, altering and preparing the Demised Premises for new tenants, brokers' commissions, legal fees, and all other expenses properly chargeable against the Demised Premises and the rental therefrom, it being understood that any such reletting may be for a period shorter or longer than the period ending on the Expiration Date; but in no event shall Tenant be entitled to receive any excess of such net rents over the sums payable by Tenant to Landlord hereunder, nor shall Tenant be entitled in any suit for the collection of damages pursuant to this subdivision (b) to a credit in respect of any rents from a reletting, except to the extent that such net rents are actually received by Landlord. If the Demised Premises or any part thereof should be relet in combination with other space, then proper apportionment on a square foot basis shall be made of the rent received from such reletting and of the expenses of reletting.

37

If the Demised Premises or any part thereof should be re-let by Landlord before presentation of proof of such damages to any court, commission or tribunal, the amount of rent reserved upon such re-letting shall, prima facie, be the fair and reasonable rental value for the Demised Premises, or part thereof, so re-let during the term of the re-letting. Landlord shall not be liable in any way whatsoever for its failure to re-let the Demised Premises or any part thereof, or if the Demised Premises or any part thereof are re-let, for its failure to collect the rent under such re-letting, and no such failure to re-let or failure to collect rent shall release or affect Tenant's liability for damages or otherwise under this Lease. Landlord shall use commercially reasonable efforts to re-let the Demised Premises to mitigate Landlord's damages. For the purposes hereof, "commercially reasonable efforts" shall mean the following actions, which actions shall create an irrebuttable presumption that Landlord has fulfilled such obligation: (i) Landlord shall include the availability of the Demised Premises in Landlord's leasing flyers sent to brokers (if any), commencing following Landlord's recovery of possession of the Demised Premises, and ending upon re-leasing of the Demised Premises; and (ii) Landlord shall include the availability of the Demised Premises on a website operated by Landlord or its affiliate (if any), commencing following Landlord's recovery of possession of the Demised Premises, and ending upon re-leasing of the Demised Premises; and (iii) Landlord shall hold an "Open House" for the Demised Premises within forty-five (45) days of Landlord's recovery of possession of the Demised Premises, or (iv) in lieu of (i), (ii) and (iii) of this paragraph, upon Tenant's written request, or at Landlord's option, Landlord shall engage an independent commercial real estate broker to re-let the Demised Premises, the cost and expense of which shall be an element of Landlord's damages in addition to any other damages recoverable pursuant to Section 29.01 hereof. Nothing contained herein shall require Landlord to re-let the Demised Premises prior to or with any preference over the leasing of any other similar premises of Landlord or any affiliate of Landlord, nor shall any rental of such other premises reduce the damages which Landlord would be entitled to recover from Tenant. In the event Tenant, on behalf of itself or any and all persons claiming through or under Tenant, attempts to raise a defense or assert any affirmative obligations on Landlord's part to mitigate such damages or re-let the Demised Premises other than as provided herein, Tenant shall reimburse Landlord for any costs and expenses incurred by Landlord as a result of any such defense or assertion, including but not limited to Landlord's attorneys' fees incurred in connection therewith.

27.02. Suit or suits for the recovery of such damages or, any installments thereof, may be brought by Landlord at any time and from time to time at its election, and nothing contained herein shall be deemed to require Landlord to postpone suit until the date when the Term would have expired if it had not been so terminated under the provisions of Article 24, or under any provision of law, or had Landlord not re-entered the Demised Premises. Nothing herein contained shall be construed to limit or preclude recovery by Landlord against Tenant of any sums or damages to which, in addition to the damages particularly provided above, Landlord may lawfully be entitled by reason of any default hereunder on the part of Tenant. Nothing herein contained shall be construed to limit or prejudice the right of Landlord to prove for and obtain as damages by reason of the termination of this Lease or re-entry of the Demised Premises for the default of Tenant under this Lease, an amount equal to the maximum allowed by any statute or rule of law in effect at the time, whether or not such amount be greater than, equal to, or less than any of the sums referred to in Section 27.01.

27.03. In addition, if this Lease is terminated under the provisions of Article 25, or if Landlord shall re-enter the Demised Premises under the provisions of Article 26, Tenant covenants that: (a) the Demised Premises then shall be in the same condition as that in which Tenant has agreed to surrender the same to Landlord at the Expiration Date; (b) Tenant shall have performed

38

prior to any such termination any obligation of Tenant contained in this Lease for the making of any alteration or for restoring or rebuilding the Demised Premises or the Building, or any part thereof; and (c) for the breach of any covenant of Tenant set forth above in this Section 27.03, Landlord shall be entitled immediately, without notice or other action by Landlord, to recover, and Tenant shall pay, as and for liquidated damages therefor, the cost of performing such covenant (as estimated by an independent contractor selected by Landlord).

27.04. In addition to any other remedies Landlord may have under this Lease, and without reducing or adversely affecting any of Landlord's rights and remedies under this Article 27, if any Rent or damages payable hereunder by Tenant to Landlord are not paid within ten (10) Business Days of written demand therefor, the same shall bear interest at the Late Payment Rate or the maximum rate permitted by law, whichever is less, from the due date thereof until paid, and the amounts of such interest shall be Additional Charges hereunder.

## ARTICLE 28 - AFFIRMATIVE WAIVERS

28.01. Tenant, on behalf of itself and any and all persons claiming through or under Tenant, does hereby waive and surrender all right and privilege which it, they or any of them might have under or by reason of any present or future law, to redeem the Demised Premises or to have a continuance of this Lease after being dispossessed or ejected from the Demised Premises by process of law or under the terms of this Lease or after the termination of this Lease as provided in this Lease.

28.02. Landlord and Tenant hereby waive trial by jury in any action, proceeding or counterclaim brought by either against the other on any matter whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, and Tenant's use or occupancy of the Demised Premises and use of the Common Areas including, without limitation, any claim of injury or damage, and any emergency and other statutory remedy with respect thereto. Tenant shall not interpose any counterclaim of any kind in any action or proceeding commenced by Landlord to recover possession of the Demised Premises.

## ARTICLE 29 - NO WAIVERS

29.01. The failure of either party to insist in any one or more instances upon the strict performance of any one or more of the obligations of this Lease, or to exercise any election herein contained, shall not be construed as a waiver or relinquishment for the future of the performance of such one or more obligations of this Lease or of the right to exercise such election, but the same shall continue and remain in full force and effect with respect to any subsequent breach, act or omission. The receipt by Landlord of Fixed Rent or Additional Charges with knowledge of breach by Tenant of any obligation of this Lease shall not be deemed a waiver of such breach.

## ARTICLE 30 - CURING TENANT'S DEFAULTS

30.01. If Tenant shall default in the performance of any of Tenant's obligations under this Lease beyond applicable notice and cure periods, Landlord, without thereby waiving such default, may (but shall not be obligated to) perform the same for the account and at the expense of Tenant, without notice in a case of emergency, and in any other case only if such default continues after the expiration of thirty (30) days from the date Landlord gives Tenant notice of the default beyond

39

applicable notice and cure periods. Charges for any expenses incurred by Landlord in connection with any such performance by it for the account of Tenant, and charges for all costs, expenses and disbursements of every kind and nature whatsoever, including reasonable attorneys' fees and expenses, involved in collecting or endeavoring to collect the Rent or any part thereof or enforcing or endeavoring to enforce any rights against Tenant or Tenant's obligations hereunder, under or in connection with this Lease or pursuant to law, including any such cost, expense and disbursement involved in instituting and prosecuting summary proceedings or in recovering possession of the Demised Premises after default by Tenant or upon the expiration of the Term or sooner termination of this Lease, and interest on all sums advanced by Landlord under this Article at the Late Payment Rate or the maximum rate permitted by law, whichever is less, shall be payable by Tenant and may be invoiced by Landlord to Tenant monthly, or immediately, or at any time, at Landlord's option, and such amounts shall be due and payable within ten (10) Business Days of the delivery of written demand therefor.

## ARTICLE 31 - BROKER

31.01. Landlord and Tenant each represent to the other that no broker except the Broker was instrumental in bringing about or consummating this Lease and that Tenant had no conversations or negotiations with any broker except the Broker concerning the leasing of the Demised Premises to Tenant. The representing party agrees to indemnify and hold harmless the other against and from any claims for any brokerage commissions and all costs, expenses and liabilities in connection therewith, including, without limitation, attorneys' fees and expenses, arising out of any conversations or negotiations had by the representing party with any broker other than the Broker. Landlord shall pay any brokerage commissions due the Broker pursuant to a separate agreement between Landlord and the Broker. Landlord agrees to indemnify and hold harmless Tenant against and from any claims for any brokerage commission and all costs, expenses and liabilities in connection therewith, including, without limitation, attorneys' fees and expenses, arising out of claim for a commission or other compensation in connection with this Lease by the Broker.

## ARTICLE 32 - NOTICES

32.01. Any notice, statement, demand, consent, approval or other communication required or permitted to be given, rendered or made by either party to the other, pursuant to this Lease or pursuant to any applicable Legal Requirement (each, a "Notice"), shall be in writing and shall be deemed to have been properly given, rendered or made only if hand delivered or sent by United States registered or certified mail, return receipt requested, addressed to the other party at the address hereinabove set forth and as to Landlord, to the attention of General Counsel with a concurrent copy of the Notice to the attention of Controller, as to Tenant, to the attention of the Chief Financial Officer with a concurrent copy of a Notice pertaining to a default and/or lease termination to Chiesa Shahinian & Giantomasi PC, One Boland Drive, West Orange, New Jersey 07052, to the attention of Mitchell S. Berkey, Esq., and shall be deemed to have been given, rendered or made on the second day after the day so mailed, unless mailed outside the State of New Jersey, in which case it shall be deemed to have been given, rendered or made on the third business day after the day so mailed. Either party may, by notice as aforesaid, designate a different address or addresses for notices, statements, demands, consents, approvals or other communications intended for it. In addition, upon and to the extent requested by Landlord, copies of notices shall be sent to the Superior Mortgagee. Notices sent by counsel to either party and complying with the foregoing provisions of this Article 32 shall be valid and effective.

40

ARTICLE 33 - ESTOPPEL CERTIFICATES

33.01. Tenant shall, at any time and from time to time, as requested by the Landlord, but not more than twice in a given twelve (12) month period, upon not less than ten (10) days' prior notice, execute and deliver to the Landlord or a Superior Mortgagee or Superior Lessor a statement certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications), certifying the dates to which the Fixed Rent and Additional Charges have been paid, stating whether or not, to the actual knowledge of Tenant, the Landlord is in default in performance of any of its obligations under this Lease, and, if so, specifying each such default of which Tenant shall have actual knowledge, and stating whether or not, to the actual knowledge of Tenant, any event has occurred which with the giving of notice or passage of time, or both, would constitute such a default of Landlord, and, if so, specifying each such event; any such statement delivered pursuant hereto shall be deemed a representation and warranty to be relied upon by others with whom such party may be dealing, regardless of independent investigation, but as between Landlord and Tenant shall not be deemed to be an amendment of this Lease. Tenant also shall include in any such statement such other information concerning this Lease as Landlord may reasonably request.

33.02. Landlord shall, at any time and from time to time as requested by the Tenant, but not more frequently than twice in any given twelve (12) month period, upon not less than ten (10) days' prior notice, execute and deliver to the Tenant or its designee a statement certifying that this Lease is unmodified and in full for and effect (or if there have been modifications, that the same is in full for and effect as modified and stating the modifications), certifying the dates to which the Fixed Rent and Additional Charges have been paid, stating whether or not, to the actual knowledge of Landlord, the Tenant is in default in performance of any of its obligations under this Lease, and if so, specifying each such default of which Landlord shall have actual knowledge, and stating whether or not, to the actual knowledge of Landlord, any event has occurred which with the giving of notice or passage of time, or both, would constitute such a default of Tenant, and, if so, specifying each such event; any such statement delivered pursuant thereto shall be deemed a representation and warranty to be relied upon by others with whom Tenant may be dealing, regardless of independent investigation, but as between Landlord and Tenant shall not be deemed to be an amendment of this Lease. Landlord also shall include in any such statement such other information concerning this Lease as Tenant may reasonably request.

ARTICLE 34 - ARBITRATION

34.01. Landlord may at any time request arbitration, and Tenant may at any time when not in default in the payment of any Rent beyond applicable notice and cure periods, request arbitration, of any matter in dispute but only where arbitration is expressly provided for in this Lease. The party requesting arbitration shall do so by giving notice to that effect to the other party, specifying in said notice the nature of the dispute, and said dispute shall be determined in Newark, New Jersey, by a single arbitrator, in accordance with the rules then obtaining of the American Arbitration Association. The award in such arbitration may be enforced on the application of either party by the order or judgment of a court of competent jurisdiction. The fees and expenses of any

41

arbitration shall be borne by the parties equally, but each party shall bear the expense of its own attorneys and experts and the additional expenses of presenting its own proof. If Tenant gives notice requesting arbitration as provided in this Article, Tenant shall simultaneously serve a duplicate of the notice on each Superior Mortgagee and Superior Lessor whose name and address shall previously have been furnished to Tenant in writing, and such Superior Mortgagees and Superior Lessor shall have the right to participate in such arbitration.


ARTICLE 35 - MEMORANDUM OF LEASE

35.01. At the request of either party, the other party shall promptly execute, acknowledge and deliver to the requesting party a memorandum of lease in respect of this Lease sufficient for recording. Such memorandum shall not be deemed to change or otherwise affect any of the obligations or provisions of this Lease. Whichever party records such memorandum of Lease shall pay all recording costs and expenses, including any taxes that are due upon such recording.


ARTICLE 36 - MISCELLANEOUS

36.01. Tenant expressly acknowledges and agrees that Landlord has not made and is not making, and Tenant, in executing and delivering this Lease, is not relying upon, any warranties, representations, promises or statements, except to the extent that the same are expressly set forth in this Lease or in any other written agreement(s) which may be made between the parties concurrently with the execution and delivery of this Lease. All understandings and agreements heretofore had between the parties with respect to the subject matter of this Lease are merged in this Lease and any other written agreement(s) made concurrently herewith, which alone fully and completely express the agreement of the parties and which are entered into after full investigation. Neither party has relied upon any statement or representation not embodied in this Lease or in any other written agreement(s) made concurrently herewith. The submission of this Lease to Tenant does not constitute by Landlord a reservation of, or an option to Tenant for, the Demised Premises, or an offer to lease on the terms set forth herein and this Lease shall become effective as a lease agreement only upon execution and delivery thereof by Landlord and Tenant.

36.02. No agreement shall be effective to change, modify, waive, release, discharge, terminate or effect an abandonment of this Lease, in whole or in part, unless such agreement is in writing, refers expressly to this Lease and is signed by the party against whom enforcement of the change, modification, waiver, release, discharge, termination or effectuation of abandonment is sought.

36.03. If Tenant shall at any time request Landlord to sublet or let the Demised Premises for Tenant's account, Landlord or its agent is authorized to receive keys for such purposes without releasing Tenant from any of its obligations under this Lease, and Tenant hereby releases Landlord of any liability for loss or damage to any of the Tenant's Property in connection with such subletting or letting unless and to the extent resulting from the negligence or intentional misconduct of Landlord or its agents, employees or contractors.

36.04. Except as otherwise expressly provided in this Lease, the obligations under this Lease shall bind and benefit the successors and assigns of the parties hereto with the same effect as if mentioned in each instance where a party is named or referred to; provided, however, that (a) no violation of the provisions of Article 11 shall operate to vest any rights in any successor or assignee of Tenant and (b) the provisions of this Section 36.04 shall not be construed as modifying the conditions of limitation contained in Article 25.

42

36.05. Except for Tenant's obligations to pay Rent, the time for Landlord or Tenant, as the case may be, to perform any of its respective obligations hereunder shall be extended if and to the extent that the performance thereof shall be prevented due to any Unavoidable Delay. Except as expressly provided to the contrary, the obligations of Tenant hereunder shall not be affected, impaired or excused, nor shall Landlord have any liability whatsoever to Tenant, because Landlord is unable to fulfill, or is delayed in fulfilling, any of its obligations under this Lease due to any of the matters set forth in the first sentence of this Section 36.05, or because of any failure or defect in the supply, quality or character of electricity, water or any other utility or service furnished to the Demised Premises for any reason beyond Landlord reasonable control.

36.06. Any liability for payments hereunder during the Term (including, without limitation, Additional Charges) shall survive the expiration of the Term or earlier termination of this Lease.

36.07. If Tenant shall request Landlord's consent and Landlord shall fail or refuse to give such consent, Tenant shall not be entitled to any damages for any withholding by Landlord of its consent; Tenant's sole remedy shall be an action for specific performance or injunction, and such remedy shall be available only in those cases where Landlord has expressly agreed in writing not to unreasonably withhold or delay its consent or where as a matter of law Landlord may not unreasonably withhold its consent.

36.08. Intentionally omitted.

36.09. Tenant shall not exercise its rights under Article 15 or any other provision of this Lease in a manner which would create any work stoppage, picketing labor disruption or dispute or any interference with the business of Landlord or any tenant or occupant of the Building.

36.10. Tenant shall give prompt notice to Landlord of (a) any occurrence in or about the Demised Premises for which Landlord might be liable, (b) any fire or other casualty in the Demised Premises, (c) any damage to or defect in the Demised Premises, including the fixtures and equipment thereof, for the repair of which Landlord might be responsible, and (d) any damage to or defect in any part of the Building's sanitary, electrical, heating, ventilating, air-conditioning, elevator or other systems located in passing through the Demised Premises or any part thereof.

36.11. This Lease shall be governed by and construed in accordance with the laws of the State of New Jersey. Tenant and Landlord each hereby irrevocably agrees that any legal action or proceeding arising out of or relating to this Lease may be brought in the Courts of the State of New Jersey, or the Federal District Court for the District of New Jersey, as Landlord or Tenant as plaintiff may elect. By execution and delivery of this Lease, Tenant hereby irrevocably accepts and submits generally and unconditionally for itself and with respect to its properties, to the jurisdiction of any such court in any such action or proceeding, and hereby waives in the case of any such action or proceeding brought in the courts of the State of New Jersey, or Federal District Court for the District of New Jersey, any defenses based on jurisdiction, venue or forum non

43

coveniens. If any provision of this Lease shall, be invalid or unenforceable, the remainder of this Lease shall not be affected and shall be enforced to the extent permitted by law. The table of contents, captions, headings and titles in this Lease are solely for convenience of reference and shall not affect its interpretation. This Lease shall be construed without regard to any presumption or other rule requiring construction against the party causing this Lease to be drafted. If any words or phrases in this Lease shall have been stricken out or otherwise eliminated, whether or not any other words or phrases have been added, this Lease shall be construed as if the words or phrases so stricken out or otherwise eliminated were never included in this Lease and no implication or inference shall be drawn from the fact that said words or phrases were so stricken out or otherwise eliminated. Each covenant, agreement, obligation or other provision of this Lease on Tenant's part to be performed, shall be deemed and construed as a separate and independent covenant of Tenant, not dependent on any other provision of this Lease. All terms and words used in this Lease, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender as the context may require. Tenant specifically agrees to pay all of Landlord's costs, charges and expenses, including attorneys' fees, incurred in connection with any document review requested by Tenant and upon submission of bills therefor. In the event Landlord permits Tenant to examine Landlord's books and records with respect to any Additional Charge imposed under this Lease, such examination shall be conducted at Tenant's sole cost and expense and shall be conditioned upon Tenant retaining an independent accounting firm for such purposes which shall not be compensated on any type of contingent fee basis with respect to such examination. Wherever in this Lease or by law Landlord is authorized to charge or recover costs and expenses for legal services or attorneys' fees, same shall include, without limitation, the costs and expenses for in-house or staff legal counsel or outside counsel at rates not to exceed the reasonable and customary charges for any such services as would be imposed in an arms length third party agreement for such services.

36.12. Upon request made not more than two (2) times in any twelve (12) month period, Tenant shall furnish to Landlord a copy of its then current audited financial statement (provided however that an unaudited statement certified as true and complete by Tenant's senior financial officer shall be acceptable in the event audited statements are not prepared for Tenant) which shall be employed by Landlord for purposes of financing the Demised Premises and not distributed otherwise without prior authorization of Tenant.

36.13. (i) Tenant represents that the NAICS code number applicable to Tenant's operations is 424310 which, as of the Commencement Date, does not subject the Demised Premises to the requirements of the New Jersey Industrial Site Recovery Act, N.J.S.A. 13:1K-6 et seq. ("ISRA") and applicable regulations, N.J.A.C. 7:26B-1.1 et seq.

(ii) Not later than ninety (90) days prior to the Expiration Date, Tenant shall provide to Landlord an affidavit, executed by a duly authorized officer of Tenant, setting forth the following: (a) the NAICS code applicable to the operations performed at the Demised Premises; and (b) the type and amounts of any hazardous substances (as defined in N.J.A.C. 7:1E-1.6) treated, stored, disposed of, handled, or used in Tenant's operations, except for such hazardous substances that may be ingredients in typical janitorial, maintenance, photography, warehouse, office and light assembly supplies so long as same are stored, handled and disposed of properly. During the term, Landlord reserves the right to require Tenant to execute an affidavit in similar form for any transaction which Landlord reasonably believes may trigger the requirements of ISRA, including without limitation, an assignment of this Lease, a subtenancy, or a sale or transfer of direct or indirect ownership or control of Tenant (a "Triggering Event").

44

(iii) In the event Tenant, or the New Jersey Department of Environmental Protection ("NJDEP") determines that ISRA is applicable to a Triggering Event or Tenant's cessation of operations at the Demised Premises, Tenant shall satisfy its obligations under ISRA prior to its lease termination date by securing an unconditional Response Action Outcome (or its equivalent in the event of a change of law) from a New Jersey Licensed Site Remediation Professional ("LSRP") reasonably acceptable to Landlord with respect to the Demised Premises. Notwithstanding the foregoing, in the event that the LSRP identifies areas of concern that are attributable solely to Landlord or other third parties (e.g., historic fill, railroad sidings, underground storage tanks, or such other areas of concern reasonably determined by the LSRP to have existed prior to the date Landlord delivers possession of the Demised Premises to Tenant) ("Landlord AOCs"), Landlord shall be solely responsible, at its sole cost and expense, for investigating and remediating such Landlord AOCs. Except for the Landlord AOCs for which Landlord is responsible, Tenant shall bear sole responsibility for any investigation and cleanup costs, fees, penalties, or damages associated with ISRA compliance, including any supplemental obligations which may arise from any audit of the LSRP, or his/her work, whether such audit is performed by the NJDEP, or the LSRP licensing board. This requirement shall survive the termination of the Lease. In the event that Tenant is unable to complete its ISRA compliance obligations by the date of its lease termination, Landlord shall continue to provide Tenant with reasonable access to the Demised Premises, provided that any work undertaken by Tenant shall be performed in such a manner as to minimize interference with Landlord's or any other tenant's use of the Demised Premises. However, Landlord reserves its rights to deem Tenant a holdover tenant in the event that Tenant's ISRA compliance unreasonably restricts the Landlord's use of the Demised Premises.

(iv) Both Landlord and Tenant shall cooperate with each other with respect to any ISRA compliance obligations with respect to the Demised Premises which shall include, but not limited to, the sharing of all correspondence, documents, data and reports, including sampling results submitted to or received from any LSRP, governmental agency or third party.

36.14. Tenant certifies that: (i) It is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control; and (ii) It is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity, or nation. Tenant hereby agrees to defend, indemnify, and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities, and expenses (including attorney's fees and costs) arising from or related to any breach of the foregoing certification.

IN WITNESS WHEREOF, Landlord and Tenant have duly executed this Lease as of the day and year first above written.

45

HARTZ ENTERPRISE LLC

By: /s/ Phillip R. Patton
    Phillip R. Patton
    Executive Vice President

THE REALREAL, INC.

By: /s/ Matt Gustke
    Name:  Matt Gustke
    Title:  CFO

Copyright © Hartz Mountain Industries, Inc. 2018. All Rights Reserved. No portion of this document may be reproduced without the express written consent of Hartz Mountain Industries, Inc.

46

RIDER TO LEASE DATED JUNE 5, 2018, BETWEEN HARTZ ENTERPRISE LLC, AS LANDLORD AND THE REALREAL, INC., AS TENANT.

R1. If any of the provisions of this Rider shall conflict with any of the provisions, printed or typewritten, of this Lease, such conflict shall resolve in every instance in favor of the provisions of this Rider.

R2. <u>Option to Renew</u>: Provided Tenant is not then in monetary or material non-monetary default of any of the terms and provisions of this Lease beyond applicable notice and cure periods, and provided Tenant has not sublet more than [***] percent of the Demised Premises in the aggregate to one or more third-party subtenants (i.e., subtenants that are not parents, subsidiaries or affiliates of Tenant), Tenant shall have [***] to extend the Term of its lease of the Demised Premises, from the date upon which this Lease would otherwise expire, [***], upon the following terms and conditions:

a. If Tenant elects to exercise said option, it shall do so by giving notice of such election to Landlord on or before the date which is [***] before the beginning of the Extended Period. Tenant agrees that it shall have forever waived its right to exercise any such option if it shall fail for any reason whatsoever to give such notice to Landlord by the time provided herein for the giving of such notice, whether such failure is inadvertent or intentional, time being of the essence as to the exercise of each such option.

b. If Tenant elects to exercise said option, the Term shall be automatically extended for the Extended Period covered by the option so exercised without execution of an extension or renewal lease. Within [***] after request of either party following the effective exercise of such option, however, Landlord and Tenant shall execute, acknowledge and deliver to each other duplicate originals of an instrument in recordable form confirming that such option was effectively exercised, provided, however, that the parties' failure to do so shall not invalidate Tenant's exercise of such option.

c. The Extended Period shall be upon the same terms and conditions as are in effect immediately preceding the commencement of such Extended Period; provided, however, that Tenant shall have no right or option to extend the Term for any period of time beyond the expiration of the Extended Period and, provided further, that in the Extended Period the Fixed Rent during the first twelve (12) months of the Extended Period shall be at Fair Market Value ("FMV"). FMV shall be determined by mutual agreement of the parties. If the parties are unable to agree on the FMV within [***] of Tenant's exercise of its option, the parties shall choose a licensed Real Estate Appraiser who shall determine the FMV. The cost of said Real Estate Appraiser shall be borne equally by the parties. If the parties are unable to agree on a licensed Real Estate Appraiser within [***] of Tenant's exercise of its option, each party shall select one Appraiser to appraise the FMV. All appraisals shall be rendered within [***] of appointment of the respective Appraiser appointed under this paragraph. If the difference between the two appraisals is [***]% or less of the lower appraisal, then the FMV shall be the average of the two appraisals. If the difference between the two appraisals is greater than [***]% of the lower appraisal, the two Appraisers shall select a third licensed Real Estate Appraiser to appraise the FMV. The cost of the third appraisal shall be borne equally by the parties. If the two Appraisers

1

shall be unable to reach agreement upon the third Appraiser within [***] of Tenant's exercise of its option, either party may contact the nearest office of the American Arbitration Associations (the "Association") and request that the Association select an independent Appraiser to determine the FMV in accordance with the provisions of this Paragraph R2. Upon the Association's designation of such Appraiser, such Appraiser shall be deemed to be the third Appraiser for purposes of this Paragraph R2. Landlord and Tenant shall split evenly the fees and expenses of the Association in selecting the third Appraiser and shall each pay their own costs and expenses of working with the Association in connection with such selection. Upon such date as shall be designated by the third Appraiser by written notice to Landlord and Tenant (which date shall be no sooner than [***] of the delivery of such notice), Tenant's Appraiser and Landlord's Appraiser each shall submit to the third Appraiser its written determination of the FMV for the Demised Premises for the first year of the applicable Extended Term. If only one party's Appraiser shall submit such a written determination by the date designated by the third Appraisers, such party's Appraiser's determination of the FMV shall be conclusive and binding upon the parties and shall be the Fixed Rent during the first year of the applicable Extended Period. If both parties' Appraisers shall timely deliver their written determinations of the FMV for the Demised Premises for the first year of the applicable Extended Term to the third Appraiser, the third Appraiser shall select the determination which is closest to the third Appraiser's own determination of the FMV for the Demised Premises for the first year of the applicable Extended Term, and such determination shall be the Fixed Rent for the Demised Premises during the first year of the applicable Extended Term. The third Appraiser must select one of the two submitted determinations; it may not select its own determination. The third Appraiser shall provide notice of its selection to Landlord and Tenant within [***] of its receipt of the last of the Appraisers' determination. Anything to the contrary contained herein notwithstanding, the Fixed Rent for the first year of the Extended Period shall not be less than the Fixed Rent for the twelve (12) month period immediately preceding the Extended Period for which the Fixed Rent is being calculated and the Fixed Rent shall increase by [***] annually on each anniversary of the commencement of each Extended Period.

d. Any termination, expiration, cancellation or surrender of this Lease shall terminate any right or option for the Extended Period not yet exercised.

e. Landlord shall have the right, for [***] after receipt of notice of Tenant's election to exercise any option to extend the Term, to reject Tenant's election if Tenant gave such notice while Tenant was in default in the performance of any of its monetary or other material non-monetary obligations under the Lease, beyond applicable notice and cure periods and such rejection shall automatically render Tenant's election to exercise such option null and void and of no effect.

f. The option provided herein to extend the Term of the Lease may not be severed from the Lease or separately sold, assigned or otherwise transferred.

R3.-R7. Intentionally omitted.

2

R8. <u>HVAC Warrantee</u>: Notwithstanding the provisions of Section 17.02 of the Lease, for the period beginning on the Commencement Date and ending on the first anniversary thereof (the "Warrantee Period") Landlord shall be responsible at its sole cost and expense for performing all repairs and replacements to the existing roof top HVAC units at the Building (the "HVAC"), provided that during the Warrantee Period, Tenant will contract with a reputable HVAC contractor for a maintenance contract and no repairs or replacement required during the Warrantee Period shall be occasioned by the misuse or negligent or wrongful acts of Tenant or its employees, agents, or contractors. Any claim made hereunder must be made upon Landlord within the Warrantee Period. If Tenant shall make such a claim, Landlord shall promptly perform the required repair and/or replacement even if same is not completed by the expiration of the Warrantee Period. Thereafter, Tenant shall repair and maintain the HVAC units at a cost not to exceed $[***] per unit during any given twelve (12) calendar month period for one or more of the HVAC units. Landlord shall reimburse Tenant for such sums reasonably incurred that exceed such $[***] per year threshold via a credit against the following month(s) Fixed Rent. If any of the HVAC units shall have reached the end of its useful life and shall require replacement, as reasonably determined by Landlord, the actual, reasonable, out-of-pocket, third party cost of replacing the unit shall be amortized in accordance with generally accepted accounting principals, on a straight line basis in monthly installments over the useful life of the replacement unit, as reasonably estimated by Landlord, and for each month during the remainder of the Lease Term Tenant shall pay an amount equal to such amortized monthly installments of the replacement cost of the unit. Such payments shall be deemed to be an Additional Charge and shall be due on the first of the month together with Tenant's payment of the monthly installment of Fixed Rent due for such month; provided, however, that (i) in no event shall Tenant have any obligation to pay any such monthly installments until Landlord shall deliver an invoice for same accompanied by copies of the third party invoices submitted in connection with the replacement of the applicable HVAC unit and (ii) Tenant shall have no obligation to reimburse Landlord for any of the amortized replacement costs that relate to any period from and after the expiration of the term of this Lease.

R9. <u>Roof Membrane</u>: Amending Section 17.02 of the Lease, Landlord shall, at its sole cost and expense, maintain the roof and roof membrane and Tenant shall pay for same as an Operating Expense hereunder at the annual rate of $[***] multiplied by the Floor Space of the Demised Premises (the "Roof Supplement"). When the roof and roof membrane has reached the end of its useful life, as reasonably determined by Landlord or, promptly upon Landlord receipt of written notice from Tenant that the roof membrane's condition is adversely impacting Tenant's use and enjoyment of the Demised Premises in more than a de minimis manner, whichever is earlier, Landlord shall install a new membrane or replace the roof membrane at the sole cost and expense of Landlord except to the extent such replacement is required due to the acts of Tenant or its agents. Following any such replacement, Tenant may elect upon not less than thirty (30) days notice to Landlord to maintain the roof and roof membrane (but not the roof structure) at its cost and expense, in which event the Roof Supplement shall cease, or to continue to pay the Roof Supplement, in which event Landlord shall continue to be responsible for all costs and expenses of maintaining and repairing the roof and the roof membrane other than for such costs and expenses as shall be required to repair damage caused by the acts of Tenant or its agents, employees or contractors.

R10. <u>Sprinkler</u>: Landlord, as part of Landlord's Work, shall install ESFR sprinklers through the warehouse portions of the Demised Premises. Tenant shall be responsible for any sprinkler upgrades in the office, warehouse or studio areas.

3

R11. <u>Signage and Building Name</u>:

a. Subject to Tenant's compliance with all applicable Legal Requirements and the rights of other tenants in the Building, Tenant shall have the right to install signage on the exterior or interior of the Demised Premises and the Building, including, without limitation, pylon and/or monument signs (but not including roof signage), as Tenant shall deem necessary or appropriate after receipt of Landlord's approval, which shall not be unreasonably withheld, delayed or conditioned. Such signs shall advertise only Tenant and any of its approved subtenants or assigns in the Demised Premises and shall not advertise any third parties. Tenant shall supply Landlord with copies of all permits and shall remove and restore any affected areas at the expiration or earlier termination of this Lease.

b. Landlord may erect "For Let" and similar signs on the exterior of the Building and/or on the Land during the last nine (9) months of the Term or following a monetary or other non-monetary default not cured within the applicable notice and cure period, but during the Term Landlord may not erect any other signs on the exterior walls of or in the Demised Premises, the right to install such signs being exclusive to Tenant except as otherwise stated herein.

R12. <u>Subordination and Non-Disturbance</u>:

a. Landlord represents to Tenant that there are no Mortgages or Superior Leases encumbering the Demised Premises or any portion thereof as of the date of this Lease except for the Mortgage and Security Agreement, given by Landlord, as mortgagor, to or for the benefit of Teachers Insurance and Annuity Association of America ("Teachers") dated November 12, 2015 and recorded November 17, 2015 in Book 18637 Page 470.

b. Landlord shall use commercially reasonable efforts to cause any Superior Mortgagee to enter into their standard form of non-disturbance, attornment and subordination agreement with Tenant, provided that Tenant shall execute such document and with respect to Teachers only: Provided that Tenant first executes the SNDA in the form annexed as Exhibit G, Landlord shall cause Teachers to countersign such SNDA within thirty (30) days following the date of this Lease and Tenant shall pay the reasonable fee in connection therewith charged by Teachers, except no fee shall be charged should Tenant execute the form annexed as Exhibit G without any changes.

c. Landlord shall cause the holder of any future Mortgage to enter into their standard form of non-disturbance, attornment and subordination agreement with Tenant unless such future Superior Mortgagee is subordinate to the Lease.

R13. <u>Landlord Representations and Covenants</u>: Landlord represents to, and covenants with, Tenant as follows:

a. There are no easements or other matters of record with respect to the Demised Premises or any portion thereof which materially restrict the use of the Demised Premises for the Permitted Uses.

4

b. To Landlord's knowledge, neither the Demised Premises nor any part thereof has been the subject of a remediation, an ISRA trigger, a no further action letter, or a response action outcome.

R14. Landlord Alterations, Improvements and Repairs:

a. Landlord shall not unreasonably interfere with Tenant, its subtenants or assigns or any of the business operations at the Demised Premises while performing any such alterations and/or improvements and shall conduct any work in connection therewith so as to minimize interference to the extent commercially practicable. Tenant shall be permitted to condition its consent to any such alterations or improvements upon Landlord scheduling on-site work with Tenant in advance and conducting such work on such dates and/or at such times as Tenant shall reasonably require to minimize any disturbance to or interference with the business operations in the Demised Premises (but shall not require any such work during overtime hours). In no event shall Landlord shall make any alterations or improvements to the Demised Premises (including, without limitation, alteration of any curb cuts leading into the Building's truck court or any utilities servicing the Building), nor shall Landlord grant any utility or other easements or rights with respect to any of the Demised Premises, if such alterations, improvements, easements or other rights would interfere with Tenant's use and/or enjoyment of the Demised Premises, other than to a de minimis extent.

b. If during the Term the Floor Space of the Development is decreased by more than [***] percent, whether due to casualty, condemnation, the exercise of eminent domain, the sale of any Floor Space or any other reason, the Floor Space of the Development shall be deemed to be not less than [***] percent of the Floor Space of the Development as of the date of this Lease for purposes of determining the Building Fraction.

c. Other than in the event of an emergency, Tenant shall have the right to have a representative present at all times Landlord or any of its employees, agents, contractor or representative are present in or about the Demised Premises. Any and all work performed by Landlord in or about the Demised Premises shall be performed in a good and workmanlike manner in accordance with all applicable Insurance Requirements and Legal Requirements. Landlord shall not unreasonably interfere with Tenant, its subtenants or assigns or any of the business operations at the Demised Premises while performing any such alterations and/or improvements and shall conduct any work in connection therewith so as to minimize any such interference to the extent commercially practicable. Tenant may require that any such work be scheduled with Tenant in advance and conducted on such dates and/or at such times as Tenant shall reasonably require to minimize any disturbance to or interference with the business operations in the Demised Premises (but not during overtime hours). In no event shall Landlord have the right to stage work to areas outside of the Demised Premises from within the parking lots or other areas of the Demised Premises if such staging would or does materially interfere with Tenant's business operations. Any pipes, conduits and other like installations shall to the extent practicable be installed behind walls, ceilings or floors or within columns. In no event shall the usable area of the Building be permanently reduced by such alterations, improvements or other work performed by or on behalf of Landlord.

5

R15. <u>Tenant Alterations and Improvements</u>:

a. Tenant shall be permitted to paint the interior of the Building or any portion thereof, install carpeting and make other decorative alterations upon advance notice to Landlord but without Landlord's consent.

b. All alterations and improvements performed by or on behalf of Tenant shall be deemed to be Tenant's Property during the Term of the Lease and Tenant shall be the sole party entitled to depreciate same as an asset for tax purposes.

c. If Landlord shall have the right to and shall require that Tenant use a contractor designated by Landlord to perform any alterations, improvements, maintenance, repairs or other work to the Demised Premises, Landlord shall cause such contractor to provide its services to Tenant at competitive market rates.

R16. <u>Zoning; Storage of Materials; Exclusive Use</u>:

a. Landlord shall not apply for any change to the zoning for the Demised Premises, or consent to any such change if the effect thereof would impact in any material manner upon Tenant's right to use the Demised Premises for the Permitted Uses during the Term.

b. Materials stored in the Building shall not be considered to be hazardous materials merely because they contain components or materials which, by themselves in concentrated quantities, would be considered hazardous materials. By way of example, but not limitation, the storage of oil paintings in the Building would not be deemed to be the improper warehouse of hazardous materials merely because the oil paint on the paintings, if stored in concentrated quantities, would be deemed to be an improper storage of hazardous materials.

c. Except as otherwise expressly provided in the Lease to the contrary, Landlord shall not prevent Tenant from having access to the Demised Premises twenty-four (24) hours per day, seven (7) days, three hundred sixty five days per year (three hundred sixty six days per year in any leap year).

R17. <u>Environmental Indemnity</u>: Landlord agrees that it shall defend, indemnify and save Tenant harmless from and against all claims, loss, damage, liability and expense (including reasonable attorney's fees and expenses) which the Tenant may sustain as a result of or on account of non-compliance of the Demised Premises with the Environmental Laws as the result of conditions existing on the Demised Premises (a) prior to the Commencement Date and/or (b) which were caused by Landlord, or its agents, and employees after the Commencement Date (except to the extent caused by Tenant, its agents, invitees, or employees). Environmental Laws are defined as laws, statutes, ordinances or regulations relating to the discharge of "Hazardous Substances", as defined under New Jersey law N.J.A.C. 7:1E-1.7, into the air, water, lands or groundwaters of the State of New Jersey, or the United States of America.

R18. <u>No Violations</u>: Supplementing Article 12, Landlord represents that to the best of its knowledge there are no current open violations of Legal Requirements affecting the Demised Premises and in the event a violation is issued prior to the Commencement Date and the issuance of same did not arise through the action of Tenant, its employees, agents or contractors or anyone acting on their behalf, Landlord shall cure such violation at its sole cost and expense.

6

R19. <u>Right to Terminate</u>: Notwithstanding anything contained herein to the contrary, if the Commencement Date does not occur on or before December 31, 2018 except to the extent the delay in the Commencement Date arises from the actions of Tenant or its agents, employees or contractors or anyone acting on their behalf, Tenant may, as its sole and exclusive remedy, terminate this Lease upon two days' written notice to Landlord (which notice must be delivered by Tenant to Landlord prior to the Commencement Date, time being of the essence, or such right to terminate will be deemed waived), and, promptly upon such termination, Landlord shall return to Tenant all monies, letters of credit and/or other security or other payments previously made or remitted by Tenant to Landlord, which obligation of Landlord shall survive such termination. Upon such termination, except for the foregoing obligation of Landlord, neither party shall have any further obligation under or in respect of this Lease.

R20. <u>Landlord's Defaults</u>: If Landlord fails to perform any of its obligations under this Lease (a "Landlord Default"), Tenant may give Landlord notice specifying the Landlord Default. A Landlord Default must be cured (i) for monetary defaults within fifteen (15) days after receiving notice from Tenant; or (ii) for non-monetary defaults within thirty (30) days after receiving notice thereof, however for those that cannot reasonably be cured within thirty (30) days, within a reasonable period of time thereafter provided that Landlord has commenced its cure within such thirty (30) day period and thereafter prosecutes its cure to completion with commercially reasonable and diligent efforts. If the Landlord Default is not corrected within the applicable cure period, the Tenant shall have all rights powers or remedies permitted by law but under no circumstances shall Tenant be permitted to offset any sums incurred against Rent due under the Lease.

R21. <u>Required Landlord Payments to Tenant</u>: No payment by Landlord or receipt or acceptance by Tenant of a lesser amount than the correct payment or reimbursement due Tenant from Landlord shall be deemed to be other than a payment on account, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and Tenant may accept such check or payment without prejudice to Tenant's right to recover the balance or pursue any other remedy in this Lease or at law provided.

R22. <u>Landlord's Work and Tenant's Delays</u>: Tenant shall not be charged with a Tenant Delay for delay in Landlord's Work resulting from changes to Landlord's Work requested by Tenant, including, without limitation, requested changes involving long lead-time items, unless (i) prior to approving such changes Landlord notifies Tenant of the estimated delay in Landlord's Work likely to result from such changes, and (ii) Tenant provides notice to Landlord requesting that Landlord proceed with the requested change. In no event shall Tenant be charged with a Tenant Delay for a delay in submitting or approving plans or other information or materials unless Tenant shall fail to provide plans, information or other submissions, or consents or approvals, expressly provided for in the Lease within the time periods expressly set forth in the Lease.

R23. <u>Landlord's Waiver of Consequential Damages</u>: Other than a holdover beyond the Expiration Date, in no event shall Tenant be liable to Landlord with respect to any consequential, exemplary or punitive damages in connection with this Lease and/or Tenant's use and occupancy of the Demised Premises.

7

R24. <u>Loss of Service</u>: If due to any activities of Landlord (i) Tenant shall lose commercially reasonable access to the Building or commercially reasonable access to a material portion of the parking areas or truck access which prevent Tenant from conducting **its** normal business activities in the Building, or (ii) the delivery of electricity or other utility or service required for Tenant to conduct its normal business activities in the Building shall be interrupted, or (iii) if Tenant shall lose the ability to use all or a significant portion of the Building for Tenant's normal business activities and the condition created in (i), (ii) or (iii) continues for five (5) consecutive Business Days during which time Tenant is prevented from and does not use the affected areas, then all Rent shall abate with respect to the affected area of the Building for the period of time following forty-eight (48) hours after Tenant has given written notice to Landlord of such loss and shall continue until the earlier of (x) the day the condition giving rise to such abatement no longer exists, or (y) the date Tenant resumes business activities in the area(s) affected.

HARTZ ENTERPRISE LLC

By: /s/ Phillip R. Patton

  Phillip R. Patton
  Executive Vice President

THE REALREAL, INC.

By: /s/ Matt Gustke

  Name: Matt Gustke
  Title: CFO

8

**Schedule 1**

**Fixed Rent**

| Period | Annual Fixed Rent | | Monthly Installments | |
|---|---|---|---|---|
| First Rent Year | $ | [***] | $ | [***] |
| Second Rent Year | $ | [***] | $ | [***] |
| Third Rent Year | $ | [***] | $ | [***] |
| Fourth Rent Year | $ | [***] | $ | [***] |
| Fifth Rent Year | $ | [***] | $ | [***] |
| Sixth Rent Year | $ | [***] | $ | [***] |
| Seventh Rent Year | $ | [***] | $ | [***] |
| Eighth Rent Year | $ | [***] | $ | [***] |
| Ninth Rent Year | $ | [***] | $ | [***] |
| Tenth Rent Year | $ | [***] | $ | [***] |

The first Rent Year shall commence on the Commencement Date and expire at 11:59 p.m. on June 30, 2020. Each succeeding Rent Year shall commence on July 1 and expire at 11:59 p.m. on June 30; provided, however, that the Tenth Rent Year shall expire on the Expiration Date.

Sch 1-1

**Schedule 2**

**Operating Expense Exclusions**

- Rentals and other related expenses, if any, incurred in leasing capital items.

- Ground rent.

- Payment of principal, finance charges or interest on debt or amortization on any mortgage or any penalties assessed as a result of Landlord's late payments of such amounts.

- Impact fees and other costs and expenses paid or incurred in connection with the initial development and construction of the Development Common Areas.

- Charitable or political contributions.

- The cost of repairs, replacements or other work occasioned by fire, windstorm or other casualty, except to the extent of any commercially reasonable deductible.

- The cost of repairs, replacements or other work occasioned by the exercise of eminent domain.

- All costs of correcting latent defects, including any allowances for same, in the initial construction of the Development Common Areas.

- The cost of any judgment, settlement or arbitration award resulting from liability of Landlord which is the result of gross, negligence, willful misconduct or fraud of Landlord and all expenses incurred in connection therewith.

- Salaries, benefits, wages, fees, etc. for employees above the grade of building manager or for directors, officers, partners or members of Landlord.

- Except for the management fee set forth in the Lease, any overhead or profit increments to any subsidiary or affiliate of Landlord for services to the extent that the costs of such services exceed competitive costs for comparable services rendered by persons or entities of similar skill, competence and experience, other than a subsidiary or affiliate of Landlord.

- Any costs of Landlord's general overhead, including general and administrative expenses, which costs would not be chargeable to operating expenses in accordance with generally accounting principals, consistently applied.

- Any otherwise includible costs of correcting defects or replacing defective equipment to the extent such costs are recovered under warranties of manufacturers, suppliers or contractors, or are otherwise borne by parties other than Landlord.

Sch 2-1

- All costs and expenses associated with the operation of the business of the entity which constitutes Landlord as the same are distinguished from the costs of operation of the Development Common Areas, including accounting and legal matters, costs of defending any lawsuits with any Landlord's Mortgagee, costs of selling, syndicating, financing, mortgaging or hypothecating any of the Landlord's interest in the Development Common Areas, costs of any disputes between Landlord and its employees (if any) not engaged in operation of the Development Common Areas, disputes of Landlord with managers of the Development Common Areas, or fees or costs paid in connection with disputes where such employee provides services.

- Depreciation and amortization (except as otherwise permitted in the definition of Operating Expenses).

- Costs and expenses relating to Landlord's willful misconduct or willful violation of law.

- Reserves.

- Costs and expenses which under GAAP would not be considered operating expenses (except for capital items otherwise permitted in the definition of Operating Expenses).

- Operating Expenses to be reduced by insurance proceeds.

Other Applicable Provisions:

- To the extent that employees are not employed exclusively at the Development Common Areas, the costs and expenses with respect to such employees should be pro-rated.

Sch 2-2

**EXHIBIT A**

**DEED DESCRIPTION**

**60 ENTERPRISE AVENUE**
**(LOT 9, BLOCK 57)**

Exhibit A-1

**EXHIBIT B**

Exhibit B-1

**EXHIBIT C**

**LANDLORD'S WORKLETTER**

**THE REALREAL, INC.**
**60 ENTERPRISE AVENUE**
**SECAUCUS, NEW JERSEY**

Landlord at its sole cost and expense shall perform the following:

1.  Construct demising walls within the Building to provide Tenant with secure and exclusive access to the Demised Premises.

2.  Install new ESFR sprinklers throughout the warehouse portion of the Demised Premises and deliver any other existing sprinklers in good working order.

3.  Remove or secure the doors providing access to and from the adjacent tenant's premises, if any.

4.  Repaint 1st floor office selections from Landlord's standard finishes.

5.  Recarpet office selections from Landlord's standard finishes.

6.  Existing bathrooms and the kitchen/pantry shall be delivered in clean and functioning order.

7.  Make all necessary repairs to deliver the loading dock doors and any existing levelers in good working order.

8.  Make all necessary repairs and replacements to existing overhead lighting and exterior lighting so as to deliver them in good working order.

9.  Fix any broken windows so that there is no broken glass and all windows are operational.

10. Deliver existing roof in leak free condition.

11. Install panic bar on the door located at the top of the mezzanine stairwell.

12. Remove any protruding portions of racking system bolts which protrude from the warehouse floor, if any.

13. Repair two potholes near existing drive-in door and re-stripe all parking areas.

14. Deliver all existing mechanical (including HVAC) and plumbing systems and loading doors in good working order.

END.

Exhibit C-1

EXHIBIT D

MULTI-WAREHOUSE
RULES AND REGULATIONS

1. The rights of each tenant in the entrances, corridors, elevators and escalators servicing the Building are limited to ingress and egress from such tenant's premises for the tenant and its employees, licensees and invitees, and no tenant shall use, or permit the use of, the entrances, corridors, escalators or elevators for any other purpose. No tenant shall invite to the tenant's premises, or permit the visit of, persons in such numbers or under such conditions as to interfere with the use and enjoyment of any of the plazas, entrances, corridors, escalators, elevators and other facilities of the Building by any other tenants. Fire exits and stairways are for emergency use only, and they shall not be used for any other purpose by the tenants, their employees, licensees or invitees. No tenant shall encumber or obstruct, or permit the encumbrance or obstruction of, any of the sidewalks, plazas, entrances, corridors, escalators, elevators, fire exits or stairways of the Building. Landlord reserves the right to control and operate the public portions of the Building and the public facilities, as well as facilities furnished for the common use of the tenants, in such manner as it deems best for the benefit of the tenants generally.

2. Landlord may refuse admission to the Building outside of Business Hours on Business Days to any person not known to the watchman in charge, or not having a pass issued by Landlord or the tenant whose premises are to be entered, or not otherwise properly identified, and Landlord may require all persons admitted to or leaving the Building outside of Business Hours on Business Days to provide appropriate identification. Tenant shall be responsible for all persons for whom it issues any such pass and shall be liable to Landlord for all acts or omissions of such persons. Any person whose presence in the Building at any time shall, in the judgment of Landlord, be prejudicial to the safety, character or reputation of the Building or of its tenants may be denied access to the Building or may be ejected therefrom. During any invasion, riot, public excitement or other commotion, Landlord may prevent all access to the Building by closing the doors or otherwise for the safety of the tenants and protection of property in the Building.

3. No tenant shall obtain or accept for use in its premises towel, barbering, bootblacking, floor polishing, cleaning or other similar services from any persons not authorized by Landlord in writing to furnish such services, provided that the charges for such services by persons authorized by Landlord are comparable to similar charges in other comparable buildings in Hudson County. Such services shall be furnished only at such hours, and under such reasonable regulations, as may be fixed by Landlord from time to time.

4. The cost of repairing any damage to the public portions of the Building or the public facilities or to any facilities used in common with other tenants, caused by a tenant or its employees, licensees or invitees, shall be paid by such tenant.

5. No awnings or other projections shall be attached to the outside walls of the Building. No curtains, blinds, shades or screens shall be attached to or hung in, or be used in connection with, any window or door of the premises of any tenant, without the prior written consent of Landlord. Such curtains, blinds, shades or screens must be of a quality, type, design and color, and attached in the manner approved by Landlord.

Exhibit D-1

6. No lettering, sign, advertisement, notice or object shall be displayed in or on the windows or doors, or on the outside of any tenant's premises, or at any point inside any tenant's premises where the same might be visible outside of such premises, without the prior written consent of Landlord. In the event of the violation of the foregoing by any tenant, Landlord may remove the same without any liability, and may charge the expense incurred in such removal to the tenant violating this rule. Interior signs, elevator cab designations and lettering on doors and the Building directory shall, if and when approved by Landlord, be inscribed, painted or affixed for each tenant by Landlord at the expense of such tenant, and shall be of a size, color and style acceptable to Landlord.

7. The sashes, sash doors, skylights, windows and doors that reflect or admit light and air into the halls, passageways or other public places in the Building shall not be covered or obstructed by any tenant, nor shall any bottles, parcels or other articles be placed on the window sills or on the peripheral air conditioning enclosures, if any.

8. No showcase or other articles shall be put in front of or affixed to any part of the exterior of the Building, nor placed in the halls, corridors or vestibules.

9. Linoleum, tile or other floor covering shall be laid in a tenant's premises only in a manner first approved in writing by Landlord.

10. No tenant shall mark, paint, drill into, or in any way deface any part of its premises or the Building. No boring, cutting or stringing of wires shall be permitted, except with the prior written consent of Landlord, and as Landlord may direct.

11. No vehicles, animals, fish or birds of any kind shall be brought into or kept in or about the premises of any tenant of the Building.

12. No noise, including, but not limited to, music or the playing of musical instruments, recordings, radio or television, which, in the judgment of Landlord, might disturb other tenants in the Building, shall be made or permitted by any tenant. Nothing shall be done or permitted in the premises of any tenant which would impair or interfere with the use or enjoyment by any other tenant of any other space in the Building.

13. No tenant, nor any tenant's contractors, employees, agents, visitors or licensees, shall at any time bring into or keep upon the premises or the Building any inflammable, combustible, explosive or otherwise dangerous fluid, chemical or substance.

14. Additional locks or bolts of any kind which shall not be operable by the grand master key for the Building shall not be placed upon any of the doors or windows by any tenant, nor shall any changes be made in locks or the mechanism thereof which shall make such locks inoperable by said grand master key. Additional keys for a tenant's premises and toilet rooms shall be procured only from Landlord who may make a reasonable charge therefor. Each tenant shall, upon the termination of its tenancy, turn over to Landlord all keys of stores, offices and toilet rooms, either furnished to, or otherwise procured by, such tenant, and in the event of the loss of any keys furnished by Landlord such tenant shall pay to Landlord the cost thereof.

EXHIBIT D-2

15. Landlord reserves the right to inspect all objects and matter to be brought into the Building and to exclude from the Building all objects and matter which violate any of these Rules and Regulations or this Lease. Landlord may require any person leaving the Building with any package or other object or matter to submit a pass, listing such package or object or matter, from the tenant from whose premises the package or object or matter is being removed, but the establishment and enlargement of such requirement shall not impose any responsibility on Landlord for the protection of any tenant against the removal of property from the premises of such tenant. Landlord shall in no way be liable to any tenant for damages or loss arising from the admission, exclusion or ejection of any person to or from the premises or the Building under the provisions of this RULE or of RULE 2 hereof.

16. No tenant shall occupy or permit any portion of its premises to be occupied as an office for a public stenographer or public typist, or for the possession, storage, manufacture, or sale of liquor, narcotics, tobacco in any form, or as a barber, beauty or manicure shop, or as a school. No tenant shall use its premises or any part thereof to be used for manufacturing, or the sale at retail or auction of merchandise, goods or property of any kind.

17. Landlord shall have the right to prohibit any advertising or identifying sign by any tenant which, in Landlord's judgment, tends to impair the reputation of the Building or its desirability as a building for others, and upon written notice from Landlord, such tenant shall refrain from and discontinue such advertising or identifying sign.

18. Landlord shall have the right to prescribe the weight and position of safes and other objects of excessive weight, and no safe or other object whose weight exceeds the lawful load for the area upon which it would stand shall be brought into or kept upon any tenant's premises. If, in the judgment of Landlord, it is necessary to distribute the concentrated weight of any heavy object, the work involved in such distribution shall be done at the expense of the tenant and in such a manner as Landlord shall determine.

19. Except as is expressly permitted in such tenant's Lease, no machinery or mechanical equipment other than ordinary portable business machines may be installed or operated in any tenant's premises without Landlord's prior written consent, and in no case (even where the same are of a type so excepted or as so consented to by Landlord) shall any machines or mechanical equipment be so placed or operated as to disturb other tenants; but machines and mechanical equipment which may be permitted to be installed and used in a tenant's premises shall be so equipped, installed and maintained by such tenant as to prevent any disturbing noise, vibration or electrical or other interference from being transmitted from such premises to any other area of the Building.

20. Landlord, its contractors, and their respective employees, shall have the right to use, without charge therefor all light, power and water in the premises of any tenant while cleaning or making repairs or alterations in the premises of such tenant.

21. No premises of any tenant shall be used for lodging or sleeping or for any immoral or illegal purpose.

EXHIBIT D-3

22. The requirements of tenants will be attended to only upon application at the office of the Building. Employees of Landlord shall not perform any work or do anything outside of their regular duties, unless under special instructions from Landlord.

23. Canvassing, soliciting and peddling in the Building are prohibited and each tenant shall cooperate to prevent the same.

24. No tenant shall cause or permit any unusual or objectionable odors to emanate from its premises which would annoy other tenants or create a public or private nuisance. No cooking shall be done in the premises of any tenant except as is expressly permitted in such tenant's Lease.

25. Nothing shall be done or permitted in any tenant's premises, and nothing shall be brought into or kept in any tenant's premises, which would impair or interfere with any of the Building's services or the proper and economic heating, cleaning or other servicing of the Building or the premises, or the use or enjoyment by any other tenant of any other premises nor shall there be installed by any tenant any ventilating, air-conditioning, electrical or other equipment of any kind which, in the judgment of Landlord, might cause any such impairment or interference.

26. No acids, vapors or other materials shall be discharged or permitted to be discharged into the waste lines, vents or flues of the Building which may damage them. The water and wash closets and other plumbing fixtures in or serving any tenant's premises shall not be used for any purpose other than the purposes for which they were designed or constructed, and no sweepings, rubbish, rags, acids or other foreign substances shall be deposited therein. All damages resulting from any misuse of the fixtures shall be borne by the tenants who, or whose servants, employees, agents, visitors or licensees shall have, caused the same. Any cuspidors or containers or receptacles used as such in the premises of any tenant or for garbage or similar refuse, shall be emptied, cared for and cleaned by and at the expense of such tenant.

27. All entrance doors in each tenant's premises shall be left locked and all windows shall be left closed by the tenant when the tenant's premises are not in use. Entrance doors shall not be left open at any time. Each tenant, before closing and leaving its premises at any time, shall turn out all lights.

28. Hand trucks not equipped with rubber tires and side guards shall not be used within the Building.

29. All windows in each tenant's premises shall be kept closed, and all blinds therein above the ground floor shall be lowered as reasonably required because of the position of the sun, during the operation of the Building air-conditioning system to cool or ventilate the tenant's premises.

30. Landlord reserves the right to rescind, alter or waive any rule or regulation at any time prescribed for the Building when, in its judgment, it deems it necessary, desirable or proper for its best interest and for the best interests of the tenants, and no alteration or waiver of any rule or regulation in favor of one tenant shall operate as an alteration or waiver in favor of any other tenant. Landlord shall not be responsible to any tenant for the non-observance or violation by any other tenant of any of the rules and regulations at any time prescribed for the Building.

EXHIBIT D-4

31. Sustainability: Tenant shall use its reasonable efforts to ensure effective and energy efficient operation of the Demised Premises. Accordingly:

(i) Tenant shall not waste electricity, water, heat, air conditioning, and other utilities and services at the Demised Premises; and

(ii) Tenant shall not obstruct, alter, or in any way impair the efficient operation of the Building's heat, air conditioning, and ventilation systems. To this end, Tenant shall:

(A) Not place furniture, equipment, or other objects where they would interfere with air flow;

(B) Keep corridor doors closed and not open any windows (except if air circulation shall not be in operation, windows may be opened with Landlord's consent; and

(C) During hot weather months, lower and partially close window blinds or drapes when the sun's rays fall directly on windows or the Premises.

(D) Use, to the maximum extent economically practicable, energy efficient materials and supplies, including but not limited to fluorescent light fixtures and bulbs, waterless plumbing fixtures, and such other items consistent with Landlord's specifications, which specifications may be amended by Landlord from time to time.

(E) Upon reasonable written request of Landlord, provide Landlord with copies of its utility bills, or authorize the various utilities (e.g. providers of electric, gas, and water) to provide copies of such bills directly to Landlord.

(F) Recycle waste materials to the maximum extent economically practicable, and in all events in compliance with applicable solid waste management laws and regulations.

EXHIBIT D-5



**EXHIBIT E**



**STANDBY LETTER OF CREDIT**

DRAFT of Standby Letter of Credit

**Draft for discussion purposes only**

**begin format**

**BENEFICIARY**:                          **Letter of Credit number**: [***]
Hartz Enterprise LLC                      Date:
400 Plaza Drive
PO Box 1515
Secaucus, NJ 07096

Ladies and Gentlemen:

At the request and for the account of The RealReal, Inc., 55 Francisco Street, Suite 600, San Francisco, CA 94133, we hereby establish our standby letter of credit number [***] in your favor in the amount of [***] (hereinafter the "maximum amount") available with us at our office listed below, by payment of your draft(s) drawn on us at sight accompanied by the following:

1. The original of this letter of credit and all amendments (if any).

2. Statement purportedly signed by the beneficiary stating the following:

"This demand is pursuant to the lease dated May 31, 2018, as subsequently amended, by between the applicant and the beneficiary."

Partial and Multiple drawings under this letter of credit are permitted. We shall, after each presentation of this letter of credit, return the same to you, marking this letter of credit to show the amount paid by us and the date of such payment.

Each draft must be marked "Drawn under Pacific Western Bank Letter of Credit number [***]."

EXHIBIT E-1



This letter of credit expires at our office listed below at 5 p.m. eastern time on May 31, 2019.

Notwithstanding the foregoing, this letter of credit shall be automatically extended for a period of one year unless at least sixty (60) calendar days prior to any expiration date we have sent written notice to your above address by courier that we elect not to renew this letter of credit for such additional period. In any event, this letter of credit will not be extended beyond August 31, 2029.

Notwithstanding any provision herein to the contrary, our aggregate obligation to honor such drafts under this letter of credit shall not exceed the maximum amount, as reduced by prior draws.

If any instructions accompanying a drawing under this letter of credit request that payment is to be made by transfer to an account with us or at another bank, we and/or such other bank may rely on an account number specified in such instructions even if the number identifies a person or entity different from the intended payee.

This letter of credit is transferable one or more times, but in each instance to a single transferee and only in the full amount available to be drawn under the letter of credit at the time of such transfer. Any such transfer may be effected only through ourselves and only upon presentation to us at our below-specified office of a duly executed instrument of transfer in the format attached hereto as Exhibit A together with the original of this letter of credit. Each transfer shall be evidenced by our endorsement on the reverse of the original of this letter of credit, and we shall deliver the original of this letter of credit so endorsed to the transferee. Without prejudice to the foregoing, such transfer shall be permitted without our approval, provided that such transfer is not in favor of any person or entity identified on a then-current list of specially Designated Nationals and Blocked Persons provided by the Office of Foreign Assets Control of the U.S. Department of the Treasury. All charges in connection with any transfer under this letter of credit shall be paid by the beneficiary at the time written notice of a transfer is submitted, provided payment of any transfer fee shall not be a condition precedent to the effectiveness of the transfer.

This letter of credit shall be promptly surrendered to us by you (or any subsequent transferee) upon expiration.

Except so far as otherwise expressly stated, this Standby Letter of Credit is subject to the International Standby Practices ICC Publication No. 590 (the "ISP98").

EXHIBIT E-2



We engage with you that each draft drawn under and in compliance with the terms of this letter of credit will be duly honored on delivery of the specified documents, if presented at this office during regular business hours: 475 Fifth Avenue, 18th Floor, New York, N.Y. 10017 Attn:Trade Finance Dept.

Very truly yours,

Pacific Western Bank

_____

**end format**

_____

Agreed to and accepted by:

_____

APPLICANT

EXHIBIT E-3



PACIFIC WESTERN BANK

Exhibit A
Pacific Western Bank
Letter of Credit No. _____

Date:_____

Pacific Western Bank
Trade Services
475 Fifth Ave, 18th Floor
New York, NY 10017

Subject: Your Letter of Credit No. _____

Ladies and Gentlemen:

For value received, we hereby irrevocably assign and transfer all our rights under the above-captioned Letter of Credit, as heretofore and hereafter amended, extended or increased. to:

Insert name of transferee

_____

_____

_____

By this transfer, all of our rights in the Letter of Credit are transferred to the transferee, and the transferee shall have sole rights as beneficiary under the Letter of Credit, including sole rights relating to any amendments, whether increases or extensions or other amendments, and whether now existing or hereafter made. You are hereby irrevocably instructed to advise future amendment(s) of the Letter of Credit to the transferee without our consent or notice to us.

Enclosed are the original Letter of Credit and the original of all amendments to this date. Please notify the transferee of this transfer and of the terms and conditions of the Letter of Credit as transferred. This transfer will not become effective until the transferee is so notified.

Very truly yours,

Insert name of transferor

By:      _____

Name:   _____

Title:   _____

EXHIBIT E-4

PACIFIC WESTERN BANK

Signature of Transferor Guaranteed

Insert name of bank

By:    _____

Name:    _____

Title:    _____

EXHIBIT E-5

**EXHIBIT F**

**TENANT'S WORK**

1.  Install Racking, Shelving & Conveyors which shall be similar systems to those in 35 Enterprise;

2.  Install Electrical Work/Lighting as required within the demised premises as required for their use:

    a.  Tenant may alter/add electrical distribution panels as required for their use.

    b.  Tenant will install electrical outlets within the demised premises as required for their use.

    c.  Tenant will install telecommunication and data cabling throughout the Demised Premises;

3.  Install security system;

4.  Install material handling equipment;

5.  Construct a deck high partition for a mixed use area encompassing a photo studio, locker/lunch room, IT room, etc.;

6.  Install rooftop HVAC unit or units as indicated on the Space Plan, prepared by Studio B and dated May 23, 2018 (the "Space Plan")

    a.  A Structural Engineer will review the rooftop equipment and confirm if there is any structural reinforcement to the building required

    b.  Tenant will relocate and/or add additional gas fired heaters within the warehouse space as designed by the Engineer and as per local building codes

    c.  Tenant may install supplemental cooling system in the IT Room and a condenser on the roof

7.  Walls:

    a.  All walls will be constructed of metal studs & drywall;

    b.  wall thickness will be determined by the Architect and as required by local building codes;

    c.  walls will be spackled;

8.  Ceilings: Ceilings will be Acoustic hung ceilings grid and tile by Armstrong or equal manufacturer;

EXHIBIT F-1

9.     Flooring: Flooring will be either, carpet, VCT, LVT, Ceramic or sealed concrete;

10.    Plumbing: Plumbing alterations will be done in accordance with local building codes;

11.    Fire Protection System: Tenant shall alter the existing fire sprinkler and fire alarm systems as per their Engineers design and per local building codes;

12.    Additional work to be determined in accordance with the Space Plan.

EXHIBIT F-2

**EXHIBIT G**

**SUBORDINATION, NON-DISTURBANCE**

**AND ATTORNMENT AGREEMENT**

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "**Agreement**") is made by and between TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, a New York corporation with offices at 730 Third Avenue, New York, New York 10017 ("**Lender**") and,                     a an individual name/of/state corporation limited liability company general partnership limited partnership d/b/a/ with its principal place of business at                  ("**Tenant**").

**RECITALS:**

A. Lender has made or is about to make a loan (together with all advances and increases, the "**Loan**") to               , a an individual corporation limited company general partnership limited partnership **Borrower**").

B. Borrower, as landlord, and Tenant have entered into a lease dated                as amended by amendments dated                (the "**Lease**") which leased to Tenant Suite No.              Floor              Store No. (the "**Leased Space**") located in the Property (defined below).

C. The Loan is or will be secured by the Open-End Mortgage, Assignment of Leases and Rents, Fixture Filing Statement and Security Agreement recorded or to be recorded in the official records of the County of              , State or Commonwealth of              (together with all advances, increases, amendments or consolidations, the "**Mortgage**") and the Assignment of Leases and Rents recorded or to be recorded in such official records (together with all amendments or consolidations, the "**Assignment**"), assigning to Lender the Lease and all rent, additional rent and other sums payable by Tenant under the Lease (the "**Rent**").

D.   The Mortgage encumbers the real property, improvements and fixtures located at              in the City of              , County of         , State or Commonwealth of              , commonly known as              , and described on Exhibit "A" (the "**Property**").

IN CONSIDERATION of the mutual agreements contained in this Agreement, Lender and Tenant agree as follows:

1. The Lease and all of Tenant's rights under the Lease are and will remain subject and subordinate to the lien of the Mortgage and all of Lender's rights under the Mortgage and Tenant will not subordinate the Lease to any other lien against the Property without Lender's prior consent.

2.   This Agreement constitutes notice to Tenant of the Mortgage and the Assignment and, upon receipt of notice from Lender, Tenant will pay the Rent as and when due under the Lease to Lender and the payments will be credited against the Rent due under the Lease.

EXHIBIT G-1

3. Tenant does not have and will not acquire any right or option to purchase any portion of or interest in the Property.

4. Tenant and Lender agree that if Lender exercises its remedies under the Mortgage or the Assignment and if Tenant is not then in default under this Agreement and if Tenant is not then in default beyond any applicable grace and cure periods under the Lease:

(a) Lender will not name Tenant as a party to any judicial or non-judicial foreclosure or other proceeding to enforce the Mortgage unless joinder is required under applicable law but in such case Lender will not seek affirmative relief against Tenant, the Lease will not be terminated and Tenant's possession of the Leased Space will not be disturbed;

(b) If Lender or any other entity (a "**Successor Landlord**") acquires the Property through foreclosure, by other proceeding to enforce the Mortgage or by deed-in-lieu of foreclosure (a "**Foreclosure**"), Tenant's possession of the Leased Space will not be disturbed and the Lease will continue in full force and effect between Successor Landlord and Tenant; and

(c) If, notwithstanding the foregoing, the Lease is terminated as a result of a Foreclosure, a lease between Successor Landlord and Tenant will be deemed created, with no further instrument required, on the same terms as the Lease except that the term of the replacement lease will be the then unexpired term of the Lease. Successor Landlord and Tenant will execute a replacement lease at the request of either.

5. Upon Foreclosure, Tenant will recognize and attorn to Successor Landlord as the landlord under the Lease for the balance of the term. Tenant's attornment will be self-operative with no further instrument required to effectuate the attornment except that at Successor Landlord's request, Tenant will execute instruments reasonably satisfactory to Successor Landlord confirming the attornment.

6. Successor Landlord will not be:

(a) liable for any act or omission of any prior landlord under the Lease occurring before the date of the Foreclosure except for repair and maintenance obligations of a continuing nature imposed on the landlord under the Lease;

(b) required to credit Tenant with any Rent paid more than one month in advance or for any security deposit unless such Rent or security deposit has been received by Successor Landlord;

(c) bound by any amendment, renewal or extension of the Lease that is inconsistent with the terms of this Agreement or is not in writing and signed both by Tenant and Landlord;

(d) bound by any reduction of the Rent unless the reduction is in connection with an extension or renewal of the Lease at prevailing market terms or was made with Lender's prior consent;

EXHIBIT G-2

(e) bound by any reduction of the term[1] of the Lease or any termination, cancellation or surrender of the Lease unless the reduction, termination, cancellation or surrender occurred during the last 6 months of the term or was made with Lender's prior consent;

(f) bound by any amendment, renewal or extension of the Lease entered into without Lender's prior consent if the Leased Space represents [***] % or more of the net rentable area of the building in which the Leased Space is located;

(g) **INCLUDE ONLY FOR SHOPPING CENTER LEASES** bound by any amendment, renewal or extension of the Lease entered into without Lender's prior consent, if Tenant is a major department store or anchor tenant;

(h) subject to any credits, offsets, claims, counterclaims or defenses that Tenant may have that arose prior to the date of the Foreclosure or liable for any damages Tenant may suffer as a result of any misrepresentation, breach of warranty or any act of or failure to act by any party other than Successor Landlord;

(i) bound by any obligation to make improvements to the Property, including the Leased Space, to make any payment or give any credit or allowance to Tenant provided for in the Lease or to pay any leasing commissions arising out of the Lease, except that Successor Landlord will be:

(i) bound by any such obligations provided for in the Lender-approved form lease;

(ii) bound by any such obligations if the overall economic terms of the Lease (including the economic terms of any renewal options) represented market terms for similar space in properties comparable to the Property when the Lease was executed; and

(iii) bound to comply with the casualty and condemnation restoration provisions included in the Lease provided that Successor Landlord receives the insurance or condemnation proceeds;

or

(j) liable for obligations under the Lease with respect to any off-site property or facilities for the use of Tenant (such as off-site leased space or parking) unless Successor Landlord acquires in the Foreclosure the right, title or interest to the off-site property.

7. Lender will have the right, but not the obligation, to cure any default by Borrower, as landlord, under the Lease. Tenant will notify Lender of any default that would entitle Tenant to terminate the Lease or abate the Rent and any notice of termination or abatement will not be effective unless Tenant has so notified Lender of the default and Lender has had a 30-day cure period (or such longer period as may be necessary if the default is not susceptible to cure within 30 days) commencing on the latest to occur of the date on which (i) the cure period under the Lease expires; (ii) Lender receives the notice required by this paragraph; and (iii) Successor Landlord obtains possession of the Property if the default is not susceptible to cure without possession.

---

[1] For purposes of this subparagraph "the term of the Lease" includes any renewal term after the right to renew has been exercised.

EXHIBIT G-3

8. All notices, requests or consents required or permitted to be given under this Agreement must be in writing and sent by certified mail, return receipt requested or by nationally recognized overnight delivery service providing evidence of the date of delivery, with all charges prepaid, addressed to the appropriate party at the address set forth above.

9. Any claim by Tenant against Successor Landlord under the Lease or this Agreement will be satisfied solely out of Successor Landlord's interest in the Property and Tenant will not seek recovery against or out of any other assets of Successor Landlord. Successor Landlord will have no liability or responsibility for any obligations under the Lease that arise subsequent to any transfer of the Property by Successor Landlord.

10. This Agreement is governed by and will be construed in accordance with the laws of the state or commonwealth in which the Property is located.

11. Lender and Tenant waive trial by jury in any proceeding brought by, or counterclaim asserted by, Lender or Tenant relating to this Agreement.

12. If there is a conflict between the terms of the Lease and this Agreement, the terms of this Agreement will prevail as between Successor Landlord and Tenant.

13. This Agreement binds and inures to the benefit of Lender and Tenant and their respective successors, assigns, heirs, administrators, executors, agents and representatives.

14. This Agreement contains the entire agreement between Lender and Tenant with respect to the subject matter of this Agreement, may be executed in counterparts that together constitute a single document and may be amended only by a writing signed by Lender and Tenant.

15. **INCLUDE ONLY IN SNDA'S SIGNED POST-CLOSING** Tenant certifies that: the Lease represents the entire agreement between the landlord under the Lease and Tenant regarding the Leased Space; the Lease is in full force and effect; neither party is in default under the Lease beyond any applicable grace and cure periods and no event has occurred which with the giving of notice or passage of time would constitute a default under the Lease; Tenant has entered into occupancy and is open and conducting business in the Leased Space; and all conditions to be performed to date by the landlord under the Lease have been satisfied.

EXHIBIT G-4

IN WITNESS WHEREOF, Lender and Tenant have executed and delivered this Agreement as of            , 199  .

TEACHERS INSURANCE AND ANNUITY ASSOCIATION
OF AMERICA, a New York corporation

By: _____

    Name: _____
    Title: _____

<u>Insert Name of Tenant</u> ,

a an individual _ corporation limited liability company
general partnership limited partnership d/b/a/_.

By: _____

    Name: _____
    Title: _____

**OBSERVE ALL STATE SPECIFIC REQUIREMENTS FOR EXECUTION OF A RECORDABLE DOCUMENT AND ADD STATE-APPROVED FORMS OF ACKNOWLEDGEMENT**

EXHIBIT G-5

<u>ACKNOWLEDGMENT</u>

State of

County of

On this the       day of                , 199     before me, the undersigned officer, personally appeared                who acknowledged himself to be the
       I of               , a corporation, and that he, as such                 being authorized so to do, executed the foregoing instrument for the
purposes therein contained, by signing the name of the corporation by himself as                 .

In witness whereof I hereunto set my hand and official seal.

_____

_____

Title of Officer

EXHIBIT G-6

EXHIBIT A

Property Description

**Exhibit 10.20**

*Portions of this exhibit have been excluded because it both (i) is not material and (ii) would be competitively harmful if publicly disclosed.*

**THIS LEASE AGREEMENT** is made between Landlord and Tenant as of the Effective Date below.

**1. General Defined Terms**.

| | | | |
|---|---|---|---|
| a) | **Effective Date:** | **September 14, 2018** | |
| b) | **Landlord:** | **PROLOGIS PERTH AMBOY ASSOCIATES, LLC,**<br>a Delaware limited liability company | |
| c) | **Landlord Notice Address:** | Prologis<br>One Meadowlands Plaza,<br>Suite 100<br>East Rutherford, NJ 07073<br>Attn: Market Officer | *With copy to:* Prologis<br>1800 Wazee Street<br>Suite 500<br>Denver, CO 80202<br>Attn: General Counsel |
| d) | **Tenant:** | **THE REALREAL, INC.,**<br>A Delaware corporation<br><br>NAICS No.: 453310 | |
| e) | **Tenant Notice Address:** | 55 Francisco Street<br>Suite 600<br>San Francisco, CA 94124<br>Attn: Chief Financial Officer | *With copy to:* Chiesa Shahinian &<br>Giantomasi<br>One Boland Drive<br>West Orange, NJ 07052<br>Attn: Mitchell S. Berkey, Esq. |
| f) | **Premises:** | That portion of the Building containing approximately **[***] rentable square feet** as shown on <u>Exhibit A</u>. | |
| g) | **Building:** | 950 Convery Boulevard<br>Perth Amboy, NJ 08861 | |
| h) | **Project:** | **Prologis Perth Amboy – 950 Convery Boulevard** | |
| i) | **Tenant's Proportionate Share:** | **100.00%** | |
| j) | **Lease Term:** | **One Hundred-Twenty Three (123) months**, beginning on the Commencement Date and ending on the day which is 123 full calendar months following the Commencement Date (the "<u>Expiration Date</u>"). | |
| k) | **Commencement Date:** | The date Landlord delivers possession of the Premises to Tenant in a vacant and broom clean condition, and all major mechanical systems serving the Premises which are necessary for Tenant to operate from the Premises in good working order (projected for November 1, 2018). | |
| l) | **Monthly Base Rent:** | | |

| Period | Monthly Base Rent |
|---|---|
| Commencement Date – Day 90 | *USD$[***] |
| Day 91 – Month 12 | USD $[***] |
| Month 13- Month 24 | USD $[***] |
| Month 25- Month 36 | USD $[***] |
| Month 37- Month 48 | USD $[***] |
| Month 49- Month 60 | USD $[***] |
| Month 61- Month 72 | USD $[***] |
| Month 73- Month 84 | USD $[***] |
| Month 85- Month 96 | USD $[***] |

|  |  |
|---|---|
| Month 97- Month 108 | USD $[***] |
| Month 109- Month 120 | USD $[***] |
| Month 121- Month 123 | USD $[***] |

*Monthly Base Rent is abated during this period. Monthly Fixed Operating Expenses and Taxes will be due as provided in the Lease during this period

m) **Monthly Fixed Operating Expenses:**

Operating Expenses: USD$[***]

Capital Repairs/Replacements: USD$[***]

**Total Monthly Fixed Operating Expenses**: USD$[***]

n) **Annual Fixed Operating Expenses Increase:**   [***]%

o) **Initial Estimated Monthly Taxes:**   USD$[***]

p) **Security Deposit:**   **USD$**[***] in the form of Letter of Credit

q) **Landlord Broker:**   CBRE, Inc.

r) **Tenant Broker:**   Newmark Knight Frank

s) **Exhibits:**
Exhibit A — Site Plan
Exhibit B — Project Rules and Regulations
Exhibit C — Commencement Date Certificate
Exhibit D — Move-out Conditions
Exhibit E — Dock Equipment Maintenance
Exhibit F — ISRA Compliance
Exhibit G — [***] Renewal Option (Baseball Arbitration)
Exhibit H — Letter of Credit Form

2.  **Granting Clause**. In consideration of the obligation of Tenant to pay rent as herein provided and in consideration of the other terms, covenants, and conditions hereof, Landlord leases to Tenant, and Tenant takes from Landlord, the Premises, to have and to hold for the Lease Term, subject to the terms, covenants and conditions of this Lease.

3.  **Acceptance of Premises**. Tenant shall accept the Premises in its condition as of the Commencement Date, subject to all applicable laws, ordinances, regulations, covenants and restrictions. Landlord has made no representation or warranty as to the suitability of the Premises for the conduct of Tenant's business, and Tenant waives any implied warranty that the Premises are suitable for Tenant's intended purposes. Except as provided herein otherwise, in no event shall Landlord have any obligation for any defects in the Premises or any limitation on its use. No later than 10 days after written demand is made by Landlord of Tenant, Tenant shall execute and deliver to Landlord a Commencement Date Certificate in the form of Exhibit C attached to and made a part of this Lease.

- 2 -

Tenant acknowledges that as of the date of this Lease, the Premises are occupied by an existing tenant (the "Existing Tenant"). Tenant acknowledges and agrees that Landlord shall not deliver possession of the Premises to Tenant until Landlord has obtained lawful possession of the Premises from the Existing Tenant.

Landlord represents and warrants that as of the Commencement Date the Premises' HVAC, electrical, plumbing, sprinkler, and other mechanical systems are in good working order and Landlord warrants such systems for a period of six (6) months from the Commencement Date; provided, however, that such warranty shall not be effective for any maintenance, repairs or replacements necessitated due to the misuse of, or damages caused by, Tenant, its employees, contractors, agents, subtenants, or invitees. Furthermore, Landlord represents and warrants that as of the Commencement Date the Premises shall be vacant and in broom clean condition.

Notwithstanding any contrary term or provision contained herein, in the event Tenant has not received a grant or other financial assistance from the State of New Jersey (i.e. through the Grow New Jersey program) in an amount reasonably acceptable to Tenant on or before September 25, 2018 Tenant shall have the right to terminate this Lease upon written notice to Landlord on, or prior to September 30, 2018, in which event Landlord shall promptly return the Security Deposit and the first month's Base Rent, Taxes and Monthly Fixed Operating Expenses to Tenant, and after which neither Landlord nor Tenant shall have any further obligations to the other hereunder. Tenant shall use commercially reasonable efforts to obtain a grant or other financial assistance from the State of New Jersey through September 25, 2018.

4.  **Use**. The Premises shall be used only for the purpose of receiving, storing, shipping and selling (but specifically excluding retail selling) products and for such other lawful purposes as may be incidental thereto. Tenant shall not conduct any auction, liquidation, or going out of business sale on the Premises. Tenant will use the Premises, Building, and Project in a safe manner and will not commit waste, overload the floor or structure of the Premises, or subject the Premises to use that would damage the Premises. Tenant shall not permit any nuisance or objectionable odors, noise, or vibrations to emanate from the Premises. Outside storage is prohibited at the Project. Tenant, at its sole expense, shall use the Premises in compliance with all federal, state, local, and municipal laws, orders, judgments, ordinances, regulations, codes, directives, permits, licenses, covenants and restrictions now or hereafter applicable to the Premises (collectively, "Legal Requirements"). The Premises shall not be used as a place of public accommodation under the Americans With Disabilities Act or similar state statutes or local ordinances or any regulations promulgated thereunder, all as may be amended from time to time. The Premises shall not be used for residential purposes. Tenant shall, at its expense, make any alterations or modifications, at the Premises or Project, that are required by Legal Requirements related to Tenant's specific use or occupation of the Premises as opposed to general warehouse and distribution use. Landlord represents and warrants that, as of the Commencement Date, no written notice has been received by Landlord of non-compliance with any Legal Requirements in connection with the Premises. In the event that Landlord receives notice, or is otherwise informed, that the Premises is not in compliance with applicable Legal Requirements existing as of the Commencement Date, or which come into effect after the Commencement Date, and such non-compliance is not related to Tenant's specific use of the Premises or Tenant-Made Alterations to the Premises performed by Tenant, Landlord shall make such modifications as may be required by order or directive of applicable governmental authority, or otherwise brought to Landlord's knowledge, in order to bring the Premises into compliance with such applicable Legal Requirements without cost or expense to Tenant. Any

- 3 -

occupation of the Premises by Tenant prior to the Commencement Date shall be subject to all obligations of Tenant under this Lease, except for the payment of Monthly Base Rent, Fixed Operating Expenses and Taxes. Notwithstanding anything contained herein to the contrary, Tenant shall provide notice to Landlord that Tenant, or Tenant's agents, contractors, or employees, requires access to the roof of the Building, along with the date such access is required, prior to accessing the roof of the Building. Tenant shall follow all Legal Requirements, including, but not limited to, OSHA requirements when employees, contractors, or agents access the roof of the Building and shall use reasonable and appropriate safety precautions in order to ensure such employees, contractors, or agents are not subject to injury or death.

5.    **Base Rent**. The first month's Base Rent, Taxes, and Monthly Fixed Operating Expenses shall be due and payable upon execution of this Lease. Tenant shall pay to Landlord in advance, without demand, subsequent monthly installments of Base Rent on, or before, the first day of each calendar month succeeding the Commencement Date as set forth in Paragraph 1 (prorated for any fractional calendar month). All payments required to be made by Tenant to Landlord hereunder (or to such other party or at such location as Landlord may from time to time specify in writing) shall be made by Electronic Fund Transfer ("EFT") or Automated Clearing House ("ACH"). The obligation of Tenant to pay Base Rent and other sums to Landlord and the obligations of Landlord under this Lease are independent obligations. Tenant shall have no right at any time to abate, reduce, or set-off any amounts due and payable hereunder except as may be expressly provided in this Lease. If Tenant is delinquent in any monthly installment of Base Rent, Taxes, the Monthly Fixed Operating Expenses, or other amount due and payable herein for more than 5 days, in addition to all of Landlord's other rights and remedies (and not as a penalty), Tenant shall pay to Landlord on demand a late charge equal to [***] of such delinquent sum.

6.    **Fixed Operating Expenses**. In addition to the Base Rent, during each month of the Lease Term, on the same date that Base Rent is due, Tenant shall pay Landlord an amount equal to the Monthly Fixed Operating Expenses provided in Paragraph 1 of the Lease, which Landlord and Tenant agree shall be reimbursement for Landlord's obligations with respect to the maintenance, repairs, and replacements as provided in Paragraph 11 of the Lease, as well as the insurance premiums incurred by Landlord as provided in Paragraph 10 of the Lease. Effective on each annual anniversary of the Commencement Date during the Lease Term (or, if the first annual anniversary occurs on a date other than the first day of a calendar month, then on the first day of the immediately subsequent calendar month and on each annual anniversary date thereafter), the Monthly Fixed Operating Expenses shall be automatically increased by an amount equal to the Annual Fixed Operating Expense Increase provided in Paragraph 1 over the Monthly Fixed Operating Expenses due and payable under this Lease immediately prior to such increase. Landlord and Tenant agree that except for the increases in the Monthly Fixed Operating Expenses as provided above, the Monthly Fixed Operating Expenses shall not be reconciled against the actual operating expenses incurred by Landlord at any time during the Lease Term. Notwithstanding the foregoing, in the event the Lease Term is extended in any manner, whether via an option to extend or otherwise, Landlord shall have the right to amend the Monthly Fixed Operating Expenses due and payable by Tenant during such extension of the Lease Term, as well as the Annual Fixed Operating Expense Increase, each as determined in Landlord's reasonable determination based on the actual

- 4 -

operating expenses applicable to the Project prior to such increase and Landlord's projected annual increase of such operating expenses, upon delivery of written notice to Tenant of Landlord's intent to amend such terms. For the purpose of Landlord's determination of the Fixed Operating Expenses during any extension of the Lease Term as provided herein only, the actual operating expenses shall mean all costs and expenses incurred by Landlord with respect to the ownership, maintenance, and operation of the Project (excluding Taxes) including, but not limited to costs of: insurance; utilities; maintenance, repair and replacement of all portions of the Building, Premises, and Project, including without limitation, paving and parking areas, roads, the roof, alleys, and driveways, mowing, landscaping, snow removal, exterior painting, utility lines, fire sprinklers and fire protection systems, heating, ventilation and air conditioning systems, lighting, electrical systems and other mechanical and building systems; amounts paid to contractors and subcontractors for work or services performed in connection with any of the foregoing; charges or assessments of any association to which the Project is subject; a property management or administration fee payable to a property manager, including Landlord, or any affiliate of Landlord; security services, if any; trash collection, sweeping and debris removal; and additions or alterations made by Landlord to the Project or the Building in order to comply with Legal Requirements (other than those expressly required herein to be made by Tenant).

Notwithstanding anything in this Lease to the contrary, in no event shall Monthly Fixed Operating Expenses be calculated to include (a) reserves for future expenditures; (b) costs incurred by Landlord for repair or restoration to the extent that Landlord is reimbursed by insurance or condemnation proceeds or that is covered by warranty; (c) costs incurred due to the negligence or misconduct of Landlord or its agents, contractors, licensees and employees or the violation by Landlord of the terms and conditions of this Lease; (d) overhead and profit increment paid to Landlord or to subsidiaries or affiliates of Landlord for services to the extent the same exceeds the costs of such services rendered by other first-class unaffiliated third parties on a competitive basis; (e) any costs relating to hazardous materials, asbestos and the like not resulting from actions of tenant; (f) charges for depreciation of the Building or equipment; (g) taxes of any kind; and (h) marketing, promotions or advertising of any kind.

7.    **Security Deposit**. The Security Deposit shall be due and payable to Landlord upon execution of this Lease. The Security Deposit shall be held by Landlord as security for the performance of Tenant's obligations under this Lease and is not an advance rental deposit or a measure of Landlord's damages in case of Tenant's default. Upon any Event of Default (hereinafter defined), Landlord may use all, or part of, the Security Deposit to pay delinquent payments due under this Lease, and the cost of any damage, injury, expense or liability caused by such Event of Default, without prejudice to any other remedy provided herein or provided by law. Tenant shall pay Landlord on demand the amount that will restore the Security Deposit to its original amount. Landlord's obligation respecting the Security Deposit is that of a debtor, not a trustee. The Security Deposit shall be the property of Landlord, but shall be paid to Tenant when Tenant's obligations under this Lease have been completely fulfilled. Landlord shall not be required to keep all or any part of the Security Deposit separate from its general accounts, and no interest shall accrue thereon. Provided Landlord actually transfers the Security Deposit to any person or entity assuming Landlord's obligations under this Lease, Landlord shall be released from any obligation with respect to the Security Deposit upon transfer of this Lease, the Premises and the Security Deposit to a person or entity assuming Landlord's obligations under this Lease.

- 5 -

The Security Deposit under the Lease shall be **$[\*\*\*]**, in the form of an unconditional, irrevocable letter of credit from a bank reasonably acceptable to Landlord and in compliance with the material terms shown in <u>Exhibit H</u> attached hereto ("<u>Letter of Credit</u>"). The Letter of Credit shall either provide that it does not expire until 60 days following the Expiration Date or, if it is for less than the full Lease Term, shall be automatically renewed for an additional year unless Landlord receives notice from the issuing bank at least 60 days prior to its expiration that it will not be extended. The Letter of Credit shall provide that it may be drawn down upon by Landlord in whole or in part at any time Landlord delivers to the bank its site draft and a drawing request in the form attached hereto as Annex 2 to <u>Exhibit H</u>. If Landlord sells or conveys the Premises, Tenant shall, at Landlord's request, cooperate in having the Letter of Credit transferred to the purchaser and Landlord agrees to notify Tenant in the event of such transfer. If the Letter of Credit is ever drawn upon by Landlord pursuant to the terms of the Lease, Tenant shall within ten (10) business days thereafter cause the Letter of Credit to be restored to the then existing amount at the time immediately prior to the draw down, or supply Landlord with an additional Letter of Credit equal to the amount drawn upon such that Landlord has one or more letters of credit in the aggregate amount required by the terms of this Lease.

Notwithstanding anything contained herein to the contrary, in the event Landlord receives notice from the issuing bank that the Letter of Credit will not be renewed in accordance with the terms and conditions as set forth in this Paragraph 7, or Tenant fails to renew such Letter of Credit, or in the event that Tenant shall commence any proceeding for relief, as defined in Paragraph 24(b) of the Lease, the Letter of Credit shall provide, and Tenant agrees, that Landlord, without the requirement of notice or opportunity to cure, may immediately draw down on the full amount of the Letter of Credit, holding the proceeds of same as a cash Security Deposit.

**After the sixty-third (63rd) month** of the Lease Term, the required amount of the **Letter of Credit may be reduced to $[\*\*\*]** for the remainder of the Lease Term, provided that the following conditions are met as of the last day of the 63rd month of the Lease Term: (i) no Event of Default shall then exist or shall have existed at any time during the Lease Term; (ii) Tenant demonstrates to Landlord that it has achieved twelve (12) consecutive months of positive earnings before interest, taxes, depreciation and amortization ("<u>EBITDA</u>"); and (iii) Tenant demonstrates to Landlord that it has a tangible net worth of at least $[\*\*\*] as of such date. Prior to such Letter of Credit reduction, Tenant shall provide Landlord with audited financial statements evidencing the satisfaction of the requirements under conditions (ii) and (iii) above.

8. **Utilities**. Tenant shall pay directly for all separately metered, or contracted public and private utilities including, but not limited to, water, gas, electricity, telephone, sewer, refuse and trash collection, and other utilities and services used on the Premises, along with any taxes, penalties, or surcharges with respect thereto. Landlord may cause at Tenant's expense any jointly metered utilities to be separately metered or charged directly to Tenant by the provider. Interruptions or failures of utilities shall not result in a default by Landlord under this Lease, or the termination of this Lease, or the abatement of rent. Tenant agrees to limit use of water and sewer to amounts consistent with normal restroom and office use.

- 6 -

9.  **Taxes**. Subject to reimbursement as provided below, Landlord shall pay all taxes, assessments, governmental charges, and fees payable to tax consultants and attorneys for consultation and contesting taxes (collectively referred to as "Taxes") that accrue against the Building or Project during the Lease Term. Landlord may contest the amount, validity, or application of any Taxes or liens thereof. If Landlord fails to contest Taxes, Tenant shall have the right to request Landlord to contest such Taxes, and Landlord shall so contest, at Tenant's sole cost and expense (including, without limitation, Landlord's reasonable attorneys' fees and reasonable fees payable to tax consultants and attorneys for consultation and contesting Taxes), if, in Landlord's reasonable judgment, such contest is warranted; provided, however, Tenant's request of such contesting of Taxes shall be limited to one request in a calendar year. Landlord shall cooperate in the institution and prosecution of any such proceedings of contesting Taxes and will execute any documents reasonably required therefor. All reductions, refunds, or rebates of Taxes paid or payable by Tenant shall belong to Tenant whether as a consequence of a Tenant proceeding or otherwise. All capital levies or other taxes assessed or imposed on Landlord upon the rents payable to Landlord under this Lease and any franchise tax, any excise, use, margin, transaction, sales or privilege tax, assessment, levy or charge measured by or based, in whole or in part, upon such rents from the Premises and/or the Project or any portion thereof shall be paid by Tenant to Landlord upon demand as additional rent; provided, however, in no event shall Tenant be liable for any net income taxes imposed on Landlord unless such net income taxes are in substitution for any Taxes payable hereunder. If any tax or excise is levied or assessed directly against Tenant, or the Premises, or results from any Tenant-Made Alterations (defined below), then Tenant shall pay such tax or excise as required by the taxing authority. Tenant shall be liable for all taxes levied or assessed against any personal property or fixtures placed in the Premises by Tenant even if levied or assessed against the Landlord.

During each month of the Lease Term, on the same date that Base Rent is due, Tenant shall pay Landlord an amount equal to 1/12 of the annual cost (prorated for any fractional calendar month), as estimated by Landlord, of Tenant's Proportionate Share (hereinafter defined) of Taxes for the Project or Building. Within ninety (90) days of the conclusion of each calendar year during the Lease Term, Landlord shall provide Tenant with a copy of the tax bill and a the statement reconciling Tenant's Proportionate Share of Taxes for such just concluded calendar year. If Tenant's total payments of Taxes for any year are less than Tenant's Proportionate Share of actual Taxes for such year, then Tenant shall pay the difference to Landlord within thirty (30) days after demand, and if more, then Landlord shall pay such refund to Tenant within thirty (30) days of the date Landlord provides Tenant with the annual accounting. Any payment required to be paid by Landlord shall be delivered to the most recent address Tenant has provided to Landlord and, if undeliverable, shall be deemed forfeited by Tenant. Tenant's "Proportionate Share" shall be the percentage set forth in Paragraph 1 of this Lease as reasonably adjusted by Landlord in the future for changes in the physical size of the Premises, Building, or Project. The Taxes set forth in Paragraph 1 of this Lease is only an estimate, and Landlord makes no guaranty as to the accuracy of such estimate.

- 7 -

10. **<u>Insurance</u>**. Landlord shall maintain all risk property insurance covering the full replacement cost of the Building and commercial general liability insurance on the Project in forms and amounts customary for properties substantially similar to the Project. The Project or Building may be included in a blanket policy or captive insurance program. Tenant will not use the Premises in any manner that would void Tenant's or Landlord's insurance, increase the insurance risk, or cause the disallowance of any insurance credits. If any increase in the cost of any insurance on the Premises or the Project is caused by Tenant's use of the Premises, then Tenant shall pay the amount of such increase to Landlord. Landlord represents and warrants that the use of the Premises for the general purpose of warehousing of non-Hazardous Materials or highly flammable materials and general office space will not (i) void Landlord's insurance, or (ii) increase the insurance risk or cause the disallowance of any insurance credits.

Tenant, at its sole expense, shall maintain during the Lease Term the following insurance: (1) commercial general liability insurance, on an occurrence basis, covering Tenant, and its activities at the Project, having a minimum limit of $[***] per occurrence (which requirement may be satisfied by a combination of primary and excess policy limits); (2) all risk property insurance covering the full replacement cost of all property and improvements placed in the Premises by, or on behalf of, Tenant, including any property of Tenant's customers or which is otherwise not owned by Tenant; (3) workers' compensation insurance as required by the applicable state statute (or equivalent coverage reasonably acceptable to Landlord in the event there is no such statutory requirement) which shall include a waiver of subrogation in favor of Landlord, Prologis, Inc., its affiliates, and property manager (Landlord and such parties are collectively referred to herein as the "<u>Landlord Parties</u>"); (4) employers liability insurance of at least $[***], (5) provided Tenant uses its own automobiles as part of the business being conducted from the Premises, business automobile liability insurance having a combined single limit of not less than $[***] per occurrence which can be satisfied by a combination of primary and excess policy limits insuring Tenant against liability arising out of the ownership maintenance or use of any owned, hired or non-owned automobiles, and (6) business interruption insurance covering at least 6 months of income. Tenant's insurance companies shall have an A.M. Best rating of not less than A-VIII and provide primary and non-contributory coverage to the Landlord Parties (any policy issued to Landlord providing duplicate or similar coverage shall be deemed excess over Tenant's policies). All commercial general liability policies shall name the Landlord Parties as additional insureds. The limits and types of insurance maintained by Tenant shall not limit Tenant's liability under this Lease. Tenant shall provide Landlord with certificates of such insurance in forms reasonably acceptable to Landlord as required under this Lease prior to the date Tenant is provided with possession of the Premises, and thereafter at least 15 days prior to the expiration of the insurance coverage, and 15 days following Tenant's receipt of Landlord's request for such certificates. Acceptance by Landlord of delivery of any certificates of insurance does not constitute approval or agreement by Landlord that the insurance requirements of this section have been met. In the event any of the insurance policies required to be carried by Tenant under this Lease shall be cancelled prior to the expiration date of such policy, or if Tenant receives notice of any cancellation of such insurance policies from the insurer prior to the expiration date of such policy, Tenant shall promptly replace such insurance policy in order to assure no lapse of coverage shall occur.

- 8 -

The all-risk property insurance obtained by Landlord and Tenant shall include a waiver of subrogation by the insurers and all rights based upon an assignment from its insured, against Landlord or Tenant, their officers, directors, employees, managers, agents, invitees and contractors, in connection with any insured loss or damage. Neither party, nor its officers, directors, employees, managers, agents, invitees or contractors, shall be liable to the other for loss or damage caused by any risk coverable by all risk property insurance, and each party waives any claims against the other party, and its officers, directors, employees, managers, agents, invitees and contractors for such loss or damage. The failure of a party to insure its property shall not void this waiver. Neither party, nor its officers, directors, employees, managers, agents, or contractors, shall be liable to the other for any business interruption loss incurred, and each party waives any claims against the other party, and its officers, directors, employees, managers, agents, and contractors for such business interruption loss from any cause whatsoever, including, but not limited to damage caused in whole or in part, directly or indirectly, by the negligent acts of the other party at the Premises or the Project.

11. **Landlord's Repairs and Maintenance**. Landlord shall maintain, repair, and replace, at Landlord's expense, the exterior and structural elements of the Building, including the roof, walls, the structural integrity of the foundation, parking areas, driveways, alleys, landscaping, lighting, the Building fire sprinkler system, all components of the heating, ventilation, and air conditioning (the "HVAC") units serving the office portion of the Premises, any exterior louvers or ventilation fans for typical warehouse air changes, and any heating and/or evaporative cooler systems serving the warehouse portion of the Premises which may exist (the "Warehouse Units"), and the below slab water and sewer lines, in good working order, excluding reasonable wear and tear and uninsured damages caused by Tenant, its employees, agents, contractors, invitees, subtenant's and assignees. Notwithstanding the foregoing to the contrary, Landlord's obligation with respect to the HVAC and Warehouse Units as provided above shall expressly exclude any heating, ventilation, or air conditioning systems installed by Tenant in the Premises, any specialty HVAC systems (including but not limited to IT room supplemental HVAC or which are necessary for temperature controlled product), and any air conditioning systems serving the warehouse portion of the Premises other than the evaporative cooler systems as provided above. In addition to the foregoing, if customary in the market where the Project is located, Landlord, at Landlord's expense, shall provide snow removal for the Project to the extent applicable under the local conditions, and parking lot sweeping at the Project in a manner consistent with owners of similar buildings and projects in the market where the Building is located. The term "walls" as used in this Paragraph shall not include windows, glass or plate glass, doors or overhead doors, dock bumpers, or dock plates or levelers. Tenant shall use commercially reasonable efforts to promptly give Landlord written notice of any repair required by Landlord pursuant to this Paragraph.

In the event of an emergency (being defined as an imminent threat of personal injury to Tenant's employees, or material damage to Tenant's equipment or other property at the Premises, or a material and adverse impact on Tenant's operations as the Premises), Tenant shall have the right to make such temporary, emergency repairs to the roof, foundation, floors and exterior walls of the building of which the Premises are a part, or the roof membrane, skylights, roof vents, drains and downspouts of the Project, and the exterior and under slab utility systems for the Project, as may be reasonably necessary to prevent such material damage to the equipment or property of Tenant situated in the Premises, or such personal injury to

- 9 -

Tenant's employees, or a material and adverse impact on Tenant's operations as the Premises, provided Tenant has no reasonable alternative and has notified or attempted in good faith to notify Landlord's representative of such emergency by telephone (with subsequent written notice as soon as practicable). The provisions of this paragraph do not constitute an authorization by Landlord for Tenant to enter the premises of any other tenant of the Project, and Tenant has not been designated as Landlord's agent for the purposes of any such entry. Landlord shall reimburse Tenant for the reasonable, out-of-pocket costs incurred by Tenant in making such emergency repairs to the roof, foundation or exterior walls, as applicable, up to (but not to exceed) $[***] with respect to each such occurrence, within thirty (30) days after submission by Tenant to Landlord of an invoice therefore, accompanied by reasonable supporting documentation for the costs so incurred. In the event Landlord fails or refuses to reimburse Tenant for such costs within such thirty (30) day period and Tenant brings an action for recovery of such amounts from Landlord as provided for in this Lease, then Tenant shall be entitled to recover, in addition to the amount of such costs, interest on such amounts from the date incurred by Tenant until recovered from Landlord, at the rate provided in Paragraph 37(k) of this Lease, and the reasonable attorneys' fees and other costs of court incurred by Tenant in pursuing such action.

12. **Tenant's Repairs**. Subject to Landlord's obligations in Paragraphs 3 and 11, and subject to Paragraphs 10 and 16, Tenant, at its expense, shall repair, replace and maintain in good condition the Premises and all areas, improvements and systems exclusively serving the Premises including, without limitation, dock and loading areas, truck doors, plumbing, above slab water and sewer lines up to points of common connection, entries, doors, ceilings, windows, and interior walls, which repair and replacement obligations include capital repairs whose benefit may extend beyond the Expiration Date. Notwithstanding Landlord's obligations with respect to the HVAC units serving the office portion of the Premises as provided in Paragraph 11, Tenant, at Tenant's expense, shall be responsible for the maintenance, repair, and replacement of any warehouse air conditioning units, as wells as the exhaust fans, ductwork, vents, and registers of such air conditioning units serving the warehouse portion of the Premises. If Tenant fails to perform any maintenance, repair, or replacement for which it is responsible within thirty (30) days of Landlord's written demand, Landlord may perform such work and be reimbursed by Tenant within thirty (30) days after demand therefor. Subject to Paragraphs 10 and 16, Tenant shall bear the full cost of any repair or replacement to any part of the Building or Project that results from damage caused by Tenant, its agents, contractors, or invitees, or Tenant's failure to maintain the Premises in accordance with this Lease.

13. **Tenant-Made Alterations and Trade Fixtures**. Any alterations, additions, or improvements made by, or on behalf of, Tenant to the Premises ("Tenant-Made Alterations") shall be subject to Landlord's prior written consent and approval of the plans, not to be unreasonably withheld, delayed or conditioned provided that such alteration does not materially affect the structure or the roof of the Building, modify the exterior of the Building, or modify the utility or mechanical systems of the Project. Tenant shall cause, at its expense, all Tenant-Made Alterations to: (a) be constructed in a good and workmanlike manner by contractors reasonably acceptable to Landlord using only good grades of materials, and (b) comply with Landlord's insurance requirements and Legal Requirements. Tenant shall reimburse Landlord for its reasonable out-of-pocket costs in reviewing plans and specifications and for monitoring construction.

- 10 -

Landlord's right to review plans and specifications and to monitor construction shall be solely for its own benefit, and Landlord shall have no duty to see that such plans and specifications or construction comply with Legal Requirements. Tenant shall provide Landlord with the names and mailing addresses of all persons performing work or supplying materials, prior to beginning such construction, and Landlord may post on and about the Premises notices of non-responsibility pursuant to applicable law. Tenant shall cause its contractor to provide certificates of insurance for worker's compensation, including a waiver of subrogation in favor of the Landlord Parties, and commercial general liability in an amount equal to USD$[***] from an insurance company satisfactory to Landlord, including a provision of additional insured status for the Landlord Parties, from any contractor completing work on Tenant-Made Alterations. Upon completion of any Tenant-Made Alterations, Tenant shall deliver to Landlord all final lien waivers from all contractors and subcontractors who did work on the Tenant-Made Alterations. Upon surrender of the Premises all Tenant-Made Alterations and any leasehold improvements constructed by Landlord or Tenant shall remain on the Premises as Landlord's property, except to the extent Landlord requires removal, in which case, at Tenant's expense, Tenant shall repair any damage caused by such installation or removal. Upon Tenant's prior written request, Landlord shall provide Tenant a list of which Tenant-Made Alterations Landlord will require Tenant to remove upon surrender of the Premises.

Without Landlord's prior approval, Tenant may erect shelves, racking, bins, machinery and trade fixtures (collectively "Trade Fixtures") provided that such items do not overload the Premises, may be removed without damaging the Premises, and installation thereof complies with all Legal Requirements. Tenant shall remove its Trade Fixtures and shall repair any damage caused by such installation or removal upon surrender of the Premises.

Notwithstanding anything herein to the contrary, and provided that no Event of Default exists or would exist but for the passage of time, giving of notice, or both, Landlord shall contribute up to a maximum amount of **USD$[***]** (the "TI Allowance"), towards the Tenant-Made Alterations to the Premises which can be capitalized by Landlord (as opposed to repairs and maintenance to the Premises), which payment shall be made by Landlord to Tenant within 30 days following (i) completion of the Tenant-Made Alterations, (ii) Landlord's receipt of Tenant's invoice substantiating the costs along with copies of vendor invoices summarizing work done, (iii) Landlord's receipt of final lien waivers from all contractors and subcontractors who worked on the Tenant-Made Alterations, and (iv) Landlord's receipt of a copy of the final construction permit approved by the applicable governing authority to the extent required for such Tenant-Made

Alterations. Landlord shall be under no obligation to pay for any Tenant-Made Alterations to the Premises in excess of the TI Allowance. Further, such TI Allowance shall only be available for Tenant's use through 12/31/2019, and Tenant hereby waives any and all rights to any unused portion of the TI Allowance remaining thereafter.

14.  **Signs**. Tenant shall not install any decorations, flags, pennants, banners, window or door lettering, placards, advertising media, lights or signs to the exterior of the Building, or interior window blinds, draperies, bars, or other window treatments which are visible from the exterior of the Building, without Landlord's prior written consent, which consent may not be

- 11 -

unreasonably withheld, conditioned or delayed provided such signage is consistent with Legal Requirements and Landlord's signage criteria. Landlord, at Landlord's expense, shall allocate space on the monument sign serving the Building for Tenant's name. Prior to the surrender or vacation of the Premises, Tenant shall remove all signs and repair, paint, and/or replace the building facia surface to which its signs may be attached. Tenant shall obtain all applicable governmental permits and approvals for any sign.

15.   **Parking**. Tenant shall be entitled to the exclusive use of the automobile and truck parking areas at the Project. Landlord shall not be responsible for enforcing Tenant's parking rights against any third parties.

16.   **Restoration.** If at any time during the Lease Term the Premises are damaged by a fire or other casualty, Landlord shall notify Tenant within 60 days after such damage as to the amount of time Landlord reasonably estimates it will take to restore the Premises. If the restoration time is reasonably estimated to exceed 6 months from the date of the casualty event, either Landlord or Tenant may elect to terminate this Lease upon notice to the other party given no later than 30 days after Landlord's notice. If neither party elects to terminate this Lease, or if Landlord estimates that the restoration will take less than 6 months from the date of such damage, or if neither party terminates this Lease, then Landlord shall, subject to delays arising from the collection of insurance proceeds or from events of Force Majeure, restore the Premises, excluding any Tenant-Made Alterations. Tenant at Tenant's expense shall promptly perform, subject to delays arising from the collection of insurance proceeds, or from Force Majeure events, all repairs or restoration not required to be done by Landlord. Notwithstanding the foregoing, either party may terminate this Lease if the Premises are damaged during the last year of the Lease Term and Landlord reasonably estimates that it will take more than one month to repair such damage, provided, however, Tenant may nullify Landlord's termination notice by exercising its right to the First Extension Term (as defined in Exhibit G) within ten (10) days of its receipt of Landlord's notice of termination. With respect to any damage to the Premises attributable to Tenant, Tenant shall pay Landlord's deductible with respect to its insurance policy not to exceed USD$[***] no later than thirty (30) days following receipt of an invoice for such amount. Base Rent, Taxes, and the Monthly Fixed Operating Expenses shall be abated for the period of repair and restoration commencing on the date of such casualty event in the proportion which the area of the Premises, if any, which is not usable by Tenant bears to the total area of the Premises. Such abatement shall be the sole remedy of Tenant, and except as provided herein, Tenant waives any right to terminate the Lease by reason of damage or casualty loss.

Notwithstanding the terms and conditions of this Paragraph, if the Premises are not restored by Landlord on, or prior to, the date which is the later of 6 months of the date of the casualty event (subject to Force Majeure and Tenant-caused delays) or the date Landlord estimated completion of the restoration as described above (subject to Force Majeure and Tenant-caused delays), Tenant may terminate the Lease upon thirty (30) days written notice to Landlord; provided, however, if Landlord completes the restoration in said thirty (30) day notice period, Tenant's notice of termination shall be null and void and this Lease shall continue in full force and effect.

- 12 -

17. **Condemnation**. If any part of the Premises or the Project should be taken for any public or quasi-public use under governmental law, ordinance, or regulation, or by right of eminent domain, or by private purchase in lieu thereof (a "Taking" or "Taken"), and the Taking is a Taking of the entire Building or Project, or would result in the Project no longer being operational for the uses provided herein, then upon written notice by Landlord this Lease shall terminate and Base Rent shall be apportioned as of said date. In the event (i) more than [***] of the Premises is involved in a Taking as described in this Paragraph 17, or (ii) more than [***] of the parking spaces for the Building are Taken and not replaced by Landlord with other parking spaces in the Project proximate to the Building, and in either case the Taking, in Tenant's reasonable judgment, would materially interfere with or impair Tenant's operations at the Premises, then in any such event Tenant shall have the right to terminate this Lease by giving written notice of termination to Landlord within thirty (30) days of such Taking If part of the Premises shall be Taken, and this Lease is not terminated as provided above, the Base Rent, Operating Expenses and Taxes payable hereunder during the unexpired Lease Term shall be reduced to such extent as may be fair and reasonable under the circumstances. In the event of any such Taking, Landlord shall be entitled to receive the entire price or award from any such Taking without any payment to Tenant, and Tenant hereby assigns to Landlord Tenant's interest, if any, in such award. Tenant shall have the right, to the extent that same shall not diminish Landlord's award, to make a separate claim against the condemning authority (but not Landlord) for such compensation as may be separately awarded or recoverable by Tenant for moving expenses and damage to Tenant's Trade Fixtures.

18. **Assignment and Subletting**. Except as expressly provided herein otherwise, Tenant shall not assign this Lease or sublease the Premises or any part thereof, without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, and any attempt to do any of the foregoing without Landlord's consent shall be void and of no effect. Furthermore, Tenant shall not mortgage, or pledge, its leasehold interest in this Lease under any circumstances. It shall be reasonable for the Landlord to withhold, delay or condition its consent to any assignment or sublease if the intended use of the Premises by the assignee or sublessee would impair Landlord's ability to re-lease the Premises. Any approved assignment or sublease shall be expressly subject to the terms and conditions of this Lease. Tenant shall provide to Landlord all information concerning the assignee or sublessee as Landlord may reasonably request. Landlord may revoke its consent immediately if there is an Event of Default. For purposes of this Paragraph, a transfer of the ownership interests controlling Tenant shall be deemed an assignment of this Lease unless such ownership interests are publicly traded. Notwithstanding the foregoing to the contrary, provided no uncured default exists under this Lease, and subject to the provisions herein, Tenant may, without Landlord's prior written consent, assign this Lease to any entity into which Tenant is merged or consolidated, or to any entity to which substantially all of Tenant's assets are transferred, provided the following conditions are met: (x) such merger, consolidation, or transfer of assets is not principally for the purpose of transferring Tenant's leasehold estate, (y) either such merger, consolidation, or transfer of assets does not adversely affect the legal existence of the Tenant hereunder or such resulting entity agrees to assume all obligations and liabilities of Tenant under the Lease, including those which may have accrued prior to the effective date of such transfer in a form acceptable to Landlord, and (z) such merger, consolidation, or transfer of assets of Tenant does not reduce the tangible net worth of Tenant after giving effect to such transfer below [***] Dollars ("Permitted Transfer"). Tenant hereby

- 13 -

agrees to give Landlord written notice thirty (30) days prior to such merger, consolidation, or transfer of assets along with any documentation reasonably requested by Landlord related to the required conditions as provided above. Notwithstanding the above, Tenant may assign or sublet the Premises, or any part thereof, to any entity controlling Tenant, controlled by Tenant or under common control with Tenant (a "Tenant Affiliate"), without the prior written consent of Landlord. Tenant shall reimburse Landlord an amount equal to USD$[***] in connection with any assignment or sublease for which Landlord's consent is required. This Lease shall be binding upon Tenant and its successors and permitted assigns. Upon Landlord's receipt of Tenant's written notice of a desire to assign the Lease or sublet the entire Premises for the remainder of the Lease Term (other than to a Tenant Affiliate), Landlord may, by giving written notice to Tenant within 30 days after receipt of Tenant's notice, terminate this Lease as of the date specified in Tenant's notice for the commencement of the proposed assignment or sublease. Landlord and Tenant shall be relieved of all obligations accruing under this Lease after the effective date of such termination but not any obligations accruing under the Lease prior to the effective date of such termination.

Notwithstanding any assignment or subletting, Tenant and any guarantor of Tenant's obligations shall remain liable for the payment of the Base Rent, Taxes, the Monthly Fixed Operating Expenses and other amounts due under this Lease, and compliance with all of Tenant's obligations under this Lease (regardless of whether Landlord's approval has been obtained for any such assignments or sublettings). In the event that the rent due by a sublessee or assignee (or a combination of the rent plus any bonus or other consideration therefor) exceeds the rental payable under this Lease, then Tenant shall pay to Landlord [***] of such excess, after subtracting all reasonable and customary expenses incurred by Tenant in connection with such sublease or assignment, including, but not limited to, brokerage commissions, attorney's fees, the cost of demising the Premises, and any improvement allowance or free rent period given the subtenant or assignee, as additional rent within 10 days following receipt by Tenant.

If this Lease is assigned or if the Premises are subleased (whether in whole or in part), or if the Premises are occupied by anyone other than Tenant, then upon an Event of Default Landlord may collect rent from any occupant and, except to the extent set forth in the preceding paragraph, apply the amount collected to the next rent payable hereunder.

19. **Indemnification**. Except for the negligence of the Landlord Parties, their agents, employees or contractors, Tenant agrees to indemnify, defend and hold harmless the Landlord Parties from and against all losses, liabilities, damages, costs and expenses (including attorneys' fees) resulting from claims by third parties for injuries to any person and damage to or theft or misappropriation or loss of property occurring in or about the Project and arising from the use and occupancy of the Premises or from any activity, work, or thing done, permitted or suffered by Tenant in or about the Premises or due to any other act or omission of Tenant, its subtenants, assignees, invitees, employees, contractors and agents. The furnishing of insurance required hereunder shall not be deemed to limit Tenant's obligations under this Paragraph.

- 14 -

Except for the negligence of Tenant, its agents, employees or contractors, and to the extent permitted by law, Landlord agrees to indemnify, defend and hold harmless Tenant, and Tenant's agents, employees and contractors, from and against any and all losses, liabilities, damages, costs and expenses (including attorneys' fees) resulting from claims by third parties for injuries to any person and damage to or theft or misappropriation or loss of property occurring in or about the Project and arising from any activity, work, or thing done, permitted or suffered by Landlord in or about the Project and arising from any other act or omission of Landlord, its assignees, invitees, employees, contractors and agents. The furnishing of insurance required hereunder shall not be deemed to limit Landlord's obligations under this Paragraph 19.

If a claim under the foregoing indemnity is made against the indemnitee which the indemnitee believes to be covered by an indemnitor's indemnification obligations hereunder, the indemnitee shall promptly notify the indemnitor of the claim and, in such notice shall offer to the indemnitor the opportunity to assume the defense of the claim within 10 business days after receipt of the notice (with counsel reasonably acceptable to the indemnitee). If the indemnitor timely elects to assume the defense of the claim, the indemnitor shall have the right to settle the claim on any terms it considers reasonable and without the indemnitee's prior written consent, as long as the settlement shall not require the indemnitee to render any performance or pay any consideration, and the indemnitee shall not have the right to settle any such claim. If the indemnitor fails to timely elect to assume the defense of the claim or fails to defend the claim with diligence, then the indemnitee shall have the right to take over the defense of the claim and to settle the claim on any terms the indemnitee considers reasonable. Any such settlement shall be valid as against the indemnitor. If the indemnitor assumes the defense of a claim, the indemnitee may employ its own counsel but such employment shall be at the sole expense of the indemnitee. If any such claim arises out of the negligence of both Landlord and Tenant, responsibility for such claim shall be allocated between Landlord and Tenant based on their respective degrees of negligence. This indemnity does not cover claims arising from the presence or release of Hazardous Materials.

20. **Inspection and Access**. Landlord and its agents, representatives, and contractors may enter the Premises at any reasonable time and upon reasonable advance verbal notice to Tenant to inspect the Premises, for any business purpose, and, during the last year of the Lease Term, to show the Premises to prospective tenants. Landlord may erect a suitable sign on the Project stating the Premises are available to lease or that the Project is available for sale. Landlord may grant easements, make public dedications, designate and modify common areas and create restrictions affecting the Project, provided that no such easement, dedication, designation, modification or restriction materially interferes with Tenant's use or occupancy of the Premises. At Landlord's request, Tenant shall execute such instruments as may be reasonably necessary for such easements, dedications or restrictions.

21. **Quiet Enjoyment**. For so long as there is no Event of Default, Tenant shall, subject to the terms of this Lease have peaceful and quiet enjoyment of the Premises against any person claiming by, through or under Landlord.

22. **Surrender**. Upon the expiration of the Lease Term or 10 days following its earlier termination or of Tenant's right of possession as a result of an Event of Default, Tenant shall surrender the Premises to Landlord in the same condition as received, ordinary wear and tear, casualty loss and condemnation covered by Paragraphs 16 and 17 excepted and otherwise in accordance with the Move Out Conditions attached hereto. Any Trade Fixtures, Tenant-Made Alterations

- 15 -

and property not so removed by Tenant as permitted or required herein shall be deemed abandoned and may be stored, removed, and disposed of by Landlord at Tenant's expense, and Tenant waives all claims against Landlord for any damages resulting from Landlord's retention and disposition of such property. All outstanding Tenant obligations hereunder shall survive the termination of the Lease Term, including without limitation, indemnity obligations, payment of Taxes, and all obligations concerning the condition and repair of the Premises.

23.   **Holding Over**. If Tenant retains possession of the Premises after the Expiration Date, such possession shall be subject to immediate termination by Landlord, and all terms of this Lease shall be applicable during such holdover period (excluding any expansion or renewal option or other similar right or option), except that Tenant shall pay Landlord upon demand, as Base Rent for the holdover period, an amount equal to [***]% of the then-effective Base Rent, computed on a monthly basis for each month or part thereof during such holding over. All other payments payable under this Lease shall continue under the terms of this Lease. In addition, Tenant shall be liable for all damages incurred by Landlord as a result of such holding over. No holding over by Tenant, whether with or without consent of Landlord, shall operate to extend this Lease except as otherwise expressly provided, and this Paragraph shall not be construed as consent for Tenant to retain possession of the Premises. For purposes of this Paragraph, "possession of the Premises" shall continue until, among other things, Tenant has delivered all keys to the Premises to Landlord, Landlord has complete control over the Premises, and Tenant has completely fulfilled all obligations required of it upon termination of the Lease concerning the condition and repair of the Premises which impair Landlord's ability to release the Premises.

24.   **Events of Default**. Each of the following events shall be an event of default ("Event of Default") by Tenant under this Lease:

   a)   Tenant shall fail to pay any installment of Base Rent, Taxes, the Monthly Fixed Operating Expenses, or any other payment required herein when due, and such failure shall continue for a period of 5 days from Tenant's receipt of written notice form Landlord that same is past due.

   b)   Tenant or any guarantor or surety of Tenant's obligations hereunder shall (A) make a general assignment for the benefit of creditors; (B) commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property (collectively a "proceeding for relief"); (C) become the subject of any proceeding for relief which is not dismissed within 60 days of its filing or entry; or (D) die or suffer a legal disability (if Tenant, guarantor, or surety is an individual) or be dissolved or otherwise fail to maintain its legal existence (if Tenant, guarantor or surety is a corporation, partnership or other entity).

   c)   Any insurance required to be maintained by Tenant pursuant to this Lease shall be cancelled or terminated or shall expire or shall be reduced or materially changed, except, in each case, as permitted in this Lease or Tenant fails to timely deliver to Landlord any certificate of insurance as required under Paragraph 10 of the Lease, and said failure is not cured within five (5) business days of Tenant's receipt of written notice of such failure from Landlord.

- 16 -

**d)** Tenant shall vacate the Premises and fail to make arrangements reasonably acceptable to Landlord to ensure that (a) Tenant's insurance for the Premises will not be voided or cancelled, (b) the Premises are secured and not subject to vandalism, and (c) the Premises will be properly maintained and maintaining the utility services. Tenant shall inspect the Premises at least monthly and report to Landlord in the event the condition of the Premises has adversely changed.

**e)** Tenant shall assign, sublease or transfer Tenant's interest in this Lease except as permitted in this Lease.

**f)** Tenant shall fail to discharge any lien placed upon the Premises or Building in violation of this Lease within 20 days after receipt of actual notice any such lien or encumbrance is filed against the Premises.

**g)** Tenant shall fail to provide Landlord with an estoppel certificate within 10 days of receipt of written notice that same has not been provided within the time period required by Paragraph 29 below.

**h)** Tenant shall fail to comply with any provision of this Lease other than those specifically referred to in this Paragraph, and such default shall continue for more than 30 days after Landlord has given Tenant written notice of such default (said notice being in lieu of, and not in addition to, any notice required as a prerequisite to a forcible entry and detainer or similar action for possession of the Premises); provided, however, that Tenant shall not be in default under the circumstances described in this Paragraph 24 if Tenant has made diligent efforts to cure such default within the thirty (30) day period described therein, and thereafter proceeds continuously and diligently to cure such default within a commercially reasonable time.

**25.** **Landlord's Remedies**. Upon each occurrence of an Event of Default and so long as such Event of Default shall be continuing, Landlord may at any time elect to: (a) terminate this Lease or Tenant's right of possession, (but Tenant shall remain liable as hereinafter provided), and/or (b) pursue any other remedies at law or in equity. Upon the termination of this Lease or termination of Tenant's right of possession, it shall be lawful for Landlord, without formal demand or notice of any kind, to re-enter the Premises by summary dispossession proceedings or any other action or proceeding authorized by law and to remove Tenant and all persons and property therefrom. If Landlord re-enters the Premises, Landlord shall have the right to keep in place and use, or remove and store, all property at the Premises.

If Landlord terminates this Lease, Landlord may recover from Tenant the sum of: all Base Rent, Monthly Fixed Operating Expenses, Taxes, and all other amounts accrued hereunder to the date of such termination; the value of the Base Rent for any periods of abated Monthly Base Rent based on the Monthly Base Rent amount that immediately follows such period of abatement; the cost of reletting the whole or any part of the Premises, including without

- 17 -

limitation brokerage fees and/or leasing commissions incurred by Landlord, and costs of removing and storing property, repairing or altering the Premises for a new tenant(s), and all reasonable expenses incurred by Landlord in pursuing its remedies, including reasonable attorneys' fees and court costs; and the excess of the then present value of the Base Rent, Monthly Fixed Operating Expenses, Taxes, and other amounts payable by Tenant under this Lease applicable during the period following the termination of this Lease to the Expiration Date stated in this Lease, over the present value of any net amounts which Tenant establishes Landlord can reasonably expect to recover by reletting the Premises for such period, taking into consideration the availability of acceptable tenants and other market conditions affecting leasing. Such present values shall be calculated at a discount rate equal to the 90-day U.S. Treasury bill rate at the date of such termination.

If Landlord terminates Tenant's right to possession (but not this Lease) without terminating the Lease after an Event of Default, Landlord shall use commercially reasonable efforts to relet the Premises without thereby releasing Tenant from any liability hereunder and without demand or notice of any kind to Tenant; provided, however, (a) Landlord shall not be obligated to accept any tenant proposed by Tenant, (b) Landlord shall have the right to lease any other space controlled by Landlord first, and (c) any proposed tenant shall meet all of Landlord's leasing criteria. Any reletting of the Premises shall be on such terms and conditions as Landlord in its sole discretion may determine (including without limitation a term different than the remaining Lease Term, rental concessions, alterations and repair of the Premises, lease of less than the entire Premises to any tenant and leasing any or all other portions of the Project before reletting the Premises). Landlord shall not be liable, nor shall Tenant's obligations hereunder be diminished because of, Landlord's failure to relet the Premises or collect rent due in respect of such reletting. For the purpose of such reletting Landlord is authorized to make any repairs, changes, alterations, or additions in or to the Premises as Landlord deems reasonably necessary or desirable. If the Premises are not relet, then Tenant shall pay to Landlord as damages a sum equal to the amount of the rental reserved in this Lease for such period or periods, plus the cost of recovering possession of the Premises (including attorneys' fees and costs of suit), the unpaid Base Rent, Monthly Fixed Operating Expenses, Taxes, and other amounts accrued hereunder at the time of repossession, and the costs incurred in any attempt by Landlord to relet the Premises. If the Premises are relet and a sufficient sum shall not be realized from such reletting after first deducting therefrom, for retention by Landlord, the unpaid Base Rent, Monthly Fixed Operating Expenses, Taxes, and other amounts accrued hereunder at the time of reletting, the cost of recovering possession (including attorneys' fees and costs of suit), all of the costs and expense of repairs, changes, alterations, and additions, the expense of such reletting (including without limitation brokerage fees and leasing commissions) and the cost of collection of the rent accruing therefrom to satisfy the rent provided for in this Lease to be paid, then Tenant shall immediately satisfy and pay any such deficiency. Any such payments due Landlord shall be made upon demand and Tenant agrees that Landlord may file suit to recover any sums as they become due. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect in writing to terminate this Lease for such previous breach.

- 18 -

Except for Landlord's termination of this Lease, Landlord's exercise of any remedies shall not be deemed to be an acceptance of surrender of the Premises and/or a termination of this Lease by Landlord except by written agreement of Landlord and Tenant. Any law, usage, or custom to the contrary notwithstanding, Landlord shall have the right at all times to enforce the provisions of this Lease in strict accordance with the terms hereof; and the failure of Landlord at any time to enforce its rights under this Lease strictly in accordance the terms hereof shall not be construed as having created a custom in any way or manner contrary to the specific terms, provisions, and covenants of this Lease or as having modified the same. Tenant and Landlord further agree that forbearance or waiver by Landlord to enforce its rights pursuant to this Lease or at law or in equity, shall not be a waiver of Landlord's right to enforce one or more of its rights in connection with any subsequent Event of Default. Receipt by Landlord of rent or other payment with knowledge of the breach of any covenant hereof shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by Landlord. To the greatest extent permitted by law, Tenant waives all right of redemption in case Tenant shall be dispossessed by a judgment or by warrant of any court or judge. The terms "enter," "re-enter," "entry" or "re-entry," as used in this Lease, are not restricted to their technical legal meanings.

26.    **Tenant's Remedies/Limitation of Liability**. Landlord shall not be in default unless Landlord fails to perform any of its obligations hereunder within 30 days after written notice from Tenant specifying such failure (unless such performance will, due to the nature of the obligation, require a period of time in excess of 30 days, then after such period of time as is reasonably necessary). All obligations of Landlord shall be construed as covenants, not conditions; and, except as may be otherwise expressly provided in this Lease, Tenant may not terminate this Lease for breach of Landlord's obligations hereunder. Notwithstanding anything contained herein to the contrary, if such default by Landlord shall occur, Tenant may pursue any legal or equitable remedy for which it is entitled. All obligations of Landlord under this Lease will be binding upon Landlord only during the period of its ownership of the Premises and not thereafter. The term "Landlord" in this Lease shall mean only the then current owner of the Premises, and in the event of a transfer of the Premises, such owner shall be released and discharged from all obligations of Landlord thereafter accruing, but such obligations shall be binding during the Lease Term upon each new owner for the duration of such owner's ownership. Any liability of Landlord under this Lease shall be limited solely to its interest in the Building, and, except as specifically provided in the next sentence, in no event shall any personal liability be asserted against Landlord in connection with this Lease nor shall any recourse be had to any other property or assets of Landlord. Landlord's interest in the Premises shall be deemed to include (i) rent payments and other income and profits derived by and from the Premises, and (ii) the net proceeds of insurance received by Landlord from any casualty loss of all or any portion of the Premises, after Tenant obtains a final judgment against Landlord.

27.    **Subordination**. Without the necessity of any further instrument or act of Tenant, this Lease and Tenant's interest and rights hereunder are and shall be subject and subordinate at all times to the lien of any existing or future first mortgage on the Building, and all amendments, modifications, assignments and extensions thereof. Tenant agrees, at the election of the holder of any such mortgage, to attorn to any such holder. Tenant agrees within ten (10) days of demand to execute, acknowledge and deliver such reasonable instruments, confirming such subordination and such instruments of attornment as shall be requested by any such holder; provided such instruments do not increase, or modify, Tenant's obligations under this Lease.

- 19 -

Notwithstanding the foregoing, any such holder may at any time subordinate its mortgage to this Lease, without Tenant's consent, by notice in writing to Tenant. The term "mortgage" whenever used in this Lease shall be deemed to include deeds of trust, security assignments and any other encumbrances, and any reference to the "holder" of a mortgage shall be deemed to include the beneficiary under a deed of trust. Landlord represents to Tenant that as of the date hereof the Building is not subject to or encumbered by a mortgage. Notwithstanding the preceding provisions of this Paragraph 27, this Lease and Tenant's interest in the Premises shall not be subordinate to any future mortgage or deed of trust on the Building, and Tenant shall not be obligated to execute an instrument subordinating this Lease or Tenant's interest in the Premises to any future mortgage or deed of trust on the Building, unless concurrently with such subordination the holder of such mortgage or deed of trust agrees in such instrument of subordination not to disturb Tenant's possession of the Premises (so long as no default exists under the Lease) in the event such holder acquires title to the Premises through foreclosure, deed in lieu of foreclosure or otherwise.

28. **Mechanic's Liens**. Tenant has no express or implied authority to create or place any lien or encumbrance of any kind upon, or in any manner to bind the interest of Landlord or Tenant in, the Premises or this Lease. Tenant covenants and agrees that it will save and hold Landlord harmless from all loss, cost or expense based on or arising out of claims or liens asserted against the leasehold estate, the interest of Landlord in the Premises, or under this Lease. Tenant shall give Landlord prompt written notice of any lien or encumbrance placed against the Premises of which it becomes aware and cause such lien or encumbrance to be discharged, or bonded over in a manner satisfactory to Landlord, within 20 days of receipt of actual notice of the filing or recording thereof.

29. **Estoppel Certificates**. Tenant agrees to execute and deliver to Landlord or Landlord's designee, within ten (10) days after request of Landlord, any estoppel certificate containing customary provisions requested by Landlord. No cure or grace period provided in this Lease shall apply to Tenant's obligations to timely deliver an estoppel certificate. In the event Tenant fails to timely deliver the estoppel certificate as provided above, Landlord shall have the right to deliver to Tenant a second request for such estoppel certificate, and Tenant shall deliver such estoppel certificate no later than five (5) days from receipt of such second notice. Except as expressly provided otherwise above, no cure or grace period provided in this Lease shall apply to Tenant's obligations to timely deliver an estoppel certificate.

30. **Environmental Requirements**. Except for Hazardous Materials contained in products used by Tenant in de minimis quantities for ordinary cleaning and office purposes, propane used in Tenant's forklifts in the normal course of its business, and contained in products stored and/or distributed during Tenant's normal course of business in their original, sealed, and unopened containers, Tenant shall not permit or cause any party to bring any Hazardous Material upon the Premises or transport, store, use, generate, manufacture or release any Hazardous Material in or about the Premises without Landlord's prior written consent. Tenant, at its sole cost and expense, shall operate its business in the Premises in strict compliance with all Environmental Requirements and shall remediate in a manner satisfactory to Landlord any Hazardous Materials released on or from the Project by Tenant, its agents, employees, contractors, subtenants or invitees ("Tenant Parties"). Tenant shall complete and certify disclosure statements requested by Landlord relating to Tenant's transportation, storage, use, generation,

- 20 -

manufacture or release of Hazardous Materials on the Premises. The term "Environmental Requirements" means all applicable present and future statutes, regulations, ordinances, rules, codes, judgments, orders or other similar enactments of any governmental authority or agency regulating or relating to health, safety, or environmental conditions on, under, or about the Premises or the environment, including without limitation, the following: the Comprehensive Environmental Response, Compensation and Liability Act; the Resource Conservation and Recovery Act; and all state and local counterparts thereto, and any regulations or policies promulgated or issued thereunder. The term "Hazardous Materials" means and includes any substance, material, waste, pollutant, or contaminant listed or defined as hazardous or toxic, under any Environmental Requirements, asbestos and petroleum, including crude oil or any fraction thereof, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas). As defined in Environmental Requirements, Tenant is and shall be deemed to be the "operator" of Tenant's "facility" and the "owner" of all Hazardous Materials brought on the Premises by Tenant, its agents, employees, contractors or invitees, and the wastes, by-products, or residues generated, resulting, or produced therefrom. No cure or grace period provided in this Lease shall apply to Tenant's obligations to promptly commence and diligently pursue its remediation obligations in accordance with the terms and conditions of this Paragraph.

Notwithstanding anything to the contrary in this Paragraph, Tenant shall have no liability of any kind to Landlord as to Hazardous Materials on the Premises existing prior to the Tenant first occupied the Premises, or which were caused or permitted by (i) Landlord, its agents, employees, contractors or invitees; or (ii) any other tenants in the Project or their agents, employees, contractors, subtenants, assignees or invitees.

Tenant shall indemnify, defend, and hold the Landlord Parties harmless from and against any and all losses (including, without limitation, diminution in value of the Premises or the Project and loss of rental income from the Project), claims, demands, actions, suits, damages (including, without limitation, punitive damages), expenses (including, without limitation, remediation, removal, repair, corrective action, or cleanup expenses), and costs (including, without limitation, actual attorneys' fees, consultant fees or expert fees and including, without limitation, removal or management of any asbestos brought into the property or disturbed in breach of the requirements of this Paragraph, regardless of whether such removal or management is required by law) which are brought or recoverable against, or suffered or incurred by Landlord as a result of any release of Hazardous Materials for which Tenant is obligated to remediate as provided above or any other breach of the requirements under this Paragraph by Tenant, or Tenant Parties, regardless of whether Tenant had knowledge of such noncompliance. The obligations of Tenant under this Paragraph shall survive any termination of this Lease.

Landlord shall have access to, and a right to perform inspections and tests of, the Premises to determine Tenant's compliance with Environmental Requirements, its obligations under this Paragraph, or the environmental condition of the Premises. Tenant shall reimburse Landlord for the reasonable cost of such inspection and tests if such inspections or tests reveal that Tenant has not complied with any Environmental Requirement. Landlord's receipt of or satisfaction with any environmental assessment in no way waives any rights that Landlord holds against Tenant.

- 21 -

31.  **Rules and Regulations**. Tenant shall comply with all reasonable rules and regulations established by Landlord covering use of the Premises and the Project. The current Project rules and regulations are attached hereto as Exhibit B. Landlord shall not have any liability or obligation for the breach of any rules or regulations by other tenants in the Project. In the event of an inconsistency between the rules and regulations and the terms of this Lease, the terms of the Lease shall control.

32.  **Security Service**. Tenant acknowledges and agrees that, while Landlord may patrol the Project, Landlord is not providing any security services and that Landlord shall not be liable to Tenant for, and Tenant waives any claim against Landlord with respect to, any loss by theft or any other damage suffered or incurred by Tenant in connection with any unauthorized entry into the Premises or any other breach of security with respect to the Premises.

33.  **Force Majeure**. Except for monetary obligations, neither Landlord nor Tenant shall be responsible for delays in the performance of its obligations hereunder caused by labor disputes, acts of God, inability to obtain labor or materials, governmental restrictions or regulations or delay in issuance of permits, enemy or hostile governmental action, civil commotion, casualty, and other causes beyond the reasonable control of Landlord or Tenant, as the case may be ("Force Majeure").

34.  **Entire Agreement**. This Lease constitutes the complete agreement of Landlord and Tenant with respect to the subject matter hereof. Any prior agreements, promises, negotiations, or representations are superseded by this Lease. This Lease may only be amended by an instrument in writing signed by both parties hereto.

35.  **Severability**. If any clause of this Lease is illegal, invalid or unenforceable under present or future laws, then and in that event, it is the intention of the parties hereto that such clause be replaced with a valid clause of similar meaning and that the remainder of this Lease shall not be affected thereby.

36.  **Brokers**. Each party represents and warrants to the other that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, other than the Landlord Broker and Tenant Broker, if any, set forth in Paragraph 1 of this Lease, and each party agrees to indemnify and hold the other harmless from and against any claims by any other broker, agent or other person claiming a commission or other form of compensation by virtue of having dealt with the indemnifying party with regard to this leasing transaction.

37.  **Miscellaneous**.

   a)  **TIME IS OF THE ESSENCE AS TO THE PERFORMANCE OF TENANT'S AND LANDLORD'S OBLIGATIONS UNDER THIS LEASE.**

   b)  Any payments or charges due from Tenant to Landlord hereunder shall be considered rent for all purposes of this Lease.

- 22 -

**c)** If and when included within the term "Tenant," as used in this instrument, there is more than one person, firm or corporation, each shall be jointly and severally liable for the obligations of Tenant.

**d)** All notices required or permitted to be given under this Lease shall be in writing and shall be sent by registered or certified mail, return receipt requested, or by a reputable national overnight courier service, postage prepaid, or by hand delivery addressed to Landlord or Tenant at the applicable notice address as provided in Paragraph 1 of this Lease. Either party may, by the above notice, change its notice address for all subsequent notices or add an additional party to be copied on all subsequent notices. Except where otherwise provided to the contrary, notice shall be deemed given upon delivery.

**e)** Except as otherwise provided in this Lease or as otherwise required by law, Landlord retains the absolute right to withhold any consent or approval.

**f)** In the event of (i) a default by Tenant of its obligations under the Lease, or (ii) a need by Landlord to effectuate a financing transaction or sale of the Building, or (iii) an assignment or subletting of the Lease by Tenant, then at Landlord's request from time to time Tenant shall furnish Landlord with true and complete copies of its most recent annual and quarterly financial statements prepared by Tenant or Tenant's accountants.

**g)** Neither this Lease nor a memorandum of lease shall be recorded by or on behalf of Tenant. Landlord may prepare and file, and upon request by Landlord Tenant will execute, a memorandum of lease.

**h)** The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Lease or any exhibits or amendments hereto.

**i)** The submission by Landlord to Tenant of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Premises, nor confer any right or impose any obligations upon either party until execution of this Lease by both parties.

**j)** Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires. The captions inserted in this Lease are for convenience only and in no way define, limit or otherwise describe the scope or intent of this Lease, or any provision hereof, or in any way affect the interpretation of this Lease.

**k)** Any amount not paid by Tenant when due shall bear interest from such due date until paid in full at the lesser of the highest rate permitted by applicable law or [***]% per year. Construction and interpretation of this Lease shall be governed by the laws of the state in which the Project is located, excluding any principles of conflicts of laws.

**l)** All exhibits and addenda attached hereto are hereby incorporated into this Lease and made a part hereof. In the event of any conflict between such exhibits or addenda and the terms of this Lease, such exhibits or addenda shall control.

- 23 -

**m)**  In the event either party hereto initiates litigation to enforce the terms and provisions of this Lease, the non-prevailing party in such action shall reimburse the prevailing party for its reasonable attorney's fees, filing fees, and court costs.

**n)**  Tenant agrees that Landlord shall have the right, without Tenant's consent, to place a solar electric generating system on the roof of the Building or enter into a lease for the roof of the Building whereby such roof tenant shall have the right to install a solar electric generating system on the roof of the Building (provided that the exercise of Landlord's rights does not adversely affect Tenant's use and occupancy of the Premises or subject Tenant to additional costs). Upon receipt of written request from Landlord, Tenant, at Tenant's sole cost and expense, shall deliver to Landlord data regarding the electricity consumed in the operation of the Premises (the "Energy Data") for purposes of regulatory compliance, benchmarking, energy management, building environmental performance labeling and other related purposes. Tenant agrees and acknowledges that Landlord shall retain the exclusive right to use the exterior of the Building and Project for virtual and augmented reality purposes, and Tenant hereby waives all rights to use the exterior of the Building or Project for virtual or augmented reality purposes (provided that the exercise of Landlord's rights does not adversely affect Tenant's use and occupancy of the Premises).

**o)**  This agreement may be executed in multiple counterparts, each of which shall be considered an original, but all of which shall constitute one and the same agreement. The signature of a party transmitted electronically (e.g., e-signature) or by facsimile, PDF and/or other electronic image file format shall constitute and have the same force and effect as the original signature of the party. Following execution, a PDF (or similar image file format) scan of this entire agreement (whether signed electronically or in ink) shall be maintained, and considered to be the original agreement for all purposes.

**p)**  **EXCEPT AS EXPRESSLY PROVIDED OTHERWISE IN THIS LEASE (WHICH EXCEPTIONS INCLUDE BUT ARE NOT LIMITED TO AS PROVIDED PARAGRAPH 23, PARAGRAPH 30, AND EXHIBIT F IN WHICH CASE THE FOLLOWING SHALL NOT APPLY), NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY, SPECIAL OR INDIRECT DAMAGES, WHETHER ARISING IN TORT, CONTRACT, UNDER ANY STATUTE.**

**q)**  Tenant represents to Landlord and Landlord hereby represents to Tenant that,

**(i)**  such entity, nor any person or entity that directly owns a 10% or greater equity interest in it nor any of its officers, directors or managing members is a person or entity (each, a "Prohibited Person") with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury, including those parties names on the OFAC's Specially Designated and Blocked Persons List and those covered pursuant to Executive Order 13224 (the "Executive Order") signed on September 24, 2001, entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism", or other governmental action; and

- 24 -

(ii)     that such entity's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or USA Patriot Act or the regulations or orders promulgated thereunder (as amended from time to time, the "Money Laundering Acts").

38.    **WAIVER OF JURY TRIAL. TENANT AND LANDLORD WAIVE ANY RIGHT TO TRIAL BY JURY OR TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE (IN CONTRACT, TORT, OR OTHERWISE), BETWEEN LANDLORD AND TENANT ARISING OUT OF THIS LEASE OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED HERETO.**

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the Effective Date.

TENANT:                                              LANDLORD:

**THE REALREAL, INC.**                               **PROLOGIS PERTH AMBOY ASSOCIATES, LLC**
A Delaware corporation                               a Delaware limited liability company

                                                     By:  PROLOGIS, L.P.,
                                                          a Delaware limited partnership,
                                                          its sole member
By: /s/ Matt Gustke                                       By: PROLOGIS, INC.,
_____                            a Maryland corporation,
    Matt Gustke, Chief Financial Officer                   its general partner
                                                          By:  /s/ Nick Kitttredge
                                                          _____
                                                               Nick Kittredge, President – East Region

- 25 -

**EXHIBIT A: SITE PLAN**

- 26 -

## EXHIBIT B: PROJECT RULES AND REGULATIONS

1.  The sidewalk, entries, and driveways of the Project shall not be obstructed by Tenant, or its agents, or used by them for any purpose other than ingress and egress to and from the Premises.

2.  Tenant shall not place any personal property or objects in the parking areas, landscaped areas or other areas outside of its Premises, or on the roof of the Project.

3.  Except for service dogs, no animals shall be allowed in, or on, any part of the Building or the Project.

4.  Tenant shall not disturb any other occupants of the Building or Project by the use of any radio, speakers, or musical instrument or by the making of loud or improper noises.

5.  If Tenant desires telegraphic, telephonic or other electric connections in the Premises, Landlord or its agent will direct the electrician as to where and how any conduit or the wires may be introduced; and, without such direction, no boring or cutting of wires or conduit will be permitted. Any such installation or connection shall be made at Tenant's expense.

6.  Tenant shall not install or operate any steam or gas engine or boiler except as specifically approved in the Lease. The use of oil, gas or inflammable liquids for heating, lighting or any other purpose is expressly prohibited. Explosives or other articles deemed extra hazardous shall not be brought into the Project.

7.  Parking any type of recreational vehicles is specifically prohibited on or about the Project. Parking any type of trucks, trailers or other vehicles in the Building is specifically prohibited. In no event shall inoperable cars, trucks, or trailers be parked at the Project. There shall be no "For Sale" or other advertising signs on or about any parked vehicle. All vehicles shall be parked in the designated parking areas in conformity with all signs and other markings. All parking will be open parking, and no reserved parking, numbering or lettering of individual spaces will be permitted except as specified by Landlord or in the Lease. There shall be no repair, maintenance or washing of vehicles in the parking lot, drive areas, or truck courts.

8.  Tenant shall maintain the Premises free from rodents, insects and other pests.

9.  Landlord reserves the right to exclude or expel from the Project any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs or who shall in any manner do any act in violation of the Rules and Regulations of the Project.

10. Tenant shall not cause any unnecessary labor or maintenance by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness. Landlord shall not be responsible to Tenant for any loss of property on the Premises, however occurring, or for any damage done to the effects of Tenant by the janitors, maintenance personnel, or any other employee or person.

11. Tenant shall give Landlord prompt notice of any defects or leaks in the water, lawn sprinkler, sewage, gas pipes, exterior electrical lights and fixtures, heating apparatus, fire sprinklers or any other service system or equipment affecting the Premises.

- 27 -

12. Tenant shall not permit dumping of waste or refuse, other than in designated receptacles, or permit any harmful materials to be placed in any drainage system or sanitary system in or about the Premises, Building, or Project.

13. All moveable trash receptacles provided by the trash disposal firm for the Premises must be kept in the trash enclosure areas provided for that purpose and all trash receptacles shall remain closed at all times.

14. No public or private auction will be permitted on the Premises, Building, or the Project.

15. No awnings shall be placed over the windows in the Premises except with the prior written consent of Landlord.

16. The Premises shall not be used for lodging, sleeping or cooking (other than kitchenette or break room use) or for any immoral or illegal purposes or for any purpose other than that specified in the Lease. No gaming devices shall be operated in the Premises.

17. Tenant shall ascertain from Landlord the maximum amount of electrical load which can safely be used in the Premises, taking into account the capacity of the electrical wiring in the Project, Building or the Premises and the needs of other tenants, and shall not use more than such safe capacity. Landlord's consent to the installation of electric equipment shall not relieve Tenant from the obligation to use no more electricity than such safe capacity.

18. Tenant assumes full responsibility for protecting the Premises from theft, robbery and pilferage.

19. Tenant shall not permit recreational or medical marijuana to be grown, sold, dispensed, or consumed on the Premises or Project.

20. Tenant shall not permit smoking in any interior area of the Premises.

- 28 -

**EXHIBIT C: FORM OF COMMENCEMENT DATE CERTIFICATE**

Notice Contact Name
Company Name
Notice Street Address
City, State, Zip Code


RE:  Lease dated Date between Customer & Owner for Premises Address


Dear Salutation Notice Contact Last Name:


Welcome to your new facility. We would like to confirm the terms of the above referenced lease agreement:


Commencement Date:                                            Date

Expiration Date:                                                     Date

Base Rent Commencement Date:                             Date


We are pleased to welcome you as a customer of Prologis and look forward to working with you. Please indicate your agreement with the above changes to your lease by signing and returning the enclosed copy of this letter to me. If I can be of service, please do not hesitate to contact me.


                                                                 Sincerely,

                                                                 Property Manager Name
                                                                 Title


Accepted   Accepted by                                                        Date:
by:
             By:       _____
             Printed:  _____
             Title:    _____


- 29 -

**EXHIBIT D: MOVE-OUT CONDITIONS**

Tenant shall surrender the Premises in the same condition as received, ordinary wear and tear, casualty loss, and condemnation covered by Paragraphs 16 and 17 excepted.

Before surrendering the Premises, Tenant shall remove all of its personal property, trade fixtures, and such alterations or additions to the Premises made by Tenant as may be specified for removal thereof. If Tenant fails to remove such personal property, trade fixtures, and alterations upon the Expiration Date or earlier termination of this Lease, the same shall be deemed abandoned and shall become the property of the Landlord. The following list is designed to assist Tenant in the move-out procedures but is not intended to be all inclusive. Upon Tenant's completion of its surrender obligations as provided in this Lease, please contact Landlord's property manager to coordinate turning in keys, utility changeover, and scheduling an inspection of the Premises. In the event Tenant fails to arrange a joint inspection of the Premises with Landlord upon Tenant's vacating of the Premises, Landlord's inspection at, or subsequent to, Tenant's vacation of the Premises shall be conclusively deemed correct for the purpose of determining Tenant's responsibilities with respect to the repair and restoration of the Premises.

1. Lights: All interior office, warehouse, emergency and exit lights will be fully operational with all bulbs and ballasts functioning.

2. Dock Levelers, Service Doors and Roll Up Doors: All truck doors, service doors, roll up doors and dock levelers shall be serviced and placed in good operating order, including the replacement of any dented or damaged truck door panels and adjustment of door tension to insure proper operation. All door panels which are replaced must be painted to match the building standard.

3. Dock Seals/Dock Bumpers: Free of tears and broken backboards repaired. All dock bumpers must be left in place and well secured.

4. Structural Columns All structural steel columns in the warehouse and office shall be inspected for damage caused by Tenant, or its employees, agents, contractors, or subtenants. Necessary repairs must be pre-approved by Landlord prior to implementation.

5. Warehouse Floor: Free of stains and swept with no racking bolts and other protrusions or holes left in floor. Cracks and racking bolts must be repaired with an mm-80 (or equivalent) epoxy or polymer to match concrete color. All floor striping (including paint or tape) in the Premises shall be removed with no residual staining or other indication that such striping or taping existed.

6. Tenant-Installed Equipment and Wiring: Air lines, conveyor or process electrical distribution, junction boxes, conduit, etc., removed and space returned to original condition when leased.

7. Walls: Sheetrock (drywall) and/ or plywood damage should be patched and fire-taped so that there are no holes in either office or warehouse walls.

8. Carpet and Tile The carpet and vinyl tiles should be in a clean condition and should not have any holes or chips in them, ordinary wear and tear on these items is acceptable provided they have been maintained.

- 30 -

9.  Roof:

Any Tenant-installed equipment must be removed with all roof penetrations properly repaired by a licensed roofing contractor approved by Landlord. Leaks arising from any Tenant-installed equipment or roof penetrations must be fixed in accordance with Landlord's maintenance and repair recommendations.

10. Signs:

All exterior signs must be removed with holes patched and painted to match Building standard paint as necessary. All window or other interior signs must be removed.

11. Intentionally Omitted

12. Electrical & Plumbing:

All electrical and plumbing equipment to be returned in good working condition and repair and conforming to code.

13. Overall Cleanliness:

Clean windows, sanitize bathroom(s), vacuum carpet, and remove any and all debris from office and warehouse. Remove all pallets and debris from exterior of Premises. All trade fixtures, dumpsters, racking, trash, vending machines and other personal property to be removed.

14. Odors:

Tenant shall remove any odor which may exist in the Premises resulting from Tenant's occupancy of the Premises prior to surrendering or vacating the Premises.

- 31 -

**EXHIBIT E: DOCK EQUIPMENT MAINTENANCE**

Tenant agrees to enter into and maintain through the Lease Term, a preventative maintenance/service contract for servicing all doors, dock levelers, truck restraints serving the Premises. Landlord requires a qualified door and dock contractor to perform this work. The service contract must become effective within thirty (30) days of occupancy, and service visits should be performed no less than twice per year. Landlord requires that Tenant send the following list to Tenant's contractor to be assured that these items are included in the maintenance contract:

Dock/Overhead/Service Doors:

1. Inspect panels for damage;
2. Inspect dock seals and shelters;
3. Inspect weather seal condition;
4. Inspect tracks and wall for damage/loose attachments;
5. Inspect springs for breaks/weakness; hinges/bearings/rollers;
6. Inspect anchors and welds/drums/cables/couplers;
7. Inspect shaft for deflection/bending;
8. Inspect chain hoist assembly;
9. Adjust spring tension & track guide wall attachments;
10. Adjust door panel/slat curtain closer to seals;
11. Lubricate springs/hinges/rollers/bearings/cables/tracks/guides;
12. Clean any debris from operational systems.

If Electrical Door Operators, add:

1. Inspect drive chain/belt/hoist assemblies;
2. Inspect sprockets/bearings/linkages;
3. Inspect brake solenoid/clutch assembly;
4. Inspect mounting bolts/welds/wiring;
5. Inspect drawbar arm/limit, photo eyes and safety switches;
6. Adjust upward/downward limits;
7. Adjust clutch/brake assemblies;
8. Adjust sprockets/belts//chains as required;
9. Adjust drive chain/hoist as required;
10. Lubricate chains/sprockets/bearings/bushings;
11. Lubricate gear reducers and all pivot points.

Dock Levelers:

1. Inspect hold down and sub-frame structure for cracked welds/rusted through steel;
2. Inspect deck surface for any malformation;
3. Inspect lip/rear hinge assembly for cracked/broken spools;
4. Inspect lip extension mechanism;
5. Inspect all chains, linkages, springs, cables, sprockets, rollers;
6. Inspect dock bumper condition/attachment;
7. Inspect safety leg assembly; lip shock/gas spring;
8. Inspect pit steel attachment points;
9. Inspect all electrical connections/feeds;

- 32 -

10. Inspect toe guards and weather seal condition;
11. Adjust hold down assembly & snubber chain/cable;
12. Adjust activation springs & lip extension mechanism;
13. Adjust all low screws/springs/cables;
14. Lubricate front/rear hinge assemblies & activation springs;
15. Lubricate all springs/cables/rollers/chains;
16. Lubricate cotter and pins/all pivot points & clean pit.

If Hydraulic Dock Levelers, add:

1. Inspect oil level and quality & cylinders/hoses for leaks;
2. Inspect and verify panic valve installation;
3. Adjust hydraulic hoses, valves and connections & fill reservoirs as need;
4. Adjust hydraulic hoses, valves and connections & fill reservoirs as need.

Truck Restraints:

1. Inspect restraint wall attachment points;
2. Inspect locking hook/arm/piston;
3. Inspect electrical/pneumatic lines for leakage/breaks;
4. Inspect interior/exterior safety light packages;
5. Inspect all sensors/activation devices;
6. Inspect control box/interlock connections;
7. Inspect unit for damaged, cracked or missing parts;
8. Adjust all drive chains/belts/cams/roller/spring assemblies;
9. Adjust any loose electric/pneumatic connections;
10. Lubricate all springs/pivot points/chains & clean any debris from system.

If Hydraulic Restraints, add:

1. Inspect oil level and quality;
2. Inspect all hydraulic cylinders for leaks and damage;
3. Inspect all hydraulic hoses and connections for leaks;
4. Lubricate all fittings;
5. Adjust hydraulic hoses, valves and connections;
6. Fill hydraulic reservoirs as needed.

Hurricane Shutters/Fire Shutters and Fire Doors:

1. See Dock Door maintenance; test annually or as required per code.

Hydraulic Scissors Lifts:

1. Inspect all pivot points, cams, structural frame, hydraulic hoses;
2. Inspect hydraulic hoses, pump, and reservoir;
3. Inspect controls and safety rails & clean pit;
4. Adjust limit assemblies, hinges, safety rails and chains; Adjust valves & idlers
5. Lubricate all pivot points, lip hinges and shafts;
6. Lubricate fittings and cam followers & fill hydraulic reservoirs.

- 33 -

**EXHIBIT F: ISRA COMPLIANCE**

Notwithstanding anything contained in this Lease to the contrary, Tenant expressly covenants and agrees to fully comply with the provisions of the New Jersey Industrial Site Recovery Act (N.J.S.A. 13:1K-6, et seq.), and all regulations promulgated thereto (or under its predecessor statute, the New Jersey Environmental Cleanup Responsibility Act) hereinafter referred to collectively as "ISRA" prior to the expiration or earlier termination of the Lease Term or at any time that any action of the Tenant triggers the applicability of ISRA. In the event that Tenant triggers the applicability of ISRA at any time during the Lease Term then Tenant shall complete its ISRA compliance no later than ninety (90) days of the date ISRA is triggered or prior to the termination of the Lease, whichever is earlier. In particular, the Tenant agrees that it shall comply with the provisions of ISRA in the event of any "closing, terminating or transferring" of Tenant's operations or any other event or transaction or circumstance defined as being subject to ISRA, pursuant to, and in accordance with, the regulations that have been promulgated pursuant to ISRA. In the event evidence of such compliance is not delivered to the Landlord prior to surrender of the Premises by the Tenant to the Landlord, it is understood and agreed that the Tenant shall be deemed in holdover as provided in the Lease until such time as evidence of compliance with ISRA has been delivered to the Landlord, and together with any costs and expenses incurred by Landlord in enforcing and/or fulfilling Tenant's obligations under this Addendum. Evidence of compliance, as used herein, shall mean a "no further action letter" issued by the New Jersey Department of Environmental Protection ("NJDEP") or a Response Action Outcome ("RAO") certified and submitted to the NJDEP by a Licensed Site Remediation Professional ("LSRP") pursuant to the Site Remediation Reform Act (N.J.S.A. 58:10C-1 et seq.) hereinafter referred to as "SRRA" and all regulations promulgated thereto. Evidence of compliance shall be delivered to Landlord, together with copies of all submissions made to, and received from, the NJDEP, including all environmental reports, test results and other supporting documentation. Tenant shall take no action in regard to any investigation or remediation that may be required pursuant to ISRA and/or SRRA that may limit or restrict the use of the Premises in any respect, including, without limitation, the use of engineering or institutional controls as such terms may be defined in SRRA and the Technical Requirements for Site Remediation, N.J.A.C. 7:26E-1 et seq., without the express written consent and approval of the Landlord. In the event that the NJDEP or any other agency shall audit an RAO certified and submitted to the NJDEP by an LSRP on behalf of Tenant, Tenant shall remain liable for all costs associated with any such audit and for taking, at Tenant's sole cost and expense, any such action as may be required as a result of any such audit or review. In the event that the NJDEP or any other agency shall modify or rescind a no further action letter issued to Tenant or invalidate an RAO certified and submitted to the NJDEP on behalf of Tenant, Tenant shall remain liable for all costs associated with any such rescission or invalidation and shall, at Tenant's sole cost and expense, take any and all actions as may be required to have the no further action letter or the RAO reinstated or reissued as the case may be. Landlord shall provide access to Tenant, the NJDEP and/or the United States Environmental Protection Agency ("USEPA") to comply with the requirements of this Addendum and Landlord shall cooperate with Tenant to expedite such compliance. In addition to the above, Tenant hereby agrees that it shall cooperate with Landlord in the event of the termination or expiration of any other lease affecting the Project, or a transfer of any portion of the property, or any interest therein, which triggers the provisions of ISRA. In such case, Tenant agrees that it shall fully cooperate with Landlord, at no cost to Tenant, in connection with any information or documentation that may be requested by the NJDEP. In the event that any investigation or remediation of the Project is required in connection

- 34 -

with the conduct by Tenant in the Premises, regardless of whether Tenant or Landlord causes ISRA to apply, Tenant expressly covenants and agrees that it shall conduct and complete, within ninety (90) days of being notified of such an obligation to investigate or remediate, that portion of said investigation and remediation which is attributable to the Tenant's use and occupancy thereof, at Tenant's sole cost and expense, except where caused by the fault of Landlord, or arising out of conditions that pre-exist Tenant's use or occupancy, or which arise following the expiration or earlier termination of the Lease, provided the same are not a result of Tenant's acts or omissions. Tenant hereby represents and warrants that its North American Industry Classification System ("NAICS") No. is 453310, and that Tenant shall not generate, manufacture, refine, transport, treat, store, handle or dispose of "hazardous substances" as the same are defined under ISRA and the regulations promulgated pursuant thereto, except in accordance with all applicable statutes, laws, ordinances, rules and regulations governing such hazardous substances. Tenant hereby agrees that it shall not make any changes in the nature of the business to be conducted at the Premises that would result in a change from a non-ISRA to an ISRA-subject NAICS without the written consent of the Landlord. The within covenants shall survive the expiration or earlier termination of the Lease Term.

- 35 -

**EXHIBIT G: [***] RENEWAL OPTION AT MARKET**
**(BASEBALL ARBITRATION)**

(a) Extension Term; Extension Notice. Provided that as of the time of the giving of the First Extension Notice and the Commencement Date of the First Extension Term (as such terms are defined below), (x) Tenant is the Tenant originally named herein, (y) Tenant actually occupies all of the Premises initially demised under this Lease and any space added to the Premises, and (z) no Event of Default exists, or would exist but for the passage of time or the giving of notice, or both; then Tenant shall have the right to extend the Lease Term for [***] commencing on the day following the expiration of the Lease Term (hereinafter referred to as the "Commencement Date of the [***] Extension Term"). Tenant must give **Landlord notice** (hereinafter called the "[***] Extension Notice") of its election to extend the term of the Lease Term at least [***], prior to the Expiration Date.

(b) Base Rental Rate. The Base Rent payable by Tenant to Landlord during the [***] Extension Term shall be the greater of:

(i) the Base Rent in effect on the Expiration Date (if the Base Rent is stated as an annual or other periodic rate, adjusted for the length of the Lease Term), and

(ii) the Fair Market Rent, as defined and determined pursuant to Paragraphs (c), (d), and (e) below.

(c) Fair Market Rent. The term "Fair Market Rent" shall mean the Base Rent, expressed as an annual rent per square foot of floor area, which Landlord would have received from leasing the Premises for the [***] Extension Term to an unaffiliated person which is not then a tenant in the Project, assuming that such space were to be delivered in "as-is" condition, and taking into account the rental which such other tenant would most likely have paid for such premises, including market escalations, provided that Fair Market Rent shall not in any event be less than the Base Rent for the Premises as of the expiration of the Lease Term. Fair Market Rent shall not be reduced by reason of any costs or expenses saved by Landlord by reason of Landlord's not having to find a new tenant for the Premises (including without limitation brokerage commissions, cost of improvements necessary to prepare the space for such tenant's occupancy, rent concession, or lost rental income during any vacancy period), but shall take into account market rental concessions and allowances for comparable lease renewals in the market. Fair Market Rent means only the rent component defined as Base Rent in the Lease and does not include reimbursements and payments by Tenant to Landlord with respect to Monthly Fixed Operating Expenses, Taxes, or other items payable or reimbursable by Tenant under the Lease. In addition to its obligation to pay Base Rent (as determined herein), Tenant shall continue to pay and reimburse Landlord as set forth in the Lease with respect to such Monthly Fixed Operating Expenses (subject to be increased by Landlord), Taxes, and other items with respect to the Premises during the [***] Extension Term. The arbitration process described below shall be limited to the determination of the Base Rent and shall not affect or otherwise reduce or modify the Tenant's obligation to pay or reimburse Landlord for such Monthly Fixes Operating Expenses, Taxes, and other reimbursable items. Notwithstanding anything contained herein to the contrary,

- 36 -

upon the determination of the Base Rent for the first twelve (12) months of the [***] Extension Term, whether through an agreement between Landlord and Tenant or through arbitration as provided below, the Base Rent shall automatically increase on each twelve (12) month anniversary thereafter during the [***] Extension Term by [***] percent over the Base Rent in effect immediately prior to such anniversary.

(d) <u>Fair Market Rent Notification/Acceptance</u>. Landlord shall notify Tenant of its determination of the Fair Market Rent for the [***] Extension Term, along with the Monthly Fixed Operating Expenses and the Annual Fixed Operating Expense Increase, as determined in Landlord's sole but reasonable determination, applicable to the [***] Extension Term (the "<u>Fair Market Rent Notice</u>") within [***] of Tenant's [***] Extension Notice, and Tenant shall deliver written notice to Landlord within [***] of receipt of the Fair Market Rent Notice of any objection to the Fair Market Rent Notice. Failure to respond within the [***] period shall constitute Tenant's acceptance of such Fair Market Rent, Monthly Fixed Operating Expenses, and the Annual Fixed Operating Expense Increase. If Tenant objects, Landlord and Tenant shall commence negotiations to attempt to agree upon the Fair Market Rent within [***] of Landlord's receipt of Tenant's notice. If the parties cannot agree, each acting in good faith but without any obligation to agree, then the Lease Term shall not be extended and shall terminate on its scheduled termination date and Tenant shall have no further right hereunder or any remedy by reason of the parties' failure to agree unless Tenant or Landlord invokes the arbitration procedure provided below to determine the Fair Market Rent. Notwithstanding anything contained herein to the contrary, in no event shall either party have the right to invoke the arbitration provision as provided herein until Landlord and Tenant have mutually agreed (or be deemed to have agreed) to the Monthly Fixed Operating Expenses and Annual Fixed Operating Expense Increase applicable during the [***] Extension Term, and any attempt to invoke arbitration absent such agreement shall be null and void. The arbitration process described below shall be limited to the determination of the Base Rent and shall not affect or otherwise reduce or modify the Tenant's obligation to pay or reimburse Landlord for the Monthly Fixed Operating Expenses, Taxes, or any other reimbursable items.

(e) <u>Arbitration</u>. Arbitration to determine the Fair Market Rent shall be in accordance with the Real Estate Valuation Arbitration Rules of the American Arbitration Association. Unless otherwise required by state law, arbitration shall be conducted in the metropolitan area where the Project is located by a single arbitrator unaffiliated with either party. Either party may elect to arbitrate by sending written notice to the other party and the Regional Office of the American Arbitration Association within [***] after the [***] negotiating period provided in Paragraph (d), invoking the binding arbitration provisions of this paragraph. Landlord and Tenant shall each submit to the arbitrator their respective proposal of Fair Market Rent. The arbitrator must choose between the Landlord's proposal and the Tenant's proposal and may not compromise between the two or select some other amount. Notwithstanding any other provision herein, the Fair Market Rent determined by the arbitrator shall not be less than, and the arbitrator shall have no authority to determine a Fair Market Rent less than, the Base Rent in effect as of the scheduled expiration of the Lease Term. The cost of the arbitration shall be paid by Landlord if the Fair Market Rent is that proposed by Tenant and by Tenant if the Fair Market Rent is that proposed by Landlord; and shall be borne equally otherwise. If the arbitrator has not determined the Fair Market Rent as of the end of the Lease Term, Tenant shall pay [***] percent of the Base Rent in effect under the Lease as of the end of the Lease Term until the Fair Market Rent is determined as provided herein. Upon such determination, Landlord and Tenant shall make the appropriate adjustments to the payments between them.

- 37 -

(f) <u>Consent to Jurisdiction</u>. The parties consent to the jurisdiction of any appropriate court to enforce the arbitration provisions of this Addendum and to enter judgment upon the decision of the arbitrator.

(g) <u>Lease Terms/Provisions</u>. Except for the Base Rent, Fixed Monthly Operating Expense Payment and Annual Fixed Operating Expense Increase, Tenant's occupancy of the Premises during the First Extension Term shall be on the same terms and conditions as are in effect immediately prior to the expiration of the initial Lease Term; provided, however, Tenant shall have no further right to extend the Lease Term pursuant to this addendum or to any allowances, credits or abatements or options to expand, contract, renew or extend the Lease.

(h) <u>Failure to Give Extension Notice</u>. If Tenant does not send the [***] Extension Notice within the period set forth in Paragraph (a), Tenant's right to extend the Lease Term shall automatically terminate. Time is of the essence as to the giving of the [***] Extension Notice and the notice of Tenant's objection under Paragraph (d).

(i) <u>As-Is Condition</u>. Landlord shall have no obligation to refurbish or otherwise improve the Premises for the First Extension Term. The Premises shall be tendered on the Commencement Date of the [***] Extension Term in "as-is" condition. Nothing herein shall limit or otherwise affect Landlord's maintenance obligations under this Lease.

(j) <u>Amendment Preparation</u>. If the Lease is extended for the [***] Extension Term, then Landlord shall prepare and Tenant shall execute an amendment to the Lease confirming the extension of the Lease Term, the Base Rent, the Monthly Fixed Operating Expenses, and the Annual Fixed Operating Expense Increase applicable to the [***] Extension Term, and the other provisions applicable thereto (the "<u>Amendment</u>").

(k) <u>Lease Term</u>. If Tenant exercises its right to extend the term of the Lease for the [***] Extension Term pursuant to this Addendum, the term "<u>Lease Term</u>" as used in the Lease, shall be construed to include, when practicable, the [***] Extension Term except as provided in (g) above.

- 38 -

**EXHIBIT H: LETTER OF CREDIT FORM**

**IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____**

DATE: _____

BENEFICIARY:                                                                                          APPLICANT:

1800 Wazee Street, Suite 500
Denver, Co 80202
Attn: Legal Department

BENEFICIARY:

By order of our client,            , as tenant ("Tenant") in that certain lease agreement dated            , 20      by and between Beneficiary and Tenant (the "Lease Agreement"), we hereby establish this Irrevocable Transferable Letter Of Credit No.         in your favor for an amount up to but not exceeding the aggregate sum of            and no/100 U.S. Dollars ($         ) (as reduced from time to time in accordance with the terms hereof, the "Letter Of Credit Amount"), effective immediately, and expiring on the close of business one year from the date hereof at our office at            Attn:            unless renewed as hereinafter provided.

Funds under this Letter Of Credit are available to you on or prior to the expiry date against presentation by you of your (i) sight drafts drawn on us in the form of **Annex 1** hereto, indicating this letter of credit number and (ii) request in the form of **Annex 2** hereto (such sight draft and request, together referred to as a "Drawing Request"), sight draft(s), completed and signed by an agent of the Beneficiary. Presentation of your Drawing Request may be made by you to us at the address set forth above or may be made by facsimile transmission, to the following facsimile number            . You may present to us one or more Drawing Request from time to time prior to the expiry date in an aggregate amount not to exceed the Letter Of Credit Amount then in effect (it being understood that the honoring by us of each drawing request shall reduce the Letter Of Credit Amount then in effect). The proceeds of any draw under this Letter of Credit shall be remitted to an account designated by the Beneficiary in the Draw Letter, whether such account is in the name of the Beneficiary or any other named entity.

This Letter Of Credit will be automatically renewed for a one-year period upon the expiration date set forth above and upon each anniversary of such date, unless at least sixty (60) days prior to such expiration date, or prior to any anniversary of such date, we notify both you and the applicant in writing by certified mail that we elect not to so renew the Letter Of Credit. In the event that we elect not to renew the Letter Of Credit, you may immediately draw down on the full amount of the Letter Of Credit by presentation of your drawing request. Further, in the event that the Applicant commences any proceeding for relief as defined in the Lease Agreement, you may immediately draw down on the full amount of the Letter Of Credit by presentation of your drawing request.

- 39 -

This Letter Of Credit sets forth in full the terms of our undertaking and such undertaking shall not in any way be modified, amended or amplified by reference to any document or instrument referred to herein or in which this Letter Of Credit is referred to or to which this Letter Of Credit relates, and no such reference shall be deemed to incorporate herein by reference any document or instrument.

All bank charges and commission incurred in this transaction are for the Applicant's account.

This Letter Of Credit is transferable by you and your successors and assigns any number of times in its entirety and not in part, to any successor of the Beneficiary's interests in the Lease Agreement, but only by delivery to us of a Notice Of Transfer in the form of **Annex 3** hereto. Our transfer fee will be payable by the Applicant.

We hereby agree with the drawers, endorsers, and bona fide holders of drafts drawn under and in compliance with the terms of this Letter Of Credit that such drafts will be duly honored upon presentation to the drawee from our own funds and not the funds of the Applicant and shall be available to such drawers, endorsers, and bona fide holders, as the case may be, on or before 4:00 p.m.,                time, on the business day (defined below) next following the date on which such drafts are received by us. "Business Day" shall mean any day which is not a Saturday, Sunday or day on which we are required or authorized by law to be closed in                    .

To the extent not inconsistent with the express terms hereof, this Letter Of Credit shall be governed by, and construed in accordance with, the terms of the International Standby Practices 1998 Publication 590 ("ISP 98") and as to matters not governed by the ISP 98, this Letter Of Credit shall be governed by and construed in accordance with the laws of the State of                    .

Very truly yours,

| | |
|---|---|
| Name: | Name: |
| Title: | Title: |

- 40 -

**Annex 1**

Sight Draft

_____, 20__

Name & address of issuing bank

For value received, at sight pay to the order of name of Beneficiary, the sum of amount in words amount in figures United States Dollars drawn under Irrevocable Transferable Letter Of Credit No.        dated            , 20   .

Beneficiary

By:     _____
Name:   _____
Title:  _____

- 41 -

**Annex 2**

Drawing Request

_____, 20__

Name & address of bank

RE: Irrevocable Transferable Letter Of Credit No.                    (the "Letter Of Credit")

The undersigned (the "Beneficiary"), hereby certifies to                    (the "Issuer") that:

(A) The Beneficiary is making a request for payment in lawful currency of the United States Of America under Irrevocable Transferable Letter Of Credit No.                    (the "Letter Of Credit") in the amount of $                    .

(B) The Letter Of Credit Amount (as defined in the Letter Of Credit) as of the date hereof and prior to payment of the amount demanded in this drawing request is $        . The amount requested by this drawing request does not exceed the Letter Of Credit Amount.

(C) Demand is made for payment under the Letter Of Credit as a result of the occurrence and continuation of an event of default under the Lease Agreement (as defined in the Letter Of Credit) or as a result of non-renewal of the Letter Of Credit or as a result of the Applicant or Tenant (as defined in said Lease Agreement) commencing a proceeding of relief (as defined in said Lease Agreement).

Please wire the proceeds of the drawing to the following account of the Beneficiary at the financial institution indicated below:

_____

_____

Unless otherwise defined, all capitalized terms used herein have the meanings provided in, or by reference in, the Letter Of Credit.

IN WITNESS WHEREOF, the undersigned has duly executed and delivered this drawing request as of the        day of,                    20        .

Beneficiary

By:        _____
Name:        _____
Title:        _____

- 42 -

**Annex 3**

Notice Of Transfer

, 20__

Name & address of issuing bank

RE: Irrevocable Transferable Letter Of Credit No. _____

The undersigned (the "<u>Beneficiary</u>"), hereby notifies                (the "<u>Issuer</u>") that it has irrevocably transferred the above-referenced Letter Of Credit to        (the "<u>Transferee</u>") with an address at                effective as of the date the Issuer receives this Notice Of Transfer. The Transferee acknowledges and agrees that the Letter Of Credit Amount may have been reduced pursuant to the terms thereof, and that the Transferee is bound by any such reduction.

IN WITNESS WHEREOF, the undersigned has duly executed and delivered this Notice Of Transfer this        day of                , 20        .

Beneficiary

By:        _____
Name:
Title:

Agreed:

Transferee

By:        _____
Name:      _____
Its:       _____

- 43 -

**Exhibit 23.1**

**Consent of Independent Registered Public Accounting Firm**

The Board of Directors
The RealReal, Inc.:

We consent to the use of our report included herein and to the reference to our firm under the heading "Experts" in the prospectus.

Our report refers to a change in the Company's method of accounting for revenue due to the adoption of Accounting Standards Update 2014-09, Revenue from Contracts with Customers, on January 1, 2018.

/s/ KPMG LLP

San Francisco, California
May 31, 2019

# Exhibit B

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, DC 20549**

## FORM 10-Q

**(Mark One)**

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2019**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

**Commission File Number: 001-38953**

# The RealReal, Inc.
**(Exact Name of Registrant as Specified in its Charter)**

| | |
|---|---|
| **Delaware** | **45-1234222** |
| **( State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **55 Francisco Street Suite 600** | |
| **San Francisco, CA** | **94133** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(855) 435-5893**

**(Registrant's telephone number, including area code)**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, $0.00001 par value | REAL | The Nasdaq Global Select Market |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☐   No ☒

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☐ | | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | | Smaller reporting company | ☐ |
| Emerging growth company | ☒ | | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐   No ☒

As of August 5, 2019, the registrant had 85,316,361 shares of common stock, $0.00001 par value per share, outstanding.

**Table of Contents**

|  |  | Page |
|---|---|---|
| **PART I.** | FINANCIAL INFORMATION | |
| Item 1. | Financial Statements (Unaudited) | 1 |
| | Condensed Balance Sheets as of June 30, 2019 and December 31, 2018 | 1 |
| | Condensed Statements of Operations for the Three and Six Months Ended June 30, 2019 and 2018 | 2 |
| | Condensed Statements of Comprehensive Loss for the Three and Six Months Ended June 30, 2019 and 2018 | 3 |
| | Condensed Statements of Redeemable Convertible Preferred Stock, Convertible Preferred Stock and Stockholders' Deficit as of June 30, 2019 and 2018 | 4 |
| | Condensed Statements of Cash Flows for the Six Months Ended June 30, 2019 and 2018 | 6 |
| | Notes to Unaudited Condensed Financial Statements | 7 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 21 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 31 |
| Item 4. | Controls and Procedures | 32 |
| | | |
| **PART II.** | OTHER INFORMATION | |
| Item 1. | Legal Proceedings | 33 |
| Item 1A. | Risk Factors | 33 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 50 |
| Item 3. | Defaults Upon Senior Securities | 51 |
| Item 4. | Mine Safety Disclosures | 51 |
| Item 5. | Other Information | 51 |
| Item 6. | Exhibits | 52 |
| Signatures | | 53 |

i

**NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Quarterly Report on Form 10-Q contains forward-looking statements within the meaning of the federal securities laws. All statements other than statements of historical fact contained in this Quarterly Report on Form 10-Q, including statements regarding our future results of operations and financial position, business strategy and plans, objectives of management for future operations, long term operating expenses, the opening of additional retail stores in the future, the development of our automation technology, expectations for capital requirements and the use of proceeds from our initial public offering, are forward-looking statements. These statements involve known and unknown risks, uncertainties and other important factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements.

In some cases, you can identify forward-looking statements by terms such as "may," "should," "expects," "plans," "anticipates," "could," "intends," "target," "projects," "contemplates," "believes," "estimates," "predicts," "potential" or "continue" or the negative of these terms or other similar expressions. The forward-looking statements in this Quarterly Report on Form 10-Q are only predictions. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our business, financial condition and results of operations. These forward-looking statements speak only as of the date of this Quarterly Report on Form 10-Q and are subject to a number of risks, uncertainties and assumptions described in the section titled "Risk Factors" included under Part II, Item 1A below and elsewhere in this Quarterly Report on Form 10-Q. Because forward-looking statements are inherently subject to risks and uncertainties, some of which cannot be predicted or quantified, you should not rely on these forward-looking statements as predictions of future events. The events and circumstances reflected in our forward-looking statements may not be achieved or occur and actual results could differ materially from those projected in the forward-looking statements. Some of the key factors that could cause actual results to differ from our expectations include:

- our future financial performance, including our expectations regarding our revenue, cost of revenue, operating expenses, and our ability to achieve and maintain future profitability;

- our ability to effectively manage or sustain our growth and to effectively expand our operations;

- our strategies, plans, objectives and goals;

- the market demand for authenticated, pre-owned luxury goods and new and pre-owned luxury goods in general and the online market for luxury goods;

- our ability to compete with existing and new competitors in existing and new markets and offerings;

- our ability to attract and retain consignors and buyers;

- our ability to increase the supply of luxury goods offered through our online marketplace;

- our ability to timely and effectively scale our operations;

- our ability to enter international markets;

- our ability to optimize, operate and manage our merchandising and fulfillment facilities;

- our ability to develop and protect our brand;

- our ability to comply with laws and regulations;

- our expectations regarding outstanding litigation;

- our expectations and management of future growth;

- our expectations concerning relationships with third parties;

- economic and industry trends, projected growth or trend analysis;

- seasonal sales fluctuations;

- our ability to add capacity, capabilities and automation to our operations; and

- our ability to attract and retain key personnel.

In addition, statements such as "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based upon information available to us as of the date of this Quarterly Report on Form 10-Q and, although we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted a thorough inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain and investors are cautioned not to unduly rely upon these statements. Furthermore, if our forward-looking statements prove to be inaccurate, the inaccuracy may be material. In light of the significant uncertainties in these forward-looking statements, you should not regard these statements as a representation or warranty by us or any other person that we will achieve our objectives and plans in any specified time frame, or at all. Except as required by applicable law, we do not plan to publicly update or revise any forward-looking statements contained in this Quarterly Report on Form 10-Q, whether as a result of any new information, future events or otherwise.

**PART I—FINANCIAL INFORMATION**

**Item 1. Financial Statements**

**THE REALREAL, INC.**
**Condensed Balance Sheets**

*(In thousands, except share and per share data)*
*(unaudited)*

| | | June 30, 2019 | | December 31, 2018 |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets | | | | |
| Cash and cash equivalents | $ | 53,314 | $ | 34,393 |
| Short-term investments | | 13,372 | | 27,131 |
| Accounts receivable | | 9,517 | | 7,571 |
| Inventory, net | | 12,664 | | 10,355 |
| Prepaid expenses and other current assets | | 10,563 | | 9,696 |
| Total current assets | | 99,430 | | 89,146 |
| Property and equipment, net | | 40,427 | | 33,286 |
| Restricted cash | | 11,700 | | 11,234 |
| Other assets | | 6,573 | | 1,751 |
| Total assets | $ | 158,130 | $ | 135,417 |
| **Liabilities, Redeemable Convertible Preferred Stock, Convertible Preferred Stock and Stockholders' Deficit** | | | | |
| Current liabilities | | | | |
| Accounts payable | $ | 4,469 | $ | 5,149 |
| Accrued consignor payable | | 33,404 | | 35,259 |
| Other accrued and current liabilities | | 42,475 | | 41,956 |
| Long-term debt, current portion | | 6,498 | | 5,990 |
| Total current liabilities | | 86,846 | | 88,354 |
| Long-term debt, net of current portion | | — | | 3,249 |
| Other noncurrent liabilities | | 10,076 | | 7,304 |
| Total liabilities | | 96,922 | | 98,907 |
| Commitments and contingencies (Note 10) | | | | |
| Redeemable convertible preferred stock, $0.00001 par value; 37,403,946 and 31,053,601 shares authorized as of June 30, 2019 and December 31, 2018, respectively; 37,403,946 and 31,053,601 shares issued and outstanding as of June 30, 2019 and December 31, 2018, respectively | | 198,228 | | 151,381 |
| Convertible preferred stock $0.00001 par value; 77,781,921 and 73,950,153 shares authorized as of June 30, 2019 and December 31, 2018, respectively; 77,556,411 and 73,724,645 shares issued and outstanding as of June 30, 2019 and December 31, 2018, respectively | | 169,102 | | 142,819 |
| Stockholders' deficit: | | | | |
| Common stock, $0.00001 par value; 155,649,887 and 145,467,774 shares authorized as of June 30, 2019 and December 31, 2018, respectively; 9,701,266 and 8,593,077 shares issued and outstanding as of June 30, 2019 and December 31, 2018, respectively | | 1 | | — |
| Additional paid-in capital | | 1,729 | | — |
| Accumulated comprehensive income (loss) | | 5 | | (25) |
| Accumulated deficit | | (307,857) | | (257,665) |
| Total stockholders' deficit | | (306,122) | | (257,690) |
| Total liabilities, redeemable convertible preferred stock, convertible preferred stock and stockholders' deficit | $ | 158,130 | $ | 135,417 |

The accompanying notes are an integral part of these unaudited condensed financial statements.

1

**THE REALREAL, INC.**
**Condensed Statements of Operations**

*(In thousands, except share and per share data)*
*(unaudited)*

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2019 | 2018 | 2019 | 2018 |
| Revenue: | | | | |
| Consignment and service revenue | $ 60,713 | $ 42,178 | $ 116,950 | $ 83,177 |
| Direct revenue | 10,263 | 4,807 | 23,281 | 10,267 |
| Total revenue | 70,976 | 46,985 | 140,231 | 93,444 |
| Cost of revenue: | | | | |
| Cost of consignment and service revenue | 17,200 | 12,349 | 33,147 | 23,926 |
| Cost of direct revenue | 7,726 | 3,857 | 18,652 | 8,134 |
| Total cost of revenue | 24,926 | 16,206 | 51,799 | 32,060 |
| Gross profit | 46,050 | 30,779 | 88,432 | 61,384 |
| Operating expenses: | | | | |
| Marketing | 11,715 | 9,276 | 23,448 | 18,910 |
| Operations and technology | 34,320 | 22,997 | 65,865 | 44,329 |
| Selling, general and administrative | 25,355 | 14,377 | 47,674 | 27,901 |
| Total operating expenses | 71,390 | 46,650 | 136,987 | 91,140 |
| Loss from operations | (25,340) | (15,871) | (48,555) | (29,756) |
| Interest income | 610 | 81 | 1,015 | 165 |
| Interest expense | (380) | (526) | (511) | (723) |
| Other expense, net | (1,706) | (1,279) | (1,987) | (1,387) |
| Loss before provision for income taxes | (26,816) | (17,595) | (50,038) | (31,701) |
| Provision for income taxes | 59 | — | 59 | — |
| Net loss | $ (26,875) | $ (17,595) | $ (50,097) | $ (31,701) |
| Accretion of redeemable convertible preferred stock to redemption value | — | $ (1,342) | $ (3,355) | $ (2,451) |
| Net loss attributable to common stockholders | $ (26,875) | $ (18,937) | $ (53,452) | $ (34,152) |
| Net loss per share attributable to common stockholders, basic and diluted | $ (2.83) | $ (2.28) | $ (5.87) | $ (4.11) |
| Shares used to compute net loss per share attributable to common stockholders, basic and diluted | 9,494,447 | 8,314,251 | 9,102,234 | 8,307,010 |

The accompanying notes are an integral part of these unaudited condensed financial statements.

2

**THE REALREAL, INC.**
**Condensed Statements of Comprehensive Loss**

*(In thousands)*
*(unaudited)*

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2019 | 2018 | 2019 | 2018 |
| Net loss | $ (26,875) | $ (17,595) | $ (50,097) | $ (31,701) |
| Other comprehensive loss, net of tax: | | | | |
| Unrealized gain on investments | 2 | — | 30 | 6 |
| Comprehensive loss | $ (26,873) | $ (17,595) | $ (50,067) | $ (31,695) |

The accompanying notes are an integral part of these unaudited condensed financial statements.

3

**THE REALREAL, INC.**
**Condensed Statements of Redeemable Convertible Preferred Stock, Convertible Preferred Stock and Stockholders' Deficit**

*(In thousands, except share amounts)*
*(unaudited)*

| | Redeemable convertible preferred stock | | Convertible preferred stock | | Common stock | | Additional Paid-in | Accumulated Other comprehensive | Accumulated | Total |
| | Shares | Amount | Shares | Amount | Shares | Amount | capital | gain (loss) | deficit | Stockholders' |
|---|---|---|---|---|---|---|---|---|---|---|
| **Balance as of December 31, 2017** | 12,956,724 | $ 50,367 | 69,834,789 | $122,990 | 8,287,983 | $ — | $ 4,591 | $ (6) | $ (181,571) | $ (176,986) |
| Accretion of redeemable convertible preferred stock to redemption value | — | 1,109 | — | — | — | — | (1,109) | — | — | (1,109) |
| Issuance of common stock upon exercise of options | — | — | — | — | 18,621 | — | 39 | — | — | 39 |
| Stock-based compensation expense | — | — | — | — | — | — | 545 | — | — | 545 |
| Other comprehensive income | — | — | — | — | — | — | — | 6 | — | 6 |
| Net loss | — | — | — | — | — | — | — | — | (14,106) | (14,106) |
| **Balance as of March 31, 2018** | 12,956,724 | 51,476 | 69,834,789 | 122,990 | 8,306,604 | — | 4,066 | — | (195,677) | (191,611) |
| Issuance of Series G redeemable convertible preferred stock upon conversion of notes, net of issuance costs of $190 | 1,067,550 | 5,452 | — | — | — | — | — | — | — | — |
| Issuance of Series G convertible preferred stock upon conversion of notes, net of issuance costs of $355 | — | — | 1,997,709 | 10,202 | — | — | — | — | — | — |
| Loss on extinguishment of convertible notes | — | — | — | — | — | — | (370) | — | — | (370) |
| Issuance of Series G redeemable convertible preferred stock, net of issuance costs of $3,360 | 17,029,327 | 86,640 | — | — | — | — | — | — | — | — |
| Accretion of redeemable convertible preferred stock to redemption value | — | 1,342 | — | — | — | — | (1,342) | — | — | (1,342) |
| Issuance of common stock upon exercise of options | — | — | — | — | 17,502 | — | 24 | — | — | 24 |
| Stock-based compensation expense | — | — | — | — | — | — | 681 | — | — | 681 |
| Net loss | — | — | — | — | — | — | — | — | (17,595) | (17,595) |
| **Balance as of June 30, 2018** | 31,053,601 | $144,910 | 71,832,498 | $133,192 | 8,324,106 | $ — | $ 3,059 | $ — | $ (213,272) | $ (210,213) |

The accompanying notes are an integral part of these unaudited condensed financial statements.

4

**THE REALREAL, INC.**
**Condensed Statements of Redeemable Convertible Preferred Stock, Convertible Preferred Stock and Stockholders' Deficit**

*(In thousands, except share amounts)*
*(unaudited)*

| | Redeemable Convertible Preferred Stock | | Convertible Preferred Stock | | Common Stock | | Additional Paid-in capital | Accumulated Other comprehensive gain (loss) | Accumulated deficit | Total Stockholders' |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | | | | |
| **Balance as of December 31, 2018** | 31,053,601 | $ 151,381 | 73,724,645 | $ 142,819 | 8,593,077 | $ — | $ — | $ (25) | $ (257,665) | $ (257,690) |
| Issuance of Series H redeemable convertible preferred stock net of issuance costs of $86 | 6,350,345 | 43,572 | — | — | — | — | — | — | — | — |
| Issuance of Series H convertible preferred stock net of issuance costs of $63 | — | — | 3,831,766 | 26,279 | — | — | — | — | — | — |
| Accretion of redeemable preferred stock to redemption value | — | 3,355 | — | — | — | — | (3,260) | — | (95) | (3,355) |
| Compensation expense related to stock sales by current and former employees | — | — | — | — | — | — | 819 | — | — | 819 |
| Issuance of common stock upon exercise of options | — | — | — | — | 739,053 | — | 1,319 | — | — | 1,319 |
| Issuance of common stock upon exercise of warrants | — | — | — | — | 4,935 | — | 13 | — | — | 13 |
| Stock-based compensation expense | — | — | — | — | — | — | 1,109 | — | — | 1,109 |
| Other comprehensive income | — | — | — | — | — | — | — | 28 | — | 28 |
| Net loss | — | — | — | — | — | — | — | — | (23,222) | (23,222) |
| **Balance as of March 31, 2019** | 37,403,946 | 198,308 | 77,556,411 | 169,098 | 9,337,065 | — | — | 3 | (280,982) | (280,979) |
| Additional issuance costs for Series H redeemable convertible preferred stock (total issuance costs of $166) | — | (80) | — | — | — | — | — | — | — | — |
| Reallocation of issuance costs for Series H convertible preferred stock (total issuance costs of $59) | — | — | — | 4 | — | — | — | — | — | — |
| Issuance of common stock upon exercise of options | — | — | — | — | 358,459 | 1 | 422 | — | — | 423 |
| Issuance of common stock upon exercise of warrants | — | — | — | — | 5,742 | — | 20 | — | — | 20 |
| Stock-based compensation expense | — | — | — | — | — | — | 1,287 | — | — | 1,287 |
| Other comprehensive income | — | — | — | — | — | — | — | 2 | — | 2 |
| Net loss | — | — | — | — | — | — | — | — | (26,875) | (26,875) |
| **Balance as of June 30, 2019** | 37,403,946 | $ 198,228 | 77,556,411 | $ 169,102 | 9,701,266 | $ 1 | $ 1,729 | $ 5 | $ (307,857) | $ (306,122) |

The accompanying notes are an integral part of these unaudited condensed financial statements.

5

**THE REALREAL, INC.**
**Condensed Statements of Cash Flows**

*(in thousands)*
*(unaudited)*

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2019 | 2018 |
| **Cash flows from operating activities:** | | |
| Net loss | $ (50,097) | $ (31,701) |
| Adjustments to reconcile net loss to cash used in operating activities: | | |
| Depreciation and amortization | 5,993 | 4,136 |
| Stock-based compensation expense | 2,397 | 1,226 |
| Change in fair value of convertible note derivative liability | — | 1,248 |
| Bad debt expense | 681 | 333 |
| Compensation expense related to stock sales by current and former employees | 819 | — |
| Change in fair value of convertible preferred stock warrant liability | 2,100 | 183 |
| Accrued interest on convertible notes | — | 223 |
| Accretion of unconditional endowment grant liability | 44 | 53 |
| Accretion of debt discounts | 9 | 97 |
| Amortization of premiums on short-term investments | 42 | 15 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (2,627) | 918 |
| Inventory, net | (2,309) | (1,453) |
| Prepaid expenses and other current assets | (867) | (3,913) |
| Other assets | 411 | 70 |
| Accounts payable | 157 | (1,480) |
| Accrued consignor payable | (1,855) | (3,872) |
| Other accrued and current liabilities | (1,744) | 4,516 |
| Other noncurrent liabilities | 672 | 695 |
| Net cash used in operating activities | (46,174) | (28,706) |
| **Cash flow from investing activities:** | | |
| Purchases of investments | (9,151) | (2,211) |
| Proceeds from maturities of short-term investments | 22,898 | 7,600 |
| Proceeds from sale of short-term investments | — | 7,023 |
| Capitalized proprietary software development costs | (3,887) | (2,245) |
| Purchases of property and equipment | (10,042) | (4,164) |
| Net cash (used in) provided by investing activities | (182) | 6,003 |
| **Cash flow from financing activities:** | | |
| Proceeds from issuance of redeemable convertible preferred stock, net of issuance costs | 43,492 | 86,640 |
| Proceeds from issuance of convertible preferred stock, net of issuance costs | 26,283 | — |
| Proceeds from issuance convertible notes, net of issuance costs | — | 14,273 |
| Proceeds from exercise of stock options and common stock warrants | 1,775 | 63 |
| Payment of deferred offering costs | (3,057) | — |
| Issuance cost paid related to conversion of convertible notes | — | (545) |
| Repayment of debt | (2,750) | (1,500) |
| Net cash provided by financing activities | 65,743 | 98,931 |
| Net increase in cash, cash equivalents and restricted cash | 19,387 | 76,228 |
| **Cash, cash equivalents, and restricted cash** | | |
| Beginning of period | 45,627 | 20,660 |
| End of period | $ 65,014 | $ 96,888 |
| | | |
| **Supplemental disclosures of cash flow information** | | |
| Cash paid for interest | $ 219 | $ 324 |
| Cash paid for income taxes | 141 | 45 |
| **Supplemental disclosures of non-cash investing and financing activities** | | |
| Issuance of convertible preferred stock upon extinguishment of convertible notes | — | 10,557 |
| Issuance of redeemable convertible preferred stock upon extinguishment of convertible notes | — | 5,642 |
| Accretion of redeemable convertible preferred stock to redemption value | 3,355 | 2,451 |
| Loss on extinguishment of convertible notes | — | 370 |
| Purchases of property and equipment included in accounts payable | (837) | (695) |
| Deferred offering costs in accounts payable and accrued liabilities | 2,219 | — |

The accompanying notes are an integral part of these unaudited condensed financial statements.

6

**THE REALREAL, INC.**
**Notes to Unaudited Condensed Financial Statements**

**Note 1. Description of Business and Basis of Presentation**

**Organization and Description of Business**

The RealReal, Inc. (the "Company") is an online marketplace for authenticated, consigned luxury goods across multiple categories, including women's, men's, kids', jewelry and watches, and home and art. The Company was incorporated in the state of Delaware on March 29, 2011 and is headquartered in San Francisco, California.

*Basis of Presentation*

The accompanying unaudited condensed financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") and the requirements of the U.S. Securities and Exchange Commission (the "SEC") for interim reporting. The Company's functional and reporting currency is the U.S. dollar.

The condensed balance sheet as of December 31, 2018 included herein was derived from the audited financial statements as of that date. The accompanying unaudited condensed financial statements have been prepared on the same basis as the annual financial statements and, in the opinion of management, reflect all adjustments, which include only normal recurring adjustments, necessary to state fairly the Company's financial position, results of operations, comprehensive loss, redeemable convertible preferred stock, convertible preferred stock, and stockholders' deficit, and cash flows for the periods presented.

These unaudited condensed financial statements should be read in conjunction with the Company's financial statements and notes included in the final prospectus filed with the SEC pursuant to Rule 424(b) under the Securities Act of 1933, as amended on June 28, 2019 (the "Prospectus").

*Initial Public Offering*

The Company's registration statement on Form S-1 (the "IPO Registration Statement") related to its initial public offering ("IPO") was declared effective on June 27, 2019, and the Company's common stock began trading on the Nasdaq Global Select Market on June 28, 2019. On July 2, 2019, after the quarter end, the Company completed its IPO, selling 15,000,000 shares of common stock at price to the public of $20.00 per share, plus an additional 2,250,000 shares of common stock at a price to the public of $20.00 per share pursuant to the exercise of the underwriters' option to purchase additional shares. On July 2, 2019, after the quarter end, the Company received aggregate net proceeds of $320.9 million after deducting underwriting discounts and commissions of $24.1 million.

Immediately prior to the completion of the IPO, the Company filed its Amended and Restated Certificate of Incorporation, which authorizes a total of 500,000,000 shares of common stock, and 50,000,000 shares of undesignated preferred stock.

The unaudited pro forma condensed balance sheet data set forth below is presented as if the IPO was completed on June 30, 2019, by applying adjustments to the Company's historical condensed balance sheet. The pro forma adjustments reflect the issuance of 17,250,000 shares of common stock for aggregate net proceeds of $320.9 million and the reclassification of deferred offering costs of $5.3 million to additional paid-in capital. The proforma adjustments do not include the $3.2 million donation to The RealReal Foundation, which the Company anticipates funding in the latter part of 2019.

7

The pro forma adjustments also reflect the conversion of 114,960,357 shares of convertible preferred stock and redeemable convertible preferred stock then outstanding into 58,363,606 shares of common stock and the corresponding reclassification of the preferred stock warrant liability to additional paid-in capital upon conversion of all outstanding preferred stock warrants into an aggregate of 103,563 common stock warrants.

| | Actual June 30, 2019 | | Pro Forma Adjustments | | Pro Forma June 30, 2019 | |
|---|---|---|---|---|---|---|
| | | | *(in thousands)* | | | |
| **Assets** | | | | | | |
| Total current assets | $ | 99,430 | $ | 320,850 | $ | 420,280 |
| Total noncurrent assets | | 58,700 | | (5,307) | | 53,393 |
| Total assets | $ | 158,130 | $ | 315,543 | $ | 473,673 |
| **Liabilities, Redeemable Convertible Preferred Stock, Convertible Preferred Stock and Stockholders' Equity (Deficit)** | | | | | | |
| Total current liabilities | $ | 86,846 | $ | — | $ | 86,846 |
| Total noncurrent liabilities | | 10,076 | | (2,710) | | 7,366 |
| Total liabilities | | 96,922 | | (2,710) | | 94,212 |
| Redeemable convertible preferred stock | | 198,228 | | (198,228) | | — |
| Convertible preferred stock | | 169,102 | | (169,102) | | — |
| Stockholder's equity (deficit) | | | | | | |
| Common stock | | 1 | | 1 | | 2 |
| Additional paid-in capital | | 1,729 | | 685,582 | | 687,311 |
| Accumulated other comprehensive income | | 5 | | — | | 5 |
| Accumulated deficit | | (307,857) | | — | | (307,857) |
| Total stockholders' equity (deficit) | | (306,122) | | 685,583 | | 379,461 |
| Total liabilities, redeemable convertible preferred stock, convertible preferred stock, and stockholders' equity (deficit) | $ | 158,130 | $ | 315,543 | $ | 473,673 |

*Reverse Stock Split*

On June 13, 2019 the Company effected a reverse split of shares of the Company's common stock on a 1-for-2 basis (the "Reverse Stock Split"). All issued and outstanding shares of common stock, warrants for common stock, options to purchase common stock and the related per share amounts contained in the financial statements have been retroactively adjusted to reflect this Reverse Stock Split for all periods presented. The par value and authorized shares of common stock were not adjusted as a result of the Reverse Stock Split. Additionally, the authorized, issued and outstanding shares of redeemable convertible preferred stock and convertible preferred stock and their related per share amounts, other than the conversion price per share, were not adjusted as a result of the Reverse Stock Split.

**Note 2. Summary of Significant Accounting Policies**

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the financial statements and the reported amounts of expenses during the reporting period. Significant items subject to such estimates and assumptions include those related to revenue recognition, including the returns reserve and material right related to the Company's tiered consignor commission plan, valuation of inventory, stock-based compensation, redemption value of redeemable convertible preferred stock, and other contingencies. The Company evaluates its estimates and assumptions on an ongoing basis using historical experience and other factors and adjusts those estimates and assumptions when facts and circumstances dictate. Actual results could differ from those estimates.

8

***Net Loss per Share Attributable to Common Stockholders***

The Company follows the two-class method when computing net loss per common share when shares are issued that meet the definition of participating securities. The two-class method determines net loss per common share for each class of common stock and participating securities according to dividends declared or accumulated and participation rights in undistributed earnings. The two-class method requires income available to common stockholders for the period to be allocated between common stock and participating securities based upon their respective rights to receive dividends as if all income for the period had been distributed. The Company's redeemable convertible preferred stock and convertible preferred stock contractually entitles the holders of such shares to participate in dividends but does not contractually require the holders of such shares to participate in the Company's losses.

For periods in which the Company reports net losses, diluted net loss per common share attributable to common stockholders is the same as basic net loss per common share attributable to common stockholders, because potentially dilutive common shares are not assumed to have been issued if their effect is anti-dilutive.

***Revenue Recognition***

The Company generates revenue from the sale of pre-owned luxury goods through its online marketplace.

*Consignment and Service Revenue*

The Company provides a service to sell pre-owned luxury goods on behalf of consignors to buyers through its online marketplace and retail locations. The Company retains a percentage of the proceeds received as payment for its consignment service, which the Company refers to as its take rate. The Company reports consignment revenue on a net basis as an agent and not the gross amount collected from the buyer. Title to the consigned goods remain with the consignor until transferred to the end customer subsequent to purchase of the consigned goods. The Company does not take title of consigned goods at any time except in certain cases where returned goods become Company-owned inventory.

The Company recognizes consignment revenue upon purchase of the consigned good by the buyer as its performance obligation of providing consignment services to the consignor is satisfied at that point. Consignment revenue is recognized net of certain buyer incentives and estimated returns and cancellations. The Company recognizes a returns reserve, based on historical experience, which is recorded in other accrued and current liabilities on the balance sheets (see Note 5). Sales tax assessed by governmental authorities is excluded from revenue.

Certain transactions provide consignors with a material right resulting from the tiered consignor commission plan. Under this plan, the amount an individual consignor receives for future sales of consigned goods may be dependent on previous consignment sales for that consignor within his/her consignment period. Accordingly, in certain consignment transactions, a small portion of the Company's consignment revenue is allocated to such material right using the portfolio method and recorded as deferred revenue.

The Company charges shipping fees to buyers and has elected to treat shipping and handling activities performed after control transfers to the buyer as fulfillment activities. All outbound shipping and handling costs are accounted for as fulfillment costs in cost of consignment and service revenue at the time revenue is recognized.

The Company also generates subscription revenue from monthly memberships allowing buyers early access to shop for luxury goods. The buyers receive the early access and other benefits over the term of the subscription period, which represents a single stand-ready performance obligation. Therefore, the subscription fees paid by the buyer are recognized over the monthly subscription period. Subscription revenue was not material in the three or six months ended June 30, 2019 and 2018.

*Direct Revenue*

The Company generates direct revenue from the sale of Company-owned inventory. The Company recognizes direct revenue upon shipment of the purchased good to the buyer as its performance obligation, consisting of the sale of goods, is satisfied at this point. Direct revenue is recognized net of incentives and estimated returns. Sales tax assessed by governmental authorities is excluded from revenue.

*Incentives*

Promotional incentives, which include basket promotional code discounts and other credits, may periodically be offered to consignors and buyers. These are treated as a reduction of consignment and service revenue and direct revenue. Additionally, the Company may offer site credits to buyers on current transactions to be applied towards future transactions, which are accounted as site credit liabilities and included in other accrued and current liabilities on the balance sheets.

9

*Contract Liabilities*

The Company's contractual liabilities consist of deferred revenue for material rights primarily related to the tiered consignor commission plan totaling $3.3 million as of June 30, 2019 and $2.7 million as of December 31, 2018, which are recognized as revenue using a portfolio approach based on the pattern of exercise and certain unredeemed site credits, which were immaterial as of June 30, 2019 and December 31, 2018. Contract liabilities are recorded in other accrued and current liabilities on the balance sheets and are generally expected to be recognized within one year.

### Cost of Revenue

Cost of revenue for consignment and services and direct revenue consists of shipping costs, credit card fees, packaging, customer service and website hosting services. Cost of direct revenue also includes the cost of goods sold.

### Stock-based Compensation

Stock-based compensation expense related to employees is measured based on the grant-date fair value of the awards. Compensation expense is recognized in the statements of operations over the period during which the employee is required to perform services in exchange for the award (the vesting period of the applicable award) using the straight-line method. The Company estimates the fair value of stock options granted using the Black-Scholes option pricing model and accounts for forfeitures as they occur.

Historically, certain employees were able to sell their shares of the Company's common stock to the Company's existing investors. In such secondary sale transactions, the Company recorded the difference in purchase price and the fair value of such shares as compensation expense within selling, general and administrative in the statement of operations and a corresponding credit to additional paid-in capital.

### Cash, Cash Equivalents and Restricted Cash

The Company considers all highly liquid investments purchased with original maturities of three months or less from the purchase date to be cash equivalents. Cash equivalents consist primarily of amounts invested in reverse repurchase agreement ("RRAs"). RRAs are collateralized by deposits in the form of United States government securities and obligations for an amount not less than 102% of their value. The Company has a policy that the collateral has at least an A (or equivalent) credit rating. The Company utilizes a third-party custodian to manage the exchange of funds and ensure that collateral received is maintained at 102% of the value of the RRAs on a daily basis. RRAs with stated maturities of greater than three months from the date of purchase are classified as short-term investments.

Restricted cash consists of cash deposited with a financial institution as collateral for the Company's letters of credit for its facility leases and the Company's credit cards. As of June 30, 2019 and December 31, 2018, the Company had letters of credit outstanding and collateral accounts in the amounts of $11.7 million and $11.2 million, respectively. The restricted cash is classified as noncurrent as the Company expects the cash to remain restricted for a period greater than one year.

The following table provides a reconciliation of cash, cash equivalents and restricted cash that sum to the total of the same amounts shown in the statements of cash flows (in thousands):

|  | June 30, 2019 | June 30, 2018 |
|---|---|---|
| Cash and cash equivalents | $ 53,314 | $ 91,216 |
| Restricted cash | 11,700 | 5,672 |
| Total cash, cash equivalents and restricted cash | $ 65,014 | $ 96,888 |

### Inventory, Net

Inventory primarily consists of finished goods arising from goods returned after the consignor has been paid, upon which the Company assumes the title to the goods until it is resold and recognizes it as inventory in an amount equal to that paid to the consignor. The Company also periodically purchases finished goods directly from vendors. Inventory is valued at the lower of cost and net realizable value using the specific identification method, and the Company records provisions, as appropriate, to write down obsolete and excess inventory to estimated net realizable value.

The inventory reserve, which reduces inventory on the balance sheets, was $1.2 million and $0.7 million as of June 30, 2019 and December 31, 2018, respectively.

### Software Development Costs

Proprietary software includes the costs of developing the Company's internal proprietary business platform. The Company capitalizes qualifying proprietary software development costs that are incurred during the application development stage. Capitalization of costs begins when two criteria are met: (1) the preliminary project stage is completed and (2) it is probable that the software will be completed and used for its intended function. Such costs are capitalized in the period incurred. Capitalization ceases and amortization begins when the software is substantially complete and ready for its intended use, including the completion of all significant testing. Costs related to preliminary project activities and post-implementation operating activities are expensed as incurred.

### Accretion of Redeemable Convertible Preferred Stock

The carrying value of the redeemable convertible preferred stock that is probable of redemption is accreted to redemption value from the date of issuance to the earliest redemption date using the effective interest method. Increases to the carrying value of redeemable convertible preferred stock recognized in each period are charged to additional paid-in capital, or in the absence of additional paid-in capital, charged to accumulated deficit.

### Convertible Preferred Stock Warrant Liability

The Company issued convertible preferred stock warrants in conjunction with the issuance of debt. Such warrants are recorded as other noncurrent liabilities on the balance sheets at their estimated fair value because the shares underlying the warrants may obligate the Company to transfer assets to the holders at a future date under certain circumstances such as a deemed liquidation event. The warrants are subject to re-measurement at each balance sheet date and the change in fair value, if any, is included in other expense, net. The Company continued to remeasure these warrants until the earlier of the expiration, exercise or conversion of the convertible preferred stock warrants into common warrants, which occurred upon the completion of the IPO on July 2, 2019. In connection with the completion of the IPO, the convertible preferred stock warrants automatically converted into common stock warrants. Upon conversion of the convertible preferred stock warrants, the related convertible preferred stock warrant liability was reclassified to additional paid-in capital.

### Leases

Leases are reviewed for classification as operating or capital leases. For operating leases, the Company recognizes rent on a straight-line basis over the term of the lease. The Company records the difference between cash payments and rent expense recognized as a deferred rent liability included in other accrued and current liabilities and other noncurrent liabilities on the balance sheets. Incentives granted under the Company's facility leases, including allowances to fund leasehold improvements, are deferred and are recognized as adjustments to rental expense on a straight-line basis over the term of the lease.

### Concentrations of Credit Risks

Financial instruments that potentially subject the Company to concentrations of credit risk consist of cash and cash equivalents. At times, such amount may exceed federally-insured limits. The Company reduces credit risk by placing its cash and cash equivalents with major credit-worthy financial institutions within the United States.

As of June 30, 2019 and December 31, 2018, there were no customers that represented 10% or more of the Company's accounts receivable balance and there were no customers that individually exceeded 10% of the Company's total revenue for each of the three and six months ended June 30, 2019 and 2018.

### Recently Adopted Accounting Pronouncements

In May 2014, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update ("ASU") 2014-09, *Revenue from Contracts with Customers* (ASC 606), which supersedes the existing revenue recognition requirements and requires entities to recognize revenue when control of the promised goods or services is transferred to customers at an amount that reflects the consideration to which the entity expects to be entitled to in exchange for those goods or services. The Company adopted ASC 606 as of January 1, 2018 using the full retrospective transition method.

11

In June 2018, the FASB issued ASU 2018-08, *Clarifying the Scope and the Accounting Guidance for Contributions Received and Contributions Made (Topic 958)*, which clarified the accounting for contributions made or received by business entities. The Company adopted this guidance beginning on January 1, 2018 using the modified prospective transition. Adoption of the standard did not have a material impact on its financial statements.

In August 2018, the FASB issued ASU 2018-15, *Intangibles—Goodwill and Other—Internal-Use Software (Subtopic 350-40)*. ASU 2018-15 clarifies and aligns the accounting for implementation costs for hosting arrangements with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software. The Company has early adopted this standard effective January 1, 2018 on a prospective basis, which did not have a material impact on its financial statements.

### *Recently Issued Accounting Pronouncements*

In January 2016, the FASB issued ASU 2016-01, *Recognition and Measurement of Financial Assets and Financial Liabilities (Subtopic 825-10)*, which will change how to recognize, measure, present and make disclosures about certain financial assets and financial liabilities. Under this standard, if an entity designates a financial liability under the fair value option in accordance with ASC 825, the entity shall measure the financial liability at fair value with qualifying changes in fair value recognized in net income. The entity shall present separately in other comprehensive loss the portion of the total change in the fair value of the liability that results from a change in the instrument-specific credit risk. ASU 2016-01 is effective for the Company for annual and interim periods within fiscal years beginning after December 15, 2019. The Company does not expect the adoption of this standard to have a material impact on the operating results.

In February 2016, the FASB issued ASU 2016-02, *Leases (Topic 842)*. ASU 2016-02 is aimed at making leasing activities more transparent and comparable and requires substantially all leases to be recognized by lessees on their balance sheet as a right-of-use asset and corresponding lease liability, including leases currently accounted for as operating leases. The new standard is effective for non-public entities in fiscal years beginning after December 15, 2019. Therefore, as an "emerging growth company" as defined in the JOBS Act, the new standard is effective for the Company beginning January 1, 2020. Under the JOBS Act, emerging growth companies can delay adopting new or revised accounting standards issued subsequent to the enactment of the JOBS Act until such time as those standards apply to private companies. The Company is currently evaluating the impact that this standard will have on its financial statements but expects that it will result in a significant increase in its long-term assets and liabilities.

In June 2016, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2016-13 "Financial Instruments —Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments." The standard amended guidance on reporting credit losses for assets held at amortized cost basis and available for sale debt securities. For available for sale debt securities, credit losses will be presented as an allowance rather than as a write-down. This standard is effective for fiscal years beginning after December 15, 2019, including interim periods within those fiscal years. Early adoption is permitted for all entities. The Company does not expect the adoption of this standard to have a material impact on the operating results.

In June 2018, the FASB issued ASU 2018-07, *Compensation—Stock Compensation (Topic 718),* which expands the scope of Topic 718 to include share-based payment transactions for acquiring goods and services from non-employees. The standard is effective for fiscal years beginning after December 15, 2019, including interim reporting periods within that fiscal year. Early adoption is permitted, but no earlier than the Company's adoption date of ASC 606. The Company does not expect the adoption of this standard to have a material impact on the operating results.

In August 2018, the FASB issued ASU 2018-13, *Fair Value Measurement (Topic 820)*. This standard modifies disclosure requirements related to fair value measurement and is effective for all entities for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2019. Early adoption is permitted. Implementation on a prospective or retrospective basis varies by specific disclosure requirement. The standard also allows for early adoption of any removed or modified disclosures upon issuance while delaying adoption of the additional disclosures until their effective date. The Company is currently evaluating the impact that this standard will have on its financial statements.

**Note 3. Cash, Cash Equivalents and Short-Term Investments**

The following tables summarize the estimated value of the Company's cash, cash equivalents and short-term investments (in thousands):

| | June 30, 2019 | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Amortized Cost | | Unrealized Gain | | Unrealized Loss | | Fair Value | |
| Cash and cash equivalents: | | | | | | | | |
| Cash | $ | 35,479 | $ | — | $ | — | $ | 35,479 |
| Money market fund | | 5,835 | | — | | — | $ | 5,835 |
| Reverse repurchase agreements | | 12,000 | | — | | — | | 12,000 |
| Total cash and cash equivalents | $ | 53,314 | $ | — | $ | — | $ | 53,314 |
| Short-term investments: | | | | | | | | |
| U.S. corporate bonds | $ | 9,172 | $ | 4 | | — | $ | 9,176 |
| International corporate bonds | | 4,195 | | 1 | | — | $ | 4,196 |
| Total short-term investments | $ | 13,367 | $ | 5 | $ | — | $ | 13,372 |

| | December 31, 2018 | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Amortized Cost | | Unrealized Gain | | Unrealized Loss | | Fair Value | |
| Cash and cash equivalents: | | | | | | | | |
| Cash | $ | 10,253 | $ | — | $ | — | $ | 10,253 |
| Money market fund | | 140 | | — | | — | | 140 |
| Reverse repurchase agreements | | 24,000 | | — | | — | | 24,000 |
| Total cash and cash equivalents | $ | 34,393 | $ | — | $ | — | $ | 34,393 |
| Short-term investments: | | | | | | | | |
| U.S. corporate bonds | $ | 21,184 | $ | — | $ | (19) | $ | 21,165 |
| International corporate bonds | | 5,972 | | — | | (6) | | 5,966 |
| Total short-term investments | $ | 27,156 | $ | — | $ | (25) | $ | 27,131 |

As of June 30, 2019 and December 31, 2018, the contractual maturity for the short-term investments is less than one year. For the three and six months ended June 30, 2019 and 2018, the Company recognized no material realized gains or losses on short-term investments.

**Note 4. Fair Value Measurement**

Assets and liabilities recorded at fair value on a recurring basis on the balance sheets are categorized based upon the level of judgment associated with the inputs used to measure their fair values. Fair value is defined as the exchange price that would be received for an asset or an exit price that would be paid to transfer a liability in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. Valuation techniques used to measure fair value must maximize the use of observable inputs and minimize the use of unobservable inputs. The authoritative guidance on fair value measurements establishes a three-tier fair value hierarchy for disclosure of fair value measurements as follows:

Level 1—Observable inputs such as unadjusted, quoted prices in active markets for identical assets or liabilities at the measurement date.

Level 2—Inputs (other than quoted prices included in Level 1) are either directly or indirectly observable for the asset or liability. These include quoted prices for similar assets or liabilities in active markets and quoted prices for identical or similar assets or liabilities in markets that are not active.

Level 3—Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

There were no transfers between Level 1, Level 2 or Level 3 of the fair value hierarchy during the periods presented.

13

The following tables provide the financial instruments measured at fair value (in thousands):

| | June 30, 2019 | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Level 1 | | Level 2 | | Level 3 | | Total | |
| **Assets** | | | | | | | | |
| Cash equivalents: | | | | | | | | |
| Money market fund | $ | 5,835 | $ | — | $ | — | $ | 5,835 |
| Reverse repurchase agreements | | — | | 12,000 | | — | $ | 12,000 |
| Total cash equivalents | $ | 5,835 | $ | 12,000 | $ | — | $ | 17,835 |
| Short-term investments: | | | | | | | | |
| U.S. corporate bonds | $ | — | $ | 9,176 | $ | — | $ | 9,176 |
| International corporate bonds | | — | | 4,196 | | — | $ | 4,196 |
| Total short-term investments | $ | — | $ | 13,372 | $ | — | $ | 13,372 |
| Total assets | $ | 5,835 | $ | 25,372 | $ | — | $ | 31,207 |
| **Liabilities** | | | | | | | | |
| Convertible preferred stock warrant liability | $ | — | $ | — | $ | 2,710 | $ | 2,710 |
| Total liabilities | $ | — | $ | — | $ | 2,710 | $ | 2,710 |

| | December 31, 2018 | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Level 1 | | Level 2 | | Level 3 | | Total | |
| **Assets** | | | | | | | | |
| Cash equivalents: | | | | | | | | |
| Money market fund | $ | 140 | $ | — | $ | — | $ | 140 |
| Reverse repurchase agreements | | — | | 24,000 | | — | | 24,000 |
| Total cash equivalents | $ | 140 | $ | 24,000 | $ | — | $ | 24,140 |
| Short-term investments: | | | | | | | | |
| U.S. corporate bonds | $ | — | $ | 21,165 | $ | — | $ | 21,165 |
| International corporate bonds | | — | | 5,966 | | — | | 5,966 |
| Total short-term investments | $ | — | $ | 27,131 | $ | — | $ | 27,131 |
| Total assets | $ | 140 | $ | 51,131 | $ | — | $ | 51,271 |
| **Liabilities** | | | | | | | | |
| Convertible preferred stock warrant liability | $ | — | $ | — | $ | 610 | $ | 610 |
| Total liabilities | $ | — | $ | — | $ | 610 | $ | 610 |

The fair value of the convertible preferred stock warrant liability on the date of issuance and each re-measurement date was estimated using the Black-Scholes option pricing model. Inputs used to determine the estimated fair value as of each valuation date included expected term of the warrants, the risk-free interest rate, volatility, and the fair value of underlying shares. Due to the nature of these inputs, the valuation of the warrants is considered a Level 3 measurement. The following table presents a rollforward of the fair value of the level 3 liabilities recorded at fair value at June 30, 2019 (in thousands):

| | Convertible Preferred Stock Warrant Liability | |
| --- | --- | --- |
| Balance as of December 31, 2018 | $ | 610 |
| Changes in estimated fair value | | 2,100 |
| Balance as of June 30, 2019 | $ | 2,710 |

14

**Note 5. Balance Sheet Components**

*Property and Equipment, Net*

Property and equipment, net is recorded at cost less accumulated depreciation and amortization. Depreciation and amortization are recorded on a straight-line basis over the estimated useful lives of the respective assets. Property and equipment, net consists of the following (in thousands):

| | June 30, 2019 | | December 31, 2018 | |
|---|---|---|---|---|
| Proprietary software | $ | 17,939 | $ | 14,052 |
| Furniture and equipment | | 16,877 | | 12,665 |
| Automobiles | | 516 | | 346 |
| Leasehold improvements | | 30,515 | | 25,702 |
| | | 65,847 | | 52,765 |
| Less: accumulated depreciation and amortization | | (25,420) | | (19,479) |
| Property and equipment, net | $ | 40,427 | $ | 33,286 |

Depreciation and amortization expense on property and equipment was $3.2 million and $2.1 million for the three months ended June 30, 2019 and 2018, respectively, and $6.0 million and $4.1 million for the six months ended June 30, 2019 and 2018, respectively.

*Other Accrued and Current Liabilities*

Other accrued and current liabilities consist of the following (in thousands):

| | June 30, 2019 | | December 31, 2018 | |
|---|---|---|---|---|
| Returns reserve | $ | 8,678 | $ | 14,311 |
| Accrued compensation | | 8,833 | | 8,078 |
| Site credit liability | | 5,921 | | 4,700 |
| Accrued sales tax and other taxes | | 3,170 | | 4,476 |
| Deferred revenue | | 3,943 | | 3,184 |
| Accrued marketing and outside services | | 6,558 | | 4,152 |
| Other | | 5,372 | | 3,055 |
| Other accrued and current liabilities | $ | 42,475 | $ | 41,956 |

**Note 6. Debt and Convertible Preferred Stock Warrants**

*Term Loans*

In 2013, the Company entered into an agreement to obtain a term loan facility ("Term Loan Facility") in the amount of $5.0 million for general corporate purposes and working capital expenditures. In 2014, 2015 and 2016, the Company amended its Term Loan Facility to increase the amount borrowed under the facility by $11.6 million. The Term Loan Facility is secured by liens on substantially all of the Company's present and future assets.

The Term Loan Facility includes affirmative, negative and financial covenants that restrict the Company's ability to, among other things, incur additional indebtedness, make investments, sell or otherwise dispose of assets, pay dividends or repurchase stock. The Term Loan Facility's financial covenants required the Company to achieve at least 80% of its forecasted gross revenue and a liquidity ratio on a monthly basis. As of June 30, 2019, the Company was in compliance with all covenants.

In 2017, the Company executed the eighth amendment ("Eight Amendment") to the Term Loan Facility. The Eighth Amendment refinanced the $15.0 million repayment schedule to be two term loans, which included a $7.5 million interest only term loan with a maturity date of January 31, 2019 ("Term Loan I"), and the remaining $7.5 million under the existing Term Loan Facility with a maturity date of January 1, 2020 ("Term Loan II") (together the "Term Loans").

15

In 2018, the Company entered into the ninth, tenth, eleventh, and twelfth amendment ("Ninth Amendment," "Tenth Amendment," "Eleventh Amendment" and "Twelfth Amendment") to the existing Term Loans. The Ninth Amendment removed the liquidity ratio covenant, amended Term Loan I to be due in 30 equal monthly installments, plus all accrued interest, beginning July 31, 2018, increased the variable annual interest rate from 0.10% above the prime rate to 0.35% above the prime rate and extended the maturity date of Term Loan I to January 31, 2021.

The Eighth Amendment and Ninth Amendment required the Company to pay a combined success fee of $0.3 million upon (1) any sale or licensing of all or substantially all of the Company's assets, (2) any change in control of the Company, or (3) an initial public offering of the Company's equity securities. The Ninth Amendment also required the Company to pay an additional success fee of $0.1 million upon the sale or issuance of the Company's equity securities or subordinated debt securities for net cash proceeds of at least $50.0 million on or prior to June 30, 2018. The Company paid the $0.1 million success fee upon the Series G convertible preferred stock financing in June 2018.

The Tenth and Twelfth Amendments adjusted and waived certain covenant violations which were subsequently amended and met. The Eleventh Amendment provided an additional letter of credit of $1.5 million for corporate credit cards with a maturity date of August 1, 2019.

During the three months ended, June 30, 2019, the Company recorded interest expense related to the Term Loans of $0.4 million which included the success fee of $0.3 million. During the three months ended June 30, 2018, the Company recorded interest expense related to the Term Loans of $0.1 million. During the six months ended June 30, 2019 and 2018, the Company recorded interest expense related to the Term Loans of $0.5 million and $0.3 million, respectively.

On July 26, 2019 the Company fully repaid the principal of its Terms Loans in the amount of $6.5 million and as such the entire balance is recorded in current liabilities.

***Warrants Issued with Term Loan Facility***

During the period from 2013 to 2016, in connection with the Term Loan Facility, the Company issued convertible preferred stock warrants, which included warrants to purchase 131,652 shares of its Series B convertible preferred stock with an exercise price of $1.03 per share, 6,868 shares of its Series C convertible preferred stock with an exercise price of $2.18 per share, 43,010 shares of its Series D convertible preferred stock with an exercise price of $2.79 per share and 25,597 shares of its Series E convertible preferred stock with an exercise price of $2.93 per share (together the "Convertible Preferred Stock Warrants"). The Convertible Preferred Stock Warrants were exercisable from the date of issuance and have a 10-year term. The initial estimated fair value of the Convertible Preferred Stock Warrants was recorded as convertible preferred stock warrant liability with an offset to the debt discount associated with the Term Loan Facility. The debt discount is amortized to interest expense over the repayment period of the loan using the effective-interest method. All Convertible Preferred Stock Warrants were unexercised and outstanding as of June 30, 2019 and December 31, 2018.

**Note 7. Convertible Notes**

In April 2018, the Company issued $14.4 million in convertible notes ("Convertible Notes") to existing shareholders of redeemable convertible and convertible preferred stock. Interest accrued on the principal balance at an annual rate of 8%. Principal and accrued interest were due at the earliest of (1) the one-year anniversary of the issuance date, (2) event of default and (3) a change of control, defined as either a merger, sale of stock or assets or other form of transaction.

The maturity date could be extended if agreed upon by the Company and investors holding the convertible notes representing at least 80% of the outstanding amount at such time. On change of control, the holders of convertible notes could elect to either (1) receive full repayment of the note outstanding or (2) convert the entire outstanding amount of principal and accrued interest into shares of Series F preferred stock at a price per share of $3.8590.

The outstanding balance of principal and accrued interest automatically converts into fully paid and nonassessable shares of preferred stock issued on the issuance of preferred stock with aggregate gross proceeds of at least $25.0 million (a "Qualified Financing") prior to the maturity date of the convertible notes. On the issuance of preferred stock with aggregate gross proceeds of less than $25.0 million (a "Non-Qualified Financing"), holders of the Convertible Notes could elect to convert all or any portion of the outstanding principal and interest into fully paid and nonassessable shares of preferred stock. On conversion of the convertible notes in either a Qualified Financing or Non-Qualified Financing, preferred shares would be issued at a price of 90% of the price per share paid by the purchasers of preferred stock participating in the financing.

16

The Qualified Financing and Non-Qualified Financing redemption features were determined to be a compound embedded derivative requiring bifurcation and separate accounting at its estimated fair value. On issuance of the Convertible Notes, the Company recognized a liability of $0.4 million for the estimated fair value of the embedded derivative and incurred $0.1 million in debt issuance costs, both of which were recorded as a debt discount associated with the Convertible Notes.

During the three and six months ended June 30, 2018, the Company recognized $0.2 million of interest expense related to the Convertible Notes. The Company also recognized an expense of $1.2 million during the three and six months ended June 30, 2018 related to the change in fair value of the Convertible Notes embedded derivative liability, which was included in other expense, net in the statements of operations.

In June 2018, the outstanding balance of principal and accrued interest on the Convertible Notes of $14.6 million converted into 1,067,550 and 1,997,709 shares of the Company's Series G redeemable convertible and convertible preferred stock, respectively, at a price of $4.7565 per share in conjunction with the Company's Series G convertible preferred stock financing, which was a Qualified Financing under the terms of the Convertible Notes. The conversion of the Convertible Notes into Series G redeemable convertible preferred stock and Series G convertible preferred stock was accounted for as an extinguishment. The extinguishment of the Convertible Notes was considered a capital transaction and accordingly, the Company recognized a $0.4 million loss on extinguishment through additional paid in capital equal to the unamortized debt discount at the date of conversion.

## Note 8. Convertible Preferred Stock and Redeemable Convertible Preferred Stock

On July 2, 2019 and immediately prior to the completion of the IPO, all outstanding shares of convertible preferred stock and redeemable convertible preferred stock then outstanding converted into 58,363,606 shares of common stock. The carrying value of the redeemable convertible preferred stock is accreted to redemption value from the date of issuance to the earliest redemption date using the effective interest method. Due to the IPO becoming effective in the second quarter of 2019, the Company determined that redemption of the redeemable convertible preferred stock was not probable and as such, did not record accretion for the three months ended June 30, 2019. Convertible preferred stock and redeemable convertible preferred stock consisted of the following (in thousands, except share amounts):

| | June 30, 2019 | | | |
| | Shares Authorized | Shares Issued and Outstanding | Net Carrying Value | Aggregate Liquidation Preference |
|---|---|---|---|---|
| Series A | 18,960,000 | 18,941,619 | $ 9,161 | $ 9,217 |
| Series B | 13,784,443 | 13,652,791 | 13,774 | 14,000 |
| Series C | 9,335,659 | 9,328,791 | 20,289 | 20,374 |
| Series D | 14,367,652 | 14,324,642 | 39,886 | 40,000 |
| Series E | 13,612,543 | 13,586,946 | 39,880 | 40,000 |
| Series F | 12,956,724 | 12,956,724 | 56,154 | 59,623 |
| Series G | 21,986,733 | 21,986,733 | 118,325 | 126,444 |
| Series H | 10,182,113 | 10,182,111 | 69,861 | 71,539 |
| Total | 115,185,867 | 114,960,357 | $ 367,330 | $ 381,197 |

| | December 31, 2018 | | | |
| | Shares Authorized | Shares Issued and Outstanding | Net Carrying Value | Aggregate Liquidation Preference |
|---|---|---|---|---|
| Series A | 18,960,000 | 18,941,619 | $ 9,161 | $ 9,217 |
| Series B | 13,784,443 | 13,652,791 | 13,774 | 14,000 |
| Series C | 9,335,659 | 9,328,791 | 20,289 | 20,374 |
| Series D | 14,367,652 | 14,324,642 | 39,886 | 40,000 |
| Series E | 13,612,543 | 13,586,946 | 39,880 | 40,000 |
| Series F | 12,956,724 | 12,956,724 | 54,968 | 57,211 |
| Series G | 21,986,733 | 21,986,733 | 116,242 | 120,544 |
| Total | 105,003,754 | 104,778,246 | $ 294,200 | $ 301,346 |

## Note 9. Share-based Compensation Plans

### 2011 Equity Incentive Plan

In 2011, the Company adopted the Equity Incentive Plan (2011 Plan) authorizing the granting of incentive stock options (ISOs) and non-statutory stock options (NSOs) to eligible participants for up to 12,987,255 shares of common stock. Under the 2011 Plan,

17

incentive stock options and non-statutory stock options are to be granted at an exercise price that is no less than 100% of the fair value of the stock at the date of grant. Options generally vest over four years and are exercisable for up to 10 years after the date of grant. Incentive stock options granted to stockholders who own more than 10% of the outstanding stock of the Company at the time of grant must be issued at an exercise price no less than 110% of the fair value of the stock on the date of grant. The 2011 Plan has been replaced by the Company's 2019 Plan as defined below with respect to future equity awards.

### 2019 Equity Incentive Plan

In connection with the Company's initial public offering, the Company adopted the 2019 Equity Incentive Plan (the "2019 Plan").  The 2019 Plan allows the Company to grant stock options, stock appreciation rights, restricted stock, restricted stock units and performance awards to participants.  Subject to the terms and conditions of the 2019 Plan, the initial number of shares authorized for grants under the 2019 Plan is 8,000,000.

### Employee Stock Purchase Plan

In connection with the Company's initial public offering, the Company adopted the Employee Stock Purchase Plan.  The Employee Stock Purchase Plan permits employees to purchase shares of common stock during six-month offering periods at a purchase price equal to the lesser of (1) 85% of the fair market value of a share of common stock on the first business day of such offering period and (2) 85% of the fair market value of a share of common stock on the last business day of such offering period.   The plan is considered compensatory and, as such, the purchase discount from market price purchased by employees will be recorded as compensation expense.  As of June 30, 2019, the maximum number of shares of common stock that can be issued under the employee stock purchase plan was 1,750,000 shares.

### Stock-based Compensation

Total stock-based compensation expense, excluding compensation expense related to stock sales by current and former employees, by function was as follows (in thousands):

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2019 | | 2018 | | 2019 | | 2018 | |
| Marketing | $ | 74 | $ | 39 | $ | 143 | $ | 72 |
| Operations and technology | | 476 | | 263 | | 966 | | 536 |
| Selling, general and administrative | | 737 | | 379 | | 1,288 | | 618 |
| Total | $ | 1,287 | $ | 681 | $ | 2,397 | $ | 1,226 |

The amounts presented in the above table exclude compensation expense related to the stock sales by current and former employees. In March 2019, executives of the Company sold an aggregate of 382,477 shares of the Company's common stock at a price of $12.72 per share for an aggregate amount of $4.9 million to certain of the Company's existing investors. The Company determined that the purchase price was in excess of the fair value of such shares. As a result, during the three months ended March 31, 2019, the Company recorded the excess of the purchase price above fair value of $0.8 million as compensation expense within selling, general and administrative in the statement of operations and a corresponding credit to additional paid-in capital.

### Note 10. Commitments and Contingencies

### Leases

The Company leases its corporate offices, retail spaces and merchandising and fulfillment facilities under various noncancelable operating leases with terms ranging from one year to eleven years. Rent expense from operating leases totaled $4.6 million and $2.2 million for the three months ended June 30, 2019 and 2018, respectively and $8.7 million and $4.2 million for the six months ended June 30, 2019 and 2018, respectively. The current portion of deferred rent was $0.9 million as of June 30, 2019 and is included in other accrued and current liabilities on the balance sheets. The noncurrent portion of deferred rent was $6.0 million as of June 30, 2019 and is included in other noncurrent liabilities on the balance sheets.

As of June 30, 2019, the Company's future minimum lease payments under the noncancelable leases are as follows (in thousands):

| Year Ending December 31, | Operating Leases |
|---|---|
| 2019 | $ 8,554 |
| 2020 | 17,753 |
| 2021 | 17,718 |
| 2022 | 14,941 |
| 2023 | 13,693 |
| Thereafter | 56,145 |
| Total future minimum payments | $ 128,804 |

### Noncancelable Purchase Commitments

The Company has commitments for cloud services and other items in the ordinary course of business with varying expiration terms through 2021.  As of June 30, 2019, there were no material changes to the Company's noncancelable purchase commitments disclosed in the financial statements in the Prospectus.

### Other Commitments

In January 2018, the Company and the University of Arizona Foundation entered into an endowment agreement (the "Endowment Agreement") to establish a fund (the "Fund") to create and grow a gemology degree program in the Department of Geosciences at the University of Arizona (the "University"). The Company agreed to donate a total of $2.0 million, payable in four annual installments of $0.5 million. The first installment was paid in January 2018 on execution of the Endowment Agreement.

There are no conditions that the University must meet to receive the funds nor any penalties to the University for nonperformance. The Endowment Agreement directs the use of the funds but contains no binding restrictions on the use of the funds. On the execution of the Endowment Agreement, the Company recognized $1.7 million expense for the estimated fair value of the grant, using a discount rate of 10%, to selling, general and administrative expenses in the statements of operations. The Company recognized a corresponding liability for the remaining installment payments and will recognize accretion of the liability as interest expense over the remaining term of the Endowment Agreement.

Interest expense related to the accretion of the grant liability was not material in the three and six months ended June 30, 2019 and 2018.  As of June 30, 2019, the outstanding liability was $1.4 million, of which $1.0 million is included in other accrued and current liabilities on the balance sheet and $0.4 million is included in other noncurrent liabilities on the balance sheet.

### Contingencies

From time to time the Company is subject to, and it is presently involved in, litigation and other legal proceedings. Accounting for contingencies requires the Company to use judgment related to both the likelihood of a loss and the estimate of the amount or range of loss. The Company records a loss contingency when it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. The Company discloses material contingencies when a loss is not probable but reasonably possible.

On November 14, 2018, Chanel, Inc. ("Chanel") filed a lawsuit against the Company in the U.S. District Court for the Southern District of New York bringing various trademark- and advertising-related claims under the Lanham Act and New York state law analogues. Chanel alleges that the Company's resale of Chanel products confuses consumers into believing that Chanel is affiliated with the Company and involved in authenticating consignors' goods and that only Chanel is capable of authenticating second-hand Chanel goods. Chanel alleges, in particular, that the Company has made false representations concerning the Chanel-branded goods sold on our platform and that a number of these goods were counterfeit. The lawsuit seeks money damages as well as injunctive relief. The Company believes that it has meritorious defenses and intends to defend this lawsuit vigorously. The Company is not able to predict or reasonably estimate the ultimate outcome or possible losses relating to this claim.

### Indemnifications

In the ordinary course of business, the Company may provide indemnifications of varying scope and terms to vendors, directors, officers and other parties with respect to certain matters. The Company has not incurred any material costs as a result of such indemnifications and have not accrued any liabilities related to such obligations in its financial statements.

19

**Note 11. Income Taxes**

The quarterly income tax provision reflects an estimate of the corresponding quarter's state taxes in the United States.

**Note 12. Net Loss Per Share**

A reconciliation of the numerator and denominator used in the calculation of the basic and diluted net loss per share attributable to common stockholders is as follows (in thousands, except share and per share data):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2019 | 2018 | 2019 | 2018 |
| **Numerator** | | | | |
| Net loss attributable to common stockholders | $ (26,875) | $ (18,937) | $ (53,452) | $ (34,152) |
| **Denominator** | | | | |
| Weighted-average common shares outstanding used to calculate net loss per share attributable to common stockholders, basic and diluted | 9,494,447 | 8,314,251 | 9,102,234 | 8,307,010 |
| Net loss per share attributable to common stockholders, basic and diluted | $ (2.83) | $ (2.28) | $ (5.87) | $ (4.11) |

The following securities were excluded from the computation of diluted net loss per share attributable to common stockholders for the periods presented, because including them would have been anti-dilutive (on an as-converted basis):

| | June 30, | |
| --- | --- | --- |
| | 2019 | 2018 |
| Convertible preferred stock | 38,778,180 | 35,916,225 |
| Redeemable convertible preferred stock | 19,585,426 | 16,410,256 |
| Options to purchase common stock | 9,537,699 | 8,703,564 |
| Warrants to purchase convertible preferred stock | 103,563 | 103,563 |
| Warrant to purchase common stock | — | 67,974 |
| Total | 68,004,868 | 61,201,582 |

**Note 13. Subsequent Events**

On July 2, 2019, after the quarter end, the Company completed its IPO. For details of this event, refer to Note 1 – Description of Business and Basis of Presentation – Initial Public Offering.

On July 26, 2019 the Company fully repaid the principal of its Terms Loans in the amount of $6.5 million.

20

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*The following discussion of our financial condition and results of operations should be read together with our condensed financial statements and related notes thereto included elsewhere in this Quarterly Report on Form 10-Q and our final prospectus, dated June 27, 2019 and filed pursuant to Rule 424(b) under the Securities Act of 1933, as amended, the "Securities Act," which we refer to as our Prospectus. The following discussion contains forward-looking statements that reflect our plans, estimates and beliefs. Our actual results could differ materially from those discussed in the forward-looking statements. Factors that could cause or contribute to these differences include those discussed below and particularly in the section titled "Risk Factors" and elsewhere in this Quarterly Report on Form 10-Q and in our Prospectus. Our historical results are not necessarily indicative of the results that may be expected for any period in the future, and our interim results are not necessarily indicative of the results we expect for the full calendar year or any other period.*

**Overview**

We are the world's largest online marketplace for authenticated, consigned luxury goods. We are revolutionizing luxury resale by providing an end-to-end service that unlocks supply from consignors and creates a trusted, curated online marketplace for buyers globally. Over the past eight years, we have cultivated a loyal and engaged consignor and buyer base through continuous investment in our technology platform, logistics infrastructure and people. We aggregate and curate unique, pre-owned luxury supply that is exclusive to The RealReal across multiple categories, including women's, men's, kids', jewelry and watches, and home and art. We have built a vibrant online marketplace that we believe expands the overall luxury market, promotes the recirculation of luxury goods and contributes to a more sustainable world.

We have transformed the luxury consignment experience by removing the friction and pain points inherent in the traditional consignment model. For consignors, we provide White Glove in-home consultation and pickup, drop off at one of our eleven luxury consignment offices ("LCOs") three of which are located in our retail stores, or complimentary shipping directly to our merchandising and fulfillment facilities. We leverage our proprietary transactional database and market insights to deliver optimal pricing and rapid sell-through. For buyers, we offer highly coveted and exclusive authenticated pre-owned luxury goods at attractive values, as well as a high-quality experience befitting the products we offer. Our online marketplace is powered by our proprietary technology platform, including consumer facing applications and purpose-built software that supports our complex, individual stock keeping unit ("single-SKU") inventory model and merchandising operations.

The substantial majority of our revenue is generated by consignment sales. We also generate revenue from other services and direct sales.

- *Consignment and service revenue.* When we sell goods through our online marketplace on behalf of our consignors, we retain a percentage of the proceeds, which we refer to as our take rate. Take rates vary depending on the total value of goods sold through our online marketplace on behalf of a particular consignor as well as the category and price point of the items. In the three months ended June 30, 2019 and 2018, our overall take rate on consigned goods was 36.6% and 35.5%, respectively. In the six months ended June 30, 2019 and 2018, our overall take rate on consigned goods was 36.0% and 35.3%, respectively. Additionally, we earn revenue from shipping fees and from our subscription program, *First Look*, in which we offer buyers early access to the items we sell in exchange for a monthly fee.

- *Direct revenue.* In certain cases, such as when we accept returns from buyers after we have already remitted sale proceeds to the consignor, we take ownership of goods and retain 100% of the proceeds when the goods subsequently resell through our online marketplace.

We generate revenue from orders processed through our website, mobile app, LCOs, and three retail stores located in New York and Los Angeles. Our omni-channel experience enables buyers to purchase anytime and anywhere. We have a global base of approximately 12.7 million members as of June 30, 2019. We count as a member any user who has registered an email address on our website or downloaded our mobile app, thereby agreeing to our terms of service.

Through June 30, 2019, we have cumulatively paid $1.1 billion in commissions to our consignors. In the three months ended June 30, 2019 and 2018, our gross merchandise value ("GMV") was $228.5 million and $163.0 million, respectively, representing a growth rate of 40%. In the six months ended June 30, 2019 and 2018, our GMV was $452.6 million and $321.3 million, respectively, representing a growth rate of 41%. In the three months ended June 30, 2019 and 2018, our total revenue was $71.0 million and $47.0 million, respectively, representing a growth rate of 51%. In the six months ended June 30, 2019 and 2018, our total revenue was $140.2 million and $93.4 million, respectively, representing a growth rate of 50%.

21

**Initial Public Offering**

Our registration statement on Form S-1 (the "IPO Registration Statement") related to our initial public offering ("IPO") was declared effective on June 27, 2019 and our common stock began trading on the Nasdaq Global Select Market on June 28, 2019. Our IPO was completed on July 2, 2019 after the quarter end, in which we sold 17,250,000 shares of common stock at price to the public of $20.00 per share (including shares subject to the exercise of the underwriters' over-allotment option). As a result, our condensed financial statements as of June 30, 2019 and for the period then-ended do not reflect the sale by us of an aggregate of 17,250,000 shares in the completion of our IPO for aggregate net proceeds to us of approximately $320.9 million, after underwriting discounts and commissions.

**Factors Affecting Our Performance**

To analyze our business performance, determine financial forecasts and help develop long-term strategic plans, we focus on the factors described below. While each of these factors presents significant opportunity for our business, collectively, they also pose important challenges that we must successfully address in order to sustain our growth, improve our operating results and achieve and maintain our profitability.

***Supply and Demand***

*Consignor growth and retention.* We grow our sales by increasing the supply of luxury goods offered through our consignment online marketplace. In the three months ended June 30, 2019 consignors consigned approximately 0.9 million items on our online marketplace, a 46% increase over the three months ended June 30, 2018. In the six months ended June 30, 2019 consignors consigned approximately 1.6 million items on our online marketplace, a 46% increase over the six months ended June 30, 2018.

We grow our supply both by attracting new consignors and by creating lasting engagement with existing consignors. We generate leads for new consignors principally through our advertising activity. We convert those leads into active consignors through the activities of our sales professionals, who are trained and incentivized to identify and source high-quality, coveted luxury goods from consignors. Our sales professionals form a consultative relationship with consignors and deliver a high-quality, rapid consigning experience. Our existing relationships with consignors allow us to unlock valuable supply across multiple categories within the home, including women's, men's, kids', jewelry and watches, and home and art. We leverage our proprietary transactional database and market insights based on more than 9.4 million item sales since inception to deliver consignors optimal pricing and rapid sell-through.

Our growth has been driven in significant part by repeat sales from existing consignors concurrent with growth of our consignor base. Consignors in historical cohorts continue to drive the significant majority of sales on our platform. The percentage of GMV from repeat consignors in the three and six months ended June 30, 2019 was 81% as compared to 80% for both the three and six months ended June 30, 2018 periods. If we fail to continue to attract consignors to our online marketplace or grow available supply over time, our operating results would be adversely affected.

*Buyer growth and retention.* We grow our business by attracting and retaining buyers. We attract and retain buyers by offering highly coveted, authenticated, pre-owned luxury goods at attractive values and delivering a high-quality, luxury experience. We measure our success in attracting and retaining buyers by tracking buyer satisfaction and purchasing activity over time. Historically, we have experienced high buyer satisfaction. The percentage of GMV from repeat buyers for the three months ended June 30, 2019 and 2018 was 83%. The percentage of GMV from repeat buyers for the six months ended June 30, 2019 was 83% compared to 82% for the six months ended June 30, 2018.

We believe there is substantial opportunity to grow our business by having buyers also become consignors and vice versa. As of June 30, 2019, 13% of our buyers had become consignors and 53% of our consignors had become buyers. If we fail to continue to attract and retain our buyer base to our online marketplace, our operating results would be adversely affected.

*Scaling operations and technology.* To support the future growth of our business, we are expanding our capacity through investments in physical infrastructure, talent and technology. We principally conduct our intake, authentication, merchandising and fulfillment operations in our four leased merchandising and fulfillment facilities located in California and New Jersey comprising an aggregate of approximately 1 million square feet of space. The market for real estate to support operations centers such as ours is becoming increasingly competitive, and we will need to continue to secure and efficiently bring online additional capacity to support future growth. The opening of our retail stores in New York in late 2017 and Los Angeles in mid-2018 significantly contributed to the increase in operations and technology expense in 2018. We opened a second retail store in New York in May 2019 and we intend to open additional retail stores in the future. In addition to scaling our physical infrastructure, growing our single-SKU business operations requires that we attract, train and retain highly-skilled personnel for purposes of authentication, copywriting, merchandising, pricing and fulfilling orders. We are also investing substantially in technology to automate our operations and support growth. While we expect our operations and technology development expenses to increase as we continue to grow, we expect such expenses to decrease as a percentage of total revenue over the longer-term.

22

*Seasonality.* We have observed trends in seasonality of supply and demand in our business that we believe will continue. Specifically, our supply increases in the third and fourth quarters, and our demand increases in the fourth quarter. As a result of this seasonality, we typically see stronger average order value ("AOV"), and more rapid sell-through in the fourth quarter. We also incur higher operating expenses in the last four months of the year as we increase advertising spend to attract consignors and buyers and increase headcount in sales and operations to handle the higher volumes.

**Key Financial and Operating Metrics**

The key operating and financial metrics that we use to assess the performance of our business are set forth below for the three and six months ended June 30, 2019 and 2018.

| | Three Months Ended | | Six Months Ended | |
| --- | --- | --- | --- | --- |
| | June 30, 2019 | June 30, 2018 | June 30, 2019 | June 30, 2018 |
| | (In thousands, except AOV and percentages) | | | |
| GMV | $ 228,487 | $ 162,954 | $ 452,603 | $ 321,332 |
| NMV | $ 164,782 | $ 115,916 | $ 325,320 | $ 229,263 |
| Number of Orders | 505 | 359 | 1,003 | 715 |
| Take Rate | 36.6% | 35.5% | 36.0% | 35.3% |
| Active Buyers | 492 | 352 | 492 | 352 |
| AOV | $ 453 | $ 453 | $ 451 | $ 449 |

**GMV**

GMV represents the total amount paid for goods across our online marketplace in a given period. We do not reduce GMV to reflect product returns or order cancellations. GMV includes amounts paid for both consigned goods and our inventory net of platform-wide discounts and excludes the effect of direct buyer incentives, shipping fees and sales tax. Buyer incentives consist of coupons or promotions that offer credits in connection with purchases on our platform. We believe this is the primary measure of the scale and growth of our online marketplace and the key indicator of the health of our consignor ecosystem. We monitor trends in GMV to inform budgeting and operational decisions to support and promote growth in our business and to monitor our success in adapting our business to meet the needs of our consignors and buyers. While GMV is the primary driver of our revenue, it is not a proxy for revenue or revenue growth.

**NMV**

NMV, or net merchandise value, represents GMV less product returns and order cancellations and directed buyer incentives. NMV includes amounts paid for both consigned goods and our inventory. We believe NMV is a useful supplemental measure of the scale and growth of our online marketplace as it is the basis for calculating consignor commissions and is therefore an important indicator of the health of our consignor ecosystem for investors. Like GMV, NMV is not a proxy for revenue or revenue growth.

**Number of Orders**

Number of orders means the total number of orders placed across our online marketplace in a given period. We do not reduce number of orders to reflect product returns or order cancellations.

**Take Rate**

Take rate is a key driver of our revenue and provides comparability to other marketplaces. The numerator used to calculate our take rate is equal to GAAP consignment and service revenue, excluding certain buyer incentives and shipping and subscription service revenue. The denominator is equal to the numerator plus consignor commissions. We exclude direct revenue from our calculation of take rate because direct revenue represents the sale of inventory owned by us, which costs are included in cost of direct revenue. See the subsection titled "—Components of our Operating Results—Revenue" for further discussion of consignment and service revenue and direct revenue. Our take rate reflects the high level of service that we provide to our consignors across multiple touch points and the consistently high velocity of sales for their goods. Our take rate structure is a tiered commission structure for consignors, where the more they sell the higher percent commission they earn. Consignors start at a 55% commission (which equals a 45% take rate for us) and can earn up to a 70% commission. This tiered structure applies unless it is overridden by a commission exception.

23

Commission exceptions are used to incentivize our sales team, optimize supply and drive take rate changes. Examples of current commission exceptions include a flat 40% commission on all items under $145, and an 85% commission on watches over $2,500. Management assesses changes in take rates by monitoring the volume of GMV and take rate across each discrete commission grouping, encompassing commission tiers and exceptions. In the three and six months ended June 30, 2019 and 2018, take rate increased due to higher take rates for items under $196, partially offset by lower take rates for certain products, such as watches over $2,500, handbags over $5,000 and sneakers over $500. These take rate changes enabled us to optimize our unit economics for items under $200 while driving supply of certain higher priced products.

**Active Buyers**

Active buyers includes buyers who purchased goods through our online marketplace during the 12 months ended on the last day of the period presented, irrespective of returns or cancellations. We believe this metric reflects scale, brand awareness, buyer acquisition and engagement.

**Average Order Value ("AOV")**

Average order value ("AOV") means the average value of all orders placed across our online marketplace, excluding shipping fees and sales taxes. Our focus on luxury goods across multiple categories drives a consistently high AOV. Our AOV reflects both the average price of items sold as well as the number of items per order. Our high AOV is a key driver of our operating leverage.

**Adjusted EBITDA**

Adjusted EBITDA means net loss before net interest expense, income tax provision, depreciation and amortization, and remeasurement of preferred stock warrant liability included in other expense, further adjusted to exclude stock-based compensation and certain one-time expenses. Adjusted EBITDA provides a basis for comparison of our business operations between current, past and future periods by excluding items that we do not believe are indicative of our core operating performance. Adjusted EBITDA is a non-GAAP measure. The following table provides a reconciliation of net loss to Adjusted EBITDA (in thousands):

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | **2019** | **2018** | **2019** | **2018** |
| **Adjusted EBITDA Reconciliation:** | | | | |
| Net loss | $ (26,875) | $ (17,595) | $ (50,097) | $ (31,701) |
| Depreciation and amortization | 3,185 | 2,138 | 5,993 | 4,136 |
| Stock-based compensation | 1,287 | 681 | 2,397 | 1,226 |
| Compensation expense related to stock sales by current and former employees | — | — | 819 | — |
| Interest income | (610) | (81) | (1,015) | (165) |
| Interest expense | 380 | 526 | 511 | 723 |
| Other expense, net | 1,706 | 1,279 | 1,987 | 1,387 |
| Provision for income taxes | 59 | — | 59 | — |
| **Adjusted EBITDA** | $ (20,868) | $ (13,052) | $ (39,346) | $ (24,394) |

**Components of our Operating Results**

**Revenue**

Our revenue is comprised of consignment and service revenue and direct revenue.

- *Consignment and service revenue.* We generate the substantial majority of our revenue from the sale of pre-owned luxury goods through our online marketplace on behalf of consignors. For consignment sales, we retain a percentage of the proceeds received, which we refer to as our take rate. We recognize consignment revenue, net of allowances for product returns, order cancellations and certain buyer incentives. Additionally, we generate revenue from shipping fees we charge to buyers. We also generate service revenue from subscription fees paid by buyers for early access to products, but to date our subscription revenue has not been material.

- *Direct revenue.* We generate direct revenue from the sale of items that we own, which we refer to as our inventory. We generally acquire inventory when we accept returns from buyers after we have already remitted sale proceeds to the consignor. As such, growth in direct sales is generally a byproduct of growth in our consignment business. We recognize direct revenue based on the gross purchase price paid by buyers, net of allowances for product returns and order cancellations and certain incentives.

24

**Cost of Revenue**

Cost of revenue consists of shipping costs, credit card fees, packaging, customer service and website hosting services. Cost of direct revenue also includes the cost of our inventory sold through our online marketplace.

**Marketing**

Marketing expense comprises the cost of acquiring new consignors and buyers, including the cost of television, digital and direct mail advertising. Marketing expense also includes personnel-related costs for employees engaged in these activities. We intend to increase marketing spend as we invest to drive the growth of our business. While these expenses may vary from period to period, we expect these expenses to decrease as a percentage of revenue over the longer term.

**Operations and Technology**

Operations and technology expense principally includes personnel-related costs for employees involved with the authentication, merchandising and fulfillment of goods sold through our online marketplace, as well as our general information technology expense. Operations and technology expense also includes allocated facility and overhead costs, costs related to our retail stores, facility supplies and depreciation of hardware and equipment, as well as research and development expense for technology associated with managing and improving our operations. We capitalize a portion of our proprietary software development costs. As such, operations and technology expense also includes amortization of capitalized software development costs. We expect operations and technology expense to increase in future periods to support our growth, including bringing on additional merchandising and fulfillment facilities and continuing to invest in automation and other technology improvements to support and drive efficiency in our operations. These expenses may vary from period to period as a percentage of revenue, depending primarily upon when we choose to make more significant investments. We expect these expenses to decrease as a percentage of revenue over the longer term.

**Selling, General and Administrative**

Selling, general and administrative expense is principally comprised of personnel-related costs for our sales professionals and employees involved in finance and administration. Selling, general and administrative expense also includes allocated facilities and overhead costs and professional services, including accounting and legal advisors. We expect to increase selling, general and administrative expense as we grow our infrastructure to support operating as a public company and the overall growth in our business. While these expenses may vary from period to period as a percentage of revenue, we expect them to decrease as a percentage of revenue over the longer term.

**Income Tax Provision**

Our provision for income taxes consists primarily of state minimum taxes in the United States. We have a full valuation allowance for our net deferred tax assets primarily consisting of net operating loss carryforwards, accruals and reserves. We expect to maintain this full valuation allowance for the foreseeable future.

25

**Results of Operations**

The following tables set forth our results of operations (in thousands) and such data as a percentage of revenue for the periods presented:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2019 | 2018 | 2019 | 2018 |
| Revenue: | | | | |
| Consignment and service revenue | $ 60,713 | $ 42,178 | $ 116,950 | $ 83,177 |
| Direct revenue | 10,263 | 4,807 | 23,281 | 10,267 |
| Total revenue | 70,976 | 46,985 | 140,231 | 93,444 |
| Cost of revenue: | | | | |
| Cost of consignment and service revenue | 17,200 | 12,349 | 33,147 | 23,926 |
| Cost of direct revenue | 7,726 | 3,857 | 18,652 | 8,134 |
| Total cost of revenue | 24,926 | 16,206 | 51,799 | 32,060 |
| Gross profit | 46,050 | 30,779 | 88,432 | 61,384 |
| Operating expenses: | | | | |
| Marketing | 11,715 | 9,276 | 23,448 | 18,910 |
| Operations and technology | 34,320 | 22,997 | 65,865 | 44,329 |
| Selling, general and administrative | 25,355 | 14,377 | 47,674 | 27,901 |
| Total operating expenses | 71,390 | 46,650 | 136,987 | 91,140 |
| Loss from operations | (25,340) | (15,871) | (48,555) | (29,756) |
| Interest income | 610 | 81 | 1,015 | 165 |
| Interest expense | (380) | (526) | (511) | (723) |
| Other expense, net | (1,706) | (1,279) | (1,987) | (1,387) |
| Loss before provision for income taxes | (26,816) | (17,595) | (50,038) | (31,701) |
| Provision for income taxes | 59 | — | 59 | — |
| Net loss | $ (26,875) | $ (17,595) | $ (50,097) | $ (31,701) |

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2019 | 2018 | 2019 | 2018 |
| Revenue: | | | | |
| Consignment and service revenue | 86% | 90% | 83% | 89% |
| Direct revenue | 14% | 10% | 17% | 11% |
| Total revenue | 100% | 100% | 100% | 100% |
| Cost of revenue: | | | | |
| Cost of consignment and service revenue | 24% | 26% | 24% | 26% |
| Cost of direct revenue | 11% | 8% | 13% | 9% |
| Total cost of revenue | 35% | 34% | 37% | 34% |
| Gross profit | 65% | 66% | 63% | 66% |
| Operating expenses: | | | | |
| Marketing | 17% | 20% | 17% | 20% |
| Operations and technology | 48% | 49% | 47% | 47% |
| Selling, general and administrative | 36% | 31% | 34% | 30% |
| Total operating expenses | 101% | 99% | 98% | 98% |
| Loss from operations | (36)% | (34)% | (35)% | (32)% |
| Interest income | 1% | 0% | 1% | 0% |
| Interest expense | (1)% | (1)% | 0% | (1)% |
| Other expense, net | (2)% | (3)% | (1)% | (1)% |
| Loss before provision for income taxes | (38)% | (37)% | (36)% | (34)% |
| Provision for income taxes | 0% | 0% | 0% | 0% |
| Net loss | (38)% | (37)% | (36)% | (34)% |

26

**Comparison of the Three and Six Months Ended June 30, 2019 and 2018**

*Consignment and Service Revenue*

Consignment and service revenue increased by $18.5 million, or 44%, in the three months ended June 30, 2019 compared to the three months ended June 30, 2018 and $33.8 million, or 41%, in the six months ended June 30, 2019 compared to the six months ended June 30, 2018. For both periods the growth in revenue was driven primarily by growth in GMV and improvement in our take rate. Our take rate improved from 35.5% to 36.6% in the three months ended June 30, 2019 compared to the same period last year and from 35.3% to 36.0% in the six months ended June 30, 2019 compared to the six months ended June 30, 2018. Take rate improved due to changes to our commission structure that yielded a higher take rate on lower-priced items. GMV growth was driven by a 40% increase in active buyers. Active buyer growth was driven by an increase in new buyers due to the combination of the effect of marketing spend and consignors becoming buyers.

*Direct Revenue*

Direct revenue increased by $5.5 million, or 114%, in the three months ended June 30, 2019 compared to the three months ended June 30, 2018 and by $13.0 million, or 127%, in the six months ended June 30, 2019 compared to the six months ended June 30, 2018. The increase was driven in part by an increase in our owned-inventory as a result of a higher than usual volume of returns received subsequent to payments to consignors. The subsequent sale of our owned-inventory drove the increase in direct revenue in the three and six months ended June 30, 2019 both on an absolute basis and as a percent of total revenue. We expect direct revenue as a percent of total revenue to vary from period to period.

*Cost of Consignment and Service Revenue*

Cost of consignment and service revenue increased by $4.9 million, or 39%, in the three months ended June 30, 2019 compared to the three months ended June 30, 2018 and by $9.2 million, or 39%, in the six months ended June 30, 2019 compared to the six months ended June 30, 2018. The increase for both periods was primarily attributable to increases in shipping costs driven by fulfillment of a larger number of orders and credit card fees driven by growth in our business.

*Cost of Direct Revenue*

Cost of direct revenue increased by $3.9 million, or 100%, in the three months ended June 30, 2019 compared to the three months ended June 30, 2018 and by $10.5 million, or 129%, in the six months ended June 30, 2019 compared to the six months ended June 30, 2018, consistent with the increase in direct revenue.

*Marketing*

Marketing expense increased by $2.4 million, or 26%, in the three months ended June 30, 2019 compared to the three months ended June 30, 2018 and by $4.5 million, or 24%, in the six months ended June 30, 2019 compared to the six months ended June 30, 2018. The increase in both periods was primarily due to increased advertising costs as we seek to grow the number of buyers and consignors using our online marketplace. As a percent of revenue, marketing expense decreased to 17% in the three and six months ended June 30, 2019 from 20% in the same periods last year, reflecting greater scale in our business and efficiency in our buyer and consignor acquisition and retention activities.

*Operations and Technology*

Operations and technology expense increased by $11.3 million, or 49%, in the three months ended June 30, 2019 compared to the three months ended June 30, 2018. Operations and technology expense increased by $21.5 million, or 49%, in the six months ended June 30, 2019 compared to the six months ended June 30, 2018. The increase in both periods was primarily due to higher headcount primarily in our authentication, merchandising and technology teams and higher occupancy costs primarily due to the inclusion of our Perth Amboy fulfilment center in Q4 2018 and the opening of our Los Angeles retail store in July 2018.

As a percent of revenue, operations and technology expense decreased to 48% from 49% in the three months ended June 30, 2019 and 2018, respectively and was consistent at 47% in the six months ended June 30, 2019 and 2018. These expenses may vary from period to period as a percentage of revenue, depending primarily upon when we choose to make more significant investments. We expect these expenses to decrease as a percentage of revenue over the longer term.

27

*Selling, General and Administrative*

Selling, general and administrative expense increased by $11.0 million, or 76%, in the three months ended June 30, 2019 compared to the three months ended June 30, 2018. The increase was due to higher headcount in our general and administrative functions and our sales organization, higher stock compensation expense which includes the expense from the secondary sale transaction in March 2019, and higher legal and consulting fees.

Selling, general and administrative expense increased by $19.8 million, or 71%, in the six months ended June 30, 2019 compared to the six months ended June 30, 2018. The increase was due to higher headcount in our sales organization and general and administrative functions, higher accounting, consulting and legal fees, and higher stock compensation expense.

As a percent of revenue, selling, general and administrative expense increased to 36% from 31% in the three months ended June 30, 2019 and 2018; respectively and to 34% from 30% in the six months ended June 30, 2019 and 2018; respectively as we invested in the growth of the sale organization and expanded our finance and administrative functions in anticipation of being a public company. These expenses may vary from period to period as a percentage of revenue. We expect these expenses to decrease as a percentage of revenue over the long term.

*Interest Income*

Interest income increased $0.5 million, or 653%, in the three months ended June 30, 2019 as compared to the three months ended June 30, 2018. Interest income increased $0.9 million, or 515%, in the six months ended June 30, 2019 as compared to the six months ended June 30, 2018.The increase in both periods was due to an increase in the investments balance in 2019 from 2018.

*Interest Expense*

Interest expense decreased $0.1 million, or 28%, in the three months ended June 30, 2019 compared to the three months ended June 30, 2018 and decreased $0.2 million, or 29%, in the six months ended June 30, 2019 as compared to the six months ended June 30, 2018 due to lower debt balances year over year offset by success fee of $0.3 million per our Term Loan agreements.

*Other Expense*

Other expense increased $0.4 million, or 33%, in the three months ended June 30, 2019 as compared to the three months ended June 30, 2018 due to remeasurement of the warrant liability. Other expense increased $0.6 million, or 43%, in the six months ended June 30, 2019 as compared to the six months ended June 30, 2018 due to remeasurement of the warrant liability offset by the extinguishment of the derivative liability on conversion of the convertible notes.

**Liquidity and Capital Resources**

As of June 30, 2019, we had unrestricted cash, cash equivalents and short-term investments of $66.7 million and an accumulated deficit of $307.9 million. In July 2019, we received net proceeds of $320.9 million upon completion of our IPO on July 2, 2019. Since inception, we have generated negative cash flows from operations and have primarily financed our operations through several rounds of venture capital financing. In addition, proceeds from our IPO will be used to finance our operations.

We expect that operating losses and negative cash flows from operations could continue in the foreseeable future as we continue to invest in expansion activities. We believe our existing cash and cash equivalents and short-term investments as of June 30, 2019 will be sufficient to meet our working capital and capital expenditures needs for at least the next 12 months.

Our future capital requirements will depend on many factors, including, but not limited to, our ability to grow our revenues and the timing of investments to support growth in our business, such as the build-out of new fulfillment centers and, to a lesser extent, the opening of new retail stores. We may seek additional equity or debt financing. In the event that additional financing is required from outside sources, we may not be able to raise it on terms acceptable to us or at all. If we are unable to raise additional capital when desired, our business, financial condition and results of operations could be adversely affected.

28

*Cash Flows*

The following table summarizes our cash flows for the periods indicated.

|  | Six Months Ended June 30, | |
| --- | --- | --- |
|  | **2019** | **2018** |
| Net cash (used by) provided by: | | |
| Operating activities | $ (46,174) | $ (28,706) |
| Investing activities | (182) | 6,003 |
| Financing activities | 65,743 | 98,931 |
| Net  increase in cash, cash equivalents and restricted cash | $ 19,387 | $ 76,228 |

**Net Cash Used in Operating Activities**

During the six months ended June 30, 2019, net cash used in operating activities was $46.2 million, which consisted of a net loss of $50.1 million, adjusted by non-cash charges of $12.1 million and a net change of $8.2 million in our operating assets and liabilities. The net change in our operating assets and liabilities was primarily the result of a $2.6 million increase in accounts receivable driven by the timing of settlement of credit card purchases relative to year-end sales and a $2.3 million increase in inventory, partially offset by a $1.9 million decrease in accrued consignor payable and $1.8 million decrease in other accrued and current liabilities.

During the six months ended June 30, 2018, net cash used in operating activities was $28.7 million, which consisted of a net loss of $31.7 million, adjusted by non-cash charges of $7.5 million and a net change of $4.5 million in our operating assets and liabilities. The net change in our operating assets and liabilities was primarily the result of a $4.5 million increase in other accrued and current liabilities driven by our growth, $3.9 million increase in prepaid expenses and other current assets, a $3.9 million decrease in accrued consignor payable, and a $1.5 million increase in inventory, net.

**Net Cash Used in Investing Activities**

During the six months ended June 30, 2019, net cash used in investing activities was $0.2 million, which consisted of $22.9 million proceeds from maturities on short-term investments partially offset by $10.0 million for purchases of property and equipment, net, including leasehold improvements, $9.2 million for purchases of short-term investments, and $3.9 million for capitalized proprietary software development costs.

During the six months ended June 30, 2018, net cash provided by investing activities was $6.0 million, which consisted of proceeds of $7.6 million from maturities on short-term investments and proceeds of $7.0 million from the sale of short-term investments, partially offset by $4.2 million for purchases of property and equipment, net, $2.2 million for purchases of short-term investments and $2.2 million for capitalized proprietary software development costs.

*Net Cash Provided by Financing Activities*

During the six months ended June 30, 2019, net cash provided by financing activities was $65.7 million, which primarily consisted of proceeds of $69.8 million from the issuance of redeemable convertible preferred stock and convertible preferred stock, net of issuance costs, and proceeds of $1.8 million from the exercise of stock options and warrants partially offset by $3.1 million in deferred offering costs and $2.8 million for repayment of debt.

During the six months ended June 30, 2018, net cash used in financing activities was $98.9 million which primarily consisted of proceeds of $86.6 million from the issuance of preferred stock, net of issuance costs, and proceeds of $14.3 million from the issuance of convertible notes, net of issuance costs, partially offset by $1.5 million for repayments of debt.

**Contractual Obligations and Commitments**

As of June 30, 2019, there have been no material changes from the contractual obligations and commitments previously disclosed in our Prospectus.

*Term Loans*

We are party to a loan and security agreement that includes a term loan facility, which consists of a $7.5 million term loan with a maturity date of January 1, 2020 and a $7.5 million term loan maturing at January 31, 2021 (together the "Term Loans").

The Term Loans bear interest on the outstanding daily balance thereof at a variable annual rate equal to 0.35% above the prime rate then in effect. As of June 30, 2019 and December 31, 2018, we had $6.5 million and $9.2 million, respectively, outstanding under the Term Loans, and the associated interest rate on our debt was 5.85%. The Term Loans are secured by liens on substantially all of our present and future assets.

The Term Loans include affirmative, negative and financial covenants that restrict our ability to, among other things, incur additional indebtedness, make investments, sell or otherwise dispose of assets, pay dividends or repurchase stock. As of June 30, 2019 and December 31, 2018, we were in compliance with all debt covenants.  On July 26, 2019, we fully repaid the principal amount of our term loans; see Notes 6 and 13 of our unaudited condensed financial statements.

**Off-Balance Sheet Arrangements**

We did not have during the periods presented, and we do not currently have, any off-balance sheet financing arrangements or any relationships with unconsolidated entities or financial partnerships, including entities sometimes referred to as structured finance or special purpose entities, that were established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes.

**Critical Accounting Policies and Estimates**

Our management's discussion and analysis of our financial condition and results of operations is based on our financial statements, which have been prepared in accordance with United States generally accepted accounting principles. The preparation of these financial statements requires our management to make judgments and estimates that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements, as well as the reported revenue generated, and expenses incurred during the reporting periods. Our estimates are based on our historical experience and on various other factors that we believe are reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these judgments and estimates under different assumptions or conditions and any such differences may be material. We believe that the accounting policies discussed below are critical to understanding our historical and future performance, as these policies relate to the more significant areas involving management's judgments and estimates.

*Revenue Recognition*

*Consignment and Service Revenue*

We generate the majority of our revenue from consignment services for the sale of pre-owned luxury goods on behalf of consignors through our online consignment marketplace. For consignment sales, we retain a portion of the proceeds received, which we refer to as our take rate, and remit the balance to the consignors. We recognize consignment revenue upon purchase of the goods by the buyer based on our take rate, net of allowances for product returns and order cancellations and certain incentives.

We also generate revenue from shipping fees to buyers, and occasionally consignors, and have elected to treat shipping and handling activities performed after control transfers to the buyer as fulfillment activities. Accordingly, we recognized shipping fees as revenue upon purchase of the goods by the buyer. We also generate service revenue from our *First Look* subscription program, through which buyers pay a monthly fee for early access to our listings. Subscription fees are recognized on a monthly basis.

Certain transactions provide consignors with a material right resulting from the tiered consignor commission plan. Under this plan, the amount an individual consignor receives for future sales of consigned goods may be dependent on previous consignment sales for that consignor. Accordingly, in certain consignment transactions, a small portion of our consignment service revenue is allocated to such material right using the portfolio method, as applicable. Such material right is recorded as deferred revenue and recognized based on the pattern of exercise.

We recognize a returns reserve in the period that the related revenue is recorded based on historical experience. Historically, our estimate for returns has not varied materially from our actual returns. In the future, if we conclude that an adjustment is required due to material changes in returns activity, the returns reserve will be adjusted accordingly.

*Direct Revenue*

We also generate revenue from the sales of company-owned inventory. We recognize direct revenue upon purchase of the goods through our online marketplace, based on the gross purchase price net of allowances for product returns and order cancellations and certain incentives.

30

*Stock-based Compensation*

We estimate the fair value of stock options granted to employees, non-employees and directors using the Black-Scholes option-pricing model. The fair value of stock options that is expected to vest is recognized as compensation expense on a straight-line basis over the requisite service period.

The Black-Scholes model considers several variables and assumptions in estimating the fair value of stock-based awards. These variables include per share fair value of the underlying common stock, exercise price, expected term, risk-free interest rate, expected annual dividend yield and expected stock price volatility over the expected term. For all stock options granted to date, we calculated the expected term using the simplified method for "plain vanilla" stock option awards. We determine volatility using the historical volatility of the stock price of similar publicly traded peer companies. The risk-free interest rate is based on the yield available on U.S. Treasury zero-coupon issues similar in duration to the expected term of the equity-settled award.

The fair value of the shares of common stock underlying the stock options has historically been determined by our board of directors, with assistance by management and using contemporaneous third-party valuations, as there was no public market for the common stock. The fair value of our common stock is determined by considering a number of objective and subjective factors, including: the valuation of comparable companies, sales of preferred stock to unrelated third parties, secondary sale transactions, our operating and financial performance, the lack of liquidity of common stock and general and industry specific economic outlook, amongst other factors. Following the closing of our initial public offering, the fair value per share of our common stock for purposes of determining stock-based compensation will be the closing price of our common stock as reported on the applicable grant date.

**Recent Accounting Pronouncements**

In February 2016, the FASB issued ASU No. 2016-02, Leases (Topic 842), or ASU 2016-02, which is aimed at making leasing activities more transparent and comparable and requires substantially all leases to be recognized by lessees on their balance sheet as a right-of-use asset and corresponding lease liability, including leases currently accounted for as operating leases. The new standard is effective for non-public entities in fiscal years beginning after December 15, 2019. Therefore, as an "emerging growth company" as defined in the JOBS Act the new standard is effective for us beginning January 1, 2020. We are currently evaluating the impact that this standard will have on our financial statements but we expect that it will result in a significant increase in our long-term assets and liabilities.

For more information on recently issued accounting pronouncements, see Note 2 to our unaudited condensed financial statements "Summary of Significant Accounting Policies."

**JOBS Act Accounting Election**

We are an "emerging growth company," as defined in the JOBS Act. Under the JOBS Act, emerging growth companies can delay adopting new or revised accounting standards issued subsequent to the enactment of the JOBS Act until such time as those standards apply to private companies. We have elected to use this extended transition period to enable us to comply with new or revised accounting standards that have different effective dates for public and private companies until the earlier of the date we (1) are no longer an emerging growth company or (2) affirmatively and irrevocably opt out of the extended transition period provided in the JOBS Act. As a result, our financial statements may not be comparable to companies that comply with new or revised accounting pronouncements as of public company effective dates.

**Item 3. Quantitative and Qualitative Disclosures About Market Risk.**

We are exposed to market risks in the ordinary course of our business, including fluctuations in interest rates. Such fluctuations to date have not been significant.

As of June 30, 2019, we had unrestricted cash, cash equivalents and short-term investments of approximately $66.7 million, which carry a degree of interest rate risk. A hypothetical 10% change in interest rates would not have a material impact on our financial condition or results of operations due to the short-term nature of our investment portfolio.

We do not believe that inflation has had a material effect on our business, results of operations or financial condition. Nonetheless, if our costs were to become subject to significant inflationary pressures, we may not be able to fully offset such higher costs. Our inability or failure to do so could harm our business, results of operations or financial condition.

**Item 4. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our principal executive officer and principal financial officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended ("Exchange Act"), as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on such evaluation, our principal executive officer and principal financial officer have concluded that, as of such date, our disclosure controls and procedures were effective at a reasonable assurance level.

**Changes in Internal Control**

There were no changes in our internal control over financial reporting identified in management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Exchange Act during the period covered by this Quarterly Report on Form 10-Q that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Limitations on Effectiveness of Controls and Procedures**

Our management, including our principal executive officer and principal financial officer, do not expect that our disclosure controls and procedures or our internal control over financial reporting will prevent all errors and all fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty, and that breakdowns can occur because of a simple error or mistake. Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. Due to inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

**PART II—OTHER INFORMATION**

**Item 1. Legal Proceedings.**

We are from time to time subject to, and are presently involved in, litigation and other legal proceedings. See "Note 10—Commitments and Contingencies" in the notes to unaudited condensed financial statements. This item should be read in conjunction with the Legal Proceedings disclosures in our final prospectus related to our IPO filed with the SEC pursuant to Rule 424(b) under the Securities Act.

In November 2018, Chanel, Inc. ("Chanel") filed a lawsuit against us in the U.S. District Court for the Southern District of New York bringing various trademark and advertising-related claims under the Lanham Act and New York state law analogues. Chanel alleges, among other things, that we have misrepresented certain counterfeit Chanel products as authentic Chanel products, that our resale of Chanel products confuses consumers into believing that Chanel is affiliated with us and involved in authenticating consignors' goods and that only Chanel is capable of authenticating second-hand Chanel goods. This litigation is in its early stages and the final outcome, including our liability, if any, with respect to Chanel's claims, is uncertain. Chanel could in the future assert additional trademark and advertising or other claims against us in this or other proceedings. An unfavorable outcome in this or similar litigation could adversely affect our business and could lead to other similar lawsuits.

We are currently involved in, and may in the future be involved in, legal proceedings in the ordinary course of business. While it is not possible to determine the outcome of any legal proceedings brought against us, we believe that, except for the matter described above, the resolution of all such matters will not have a material adverse effect on our consolidated financial position or liquidity, but could be material to our consolidated results of operations in any one accounting period. Regardless of final outcomes, however, any such legal proceedings may nonetheless impose a significant burden on management and employees and may come with costly defense costs or unfavorable preliminary and interim rulings. There are inherent uncertainties in these legal matters, some of which are beyond management's control, making the ultimate outcomes difficult to predict. Moreover, management's views and estimates related to these matters may change in the future, as new events and circumstances arise and as the matters continue to develop.

**Item 1A. Risk Factors.**

*Investing in our common stock involves a high degree of risk. You should consider and read carefully all of the risks and uncertainties described below, as well as other information included in this Quarterly Report on Form 10-Q, including the sections titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and related notes included elsewhere in this Quarterly Report on Form 10-Q. The risks described below are not the only ones we face. The occurrence of any of the following risks or additional risks and uncertainties not presently known to us or that we currently believe to be immaterial could materially and adversely affect our business, financial condition or results of operations. In such case, the trading price of our common stock could decline, and you may lose all or part of your investment. This Quarterly Report on Form 10-Q also contains forward-looking statements and estimates that involve risks and uncertainties. Our actual results could differ materially from those anticipated in the forward-looking statements as a result of specific factors, including the risks and uncertainties described below.*

**Risks Relating to Our Business**

*If we fail to generate a sufficient amount of new and recurring supply of pre-owned luxury goods by attracting and retaining consignors, our business would be harmed.*

Our success depends on our ability to cost-effectively attract, retain and grow relationships with consignors, and in turn, our supply of luxury goods sold through our online marketplace. To expand our consignor base, we must appeal to and engage individuals new to consignment, or who have consigned through traditional brick-and-mortar shops but are unfamiliar with our business. We find new consignors by converting buyers utilizing our online marketplace, shopping in our three retail stores, utilizing our eleven luxury consignment offices ("LCOs"), paid advertising, referral programs, organic word-of-mouth and other methods of discovery, such as mentions in the press, Internet search engine results and through our partnership with Stella McCartney. We recently increased our paid marketing expenses by investing more in television advertising and digital marketing and we expect to increase our spending on these and other paid marketing channels in the future. We cannot be certain that these efforts will yield more consignors or be cost-effective. Moreover, new consignors may not choose to consign with us a second time or consign as frequently, or consign as many items or the same value of items, as has historically been the case with existing consignors. Therefore, the revenue generated from new consignors may not be as high as the revenue generated historically from our existing consignors or as high as we expect. If we fail to attract new consignors or drive repeat consignments, our ability to grow our business would be adversely affected.

33

Our ability to drive growth also depends on our success in continuing to generate a high volume of consigned items from new and existing consignors. To accomplish this, we rely on our sales professionals to drive our supply of luxury goods by identifying, developing and maintaining relationships with our consignors. Our sales professionals source high-quality, coveted luxury goods from consignors through a variety of methods including White Glove consultation, meeting with potential consignors in one of our eleven LCOs or shipping consigned goods to us from remote locations. The process of identifying and hiring sales professionals with the combination of skills and attributes required in these roles can be difficult and can require significant time. In addition, competition for qualified employees and personnel in the retail industry is intense and turnover amongst our sales professionals within a few years is not uncommon. Any shortage in sales professionals or delay in identifying and hiring quality sales professionals could have a negative impact on the business. If we are not successful in attracting and retaining effective sales professionals, the quantity and quality of the luxury goods sold through our online marketplace may be negatively impacted, which would have a material adverse effect on our business and operating results.

*We may not be able to attract and retain specialized personnel to effectively manage the merchandising operations required to authenticate, process and sell consigned luxury goods or identify and lease merchandising and fulfillment facilities in geographic regions that enable us to effectively scale our operations.*

We lease facilities to store and accommodate the logistics infrastructure required to merchandise and ship the pre-owned luxury goods we sell through our online marketplace. To grow our business, we must continue to improve and expand our merchandising and fulfillment operations, information systems and skilled personnel in the jurisdictions in which we operate so that we have the skilled talent necessary to effectively operate our business. The operation of our business is complex and requires the coordination of multiple functions that are highly dependent on numerous employees and personnel. Each luxury item that we offer through our online marketplace is unique and requires multiple touch points, including inspection, evaluation, authentication, photography, pricing, copywriting, application of a unique single-SKU and fulfillment. We have rapidly increased our operations employee headcount to support the growth of our business. The market for these employees is increasingly competitive and is highly dependent on geographic location. Some of our employees have specific knowledge and skills that would make it more difficult to hire replacement personnel capable of effectively performing the same tasks without substantial training. If we fail to effectively locate, hire and retain such personnel, our operations would be negatively impacted, which would have an adverse effect on our business, financial condition and operating results.

Our ability to successfully grow our business also depends on the availability and cost of leasing additional merchandising and fulfillment facilities that meet our criteria for a geographic location with access to a large, qualified talent pool, square footage, cost and other factors. We currently have four merchandising and fulfillment facilities—one in California and three in New Jersey. Optimal space is becoming increasingly scarce, and where it is available, the lease terms offered by landlords are increasingly competitive. Incentives currently offered by local, state and federal entities to offset operating expenses may be reduced or become unavailable. Companies who have more financial resources and negotiating leverage than us may be more attractive tenants and, as a result, may outbid us for the facilities we seek. We also may be unable to renew our existing leases or renew them on satisfactory terms. Failure to identify and secure adequate new merchandising and fulfillment facilities in optimal geographic locations or maintain our current merchandising and fulfillment facilities could have an adverse effect on our business and operating results.

*We have a history of losses and we may not achieve or maintain profitability in the future.*

We experienced net losses of $52.3 million, $75.8 million and $50.1 million in 2017, 2018 and the six months ended June 30, 2019, respectively, and as of June 30, 2019 we had an accumulated deficit of $307.9 million. We believe there is substantial opportunity for growth in our business and our market and intend to invest aggressively to capitalize on this opportunity. As a result of these investments, we expect to incur additional losses for the foreseeable future. In particular, we are making significant investments in our marketing initiatives, expanding our operations and infrastructure, developing and introducing new technologies and automation and hiring additional personnel. These efforts may be more costly than we expect and may not result in revenue growth. In addition, in connection with operating as a public company, we will incur additional significant legal, accounting and other expenses that we did not incur as a private company. If our investments do not prove successful or our market does not develop as we expect, we may continue to experience losses over the long term. Any failure to increase our revenue sufficiently to keep pace with our investments and other expenses could prevent us from achieving or maintaining profitability or positive cash flow on a consistent basis. If we are unable to successfully address these risks and challenges as we encounter them, our business, financial condition and operating results could be adversely affected. We cannot assure you that we will ever achieve or sustain profitability and may continue to incur significant losses going forward.

34

***We may not be able to sustain our revenue growth rate or effectively manage growth.***

Our recent revenue growth should not be considered indicative of our future performance. As we grow our business, we expect our future revenue growth rates may slow due to a number of factors, including the maturation of our business, increased market adoption against which future growth will be measured, increasing competition or our failure to capitalize on growth opportunities. Additionally, consignors may opt to consign less with us to the extent we take steps, such as increasing our take rates, that make our online marketplace appear less attractive to them. Alternatively, the emergence of direct competitors may force us to decrease our take rates to remain competitive to attract consignors, which will have a negative impact on our financial performance.

We have experienced, and expect to continue to experience, rapid growth, which has placed, and will continue to place, significant demands on our management and our operational and financial infrastructure. Continued growth could also strain our ability to maintain reliable service levels for our consignors and buyers, develop and improve our operational, financial and management controls, enhance our reporting systems and procedures and recruit, train and retain highly skilled personnel. To support anticipated growth, we are committing substantial financial, operational and technical resources. Failure to effectively manage the growth of our business and operations would negatively affect our reputation and brand, business, financial condition and operating results.

***National retailers and brands set their own retail prices and promotional discounts on new luxury goods, which could adversely affect our value proposition to consumers.***

National retailers and brands set pricing for new luxury goods. Promotional pricing by these parties may adversely affect the value of products consigned with us and our inventory, and, in turn, GMV and operating results. In order to attract buyers to our online marketplace, the prices for the pre-owned luxury goods sold through our online marketplace may need to be lowered in order to compete with these pricing strategies, which could negatively affect gross merchandise value and in turn, our revenue. We have experienced a reduction in our GMV in the past due to fluctuations in the price of new luxury goods sold by retailers and brands, and we anticipate similar reductions and fluctuations in the future. Any of the foregoing risks could adversely affect our business, financial condition and operating results.

***We have a relatively short operating history in an evolving industry and, as a result, our past results may not be indicative of future operating performance.***

Our online marketplace represents a substantial departure from the traditional resale market for luxury goods. While our business has grown rapidly, the resale market for luxury goods may not continue to develop in a manner that we expect or that otherwise would be favorable to our business. Our relatively short operating history and the changes in our market make it difficult to assess our future performance. You should consider our business and prospects in light of the risks and difficulties we may encounter.

Our future success will depend in large part upon our ability to, among other things:

- cost-effectively acquire and engage with new and existing consignors and buyers and grow our supply of high-quality, coveted luxury goods for sale through our online marketplace;

- scale our revenue and achieve the operating efficiencies necessary to achieve and maintain profitability;

- increase consignor and buyer awareness of our brand;

- anticipate and respond to changing consignor and buyer preferences;

- manage and improve our business processes in response to changing business needs;

- anticipate and respond to macroeconomic changes generally, including changes in both the primary and secondary market for luxury goods;

- effectively scale our operations while maintaining high service quality and consignor and buyer satisfaction;

- hire and retain talented people at all levels of our business;

- avoid or manage interruptions in our business from information technology downtime, cybersecurity breaches and other factors affecting our physical and digital infrastructure;

- fulfill and deliver orders in a timely manner and in accordance with customer expectations, which may change over time;

- maintain the quality of our technology and operations infrastructure;

- develop new technology or services to enhance the consignor and buyer experience; and

- comply with regulations applicable to our business.

35

If we fail to address the risks and difficulties that we face, including those associated with the challenges listed above as well as those described elsewhere in this "Risk Factors" section, our business and our operating results would be adversely affected.

***We rely on consumer discretionary spending and may be adversely affected by economic downturns and other macroeconomic conditions or trends.***

Our business and operating results are subject to global economic conditions and their impact on consumer discretionary spending, particularly in the luxury goods market. Some of the factors that may negatively influence consumer spending on luxury goods include high levels of unemployment, higher consumer debt levels, reductions in net worth, and declines in asset values and related market uncertainty, home foreclosures and reductions in home values, fluctuating interest rates and credit availability, fluctuating fuel and other energy costs, fluctuating commodity prices and general uncertainty regarding the overall future political and economic environment. Economic conditions in certain regions may also be affected by natural disasters, such as earthquakes, hurricanes and wildfires. Consumer purchases of new luxury goods have declined during periods of economic uncertainty, when disposable income is reduced or when there is a reduction in consumer confidence. Such economic uncertainty and decrease in the rate of luxury purchases in the primary market may slow the rate at which individuals choose to consign their goods with us which could result in a decrease of items available in our online marketplace.

***As an online marketplace for pre-owned luxury goods, our success depends on the accuracy of our authentication process. Failure by us to identify counterfeit goods could adversely affect our reputation, subject us to adverse publicity, and expose us to liability for the sale of counterfeit goods.***

Our success depends on our ability to accurately and cost-effectively determine whether an item offered for consignment is an authentic product, a genuine gemstone or piece of jewelry or a validated work of art. From time to time we receive counterfeit goods for consignment. While we have invested heavily in our authentication processes and we reject any goods we believe to be counterfeit, we cannot be certain that we will identify every counterfeit item that is consigned to us. As the sophistication of counterfeiters increases, it may be increasingly difficult to identify counterfeit products. We refund the cost of a product to a buyer if the buyer questions its authenticity and returns the item. The sale of any counterfeit goods may damage our reputation as a trusted online marketplace for authenticated, pre-owned luxury goods which may impact our ability to attract and maintain repeat consignors and buyers. Additionally, we may be subject to allegations that a pre-owned luxury item we sold is not authentic despite our authentication of such item. Such controversy could negatively impact our reputation and brand and harm our business and operating results.

***We may not succeed in promoting and sustaining our brand, which could have an adverse effect on our business and future growth.***

We believe that maintaining The RealReal brand is critical to driving consignor and buyer engagement. An important goal of our brand promotion strategy is establishing trust with our consignors and buyers. Maintaining our brand will depend largely on our ability to continue providing our consignors with service that is consistent with the level of luxury associated with the goods they are consigning and delivering value for the goods they consign, all in a timely and consistent manner. Our success depends in part on the quality of our sales professionals who represent our brand to new and existing consignors. Sales professionals cultivate relationships with our consignor base by making in-home visits to evaluate the luxury goods that our consignors want to consign. While we require that all sales professionals undergo a background check, this may not prevent illegal, improper or otherwise inappropriate actions by such employees, such as theft or physical assault, from occurring in connection with our services. Any negative publicity related to the foregoing could adversely affect our reputation and brand or public perception of our model of luxury consignment, which could negatively affect demand for our services and harm our business, financial condition and operating results.

For buyers, maintaining our brand requires that we foster trust through authentication, timely and reliable fulfillment of orders, and responsive and effective customer service. If we fail to provide consignors or buyers with the service and experience they expect, or experience consignor or buyer complaints or negative publicity about our online marketplace services, merchandise, delivery times or customer support, whether justified or not, the value of our brand would be harmed and our business may suffer.

***Our continued growth depends on attracting new and retaining repeat buyers.***

To expand our buyer base, we must appeal to and attract buyers who do not typically purchase luxury goods, who have historically purchased only new luxury goods or who used other means to purchase pre-owned luxury goods, such as traditional brick-and-mortar consignment shops, auction houses and the websites of other secondary marketplaces. We reach new buyers through television and digital advertising, other paid marketing, press coverage, referral programs, organic word of mouth and other methods of discovery, such as converting consignors to buyers. We expect to continue investing heavily in these and other marketing channels in the future and cannot be certain that these efforts will yield more buyers or be cost-effective. Moreover, new buyers may not purchase through our online marketplace as frequently or spend as much with us as historically has been the case with existing buyers. As a result, the revenue generated from new buyer transactions may not be as high as the revenue generated from transactions with our existing buyers. Failure to attract new buyers and to maintain relationships with existing buyers would adversely affect our operating results and our ability to attract and retain consignors.

36

***We are currently, and may be in the future, party to lawsuits and other claims that are expensive and time consuming, could lead to adverse publicity, and, if resolved adversely, could have a significant impact on our business, financial condition or operating results.***

We rely on the fair use doctrine when we routinely refer to third-party intellectual property, such as trademarks, on our platform. Third parties may dispute the scope of that doctrine and challenge our ability to reference their intellectual property in the course of our business. For instance, from time to time, we are contacted by companies controlling brands of goods consignors sell, demanding that we cease referencing those brands in connection with such sales, whether in advertising or on our website. We have consistently responded by reference to the holding in *Tiffany (NY), Inc. v. eBay* that factual use of a brand to describe and sell a used good is not false advertising. These matters have generally been resolved with no further communications, but some have resulted in litigation against us. For example, in November 2018, Chanel filed a lawsuit against us in the U.S. District Court for the Southern District of New York bringing various trademark and advertising-related claims under the Lanham Act and New York state law analogues. Chanel alleges, among other things, that we have misrepresented certain counterfeit Chanel products as authentic Chanel products, that our resale of Chanel products confuses consumers into believing that Chanel is affiliated with us and involved in authenticating consignors' goods and that only Chanel is capable of authenticating second-hand Chanel goods. This litigation is in its early stages and the final outcome, including our liability, if any, with respect to Chanel's claims, is uncertain. Chanel could in the future assert additional trademark and advertising or other claims against us in this or other proceedings. An unfavorable outcome in this or similar litigation could adversely affect our business and could lead to other similar lawsuits.

We are also at risk of claims by others that we have infringed their copyrights, trademarks or patents or improperly used or disclosed their trade secrets. In particular, third parties may allege that goods consigned to us are counterfeit or that by offering goods of a particular brand we are suggesting that we are sponsored by or affiliated with that brand. The costs of resolving any litigation or disputes related to these claims can be considerable, and we cannot assure you that we will achieve a favorable outcome of any such claim.

In addition, we have in the past and could face in the future a variety of employee claims against us, including but not limited to general discrimination, privacy, wage and hour, labor and employment, ERISA and disability claims. Any claims could also result in litigation against us or regulatory proceedings being brought against us by various federal and state agencies that regulate our business, including the U.S. Equal Employment Opportunity Commission. Often these cases raise complex factual and legal issues and create risks and uncertainties.

Defending litigation is costly and can impose a significant burden on management and employees, and there can be no assurances that favorable final outcomes will be obtained. The results of any such litigation, investigations and other legal proceedings are inherently unpredictable and expensive. In addition, plaintiffs may seek, and we may become subject to, preliminary or provisional rulings in the course of any such litigation, including potential preliminary injunctions requiring us to cease some or all of our operations. We may decide to settle such lawsuits and disputes on terms that are unfavorable to us. Similarly, if any litigation to which we are a party is resolved adversely, we may be subject to an unfavorable judgment that may not be reversed upon appeal. The terms of such a settlement or judgment may require us to cease some or all of our operations or pay substantial amounts to the other party. In addition, we may have to seek a license to continue practices found to be in violation of a third-party's rights, which may not be available on reasonable terms or at all, and may significantly increase our operating costs and expenses. As a result, we may also be required to develop alternative practices or discontinue the practices. The development of alternative practices could require significant effort and expense or may not be feasible. Our business, financial condition or operating results could be adversely affected as a result of an unfavorable resolution of the disputes and litigation referred to above.

***If we are unable to successfully leverage technology to automate and drive efficiencies in our operations, our business could be adversely affected.***

We are building automation, machine learning and other capabilities to drive efficiencies in our merchandising and fulfillment operations. As we continue to add capacity, capabilities and automation, our operations will become increasingly complex and challenging. While we expect these technologies to improve productivity in many of our merchandising operations, including pricing, copywriting, authentication, photography and photo retouching, any flaws or failures of such technologies could cause interruptions in and delays to our operations which may harm our business. We are increasing our investment in technology to support these efforts but they may not be effective in driving productivity, maintaining or improving the experience for buyers and consignors or providing a positive return on investment. We have created our own purpose-built technology to operate our business, but we also rely on technology from third parties. If these technologies do not perform in accordance with our expectations, third parties change the terms and conditions that govern their relationships with us, or if competition increases for the technology and services provided by third parties, our business may be harmed. In addition, if we are unable to add automation to our operations, we may be unable to reduce the costs of processing consignments and fulfilling orders, which could cause delays in buyers receiving their purchases. Any of these outcomes could harm our reputation and our relationships with our consignors and buyers.

37

***Our advertising activity may fail to efficiently drive growth in consignors and buyers.***

Our future growth and profitability will depend in large part upon the effectiveness and efficiency of our advertising, promotion, public relations and marketing programs and we are investing heavily in these activities. These brand promotion activities may not yield increased revenue and the efficacy of these activities will depend on a number of factors, including our ability to do the following:

- determine the effective creative message and media mix for advertising, marketing and promotional expenditures;

- select the right markets, media and specific media vehicles in which to advertise;

- identify the most effective and efficient level of spending in each market, media and specific media vehicle; and

- effectively manage marketing costs, including creative and media expenses, to maintain acceptable consignor and buyer acquisition costs.

We closely monitor the effectiveness of our advertising campaigns and changes in the advertising market, and adjust or re-allocate our advertising spend across channels, customer segments and geographic markets in real-time to optimize the effectiveness of these activities. We expect to increase advertising spend in future periods to continue driving our growth. Increases in the pricing of one or more of our marketing and advertising channels could increase our marketing and advertising expenses or cause us to choose less expensive but possibly less effective marketing and advertising channels. If we implement new marketing and advertising strategies, we may incur significantly higher costs than our current channels, which, in turn, could adversely affect our operating results.

Implementing new marketing and advertising strategies also could increase the risk of devoting significant capital and other resources to endeavors that do not prove to be cost effective. We also may incur marketing and advertising expenses significantly in advance of the time we anticipate recognizing revenue associated with such expenses and our marketing and advertising expenditures may not generate sufficient levels of brand awareness or result in increased revenue. Even if our marketing and advertising expenses result in increased sales, the increase might not offset our related expenditures. If we are unable to maintain our marketing and advertising channels on cost-effective terms or replace or supplement existing marketing and advertising channels with similarly or more effective channels, our marketing and advertising expenses could increase substantially, our consignor and buyer base could be adversely affected, and our business, operating results, financial condition and brand could suffer.

***We may experience damage or destruction to our merchandising and fulfillment facilities or retail stores in which we store all of the consigned luxury goods we offer through our online marketplace which may materially adversely impact our business and operating results.***

We store the majority of the luxury goods we offer through our online marketplace in our merchandising and fulfillment facilities in California and New Jersey, with a small portion of luxury goods offered for sale in our three retail stores. Our merchandising and fulfillment facilities are located in areas that have a history of natural disasters, such as earthquakes and severe weather events, rendering our merchandising and fulfillment facilities vulnerable to damage. Any large scale damage to or catastrophic loss of goods stored in such merchandising and fulfillment facilities or retail stores, due to natural disasters or man-made disasters such as arson or theft or otherwise would result in liability to our consignors for the expected commission liability for the lost items, reduction in the value of our inventory and a significant disruption to our business. Additionally, given the nature of the unique consigned luxury goods we offer on our online marketplace, our ability to restore the supply of consigned luxury goods on our online marketplace would take time and would result in a limitation and delay of available supply for buyers which would negatively impact our revenue and operating results. While we carry insurance for the consigned luxury goods stored in these merchandising and fulfillment facilities, the number of carriers which provide for such insurance has declined, which has resulted in increased premiums and deductibles. The insurance we do carry may not continue to be available on commercially reasonable terms and, in any event, may not be adequate to cover all possible losses that our business could suffer. In the event that we suffer a catastrophic loss of any or all of our merchandising and fulfillment facilities and the consigned luxury goods stored in such facilities, our liabilities may exceed the maximum insurance coverage amount which would materially adversely impact our business and operating results.

38

*We have experienced seasonal and quarterly variations in our revenue and operating results and, as a result, our quarterly results may fluctuate and could be below expectations.*

Our business is seasonal and historically we have realized a disproportionate amount of our revenue and earnings for the year in the fourth quarter as a result of the holiday season and seasonal promotions. We expect this to continue in the future. In anticipation of increased activity during the fourth quarter, we incur significant additional expenses, including additional marketing and staffing in our sales and customer support operations. In addition, we may experience an increase in our shipping costs due to complimentary upgrades, split-shipments and additional long-zone shipments necessary to ensure timely delivery for the holiday season. At peak periods, there could also be further delays in processing consigned goods or fulfilling buyer orders, which could lead to lower consignor and/or buyer satisfaction. As a result of increased expenses or delays in shipping, if we experience lower than expected revenue during any fourth quarter, it may have a disproportionately large impact on our operating results and financial condition for that year. Any factors that harm our fourth quarter operating results, including disruptions in our consignors' willingness to consign or unfavorable economic conditions, or adverse weather could have a disproportionate effect on our operating results for our entire fiscal year. In the future, our seasonal sales patterns may become more pronounced, may strain our personnel and may cause a shortfall in revenue related to expenses in a given period, which could substantially harm our business, operating results and financial condition.

*Our industry is highly competitive and if we do not compete effectively our operating results could be adversely affected.*

The resale market for luxury goods is highly competitive. We compete with vendors of new and pre-owned luxury goods, including branded luxury goods stores, department stores, traditional brick-and-mortar consignment stores, pawn shops, auction houses, specialty retailers, discount chains, independent retail stores, the online offerings of these traditional retail competitors, resale players focused on niche or single categories, as well as technology-enabled marketplaces that may offer the same or similar luxury goods and services that we offer. We believe our ability to compete depends on many factors within and beyond our control, including:

- engaging and enhancing our relationships with existing consignors and buyers and attracting new consignors and buyers;

- further developing our data science capabilities;

- maintaining favorable brand recognition and effectively delivering our online marketplace to consignors and buyers;

- identifying and delivering authentic luxury goods;

- maintaining and increasing the amount, diversity and quality of brands and luxury goods that we or our competitors offer;

- our ability to expand the categories of luxury goods our consignors consign and sell;

- the price at which consigned, authenticated luxury goods through our online marketplace are offered;

- the speed and cost at which we can authenticate and make available consigned luxury goods and deliver purchased goods to our buyers; and

- the ease with which our consignors and buyers can consign, purchase and return goods.

Failure to adequately meet these demands may cause us to lose potential consignors and buyers which could harm our business.

Many of our competitors have longer operating histories, larger fulfillment infrastructures, greater brand recognition and technical capabilities, faster shipping times, lower-cost shipping, larger databases, greater financial, marketing, institutional and other resources and larger buyer bases than we do. As the market evolves, competitors may emerge. For example, Farfetch Ltd recently announced the launch of a new consignment service. Some of our competitors may have greater resources than we do, which may allow them to derive greater revenue and profits from their existing buyer bases, acquire consignors at lower costs or respond more quickly than we can to new or emerging technologies and changes in consumer shopping behavior. These competitors may engage in more extensive research and development efforts, enter the business of online luxury consignment, undertake more far-reaching marketing campaigns and adopt more aggressive pricing policies, which may allow them to build larger consignor or buyer bases or generate revenue from their existing buyer bases more effectively than we do. If we fail to compete effectively, our business and operating results may be adversely affected.

39

***We rely on third parties to host our website and mobile app and to process payments made by buyers or to consignors on our online marketplace. Any significant disruption in service provided by, or termination of our relationship with, such third parties could damage our reputation and result in loss of buyers and consignors, which would harm our business and results of operations.***

Our brand and ability to attract and retain consignors and buyers depends in part on the reliable performance of our network infrastructure and content delivery process. We have experienced, and expect that in the future we will experience, interruptions, delays and outages in service and availability from time to time due to a variety of factors, including infrastructure changes, human or software errors, website hosting disruptions and capacity constraints which could affect the availability of services on our platform and prevent or inhibit the ability of buyers to access our online marketplace or complete purchases on our website and app. We currently host our platform and support our operations using Amazon Web Services ("AWS"). We do not have control over the operations of the facilities of AWS that we use. AWS' facilities are vulnerable to damage or interruption from natural disasters, cybersecurity attacks, terrorist attacks, power outages and similar events or acts of misconduct. The continuing and uninterrupted performance of our online marketplace is critical to our success. Volume of traffic and activity on our online marketplace spikes on certain days and during certain periods of the year, such as during a Black Friday promotion and generally during the fourth quarter due to the seasonality of our business, and any interruption would be particularly problematic if it were to occur at such a high volume time. We also use Google services for our business emails, file storage and communications. Any disruption or failure in the services we receive from Google could harm our ability to run our business.

We rely on third-party payment processors to process payments made by buyers or to consignors on our online marketplace. If our third-party payment processors terminate their relationships with us or refuse to renew their agreements with us on commercially reasonable terms, we would need to find an alternate payment processor and may not be able to secure similar terms or replace such payment processors in an acceptable timeframe. Further, the software and services provided by our third-party payment processors may not meet our expectations, contain errors or vulnerabilities, be compromised or experience outages. Any of these risks could cause us to lose our ability to accept online payments, make payments to consignors or conduct other payment transactions, any of which could make our platform less convenient and attractive and adversely affect our ability to attract and retain buyers and consignors.

***We must successfully gauge and respond to changing preferences among our consignors and buyers.***

Our success is in large part dependent upon our ability to anticipate and identify trends in the market for pre-owned luxury goods in a timely manner and to obtain consignments of luxury goods that address those trends. We use data science to predict consignor and buyer preferences, and there can be no assurance that our data science will accurately anticipate consignor or buyer requirements. Lead times relating to these changing preferences may make it difficult for us to respond rapidly to new or changing trends. We have begun to expand our offerings and the impact on our business from these new offerings is not clear as it is difficult to accurately predict consignor and buyer preferences. To the extent we do not accurately predict the evolving preferences of our consignors and buyers, our ability to grow our business and our operating results would be adversely affected.

***Failure to comply with applicable laws or regulations, including those relating to the sale of secondhand goods, may subject us to fines, penalties, loss of licensure, registration and approval or other governmental enforcement action.***

The sale of consigned goods through our online marketplace is subject to regulation, including by regulatory bodies such as the U.S. Consumer Product Safety Commission, the Federal Trade Commission, the U.S. Fish and Wildlife Service and other international, federal, state and local governments and regulatory authorities. These laws and regulations are complex, vary from state to state and change often. We monitor these laws and regulations and adjust our business practices as warranted to comply. We receive luxury goods on consignment from numerous consignors located in all 50 U.S. states and Puerto Rico, and the goods we receive from our consignors may contain materials such as fur, python, ivory and other exotic animal product components, that are subject to regulation. Our standard consignor terms and conditions require consignors to comply with applicable laws when consigning their goods. Failure of our consignors to comply with applicable laws, regulations and contractual requirements could lead to litigation or other claims against us, resulting in increased legal expenses and costs. Moreover, failure by us to effectively monitor the application of these laws and regulations to our business, and to comply with such laws and regulations, may negatively affect our brand and subject us to penalties and fines.

Numerous U.S. states and municipalities, including the States of California and New York, have regulations regarding the handling of secondhand goods and licensing requirements of secondhand dealers. Such government regulations could require us to change the way we conduct business, or our buyers conduct their purchases in ways that increase costs or reduce revenues, such as prohibiting or otherwise restricting the sale or shipment of certain items in some locations. We could also be subject to fines or other penalties which in the aggregate could harm our business.

40

Additionally, the luxury goods our consignors sell could be subject to recalls and other remedial actions and product safety, labeling and licensing concerns may require us to voluntarily remove selected goods from our online marketplace. Such recalls or voluntary removal of goods can result in, among other things, lost sales, diverted resources, potential harm to our reputation and increased customer service costs and legal expenses, which could have a material adverse effect on our operating results.

Some of the luxury goods sold through our online marketplace on behalf of our consignors may expose us to product liability claims and litigation or regulatory action relating to personal injury, environmental or property damage. We cannot be certain that our insurance coverage will be adequate for liabilities actually incurred or that insurance will continue to be available to us on economically reasonable terms or at all. In addition, while all of our vendor agreements contain a standard indemnification provision, certain vendors may not have sufficient resources or insurance to satisfy their indemnity and defense obligations which may harm our business.

***We rely on third parties to drive traffic to our website, and these providers may change their algorithms or pricing in ways that could negatively impact our business, operations, financial condition and prospects.***

We rely in part on digital advertising, including search engine marketing, to promote awareness of our online marketplace, grow our business, attract new consignors and buyers and increase engagement with existing consignors and buyers. In particular, we rely on search engines, such as Google, and the major mobile app stores as important marketing channels. Search engine companies change their search algorithms periodically, and our ranking in searches may be adversely impacted by those changes. Search engine companies or app stores may also determine that we are not in compliance with their guidelines and penalize us as a result. If search engines change their algorithms, terms of service, display or the featuring of search results, determine we are out of compliance with their terms of service or if competition increases for advertisements, we may be unable to cost-effectively add consignors and buyers to our website and apps. Our relationships with our marketing vendors are not long term in nature and do not require any specific performance commitments. In addition, many of our online advertising vendors provide advertising services to other companies, including companies with whom we may compete. As competition for online advertising has increased, the cost for some of these services has also increased. Our marketing initiatives may become increasingly expensive and generating a return on those initiatives may be difficult. Even if we successfully increase revenue as a result of our paid marketing efforts, such increase may not offset the additional marketing expenses we incur.

***Greater than expected product returns could have a negative impact on our revenue.***

We allow buyers to return certain purchases from our website and retail stores under our return policy. We record a reserve for returns against proceeds to us from the sale of goods on our online marketplace in calculating revenue. We estimate this reserve based on historical return trends. The introduction of new products in the retail market, changes in consumer confidence or other competitive and general economic conditions may also cause actual returns to exceed our reserve for returns. We believe adverse economic conditions in the past have resulted in an increase in our returns, and we have also experienced higher than expected returns in connection with fourth quarter holiday buying. Additionally, most of the consigned luxury goods are valuable and require special handling and delivery. From time to time, such goods are damaged in transit which can increase return rates, increase our costs and harm our brand. Returned goods may also be damaged in transit as part of the return process which can significantly impact the price we are able to charge for such goods on our online marketplace. Any significant increase in returns that exceeds our reserves could adversely affect our revenue and operating results.

***Compromises of our data security could cause us to incur unexpected expenses and may materially harm our reputation and operating results.***

In the ordinary course of our business, we collect, process and store certain personal information and other data relating to individuals, such as our consignors, buyers and employees. We also maintain other information, such as our trade secrets and confidential business information, that is sensitive and that we seek to protect. We rely substantially on commercially available systems, software, tools and monitoring to provide security for our processing, transmission and storage of personal information and other confidential information. We or our vendors could be the subject of hacking, social engineering, phishing attacks or other attacks. We have faced these attacks previously. Due to these or other causes, we or our vendors may suffer a data breach or other security incident, which may allow hackers or other unauthorized parties to gain access to personal information or other data, including payment card data or confidential business information, and we might not discover such issues for an extended period. The techniques used to obtain unauthorized access or to sabotage systems change frequently and generally are not identified until they are launched against a target. As a result, we and our vendors may be unable to anticipate these techniques or to implement adequate preventative measures. In addition, our employees, contractors, vendors or other third parties with whom we do business may attempt to circumvent security measures in order to misappropriate such personal information, confidential information or other data, or may inadvertently release or compromise such data. We expect to incur ongoing costs associated with the detection and prevention of security breaches and other security-related incidents. We may incur additional costs in the event of a security breach or other security-related incident. Any actual or perceived compromise of our systems or data security measures or those of third parties with whom we do business, or any failure to prevent or mitigate the loss of personal or other confidential information and delays in detecting or providing notice of any such compromise or loss could disrupt our operations, harm the perception of our security measures, damage our reputation, cause some participants to decrease or stop their use of our online marketplace and subject us to litigation, government action, increased transaction fees, regulatory fines or penalties or other additional costs and liabilities that could adversely affect our business, financial condition and operating results.

41

We cannot be certain that our insurance coverage will be adequate for data handling or data security liabilities, that insurance will continue to be available to us on economically reasonable terms, or at all, or that any insurer will not deny coverage as to any future claim. The successful assertion of one or more large claims against us that exceed available insurance coverage or the occurrence of changes in our insurance policies, including premium increases or the imposition of large deductible or co-insurance requirements, could have a material and adverse effect on our business, including our financial condition, operating results and reputation.

***Our use and other processing of personal information and other data is subject to laws and obligations relating to privacy and data protection, and our failure to comply with such laws and obligations could harm our business.***

Numerous state, federal and international laws, rules and regulations govern privacy, data protection and the collection, use and protection of personal information and other types of data we collect, use, disclose and otherwise process. These laws, rules and regulations are constantly evolving, and we expect that there will continue to be new proposed laws, regulations and industry standards concerning privacy, data protection and information security in the United States, the EU and other jurisdictions. For example, California enacted legislation in June 2018, the California Consumer Privacy Act (the "CCPA") that will, among other things, require covered companies to provide new disclosures to California consumers and afford such consumers new abilities to opt-out of certain sales of personal information, when it goes into effect on January 1, 2020. The CCPA was amended in September 2018, and it is possible that it will be amended again before it goes into effect. It remains unclear what, if any, modifications will be made to the CCPA or how it will be interpreted. The CCPA may require us to modify our data processing practices and policies and to incur substantial costs and expenses in an effort to comply. Similarly, the European Commission adopted a General Data Protection Regulation (the "GDPR") that became fully effective on May 25, 2018, imposing stringent EU data protection requirements.

We cannot yet fully determine the impact these or future laws, rules and regulations may have on our business or operations. These laws, rules and regulations may be inconsistent from one jurisdiction to another, subject to differing interpretations and may be interpreted to conflict with our practices. Additionally, we may be bound by contractual requirements applicable to our collection, use, processing and disclosure of various types of data, including personal information, and may be bound by, or voluntarily comply with, self-regulatory or other industry standards relating to these matters.

Any failure or perceived failure by us or any third parties with which we do business to comply with these laws, rules and regulations, or with other obligations to which we or such third parties are or may become subject, may result in actions against us by governmental entities, private claims and litigation, the expenditure of legal and other costs and of substantial time and resources, and fines, penalties or other liabilities. Any such action would be expensive to defend, may require the expenditure of substantial legal and other costs and substantial time and resources and likely would damage our reputation and adversely affect our business and operating results.

Further, in view of new or modified federal, state or foreign laws and regulations, industry standards, contractual obligations and other legal obligations, or any changes in their interpretation, we may find it necessary or desirable to fundamentally change our business activities and practices or to expend significant resources to modify our product and otherwise adapt to these changes. We may be unable to make such changes and modifications in a commercially reasonable manner or at all, and our ability to develop new products and features could be limited. Privacy, data protection and information security concerns, whether valid or not valid, may inhibit the use and growth of our online marketplace, particularly in certain foreign countries.

***If we fail to attract and retain key personnel on our executive team or to effectively manage leadership succession, our business, financial condition and operating results could be adversely impacted.***

Our success depends in part on our ability to attract and retain key personnel on our executive team. Senior employees have left our company in the past and others may in the future. We often cannot anticipate such departures, and may not be able to promptly replace key leadership personnel. The loss of one or more of our key personnel or the inability to promptly identify a suitable successor to a key role could have an adverse effect on our business. In particular, our Founder and Chief Executive Officer, Julie Wainwright, has unique and valuable experience from creating and leading our company from its inception through today. If she were to depart or otherwise reduce her focus on The RealReal, our business may be disrupted.

***Labor-related matters, including labor disputes, may adversely affect our operations.***

None of our employees are currently represented by a union. If our employees decide to form or affiliate with a union, we cannot predict the negative effects such future organizational activities will have on our business and operations. If we were to become subject to work stoppages, we could experience disruption in our operations, including delays in merchandising operations and shipping, and increases in our labor costs which could materially adversely affect our business, financial condition or results of operations.

42

*Expansion of our operations internationally will require management attention and resources, involves additional risks and may be unsuccessful.*

We have members from outside the United States who purchase items from our online marketplace, but we have not expanded our physical operations outside the United States. If we choose to expand our physical operations internationally, we would need to adapt to different local cultures, languages, standards, laws and regulations and policies. The online marketplace consignment business model we employ may not appeal to consignors and buyers outside of the United States. Furthermore, to succeed with clients in international locations, it will be necessary to locate merchandising and fulfillment facilities in foreign markets and hire local employees in those markets, and we may have to invest in such facilities before demonstrating that we can successfully run operations outside of the United States. We may not be successful in expanding into international markets or in generating revenue from foreign operations for a variety of reasons, including:

- our failure to localize our luxury consignment business model, including translation into foreign languages and adaptation for local cultures and customs;

- different buyer demand dynamics, which may make our model and the merchandise we offer less successful compared to the United States;

- competition from local firms that understand the local market and may operate more effectively;

- regulatory requirements, taxes, trade laws, trade sanctions and economic embargoes, tariffs, export quotas, import laws and regulations, custom duties, shipping of pre-owned goods from or into the U.S. or other trade restrictions or any unexpected changes thereto;

- differing labor regulations where labor laws may be more advantageous to employees as compared to the United States and increased labor costs;

- more stringent regulations relating to privacy and data security and access to, or use of, commercial and personal information, particularly in Europe;

- changes in a specific country's or region's political or economic conditions; and

- risks resulting from changes in currency exchange rates.

If we invest substantial time and resources to establish and expand our operations internationally and are unable to do so successfully and in a timely manner, our operating results would suffer.

*Our inability to replicate our business model for newer categories of consigned luxury goods in a timely and cost-effective manner may damage our business, financial condition and operating results.*

Our women's category accounted for approximately 67% of our GMV in 2018. We intend to deepen our penetration in other high-value categories such as men's, jewelry and watches, and home and art. We continue to explore additional categories of luxury goods to serve our existing consignors and buyers and to attract new consignors and buyers. These additional category offerings may not have the same success, or gain traction with consignors and buyers as quickly, as our women's offerings. If these additional categories of pre-owned luxury goods are not accepted by our existing consignors or buyers, or if such categories do not attract new consignors or buyers, our revenues may fall short of expectations, our brand and reputation could be adversely affected and we may incur expenses that are not offset by revenues. In addition, our business may be adversely affected if we are unable to attract new and repeat consignors that supply the necessary high-quality, appropriately priced and in-demand luxury merchandise in these additional categories, and these categories of goods may also have a different range of margin profiles than the goods currently sold through our online marketplace. Additionally, as we enter into new categories, potential consignors may demand higher commissions than our current categories, which would adversely affect our take rate and operating results. Expansion of our offerings may also strain our management and operational resources, specifically the need to hire and manage additional authentication and market experts. We may also face greater competition in specific categories from companies that are more focused on these categories. If any of these were to occur, it could damage our reputation, limit our growth and have an adverse effect on our operating results.

*Our business, including our costs and supply of consigned goods, is subject to risks associated with sourcing, processing, warehousing and shipping.*

Nearly all of the luxury goods we offer through our online marketplace are initially sourced from consignors who are individuals. As a result, we may be subject to periodic fluctuations in the number, brands and quality of goods sold through our online marketplace on behalf of our consignors. Our operating results could be negatively impacted by these fluctuations. In addition, as we expand into new categories of luxury goods, our payments to our consignors may rise relative to our existing categories, which could adversely affect our operating results.

We can make no assurance that goods we receive from consignors will be of sufficient quality or free from damage, or that such goods will not be damaged during shipping, while stored in one of our merchandising and fulfillment facilities or when shipped to buyers. While we take measures to avoid damage, conduct inspections of consigned goods and inspect returned products, we cannot control items while they are out of our possession or prevent all damage while in our merchandising and fulfillment facilities. For example, we have in the past and may in the future experience contamination, such as mold, bacteria, insects and other pests, in the goods shipped to us by our consignors, which may cause contamination of the goods stored in our merchandising and fulfillment facilities or while shipping to buyers. If we are unable to detect and quarantine such contaminants at the time such goods are initially received in our merchandising and fulfillment facilities, some or all of the goods stored in such facilities could be contaminated. We may incur additional expenses and our reputation could be harmed if clients and potential clients believe that the luxury goods we offer on behalf of our consignors is not of high-quality or may be damaged or contain contaminants.

### *We could be liable for fraudulent or unlawful activities of consignors.*

We may fail to prevent consignors from consigning stolen goods. Government regulators and law enforcement officials may allege that our services violate, or aid and abet violations of certain laws, including laws restricting or prohibiting the transferability and, by extension, the resale, of stolen goods. Our form of consignor agreement includes a representation that the consignor has the necessary right and title to the goods they may consign, and we include such a rule and requirement in our terms of service prohibiting the listing of stolen or otherwise illegal products. In addition, we have implemented other protective measures to detect such products. If these measures prove inadequate, we may be required to spend substantial resources to take additional protective measures which could negatively impact our operations. Any costs incurred as a result of potential liability relating to the alleged or actual sale of stolen goods could harm our business. In addition, negative publicity relating to the actual or perceived listing or sale of stolen goods using our services could damage our reputation, and make our consignors and buyers reluctant to use our services. To the extent any of this occurs, it could harm our business or damage our reputation and we could face liability for such unlawful activities. Despite measures taken by us to detect stolen goods, to cooperate fully with law enforcement, and to respond to inquiries regarding potentially stolen goods, any resulting claims or liabilities could harm our business.

### *Shipping is a critical part of our business and any changes in our shipping arrangements or any interruptions in shipping could adversely affect our operating results.*

We currently rely on major vendors for our shipping. If we are not able to negotiate acceptable pricing and other terms with these vendors or they experience performance problems or other difficulties, it could negatively impact our operating results and our consignors' and buyers' experience. In addition, our ability to receive inbound consignments efficiently and ship luxury goods to buyers may be negatively affected by inclement weather, fire, flood, power loss, earthquakes, labor disputes, acts of war or terrorism and similar factors. Because of the seasonality of our business, we tend to ship more goods in the fourth quarter than any other quarter. Disruption to delivery services due to winter weather in the fourth quarter could result in delays that could adversely affect our reputation or operational results. If our goods are not delivered in a timely fashion or are damaged or lost during the consignment or the delivery process, our consignors or buyers could become dissatisfied and cease using our services, which would adversely affect our business and operating results.

### *We may incur significant losses from fraud.*

We have in the past incurred and may in the future incur losses from various types of fraudulent transactions, including the use of stolen credit card numbers, claims that a consignment of a good was not authorized and that a buyer did not authorize a purchase. In addition to the direct costs of such losses, if the fraud is related to credit card transactions and becomes excessive, it could result in us paying higher fees or losing the right to accept credit cards for payment. Under current credit card practices, we are liable for fraudulent credit card transactions because we do not obtain a cardholder's signature. Our failure to adequately prevent fraudulent transactions could damage our reputation, result in litigation or regulatory action or lead to expenses that could substantially impact our operating results.

### *Use of social media, emails and text messages may adversely impact our reputation or subject us to fines or other penalties.*

We use social media, emails, push notifications and text messages as part of our omni-channel approach to marketing. As laws and regulations evolve to govern the use of these channels, the failure by us, our employees or third parties acting at our direction to comply with applicable laws and regulations in the use of these channels could adversely affect our reputation or subject us to fines or other penalties. In addition, our employees or third parties acting at our direction may knowingly or inadvertently make use of social media in ways that could lead to the loss or infringement of intellectual property, as well as the public disclosure of proprietary, confidential or sensitive personal information of our business, employees, consumers or others. Information concerning us or our consignors and brands, whether accurate or not, may be posted on social media platforms at any time and may have an adverse impact on our brand, reputation or business. The harm may be immediate without affording us an opportunity for redress or correction and could have a material adverse effect on our reputation, business, operating results, financial condition and prospects.

44

*We may not accurately forecast revenue and appropriately plan our expenses.*

We rely on constant replenishment of consigned goods to sustain and grow our revenue, and our revenue in a given period can be difficult to predict. Additionally, our business is affected by general economic and business conditions. A downturn in the United States or global economies may result in decreased consumer disposable income and decreased purchases. We make certain assumptions when planning our expenses based on our expected revenue. These assumptions are partly based on historical results. Because our operating expenses are relatively fixed in the short term, any failure to achieve our revenue expectations would have a direct, adverse effect on our operating results. If actual results differ from our estimates, the trading price of our common stock may be adversely affected.

*If we cannot successfully protect our intellectual property, our business could suffer.*

We rely on a combination of intellectual property rights, contractual protections and other practices to protect our brand, proprietary information, technologies and processes. We primarily rely on copyright and trade secret laws to protect our proprietary technologies and processes, including the algorithms we use throughout our business. Others may independently develop the same or similar technologies and processes, or may improperly acquire and use information about our technologies and processes, which may allow them to provide a service similar to ours, which could harm our competitive position. Our principal trademark assets include the registered trademark "The RealReal" and our logos and taglines. Our trademarks are valuable assets that support our brand and consumers' perception of our services and merchandise. We also hold the rights to the "therealreal.com" Internet domain name and various related domain names, which are subject to Internet regulatory bodies and trademark and other related laws of each applicable jurisdiction. If we are unable to protect our trademarks or domain names, our brand recognition and reputation would suffer, we would incur significant expense establishing new brands and our operating results would be adversely impacted. Further, to the extent we pursue patent protection for our innovations, patents we may apply for may not issue, and patents that do issue or that we acquire may not provide us with any competitive advantages or may be challenged by third parties. There can be no assurance that any patents we obtain will adequately protect our inventions or survive a legal challenge, as the legal standards relating to the validity, enforceability and scope of protection of patent and other intellectual property rights are uncertain. We may be required to spend significant resources to monitor and protect our intellectual property rights, and the efforts we take to protect our proprietary rights may not be sufficient.

*We could be required to pay or collect sales taxes in jurisdictions in which we do not currently do so, with respect to past or future sales. This could adversely affect our business and operating results.*

An increasing number of states have considered or adopted laws that impose tax collection obligations on out-of-state sellers of goods. Additionally, the Supreme Court of the United States recently ruled in *South Dakota v. Wayfair, Inc. et al* ("Wayfair"), that online sellers can be required to collect sales tax despite not having a physical presence in the state of the customer. In response to Wayfair, or otherwise, states or local governments and taxing authorities may adopt, or begin to enforce, laws requiring us to calculate, collect and remit taxes on sales in their jurisdictions. While we collect and remit sales taxes in every state that requires sales taxes to be collected, including states where we do not have a physical presence, the adoption of new laws by, or a successful assertion by the taxing authorities of, one or more state or local governments requiring us to collect taxes where we presently do not do so, or to collect more taxes in a jurisdiction in which we currently do collect some taxes, could result in substantial tax liabilities, including taxes on past sales, as well as penalties and interest. The imposition by state governments and taxing authorities of sales tax collection obligations on out-of-state ecommerce businesses could also create additional administrative burdens for us, put us at a competitive disadvantage if they do not impose similar obligations on our competitors and decrease our future sales, which could have a materially adverse impact on our business and operating results.

*Application of existing tax laws, rules or regulations are subject to interpretation by taxing authorities.*

The application of the income and tax laws is subject to interpretation. Although we believe our tax methodologies are compliant, a taxing authority's final determination in the event of a tax audit could materially differ from our past or current methods for determining and complying with our tax obligations, including the calculation of our tax provisions and accruals, in which case we may be subject to additional tax liabilities, possibly including interest and penalties. Furthermore, taxing authorities have become more aggressive in their interpretation and enforcement of such laws, rules and regulations over time, as governments are increasingly focused on ways to increase revenues. This has contributed to an increase in audit activity and stricter enforcement by taxing authorities. As such, additional taxes or other assessments may be in excess of our current tax reserves or may require us to modify our business practices to reduce our exposure to additional taxes going forward, any of which may have a material adverse effect on our business, results of operations, financial condition and prospects.

*Amendments to existing tax laws, rules or regulations or enactment of new unfavorable tax laws, rules or regulations could have an adverse effect on our business and operating results.*

Many of the underlying laws, rules and regulations imposing taxes and other obligations were established before the growth of the Internet and ecommerce. U.S. federal, state and local taxing authorities are currently reviewing the appropriate treatment of companies engaged in Internet commerce and considering changes to existing tax or other laws that could levy sales, income, consumption, use or other taxes relating to our activities, and/or impose obligations on us to collect such taxes. If such tax or other laws, rules or regulations are amended, or if new unfavorable laws, rules or regulations are enacted, the results could increase our tax payments or other obligations, prospectively or retrospectively, subject us to interest and penalties, decrease the demand for our services if we pass on such costs to our buyers or consignors, result in increased costs to update or expand our technical or administrative infrastructure or effectively limit the scope of our business activities if we decided not to conduct business in particular jurisdictions. As a result, these changes may have a material adverse effect on our business, results of operations, financial condition and prospects.

Recently enacted legislation commonly referred to as the Tax Cuts and Jobs Act of 2017 made a number of significant changes to the current U.S. federal income tax rules, including reducing the generally applicable corporate tax rate from 35% to 21%, imposing additional limitations on the deductibility of interest, placing limits on the utilization of net operating losses and making substantial changes to the international tax rules. Many of the provisions of the Tax Cuts and Jobs Act still require guidance through the issuance and/or finalization of regulations by the U.S. Department of the Treasury in order to fully assess their effect, and there may be substantial delays before such regulations are promulgated and/or finalized, increasing the uncertainty as to the ultimate effect of the Tax Cuts and Jobs Act on us and our stockholders. There also may be technical corrections legislation or other legislative changes proposed with respect to the Tax Cuts and Jobs Act, the effect of which cannot be predicted and may be adverse to us or our stockholders.

*Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited.*

We have incurred substantial net operating losses ("NOLs"), during our history. Unused NOLs may carry forward to offset future taxable income if we achieve profitability in the future, unless such NOLs expire under applicable tax laws. However, under the rules of Sections 382 and 383 of the Internal Revenue Code of 1986, as amended (the "Code"), if a corporation undergoes an "ownership change," generally defined as a greater than 50% change (by value) in its equity ownership over a three-year period, the corporation's ability to use its NOLs and other pre-change tax attributes to offset its post-change taxable income or taxes may be limited. The applicable rules generally operate by focusing on changes in ownership among stockholders considered by the rules as owning, directly or indirectly, 5% or more of the stock of a company, as well as changes in ownership arising from new issuances of stock by the company. To date, we have not undertaken an analysis of whether we have experienced a change of control that would limit our ability to use our NOLs. As a result of these rules, in the event that it is determined that we have experienced an ownership change in the past, or if we experience one or more ownership changes as a result of this offering or future transactions in our stock, then we may be limited in our ability to use our NOL carryforwards to offset our future taxable income, if any. In addition, the Tax Cuts and Jobs Act imposes certain limitations on the deduction of NOLs generated in tax years that began on or after January 1, 2018, including a limitation on use of NOLs to offset 80% of taxable income and the disallowance of NOL carryback. Although NOLs generated in tax years before 2018 may still be used to offset future income without limitation, the recent legislation may limit our ability to use our NOLs to offset any future taxable income.

*We may require additional capital to support business growth, and this capital might not be available or may be available only by diluting existing stockholders.*

We intend to continue making investments to support our growth and may require additional funds to support this growth and respond to business challenges, including the need to develop our online marketplace services, expand our categories of pre-owned luxury goods, enhance our operating infrastructure, expand the markets in which we operate and potentially acquire complementary businesses and technologies. Accordingly, we may need to engage in equity or debt financings to secure additional funds. If we raise additional funds through further issuances of equity or convertible debt securities, our existing stockholders could suffer significant dilution, and any new equity securities we issue could have rights, preferences and privileges superior to those of holders of our common stock. Any debt financing secured by us in the future could involve restrictive covenants relating to our capital-raising activities and other financial and operational matters, which may make it more difficult for us to obtain additional capital and to pursue business opportunities. In addition, we may not be able to obtain additional financing on terms favorable to us, if at all. If we are unable to obtain financing on terms satisfactory to us when we require it, our ability to continue to support our business growth and to respond to business challenges could be significantly limited, and our business and prospects could fail or be adversely affected.

46

***Our reported results of operations may be adversely affected by changes in generally accepted accounting principles.***

Generally accepted accounting principles are subject to interpretation by the Financial Accounting Standards Board ("FASB"), the SEC and various bodies formed to promulgate and interpret appropriate accounting principles. A change in these principles or interpretations could have a significant effect on our reported results of operations and could affect the reporting of transactions completed before the announcement of a change. It is difficult to predict the impact of future changes to accounting principles or our accounting policies, any of which could negatively affect our reported results of operations.

***If our internal control over financial reporting or our disclosure controls and procedures are not effective, we may not be able to accurately report our financial results, prevent fraud or file our periodic reports in a timely manner, which may cause investors to lose confidence in our reported financial information and may lead to a decline in our stock price.***

We have been a private company and, as such, we have not been subject to the internal control and financial reporting requirements applicable to a publicly-traded company. We are required to comply with the requirements of Section 404 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), following the later of the date we are deemed to be an "accelerated filer" or a "large accelerated filer," each as defined in the Exchange Act, or the date we are no longer an "emerging growth company," as defined in the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"). Section 404 of the Sarbanes-Oxley Act requires that we maintain effective internal control over financial reporting and disclosure controls and procedures. In particular, we must perform system and process evaluations, document our controls and perform testing of our key controls over financial reporting to allow management and our independent public accounting firm to report on the effectiveness of our internal control over financial reporting. Our testing, or the subsequent testing by our independent public accounting firm, may reveal deficiencies in our internal control over financial reporting that are deemed to be material weaknesses. If we are not able to comply with the requirements of Section 404 in a timely manner, or if we or our accounting firm identify deficiencies in our internal control over financial reporting that are deemed to be material weaknesses, the market price of our stock would likely decline and we could be subject to lawsuits, sanctions or investigations by regulatory authorities, which would require additional financial and management resources.

We may encounter difficulties in the timely and accurate reporting of our financial results, which would impact our ability to provide our investors with information in a timely manner. As a result, our investors could lose confidence in our reported financial information, and our stock price could decline.

**Risks Relating to Ownership of Our Common Stock**

***The market price of our common stock may be volatile or may decline steeply or suddenly regardless of our operating performance and we may not be able to meet investor or analyst expectations. You may not be able to resell your shares at or above the price you paid and may lose all or part of your investment.***

If you purchase shares of our common stock, you may not be able to resell those shares at or above the price you paid. We cannot assure you that the market price of our shares will equal or exceed prices in privately negotiated transactions of our shares that have occurred from time to time before our IPO. The market price of our common stock may fluctuate or decline significantly in response to numerous factors, many of which are beyond our control, including:

- actual or anticipated fluctuations in our consignor or buyer base, the level of consignor and buyer engagement, revenue or other operating results;

- variations between our actual operating results and the expectations of securities analysts, investors and the financial community;

- any forward-looking financial or operating information we may provide to the public or securities analysts, any changes in this information or our failure to meet expectations based on this information;

- actions of securities analysts who initiate or maintain coverage of us, changes in financial estimates by any securities analysts who follow our company or our failure to meet these estimates or the expectations of investors;

- announcements by us or our competitors of significant products or features, technical innovations, acquisitions, strategic partnerships, joint ventures or capital commitments;

- changes in operating performance and stock market valuations of companies in our industry, including our competitors;

- price and volume fluctuations in the overall stock market, including as a result of trends in the economy as a whole;

- lawsuits threatened or filed against us;

- developments in new legislation and pending lawsuits or regulatory actions, including interim or final rulings by judicial or regulatory bodies; and

- other events or factors, including those resulting from war or incidents of terrorism, or responses to these events.

47

In addition, price and volume fluctuations in the stock markets have affected and continue to affect many online marketplace and other technology companies' stock prices. Stock prices often fluctuate in ways unrelated or disproportionate to the companies' operating performance. In the past, stockholders have filed securities class action litigation following periods of market volatility. If we were to become involved in securities litigation, it could subject us to substantial costs, divert resources and the attention of management from our business and seriously harm our business.

Moreover, because of these fluctuations, comparing our operating results on a period-to-period basis may not be meaningful. You should not rely on our past results as an indication of our future performance. This variability and unpredictability could also result in our failing to meet the expectations of industry or financial analysts or investors for any period. If our revenue or operating results fall below the expectations of analysts or investors or below any forecasts we may provide to the market, or if the forecasts we provide to the market are below the expectations of analysts or investors, the price of our common stock could decline substantially. Such a stock price decline could occur even when we have met any previously publicly stated revenue or earnings forecasts that we may provide.

### *Future sales of shares by existing stockholders could cause our stock price to decline.*

If our existing stockholders, including employees and service providers who obtain equity, sell or indicate an intention to sell, substantial amounts of our common stock in the public market after the lock-up and legal restrictions on resale lapse, the trading price of our common stock could decline. Each of our directors, executive officers and other holders of substantially all our outstanding equity securities are subject to lock-up agreements that restrict their ability to sell or transfer their shares for a period of 180 days after the date of the prospectus delivered in connection with our IPO, subject to certain exceptions. However, Credit Suisse Securities (USA) LLC and BofA Securities, Inc. may, in their sole discretion, waive the contractual lock-up before the lock-up agreements expire. Sales of a substantial number of such shares upon expiration of the lock-up and market stand-off agreements, the perception that such sales may occur or early release of these agreements, could cause our market price to fall or make it more difficult for you to sell your common stock at a time and price that you deem appropriate.

### *If securities or industry analysts either do not publish research about us or publish inaccurate or unfavorable research about us, our business or our market, or if they change their recommendations regarding our common stock adversely, the trading price or trading volume of our common stock could decline.*

The trading market for our common stock will be influenced in part by the research and reports that securities or industry analysts may publish about us, our business, our market or our competitors. If one or more analysts initiate research with an unfavorable rating or downgrade our common stock, provide a more favorable recommendation about our competitors or publish inaccurate or unfavorable research about our business, our common stock price would likely decline. If any analyst who may cover us were to cease coverage of us or fail to regularly publish reports on us, we could lose visibility in the financial markets, which in turn could cause the trading price or trading volume of our common stock to decline.

### *We are an emerging growth company, and any decision on our part to comply only with certain reduced reporting and disclosure requirements applicable to emerging growth companies could make our common stock less attractive to investors.*

We are an emerging growth company and, for as long as we continue to be an emerging growth company, we may choose to take advantage of exemptions from various reporting requirements applicable to other public companies but not to "emerging growth companies," including:

- not being required to have our independent registered public accounting firm audit our internal control over financial reporting under Section 404 of the Sarbanes-Oxley Act;

- reduced disclosure obligations regarding executive compensation in our periodic reports and annual report on Form 10-K; and

- exemptions from the requirements of holding non-binding advisory votes on executive compensation and stockholder approval of any golden parachute payments not previously approved.

As a result, our stockholders may not have access to certain information that they may deem important. We could be an emerging growth company for up to five years, although circumstances could cause us to lose that status earlier, including if our total annual gross revenue exceeds $1.07 billion, if we issue more than $1.0 billion in non-convertible debt securities during any three-year period, or if we are a large accelerated filer and the market value of our common stock held by non-affiliates exceeds $700 million as of the end of any second quarter before that time. We cannot predict if investors will find our common stock less attractive if we choose to rely on any of the exemptions afforded emerging growth companies. If some investors find our common stock less attractive because we rely on any of these exemptions, there may be a less active trading market for our common stock and the market price of our common stock may be more volatile.

48

Under the JOBS Act, "emerging growth companies" can also delay adopting new or revised accounting standards until such time as those standards apply to private companies. We elected to use the extended transition period for complying with new or revised accounting standards that have different effective dates for public and private companies until the earlier of the date that we (1) are no longer an emerging growth company or (2) affirmatively and irrevocably opt out of the extended transition period provided in the JOBS Act. As a result, these financial statements may not be comparable to companies that comply with the new or revised accounting pronouncements as of public company effective dates.

### *Future securities issuances could result in significant dilution to our stockholders and impair the market price of our common stock.*

Future issuances of shares of our common stock, or the perception that these sales may occur, could depress the market price of our common stock and result in dilution to existing holders of our common stock. Also, to the extent outstanding options and warrants to purchase our shares of our common stock are exercised or options or other stock-based awards are issued or become vested, there will be further dilution. The amount of dilution could be substantial depending upon the size of the issuances or exercises. Furthermore, we may issue additional equity securities that could have rights senior to those of our common stock. As a result, purchasers of our common stock in this offering bear the risk that future issuances of debt or equity securities may reduce the value of our common stock and further dilute their ownership interest.

### *Operating as a public company requires us to incur substantial costs and management attention.*

As a public company, we incur substantial legal, accounting and other expenses that we did not incur as a private company.  For example, we are subject to the reporting requirements of the Exchange Act, the applicable requirements of the Sarbanes-Oxley Act and the Dodd-Frank Wall Street Reform and Consumer Protection Act, the rules and regulations of the SEC and the listing standards of the Nasdaq Global Select Market.  We are also required to establish and maintain effective disclosure and financial controls and make changes to our corporate governance practices. Compliance with these requirements increases our legal and financial compliance costs and increases demand on our system.

Our management and other personnel divert attention from other business matters to devote substantial time to the reporting and other requirements of being a public company. In particular, we incur significant expense and devote substantial management effort to complying with the requirements of Section 404 of the Sarbanes-Oxley Act. We are in the process of hiring additional accounting and financial staff with appropriate public company experience and technical accounting knowledge.

### *Delaware law and provisions in our certificate of incorporation and bylaws could make a merger, tender offer or proxy contest difficult, thereby depressing the trading price of our common stock.*

Our certificate of incorporation and bylaws contain provisions that could depress the trading price of our common stock by acting to discourage, delay or prevent a change of control of our company or changes in our management that the stockholders of our company may deem advantageous. These provisions include the following:

- establish a classified board of directors so that not all members of our board of directors are elected at one time;

- permit the board of directors to establish the number of directors and fill any vacancies and newly-created directorships;

- provide that directors may only be removed for cause;

- require super-majority voting to amend some provisions in our certificate of incorporation and bylaws;

- authorize the issuance of "blank check" preferred stock that our board of directors could use to implement a stockholder rights plan;

- prohibit stockholders from calling special meetings of stockholders;

- prohibit stockholder action by written consent, which requires all stockholder actions to be taken at a meeting of our stockholders;

- provide that the board of directors is expressly authorized to make, alter or repeal our bylaws;

- restrict the forum for certain litigation against us to Delaware; and

- establish advance notice requirements for nominations for election to our board of directors or for proposing matters that can be acted upon by stockholders at annual stockholder meetings.

Any provision of our certificate of incorporation or bylaws or Delaware law that has the effect of delaying or deterring a change in control could limit the opportunity for our stockholders to receive a premium for their shares of our common stock, and could also affect the price that some investors are willing to pay for our common stock.

***Our certificate of incorporation designates the Court of Chancery of the State of Delaware located within the State of Delaware as the exclusive forum for substantially all disputes between us and our stockholders, which could limit our stockholders' ability to choose the judicial forum for disputes with us or our directors, officers or employees.***

Our certificate of incorporation provides that, unless we consent in writing to the selection of an alternative forum, to the fullest extent permitted by law, the Court of Chancery of the State of Delaware (or, if the Court of Chancery does not have jurisdiction, another state court located within the State of Delaware or, if no court located within the State of Delaware has jurisdiction, the federal district court for the District of Delaware) shall be the sole and exclusive forum for (1) any derivative action or proceeding brought on our behalf under Delaware law, (2) any action asserting a claim of breach of a fiduciary duty owed by any of our directors, officers or other employees to us or our stockholders, (3) any action arising pursuant to any provision of the Delaware General Corporation Law ("DGCL"), our certificate of incorporation or our bylaws, (4) any other action asserting a claim that is governed by the internal affairs doctrine shall be the Court of Chancery of the State of Delaware (or, if the Court of Chancery does not have jurisdiction, the federal district court for the District of Delaware) or (5) any other action asserting an "internal corporate claim," as defined in Section 115 of the DGCL, in all cases subject to the court having jurisdiction over indispensable parties named as defendants. These exclusive-forum provisions do not apply to claims under the Securities Act or the Exchange Act.

Any person or entity purchasing or otherwise acquiring any interest in any of our securities shall be deemed to have notice of and consented to this provision. This exclusive-forum provision may limit a stockholder's ability to bring a claim in a judicial forum of its choosing for disputes with us or our directors, officers or other employees, which may discourage lawsuits against us and our directors, officers and other employees. If a court were to find the exclusive-forum provision in our certificate of incorporation to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving the dispute in other jurisdictions, which could harm our results of operations.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds.**

In March 2019, we sold an aggregate of 10,182,111 shares of our Series H preferred stock to 15 accredited investors at a purchase price of $6.8748 per share, for an aggregate purchase price of $70.0 million.

From January 1, 2019 through July 3, 2019 (the date of the filing of our registration statement on Form S-8), we issued and sold to our directors, officers, employees, consultants and other service providers an aggregate of 1,144,129 shares of common stock upon the exercise of options issued under our 2011 Equity Incentive Plan at a weighted average price of $1.63, for an aggregate exercise price of $1,865,860.

None of the foregoing transactions involved any underwriters, underwriting discounts or commissions, or any public offering. We believe the offers, sales and issuances of the above securities were exempt from registration under the Securities Act (or Regulation D or Regulation S promulgated thereunder) by virtue of Section 4(a)(2) of the Securities Act as transactions by an issuer not involving a public offering, or was in reliance on Rule 701 because the transactions were pursuant to compensatory benefit plans or contracts relating to compensation as provided under such rule. The recipients of the securities in each of these transactions represented their intentions to acquire the securities for investment only and not with a view to or for sale in connection with any distribution thereof, and appropriate legends were placed upon the stock certificates issued in these transactions. All recipients had adequate access, through their relationships with us, to information about us. The sales of these securities were made without any general solicitation or advertising.

*Use of proceeds from our IPO*

On July 2, 2019, we completed our IPO, selling 17,250,000 shares of our common stock at a price of $20.00 per share (including shares subject to the underwriters' over-allotment option) for an aggregate price of $345.0 million. The offer and sale of the shares in the IPO was registered under the Securities Act pursuant to a registration statement on Form S-1 (File No. 333-231891), which was declared effective by the SEC on June 27, 2019. We raised approximately $320.9 million in net proceeds after deducting underwriting discounts and commissions of approximately $24.1 million.

Of the aggregate net proceeds from our IPO, we used $0.3 million to pay a success fee to the lender under our term loan facility and $6.5 million to fully repay our term loans as described in Note 6 of our condensed financial statements included elsewhere in this Quarterly Report on Form 10-Q. We will use $3.2 million to fund The RealReal Foundation, a Delaware non-profit organization formed to engage in charitable activities. We intend to use the remaining net proceeds from this offering for general corporate purposes, including working capital, operating expenses and capital expenditures. We may also use a portion of the net proceeds to acquire, invest in or obtain rights to complementary technologies, products, services or businesses. The underwriters of the offering were Credit Suisse Securities (USA) LLC, BofA Securities, Inc. and UBS Securities LLC. No payments were made by us to directors, officers or persons owning ten percent or more of our common stock or to their associates, or to our affiliates, other than payments in the ordinary course of business to officers for salaries.

There has been no material change in the planned use of the IPO proceeds as described in our final prospectus dated June 27, 2019 and filed with the SEC on June 28, 2019, pursuant to Rule 424(b) of the Securities Act.

**Item 3. Defaults Upon Senior Securities.**

Not applicable.

**Item 4. Mine Safety Disclosures.**

Not applicable.

**Item 5. Other Information.**

Not applicable.

51

**Item 6. Exhibits.**

Furnish the exhibits required by Item 601 of Regulation S-K (§ 229.601 of this chapter).

| Exhibit Number | Description |
| --- | --- |
| 10.1* | 2019 Equity Incentive Plan Stock Option Agreement and related form agreements. |
| 10.2* | 2019 Equity Incentive Plan Restricted Stock Unit Award Agreement and related form agreements. |
| 31.1* | Certification of Principal Executive Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification of Principal Financial Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1* | Certification of Principal Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2* | Certification of Principal Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

*      Filed herewith.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

The RealReal, Inc.

Date: August 14, 2019                    By:        /s/ Julie Wainwright
                                                    **Julie Wainwright**
                                          **President and Chief Executive Officer**

Date: August 14, 2019                    By:        /s/ Matt Gustke
                                                    **Matt Gustke**
                                            **Chief Financial Officer**

53

**Exhibit 10.1**

**The realreal, inc.**
**2019 Equity INCENTIVE PLAN**

**OPTION AWARD NOTICE**

**[Name of Optionee]**

      You have been awarded an option to purchase shares of Common Stock of The RealReal, Inc., a Delaware corporation (the "Company"). The option is granted pursuant to the terms and conditions of The RealReal, Inc. 2019 Equity Incentive Plan (the "Plan") and the Stock Option Agreement (together with this Award Notice, the "Agreement"). Copies of the Plan and the Stock Option Agreement are attached hereto. Capitalized terms not defined herein shall have the meanings specified in the Plan or the Agreement.

Option:    You have been awarded **[a Nonqualified Stock Option][an Incentive Stock Option]** to purchase from the Company [_____] shares of its Common Stock, par value $0.00001 per share (the "Common Stock"), subject to adjustment as provided in Section 4.2 of the Agreement.

Option Date:    [_____, ____]

Exercise Price:    $[____] per share, subject to adjustment as provided in Section 4.2 of the Agreement.

Vesting Schedule:    Except as otherwise provided in the Plan, the Agreement or any other agreement between the Company or any of its Subsidiaries and you, the Option shall vest on the one-year anniversary of the Option Date with respect to 25% of the shares subject to the Option on the Option Date and in thirty-six (36) equal installments on a monthly basis thereafter if, and only if, you are, and have been, continuously (except for any absence for vacation, leave, etc. in accordance with the Company's or its Subsidiaries' policies): (i) employed by the Company or any of its Subsidiaries; (ii) serving as a Non-Employee Director; or (iii) providing services to the Company or any of its Subsidiaries as an advisor or consultant, in each case, from the date of this Agreement through and including the applicable vesting date.

Expiration Date:    Except to the extent earlier terminated pursuant to Section 2.2 of the Agreement or earlier exercised pursuant to Section 2.3 of the Agreement, the Option shall terminate at 5:00 p.m., U.S. Pacific time, on the ten-year anniversary of the Option Date.
.

THE REALREAL, INC.

By:
Name:
Title:

Acknowledgment, Acceptance and Agreement:

By accepting this grant on the Company's stock plan administrator's website, I hereby accept the Option granted to me and acknowledge and agree to be bound by the terms and conditions of this Award Notice, the Agreement and the Plan.

**THE REALREAL, INC.**
**2019 EQUITY INCENTIVE PLAN**

**Stock Option Agreement**

The RealReal, Inc., a Delaware corporation (the "Company"), hereby grants to the individual ("Optionee") named in the award notice attached hereto (the "Award Notice") as of the date set forth in the Award Notice (the "Option Date"), pursuant to the provisions of The RealReal, Inc. 2019 Equity Incentive Plan (the "Plan"), an option to purchase from the Company the number of shares of the Company's Common Stock, par value $0.00001 per share ("Common Stock"), set forth in the Award Notice at the price per share set forth in the Award Notice (the "Exercise Price") (the "Option"), upon and subject to the terms and conditions set forth below, in the Award Notice and in the Plan. Capitalized terms not defined herein shall have the meanings specified in the Plan.

1.    Option Subject to Acceptance of Agreement. The Option shall be null and void unless Optionee shall accept this Agreement by electronically accepting this Agreement within the Optionee's stock plan account with the Company's stock plan administrator according to the procedures then in effect.

2.    Time and Manner of Exercise of Option.

2.1.  Maximum Term of Option. In no event may the Option be exercised, in whole or in part, after the expiration date set forth in the Award Notice (the "Expiration Date").

2.2.  Vesting and Exercise of Option. The Option shall become vested and exercisable in accordance with the vesting schedule set forth in the Award Notice (the "Vesting Schedule"). The period of time prior to the full vesting of the Option shall be referred to herein as the "Vesting Period." The Option shall be vested and exercisable following a termination of Optionee's employment according to the following terms and conditions:

(a)    Termination due to Death or Disability. If Optionee's employment with the Company terminates prior to the end of the Vesting Period by reason of Optionee's death or a termination by the Company due to Disability (as defined below), then in either such case, the Option only to the extent vested on the effective date of Optionee's death or such termination of employment, may thereafter be exercised by Optionee or Optionee's executor, administrator, legal representative, guardian or similar person until and including the earlier to occur of (i) the date which is one year after the date of death or termination of employment and (ii) the Expiration Date. The unvested portion of the Option shall terminate immediately upon such death or termination of employment.

(b)    Termination other than for Cause or due to death or Disability. If Optionee's employment with the Company terminates prior to the end of the Vesting Period by reason of a termination of Optionee's employment (i) by the Company for any reason other than for Cause (as defined below) or Disability or (ii) by the Optionee for any reason, the Option, only to the extent vested on the effective date of such termination of employment, may thereafter be exercised by Optionee until and including the earlier to occur of (i) the date which is ninety (90) days after the date of such termination of employment and (ii) the Expiration Date. The unvested portion of the Option shall terminate immediately upon such death or termination of employment.

(c)    Termination in Connection with a Change in Control. In the event that the Company terminates Optionee's employment without Cause or Optionee resigns for Good Reason (as defined below), in either case, prior to the expiration of the Vesting Period and on or within 12 months after the effective date of a Change in Control, 50% of the unvested Option shall remain outstanding and shall vest as of such termination of employment if the Optionee executes and does not revoke a waiver and release of claims in the form prescribed by the Company within 60 days after the date of such termination, and the Option, to the extent vested as of the Optionee's termination of employment, may thereafter be exercised by Optionee until and including the earlier to occur of (i) the date which is one year after the date of termination of employment and (ii) the Expiration Date. The unvested portion of the Option shall terminate immediately upon such termination of employment.

(d)      Termination for Cause. If Optionee's employment with the Company terminates by reason of the Company's termination of Optionee's employment for Cause, then the Option, whether or not vested, shall terminate immediately upon such termination of employment.

(e)      Definitions.

(i)      Cause.  For purposes of this Option, "Cause" shall have the meaning assigned to such term in any written employment or similar agreement between the Company or any of its Subsidiaries and the Optionee in effect on the Option Date or (ii) if Optionee is not party to an employment or similar agreement in effect on the Option Date which defines "Cause," then "Cause" shall mean: (A) Optionee's failure to perform his assigned duties or responsibilities as an employee, director or consultant (as applicable) of the Company or its affiliates (other than a failure resulting from Optionee's disability) after written notice thereof from the Company describing Optionee's failure to perform such duties or responsibilities; (B) Optionee's act, or failure to act, that was performed in bad faith and to the detriment of the Company or any of its affiliates; (C) Optionee engaging in any act of dishonesty, disloyalty to the Company or any of its affiliates, embezzlement, fraud, breach of trust or misrepresentation; (D) Optionee's violation of any law or regulation applicable to the business of the Company or any of its affiliates; (E) Optionee's breach of any confidentiality agreement or invention assignment agreement between Optionee and the Company (or any affiliate of the Company); or (F) Optionee's admission or conviction of, or entering a plea of guilty or nolo contendere to, any crime or Optionee's commission of any act of moral turpitude.  Optionee understands that nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b).  The Optionee further understands that nothing contained in this Agreement limits the Optionee's ability to file a charge or complaint with the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission or any other federal, state or local governmental agency or commission ("Government Agencies").  The Optionee further understands that neither this Agreement limits the Optionee's ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to the Company.

(ii)      Disability.  For purpose of this Option, "Disability" shall mean Optionee's absence from the Optionee's duties with the Company on a full-time basis for at least 180 consecutive days as a result of the Optionee's incapacity due to physical or mental illness, or under such other circumstances as the Committee determines, in its sole discretion, constitute a Disability.

(iii)      Good Reason. For purposes of this Option, (i) "Good Reason" shall have the meaning assigned to such term in any written employment or similar agreement between the Company or any of its Subsidiaries and the Optionee in effect on the Option Date or (ii) if Optionee is not party to an employment or similar agreement in effect on the Grant Date which defines "Good Reason," then "Good Reason" shall mean Optionee's voluntary termination as an employee, director or consultant of the Company or its affiliates within 60 days after (A) a requirement by the Company or an affiliate of the Company that Optionee relocate or commute to a location more than 50 miles away from Optionee's work location as of the Option Date, unless Optionee has consented in writing to such requirement, (B) a material reduction by the Company in Optionee's base salary (other than a reduction in connection with substantially proportionate reductions to the base salary of substantially all other executives of the Company), unless Optionee has consented in writing to such reduction, or (C) a material diminution in Optionee's duties and responsibilities inconsistent with Optionee's position with the Company and Optionee's duties and responsibilities immediately prior to such material diminution (but excluding transfers of duties and responsibilities to one or more employees as a result of the Company's natural growth, and excluding further any material diminution in Optionee's duties and responsibilities as a result of a corporate transaction, so long as Optionee has substantially similar duties and responsibilities in a division, subsidiary or other entity that is substantially similar in size to the division, subsidiary or other entity over which Optionee had authority and responsibility prior to the relevant corporate transaction), unless Optionee has consented in writing to such diminution; provided, however, that the Company shall have a 30-day period to cure any such Good Reason event and, if cured, the Optionee shall not be eligible to terminate Optionee's employment due to such Good Reason event.

2.3. <u>Method of Exercise</u>. Subject to the limitations set forth in this Agreement, the Option, to the extent vested, may be exercised by Optionee (a) by delivering to the Company an exercise notice in the form prescribed by the Company specifying the number of whole shares of Common Stock to be purchased and by accompanying such notice with payment therefor in full (or by arranging for such payment to the Company's satisfaction), and (b) by executing such documents as the Company may reasonably request.  The Optionee shall satisfy the payment of the aggregate purchase price payable pursuant to the exercise of the Option by the Company withholding from the shares of Common Stock otherwise to be delivered to the Optionee pursuant to the Option a whole number of shares of Common Stock having a Fair Market Value, determined as of the date of exercise, equal to the aggregate purchase price payable pursuant to the Option by reason of such exercise. Notwithstanding the foregoing, the Optionee may elect, in Optionee's sole discretion, to satisfy the purchase price payable by reason of exercise (i) in cash, (ii) by delivery to the Company (either actual delivery or by attestation procedures established by the Company) of shares of Common Stock having an aggregate Fair Market Value, determined as of the date of exercise, equal to the aggregate purchase price payable pursuant to the Option by reason of such exercise, (iii) except as may be prohibited by applicable law, in cash by a broker-dealer acceptable to the Company to whom Optionee has submitted an irrevocable notice of exercise or (iv) by a combination of (i) and (ii).  No share of Common Stock or certificate representing a share of Common Stock shall be issued or delivered until the full purchase price therefor and any withholding taxes thereon, as described in <u>Section 4.1</u>, have been paid.

2.4. <u>Termination of Option</u>. In no event may the Option be exercised after it terminates as set forth in this <u>Section 2.4</u>. The Option shall terminate, to the extent not earlier terminated pursuant to <u>Section 2.2</u> or exercised pursuant to <u>Section 2.3</u>, on the Expiration Date. Upon the termination of the Option, the Option and all rights hereunder shall immediately become null and void.

3. <u>Transfer Restrictions and Investment Representations</u>.

3.1. <u>Nontransferability of Option</u>. The Option may not be transferred by Optionee other than by will or the laws of descent and distribution or pursuant to the designation of one or more beneficiaries on the form prescribed by the Company. Except to the extent permitted by the foregoing sentence, (i) during Optionee's lifetime the Option is exercisable only by Optionee or Optionee's legal representative, guardian or similar person and (ii) the Option may not be sold, transferred, assigned, pledged, hypothecated, encumbered or otherwise disposed of (whether by operation of law or otherwise) or be subject to execution, attachment or similar process. Upon any attempt to so sell, transfer, assign, pledge, hypothecate, encumber or otherwise dispose of the Option, the Option and all rights hereunder shall immediately become null and void.

3.2. <u>Investment Representation</u>. Optionee hereby represents and covenants that (a) any shares of Common Stock purchased upon exercise of the Option will be purchased for investment and not with a view to the distribution thereof within the meaning of the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), unless such purchase has been registered under the Securities Act and any applicable state securities laws; (b) any subsequent sale of any such shares shall be made either pursuant to an effective registration statement under the Securities Act and any applicable state securities laws, or pursuant to an exemption from registration under the Securities Act and such state securities laws; and (c) if requested by the Company, Optionee shall submit a written statement, in a form satisfactory to the Company, to the effect that such representation (x) is true and correct as of the date of any purchase of any shares hereunder or (y) is true and correct as of the date of any sale of any such shares, as applicable. As a further condition precedent to any exercise of the Option, Optionee shall comply with all regulations and requirements of any regulatory authority having control of or supervision over the issuance or delivery of the shares and, in connection therewith, shall execute any documents which the Board or the Committee shall in its sole discretion deem necessary or advisable.

4.        Additional Terms and Conditions.

4.1.   Withholding Taxes.

(a)        As a condition precedent to the issuance of Common Stock following the exercise of the Option, Optionee shall, upon request by the Company, pay to the Company in addition to the purchase price of the shares, such amount as the Company determines is required, under all applicable federal, state, local or other laws or regulations, to be withheld and paid over as income or other withholding taxes (the "Required Tax Payments") with respect to such exercise of the Option. If Optionee shall fail to advance the Required Tax Payments after request by the Company, the Company may, in its discretion, deduct any Required Tax Payments from any amount then or thereafter payable by the Company to Optionee.

(b)        Optionee shall satisfy his or her obligation to advance the Required Tax Payments by the Company withholding whole shares of Common Stock which would otherwise be delivered to Optionee upon exercise of the Option having an aggregate Fair Market Value, determined as of the date on which such withholding obligation arises (the "Tax Date"), equal to the Required Tax Payments.  Notwithstanding the foregoing, the Optionee may elect to satisfy his or her obligation to advance the Required Tax Payments by any of the following means: (i) a cash payment to the Company; (ii)  delivery to the Company (either actual delivery or by attestation procedures established by the Company) of previously owned whole shares of Common Stock having an aggregate Fair Market Value, determined as of the Tax Date, equal to the Required Tax Payments; (iii) except as may be prohibited by applicable law, a cash payment by a broker-dealer acceptable to the Company to whom Optionee has submitted an irrevocable notice of exercise or (iv) any combination of (i) and (ii). Shares to be delivered to the Company or withheld may not have a Fair Market Value in excess of the minimum amount of the Required Tax Payments (or such greater withholding amount to the extent permitted by applicable withholding rules and accounting rules without resulting in variable accounting treatment).  Any fraction of a share which would be required to satisfy any such obligation shall be disregarded and the remaining amount due shall be paid in cash by the Optionee.   No share of Common Stock or certificate representing a share of Common Stock shall be issued or delivered until the Required Tax Payments have been satisfied in full.

4.2.   Adjustment. In the event of any equity restructuring (within the meaning of Financial Accounting Standards Board Accounting Standards Codification Topic 718, Compensation—Stock Compensation) that causes the per share value of shares of Common Stock to change, such as a stock dividend, stock split, spinoff, rights offering or recapitalization through an extraordinary dividend, the number and class of securities subject to the Option and the Exercise Price shall be equitably adjusted by the Committee, such adjustment to be made in accordance with Section 409A of the Code. In the event of any other change in corporate capitalization, including a merger, consolidation, reorganization, or partial or complete liquidation of the Company, such equitable adjustments described in the foregoing sentence may be made as determined to be appropriate and equitable by the Committee (or, if the Company is not the surviving corporation in any such transaction, the board of directors of the surviving corporation) to prevent dilution or enlargement of rights of participants. The decision of the Committee regarding any such adjustment shall be final, binding and conclusive.

4.3.   Compliance with Applicable Law. The Option is subject to the condition that if the listing, registration or qualification of the shares subject to the Option upon any securities exchange or under any law, or the consent or approval of any governmental body, or the taking of any other action is necessary or desirable as a condition of, or in connection with, the purchase or issuance of shares hereunder, the Option may not be exercised, in whole or in part, and such shares may not be issued, unless such listing, registration, qualification, consent, approval or other action shall have been effected or obtained, free of any conditions not acceptable to the Company. The Company agrees to use reasonable efforts to effect or obtain any such listing, registration, qualification, consent, approval or other action.

4.4.   Issuance or Delivery of Shares. Upon the exercise of the Option, in whole or in part, the Company shall issue or deliver, subject to the conditions of this Agreement, the number of shares of Common Stock purchased against full payment therefor. Such issuance shall be evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company. The Company shall pay all original issue or transfer taxes and all fees and expenses incident to such issuance, except as otherwise provided in Section 4.1.

4.5.    <u>Option Confers No Rights as Stockholder</u>. Optionee shall not be entitled to any privileges of ownership with respect to shares of Common Stock subject to the Option unless and until such shares are purchased and issued upon the exercise of the Option, in whole or in part, and Optionee becomes a stockholder of record with respect to such issued shares. Optionee shall not be considered a stockholder of the Company with respect to any such shares not so purchased and issued.

4.6.    <u>Option Confers No Rights to Continued Employment</u>. In no event shall the granting of the Option or its acceptance by Optionee, or any provision of this Agreement or the Plan, give or be deemed to give Optionee any right to continued employment by the Company, any Subsidiary or any affiliate of the Company or affect in any manner the right of the Company, any Subsidiary or any affiliate of the Company to terminate the employment of any person at any time.

4.7.    <u>Decisions of Board or Committee</u>. The Board or the Committee shall have the right to resolve all questions which may arise in connection with the Option or its exercise. Any interpretation, determination or other action made or taken by the Board or the Committee regarding the Plan or this Agreement shall be final, binding and conclusive.

4.8.    <u>Successors</u>. This Agreement shall be binding upon and inure to the benefit of any successor or successors of the Company and any person or persons who shall, upon the death of Optionee, acquire any rights hereunder in accordance with this Agreement or the Plan.

4.9.    <u>Notices</u>. All notices, requests or other communications provided for in this Agreement shall be made, if to the Company, to The RealReal, Inc., Attn: Stock Plan Administrator, 55 Francisco Street, Suite 600, San Francisco, California 94133, and if to Optionee, to the last known mailing address of Optionee contained in the records of the Company. All notices, requests or other communications provided for in this Agreement shall be made in writing either (a) by personal delivery, (b) by facsimile or electronic mail with confirmation of receipt, (c) by mailing in the United States mails or (d) by express courier service. The notice, request or other communication shall be deemed to be received upon personal delivery, upon confirmation of receipt of facsimile or electronic mail transmission or upon receipt by the party entitled thereto if by United States mail or express courier service; <u>provided</u>, <u>however</u>, that if a notice, request or other communication sent to the Company is not received during regular business hours, it shall be deemed to be received on the next succeeding business day of the Company.

4.10.    <u>Governing Law</u>. This Agreement, the Option and all determinations made and actions taken pursuant hereto and thereto, to the extent not governed by the Code or the laws of the United States, shall be governed by the laws of the State of Delaware and construed in accordance therewith without giving effect to principles of conflicts of laws.

4.11.    <u>Agreement Subject to the Plan</u>. This Agreement is subject to the provisions of the Plan and shall be interpreted in accordance therewith. In the event that the provisions of this Agreement and the Plan conflict, the Plan shall control. The Optionee hereby acknowledges receipt of a copy of the Plan.

4.12.    <u>Entire Agreement</u>. This Agreement and the Plan constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and the Optionee with respect to the subject matter hereof, and may not be modified adversely to the Optionee's interest except by means of a writing signed by the Company and the Optionee.

4.13.    <u>Partial Invalidity</u>. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

4.14.    <u>Amendment and Waiver</u>. The provisions of this Agreement may be amended or waived only by the written agreement of the Company and the Optionee, and no course of conduct or failure or delay in enforcing the provisions of this Agreement shall affect the validity, binding effect or enforceability of this Agreement.

4.15.  Counterparts. The Award Notice may be executed in two counterparts, each of which shall be deemed an original and both of which together shall constitute one and the same instrument.

4.16  Tax Matters.  The Award Notice shall designate whether this Option is intended to qualify as an "incentive stock option" under Section 422 of the Code.  Notwithstanding anything in the Award Notice to the contrary, the Option will not qualify as an "incentive stock option," among other events, (i) if the Optionee disposes of the shares of Common Stock acquired pursuant to the Option at any time during the two year period following the date of this Agreement or the one year period following the date on which the Option is exercised; (ii) except in the event of the Participant's death or disability (as defined in Section 22(e)(3) of the Code), if the Optionee is not employed by the Company at all times during the period beginning on the date of this Agreement and ending on the day three months before the date of exercise of the Option; or (iii) to the extent the aggregate fair market value (determined as of the time the Option is granted) of the shares of Common Stock subject to "incentive stock options" which become exercisable for the first time in any calendar year exceeds $100,000.  To the extent that the Option does not qualify as an "incentive stock option," it shall not affect the validity of the Option and shall constitute a separate non-qualified stock option.

**Exhibit 10.2**

**The RealReal, Inc.**
**2019 Equity Incentive Plan**
**Restricted Stock Unit Award Notice**

**[Name of Holder]**

You have been awarded a restricted stock unit award with respect to shares of common stock of The RealReal, Inc., a Delaware corporation (the "Company"), pursuant to the terms and conditions of The RealReal, Inc. 2019 Equity Incentive Plan (the "Plan") and the Restricted Stock Unit Award Agreement (together with this Award Notice, the "Agreement"). Copies of the Plan and the Restricted Stock Unit Award Agreement are attached hereto. Capitalized terms not defined herein shall have the meanings specified in the Plan or the Agreement.

| | |
|---|---|
| Restricted Stock Units: | You have been awarded a restricted stock unit award with respect to [_____] shares of Common Stock, par value $0.00001 per share (the "Common Stock"), subject to adjustment as provided in the Plan. |
| Grant Date: | [_____, ____] |
| Vesting Schedule: | Except as otherwise provided in the Plan, the Agreement or any other agreement between the Company or any of its Subsidiaries and you, the Award shall vest on the one-year anniversary of the Grant Date with respect to 25% of the shares of Common Stock subject to the Award on the Grant Date and in twelve (12) equal installments on a quarterly basis thereafter if, and only if, you are, and have been, continuously (except for any absence for vacation, leave, etc. in accordance with the Company's or its Subsidiaries' policies): (i) employed by the Company or any of its Subsidiaries; (ii) serving as a Non-Employee Director; or (iii) providing services to the Company or any of its Subsidiaries as an advisor or consultant, in each case, from the date of this Agreement through and including the applicable vesting date. |

THE REALREAL, INC.

By: _____
Name:
Title:

Acknowledgment, Acceptance and Agreement:

By accepting this grant on the Company's stock plan administrator's website, I hereby accept the Award granted to me and acknowledge and agree to be bound by the terms and conditions of this Award Notice, the Agreement and the Plan.

**The RealReal, Inc.**
**2019 Equity Incentive Plan**

**RESTRICTED STOCK UNIT AWARD AGREEMENT**

The RealReal, Inc., a Delaware corporation (the "Company"), hereby grants to the individual (the "Holder") named in the award notice attached hereto (the "Award Notice") as of the date set forth in the Award Notice (the "Grant Date"), pursuant to the provisions of The RealReal, Inc. 2019 Equity Incentive Plan (the "Plan"), a restricted stock unit award (the "Award") with respect to the number of shares of the Company's Common Stock, par value $0.00001 per share ("Common Stock"), set forth in the Award Notice, upon and subject to the restrictions, terms and conditions set forth in the Plan and this agreement (the "Agreement"). Capitalized terms not defined herein shall have the meanings specified in the Plan.

1.    Award Subject to Acceptance of Agreement. The Award shall be null and void unless the Holder accepts this Agreement by executing the Award Notice in the space provided therefor and returning an original execution copy of the Award Notice to the Company (or electronically accepting this Agreement within the Holder's stock plan account with the Company's stock plan administrator according to the procedures then in effect).

2.    Rights as a Stockholder. The Holder shall not be entitled to any privileges of ownership with respect to the shares of Common Stock subject to the Award unless and until, and only to the extent, such shares become vested pursuant to Section 3 hereof and the Holder becomes a stockholder of record with respect to such shares. The Award includes a right to Dividend Equivalents equal to the value of any dividends paid on the Common Stock for which the dividend record date occurs between the Grant Date and the date the Award is settled or forfeited. Subject to vesting, each Dividend Equivalent entitles Holder to receive the equivalent cash value of any such dividends paid on the number of shares of Common Stock underlying the Award that are outstanding during such period. Dividend Equivalents will be accrued (without interest) and will be subject to the same conditions as the shares of Common Stock to which they are attributable, including, without limitation, the vesting conditions, the provisions governing the time and form of settlement of the Award.

3.    Restriction Period and Vesting.

3.1 Service-Based Vesting Conditions.  Except as otherwise provided for in this Agreement, the Award shall vest in accordance with the vesting schedule set forth in the Award Notice if, and only if, the Holder is, and has been, continuously (except for any absence for vacation, leave, etc. in accordance with the Company's or its Subsidiaries' policies): (a) employed by the Company or any of its Subsidiaries; (b) serving as a Non-Employee Director or (c) providing services to the Company or any of its Subsidiaries as an advisor or consultant, in each case, from the date of this Agreement through and including the applicable vesting date.   The period of time prior to the vesting shall be referred to herein as the "Restriction Period."

3.2 Termination of Employment.

(a)    Termination Other Than in Connection with a Change in Control.  Except as otherwise provided for in Section 3.2(b), if the Holder's employment with the Company terminates prior to the end of the Restriction Period for any reason, the Award shall be immediately forfeited by the Holder and cancelled by the Company.

(b)    Termination in Connection with a Change in Control.  In the event of a Change in Control prior to the end of the Restriction Period and the Company terminates the Holder's employment without Cause (as defined below) or the Holder resigns for Good Reason (as defined below), in either case, prior to the expiration of the Restriction Period and on or within 12 months after the effective date of such Change in Control and the Holder executes and does not revoke a waiver and release of claims in the form prescribed by the Company within 60 days after the date of such termination, then 50% of the unvested portion of the Award shall immediately vest upon such termination of employment and the remaining unvested portion of the Award shall be immediately forfeited by the Holder and cancelled by the Company.

3.3 <u>Definitions</u>.

(a) <u>Cause</u>. For purposes of this Award, (i) "Cause" shall have the meaning assigned to such term in any written employment or similar agreement between the Company or any of its Subsidiaries and the Holder in effect on the Grant Date or (ii) if Holder is not party to an employment or similar agreement in effect on the Grant Date which defines "Cause," then "Cause" shall mean: (A) Holder's failure to perform his assigned duties or responsibilities as an employee, director or consultant (as applicable) of the Company or its affiliates (other than a failure resulting from Holder's disability) after written notice thereof from the Company describing Holder's failure to perform such duties or responsibilities; (B) Holder's act, or failure to act, that was performed in bad faith and to the detriment of the Company or any of its affiliates; (C) Holder engaging in any act of dishonesty, disloyalty to the Company or any of its affiliates, embezzlement, fraud, breach of trust or misrepresentation; (D) Holder's violation of any law or regulation applicable to the business of the Company or any of its affiliates; (E) Holder's breach of any confidentiality agreement or invention assignment agreement between Holder and the Company (or any affiliate of the Company); or (F) Holder's admission or conviction of, or entering a plea of guilty or nolo contendere to, any crime or Holder's commission of any act of moral turpitude.  Holder understands that nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b).  The Holder further understands that nothing contained in this Agreement limits the Holder's ability to file a charge or complaint with the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission or any other federal, state or local governmental agency or commission ("Government Agencies").  The Holder further understands that neither this Agreement limits the Holder's ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to the Company.

(b)    <u>Good Reason</u>. For purposes of this Award, (i) "Good Reason" shall have the meaning assigned to such term in any written employment or similar agreement between the Company or any of its Subsidiaries and the Holder in effect on the Grant Date or (ii) if Holder is not party to an employment or similar agreement in effect on the Grant Date which defines "Good Reason," then "Good Reason" shall mean Holder's voluntary termination as an employee, director or consultant of the Company or its affiliates within 60 days after (A) a requirement by the Company or an affiliate of the Company that Holder relocate or commute to a location more than 50 miles away from Holder's work location as of the Grant Date, unless Holder has consented in writing to such requirement, (B) a material reduction by the Company in Holder's base salary (other than a reduction in connection with substantially proportionate reductions to the base salary of substantially all other executives of the Company), unless Holder has consented in writing to such reduction, or (C) a material diminution in Holder's duties and responsibilities inconsistent with Holder's position with the Company and Holder's duties and responsibilities immediately prior to such material diminution (but excluding transfers of duties and responsibilities to one or more employees as a result of the Company's natural growth, and excluding further any material diminution in Holder's duties and responsibilities as a result of a corporate transaction, so long as Holder has substantially similar duties and responsibilities in a division, subsidiary or other entity that is substantially similar in size to the division, subsidiary or other entity over which Holder had authority and responsibility prior to the relevant corporate transaction), unless Holder has consented in writing to such diminution; <u>provided</u>, <u>however</u>, that the Company shall have a 30-day period to cure any such Good Reason event and, if cured, the Holder shall not be eligible to terminate Holder's employment due to such Good Reason event.

4.        <u>Issuance or Delivery of Shares</u>.  Except as otherwise provided for herein, within 70 days after the vesting of any portion of the Award (and in any event no later than the March 15th immediately following the year in which the substantial risk of forfeiture with respect to the Award lapses), the Company shall issue or deliver, subject to the conditions of this Agreement, the vested shares of Common Stock to the Holder. Such issuance or delivery shall be evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company. The Company shall pay all original issue or transfer taxes and all fees and expenses incident to such issuance or delivery, except as otherwise provided in <u>Section 6</u>.  Prior to the issuance to the Holder of the shares of Common Stock subject to the Award, the Holder shall have no direct or secured claim in any specific assets of the Company or in such shares of Common Stock, and will have the status of a general unsecured creditor of the Company.

5.        Transfer Restrictions and Investment Representation.

5.1.    Nontransferability of Award. The Award may not be transferred by the Holder other than by will or the laws of descent and distribution. Except to the extent permitted by the foregoing sentence, the Award may not be sold, transferred, assigned, pledged, hypothecated, encumbered or otherwise disposed of (whether by operation of law or otherwise) or be subject to execution, attachment or similar process. Upon any attempt to so sell, transfer, assign, pledge, hypothecate, encumber or otherwise dispose of the Award, the Award and all rights hereunder shall immediately become null and void.

5.2.    Investment Representation. The Holder hereby covenants that (a) any sale of any share of Common Stock acquired upon the vesting of the Award shall be made either pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "Securities Act"), and any applicable state securities laws, or pursuant to an exemption from registration under the Securities Act and such state securities laws and (b) the Holder shall comply with all regulations and requirements of any regulatory authority having control of or supervision over the issuance of the shares and, in connection therewith, shall execute any documents which the Committee shall in its sole discretion deem necessary or advisable.

6.        Additional Terms and Conditions of Award.

6.1.    Withholding Taxes.

(a)        As a condition precedent to the delivery to the Holder of any of the shares of Common Stock subject to the Award, the Holder shall, upon request by the Company, pay to the Company (or shall cause a broker-dealer on behalf of the Holder to pay to the Company) such amount of cash as the Company may be required, under all applicable federal, state, local or other laws or regulations, to withhold and pay over as income or other withholding taxes (the "Required Tax Payments") with respect to the Award. If the Holder shall fail to advance the Required Tax Payments after request by the Company, the Company may, in its discretion, deduct any Required Tax Payments from any amount then or thereafter payable by the Company to the Holder.

(b)        Holder shall satisfy his or her obligation to advance the Required Tax Payments by the Company withholding whole shares of Common Stock which would otherwise be delivered to Holder upon vesting of the Award having an aggregate Fair Market Value, determined as of the date on which such withholding obligation arises (the "Tax Date"), equal to the Required Tax Payments. Notwithstanding the foregoing, the Holder may elect to satisfy his or her obligation to advance the Required Tax Payments by any of the following means: (i) a check or cash payment to the Company, (ii) delivery to the Company (either actual delivery or by attestation procedures established by the Company) of previously owned whole shares having an aggregate Fair Market Value, determined as of the Tax Date, equal to the Required Tax Payments, (iii) except as may be prohibited by applicable law, a cash payment by a broker whom the Company has selected for this purpose and to whom the Holder has authorized to sell any shares acquired upon the vesting of the Award to meet the Required Tax Payments, or (iv) any combination of (i) and (ii). Shares to be delivered to the Company or withheld may not have a Fair Market Value in excess of the minimum amount of the Required Tax Payments (or such greater withholding amount to the extent permitted by applicable withholding rules and accounting rules without resulting in variable accounting treatment). Any fraction of a share which would be required to satisfy any such obligation shall be disregarded and the remaining amount due shall be paid in cash by the Holder. No share of Common Stock or certificate representing a share of Common Stock shall be issued or delivered until the Required Tax Payments have been satisfied in full.

6.2.    Compliance with Applicable Law. The Award is subject to the condition that if the listing, registration or qualification of the shares of Common Stock subject to the Award upon any securities exchange or under any law, or the consent or approval of any governmental body, or the taking of any other action is necessary or desirable as a condition of, or in connection with, the delivery of shares hereunder, the shares of Common Stock subject to the Award shall not be delivered, in whole or in part, unless such listing, registration, qualification, consent, approval or other action shall have been effected or obtained, free of any conditions not acceptable to the Company. The Company agrees to use reasonable efforts to effect or obtain any such listing, registration, qualification, consent, approval or other action.

6.3.    Award Confers No Rights to Continued Employment. In no event shall the granting of the Award or its acceptance by the Holder, or any provision of the Agreement or the Plan, give or be deemed to give the Holder any right to continued employment by the Company, any Subsidiary or any affiliate of the Company or affect in any manner the right of the Company, any Subsidiary or any affiliate of the Company to terminate the employment of any person at any time.

6.4.    Decisions of Board or Committee. The Board or the Committee shall have the right to resolve all questions which may arise in connection with the Award. Any interpretation, determination or other action made or taken by the Board or the Committee regarding the Plan or this Agreement shall be final, binding and conclusive.

6.5.    Successors. This Agreement shall be binding upon and inure to the benefit of any successor or successors of the Company and any person or persons who shall, upon the death of the Holder, acquire any rights hereunder in accordance with this Agreement or the Plan.

6.6.    Notices. All notices, requests or other communications provided for in this Agreement shall be made, if to the Company, to The RealReal, Inc., Attn: Stock Plan Administrator, 55 Francisco Street, Suite 600, San Francisco, California 94133, and if to the Holder, to the last known mailing address of the Holder contained in the records of the Company. All notices, requests or other communications provided for in this Agreement shall be made in writing either (a) by personal delivery, (b) by facsimile or electronic mail with confirmation of receipt, (c) by mailing in the United States mails or (d) by express courier service. The notice, request or other communication shall be deemed to be received upon personal delivery, upon confirmation of receipt of facsimile or electronic mail transmission or upon receipt by the party entitled thereto if by United States mail or express courier service; provided, however, that if a notice, request or other communication sent to the Company is not received during regular business hours, it shall be deemed to be received on the next succeeding business day of the Company.

6.7.    Governing Law. This Agreement, the Award and all determinations made and actions taken pursuant hereto and thereto, to the extent not governed by the laws of the United States, shall be governed by the laws of the State of Delaware and construed in accordance therewith without giving effect to principles of conflicts of laws.

6.8.    Agreement Subject to the Plan. This Agreement is subject to the provisions of the Plan, including Section 5.8 with respect to a Change in Control, and shall be interpreted in accordance therewith. In the event that the provisions of this Agreement and the Plan conflict, the Plan shall control. The Holder hereby acknowledges receipt of a copy of the Plan.

6.9.    Entire Agreement. This Agreement and the Plan constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and the Holder with respect to the subject matter hereof, and may not be modified adversely to the Holder's interest except by means of a writing signed by the Company and the Holder.

6.10.    Partial Invalidity. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision was omitted.

6.11.  Amendment and Waiver. The Company may amend the provisions of this Agreement at any time; provided that an amendment that would materially impair the Holder's rights under this Agreement shall be subject to the written consent of the Holder. No course of conduct or failure or delay in enforcing the provisions of this Agreement shall affect the validity, binding effect or enforceability of this Agreement.

6.12.  Compliance With Section 409A of the Code. This Award is intended to be exempt from or comply with Section 409A of the Code, and shall be interpreted and construed accordingly, and each payment hereunder shall be considered a separate payment.  To the extent this Agreement provides for the Award to become vested and be settled upon the Holder's termination of employment, the applicable shares of Common Stock shall be transferred to the Holder or his or her beneficiary upon the Holder's "separation from service," within the meaning of Section 409A of the Code; provided that if the Holder is a "specified employee," within the meaning of Section 409A of the Code, then to the extent the Award constitutes nonqualified deferred compensation, within the meaning of Section 409A of the Code, such shares of Common Stock shall be transferred to the Holder or his or her beneficiary upon the earlier to occur of (i) the six-month anniversary of such separation from service and (ii) the date of the Holder's death.

**Exhibit 31.1**

**CERTIFICATION PURSUANT TO**
**RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Julie Wainwright, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q of The RealReal, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 14, 2019                                    By:    _____/s/ Julie Wainwright_____

                                                                **Julie Wainwright**
                                                                **President and Chief Executive Officer**

**Exhibit 31.2**

**CERTIFICATION PURSUANT TO**
**RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Matt Gustke, certify that:

1.   I have reviewed this Quarterly Report on Form 10-Q of The RealReal, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

  (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

  (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

  (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

  (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

  (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

  (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 14, 2019                    By:  _____/s/ Matt Gustke_____

                                                    **Matt Gustke**
                                                    **Chief Financial Officer**

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of The RealReal, Inc. (the "Company") on Form 10-Q for the period ending June 30, 2019 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

(1)    The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: August 14, 2019                                   By:                        /s/ Julie Wainwright
                                                                                   **Julie Wainwright**
                                                                   **President and Chief Executive Officer**

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of The RealReal, Inc. (the "Company") on Form 10-Q for the period ending June 30, 2019 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

(1)    The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: August 14, 2019                    By:    _____/s/ Matt Gustke_____
                                                    **Matt Gustke**
                                                    **Chief Financial Officer**

# Exhibit C

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, DC 20549**

# FORM 10-Q

**(Mark One)**

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2019**

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission File Number: 001-38953**

# The RealReal, Inc.
**(Exact Name of Registrant as Specified in its Charter)**

| | |
|---|---|
| **Delaware** | **45-1234222** |
| **( State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **55 Francisco Street Suite 600** | |
| **San Francisco, CA** | **94133** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(855) 435-5893**

**(Registrant's telephone number, including area code)**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, $0.00001 par value | REAL | The Nasdaq Global Select Market |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☐ |
| Emerging growth company | ☒ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

As of October 31, 2019, the registrant had 85,791,236 shares of common stock, $0.00001 par value per share, outstanding.

**Table of Contents**

| | | Page |
|---|---|---|
| **PART I.** | FINANCIAL INFORMATION | |
| Item 1. | Financial Statements (Unaudited) | 1 |
| | Condensed Balance Sheets as of September 30, 2019 and December 31, 2018 | 1 |
| | Condensed Statements of Operations for the Three and Nine Months Ended September 30, 2019 and 2018 | 2 |
| | Condensed Statements of Comprehensive Loss for the Three and Nine Months Ended September 30, 2019 and 2018 | 3 |
| | Condensed Statements of Redeemable Convertible Preferred Stock, Convertible Preferred Stock and Stockholders' Equity (Deficit) as of September 30, 2019 and 2018 | 4 |
| | Condensed Statements of Cash Flows for the Nine Months Ended September 30, 2019 and 2018 | 6 |
| | Notes to Unaudited Condensed Financial Statements | 7 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 20 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 31 |
| Item 4. | Controls and Procedures | 31 |
| | | |
| **PART II.** | OTHER INFORMATION | |
| Item 1. | Legal Proceedings | 32 |
| Item 1A. | Risk Factors | 32 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 50 |
| Item 3. | Defaults Upon Senior Securities | 50 |
| Item 4. | Mine Safety Disclosures | 50 |
| Item 5. | Other Information | 50 |
| Item 6. | Exhibits | 51 |
| Signatures | | 52 |

i

## NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Quarterly Report on Form 10-Q contains forward-looking statements within the meaning of the federal securities laws. All statements other than statements of historical fact contained in this Quarterly Report on Form 10-Q, including statements regarding our future results of operations and financial position, business strategy and plans, objectives of management for future operations, long term operating expenses, the opening of additional retail stores in the future, the development of our automation technology, expectations for capital requirements and the use of proceeds from our initial public offering, are forward-looking statements. These statements involve known and unknown risks, uncertainties and other important factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements.

In some cases, you can identify forward-looking statements by terms such as "may," "should," "expects," "plans," "anticipates," "could," "intends," "target," "projects," "contemplates," "believes," "estimates," "predicts," "potential" or "continue" or the negative of these terms or other similar expressions. The forward-looking statements in this Quarterly Report on Form 10-Q are only predictions. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our business, financial condition and results of operations. These forward-looking statements speak only as of the date of this Quarterly Report on Form 10-Q and are subject to a number of risks, uncertainties and assumptions described in the section titled "Risk Factors" included under Part II, Item 1A below and elsewhere in this Quarterly Report on Form 10-Q. Because forward-looking statements are inherently subject to risks and uncertainties, some of which cannot be predicted or quantified, you should not rely on these forward-looking statements as predictions of future events. The events and circumstances reflected in our forward-looking statements may not be achieved or occur and actual results could differ materially from those projected in the forward-looking statements. Some of the key factors that could cause actual results to differ from our expectations include:

- our future financial performance, including our expectations regarding our revenue, cost of revenue, operating expenses, and our ability to achieve and maintain future profitability;

- our ability to effectively manage or sustain our growth and to effectively expand our operations;

- our strategies, plans, objectives and goals;

- the market demand for authenticated, pre-owned luxury goods and new and pre-owned luxury goods in general and the online market for luxury goods;

- our ability to compete with existing and new competitors in existing and new markets and offerings;

- our ability to attract and retain consignors and buyers;

- our ability to increase the supply of luxury goods offered through our online marketplace;

- our ability to timely and effectively scale our operations;

- our ability to enter international markets;

- our ability to optimize, operate and manage our merchandising and fulfillment facilities;

- our ability to develop and protect our brand;

- our ability to comply with laws and regulations;

- our expectations regarding outstanding litigation;

- our expectations and management of future growth;

- our expectations concerning relationships with third parties;

- economic and industry trends, projected growth or trend analysis;

- seasonal sales fluctuations;

- our ability to add capacity, capabilities and automation to our operations; and

- our ability to attract and retain key personnel.

In addition, statements such as "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based upon information available to us as of the date of this Quarterly Report on Form 10-Q and, although we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted a thorough inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain and investors are cautioned not to unduly rely upon these statements. Furthermore, if our forward-looking statements prove to be inaccurate, the inaccuracy may be material. In light of the significant uncertainties in these forward-looking statements, you should not regard these statements as a representation or warranty by us or any other person that we will achieve our objectives and plans in any specified time frame, or at all. Except as required by applicable law, we do not plan to publicly update or revise any forward-looking statements contained in this Quarterly Report on Form 10-Q, whether as a result of any new information, future events or otherwise.

**PART I—FINANCIAL INFORMATION**

**Item 1. Financial Statements**

**THE REALREAL, INC.**
Condensed Balance Sheets

*(In thousands, except share and per share data)*
*(unaudited)*

| | | September 30, 2019 | | December 31, 2018 |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets | | | | |
| Cash and cash equivalents | $ | 364,995 | $ | 34,393 |
| Short-term investments | | 5,290 | | 27,131 |
| Accounts receivable | | 8,935 | | 7,571 |
| Inventory, net | | 13,846 | | 10,355 |
| Prepaid expenses and other current assets | | 13,071 | | 9,696 |
| Total current assets | | 406,137 | | 89,146 |
| Property and equipment, net | | 45,715 | | 33,286 |
| Restricted cash | | — | | 11,234 |
| Other assets | | 1,518 | | 1,751 |
| Total assets | $ | 453,370 | $ | 135,417 |
| **Liabilities, Redeemable Convertible Preferred Stock, Convertible Preferred Stock and Stockholders' Equity (Deficit)** | | | | |
| Current liabilities | | | | |
| Accounts payable | $ | 5,666 | $ | 5,149 |
| Accrued consignor payable | | 39,870 | | 35,259 |
| Other accrued and current liabilities | | 42,548 | | 41,956 |
| Long-term debt, current portion | | — | | 5,990 |
| Total current liabilities | | 88,084 | | 88,354 |
| Long-term debt, net of current portion | | — | | 3,249 |
| Other noncurrent liabilities | | 8,050 | | 7,304 |
| Total liabilities | | 96,134 | | 98,907 |
| Commitments and contingencies (Note 10) | | | | |
| Redeemable convertible preferred stock, $0.00001 par value; no and 31,053,601 shares authorized as of September 30, 2019 and December 31, 2018, respectively; no and 31,053,601 shares issued and outstanding as of September 30, 2019 and December 31, 2018, respectively | | — | | 151,381 |
| Convertible preferred stock $0.00001 par value; no and 73,950,153 shares authorized as of September 30, 2019 and December 31, 2018, respectively; no and 73,724,645 shares issued and outstanding as of September 30, 2019 and December 31, 2018, respectively | | — | | 142,819 |
| Stockholders' equity (deficit): | | | | |
| Common stock, $0.00001 par value; 500,000,000 and 145,467,774 shares authorized as of September 30, 2019 and December 31, 2018, respectively; 85,759,021 and 8,593,077 shares issued and outstanding as of September 30, 2019 and December 31, 2018, respectively | | 1 | | — |
| Additional paid-in capital | | 690,365 | | — |
| Accumulated comprehensive income (loss) | | 1 | | (25) |
| Accumulated deficit | | (333,131) | | (257,665) |
| Total stockholders' equity (deficit) | | 357,236 | | (257,690) |
| Total liabilities, redeemable convertible preferred stock, convertible preferred stock and stockholders' equity (deficit) | $ | 453,370 | $ | 135,417 |

The accompanying notes are an integral part of these unaudited condensed financial statements.

1

**THE REALREAL, INC.**
**Condensed Statements of Operations**

*(In thousands, except share and per share data)*
*(unaudited)*

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2019 | 2018 | 2019 | 2018 |
|---|---|---|---|---|
| Revenue: | | | | |
| Consignment and service revenue | $ 69,790 | $ 45,744 | $ 186,740 | $ 128,921 |
| Direct revenue | 10,695 | 6,095 | 33,976 | 16,362 |
| Total revenue | 80,485 | 51,839 | 220,716 | 145,283 |
| Cost of revenue: | | | | |
| Cost of consignment and service revenue | 19,446 | 13,157 | 52,593 | 37,083 |
| Cost of direct revenue | 8,811 | 5,352 | 27,464 | 13,486 |
| Total cost of revenue | 28,257 | 18,509 | 80,057 | 50,569 |
| Gross profit | 52,228 | 33,330 | 140,659 | 94,714 |
| Operating expenses: | | | | |
| Marketing | 13,390 | 10,624 | 36,838 | 29,534 |
| Operations and technology | 37,407 | 28,257 | 103,271 | 72,586 |
| Selling, general and administrative | 28,436 | 16,325 | 76,110 | 44,226 |
| Total operating expenses | 79,233 | 55,206 | 216,219 | 146,346 |
| Loss from operations | (27,005) | (21,876) | (75,560) | (51,632) |
| Interest income | 1,902 | 437 | 2,918 | 602 |
| Interest expense | (60) | (204) | (572) | (927) |
| Other expense, net | (119) | (205) | (2,106) | (1,592) |
| Loss before provision for income taxes | (25,282) | (21,848) | (75,320) | (53,549) |
| Provision (benefit) for income taxes | (8) | 37 | 51 | 37 |
| Net loss | $ (25,274) | $ (21,885) | $ (75,371) | $ (53,586) |
| Accretion of redeemable convertible preferred stock to redemption value | $ — | $ (3,200) | $ (3,355) | $ (5,651) |
| Net loss attributable to common stockholders | $ (25,274) | $ (25,085) | $ (78,726) | $ (59,237) |
| Net loss per share attributable to common stockholders, basic and diluted | $ (0.30) | $ (3.00) | $ (2.28) | $ (7.12) |
| Shares used to compute net loss per share attributable to common stockholders, basic and diluted | 84,634,956 | 8,349,403 | 34,556,485 | 8,321,296 |

The accompanying notes are an integral part of these unaudited condensed financial statements.

2

**THE REALREAL, INC.**
**Condensed Statements of Comprehensive Loss**

*(In thousands)*
*(unaudited)*

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|  | 2019 | 2018 | 2019 | 2018 |
|---|---|---|---|---|
| Net loss | $ (25,274) | $ (21,885) | $ (75,371) | $ (53,586) |
| Other comprehensive income (loss), net of tax: | | | | |
| Unrealized gain (loss) on investments | (4) | (8) | 26 | (2) |
| Comprehensive loss | $ (25,278) | $ (21,893) | $ (75,345) | $ (53,588) |

The accompanying notes are an integral part of these unaudited condensed financial statements.

3

**THE REALREAL, INC.**
**Condensed Statements of Redeemable Convertible Preferred Stock, Convertible Preferred Stock and Stockholders' Equity (Deficit)**

*(In thousands, except share amounts)*
*(unaudited)*

| | Redeemable Convertible Preferred Stock | | Convertible Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Other Comprehensive Gain (Loss) | Accumulated Deficit | 'Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | | | | |
| **Balance as of December 31, 2017** | 12,956,724 | $ 50,367 | 69,834,789 | $ 122,990 | 8,287,983 | $ — | $ 4,591 | $ (6) | $ (181,571) | $ (176,986) |
| Accretion of redeemable convertible preferred stock to redemption value | — | 1,109 | — | — | — | — | (1,109) | — | — | (1,109) |
| Issuance of common stock upon exercise of options | — | — | — | — | 18,621 | — | 39 | — | — | 39 |
| Stock-based compensation expense | — | — | — | — | — | — | 545 | — | — | 545 |
| Other comprehensive income | — | — | — | — | — | — | — | 6 | — | 6 |
| Net loss | — | — | — | — | — | — | — | — | (14,106) | (14,106) |
| **Balance as of March 31, 2018** | 12,956,724 | 51,476 | 69,834,789 | 122,990 | 8,306,604 | — | 4,066 | — | (195,677) | (191,611) |
| Issuance of Series G redeemable convertible preferred stock upon conversion of notes, net of issuance costs of $190 | 1,067,550 | 5,452 | — | — | — | — | — | — | — | — |
| Issuance of Series G convertible preferred stock upon conversion of notes, net of issuance costs of $355 | — | — | 1,997,709 | 10,202 | — | — | — | — | — | — |
| Loss on extinguishment of convertible notes | — | — | — | — | — | — | (370) | — | — | (370) |
| Issuance of Series G redeemable convertible preferred stock, net of issuance costs of $3,360 | 17,029,327 | 86,640 | — | — | — | — | — | — | — | — |
| Accretion of redeemable convertible preferred stock to redemption value | — | 1,342 | — | — | — | — | (1,342) | — | — | (1,342) |
| Issuance of common stock upon exercise of options | — | — | — | — | 17,502 | — | 24 | — | — | 24 |
| Stock-based compensation expense | — | — | — | — | — | — | 681 | — | — | 681 |
| Net loss | — | — | — | — | — | — | — | — | (17,595) | (17,595) |
| **Balance as of June 30, 2018** | 31,053,601 | 144,910 | 71,832,498 | 133,192 | 8,324,106 | — | 3,059 | — | (213,272) | (210,213) |
| Issuance of Series G convertible preferred stock, net of issuance costs of $373 | — | — | 1,892,147 | 9,627 | — | — | — | — | — | — |
| Accretion of redeemable convertible preferred stock to redemption value | — | 3,200 | — | — | — | — | (3,200) | — | — | (3,200) |
| Compensation expense related to stock sales by current and former employees | — | — | — | — | — | — | 847 | — | — | 847 |
| Issuance of common stock upon exercise of options | — | — | — | — | 124,083 | — | 194 | — | — | 194 |
| Stock-based compensation expense | — | — | — | — | — | — | 740 | — | — | 740 |
| Other comprehensive loss | — | — | — | — | — | — | — | (8) | — | (8) |
| Net loss | — | — | — | — | — | — | — | — | (21,885) | (21,885) |
| **Balance as of September 30, 2018** | 31,053,601 | $ 148,110 | 73,724,645 | $ 142,819 | $ 8,448,188 | $ — | $ 1,640 | $ (8) | $ (235,157) | $ (233,525) |

The accompanying notes are an integral part of these unaudited condensed financial statements.

4

**THE REALREAL, INC.**
**Condensed Statements of Redeemable Convertible Preferred Stock, Convertible Preferred Stock and Stockholders' Equity (Deficit)**

*(In thousands, except share amounts)*
*(unaudited)*

| | Redeemable Convertible Preferred Stock | | Convertible Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Other Comprehensive Gain (Loss) | Accumulated Deficit | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | Capital | | | |
| Balance as of December 31, 2018 | 31,053,601 | $ 151,381 | 73,724,645 | $ 142,819 | 8,593,077 | $ — | $ — | $ (25) | $ (257,665) | $ (257,690) |
| Issuance of Series H redeemable convertible preferred stock net of issuance costs of $86 | 6,350,345 | 43,572 | — | — | — | — | — | — | — | — |
| Issuance of Series H convertible preferred stock net of issuance costs of $63 | — | — | 3,831,766 | 26,279 | — | — | — | — | — | — |
| Accretion of redeemable preferred stock to redemption value | — | 3,355 | — | — | — | — | (3,260) | — | (95) | (3,355) |
| Compensation expense related to stock sales by current and former employees | — | — | — | — | — | — | 819 | — | — | 819 |
| Issuance of common stock upon exercise of options | — | — | — | — | 739,053 | — | 1,319 | — | — | 1,319 |
| Issuance of common stock upon exercise of warrants | — | — | — | — | 4,935 | — | 13 | — | — | 13 |
| Stock-based compensation expense | — | — | — | — | — | — | 1,109 | — | — | 1,109 |
| Other comprehensive income | — | — | — | — | — | — | — | 28 | — | 28 |
| Net loss | — | — | — | — | — | — | — | — | (23,222) | (23,222) |
| Balance as of March 31, 2019 | 37,403,946 | 198,308 | 77,556,411 | 169,098 | 9,337,065 | — | — | 3 | (280,982) | (280,979) |
| Additional issuance costs for Series H redeemable convertible preferred stock (total issuance costs of $166) | — | (80) | — | — | — | — | — | — | — | — |
| Reallocation of issuance costs for Series H convertible preferred stock (total issuance costs of $59) | — | — | — | 4 | — | — | — | — | — | — |
| Issuance of common stock upon exercise of options | — | — | — | — | 358,459 | 1 | 422 | — | — | 423 |
| Issuance of common stock upon exercise of warrants | — | — | — | — | 5,742 | — | 20 | — | — | 20 |
| Stock-based compensation expense | — | — | — | — | — | — | 1,287 | — | — | 1,287 |
| Other comprehensive income | — | — | — | — | — | — | — | 2 | — | 2 |
| Net loss | — | — | — | — | — | — | — | — | (26,875) | (26,875) |
| Balance as of June 30, 2019 | 37,403,946 | 198,228 | 77,556,411 | 169,102 | 9,701,266 | 1 | 1,729 | 5 | (307,857) | (306,122) |
| Conversion of redeemable convertible preferred stock to common stock in connection with initial public offering | (37,403,946) | (198,228) | — | — | 19,585,426 | — | 198,228 | — | — | 198,228 |
| Conversion of convertible preferred stock to common stock in connection with initial public offering | — | — | (77,556,411) | (169,102) | 38,778,180 | — | 169,102 | — | — | 169,102 |
| Conversion of convertible preferred stock warrants to common stock warrants in connection with initial public offering | — | — | — | — | — | — | 2,710 | — | — | 2,710 |
| Issuance of common stock in connection with initial public offering, net of issuance costs of $5,428 | — | — | — | — | 17,250,000 | — | 315,422 | — | — | 315,422 |
| Issuance of common stock upon vesting of restricted stock units, net of shares withheld for employee taxes | — | — | — | — | 1,969 | — | (20) | — | — | (20) |
| Issuance of common stock upon exercise of options | — | — | — | — | 352,638 | — | 674 | — | — | 674 |
| Issuance of common stock for cashless exercise of warrants | — | — | — | — | 89,542 | — | — | — | — | — |
| Stock-based compensation expense | — | — | — | — | — | — | 2,520 | — | — | 2,520 |
| Other comprehensive loss | — | — | — | — | — | — | — | (4) | — | (4) |
| Net loss | — | — | — | — | — | — | — | — | (25,274) | (25,274) |
| Balance as of September 30, 2019 | — | $ — | — | $ — | 85,759,021 | $ 1 | $ 690,365 | $ 1 | $ (333,131) | $ 357,236 |

The accompanying notes are an integral part of these unaudited condensed financial statements.

5

**THE REALREAL, INC.**
**Condensed Statements of Cash Flows**

*(in thousands)*
*(unaudited)*

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2019 | 2018 |
| **Cash flows from operating activities:** | | |
| Net loss | $ (75,371) | $ (53,586) |
| Adjustments to reconcile net loss to cash used in operating activities: | | |
| Depreciation and amortization | 9,537 | 6,489 |
| Stock-based compensation expense | 4,916 | 1,966 |
| Change in fair value of convertible note derivative liability | — | 1,248 |
| Bad debt expense | 1,208 | 609 |
| Compensation expense related to stock sales by current and former employees | 819 | 847 |
| Change in fair value of convertible preferred stock warrant liability | 2,100 | 388 |
| Accrued interest on convertible notes | — | 223 |
| Accretion of unconditional endowment grant liability | 70 | 85 |
| Accretion of debt discounts | 11 | 104 |
| Amortization of premiums on short-term investments | 38 | 27 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (2,572) | (2,854) |
| Inventory, net | (3,491) | (1,607) |
| Prepaid expenses and other current assets | (3,375) | (10,060) |
| Other assets | 136 | 445 |
| Accounts payable | 1,394 | 2,752 |
| Accrued consignor payable | 4,611 | 1,537 |
| Other accrued and current liabilities | 494 | 10,000 |
| Other noncurrent liabilities | 1,356 | 1,762 |
| Net cash used in operating activities | (58,119) | (39,625) |
| **Cash flow from investing activities:** | | |
| Purchases of short-term investments | (12,169) | (24,237) |
| Proceeds from maturities of short-term investments | 33,998 | 7,600 |
| Proceeds from sale of short-term investments | — | 7,023 |
| Capitalized proprietary software development costs | (6,670) | (4,204) |
| Purchases of property and equipment | (16,111) | (8,781) |
| Net cash used in investing activities | (952) | (22,599) |
| **Cash flow from financing activities:** | | |
| Proceeds from issuance of common stock in initial public offering, net of issuance costs | 315,486 | — |
| Proceeds from issuance of redeemable convertible preferred stock, net of issuance costs | 43,492 | 86,640 |
| Proceeds from issuance of convertible preferred stock, net of issuance costs | 26,283 | 9,627 |
| Proceeds from issuance of convertible notes, net of issuance costs | — | 14,273 |
| Proceeds from exercise of stock options and common stock warrants | 2,448 | 257 |
| Taxes paid related to net share settlement of equity awards | (20) | — |
| Issuance cost paid related to conversion of convertible notes | — | (545) |
| Repayment of debt | (9,250) | (2,750) |
| Net cash provided by financing activities | 378,439 | 107,502 |
| Net increase in cash, cash equivalents and restricted cash | 319,368 | 45,278 |
| **Cash, cash equivalents, and restricted cash** | | |
| Beginning of period | 45,627 | 20,660 |
| End of period | $ 364,995 | $ 65,938 |
| | | |
| **Supplemental disclosures of cash flow information** | | |
| Cash paid for interest | $ 532 | $ 488 |
| Cash paid for income taxes | — | 35 |
| **Supplemental disclosures of non-cash investing and financing activities** | | |
| Issuance of convertible preferred stock upon extinguishment of convertible notes | — | 10,557 |
| Issuance of redeemable convertible preferred stock upon extinguishment of convertible notes | — | 5,642 |
| Accretion of redeemable convertible preferred stock to redemption value | 3,355 | 5,651 |
| Loss on extinguishment of convertible notes | — | 370 |
| Purchases of property and equipment included in accounts payable | (877) | (767) |
| Deferred offering costs in accounts payable and accrued liabilities | 28 | — |
| Conversion of convertible preferred stock warrants in connection with IPO | 2,710 | — |
| Conversion of redeemable convertible preferred stock in connection with IPO | 198,228 | — |
| Conversion of convertible preferred stock in connection with IPO | 169,102 | — |

The accompanying notes are an integral part of these unaudited condensed financial statements.

6

**THE REALREAL, INC.**
**Notes to Unaudited Condensed Financial Statements**

**Note 1. Description of Business and Basis of Presentation**

**Organization and Description of Business**

The RealReal, Inc. (the "Company") is an online marketplace for authenticated, consigned luxury goods across multiple categories, including women's, men's, kids', jewelry and watches, and home and art. The Company was incorporated in the state of Delaware on March 29, 2011 and is headquartered in San Francisco, California.

*Basis of Presentation*

The accompanying unaudited condensed financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") and the requirements of the U.S. Securities and Exchange Commission (the "SEC") for interim reporting. The Company's functional and reporting currency is the U.S. dollar.

The condensed balance sheet as of December 31, 2018 included herein was derived from the audited financial statements as of that date. The accompanying unaudited condensed financial statements have been prepared on the same basis as the annual financial statements and, in the opinion of management, reflect all adjustments, which include only normal recurring adjustments, necessary to state fairly the Company's financial position, results of operations, comprehensive loss, redeemable convertible preferred stock, convertible preferred stock, and stockholders' equity (deficit), and cash flows for the periods presented.

These unaudited condensed financial statements should be read in conjunction with the Company's financial statements and notes included in the final prospectus filed with the SEC pursuant to Rule 424(b) under the Securities Act of 1933, as amended on June 28, 2019 (the "Prospectus").

*Initial Public Offering*

The Company's registration statement on Form S-1 (the "IPO Registration Statement") related to its initial public offering ("IPO") was declared effective on June 27, 2019, and the Company's common stock began trading on the Nasdaq Global Select Market on June 28, 2019. On July 2, 2019, the Company completed its IPO, selling 15,000,000 shares of common stock at a price to the public of $20.00 per share, plus an additional 2,250,000 shares of common stock at a price to the public of $20.00 per share pursuant to the exercise of the underwriters' option to purchase additional shares. The Company received aggregate net proceeds of $315.5 million after deducting underwriting discounts and commissions of $24.1 million and issuance costs of $5.4 million.

Immediately prior to the completion of the IPO, the Company filed its Amended and Restated Certificate of Incorporation, which authorizes a total of 500,000,000 shares of common stock, and 50,000,000 shares of undesignated preferred stock.

The Company recorded the conversion of 114,960,357 shares of convertible preferred stock and redeemable convertible preferred stock then outstanding into 58,363,606 shares of common stock to additional paid-in capital. All outstanding preferred stock warrants converted into an aggregate of 103,563 common stock warrants.

*Reverse Stock Split*

On June 13, 2019 the Company effected a reverse split of shares of the Company's common stock on a 1-for-2 basis (the "Reverse Stock Split"). All issued and outstanding shares of common stock, warrants for common stock, options to purchase common stock and the related per share amounts contained in the financial statements have been retroactively adjusted to reflect this Reverse Stock Split for all periods presented. The par value and authorized shares of common stock were not adjusted as a result of the Reverse Stock Split. Additionally, the authorized, issued and outstanding shares of redeemable convertible preferred stock and convertible preferred stock and their related per share amounts, other than the conversion price per share, were not adjusted as a result of the Reverse Stock Split.

**Note 2. Summary of Significant Accounting Policies**

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the financial statements and the reported amounts of expenses during the reporting period. Significant items subject to such estimates and assumptions include those related to revenue recognition, including the returns reserve and material right related to the Company's tiered consignor commission plan, valuation of inventory, stock-based compensation, redemption value of redeemable convertible preferred stock, and other contingencies. The Company evaluates its estimates and assumptions on an ongoing basis using historical experience and other factors and adjusts those estimates and assumptions when facts and circumstances dictate. Actual results could differ from those estimates.

*Net Loss per Share Attributable to Common Stockholders*

The Company follows the two-class method when computing net loss per common share when shares are issued that meet the definition of participating securities. The two-class method determines net loss per common share for each class of common stock and participating securities according to dividends declared or accumulated and participation rights in undistributed earnings. The two-class method requires income available to common stockholders for the period to be allocated between common stock and participating securities based upon their respective rights to receive dividends as if all income for the period had been distributed. The Company's redeemable convertible preferred stock and convertible preferred stock contractually entitles the holders of such shares to participate in dividends but does not contractually require the holders of such shares to participate in the Company's losses.

For periods in which the Company reports net losses, diluted net loss per common share attributable to common stockholders is the same as basic net loss per common share attributable to common stockholders, because potentially dilutive common shares are not assumed to have been issued if their effect is anti-dilutive.

*Revenue Recognition*

The Company generates revenue from the sale of pre-owned luxury goods through its online marketplace.

*Consignment and Service Revenue*

The Company provides a service to sell pre-owned luxury goods on behalf of consignors to buyers through its online marketplace and retail locations. The Company retains a percentage of the proceeds received as payment for its consignment service, which the Company refers to as its take rate. The Company reports consignment revenue on a net basis as an agent and not the gross amount collected from the buyer. Title to the consigned goods remain with the consignor until transferred to the end customer subsequent to purchase of the consigned goods. The Company does not take title of consigned goods at any time except in certain cases where returned goods become Company-owned inventory.

The Company recognizes consignment revenue upon purchase of the consigned good by the buyer as its performance obligation of providing consignment services to the consignor is satisfied at that point. Consignment revenue is recognized net of certain buyer incentives and estimated returns and cancellations. The Company recognizes a returns reserve, based on historical experience, which is recorded in other accrued and current liabilities on the balance sheets (see Note 5). Sales tax assessed by governmental authorities is excluded from revenue.

Certain transactions provide consignors with a material right resulting from the tiered consignor commission plan. Under this plan, the amount an individual consignor receives for future sales of consigned goods may be dependent on previous consignment sales for that consignor within his/her consignment period. Accordingly, in certain consignment transactions, a small portion of the Company's consignment revenue is allocated to such material right using the portfolio method and recorded as deferred revenue.

The Company charges shipping fees to buyers and has elected to treat shipping and handling activities performed after control transfers to the buyer as fulfillment activities. All outbound shipping and handling costs are accounted for as fulfillment costs in cost of consignment and service revenue at the time revenue is recognized.

The Company also generates subscription revenue from monthly memberships allowing buyers early access to shop for luxury goods. The buyers receive the early access and other benefits over the term of the subscription period, which represents a single stand-ready performance obligation. Therefore, the subscription fees paid by the buyer are recognized over the monthly subscription period. Subscription revenue was not material in the three or nine months ended September 30, 2019 and 2018.

8

*Direct Revenue*

The Company generates direct revenue from the sale of Company-owned inventory. The Company recognizes direct revenue upon shipment of the purchased good to the buyer as its performance obligation, consisting of the sale of goods, is satisfied at this point. Direct revenue is recognized net of incentives and estimated returns. Sales tax assessed by governmental authorities is excluded from revenue.

*Incentives*

Promotional incentives, which include basket promotional code discounts and other credits, may periodically be offered to consignors and buyers. These are treated as a reduction of consignment and service revenue and direct revenue. Additionally, the Company may offer site credits to buyers on current transactions to be applied towards future transactions, which are accounted as site credit liabilities and included in other accrued and current liabilities on the balance sheets.

*Contract Liabilities*

The Company's contractual liabilities consist of deferred revenue for material rights primarily related to the tiered consignor commission plan totaling $3.4 million as of September 30, 2019 and $2.7 million as of December 31, 2018, which are recognized as revenue using a portfolio approach based on the pattern of exercise and certain unredeemed site credits, which were immaterial as of September 30, 2019 and December 31, 2018. Contract liabilities are recorded in other accrued and current liabilities on the balance sheets and are generally expected to be recognized within one year.

**Cost of Revenue**

Cost of revenue for consignment and services and direct revenue consist of shipping costs, credit card fees, packaging, customer service and website hosting services. Cost of direct revenue also includes the cost of goods sold.

**Stock-based Compensation**

Stock-based compensation expense related to employees is measured based on the grant-date fair value of the awards. Compensation expense is recognized in the statements of operations over the period during which the employee is required to perform services in exchange for the award (the vesting period of the applicable award) using the straight-line method. The Company estimates the fair value of stock options granted using the Black-Scholes option pricing model and accounts for forfeitures as they occur. The fair value of restricted stock units ("RSUs") is estimated based on the fair market value of the Company's common stock on the date of grant, which is determined based on the closing price of the Company's common stock.

Historically, certain employees were able to sell their shares of the Company's common stock to the Company's existing investors. In such secondary sale transactions, the Company recorded the difference in purchase price and the fair value of such shares as compensation expense within selling, general and administrative in the statement of operations and a corresponding credit to additional paid-in capital.

**Cash, Cash Equivalents and Restricted Cash**

The Company considers all highly liquid investments purchased with original maturities of three months or less from the purchase date to be cash equivalents. Cash equivalents consist primarily of amounts invested in reverse repurchase agreement ("RRAs"). RRAs are collateralized by deposits in the form of United States government securities and obligations for an amount not less than 102% of their value. The Company has a policy that the collateral has at least an A (or equivalent) credit rating. The Company utilizes a third-party custodian to manage the exchange of funds and ensure that collateral received is maintained at 102% of the value of the RRAs on a daily basis. RRAs with stated maturities of greater than three months from the date of purchase are classified as short-term investments.

Restricted cash consists of cash deposited with a financial institution as collateral for the Company's letters of credit for its facility leases and the Company's credit cards. As of September 30, 2019 and December 31, 2018, the Company had letters of credit outstanding and collateral accounts in the amounts of zero and $11.2 million, respectively.

9

The following table provides a reconciliation of cash, cash equivalents and restricted cashthat sum to the total of the same amounts shown in the statements of cash flows (in thousands):

|  | September 30, 2019 | | September 30, 2018 |
|---|---|---|---|
| Cash and cash equivalents | $ | 364,995 | $ 54,704 |
| Restricted cash | | — | 11,234 |
| Total cash, cash equivalents and restricted cash | $ | 364,995 | $ 65,938 |

### Inventory, Net

Inventory primarily consists of finished goods arising from goods returned after the consignor has been paid, upon which the Company assumes the title to the goods until it is resold and recognizes it as inventory in an amount equal to that paid to the consignor. The Company also periodically purchases finished goods directly from vendors. Inventory is valued at the lower of cost and net realizable value using the specific identification method and the Company records provisions, as appropriate, to write down obsolete and excess inventory to estimated net realizable value. After the inventory value is reduced, adjustments are not made to increase it from the estimated net realizable value.

The inventory reserve, which reduces inventory on the balance sheets, was $1.4 million and $0.7 million as of September 30, 2019 and December 31, 2018, respectively.

### Software Development Costs

Proprietary software includes the costs of developing the Company's internal proprietary business platform. The Company capitalizes qualifying proprietary software development costs that are incurred during the application development stage. Capitalization of costs begins when two criteria are met: (1) the preliminary project stage is completed and (2) it is probable that the software will be completed and used for its intended function. Such costs are capitalized in the period incurred. Capitalization ceases and amortization begins when the software is substantially complete and ready for its intended use, including the completion of all significant testing. Costs related to preliminary project activities and post-implementation operating activities are expensed as incurred.

### Accretion of Redeemable Convertible Preferred Stock

The carrying value of the redeemable convertible preferred stock that is probable of redemption is accreted to redemption value from the date of issuance to the earliest redemption date using the effective interest method. Increases to the carrying value of redeemable convertible preferred stock recognized in each period are charged to additional paid-in capital, or in the absence of additional paid-in capital, charged to accumulated deficit.

### Convertible Preferred Stock Warrant Liability

The Company issued convertible preferred stock warrants in conjunction with the issuance of debt. Such warrants were recorded as other noncurrent liabilities on the balance sheets at their estimated fair value because the shares underlying the warrants may obligate the Company to transfer assets to the holders at a future date under certain circumstances such as a deemed liquidation event. The warrants are subject to re-measurement at each balance sheet date and the change in fair value, if any, is included in other expense, net. The Company continued to remeasure these warrants until the earlier of the expiration, exercise or conversion of the convertible preferred stock warrants into common warrants, which occurred upon the completion of the IPO on July 2, 2019. In connection with the completion of the IPO, the convertible preferred stock warrants automatically converted into common stock warrants. Upon conversion of the convertible preferred stock warrants, the related convertible preferred stock warrant liability was reclassified to additional paid-in capital.

### Leases

Leases are reviewed for classification as operating or capital leases. For operating leases, the Company recognizes rent on a straight-line basis over the term of the lease. The Company records the difference between cash payments and rent expense recognized as a deferred rent liability included in other accrued and current liabilities and other noncurrent liabilities on the balance sheets. Incentives granted under the Company's facility leases, including allowances to fund leasehold improvements, are deferred and are recognized as adjustments to rental expense on a straight-line basis over the term of the lease.

*Concentrations of Credit Risks*

Financial instruments that potentially subject the Company to concentrations of credit risk consist of cash and cash equivalents. At times, such amount may exceed federally-insured limits. The Company reduces credit risk by placing its cash and cash equivalents with major credit-worthy financial institutions within the United States.

As of September 30, 2019 and December 31, 2018, there were no customers that represented 10% or more of the Company's accounts receivable balance and there were no customers that individually exceeded 10% of the Company's total revenue for each of the three and nine months ended September 30, 2019 and 2018.

*Recently Adopted Accounting Pronouncements*

In May 2014, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update ("ASU") 2014-09, *Revenue from Contracts with Customers* (ASC 606), which supersedes the existing revenue recognition requirements and requires entities to recognize revenue when control of the promised goods or services is transferred to customers at an amount that reflects the consideration to which the entity expects to be entitled to in exchange for those goods or services. The Company adopted ASC 606 as of January 1, 2018 using the full retrospective transition method.

In June 2018, the FASB issued ASU 2018-08, *Clarifying the Scope and the Accounting Guidance for Contributions Received and Contributions Made (Topic 958)*, which clarified the accounting for contributions made or received by business entities. The Company adopted this guidance beginning on January 1, 2018 using the modified prospective transition. Adoption of the standard did not have a material impact on its financial statements.

In August 2018, the FASB issued ASU 2018-15, *Intangibles—Goodwill and Other—Internal-Use Software (Subtopic 350-40)*. ASU 2018-15 clarifies and aligns the accounting for implementation costs for hosting arrangements with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software. The Company has early adopted this standard effective January 1, 2018 on a prospective basis, which did not have a material impact on its financial statements.

*Recently Issued Accounting Pronouncements*

In January 2016, the FASB issued ASU 2016-01, *Recognition and Measurement of Financial Assets and Financial Liabilities (Subtopic 825-10)*, which will change how to recognize, measure, present and make disclosures about certain financial assets and financial liabilities. Under this standard, if an entity designates a financial liability under the fair value option in accordance with ASC 825, the entity shall measure the financial liability at fair value with qualifying changes in fair value recognized in net income. The entity shall present separately in other comprehensive loss the portion of the total change in the fair value of the liability that results from a change in the instrument-specific credit risk. ASU 2016-01 is effective for fiscal years beginning after December 15, 2018, and interim periods within fiscal years beginning after December 15, 2019. The Company does not expect the adoption of this standard to have a material impact on the operating results.

In February 2016, the FASB issued ASU 2016-02, *Leases (Topic 842)*. ASU 2016-02 is aimed at making leasing activities more transparent and comparable and requires substantially all leases to be recognized by lessees on their balance sheet as a right-of-use asset and corresponding lease liability, including leases currently accounted for as operating leases. The new standard is effective for non-public entities in fiscal years beginning after December 15, 2019 and interim periods in fiscal years beginning after December 15, 2020. Therefore, as an "emerging growth company" as defined in the JOBS Act, the new standard is effective for the Company beginning January 1, 2020.  Under the JOBS Act, emerging growth companies can delay adopting new or revised accounting standards issued subsequent to the enactment of the JOBS Act until such time as those standards apply to private companies. The Company is currently evaluating the impact that this standard will have on its financial statements but expects that it will result in a significant increase in its long-term assets and liabilities.

In June 2016, the FASB issued ASU 2016-13, *Financial Instruments—Credit Losses: Measurement of Credit Losses on Financial Instruments (Topic 326)*. The standard amended guidance on reporting credit losses for assets held at amortized cost basis and available for sale debt securities. For available for sale debt securities, credit losses will be presented as an allowance rather than as a write-down. This standard is effective for fiscal years beginning after December 15, 2020, and interim periods within fiscal years beginning after December 15, 2021. Early adoption is permitted for all entities. The Company does not expect the adoption of this standard to have a material impact on the operating results.

11

In June 2018, the FASB issued ASU 2018-07,*Compensation—Stock Compensation (Topic 718),* which expands the scope of Topic 718 to include share-based payment transactions for acquiring goods and services from non-employees. The standard is effective for fiscal years beginning after December 15, 2019, and interim periods in fiscal years beginning after December 15, 2020. Early adoption is permitted, but no earlier than the Company's adoption date of ASC 606. The Company does not expect the adoption of this standard to have a material impact on the operating results.

In August 2018, the FASB issued ASU 2018-13,*Fair Value Measurement (Topic 820).* This standard modifies disclosure requirements related to fair value measurement and is effective for all entities for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2019. Early adoption is permitted. Implementation on a prospective or retrospective basis varies by specific disclosure requirement. The standard also allows for early adoption of any removed or modified disclosures upon issuance while delaying adoption of the additional disclosures until their effective date. The Company is currently evaluating the impact that this standard will have on its financial statements.

## Note 3. Cash, Cash Equivalents and Short-Term Investments

The following tables summarize the estimated value of the Company's cash, cash equivalents and short-term investments (in thousands):

| | September 30, 2019 | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Amortized Cost | | Unrealized Gain | | Unrealized Loss | | Fair Value | |
| Cash and cash equivalents: | | | | | | | | |
| Cash | $ | 119,130 | $ | — | $ | — | $ | 119,130 |
| Money market fund | | 231,865 | | — | | — | | 231,865 |
| Corporate bonds | | 2,000 | | — | | — | | 2,000 |
| Reverse repurchase agreements | | 12,000 | | — | | — | | 12,000 |
| Total cash and cash equivalents | $ | 364,995 | $ | — | $ | — | $ | 364,995 |
| Short-term investments: | | | | | | | | |
| U.S. corporate bonds | $ | 2,282 | $ | 1 | | — | $ | 2,283 |
| International corporate bonds | | 3,007 | | — | | — | | 3,007 |
| Total short-term investments | $ | 5,289 | $ | 1 | $ | — | $ | 5,290 |

| | December 31, 2018 | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Amortized Cost | | Unrealized Gain | | Unrealized Loss | | Fair Value | |
| Cash and cash equivalents: | | | | | | | | |
| Cash | $ | 10,253 | $ | — | $ | — | $ | 10,253 |
| Money market fund | | 140 | | — | | — | | 140 |
| Reverse repurchase agreements | | 24,000 | | — | | — | | 24,000 |
| Total cash and cash equivalents | $ | 34,393 | $ | — | $ | — | $ | 34,393 |
| Short-term investments: | | | | | | | | |
| U.S. corporate bonds | $ | 21,184 | $ | — | $ | (19) | $ | 21,165 |
| International corporate bonds | | 5,972 | | — | | (6) | | 5,966 |
| Total short-term investments | $ | 27,156 | $ | — | $ | (25) | $ | 27,131 |

As of September 30, 2019 and December 31, 2018, the contractual maturity for the short-term investments is less than one year. For the three and nine months ended September 30, 2019 and 2018, the Company recognized no material realized gains or losses on short-term investments.

12

**Note 4. Fair Value Measurement**

Assets and liabilities recorded at fair value on a recurring basis on the balance sheets are categorized based upon the level of judgment associated with the inputs used to measure their fair values. Fair value is defined as the exchange price that would be received for an asset or an exit price that would be paid to transfer a liability in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. Valuation techniques used to measure fair value must maximize the use of observable inputs and minimize the use of unobservable inputs. The authoritative guidance on fair value measurements establishes a three-tier fair value hierarchy for disclosure of fair value measurements as follows:

Level 1—Observable inputs such as unadjusted, quoted prices in active markets for identical assets or liabilities at the measurement date.

Level 2—Inputs (other than quoted prices included in Level 1) are either directly or indirectly observable for the asset or liability. These include quoted prices for similar assets or liabilities in active markets and quoted prices for identical or similar assets or liabilities in markets that are not active.

Level 3—Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

There were no transfers between Level 1, Level 2 or Level 3 of the fair value hierarchy during the periods presented.

The following tables provide the financial instruments measured at fair value (in thousands):

| | September 30, 2019 | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash equivalents: | | | | |
| Money market fund | $ 231,865 | $ — | $ — | $ 231,865 |
| Corporate bonds | — | 2,000 | — | 2,000 |
| Reverse repurchase agreements | — | 12,000 | — | 12,000 |
| Total cash equivalents | $ 231,865 | $ 14,000 | $ — | $ 245,865 |
| Short-term investments: | | | | |
| U.S. corporate bonds | $ — | $ 2,283 | $ — | $ 2,283 |
| International corporate bonds | — | 3,007 | — | 3,007 |
| Total short-term investments | $ — | $ 5,290 | $ — | $ 5,290 |
| Total assets | $ 231,865 | $ 19,290 | $ — | $ 251,155 |

| | December 31, 2018 | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash equivalents: | | | | |
| Money market fund | $ 140 | $ — | $ — | $ 140 |
| Reverse repurchase agreements | — | 24,000 | — | 24,000 |
| Total cash equivalents | $ 140 | $ 24,000 | $ — | $ 24,140 |
| Short-term investments: | | | | |
| U.S. corporate bonds | $ — | $ 21,165 | $ — | $ 21,165 |
| International corporate bonds | — | 5,966 | — | 5,966 |
| Total short-term investments | $ — | $ 27,131 | $ — | $ 27,131 |
| Total assets | $ 140 | $ 51,131 | $ — | $ 51,271 |
| **Liabilities** | | | | |
| Convertible preferred stock warrant liability | $ — | $ — | $ 610 | $ 610 |
| Total liabilities | $ — | $ — | $ 610 | $ 610 |

13

The fair value of the convertible preferred stock warrant liability on the date of issuance and each re-measurement date was estimated using the Black-Scholes option pricing model.  Inputs used to determine the estimated fair value as of each valuation date included expected term of the warrants, the risk-free interest rate, volatility, and the fair value of underlying shares. Due to the nature of these inputs, the valuation of the warrants is considered a Level 3 measurement. The following table presents a rollforward of the fair value of the level 3 liabilities recorded at fair valueat September 30, 2019 (in thousands):

| | Convertible Preferred Stock Warrant Liability |
|---|---|
| Balance as of December 31, 2018 | $ 610 |
| Changes in estimated fair value | 2,100 |
| Reclass to additional paid-in capital upon conversion to common stock warrants | (2,710) |
| Balance as of September 30, 2019 | $ — |

**Note 5. Balance Sheet Components**

*Property and Equipment, Net*

Property and equipment, net is recorded at cost less accumulated depreciation and amortization. Depreciation and amortization are recorded on a straight-line basis over the estimated useful lives of the respective assets. Property and equipment, net consists of the following (in thousands):

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Proprietary software | $ 20,721 | $ 14,052 |
| Furniture and equipment | 18,463 | 12,665 |
| Automobiles | 521 | 346 |
| Leasehold improvements | 34,954 | 25,702 |
| | 74,659 | 52,765 |
| Less: accumulated depreciation and amortization | (28,944) | (19,479) |
| Property and equipment, net | $ 45,715 | $ 33,286 |

Depreciation and amortization expense on property and equipment was $3.5 million and $2.4 million for the three months ended September 30, 2019 and 2018, respectively, and $9.5 million and $6.5 million for the nine months ended September 30, 2019 and 2018, respectively.

*Other Accrued and Current Liabilities*

Other accrued and current liabilities consist of the following (in thousands):

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Returns reserve | $ 12,163 | $ 14,311 |
| Accrued compensation | 8,134 | 8,078 |
| Site credit liability | 5,612 | 4,700 |
| Accrued sales tax and other taxes | 4,703 | 4,476 |
| Deferred revenue | 3,582 | 3,184 |
| Accrued marketing and outside services | 4,963 | 4,152 |
| Other | 3,391 | 3,055 |
| Other accrued and current liabilities | $ 42,548 | $ 41,956 |

14

**Note 6. Debt and Convertible Preferred Stock Warrants**

*Term Loans*

In 2013, the Company entered into an agreement to obtain a term loan facility ("Term Loan Facility") in the amount of $5.0 million for general corporate purposes and working capital expenditures. In 2014, 2015 and 2016, the Company amended its Term Loan Facility to increase the amount borrowed under the facility by $11.6 million. The Term Loan Facility is secured by liens on substantially all of the Company's present and future assets.

The Term Loan Facility includes affirmative, negative and financial covenants that restrict the Company's ability to, among other things, incur additional indebtedness, make investments, sell or otherwise dispose of assets, pay dividends or repurchase stock. The Term Loan Facility's financial covenants required the Company to achieve at least 80% of its forecasted gross revenue and a liquidity ratio on a monthly basis.

In 2017, the Company executed the eighth amendment ("Eight Amendment") to the Term Loan Facility. The Eighth Amendment refinanced the $15.0 million repayment schedule to be two term loans, which included a $7.5 million interest only term loan with a maturity date of January 31, 2019 ("Term Loan I"), and the remaining $7.5 million under the existing Term Loan Facility with a maturity date of January 1, 2020 ("Term Loan II") (together the "Term Loans").

In 2018, the Company entered into the ninth, tenth, eleventh, and twelfth amendment ("Ninth Amendment," "Tenth Amendment," "Eleventh Amendment" and "Twelfth Amendment") to the existing Term Loans. The Ninth Amendment removed the liquidity ratio covenant, amended Term Loan I to be due in 30 equal monthly installments, plus all accrued interest, beginning July 31, 2018, increased the variable annual interest rate from 0.10% above the prime rate to 0.35% above the prime rate and extended the maturity date of Term Loan I to January 31, 2021.

The Eighth Amendment and Ninth Amendment required the Company to pay a combined success fee of $0.3 million upon (1) any sale or licensing of all or substantially all of the Company's assets, (2) any change in control of the Company, or (3) an initial public offering of the Company's equity securities. The Ninth Amendment also required the Company to pay an additional success fee of $0.1 million upon the sale or issuance of the Company's equity securities or subordinated debt securities for net cash proceeds of at least $50.0 million on or prior to June 30, 2018. The Company paid the $0.1 million success fee upon the Series G convertible preferred stock financing in June 2018 and the $0.3 million success fee related to its IPO in July 2019.

The Tenth and Twelfth Amendments adjusted and waived certain covenant violations which were subsequently amended and met. The Eleventh Amendment provided an additional letter of credit of $1.5 million for corporate credit cards with a maturity date of August 1, 2019.

On July 26, 2019 the Company fully repaid the principal of its Terms Loans in the amount of $6.5 million. With the repayment of the term loans, the Company was no longer subject to debt covenants as of September 30, 2019. During the three months ended, September 30, 2019 and 2018, the Company recorded interest expense related to the Term Loans of $0.1 million and $0.2 million, respectively. During the nine months ended September 30, 2019 and 2018, the Company recorded interest expense related to the Term Loans of $0.6 million and $0.5 million, respectively.

*Warrants Issued with Term Loan Facility*

During the period from 2013 to 2016, in connection with the Term Loan Facility, the Company issued convertible preferred stock warrants, which included warrants to purchase 131,652 shares of its Series B convertible preferred stock with an exercise price of $1.03 per share, 6,868 shares of its Series C convertible preferred stock with an exercise price of $2.18 per share, 43,010 shares of its Series D convertible preferred stock with an exercise price of $2.79 per share and 25,597 shares of its Series E convertible preferred stock with an exercise price of $2.93 per share (together the "Convertible Preferred Stock Warrants"). The Convertible Preferred Stock Warrants were exercisable from the date of issuance and have a 10-year term. The initial estimated fair value of the Convertible Preferred Stock Warrants was recorded as convertible preferred stock warrant liability with an offset to the debt discount associated with the Term Loan Facility. The debt discount is amortized to interest expense over the repayment period of the loan using the effective-interest method. All convertible Preferred Stock Warrants were converted to common stock warrants and exercised through net share settlement in July 2019. No warrants were outstanding as of September 30, 2019.

15

**Note 7. Convertible Notes**

In April 2018, the Company issued $14.4 million in convertible notes ("Convertible Notes") to existing shareholders of redeemable convertible and convertible preferred stock. Interest accrued on the principal balance at an annual rate of 8%. Principal and accrued interest were due at the earliest of (1) the one-year anniversary of the issuance date, (2) event of default and (3) a change of control, defined as either a merger, sale of stock or assets or other form of transaction.

The maturity date could be extended if agreed upon by the Company and investors holding the convertible notes representing at least 80% of the outstanding amount at such time. On change of control, the holders of convertible notes could elect to either (1) receive full repayment of the note outstanding or (2) convert the entire outstanding amount of principal and accrued interest into shares of Series F preferred stock at a price per share of $3.8590.

The outstanding balance of principal and accrued interest automatically converts into fully paid and nonassessable shares of preferred stock issued on the issuance of preferred stock with aggregate gross proceeds of at least $25.0 million (a "Qualified Financing") prior to the maturity date of the convertible notes. On the issuance of preferred stock with aggregate gross proceeds of less than $25.0 million (a "Non-Qualified Financing"), holders of the Convertible Notes could elect to convert all or any portion of the outstanding principal and interest into fully paid and nonassessable shares of preferred stock. On conversion of the convertible notes in either a Qualified Financing or Non-Qualified Financing, preferred shares would be issued at a price of 90% of the price per share paid by the purchasers of preferred stock participating in the financing.

The Qualified Financing and Non-Qualified Financing redemption features were determined to be a compound embedded derivative requiring bifurcation and separate accounting at its estimated fair value. On issuance of the Convertible Notes, the Company recognized a liability of $0.4 million for the estimated fair value of the embedded derivative and incurred $0.1 million in debt issuance costs, both of which were recorded as a debt discount associated with the Convertible Notes.

In June 2018, the outstanding balance of principal and accrued interest on the Convertible Notes of $14.6 million converted into 1,067,550 and 1,997,709 shares of the Company's Series G redeemable convertible and convertible preferred stock, respectively, at a price of $4.7565 per share in conjunction with the Company's Series G convertible preferred stock financing, which was a Qualified Financing under the terms of the Convertible Notes. The conversion of the Convertible Notes into Series G redeemable convertible preferred stock and Series G convertible preferred stock was accounted for as an extinguishment. The extinguishment of the Convertible Notes was considered a capital transaction and accordingly, the Company recognized a $0.4 million loss on extinguishment through additional paid in capital equal to the unamortized debt discount at the date of conversion.

During the nine months ended September 30, 2018 the Company recognized $0.2 million of interest expense and an expense of $1.2 million related to the change in fair value of the Convertible Notes embedded derivative liability, which was included in other expense, net in the statements of operations.

**Note 8. Convertible Preferred Stock and Redeemable Convertible Preferred Stock**

On July 2, 2019 and immediately prior to the completion of the IPO, all outstanding shares of convertible preferred stock and redeemable convertible preferred stock then outstanding converted into 58,363,606 shares of common stock. The carrying value of the redeemable convertible preferred stock was accreted to redemption value from the date of issuance to the earliest redemption date using the effective interest method. The Company determined that redemption of the redeemable convertible preferred stock was not probable and as such, did not record any additional accretion after March 31, 2019.

At December 31, 2018, convertible preferred stock and redeemable convertible preferred stock consisted of the following (in thousands, except share amounts):

| | December 31, 2018 | | | |
| --- | --- | --- | --- | --- |
| | Shares Authorized | Shares Issued and Outstanding | Net Carrying Value | Aggregate Liquidation Preference |
| Series A | 18,960,000 | 18,941,619 | $ 9,161 | $ 9,217 |
| Series B | 13,784,443 | 13,652,791 | 13,774 | 14,000 |
| Series C | 9,335,659 | 9,328,791 | 20,289 | 20,374 |
| Series D | 14,367,652 | 14,324,642 | 39,886 | 40,000 |
| Series E | 13,612,543 | 13,586,946 | 39,880 | 40,000 |
| Series F | 12,956,724 | 12,956,724 | 54,968 | 57,211 |
| Series G | 21,986,733 | 21,986,733 | 116,242 | 120,544 |
| Total | 105,003,754 | 104,778,246 | $ 294,200 | $ 301,346 |

16

**Note 9. Share-based Compensation Plans**

*2011 Equity Incentive Plan*

In 2011, the Company adopted the Equity Incentive Plan (2011 Plan) authorizing the granting of incentive stock options (ISOs) and non-statutory stock options (NSOs) to eligible participants for up to 12,987,255 shares of common stock. Under the 2011 Plan, incentive stock options and non-statutory stock options are to be granted at an exercise price that is no less than 100% of the fair value of the stock at the date of grant. Options generally vest over four years and are exercisable for up to 10 years after the date of grant. Incentive stock options granted to stockholders who own more than 10% of the outstanding stock of the Company at the time of grant must be issued at an exercise price no less than 110% of the fair value of the stock on the date of grant. The 2011 Plan has been replaced by the Company's 2019 Plan as defined below with respect to future equity awards.

*2019 Equity Incentive Plan*

In connection with the Company's initial public offering, the Company adopted the 2019 Equity Incentive Plan (the "2019 Plan"). The 2019 Plan allows the Company to grant stock options, stock appreciation rights, restricted stock, restricted stock units and performance awards to participants. Subject to the terms and conditions of the 2019 Plan, the initial number of shares authorized for grants under the 2019 Plan is 8,000,000.

*Employee Stock Purchase Plan*

In connection with the Company's initial public offering, the Company adopted the Employee Stock Purchase Plan. The Employee Stock Purchase Plan permits employees to purchase shares of common stock during six-month offering periods at a purchase price equal to the lesser of (1) 85% of the fair market value of a share of common stock on the first business day of such offering period and (2) 85% of the fair market value of a share of common stock on the last business day of such offering period.   The plan is considered compensatory and, as such, the purchase discount from market price purchased by employees will be recorded as compensation expense.  As of September 30, 2019, the maximum number of shares of common stock that can be issued under the employee stock purchase plan was 1,750,000 shares.  No offering period started during the three months ended September 30, 2019 and thus there was no activity associated with the plan for the three or nine months ended September 30, 2019.

*Stock-based Compensation*

Total stock-based compensation expense, excluding compensation expense related to stock sales by current and former employees, by function was as follows (in thousands):

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2019 | 2018 | 2019 | 2018 |
| Marketing | $ 145 | $ 42 | $ 287 | $ 115 |
| Operations and technology | 1,098 | 239 | 2,064 | 775 |
| Selling, general and administrative | 1,277 | 459 | 2,565 | 1,076 |
| Total | $ 2,520 | $ 740 | $ 4,916 | $ 1,966 |

The amounts presented in the above table exclude compensation expense related to the stock sales by current and former employees In September 2018, executives of the Company sold an aggregate of 432,270 shares of the Company's common stock at a price of $9.0902 per share for an aggregate amount of $3.9 million to certain of the Company's existing investors. The Company determined that the purchase price was in excess of the fair value of such shares. As a result, during the year ended December 31, 2018, the Company recorded the excess of the purchase price above fair value of $0.8 million as compensation expense within selling, general and administrative in the statements of operations and a corresponding credit to additional paid-in capital.

Additionally, in March 2019, executives of the Company sold an aggregate of 382,477 shares of the Company's common stock at a price of $12.72 per share for an aggregate amount of $4.9 million to certain of the Company's existing investors. The Company determined that the purchase price was in excess of the fair value of such shares. As a result, during the three months ended March 31, 2019, the Company recorded the excess of the purchase price above fair value of $0.8 million as compensation expense within selling, general and administrative in the statement of operations and a corresponding credit to additional paid-in capital.

**Note 10. Commitments and Contingencies**

*Leases*

The Company leases its corporate offices, retail spaces and merchandising and fulfillment facilities under various noncancelable operating leases with terms ranging from one year to eleven years. Rent expense from operating leases totaled $4.8 million and $2.7 million for the three months ended September 30, 2019 and 2018, respectively and $13.4 million and $6.9 million for the nine months ended September 30, 2019 and 2018, respectively. The current portion of deferred rent was $0.8 million as of September 30, 2019 and is included in other accrued and current liabilities on the balance sheets. The noncurrent portion of deferred rent was $6.8 million as of September 30, 2019 and is included in other noncurrent liabilities on the balance sheets.

As of September 30, 2019, the Company's future minimum lease payments under the noncancelable leases are as follows (in thousands):

| Year Ending December 31, | Operating Leases |
|---|---|
| 2019 | $ 4,728 |
| 2020 | 19,439 |
| 2021 | 19,455 |
| 2022 | 16,733 |
| 2023 | 15,539 |
| Thereafter | 64,537 |
| Total future minimum payments | $ 140,431 |

*Noncancelable Purchase Commitments*

The Company has commitments for cloud services and other items in the ordinary course of business with varying expiration terms through 2021. As of September 30, 2019, there were no material changes to the Company's noncancelable purchase commitments disclosed in the financial statements in the Prospectus.

*Other Commitments*

In January 2018, the Company and the University of Arizona Foundation entered into an endowment agreement (the "Endowment Agreement") to establish a fund (the "Fund") to create and grow a gemology degree program in the Department of Geosciences at the University of Arizona (the "University"). The Company agreed to donate a total of $2.0 million, payable in four annual installments of $0.5 million. The first installment was paid in January 2018 on execution of the Endowment Agreement.

There are no conditions that the University must meet to receive the funds nor any penalties to the University for nonperformance. The Endowment Agreement directs the use of the funds but contains no binding restrictions on the use of the funds. On the execution of the Endowment Agreement, the Company recognized $1.7 million expense for the estimated fair value of the grant, using a discount rate of 10%, to selling, general and administrative expenses in the statements of operations. The Company recognized a corresponding liability for the remaining installment payments and will recognize accretion of the liability as interest expense over the remaining term of the Endowment Agreement.

Interest expense related to the accretion of the grant liability was not material in the three and nine months ended September 30, 2019 and 2018. As of September 30, 2019, the outstanding liability was $0.9 million, of which $0.4 million is included in other accrued and current liabilities on the balance sheets and $0.5 million is included in other noncurrent liabilities on the balance sheets.

*Contingencies*

From time to time the Company is subject to, and it is presently involved in, litigation and other legal proceedings. Accounting for contingencies requires the Company to use judgment related to both the likelihood of a loss and the estimate of the amount or range of loss. The Company records a loss contingency when it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. The Company discloses material contingencies when a loss is not probable but reasonably possible.

On November 14, 2018, Chanel, Inc. ("Chanel") filed a lawsuit against the Company in the U.S. District Court for the Southern District of New York bringing various trademark and advertising-related claims under the Lanham Act and New York state law analogues. Chanel alleges, among other things, that the Company has misrepresented certain counterfeit Chanel products as authentic Chanel products, that the Company's resale of Chanel products confuses consumers into believing that Chanel is affiliated with the

18

Company and involved in authenticating consignors' goods and that only Chanel is capable of authenticating second-hand Chanel goods. This litigation is in its early stages and the final outcome, including the Company's liability, if any, with respect to Chanel's claims, is uncertain. Chanel could in the future assert additional trademark and advertising or other claims against the Company in this or other proceedings. An unfavorable outcome in this or similar litigation could adversely affect our business and could lead to other similar lawsuits.  The Company is not able to predict or reasonably estimate the ultimate outcome or possible losses relating to this claim.

On September 11, 2019, a purported shareholder class action complaint was filed against the Company, its officers and directors and the underwriters of its IPO in the Superior Court of the State of California in the County of San Mateo. A second purported class action was filed in Marin County Superior Court on September 16, 2019 and a third purported action was filed in Marin County Superior Court on October 7, 2019. The complaints each allege claims under the Securities Act of 1933, as amended ("Securities Act") on behalf of a purported class of those who acquired the Company's stock pursuant to or traceable to the registration statement for the Company's IPO. The complaints allege, among other things, that the defendants violated federal securities laws by issuing false or misleading statements regarding certain of the Company's key financial and operating metrics at the time of the IPO.  The complaints seek, among other things, damages and interest, rescission, and attorneys' fees and costs.  Plaintiff in the San Mateo action voluntarily dismissed that case in order to re-file in Marin County Superior Court and the cases are in the process of being coordinated before the Marin County Superior Court. While the Company intends to vigorously defend against this consolidated litigation, the cases are at a very early stage and there can be no assurance that the Company will be successful in its defense. For this same reason, the Company cannot currently estimate the loss or the range of possible losses it may experience in connection with this litigation.

*Indemnifications*

In the ordinary course of business, the Company may provide indemnifications of varying scope and terms to vendors, directors, officers and other parties with respect to certain matters. The Company has not incurred any material costs as a result of such indemnifications and have not accrued any liabilities related to such obligations in its financial statements.

**Note 11. Income Taxes**

The quarterly income tax provision reflects an estimate of the corresponding quarter's state taxes in the United States.

**Note 12. Net Loss Per Share**

A reconciliation of the numerator and denominator used in the calculation of the basic and diluted net loss per share attributable to common stockholders is as follows (in thousands, except share and per share data):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2019 | 2018 | 2019 | 2018 |
| **Numerator** | | | | |
| Net loss attributable to common stockholders | $ (25,274) | $ (25,085) | $ (78,726) | $ (59,237) |
| **Denominator** | | | | |
| Weighted-average common shares outstanding used to calculate net loss per share attributable to common stockholders, basic and diluted | 84,634,956 | 8,349,403 | 34,556,485 | 8,321,296 |
| Net loss per share attributable to common stockholders, basic and diluted | $ (0.30) | $ (3.00) | $ (2.28) | $ (7.12) |

The following securities were excluded from the computation of diluted net loss per share attributable to common stockholders for the periods presented, because including them would have been anti-dilutive (on an as-converted basis):

| | September 30, | |
| --- | --- | --- |
| | 2019 | 2018 |
| Convertible preferred stock | — | 36,862,298 |
| Redeemable convertible preferred stock | — | 16,410,256 |
| Options to purchase common stock | 9,417,490 | 8,628,662 |
| Restricted stock units | 551,549 | — |
| Warrants to purchase convertible preferred stock | — | 103,563 |
| Warrant to purchase common stock | — | 67,974 |
| Total | 9,969,039 | 62,072,753 |

19

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*The following discussion of our financial condition and results of operations should be read together with our condensed financial statements and related notes thereto included elsewhere in this Quarterly Report on Form 10-Q and our final prospectus, dated June 27, 2019 and filed pursuant to Rule 424(b) under the Securities Act of 1933, as amended, the "Securities Act," which we refer to as our Prospectus. The following discussion contains forward-looking statements that reflect our plans, estimates and beliefs. Our actual results could differ materially from those discussed in the forward-looking statements. Factors that could cause or contribute to these differences include those discussed below and particularly in the section titled "Risk Factors" and elsewhere in this Quarterly Report on Form 10-Q and in our Prospectus. Our historical results are not necessarily indicative of the results that may be expected for any period in the future, and our interim results are not necessarily indicative of the results we expect for the full calendar year or any other period.*

**Overview**

We are the world's largest online marketplace for authenticated, consigned luxury goods. We are revolutionizing luxury resale by providing an end-to-end service that unlocks supply from consignors and creates a trusted, curated online marketplace for buyers globally. Over the past eight years, we have cultivated a loyal and engaged consignor and buyer base through continuous investment in our technology platform, logistics infrastructure and people. We aggregate and curate unique, pre-owned luxury supply that is exclusive to The RealReal across multiple categories, including women's, men's, kids', jewelry and watches, and home and art. We have built a vibrant online marketplace that we believe expands the overall luxury market, promotes the recirculation of luxury goods and contributes to a more sustainable world.

We have transformed the luxury consignment experience by removing the friction and pain points inherent in the traditional consignment model. For consignors, we provide White Glove in-home consultation and pickup, drop off at one of our nine luxury consignment offices ("LCOs") three of which are located in our retail stores, or complimentary shipping directly to our merchandising and fulfillment facilities. We leverage our proprietary transactional database and market insights to deliver optimal pricing and rapid sell-through. For buyers, we offer highly coveted and exclusive authenticated pre-owned luxury goods at attractive values, as well as a high-quality experience befitting the products we offer. Our online marketplace is powered by our proprietary technology platform, including consumer facing applications and purpose-built software that supports our complex, individual stock keeping unit ("single-SKU") inventory model and merchandising operations.

The substantial majority of our revenue is generated by consignment sales. We also generate revenue from other services and direct sales.

- *Consignment and service revenue.* When we sell goods through our online marketplace on behalf of our consignors, we retain a percentage of the proceeds, which we refer to as our take rate. Take rates vary depending on the total value of goods sold through our online marketplace on behalf of a particular consignor as well as the category and price point of the items. In the three months ended September 30, 2019 and 2018, our overall take rate on consigned goods was 36.8% and 36.4%, respectively. In the nine months ended September 30, 2019 and 2018, our overall take rate on consigned goods was 36.3% and 35.7%, respectively. Additionally, we earn revenue from shipping fees and from our subscription program, *First Look*, in which we offer buyers early access to the items we sell in exchange for a monthly fee.

- *Direct revenue.* In certain cases, such as when we accept returns from buyers after we have already remitted sale proceeds to the consignor, we take ownership of goods and retain 100% of the proceeds when the goods subsequently resell through our online marketplace.

We generate revenue from orders processed through our website, mobile app, LCOs, and three retail stores located in New York and Los Angeles. Our omni-channel experience enables buyers to purchase anytime and anywhere. We have a global base of approximately 14.0 million members as of September 30, 2019. We count as a member any user who has registered an email address on our website or downloaded our mobile app, thereby agreeing to our terms of service.

Through September 30, 2019, we have cumulatively paid $1.2 billion in commissions to our consignors. In the three months ended September 30, 2019 and 2018, our gross merchandise value ("GMV") was $252.8 million and $170.9 million, respectively, representing a growth rate of 48%. In the nine months ended September 30, 2019 and 2018, our GMV was $705.4 million and $492.3 million, respectively, representing a growth rate of 43%. In the three months ended September 30, 2019 and 2018, our total revenue was $80.5 million and $51.8 million, respectively, representing a growth rate of 55%. In the nine months ended September 30, 2019 and 2018, our total revenue was $220.7 million and $145.3 million, respectively, representing a growth rate of 52%.

20

**Initial Public Offering**

Our registration statement on Form S-1 (the "IPO Registration Statement") related to our initial public offering ("IPO")was declared effective on June 27, 2019 and our common stock began trading on the Nasdaq Global Select Market on June 28, 2019. Our IPO was completed on July 2, 2019, in which we sold 17,250,000 shares of common stock at price to the public of $20.00 per share (including shares subject to the exercise of the underwriters' over-allotment option) for aggregate net proceeds to us of approximately $315.5 million, after underwriting discounts, commissions and issuance costs.

**Factors Affecting Our Performance**

To analyze our business performance, determine financial forecasts and help develop long-term strategic plans, we focus on the factors described below. While each of these factors presents significant opportunity for our business, collectively, they also pose important challenges that we must successfully address in order to sustain our growth, improve our operating results and achieve and maintain our profitability.

*Supply and Demand*

*Consignor growth and retention.* We grow our sales by increasing the supply of luxury goods offered through our consignment online marketplace. We grow our supply both by attracting new consignors and by creating lasting engagement with existing consignors. We generate leads for new consignors principally through our advertising activity. We convert those leads into active consignors through the activities of our sales professionals, who are trained and incentivized to identify and source high-quality, coveted luxury goods from consignors. Our sales professionals form a consultative relationship with consignors and deliver a high-quality, rapid consigning experience. Our existing relationships with consignors allow us to unlock valuable supply across multiple categories within the home, including women's, men's, kids', jewelry and watches, and home and art. We leverage our proprietary transactional database and market insights based on more than 11.5 million item sales since inception to deliver consignors optimal pricing and rapid sell-through.

Our growth has been driven in significant part by repeat sales from existing consignors concurrent with growth of our consignor base. Consignors in historical cohorts continue to drive the significant majority of sales on our platform. The percentage of GMV from repeat consignors in the three and nine months ended September 30, 2019 was 81% as compared to 80% for both the three and nine months ended September 30, 2018 periods.  If we fail to continue to attract consignors to our online marketplace or grow available supply over time, our operating results would be adversely affected.

*Buyer growth and retention.* We grow our business by attracting and retaining buyers. We attract and retain buyers by offering highly coveted, authenticated, pre-owned luxury goods at attractive values and delivering a high-quality, luxury experience. We measure our success in attracting and retaining buyers by tracking buyer satisfaction and purchasing activity over time. Historically, we have experienced high buyer satisfaction. The percentage of GMV from repeat buyers for the three months ended September 30, 2019 was 82% compared to 83% for the three months ended September 30, 2018. The percentage of GMV from repeat buyers for the nine months ended September 30, 2019 and 2018 was 82%.

We believe there is substantial opportunity to grow our business by having buyers also become consignors and vice versa. As of September 30, 2019, 13% of our buyers had become consignors and 54% of our consignors had become buyers. If we fail to continue to attract and retain our buyer base to our online marketplace, our operating results would be adversely affected.

*Scaling operations and technology.* To support the future growth of our business, we are expanding our capacity through investments in physical infrastructure, talent and technology. We principally conduct our intake, authentication, merchandising and fulfillment operations in our four leased merchandising and fulfillment facilities located in California and New Jersey comprising an aggregate of approximately 1 million square feet of space. The market for real estate to support operations centers such as ours is becoming increasingly competitive, and we will need to continue to secure and efficiently bring online additional capacity to support future growth. The opening of our retail stores in New York in late 2017 and Los Angeles in mid-2018 significantly contributed to the increase in operations and technology expense in 2018. We opened a second retail store in New York in May 2019 and we intend to open additional retail stores in the future. In addition to scaling our physical infrastructure, growing our single-SKU business operations requires that we attract, train and retain highly-skilled personnel for purposes of authentication, copywriting, merchandising, pricing and fulfilling orders. We are also investing substantially in technology to automate our operations and support growth. While we expect our operations and technology development expenses to increase as we continue to grow, we expect such expenses to decrease as a percentage of total revenue over the longer-term.

*Seasonality.* We have observed trends in seasonality of supply and demand in our business that we believe will continue. Specifically, our supply increases in the third and fourth quarters, and our demand increases in the fourth quarter. As a result of this seasonality, we typically see stronger average order value ("AOV"), and more rapid sell-through in the fourth quarter. We also incur higher operating expenses in the last four months of the year as we increase advertising spend to attract consignors and buyers and increase headcount in sales and operations to handle the higher volumes.

**Key Financial and Operating Metrics**

The key operating and financial metrics that we use to assess the performance of our business are set forth below for the three and nine months ended September 30, 2019 and 2018.

| | Three Months Ended | | | | Nine Months Ended | | | |
| | September 30, 2019 | | September 30, 2018 | | September 30, 2019 | | September 30, 2018 | |
| | (In thousands, except AOV and percentages) | | | | | | | |
| GMV | $ | 252,766 | $ | 170,923 | $ | 705,358 | $ | 492,255 |
| NMV | $ | 186,617 | $ | 123,550 | $ | 511,937 | $ | 352,813 |
| Number of Orders | | 577 | | 409 | | 1,581 | | 1,124 |
| Take Rate | | 36.8% | | 36.4% | | 36.3% | | 35.7% |
| Active Buyers | | 543 | | 379 | | 543 | | 379 |
| AOV | $ | 438 | $ | 418 | $ | 446 | $ | 439 |

**GMV**

GMV represents the total amount paid for goods across our online marketplace in a given period. We do not reduce GMV to reflect product returns or order cancellations. GMV includes amounts paid for both consigned goods and our inventory net of platform-wide discounts and excludes the effect of direct buyer incentives, shipping fees and sales tax. Buyer incentives consist of coupons or promotions that offer credits in connection with purchases on our platform. We believe this is the primary measure of the scale and growth of our online marketplace and the key indicator of the health of our consignor ecosystem. We monitor trends in GMV to inform budgeting and operational decisions to support and promote growth in our business and to monitor our success in adapting our business to meet the needs of our consignors and buyers. While GMV is the primary driver of our revenue, it is not a proxy for revenue or revenue growth.

**NMV**

NMV, or net merchandise value, represents GMV less product returns and order cancellations and direct buyer incentives. NMV includes amounts paid for both consigned goods and our inventory. We believe NMV is a useful supplemental measure of the scale and growth of our online marketplace as it is the basis for calculating consignor commissions and is therefore an important indicator of the health of our consignor ecosystem for investors. Like GMV, NMV is not a proxy for revenue or revenue growth.

**Number of Orders**

Number of orders means the total number of orders placed across our online marketplace in a given period. We do not reduce number of orders to reflect product returns or order cancellations.

**Take Rate**

Take rate is a key driver of our revenue and provides comparability to other marketplaces. The numerator used to calculate our take rate is equal to GAAP consignment and service revenue, excluding certain buyer incentives and shipping and subscription service revenue. The denominator is equal to the numerator plus consignor commissions. We exclude direct revenue from our calculation of take rate because direct revenue represents the sale of inventory owned by us, which costs are included in cost of direct revenue. See the subsection titled "—Components of our Operating Results—Revenue" for further discussion of consignment and service revenue and direct revenue. Our take rate reflects the high level of service that we provide to our consignors across multiple touch points and the consistently high velocity of sales for their goods. Our take rate structure is a tiered commission structure for consignors, where the more they sell the higher percent commission they earn. Consignors start at a 55% commission (which equals a 45% take rate for us) and can earn up to a 70% commission. This tiered structure applies unless it is overridden by a commission exception.

Commission exceptions are used to incentivize our sales team, optimize supply and drive take rate changes. Examples of current commission exceptions include a flat 40% commission on all items under $145, and an 85% commission on watches over $2,500. Management assesses changes in take rates by monitoring the volume of GMV and take rate across each discrete commission grouping, encompassing commission tiers and exceptions. In the three and nine months ended September 30, 2019 and 2018, take rate increased due to higher take rates for items under $196 compared to prior year, partially offset by lower take rates for certain products, such as watches over $2,500, handbags over $5,000 and sneakers over $500. These take rate changes enabled us to optimize our unit economics for items under $200 while driving supply of certain higher priced products.

22

**Active Buyers**

Active buyers include buyers who purchased goods through our online marketplace during the 12 months ended on the last day of the period presented, irrespective of returns or cancellations. We believe this metric reflects scale, brand awareness, buyer acquisition and engagement.

**Average Order Value ("AOV")**

Average order value ("AOV") means the average value of all orders placed across our online marketplace, excluding shipping fees and sales taxes. Our focus on luxury goods across multiple categories drives a consistently high AOV. Our AOV reflects both the average price of items sold as well as the number of items per order. Our high AOV is a key driver of our operating leverage.

**Adjusted EBITDA**

Adjusted EBITDA means net loss before net interest expense, income tax provision, depreciation and amortization, and remeasurement of preferred stock warrant liability included in other expense, further adjusted to exclude stock-based compensation and certain one-time expenses. Adjusted EBITDA provides a basis for comparison of our business operations between current, past and future periods by excluding items that we do not believe are indicative of our core operating performance. Adjusted EBITDA is a non-GAAP measure. The following table provides a reconciliation of net loss to Adjusted EBITDA (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2019 | 2018 | 2019 | 2018 |
| **Adjusted EBITDA Reconciliation:** | | | | |
| Net loss | $ (25,274) | $ (21,885) | $ (75,371) | $ (53,586) |
| Depreciation and amortization | 3,545 | 2,353 | 9,537 | 6,489 |
| Stock-based compensation | 2,520 | 740 | 4,916 | 1,966 |
| Vendor services settlement | — | 2,000 | — | 2,000 |
| Compensation expense related to stock sales by current and former employees | — | 847 | 819 | 847 |
| Interest income | (1,902) | (437) | (2,918) | (602) |
| Interest expense | 60 | 204 | 572 | 927 |
| Other expense, net | 119 | 205 | 2,106 | 1,592 |
| Provision for income taxes | (8) | 37 | 51 | 37 |
| **Adjusted EBITDA** | $ (20,940) | $ (15,936) | $ (60,288) | $ (40,330) |

**Components of our Operating Results**

**Revenue**

Our revenue is comprised of consignment and service revenue and direct revenue.

- *Consignment and service revenue.* We generate the substantial majority of our revenue from the sale of pre-owned luxury goods through our online marketplace on behalf of consignors. For consignment sales, we retain a percentage of the proceeds received, which we refer to as our take rate. We recognize consignment revenue, net of allowances for product returns, order cancellations and certain buyer incentives. Additionally, we generate revenue from shipping fees we charge to buyers. We also generate service revenue from subscription fees paid by buyers for early access to products, but to date our subscription revenue has not been material.

- *Direct revenue.* We generate direct revenue from the sale of items that we own, which we refer to as our inventory. We generally acquire inventory when we accept returns from buyers after we have already remitted sale proceeds to the consignor. As such, growth in direct sales is generally a byproduct of growth in our consignment business. We recognize direct revenue based on the gross purchase price paid by buyers, net of allowances for product returns and order cancellations and certain incentives.

**Cost of Revenue**

Cost of revenue consists of shipping costs, credit card fees, packaging, customer service and website hosting services. Cost of direct revenue also includes the cost of our inventory sold through our online marketplace.

23

**Marketing**

Marketing expense comprises the cost of acquiring new consignors and buyers, including the cost of television, digital and direct mail advertising. Marketing expense also includes personnel-related costs for employees engaged in these activities. We intend to increase marketing spend as we invest to drive the growth of our business. While these expenses may vary from period to period, we expect these expenses to decrease as a percentage of revenue over the longer term.

**Operations and Technology**

Operations and technology expense principally includes personnel-related costs for employees involved with the authentication, merchandising and fulfillment of goods sold through our online marketplace, as well as our general information technology expense. Operations and technology expense also includes allocated facility and overhead costs, costs related to our retail stores, facility supplies and depreciation of hardware and equipment, as well as research and development expense for technology associated with managing and improving our operations. We capitalize a portion of our proprietary software development costs. As such, operations and technology expense also includes amortization of capitalized software development costs. We expect operations and technology expense to increase in future periods to support our growth, including bringing on additional merchandising and fulfillment facilities and continuing to invest in automation and other technology improvements to support and drive efficiency in our operations. These expenses may vary from period to period as a percentage of revenue, depending primarily upon when we choose to make more significant investments. We expect these expenses to decrease as a percentage of revenue over the longer term.

**Selling, General and Administrative**

Selling, general and administrative expense is principally comprised of personnel-related costs for our sales professionals and employees involved in finance and administration. Selling, general and administrative expense also includes allocated facilities and overhead costs and professional services, including accounting and legal advisors. We expect to increase selling, general and administrative expense as we grow our infrastructure to support operating as a public company and the overall growth in our business. While these expenses may vary from period to period as a percentage of revenue, we expect them to decrease as a percentage of revenue over the longer term.

**Income Tax Provision**

Our provision for income taxes consists primarily of state minimum taxes in the United States. We have a full valuation allowance for our net deferred tax assets primarily consisting of net operating loss carryforwards, accruals and reserves. We expect to maintain this full valuation allowance for the foreseeable future.

24

**Results of Operations**

The following tables set forth our results of operations (in thousands) and such data as a percentage of revenue for the periods presented:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2019 | 2018 | 2019 | 2018 |
|---|---|---|---|---|
| Revenue: | | | | |
| Consignment and service revenue | $ 69,790 | $ 45,744 | $ 186,740 | $ 128,921 |
| Direct revenue | 10,695 | 6,095 | 33,976 | 16,362 |
| Total revenue | 80,485 | 51,839 | 220,716 | 145,283 |
| Cost of revenue: | | | | |
| Cost of consignment and service revenue | 19,446 | 13,157 | 52,593 | 37,083 |
| Cost of direct revenue | 8,811 | 5,352 | 27,464 | 13,486 |
| Total cost of revenue | 28,257 | 18,509 | 80,057 | 50,569 |
| Gross profit | 52,228 | 33,330 | 140,659 | 94,714 |
| Operating expenses: | | | | |
| Marketing | 13,390 | 10,624 | 36,838 | 29,534 |
| Operations and technology | 37,407 | 28,257 | 103,271 | 72,586 |
| Selling, general and administrative | 28,436 | 16,325 | 76,110 | 44,226 |
| Total operating expenses | 79,233 | 55,206 | 216,219 | 146,346 |
| Loss from operations | (27,005) | (21,876) | (75,560) | (51,632) |
| Interest income | 1,902 | 437 | 2,918 | 602 |
| Interest expense | (60) | (204) | (572) | (927) |
| Other expense, net | (119) | (205) | (2,106) | (1,592) |
| Loss before provision for income taxes | (25,282) | (21,848) | (75,320) | (53,549) |
| Provision for income taxes | (8) | 37 | 51 | 37 |
| Net loss | $ (25,274) | $ (21,885) | $ (75,371) | $ (53,586) |

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2019 | 2018 | 2019 | 2018 |
|---|---|---|---|---|
| Revenue: | | | | |
| Consignment and service revenue | 87% | 88% | 85% | 89% |
| Direct revenue | 13% | 12% | 15% | 11% |
| Total revenue | 100% | 100% | 100% | 100% |
| Cost of revenue: | | | | |
| Cost of consignment and service revenue | 24% | 25% | 24% | 26% |
| Cost of direct revenue | 11% | 10% | 12% | 9% |
| Total cost of revenue | 35% | 36% | 36% | 35% |
| Gross profit | 65% | 64% | 64% | 65% |
| Operating expenses: | | | | |
| Marketing | 17% | 20% | 17% | 20% |
| Operations and technology | 46% | 55% | 47% | 50% |
| Selling, general and administrative | 35% | 31% | 34% | 30% |
| Total operating expenses | 98% | 106% | 98% | 101% |
| Loss from operations | (34)% | (42)% | (34)% | (36)% |
| Interest income | 2% | 1% | 1% | 0% |
| Interest expense | (0)% | (0)% | (0)% | (1)% |
| Other expense, net | (0)% | (0)% | (1)% | (1)% |
| Loss before provision for income taxes | (32)% | (41)% | (34)% | (38)% |
| Provision for income taxes | 0% | 0% | 0% | 0% |
| Net loss | (32)% | (41)% | (34)% | (38)% |

**Comparison of the Three and Nine Months Ended September 30, 2019 and 2018**

*Consignment and Service Revenue*

Consignment and service revenue increased by $24.0 million, or 53%, in the three months ended September 30, 2019 compared to the three months ended September 30, 2018 and $57.8 million, or 45%, in the nine months ended September 30, 2019 compared to the nine months ended September 30, 2018. For both periods the growth in revenue was driven primarily by growth in GMV and improvement in our take rate.  Our take rate improved from 36.4% to 36.8% in the three months ended September 30, 2019 compared to the same period last year and from 35.7% to 36.3% in the nine months ended September 30, 2019 compared to the nine months ended September 30, 2018. Take rate improved due to changes to our commission structure that yielded a higher take rate on lower-priced items. GMV growth was driven by a 43% increase in active buyers. Active buyer growth was driven by an increase in new buyers due to the combination of the effect of marketing spend and consignors becoming buyers.

*Direct Revenue*

Direct revenue increased by $4.6 million, or 75%, in the three months ended September 30, 2019 compared to the three months ended September 30, 2018 and by $17.6 million, or 108%, in the nine months ended September 30, 2019 compared to the nine months ended September 30, 2018. The increase was driven in part by an increase in our owned-inventory as a result of a higher volume of returns received subsequent to payments to consignors. The subsequent sale of our owned-inventory drove the increase in direct revenue in the three and nine months ended September 30, 2019 both on an absolute basis and as a percent of total revenue. We expect direct revenue as a percent of total revenue to vary from period to period.

*Cost of Consignment and Service Revenue*

Cost of consignment and service revenue increased by $6.3 million, or 48%, in the three months ended September 30, 2019 compared to the three months ended September 30, 2018 and by $15.5 million, or 42%, in the nine months ended September 30, 2019 compared to the nine months ended September 30, 2018. The increase for both periods was primarily attributable to increases in shipping costs driven by fulfillment of a larger number of orders and credit card fees driven by growth in our business.  Gross margin for the three months ended September 30, 2019 increased by 0.9% compared to the three months ended September 30, 2018 primarily due to a one-time inventory charge in 2018.  Gross margin increased by 0.6% in the nine months ended September 30, 2019 compared to the nine months ended September 30, 2018. The increase was primarily attributable to an improvement in shipping costs.

*Cost of Direct Revenue*

Cost of direct revenue increased by $3.5 million, or 65%, in the three months ended September 30, 2019 compared to the three months ended September 30, 2018 and by $14.0 million, or 104%, in the nine months ended September 30, 2019 compared to the nine months ended September 30, 2018, consistent with the increase in direct revenue. Gross margin for the three months ended September 30, 2019 increased by 5.4% compared to the three months ended September 30, 2018 and by 1.6% in the nine months ended September 30, 2019 compared to the nine months ended September 30, 2018 due to favorable product margins.

*Marketing*

Marketing expense increased by $2.8 million, or 26%, in the three months ended September 30, 2019 compared to the three months ended September 30, 2018 and by $7.3 million, or 25%, in the nine months ended September 30, 2019 compared to the nine months ended September 30, 2018. The increase in both periods was primarily due to increased advertising costs as we seek to grow the number of buyers and consignors using our online marketplace.

As a percent of revenue, marketing expense decreased to 17% in the three and nine months ended September 30, 2019 from 20% in the same periods last year, reflecting greater scale in our business and efficiency in our buyer and consignor acquisition and retention activities.  These expenses may vary from period to period as a percentage of revenue, depending primarily upon our marketing investments.

*Operations and Technology*

Operations and technology expense increased by $9.1 million, or 32%, in the three months ended September 30, 2019 compared to the three months ended September 30, 2018. Operations and technology expense increased by $30.7 million, or 42%, in the nine months ended September 30, 2019 compared to the nine months ended September 30, 2018. Excluding a one-time $2.0 million settlement payment in connection with the early termination of a vendor services agreement in the three months ended September 30, 2018, operations and technology increased by $11.1 million, or 42% for the three months ended September 30, 2019 compared to three months ended September 30, 2018.  The increase in the three- and nine-months periods was primarily due to higher headcount primarily in our authentication, merchandising and technology teams and higher occupancy costs primarily due to the inclusion of our Perth Amboy fulfilment center in Q4 2018.

26

As a percent of revenue, operations and technology expense decreased to 46% from 55% in the three months ended September 30, 2019 and 2018, respectively and decreased to 47% from 50% in the nine months ended September 30, 2019 and 2018. These expenses may vary from period to period as a percentage of revenue, depending primarily upon when we choose to make more significant investments. We expect these expenses to decrease as a percentage of revenue over the longer term.

### Selling, General and Administrative

Selling, general and administrative expense increased by $12.1 million, or 74%, in the three months ended September 30, 2019 compared to the three months ended September 30, 2018. The increase was due to higher headcount in our general and administrative functions and our sales organization, higher insurance premiums driven by our IPO, and higher legal and consulting fees.

Selling, general and administrative expense increased by $31.9 million, or 72%, in the nine months ended September 30, 2019 compared to the nine months ended September 30, 2018. The increase was due to higher headcount in our sales organization and general and administrative functions, higher insurance and legal fees, and higher stock compensation expense. Additionally, there were higher occupancy costs primarily due to the expansion of our LCOs and office spaces.

As a percent of revenue, selling, general and administrative expense increased to 35% from 31% in the three months ended September 30, 2019 and 2018; respectively and to 34% from 30% in the nine months ended September 30, 2019 and 2018; respectively as we invested in the growth of the sale organization and expanded our finance and administrative functions in anticipation of being a public company. These expenses may vary from period to period as a percentage of revenue. We expect these expenses to decrease as a percentage of revenue over the long term.

### Interest Income

Interest income increased $1.5 million, or 335%, in the three months ended September 30, 2019 as compared to the three months ended September 30, 2018. Interest income increased $2.3 million, or 385%, in the nine months ended September 30, 2019 as compared to the nine months ended September 30, 2018. The increase in both periods was due to higher cash and investment balances associated with IPO proceeds in 2019.

### Interest Expense, Net

Interest expense decreased $0.1 million, or 70%, in the three months ended September 30, 2019 compared to the three months ended September 30, 2018 due to lower debt balances year over year. Interest expense decreased $0.4 million, or 38%, in the nine months ended September 30, 2019 as compared to the nine months ended September 30, 2018 due to lower debt balances year over year offset by success fee of $0.3 million per our Term Loan agreements.

### Other Expense

Other expense decreased $0.1 million, or 42%, in the three months ended September 30, 2019 as compared to the three months ended September 30, 2018 due to remeasurement of the warrant liability as there were no warrants outstanding at September 30, 2019. Other expense increased $0.5 million, or 32%, in the nine months ended September 30, 2019 as compared to the nine months ended September 30, 2018 due to remeasurement of the warrant liability offset by the extinguishment of the derivative liability on conversion of the convertible notes.

## Liquidity and Capital Resources

As of September 30, 2019, we had unrestricted cash, cash equivalents and short-term investments of $370.3 million and an accumulated deficit of $333.1 million. In July 2019, we received net proceeds of $315.5 million upon completion of our IPO on July 2, 2019. Since inception, we have generated negative cash flows from operations and have primarily financed our operations through several rounds of venture capital financing. In addition, proceeds from our IPO will be used to finance our operations.

We expect that operating losses and negative cash flows from operations could continue in the foreseeable future as we continue to invest in expansion activities. We believe our existing cash and cash equivalents and short-term investments as of September 30, 2019 will be sufficient to meet our working capital and capital expenditures needs for at least the next 12 months.

Our future capital requirements will depend on many factors, including, but not limited to, our ability to grow our revenues and the timing of investments to support growth in our business, such as the build-out of new fulfillment centers and, to a lesser extent, the opening of new retail stores. We may seek additional equity or debt financing. In the event that additional financing is required from outside sources, we may not be able to raise it on terms acceptable to us or at all. If we are unable to raise additional capital when desired, our business, financial condition and results of operations could be adversely affected.

27

*Cash Flows*

The following table summarizes our cash flows for the periods indicated.

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2019 | 2018 |
| Net cash (used by) provided by: | | |
| Operating activities | $ (58,119) | $ (39,625) |
| Investing activities | (952) | (22,599) |
| Financing activities | 378,439 | 107,502 |
| Net  increase in cash, cash equivalents and restricted cash | $ 319,368 | $ 45,278 |

*Net Cash Used in Operating Activities*

During the nine months ended September 30, 2019, net cash used in operating activities was $58.1 million, which consisted of a net loss of $75.4 million, adjusted by non-cash charges of $18.7 million and a net change of $1.4 million in our operating assets and liabilities. The net change in our operating assets and liabilities was primarily the result of a $2.6 million increase in accounts receivable driven by the timing of settlement of credit card purchases relative to year-end sales, a $3.5 million increase in inventory, and a $3.4 million increase in prepaid expenses and other current assets partially offset by a $4.6 million increase in accrued consignor payable, a $1.4 million increase in other noncurrent liabilities, and a $1.4 million increase in accounts payable.

During the nine months ended September 30, 2018, net cash used in operating activities was $39.6 million, which consisted of a net loss of $53.6 million, adjusted by non-cash charges of $12.0 million and a net change of $2.0 million in our operating assets and liabilities. The net change in our operating assets and liabilities was primarily the result of a $10.1 million increase in prepaids expenses and other current assets, a $2.9 million increase in accounts receivable and a $1.6 million increase in inventory, net partially offset by a $10.0 million increase in other accrued and current liabilities driven by our growth, $2.8 million increase in accounts payable, a $1.8 million increase in other noncurrent liabilities and a $1.5 million increase in accrued consignor payable.

*Net Cash Used in Investing Activities*

During the nine months ended September 30, 2019, net cash used in investing activities was $1.0 million, which consisted of $34.0 million proceeds from maturities on short-term investments partially offset by $16.1 million for purchases of property and equipment, net, including leasehold improvements, $12.2 million for purchases of short-term investments, and $6.7 million for capitalized proprietary software development costs.

During the nine months ended September 30, 2018, net cash used in investing activities was $22.6 million, which consisted of proceeds of $7.6 million from maturities on short-term investments and proceeds of $7.0 million from the sale of short-term investments, partially offset by $24.2 million for purchases of short-term investments, 8.8 million for purchases of property and equipment, net, and $4.2 million for capitalized proprietary software development costs.

*Net Cash Provided by Financing Activities*

During the nine months ended September 30, 2019, net cash provided by financing activities was $378.4 million, which primarily consisted of proceeds of $315.5 million from the initial public offering, net of issuance costs, $69.8 million from the issuance of redeemable convertible preferred stock and convertible preferred stock, net of issuance costs, and proceeds of $2.4 million from the exercise of stock options and warrants partially offset $9.3 million for repayment of debt.

During the nine months ended September 30, 2018, net cash provided by financing activities was $107.5 million which primarily consisted of proceeds of $96.3 million from the issuance of redeemable convertible preferred stock and convertible preferred stock, net of issuance costs, and proceeds of $14.3 million from the issuance of convertible notes, net of issuance costs, partially offset by $2.8 million for repayments of debt.

**Contractual Obligations and Commitments**

As of September 30, 2019, there have been no material changes from the contractual obligations and commitments previously disclosed in our Prospectus.

***Term Loans***

We were party to a loan and security agreement that included a term loan facility, which consisted of a $7.5 million term loan with a maturity date of January 1, 2020 and a $7.5 million term loan maturing at January 31, 2021 (together the "Term Loans").  On July 26, 2019, we fully repaid the principal amount of our term loans.

The Term Loans bear interest on the outstanding daily balance thereof at a variable annual rate equal to 0.35% above the prime rate then in effect. As of September 30, 2019 and December 31, 2018, we had zero and $9.2 million, respectively, outstanding under the Term Loans, and the associated interest rate on our debt was 5.85%. The Term Loans were secured by liens on substantially all of our present and future assets.

The Term Loans included affirmative, negative and financial covenants that restrict our ability to, among other things, incur additional indebtedness, make investments, sell or otherwise dispose of assets, pay dividends or repurchase stock. With the repayment of the term loans, we were no longer subject to the debt covenants as of September 30, 2019. We were in compliance with all debt covenants as of December 31, 2018.

**Off-Balance Sheet Arrangements**

We did not have during the periods presented, and we do not currently have, any off-balance sheet financing arrangements or any relationships with unconsolidated entities or financial partnerships, including entities sometimes referred to as structured finance or special purpose entities, that were established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes.

**Critical Accounting Policies and Estimates**

Our management's discussion and analysis of our financial condition and results of operations is based on our financial statements, which have been prepared in accordance with United States generally accepted accounting principles. The preparation of these financial statements requires our management to make judgments and estimates that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements, as well as the reported revenue generated, and expenses incurred during the reporting periods. Our estimates are based on our historical experience and on various other factors that we believe are reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these judgments and estimates under different assumptions or conditions and any such differences may be material. We believe that the accounting policies discussed below are critical to understanding our historical and future performance, as these policies relate to the more significant areas involving management's judgments and estimates.

***Revenue Recognition***

***Consignment and Service Revenue***

We generate the majority of our revenue from consignment services for the sale of pre-owned luxury goods on behalf of consignors through our online consignment marketplace. For consignment sales, we retain a portion of the proceeds received, which we refer to as our take rate, and remit the balance to the consignors. We recognize consignment revenue upon purchase of the goods by the buyer based on our take rate, net of allowances for product returns and order cancellations and certain incentives.

We also generate revenue from shipping fees to buyers, and occasionally consignors, and have elected to treat shipping and handling activities performed after control transfers to the buyer as fulfillment activities. Accordingly, we recognized shipping fees as revenue upon purchase of the goods by the buyer. We also generate service revenue from our *First Look* subscription program, through which buyers pay a monthly fee for early access to our listings. Subscription fees are recognized on a monthly basis.

Certain transactions provide consignors with a material right resulting from the tiered consignor commission plan. Under this plan, the amount an individual consignor receives for future sales of consigned goods may be dependent on previous consignment sales for that consignor. Accordingly, in certain consignment transactions, a small portion of our consignment service revenue is allocated to such material right using the portfolio method, as applicable. Such material right is recorded as deferred revenue and recognized based on the pattern of exercise.

We recognize a returns reserve in the period that the related revenue is recorded based on historical experience. Historically, our estimate for returns has not varied materially from our actual returns. In the future, if we conclude that an adjustment is required due to material changes in returns activity, the returns reserve will be adjusted accordingly.

29

*Direct Revenue*

We also generate revenue from the sales of company-owned inventory. We recognize direct revenue upon purchase of the goods through our online marketplace, based on the gross purchase price net of allowances for product returns and order cancellations and certain incentives.

*Stock-based Compensation*

We estimate the fair value of stock options granted to employees, non-employees and directors using the Black-Scholes option-pricing model. The fair value of stock options that is expected to vest is recognized as compensation expense on a straight-line basis over the requisite service period. We estimate the fair value of restricted stock units based on the fair market value of the Company's common stock on the date of grant, which is determined based on the closing price of the Company's common stock.

The Black-Scholes model considers several variables and assumptions in estimating the fair value of stock-based awards. These variables include per share fair value of the underlying common stock, exercise price, expected term, risk-free interest rate, expected annual dividend yield and expected stock price volatility over the expected term. For all stock options granted to date, we calculated the expected term using the simplified method for "plain vanilla" stock option awards. We determine volatility using the historical volatility of the stock price of similar publicly traded peer companies. The risk-free interest rate is based on the yield available on U.S. Treasury zero-coupon issues similar in duration to the expected term of the equity-settled award.

The fair value of the shares of common stock underlying the stock options has historically been determined by our board of directors, with assistance by management and using contemporaneous third-party valuations, as there was no public market for the common stock. The fair value of our common stock is determined by considering a number of objective and subjective factors, including: the valuation of comparable companies, sales of preferred stock to unrelated third parties, secondary sale transactions, our operating and financial performance, the lack of liquidity of common stock and general and industry specific economic outlook, amongst other factors. Following the closing of our initial public offering, the fair value per share of our common stock for purposes of determining stock-based compensation will be the closing price of our common stock as reported on the applicable grant date.

**Recent Accounting Pronouncements**

In February 2016, the FASB issued ASU No. 2016-02, Leases (Topic 842), or ASU 2016-02, which is aimed at making leasing activities more transparent and comparable and requires substantially all leases to be recognized by lessees on their balance sheet as a right-of-use asset and corresponding lease liability, including leases currently accounted for as operating leases. The new standard is effective for non-public entities in fiscal years beginning after December 15, 2019. Therefore, as an "emerging growth company" as defined in the JOBS Act the new standard is effective for us beginning January 1, 2020. We are currently evaluating the impact that this standard will have on our financial statements but we expect that it will result in a significant increase in our long-term assets and liabilities.

For more information on recently issued accounting pronouncements, see Note 2 to our unaudited condensed financial statements "Summary of Significant Accounting Policies" in this Quarterly Report on Form 10-Q.

**JOBS Act Accounting Election**

We are an "emerging growth company," as defined in the JOBS Act. Under the JOBS Act, emerging growth companies can delay adopting new or revised accounting standards issued subsequent to the enactment of the JOBS Act until such time as those standards apply to private companies. We have elected to use this extended transition period to enable us to comply with new or revised accounting standards that have different effective dates for public and private companies until the earlier of the date we (1) are no longer an emerging growth company or (2) affirmatively and irrevocably opt out of the extended transition period provided in the JOBS Act. As a result, our financial statements may not be comparable to companies that comply with new or revised accounting pronouncements as of public company effective dates.

**Item 3. Quantitative and Qualitative Disclosures About Market Risk.**

We are exposed to market risks in the ordinary course of our business, including fluctuations in interest rates. Such fluctuations to date have not been significant.

As of September 30, 2019, we had unrestricted cash, cash equivalents and short-term investments of approximately $370.3 million, which carry a degree of interest rate risk. A hypothetical 10% change in interest rates would not have a material impact on our financial condition or results of operations due to the short-term nature of our investment portfolio.

We do not believe that inflation has had a material effect on our business, results of operations or financial condition. Nonetheless, if our costs were to become subject to significant inflationary pressures, we may not be able to fully offset such higher costs. Our inability or failure to do so could harm our business, results of operations or financial condition.

**Item 4. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our principal executive officer and principal financial officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended ("Exchange Act"), as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on such evaluation, our principal executive officer and principal financial officer have concluded that, as of such date, our disclosure controls and procedures were effective at a reasonable assurance level.

**Changes in Internal Control**

There were no changes in our internal control over financial reporting identified in management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Exchange Act during the period covered by this Quarterly Report on Form 10-Q that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Limitations on Effectiveness of Controls and Procedures**

Our management, including our principal executive officer and principal financial officer, do not expect that our disclosure controls and procedures or our internal control over financial reporting will prevent all errors and all fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty, and that breakdowns can occur because of a simple error or mistake. Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. Due to inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

31

**PART II—OTHER INFORMATION**

**Item 1. Legal Proceedings.**

We are from time to time subject to, and are presently involved in, litigation and other legal proceedings. See "Note 10—Commitments and Contingencies" in the notes to unaudited condensed financial statements. This item should be read in conjunction with the Legal Proceedings disclosures in our final prospectus related to our IPO filed with the SEC pursuant to Rule 424(b) under the Securities Act.

In November 2018, Chanel filed a lawsuit against us in the U.S. District Court for the Southern District of New York bringing various trademark and advertising-related claims under the Lanham Act and New York state law analogues. Chanel alleges, among other things, that we have misrepresented certain counterfeit Chanel products as authentic Chanel products, that our resale of Chanel products confuses consumers into believing that Chanel is affiliated with us and involved in authenticating consignors' goods and that only Chanel is capable of authenticating second-hand Chanel goods. This litigation is in its early stages and the final outcome, including our liability, if any, with respect to Chanel's claims, is uncertain. Chanel could in the future assert additional trademark and advertising or other claims against us in this or other proceedings. An unfavorable outcome in this or similar litigation could adversely affect our business and could lead to other similar lawsuits.

On September 11, 2019, a purported shareholder class action complaint was filed against us, our officers and directors and the underwriters of our IPO in the Superior Court of the State of California in the County of San Mateo. A second purported class action was filed in Marin County Superior Court on September 16, 2019 and a third purported action was filed in Marin County Superior Court on October 7, 2019. The complaints each allege claims under the Securities Act of 1933 on behalf of a purported class of those who acquired our stock pursuant to or traceable to the registration statement for our IPO. The complaints allege, among other things, that the defendants violated federal securities laws by issuing false or misleading statements regarding certain of our key financial and operating metrics at the time of the IPO. The complaints seek, among other things, damages and interest, rescission, and attorneys' fees and costs. Plaintiff in the San Mateo action voluntarily dismissed that case in order to re-file in Marin County Superior Court and the cases are in the process of being coordinated before the Marin County Superior Court. While we intend to vigorously defend against this consolidated litigation, the cases are at a very early stage and there can be no assurance that we will be successful in our defense. For this same reason, we cannot currently estimate the loss or the range of possible losses we may experience in connection with this litigation.

We are currently involved in, and may in the future be involved in, legal proceedings in the ordinary course of business. While it is not possible to determine the outcome of any legal proceedings brought against us, we believe that, except for the matters described above, the resolution of all such matters will not have a material adverse effect on our consolidated financial position or liquidity, but could be material to our consolidated results of operations in any one accounting period. Regardless of final outcomes, however, any such legal proceedings may nonetheless impose a significant burden on management and employees and may come with costly defense costs or unfavorable preliminary and interim rulings. There are inherent uncertainties in these legal matters, some of which are beyond management's control, making the ultimate outcomes difficult to predict. Moreover, management's views and estimates related to these matters may change in the future, as new events and circumstances arise and as the matters continue to develop.

**Item 1A. Risk Factors.**

*Investing in our common stock involves a high degree of risk. You should consider and read carefully all of the risks and uncertainties described below, as well as other information included in this Quarterly Report on Form 10-Q, including the sections titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and related notes included elsewhere in this Quarterly Report on Form 10-Q. The risks described below are not the only ones we face. The occurrence of any of the following risks or additional risks and uncertainties not presently known to us or that we currently believe to be immaterial could materially and adversely affect our business, financial condition or results of operations. In such case, the trading price of our common stock could decline, and you may lose all or part of your investment. This Quarterly Report on Form 10-Q also contains forward-looking statements and estimates that involve risks and uncertainties. Our actual results could differ materially from those anticipated in the forward-looking statements as a result of specific factors, including the risks and uncertainties described below.*

32

**Risks Relating to Our Business**

*If we fail to generate a sufficient amount of new and recurring supply of pre-owned luxury goods by attracting and retaining consignors, our business would be harmed.*

Our success depends on our ability to cost-effectively attract, retain and grow relationships with consignors, and in turn, our supply of luxury goods sold through our online marketplace. To expand our consignor base, we must appeal to and engage individuals new to consignment, or who have consigned through traditional brick-and-mortar shops but are unfamiliar with our business. We find new consignors by converting buyers utilizing our online marketplace, shopping in our three retail stores, utilizing our nine luxury consignment offices ("LCOs"), paid advertising, referral programs, organic word-of-mouth and other methods of discovery, such as mentions in the press, Internet search engine results and through our partnerships with Stella McCartney and Burberry. We recently increased our paid marketing expenses by investing more in television advertising and digital marketing and we expect to increase our spending on these and other paid marketing channels in the future. We cannot be certain that these efforts will yield more consignors or be cost-effective. Moreover, new consignors may not choose to consign with us a second time or consign as frequently, or consign as many items or the same value of items, as has historically been the case with existing consignors. Therefore, the revenue generated from new consignors may not be as high as the revenue generated historically from our existing consignors or as high as we expect. If we fail to attract new consignors or drive repeat consignments, our ability to grow our business would be adversely affected.

Our ability to drive growth also depends on our success in continuing to generate a high volume of consigned items from new and existing consignors. To accomplish this, we rely on our sales professionals to drive our supply of luxury goods by identifying, developing and maintaining relationships with our consignors. Our sales professionals source high-quality, coveted luxury goods from consignors through a variety of methods including White Glove consultation, meeting with potential consignors in one of our nine LCOs or shipping consigned goods to us from remote locations. The process of identifying and hiring sales professionals with the combination of skills and attributes required in these roles can be difficult and can require significant time. In addition, competition for qualified employees and personnel in the retail industry is intense and turnover amongst our sales professionals within a few years is not uncommon. Any shortage in sales professionals or delay in identifying and hiring quality sales professionals could have a negative impact on the business. If we are not successful in attracting and retaining effective sales professionals, the quantity and quality of the luxury goods sold through our online marketplace may be negatively impacted, which would have a material adverse effect on our business and operating results.

*We may not be able to attract, train and retain specialized personnel and skilled employees to effectively manage the merchandising operations required to authenticate, process and sell consigned luxury goods or identify and lease merchandising and fulfillment facilities in geographic regions that enable us to effectively scale our operations.*

We lease facilities to store and accommodate the logistics infrastructure required to merchandise and ship the pre-owned luxury goods we sell through our online marketplace. To grow our business, we must continue to improve and expand our merchandising and fulfillment operations, information systems and skilled personnel in the jurisdictions in which we operate so that we have the skilled talent necessary to effectively operate our business. The operation of our business is complex and requires the coordination of multiple functions that are highly dependent on numerous employees and personnel. Each luxury item that we offer through our online marketplace is unique and requires multiple touch points, including inspection, evaluation, authentication, photography, pricing, copywriting, application of a unique single-SKU and fulfillment. We have rapidly increased our operations employee headcount to support the growth of our business. The market for these employees is increasingly competitive and is highly dependent on geographic location. Some of our employees have specific knowledge and skills that would make it more difficult to hire replacement personnel capable of effectively performing the same tasks without substantial training. We also provide specific training to our employees in each of our specific business functions in order to provide our consignors and buyers with a consistent luxury experience. If we fail to effectively locate, hire, train and retain such personnel, our operations would be negatively impacted, which would have an adverse effect on our business, financial condition and operating results.

Our ability to successfully grow our business also depends on the availability and cost of leasing additional merchandising and fulfillment facilities that meet our criteria for a geographic location with access to a large, qualified talent pool, square footage, cost and other factors. We currently have four merchandising and fulfillment facilities-one in California and three in New Jersey. Optimal space is becoming increasingly scarce, and where it is available, the lease terms offered by landlords are increasingly competitive. Incentives currently offered by local, state and federal entities to offset operating expenses may be reduced or become unavailable. Companies who have more financial resources and negotiating leverage than us may be more attractive tenants and, as a result, may outbid us for the facilities we seek. We also may be unable to renew our existing leases or renew them on satisfactory terms. Failure to identify and secure adequate new merchandising and fulfillment facilities in optimal geographic locations or maintain our current merchandising and fulfillment facilities could have an adverse effect on our business and operating results.

33

***We have a history of losses and we may not achieve or maintain profitability in the future.***

We experienced net losses of $52.3 million, $75.8 million and $75.4 million in 2017, 2018 and the nine months ended September 30, 2019, respectively, and as of September 30, 2019 we had an accumulated deficit of $333.1 million. We believe there is substantial opportunity for growth in our business and our market and intend to invest aggressively to capitalize on this opportunity. As a result of these investments, we expect to incur additional losses for the foreseeable future. In particular, we are making significant investments in our marketing initiatives, expanding our operations and infrastructure, developing and introducing new technologies and automation and hiring additional personnel. These efforts may be more costly than we expect and may not result in revenue growth. In addition, in connection with operating as a public company, we will incur additional significant legal, accounting and other expenses that we did not incur as a private company. If our investments do not prove successful or our market does not develop as we expect, we may continue to experience losses over the long term. Any failure to increase our revenue sufficiently to keep pace with our investments and other expenses could prevent us from achieving or maintaining profitability or positive cash flow on a consistent basis. If we are unable to successfully address these risks and challenges as we encounter them, our business, financial condition and operating results could be adversely affected. We cannot assure you that we will ever achieve or sustain profitability and may continue to incur significant losses going forward.

***We may not be able to sustain our revenue growth rate or effectively manage growth.***

Our recent revenue growth should not be considered indicative of our future performance. As we grow our business, we expect our future revenue growth rates may slow due to a number of factors, including the maturation of our business, increased market adoption against which future growth will be measured, increasing competition or our failure to capitalize on growth opportunities. Additionally, consignors may opt to consign less with us to the extent we take steps, such as increasing our take rates, that make our online marketplace appear less attractive to them. Alternatively, the emergence of direct competitors may force us to decrease our take rates to remain competitive to attract consignors, which will have a negative impact on our financial performance.

We have experienced, and expect to continue to experience, rapid growth, which has placed, and will continue to place, significant demands on our management and our operational and financial infrastructure. Continued growth could also strain our ability to maintain reliable service levels for our consignors and buyers, develop and improve our operational, financial and management controls, enhance our reporting systems and procedures and recruit, train and retain highly skilled personnel. To support anticipated growth, we are committing substantial financial, operational and technical resources. Failure to effectively manage the growth of our business and operations would negatively affect our reputation and brand, business, financial condition and operating results.

***National retailers and brands set their own retail prices and promotional discounts on new luxury goods, which could adversely affect our value proposition to consumers.***

National retailers and brands set pricing for new luxury goods. Promotional pricing by these parties may adversely affect the value of products consigned with us and our inventory, and, in turn, GMV and operating results. In order to attract buyers to our online marketplace, the prices for the pre-owned luxury goods sold through our online marketplace may need to be lowered in order to compete with these pricing strategies, which could negatively affect gross merchandise value and in turn, our revenue. We have experienced a reduction in our GMV and AOV in the past due to fluctuations in the price of new luxury goods sold by retailers and brands, and we anticipate similar reductions and fluctuations in the future. However, the timing and magnitude of such discounting can be difficult to predict. Any of the foregoing risks could adversely affect our business, financial condition and operating results.

***We have a relatively short operating history in an evolving industry and, as a result, our past results may not be indicative of future operating performance.***

Our online marketplace represents a substantial departure from the traditional resale market for luxury goods. While our business has grown rapidly, the resale market for luxury goods may not continue to develop in a manner that we expect or that otherwise would be favorable to our business. Our relatively short operating history and the changes in our market make it difficult to assess our future performance. You should consider our business and prospects in light of the risks and difficulties we may encounter.

Our future success will depend in large part upon our ability to, among other things:

- cost-effectively acquire and engage with new and existing consignors and buyers and grow our supply of high-quality, coveted luxury goods for sale through our online marketplace;
- scale our revenue and achieve the operating efficiencies necessary to achieve and maintain profitability;
- increase consignor and buyer awareness of our brand;
- anticipate and respond to changing consignor and buyer preferences;

34

- manage and improve our business processes in response to changing business needs;

- anticipate and respond to macroeconomic changes generally, including changes in both the primary and secondary market for luxury goods;

- effectively scale our operations while maintaining high service quality and consignor and buyer satisfaction;

- hire, train and retain talented people at all levels of our business;

- avoid or manage interruptions in our business from information technology downtime, cybersecurity breaches and other factors affecting our physical and digital infrastructure;

- fulfill and deliver orders in a timely manner and in accordance with customer expectations, which may change over time;

- maintain the quality of our technology and operations infrastructure;

- develop new technology or services to enhance the consignor and buyer experience; and

- comply with regulations applicable to our business.

If we fail to address the risks and difficulties that we face, including those associated with the challenges listed above as well as those described elsewhere in this "Risk Factors" section, our business and our operating results would be adversely affected.

### *We rely on consumer discretionary spending and may be adversely affected by economic downturns and other macroeconomic conditions or trends.*

Our business and operating results are subject to global economic conditions and their impact on consumer discretionary spending, particularly in the luxury goods market. Some of the factors that may negatively influence consumer spending on luxury goods include high levels of unemployment, higher consumer debt levels, reductions in net worth, and declines in asset values and related market uncertainty, home foreclosures and reductions in home values, fluctuating interest rates and credit availability, fluctuating fuel and other energy costs, fluctuating commodity prices and general uncertainty regarding the overall future political and economic environment. Economic conditions in certain regions may also be affected by natural disasters, such as earthquakes, hurricanes and wildfires. Consumer purchases of new luxury goods have declined during periods of economic uncertainty, when disposable income is reduced or when there is a reduction in consumer confidence. Such economic uncertainty and decrease in the rate of luxury purchases in the primary market may slow the rate at which individuals choose to consign their goods with us which could result in a decrease of items available in our online marketplace.

### *As an online marketplace for pre-owned luxury goods, our success depends on the accuracy of our authentication process. Failure by us to identify counterfeit goods could adversely affect our reputation, subject us to adverse publicity, and expose us to liability for the sale of counterfeit goods.*

Our success depends on our ability to accurately and cost-effectively determine whether an item offered for consignment is an authentic product, a genuine gemstone or piece of jewelry or a validated work of art. From time to time, we receive counterfeit goods for consignment. While we have invested heavily in our authentication processes, and we reject any goods we believe to be counterfeit, we cannot be certain that we will identify every counterfeit item that is consigned to us. As the sophistication of counterfeiters increases, it may be increasingly difficult to identify counterfeit products. We refund the cost of a product to a buyer if the buyer questions its authenticity and returns the item. The sale of any counterfeit goods may damage our reputation as a trusted online marketplace for authenticated, pre-owned luxury goods which may impact our ability to attract and maintain repeat consignors and buyers. Additionally, we have been and may in the future be subject to public allegations that our authentication processes are inadequate. Such controversy could negatively impact our reputation and brand and harm our business and operating results.

### *We may not succeed in promoting and sustaining our brand, which could have an adverse effect on our business and future growth.*

We believe that maintaining The RealReal brand is critical to driving consignor and buyer engagement. An important goal of our brand promotion strategy is establishing trust with our consignors and buyers. Maintaining our brand will depend largely on our ability to continue providing our consignors with service that is consistent with the level of luxury associated with the goods they are consigning and delivering value for the goods they consign, all in a timely and consistent manner. Our success depends in part on the quality of our sales professionals who represent our brand to new and existing consignors. Sales professionals cultivate relationships with our consignor base by making in-home visits to evaluate the luxury goods that our consignors want to consign. While we require that all sales professionals undergo a background check, this may not prevent illegal, improper or otherwise inappropriate actions by such employees, such as theft or physical assault, from occurring in connection with our services. Any negative publicity related to the foregoing could adversely affect our reputation and brand or public perception of our model of luxury consignment, which could negatively affect demand for our services and harm our business, financial condition and operating results.

For buyers, maintaining our brand requires that we foster trust through authentication, timely and reliable fulfillment of orders, and responsive and effective customer service. If we fail to provide consignors or buyers with the service and experience they expect, or experience consignor or buyer complaints or negative publicity about our online marketplace services, merchandise, delivery times or customer support, whether justified or not, the value of our brand would be harmed and our business may suffer.

### *Our continued growth depends on attracting new and retaining repeat buyers.*

To expand our buyer base, we must appeal to and attract buyers who do not typically purchase luxury goods, who have historically purchased only new luxury goods or who used other means to purchase pre-owned luxury goods, such as traditional brick-and-mortar consignment shops, auction houses and the websites of other secondary marketplaces. We reach new buyers through television and digital advertising, other paid marketing, press coverage, referral programs, organic word of mouth and other methods of discovery, such as converting consignors to buyers. We expect to continue investing heavily in these and other marketing channels in the future and cannot be certain that these efforts will yield more buyers or be cost-effective. Moreover, new buyers may not purchase through our online marketplace as frequently or spend as much with us as historically has been the case with existing buyers. As a result, the revenue generated from new buyer transactions may not be as high as the revenue generated from transactions with our existing buyers. Failure to attract new buyers and to maintain relationships with existing buyers would adversely affect our operating results and our ability to attract and retain consignors.

### *We are currently, and may be in the future, party to lawsuits and other claims that are expensive and time consuming, could lead to adverse publicity, and, if resolved adversely, could have a significant impact on our business, financial condition or operating results.*

We rely on the fair use doctrine when we routinely refer to third-party intellectual property, such as trademarks, on our platform. Third parties may dispute the scope of that doctrine and challenge our ability to reference their intellectual property in the course of our business. For instance, from time to time, we are contacted by companies controlling brands of goods consignors sell, demanding that we cease referencing those brands in connection with such sales, whether in advertising or on our website. We have consistently responded by reference to the holding in *Tiffany (NY), Inc. v. eBay* that factual use of a brand to describe and sell a used good is not false advertising. These matters have generally been resolved with no further communications, but some have resulted in litigation against us. For example, in November 2018, Chanel filed a lawsuit against us in the U.S. District Court for the Southern District of New York bringing various trademark and advertising-related claims under the Lanham Act and New York state law analogues. Chanel alleges, among other things, that we have misrepresented certain counterfeit Chanel products as authentic Chanel products, that our resale of Chanel products confuses consumers into believing that Chanel is affiliated with us and involved in authenticating consignors' goods and that only Chanel is capable of authenticating second-hand Chanel goods. This litigation is in its early stages and the final outcome, including our liability, if any, with respect to Chanel's claims, is uncertain. Chanel could in the future assert additional trademark and advertising or other claims against us in this or other proceedings. An unfavorable outcome in this or similar litigation could adversely affect our business and could lead to other similar lawsuits.

We are also at risk of claims by others that we have infringed their copyrights, trademarks or patents or improperly used or disclosed their trade secrets. In particular, third parties may allege that goods consigned to us are counterfeit or that by offering goods of a particular brand we are suggesting that we are sponsored by or affiliated with that brand. The costs of resolving any litigation or disputes related to these claims can be considerable, and we cannot assure you that we will achieve a favorable outcome of any such claim.

On September 11, 2019, a purported shareholder class action complaint was filed against us, our officers and directors and the underwriters of our initial public offering in the Superior Court of the State of California in the County of San Mateo. A second purported class action was filed in Marin County Superior Court on September 16, 2019 and a third purported action was filed in Marin County Superior Court on October 7, 2019. The complaints each allege claims under the Securities Act of 1933 on behalf of a purported class of those who acquired our stock pursuant to or traceable to the registration statement for our IPO. The complaints allege, among other things, that the defendants violated federal securities laws by issuing false or misleading statements regarding certain of our key financial and operating metrics at the time of the IPO. The complaints seek, among other things, damages and interest, rescission, and attorneys' fees and costs. Plaintiff in the San Mateo action voluntarily dismissed that case in order to re-file in Marin County Superior Court and the cases are in the process of being coordinated before the Marin County Superior Court. While we intend to vigorously defend against this consolidated litigation, the cases are at a very early stage and there can be no assurance that we will be successful in our defense. For this same reason, we cannot currently estimate the loss or the range of possible losses we may experience in connection with this litigation.

In addition, we have in the past and could face in the future a variety of employee claims against us, including but not limited to general discrimination, privacy, wage and hour, labor and employment, ERISA and disability claims. Any claims could also result in litigation against us or regulatory proceedings being brought against us by various federal and state agencies that regulate our business, including the U.S. Equal Employment Opportunity Commission. Often these cases raise complex factual and legal issues and create risks and uncertainties.

36

Defending litigation is costly and can impose a significant burden on management and employees, and there can be no assurances that favorable final outcomes will be obtained. The results of any such litigation, investigations and other legal proceedings are inherently unpredictable and expensive. Although we have insurance, it provides for a substantial retention of liability and is subject to limitations. As a result, it may not cover a significant portion, or any, of the expenses we may incur or be subject to in connection with shareholder class action or other litigation to which we are party. In addition, plaintiffs may seek, and we may become subject to, preliminary or provisional rulings in the course of any such litigation, including potential preliminary injunctions requiring us to cease some or all of our operations. We may decide to settle such lawsuits and disputes on terms that are unfavorable to us. Similarly, if any litigation to which we are a party is resolved adversely, we may be subject to an unfavorable judgment that may not be reversed upon appeal. The terms of such a settlement or judgment may require us to cease some or all of our operations or pay substantial amounts to the other party. In addition, we may have to seek a license to continue practices found to be in violation of a third-party's rights, which may not be available on reasonable terms or at all, and may significantly increase our operating costs and expenses. As a result, we may also be required to develop alternative practices or discontinue the practices. The development of alternative practices could require significant effort and expense or may not be feasible. Our business, financial condition or operating results could be adversely affected as a result of an unfavorable resolution of the disputes and litigation referred to above.

### *If we are unable to successfully leverage technology to automate and drive efficiencies in our operations, our business could be adversely affected.*

We are building automation, machine learning and other capabilities to drive efficiencies in our merchandising and fulfillment operations. As we continue to add capacity, capabilities and automation, our operations will become increasingly complex and challenging. While we expect these technologies to improve productivity in many of our merchandising operations, including pricing, copywriting, authentication, photography and photo retouching, any flaws or failures of such technologies could cause interruptions in and delays to our operations which may harm our business. We are increasing our investment in technology to support these efforts but they may not be effective in driving productivity, maintaining or improving the experience for buyers and consignors or providing a positive return on investment. We have created our own purpose-built technology to operate our business, but we also rely on technology from third parties. If these technologies do not perform in accordance with our expectations, third parties change the terms and conditions that govern their relationships with us, or if competition increases for the technology and services provided by third parties, our business may be harmed. In addition, if we are unable to add automation to our operations, we may be unable to reduce the costs of processing consignments and fulfilling orders, which could cause delays in buyers receiving their purchases. Any of these outcomes could harm our reputation and our relationships with our consignors and buyers.

### *Our advertising activity may fail to efficiently drive growth in consignors and buyers.*

Our future growth and profitability will depend in large part upon the effectiveness and efficiency of our advertising, promotion, public relations and marketing programs and we are investing heavily in these activities. These brand promotion activities may not yield increased revenue and the efficacy of these activities will depend on a number of factors, including our ability to do the following:

- determine the effective creative message and media mix for advertising, marketing and promotional expenditures;

- select the right markets, media and specific media vehicles in which to advertise;

- identify the most effective and efficient level of spending in each market, media and specific media vehicle; and

- effectively manage marketing costs, including creative and media expenses, to maintain acceptable consignor and buyer acquisition costs.

We closely monitor the effectiveness of our advertising campaigns and changes in the advertising market, and adjust or re-allocate our advertising spend across channels, customer segments and geographic markets in real-time to optimize the effectiveness of these activities. We expect to increase advertising spend in future periods to continue driving our growth. Increases in the pricing of one or more of our marketing and advertising channels could increase our marketing and advertising expenses or cause us to choose less expensive but possibly less effective marketing and advertising channels. If we implement new marketing and advertising strategies, we may incur significantly higher costs than our current channels, which, in turn, could adversely affect our operating results.

Implementing new marketing and advertising strategies also could increase the risk of devoting significant capital and other resources to endeavors that do not prove to be cost effective. We also may incur marketing and advertising expenses significantly in advance of the time we anticipate recognizing revenue associated with such expenses and our marketing and advertising expenditures may not generate sufficient levels of brand awareness or result in increased revenue. Even if our marketing and advertising expenses result in increased sales, the increase might not offset our related expenditures. If we are unable to maintain our marketing and advertising channels on cost-effective terms or replace or supplement existing marketing and advertising channels with similarly or more effective channels, our marketing and advertising expenses could increase substantially, our consignor and buyer base could be adversely affected, and our business, operating results, financial condition and brand could suffer.

***We may experience damage or destruction to our merchandising and fulfillment facilities or retail stores in which we store all of the consigned luxury goods we offer through our online marketplace which may materially adversely impact our business and operating results.***

We store the majority of the luxury goods we offer through our online marketplace in our merchandising and fulfillment facilities in California and New Jersey, with a small portion of luxury goods offered for sale in our three retail stores. Our merchandising and fulfillment facilities are located in areas that have a history of natural disasters, such as earthquakes and severe weather events, rendering our merchandising and fulfillment facilities vulnerable to damage. Any large scale damage to or catastrophic loss of goods stored in such merchandising and fulfillment facilities or retail stores, due to natural disasters or man-made disasters such as arson or theft or otherwise would result in liability to our consignors for the expected commission liability for the lost items, reduction in the value of our inventory and a significant disruption to our business. Additionally, given the nature of the unique consigned luxury goods we offer on our online marketplace, our ability to restore the supply of consigned luxury goods on our online marketplace would take time and would result in a limitation and delay of available supply for buyers which would negatively impact our revenue and operating results. While we carry insurance for the consigned luxury goods stored in these merchandising and fulfillment facilities, the number of carriers which provide for such insurance has declined, which has resulted in increased premiums and deductibles. The insurance we do carry may not continue to be available on commercially reasonable terms and, in any event, may not be adequate to cover all possible losses that our business could suffer. In the event that we suffer a catastrophic loss of any or all of our merchandising and fulfillment facilities and the consigned luxury goods stored in such facilities, our liabilities may exceed the maximum insurance coverage amount which would materially adversely impact our business and operating results.

***We have experienced seasonal and quarterly variations in our revenue and operating results and, as a result, our quarterly results may fluctuate and could be below expectations.***

Our business is seasonal and historically we have realized a disproportionate amount of our revenue and earnings for the year in the fourth quarter as a result of the holiday season and seasonal promotions. We expect this to continue in the future. In anticipation of increased activity during the fourth quarter, we incur significant additional expenses, including additional marketing and staffing in our sales and customer support operations. In addition, we may experience an increase in our shipping costs due to complimentary upgrades, split-shipments and additional long-zone shipments necessary to ensure timely delivery for the holiday season. At peak periods, there could also be further delays in processing consigned goods or fulfilling buyer orders, which could lead to lower consignor and/or buyer satisfaction. As a result of increased expenses or delays in shipping, if we experience lower than expected revenue during any fourth quarter, it may have a disproportionately large impact on our operating results and financial condition for that year. Any factors that harm our fourth quarter operating results, including disruptions in our consignors' willingness to consign or unfavorable economic conditions, or adverse weather could have a disproportionate effect on our operating results for our entire fiscal year. In the future, our seasonal sales patterns may become more pronounced, may strain our personnel and may cause a shortfall in revenue related to expenses in a given period, which could substantially harm our business, operating results and financial condition.

***Our industry is highly competitive and if we do not compete effectively our operating results could be adversely affected.***

The resale market for luxury goods is highly competitive. We compete with vendors of new and pre-owned luxury goods, including branded luxury goods stores, department stores, traditional brick-and-mortar consignment stores, pawn shops, auction houses, specialty retailers, discount chains, independent retail stores, the online offerings of these traditional retail competitors, resale players focused on niche or single categories, as well as technology-enabled marketplaces that may offer the same or similar luxury goods and services that we offer. We believe our ability to compete depends on many factors within and beyond our control, including:

- engaging and enhancing our relationships with existing consignors and buyers and attracting new consignors and buyers;

- further developing our data science capabilities;

- maintaining favorable brand recognition and effectively delivering our online marketplace to consignors and buyers;

- identifying and delivering authentic luxury goods;

- maintaining and increasing the amount, diversity and quality of brands and luxury goods that we or our competitors offer;

- our ability to expand the categories of luxury goods our consignors consign and sell;

- the price at which consigned, authenticated luxury goods through our online marketplace are offered;

- the speed and cost at which we can authenticate and make available consigned luxury goods and deliver purchased goods to our buyers; and

- the ease with which our consignors and buyers can consign, purchase and return goods.

Failure to adequately meet these demands may cause us to lose potential consignors and buyers which could harm our business.

Many of our competitors have longer operating histories, larger fulfillment infrastructures, greater brand recognition and technical capabilities, faster shipping times, lower-cost shipping, larger databases, greater financial, marketing, institutional and other resources and larger buyer bases than we do. As the market evolves, competitors may emerge. For example, Farfetch Ltd recently announced the launch of a new consignment service. Some of our competitors may have greater resources than we do, which may allow them to derive greater revenue and profits from their existing buyer bases, acquire consignors at lower costs or respond more quickly than we can to new or emerging technologies and changes in consumer shopping behavior. These competitors may engage in more extensive research and development efforts, enter the business of online luxury consignment, undertake more far-reaching marketing campaigns and adopt more aggressive pricing policies, which may allow them to build larger consignor or buyer bases or generate revenue from their existing buyer bases more effectively than we do. If we fail to compete effectively, our business and operating results may be adversely affected.

***We rely on third parties to host our website and mobile app and to process payments made by buyers or to consignors on our online marketplace. Any significant disruption in service provided by, or termination of our relationship with, such third parties could damage our reputation and result in loss of buyers and consignors, which would harm our business and results of operations.***

Our brand and ability to attract and retain consignors and buyers depends in part on the reliable performance of our network infrastructure and content delivery process. We have experienced, and expect that in the future we will experience, interruptions, delays and outages in service and availability from time to time due to a variety of factors, including infrastructure changes, human or software errors, website hosting disruptions and capacity constraints which could affect the availability of services on our platform and prevent or inhibit the ability of buyers to access our online marketplace or complete purchases on our website and app. We currently host our platform and support our operations using Amazon Web Services ("AWS"). We do not have control over the operations of the facilities of AWS that we use. AWS' facilities are vulnerable to damage or interruption from natural disasters, cybersecurity attacks, terrorist attacks, power outages and similar events or acts of misconduct. The continuing and uninterrupted performance of our online marketplace is critical to our success. Volume of traffic and activity on our online marketplace spikes on certain days and during certain periods of the year, such as during a Black Friday promotion and generally during the fourth quarter due to the seasonality of our business, and any interruption would be particularly problematic if it were to occur at such a high volume time. We also use Google services for our business emails, file storage and communications. Any disruption or failure in the services we receive from Google could harm our ability to run our business.

We rely on third-party payment processors to process payments made by buyers or to consignors on our online marketplace. If our third-party payment processors terminate their relationships with us or refuse to renew their agreements with us on commercially reasonable terms, we would need to find an alternate payment processor and may not be able to secure similar terms or replace such payment processors in an acceptable timeframe. Further, the software and services provided by our third-party payment processors may not meet our expectations, contain errors or vulnerabilities, be compromised or experience outages. Any of these risks could cause us to lose our ability to accept online payments, make payments to consignors or conduct other payment transactions, any of which could make our platform less convenient and attractive and adversely affect our ability to attract and retain buyers and consignors.

***We must successfully gauge and respond to changing preferences among our consignors and buyers.***

Our success is in large part dependent upon our ability to anticipate and identify trends in the market for pre-owned luxury goods in a timely manner and to obtain consignments of luxury goods that address those trends. We use data science to predict consignor and buyer preferences, and there can be no assurance that our data science will accurately anticipate consignor or buyer requirements. Lead times relating to these changing preferences may make it difficult for us to respond rapidly to new or changing trends. We have begun to expand our offerings and the impact on our business from these new offerings is not clear as it is difficult to accurately predict consignor and buyer preferences. To the extent we do not accurately predict the evolving preferences of our consignors and buyers, our ability to grow our business and our operating results would be adversely affected.

39

*Failure to comply with applicable laws or regulations, including those relating to the sale of secondhand goods, may subject us to fines, penalties, loss of licensure, registration, facility closures and approval or other governmental enforcement action.*

The sale of consigned goods through our online marketplace is subject to regulation, including by regulatory bodies such as the U.S. Consumer Product Safety Commission, the Federal Trade Commission, the U.S. Fish and Wildlife Service and other international, federal, state and local governments and regulatory authorities. These laws and regulations are complex, vary from state to state and change often. We monitor these laws and regulations and adjust our business practices as warranted to comply. We receive luxury goods on consignment from numerous consignors located in all 50 U.S. states and Puerto Rico, and the goods we receive from our consignors may contain materials such as fur, python, ivory and other exotic animal product components, that are subject to regulation. Our standard consignor terms and conditions require consignors to comply with applicable laws when consigning their goods. Failure of our consignors to comply with applicable laws, regulations and contractual requirements could lead to litigation or other claims against us, resulting in increased legal expenses and costs. Moreover, failure by us to effectively monitor the application of these laws and regulations to our business, and to comply with such laws and regulations, may negatively affect our brand and subject us to penalties and fines.

Numerous U.S. states and municipalities, including the States of California, New York and Florida, have regulations regarding the handling of secondhand goods and licensing requirements of secondhand dealers. Such government regulations could require us to change the way we conduct business, or our buyers conduct their purchases in ways that increase costs or reduce revenues, such as prohibiting or otherwise restricting the sale or shipment of certain items in some locations. We could also be subject to business interruption, fines or other penalties which in the aggregate could harm our business. To the extent we fail to comply with the local requirements for secondhand dealers, we may experience unanticipated permanent or temporary shutdowns of our facilities which may negatively affect our ability to increase the supply of our goods, result in negative publicity and subject us to penalties and fines.

Additionally, the luxury goods our consignors sell could be subject to recalls and other remedial actions and product safety, labeling and licensing concerns may require us to voluntarily remove selected goods from our online marketplace. Such recalls or voluntary removal of goods can result in, among other things, lost sales, diverted resources, potential harm to our reputation and increased customer service costs and legal expenses, which could have a material adverse effect on our operating results.

Some of the luxury goods sold through our online marketplace on behalf of our consignors may expose us to product liability claims and litigation or regulatory action relating to personal injury, environmental or property damage. We cannot be certain that our insurance coverage will be adequate for liabilities actually incurred or that insurance will continue to be available to us on economically reasonable terms or at all. In addition, while all of our vendor agreements contain a standard indemnification provision, certain vendors may not have sufficient resources or insurance to satisfy their indemnity and defense obligations which may harm our business.

*We rely on third parties to drive traffic to our website, and these providers may change their algorithms or pricing in ways that could negatively impact our business, operations, financial condition and prospects.*

We rely in part on digital advertising, including search engine marketing, to promote awareness of our online marketplace, grow our business, attract new consignors and buyers and increase engagement with existing consignors and buyers. In particular, we rely on search engines, such as Google, and the major mobile app stores as important marketing channels. Search engine companies change their search algorithms periodically, and our ranking in searches may be adversely impacted by those changes. Search engine companies or app stores may also determine that we are not in compliance with their guidelines and penalize us as a result. If search engines change their algorithms, terms of service, display or the featuring of search results, determine we are out of compliance with their terms of service or if competition increases for advertisements, we may be unable to cost-effectively add consignors and buyers to our website and apps. Our relationships with our marketing vendors are not long term in nature and do not require any specific performance commitments. In addition, many of our online advertising vendors provide advertising services to other companies, including companies with whom we may compete. As competition for online advertising has increased, the cost for some of these services has also increased. Our marketing initiatives may become increasingly expensive and generating a return on those initiatives may be difficult. Even if we successfully increase revenue as a result of our paid marketing efforts, such increase may not offset the additional marketing expenses we incur.

*Greater than expected product returns could have a negative impact on our revenue.*

We generally allow buyers to return certain purchases from our website and retail stores under our return policy. We record a reserve for returns against proceeds to us from the sale of goods on our online marketplace in calculating revenue. We estimate this reserve based on historical return trends. The introduction of new products in the retail market, changes in consumer confidence or other competitive and general economic conditions may also cause actual returns to exceed our reserve for returns. We believe adverse economic conditions in the past have resulted in an increase in our returns, and we have also experienced higher than expected returns in connection with fourth quarter holiday buying. Additionally, most of the consigned luxury goods are valuable and require special handling and delivery. From time to time, such goods are damaged in transit which can increase return rates, increase our costs and harm our brand. Returned goods may also be damaged in transit as part of the return process which can significantly impact the price we are able to charge for such goods on our online marketplace. Any significant increase in returns that exceeds our reserves could adversely affect our revenue and operating results.

40

***Compromises of our data security could cause us to incur unexpected expenses and may materially harm our reputation and operating results.***

In the ordinary course of our business, we collect, process and store certain personal information and other data relating to individuals, such as our consignors, buyers and employees. We also maintain other information, such as our trade secrets and confidential business information, that is sensitive and that we seek to protect. We rely substantially on commercially available systems, software, tools and monitoring to provide security for our processing, transmission and storage of personal information and other confidential information. We or our vendors could be the subject of hacking, social engineering, phishing attacks or other attacks. We have faced these attacks previously. Due to these or other causes, we or our vendors may suffer a data breach or other security incident, which may allow hackers or other unauthorized parties to gain access to personal information or other data, including payment card data or confidential business information, and we might not discover such issues for an extended period. The techniques used to obtain unauthorized access or to sabotage systems change frequently and generally are not identified until they are launched against a target. As a result, we and our vendors may be unable to anticipate these techniques or to implement adequate preventative measures. In addition, our employees, contractors, vendors or other third parties with whom we do business may attempt to circumvent security measures in order to misappropriate such personal information, confidential information or other data, or may inadvertently release or compromise such data. We expect to incur ongoing costs associated with the detection and prevention of security breaches and other security-related incidents. We may incur additional costs in the event of a security breach or other security-related incident. Any actual or perceived compromise of our systems or data security measures or those of third parties with whom we do business, or any failure to prevent or mitigate the loss of personal or other confidential information and delays in detecting or providing notice of any such compromise or loss could disrupt our operations, harm the perception of our security measures, damage our reputation, cause some participants to decrease or stop their use of our online marketplace and subject us to litigation, government action, increased transaction fees, regulatory fines or penalties or other additional costs and liabilities that could adversely affect our business, financial condition and operating results.

We cannot be certain that our insurance coverage will be adequate for data handling or data security liabilities, that insurance will continue to be available to us on economically reasonable terms, or at all, or that any insurer will not deny coverage as to any future claim. The successful assertion of one or more large claims against us that exceed available insurance coverage or the occurrence of changes in our insurance policies, including premium increases or the imposition of large deductible or co-insurance requirements, could have a material and adverse effect on our business, including our financial condition, operating results and reputation.

***Our use and other processing of personal information and other data is subject to laws and obligations relating to privacy and data protection, and our failure to comply with such laws and obligations could harm our business.***

Numerous state, federal and international laws, rules and regulations govern privacy, data protection and the collection, use and protection of personal information and other types of data we collect, use, disclose and otherwise process. These laws, rules and regulations are constantly evolving, and we expect that there will continue to be new proposed laws, regulations and industry standards concerning privacy, data protection and information security in the United States, the EU and other jurisdictions. For example, California enacted legislation in June 2018, the California Consumer Privacy Act (the "CCPA") that will, among other things, require covered companies to provide new disclosures to California consumers and afford such consumers new abilities to opt-out of certain sales of personal information, when it goes into effect on January 1, 2020. The CCPA was amended in September 2018, and it is possible that it will be amended again before it goes into effect. It remains unclear what, if any, modifications will be made to the CCPA or how it will be interpreted. The CCPA may require us to modify our data processing practices and policies and to incur substantial costs and expenses in an effort to comply. Similarly, the European Commission adopted a General Data Protection Regulation (the "GDPR") that became fully effective on May 25, 2018, imposing stringent EU data protection requirements.

We cannot yet fully determine the impact these or future laws, rules and regulations may have on our business or operations. These laws, rules and regulations may be inconsistent from one jurisdiction to another, subject to differing interpretations and may be interpreted to conflict with our practices. Additionally, we may be bound by contractual requirements applicable to our collection, use, processing and disclosure of various types of data, including personal information, and may be bound by, or voluntarily comply with, self-regulatory or other industry standards relating to these matters.

Any failure or perceived failure by us or any third parties with which we do business to comply with these laws, rules and regulations, or with other obligations to which we or such third parties are or may become subject, may result in actions against us by governmental entities, private claims and litigation, the expenditure of legal and other costs and of substantial time and resources, and fines, penalties or other liabilities. Any such action would be expensive to defend, may require the expenditure of substantial legal and other costs and substantial time and resources and likely would damage our reputation and adversely affect our business and operating results.

41

Further, in view of new or modified federal, state or foreign laws and regulations, industry standards, contractual obligations and other legal obligations, or any changes in their interpretation, we may find it necessary or desirable to fundamentally change our business activities and practices or to expend significant resources to modify our product and otherwise adapt to these changes. We may be unable to make such changes and modifications in a commercially reasonable manner or at all, and our ability to develop new products and features could be limited. Privacy, data protection and information security concerns, whether valid or not valid, may inhibit the use and growth of our online marketplace, particularly in certain foreign countries.

***If we fail to attract and retain key personnel on our executive team or to effectively manage leadership succession, our business, financial condition and operating results could be adversely impacted.***

Our success depends in part on our ability to attract and retain key personnel on our executive team. Senior employees have left our company in the past and others may in the future. We often cannot anticipate such departures, and may not be able to promptly replace key leadership personnel. The loss of one or more of our key personnel or the inability to promptly identify a suitable successor to a key role could have an adverse effect on our business. In particular, our Founder and Chief Executive Officer, Julie Wainwright, has unique and valuable experience from creating and leading our company from its inception through today. If she were to depart or otherwise reduce her focus on The RealReal, our business may be disrupted.

***Labor-related matters, including labor disputes, may adversely affect our operations.***

None of our employees are currently represented by a union. If our employees decide to form or affiliate with a union, we cannot predict the negative effects such future organizational activities will have on our business and operations. If we were to become subject to work stoppages, we could experience disruption in our operations, including delays in merchandising operations and shipping, and increases in our labor costs which could materially adversely affect our business, financial condition or results of operations.

***Expansion of our operations internationally will require management attention and resources, involves additional risks and may be unsuccessful.***

We have members from outside the United States who purchase items from our online marketplace, but we have not expanded our physical operations outside the United States. If we choose to expand our physical operations internationally, we would need to adapt to different local cultures, languages, standards, laws and regulations and policies. The online marketplace consignment business model we employ may not appeal to consignors and buyers outside of the United States. Furthermore, to succeed with clients in international locations, it will be necessary to locate merchandising and fulfillment facilities in foreign markets and hire local employees in those markets, and we may have to invest in such facilities before demonstrating that we can successfully run operations outside of the United States. We may not be successful in expanding into international markets or in generating revenue from foreign operations for a variety of reasons, including:

- our failure to localize our luxury consignment business model, including translation into foreign languages and adaptation for local cultures and customs;

- different buyer demand dynamics, which may make our model and the merchandise we offer less successful compared to the United States;

- competition from local firms that understand the local market and may operate more effectively;

- regulatory requirements, taxes, trade laws, trade sanctions and economic embargoes, tariffs, export quotas, import laws and regulations, custom duties, shipping of pre-owned goods from or into the U.S. or other trade restrictions or any unexpected changes thereto;

- differing labor regulations where labor laws may be more advantageous to employees as compared to the United States and increased labor costs;

- more stringent regulations relating to privacy and data security and access to, or use of, commercial and personal information, particularly in Europe;

- changes in a specific country's or region's political or economic conditions; and

- risks resulting from changes in currency exchange rates.

If we invest substantial time and resources to establish and expand our operations internationally and are unable to do so successfully and in a timely manner, our operating results would suffer.

42

*Our inability to replicate our business model for newer categories of consigned luxury goods in a timely and cost-effective manner may damage our business, financial condition and operating results.*

Our women's category accounted for approximately 67% of our GMV in 2018. We intend to deepen our penetration in other high-value categories such as men's, jewelry and watches, and home and art. We continue to explore additional categories of luxury goods to serve our existing consignors and buyers and to attract new consignors and buyers. These additional category offerings may not have the same success, or gain traction with consignors and buyers as quickly, as our women's offerings. If these additional categories of pre-owned luxury goods are not accepted by our existing consignors or buyers, or if such categories do not attract new consignors or buyers, our revenues may fall short of expectations, our brand and reputation could be adversely affected and we may incur expenses that are not offset by revenues. In addition, our business may be adversely affected if we are unable to attract new and repeat consignors that supply the necessary high-quality, appropriately priced and in-demand luxury merchandise in these additional categories, and these categories of goods may also have a different range of margin profiles than the goods currently sold through our online marketplace. Additionally, as we enter into new categories, potential consignors may demand higher commissions than our current categories, which would adversely affect our take rate and operating results. Expansion of our offerings may also strain our management and operational resources, specifically the need to hire and manage additional authentication and market experts. We may also face greater competition in specific categories from companies that are more focused on these categories. If any of these were to occur, it could damage our reputation, limit our growth and have an adverse effect on our operating results.

*Our business, including our costs and supply of consigned goods, is subject to risks associated with sourcing, processing, warehousing and shipping.*

Nearly all of the luxury goods we offer through our online marketplace are initially sourced from consignors who are individuals. As a result, we may be subject to periodic fluctuations in the number, brands and quality of goods sold through our online marketplace on behalf of our consignors. Our operating results could be negatively impacted by these fluctuations. In addition, as we expand into new categories of luxury goods, our payments to our consignors may rise relative to our existing categories, which could adversely affect our operating results.

We can make no assurance that goods we receive from consignors will be of sufficient quality or free from damage, or that such goods will not be damaged during shipping, while stored in one of our merchandising and fulfillment facilities or when shipped to buyers. While we take measures to avoid damage, conduct inspections of consigned goods and inspect returned products, we cannot control items while they are out of our possession or prevent all damage while in our merchandising and fulfillment facilities. For example, we have in the past and may in the future experience contamination, such as mold, bacteria, insects and other pests, in the goods shipped to us by our consignors, which may cause contamination of the goods stored in our merchandising and fulfillment facilities or while shipping to buyers. If we are unable to detect and quarantine such contaminants at the time such goods are initially received in our merchandising and fulfillment facilities, some or all of the goods stored in such facilities could be contaminated. We may incur additional expenses and our reputation could be harmed if clients and potential clients believe that the luxury goods we offer on behalf of our consignors is not of high-quality or may be damaged or contain contaminants.

*We could be liable for fraudulent or unlawful activities of consignors.*

We may fail to prevent consignors from consigning stolen goods. Government regulators and law enforcement officials may allege that our services violate, or aid and abet violations of certain laws, including laws restricting or prohibiting the transferability and, by extension, the resale, of stolen goods. Our form of consignor agreement includes a representation that the consignor has the necessary right and title to the goods they may consign, and we include such a rule and requirement in our terms of service prohibiting the listing of stolen or otherwise illegal products. In addition, we have implemented other protective measures to detect such products. If these measures prove inadequate, we may be required to spend substantial resources to take additional protective measures which could negatively impact our operations. Any costs incurred as a result of potential liability relating to the alleged or actual sale of stolen goods could harm our business. In addition, negative publicity relating to the actual or perceived listing or sale of stolen goods using our services could damage our reputation, and make our consignors and buyers reluctant to use our services. To the extent any of this occurs, it could harm our business or damage our reputation and we could face liability for such unlawful activities. Despite measures taken by us to detect stolen goods, to cooperate fully with law enforcement, and to respond to inquiries regarding potentially stolen goods, any resulting claims or liabilities could harm our business.

43

***Shipping is a critical part of our business and any changes in our shipping arrangements or any interruptions in shipping could adversely affect our operating results.***

We currently rely on major vendors for our shipping. If we are not able to negotiate acceptable pricing and other terms with these vendors or they experience performance problems or other difficulties, it could negatively impact our operating results and our consignors' and buyers' experience. In addition, our ability to receive inbound consignments efficiently and ship luxury goods to buyers may be negatively affected by inclement weather, fire, flood, power loss, earthquakes, labor disputes, acts of war or terrorism and similar factors. Because of the seasonality of our business, we tend to ship more goods in the fourth quarter than any other quarter. Disruption to delivery services due to winter weather in the fourth quarter could result in delays that could adversely affect our reputation or operational results. If our goods are not delivered in a timely fashion or are damaged or lost during the consignment or the delivery process, our consignors or buyers could become dissatisfied and cease using our services, which would adversely affect our business and operating results.

***We may incur significant losses from fraud.***

We have in the past incurred and may in the future incur losses from various types of fraudulent transactions, including the use of stolen credit card numbers, claims that a consignment of a good was not authorized and that a buyer did not authorize a purchase. In addition to the direct costs of such losses, if the fraud is related to credit card transactions and becomes excessive, it could result in us paying higher fees or losing the right to accept credit cards for payment. Under current credit card practices, we are liable for fraudulent credit card transactions because we do not obtain a cardholder's signature. Our failure to adequately prevent fraudulent transactions could damage our reputation, result in litigation or regulatory action or lead to expenses that could substantially impact our operating results.

***Use of social media, emails and text messages may adversely impact our reputation or subject us to fines or other penalties.***

We use social media, emails, push notifications and text messages as part of our omni-channel approach to marketing. As laws and regulations evolve to govern the use of these channels, the failure by us, our employees or third parties acting at our direction to comply with applicable laws and regulations in the use of these channels could adversely affect our reputation or subject us to fines or other penalties. In addition, our employees or third parties acting at our direction may knowingly or inadvertently make use of social media in ways that could lead to the loss or infringement of intellectual property, as well as the public disclosure of proprietary, confidential or sensitive personal information of our business, employees, consumers or others. Information concerning us or our consignors and brands, whether accurate or not, may be posted on social media platforms at any time and may have an adverse impact on our brand, reputation or business. The harm may be immediate without affording us an opportunity for redress or correction and could have a material adverse effect on our reputation, business, operating results, financial condition and prospects.

***We may not accurately forecast revenue and appropriately plan our expenses.***

We rely on constant replenishment of consigned goods to sustain and grow our revenue, and our revenue in a given period can be difficult to predict. Additionally, our business is affected by general economic and business conditions. A downturn in the United States or global economies may result in decreased consumer disposable income and decreased purchases. We make certain assumptions when planning our expenses based on our expected revenue. These assumptions are partly based on historical results. Because our operating expenses are relatively fixed in the short term, any failure to achieve our revenue expectations would have a direct, adverse effect on our operating results. If actual results differ from our estimates, the trading price of our common stock may be adversely affected.

***If we cannot successfully protect our intellectual property, our business could suffer.***

We rely on a combination of intellectual property rights, contractual protections and other practices to protect our brand, proprietary information, technologies and processes. We primarily rely on copyright and trade secret laws to protect our proprietary technologies and processes, including the algorithms we use throughout our business. Others may independently develop the same or similar technologies and processes, or may improperly acquire and use information about our technologies and processes, which may allow them to provide a service similar to ours, which could harm our competitive position. Our principal trademark assets include the registered trademark "The RealReal" and our logos and taglines. Our trademarks are valuable assets that support our brand and consumers' perception of our services and merchandise. We also hold the rights to the "therealreal.com" Internet domain name and various related domain names, which are subject to Internet regulatory bodies and trademark and other related laws of each applicable jurisdiction. If we are unable to protect our trademarks or domain names, our brand recognition and reputation would suffer, we would incur significant expense establishing new brands and our operating results would be adversely impacted. Further, to the extent we pursue patent protection for our innovations, patents we may apply for may not issue, and patents that do issue or that we acquire may not provide us with any competitive advantages or may be challenged by third parties. There can be no assurance that any patents we obtain will adequately protect our inventions or survive a legal challenge, as the legal standards relating to the validity, enforceability and scope of protection of patent and other intellectual property rights are uncertain. We may be required to spend significant resources to monitor and protect our intellectual property rights, and the efforts we take to protect our proprietary rights may not be sufficient.

*We could be required to pay or collect sales taxes in jurisdictions in which we do not currently do so, with respect to past or future sales. This could adversely affect our business and operating results.*

An increasing number of states have considered or adopted laws that impose tax collection obligations on out-of-state sellers of goods. Additionally, the Supreme Court of the United States recently ruled in *South Dakota v. Wayfair, Inc. et al* ("Wayfair"), that online sellers can be required to collect sales tax despite not having a physical presence in the state of the customer. In response to Wayfair, or otherwise, states or local governments and taxing authorities may adopt, or begin to enforce, laws requiring us to calculate, collect and remit taxes on sales in their jurisdictions. While we collect and remit sales taxes in every state that requires sales taxes to be collected, including states where we do not have a physical presence, the adoption of new laws by, or a successful assertion by the taxing authorities of, one or more state or local governments requiring us to collect taxes where we presently do not do so, or to collect more taxes in a jurisdiction in which we currently do collect some taxes, could result in substantial tax liabilities, including taxes on past sales, as well as penalties and interest. The imposition by state governments and taxing authorities of sales tax collection obligations on out-of-state ecommerce businesses could also create additional administrative burdens for us, put us at a competitive disadvantage if they do not impose similar obligations on our competitors and decrease our future sales, which could have a materially adverse impact on our business and operating results.

*Application of existing tax laws, rules or regulations are subject to interpretation by taxing authorities.*

The application of the income and tax laws is subject to interpretation. Although we believe our tax methodologies are compliant, a taxing authority's final determination in the event of a tax audit could materially differ from our past or current methods for determining and complying with our tax obligations, including the calculation of our tax provisions and accruals, in which case we may be subject to additional tax liabilities, possibly including interest and penalties. Furthermore, taxing authorities have become more aggressive in their interpretation and enforcement of such laws, rules and regulations over time, as governments are increasingly focused on ways to increase revenues. This has contributed to an increase in audit activity and stricter enforcement by taxing authorities. As such, additional taxes or other assessments may be in excess of our current tax reserves or may require us to modify our business practices to reduce our exposure to additional taxes going forward, any of which may have a material adverse effect on our business, results of operations, financial condition and prospects.

*Amendments to existing tax laws, rules or regulations or enactment of new unfavorable tax laws, rules or regulations could have an adverse effect on our business and operating results.*

Many of the underlying laws, rules and regulations imposing taxes and other obligations were established before the growth of the Internet and ecommerce. U.S. federal, state and local taxing authorities are currently reviewing the appropriate treatment of companies engaged in Internet commerce and considering changes to existing tax or other laws that could levy sales, income, consumption, use or other taxes relating to our activities, and/or impose obligations on us to collect such taxes. If such tax or other laws, rules or regulations are amended, or if new unfavorable laws, rules or regulations are enacted, the results could increase our tax payments or other obligations, prospectively or retrospectively, subject us to interest and penalties, decrease the demand for our services if we pass on such costs to our buyers or consignors, result in increased costs to update or expand our technical or administrative infrastructure or effectively limit the scope of our business activities if we decided not to conduct business in particular jurisdictions. As a result, these changes may have a material adverse effect on our business, results of operations, financial condition and prospects.

Recently enacted legislation commonly referred to as the Tax Cuts and Jobs Act of 2017 made a number of significant changes to the current U.S. federal income tax rules, including reducing the generally applicable corporate tax rate from 35% to 21%, imposing additional limitations on the deductibility of interest, placing limits on the utilization of net operating losses and making substantial changes to the international tax rules. Many of the provisions of the Tax Cuts and Jobs Act still require guidance through the issuance and/or finalization of regulations by the U.S. Department of the Treasury in order to fully assess their effect, and there may be substantial delays before such regulations are promulgated and/or finalized, increasing the uncertainty as to the ultimate effect of the Tax Cuts and Jobs Act on us and our stockholders. There also may be technical corrections legislation or other legislative changes proposed with respect to the Tax Cuts and Jobs Act, the effect of which cannot be predicted and may be adverse to us or our stockholders.

*Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited.*

We have incurred substantial net operating losses ("NOLs"), during our history. Unused NOLs may carry forward to offset future taxable income if we achieve profitability in the future, unless such NOLs expire under applicable tax laws. However, under the rules of Sections 382 and 383 of the Internal Revenue Code of 1986, as amended (the "Code"), if a corporation undergoes an "ownership change," generally defined as a greater than 50% change (by value) in its equity ownership over a three-year period, the corporation's ability to use its NOLs and other pre-change tax attributes to offset its post-change taxable income or taxes may be limited. The applicable rules generally operate by focusing on changes in ownership among stockholders considered by the rules as owning, directly or indirectly, 5% or more of the stock of a company, as well as changes in ownership arising from new issuances of stock by the company. To date, we have not undertaken an analysis of whether we have experienced a change of control that would

45

limit our ability to use our NOLs. As a result of these rules, in the event that it is determined that we have experienced an ownership change in the past, or if we experience one or more ownership changes as a result of this offering or future transactions in our stock, then we may be limited in our ability to use our NOL carryforwards to offset our future taxable income, if any. In addition, the Tax Cuts and Jobs Act imposes certain limitations on the deduction of NOLs generated in tax years that began on or after January 1, 2018, including a limitation on use of NOLs to offset 80% of taxable income and the disallowance of NOL carryback. Although NOLs generated in tax years before 2018 may still be used to offset future income without limitation, the recent legislation may limit our ability to use our NOLs to offset any future taxable income.

*We may require additional capital to support business growth, and this capital might not be available or may be available only by diluting existing stockholders.*

We intend to continue making investments to support our growth and may require additional funds to support this growth and respond to business challenges, including the need to develop our online marketplace services, expand our categories of pre-owned luxury goods, enhance our operating infrastructure, expand the markets in which we operate and potentially acquire complementary businesses and technologies. Accordingly, we may need to engage in equity or debt financings to secure additional funds. If we raise additional funds through further issuances of equity or convertible debt securities, our existing stockholders could suffer significant dilution, and any new equity securities we issue could have rights, preferences and privileges superior to those of holders of our common stock. Any debt financing secured by us in the future could involve restrictive covenants relating to our capital-raising activities and other financial and operational matters, which may make it more difficult for us to obtain additional capital and to pursue business opportunities. In addition, we may not be able to obtain additional financing on terms favorable to us, if at all. If we are unable to obtain financing on terms satisfactory to us when we require it, our ability to continue to support our business growth and to respond to business challenges could be significantly limited, and our business and prospects could fail or be adversely affected.

*Our reported results of operations may be adversely affected by changes in generally accepted accounting principles.*

Generally accepted accounting principles are subject to interpretation by the Financial Accounting Standards Board ("FASB"), the SEC and various bodies formed to promulgate and interpret appropriate accounting principles. A change in these principles or interpretations could have a significant effect on our reported results of operations and could affect the reporting of transactions completed before the announcement of a change. It is difficult to predict the impact of future changes to accounting principles or our accounting policies, any of which could negatively affect our reported results of operations.

*If our internal control over financial reporting or our disclosure controls and procedures are not effective, we may not be able to accurately report our financial results, prevent fraud or file our periodic reports in a timely manner, which may cause investors to lose confidence in our reported financial information and may lead to a decline in our stock price.*

We are required to comply with the requirements of Section 404 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), following the later of the date we are deemed to be an "accelerated filer" or a "large accelerated filer," each as defined in the Exchange Act, or the date we are no longer an "emerging growth company," as defined in the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"). Section 404 of the Sarbanes-Oxley Act requires that we maintain effective internal control over financial reporting and disclosure controls and procedures. In particular, we must perform system and process evaluations, document our controls and perform testing of our key controls over financial reporting to allow management and our independent public accounting firm to report on the effectiveness of our internal control over financial reporting. Our testing, or the subsequent testing by our independent public accounting firm, may reveal deficiencies in our internal control over financial reporting that are deemed to be material weaknesses. If we are not able to comply with the requirements of Section 404 in a timely manner, or if we or our accounting firm identify deficiencies in our internal control over financial reporting that are deemed to be material weaknesses, the market price of our stock would likely decline and we could be subject to lawsuits, sanctions or investigations by regulatory authorities, which would require additional financial and management resources.

We may encounter difficulties in the timely and accurate reporting of our financial results, which would impact our ability to provide our investors with information in a timely manner. As a result, our investors could lose confidence in our reported financial information, and our stock price could decline.

46

**Risks Relating to Ownership of Our Common Stock**

***The market price of our common stock may be volatile or may decline steeply or suddenly regardless of our operating performance and we may not be able to meet investor or analyst expectations. You may not be able to resell your shares at or above the price you paid and may lose all or part of your investment.***

If you purchase shares of our common stock, you may not be able to resell those shares at or above the price you paid. We cannot assure you that the market price of our shares will equal or exceed prices in privately negotiated transactions of our shares that have occurred from time to time before our IPO. The market price of our common stock may fluctuate or decline significantly in response to numerous factors, many of which are beyond our control, including:

- actual or anticipated fluctuations in our consignor or buyer base, the level of consignor and buyer engagement, revenue or other operating results;

- variations between our actual operating results and the expectations of securities analysts, investors and the financial community;

- any forward-looking financial or operating information we may provide to the public or securities analysts, any changes in this information or our failure to meet expectations based on this information;

- actions of securities analysts who initiate or maintain coverage of us, changes in financial estimates by any securities analysts who follow our company or our failure to meet these estimates or the expectations of investors;

- additional shares of our common stock being sold into the market by us or our existing stockholders, or the anticipation of such sales, including if existing stockholders sell shares into the market when the applicable "lock-up" periods associated with our IPO ends;

- hedging activities by market participants;

- announcements by us or our competitors of significant products or features, technical innovations, acquisitions, strategic partnerships, joint ventures or capital commitments;

- changes in operating performance and stock market valuations of companies in our industry, including our competitors;

- price and volume fluctuations in the overall stock market, including as a result of trends in the economy as a whole;

- lawsuits threatened or filed against us;

- developments in new legislation and pending lawsuits or regulatory actions, including interim or final rulings by judicial or regulatory bodies; and

- other events or factors, including those resulting from war or incidents of terrorism, or responses to these events.

In addition, price and volume fluctuations in the stock markets have affected and continue to affect many online marketplace and other technology companies' stock prices. Stock prices often fluctuate in ways unrelated or disproportionate to the companies' operating performance. In the past, stockholders have filed securities class action litigation following periods of market volatility. We have been the target of litigation associated with these fluctuations and market volatility and may be the target of this type of litigation in the future. Securities litigation against us could result in substantial costs and divert our management's attention from other business concerns, which could harm our business. See the risk factor entitled "*We are currently, and may be in the future, party to lawsuits and other claims that are expensive and time consuming, could lead to adverse publicity, and, if resolved adversely, could have a significant impact on our business, financial condition or operating results*."

Moreover, because of these fluctuations, comparing our operating results on a period-to-period basis may not be meaningful. You should not rely on our past results as an indication of our future performance. This variability and unpredictability could also result in our failing to meet the expectations of industry or financial analysts or investors for any period. If our revenue or operating results fall below the expectations of analysts or investors or below any forecasts we may provide to the market, or if the forecasts we provide to the market are below the expectations of analysts or investors, the price of our common stock could decline substantially. Such a stock price decline could occur even when we have met any previously publicly stated revenue or earnings forecasts that we may provide.

***Future sales of shares by existing stockholders could cause our stock price to decline.***

If our existing stockholders, including employees and service providers who obtain equity, sell or indicate an intention to sell, substantial amounts of our common stock in the public market after the lock-up and legal restrictions on resale lapse, the trading price of our common stock could decline. Each of our directors, executive officers and other holders of substantially all our outstanding equity securities are subject to lock-up agreements that restrict their ability to sell or transfer their shares for a period of 180 days after the date of the prospectus delivered in connection with our IPO, subject to certain exceptions. However, Credit Suisse Securities (USA) LLC and BofA Securities, Inc. may, in their sole discretion, waive the contractual lock-up before the lock-up agreements expire. Sales of a substantial number of such shares upon expiration of the lock-up and market stand-off agreements, the perception that such sales may occur or early release of these agreements, could cause our market price to fall or make it more difficult for you to sell your common stock at a time and price that you deem appropriate.

47

*If securities or industry analysts either do not publish research about us or publish inaccurate or unfavorable research about us, our business or our market, or if they change their recommendations regarding our common stock adversely, the trading price or trading volume of our common stock could decline.*

The trading market for our common stock is influenced in part by the research and reports that securities or industry analysts may publish about us, our business, our market or our competitors. If one or more analysts initiate research with an unfavorable rating or downgrade our common stock, provide a more favorable recommendation about our competitors or publish inaccurate or unfavorable research about our business, our common stock price would likely decline. If any analyst who covers us, or may cover us, were to cease coverage of us or fail to regularly publish reports on us, we could lose visibility in the financial markets, which in turn could cause the trading price or trading volume of our common stock to decline.

*We are an emerging growth company, and any decision on our part to comply only with certain reduced reporting and disclosure requirements applicable to emerging growth companies could make our common stock less attractive to investors.*

We are an emerging growth company and, for as long as we continue to be an emerging growth company, we may choose to take advantage of exemptions from various reporting requirements applicable to other public companies but not to "emerging growth companies," including:

- not being required to have our independent registered public accounting firm audit our internal control over financial reporting under Section 404 of the Sarbanes-Oxley Act;

- reduced disclosure obligations regarding executive compensation in our periodic reports and annual report on Form 10-K; and

- exemptions from the requirements of holding non-binding advisory votes on executive compensation and stockholder approval of any golden parachute payments not previously approved.

As a result, our stockholders may not have access to certain information that they may deem important. We could be an emerging growth company until the end of fiscal year 2024, although circumstances could cause us to lose that status earlier, including if our total annual gross revenue exceeds $1.07 billion, if we issue more than $1.0 billion in non-convertible debt securities during any three-year period, or if we are a large accelerated filer and the market value of our common stock held by non-affiliates exceeds $700 million as of the end of any second quarter before that time. We cannot predict if investors will find our common stock less attractive if we choose to rely on any of the exemptions afforded emerging growth companies. If some investors find our common stock less attractive because we rely on any of these exemptions, there may be a less active trading market for our common stock and the market price of our common stock may be more volatile.

Under the JOBS Act, "emerging growth companies" can also delay adopting new or revised accounting standards until such time as those standards apply to private companies. We elected to use the extended transition period for complying with new or revised accounting standards that have different effective dates for public and private companies until the earlier of the date that we (1) are no longer an emerging growth company or (2) affirmatively and irrevocably opt out of the extended transition period provided in the JOBS Act. As a result, these financial statements may not be comparable to companies that comply with the new or revised accounting pronouncements as of public company effective dates.

*Future securities issuances could result in significant dilution to our stockholders and impair the market price of our common stock.*

Future issuances of shares of our common stock, or the perception that these sales may occur, could depress the market price of our common stock and result in dilution to existing holders of our common stock. Also, to the extent outstanding options and warrants to purchase our shares of our common stock are exercised or options or other stock-based awards are issued or become vested, there will be further dilution. The amount of dilution could be substantial depending upon the size of the issuances or exercises. Furthermore, we may issue additional equity securities that could have rights senior to those of our common stock. As a result, purchasers of our common stock in this offering bear the risk that future issuances of debt or equity securities may reduce the value of our common stock and further dilute their ownership interest.

*Operating as a public company requires us to incur substantial costs and management attention.*

As a public company, we incur substantial legal, accounting and other expenses that we did not incur as a private company.  For example, we are subject to the reporting requirements of the Exchange Act, the applicable requirements of the Sarbanes-Oxley Act and the Dodd-Frank Wall Street Reform and Consumer Protection Act, the rules and regulations of the SEC and the listing standards of the Nasdaq Global Select Market.  We are also required to establish and maintain effective disclosure and financial controls and make changes to our corporate governance practices. Compliance with these requirements increases our legal and financial compliance costs and increases demand on our system.

Our management and other personnel divert attention from other business matters to devote substantial time to the reporting and other requirements of being a public company. In particular, we expect to incur significant expense and devote substantial management effort to complying with the requirements of Section 404 of the Sarbanes-Oxley Act once we are no longer an emerging growth company. We are in the process of hiring additional accounting and financial staff with appropriate public company experience and technical accounting knowledge.

***Delaware law and provisions in our certificate of incorporation and bylaws could make a merger, tender offer or proxy contest difficult, thereby depressing the trading price of our common stock.***

Our certificate of incorporation and bylaws contain provisions that could depress the trading price of our common stock by acting to discourage, delay or prevent a change of control of our company or changes in our management that the stockholders of our company may deem advantageous. These provisions include the following:

- establish a classified board of directors so that not all members of our board of directors are elected at one time;

- permit the board of directors to establish the number of directors and fill any vacancies and newly-created directorships;

- provide that directors may only be removed for cause;

- require super-majority voting to amend some provisions in our certificate of incorporation and bylaws;

- authorize the issuance of "blank check" preferred stock that our board of directors could use to implement a stockholder rights plan;

- prohibit stockholders from calling special meetings of stockholders;

- prohibit stockholder action by written consent, which requires all stockholder actions to be taken at a meeting of our stockholders;

- provide that the board of directors is expressly authorized to make, alter or repeal our bylaws;

- restrict the forum for certain litigation against us to Delaware; and

- establish advance notice requirements for nominations for election to our board of directors or for proposing matters that can be acted upon by stockholders at annual stockholder meetings.

Any provision of our certificate of incorporation or bylaws or Delaware law that has the effect of delaying or deterring a change in control could limit the opportunity for our stockholders to receive a premium for their shares of our common stock, and could also affect the price that some investors are willing to pay for our common stock.

***Our certificate of incorporation designates the Court of Chancery of the State of Delaware located within the State of Delaware as the exclusive forum for substantially all disputes between us and our stockholders, which could limit our stockholders' ability to choose the judicial forum for disputes with us or our directors, officers or employees.***

Our certificate of incorporation provides that, unless we consent in writing to the selection of an alternative forum, to the fullest extent permitted by law, the Court of Chancery of the State of Delaware (or, if the Court of Chancery does not have jurisdiction, another state court located within the State of Delaware or, if no court located within the State of Delaware has jurisdiction, the federal district court for the District of Delaware) shall be the sole and exclusive forum for (1) any derivative action or proceeding brought on our behalf under Delaware law, (2) any action asserting a claim of breach of a fiduciary duty owed by any of our directors, officers or other employees to us or our stockholders, (3) any action arising pursuant to any provision of the Delaware General Corporation Law ("DGCL"), our certificate of incorporation or our bylaws, (4) any other action asserting a claim that is governed by the internal affairs doctrine shall be the Court of Chancery of the State of Delaware (or, if the Court of Chancery does not have jurisdiction, the federal district court for the District of Delaware) or (5) any other action asserting an "internal corporate claim," as defined in Section 115 of the DGCL, in all cases subject to the court having jurisdiction over indispensable parties named as defendants. These exclusive-forum provisions do not apply to claims under the Securities Act or the Exchange Act.

Any person or entity purchasing or otherwise acquiring any interest in any of our securities shall be deemed to have notice of and consented to this provision. This exclusive-forum provision may limit a stockholder's ability to bring a claim in a judicial forum of its choosing for disputes with us or our directors, officers or other employees, which may discourage lawsuits against us and our directors, officers and other employees. If a court were to find the exclusive-forum provision in our certificate of incorporation to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving the dispute in other jurisdictions, which could harm our results of operations.

49

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds.**

In March 2019, we sold an aggregate of 10,182,111 shares of our Series H preferred stock to 15 accredited investors at a purchase price of $6.8748 per share, for an aggregate purchase price of $70.0 million.

From January 1, 2019 through July 3, 2019 (the date of the filing of our registration statement on Form S-8), we issued and sold to our directors, officers, employees, consultants and other service providers an aggregate of 1,144,129 shares of common stock upon the exercise of options issued under our 2011 Equity Incentive Plan at a weighted average price of $1.63, for an aggregate exercise price of $1.9 million.

None of the foregoing transactions involved any underwriters, underwriting discounts or commissions, or any public offering. We believe the offers, sales and issuances of the above securities were exempt from registration under the Securities Act (or Regulation D or Regulation S promulgated thereunder) by virtue of Section 4(a)(2) of the Securities Act as transactions by an issuer not involving a public offering, or was in reliance on Rule 701 because the transactions were pursuant to compensatory benefit plans or contracts relating to compensation as provided under such rule. The recipients of the securities in each of these transactions represented their intentions to acquire the securities for investment only and not with a view to or for sale in connection with any distribution thereof, and appropriate legends were placed upon the stock certificates issued in these transactions. All recipients had adequate access, through their relationships with us, to information about us. The sales of these securities were made without any general solicitation or advertising.

*Use of proceeds from our IPO*

On July 2, 2019, we completed our IPO, selling 17,250,000 shares of our common stock at a price of $20.00 per share (including shares subject to the underwriters' over-allotment option) for an aggregate price of $345.0 million. The offer and sale of the shares in the IPO was registered under the Securities Act pursuant to a registration statement on Form S-1 (File No. 333-231891), which was declared effective by the SEC on June 27, 2019. We raised approximately $320.9 million in net proceeds after deducting underwriting discounts and commissions of approximately $24.1 million.

Of the aggregate net proceeds from our IPO, we used $0.3 million to pay a success fee to the lender under our term loan facility and $6.5 million to fully repay our term loans as described in Note 6 of our condensed financial statements included elsewhere in this Quarterly Report on Form 10-Q. We will use $3.2 million to fund The RealReal Foundation, a Delaware non-profit organization formed to engage in charitable activities. We intend to use the remaining net proceeds from this offering for general corporate purposes, including working capital, operating expenses and capital expenditures. We may also use a portion of the net proceeds to acquire, invest in or obtain rights to complementary technologies, products, services or businesses. The underwriters of the offering were Credit Suisse Securities (USA) LLC, BofA Securities, Inc. and UBS Securities LLC.  No payments were made by us to directors, officers or persons owning ten percent or more of our common stock or to their associates, or to our affiliates, other than payments in the ordinary course of business to officers for salaries.

There has been no material change in the planned use of the IPO proceeds as described in our final prospectus dated June 27, 2019 and filed with the SEC on June 28, 2019, pursuant to Rule 424(b) of the Securities Act.

**Item 3. Defaults Upon Senior Securities.**

Not applicable.

**Item 4. Mine Safety Disclosures.**

Not applicable.

**Item 5. Other Information.**

Not applicable.

**Item 6. Exhibits.**

Furnish the exhibits required by Item 601 of Regulation S-K (§ 229.601 of this chapter).

| Exhibit Number | Description |
|---|---|
| 31.1* | Certification of Principal Executive Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification of Principal Financial Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1* | Certification of Principal Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2* | Certification of Principal Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

\*      Filed herewith.

51

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

The RealReal, Inc.

Date: November 5, 2019                              By:    /s/ Julie Wainwright
                                                        **Julie Wainwright**
                                                        **President and Chief Executive Officer**

Date: November 5, 2019                              By:    /s/ Matt Gustke
                                                        **Matt Gustke**
                                                        **Chief Financial Officer**

52

**Exhibit 31.1**

**CERTIFICATION PURSUANT TO**
**RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Julie Wainwright, certify that:

1.    I have reviewed this Quarterly Report on Form 10-Q of The RealReal, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 5, 2019                                      By:    _____/s/ Julie Wainwright_____

                                                                    **Julie Wainwright**
                                                                    **President and Chief Executive Officer**

**Exhibit 31.2**

**CERTIFICATION PURSUANT TO**
**RULES 13a-14(a) AND 15d-14(a) UNDER THE SECURITIES EXCHANGE ACT OF 1934,**
**AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Matt Gustke, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q of The RealReal, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 5, 2019

By:      /s/ Matt Gustke

**Matt Gustke**
**Chief Financial Officer**

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of The RealReal, Inc. (the "Company") on Form 10-Q for the period ending September 30, 2019 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

(1)    The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: November 5, 2019                    By:            /s/ Julie Wainwright
                                                **Julie Wainwright**
                                        **President and Chief Executive Officer**

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of The RealReal, Inc. (the "Company") on Form 10-Q for the period ending September 30, 2019 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

(1)     The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: November 5, 2019                                    By:  _____/s/ Matt Gustke_____

                                                                        **Matt Gustke**
                                                                        **Chief Financial Officer**