Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL SANDERS, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>THE REALREAL, INC., *et al.*,<br><br>    Defendants. | No: 5:19-cv-07737-EJD<br><br>CLASS ACTION<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>JUDGE:  Hon. Edward J. Davila<br>DATE:   August 20, 2020<br>TIME:    9:00 a.m.<br>CTRM:   4, 5th Floor |

## **TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT .......................................................................................1

II.   STATEMENT OF FACTS ...........................................................................................2

    A.   The Company's Chief Value Proposition is its "Authentication" Process .............2

    B.   Defendants Deceived Investors About TRR's Authentication Process ...................3

    C.   News Reports Revealed the Truth About TRR's Authentication Process ...............5

    D.   Thirteen Former TRR Employees Corroborate the News Reports ..........................6

    E.   The Prospectus Included Misleading Statements About the Company's AOV ........................................................................................................................7

III.  ARGUMENT ...............................................................................................................7

    A.   Plaintiffs Face a Minimal Pleading Burden Under the Securities Act ....................8

    B.   The Complaint Adequately Alleges False and Misleading Statements .................10

        1.   The Prospectus Contained False and Misleading Statements About the Company's Authentication Process .......................................................10

        2.   Defendants Made Additional False and Misleading Statements About the Company's Authentication Process after the IPO .....................14

        3.   The Former Employees and News Reports are Reliable and Credible ......................................................................................................16

        4.   The Prospectus Contained Misleading Statements About AOV ..............17

    C.   The Complaint's Exchange Act Allegations Adequately Allege Scienter ............19

    D.   The Complaint Adequately Alleges Loss Causation .............................................21

    E.   The Complaint Adequately Alleges Control Person Claims ..................................25

IV.   CONCLUSION ............................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Ahern v. Apple Inc.*,
   411 F. Supp. 3d 541 (N.D. Cal. 2019) ...............................................................................12

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
   842 F. Supp. 2d 1216 (C.D. Cal. 2012).................................................................................8

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008).....................................................................................passim

*Brand Mktg. Grp., LLC v. Intertek Testing Servs. NA, Inc.*,
   No. 12CV1572, 2013 WL 3854461 (W.D. Pa. July 23, 2013) .................................................12

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
   866 F. Supp. 2d 223 (S.D.N.Y. 2012).................................................................................15

*Casella v. Webb*,
   883 F.2d 805 (9th Cir. 1989)..............................................................................................11

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat., PLC*,
   423 F. Supp. 2d 348 (S.D.N.Y. 2006).................................................................................24

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) ...................................................................................................8, 21

*Fadia v. FireEye, Inc.*,
   No. 5:14-CV-05204-EJD, 2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ...............................16

*Garcia v. Guo*,
   No. CV–15–1862–MWF–MRWx, 2016 WL 102213 (C.D. Cal. Jan. 7, 2016)........................23

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,
   286 F. Supp. 2d 284 (S.D.N.Y. 2003).................................................................................11

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992)..............................................................................................23

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983) ...........................................................................................................8

*Hildes v. Arthur Andersen LLP*,
   734 F.3d 854 (9th Cir. 2013).................................................................................................8

*Howard v. Everex Sys., Inc.*,
   228 F.3d 1057 (9th Cir. 2000)..............................................................................................25

*In re Am. Apparel, Inc. S'holder Litig.*,
No. CV1006352MMMRCX, 2013 WL 10914316 (C.D. Cal. Aug. 8, 2013)............................25

*In re Apollo Grp., Inc. Sec. Litig.*,
No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) ................................................23, 24

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
No. 17-CV-4846 (WFK), 2020 WL 1950783 (E.D.N.Y. Apr. 22, 2020) .................................19

*In re Charles Schwab Corp. Sec. Litig.*,
257 F.R.D. 534 (N.D. Cal. 2009) ..............................................................................................9

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008).....................................................................................16

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005).........................................................................................8, 9, 22

*In re Eventbrite, Inc. Sec. Litig.*,
No. 5:18-CV-02019-EJD, 2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) .................................10

*In re Exodus Commc'ns, Inc. Sec. Litig.*,
No. C-01-2661-MMC, 2005 WL 2206693 (N.D. Cal. Sept. 12, 2005) ......................................9

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008).............................................................................................21, 23

*In re Gilead Scis. Sec. Litig.*,
No. C 03-4999 SI, 2009 WL 1561584 (N.D. Cal. June 3, 2009)..............................................16

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) .......................................................................................20

*In re Juniper Networks, Inc. Sec. Litig.*,
542 F. Supp. 2d 1037 (N.D. Cal. 2008) ..............................................................................22, 25

*In re LDK Solar Sec. Litig.*,
255 F.R.D. 519 (N.D. Cal. 2009) ..............................................................................................23

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) .....................................................................................21

*In re Novatel Wireless Sec. Litig.*,
830 F. Supp. 2d 996 (S.D. Cal. 2011) .......................................................................................23

*In re PMA Capital Corp. Sec. Litig.*,
No. 03-6121, 2005 WL 1806503 (E.D. Pa. July 27, 2005).......................................................12

*In re Restoration Robotics, Inc. Sec. Litig.*,
417 F. Supp. 3d 1242 (N.D. Cal. 2019) .............................................................................11, 18

*In re Rigel Pharm., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ............................................................................................9

*In re Toronto-Dominion Bank Sec. Litig.*,
   No. CV 17-1665 (NLH/JS), 2018 WL 6381882 (D.N.J. Dec. 6, 2018) ..............................16, 17

*In re Violin Memory Sec. Litig.*,
   No. 13-CV-5486 YGR, 2014 WL 5525946 (N.D. Cal. Oct. 31, 2014) ................................9

*Kinda Wood USA v. MGV Enterprises LLC*,
   No. 2:07-CV-1137, 2009 WL 649793 (S.D. Ohio Mar. 10, 2009) ...........................................12

*Knollenberg v. Harmonic, Inc.*,
   152 F. App'x 674 (9th Cir. 2005) .....................................................................................9

*Kyung Cho v. UCBH Holdings, Inc.*,
   890 F. Supp. 2d 1190 (N.D. Cal. 2012) ........................................................................21, 25

*L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*,
   114 F. Supp. 3d 852 (N.D. Cal. 2015) .............................................................................12

*Lomingkit v. Apollo Educ. Grp. Inc.*,
   275 F. Supp. 3d 1139 (D. Ariz. 2017) ..............................................................................14

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ...................................................................................................7, 10

*Maverick Fund, L.D.C. v. Comverse Tech., Inc.*,
   801 F. Supp. 2d 41 (E.D.N.Y. 2011) ...............................................................................22

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008) ......................................................................................10, 18

*Mulligan v. Impax Labs., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) ..............................................................................12

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) .........................................................................................21

*Pirani v. Slack Techs., Inc.*,
   No. 19-CV-05857-SI, 2020 WL 1929241 (N.D. Cal. Apr. 21, 2020) ......................................18

*Reese v. BP Expl. (Alaska) Inc.*,
   643 F.3d 681 (9th Cir. 2011) ..........................................................................................10

*Reitman v. Champion Petfoods USA, Inc.*,
   No. CV181736DOCJPRX, 2019 WL 1670718 (C.D. Cal. Feb. 6, 2019) ................................15

*Rubke v. Capitol Bancorp Ltd*,
   551 F.3d 1156 (9th Cir. 2009) ........................................................................................9

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; 5:19-cv-07737-EJD

*Rudolph v. UTStarcom,*
    No. C 07-04578 SI, 2008 WL 4002855 (N.D. Cal. Aug. 21, 2008) .........................................21

*S. Ferry LP, No. 2 v. Killinger,*
    542 F.3d 776 (9th Cir. 2008)......................................................................................................20

*S.E.C. v. Todd,*
    642 F.3d 1207 (9th Cir. 2011).....................................................................................................25

*Safron Capital Corp. v. Leadis Tech., Inc.,*
    274 F. App'x 540 (9th Cir. 2008) ..................................................................................................9

