1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6                         SAN JOSE DIVISION

7

8    MICHAEL SANDERS, et al.,              Case No.  19-cv-07737-EJD

           Plaintiffs,
9                                          **ORDER GRANTING IN PART AND**
                                           **DENYING IN PART DEFENDANTS'**
10      v.                                 **MOTION DISMISS**

11   THE REALREAL, INC., et al.,           Re: Dkt. No. 32

           Defendants.
12

13          This class action arises out of Defendants' alleged violations of Sections 11 and 15 of the

14   Securities Act of 1933, Item 303 of SEC Regulation S-k, and Section 10(b) and 20(a) of the

15   Securities Exchange Act of 1934.

16          Lead Plaintiff, Michael Sanders, along with Nubia Lorelle and Garth Wakeford

17   ("Plaintiffs") purchased securities in connection with The RealReal, Inc.'s ("Defendants") June

18   2019 Initial Public Offering ("IPO").  Plaintiffs allege violations of federal securities laws arising

19   in two distinct time periods.  First, Plaintiffs contend Defendants made false and misleading

20   statements in the company's registration documents prior to the IPO.  Second, Plaintiffs allege

21   these false and misleading statements continued in the months following the IPO, thereby

22   artificially inflating the stock's market price.  Additionally, Plaintiffs claim Defendants failed to

23   disclose known trends or uncertainties during both time periods.

24          The Complaint names multiple defendants: (1) The RealReal, Inc.; (2) Individual

25   Defendants Julie Wainwright (Chief Executive Officer "CEO"), Matt Gustke (Chief Financial

26   Officer "CFO"), Steve Lo (Vice President and Corporate Controller), Chip Baird (Director), Maha

27   Case No.: 19-cv-07737-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
28   DISMISS

                                               1

*United States District Court*
*Northern District of California*

1    Ibrahim (Director), Rob Krolik (Director), Michael Kumin (Director), Stefan Larsson (Director),

2    Niki Leondakis (Director), and James Miller (Director); and (3) Underwriter Defendants Credit

3    Suisse Securities LLC, Bank of America Securities, Inc., UBS Securities LLC, KeyBanc Capital

4    Markets Inc., Cowan and Company, LLC, Raymond James & Associates, Inc., and Stifel,

5    Nicolaus & Company.

6         Defendant The RealReal, Inc. and Individual Defendants filed a motion to dismiss the

7    lawsuit arguing that Plaintiffs have not met the heightened pleading requirements applicable in

8    securities fraud cases.  Based on the below, the Court GRANTS Defendants' motion to dismiss on

9    Rule 10b-5 claims and DENIES Defendants' motion to dismiss on Section 11 claims.

10   **I.  BACKGROUND**

11        The RealReal, Inc. ("Company") is an online marketplace that sells authenticated,

12   consigned luxury goods.  Dkt. No. 32, Amended Complaint ("AC") ¶ 2.  The website offers used

13   clothing, jewelry, and accessories from "over 7,000 luxury and premium designers."  *Id.* ¶ 3.  The

14   Company occupies a unique niche in the luxury goods marketplace.  *Id.* ¶ 64.  Utilizing a

15   streamlined model, "[o]nce consigned items reach one of [the Company's] four merchandising and

16   fulfillment facilities, [employees] authenticate, write the associated copy, photograph, price, sell

17   and handle all fulfillment and returns logistics."  *Id.* ¶ 75.

18        The Company generates revenue by processing orders via the website, mobile application,

19   and retail stores.  Dkt. No. 33, Request for Judicial Notice ("RJN"), Exh. 1 at 2.[1]  Specifically, this

20   revenue is primarily derived from the "take rates" the Company levies on these transactions.  *Id.*

21   The financial performance of the Company is assessed through a number of various operating and

22   financial metrics.  AC ¶ 144.  Of particular importance to this case, the Company utilizes two "key

23   financial and operating metrics," known as Average Order Value ("AOV") and Gross

24   Merchandise Value ("GMV").  *Id.*; *see also* RJN, Exh. 1 at 56.

25

26   _____

27   [1] As discussed below, the Court grants Defendants' Request for Judicial Notice pursuant to
     Federal Rule of Evidence 201(b).

28   Case No.: 19-cv-07737-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
     DISMISS

United States District Court
Northern District of California

GMV is the "total amount customers paid for goods across the Company's platform." AC ¶ 146. The GMV drives revenue growth and represents a "key indicator of the health of [the Company's] consignor ecosystem." RJN, Ex.1 at 56. AOV is a more granular metric that measures the "average value of all orders placed across . . . [the] online marketplace, excluding shipping fees and sales taxes." *Id*. These metrics are intimately connected because even small changes in AOV could result in large effects to the Company's overall GMV. AC ¶ 146. Furthermore, these metrics, especially AOV, are linked to the market for new luxury goods because promotional or discounted luxury goods force the Company to lower prices on consigned luxury items. *Id*. ¶ 147.

At the core of this business strategy is the Company's "rigorous, multi-point authentication process" to ensure each item is genuine (hence the company name, The RealReal). *Id*. ¶ 77. According to its Registration Statement, the Company employs "more than 100 gemologists, horologists, brand experts and art curators . . . [who] are highly trained, experienced experts in their respective fields." RJN, Exh. 1 at 86. This authentication process is important because it breeds consumer trust, and this trust forms "the cornerstone of [The RealReal's] online marketplace." *Id*. at 87.

Plaintiffs allege the Company's authentication process was far from rigorous. AC ¶ 80. To support these allegations, Plaintiffs rely on numerous confidential former employees ("FEs"). *Id*. ¶ 115. These FEs range in job function, seniority, and time employed with the Company, and were employed both pre- and post-IPO. According to FE4, prior to the IPO the majority of the purportedly authenticated items on the website were never "seen by the official authentication team." *Id*. ¶ 116. Instead, as FE4 and FE6 explain, most items were authenticated by copywriters. *Id*. These copywriters faced several structural challenges. First, copywriters reportedly received very minimal authentication training consisting of a "1-hour PowerPoint presentation" and irregular follow-up trainings. *Id*. ¶¶ 128-30. Moreover, the copywriting role involved many conflicting responsibilities. According to numerous copywriters, these responsibilities included

1    pricing the item based on historical trends, measuring the item, authenticating the item, writing a

2    product description, and finally posting the item to the website.  *Id.* ¶¶ 123-25.  However, this

3    process was complicated by the Company's quota system.  FE6 and FE8 reported their daily

4    authentication quotas ranged between 120 to 300 items a day.  *Id*. ¶ 122.  These quotas left only a

5    few minutes per item to compete the myriad of tasks required, including authentication and

6    posting to the website.  *Id*. ¶ 123.  FE6 claimed these practices occurred during their time at the

7    Company, which spanned several years before the IPO and immediately after.  *Id.* ¶ 227.

8        On May 31, 2019, the Company field its Registration Statement with the Securities and

9    Exchange Commission ("SEC").  *Id*. ¶ 62.  After several amendments, the statement became

10   effective on June 27, 2019.  *Id*.  The next day, the Company filed a Prospectus pursuant to Rule

11   424(b)(4) with the SEC, commencing the public offering of 17.25 million shares priced at $20 per

12   share.  *Id*.  In total, the Company received $345 million in gross offering proceeds.  *Id*.  This

13   Registration Statement and Prospectus ("Offering Materials") form the basis of Plaintiffs' Section

14   11 and 15 claims.  *Id*. ¶¶ 169-91.

15       Following the IPO, Plaintiff alleges Defendants continued to make false and misleading

16   statements concerning the veracity of its authentication process.  *Id*. ¶ 192.  Many of these alleged

17   misstatements were in response to sustained media reporting on the Company's dubious

18   authentication claims.  *See Id*. ¶¶ 200, 213.  Early reports of the Company's subpar authentication

19   procedures appeared in an investigation by the Capitol Forum, a private consumer protection

20   group, which was subsequently covered in an article on a popular fashion website called

21   Fashionista.  *Id*. ¶ 93.  Together, these articles were the first to report on the "grueling" workplace

22   requirements at the Company, namely under-trained copywriters authenticating upwards of 100

23   clothing items per day to satisfy their daily quota.  *Id*. ¶¶ 94-95.  Shortly thereafter, Forbes

24   magazine published an article that further examined the authentication process.  *Id*. ¶ 99.  In

25   particular, the Forbes article noted a sorting procedure at the Company's Secaucus, NJ, facility by

26   which "high-risk" products known to attract forgeries are sent to higher trained individuals.  The

27
28   Case No.: 19-cv-07737-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
     DISMISS

United States District Court
Northern District of California

1   article concluded that "not enough of the products" are sent to these more trained employees. *Id.* ¶

2   101. Finally, CNBC published two articles covering the insufficient training of copywriters, the

3   "onerous quota system," and the diversion of only "very high-value items" to actual

4   authenticators. *Id.* ¶ 103-10. The CNBC articles also uncovered internal documents, titled

5   "Copywriting Faux and Tell," which detailed hundreds of examples of counterfeit items that

6   "slipped through the company's vetting process." *Id.* ¶ 112. As a result of this reporting,

7   Plaintiffs allege the Company's "stock price . . . declined significantly since the IPO." *Id.* ¶ 11.

8        On March 31, 2020, Plaintiff filed an Amended Complaint, which is the subject of

9   Defendants' current motion to dismiss pursuant to Rule 12(b)(6). Dkt. No. 32, Motion to Dismiss

10  ("Mot."). In addition, Underwriter Defendants seek to join this motion to dismiss. *See* Dkt. No.

11  35, Notice of Joinder. Plaintiffs filed an opposition to Defendants' motion to dismiss. Dkt. No.

12  36, Opposition ("Opp."). Defendants filed a reply. Dkt. No. 40, Defendants' Reply ("Reply").

13  **II.   LEGAL STANDARD**

14       To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual

15  matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

16  (2009); Fed. R. Civ. Pro. 8(a). A claim has facial plausibility when the plaintiff pleads factual

17  content that allows the court to draw the reasonable inference that the defendant is liable for the

18  misconduct alleged. *Ashcroft*, 556 U.S. at 678. Courts must consider the complaint in its entirety,

19  "accept all factual allegations ... as true" and construe them in the light most favorable to the

20  plaintiff. *See, e.g.*, *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1253 (N.D.

