Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL SANDERS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>      Plaintiff,<br><br>      v.<br><br>THE REALREAL, INC., JULIE WAINWRIGHT, MATT GUSTKE, STEVE LO, CHIP BAIRD, MAHA IBRAHIM, ROB KROLIK, MICHAEL KUMIN, STEFAN LARSSON, NIKI LEONDAKIS, JAMES MILLER, CREDIT SUISSE SECURITIES (USA) LLC, BOFA SECURITIES, INC., UBS SECURITIES LLC, KEYBANC CAPITAL MARKETS INC., STIFEL, NICOLAUS & COMPANY, COWEN AND COMPANY, LLC, and RAYMOND JAMES & ASSOCIATES, INC.,<br><br>      Defendants. | Case No: 5:19-cv-07737-EJD<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Table of Contents

NATURE OF THE ACTION ................................................................................ 4

JURISDICTION AND VENUE ......................................................................... 6

PARTIES ........................................................................................................... 7

CONFIDENTIAL WITNESSES ..................................................................... 11

COMPANY BACKGROUND ......................................................................... 14

THE COMPANY'S REGISTRATION STATEMENT CONTAINED FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ABOUT THE COMPANY'S AUTHENTICATION PROCESS ......................................................................... 15

THE TRUTH ABOUT REALREAL'S AUTHENTICATION PROCESS ...................... 19

    Media Reports Reveal How the Company's Authentication Process Really Works ................... 19

    RealReal's Former Employees Corroborate the Media Investigations ......................... 24

    Regarding the Truth About the Company's Authentication Process ........................... 24

CLASS ACTION ALLEGATIONS ................................................................ 33

SECURITIES ACT CLAIMS ......................................................................... 35

    COUNT I       Violations of Section 11 of the Securities Act ........................ 35

    COUNT II      Violations of Section 15 of The Securities Act .................... 37

EXCHANGE ACT ALLEGATIONS .............................................................. 38

    Additional False and Misleading Statements About the Company's Authentication Process ...... 38

    The Authentication Statements Were Made with Scienter ........................... 42

    The Truth Slowly Leaks Out and Concealed Risks Materialize Through Partial Corrective Disclosures, Damaging Plaintiffs and the Class ............................................... 50

PRESUMPTION OF RELIANCE AND FRAUD-ON-THE-MARKET ALLEGATIONS ............. 52

Second Amended Class Action Complaint for Violations of the Federal Securities Laws

EXCHANGE ACT CLAIMS ........................................................................................... 54

    COUNT III     Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated

    Thereunder.......................................................................................................................... 54

    COUNT IV     Violations of Section 20(a) of the Exchange Act .................................... 56

PRAYER FOR RELIEF ................................................................................................. 57

JURY TRIAL DEMANDED ........................................................................................... 57

Second Amended Class Action Complaint for Violations of the Federal Securities Laws

Lead Plaintiff Michael Sanders and named plaintiffs Nubia Lorelle and Garth Wakeford ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, allege in this amended complaint the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, inter alia: review and analysis of relevant filings made by The RealReal, Inc. ("RealReal" or "Company") with the United States Securities and Exchange Commission ("SEC"); review and analysis of Defendants' public statements, public documents, and wire and press releases about the Company; media and analyst reports and advisories about the Company; interviews with confidential witnesses; information from related court filings; and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants (defined below) or are exclusively within their control.[1]

## **NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of all persons and entities who purchased RealReal common stock from June 27, 2019 through November 20, 2019, both dates inclusive ("Class," and the period from June 27, 2019 through November 20, 2019 is the "Class Period").[2] Plaintiffs bring the following claims on behalf of the Class: (1) claims pursuant to Sections 11 and 15 of the Securities Act of 1933 ("Securities Act") for all persons and entities who purchased RealReal common stock pursuant or traceable to the Company's Registration Statement (defined below) issued in connection with the Company's June 27, 2019 initial public offering ("IPO"); and (2) claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") for all persons and entities who purchased RealReal common stock during the Class Period at

---

[1] Pursuant to the Court's Standing Order for Civil Cases, Section III, attached hereto as Exhibit A is a red-line document showing the changes made to the previously filed complaint (Dkt. No. 31).

[2] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of the Company at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

Second Amended Class Action Complaint for Violations of the Federal Securities Laws

artificially inflated prices and were damaged when the artificial inflation dissipated upon a series of corrective disclosures.

2.     RealReal describes itself as the world's largest online marketplace for authenticated, consigned luxury goods. RealReal held its IPO on June 27, 2019, selling 17.25 million shares at $20 per share for approximately $345 million in gross offering proceeds. The IPO was issued in connection with a Registration Statement filed by the Company with the SEC, and a Prospectus that was incorporated into the Registration Statement.

3.     According to the Prospectus, RealReal takes in used luxury goods from various consignors, processes those items at its facilities, then sells the items on the RealReal's website for varying commission fees. The Company handles items from a broad range of over 7,000 luxury and premium designers. Instead of self-listing or brick-and-mortar shops, RealReal purports to "authenticate, write the associated copy, photograph, price, sell and handle all fulfillment and returns logistics" for the items it receives from consignors.

4.     The key to the Company's value proposition is its purported authentication process. Replete throughout the Prospectus, the Company's website, and its officers' public comments are comments boasting that, "[o]ur highly trained experts build trust in our buyer base by thoroughly inspecting the quality and condition of, and authenticating, every item we receive."

5.     In truth, the Company's authentication process fell far short of its description. Only a small proportion of the thousands of items processed by the Company each day actually go to its small group of expert authenticators – specifically only certain brands and items deemed to face a particularly high risk of counterfeiting.

6.     The vast majority of items supposedly "authenticated" by the Company were actually reviewed only by the Company's copywriters. These copywriters were low-wage hourly employees, often with little or no experience in fashion or luxury products. They received at best 1-3 hours of training on the immense number of products and brands they were expected to authenticate, and much of this training was focused on how to process the items for sale on the Company's website as fast as possible.

Second Amended Class Action Complaint for Violations of the Federal Securities Laws

7.      In addition to their striking lack of experience or training, copywriters were also held to onerous quotas of a certain number of items they were required to process per day. These quotas were strictly enforced, and employees faced potential termination if they did not consistently meet or exceed their quotas.

8.      As a result of these quotas, which former RealReal copywriters reported as ranging from 120 up to as much as 300 items per day, copywriters could only devote approximately 2-4 minutes to any given item. Within those 2-4 minutes, they were responsible for not only authenticating the item, but also measuring it, entering various information and datapoints into the Company's complex spreadsheets, and writing descriptions of the items (or in other words, copywriting) for listing on the Company's website.

9.      As the inevitable result of this highly-pressurized "authentication" process, hundreds of counterfeit items were processed and sold to RealReal customers. The Company even circulated an internal "Faux and Tell" document highlighting counterfeit items that had been sold to customers. Examples of these documents are attached herein, and include over 130 counterfeit items identified in one quarter alone.

10.     In the months following the IPO, the truth about RealReal's authentication process began to leak out. A series of media articles, culminating in an extensive investigative report conducted and published by CNBC, revealed that these untrained, inexperienced, and overworked copywriters were performing the bulk of the "authentication" efforts at the Company.

11.     As a result, RealReal's stock price has declined significantly since the IPO, damaging investors.

**JURISDICTION AND VENUE**

12.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14. This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) because the alleged false and misleading public filings and statements were made in or issued from this District and the Company's headquarters are located in this District.

16. In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, the Internet, and the facilities of the national securities markets.

## **PARTIES**

17. Lead Plaintiff Michael Sanders, as set forth in his certification on file with the Court (Dkt. No. 1-1) and incorporated by reference herein, purchased shares of RealReal common stock pursuant and/or traceable to the Company's Registration Statement during the Class Period and was damaged thereby.

18. Named Plaintiff Nubia Lorelle, as set forth in her PSLRA certification on file with the Court (Dkt. No. 31-1) and incorporated by reference herein, purchased shares of RealReal common stock traceable to the Company's Registration Statement during the Class Period and was damaged thereby.

19. Named Plaintiff Garth Wakeford, as set forth in his PSLRA certification on file with the Court (Dkt. No. 31-2) and incorporated by reference herein, purchased shares of RealReal common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the corrective disclosures alleged herein.

20.     Defendant RealReal purports to operate as an online marketplace for consigned luxury goods. The Company is a Delaware corporation with principal executive offices located at 55 Francisco Street, Suite 600, San Francisco, CA 94133. The Company maintains four merchandising and fulfillment facilities where items are received from consignors and processed for listing on the Company's website. Two of the main processing facilities are located in Secaucus, New Jersey, and in Brisbane, California. RealReal's common stock trades on NASDAQ under the ticker symbol "REAL."

21.     Defendant Julie Wainwright founded the Company and served as its President, CEO, and Chairperson of the Board of Directors from 2011 through the time of the IPO, and at all relevant times during the Class Period. Wainwright reviewed and signed the Registration Statement.

22.     Defendant Matt Gustke served as the Company's CFO since at least April 2013, at the time of the IPO, and at all relevant times during the Class Period. Gustke reviewed and signed the Registration Statement.

23.     Wainwright and Gustke are collectively referred to hereinafter as the "Officer Defendants."

24.     The Officer Defendants, as directors, executive officers, and major shareholders of the Company, solicited and sold RealReal common stock in the IPO for the benefit of themselves and the Company. Both Wainwright and Gustke were among the RealReal personnel designated by the Company to serve in the IPO working group. As executives in the Company's IPO working group, Wainwright and Gustke each reviewed, approved, and helped draft the Registration Statement, and the IPO road show presentation, talking points, and script, for the purpose of selling RealReal common stock in the IPO or soliciting such sales. Both Wainwright and Gustke received substantial additional financial compensation tied to the successful completion of the IPO.

25.     Defendant Steve Lo ("Lo") served as the Company's Vice President and Corporate Controller, the Company's principal accounting officer, since at least May 2019, at the time of the IPO and at all relevant times during the Class Period. Lo reviewed and signed the Registration Statement.

26.     Defendant Chip Baird ("Baird") served as a director of RealReal at the time of the IPO and at all relevant times during the Class Period. Baird reviewed the Registration Statement and authorized the signing of the Registration Statement by Wainwright as Baird's attorney-in-fact.

27.     Defendant Maha Ibrahim ("Ibrahim") served as a director of RealReal at the time of the IPO and at all relevant times during the Class Period. Ibrahim reviewed the Registration Statement and authorized the signing of the Registration Statement by Wainwright as Ibrahim's attorney-in-fact.

28.      Defendant Rob Krolik ("Krolik") served as a director of RealReal at the time of the IPO and at all relevant times during the Class Period. Krolik reviewed the Registration Statement and authorized the signing of the Registration Statement by Wainwright as Krolik's attorney-in-fact.

29.     Defendant Michael Kumin ("Kumin") served as a director of RealReal at the time of the IPO and at all relevant times during the Class Period. Kumin reviewed the Registration Statement and authorized the signing of the Registration Statement by Wainwright as Kumin's attorney-in-fact.

30.     Defendant Stefan Larsson ("Larsson") served as a director of RealReal at the time of the IPO and at all relevant times during the Class Period. Larsson reviewed the Registration Statement and authorized the signing of the Registration Statement by Wainwright as Larsson's attorney-in-fact.

31.     Defendant Niki Leondakis ("Leondakis") served as a director of RealReal at the time of the IPO and at all relevant times during the Class Period. Leondakis reviewed the Registration Statement and authorized the signing of the Registration Statement by Wainwright as Leondakis's attorney-in-fact.