*Scott v. ZST Digital Networks, Inc.,*
    No. CV 11-03531 GAF JCX, 2012 WL 538279 (C.D. Cal. Feb. 14, 2012) ..............................24

*Starr v. Baca,*
    652 F.3d 1202 (9th Cir. 2011).......................................................................................................8

*Steckman v. Hart Brewing, Inc.,*
    143 F.3d 1293 (9th Cir. 1998)......................................................................................................18

*Sudunagunta v. NantKwest, Inc.,*
    No. CV1601947MWFJEMX, 2017 WL 8811116 (C.D. Cal. May 16, 2017) ...........................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ..............................................................................................................8, 19

*Vancouver Alumni Asset Holdings Inc. v. Daimler AG,*
    No. CV1602942SJOKSX, 2017 WL 2378369 (C.D. Cal. May 31, 2017) ................................22

*Vernazza v. S.E.C.,*
    327 F.3d 851 (9th Cir. 2003).......................................................................................................21

*Vess v. Ciba-Geigy Corp. USA,*
    317 F.3d 1097 (9th Cir. 2003).......................................................................................................9

*Westley v. Oclaro, Inc.,*
    897 F. Supp. 2d 902 (N.D. Cal. 2012) ........................................................................................16

*Zeiger v. WellPet LLC,*
    304 F. Supp. 3d 837 (N.D. Cal. 2018) ........................................................................................12

*Zucco Partners, LLC v. Digimarc Corp.,*
    552 F.3d 981 (9th Cir. 2009).......................................................................................................16

**Statutes**

15 U.S.C. § 78t(a), 77o(a).............................................................................................................25

15 U.S.C. § 78u-4(b)(2) ...............................................................................................................19

**Rules**

Fed. R. Civ. P. 8 ........................................................................................................................... 8, 9, 10

Fed. R. Civ. P. 9 ..................................................................................................................................... 10

Fed. R. Civ. P. 15(a)(2) ........................................................................................................................... 26

**Regulations**

17 C.F.R. § 229.303 ............................................................................................................................... 18

Plaintiffs submit this memorandum of points and authorities in opposition to the motion to dismiss filed by Defendants The RealReal, Inc. ("TRR" or "Company"), Julie Wainwright, Matt Gustke, Steve Lo, Maha Ibrahim, Michael A. Kumin, Gilbert L. Baird III, Rob Krolik, Stefan Larsson, Niki Leondakis, and James Miller ("Individual Defendants," and with TRR, "TRR Defendants"). Dkt. No. 32 ("MTD"). Defendants Credit Suisse Securities (USA) LLC, BofA Securities, Inc., UBS Securities LLC, KeyBanc Capital Markets Inc., Stifel, Nicolaus & Company, Cowen and Company, LLC, and Raymond James & Associates, Inc. ("Underwriter Defendants") joined the TRR Defendants' motion to dismiss. Dkt. No. 35. Accordingly, Plaintiffs also oppose the motion to dismiss as adopted by the Underwriter Defendants.

## I.     PRELIMINARY STATEMENT

Plaintiffs are investors in TRR common stock who allege two sets of claims in this action. First, Plaintiffs allege claims under Sections 11 and 15 of the Securities Act of 1933 ("Securities Act") arising from false and misleading statements of material fact in the registration statement and prospectus (together, "Prospectus") issued in connection with TRR's June 27, 2019 initial public offering ("IPO"). Second, Plaintiffs allege claims under Sections 10(b) and 20(a) of the Exchange Act of 1934 ("Exchange Act") arising from false and misleading statements of material fact made with scienter, both in the Prospectus and in additional public statements after the IPO.

The gravamen of Plaintiffs' Amended Class Action Complaint for Violations of the Federal Securities Laws, Dkt. No. 31 ("Complaint"), is that Defendants materially misrepresented the Company's authentication process. TRR operates an online marketplace for "authenticated" consigned luxury goods. TRR sells items from over 7,000 different luxury brands and designers, sent in by consignors to TRR's fulfillment facilities. TRR then purports to "authenticate, write the associated copy, photograph, price, sell and handle all fulfillment and returns logistics" for these items, paying consignors a commission on the sale. What separates TRR from competing stores or self-listing is its vaunted authentication process. In the Prospectus and in post-IPO statements, Defendants repeatedly boasted that "buyers trust us because we have a rigorous authentication process. We employ more than 100 gemologists, horologists and authentication experts, who authenticate each item we sell."

In truth, the vast majority of items sold by TRR were authenticated by copywriters, not expert authenticators. This is a critical distinction. TRR's copywriters were largely inexperienced—often hired with little or no experience in luxury brands or authentication. They received barely any training on how to properly authenticate a vast array of luxury brands and items. Most strikingly, they were tremendously overburdened and faced intense pressure to hit daily quotas of hundreds of items—meaning that in as little as two minutes they had to title, categorize, price, and write a description for each item, *in addition to* "authenticating." The TRR Defendants argue that these copywriters fit their description of "experts" and a "rigorous" authentication process. They do not.

The Complaint bases its account of the real TRR authentication process on a series of news reports and investigations, corroborated by thirteen former TRR employees, including copywriters, supervisors, and executives. Between sources from the news reports and Plaintiffs' own witnesses, *over fifty former TRR employees* have come forward to corroborate allegations that Defendants' statements about the Company's authentication process misrepresented the true state of affairs at TRR. As the market learned the truth, TRR's stock price fell, damaging investors.

The Complaint adequately alleges each element of its claims with the requisite level of particularity, including falsity, scienter, and loss causation. For the following reasons, therefore, this Court should deny the TRR Defendants' motion to dismiss in its entirety.

## II.  STATEMENT OF FACTS

### A.  The Company's Chief Value Proposition is its "Authentication" Process

TRR describes itself as the world's largest online marketplace for authenticated, consigned luxury goods. ¶61.[1] The Company solicits consignors to send in a wide range of luxury items to be listed and sold on the Company's website. ¶65. According to the Prospectus, in 2018 the Company sold various goods "bearing the brand of over 7,000 luxury and premium designers." ¶69. Once the Company receives an item, it purports to "authenticate [the item], write the associated copy, photograph, price, sell and handle all fulfillment and returns logistics." ¶66. Once an item is sold, consignors receive a certain percentage of the sales price as a commission. ¶67.

---

[1] References to "¶__" are to paragraphs of the Complaint.

The key to TRR's success was its vaunted authentication process. The importance of authentication – ensuring that the luxury products sold on the Company's website are "real" and not counterfeit – is inherent in the Company's name. Throughout the Prospectus, the Company repeatedly touted the importance of the authentication process to its business prospects. For example, the Prospectus stated that "[o]ur highly trained experts build trust in our buyer base by thoroughly inspecting the quality and condition of, and authenticating, every item we receive. This trust drives repeat purchases from our buyer base and instills confidence in first-time buyers to purchase pre-owned luxury goods." ¶71. Building and maintaining their customers' trust was paramount to the Company's continued ability to attract new and repeat customers. ¶73. The Company's reliance on a network effect from customers to drive growth multiplied the importance of customers' trust. *Id.* Quite simply, as the Prospectus stated, "[the Company's] success depends on the accuracy of our authentication process." ¶¶81, 88. TRR's executives also echoed this sentiment, stating that "authentication is core and central to our brand," ¶210, and that authentication "is literally everything to what we do. It is central to who we are, to what our brand stands for. It is in our name, it is -- there's nothing more important to what we do." ¶200.

**B.**     **Defendants Deceived Investors About TRR's Authentication Process**

In the Prospectus, and in post-IPO public statements, the TRR Defendants made a host of false and misleading statements touting the Company's authentication process.