21  Cal. 2019). Threadbare recitals of the elements of a cause of action supported by mere conclusory

22  statements "do not suffice." *Ashcroft*, 556 U.S. at 678. Hence, the requirement that the court

23  "accept as true" all allegations in the complaint is "inapplicable to legal conclusions." *Id.*

24       Securities fraud cases must meet Rule 8's plausibility standard, Rule 9(b)'s higher pleading

25  standard, and the standards established in the Private Securities Litigation Reform Act

26  ("PSLRA"). *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319–22 (2007);

27
    Case No.: 19-cv-07737-EJD
28  ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
    DISMISS

    5

1   *Zucco Partners, LLC v. Digimarc, Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).  Rule 9 requires a

2   plaintiff pleading securities fraud to state, with particularity, the circumstances constituting fraud

3   or mistake.  Fed. R. Civ. Pro 9(b).

4   The PSLRA mandates that "securities fraud complaints 'specify' each misleading

5   statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was

6   'formed'; and that they 'state with particularity facts giving rise to a strong inference that the

7   defendant acted with the required state of mind.'"  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336,

8   345 (2005) (alterations in original) (quoting 15 U.S.C. §§ 78u–4(b)(1)–(2)); *see also Metzler Inv.*

9   *GmbH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th. Cir. 2008) ("The PSLRA has

10  exacting requirements for pleading 'falsity.'").  Plaintiffs bear the burden of proving that the

11  defendant's misrepresentations "'caused the loss for which the plaintiff seeks to recover.'"  *Dura*

12  *Pharm.*, 544 U.S. at 345–46 (quoting § 78u-4(b)(4)).  In determining whether a "strong inference"

13  of scienter has been sufficiently alleged, this Court must not only draw "inferences urged by the

14  plaintiff," but also engage in a "comparative evaluation," thus examining and considering

15  "competing inferences [in defendants' favor] drawn from the facts alleged."  *Tellabs*, 551 U.S. at

16  314.  Hence, scienter must not only be "plausible or reasonable," it must also be "cogent and at

17  least as compelling as any opposing inference of nonfraudulent intent."  *Id*. at 324.

18  ## III.   PRELIMINARY MATTERS

19  Before turning to the substantive claims, the Court will address initial motions from

20  Defendants.

21  ### A.   Request for Judicial Notice & Incorporation by Reference

22  Defendants ask the Court to take judicial notice of six documents, which are attached as

23  exhibits to the declaration of Jamie A. Bartlett.  Dkt. No. 33, Request for Judicial Notice ("RJN")

24  at 1.  Specifically, Defendants request the Court take judicial notice of all six exhibits and treat

25  Exhibits 1-2 and 4-6 as incorporated by reference.  Plaintiff does not challenge the judicial notice

26  of such documents for their limited purpose of demonstrating the statements were made to the

27  Case No.: 19-cv-07737-EJD

28  ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION DISMISS

United States District Court
Northern District of California

1    public.  *See* Dkt. No. 37, Response to Judicial Notice at 1.

2           Generally, district courts may not consider material outside the pleadings when assessing

3    the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *Lee v.*

4    *City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d

5    988, 998 (9th Cir. 2018); *see also* Fed. R. Civ. P. 12(d).   However, there are two exceptions to

6    this bar on extrinsic information: the incorporation by reference doctrine and judicial notice under

7    Federal Rule of Evidence 201.  *Khoja*, 899 F.3d at 998.

8           **i.    Judicial Notice**

9           Rule 201 permits a court to take judicial notice of an adjudicative fact "not subject to

10   reasonable dispute" because they are either "generally known" or "can be accurately and readily

11   determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).

12   However, simply because a document is subject to judicial notice "does not mean that every

13   assertion of fact within that document is judicially noticeable for its truth."  *Khoja*, 899 F.3d at

14   999.  While not taken for the truth of the matter, the statements may be used to show that certain

15   information was available to investors in the market.  *In re Intel Corp. Sec. Litig.*, No. 18-CV-

16   00507-YGR, 2019 WL 1427660, at *6 (N.D. Cal. Mar. 29, 2019).

17          Defendants' Exhibits 1-3 are various documents the Company filed with the SEC.  *See*

18   RJN at 3.  Public SEC filings are routinely subject to judicial notice since their accuracy cannot

19   reasonably be questioned.  *Wochos v. Tesla, Inc.*, No. 17-CV-05828-CRB, 2018 WL 4076437, at

20   *2 (N.D. Cal. Aug. 27, 2018); *In re Intel*, 2019 WL 1427660 at *6.  However, as Plaintiffs

21   correctly noted, the Court is not taking notice of the truth of any of the facts asserted.  Rather, the

22   documents will be considered for the single purpose of determining what representations the

23   Company made to the market.  *See Wochos*, 2018 WL 4076437 at *2.

24          Likewise, the remaining documents are transcripts of public statements and a press release

25   issued by the Company.  *See* RJN at 4-5.  Transcripts of earnings calls and investor presentations

26   are publicly available documents and are thus matters of public record not subject to reasonable

27   Case No.: 19-cv-07737-EJD
28   ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
     DISMISS

     7

dispute.  *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1009 (N.D. Cal. 2020).

Furthermore, "the Ninth Circuit routinely take judicial notice of press releases."  *In re Am.*

*Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1062 (C.D. Cal. 2012).  As with the SEC

filings, however, the statements contained in these documents will not be considered for their

truth.  Thus, the Court will take judicial notice of Exhibits 1-6, in accordance with the limited

purpose of identifying what statements were available to the market.

### ii.   Incorporation by Reference

The incorporation by reference doctrine treats certain documents, even those not attached

to the complaint, as if they were part of the pleadings.  *Khoja*, 899 F.3d at. at 1002.  These

documents may be incorporated "if the plaintiff refers extensively to the documents or the

document forms the basis of the plaintiff's claim."  *Id.* (quoting *United States v. Ritchie*, 342 F.3d

903, 908 (9th Cir. 2003)).  If a document is deemed incorporated by reference, "the entire

document is assumed to be true for purposes of a motion to dismiss, and both parties—and the

Court—are free to refer to any of its contents."  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046,

1058 n.10 (9th Cir. 2014) (citation and quotation marks omitted).

Here, Plaintiffs' Amended Complaint incorporates by reference Exhibits 1, 2, 4, 5 and 6

because Plaintiff explicitly and repeatedly refers to excerpts of these exhibits to support their

claims.  Accordingly, these five documents are properly considered on this motion to dismiss

because they have been incorporated by reference.

### B.   Request for Joinder

The Underwriter Defendants seek to join The Company and Individual Defendants' motion

to dismiss.  Plaintiffs do not oppose these joinder motions.  Thus, the Court GRANTS these

joinder motions.

## IV.   PLAINTIFFS' SECTION 10 AND SECTION 20 CLAIMS

Plaintiffs bring two claims under the Securities Exchange Act of 1934.  First, Plaintiffs

allege the Company and its President, CEO, and Chairperson of the Board of Directors, Julie

United States District Court
Northern District of California

Wainwright, and CFO, Matt Gustke, ("Officer Defendants") violated Section 10(b) of the Act via Rule 10b-5 promulgated by the SEC.  AC ¶ 272.  Second, Plaintiffs allege Individual Defendants (Julie Wainwright and Matt Gustke) violated Section 20(a) as "controlling persons" within the Company.  *Id*. ¶ 285.  The Court will address each of these claims individually.

### A.   Legal Standard

To show securities fraud under Section 10(b) and Rule 10b-5 of the Securities Exchange Act, plaintiffs must allege facts sufficient to establish (1) a material misrepresentation or omission; (2) made with scienter, i.e., a wrongful state of mind; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation.  *Loos v. Immersion Corp.*, 762 F.3d 880 (9th. Cir. 2014), *amended* (Sept. 11, 2014).  "To determine whether a private securities fraud complaint can survive a motion to dismiss for failure to state a claim, the court must determine whether particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or with deliberate recklessness made false or misleading statements to investors."  *In re LeapFrog Enter., Inc. Sec. Litig.*, 527 F. Supp. 2d. 1033, 1039–40 (N.D. Cal. 2007).

For a misstatement to be actionable, the statement must be both false and material.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) ("It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant.").  To survive a motion to dismiss, a complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  *Metzler*, 540 F. 3d at 1070 (quoting 15 U.S.C. § 78u–4(b)(1)).  Statements are misleading only if they "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."  *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  Rule 10b-5 prohibits "only misleading and untrue statements, not statements that are incomplete."  *Id*.  Silence, absent a duty to disclose, "is not misleading under Rule 10b-5."  *Basic*, 485 U.S. at 239 n.17.  "Often a statement will not mislead even if it is incomplete or does not include all relevant facts."  *Brody*,

United States District Court
Northern District of California

1  280 F.3d at 1006.  Not all material adverse events must be disclosed to investors.  *See In re Rigel*

2  *Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012).

3       An actionable statement must also "be capable of objective verification."  *Retail Wholesale*

4  *& Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir.

5  2017).  For example, business puffery or opinion statements are not actionable because they do not

6  "induce the reliance of a reasonable investor."  *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774

7  F.3d 598, 606 (9th Cir. 2014).

8      **B.**    **Alleged Material Misstatements & Omissions**

9       Plaintiffs allege that Defendants made ten false, misleading, and/or incomplete statements

10  regarding the Company's authentication process following the IPO.  *See* AC ¶¶ 193, 196, 198,

11  200, 203, 205, 207, 211, 214, and 216.  For clarity, the Court has numbered the alleged actionable

12  statements for Plaintiffs' Section 10(b) claims below.[2]

13  ***CNBC "Squawk on the Street" Interview***

14  **Statement 1**

15  "every single item on the site has already been inspected, authenticated before it gets on the site.

16  … We employ over 100 experts … our brand authenticators also train people, so it happens every

17  single day, on a regular basis, and we put it through a rigorous multi-point inspection process."

18  AC ¶ 193.

19  ***Wells Fargo Conference Call***

20  **Statement 2**

21  "At the basis of the business is two pillars. For buyers it is trust and we establish that through

22  taking possession of goods and authenticating through a no risk multi-point process -- absolutely,

23  every item."

24  AC ¶ 196.

25

26  ──────────────────

27  [2] Any bold or italicized wording in quotations is directly copied from Plaintiffs' Amended
Complaint to indicate the part of the statement alleged to be materially false and misleading.
Case No.: 19-cv-07737-EJD

28  ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
DISMISS

**Statement 3**

"buyers come to us and give us a chance because they trust us and they trust us because we authenticate every item."