32.     Defendant James Miller ("Miller") served as a director of RealReal at the time of the IPO and at all relevant times during the Class Period. Miller reviewed the Registration Statement and authorized the signing of the Registration Statement by Wainwright as Miller's attorney-in-fact.

33.     Defendants Wainwright, Gustke, Lo, Baird, Ibrahim, Krolik, Kumin, Larsson, Leondakis, and Miller are collectively referred to hereinafter as the "Individual Defendants."

34.     RealReal is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

35.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a financial services company located in New York, New York. Credit Suisse served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and to solicit investors to purchase RealReal common stock issued pursuant thereto.

36.     Defendant BofA Securities, Inc. ("BoA") is a financial services company located in New York, New York. BoA served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and to solicit investors to purchase RealReal common stock pursuant thereto.

37.     Defendant UBS Securities LLC ("UBS") is a financial services company located in New York, New York. UBS served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and to solicit investors to purchase RealReal common stock pursuant thereto.

38.     Defendant KeyBanc Capital Markets Inc. ("KeyBanc") is a financial services company located in Cleveland, Ohio. KeyBanc served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and to solicit investors to purchase RealReal common stock issued pursuant thereto.

39.     Defendant Stifel, Nicolaus & Company ("Stifel") is a financial services company located in St. Louis, Missouri. Stifel served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and to solicit investors to purchase RealReal common stock issued pursuant thereto.

40.     Defendant Cowen and Company, LLC ("Cowen") is a financial services company located in New York, New York. Cowen served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and to solicit investors to purchase RealReal common stock issued pursuant thereto.

41.     Defendant Raymond James & Associates, Inc. ("Raymond James") is a financial services company located in St. Petersburg, Florida. Raymond James served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and to solicit investors to purchase RealReal common stock issued pursuant thereto.

42.     Defendants Credit Suisse, BofA, UBS, KeyBanc, Stifel, Cowen, and Raymond James are referred to herein as the "Underwriters."

43.     RealReal, the Individual Defendants, and the Underwriters are collectively referred to herein as "Defendants."

44.     The Underwriters agreed to purchase and to sell shares of RealReal common stock to the public as follows:

| Underwriter | Number of Shares |
|---|---|
| Credit Suisse Securities (USA) LLC | 4,500,000 |
| BofA Securities, Inc. | 4,200,000 |
| UBS Securities LLC | 3,300,000 |
| KeyBanc Capital Markets Inc. | 1,200,000 |
| Stifel, Nicolaus & Company | 1,050,000 |
| Cowen and Company, LLC | 450,000 |
| Raymond James & Associates, Inc. | 300,000 |
| Total | 15,000,000 |

45.     The Underwriters had an option to sell an additional 2.25 million RealReal shares in the IPO, which they exercised in full. The Underwriters collectively received over $24 million in underwriting discounts and fees for underwriting the IPO.

46.     Credit Suisse, BofA, and UBS acted as underwriter representatives for the Underwriters.

## CONFIDENTIAL WITNESSES[3]

47.     Plaintiffs' investigators spoke with former employees of the Company who have personal knowledge of the facts alleged and attributed to them in this Complaint.

48.     Former Employee 1 ("FE1") served as a copywriter in the Company's Secaucus, New Jersey facility between August 2018 and March 2019. During this time, FE1 worked in the womenswear and menswear units of the copywriting department.

49.     Former Employee 2 ("FE2") served as a copywriter and was later promoted to supervisor in the Company's Brisbane, California facility between late 2016 and March 2018. FE2 worked as a copywriter in women's ready-to-wear clothing, and later served in a customer service role.

---

[3] The Former Employees have been renumbered from the prior complaint (Dkt. No. 31). FE1 here was FE2 in the prior complaint. FE2 – FE11 here were FE4-FE13 in the prior complaint.

Second Amended Class Action Complaint for Violations of the Federal Securities Laws

50.     Former Employee 3 ("FE3") served as a senior vice president of the Company and was the Company's chief human resources officer. Wainwright hired FE3 and FE3 reported directly to Wainwright. In that role FE3 was instrumental in identifying new hires and streamlining the Company's recruiting process. FE3 was responsible for overseeing key employee-focused functions including recruitment, workers' compensation, payroll, communications, performance management, compensation, and training. FE3 served in this role from May 2017 through August 2018 and worked primarily in the Company's Brisbane, California facility. FE3 was a member of RealReal's executive committee, which included Defendants Wainwright and Gustke as well as FE10. FE3 had regular, direct communications with and met with the executives of the Company, including the Officer Defendants, throughout FE3's time with the Company. In particular, FE3 reported participating in weekly executive meetings with Wainwright, Gustke, the Company's COO, and other department heads on the executive committee. These meetings were held Monday mornings at the Company's San Francisco headquarters. FE3 also had one-on-one meetings with Wainwright and had a desk immediately next to Wainwright's. FE3 also reported that all of the executives, including FE3, provided weekly written updates to Wainwright.

51.     Former Employee 4 ("FE4") served as a copywriter and was later promoted to copywriting supervisor at the Company's Brisbane, California facility from late 2017 through August 2019. FE4 is now employed with a different company located close to RealReal's Brisbane facility, and FE4 has maintained close contact with many of FE4's former coworkers at the Company who are still employed by RealReal.

52.     Former Employee 5 ("FE5") served as a copywriter and was later promoted to senior copywriter and then category manager for men's items at the Company's Brisbane, California facility between September 2016 and April 2019.

53.     Former Employee 6 ("FE6") served as a copywriter for men's items at the Company's Brisbane, California facility between November 2017 and August 2018. FE6 reported to FE5 during FE6's employment with the Company.

54.     Former Employee 7 ("FE7") served as a copywriter primarily for shoes and accessories, later working on handbags and "home and art," at the Company's Brisbane, California facility between May 2018 and June 2019.

55.     Former Employee 8 ("FE8") served as copywriter and was later promoted to senior copywriter for the women's ready-to-wear category at the Company's Brisbane, California facility between August 2018 and November 2019.

56.     Former Employee 9 ("FE9") served as a luxury manager working out of the Company's office located in Century City, Los Angeles, California, from 2015 to 2017. Luxury managers at the Company were responsible for meeting with certain consignors in their homes to inspect and pick up high-ticket items to be submitted to the Company. FE9 attended at least one "summit" held by the Company in Las Vegas, at which Wainwright and all of the Company's department heads were present. FE9 also interacted with Wainwright personally when Wainwright visited the Company's Los Angeles office.

57.     Former Employee 10 ("FE10") served as the Company's vice president of fulfillment and was a member of the Company's executive committee. FE10 worked out of the Company's San Francisco headquarters from April 2016 to December 2017. FE10 served as the head of the Company's supply chain and logistics operations and was responsible for building the Company's eCommerce distribution system. During FE10's tenure with the Company, the Company's executive committee included Defendants Wainwright and Gustke, the Company's COO, FE3, FE10, and the heads of the Company's various departments including sales, merchandising, technology, legal, and marketing. Defendant Lo also joined the executive committee when he joined the Company. According to FE10, the executive committee held weekly meetings every Monday, where "every functional would talk about their issues." FE10 reported that it was Wainwright and Gustke's practice, as well as FE10's, to attend every executive committee meeting during FE10's tenure with the Company.

58.     Former Employee 11 ("FE11") served as a photography production assistant, copywriter and was later promoted to senior copywriter at the Company's Brisbane, California facility between December 2017 and November 2019.

59.     Former Employee 12 ("FE12") served as a copywriter at the Company's Brisbane, California facility from May 2019 to January 2020. FE12 worked primarily on handbags but occasionally was tasked with working on shoes or clothing.

## COMPANY BACKGROUND

60.      RealReal describes itself as the world's largest online marketplace for authenticated, consigned luxury goods. The Company is based in San Francisco, California. Its common stock trades on the NASDAQ under the ticker symbol "REAL."

61.     On May 31, 2019, RealReal filed a registration statement for the IPO with the SEC on Form S-1, which, after several amendments, was declared effective on June 27, 2019 ("Registration Statement"). On June 28, 2019, RealReal filed the prospectus for the IPO with the SEC on Form 424B4 ("Prospectus"). The Prospectus was dated June 27, 2019. The Prospectus was incorporated into and formed part of the Registration Statement. By way of the Registration Statement, Defendants offered and sold 17.25 million shares at $20 per share for approximately $345 million in gross offering proceeds, which included the full exercise of the Underwriters' over-allotment option of 2.25 million shares.

62.     The Prospectus stated that, "**You should rely only on the information contained in this document or to which we have referred you. Neither we nor the underwriters have authorized anyone to provide you with information that is different.**" (Emphasis in original).

63.     According to the Prospectus, RealReal offers a "unique service model" as an alternative to brick and mortar consignment stores or self-listing on peer-to-peer platforms for selling used personal luxury goods.

64.     First, according to the Prospectus, through its sales and marketing efforts, RealReal solicits consignors to send in their items. Then, either RealReal employees pick up the items from the consignor's home, the consignor can send in their items through RealReal's eleven consignment offices, or most commonly, RealReal offers free shipping for consignors to send their items directly to RealReal's merchandising and fulfillment facilities.

65.     According to the Prospectus, once the consignor's items reach the Company's merchandising and fulfillment facilities, RealReal purports to "authenticate, write the associated copy, photograph, price, sell and handle all fulfillment and returns logistics."

66.     According to the Prospectus, once their item is sold through RealReal's online marketplace, consignors purportedly receive "up to 85% in commissions and achieved an average commission rate of approximately 65% in 2018." RealReal also purports to offer its consignors rapid sales turnaround, boasting that "[i]n 2017 and 2018, approximately 60% and 80% of the products on our online marketplace sold within 30 days and 90 days, respectively."

67.     According to the Prospectus, in 2018 the Company "had approximately 416,000 active buyers in approximately 60 countries and greater than 80% of our GMV [gross merchandise value] came from repeat buyers."

68.     The Company's offerings were extremely wide-ranging. According to the Prospectus, in 2018 the Company "sold goods bearing the brand of over 7,000 luxury and premium designers."

69.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

**THE COMPANY'S REGISTRATION STATEMENT CONTAINED FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ABOUT THE COMPANY'S AUTHENTICATION PROCESS**

70.     In the Registration Statement, the Company repeatedly emphasized how important the Company's authentication process was in maintaining the trust of its customers. Specifically, the Company stated that "***[o]ur highly trained experts build trust in our buyer base by thoroughly inspecting the quality and condition of, and authenticating, every item we receive***. This trust drives repeat purchases from our buyer base and instills confidence in first-time buyers to purchase pre-owned luxury goods." (Emphasis added).

71.     This statement was false and misleading because the Prospectus failed to disclose that (1) the small group of authenticators employed by the Company did not inspect and authenticate every item, or even most items, the Company received; and (2) the copywriters who actually did inspect

and purportedly "authenticate" the vast majority of the items the Company received were far from "highly trained experts," but rather had little experience, received inadequate training in authentication of the thousands of products and brands accepted by the Company, and operated under a strict quota system that did not allow copywriters to spend sufficient time with each item in order to adequately authenticate it.

72.     Maintaining the trust of customers was paramount to the Company's continued success. Building and keeping RealReal customers' trust in the Company's authentication process was crucial to the Company's ability to attract both repeat and new customers. Further, the Company relied on a network effect to continue to drive its growth. As the Company stated in the Prospectus:

> A strong network effect drives the growth of our online marketplace. As we bring more consignors onto our platform, we unlock more high-quality, luxury supply, which increases our merchandise assortment and attracts more buyers. This, in turn, increases sales velocity and commissions for our consignors. In addition, a meaningful share of our consignors become buyers and vice versa, which creates a differentiated flywheel that enhances the network effect of our online marketplace.