First, the Prospectus falsely claimed and misleadingly implied that the persons responsible for authenticating ***all*** of the items TRR sold were "highly trained experts" tasked with "authenticating, every item we receive." ¶71. The Prospectus described TRR's authenticators as "highly trained gemologists, horologists, brand experts and art curators," who were "expertly authenticating every item" TRR sold. ¶¶77, 84. The Company's website made nearly identical claims. ¶203 ("Our 100+ in-house experts including gemologists, horologists and luxury brand authenticators inspect thousands of items every day."). So did Wainwright. ¶205 ("We employ more than 100 gemologists, horologists and authentication experts, who authenticate each item we sell."). The Prospectus explicitly claimed that ***"[o]ur authenticators are highly trained, experienced experts in their respective fields."*** ¶77.

Second, the TRR Defendants made false and misleading claims that every item the Company sold was vetted by their "expert" authenticators through a "rigorous" authentication process. *E.g.,* ¶77 ("Each item we receive is put through a rigorous, multi-point authentication process"); ¶79 ("Buyers trust us because we have a rigorous authentication process"); ¶84 ("All items pass through a rigorous multi-point, brand-specific authentication process before they are accepted for consignment"). Gustke claimed that the Company was "authenticating through a ***no risk*** multi-point process -- absolutely, every item." ¶196. The Company's website touted that "everything we sell is 100% authenticity guaranteed." ¶203. Time and time again, in the context of descriptions of TRR's "expert" authenticators and "rigorous" authentication process, the TRR Defendants declared that "[w]e authenticate every item we sell." ¶¶82, 84, 193, 198, 214.

Third, the TRR Defendants made misleading statements implying that the Company's authentication and copywriting functions were separate tasks assigned to separate groups of employees. The TRR Defendants listed authentication and copywriting separately in lists of the various functions performed by TRR between receiving an item and selling it. ¶¶75-76, 86, 207.

Even when the Company admitted (after the IPO) that copywriters authenticated some of TRR's items, Gustke and Wainwright continued to make false and misleading claims about the training afforded to TRR's copywriters. Gustke claimed that copywriters "receive deep training in their area of specialization." ¶200. Wainwright stated that copywriters "receive deep training in authentication," and downplayed the authenticator/copywriter distinction by purporting that copywriters' "title has become outdated." ¶216.

Finally, the risk factor disclosures in the Prospectus also misled investors. The Prospectus stated that "our success depends on the accuracy of our authentication process. Failure by us to identify counterfeit goods ***could*** adversely affect our reputation." ¶88. The Prospectus continued, stating that "[t]he sale of ***any*** counterfeit goods ***may*** damage our reputation … which ***may*** impact our ability to attract and maintain repeat consignors and buyers. Additionally, we ***may*** be subject to allegations that a pre-owned luxury item we sold is not authentic despite our confirmed authentication of such item. Such controversy ***could*** negatively impact our reputation and brand

and harm our business and operating results." ¶88. In truth these risks were not merely hypothetical. They had materialized and were ongoing.

### C.    News Reports Revealed the Truth About TRR's Authentication Process

In the months following the IPO, a series of news reports gradually revealed the truth about the Company's authentication process. First, on September 13, 2019, the website Fashionista published an article summarizing an investigative report released by The Capitol Forum – a private consumer protection organization. ¶¶92-93 ("Fashionista article"). The Capitol Forum report alleged that inexperienced copywriters with minimal training, rather than authentication experts, were actually responsible for "authenticating" most of items sold by TRR. ¶94. The Capitol Forum cited interviews with seven former TRR copywriters who reported that they faced intense quota requirements that could exceed 120 items per day. ¶¶94-95. In the Fashionista article, TRR dismissed the report as "misrepresentations [that] are clearly calculated to sell their subscriptions and improperly manipulate the market for the benefit of short-sellers on behalf of their subscribers. These people are not journalists and they are not credible." ¶97.

On October 23, 2019, Forbes published an article that provided new details and corroborative accounts from additional confidential sources. ¶¶98-99 ("Forbes article"). The Forbes article reported that "copywriters have a small fraction of the training that the more expert people have," and that copywriters "come to the job with little or (usually) no experience in authentication." ¶100. The Forbes article aptly summarized how the Company's deceptions hurt investors: "When I read the prospectus, the chart above and The RealReal website, I get the clear impression that the authenticators and the copywriters are different people. There is no mention of having two tiers of authenticators. Investors putting up money in The RealReal might make a different decision if they were told more about how the authentication process works." ¶102.

On November 5, 2019, CNBC published an article challenging the claims by TRR and Wainwright that there are "no fakes on our site," and that "every single item [is] authenticated." ¶103 ("11/5 CNBC article"). The 11/5 CNBC article was the product of CNBC's in-depth investigation into the Company's authentication practices, which included interviews of nearly three dozen former employees. ¶104. CNBC reported that the copywriters had "little training" in

authentication, certainly insufficient training to properly authenticate a vast array of luxury items. ¶105-106. CNBC also reported that internal TRR documents "clearly spell out strict quotas" that copywriters were expected to meet—as many as 160 items in a 10-hour shift. ¶109.

On November 21, 2019, CNBC published a follow-up article. ¶111 ("11/21 CNBC article"). The 11/21 CNBC article revealed that the Company maintained internal documents, circulated at multiple TRR facilities, that provided weekly recaps of counterfeits sold on TRR's website, including some obvious mistakes. ¶112-113. The 11/21 CNBC article also reported the Company's apparent efforts to fix their messaging following the 11/5 CNBC article, scrubbing references to "100% real" or "100% authentic" from TRR's website and social media. ¶114.

**D.    Thirteen Former TRR Employees Corroborate the News Reports**

Plaintiffs also conducted an independent investigation into TRR's authentication process, corroborating and expanding upon the accounts from the news articles with additional information from thirteen former TRR employees. ¶¶115-143. These former employees, including copywriters, supervisors, and executives, confirmed that the vast majority ("85-90 percent") of items sold by TRR were authenticated by copywriters, not the separate team of expert authenticators. ¶116. They confirmed that authenticators and copywriters were "different roles." ¶117. They reported that copywriters "would have no experience in authentication," received merely "a couple of hours" of training in authentication. ¶118. Copywriters were often "not qualified," hired without any relevant experience or knowledge in fashion or authentication. ¶120. They faced onerous daily quotas requiring them to process hundreds of items each day—which meant titling, categorizing, pricing, writing a description, *and* "authenticating" each item in as little as two minutes. ¶122-125.

The former employees also corroborated and detailed the paucity of training they received. Their initial training was merely a 1-hour PowerPoint presentation. ¶128. Most of their limited training time was spent on how to process items into TRR's computer system, not on authentication. ¶129-130. The short and sporadic follow-up trainings were insufficient, copywriters could not request additional training, they had little to no time to absorb the immense breadth of brand- and item-specific knowledge they needed to remember and consistently apply, and they were constantly distracted by concerns over hitting their daily quotas. ¶131.

The former employees also detailed the intense pressure on copywriters to hit their quotas. Quotas were strictly enforced. TRR management tied job promotions and financial incentives to meeting quotas and meted out harsh punitive measures if the quotas were unmet. ¶133-134. The Company required workers to continue working even in the wake of a stabbing incident on the premises, during active construction, and when the deadly California wildfires sent smoke into the building. ¶135. The former employees felt forced to skip their lunch and other breaks just to meet their quotas, and some felt uncomfortable even going to the bathroom during their shift, lest they fall behind. ¶138. This was the setting for copywriters in TRR's "rigorous" authentication process.

One former employee provided internal documents circulated at least biweekly, with examples of counterfeit items sold on TRR's website that copywriters had "authenticated." ¶140. The examples included many easily identifiable counterfeits marked by misspellings, colors never produced by the brand, inferior materials, and other obvious tells of inauthenticity. ¶141.

**E.    The Prospectus Included Misleading Statements About the Company's AOV**

One of the Company's "Key Financial and Operating Metrics" was Average Order Value ("AOV"). ¶144. The Prospectus described AOV as a "key driver of our operating leverage." ¶145. Small changes in AOV would have a large effect on the Company's gross merchandise value ("GMV"), which drove the Company's revenue growth. ¶146. The Prospectus failed to disclose that the Company's AOV for the second quarter of 2019 had decreased year-over-year due to promotional pricing in the luxury goods market. ¶¶149-153. At the time of the IPO, just three days before the quarter ended, Defendants had sufficient information based on regular internal reports and data they received, to show the material effect of this adverse trend. On August 13, 2019, the Company announced its second quarter financial results, revealing a decrease in year-over-year AOV. ¶156. Gustke attributed the disappointing AOV numbers to promotional pricing in the luxury market that depressed prices for TRR. ¶263. The Company's stock price promptly fell 16%. ¶265.