AC ¶ 198.

**Statement 4**

In response to analyst concerns regarding the risk of counterfeits arising since "authenticators are asked to do a lot of things on a day-to-day basis," Gustke responded:

"It is literally everything to what we do. It is central to who we are, to what our brand stands for. It is in our name, it is – there's nothing more important to what we do. So here's how it actually works. So, every product that is brought into us we see physically and it goes through a multi-point brand specific or product specific inspection. And that product can be touched by multiple people throughout its journey before it even makes it to the site.

If it doesn't trip any of those flags it's going to move on to the copywriting function. Copywriters do a bunch of things. In addition to authentication they are setting price -- less and less frequently because algorithms are doing that. They are creating the taxonomy for items, they are writing a description, a title, taking measurements, etc., and they are trained in a specific category.

***So, you have a copywriter who specializes in women's contemporary or in handbags or sneakers and they receive deep training in their area of specialization***. And the people doing that training are the experts. The experts in turn will be reviewing high-risk items personally.

AC ¶ 200 (emphasis in Complaint).

***Company Website Statements***

**Statement 5**

"Authenticity Is Everything To Us. Our 100+ in-house experts including gemologists, horologists and luxury brand authenticators inspect thousands of items every day, ensuring everything we sell is 100% authenticity guaranteed."

AC ¶ 203.

Case No.: 19-cv-07737-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
DISMISS

1    _**Q2 2019 Earnings Call**_

2    **Statement 6**

3    "buyers trust us because we have a rigorous authentication process. We employ more than 100

4    gemologists, horologists and authentication experts, who authenticate each item we sell."

5    AC ¶ 205.

6    **Statement 7**

7    "[f]or our consigners, we make consignment easy and frictionless by providing them with an end

8    to end solution. From advising them on the products to consign to in-home pickup, shipping to our

9    warehouse, authentication, copywriting, pricing, photography and pick, pack and ship."

10   AC ¶ 207.

11   _**Q3 2019 Earnings Call**_

12   **Statement 8**

13   In response to question by an investment analyst regarding the authentication process and the

14   potential for inauthentic items to make it into the Company's inventory, Wainwright responded:

15   "authentication is core and central to our brand." She then outlined the Company's authentication

16   process, noting that an unspecified number of "high risk" items go to the Company's

17   authenticators, and that "other items are authenticated by our copywriters. These – this team which

18   is very large are trained in specific categories and specific brands."

19   AC ¶¶ 209-11.

20   _**Company Press Release**_

21   **Statement 9**

22   "We are the only resale company in the world that authenticates every single item we sell."

23   AC ¶ 214.

24   **Statement 10**

25   "Items that are considered "low risk," such as contemporary brands with clear authenticity

26   markers, are sent to be authenticated by **our copywriters, who receive deep training in**

27
     Case No.: 19-cv-07737-EJD
28   ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
     DISMISS

United States District Court
Northern District of California

**authentication**, but whose title has become outdated."

"For context—when we originally launched our business, our copywriters only wrote copy. As our business has grown, the associated scope of their job has changed. **Copywriters have been receiving the initial and ongoing training required to authenticate products**, which has become an important element of their job."

AC ¶ 216 (emphasis in Complaint).

### C.  Confidential Witness Accounts

When plaintiffs rely on statements from confidential witnesses to support their allegations, the PSLRA's particularity standard must be satisfied.  Personal sources in a complaint must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *In re Daou Sys.*, 411 F.3d at 1015; *see also In re Lockheed Martin*, 272 F. Supp. 2d at 940.

"To determine whether a confidential witness is sufficiently reliable, courts look to the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged ... [including] the coherence and plausibility of the allegations, the number of sources, the reliability of sources, and similar indicia."  *Gammel v. Hewlett-Packard Co.*, No. SACV-11-1404-AG, 2013 WL 1947525, *11 (May 8, 2013) (citations and internal quotations omitted).

Recognizing that the heightened pleading standard applies here, and because many of the allegations are derived from statements made by confidential witnesses, the Court must first consider  whether Plaintiffs satisfy the heightened pleading requirement with respect to these confidential former employees ("FEs").

Defendants challenge all thirteen of Plaintiffs' confidential witnesses on two distinct grounds.  First, Defendants argue that ten of the thirteen witnesses ("Pre-IPO Witnesses") are not reliable since they were not employed by the Company during the class period.  Mot. at 16.  Second, as to the remaining witnesses, Defendants attribute their testimony to gripes of a few insufficiently trained employees that do not render the Company's statements regarding

Case No.: 19-cv-07737-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
DISMISS

United States District Court
Northern District of California

1    authentication false or misleading.  *Id*. at 17.

2         As a starting point, Plaintiffs' suit includes "all persons and entities who purchased

3    RealReal common stock from June 27, 2019 through November 20, 2019."  AC ¶ 1.  The AC

4    adequately numbers each of the individual witnesses and lists their job titles.  *See id*. ¶¶ 48-60.

5    However, the AC is lacking in specificity regarding many of the witnesses' job descriptions and

6    responsibilities.  *See In re Daou Sys.*, 411 F.3d at 1016; *see also McGovney v. Aerohive Networks,*

7    *Inc.*, 367 F. Supp. 3d 1038, 1053 (N.D. Cal. 2019) (holding confidential witnesses lacked personal

8    knowledge, in part, because they were not employed at the time of the alleged misstatements).

9    Specifically, the Court agrees with Defendants that four of the former employees listed in the AC

10   are not described with sufficient particularity.

11        FE12 is described as the Company's vice president of fulfillment, who participated on the

12   Company's "executive committee."  AC ¶ 59.  However, the AC failed to describe with any detail

13   what a fulfillment officer does nor did it describe in any level of specificity what took place at

14   executive meetings beyond officers "talk[ing] about their issues."  AC ¶ 59.  Therefore, there is no

15   factual basis to support FE12's understanding of the "depth of knowledge" required for

16   authenticators in the industry.  *Id*. ¶ 117.  Moreover, FE12 served in their capacity until December

17   2017 — a full year and a half before the class period.  *Id*. ¶ 59.

18        Likewise, the AC lists FE5 as the "Company's chief human resources officer."  *Id*. ¶ 52.

19   This individual should have insight into the Company's employee relations, yet the AC merely

20   states FE5 "was a member of RealReal's executive committee . . . [who] had regular, direct

21   communications" with other executives.  *Id*.  Based on this limited description, it is difficult to

22   discern how a human resources officer would know that "only a tiny fraction of anything that ever

23   goes on at that site is authenticated."  *Id*. ¶ 116.  Furthermore, there is little indication that a

24   purportedly high-level officer would be familiar with the nuances of copywriter training.  *See Id*. ¶

25   118 (According to FE5, the copywriters' training in authentication was limited to "a couple of

26   hours," or "like none, almost none.").  Like FE12, FE5 was not employed by the Company during

27

28   Case No.: 19-cv-07737-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
     DISMISS

United States District Court
Northern District of California

1   the class period, rather they had left nearly a full year before the IPO.  *Id*. ¶ 52.

2           The Plaintiffs' descriptions of two other lower-ranking former employees do not fare much

3   better.  FE1 is simply described as working "in various capacities of increasing responsibility . . .

4   including as a production assistant and as a manager."  *Id*. ¶ 48.  Similarly, FE3 purportedly held

5   "various roles in the shipping and receiving department in the warehouse."  *Id*. ¶ 50.  These

6   threadbare descriptions of former employees do not meet the particularity threshold required to

7   ensure reliability.  *See McGovney*, 367 F. Supp. 3d at 1053 ("At a bare minimum, the Ninth

8   Circuit requires that the complaint describe the confidential witnesses with a 'large degree of

9   specificity,' including not just the witnesses' job description, but also his or her

10  'responsibilities.'") (citing *In re Daou*, 411 F.3d at 1016).

11          Turning to the remaining witnesses, Defendants' arguments are unavailing.  FEs 2, 8, and

12  9 were described as copywriters working in various departments before the IPO.  *See* AC ¶¶ 49,

13  55, 56.  Similarly, FEs 4 and 7 are described as being copywriters and, later, serving in more

14  senior roles.  *See id*. ¶¶ 51, 54.  In addition to title, the Amended Complaint also includes

15  employment dates and office location for these witnesses.  *Id*.  Despite a lack of specific job

16  responsibilities, these witnesses are readily distinguishable from those excluded above.  As noted

17  above, plaintiffs must show the witnesses were in a position to be personally knowledgeable about

18  the information alleged.  Unlike the witnesses occupying senior-level positions with no

19  information clarifying the extent of these roles, the copywriter's role is encapsulated within their

20  job title.  Furthermore, a chief of human resources, like FE5, likely has widely differing roles

21  depending on the company.  To the extent these witnesses may have had job responsibilities that

22  extended beyond copywriting, there is a high level of consistency between the witnesses'

23  accounts.  In addition, executives within the Company corroborate these expanded responsibilities.

24  See AC ¶ 216 (Wainwright stated "when we originally launched our business, our copywriters

25  only wrote copy. As our business has grown, the associated scope of their job has changed.").

26          In sum, the Court finds that Plaintiffs have not sufficiently pled personal knowledge and

27

28  Case No.: 19-cv-07737-EJD
    ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
    DISMISS

United States District Court
Northern District of California

1    reliability as to FEs 1, 3, 5, and 12 because those witnesses were not employed during the class

2    period and the AC failed to provide a detailed employment description.  However, the allegations

3    as to FEs 2, 4, 6, 7, 8, 9, 10, 11, and 13 meet the particularity requirement.

4            **D.    Discussion**

5             In their motion to dismiss, Defendants challenge the sufficiency of Plaintiffs' Section 10(b)

6    and Rule 10b-5 claims by first arguing that Plaintiffs' allegations do not demonstrate that any

7    challenged statements were false or misleading and, in any event, represent corporate puffery.  *See*

8    Mot. at 19-21.  Defendants next contend that Plaintiffs have failed to establish scienter.  *Id*. at 21.

9    Then, even if the Court finds falsity and scienter, the Defendants argue that Plaintiffs' loss

10   causation claims are inadequate.  *Id*. at 23.