73.     In the Prospectus, the Company purported to differentiate itself from its competitors in the luxury resale market. Under "Challenges with Existing Luxury Resale Models," the Company noted that its competitors faced a significant problem with "***Lack of trust for buyers.*** Due to the pervasiveness of counterfeit luxury goods and inconsistent authentication standards, buyers can be hesitant to purchase pre-owned luxury goods. … Peer-to-peer marketplaces and consignment stores do not authenticate effectively as they do not take physical possession of the item, have inconsistent authentication standards or do not employ expert authenticators." (Emphasis in original).

74.     Again touting the importance of the Company's authentication process to building and maintaining the trust of its customers, the Prospectus stated:

> *We build trust by expertly authenticating every item.* We employ more than 100 gemologists, horologists, brand experts and art curators. Our authenticators are highly trained, experienced experts in their respective fields. ***Each item we receive is put through a rigorous, multi-point authentication process before it is curated onto our online marketplace.*** As a result, we believe we have become the most trusted online marketplace for pre-owned luxury goods.

[Emphasis added].

75.   This statement was false and misleading because the Prospectus failed to disclose that (1) the small group of "gemologists, horologists, brand experts and art curators" employed by the Company did not authenticate every item, or even most items, the Company received; and (2) the copywriters who actually did inspect and purportedly "authenticate" the vast majority of the items the Company received did not put each item through a "rigorous, multi-point authentication process," but rather had little experience, received inadequate training in authentication of the thousands of products and brands accepted by the Company, and operated under a strict quota system that did not allow copywriters to spend sufficient time with each item in order to adequately authenticate it.

76.   Further underlining the importance of gaining and keeping their customers' trust, the Company stated in the Prospectus that:

> **Trust**
>
> Trust is the cornerstone of our online marketplace. Consignors trust that we will treat their items with the utmost care and quickly sell them at the optimal price. ***Buyers trust us because we have a rigorous authentication process.*** We believe the trust and personal relationships that we have built with both consignors and buyers over the past eight years cannot be easily replicated.

[Emphasis added].

77.   This statement was false and misleading because the Prospectus failed to disclose that the Company did not in fact have a rigorous authentication process. In truth, (1) the small group of authenticators employed by the Company did not authenticate every item, or even most items, the Company received; and (2) the copywriters who actually did inspect and purportedly "authenticate" the vast majority of the items the Company received did not use a "rigorous authentication process," but rather had little experience, received inadequate training in authentication of the thousands of products and brands accepted by the Company, and operated under a strict quota system that did not allow copywriters to spend sufficient time with each item in order to adequately authenticate it.

78.   In the Prospectus, the Company summarized its risk factors, including that "[o]ur success depends on the accuracy of our authentication process, and failure by us to identify counterfeit goods could adversely affect our reputation and expose us to liability." Accordingly, knowing that

- 17 -

the accuracy and adequacy of the Company's authentication process was substantially overstated is a fact that would have been critically important to investors. The risk that RealReal's customers would lose trust in the Company upon revelation of the Company's true authentication process was a significant risk concealed by the Company's statements.

79.     In the Prospectus, under the sub-heading "How Our Business Works," the Company claimed that "We authenticate every item we sell."

80.     This statement was false and misleading because the Prospectus failed to disclose that (1) the small group of authenticators employed by the Company did not authenticate every item, or even most items, the Company sells; and (2) the copywriters who actually did inspect and purportedly "authenticate" the vast majority of the items the Company sells had little experience, received inadequate training in authentication of the thousands of products and brands accepted by the Company, and operated under a strict quota system that did not allow copywriters to spend sufficient time with each item in order to adequately authenticate it.

81.     In the Prospectus, under the sub-heading, "Inbound Merchandising Operations," the Company made additional false and misleading claims about its authentication process. Specifically, the Company stated that:

> *Authentication.* ***We authenticate every item we sell to continue building trust in our online marketplace.*** We employ over 100 highly trained gemologists, horologists, brand experts and art curators who collectively inspect thousands of items each day. ***All items pass through a rigorous multi-point, brand-specific authentication process before they are accepted for consignment.***

[Emphasis added].

82.     This statement was false and misleading because the Prospectus failed to disclose that (1) the small group of authenticators employed by the Company did not authenticate every item, or even most items, the Company received; and (2) the copywriters who actually did inspect and purportedly "authenticate" the vast majority of the items the Company received did not use a "rigorous multi-point, brand-specific authentication process," but rather they had little experience, received inadequate training in authentication of the thousands of products and brands accepted by

the Company, and operated under a strict quota system that did not allow copywriters to spend sufficient time with each item in order to adequately authenticate it.

## THE TRUTH ABOUT REALREAL'S AUTHENTICATION PROCESS

### Media Reports Reveal How the Company's Authentication Process Really Works

83.     On September 13, 2019, the website Fashionista published an article titled "The RealReal's Authentication Practices Are Not What They Seem, According to New Investigation." *Available at* https://fashionista.com/2019/09/the-realreal-authentication-process-exposed. ("Fashionista article").

84.     The Fashionista article summarized an investigative report released by The Capitol Forum, a private D.C.-based consumer protection organization. The Capitol Forum's report was, and is, accessible only to its subscribers and not directly to the public.

85.     According to the Fashionista article, the Capitol Forum report alleged that RealReal copywriters, rather than professional authenticators, were responsible for "authenticating" the majority of the Company's items. The Capitol Forum reportedly interviewed seven former RealReal copywriters, "all of whom said they didn't feel it was appropriate for them to be authenticating." These former copywriters explained that the authentication training they received was minimal.

> "They give you a quick 5-minute presentation on what things should look like and then have you go. [...] I should not have been authenticating an Hermes scarf, for example, but all they care about is the product getting on the site," said one former employee. Additionally, according to the former employees, the job had such a high turnover rate that experience levels remained low.

> "The pay was so low and the work so grueling that everybody thought of it as just a temporary job," said one interviewee, "so no one really took it that seriously because they'd be gone in a couple of months."

86.     The Fashionista article also revealed that copywriters were subject to intense quota requirements that could exceed 120 items processed per day. Those quotas made it extremely difficult for copywriters to adequately perform their authentication responsibilities, in addition to the other tasks they were required to complete for each item.

> Per one former copywriter, "Training was rushed and they put a lot of pressure on meeting our daily goals, so a lot of fake items slipped through the cracks because of all the goods we had to authenticate in

- 19 -

> one day, which could be 130 to 155 depending on what department you worked in. Our days were super long and draining, so a majority of employees were rushing to meet the quota so that they would not get fired. It was more about not getting fired than authenticating the goods."

87.     The Fashionista article reported that in response to the Capitol Forum report, the Company "confirmed to Capitol Forum that copywriters do authenticate products that it identifies as 'low-risk'" and admitted that "we're not training them on everything, they have guides they can refer to." The Company would not acknowledge the existence of quotas.

88.     The Fashionista article also reported that the Company responded dismissively to the Capitol Forum report, stating to Fashionista: "This company's [Capital Forum's] actions and misrepresentations are clearly calculated to sell their subscriptions and improperly manipulate the market for the benefit of short-sellers on behalf of their subscribers. These people are not journalists and they are not credible."

89.     On October 23, 2019, at 7:05am, Forbes published an article on its website titled, "The RealReal Sold Me A $3,600 Fake; Here's Why Counterfeits Slip Through Its Authentication Process." *Available at* https://www.forbes.com/sites/richardkestenbaum/2019/10/23/if-fake-bags-are-being-sold-on-the-realreal-how-can-the-resale-business-ever-succeed/#5c6eeeb06acb. ("Forbes article").

90.     In the Forbes article, the author provided new details and corroborated the account from The Capitol Forum's report as described in the Fashionista article with two new "informed, confidential sources." According to the Forbes article: "They all say the actual process for authentication at The RealReal is different from the impression you get by reading the prospectus or visiting the company website."

91.     According to the Forbes article:

> Here is the nub of the problem: A great deal of the authentication at The RealReal is done by people whose title is "copywriter." According to my sources, a majority of products sold are authenticated by these so-called copywriters. Normally, a copywriter is a person who, well, writes copy. And indeed the copywriters do write the copy–the words that accompany the pictures next to an item for sale on The RealReal's website–but they are also doing authenticating.

> The problem is that the copywriters have a small fraction of the training that the more expert people have. That's a problem because, without the training that the true experts have, the copywriters can miss things, which are often things they shouldn't miss.
>
> … everything I've heard and read about the copywriters indicates that they come to the job with little or (usually) no experience in authentication.

92.     In researching for the Forbes article, the author was invited to tour the Company's Secaucus, NJ facility. Of his experience there, he stated:

> The employees I met were open about having copywriters doing the authenticating, and I saw it myself. They do it by dividing products into what they consider to be "high-risk" or "low-risk" categories. Products that are known to attract forgers–either because they are very desirable, very popular, very expensive or some combination of the three–are sent to high-risk authenticators, who have more training and knowledge.
>
> My sources say that the high-risk authenticators do as good a job as any human can; the problem is that not enough of the products go to them, and that's how fakes get through. As a result, consumers are buying fakes, and no one knows how many because too many products are authenticated by copywriters.

93.     The Forbes article summed up the problems it found with the RealReal's purported authentication process:

> **Why This Is So Wrong**
>
> There are a host of reasons what's happening is wrong. The first is that it's bad for consumers. Most people don't have access to experts who can tell them that the $3,600 bag they bought is fake. What's even worse is that when a maker of fake bags succeeds in selling a fake on The RealReal, it encourages that maker to produce more fake bags, and that compounds the problem.
>
> The other group of victims is investors. When I read the prospectus, the chart above and The RealReal website, I get the clear impression that the authenticators and the copywriters are different people. There is no mention of having two tiers of authenticators. Investors putting up money in The RealReal might make a different decision if they were told more about how the authentication process works. They would be more likely to suspect that $3,600 bag being sold was as fake as the bag I bought. That would make The RealReal a less interesting investment opportunity.

94.     On November 5, 2019, at 6:15am, CNBC published an article challenging the claims by RealReal and its CEO, Defendant Wainwright, that there are "no fakes on our site," and that "every single item [is] authenticated." The article was updated later that day at 4:06pm. *Available at* https://www.cnbc.com/2019/11/05/the-realreals-no-fakes-pledge-is-threatened-by-poor-training-quotas.html. ("11/5 CNBC article").

95.     The 11/5 CNBC article was the result of CNBC's in-depth investigation into the Company's authentication practices and complaints from customers – including over 1,400 online reviews – who purchased counterfeit goods from the RealReal's website that they had believed were properly authenticated. The investigation included interviews of "nearly three dozen former employees, speaking to unsatisfied customers around the country and obtaining an internal company document from 2018 that shows copywriters in the Secaucus, New Jersey, warehouse have been tasked with authenticating some of the items that go on The RealReal's site."

96.     The former copywriters CNBC interviewed "said they had little training on how to spot fakes and were hired to write descriptions of the items to post on the website." CNBC also pointed to other internal company documents it had reviewed, which "clearly spell out strict quotas that employees have been expected to meet or face discipline—which was revealed for the first time to the investing public. This means some obvious problems with merchandise can be overlooked."