**III.    ARGUMENT**

On a motion to dismiss, a complaint "need only allege enough facts to state a claim to relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011). At the pleading stage, courts must accept all well-pled factual allegations as true, draw all

reasonable inferences in the plaintiffs' favor, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320–22 n.4 (2007). "A court reads the complaint as a whole … rather than isolating allegations and taking them out of context." *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 842 F. Supp. 2d 1216, 1223 (C.D. Cal. 2012) (citing *Tellabs*, 551 U.S. 308).[2] If there are competing, plausible explanations advanced by defendants and plaintiffs, the complaint survives a motion to dismiss. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

With respect to Plaintiffs' claims under Section 11 of the Securities Act, the TRR Defendants challenge the Complaint only as to the element of falsity. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005) (the elements of a Section 11 claim are falsity and materiality). With respect to Plaintiffs' claims under Section 10(b) of the Exchange Act, the TRR Defendants challenge the Complaint only as to the elements of falsity, scienter, and loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005) (the elements of a Section 10(b) claim are falsity, materiality, scienter, reliance, loss causation, and damages).

### A.    Plaintiffs Face a Minimal Pleading Burden Under the Securities Act

Section 11 of the Securities Act places "a relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). "The section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability." *Id.* at 381–82. To plead a claim under Section 11, Plaintiffs must allege only "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material." *Daou*, 411 F.3d at 1027. In contrast to claims under Section 10(b) of the Exchange Act, scienter is not required under Section 11. *Id.* Neither are reliance or loss causation. *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859–60 (9th Cir. 2013).

Allegations of non-fraudulent conduct need only satisfy the ordinary pleading standards of Rule 8. *See Daou*, 411 F.3d at 1027; Fed. R. Civ. P. 8. Unless the allegations sound in fraud, the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 do not

---

[2] Emphasis is added and internal citations and quotations are omitted unless otherwise noted.

apply to Section 11 claims. *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009). The Ninth Circuit recognizes that when a plaintiff alleges "some fraudulent and some non-fraudulent conduct… only the allegations of fraud are subject to Rule 9(b)'s heightened pleading requirements." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104 (9th Cir. 2003). "The only consequence of a holding that Rule 9(b) is violated with respect to a § 11 claim would be that any allegations of fraud would be stripped from the claim. The allegations of innocent or negligent misrepresentation, which are at the heart of a § 11 claim, would survive." *Daou*, 411 F.3d at 1027.

Courts in the Ninth Circuit typically apply the Rule 8 pleading standard to Section 11 claims where such claims are adequately distinguished from fraud claims. *See, e.g.*, *Safron Capital Corp. v. Leadis Tech., Inc.*, 274 F. App'x 540, 541 (9th Cir. 2008); *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 684 (9th Cir. 2005); *In re Exodus Commc'ns, Inc. Sec. Litig.*, No. C-01-2661-MMC, 2005 WL 2206693, at *1 (N.D. Cal. Sept. 12, 2005) (applying Rule 8 where plaintiffs "state a non-fraud basis" for liability based on a registration statement containing false statements); *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 545–56 (N.D. Cal. 2009) (claims did not sound in fraud where plaintiffs did not expressly plead fraud and "pled non-fraud bases for liability.").

In assessing Plaintiffs' Section 11 claims, the Court should apply the Rule 8 pleading standard. Neither the TRR Defendants nor Underwriter Defendants argue that Plaintiffs' Section 11 claims allege or rely on fraud, which they do not. The TRR Defendants baselessly conclude that "all of Plaintiffs' allegations sound in fraud," MTD at 8, without a single citation or example of how that is so. In truth, nothing in the Complaint's Securities Act allegations (¶¶1-191) contains or relies on any allegations of Defendants' scienter, knowledge, motive, or a fraudulent scheme. Plaintiffs' Securities Act claims expressly disclaim and do not incorporate by reference any allegations of fraud contained in the separate Exchange Act section of the Complaint. ¶¶169-170.

Even if allegations sounding in fraud "could be inferred, the allegations in the [Complaint] can equally support the inference that Defendants committed such misrepresentations without any scienter." *In re Violin Memory Sec. Litig.*, No. 13-CV-5486 YGR, 2014 WL 5525946, at *8 (N.D. Cal. Oct. 31, 2014) (applying Rule 8 standard to Section 11 claims). Unlike in *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012), Plaintiffs' Section 11 claims here do not "rely

on the same alleged misrepresentations … that are central" to Plaintiffs' Section 10(b) claims. Plaintiffs' Section 11 claims are based on only those statements contained in the Prospectus (¶¶71-91), whereas the Section 10(b) claims allege additional post-IPO false statements by Wainwright, Gustke, and TRR (¶¶192-217). *See Sudunagunta v. NantKwest, Inc.*, No. CV1601947MWFJEMX, 2017 WL 8811116, at \*5–6 (C.D. Cal. May 16, 2017) (applying Rule 8 standard to Section 11 claims where Section 10(b) claims were based on statements in the registration statement *and* further class period statements). Here, unlike in *In re Eventbrite, Inc. Sec. Litig.*, No. 5:18-CV-02019-EJD, 2020 WL 2042078, at \*15 (N.D. Cal. Apr. 28, 2020), Plaintiffs' Section 11 claims do not center on knowledge or fraudulent concealment. *See id.* ("Plaintiffs' entire Complaint is built around the idea that Defendants knew [the omitted facts] and fraudulently concealed information").

The Underwriter Defendants assert that the Complaint "alleges no particularized facts detailing the Underwriter Defendants' purported participation in an alleged fraud." Dkt. No. 35 at 2. Even if the Court applies the Rule 9(b) particularity requirement, the Complaint adequately alleges the Underwriter Defendants' role in drafting and disseminating the Registration Statement and soliciting investors to purchase TRR common stock issued pursuant thereto. ¶¶35-46, 173-180. The Complaint need not allege any fraud claim against the Underwriter Defendants.

The Complaint alleges each of its claims with sufficient particularity under Rule 8 or 9(b).

## B.    The Complaint Adequately Alleges False and Misleading Statements

Statements of material fact are actionable in the securities fraud context if they are either false or misleading. *See Matrixx*, 563 U.S. at 36. "A statement or omission is misleading in the securities fraud context if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011). Even literally true statements may mislead, due to their context and manner of presentation. *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008).

### 1.    The Prospectus Contained False and Misleading Statements About the Company's Authentication Process

The Complaint alleges that the Prospectus contained false and misleading statements about TRR's authentication process, which are actionable under both Section 11 and Section 10(b).

Plaintiffs' theory for why these statements were false or misleading is simple, despite the TRR Defendants' attempts to mischaracterize the Complaint. The Complaint alleges that the Prospectus portrayed a state of affairs where every item the Company received was rigorously authenticated by a team of highly-trained authentication experts. This portrayal differed materially from reality. In truth, the vast majority of items the Company received were never seen by expert authenticators. Instead they were processed by inexperienced copywriters, who had insufficient training in authentication and insufficient time to properly authenticate. The statements in the Prospectus were false and misleading both individually and in the collective context they presented.

First, the Prospectus falsely claimed and misleadingly implied that the persons responsible for authenticating *all* of the items TRR sold were "highly trained experts." ¶71. The Prospectus described these authenticators as "highly trained gemologists, horologists, brand experts and art curators," who were "expertly authenticating every item" TRR sold. ¶¶77, 84. The Prospectus claimed that ***"[o]ur authenticators are highly trained, experienced experts in their respective fields."*** ¶77. In truth, the small group of authenticators who did have these expert qualifications did not authenticate most of TRR's items. The copywriters did.