11            **i.    Falsity**

12                    a.   Corporate Puffery

13           Defendants argue that Statements 1, 4, 6, and 10 are nonactionable because they amount to

14   no more than "corporate puffery."  In the Ninth Circuit, "vague, generalized assertions of

15   corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations

16   under federal securities laws" because no reasonable investor would rely on such statements.  *In re*

17   *Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *14 (N.D. Cal. Feb. 12, 2015) (collecting cases).

18   Statements that merely present an "optimistic, subjective assessment hardly amounts to a

19   securities violation."  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060

20   (9th Cir. 2014) (citing *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010)).  A simple

21   heuristic to distinguish between an actionable misstatement and corporate puffery is that the latter

22   is incapable of objective verification.  *In re Verifone Sec. Litig.*, No. 5:13-CV-01038-EJD, 2016

23   WL 1213666, at *4 (N.D. Cal. Mar. 29, 2016).

24           **Statements 4 and 10** pertain to the level of authentication training copywriters receive.

25   Specifically, the statements indicate that copywriters receive "deep training" in authentication.

26   AC ¶¶ 200, 216.  Plaintiffs allege these statements are misleading because "copywriters received

27

28   Case No.: 19-cv-07737-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
     DISMISS
                                             16

United States District Court
Northern District of California

minimal training in authentication . . . consisting of a one-hour PowerPoint presentation, a handful of reference documents, and follow up trainings." Opp. at 15. Thus, according to Plaintiffs, these statements are not mere puffery because they can be objectively verified. *Id.*

There are numerous problems with Plaintiffs characterization of these statements. First, the descriptor "deep" is vague with nothing particularly concrete for a potential investor to rely upon. Second, and relatedly, the depth of training received by copywriters is entirely incapable of objective verification. Plaintiffs contend the Defendants' use of "deep training" comports with *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, where the court held the defendant's use of "extensive training and safety programs" was actionable. *Bricklayers*, 866 F. Supp. 2d 223, 243 (S.D.N.Y. 2012). In *Bricklayers*, however, the court based its decision on the fact that safety training in "an industry as dangerous as deepwater drilling" would be considered seriously by investors. *Id.* at 244. While authentication is undoubtedly important to the Company's business model, the statement must be read in context. The description of "extensive training" in *Bricklayers* objectively implies a high degree of training, e.g. the safety training comports with all requisite standards within a highly regulated industry. In this case, however, the phrase "deep training" does not have the same level of objective verification. Thus, activities constituting "deep training" are fundamentally subjective and not capable of being disproved. For these reasons, the Court finds Statements 4 and 10 are not actionable.

**Statements 1 and 6** reference the Company's "rigorous" authentication process. *See* AC ¶¶ 193, 205. Plaintiffs allege these statements are actionable because they are "objectively verifiable." Opp. at 12. Defendants argue these statements amount to nonactionable puffery because the word "rigorous" is not connected to a qualifier or objectively measurable standard. Reply at 7.

Standing alone, the word "rigorous" might be understood as mere corporate window dressing, however the term cannot be read in isolation. *See Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989). Instead, the term must be read in context to determine if it can be understood "as

an integral part of a representation." *Id.* Indeed, as both Plaintiffs and Defendants acknowledge, the word "rigorous" can be actionable when used as a qualifier or basis of comparison. Opp. at 12; *accord* Reply at 7. For example, courts in this district have found statements, such as "rigorous testing methods that simulated customers' experiences," are actionable because it suggests the company provides some form of testing and is therefore able to be proved or disproved. *Ahern v. Apple Inc.*, 411 F. Supp. 3d 541, 557 (N.D. Cal. 2019); *see also Zeiger v. WellPet LLC*, 304 F. Supp. 3d 837, 851 (N.D. Cal. 2018) (holding statement claiming "rigorous standards and practices are put in place to protect the nutritional integrity of our food" was not puffery).

Here, Defendants argue these statements are nonactionable because the word "rigorous" is "not connected to any objectively-measurable standard." Reply. at 7. Not so. Authentication is a cognizable process that delivers an outcome: a determination that something is or is not authentic. As in *Ahern*, whether items on the Company's online marketplace underwent any authentication is testable and, ultimately, verifiable. *See Ahern*, 411 F. Supp. 3d at 558. Therefore, the Court finds that Statements 1 and 6 are actionable.

b. Actionable Misstatements

To assert a claim under the PSLRA, the plaintiff must particularly plead the element of falsity. *Zucco*, 552 F.3d at 990; *see also Metzler*, 540 F.3d at 1070 (noting the PSLRA's exacting pleading requirements). To satisfy the PSLRA's "exacting requirements," a plaintiff must plead "specific facts indicating why" the statements at issue were false. *See Metzler*, 540 F.3d at 1070; *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001). A plaintiff may rely on contemporaneous statements or conditions to demonstrate why statements were false when made, but such circumstantial evidence must be plead with particularity. *In re Stratosphere Corp. Sec. Litig.*, 1997 WL 581032, at *13 (D. Nev. May 20, 1997). Thus, to be actionable, a statement must be false "at [the] time by the people who made them." *Ronconi*, 253 F.3d at 430.

**Statements 1, 2, 3, 5, 6, and 9** contend that the Company authenticates every item posted

to the online marketplace.  Plaintiffs argue these statements are false and misleading because:

- "the small group of authenticators employed by the company did not authenticate every item, or even most items;" and

- The copywriters who did authenticate the "vast majority of items . . . had little experience, received inadequate training in authentication of the thousands of products and brands accepted by the Company, and operated under a strict quota system that did not allow copywriters to spend sufficient time with each item in order to adequately authenticate it."

AC ¶¶ 194, 197, 199, 204, 206.

The Plaintiffs' allegations require a few inferential steps to discern the core message. Essentially, Plaintiffs allege that Defendants' imply there is a closed universe of authenticators within the Company: the "100 + in-house experts including gemologists, horologists and luxury brand authenticators."  *Id*. ¶ 203.  According to Plaintiffs, "copywriters . . . [are] not expert authenticators."  Opp. at 14.  Since copywriters allegedly completed the "vast majority" of the authentication, Plaintiffs argue the statements are misleading because most items were not authenticated by the "in-house experts" that the Company touts.  *Id*. at 2.  Therefore, the falsity of the statement hinges upon whether the copywriters constitute "experts" in authenticating luxury goods.

Defendants proffer the dictionary definition of "expert" as "a person with special skill or knowledge of a particular subject."  Mot. at 14; *see also* Expert, Merriam Webster Dictionary. Therefore, according to Defendants, an expert authenticator is simply someone "who possessed more information and understanding that the average person about the indicators of counterfeits." Mot. at 14.  This definition is too broad for the purposes of this case.  The dictionary alternatively defines expert as "one with the special skill or knowledge representing mastery of a particular subject."  *Expert*, Merriam Webster Dictionary.  Plaintiffs base their arguments on this definition, likening the Defendants arguments to stating a "brand new paralegal who watches a one-hour PowerPoint" as an expert since they possess more information on appellate brief writing than the

Case No.: 19-cv-07737-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION DISMISS

19

average person.  Opp. at 11.  Given the central importance of the authentication process to the

Company's business model and reputation in the market (*see, e.g.*, AC ¶ 200, Gustke stating "It is

literally everything to what we do."), it is reasonable to conclude that an average investor would

expect "expert authenticators" to mean more than "above average."  Therefore, the Court will

assess falsity according to whether copywriters possessed skills or knowledge representing

"mastery," of authentication.  In other words, in order to adequately allege falsity, Plaintiffs must

allege particular facts giving rise to an inference that the copywriters who were responsible for

authenticating the majority of items did not possess a mastery of the authentication process such

that they could be called experts.

Based on the allegations from confidential witnesses, coupled with corroborating news

coverage, Plaintiffs' allegations meet this burden.  Numerous FEs reported that copywriters came

from "backgrounds that have nothing to do with luxury products."  AC ¶ 120.  FEs 2, 4, and 8

stated their "initial training session was a 1-hour PowerPoint presentation."  *Id.* ¶ 128.  Between

this initial training and sparse follow-up trainings, copywriters were expected to absorb a

complicated authentication process that involved thousands of brands, each with their own

particularized quirks and trademarks.  *See id.* ¶ 125 (FE9 recalled authentication would entail

looking for "certain font on the label, a specific shade of red on the sole of the shoe . . . [and] lots

of measurements, counting of buttons, spacing of buttons").  Moreover, these witnesses allege that

the pressure to meet the Company's daily quotas prevented them from focusing on authenticating

items.  *See id.* ¶ 123 (copywriters expected to title, price, write description, authenticate, and post

within 3-4 minutes for each item); *id.* ¶ 124 ("Maybe the longest I spent was five minutes, but

that's if I had to do a three-piece suit.").

These accounts are largely corroborated by news reporting on the Company during the

class period following the IPO.  When the Fashionista and Capitol Forum articles were published

in the Fall of 2019, they reported on the inadequacy of the training experience, where Company

representatives even stated that they were "not training [copywriters] on everything, they have

Case No.: 19-cv-07737-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
DISMISS

1    guides they can refer to." *Id.* ¶¶ 94-96.  The Forbes article further stated that the "copywriters

2    have a small fraction of the training that the more expert people have." *Id.* ¶ 100.  Likewise,

3    CNBC allegedly confirmed the existence of the quota system via internal documents and

4    interviewed former employees who noted they did not receive adequate authentication training,

5    especially when acting in such a pressurized work environment. *Id.* ¶¶ 105-07.  Moreover, CNBC

6    reported on the sorting of items with "most pieces . . . being handled by the copywriters, and only

7    very, very high-value items . . . being authenticated by the actual lead authenticators." *Id.* ¶ 110.

8    The Company confirmed this sorting system in various conference calls throughout the class

9    period.  *See id.* ¶¶ 200, 211.

10         The Defense argues Statements 1, 2, 3, 5, 6, and 8 are not false because the Company

11   disclosed the fact that the authentication was imperfect.  Mot. at 12.  However, this confuses the

12   issue.  Plaintiffs do not argue that the company presented an infallible authentication process to

13   investors.  Instead, Plaintiffs argue the Company's representations implied the authentication

14   (even if imperfect) was undertaken by skilled, expert authenticators.  This point is underscored by

15   the language of many of the alleged misstatements.  For example, Statement 5 groups

16   "gemologists, horologists and luxury brand authenticators" in the same sentence.  AC ¶ 203.  As

17   Defendants recognize in their Registration Statement, certain of these practices require advanced

18   training, including specialized degrees.  *See* RJN, Exh. 1 at 69 ("In January 2018, [the Company]

19   entered into an agreement with the University of Arizona Foundation to endow a gemology degree

20   program in the Department of Geosciences.").  It is therefore reasonable for an investor to

21   conclude that the "luxury brand authenticators" and remaining in-house experts shared a similar

22   level of training and specialization as the gemologists and horologists the Company advertised.