97.     One former copywriting supervisor interviewed by CNBC disputed the Company's authentication claims, explaining that the copywriters did not receive sufficient training to properly authenticate all the items they processed, and that the onerous quota system compounded this problem. As the former supervisor, who had worked for the Company for three and a half years put it: "It's so much product. It's really hard for someone to properly authenticate something when they're not probably the best qualified to be even doing that in the first place. And they're being rushed to hit a goal." Continuing, the former supervisor said, "I don't think anyone had enough training at the end of the day. The fakes are getting really good. And when you have such a high volume that you have to get through and you're worried about hitting your goal, at the end of the day, I don't really think they cared whether it was real or not anyway."

98.     As another former copywriter stated in the 11/5 CNBC article, "We had such a big number to hit every single day, 10 hours a day, four days a week, you know? And it's overwhelming. And all you focused on is, 'I have to hit this goal, so I could be good for the month.'" The former copywriter also said "I wouldn't say I had enough" training to effectively authenticate the items she worked on.

99.     The 11/5 CNBC article also explained that only certain brands or certain types of items were sent to the authenticators, and that the rest of the items were purportedly "authenticated" by the Company's copywriters.

100.     According to the 11/5 CNBC article:

> Internal documents stated copywriters have been subject to disciplinary action if a minimum of 50% of their daily quota was not met.

> "It is expected that copywriters will reach their daily quota during their shift," a document marked "updated Feb. 1, 2019" stated. "Daily quotas are set depending on the category the copywriter is in. Copywriters are expected to consistently reach their daily quotas."

> In the ready-to-wear category, the daily quota was 105 items for an eight-hour shift and 131 items for a 10-hour shift. In contemporary ready-to-wear, it was 128 items for an eight-hour shift and 160 items for a 10-hour shift.

101.     Another former employee quoted in the 11/5 CNBC article stated that these "authentication" practices were not new, and she had seen them in place as early as 2015. "So instead of the top-tier authenticators taking a long time, a sufficient amount of time to review each piece, most pieces were being handled by the copywriters, and only very, very high-value items, it seemed, were being authenticated by the actual lead authenticators," she said. "It was very surprising because I was under the impression, even as an employee, that every item was authenticated by an expert. And it didn't really seem to be the case when we saw what was actually happening."

102.     On November 21, 2019 at 6:31am, CNBC published a follow-up article to the 11/5 CNBC article, titled "The RealReal's 'Faux and Tell' reports disclose fake items published on the site and returned." *Available at* https://www.cnbc.com/2019/11/20/the-realreals-faux-and-tell-discloses-fakes-published-on-the-site.html. ("11/21 CNBC article").

103.    The 11/21 CNBC article revealed that the Company maintained internal documents, called "Copywriting Faux and Tell," that provided "a weekly recap of TRR published and returned counterfeits." These "Faux and Tell" documents were sent to copywriters at the company's facility in Brisbane, California. The 11/21 CNBC article gave details and examples from the expansive "Faux and Tell" documents, which "offer a sampling of the types of counterfeit products that slipped through the company's vetting process. These include mistakes that may appear to be obvious."

> A total of 227 pages from the first and third quarters of 2019 show specific examples of what are labeled 'TRR fakes.' The items include purported Louis Vuitton slides in a style that was never created. Ugg boots marked with the wrong logo and bow. Moncler track pants tagged with a label that says T-shirt. A separate pair of slides from "The Row" and a Valentino scarf were supposed to be made in Italy but the label on the TRR fakes say they were "Made in China."

104.    Regarding the "Faux and Tell" documents, the 11/21 CNBC article also noted that a former employee who worked at the Company's Secaucus, New Jersey, facility reported seeing similar documents during presentations to staff.

105.    The 11/21 CNBC article also reported the Company's apparent efforts to change their messaging about their authentication process following the 11/5 CNBC article:

> The RealReal has advertised on its Facebook page that it "is the leader in authenticated luxury consignment. With an expert behind every item, we ensure everything we sell is 100% real."

> The reference to "100% real" was removed from the page on Nov. 5, the day the CNBC investigation aired.

> Claims of everything "100% authentic" also have been scrubbed from the company's website.

**RealReal's Former Employees Corroborate the Media Investigations Regarding the Truth About the Company's Authentication Process**

106.    Interviews conducted by Plaintiffs' investigator with over one dozen former RealReal employees corroborate the facts reported in these media reports.

107.    According to FE1, outside of certain brands, garments, and specialty leather goods and furs, "everything else in the runs, essentially, did *not* have to go through authentication. Those garments that did not have to go through authentication, we were held [to] that entire responsibility

as copywriters to go through that." According to FE2, "85-90 percent of the product never gets seen by the official authentication team. It goes straight to the copywriters from receiving, because [authenticators] only checked out certain brands." FE3 reported that "only a tiny fraction of anything that ever goes on at that site is authenticated. Otherwise, it's copywriters." FE3 recalled that, outside of some high-ticket items, the authentication is performed by "copywriters that don't have any training in authentication." FE4 reported the same process, where the "majority" of items were not seen by the authentication team, "which led to a bunch of fake things being put on the website." FE4, who now works close to the Brisbane facility and has maintained close contact with former co-workers, reports that "that's still happening. I work right next door to the warehouse -- I have a bunch of friends over there who say nothing's changed." FE11 also reported that the authentication team would only review specific high-end brands that were frequently counterfeited – the rest of the products "authenticated" by the Company were reviewed by copywriters.

108.    As FE3 explained, "there's a very, very small team of authenticators. The rest of them are copywriters who predominantly would have no experience in authentication." According to FE3, the copywriters' training in authentication was limited to "a couple of hours," or "like none, almost none." Between the lack of training and the high quota demands placed on workers to get items on the website for sale, FE3 said, "There's no way that things could be authenticated on the site. There were never enough people to do it." As FE3 explained, it simply isn't realistic that a copywriter with a few hours of training can reliably authenticate luxury items.

109.    FE3 specifically confirmed that media portrayals of the Company as having a lax to nonexistent authentication operation, referencing the 11/5 CNBC article as an example, were substantially true. FE5 also corroborated that the 11/5 CNBC article about the Company's authentication practices was accurate.

110.    FE2 reported being hired as a copywriter in the women's ready-to-wear clothing category with no experience in fashion or authentication whatsoever. FE8 corroborated that the Company would often hire copywriters with no experience in fashion, and that many of these people would struggle with authentication and would inadvertently pass counterfeit items on to the Company's website. FE9 stated that the copywriters responsible for authenticating most items were

- 25 -

in large part "not qualified…they come from backgrounds that have nothing to do with luxury products." FE11 recalled that, in an effort to push through as much product as possible onto the Company's website, the Company often hired copywriters who had no knowledge of fashion and no relevant experience in authentication. According to FE11, the Company "hired all kinds of temp people" as copywriters to help deal with the massive volume of products the Company was processing, some of whom "don't know the difference between wool and satin." FE12 was hired with no background in fashion or luxury goods after just one brief interview. FE12 reported that during the hiring process they were given a quiz to spell the names of certain brands and answered some generic interview questions.

111.    In a typical shift, FE2 recalled that there would be approximately 25-30 copywriters on duty, and less than 5 authenticators. On weekends, FE2 stated that those numbers went down to 10-15 copywriters and only 1 authenticator, who was typically the newest hire. During FE4's time at the Brisbane facility, FE4 estimated that "there were probably about five authenticators and probably about 200 copywriters." During FE6's tenure with the Company, FE6 estimated that only 5-7 members of the authentication staff were working on a given day, compared to well over 100 copywriters.

112.    FE1 was given a quota of 130 items per day in a 10-hour shift, which, accounting for the minimal breaks allowed meant processing "about one product every 3-4 minutes." According to FE4, the daily quota for a copywriter varied depending on the category of item the copywriter was responsible for and the length of their shift (8 or 10 hours). FE4 reported that in the shoes category, the daily quotas ranged from 120 up to 250 items per day that copywriters were expected to authenticate and process. By the end of FE6's employment with RealReal, FE6 was regularly tasked with handling 250-300 items per day. During FE4's employment with the Company, FE4 estimated that the Company was receiving at least 20,000 items per day. "That's where the high quotas come in." During FE4's time at the Company, "the quotas never went down. They always went up." According to FE7, if the quota for the day was 150 items, "to hit your goals you would be processing something in two to four minutes." FE8 reported having a daily quota of 140 items in a 10-hour shift, "so if you do the math on it, three minutes per item."

113.     According to FE 2, within the 3-4 minutes the copywriters could spend with each item, copywriters were responsible for a number of separate responsibilities on top of authenticating the item. "The expectation for what copywriters were supposed to do was to title the products, to place the item under a 'taxon,' or category… We were tasked to price the product based on historical trend — maybe we received the same product in the past [so] we would look at how long it took that product to sell, and at what price." FE1 explained that copywriters were also charged with writing a short description of each item for buyers to read online: "Part of the job with consigned pieces was to communicate to the end consumer what the condition of the product is. What we tended to do as copywriters was not only look for conditions, look for damages [and also] check for authentication."

114.     FE6 recalled that in addition to attempting to authenticate each item, copywriters were tasked with taking measurements and entering other information into a comprehensive database to prepare them for sale. As FE6 described, for each item, "you're scanning, you're typing the title, you're inspecting for damage. I tried to keep it under a minute for everything. Maybe the longest I spent was five minutes, but that's if I had to do a three-piece suit."

115.     FE5 corroborated this account, stating that the high quotas limited copywriters to less than five minutes per item. "You're trying to measure the item; you're trying to write the product description. Things were passed by very quickly. A lot of copywriters tried to voice our concern -- we're not really doing the customer justice by processing the items as fast as possible... A lot of people took shortcuts, didn't do the full research, didn't authenticate the items properly." As FE7 reported, the authentication process copywriters were responsible for was complicated for many items. FE7 explained that copywriters had to search each item for certain indicators of counterfeiting – a certain item may have a certain font on the label, a specific shade of red on the sole of a shoe. "People struggled the most in clothing," FE7 recalled, because they had to inspect "lots of measurements, counting buttons, spacing of buttons." As FE11 explained, "It could be very involved just trying to figure out if a button is real or not based on the season they made it, time period they made it. That's something hard to teach. It takes a lot of time. If you're trying to go fast because you have a quota, you're not going to have the time to sit and look."

116.    Tasked with all these responsibilities and only a few minutes for each item under the quota system, copywriters did not feel that they could spend any extra time on items they deemed questionable. As FE2 recalled, "When you're trying to hit a certain goal in a certain number of hours, you can't spend that extra five minutes to see. So, I guarantee so many counterfeit items get pushed through, because we just don't have the time." FE10 explained that, "we didn't have enough people, and therefore we could not keep up with the volume. … If you don't have enough people, and you're trying to push the volume through, that's where you have a tendency to lapse on critical things."

117.    FE4 echoed this sentiment, stating that "the goals [quota] of each copywriter [were] too high for the number of things" that were expected to be processed, adding "that is just not enough time to do the authentication and hit that number by the end of your eight-hour shift with your 30-minute lunch and your two breaks." According to FE4, "a lot of the people who were working there -- they feel the same way. They just are confused, and they don't have the proper training; they don't have resources to do the proper job that's expected of them." FE7 confirmed that "all levels of quality were affected by having to be that fast. We did not have time to research stuff sometimes, or to really double check your work."

118.    With respect to training, FE1 stated that "I couldn't tell you there was an intensive training process." FE6 agreed, saying that "I wouldn't say I was actually ever trained on authenticating things." Indeed, copywriters received extremely limited instruction on authentication. FE1, FE2, and FE6 reported that their initial training session was a 1-hour PowerPoint presentation. According to FE6, "I'm used to having a full training day, [or] a couple of days. They gave us the packets and told us to read it, and that was pretty much it." FE12 also reported receiving only a basic two-hour training on their first day and then was given their daily quota and informed for the first time that they would be responsible for authentication as well as copywriting.