No reasonable investor or customer would understand these copywriters to be "highly trained, experienced experts" at authenticating a dizzying array of luxury brands. The TRR Defendants' proposed definition of "expert" is nonsensical. A brand new paralegal who watches a one-hour PowerPoint presentation is not a "highly trained, experienced expert" at writing appellate briefs simply because they "possess[] more information and understanding than the average person." MTD at 14. Even courts regularly use expert testimony to identify counterfeit goods. *See, e.g.*, *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 288 (S.D.N.Y. 2003).

The use of the word "expert" in the Prospectus is not general corporate puffery, MTD at 13-14, nor a "semantic" matter of "employee titles," *id.* at 15. "Statements that are capable of 'objective verification' are not 'puffery' and can constitute material misrepresentations." *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1255 (N.D. Cal. 2019) (Davila, J.). *See also Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact").

- 11 -

Courts dismiss statements as inactionable puffery only if the statement is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 967 (N.D. Cal. 2014).

Other courts have found statements that a person or entity was an "expert" to be actionable and not puffery. *E.g., Brand Mktg. Grp., LLC v. Intertek Testing Servs. NA, Inc.*, No. 12CV1572, 2013 WL 3854461, at *5 (W.D. Pa. July 23, 2013); *Kinda Wood USA v. MGV Enterprises LLC*, No. 2:07-CV-1137, 2009 WL 649793, at *3 (S.D. Ohio Mar. 10, 2009); *In re PMA Capital Corp. Sec. Litig.*, No. 03-6121, 2005 WL 1806503, at *16 (E.D. Pa. July 27, 2005). As used in the Prospectus, "expert" describes the specialized and highly material qualifications and abilities of TRR employees with respect to a critical task. As used, "expert" is not an opinion, or vague corporate braggadocio. A gemologist may be an expert authenticator of jewelry. A horologist may be an expert authenticator of timepieces. TRR's copywriters were not expert authenticators.

Second, the Prospectus made false and misleading claims that every item the Company sold was vetted by their "expert" authenticators through a "rigorous" authentication process. *E.g.,* ¶77 ("Each item we receive is put through a rigorous, multi-point authentication process"); ¶79 ("we have a rigorous authentication process"); ¶84 ("All items pass through a rigorous multi-point, brand-specific authentication process"). The use of "rigorous" in the Prospectus to describe TRR's authentication process is not puffery, MTD at 13 n.7, because it is objectively verifiable. *Ahern v. Apple Inc.*, 411 F. Supp. 3d 541, 557–58 (N.D. Cal. 2019) (use of "rigorous" was not puffery); *see also L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*, 114 F. Supp. 3d 852, 861 (N.D. Cal. 2015) (same); *Zeiger v. WellPet LLC*, 304 F. Supp. 3d 837, 851 (N.D. Cal. 2018) (same). Whereas the *Apple* plaintiffs ultimately did not adequately allege why the "rigorous testing" statements at issue in that case were false or misleading, 411 F. Supp. 3d at 559, here the Complaint explains in detail why TRR's "rigorous" authentication process was objectively not so. In the context of the Prospectus's repeated depictions of "highly trained gemologists, horologists, brand experts and art curators," who were "expertly authenticating every item" TRR sold, descriptions of the "rigorous" authentication process implicate the same false and misleading characterization. ¶¶77, 84. On top of their lack of expertise and inadequate training, copywriters were tasked with titling, categorizing,

- 12 -

pricing, and writing a description for each item they processed, *in addition to* "authenticating," all in as little as two minutes. ¶122-125. It is objectively verifiable that this process does not comport with the Prospectus's use of "rigorous."

The Prospectus also compared TRR's authentication process favorably to that of competitors, who had "inconsistent authentication standards or do not employ expert authenticators." ¶¶74-75. The misleading implication here was that TRR maintained a consistent and superior standard of authentication because it employs expert authenticators. ¶76. In reality, TRR's authentication standards were not consistent because some items were reviewed by expert authenticators and others by inexperienced, under-trained, and overburdened copywriters.

The Prospectus also contained statements misleadingly implying that the Company's authentication and copywriting functions were separate tasks assigned to separate employees. ¶¶75-76, 86. For copywriters, they were not. The Forbes article illustrates this misrepresentation. ¶102 ("When I read the prospectus … I get the clear impression that the authenticators and the copywriters are different people. There is no mention of having two tiers of authenticators.").

Finally, the Prospectus also contained misleading statements about the risks the Company faced relating to its authentication process. Risk warnings may be actionable when they "speak[] entirely of as-yet-unrealized risks" and fail to "alert[] the reader that some of these risks may already have come to fruition." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008). The Prospectus misleadingly described as hypothetical certain risks that had in fact materialized and were ongoing. *E.g.,* ¶88 ("The sale of *any* counterfeit goods *may* damage our reputation … which *may* impact our ability to attract and maintain repeat consignors and buyers. Additionally, we *may* be subject to allegations that a pre-owned luxury item we sold is not authentic despite our confirmed authentication of such item. Such controversy *could* negatively impact our reputation and brand and harm our business and operating results."). The Company regularly circulated examples of counterfeit items that TRR had sold, which were already damaging the Company's reputation. ¶141; Complaint, Ex. C; ¶104 (11/5 CNBC article reviewed TRR customer complaints from over 1,400 online reviews). Notably, these were merely *examples* of counterfeits that were caught. The percentage of items listed out of all items sold is thus irrelevant. MTD at 13.

- 13 -

Rather than "expressly disclos[ing] the ongoing risk that counterfeits could be missed," or that the risk was not unrealized but "present," MTD at 12, the Prospectus misled investors by couching the risk as hypothetical. ¶88 ("Failure by us to identify counterfeit goods *could* adversely affect our reputation"). Although the Company disclosed that it *received* counterfeit goods and that it had a refund policy for *if* a customer questions an item's authenticity, MTD at 12, that falls short of disclosing that the Company knew that hundreds of counterfeit items were currently slipping through their "rigorous" authentication process. The 2018 lawsuit TRR disclosed, *id.*, was specific to Chanel items and the Prospectus disclosed only Chanel's disputed allegations, not that TRR truly was selling counterfeits on a regular basis. Dkt. No. 34-1 (Prospectus), at 17-18. This case is unlike *Lomingkit v. Apollo Educ. Grp. Inc.*, 275 F. Supp. 3d 1139, 1162 (D. Ariz. 2017), where the risk disclosures "provided notice to investors that some of the warned-of events had already occurred."

### 2.    Defendants Made Additional False and Misleading Statements About the Company's Authentication Process after the IPO

The Complaint alleges that Wainwright, Gustke, and TRR made additional false and misleading statements about TRR's authentication process after the IPO. These statements are actionable under Section 10(b) in addition to the statements in the Prospectus, for similar reasons.

During the Class Period the Company's website published the false and misleading claim that "[o]ur 100+ in-house experts including gemologists, horologists and luxury brand authenticators inspect thousands of items every day, ***ensuring everything we sell is 100% authenticity guaranteed***." ¶203. This was false and misleading because (1) counterfeits were regularly sold on the TRR website, *e.g.*, ¶141, Complaint, Ex. C; and (2) it misleadingly implied that expert authenticators were authenticating "everything we sell," which they were not because the copywriters who "authenticated" the vast majority of items TRR sold were not expert authenticators. Wainwright made the same false claim. ¶205 ("We employ more than 100 gemologists, horologists and authentication experts, who authenticate each item we sell."). Similarly, Gustke claimed the Company was "authenticating through a no risk multi-point process -- absolutely, every item." ¶196. Wainwright's and Gustke's statements were false and misleading for the same reasons as the TRR website's statement. The false claims of "100% authenticity

guaranteed" and "no risk … process" are "disputable facts that cannot be dismissed as mere puffery." *See Reitman v. Champion Petfoods USA, Inc.*, No. CV181736DOCJPRX, 2019 WL 1670718, at *4 (C.D. Cal. Feb. 6, 2019) (statement that the company's food was "guaranteed to keep your dog healthy, happy and strong," was actionable, not puffery).