23   Thus, the Court finds that Plaintiffs have sufficiently alleged that Statements 1, 2, 3, 5, 6, and 9 are

24   actionable misstatements.  Accordingly, this Court DENIES Defendants' motion to dismiss as to

25   these claims.

26         **Statement 7** refers to the consignment process, whereupon the Company eases the burden

27

28   Case No.: 19-cv-07737-EJD
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
     DISMISS

United States District Court
Northern District of California

on consignors by handling the items from intake to sale.  *See* AC ¶ 207.  In the statement, Wainwright briefly outlines the company's role of "authentication, copywriting, pricing, photography and pick, pack and ship."  *Id.*

Plaintiffs argue the statement is misleading because it implies "that the Company's authentication and copywriting functions were separate tasks assigned to separate groups of employees."  Opp. at 4.  Plaintiffs make similar claims elsewhere in the Amended Complaint, arguing the supposed separation of roles is belied by the "fact it was inexperienced and insufficiently trained copywriters who purportedly 'authenticated' the vast majority of items."  AC ¶ 87.  However, the statement makes no mention of specific roles or employees.  In fact, as Defendants note, the statement appears to be a generic list of tasks undertaken by the company, no matter if undertaken by "one, two or ten people."  Mot. at 15 n.8.  Given these vague assertions of separate functions, Plaintiffs have not plead particular facts showing why Statement 7 is actionable.

The Court GRANTS Defendants' motion to dismiss as to this statement.

**Statement 8** pertains to a statement made during the Company's third quarter earnings call, where Wainwright explains how certain "high risk" items are sent to authenticators and "other items" are authenticated by copywriters.  AC ¶ 211.  Plaintiffs contend the statement is misleading because Wainwright failed to disclose that most of the items were not sent to authenticators and the "vast majority" of items were authenticated by inexperienced copywriters. *Id.* ¶ 212.  Defendants, however, contend the falsity of this statement is "flatly contradicted" by disclosures in the Registration documents and the facts set out by the Plaintiffs.  Mot. at 12.

Indeed, there are numerous statements made by members of the Company's executive team and the Plaintiffs' own witnesses that defuse this argument.  In an earlier conference call, Gustke describes that "copywriters do a bunch of things . . . [i]n addition to authenticating."  AC ¶ 200.  Additionally, Gustke noted that experts review the "high-risk items personally."  *Id.*  The Plaintiffs' witnesses confirm this split authority in the authentication process.  For example, FE9

Case No.: 19-cv-07737-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION DISMISS

United States District Court
Northern District of California

described their authentication process and stated that they "don't always push things through [to authentication if there's a question]." *Id.* ¶ 136. Plaintiffs appear to attempt to shoehorn any statements regarding the authentication process as misleading, but they cannot have it both ways. Therefore, Plaintiffs have failed to show that Statement 8 is misleading. The Court GRANTS Defendants' motion to dismiss regarding this statement.

### ii. Scienter

In addition to satisfactorily alleging falsity, Plaintiffs in securities fraud actions must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To demonstrate scienter, the complaint "must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco*, 552 F.3d at 991. Courts determine if the complaint's allegations meet the "strong inference" of scienter by engaging in a "comparative evaluation," where they not only consider a plaintiff's proffered inferences, but also competing inferences drawn from the facts. *Tellabs*, 551 U.S. at 314. Ultimately, to satisfy the burden of a "strong inference" of scienter, the inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.*

The Ninth Circuit applies a two-part inquiry for scienter: first, the court must determine if "plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, we will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Zucco*, 552 F.3d at 99; *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014). "If a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference," then the court will deny the motion to dismiss. *Tellabs*, 551 U.S. at 324.

Plaintiffs rely on two primary allegations to support an inference that Company executives Wainwright and Gustke intentionally misled investors to believe that all items were authenticated

Case No.: 19-cv-07737-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
DISMISS

23

by trained experts.  First, Plaintiffs allege the importance of authentication in the Company's

business model makes it "unfathomable" that Wainwright and Gustke were not familiar with the

"true authentication process."  AC ¶ 222.  Second, Plaintiffs claim FE testimony supports a strong

inference of scienter.  Opp. at 20.

a.  Core Operations Theory

The core operations theory infers scienter based on the "principle that 'corporate officers

have knowledge of the critical core operation of their companies.'"  *Intuitive Surgical*, 759 F.3d at

1062 (citing *Reese v. Malone*, 747 F.3d 557, 568 (9th Cir.2014)).  The core operations theory

applies in three distinct scenarios:

> First, the allegations may be used in any form along with other
> allegations that, when read together, raise an inference of scienter that
> is cogent and compelling, thus strong in light of other explanations ...
> Second, such allegations may independently satisfy the PSLRA
> where they are particular and suggest that defendants had access to
> the disputed information ... Finally, such allegations may conceivably
> satisfy the PSLRA standard in a more bare form, without
> accompanying particularized allegations, in rare circumstances where
> the nature of the relevant fact is of such prominence that it would be
> absurd to suggest that management was without knowledge of the
> matter.

*South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008).

To succeed on a core operations theory, Plaintiffs "must produce either specific admissions

by one or more corporate executives of detailed involvement in the minutia of a company's

operations" or witness statements corroborating actual involvement in the alleged activity.

*Intuitive Surgical*, 759 F.3d at 1062; *see also In re Daou*, 411 F.3d at 1023 (allegations of

executives "manually adjusting" figures in violation of accounting procedures are probative of

scienter); *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir.

2004) (CEO stating "I love getting involved in every detail of the business" permits inference that

"detail oriented management style" led executives to become aware of improper accounting

practices).

Plaintiff argues that Wainwright and Gustke admit to understanding the Company's

Case No.: 19-cv-07737-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
DISMISS
24

authentication process.  *See* AC ¶ 200 (alleging that Gustke stated "here's how [the authentication process] actually works"); *id.* ¶ 211 (alleging that Wainwright stated "other items are authenticated by our copywriters").  Moreover, Plaintiffs claim Wainwright and Gustke recognized the importance of the authentication process as "central" to the Company's business model and brand.  *Id*.  Therefore, Plaintiffs argue, it would be "absurd" to infer that these executives did not know about the alleged flaws in the authentication process.  Opp. at 20.  The Court disagrees.

While Plaintiffs sufficiently allege that the authentication process is a core operation of the Company, they have failed to bridge the inferential gap connecting Wainwright and Gustke to its operation.  *See Intuitive Surgical*, 759 F.3d at 1062 (noting the defendant's knowledge of all core operations does not equate to scienter).  Specifically, Plaintiffs are missing "detailed and specific allegations about management's exposure to factual information" pertaining to authentication training, counterfeiting data, or any other metrics that suggest Wainwright and Gustke understood that not every item was expertly authenticated.  *See South Ferry*, 542 F.3d at 785 (noting past cases that successfully pled core operations theory "included details about the defendants' access to information within the company").

Nonetheless, Plaintiffs argue this case is one of the rare situations where facts indicating falsity "are prominent enough that it would be absurd to suggest that top management was unaware of them."  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008).  In *Berson*, the court inferred scienter since defendants' involvement in "day-to-day operations" would make it implausible that they would be unaware of stop work orders resulting in halt of "tens of millions of dollars."  *Id*. at 988; *cf. Webb v. Solarcity Corp.*, 884 F.3d 844, 855 (9th Cir. 2018) (holding core operations theory does not apply based on accounting formula error).  However, the case at hand is distinguishable in two key respects.  First, there are no allegations of Wainwright and Gustke's involvement in the day-to-day operations of the Company.  Second, the misstatements in *Berson* involved the loss of tens of millions of dollars and a government

Case No.: 19-cv-07737-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION DISMISS

25

investigation, whereas the alleged misstatements in this case involve internal processes and training of certain employees.  *Berson*, 527 F.3d at 989.  Here, Plaintiffs argue that Wainwright and Gustke had access to internal reports, known as "Faux and Tell" lists, which highlight counterfeit items that had been sold to customers.  AC ¶ 9.  Plaintiffs note these documents included hundreds of counterfeit items, including "130 counterfeit items identified in one quarter alone."  *Id*.  Assuming Wainwright and Gustke read these reports, the counterfeit items would only amount to a small percentage of total items sold by the Company.  *See* Mot. at 13 ("Even assuming each of the 498,000 orders [in Q1 2019] contained only one item . . . the allegedly counterfeit items sold . . . was at most 0.027% of items sold.").  Thus, knowledge of these reports would not suggest a fatal flaw in the Company's authentication process like *Berson*.

Moreover, the actionable misstatements do not involve Wainwright and Gustke claiming the authentication process is infallible.  Rather, the alleged misstatements involve management's claims that every item on the site is authenticated by trained experts.  Plaintiffs have not alleged any facts indicating that Wainwright and Gustke knew about the level of training and expertise of the copywriters purportedly authenticating the items.  *See South Ferry*, 542 F.3d ("Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard.").

Based on the foregoing, Plaintiffs allegations fail to raise a strong inference of scienter under the core operations theory.

### b.  Confidential Witnesses

Plaintiffs next assert that numerous FE witness allegations support their claim that Wainwright and Gustke knew that not every item on the website was expertly authenticated.  Opp. at 20.  As previously noted, Plaintiffs lack particularized facts tying Wainwright and Gustke to the authentication process.  Plaintiffs argue FE testimony bridges the gap to this "inescapable inference" based on a combination of sightings of Wainwright at Company facilities, internal

United States District Court
Northern District of California

1   documents, and a purported internal investigation conducted by the human resources department.

2   *Id*.

3           "To satisfy the PSLRA, a complaint relying on statements from confidential witnesses

4   must past two hurdles."  *Zucco*, 552 F.3d at 995.  "First, the confidential witnesses whose

5   statements are introduced to establish scienter must be described with sufficient particularity to

6   establish their reliability and personal knowledge."  *Id*. (citations and internal quotations omitted).