119.    As FE1 reported, the copywriters' bi-weekly follow-up trainings involved "essentially us sort of sitting in a conference room. They put up a presentation ... [but] with the large brand portfolio, it was difficult, as a human being, to maintain all that authentication information." Copywriters were also directed to a document on a Google server with additional information for different brands and garments. Ultimately, FE1 described authentication training as "a process that

you had to teach yourself." As FE2 stated, "but there's just so many brands... They would send out little PowerPoints that everyone could access through Google docs, the collections, and just through the daily copywriting, you start to remember those terms for those specific brands, but you don't really get that much training on whether something is fake. It's not thorough by any means."

120.    As FE4 reported, the scant training that RealReal copywriters did receive was less about authentication and more about getting items into the system and listed online as quickly as possible. FE8 explained that new copywriters hired in the apparel category would spend 2-3 hours reading a deck of 80-100 slides that covered information such as the grammar and style expected for ecommerce item descriptions, sizing across different brands offered by the RealReal, dress silhouettes, colors of jeans, and "information about a designer and their signature prints." As FE8 explained, new hires would then spend a one-hour session with a senior copywriter, but that this training was focused much more on how to use the computer system to process items, as opposed to training in authentication. FE11 also noted that the follow-up training that FE11 both received and later was instructed to provide as a senior copywriter was focused in large part on processing items faster, not more accurately. Overall, FE8 reported that "there was no official authentication process, it's really more like trial and error." FE11 echoed this sentiment, stating that the training was "not enough. It's not consistent."

121.    Even when copywriters did receive additional training, including the bi-weekly meetings, copywriters were distracted by the onerous quotas. According to FE7, if the trainings were under one hour, copywriters' daily quotas were not adjusted. FE7 explained that as a result, copywriters were so concerned about meeting their quotas that during the trainings, "you're counting the minutes and you're not really listening." Moreover, FE7 reported that there were not as many training classes as were needed, and copywriters could not request additional training. According to FE11, copywriters had little to no time to absorb what training they were given, and not enough time to put that training to practical use. FE12 reported that the only additional "trainings" they received took place about every other month and consisted of authentication team members simply bringing in a counterfeit item and explaining why that item was fake. On occasion, FE12 was directed to authenticate shoes or clothing despite receiving zero training on authenticating those items or brands

other than being given access to a large online slide deck. Even after allegations about the Company's authentication process came to light in media reports such as the 11/5 CNBC article, FE12 reported that the only additional training instituted by the Company comprised morning meetings where managers would spend five minutes showing the copywriters a counterfeit item and explaining why it was fake.

122.    FE2 also reported that new copywriters started on lower-value items, but no extra instruction was given as they moved up. "Once you start doing luxury items, you don't really get any more training beyond that. Honestly, the authentication training wasn't really there." As FE11 explained, the result of the lack of experienced hires, lack of training, chaotic and pressurized work environment, and focus on quotas was a shocking lack of quality in copywriters' authentication work.

123.    There was intense pressure on copywriters to hit their daily quotas. FE1 reported that the daily quotas and work quality were enforced by a ratings system imposed by their managers. According to FE2, at least every hour managers sent an email to the entire copywriting team showing everyone's performance numbers, including calling out individuals by name. FE2 recalled that if copywriters missed their quotas, they were required to speak to their manager before leaving for the day. As FE3 reported, if copywriters didn't consistently meet their quotas, "you wouldn't keep your job." FE4 reported a strict disciplinary system under which copywriters who missed their daily quota would first receive a verbal warning, with additional censures leading up to termination. FE5 added that workers who surpassed their daily quota would reap financial incentives. According to FE11, if copywriters "didn't hit their [quotas] for two weeks straight, they would be remanded to training. At the end of the week, if that same employee still fell short of their monthly quota, they would be immediately terminated instead of receiving a final warning."

124.    FE2 explained that quota was pushed above everything at the Company. Managers would routinely shout at staff and reduced some copywriters to tears. FE2 recalled that the managers were mostly outside hires with no copywriting or authentication experience, who "were just pushing us to hit quotas." FE8 noted that FE8's promotion to senior copywriter was primarily due to FE8's ability to keep up with the quotas. FE11 also reported being promoted to a supervisory role in the copywriting department because of FE11's ability to work fast and keep up with quotas.

125.     FE5 detailed a number of instances illustrating the intensely pressurized work conditions at the Company for copywriters, who were pushed relentlessly to hit their daily quotas. After a stabbing incident between two employees in the Brisbane facility, FE5 reported that workers were instructed to carry on business as usual. When the Company was expanding its Brisbane facility and construction workers on lifts performing noisy work like hammering, FE5 recalled that copywriters were instructed not to be distracted, and were still held to their quotas. Even during the deadly and destructive wildfires that ravaged California in 2018, FE5 reported that "they didn't send us home. We had to stay and work, and the smoke crept all the way here, it was inside the building … They told us we still had to produce. They tried to give us masks that were not even the [approved] N-95 [model]."

126.     As FE7 recalled, "I remember people saying that 'I don't always push things through [to authentication if there's a question], because I'm trying to hit my quota.' I remember people saying, 'I don't even push things anymore, because I don't even have time.'" FE9 confirmed that this pressurized, volume-focused environment extended to luxury managers too, stating that "the pressure to do our numbers was astronomical. There were people who were let go because they did not produce the way they were supposed to. ... The pressure was unreal, unreal."

127.     After several copywriters raised concerns to the Company's human resources department about the unreasonable quotas, which gave workers just minutes to devote to each item and pressured some employees to skip the few breaks they were allowed each day, FE4 recalled an internal investigation led by Mary Chavez, the Company's Compliance Senior Manager, Employee Relations, in the summer of 2019. However, according to FE4, "nothing changed at all" after the investigation. FE8 also corroborated this description of Ms. Chavez's investigation into complaints about the quota system.

128.     Due to concerns that copywriters felt forced to skip their lunch and other breaks just to meet their quotas, FE5 and a coworker gathered signatures from their colleagues who signed a statement that they had even received written warnings for not making their quota on days when the employee was off of work. FE6 reported that "I was uncomfortable with going to the bathroom because I [might] not make my quota."

129.    After shifting to a customer service role at the Company, FE2 reported that "people would return stuff all the time" as counterfeit. "It just happened way more than it should have for a company that says everything [is] authenticated."

130.    FE4 reported that management would release "Copywriting Faux and Tell" documents about every two weeks, and sometimes more often. These documents were a list with pictures of some of the fake inventory that made it through the Company's purported authentication process and onto its website. The list included numerous items that customers had bought and returned because the items were fake, which managers compiled into the "Faux and Tell" lists.

131.    FE4 provided copies of the "Faux and Tell" lists from the first quarter of 2019, which included approximately 137 items. A copy of the "Faux and Tell" document is attached hereto as Exhibit B. FE4 explained that many of these items should have been easily identifiable as counterfeit, including, for example:

- A pair of Louis Vuitton slides that were never produced by Louis Vuitton (Ex. B, p. 19);
- A "Philipp Plein 'Kenzo' T-Shirt marketed as such even though, according to the document, "Kenzo and Philipp Plein never collaborated on a collection" (p. 22);
- A pair of "Gucci Princetown Mules" sold in a "colorway" (combination of colors) that was never produced by the company (p. 28);
- An Yves Saint Laurent T-Shirt with an "overall aesthetic" that "is not consistent with an era of Yves Saint Laurent past thru present" (p. 51);
- A pair of Jimmy Choo flats labeled "Jimmy Ghoo" on the sole (p. 115);
- A "Fendi Beaded Peekaboo Bag" with the word "removable" misspelled on the label (p. 121);
- A "Missoni Zip-Up Top" with the brand name botched as "Mssioni" on the label (p. 171);
- Multiple items, including clothing, bags, and shoes, described as coated with plastic film, displaying excessive glue, constructed with "inferior" materials, and/or giving off a "strong chemical odor."

132.    As FE4 reported, "by showing us the fake items that made it onto the site — that was their training. Not everyone would see that list, so they wouldn't get the training. It was a poor way of training on something so huge. And I believe that it's still ongoing. They would do little five-minute trainings in the morning, like in the huddle -- no one would really be listening."

133.     FE6 reported that luxury managers, who were responsible for going to consignors' homes to collect items from VIP clients, were working on commission and were strongly motivated to accept as many consignments as possible, without regard to their authenticity. FE9 confirmed this account, estimating that on at least 10 separate occasions FE9 personally saw items submitted by luxury managers that were rejected as fake in the authentication process, but were then resubmitted and sold as "authentic" on a second attempt.

134.     Since the IPO, and as a result of the disclosure of material adverse facts omitted from RealReal's Prospectus and Registration Statement, RealReal's stock price has fallen well below its IPO price, damaging Plaintiffs and Class members.

## CLASS ACTION ALLEGATIONS

135.     Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and a Class consisting of all persons and entities who purchased RealReal common stock from June 27, 2019 through November 20, 2019, both dates inclusive. Included in the Class are all persons and entities who purchased RealReal common stock pursuant and/or traceable to the Company's Registration Statement issued in connection with the Company's June 27, 2019 IPO and all persons and entities who purchased RealReal common stock during the Class Period at artificially inflated prices and were damaged thereby. Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of the Company at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

136.     The members of the Class are so numerous that joinder of all members is impracticable. There were 17.25 million shares of RealReal common stock sold in the IPO. Since the IPO, the Company's securities have actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by

RealReal or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

137.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

138.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

139.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

140.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

 (a) whether Defendants violated the federal securities laws;

 (b) whether the Registration Statement was negligently prepared and contained materially false or misleading statements and/or omitted material information about the Company's business, operations, and prospects;

 (c) the extent to which members of the Class have sustained damages and the proper measure of damages; and

 (d) exclusively with respect to the Exchange Act allegations, Counts III and IV below:

  i.  whether Defendants made false and misleading statements and omissions of material fact in the Registration Statement and during the Class Period; and

  ii.  whether Defendants' false and misleading statements and omissions were made with scienter.

141.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SECURITIES ACT CLAIMS

### COUNT I
**Violations of Section 11 of the Securities Act**
**(Against all Defendants)**

142.    Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

143.    Any proceeding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Count. For the purposes of this Count, Plaintiffs do not allege that the Defendants named in this Count had scienter or fraudulent intent, which are not elements of this claim.

144.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against Defendants.

145.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

146.    RealReal is the registrant for the IPO. Defendants were responsible for the contents and dissemination of the Registration Statement, and/or were directors or underwriters who are appropriate defendants as to this Count.

147.    Defendants are strictly liable to Plaintiffs and the Class for the misrepresentations and omissions in the Registration Statement.

148.    None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

149.    The Underwriters participated in drafting the Registration Statement, caused the Registration Statement to be filed with the SEC and to be declared effective in connection with the IPO, and participated in the dissemination of the Registration Statement. However, the Underwriters

failed to perform adequate due diligence in connection with their role as underwriters for the IPO and were negligent in failing to ensure that the Registration Statement was prepared properly and accurately, free of misrepresentations or omissions.