Wainwright and Gustke made many other misleading statements, asserting in various forms that "[w]e authenticate every item we sell" in the context of statements about TRR's "expert" authenticators and the Company's "rigorous" authentication process. ¶¶193, 198, 214. These statements were misleading because they misleadingly implied that expert authenticators were authenticating every item TRR sold, which they were not because TRR's copywriters who did most of the "authentication" were not expert authenticators. Wainwright also made a public statement misleadingly implying that TRR's authentication and copywriting functions were separate tasks assigned to separate groups of employees. ¶207. For copywriters, they were not.

Gustke and Wainwright also made false and misleading claims about the training provided to TRR's copywriters. Gustke claimed that copywriters "receive deep training in their area of specialization." ¶200. Wainwright claimed that "our copywriters… receive deep training in authentication," and that they "have been receiving the initial and ongoing training required to authenticate products." ¶216. These statements were false and misleading because copywriters received minimal training in authentication, consisting of a one-hour PowerPoint presentation, a handful of reference documents, and follow-up trainings they could not truly absorb due to the quotas. ¶¶128-131. These statements about the "deep training" copywriters received are actionable, not mere puffery, because they are objectively verifiable. *See Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 243-44 (S.D.N.Y. 2012) (statement regarding "extensive" training was actionable, not puffery). TRR's gemologists and horologists had deep training in authentication. The copywriters objectively did not.

The TRR Defendants argue that Wainwright's and Gustke's statements provided "detailed accounts of the authentication process" as compared to the Prospectus, MTD at 19. While these post-IPO statements disclosed that an unspecified amount of "low risk" items were authenticated by copywriters, they were false and misleading because they misrepresented the lack of experience

- 15 -

and training that copywriters had in authentication and the time they had to authenticate, and concealed the *extent* of items authenticated by copywriters instead of actual experts. The TRR Defendants cite no authority for their baseless argument that the Fashionista article somehow exculpated the *subsequent* false and misleading statements, MTD at 20, especially in light of TRR's fervent denial of the Capitol Forum allegations, which was published in the Fashionista article.

### 3.     The Former Employees and News Reports are Reliable and Credible

The Complaint's allegations from former employees ("FEs") are reliable and credible. "[A] court's concern with respect to a confidential witness is whether he or she is 'described with sufficient particularity to establish [his or her] reliability and personal knowledge.'" *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 915 (N.D. Cal. 2012) (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009)). To the extent the TRR Defendants claim the FEs' allegations are not "*credible*," MTD at 15, as opposed to *reliable*, they are improperly disputing the facts alleged in the Complaint. *In re Gilead Scis. Sec. Litig.*, No. C 03-4999 SI, 2009 WL 1561584, at *2 (N.D. Cal. June 3, 2009) ("the Court cannot weigh the credibility of a witness on a motion to dismiss."). To assess reliability, "courts look to the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged ... [including] the coherence and plausibility of the allegations, the number of sources, the reliability of sources, and similar indicia." *Fadia v. FireEye, Inc.*, No. 5:14-CV-05204-EJD, 2016 WL 6679806, at *5 (N.D. Cal. Nov. 14, 2016) (Davila, J.). Here, including the news reports, ***over fifty former employees*** have corroborated claims that TRR misrepresented its authentication process. ¶¶48-60 (Complaint, thirteen FEs), ¶94 (Capital Forum, seven), ¶99 (Forbes, two), ¶104 (CNBC, "nearly three dozen").

This case is similar to *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044 (C.D. Cal. 2008). In *Countrywide*, the court found that allegations of fourteen confidential witnesses holding positions of varying seniority in four locations over a period of four years were sufficient to allege nationwide practices. *Id.* at 1058–59. The *Countrywide* court found the consistency of the witnesses' statements was particularly persuasive. *Id.*; *see also In re Toronto-Dominion Bank Sec. Litig.*, No. CV 17-1665 (NLH/JS), 2018 WL 6381882, at *1, *7 (D.N.J. Dec. 6, 2018) (allegations from nineteen confidential witnesses and news reports based on "hundreds" more were adequate to

support falsity). Here, the Complaint includes allegations from thirteen FEs who worked at four different locations in varying levels of seniority over four years, before and after the IPO. ¶¶48-60. They allege a consistent picture of the authentication process at TRR, which differed materially from the process depicted by the statements in the Prospectus and other challenged statements.

Contrary to the TRR Defendants' arguments, MTD at 16, the FEs' allegations adequately demonstrate the state of affairs at TRR at the time of the IPO. The FEs who left before the IPO provide detailed first-hand accounts of the Company's authentication process as it existed during their time with TRR. However, their allegations do not stand alone. They strongly corroborate the accounts from the FEs who worked for TRR at the time of the IPO. The consistency of the FEs' allegations shows that these facts were systemic and static before or after the IPO. By far the most plausible inference is that the corroborative allegations of over fifty former employees accurately and reliably depict TRR's authentication process at the time of the IPO and during the Class Period.

The FE allegations demonstrate more than a mere "disagreement among employees." MTD at 17. The FEs give first-hand accounts of their experience as copywriters – including the level of experience they and their coworkers had, the paucity of training they received, and the quotas they faced. *E.g.*, ¶¶120, 122-125, 128-131. These are facts, not opinions. Based on these detailed accounts, the FEs consistently asserted that it was not realistic for copywriters to reliably authenticate luxury items under these conditions. ¶¶118, 125-127, 131-132.

The news reports also credibly demonstrate falsity. The fact that three independent news organizations spoke with dozens of former TRR employees—some named, some confidential—who corroborated each other and the accounts of Plaintiffs' FEs, bolsters rather than discounts their reliability and credibility. *See, e.g., Toronto-Dominion Bank*, 2018 WL 6381882, at *6 ("the Court assumes the veracity of allegations in a news report for purposes of a motion to dismiss. Considering Plaintiffs' CW allegations are consistent with those made by the [news report's] CWs, there is no reason to seriously doubt their reliability at this stage in the proceedings.").

### 4.    The Prospectus Contained Misleading Statements About AOV

The statements in the Prospectus about AOV were actionably misleading. Statements that are literally true may nonetheless be misleading, due to their context and manner of presentation.

*Thane*, 519 F.3d at 886. Additionally, Item 303 imposes a duty to disclose where a trend is "[1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operation." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998) (brackets in original); 17 C.F.R. § 229.303. This Court has previously held that Item 303 claims may be actionable under Section 11. *Restoration Robotics*, 417 F. Supp. 3d at 1263.

The Complaint alleges that the statements in the Prospectus discussing the Company's AOV—one of its Key Financial and Operating Metrics—misleadingly failed to disclose that the Company's AOV for the second quarter of 2019 was set to decrease year-over-year due to promotional pricing. ¶¶148-153. At the time of the IPO, the TRR Defendants received regular internal reports and data that would have showed AOV would be down for the quarter (which was three days from closing) due to the ongoing adverse pricing trend. ¶¶158, 260-261, 242. Contrary to the TRR Defendants' assertions, MTD at 9, the second quarter AOV decrease was the *result* of the trend, not the trend itself. Depressed pricing was the undisclosed trend. When the Company announced its financial results for the quarter, it revealed a year-over-year decrease in AOV, ¶156, which Gustke attributed to promotional pricing in the retail luxury market that depressed prices for TRR, and which had been going on since the first quarter of that year. ¶263. On this news the Company's stock price fell 16%, further demonstrating the materiality of this adverse trend. ¶265. *Pirani v. Slack Techs., Inc.*, No. 19-CV-05857-SI, 2020 WL 1929241, at *13 (N.D. Cal. Apr. 21, 2020) (12% stock drop immediately following corrective disclosure indicated materiality).