7   "Second, those statements which are reported by confidential witnesses with sufficient reliability

8   and personal knowledge must themselves be indicative of scienter." *Id*.  Conclusory allegations

9   are typically insufficient to establish scienter.  *In re Cadence Design Sys., Inc. Sec. Litig.*, 654 F.

10  Supp. 2d 1037, 1046 (N.D. Cal. 2009) ("conclusory allegations that a defendant must have known

11  about particular wrongdoing are, standing alone, generally insufficient.").  For the reasons stated

12  above, the first prong has been satisfied with respect to FEs 2, 4, 6, 7, 8, 9, 10, 11, and 13.  Under

13  the second step of the analysis, however, the various FE statements fail to establish a strong

14  inference of scienter.

15          Numerous FEs recalled seeing Wainwright visiting Company facilities.  *See* AC ¶¶ 224-25.

16  Based on these observations, Plaintiffs allege that Wainwright and other executives had to "know

17  how the process works."  *Id*. ¶ 237.  This conclusory assessment of scienter falls short of a strong

18  inference.  Moreover, Plaintiffs fail to allege any additional facts that Wainwright engaged with

19  the authentication process, inquired about training, or that these tours in any way exposed her to

20  the ground-level training or authentication process.  *See Fadia v. FireEye, Inc.*, No. 5:14-CV-

21  05204-EJD, 2016 WL 6679806, at *13 (N.D. Cal. Nov. 14, 2016) (holding that "participation in a

22  meeting is merely routine corporate activity—hardly indicative of scienter.").

23          Plaintiffs further argue FE's statements related to internal documents and data, along with

24  an internal investigation into the Company's work environment show scienter.  FE9 described

25  spreadsheets that tracked "copywriter's performance against their quota."  AC ¶ 234.  According

26  to FE9, the "RealReal [leadership]" had access to these spreadsheets.  *Id*.  However, FE9 only

27

28

United States District Court
Northern District of California

1   identifies two individuals with clear access to the spreadsheets: Rainee Walker, director of

2   copywriting department, and Michelle Jones-Jackson, director of merchandising.  *Id.*  Plaintiffs do

3   not allege any further connections between these individuals and Wainwright and Gustke other

4   than their status as upper-level employees.  Moreover, Wainwright's statement that "we don't

5   want customers to have such a long wait" is not specific enough to create an inference that she

6   knew about the spreadsheets or directed the implementation of quotas.  *Id.* ¶¶ 235-37.

7         Plaintiffs' allegations regarding the Company's internal investigation into "employees'

8   complaints about the quota system" suffer from similar flaws.  *Id.* ¶ 229.  According to FE6, this

9   internal investigation consisted of "one-on-one" meetings with the Company's senior compliance

10   manager.  *Id.*  However, there are no further allegations indicating that these meetings were part of

11   a formal internal investigation by the Company, or that any such investigation was completed,

12   reviewed by the executive team, or reported to the board.  Without more, it is difficult to infer that

13   a company would commit resources to an internal investigation, uncover wrongdoing, and

14   subsequently fail to disclose.  *See In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 407 (S.D.N.Y.

15   2016), *judgment entered*, No. 14 CIVIL 9624(PKC), 2016 WL 145867 (S.D.N.Y. Jan. 7, 2016)

16   ("To assume that [the board] was silently clutching the results of an investigation . . . directly

17   contradicts the rationale behind engaging in an internal investigation in the first place: the desire to

18   uncover any improper conduct").

19        **E.**    **Control Person Claim under Section 20(a)**

20         Congress established liability under § 20(a) for "[e]very person who, directly or indirectly,

21   controls any person liable" for violations of the securities laws.  15 U.S.C. § 78t(a).  To prevail on

22   its claim under Section 20(a) of the Exchange Act, Plaintiffs must demonstrate "a primary

23   violation of federal securities law" and that "the defendant exercised actual power or control over

24   the primary violator."  *Zucco*, 552 F.3d at 990.  Section 20(a) claims may be dismissed if plaintiff

25   "fails to adequately plead a primary violation of section 10(b)."  *Id.*

26         For the reasons discussed above, the Court finds that Plaintiffs failed to allege a viable

27

28   Case No.: 19-cv-07737-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
DISMISS

1    Section 10(b) or Rule 10b-5 claim.  The Court, therefore, finds that Plaintiffs have likewise failed

2    to adequately allege a claim under Section 20(a).  *Id.*

3    **V.    SECTION 11 AND 15 CLAIMS**

4         **A.    Legal Standard**

5         Section 11 of the Securities Act of 1933 creates a private right of action for any individual

6    who purchased a security if "any part of the registration statement, when such part became

7    effective, contained an untrue statement of a material fact or omitted to state a material fact

8    required to be stated therein or necessary to make the statements therein not misleading."  15

9    U.S.C. § 77k(a); *see also In re Daou*, 411 F.3d at 1027.

10        To allege a claim under Section 11, a plaintiff must prove "'(1) that the registration

11   statement contained an omission or misrepresentation, and (2) that the omission or

12   misrepresentation was material, that is, it would have misled a reasonable investor about the nature

13   of his or her investment.'"  *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009);

14   *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44, 131 S. Ct. 1309, 179 L.Ed.2d 398

15   (2011) (noting that fact is material when "a reasonable investor would [view] the nondisclosed

16   information as having significantly altered the total mix of information made available") (citation

17   and quotation marks omitted).  Section 11 creates a private cause of action in favor of securities

18   purchasers who rely upon a materially false or misleading prospectus.  *In re Worlds of Wonder*

19   *Sec. Litig.*, 35 F.3d 1407, 1412 (9th Cir. 1994) (citing 15 U.S.C. § 77k(a)).  "No scienter is

20   required for liability under § 11; defendants will be liable for innocent or negligent material

21   misstatements or omissions."  *In re Daou*, 411 F.3d at 1027.

22        For a misstatement to be actionable, the statement must be both false and material.  *See*

23   *Basic*, 485 U.S. at 238.  To survive a motion to dismiss, a complaint must "specify each statement

24   alleged to have been misleading, [and] the reason or reasons why the statement is misleading."

25   *Metzler* 540 F. 3d at 1070.  Statements are misleading only if they "affirmatively create an

26   impression of a state of affairs that differs in a material way from the one that actually exists."

27   Case No.: 19-cv-07737-EJD

28   ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
     DISMISS

United States District Court
Northern District of California

*Brody*, 280 F.3d at 1006.  Silence, absent a duty to disclose, "is not misleading under Rule 10b-5." *Basic*, 485 U.S. at 239 n.17, 108 S.Ct. 978; *see also City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (treating 10(b)(5) and Section 11 claims the same as to their applicability to "untrue statement[s] of fact").  "Often a statement will not mislead even if it is incomplete or does not include all relevant facts."  *Brody*, 280 F.3d at 1006.

Not all material adverse events must be disclosed to investors.  *See Rigel*, 697 F.3d at 880 n.8 (9th Cir. 2012) (discussing *Matrixx*, 563 U.S. at 38–45, 131 S.Ct. 1309).  Consequently, omissions are actionable only if a defendant has a duty to disclose information and fails to do so.  *Basic*, 485 U.S. at 239 n.17, 108 S.Ct. 978.  Hence, if the omission does not "make the actual statement[ ] misleading," a company need not supplement the statement "even if investors would consider the omitted information significant."  *Rigel*, 697 F.3d at 880 n.8.

Finally, an actionable statement must also "be capable of objective verification."  *Retail Wholesale*, 845 F.3d at 1275. For example, business puffery or opinion (vague, optimistic statements) are not actionable because they do not "induce the reliance of a reasonable investor." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).

### B.   Alleged Misstatements and Omissions

Plaintiffs allege eleven statements contained in the Company's Registration Statement violate Section 11 of the Securities Act.

#### *Statements Concerning Authentication Process*

#### Statement 1

"Our highly trained experts build trust in our buyer base by thoroughly inspecting the quality and condition of, and authenticating, every item we receive. This trust drives repeat purchases from our buyer base and instills confidence in first-time buyers to purchase pre-owned luxury goods." AC ¶ 71.

Case No.: 19-cv-07737-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
DISMISS

**Statement 2**

"We do the work on behalf of consignors. Once consigned items reach one of our four merchandising and fulfillment facilities, we authenticate, write the associated copy, photograph, price, sell and handle all fulfillment and returns logistics, making the process seamless for the consignor."

AC ¶ 75.

**Statement 3**

"We build trust by expertly authenticating every item. We employ more than 100 gemologists, horologists, brand experts and art curators. Our authenticators are highly trained, experienced experts in their respective fields. Each item we receive is put through a rigorous, multi-point authentication process before it is curated onto our online marketplace. As a result, we believe we have become the most trusted online marketplace for pre-owned luxury goods."

AC ¶ 77.

**Statement 4**

"Trust is the cornerstone of our online marketplace. Consignors trust that we will treat their items with the utmost care and quickly sell them at the optimal price. Buyers trust us because we have a rigorous authentication process. We believe the trust and personal relationships that we have built with both consignors and buyers over the past eight years cannot be easily replicated."

AC ¶ 79.

**Statement 5**

"We authenticate every item we sell."

AC ¶ 82.

**Statement 6**

"We authenticate every item we sell to continue building trust in our online marketplace. We employ over 100 highly trained gemologists, horologists, brand experts and art curators who collectively inspect thousands of items each day. All items pass through a rigorous multi-point,

Case No.: 19-cv-07737-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION DISMISS

31

1   brand-specific authentication process before they are accepted for consignment.

2   AC ¶ 84.

3   **Statement 7**

4   "[o]nce we receive consigned items, our merchandising team leverages our technology platform

5   and data analytics capabilities for a first point of authentication and to efficiently write copy,

6   photograph and price the items before they are curated onto our online marketplace."



13   AC ¶ 86.

14   **Statement 8**

15   "As an online marketplace for pre-owned luxury goods, our success depends on the accuracy of

16   our authentication process. Failure by us to identify counterfeit goods could adversely affect our

17   reputation and expose us to liability for the sale of counterfeit goods.