150.     In addition, the Underwriters met with potential investors and presented highly favorable but incorrect and/or misleading information about the Company, its business, products, plans, and financial prospects, and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

151.     Representatives of the Underwriters also assisted the Company and the Individual Defendants in planning the IPO. They also purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During the course of their due diligence, the Underwriters had access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

152.     In addition to having access to internal corporate documents, the Underwriters and/or their agents, including their counsel, had access to the Company's lawyers, management, directors, and top executives to determine: (1) the strategy to best accomplish the IPO; (2) the terms of the IPO, including the price at which the Company's common stock would be sold; (3) the language to be used in the Registration Statement; (4) what disclosures about the Company would be made in the Registration Statement; and (5) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those contacts and communications between the Underwriters' representatives and the Company's management and top executives, the Underwriters were, at a minimum, negligent in allowing dissemination of the material misrepresentations and omissions contained in the Registration Statement as detailed herein.

153.     The Underwriters' negligence and failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein and, pursuant to the Securities Act, they are liable for the materially false and misleading statements and omissions in the Registration Statement.

154.    By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

155.    Plaintiffs acquired shares of RealReal's common stock pursuant and/or traceable to the Registration Statement for the IPO.

156.    Plaintiffs and the Class have sustained damages. The value of RealReal common stock has declined substantially subsequent to and due to Defendants' violations.

157.    This claim is brought within one year after discovery of the untrue and misleading statements and omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

## COUNT II
### Violations of Section 15 of The Securities Act
### (Against the Individual Defendants)

158.    Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

159.    Any proceeding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Count. For the purposes of this Count, Plaintiffs do not allege that the Defendants named in this Count had scienter or fraudulent intent, which are not elements of this claim.

160.    This count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

161.    The Individual Defendants were in positions to control and did control, the issuance of the false and misleading statements and omissions contained in the Registration Statement.

162.    None of the Individual Defendants or the Company made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misrepresentations and omissions alleged herein.

163.    Plaintiffs and the Class have sustained damages. The value of RealReal common stock has declined substantially due to the Securities Act violations alleged herein.

164.    This claim is brought within one year after discovery of the untrue and misleading statements and omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

## EXCHANGE ACT ALLEGATIONS

### Additional False and Misleading Statements About the Company's Authentication Process

165.    Defendants made a number of additional false and misleading statements and omissions of material fact during the Class Period about the Company's purported authentication process.

166.    On the day of the Company's IPO, Defendant Wainwright appeared on CNBC's "Squawk on the Street" television segment. On the show, Wainwright stated that "every single item on the site has already been inspected, authenticated before it gets on the site. … We employ over 100 experts … our brand authenticators also train people, so it happens every single day, on a regular basis, and we put it through a rigorous multi-point inspection process."

167.    These statements were false and misleading because Wainwright failed to disclose that (1) the small group of authenticators employed by the Company did not authenticate every item, or even most items; and (2) the copywriters who actually did inspect and purportedly "authenticate" the vast majority of the items did not put the items through a "rigorous multi-point inspection process," but rather they had little experience, received inadequate training in authentication of the thousands of products and brands accepted by the Company, and operated under a strict quota system that did not allow copywriters to spend sufficient time with each item in order to adequately authenticate it.

168.    On September 26, 2019, Wells Fargo hosted a Consumer Conference, during which Defendant Gustke engaged in an extended conference call discussion with a Wells Fargo securities analyst and answered questions about the Company's authentication process.

169.    During the call, Gustke described the importance of customer trust to the Company's business: "At the basis of the business is two pillars. For buyers it is trust and we establish that through

taking possession of goods and authenticating through a no risk multi-point process -- absolutely, every item."

170.    This statement was false and misleading because Gustke failed to disclose that (1) the Company's authentication process was not "no risk," and in fact the Company maintained an internal, regularly updated list of hundreds of purportedly authenticated items returned by customers as counterfeit; (2) the Company did not authenticate every item through a "no risk multi-point process," because the small group of authenticators employed by the Company did not authenticate every item, or even most items; and (3) the copywriters who actually did inspect and purportedly "authenticate" the vast majority of the items had little experience, received inadequate training in authentication of the thousands of products and brands accepted by the Company, and operated under a strict quota system that did not allow copywriters to spend sufficient time with each item in order to adequately authenticate it.

171.    Later in the same Wells Fargo conference call, Gustke stated that "buyers come to us and give us a chance because they trust us and they trust us because we authenticate every item."

172.    This statement was false and misleading because Gustke failed to disclose that (1) the small group of authenticators employed by the Company did not authenticate every item, or even most items; and (2) the copywriters who actually did inspect and purportedly "authenticate" the vast majority of the items had little experience, received inadequate training in authentication of the thousands of products and brands accepted by the Company, and operated under a strict quota system that did not allow copywriters to spend sufficient time with each item in order to adequately authenticate it.

173.    Later during the same call, the Wells Fargo analyst asked Gustke about investors' concerns that "there's a lot of risk because of authenticators are asked to do a lot of things on a day-to-day basis." Gustke responded by describing the Company's purported authentication process: "It is literally everything to what we do. It is central to who we are, to what our brand stands for. It is in our name, it is -- there's nothing more important to what we do."

174.    The Company's website, which was available to all of the Company's customers and investors throughout the Class Period, also published false and misleading statements about the Company's authentication process.

175.    During the Class Period, the Company's "About Us" web page stated, "Authenticity Is Everything To Us. Our 100+ in-house experts including gemologists, horologists and luxury brand authenticators inspect thousands of items every day, ensuring everything we sell is 100% authenticity guaranteed." *See*  https://web.archive.org/web/20190821030143/https://www.therealreal.com/about (showing the web page https://www.therealreal.com/about as it existed on August 21, 2019). This webpage was archived by The Internet Archive, a non-profit organization which provides over 20 years of web page history through the Wayback Machine. *See* https://archive.org/about/.

176.    This statement was false and misleading because the Company failed to disclose that every item sold by the Company could not be "100% authenticity guaranteed" because (1) the small group of authenticators employed by the Company did not authenticate every item, or even most items, the Company received; and (2) the copywriters who actually did inspect and purportedly "authenticate" the vast majority of the items the Company received had little experience, received inadequate training in authentication of the thousands of products and brands accepted by the Company, and operated under a strict quota system that did not allow copywriters to spend sufficient time with each item in order to adequately authenticate it.

177.    On August 13, 2019, the Company held an earnings conference call to discuss the Company's financial results from the second quarter of 2019. During her opening remarks on the call, Defendant Wainwright stated that "buyers trust us because we have a rigorous authentication process. We employ more than 100 gemologists, horologists and authentication experts, who authenticate each item we sell."

178.    These statements were false and misleading because Wainwright failed to disclose that the Company did not have a rigorous authentication process. In truth, (1) the small group of authenticators employed by the Company did not authenticate every item, or even most items, the Company sells; and (2) the copywriters who actually did inspect and purportedly "authenticate" the vast majority of the items the Company sells did not use a "rigorous authentication process," but

rather had little experience, received inadequate training in authentication of the thousands of products and brands accepted by the Company, and operated under a strict quota system that did not allow copywriters to spend sufficient time with each item in order to adequately authenticate it.

179.    On November 4, 2019, the Company held an earnings conference call to discuss the Company's financial results from the third quarter of 2019. During the question and answer portion of the call, an analyst asked "about the authentication process and the potential for inauthentic items to make it into inventory and be purchased."

180.    In response, Defendant Wainwright stated once again that "authentication is core and central to our brand," underlining the importance to customers and to investors of the Company's purported authentication process.

181.    During the earnings call, Wainwright also falsely claimed that the Company's copywriters "receive daily, weekly, and monthly training."

182.    This statement was false and misleading because Wainwright failed to disclose that the copywriters received only 1-3 hours of initial training, and the limited follow-up trainings were sporadic, untargeted, and unhelpful with respect to training copywriters on authentication.

183.    On November 12, 2019, in response to concerns from customers and investors over the 11/5 CNBC article, the Company issued a press release containing a letter from Defendant Wainwright to the Company's customers and consignors. *Available at* https://investor.therealreal.com/news-releases/news-release-details/realreal-sets-record-straight-its-authentication-process.

184.    In her letter, Wainwright wrote that "We are the only resale company in the world that authenticates every single item we sell" and touted the Company's "rigorous, brand-specific authentication process."

185.    This statement was misleading because Wainwright failed to disclose that the Company does not truly authenticate every item it sells. In reality, (1) the small group of authenticators employed by the Company did not authenticate every item, or even most items, the Company received; and (2) the copywriters who actually did inspect and purportedly "authenticate" the vast majority of the items the Company received had little experience, received inadequate

training in authentication of the thousands of products and brands accepted by the Company, and operated under a strict quota system that did not allow copywriters to spend sufficient time with each item in order to adequately authenticate it.

186.   Wainwright also wrote in the letter that "[w]ithin their first month on the job, we require that our copywriters receive a minimum of 30 hours of training, including onboarding, job shadowing, daily training sessions and quizzes."

187.   This statement was false and misleading because Wainwright failed to disclose that the copywriters received only 1-3 hours of initial training, and the limited follow-up trainings were sporadic, untargeted, and unhelpful with respect to training copywriters on authentication.

188.   In a November 13, 2019 interview with Jim Cramer on CNBC[4], attempting to respond to the 11/5 CNBC article, Wainwright falsely claimed that "each copywriter/authenticator gets 30 hours of training."

189.   This statement was false and misleading because Wainwright failed to disclose that the copywriters received only 1-3 hours of initial training, and the limited follow-up trainings were sporadic, untargeted, and unhelpful with respect to training copywriters on authentication.

**The Authentication Statements Were Made with Scienter**

190.   At all relevant times, including at the time of the IPO and during the Class Period, the Officer Defendants and the Company knew, or were reckless in not knowing, that their public statements were false and misleading as outlined herein.

191.   RealReal is liable for the acts of the Individual Defendants under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

192.   The scienter of the Officer Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

193.   As described in varying detail in the Fashionista article, the Forbes article, and the two CNBC articles, the Company's authentication process – having untrained and overloaded copywriters

---

[4]   *See*   https://www.cnbc.com/2019/11/13/the-realreal-ceo-says-we-keep-changing-to-fend-off-fakes.html (video at 1:06).

Second Amended Class Action Complaint for Violations of the Federal Securities Laws

take on the responsibility of authenticating hundreds of items each day that were not seen by the Company's actual authenticators – had been in place for years and was well known to everyone working at the Company.

194.    Indeed, as the Company admitted, its authentication process was "core and central to our brand." As Defendant Gustke explained, "It is literally everything to what we do. It is central to who we are, to what our brand stands for. It is in our name, it is -- there's nothing more important to what we do." Accordingly, it is unfathomable that Defendants Wainwright and Gustke, the Company's top executives, were not intimately familiar with the Company's true authentication practices.

195.    The former employees who spoke with Plaintiffs' investigator confirmed that the Company's executives, and particularly Defendant Wainwright, were unquestionably aware of the Company's flawed authentication process, including the onerous quota system and lack of sufficient training for copywriters.

196.    FE2 reported seeing Wainwright do "walkthroughs" during visits to the Company's Brisbane facility. FE4 recalled that Wainwright visited the Brisbane facility multiple times, "probably once a month." FE5 recalled seeing Wainwright at the Brisbane facility periodically, and that "she would check in and ask how the team was doing." FE6 recalled that Wainwright repeatedly visited the Brisbane facility and would do walkthroughs of the facility to get a personal look at the warehouse and operations. FE11 also reported seeing Wainwright take frequent tours of the Brisbane facility.