The Prospectus also made actionable misleading statements in its risk disclosures, misleadingly portraying risks which had currently materialized at the time of the IPO as hypothetical. ¶159 ("Promotional pricing by these parties *may* adversely affect" our GMV). The Prospectus thus failed to "alert[] the reader that some of these risks may already have come to fruition." *Berson*, 527 F.3d at 986. The disclosure of reductions in GMV due to pricing fluctuations "in the past" and "in the future" describe events that have ended or not yet begun, respectively, and did not adequately disclose the then-current depressive pricing pressures affecting GMV. ¶159.

This case is similar to *In re Blue Apron Holdings, Inc. Sec. Litig.*, No. 17-CV-4846 (WFK), 2020 WL 1950783, at *9 (E.D.N.Y. Apr. 22, 2020), where the court found that "[t]he post-IPO

earnings call demonstrated the [facility delays] in fact adversely affected Blue Apron's financial condition." The *Blue Apron* court inferred in the plaintiffs' favor that the defendants reasonably expected the facility delays to be material prior to the IPO, based on allegations that the company knew the delays could have a material impact and knew the delays were occurring prior to the IPO. *Id.* Here, the August 13, 2019 press release and earnings call demonstrated that promotional pricing had materially affected TRR's financial condition in the form of decreased AOV. ¶¶156-157. The Prospectus acknowledged promotional pricing could have a material impact, ¶159, and Defendants knew at the time of the IPO that the promotional pricing would lower AOV for the quarter. ¶¶158, 260-261. Defendants had a duty under Item 303 to disclose this material adverse trend.

**C.    The Complaint's Exchange Act Allegations Adequately Allege Scienter**

To adequately allege scienter, "Plaintiffs must 'state with particularity facts giving rise to a strong inference' that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson*, 527 F.3d at 987 (quoting 15 U.S.C. § 78u-4(b)(2)). In *Tellabs*, the Supreme Court held that scienter is adequately pled where the inference of fraud is cogent and at least *equally* as likely as any non-culpable explanation of the alleged conduct. 551 U.S. at 314. The appropriate inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323 (emphasis in original). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Id.* at 324. Here, the Complaint alleges facts supporting a strong inference that Wainwright and Gustke acted with scienter.

The TRR Defendants concede that the Complaint alleges Wainwright and Gustke "knew how [TRR's authentication process] operated." MTD at 21 (citing ¶¶218-243). As to the authentication process, Gustke stated that "there's nothing more important to what we do." ¶222. As demonstrated above, *supra* part III(B), the truth about the authentication process differed materially from Defendants' portrayals. Thus, Wainwight and Gustke acted with at least "deliberate recklessness as to the possibility of misleading investors." *Berson*, 527 F.3d at 987 (allegations that the company's chief executives presumably knew or should have known about facts contradicting

their statements were sufficient to support a finding of scienter). "[T]hat the defendants published statements when they knew facts suggesting the statements were inaccurate … is classic evidence of scienter." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005).

The Complaint does not rely entirely on the core operations theory, which supports a strong inference of scienter where it is alleged "along with other allegations that, when read together, raise an inference of scienter that is cogent and compelling" or where "it would be absurd to suggest that management was without knowledge of the matter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785–86 (9th Cir. 2008). The Complaint amply alleges each of those circumstances.

In addition to allegations supporting the inescapable inference that Wainwright and Gustke knew how TRR's authentication process really worked, the Complaint alleges myriad corroborating facts. Two members of TRR's executive committee, which also included Wainwright and Gustke (and Defendant Lo), reported that the executive committee held weekly meetings during which they would review a report concerning items from the Company's website identified as counterfeit, and that "every single executive in that company knew about [the quota system and lack of proper authentication] intimately." ¶226, 241. Multiple FEs attributed the implementation of quotas directly to Wainwright, ¶¶235, 237, 241. Wainwright conducted frequent walkthroughs of the processing facilities where the copywriters worked. ¶224-225. TRR management conducted an internal investigation into copywriters' persistent complaints about the quota system after receiving an email from a group of copywriters referencing prior discussions with the human resources department. ¶¶229, 231. Data about counterfeit items were tracked and would have been reported to senior management, ¶233, and the "Faux and Tell" documents were circulated by management and sent to all staff, ¶228. The Complaint alleges compelling facts supporting a strong inference of scienter as to Wainwright, Gustke, and the Company. The TRR Defendants do not contest that the officers' scienter is properly imputed to the Company.

With respect to the AOV statements, the Complaint alleges that Wainwright and Gustke, through the executive committee, received frequent reports including during weekly meetings. ¶¶261, 241. These reports apprised TRR officers of the adverse pricing trend and its effect on the second quarter's AOV at the time of the IPO, just days before the quarter ended. Likewise, they

- 20 -

had access to internal data that would have shown pricing trends, as manifested in the Company's "Key Financial and Operating Metric," AOV. ¶260. Moreover, Defendants were aware of the promotional pricing, which caused the adverse pricing trend and resulted in decreased AOV, because it had been ongoing since the first quarter, months before the IPO. ¶¶148, 157, 260.

Section 10(b) claims "may be supported by knowing or reckless conduct, without a showing of willful intent to defraud." *Vernazza v. S.E.C.*, 327 F.3d 851, 860 (9th Cir. 2003). Here, it is implausible that Wainwright and Gustke subjectively believed the challenged statements were true and not misleading, supporting the inference that they (and TRR) acted knowingly or recklessly.

"A motive for fraud, such as personal gain, is not a required element of scienter." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1269 (N.D. Cal. 2000). There is no merit to the argument that a lack of alleged stock sales by the individual defendants negates an inference of scienter. MTD at 23. *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period."). Moreover, "courts have refused to hold that stock purchases were inconsistent with fraud where the defendants could have believed they could have continued to hide the fraud." *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1202 n.2 (N.D. Cal. 2012).

### D. The Complaint Adequately Alleges Loss Causation

With respect to loss causation, all that is required at the pleading stage is that a plaintiff provide "some indication of the loss and the causal connection that he has in mind." *Dura*, 544 U.S. at 347. A plaintiff must allege only "facts that, if taken as true, plausibly establish loss causation," *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008), "suggesting that loss causation is a fact-intensive inquiry better suited for determination at trial than at the pleading stage," *Rudolph v. UTStarcom*, No. C 07-04578 SI, 2008 WL 4002855, at *4 (N.D. Cal. Aug. 21, 2008). Loss causation may be alleged through a series of partial disclosures. *See Daou*, 411 F.3d at 1026; *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1050 (N.D. Cal. 2008).

The TRR Defendants do not challenge that the Complaint adequately alleges loss causation with respect to the Fashionista article, or the August 13, 2019 earnings call. *See* MTD at 23-24. The Court need not find further to deny the motions to dismiss as to loss causation.

The TRR Defendants argue only that the partial corrective disclosures post-dating the Fashionista article are inadequate to allege loss causation because they did not reveal new information to the market. MTD at 23-24. This argument fails because (1) the TRR Defendants denied and attempted to discredit the Capitol Forum report, and continued to make false and misleading statements between each corrective disclosure; (2) each subsequent corrective disclosure did reveal new information; and (3) the market reactions immediately following each corrective disclosure indicate a causal relationship.

First, courts have held that successive partial corrective disclosures are sufficient to allege loss causation where defendants attempt to deny or discredit a prior corrective disclosure, and when they continue to make false and misleading statements. This conduct renews or maintains the artificial inflation in the company's stock price. For example, in *Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, No. CV1602942SJOKSX, 2017 WL 2378369, at *3 (C.D. Cal. May 31, 2017), the court found that while a "partial disclosure removed some of the artificial inflation … the prices remained artificially inflated due to Defendants' vehement protestations … as well as their continued false statements relating to the allegations." Thus, the plaintiffs adequately alleged loss causation as to the subsequent disclosures. *Id.* at 18–19. Similarly, in *Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d 41, 52–53 (E.D.N.Y. 2011), the plaintiffs alleged that after an initial partial corrective disclosure the company "continued to withhold material information regarding the Company, and that defendants' partial disclosures did not reveal the full scope of the fraud until January 2008." Thus, the plaintiffs adequately alleged loss causation in that they "were still being defrauded by defendants' material misstatements and omissions," and that "the price of Comverse stock was still artificially inflated subsequent to the partial disclosures." *Id.* at 52–54.