18   Our success depends on our ability to accurately and cost-effectively determine whether an item

19   offered for consignment is an authentic product, a genuine gemstone or piece of jewelry or a

20   validated work of art. From time to time we receive counterfeit goods for consignment. While we

21   have invested heavily in our authentication processes and we reject any goods we believe to be

22   counterfeit, we cannot be certain that we will identify every counterfeit item that is consigned to

23   us. As the sophistication of counterfeiters increases, it may be increasingly difficult to identify

24   counterfeit products. We refund the cost of a product to a buyer if the buyer questions its

25   authenticity and returns the item. The sale of any counterfeit goods may damage our reputation as

26   a trusted online marketplace for authenticated, pre-owned luxury goods which may impact our

27

28   Case No.: 19-cv-07737-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
DISMISS

United States District Court
Northern District of California

ability to attract and maintain repeat consignors and buyers. Additionally, we may be subject to allegations that a pre-owned luxury item we sold is not authentic despite our confirmed authentication of such item. Such controversy could negatively impact our reputation and brand and harm our business and operating results.

AC ¶ 88.

***Statements Concerning Operational Metrics***

**Statement 9**

Key Financial and Operating Metrics The key operating and financial metrics that we use to assess the performance of our business are set forth below for 2017, 2018 and the three months ended March 31, 2018 and 2019.

| | Year Ended December 31, | | | Three Months Ended March 31, | |
| --- | --- | --- | --- | --- | --- |
| | 2017 | 2018 | | 2018 | 2019 |
| | | (In thousands, except AOV and percentages) | | | |
| GMV | $    492,205 | $    710,750 | $    158,378 | $    224,116 |
| NMV | $    349,229 | $    506,589 | $    113,347 | $    160,538 |
| Number of orders | 1,123 | 1,595 | 356 | 498 |
| Take rate | 33.7% | 35.5% | 35.1% | 35.3% |
| Active buyers | 291 | 416 | 326 | 456 |
| AOV | $    438 | $    446 | $    445 | $    450 |
| Adjusted EBITDA | $    (44,297) | $    (58,856) | $    (11,342) | $    (18,478) |

AC ¶ 148.

**Statement 10**

"Our quarterly revenue increased sequentially for all periods presented primarily due to increases in our GMV."

AC ¶ 150.

**Statement 11**

We generate revenue from orders processed through our website, mobile app and three retail stores located in New York and Los Angeles. Our revenue is primarily based on our take rates from these transactions. **Our growth and success are evidenced by our operating and financial results in 2018**:

Case No.: 19-cv-07737-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION DISMISS

- We processed 1.6 million orders, up 42% over 2017.
- **Our average order value was $446, up 2% over 2017**.
- Our GMV was $710.8 million, up 44% over 2017.
- Our NMV was $506.6 million, up 45% over 2017.
- Our total revenue was $207.4 million, up 55% over 2017.
- Our gross profit was $136.9 million, up 56% over 2017.

AC ¶ 152.

**Statement 12**

**National retailers and brands set their own retail prices and promotional discounts on new luxury goods, which could adversely affect our value proposition to consumers.**

National retailers and brands set pricing for new luxury goods. Promotional pricing by these parties **may** adversely affect the value of products consigned with us and our inventory, and, in turn, our gross merchandise value ("GMV") and operating results. In order to attract buyers to our online marketplace, the prices for the pre-owned luxury goods sold through our online marketplace **may** need to be lowered in order to compete with these pricing strategies, which could negatively affect gross merchandise value and in turn, our revenue. We have experienced a reduction in our GMV **in the past** due to fluctuations in the price of new luxury goods sold by retailers and brands, and we anticipate similar reductions and fluctuations **in the future**. Any of the foregoing risks could adversely affect our business, financial condition and operating results. AC ¶ 159.

### C.   Discussion

As an initial matter, the Court must determine whether the heightened pleading standard under Rule 9(b) applies to Plaintiffs' Section 11 claims.  Defendants argue this heightened pleading standard applies to Plaintiffs' Section 11 claims "because their Securities Act and Exchange Act claims are premised on the same alleged misconduct."  Mot. at 8.  Plaintiffs, however, counter that the claims are distinct because the "Section 11 claims are based on only

United States District Court
Northern District of California

those statements contained in the Prospectus . . . whereas the Section 10(b) claims allege additional post-IPO false statements."  Opp. at 10.  Further, Plaintiffs argue the Section 11 claims are not centered on knowledge or fraudulent concealment.  *Id.*

On its face, Section 11 does not require plaintiffs to meet the heightened pleading standard set forth in Rule 9(b) because fraud is not an essential element of the claim.  *In re Daou*, 411 F.3d at 1027.  Nonetheless, Plaintiffs may still be required to meet this heightened standard "if [the] complaint 'sounds in fraud.'"  *Id.* (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003)).  To determine if a complaint "sounds in fraud," courts can assess whether the plaintiff "allege[d] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim."  *Vess*, 317 F.3d at 1103.  Moreover, when a "complaint employs the exact factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act, we can assume that it sounds in fraud."  *Rubke*, 551 F.3d at 1161.

Here, Plaintiffs' claims under Sections 11 and 10(b) are so "substantively similar" that the Court finds the Section 11 claims to require analysis under the heightened pleading standard of Rule 9(b).  *See In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1068 (N.D. Cal. 2010).  The crux of the entire Amended Complaint is that Defendants knew the authentication process was flawed yet concealed or obfuscated this information from investors.  The only difference between the claims is that Plaintiffs expressly disavow any claims of fraud in their Section 11 allegations.  *See* AC ¶¶ 169, 170.  However, Plaintiffs cannot avoid the strictures of the Rule 9(b) requirement by conveniently "scissor[ing] out a non-fraud claim from the center of that unified course of conduct."  *In re Metricom Sec. Litig.*, No. C 01-4085 PJH, 2004 WL 966291, at *24 (N.D. Cal. Apr. 29, 2004), *aff'd sub nom. Young v. Dreisbach*, 182 F. App'x 714 (9th Cir. 2006).  Accordingly, Plaintiffs must prove the elements of Section 11, with particularity, pursuant to Rule 9(b).

The Court now turns to the core contentions of Plaintiffs' Section 11 claim—the alleged

Case No.: 19-cv-07737-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION DISMISS

35

misstatements and omissions contained in the Company's Registration documents.  These misstatements and omissions can be classified into three categories: (i) statements concerning the Company's authentication process, (ii) statements concerning risk factors, and (iii) statements concerning the reporting of certain financial metrics.

### i.  Statements Concerning Authentication Process

**Statement 1, 3, 4, 5, and 6** are the same as the corresponding Statements asserted by Plaintiffs in the Section 10(b) context.  As above, Plaintiffs allege a group of inadequately trained and overworked copywriters did the majority of the authenticating.  *See* AC ¶ 72.  The Court found above that Plaintiffs' allegations as to these statements met the particularity requirement for pleading falsity under Rule 10b-5.  For the same reasons, the Court finds that Plaintiffs sufficiently alleged that these statements are material and misleading to a reasonable consumer in the Section 11 context.

**Statements 2 and 7**.  Like Statement 7 discussed above, these statements pertain to the specific tasks involved in the Company's authentication process.  *See id*. ¶¶ 75, 86.  As in the previous authentication statements, Plaintiffs allege these statements are false and misleading because they gave the "impression that authenticating and copywriting were separate responsibilities." *Id*. ¶ 76.  In accordance with the Court's analysis above, the Court finds that Plaintiffs failed to meet the particularity requirement for these statements.

Therefore, the Court DENIES Defendants' motion to dismiss Plaintiffs' claims to the extent they are based on Statements 1, 3, 4, 5, and 6 and GRANTS Defendants' motion to dismiss claims based on Statements 2 and 7.

### ii.  Statements Concerning Company Risk Factors

Plaintiffs argue that two statements regarding risk factors in the Prospectus are misleading because the Company omitted material information.  As noted above, to claim an actionable omission the Plaintiff "must specify the reason or reasons why the statements made by [the defendant] were misleading or untrue, not simply why the statements were incomplete." *Rubke*,

Case No.: 19-cv-07737-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION DISMISS

United States District Court
Northern District of California

551 F.3d at 1162 (citing *Brody*, 280 F.3d at 1006).  Furthermore, the Ninth Circuit has carved out a niche for risk warnings that are "actionable as material omissions when the warning speaks to 'entirely . . . as-yet-unrealized risks and contingencies'" and neglects to alert potential investors to the fact that the "risks may already have come to fruition."  *Lomingkit v. Apollo Educ. Grp. Inc.*, 275 F. Supp. 3d 1139, 1161 (D. Ariz. 2017) (citing *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008)).

**Statement 8**.  This statement addresses the critical necessity of an accurate authentication process and the threat to the Company's reputation posed by the sale of counterfeit goods.  Plaintiffs assert the statement is misleading because the Company failed to disclose: (1) the maintenance of internal documents regarding returned counterfeit orders; (2) the fact that the risk was not a potential risk, rather it was "current and existing;" and (3) the sale of counterfeit goods was not due to increased sophistication of counterfeiters, but rather the "inadequate" authentication process.  AC ¶ 89.  These arguments are uncompelling.

Turning to Plaintiffs' first argument, although the information contained in the Company's internal "Faux and Tell" documents would undoubtedly be interesting to investors, this is not the standard.  Instead, Plaintiffs must show that the omission of information about these internal documents makes the statement misleading.  *See Rigel*, 697 F.3d at 880 n.8.  The statement discloses the fact that the authentication process is critical to the Company's success and that the Company's failure to accurately identify counterfeits may harm the Company's reputation, brand, and business.  The existence of internal records documenting instances where counterfeit items have been falsely authenticated does not render the statement misleading.  In fact, quite the opposite.  Plaintiffs' argument runs headlong into the fact that this purported omission "is contradicted by the face of the disclosures."  Mot. at 12.  Indeed, the language of the statement provided in the Amended Complaint states that "from time to time [the Company] receive[s] counterfeit goods . . . we cannot be certain that we will identify every counterfeit item."  AC ¶ 88.  Thus, this affirmative disclosure undermines the suggestion that investors would be misled

1   regarding the presence of counterfeit orders without the "Faux and Tell" documents.