197.    FE3, a senior executive with the Company, confirmed that each of the executives at the Company, from Wainwright down, were well aware of the Company's flawed authentication process, including the burdensome quota system and lack of sufficient training for copywriters. Regarding the lack of authentication and the onerous quota system, FE3 stated that "every single executive in that company knew about it intimately. There's no secrets. Tons of documentation. That there's quotas is documented all over the place." FE3 also specifically confirmed that Defendants Wainwright and Gustke were each deeply familiar with all that was transpiring with the authentication process and quota system.

198.    FE4, who worked at the Company at the time of the IPO and has maintained close contact with some of FE4's former co-workers, stated that the authentication process did not change during or after FE4's employment with the Company. As to the Company's claims about authentication, FE4 stated, "That's just a lie. They really don't care about authenticating. They just care about pushing things through to make a sale -- even if that item's fake."

199.    FE4 also confirmed that RealReal management were the ones who shared the internal "Faux and Tell" documents every week or two. Indeed, FE4 confirms that the "Faux and Tell" documents were typically sent to the email address "ALL@therealreal.com", which sends the email to every employee at the Company, including multiple categories of workers and multiple layers of management. Examples of these "Faux and Tell" documents from the first quarter of 2019 included approximately 137 counterfeit items listed for sale on the Company's website from that quarter alone.

200.    FE4 described an internal investigation carried out by the Company's management, specifically to address employees' complaints about the quota system and highly pressurized work environment. During the course of this investigation, employees met with Mary Chavez, the Company's Compliance Senior Manager, Employee Relations, one-on-one to go through a list of compiled complaints from employees, asking if the employee had witnessed the issue firsthand. This demonstrates that the Company's management was aware of complaints about the quota system hurting copywriters' ability to perform their many responsibilities, including adequately authenticating hundreds of items each day. According to FE4, "there is no way that she [Wainwright] did not know" about the Company's flawed authentication process, including the burdensome quota system and lack of sufficient training for copywriters.

201.    FE5 reported that the Company's flawed authentication process "didn't match what the business model was portraying to the consumer. When they say, 'We looked at everything,' that wasn't the reality of it. Everyone knew that it was smoke and mirrors."

202.    On March 22, 2019, just three months before the IPO, FE5 and a co-worker gathered signatures from their colleagues to present to management in an attempt to get the Company to take a serious look at the flawed quota system that pushed employees to a breaking point and allowed counterfeits to make it through to the RealReal's website. The email, attached hereto as Exhibit C,

was sent to Mary Chavez, Vanessa Mendieta – RealReal's People Business Partner and formerly the Company's Senior HR Specialist, Zaina Orbai – the Company's Chief People Officer, and the general HR email address: "hr@therealreal.com." The email referenced prior discussions between FE5 and members of the HR department, and stated that "we would like to reiterate that these are company-wide issues, and that many employees are fearful to speak out due to fear of retaliation." FE5 recalled that the Company's management looked into the workers' complaints, corroborating FE4's report of individual interviews conducted by Ms. Chavez.

203.    According to FE5, Wainwright "had to know [about the authentication issues.] She had to know the ins and outs of every facet of the business, down to the copywriter quotas."

204.    FE5 also reported that data about counterfeit items that made it onto the Company's website were tracked by the authentication team. The local authentication managers would have access to that data and reported it up the chain of command to senior management. According to FE3, regular, extensive summaries of counterfeit goods that the Company caught mid-stream, just like the "Faux and Tell" document (Exhibit B), were widely disseminated including to Wainwright and Gustke specifically.

205.    FE7 reported that each copywriter's performance against their quota was tracked through spreadsheets that were created and shared among managers. "It wasn't our managers randomly saying 'Do more work, reach your quota better' -- they had been called to task in another meeting. There was nobody in the company that didn't know about those quotas." Although employees only had access to part of the spreadsheets, FE7 recalled that "the admins would have been The RealReal [leadership] - every one of those managers, everyone used that; it's not like one department used that. Everyone had access to that." Specifically, FE7 named the director of the copywriting department, Rainee Walker, as well as Michelle Jones-Jackson, the director of merchandising, as having access to the spreadsheets. FE3 also recalled seeing detailed spreadsheets tracking employee performance *vis a vis* quotas that were reviewed by the operations and compensation teams and management.

206.    FE7 also recalled that in the months leading up to the IPO, RealReal executives including Defendant Wainwright "were pushing heavy for people to hit the quotas or go above."

1    Specifically, FE7 reported that approximately one month before the IPO, "in a meeting that was either

2    webcast or prerecorded, it was Julie [Wainwright] talking about the IPO in general, [saying] 'That's

3    why we're making this drive and this push, because we don't want customers to have such a long

4    wait.'"

5        207.    FE10 reported that taking the Company public was something discussed and

6    anticipated years in advance. As FE3 explained, in the time leading up to the IPO, "The RealReal had

7    to dramatically ratchet up the number of items it offered for sale to be able to continue reporting that

8    the company was making money. That was partly because as compared to earlier times in the

9    company's life cycle, it was receiving more goods of lower quality for consignment than it had at the

10   company's inception." These lower-end goods were not profitable for the Company due to the high

11   costs of processing each item. In light of these economic factors, the Company had to dramatically

12   increase the volume of products it processed and sold in order to report increasing revenues. In order

13   to achieve sufficient volumes and boost revenues, "there was no way the business model could work

14   if every item was authenticated." This led to the intense quota system for copywriters and the

15   sweatshop-like atmosphere in the Company's processing facilities. According to FE3, while multiple

16   members of the executive committee privately expressed concerns about the Company's claims about

17   its authentication process in the face of counterfeits they knew were being sold on the Company's

18   website, "no one spoke up" or addressed the problem directly "because the IPO was all that mattered."

19   FE3 reported that, to Wainwright, "it was a really big deal pre-IPO" to show that revenue was healthy.

20       208.    According to FE3, there were numerous conversations among members of the

21   executive team about how to pay less for copywriters, and how to get them to process items even

22   faster and more efficiently than they were already doing.

23       209.    In particular FE10 noted that Wainwright was aware that the Company had problems

24   maintaining adequate staffing of copywriters and authenticators to keep up with the massive volumes

25   the Company was attempting to authenticate and process. According to FE10 that was a primary

26   reason the Company brought in FE3 to replace the former head of HR – to improve recruiting efforts.

27   FE10 and FE3 were involved in daily meetings with one other member of the executive committee

28   where they discussed these problems and introduced the idea of using quotas and incentives to

1    improve productivity of the copywriters. Per FE10, the entire executive committee would often

2    review and discuss these problems and proposed solutions, which FE3 would present along with

3    detailed statistics. According to FE10, Wainwright and Gustke would occasionally join in FE10 and

4    FE3's regular meetings.

5         210.    FE10 explained that authentication/copywriting staffing shortages, and the related

6    issues of imposing quotas and incentives for copywriters were "absolutely" discussed at executive

7    committee meetings with Wainwright and Gustke present. FE10 stated that "I was involved in

8    multiple conversations where we were specifically attacking the issue of headcount shortages in all

9    areas on the inbound and outbound side, and that Julie [Wainwright] was aware we were

10   implementing quotas and productivity incentives and initiatives to drive the volume that was

11   associated with the significant growth we were going through, and Matt [Gustke]." FE10 also reported

12   that Wainwright and Gustke would sometimes weigh in on the quotas and incentives. FE10 asserted

13   that FE10, FE3, and one other committee member were the original architects of the quota system.

14        211.    FE10 recalled that there were minutes taken at each meeting and an agenda circulated

15   in advance of each meeting to each member of the executive committee.

16        212.    FE8, who worked at the Company at the time of the IPO and through most of the Class

17   Period, reported that "From the very top to the bottom, people [are] aware of the process and how the

18   authentication goes."

19        213.    According to FE8, Wainwright and other executives "were constantly in the

20   warehouse. They know how the process works; they know how people are hired off a dime...

21   Everyone's aware of that, everyone's aware that it was always a numbers game." FE8 explained that

22   "Rainee [Walker] is the one who enforces [the quotas] throughout the warehouses [in] Secaucus [and

23   Brisbane]. Her direct boss is [RealReal COO] Rati [Levesque], and the person who Rati reports to

24   directly is Julie [Wainwright], so what's why we all know that" the quota directives come from the

25   top down. According to FE8, "Julie knows that these quotas exist because she's apparently the one

26   who's making them," citing this fact as common knowledge among the employees of the Company's

27   Brisbane facility.

28

Second Amended Class Action Complaint for Violations of the Federal Securities Laws

214.    When asked whether the Company's authentication process was known by RealReal executives, FE9 responded "Absolutely, from Julie Wainwright all the way down... To advertise yourself to be [this] accurate is misleading and deceptive, and it's made them millions and millions of dollars." FE9 reported that Wainwright "was very familiar with every procedure, every goal, every interaction."

215.    FE9 specifically recalled Wainwright fielding questions about why the Company's authentication process allowed some luxury managers to successfully re-submit items through the authentication process that were previously rejected as fake. According to FE9, when faced with challenging questions such as these during one of the Company's summits in Las Vegas, which FE9 attended, Wainwright said "If you aren't on board with the way I'm doing things, get off."

216.    FE9 was adamant that, based on FE9's observations and experiences, Wainwright and other top officials of the RealReal were well aware of weaknesses in the authentication process as evidenced by initially rejected goods later being offered for sale and quotas which encouraged workers to take shortcuts to meet goals.

217.    FE10 stated that Wainwright often spoke as if she set up the employee training system herself. FE10 confirmed that Wainwright "by her own admission, was somebody who was very involved in how the process worked and was designed." Indeed, FE10 recalled that Wainwright was actively involved when problems arose that should have been addressed in training, noting "there was constant direct feedback" from Wainwright personally on matters as small as individual item or order issues. When asked who set the quota and productivity goals, FE10 responded that "It would have had to have been Julie [Wainwright]. Julie [Wainwright] was there the entire time. There's no way she could ever say she was not involved in them." According to FE10, keeping up sufficient staffing to handle the volume the Company attempted to process was the biggest issue discussed by the executive team. FE10 also reported that Wainwright received frequent and regular reports. "There was a lot of reporting mechanism[s] that she got. She would say in meetings, 'Let's have them pull this report so I can look at it.'" Specifically, FE10 recalled that the executive committee, during its regular weekly meetings, would review a report concerning items from the Company's website identified as counterfeit.

Second Amended Class Action Complaint for Violations of the Federal Securities Laws

218.     FE10 also described their fellow executives, including Wainwright and Gustke, as "a very hands-on executive team." Specifically, they described Wainwright as "very hands-on and very knowledgeable" and that "everything was report out to Julie...she was in everything." FE10 also described Wainwright and Gustke as being actively involved on a daily basis with the Company's operations. Per FE10, "Julie was a micro-manager. She was involved in everything." Similarly, FE10 noted that "Matt [Gustke] was one of those guys who didn't just sit in an office. He would get his hands dirty. He would get out in the field. He would spend time with me to try and understand."

219.     Wainwright also repeatedly made detailed (false) claims about the training purportedly provided to copywriters, evincing a deep level of familiarity with the training process. During the November 4, 2019 earnings call, Wainwright falsely claimed "they receive daily, weekly, and monthly training." In a November 13, 2019 interview with Jim Cramer on CNBC, attempting to respond to the 11/5 CNBC article, Wainwright falsely claimed that "each copywriter/authenticator gets 30 hours of training." In Wainwright's November 12, 2019 open letter to the Company's customers, she falsely asserted that "[w]ithin their first month on the job, we require that our copywriters receive a minimum of 30 hours of training, including onboarding, job shadowing, daily training sessions and quizzes."