The disclosure of new information, or a "fuller disclosure" of the truth also supports loss causation. "Even if some information had come into the market prior to [a later disclosure,] partial disclosures at an earlier date do not negate loss causation upon fuller disclosure of the relevant

truth." *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1021 (S.D. Cal. 2011); *In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 528–29 (N.D. Cal. 2009) (series of partial disclosures).

The Ninth Circuit has found that allegations of subsequent partial corrective disclosures that reveal few new facts are nonetheless sufficient to plead loss causation. In *In re Apollo Grp., Inc. Sec. Litig.*, No. 08-16971, 2010 WL 5927988, at *1 (9th Cir. June 23, 2010), an unpublished memorandum opinion, the Ninth Circuit reversed the lower court's finding that a UBS analyst report was not a corrective disclosure because it did not reveal new facts not contained in four prior news articles. The Ninth Circuit held that a jury could reasonably conclude that the UBS report did constitute a corrective disclosure that provided "additional or more authoritative fraud-related information that deflated the stock price." *Id.* Although the market already had all the information contained in the report, the market "failed to appreciate [the] significance" or the "intensity and credibility" of the information previously disclosed. *Id.* (quoting *Gilead*, 536 F.3d at 1058, and *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 503 (9th Cir. 1992)). Here, each partial corrective disclosure provided "additional or more authoritative fraud-related information that deflated the stock price." *Id.* Moreover, even if the Court finds that the later disclosures did not reveal entirely new information, the Complaint alleges facts—namely the Company's repudiation of the Capital Forum report and their additional false and misleading statements—demonstrating that the market failed to fully appreciate the significance, or the intensity and credibility, of the information in the Fashionista article. *Id. See also Garcia v. Guo*, No. CV–15–1862–MWF–MRWx, 2016 WL 102213, at *11 (C.D. Cal. Jan. 7, 2016) ("even if the [later disclosure] contained no new facts … the Court cannot hold as a matter of law that the [later disclosure] does not qualify as a corrective disclosure" on that basis) (relying on *Apollo Group,* 2010 WL 5927988).

Here, the Company publicly disparaged the Capitol Forum report as "misrepresentations" and "not credible." ¶247. Following the Fashionista article and corresponding stock drop, the TRR Defendants also continued to make false and misleading statements concerning RealReal's authentication process between each subsequent partial corrective disclosure. ¶¶196, 198, 200 (statements after Fashionista article): ¶211 (after Forbes articles); ¶¶214, 216 (after 11/5 CNBC article). The TRR Defendants claim that these statements somehow negate any subsequent

- 23 -

corrective disclosures, MTD at 24, but the Complaint alleges that these very statements were false and misleading. ¶¶197, 199, 201. Rather than revealing the full truth, these continuing false and misleading statements reinjected or buoyed the artificial inflation in TRR's stock price.

The Forbes and CNBC articles each revealed new relevant information. The Forbes article was the first publication from a widely circulated and trusted business news outlet corroborating the Capitol Forum report, with a first-person account of TRR's authentication process as well as information from new confidential witnesses. ¶249. Contrary to the TRR Defendants' assertions, the Forbes article revealed for the first time with unchallenged credibility that TRR's copywriters have a small fraction of the training that its authenticators have, and that they were typically hired with little or no experience in authentication. *Id.*. The 11/5 CNBC article credibly revealed to investors for the first time, through interviews with dozens of former employees and access to internal RealReal documents, that the Company's onerous quota system made it nearly impossible for copywriters to properly authenticate each item they processed, contrary to the Company's claims. ¶253. Finally, the 11/21 CNBC article revealed to investors for the first time the extent of the Company's authentication deficiencies, as manifested in weekly "Copywriting Faux and Tell" documents. ¶257. The revelation of these "Faux and Tell" documents and corresponding stock drop demonstrated the materialization of the concealed risk that the Company was not adequately authenticating each of the items sold on its website. *Id.*

Each of the three partial corrective disclosures following the Fashionista article caused the price of TRR stock to drop materially, by approximately 9%, 18%, and 5% respectively. ¶¶250, 254, 258. Courts have found smaller market reactions can support loss causation. *See, e.g., City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat., PLC*, 423 F. Supp. 2d 348, 362 (S.D.N.Y. 2006) (4.3% share price decline "supports attributing the loss to [the company]'s concealment of its investment risk"). *See also Scott v. ZST Digital Networks, Inc.*, No. CV 11-03531 GAF JCX, 2012 WL 538279, at *11 (C.D. Cal. Feb. 14, 2012) (stock price drop on the same day of a partial corrective disclosure was sufficient to plead loss causation despite earlier disclosure).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; 5:19-cv-07737-EJD

**E.     The Complaint Adequately Alleges Control Person Claims**

To state a claim under Section 15 of the Securities Act or Section 20(a) of the Exchange Act, Plaintiffs must allege (1) a primary violation of the Exchange Act; and (2) the individual defendants directly or indirectly controlled the entity liable for the primary violation. 15 U.S.C. § 78t(a), 77o(a); *Juniper Networks*, 542 F. Supp. 2d at 1053-54 (finding control person claims under Section 15 and Section 20(a) were adequately alleged). Plaintiffs need not allege culpable participation. *S.E.C. v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011). Courts in the Ninth Circuit have concluded that because fraud is not a necessary element of a control person claim, the Rule 8 pleading standard applies. *In re Am. Apparel, Inc. S'holder Litig.*, No. CV1006352MMMRCX, 2013 WL 10914316, at *33 n. 249 (C.D. Cal. Aug. 8, 2013) (citing cases).

As demonstrated above, the Complaint adequately alleges primary violations under Section 11 and Section 10(b). The Complaint also adequately alleges that the Individual Defendants were officers and directors of TRR at all relevant times, directly participated in TRR's management and conduct of business affairs, and signed or directly made the false statements alleged herein. ¶¶21-32, 188-189, 283-286; *Todd*, 642 F.3d at 1223 ("actual authority over the preparation and presentation to the public of financial statements is sufficient to demonstrate control."). In *Howard v. Everex Sys., Inc.*, 228 F.3d 1057 (9th Cir. 2000), the Ninth Circuit found control person liability adequately alleged where a CEO "signed off the on the statements as correct." *Id.* at 1066. Indeed, "numerous courts have found that allegations that directors signed the statements which contain the material misrepresentations are sufficient to state Section 20(a) control status." *UCBH*, 890 F. Supp. 2d at 1208 (citing cases and noting "it does comport with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report."). Each of the Individual Defendants signed or authorized the signing of the Prospectus. ¶¶21-32. The Complaint adequately alleges control.

**IV.     CONCLUSION**

The Court should deny the motions to dismiss in their entirety. If the Court grants the motions in whole or in part, Plaintiffs request leave to amend. Fed. R. Civ. P. 15(a)(2).

DATED: June 30, 2020

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Laurence M. Rosen*
Laurence M. Rosen (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Email: lrosen@rosenlegal.com

Phillip Kim (*pro hac vice*)
Joshua Baker (*pro hac vice*)
101 Greenwood Avenue, Suite 440
Jenktintown, PA 19046
Telephone: (215) 600-2817
Email:  pkim@rosenlegal.com
        jbaker@rosenlegal.com

*Lead Counsel for Plaintiffs*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; 5:19-cv-07737-EJD

## CERTIFICATE OF SERVICE

I, Laurence M. Rosen, hereby declare under penalty of perjury as follows:

I am the managing attorney of The Rosen Law Firm, P.A., with offices at 355 S. Grand Avenue, Suite 2450 Los Angeles, CA 90071. I am over the age of eighteen.

On June 30, 2020, I electronically filed the foregoing PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on June 30, 2020.

*/s/ Laurence M. Rosen*
Laurence M. Rosen

- 27 -
CERTIFICATE OF SERVICE; 5:19-cv-07737-EJD