2          Plaintiffs next argue the statement does not expressly disclose the ongoing risk, instead

3   "couching the risk as hypothetical." Opp. at 14.  However, the statement includes present-tense

4   language from which a reasonable investor would conclude that the risk is ongoing. *See, e.g.*,

5   "We refund the cost of a product to a buyer if the buyer questions its authenticity and returns the

6   item.".  As Defendants correctly argue, the Plaintiffs cannot "cite an incomplete excerpt . . . and

7   contend that the entire risk factor is misleading." Reply at 6.  As in instructed in *Berson*, the

8   language of the statement in toto *does* suggest "some of these risks may already have come to

9   fruition." *Berson*, 527 F.3d at 986.  Therefore, this argument fails to meet the threshold of an

10  actionable omission since potential investors would have been wary of the risk of counterfeit

11  goods after reading the passage in its entirety.

12         The third argument also fails on a variety of grounds.  For one, the conclusory language

13  does not meet the specificity demanded under Rule 9(b).  Moreover, the statement does not assert

14  that increased sophistication of counterfeiters is the only reason for selling counterfeit goods.

15  Rather, it is listed as a potential risk associated with ongoing authentication procedures.

16         Taken together, the Court holds that Statement 8 is a nonactionable omission.  Accordingly,

17  this Court GRANTS Defendants' motion to dismiss as to this claim.

18         **Statement 12.**  Likewise, this statement pertains to the potential impact of promotional

19  pricing of new luxury goods on the Company's business model.  Plaintiffs argue the statement is

20  misleading because the Company's AOV metric for Q2'19 "had decreased year-over-year" due to

21  this promotional pricing.  AC ¶ 160.  Furthermore, as with the previous statement, Plaintiffs aver

22  the Company described these as "potential risks," not ones currently affecting the business. *Id*.

23  Again, this argument falters when considered in its broader context.

24         As discussed in more detail below, the Company finalized its Registration Statement three

25  days before the close of Q2'19.  Mot. at 5.  As such, Defendants argue that at the time of the IPO

26  the Q2 AOV results were not finalized. *Id*. at 6.  Plaintiffs allege "Defendants received regular

27

28  Case No.: 19-cv-07737-EJD
    ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
    DISMISS

1    internal reports and data that would have showed AOV would be down." Opp. at 18. Therefore,

2    according to Plaintiffs, the Company should have disclosed the Q2 AOV metrics prior to the IPO,

3    instead of disclosing these financial results in August after the second quarter ended. *See id.*

4    ("When the Company announced its financial results . . . Gustke attributed [decrease in AOV] to

5    promotional pricing"). However, given the fact the second quarter had not closed prior to the

6    Company's IPO, the "alleged nondisclosures are, in substance, failures to make a forecast of

7    future events." *In re VeriFone Sec. Litig.*, 11 F.3d 865, 869 (9th Cir. 1993). Even if the Company

8    had more detailed Q2 projections, which Plaintiffs do not allege beyond mere conclusory

9    statements, the Company is "not obliged to disclose these internal projections." *In re Convergent*

10   *Techs. Sec. Litig.*, 948 F.2d 507, 516 (9th Cir. 1991), *as amended on denial of reh'g* (Dec. 6,

11   1991). This accords with the policy that "securities laws do not require management 'to bury the

12   shareholders . . . a result that is hardly conducive to informed decisionmaking." *Id.* (citing *TSC*

13   *Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757

14   (1976)).

15         Plaintiffs' argument is further weakened by the fact Defendants did disclose that the

16   Company "experienced a reduction in our GMV in the past due to fluctuations . . . and we

17   anticipate similar reductions and fluctuations in the future." Mot. at 10. In support of their claim,

18   Plaintiffs rely on an out-of-district case, where the defendants failed to disclose known

19   construction delays that would have a material impact prior to the IPO. *In re Blue Apron*

20   *Holdings, Inc. Sec. Litig.*, No. 17-CV-4846 (WFK), 2020 WL 1950783, at *8 (E.D.N.Y. Apr. 22,

21   2020). This case differs in one critical respect: unlike *Blue Apron*, the Defendants in this case did

22   not entirely fail to disclose the risk of luxury promotional pricing. Therefore, investors can be

23   assumed to have been adequately apprised of the risks based on Defendants' affirmative

24   disclosures.

25         Accordingly, the Court GRANTS Defendants' motion to dismiss as to this claim.

26

27

28

Case No.: 19-cv-07737-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
DISMISS

United States District Court
Northern District of California

### iii.    Statements Concerning Operational Metrics

**Statement 9, 10, and 11**.  Each of these statements are allegedly misleading because they fail to disclose that AOV for Q2'19 had decreased year-over-year.  For the reasons stated with respect to Statement 12 above, the Court finds that these statements are not misleading in light of Defendants' affirmative disclosures.

The Court GRANTS Defendants' motion to dismiss on these claims.

### D.    Section 15 Claim

Section 15 establishes "control person" liability for violations of Section 11.  *See* 15 U.S.C. § 77o.  To establish a claim under Section 15, Plaintiffs must plead a predicate violation of Section 11.  *In re Bare Escentuals*, 745 F. Supp. 2d at 1081.  Here, Plaintiffs have successfully pled a claim under Section 11, as discussed above.  Thus, the Court finds they have likewise stated a claim for a violation of Section 15.  *Primo v. Pac Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1130–31 (N.D. Cal. 2013) (holding "there must be an underlying primary violation of the [Securities Act] before so-called 'control person' liability can be found").

## VI.    ITEM 303 CLAIM

Item 303 requires the Offering Materials to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. §§ 229.303(a)(3)(ii).  A "disclosure duty exists where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operation."  *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998).  The Ninth Circuit has held that because Section 11 imposes liability if a registrant "omits to state a material fact required to be stated" in the registration statement, "any omission of facts 'required to be stated' under Item 303 will produce liability under Section 11."  *In re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *15 (N.D. Cal. Oct. 31, 2014) (quoting *Steckman*, 143 F.3d at 1296).

Plaintiffs argue Defendants failed to disclose two trends: the trend of decreasing AOV for

1   Q2 2019 and that the Company had been selling hundreds of counterfeit items through its

2   authentication process.

3   **A.    AOV**

4        Plaintiffs argue the Company's should have disclosed that AOV in Q2 2019 decreased

5   year-over-year from its position in Q2 2018.  AC ¶ 151.  Specifically, AOV in Q2 2018 decreased

6   from $453.32 to $452.61.  *Id*. ¶ 156.  According to Plaintiffs, this decrease in AOV was

7   attributable to "promotional pricing in the luxury goods market and corresponding price cuts by

8   the Company." *Id.* ¶ 155.  Moreover, when this figure was disclosed in its Q2 2019 financial

9   results in August, the Company's stock price "fell 16%" by end of trading the following day.  *Id.* ¶

10  156.

11       When assessed closely, however, the Court finds no discernable trend.  In the Amended

12  Complaint, Plaintiffs allege that the decreasing trend "had been occurring since the first quarter of

13  2019." *Id.* ¶ 155.  As Defendants correctly note, a trend "necessarily requires more than a single

14  event or occurrence.  *See In re Restoration*, 417 F. Supp. 3d at 1263 ("only one instance of

15  warehousing" is an isolated event, not a trend).  As it applies to this case, Q1 AOV year-over-year

16  increased between 2018 and 2019.  Mot. at 9.  Following these gains, the Company AOV

17  decreased year-over-year during Q2 between 2018 and 2019.  *Id.*  However, AOV recovered by

18  increasing year-over-year in the third quarter.  *Id.*  Thus, the singular decrease noted by the

19  Plaintiffs appears to be singular occurrence, rather than a trend requiring disclosure under Item

20  303.

21       Recognizing this discrepancy, Plaintiffs attempt to change tack by asserting the trend was

22  depressed pricing and the "AOV decrease was the result of the trend."  Opp. at 18.  However,

23  under Item 303, Plaintiffs are required to allege that Defendants knew about the trend toward

24  depressed pricing in the broader luxury goods market.  *See In re Restoration*, 417 F. Supp. 3d at

25  1264.  To support this theory, Plaintiffs claim Defendants "received internal reports and data that

26  would have showed AOV would be down for the quarter . . . due to the ongoing adverse pricing

27

28  Case No.: 19-cv-07737-EJD
    ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
    DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

trend." *Id*.  Aside from this conclusory allegation, Plaintiffs failed to allege any facts indicating that Defendants knew of the alleged trend toward depressed pricing.  Therefore, the Court finds that Plaintiffs have not sufficiently alleged a duty to disclose any trend related to the Company's decreasing AOV.

### B.    Authentication

Finally, Plaintiffs allege that Defendants failed to disclose the Company's sale of "hundreds of counterfeit items" that made it through the authentication process.  AC ¶ 91. However, Defendants did disclose the risk of selling counterfeit items on the website in its Registration Documents.  Specifically, Defendants noted that "from time to time [the Company] receive[s] counterfeit goods for consignment . . . the sale of any counterfeit goods may damage our reputation."  RJN, Exh.1 at 16.  The Court finds that this risk disclosure adequately addresses the sale of counterfeit items on the website.  *See In re Eventbrite*, 2020 WL 2042078 at *16. Thus, Plaintiffs have not pled sufficient facts to show an Item 303 violation pertaining to authentication.

In sum, the Court GRANTS Defendants' motion to dismiss as to both Item 303 claims.

## VII.    CONCLUSION

Based on the foregoing, the Defendants' motion to dismiss Plaintiffs' Amended Complaint is GRANTED in part and DENIED in part.  The Court DENIES Defendants' motion to dismiss in regard to Plaintiffs' claims under Section 11 and 15 of the Securities Act.  However, the Court GRANTS Defendants' motion to dismiss in regard to Plaintiffs' claims under Section 10(b) and 20(a) of the Securities Exchange Act.

When dismissing a complaint for failure to state a claim (either in full or in part), a court should grant leave to amend "unless it determines that the pleading could not possibly be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  Although the Court has determined that Plaintiffs fail to state a claim, it is possible to cure their allegations by alleging more particular facts to support their scienter theory. Should Plaintiffs choose to file an

Case No.: 19-cv-07737-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
DISMISS

1  amended complaint, they must do so by April 30, 2021.  Failure to do so, or failure to cure the

2  deficiencies addressed in this Order, will result in dismissal of Plaintiffs' claims with prejudice.

3  Plaintiffs may not add new claims or parties without leave of the Court or stipulation by the parties

4  pursuant to Federal Rule of Civil Procedure 15.

5      **IT IS SO ORDERED.**

6  Dated: March 31, 2021

7  _____

8  EDWARD J. DAVILA
   United States District Judge

United States District Court
Northern District of California

Case No.: 19-cv-07737-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
DISMISS

43