220.     As FE2 summed up, "The RealReal — you're supposed to be able to trust them, and I just don't think you necessarily can." FE4 was similarly skeptical of the Company's authentication claims: "That's just a lie. They really don't care about authenticating. They just care about pushing things through to make a sale -- even if that item's fake." Regarding the Company's public authentication assurances to customers, FE6 stated that "it's not [a fair promise] with knowing what happened in that job. There's just no way in any shape or form that everything on there is accurate." According to FE6, "It was all about the numbers: You had to make your numbers. That's all you heard, was 'numbers, numbers, numbers.'" FE9 described RealReal's purported authentication process as "shady for sure" and "not thorough, and it's not accurate at all." As FE11 stated, with respect to the Company's public claims that "'We're RealReal. All the pieces pass through authentication.' That's not really true."

Second Amended Class Action Complaint for Violations of the Federal Securities Laws

**The Truth Slowly Leaks Out and Concealed Risks Materialize**
**Through Partial Corrective Disclosures, Damaging Plaintiffs and the Class**

221.   The Fashionista article was published on September 13, 2019 and updated on September 14, 2019.

222.   The Fashionista article revealed to investors for the first time that (1) RealReal copywriters, rather than professional authenticators, were responsible for "authenticating" the majority of the Company's items; (2) that the authentication training the copywriters received was minimal; and (3) that copywriters were subject to intense quota requirements, which made it extremely difficult for copywriters to adequately perform their authentication responsibilities.

223.   On this news, the Company's share price fell $0.26 to close at $16.75 the next trading day on September 16, 2019.

224.   However, the Fashionista article did not fully reveal to the market with sufficient intensity and credibility the truth about the Company's authentication process. Indeed, the Company attempted to discredit the Capitol Forum's report, stating that "This company's [Capitol Forum's] actions and misrepresentations are clearly calculated to sell their subscriptions and improperly manipulate the market for the benefit of short-sellers on behalf of their subscribers. These people are not journalists and they are not credible." Following the Fashionista article, the Company also continued to make false and misleading statements concerning RealReal's authentication process, as described above.

225.   The Forbes article was published on October 23, 2019 at 7:05am, before markets opened for trading that day.

226.   The Forbes article was the first publication from a widely circulated and trusted business news outlet corroborating the non-public Capitol Forum report with a first-person account of the RealReal's authentication process, as well as information from new informed, confidential witnesses. The Forbes article revealed to investors for the first time that the Company's copywriters have a small fraction of the training that Company's authenticators have, and that the copywriters were typically hired with little or no experience in authentication.

227.   On this news, the Company's share price fell $1.90, or over 9%, to close at $19.03 at the end of trading on October 23, 2019.

228.     However, the Forbes article did not fully reveal to the market with sufficient intensity and credibility the truth about the Company's authentication process. Following the Forbes article, the Company continued to make false and misleading statements concerning RealReal's authentication process, as described above.

229.     The 11/5 CNBC article was published on November 5, 2019 at 6:15am, before markets opened for trading that day. It was updated later that day at 4:06pm.

230.     The 11/5 CNBC article revealed to investors for the first time that not only were the Company's copywriters responsible for authenticating the vast majority of items processed by the RealReal despite receiving minimal training, but it credibly revealed through interviews with dozens of former employees and access to internal RealReal documents that the Company's onerous quota system made it nearly impossible for copywriters to properly authenticate each item they processed, contrary to the Company's claims.

231.     On this news, the Company's share price fell $2.37, or over 10%, to close at $19.37 at the end of trading on November 5, 2019, on unusually heavy trading volume. The Company's share price fell a total of $3.80, or over 18%, by the end of the next day to close at $17.93 on November 6, 2019, on unusually heavy trading volume.

232.     However, the 11/5 CNBC article did not fully reveal to the market with sufficient intensity and credibility the truth about the Company's authentication process. Following the 11/5 CNBC article, and directly in response to it, the Company continued to make false and misleading statements concerning RealReal's authentication process, as described above.

233.     The 11/21 CNBC article was published on November 21, 2019 at 6:31am, before markets opened for trading that day.

234.     The 11/21 CNBC article revealed to investors for the first time the extent of the Company's authentication problems, as manifested in weekly "Copywriting Faux and Tell" documents showing counterfeits published by the Company. These "Faux and Tell" documents demonstrated the materialization of the concealed risk that the Company was not adequately authenticating each of the items it sold on its website, contrary to the Company's assertions. The 11/21 CNBC article also further corroborated and confirmed the 11/5 CNBC article after the

Company's and Wainwright's attempts to deny and discredit the allegations in the 11/5 CNBC article, including through continued false and misleading statements about the Company's authentication process, as described above.

235.    On this news, the Company's share price fell $0.78, or approximately 5%, to close at $16.15 at the end of trading on November 21, 2019, on unusually heavy trading volume.

## PRESUMPTION OF RELIANCE AND FRAUD-ON-THE-MARKET ALLEGATIONS

236.    In pursuing the Section 10(b) claim, Plaintiffs will rely in part upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) during the Class Period, Defendants made public statements of material fact that were false, misleading, or were rendered misleading because of Defendants' failure to disclose material facts necessary to prevent such statement from being misleading; (b) as a result of the false and misleading statements and omissions of material fact, RealReal common stock traded at artificially inflated prices during the Class Period; (c) Plaintiffs and other members of the Class purchased or otherwise acquired RealReal common stock relying on the integrity of the market price of RealReal common stock and market information relating to the Company, and have been damaged thereby.

237.    During the Class Period, the artificial inflation of RealReal common stock was caused by Defendants' material misrepresentations and omissions as described above, causing the damages sustained by Plaintiffs and the other members of the Class. Defendants' material misrepresentations and omissions created an unrealistically positive assessment of RealReal and its business, operations, and prospects, causing the price of the Company's common stock to be artificially inflated at all relevant times, including when Plaintiffs and other members of the Class purchased the stock. When the truth hidden by these misrepresentations and omissions was disclosed, that disclosure negatively affected the value of the Company's common stock, dissipating the artificial inflation and damaging Plaintiffs and other members of the Class.

238.    The market for RealReal common stock was an efficient market at all times during the Class Period for the following reasons, among others:

> (a)  RealReal common stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b) On average, over 8 million shares, representing well over 2.0% of the Company's total shares outstanding, were traded weekly during the Class Period;

(c) As a regulated issuer, RealReal filed periodic public reports with the SEC;

(d) RealReal regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e) RealReal was followed by at least 23 securities analysts employed by major brokerage firms, who wrote reports that were widely distributed to their own sales forces and customers, were publicly available, and entered the public marketplace;

(f) At least 467 news articles about the Company were published during the Class Period; and

(g) The price of RealReal common stock responded quickly to incorporate and reflect new public information concerning the Company during the Class Period.

239.  Based on the foregoing, the market for RealReal common stock promptly digested current information regarding RealReal from all publicly available sources and reflected such information in the prices of RealReal common stock shares. Under these circumstances, all purchasers of RealReal common stock during the Class Period suffered similar injury through their purchase of RealReal common stock at artificially inflated prices, and thus are entitled to a presumption of reliance.

240.  Alternatively, Plaintiffs and the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are in large part grounded on Defendants' omissions of material facts in their Class Period statements in violation of Defendants' duty to disclose such facts. Thus, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld were material in that a reasonable investor might have considered them important in making investment decisions. Here, the misleadingly omitted facts were material, so the presumption applies.

**EXCHANGE ACT CLAIMS**

**COUNT III**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
**(Against RealReal and the Officer Defendants)**

241.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except ¶¶ 142-164.

242.    This Count is asserted against RealReal and the Officer Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

243.    During the Class Period, RealReal and the Officer Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, including the statements contained in the Registration Statement, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

244.    RealReal and the Officer Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's common stock during the Class Period.

245.    RealReal and the Officer Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading

statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

246.   The Officer Defendants, who are the senior officers and directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and Class.

247.   As a result of the foregoing, the market price of the Company's common stock was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and members of the Class relied on the statements described above and/or the integrity of the market price of the Company's common stock during the Class Period in purchasing the Company's common stock at prices that were artificially inflated as a result of RealReal and the Officer Defendants' false and misleading statements and omissions.

248.   Had Plaintiffs and members of the Class been aware that the market price of the Company's common stock had been artificially inflated by RealReal and the Officer Defendants' false and misleading statements and by the material adverse information which they did not disclose, they would not have purchased the Company's common stock at the artificially inflated prices that they did, or at all.

249.   As a result of the wrongful conduct alleged herein, Plaintiffs and members of the Class have suffered damages in an amount to be established at trial.

250.   By reason of the foregoing, RealReal and the Officer Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and members of the Class for substantial damages which they suffered in connection with their purchases of the Company's common stock during the Class Period.

251.    This action was filed within five years of each Class member's purchase of RealReal common stock and within two years of the discovery of the Defendants' fraudulent statements. It is therefore timely.

### COUNT IV
### Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

252.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except ¶¶ 142-164.

253.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

254.    As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

255.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the public filings which the Company disseminated in the marketplace during the Class Period, including the Registration Statement. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's common stock.

256.    The Individual Defendants, therefore, each acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power

1    to control the specific activities which comprise the primary violations about which Plaintiffs and the

2    other members of the Class complain.

3          257.    By reason of the above conduct, the Individual Defendants are liable pursuant to

4    Section 20(a) of the Exchange Act for the violations committed by the Company.

5          258.    This action was filed within five years of each Class member's purchase of RealReal

6    common stock and within two years of the discovery of the Defendants' fraudulent statements. It is

7    therefore timely.

8                                    **PRAYER FOR RELIEF**

9          **WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for relief and

10   judgment, as follows:

11         A.      Determining that this action may be maintained as a class action under Rule 23 of the

12   Federal Rules of Civil Procedure;

13         B.      Awarding damages in favor of Plaintiffs and the other Class members against all

14   Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing,

15   in an amount to be proven at trial, including interest thereon;

16         C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this

17   action, including counsel fees and expert fees; and

18         D.      Such other and further relief as the Court may deem just and proper.

19                                   **JURY TRIAL DEMANDED**

20         Plaintiffs hereby demands a trial by jury.

21   Dated: April 30, 2021                    Respectfully submitted,

22                                            **THE ROSEN LAW FIRM, P.A.**

23
                                             By: */s/ Laurence M. Rosen*
24                                           Laurence M. Rosen, Esq. (SBN 219683)
                                             355 S. Grand Avenue, Suite 2450
25                                           Los Angeles, CA 90071
                                             Telephone: (213) 785-2610
26                                           Facsimile: (213) 226-4684
                                             Email: lrosen@rosenlegal.com
27

28                                           -and-

Second Amended Class Action Complaint for Violations of the Federal Securities Laws

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim (*pro hac vice*)
Josh Baker (*pro hac vice*)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
Email: jbaker@rosenlegal.com

*Lead Counsel for Plaintiffs*

Second Amended Class Action Complaint for Violations of the Federal Securities Laws

1

## **CERTIFICATE OF SERVICE**

2

I, Laurence M. Rosen, hereby declare under penalty of perjury as follows:

3

I am the managing attorney of The Rosen Law Firm, P.A., with offices at 355 S. Grand

4

Avenue, Suite 2450 Los Angeles, CA 90071. I am over the age of eighteen.

5

On April 30, 2021, I electronically filed the foregoing SECOND AMENDED CLASS

6

ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS with the

7

Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of

8

record.

9

Executed on April 30, 2021.

10

*/s/ Laurence M. Rosen*

11

Laurence M. Rosen

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Second Amended Class Action Complaint for Violations of the Federal Securities Laws